# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld  and all others similarly situated, | Court File No. 11-cv-03659 (DWF/JJK) **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| Lucinda Jesson, Dennis Benson, Kevin Moser, Tom Lundquist, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their individual and official capacities, Defendants. | |

## INTRODUCTION

1.      This class action is brought on behalf of individuals civilly committed to the Minnesota Sex Offender Program against Defendants, in their individual and official capacity, for violations of Plaintiffs' constitutional, statutory and common law rights to (1) receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary, (2) be free from punishment in violation of those rights, (3) have less restrictive confinement, (4) be free from inhumane treatment in violation of those rights, (5) have religious freedom, (6) have

free speech and association, (7) be free from unreasonable searches and seizures, and (8) be free from an invasion of privacy.

## PROCEDURAL BACKGROUND

2.      Plaintiffs are all currently civilly committed to the Minnesota Sex Offender Program ("MSOP") at Moose Lake, Minnesota pursuant to Minn. Stat. § 253B. Several of the patients in the MSOP filed federal complaints against various state employees associated with the MSOP. The complaints alleged violations of the patients' civil rights pursuant to 28 U.S.C. § 1983 and other statutes.

3.      On January 12, 2012, Judge Frank referred these cases to the Minnesota Chapter of the Federal Bar Association's Pro Se Project. On January 20, 2012, the undersigned attorneys filed Notices of Appearance in *Thompson v. Ludeman, et al.*, 11-CV-01704 (DWF/JJK) ("Thompson") and *Karsjens et al., v. Minnesota Department of Human Services, et al.*, 11-CV-0359 (DWF/JSM) ("*Karsjens*").

4.      On January 25, 2012, Chief Judge Davis issued an Order [*Karsjens* Dkt. #142] staying all of the *pro se* MSOP cases with the exception of the *Thompson* and *Karsjens* actions pending the resolution of the outstanding Motion for Class Certification filed in the *Karsjens* case [*Karsjens* Dkt. # 24].  On February 6, 2012, Chief Judge Davis issued an Amended Order [*Karsjens* Dkt. # 145] applying the stay to additional MSOP cases that were unintentionally omitted from his previous order.

5.      On February 8, 2012, Judge Frank issued an Order [*Karsjens* Dkt. #146] staying the *Thompson* litigation until further notice, and setting a deadline for filing an Amended Complaint in the *Karsjens* action by February 29, 2012.  On February 29,

2

2012, Judge Frank issued an Order [*Karsjens* Dkt. # 149], pursuant to the stipulation of the parties, amending the deadline for filing an Amended Complaint in this action to March 15, 2012. On June 28, 2012, Plaintiffs moved to have an injunctive Class certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure [*Karsjens* Dkt. # 171]. On July 24, 2012, Judge Frank issued an Order certifying the Class defined as "All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat., §253B." [*Karsjens* Dkt. # 203].

6.     On September 21, 2012, Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint [*Karsjens* Dkt. # 243] and a hearing date was set for November 29, 2012.  That motion, along with Plaintiffs' Motion for Payment of Fees and Costs, were withdrawn. [*Karsjens*Dkt. # 276].

7.     The Court ordered the establishment of the Sex Offender Civil Commitment Task Force ("Task Force"). [*Karsjens* Dkt # 208].

8.     In addition to the Task Force, this Court ordered the creation of the MSOP Program Evaluation Team ("PET Team"). [*Karsjens* Dkt. # 275].

9.     The Court also ordered the establishment of a Committee of MSOP patients, staff, and respective counsel to meet and confer on issues relating to the conditions of confinement at the MSOP. [*Karsjens* Dkt. # 290].

10.     On June 20, 2013, the Court issued an Order setting a deadline of August 8, 2013 for Plaintiffs' to file a Second Amended Complaint.  [*Karsjens* Dkt. # 298].

29585

## NATURE OF THE ACTION

11.     Plaintiffs bring this action on behalf of themselves and Class members

alleging violations of their constitutional, statutory and common law rights.  Specifically,

Plaintiffs allege that the Defendants, in their official capacity and where applicable, in

their individual capacity, have, among other things:

a.      failed to provide adequate treatment to Plaintiffs and Class members in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution, the Minnesota Constitution, and the Minnesota Civil Commitment and Treatment Act;

b.      denied Plaintiffs and Class members the right to be free from punishment in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution;

c.      denied Plaintiffs and Class members less restrictive alternative confinement in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution;

d.      denied Plaintiffs and Class members the right to be free from inhumane treatment in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution;

e.      denied Plaintiffs and Class members the right to religion and religious freedom in violation of clearly established rights under the First and Fourteenth Amendments to the United States Constitution;

f.       unreasonably restricted clearly established rights under the First Amendment rights of free speech and association of Plaintiffs and Class members in violation of the United States Constitution and the Minnesota Constitution;

g.      implemented unreasonable searches and seizures upon Plaintiffs and Class members in violation of clearly established rights under the

29585

Fourth Amendment to the United States Constitution and the Minnesota Constitution;

h.      invaded the privacy of Plaintiffs and Class members in violation of clearly established rights under the Fourth Amendment to the United States Constitution and the Minnesota Constitution; and

i.      breached their contract with the Plaintiffs and Class member to provide treatment and tortiously interfered with the contracts to provide treatment to Plaintiffs and Class members.

12.     Plaintiffs seek injunctive relief for these constitutional, statutory, and common law violations on behalf of themselves and Class members. Plaintiffs also seek actual or nominal damages based on the Defendants' actions in their individual capacity to violate Plaintiffs' constitutional, statutory, and common law rights.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction for Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the acts and omissions giving rise to these claims occurred in the State of Minnesota and the Defendants all reside in the State of Minnesota.

## DECLARATORY AND INJUNCTIVE RELIEF

14.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. § 2201 as an actual controversy exists regarding the rights, privileges, and immunities to which the Plaintiffs are entitled while committed to the care and custody of the State of Minnesota. Pursuant to 28 U.S.C. § 2202, this Court has authority to grant injunctive and other necessary and proper relief.

5

29585

## PARTIES

### I.      Plaintiffs

15.     Plaintiff Kevin Scott Karsjens is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

16.     Plaintiff David LeRoy Gamble, Jr. is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

17.     Plaintiff Kevin John DeVillion is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

18.     Plaintiff Peter Gerard Lonergan is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

19.     Plaintiff James Matthew Noyer, Sr., is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

29585

20.     Plaintiff James John Rud is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

21.     Plaintiff James Allen Barber is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

22.     Plaintiff Craig Allen Bolte is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

23.     Plaintiff Dennis Richard Steiner is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

24.     Plaintiff Kaine Joseph Braun is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

25.     Plaintiff Christopher John Thuringer is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

29585

26.     Plaintiff Kenny S. Daywitt is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

27.     Plaintiff Bradley Wayne Foster is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

28.     Plaintiff Brian K. Hausfeld is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.

## II.     Defendants

29.     Defendant Lucinda Jesson is the Commissioner of the Minnesota Department of Human Services ("DHS"). The DHS is responsible for operating the MSOP.  Defendant Jesson, in her individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members.

30.     Defendant Dennis Benson was the Executive Director of MSOP from 2008 to 2012 and a member of the clinical team. Defendant Benson, in his individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class members.

8

29585

31.     Defendant Kevin Moser is the Director of MSOP. Defendant Moser, in his individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class members.

32.     Defendant Tom Lundquist is the Clinical Director of MSOP. Defendant Lundquist, in his individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class members.

33.     Defendant Ann Zimmerman is the Security Director of MSOP. Defendant Zimmerman, in her individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class members.

34.     Defendant Nancy Johnston is the current Executive Director of MSOP. Defendant Johnston, in her individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members.

35.     Defendant Jannine Hébert is the Executive Clinical Director of MSOP. Defendant Hébert, in her individual and official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class members

36.     In all respects material to this action, all Defendants acted under the color of law and under the color of their authority as officers and employees of the DHS.

9

37.  In all respects material to this action, all Defendants acted within the scope of their employment with the DHS, but exceeded the legitimate scope of their official capacity.

## CLASS ACTION ALLEGATIONS

38.  Plaintiffs bring this class action on behalf of themselves and the Class members pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class ("Injunctive Class"):

> All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat., §253B.

39.  The Class satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because, as set forth herein, Defendants have acted and/or refused to act on grounds that apply generally to Plaintiffs and the Class members, thereby warranting appropriate injunctive and/or declaratory relief respecting the Class as a whole.

40.  On July 24, 2012, pursuant to Fed. R. Civ. P. 23(b)(2), the Court issued an Order in this action certifying the injunctive Class as defined above. [*Karsjens* Dkt. # 203].

41.  Plaintiffs also bring this action on behalf of themselves and the Class members pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking actual or nominal damages for the constitutional, statutory, and common law claims on behalf of the following class ("Damages Class"):

29585

All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat., §253B who have sustained actual or nominal damages through the actions and omissions of Defendants in their individual capacity.

42.     Plaintiffs believe the number of Class members in each Class to be in excess of 600 individuals who are currently committed to the MSOP. The exact number and identity of Class members is easily ascertainable from MSOP records.

43.     Common questions of law and fact exist as to all Class members. Such questions of law and fact common to the Class members include, but are not limited to:

a.      Whether Defendants in their individual capacity violated Plaintiffs' and Class members' clearly established Due Process rights protected by the Fourteenth Amendment to the United States Constitution in the following ways:

  i.      by violating Plaintiffs' and Class members' rights to treatment such that they fail to have a realistic opportunity to meet the statutory requirements to be discharged as determined by an appropriate mental health professional and that is within the scope of acceptable mental health treatment;

  ii.     by failing to provide a less restrictive confinement option; and

  iii.    by creating an unnecessarily punitive environment;

b.      Whether Defendants in their individual capacity violated Plaintiffs' and Class members' clearly established rights to be free from unreasonable searches and seizures as protected by the Fourth Amendment to the United States Constitution;

c.      Whether Defendants in their individual capacity violated Plaintiffs' and Class members' clearly established rights to freedom of expression, speech, and religious exercise as protected by the First Amendment to the United States Constitution;

d.      Whether Minnesota's civil commitment laws are unconstitutional as applied to Plaintiffs and Class members;

11

29585

    e.    Whether Defendants in their individual capacity violated the court ordered treatment of Plaintiffs and Class members;

    f.    Whether Defendants' failure, in their individual capacity, to satisfy their obligations to Plaintiffs and Class members under the Consent for Participation in Sex Offender Treatment constitutes a breach of contract; and

    g.    Whether Defendants, in their individual capacity, tortiously interfered with the contract entered into by the Plaintiffs and Class members and the State of Minnesota for treatment.

44.    Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class members.  Plaintiffs and Class members are similarly affected by Defendants' wrongful conduct.

45.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other Class members.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of civil rights and class action litigation.

46.    The questions of law and fact common to Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

47.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of

12

29585

proceeding through the class mechanism, including providing injured persons with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

48.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, and would frustrate the efforts of this Court in efficiently resolving these claims.

49.     Proper and sufficient notice of this action may be provided to Class members through actual notice to patients at the MSOP via direct mail and also via the MSOP Patient Computer Network, among other methods.

50.     Plaintiffs and Class members have suffered harm and actual or nominal damages as a result of Defendants' wrongful conduct as alleged herein.  Absent representative action, Plaintiffs and the Class members will continue to suffer losses, thereby allowing Defendants' violation of law to proceed without remedy.

## **FACTS**

### I.     **History of the Minnesota Civil Commitment Statutes**

51.     Minnesota's civil commitment statue was first enacted in 1939. That law contained a provision for committing Psychopathic Personalities ("PP"), including those who could not control their sexual impulses and were likely to engage in violent acts. Over the course of the next fifty years, the PP law was used primarily as an alternative to criminal punishment.

29585

52.     In 1994, a civilly committed offender successfully challenged his commitment because the "utter lack of control" language in the PP statute conflicted with commitments based upon evidence showing that the offender had planned out an attack. *See In re Linehan*, 518 N.W.2d 609 (Minn. 1994).

53.     In response to that ruling, the Minnesota Legislature called a special session specifically to amend the commitment statute to remove the "utter lack of control" language. Minn. Stat. § 253B.02, subd. 18c(b).  That amendment created the Sexually Dangerous Person ("SDP") and the Sexually Psychopathic Personality ("SPP") categories under the Minnesota Civil Commitment Act in 1994.  Minn. Stat. § 253B.02, subd. 18b and subd. 18c.

54.     Pursuant to Minn. Stat. § 253B.02, subd. 18b, a SPP is defined as, "any person of such conditions or emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons."

55.     Pursuant to Minn. Stat. § 253B.02, subd. 18c., a SDP is defined as "a person who: (1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as

defined in subdivision 7a." In order to find that a person is an SDP, the state does not have to prove they have an inability to control their impulses.

56.     Harmful sexual contact is defined in Minn. Stat. § 253B.02, subd. 7a. as "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." It includes criminal sexual conduct in the first, second, third, and fourth degrees, other crimes where sexual impulses were part of the crime, or where the person's conduct had criminal sexual conduct as a goal.

57.     The Minnesota Civil Commitment Act of 1994 created a deeply flawed program that resulted in the bluntly critical report issued by the State of Minnesota Office of the Legislative Auditor ("Legislative Auditor Report"). See Office of the Legislative Auditor, State of Minnesota, Evaluation Report: Civil Commitment of Sex Offenders (March 2011), available at http://www.auditor.leg.state.mn.us/ped/pedrep/ccso.pdf.  In that Legislative Auditor Report, the Legislative Auditor found that Minnesota's civil commitment scheme for sex offenders suffers from major problems, including the fact that it is incredibly costly, lacks reasonable less restrictive alternative confinements, and does not provide adequate treatment to those who are committed to the MSOP.

## II.     The Civil Commitment Process for Sex Offenders in Minnesota

58.     In order to be civilly committed to the MSOP, the person must be found to be a SPP or SDP under Minn. Stat. § 253B.185. The Plaintiffs and Class members have all been civilly committed as an SPP, an SDP, or both under this statute.  They have all gone through the same civil commitment process.

29585

59.     Pursuant to Minn. Stat. § 253B.185, subd. 1(b), civil commitment proceedings are initiated by the county attorney. The county attorney must determine whether good cause exists to file a petition within 120 days of receiving a court's preliminary determination or a referral from the commissioner of corrections. Determinations on whether to file a petition for commitment vary greatly by geographic area. The average commitments per capita are substantially higher in the southeastern, southwestern, west central and northwestern regions than in the rest of the state. See Legislative Auditor Report at 39.

60.     Generally the county attorney files the petition before the person is released from prison or juvenile detention. The petition may also be filed before the person goes to prison as part of a plea bargain. The petition may even be filed after the person has been placed on conditional or supervised release following a prison sentence, even if they have not committed any new sexual offenses. See Office of the Ombudsman for Mental Health and Mental Retardation, Sex Offender Civil Commitment Fact Sheet (Jan. 2004), available at http://www.ombudmhdd.state.mn.us/cctrc/sexoffenderccfactsheet.htm ("Sex Offender Fact Sheet").

61.     Minn. Stat. § 253B.08 requires that the petition be considered at a civil commitment hearing within 90 days of when the petition is filed. Pursuant to Minn. Stat. § 253B.07, the court appoints counsel for the person to be committed if necessary. At the hearing, both the proposed patient and the county attorney may call witnesses and examine and cross-examine those witnesses. All relevant evidence is considered including hearsay evidence. The court may consider evidence of past sexual misconduct,

16

even if the person was not convicted of, or even charged with, a crime for that conduct.
See Sex Offender Fact Sheet.

62.    Unlike the Minnesota civil commitment process for sex offenders,
Wisconsin, Washington, Iowa, California, Florida, New Jersey, Illinois, Virginia, Kansas,
Missouri, South Carolina, Arizona, North Dakota, and New Hampshire provide for a
probable cause hearing prior to proceeding with the commitment process. See Wis. Stat.
§ 980.04, Wash. Rev. Code § 71.09.040, Iowa Code § 229A.5, Cal. Welf. & Inst. Code
§ 6602 (1996), Fla. Stat. § 394.195. N.J. Stat. Ann. § 30:4-27.28(f), 725 Ill. Comp. Stat.
207/30, Va. Code Ann. § 37.2-906, Kan. Stat. Ann. § 59-29a05, Mo. Ann. Stat. § 632.489,
S.C. Code Ann. § 44-48-80, Ariz. Rev. Stat. Ann. § 36-3705, N.D. Cent. Code § 25-03.3-
11, N.H. Rev. Stat. Ann. § 135-E:7.

63.    In Minnesota's commitment proceedings, the person to be committed does
not have the right to a jury trial, so all commitments are decided by a judge.  Pursuant to
Minn. Stat. § 253B.185, subd. 1(d), if the court finds by clear and convincing evidence
that the prospective patient is an SPP or SDD under the statutory definition, they will be
committed to the MSOP under a court order for sex offender specific treatment.  Most
other states with similar commitment statutes apply the substantially higher "reasonable
doubt" standard.

64.    Unlike in Minnesota, states like Wisconsin, Washington, Iowa, Texas,
California, Florida, Illinois, Massachusetts, Virginia, Kansas, Missouri, South Carolina,
Arizona and New Hampshire provide for trial by jury for the civil commitment of sex
offenders at the request of the prosecutor or person to be committed. See Wis. Stat. § 980.05,

17

29585

Wash. Rev. Code § 71.09.060, Iowa Code § 229A.7, Tex. Health & Safety Code Ann.

§ 841.061, Cal. Welf. & Inst. Code § 6603(a) (1996), Fl. Stat. § 394.196, 725 Ill. Comp. Stat.

207/35, Mass. Gen. Laws Ann. ch. 123A, § 14 (2010), Va. Code Ann. § 37.2-908, Kan. Stat.

Ann. § 59-29a06, Mo. Ann. Stat. § 632.492, S.C. Code Ann. § 44-48-90, Ariz. Rev. Stat.

Ann. § 36-3706, N.H. Rev. Stat. Ann. § 135-E:9.

65.     The population of people civilly committed to the MSOP has grown

dramatically since the program was started. In 1990, there were fewer than thirty patients

civilly committed as sex offenders. Legislative Auditor Report at 4. That number grew to

149 in 2000 and to 575 in 2010. Id. The Legislative Auditor Report projected that in

2020, there will be 1109 people civilly committed to the MSOP based on the current

growth trend in commitments. Id.

## III.     Civil Commitment to the MSOP

66.     All civilly committed sex offenders are indefinitely committed to the

MSOP, which is a treatment program with secure facilities in Moose Lake, MN and St.

Peter, MN. The Moose Lake facility houses patients in the first two phases of the

treatment program. The St. Peter facility houses patients in the third and final stage of the

program.

### A.     The MSOP Treatment Program

67.     MSOP is intended to be a treatment facility. All persons civilly committed

as SPP or SDP enter the MSOP treatment program.

### 1. MSOP Treatment Facilities

68.     The only MSOP facilities are the secure treatment locations at Moose Lake

and St. Peter. The MSOP does not provide for any less restrictive alternatives to

confinement at Moose Lake or St. Peter, such as halfway houses or other less secure

facilities.

69.     Other states, such as Texas, provide such alternatives.  In Texas, all civilly

committed sex offenders are part of an outpatient treatment program in which they are

subject to constant supervision, GPS monitoring, and intensive treatment. If they fail to

meet the conditions of their commitment, they are charged with a felony and must return

to prison. See Legislative Auditor Report at 42-43.

70.     Similarly, in Wisconsin, when civilly committed sex offenders progress in

treatment to a point where it is substantially probable they will not reoffend, they are

placed on supervised release. See Wisconsin's Sexually Violent Person Law, Chapter

980: Supervised Release Program (Jan. 19, 2012).

http://www.dhs.state.mn.us/main/groups/agencywide/documents/pub /dhs16_166453.pdf

(last visited Aug. 7, 2013).

71.     In New York, civilly committed sex offenders can be immediately placed in

an outpatient program called Strict and Intensive Supervision and Treatment in which the

patient participates in individualized treatment, has monthly meetings with a case officer,

and is electronically monitored. See New York Sex Offender Management and Treatment

Act: An Overview of NYS Strict and Intensive Supervision and Treatment (SIST) (Jan.

19, 2012) http://www.dhs.state.mn.us/main/groups/agencywide/documents/pub/

dhs16_166450.pdf (last visited Aug. 7, 2013).

### 2. Sex Offender Treatment Provided by the MSOP

72.     Upon entering the Moose Lake MSOP facility, all Plaintiffs and Class

members are presented with a contract entitled Consent for Participation in Sex Offender

Treatment. Each Plaintiff and Class member is required to either sign the portion of the

form consenting to receive the treatment MSOP provides according to its treatment

program and policies, or sign the portion of the form stating they refuse to participate in

sex offender treatment. Each Plaintiff and Class member is then supposed to be evaluated

and given an individual treatment plan.

73.     The contract provides that the patient's therapist has discussed the course of

treatment at the MSOP, that the patient received information about the levels of care and

stages of treatment, that the patient has received the goals and behavioral expectations at

the MSOP, that upon completion of treatment the MSOP will support their petition for

provisional discharge, that each stage of treatment has specific goals and behavioral

expectations, that services such as education and vocation are provided, that failure to

participate in treatment may prolong civil commitment status, that the patient will need to

reveal information about past crimes, and that treatment officials must report any

previously unreported child or vulnerable adult victims they learn of from the patient.

74.     Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert were

aware that each Plaintiff and Class member was required to sign the contract and that the

contract was also signed by an employee of the MSOP.

29585

75.     The MSOP treatment program is broken out into three phases. In Phase I, patients must learn how to comply with the MSOP facility's rules and learn basic treatment concepts. No sex offender-specific treatment whatsoever is provided in Phase I. In Phase II, patients must discuss and work through their sexual offenses and patterns of sexual abuse. In Phase III, which takes place at the St. Peter facility, the program focuses on community reintegration. This third phase consists of MSOP Supervised Integration, in which patients live in a secure area within the St. Peter Facility.  Patients may take accompanied outings off campus, and Community Preparation Services, in which patients live on campus in a house that is not within the secure perimeter. Throughout Phase III, patients are electronically monitored.

76.     According to MSOP treatment protocol, Plaintiffs and Class members should move through the phases of the treatment program by following their individual treatment plans, participating in treatment, completing treatment assignments, and showing they have changed their thinking and behavior. Their progress is to be reviewed quarterly and annually.

77.     Patients are evaluated on a nine factor Goal Matrix that lays out the focus of each factor in each phase of the treatment program. The nine factors are: Group Behavior, Attitude to Change, Self-Monitoring, Thinking Errors, Pro-Social Problem Solving, Emotional Regulation, Interpersonal Skills, Sexuality, Cooperation with Rules and Supervision, Healthy Lifestyle, and Life Enrichment. See Report on the Evaluation of Treatment Phase Progression at the Minnesota Sex Offender Treatment Program at 3 (Dkt. No. 294, Ex. 294-1) ("Evaluator Report"). Patients are given a score from 1-5 on

21

each category, with 1 being Deficient, 2 being Needs Attention, 3 being Satisfactory, 4 being Enhanced, and 5 being Proficient. Id. at 4.

78.     The MSOP treatment program was designed to be completed within four years. As of January 1, 2012, 64% of MSOP patients were in Phase I, 24% were in Phase II, and 12% were in Phase III. As no sex offender-specific treatment is provided for Phase I patients, the majority of MSOP patients are not provided any sex offender-specific treatment at all. Additionally, 75% of MSOP patients have been civilly committed to the MSOP for between three years and ten years or more. It was not until February of 2012 that the first patient in the history of the MSOP was deemed to have completed the treatment program, after commitment to the program for more than 18 years, and be ready for provisional discharge.  That patient is required to attend regular therapy as a provision of his discharge.

**B.      Changes to MSOP Policy Since 2008**

79.     In or around March of 2008, Defendant Benson resigned his position as the Minnesota Deputy Commissioner of Corrections ("DOC") and was named Executive Director of the MSOP by the DHS. It is unclear whether Defendant Benson had any actual expertise or past experience operating or managing a treatment facility prior to being the Executive Director of the MSOP.

80.      Defendant Benson hired a number of employees directly from the Minnesota DOC to work for the MSOP including Defendant Moser, Gregg Carlson, Timothy Gorr, Jim Berg, and Erick Skon.

29585

81.     When Defendant Benson took over the role as the Executive Director of the MSOP, he implemented new policies that restricted many of the rights previously enjoyed by Plaintiffs and Class members. He also changed the MSOP to meet the standards of a maximum security prison facility. Examples of those policy changes include punishment and abuse of Plaintiffs and Class members through threats, restricted visitation, restricted property rights, censored mail, monitored calls, restricted personal physical movement, unreasonable searches, and discipline without due process of law.

82.     Most policies and procedures implemented since the hire of Defendant Benson have been adopted directly from the DOC. Some of those policies include: Use of Force, Office of Special Investigations, Intelligence Information Gathering, Evidence Policy Behavioral Expectation Reports (BERs), Client Grievances, Client Request Policy, Visiting Behavioral Expectations, Mail Policy, and Property Policy.

83.     Nearly every policy and procedure implemented since Defendant Benson began at the MSOP in 2008 goes beyond the scope of what is necessary for treating Plaintiffs and Class members in a therapeutic manner based on professional judgment in a safe environment and instead was enacted for staff convenience. None of these restrictions were necessary prior to 2008 to maintain control or security of the facility. The restrictions and changes have created a hostile environment that encourages a sense of hopelessness, powerlessness, and fear among Plaintiffs and Class members. The Legislative Auditor Report stated, "In the absence of clinical leadership when the current administration took over MSOP in 2008, some policies were put into place without

29585

adequate consideration for the effect those policies would have upon the therapeutic environment." Legislative Auditor Report at 68.

### C.    Problems with the MSOP as Implemented

84.    The Legislative Auditor Report found that one factor that may explain why there has never been a discharge from the program is that "problems in the treatment program over the last ten years have likely affected the progress of some sex offenders." Legislative Auditor Report at xxi.

85.    The Legislative Auditor Report also found that patients get stuck in Phase I of the program, which focuses on following rules and learning how to participate in treatment groups rather than addressing  the patient's sexual offenses or how to prevent re-offending. This may be because the MSOP does not promote "positive treatment participation." Legislative Auditor Report at 64.

86.    Frequent leadership changes at MSOP have also contributed to issues with the treatment program that have resulted in the Plaintiffs and Class members remaining in the early stages of treatment. The MSOP has had three executive directors and four executive clinical directors over the last eight years, resulting in regular and substantial changes to the treatment program. This turnover has led to inconsistent treatment being provided to Plaintiffs and Class members, and Plaintiffs and Class members being forced to unnecessarily repeat treatment modules. For example, although individualized treatment plans and reviews are performed for each patient, they have become less specific and detailed than they were in the past. The Legislative Auditor Report found that the treatment plans and reviews did not give the patients a clear idea of what they

29585

need to do to advance through treatment and that clinicians did not explain how they came to conclusions about patients. Legislative Auditor Report at 73. In fact, Plaintiffs and Class members draft their own treatment plans for approval by clinicians instead of clinicians directing treatment to Plaintiffs and Class members.

87.     The Legislative Auditor Report also found that "the amount of treatment delivered at MSOP facilities is lower than at any other adult inpatient sex offender treatment program in the state." Legislative Auditor Report at 62. Therefore, the State's highest risk individuals receive the least amount of treatment. When compared to other programs across the country, MSOP "is at the low end of the range of treatment hours considered to be best practices for sex offender civil commitment programs." Id. at 64.

88.     Indeed, "[m]ost of Moose Lake clients' time is unstructured." Id. at 65. As of November 2010, clients who were participating in treatment at Moose Lake received on average six hours of group therapy a week. Id. at 62. Roughly half of clients sampled in the Report received additional psycho-educational modules for an hour and a half per week. Id.

89.     Plaintiffs and Class members are provided as little as one hour a week in support groups. Requests for additional frequent and intensive treatment are routinely denied.

90.     In contrast, the DOC, in facilities that are not primarily for treatment, provides between 9 and 10.5 hours per week of group therapy and psycho-educational classes for its sex offender treatment. Privately operated Alpha Human Services, which

29585

provides a comparable type of treatment to MSOP, provides at least 16 hours per week. Id. at 50.

91.    The MSOP has clinical staff present at the Moose Lake facility for only eight hours a day and only on weekdays. From 4:30 p.m. to 8:00 a.m. on weekdays and all day on weekends and holidays there is no clinical or treatment staff present at the facility. Plaintiffs and Class members are locked in their cells for a minimum of ten hours per day.

92.    Defendants have not provided Plaintiffs or Class members treatment by a psychiatrist or licensed clinical psychologist trained, qualified, certified, or licensed to provide meaningful treatment to a SDP or SPP. Defendants and employees treating Plaintiffs and Class members at MSOP are not qualified, certified or licensed to treat sex offenders. As the Legislative Auditor Report identified, MSOP has initiated efforts to improve therapist training, but currently, "some clinicians were formerly security staff, with backgrounds in criminal justice. Some have only a high school diploma." Legislative Auditor Report at 61. Only since 2010 has MSOP required new clinicians to have master's degrees and be licensed or license-eligible.

93.    The Legislative Auditor Report found that the MSOP has also had difficulty filling clinical supervisor positions at Moose Lake, and that as a result, has had problems ensuring that the treatment program is being implemented consistently. Id. at 60.

94.    General clinical understaffing has also been a persistent problem. The Legislative Auditor Report found that clinician caseloads are too high, which has

29585

"affected the ability of the program to deliver treatment to clients." Id. at 60-61. The

clinical director told the Legislative Auditor that the goal is to have eight patients per

clinician but that some clinicians at Moose Lake have up to 25 patients. This

understaffing has resulted in poor treatment. The Legislative Auditor Report states that

"In general, we observed that files in recent years (since 2008) tended to have much less

detail than those from previous years, suggesting that clinicians either did not have time

to fully document client behaviors or be fully aware of client behaviors relevant to

treatment." Id. Such deficient record keeping impedes Plaintiffs and Class members'

progress in the program.

95.     In 2009, psycho-educational modules at Moose Lake were completely

suspended for three quarters due to staff vacancies. There was also a time when MSOP

did not give any treatment for eight to ten days between trimesters so staff could

complete paperwork. This totaled to about a month per year where no treatment was

provided to Plaintiffs and Class members. Id. at 73-74.

96.     By any measure, the MSOP is not providing Plaintiffs or Class members

with a therapeutic environment. The Legislative Auditor Report stated, "Historically and

currently, the program [at MSOP] has struggled to create an environment that fosters

client rehabilitation. Outside advocates and experts, MSOP clients, and some MSOP staff

have complained that, historically and currently: (1) some MSOP staff held disrespectful,

negative, punitive, and untherapeutic attitudes towards clients; and (2) that the culture at

the facilities was counter-therapeutic." Id. at 66.

29585

97.     Plaintiffs and Class members who suffer from depression and other emotional disorders are routinely punished for manifesting behaviors associated with the disorder with which they have been diagnosed. Defendants have failed or refused to provide medications to help deal with these emotional management disorders. Additionally, Defendants have refused or failed to make any appropriate psychiatric or psychological treatment available to Plaintiffs and Class members.

98.     Unlike other health care facilities in the State, including the Minnesota Security Hospital in St. Peter, which treats Mentally Ill and Dangerous patients committed under §253B, MSOP is not, and has never been, accredited by any independent medical accreditation society that may provide objective guidance on standards of professional care being exercised in their facilities, such as the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

99.     Reviews of the MSOP's treatment program conducted after the Legislative Auditor Report was issued has confirmed the treatment issues identified in that report and identified further issues that have prevented patients from moving successfully through the MSOP's treatment program.

100.    As a result of the lack of movement of MSOP patients through the treatment program, the Court created the MSOP Program Evaluation Team ("PET") pursuant to this litigation to evaluate treatment phase progression at the MSOP. [*Karsjens* Dkt. # 281]. The Court ordered the PET to review the treatment records of some of the patients who have been in their current treatment phase for at least 36 months without advancing to the next treatment phase. Id. As part of this review, the PET could consider

28

topics relevant to phase progression such as staffing, the type and amount of treatment offered, and the accuracy of client placement, among other topics. Id. The Court asked that the PET provide a report to the MSOP, the Court, and counsel for the parties in this litigation with Findings and Recommendations on phase progression as well as a recommendation on the need for future reviews of the MSOP treatment program. Id.

101.    The PET was comprised of professionals who specialize in sex offender treatment. Three of the members serve on a team that performs annual site visits to the MSOP in order to review and evaluate its treatment program. The other two members had never had any prior involvement with the MSOP. They conducted a site visit, a conference call with MSOP staff, and a review of 50 treatment files prior to issuing their recommendations. See Evaluator Report at 2-3.

102.    The Evaluator Report made a number of findings and recommendations indicating that the MSOP's treatment program is not effectively moving patients through the treatment phases.

103.    The Evaluator Report found that 30% of the patients in Phase I whose files they reviewed were placed in the wrong treatment phase under the MSOP's own policies. See Evaluator Report at 4.

104.    The Evaluator Report also found that the MSOP's thresholds for movement from Phase I to Phase II and from Phase II to Phase III may be too high. Currently, the MSOP requires clients to achieve "Satisfactory" progress on all nine Goal Matrix factors for two consecutive quarters in order to move from Phase I to Phase II and patients must receive a rating of "Enhanced" on all nine Goal Matrix factors to move from Phase II to

Phase III. They recommended that the MSOP review their requirements and possibly adjust them to a more realistic and less stringent level. See Evaluator Report at 4-5.

105.    Furthermore, the Evaluator Report recommended that the MSOP identify the criteria for moving from Phase III to Community Preparation Services ("CPS") because they currently do not have any such criteria. See Evaluator Report at 5. Additionally, the Evaluator Report found that the MSOP should clearly indicate how long patients must demonstrate competency through Phase III privileges in order to be recommended for provisional discharge and that the criteria for phase progression be modified for patients in the Alternative Program at the MSOP. Id.

106.    Finally, the Evaluator Report recommended that the provisional discharge criteria for patients in the Alternative Program reflect the fact that many of those patients will be placed in environments that provide ongoing supervised care and that the level of risk reduction needed for them to live safely in the community is different than that of patients in the conventional program. Id.

107.    In order to ensure that patients are progressing through the treatment program, the Evaluator Report recommended that the MSOP institute a quality assurance process whereby clinical review is automatically triggered when a patient has not progressed to the next treatment phase in a timely manner. See Evaluator Report at 6. The Evaluator Report recommends that future reviews of the MSOP program be dependent on the MSOP's effectiveness at moving patients through the treatment program. Id.

108.    The Evaluator Report identified some other areas of the treatment program that are interfering with patients' progression through the treatment phases. The

30

Evaluator Report states that the MSOP uses multiple theoretical orientations in Phases II and III, which has interfered with the phase progression of patients. See Evaluator Report at 5. The PET identified unreliable clinician scoring of the MSOP's Goal Matrix system as an impediment to patient treatment. Id. The Evaluator Report recommended that the MSOP conduct staff trainings to address the problem, establish behavioral anchors for the scale used to rate patients on each Matrix item, and link the numerical scores with a narrative description of patient behavior for each Matrix item. Id. Additionally, the Evaluator Report recommended that patient's quarterly reports be organized to document patient barriers to phase progression. Id. Finally, the Evaluator Report identified large core group size and frequent staff changes as an issue that impacts patient progress and the therapeutic environment. Id.

109.    As mentioned above, the MSOP participates in annual site visits conducted by three independent sex offender treatment professionals, who also served on the PET. The Minnesota Sex Offender Program Site Visit Report ("Site Visit Report") dated December 27, 2012 provides the findings of the site visit conducted in 2012 and, like the Evaluator Report, suggests various changes to the treatment program. Site Visit Report [*Karsjens* Dkt. # 294, Ex. 294-3]. The Site Visit Report contained some of the same recommendations as the Evaluator Report. Additionally, the Site Visit Report recommended the following changes:

> a.    The MSOP should place a stronger emphasis on skill building rather than psychological insight in its treatment program. See Site Visit Report at 4.

31

b.      The MSOP should ensure that homework assigned to patients in psycho-educational modules be reviewed in a timely fashion because there is often not enough time in core group to review each patient's assignments. See Id. at 8.

c.      The MSOP should provide individual therapy to patients at Moose Lake, at least for patients on some of the specialized units. See Id. at 9.

d.      The MSOP should increase the ratio of security counselors to patients, which has decreased quite a bit over the last few years, in order to allow for security counselors to be involved in the therapeutic aspects of the MSOP. See Id. at 12.

e.      Each patient's rehabilitation services should be integrated into their Individual Treatment Plan. See Id. at 8.

f.      The MSOP should increase the level of psychiatric services for the program because the MSOP currently only has one full-time psychiatric nurse practitioner for both Moose Lake and St. Peter as well as 12 hours of psychiatrist time per week. See Id. at 11.

g.      The MSOP should evaluate whether the current staffing level of Unit Directors is appropriate. See Id. at 11.

110.    Defendant Jesson, in her individual capacity as well as her official capacity, has the power to determine whether the MSOP will support a patient's petition for provisional discharge or full discharge. It has been the practice and procedure of Defendant Jesson not to support such petitions unless the patient has completed the entire treatment program, which has only been accomplished by one patient in the history of the MSOP.

111.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were each aware that each

32

Plaintiff and Class member entered into a contract for treatment at the time they were civilly committed to MSOP.

112.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware of the failure to progress Plaintiffs and Class members through the different treatment phases to the point that they could be conditionally or unconditionally released.

113.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, actively participated in and supported the inadequate treatment policies as implemented by MSOP, which resulted in the failure to comply with contract to provide treatment by MSOP.

114.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware that the MSOP treatment program as implemented had only conditionally released a single person and had never unconditionally released anyone committed to MSOP.

115.    Yet Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, each failed to take action to change the inadequate treatment policies and practices at MSOP and, in fact, endorsed the use of the policies and practices by MSOP employees.

116.    Plaintiffs and Class members are not billed for individualized care. Instead, they are billed a per diem rate regardless of the individual treatment or individual costs. There are many levels of care and many varying levels of cost, depending upon the programming the patient receives or otherwise requires. Yet all of the Plaintiffs and Class

members are charged at one daily rate regardless of individual needs. That daily rate is currently $317 per day.

117.    For patients who have health insurance coverage, the billing system is ineffective. Plaintiffs and Class members who have health insurance cannot use that coverage to pay the costs associated with the MSOP. This is because the MSOP does not follow the accepted billing procedures, is not accredited and otherwise does not meet the standards of recognized mental health care. In other words, Plaintiffs and Class members who are civilly committed as mentally ill to the MSOP are receiving such deficient treatment, under such poor conditions, that it cannot be paid for through health insurance coverage.

**D.    Discipline and Punishment**

118.    In addition to the lack of treatment, Defendants have subjected Plaintiffs and Class members to disciplinary and punitive policies, practices, and procedures during their civil commitment to the MSOP, particularly since Defendant Benson became Executive Director and implemented new policies, procedures and practices.

119.    The main disciplinary tools used at the MSOP are Behavior Expectation Reports ("BER"). Plaintiffs and other Class members are expected to follow the Behavioral Expectations Handbook. The current handbook was issued in 2009 and updated in 2011. It contains descriptions of behavioral violations, consequences, and a disciplinary procedure for BERs.

120.    Defendants categorize behavioral violations as either Minor Rule Violations or Major Rule Violations. However, the handbook is not clear about what

29585

constitutes a minor or major rule violation and what the disciplinary consequences are for different violations.

121.    Minor Rule Violations are defined as those that violate facility policy or procedure but that MSOP staff does not believe places anyone in immediate danger or present management difficulties. As a result of a Minor Rule Violation, Plaintiffs and Class members may be limited from using or fully restricted from using the area or items involved in the violation.

122.    Major Rule Violations are those that MSOP staff determine jeopardize the safety of others or present significant management difficulties. This would include behavior such as possession of contraband or interfering with security procedures. As a result of a Major Rule Violation, Plaintiffs and Class members may be required to stay in their cell with the exception of a ten minute window each hour and be fully restricted from a long list of areas including the outer yard, the gym, the library, unit electronics, work for pay assignments, visits with friends or family, and the unit common area.

123.    Other behavior that the handbook classifies as violating MSOP rules includes a patient signing up for an activity and not attending that activity, a patient attending an activity that he had not signed up for, dress code violations, loitering in the halls or other common areas, or leaving the lights on in a cell.

124.    MSOP staff does not consistently apply the Behavioral Expectations Handbook to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to determine what level of punishment or restriction they should expect for any given rule violation or behavior.

29585

125.    If MSOP staff believes a Plaintiff or Class member has violated a rule, they issue a redirect or a minor or major BER. A redirect is a request from MSOP staff that the Plaintiff or Class member alter their behavior. It is supposed to be removed from the Plaintiff or Class member's record after 45 days, however, that is often not the case. If the offending behavior persists, the staff may then issue a BER. After receiving a BER, the Plaintiff or Class member can request a review of the BER itself and the restrictions imposed. The BER hearing panel consists of MSOP employees from various areas of treatment including clinical, security, and programming. The hearing board is not impartial or objective and the hearing process is a sham.

126.    At the BER hearing, Plaintiffs or Class members are not allowed to present evidence, cross examine witnesses, or face their accusers. Plaintiffs or Class members are not given copies of the incident reports or other evidence that is being used against them to impose disciplinary restrictions.

127.    A Plaintiff or Class member may only appeal the hearing panel's decision to the MSOP Facility Director. However, most of the policies and procedures complained of by the Plaintiffs and Class members are implemented by the Director, suggesting a less than impartial appellate process.

128.    The clinical team and vocational services utilize Individual Treatment Plans and Treatment Memos to issue further discipline and restrictions on Plaintiffs and Class members. Vocational services will often remove a Plaintiff or Class member from the vocational Work for Pay Program or reduce the amount of hours he is entitled to participate as a result of receiving a BER.

29585

129.   Receiving BERs directly affects a patient's progression in treatment. Disciplinary restrictions cause at least a six month delay in progression in treatment.

130.   The High Security Area ("HSA") is also used as a disciplinary measure at the MSOP. HSA is essentially solitary confinement. Plaintiffs and Class members are held in HSA when MSOP staff determines they need to be placed on Protective Isolation Status.

131.   Plaintiffs and Class members can be placed in HSA until MSOP staff determines they have regained behavioral control. While in HSA, Plaintiffs and Class members are only allowed out of their cell for one hour per day.

132.   Plaintiffs and Class members are kept in HSA much longer than is necessary, and it is used as a punitive measure rather than a behavioral control measure.

133.   Other punitive policies and practices in place at the MSOP by Defendants include:

      a.    punishing Plaintiffs and Class members by denying access to group therapy;

      b.    intentionally and unnecessarily, delaying delivery of mail to Plaintiffs and Class members;

      c.    unreasonably restricting Plaintiffs' and Class members' access to, and conduct during, visitation;

      d.    restricting Plaintiffs' and Class members' access to both a regular library and a law library;

      e.    denying Plaintiffs' and Class members' access to recreational activities and exercise;

      f.    restricting what can be purchased by Plaintiffs and Class members from the inmate store;

37

g.      denying Plaintiffs and Class members educational programming;

h.      denying Plaintiffs and Class members any meaningful employment opportunities;

i.      permitting MSOP staff to punish Plaintiffs and Class members by denying them employment;

j.      denying Plaintiffs and Class members access to hobbies;

k.      restricting the time Plaintiffs and Class members are allowed access to the yard;

l.      allowing staff to punish Plaintiffs and Class members by denying them access to the yard or to the gym;

m.      allowing staff to punish Plaintiffs and Class members by locking them in their cell;

n.      punishing Plaintiffs and Class members by removing furniture;

o.      executing security checks every half hour by knocking loudly and disruptively on the cells of Plaintiffs and Class members;

p.      creating a patient disciplinary board for Plaintiffs and Class members that does not follow constitutional standards of due process;

q.      creating policies that, as implemented, supersede statutory rights provided to Plaintiffs and Class members under the Patient Bill of Rights;

r.      taking away the basic life skills of allowing Plaintiffs and Class members to manage their personal financial affairs;

s.      taking away the right for Plaintiffs and Class members to visit each other's cells;

t.      taking away the right to drug and alcohol treatment for Plaintiffs and Class members;

29585

u.      denying Plaintiffs and Class members the right to greet and shake hands with other peers in treatment;

v.      denying Plaintiffs and Class members the right to share food and other items with others; and

w.      denying Plaintiffs and Class members the right to wear certain clothes such as hats, bandanas, and muscle shirts, within the confines of their own living units.

134.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware that Plaintiffs and Class members were subjected to these disciplinary practices on a daily basis and actively participated in such conduct.

135.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, did nothing to stop these disciplinary practices from occurring or to prevent the ongoing use of these policies and practices at the MSOP facilities.

**E.      Non-Therapeutic Environment**

136.    The policies, procedures, and practices of Defendants have led to a non-therapeutic environment in the MSOP.

**1.      Physical Layout of the Secure Facility**

137.    The MSOP facility at Moose Lake is laid out exactly like state prisons with cell units facing into a central courtyard where Plaintiffs and Class members may be observed from one central station.  MSOP staff wears police-style uniforms.  The newly designed and constructed living unit, Complex One, is designed just like a correctional

facility.  The Legislative Auditor Report confirmed that it was not designed with

therapeutic goals in mind.  Legislative Auditor Report at 68.

138.    Despite the well documented concerns regarding the difficulty of fostering

a therapeutic environment in the current facility at Moose Lake, MSOP is currently

planning an expansion that will create a second building identical to Complex One.

139.    Mail and kitchen facilities at the Moose Lake facility have not been

expanded since the program was originally started. Therefore, a facility that was designed

for 130 patients is now required to serve over 400 patients. Those limited facilities have

resulted in inadequate meal and mail service for Plaintiffs and Class members.

## 2.    Cell Conditions

140.    In 1994, the MSOP was operating in a hospital setting. Patients had

individual rooms with their own mattress, bed, dresser, desk, and storage. Private

bathrooms were available and toilets were not in the rooms. Patients were not locked in

their rooms.

141.    In the past, patients could purchase video game systems, televisions, word

processors, and furniture from any vendor. Currently, Plaintiffs and Class members must

make canteen purchases for over the counter medications, food, and hygiene products

through MINNCOR, which is the exclusive vendor for MSOP. This results in excessive

prices for purchases. In the past, patients could buy, sell, or trade with other patients upon

approval from that patient's treatment team.

142.    When Complex One was constructed, the MSOP obtained waivers from the

Minnesota Department of Health so it would not have to comply with statutorily required

40

living standards for state hospitals. The waivers allowed the MSOP facility at Moose Lake to have things like the springless beds, smaller cells with inadequate space between beds, inoperable windows in cells, smaller windows in cells, and a more prison-like setting as opposed to a home-like environment.

143.    This resulted in the current cells Plaintiffs and Class members reside in. Plaintiffs and Class members are double bunked in 9.5 x 15 ft. wet cells consisting of two metal bed frames with springless mattresses that are only 30 inches apart, small stainless steel desks, and a stainless steel toilet/sink combination unit fixed into the cell.

144.    Cell doors are metal and only have a small viewing window. The two windows in each cell are only five inches wide. The only privacy when using the toilet is a movable screen. The only storage Plaintiffs and Class members are allowed are three storage lockers that must fit under the bed.

145.    Plaintiffs and Class members are locked in these cells every day from at least 9:45 p.m. until 6:25 a.m. Prior to Defendant Benson becoming Executive Director, lock-in was contingent on a patient's progression in treatment.

146.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of these cell conditions and did nothing to changes these conditions.

### 3.    Double Bunking

147.    Most Plaintiffs and Class members are double-bunked with another civilly committed sex offender. This double bunking has led to increased physical and sexual assaults.  See *Goldhammer v. Rose, et al.*, 11-CV-00852 (JNE/JJK) (April 4, 2011). In

41

*Goldhammer*, the plaintiff was a patient at MSOP in Moose Lake. Despite both the plaintiff and his assailant warned MSOP staff of an impending sexual assault on Goldhammer, due in part to double bunking, Goldhammer was physically and sexually assaulted in his cell by his substantially larger bunkmate. At least one other lawsuit regarding an assault in a double-bunked cell at MSOP is pending.

148.    If MSOP patients are dangerous threats to society, double bunking Plaintiffs and Class members in locked cells with a known dangerous individual is inherently unsafe.

149.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of that Plaintiffs and Class members were being double bunked and did nothing to prevent this from occurring.

### 4.    Searches

150.    Defendants perform unwarranted and unreasonable searches of Plaintiffs' and Class members' persons, property, and living quarters at MSOP.

151.    Currently, Plaintiffs and Class members are subject to unwarranted pat searches of the body, unclothed body searches, and body cavity searches without reasonable suspicion being established.  Plaintiffs and Class members may be pat searched or wand searched at any time for no reason including whenever leaving the craft room in recreation, the visiting area or vocational work areas.

152.    In the past, patients were not subject to strip searches. Plaintiffs and Class members are now subject to strip searches upon entry to the HSA, regardless of the incident that led to being placed in the HSA. When a Plaintiff or Class member refuses to

29585

comply with a strip search, the facility staff will forcibly cut off his clothing and physically inspect his groin area and buttocks.

153.    Plaintiffs and Class members are also subject to strip searches any time they leave or re-enter the secure perimeter of the MSOP facility. For example, if they are suffering from a medical emergency and need to go to the hospital, the Plaintiff or Class member will be strip searched prior to being allowed to get in a waiting ambulance. The Plaintiff or Class member is then strip searched again when they return to the secure MSOP facility, even though two MSOP security guards accompany Plaintiffs and Class members the entire time they are outside the secure facility.

154.    Plaintiffs and Class members are also subject to regular random cell searches. These cell searches are used as a punitive exertion of authority on Plaintiffs and Class members.  Plaintiffs and Class members are not allowed to observe the searches or be present during their performance. No meaningful process exists to oppose the searches or appeal the resulting arbitrary confiscation of Plaintiffs' and Class members' property.

155.    In addition to pretextual random cell searches, Plaintiffs and Class members are subject to daily "window checks" of their cell. Defendants claim the purpose of these searches is to physically inspect windows in the patients' cells. The reinforced glass windows are roughly five inches wide and recessed into the wall over a foot. The windows do not open. Although the stated reason for the window checks is prevention of escape, it is not possible for a person to fit through the window opening even if the reinforced glass could be broken. The true function of the window checks is to

43

allow guards to enter the cells of the Plaintiffs and Class members and perform regular,

unwarranted searches of the cells.

156.    The following policies, procedures, and practices related to searches

performed by Defendants are also unreasonable:

a.    the policy of routinely searching the contents of Plaintiffs' and Class members' incoming and outgoing mail;

b.    the policy and practice of opening and reviewing Plaintiffs' and Class members' mail that has been clearly marked as legal correspondence;

c.    performing strip searches on Plaintiffs and Class members after visitations, despite the excessive monitoring and conduct regulations during visitation;

d.    strip searching and shackling Plaintiffs and Class members during transportation outside the secure perimeter by MSOP personnel;

e.    conducting random, unreasonable, and unwarranted searches of Plaintiffs' and Class members' quarters, property and persons;

f.    monitoring Plaintiffs' and Class members' telephone calls;

g.    constant monitoring of Plaintiffs' and Class members' every action and conversation;

h.    requiring a staff person to be present during visits between medical providers and Plaintiffs and Class members;

i.    monitoring Plaintiffs and Class members when they are speaking with clergy or other religious volunteers;

j.    forcing Plaintiffs and Class members to buy from approved vendors only, even though staff check all incoming mail; and

k.    allowing staff to shakedown Plaintiffs' and Class members' cells at any time.

29585

157.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of these policies, procedures, and practices related to unreasonable searches and yet did nothing to stop these from occurring or to prevent the ongoing use of these policies, procedures and practices at the MSOP facilities and actively participated in such conduct.

### 5.    Physical Restraints

158.    In the past, patients were allowed to leave the facility with a staff escort and without physical restraints. Patients could move freely about the compound and socialize with other patients at MSOP. Patients were not locked in their rooms at night. Patients could shop at local stores, cook food on stoves and barbeques, run their own businesses, carry cash, and conduct personal banking.

159.    Since Defendant Benson took over MSOP in 2008, the restrictions on movement at the MSOP facilities are identical to a maximum security correctional facility.

160.    When Plaintiffs and Class members leave the secure facility they are placed in handcuffs, leg irons and a black box, complete with waist-chain.  They are then pushed in a wheel chair to the transport vehicle where they are placed into a small cage inside the van. They are subject to these same restraints when they suffer a medical emergency and need to leave the secure facility via ambulance.

161.    Plaintiffs and Class members cannot ever move freely around the facility. The only time they can move around an area as they wish is when they are locked on their designated living unit.

29585

162.    The physical restraint policy is impermissibly applied across the board to Plaintiffs and Class members. No consideration is given to the individualized security risk that a patient poses.

163.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of these policies, procedures, and practices related to the unreasonable use of physical restraints and yet did nothing to stop these from occurring or to prevent the ongoing use of these policies, procedures and practices at the MSOP facilities and actively participated in such conduct.

### 6.    Inadequate Medical Treatment

164.    Defendants do not provide adequate medical treatment to Plaintiffs and Class members. This deficient treatment has caused injury to the Plaintiffs and Class members.

165.    MINNCOR is the exclusive provider of all over the counter and prescription medications at the MSOP, which may result in a delay in providing necessary medication to Plaintiffs and Class members, particularly if a prescription is ordered from a facility outside of the MSOP.

166.    Defendants do not provide necessary insulin and other diabetic management care to the Plaintiffs and Class members with diabetes. Defendants do not seek professional medical assistance outside of MSOP Health Services for conditions like salmonella and hammer toes. The medical care provided for those conditions by MSOP Health Services has resulted in Plaintiffs and Class members suffering lasting negative effects.

46

167.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the failures by Defendants to provide adequate medical treatment to Plaintiffs and Class members and did nothing to prevent this conduct from occurring and actively participated in such conduct.

### 7.    Personal Property

168.    Plaintiffs and Class members may no longer possess personal computers, laptop computers, and computer software or storage of any kind. Plaintiffs and Class members may not access printers, copiers, scanners, or the internet. This further isolates the Plaintiffs and Class members as they may not pursue online educational opportunities, engage with the outside world, or communicate with friends and family.

169.    Plaintiffs and Class members are forced, at their own expense, to mail property that the MSOP deems contraband outside the facility or the property is destroyed.

170.    If Plaintiffs and Class members possess property that is considered contraband, such as books and movies that are not on the approved media list, that property is confiscated. Plaintiffs and Class members may then submit a request to appeal the denial of their property, but such requests take the MSOP ten business days to handle. By the time that request has been processed, the property has been destroyed. Plaintiffs and Class members must submit at least two requests before they may file a grievance, which is well beyond the ten day period. The process to appeal the confiscation and destruction of property is not only overly burdensome, it is futile.

29585

171.    Plaintiffs' and Class members' personal computers were removed from the MSOP in 2008 after Defendant Benson started his tenure. A patient network was established with four computers per 96 patients to perform word-processing and other simple tasks. The MSOP seized all removable media such as floppy disks and CD-ROMs and have instructed Plaintiffs and Class members that they will have to print their electronic files instead of allowing them to save files on electronic media to send to courts, attorneys, or family. This restriction is very burdensome on Plaintiffs and Class members because their only storage space is in the three lockers under their bed.

172.    Plaintiffs and Class members have been denied and restricted from using or accessing the internet even though no individual reasonable suspicion has ever been established to warrant the restriction. The MSOP also already possesses the commercial software necessary to monitor an Internet Server, which is currently in place for employees of the MSOP

173.    Completely preventing Plaintiffs and Class members from accessing the internet further isolates them from the world because they are not able to pursue online educational or employment opportunities or even communicate with friends and family via e-mail.

174.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies preventing the possession of various personal property and internet usage by Plaintiffs and Class members and did nothing to change these policies or prevent this conduct from occurring and actively participated in such conduct.

48

### 8.    Visitation

175.    Patients use to be afforded liberal visitation policies, with visiting hours daily from 1-9 pm. Visitors were allowed to prepare food or order food to be delivered for consumption with patients. Contact between visitors and a patient was broadly permissible – hand holding, hugging, and holding children were all accepted. Visitors could drop off gifts and groceries on their visits with patients.

176.    Currently, visitation is limited to Wednesdays through Sundays from 12:30 p.m. to 8:30 p.m. Visitors must now be pre-approved for visitation, submit to a criminal background check and submit to a pat search. Contact between Plaintiffs and Class members and a visitor is limited to one hug at the beginning and end of each visit. Smoking is not permitted during visitation and no food is allowed during visits. Plaintiffs and Class members are strip searched after visitation. MSOP routinely denies access to visitors and limits the size of a Plaintiffs' and Class members' visiting list as well as the number of visitors at one time.

177.    The current visitation practices greatly discourage visitation and serve to further isolate Plaintiffs and Class members and hinder their therapeutic progress.

178.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies relating to visitation and did nothing to change these policies or prevent this conduct from occurring and actively participated in such conduct.

### 9.     Employment Options

179.    Plaintiffs' and Class members' vocational work assignments are limited to menial labor. Plaintiffs and Class members must perform janitorial maintenance work on their living unit to progress in treatment or receive vocational placement. Many do not have access to facility jobs which would allow the Plaintiff or Class member to be more employable upon re-entering society such as plumbing, electrical, HVAC or any other vocational programs which would afford them meaningful job skills.

180.    Regardless of a Plaintiff or Class member's previous college degree or age, he must maintain certain educational qualifications to hold a vocational work assignment or advance in treatment.

181.    The Legislative Auditor Report agrees with Plaintiffs' assertions that employment and education opportunities at MSOP are lacking, finding that "there are limited work opportunities for clients" and that "[m]ost of Moose Lake clients' time is unstructured." Legislative Auditor Report at 65. Although the amount of time that a patient may work is limited by their progress in treatment, the upper limit of time working is 24 hours in a two week pay period. "Few, if any, clients are scheduled the maximum amount of work hours." Id.

182.    Vocational programming jobs at the MSOP pay minimum wage, however Plaintiffs and Class members are only given half that amount as wages by the MSOP. They are not provided an accounting of the remainder of their wages.

183.    The need for employment opportunities is especially pressing given the fact that Plaintiffs and Class members are billed over $100,000 a year for their treatment. Those bills accrue until the Plaintiff or Class member is released from MSOP.

184.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices relating to employment options and did nothing to change these policies or practices or prevent this conduct from occurring and actively participated in such conduct.

### 10.    Inadequate Diet

185.    The diet for Plaintiffs and Class members must provide, at a minimum, the Recommended Daily Dietary Allowances established by the National Academy of Sciences. In developing such menus, the MSOP must utilize the moderate cost food plan of the United States Department of Agriculture.

186.    The MSOP cannot spend less per patient for raw food, including donated food, than the most recent per person costs of the Moderate Cost Food Plan for the Northern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate grouping of residents, discounted for any savings which might result from institutional procurement of such food.

187.    The MSOP food contractor CWF continually shortens meals or simply does not deliver what is on the menu. Meals are poorly prepared and in some cases handled without due care, which has led to illness. Food proportions are rationed out at a lesser degree then what the menu states due to the practice of equating food volume with

weight. The food Defendants provide to Plaintiffs and Class members is of extremely poor quality and includes by-product meat and old fruits and vegetables.

188.    In the event that extra food is available after a meal is served, MSOP disposes of the food instead of making it available to Plaintiffs and Class members.

189.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the failure of MSOP to provide adequate food on a regular basis for Plaintiffs and Class members and did nothing to prevent or change this conduct from occurring.

### 11.    Communication and Media Restrictions

190.    The MSOP charges Plaintiffs and Class members exorbitant rates for using telephones.  Currently, Plaintiffs and Class members are charged approximately 32 to 39 cents a minute to use the phone.  The MSOP phone system is the only phone system Plaintiffs and Class members are allowed to use.

191.    Plaintiffs and Class members are not allowed to use 800 numbers to conduct business.  Calling cards are prohibited.  Plaintiffs and Class members are very limited in the number of phone calls they are allowed to make.

192.    The extremely high rates Plaintiffs and Class members are charged serve no therapeutic or security purpose.

193.    Defendants limit which magazines and newspapers the Plaintiffs and Class members can read.  They also censor and remove certain articles and sections of the newspapers that are given to the Plaintiffs and Class members to read.

29585

194.    Defendants also have an unofficial policy of keeping Plaintiffs and Class members who have filed lawsuits against the MSOP or MSOP personnel separate from other Class members who have not filed lawsuits.

195.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of these practices and policies at the MSOP with regard to phone calls and limitations on media and did nothing to prevent or change this conduct from occurring.

## 12.    Religious Restrictions

196.    Defendants monitor Plaintiffs and Class members when they speak to clergy and religious volunteers, even though they have been screened by MSOP staff upon entry to the facility. They also monitor Plaintiffs and Class members during religious services.

197.    Defendants do not provide Plaintiffs and Class members Kosher or Halal meals. Plaintiffs and Class members cannot wear yarmulkes, kufis, or religious medallions and pendants unless they are in their cells or at a religious service.

198.    Plaintiffs and Class members are only allowed five religious items in their personal property, and Defendants limit the types of religious items Plaintiffs and Class members may have.

199.    Defendants only allow Plaintiffs and Class members to have religious feasts once a year, despite the fact that Plaintiffs and Class members have offered to pay for those feasts.

29585

200.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of these practices and policies at the MSOP with regard to religious restrictions and did nothing to prevent or change this conduct from occurring.

## IV.    Release from Civil Commitment to MSOP

201.    The only way the Plaintiffs and Class members can be released from their civil commitment to the MSOP is through the statutory process for a reduction in custody.

202.    Petitions for a reduction in custody must be filed with and considered by a panel of the special review board ("SRB"). The MSOP gives the SRB documents from the Plaintiffs' and Class members' records including the commitment order and any appeals, all prior SRB or judicial appeal panel findings, and relevant treatment information such as quarterly and annual reviews.

203.    The recommendation of the SRB must be sent to the judicial appeal panel, which is composed of three judges and four alternate judges selected from among all active state judges. Decisions made by the judicial appeal panel are appealable to the Minnesota Court of Appeals within 60 days of the panel's decision. No reduction in custody occurs without a majority approval of the judicial appeal board.

204.    Pursuant to Minn. Stat. § 253B.185, subd. 11b, factors that are considered by the judicial appeal panel when deciding if transfer out of the secure treatment center is appropriate are: (1) the patient's clinical progress and present treatment needs, (2) how necessary a secure facility is for continuing treatment, (3) the need for continued

institutionalization, (4) what facility will best meet the patient's needs, and (5) whether the transfer can be done while still providing for public safety. An example of a transfer would be moving a patient from the secure MSOP facility in Moose Lake to the MSOP facility in St. Peter, where the later phases of the treatment program occur.

205.    Pursuant to Minn. Stat. § 253B.185, subd. 12, the factors that are considered when deciding if provisional discharge is appropriate are: (1) whether the patient's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the patient's current treatment setting, and (2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the patient to adjust successfully to the community.

206.    Pursuant to Minn. Stat. § 253B.185, subd. 18, a patient is not completely discharged from MSOP unless "it appears to the satisfaction of the judicial appeal panel, after a hearing and recommendation by a majority of the SRB, that the patient is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision." The SRB and judicial appeals panel consider whether the public will be safe and whether the patient will be able to readjust to living in the community.

207.    As of February 2012, only two MSOP patients had ever been placed on any kind of provisional discharge. One of them had his provisional discharge revoked after violating its conditions, and the other was only recently granted provisional discharge.

29585

208.    In contrast, as of 2006, the following other states with civil commitment programs had placed the following number of people on supervised or conditional release: Arizona- 69, Illinois- 18, Wisconsin- 17, Washington- 12, Florida- 12, Kansas- 8, New Jersey- 8, Iowa- 4, California- 3, and Virginia- 3. As of 2006, the following other states with civil commitment programs had fully discharged the following number of people: Arizona- 81, California- 59, South Carolina- 32, Wisconsin- 26, New Jersey- 13, Kansas-13, Iowa- 9, Florida- 7, Washington- 4, Massachusetts- 4, Illinois- 2, and Virginia- 1. Monica Davey and Abby Goodnough, Doubts Rise as States Hold Sex Offenders After Prison, N.Y. Times (March 4, 2007), available at http://www.nytimes.com/2007/03/04/us/04 civil.html?pagewanted=1&_r=1&adxnnlx= 1329498616-AcmZtJ1J58oxOsZDKbLw6Q (last visited Aug. 7, 2013).

209.    MSOP clinicians believe Plaintiffs and Class members are not being released because of public pressure to keep civilly committed sex offenders in a secure facility. Legislative Auditor Report at 87. Additionally, Governor Pawlenty issued an executive order in 2003 stating that no sex offenders could be released without a court order. Thus, the decision not to release Plaintiffs and Class members from the MSOP is based on political considerations, not professional judgment.

210.    Defendants Jesson, Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that were implemented that prevented Plaintiffs and Class members from being released and did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct.

29585

## CLAIMS

### Count I

### Failure to Provide Treatment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution

211.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

212.    The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

213.    Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment. Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

214.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are often far too low. Plaintiffs and Class members are not progressing through the treatment program and are instead remaining in the first two phases of treatment for years.

29585

215.    The acts and omissions of Defendants, specifically set forth above, constitute an unreasonable failure to provide Plaintiffs and Class members with treatment that is reasonably related to the purpose of their civil commitment and not tantamount to punishment in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Minnesota Constitution.

216.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that were implemented at MSOP that prevented Plaintiffs and Class member from receiving treatment and did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct.

217.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above.

218.    Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count II

## Failure to Provide Treatment in Violation of the Minnesota Civil Commitment and Treatment Act

219.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

29585

220.   The Minnesota Civil Commitment and Treatment Act requires civilly committed sex offenders to be committed to a secure treatment facility. The statute promises that patients will receive individualized written program plans to be reviewed quarterly, periodic medical treatment and the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary. See Minn. Stat. §§ 253B.185, 253B.03, subd. 7.

221.   Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are often far too low. Plaintiffs and Class members are not progressing through the treatment program and are instead remaining in the first two phases of treatment for years.

222.   The acts and omissions of Defendants, specifically set forth above, constitute an unreasonable failure to provide Plaintiffs and Class members with the "proper care and treatment, best adapted, according to contemporary professional standards, to rendering future supervision unnecessary" in violation of clearly established rights Chapter 253B of the Minnesota Civil Commitment and Treatment Act.

223.   Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that were implemented at MSOP that prevented Plaintiffs and Class member from receiving treatment and did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct

59

224.     Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above.

225.     Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count III

### Denial of Right to be Free from Punishment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution

226.     Plaintiffs incorporate all previous allegations as if fully set forth herein.

227.     The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const.  amend. XIV, § 1. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

228.     Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment.

229.     Since 2008 when Defendant Benson became the Executive Director of MSOP, the program has changed drastically to become a punitive confinement facility.

29585

230.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are double bunked in wet cells in a facility modeled after a prison. Plaintiffs and Class members do not have a reasonable grievance procedure to use when they are punished with BERs because the hearing board is made up of MSOP employees and any appeals are heard by the MSOP facility director.

231.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are punished by having their rights to access activities and areas of the facility limited or completely taken away or by being placed in protective isolation in the HSA.

232.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are not allowed to possess certain property and the grievance procedure for confiscated property leaves Plaintiffs and Class members no reasonable way to challenge the confiscation because by the time their grievance is heard, the property will have been destroyed.

233.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs and Class members are denied access to group therapy.

234.    Based on the policy and procedures created and implemented by Defendants, Plaintiffs' and Class members' furniture is removed as punishment for alleged rule violations.

235.    Based on the policy and procedures created and implemented by Defendants, Defendants can punish Plaintiffs and Class members by taking away their employment options.

29585

236.    Based on the policy and procedures created and implemented by Defendants, they cause random searches of Plaintiffs' and Class members' persons, property, and cells. Plaintiffs and Class members are placed in shackles and black boxes anytime they leave the secure facility.

237.    The punitive policies, procedures, and practices of Defendants are not reasonably related to the purpose for which Plaintiffs and Class members have been civilly committed, which is treatment. Denying Plaintiffs and Class members their liberty without a proper therapeutic purpose constitutes inherently punitive detention.

238.    Defendants Jesson, Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that were implemented at MSOP the purpose of which was to punish Plaintiffs and Class member rather than to treat them and yet they each did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct.

239.    The acts and omissions of Defendants constitute a deprivation of Plaintiffs' and Class members' clearly established constitutional right to be free from punishment in violation of Plaintiffs' and Class members' rights protected by the Fourteenth Amendment of the United States Constitution and Article 1, Section 2 of the Minnesota Constitution.

240.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct

29585

and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count IV

### Denial of Less Restrictive Alternative Confinement in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution

241.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

242.    The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

243.    Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed as determined by reasonable professional judgment.

244.    Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment. Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

245.    The MSOP, as implemented, does not provide a less restrictive alternative to confinement at a MSOP secure facility.  Therefore, it is not reasonably related to a legitimate government objective.  Not all Plaintiffs and Class members have the same level of security needs, however, the MSOP as implemented does not account for this

63

29585

possibility. Also, if a Plaintiff or Class member no longer meets the statutory requirements for civil commitment, there is no less restrictive facility or program for them to enter.  As such, the MSOP as implemented fails to satisfy the legitimate governmental objective of treating MSOP patients and preventing reoffending behavior.

246.    Defendants Jesson, Benson, Johnston and Hébert, in their individual as well as their official capacity, each were aware of the ability for MSOP to establish less restrictive alternative treatment facilities yet they did nothing to establish such less restrictive alternative treatment facilities for Plaintiffs and Class members.

247.    The acts and omissions of Defendants constitute a deprivation of Plaintiffs' and Class members' clearly established constitutional right to a less restrictive alternative placement in violation of their rights guaranteed under the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Minnesota Constitution.

248.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, , Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

29585

**Count V**

**Denial of Right to be Free from Inhumane Treatment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution**

249.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

250.    The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const.  amend. XIV, § 1. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983. Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment. Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.

251.    Based on the policy and procedures created and implemented by Defendants, they subject Plaintiffs and Class members to inhumane treatment through the punitive and unnecessarily restrictive living conditions at the MSOP. Plaintiffs and Class members are double bunked in wet cells. They have their rights restricted for minor violations of MSOP facility rules. They receive inadequate meals. They are subject to arbitrary discipline and decision-making by MSOP staff. They are also subject to inadequate medical treatment that has resulted in injury to Plaintiffs and Class members.

252.    The acts and omission of Defendants constitute deprivation of Plaintiffs' and Class members' clearly established constitutional right to be free from inhumane

treatment in violation of their rights guaranteed under the First and Fourteenth

Amendments to the United States Constitution and Article 1, Section 5 of the Minnesota

Constitution.

253.    Defendants Jesson, Benson, Moser, Lundquist, Zimmerman, Johnston and

Hébert, in their individual as well as their official capacity, were each aware of the

policies and practices that were implemented at MSOP that resulted in inhumane

treatment Plaintiffs and Class member rather than to treat and yet they each did nothing

to changes these policies and practices or to prevent this conduct from occurring and

actively participated in such conduct.

254.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber,

Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have

been subject to and injured by these alleged violations and suffered damages as a direct

and proximate result of Defendants' acts and omissions as specifically set forth above.

Unless relief is granted, Plaintiffs and Class members will continue to be injured by and

suffer damages as a direct and proximate result of Defendants' acts and omissions

specifically set forth above.

## Count VI

### Denial of the Right to Religion and Religious Freedom in Violation of the First and Fourteenth Amendments to the United States Constitution

255.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

256.    The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV,

29585

§ 1. Plaintiffs bring these Fourteenth Amendment and First Amendment claims pursuant to 42 U.S.C. § 1983.

257.   Fourteenth Amendment due process requires that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed. Civilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment as determined by reasonable professional judgment.

258.   Civilly committed patients are entitled to some degree of protection under the First Amendment that is broader than that held by prisoners but less than what is held by members of free society. Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests.

259.   Based on the policy and procedures created and implemented by Defendants, they are violating Plaintiffs' and Class members' rights to religious freedom through the MSOP's policies, procedures and practices. Defendants cause Plaintiffs and Class members to be monitored when they are having private meetings with religious persons such as clergy members and during religious services. They do not permit Plaintiffs and Class members to wear religious apparel or possess certain religious property. Also, they do not allow Plaintiffs and Class members to communally celebrate their religious beliefs by having feasts.

260.   These policies, procedures and practices are not related to a legitimate institutional or therapeutic interest of the Defendants.

29585

261.    The acts and omissions of Defendants constitute unreasonable restrictions on Plaintiffs' and Class members' clearly established rights to freedom of speech, expression, religion, privileges, and immunities guaranteed by the First and Fourteenth Amendments to the United States Constitution.

262.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that resulted in the unreasonable restrictions on Plaintiffs' and Class members' right to speech, expression, and religion, and yet they each did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct

263.    Plaintiffs Bolte, Braun, Daywitt, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count VII

### Unreasonable Restriction of Free Speech and Free Association in Violation of the First Amendment to the United States Constitution and the Minnesota Constitution

264.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

265.    Civilly committed patients are entitled to some degree of protection under the First Amendment that is broader than that held by prisoners but less than what is held

by members of free society. Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests as determined by reasonable professional judgment. Plaintiffs bring this First Amendment claim pursuant to 42 U.S.C. § 1983.

266.   Based on the policy and procedures created and implemented by Defendants, they have place restrictions on free association by limiting contact among Plaintiffs and Class members, as well as other patients.

267.   Based on the policy and procedures created and implemented by Defendants, they have limited the ability of Plaintiffs and Class members to use the phone by charging a prohibitively high amount for phone use. Also, Plaintiffs and Class members are not able to call 800 numbers or use calling cards.

268.   Based on the policy and procedures created and implemented by Defendants, they have limited Plaintiffs' and Class members' access to certain newspapers and magazines and remove or censor articles from the newspapers and magazines that are provided.

269.   These policies, procedures and practices are not related to a legitimate institutional or therapeutic interest of the Defendants.

270.   The acts and omissions of Defendants constitute an unreasonable restriction on Plaintiffs' and Class members' clearly established rights to freedom of speech, expression, religion, privileges, and immunities guaranteed by the First Amendment of the United States Constitution and Article 1, Section 2 of the Minnesota Constitution.

29585

271.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that resulted in the unreasonable restrictions on Plaintiffs' and Class members' right to speech, expression, and religion, and yet they each did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct

272.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count VIII

### Unreasonable Searches and Seizures in Violation of the Fourth Amendment to the United States Constitution and the Minnesota Constitution

273.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

274.    Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." In an institutional setting, the need for the search must be balanced against the invasion of personal rights that the search entails. Plaintiffs bring this Fourth Amendment claim pursuant to 42 U.S.C. § 1983.

29585

275.    Defendants consistently violated Plaintiffs' and Class members' Fourth Amendment Rights through their search policies, procedures and practices.

276.    As part of their practices and policies, Defendants conduct random cell searches without any probable cause or purpose. They perform "window checks" daily on the pretext that they need to make sure Plaintiffs and Class members are not going to escape through the five inch wide windows.

277.    As part of their practices and policies, Defendants cause strip searches to be conducted on Plaintiffs and Class members every time they leave the secure perimeter even though Plaintiffs and Class members are always accompanied by MSOP staff.

278.    As part of their practices and policies, Defendants cause random pat downs of Plaintiffs and Class members without any probable cause or purpose.

279.    These search policies, procedures and practices unnecessarily invade the personal rights of Plaintiffs and Class members.

280.    The acts and omissions of Defendants constitute unreasonable searches and seizures in violation of Plaintiffs' and Class members' clearly established rights guaranteed by the Fourth Amendment of the United States Constitution and Article 1, Section 10 of the Minnesota Constitution.

281.    Defendants Benson, Moser, Lundquist, Zimmerman, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that resulted in the unreasonable search and seizures against Plaintiffs and Class members and yet they each did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct.

29585

282.   Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count IX

### Minnesota Statute § 253B is Unconstitutional as Applied

283. Plaintiffs incorporate all previous allegations as if fully set forth herein.

284. A statute that violates constitutional rights when enforced is unconstitutional as applied to those whose rights are violated.

285. Defendants are violating Plaintiffs' and Class members' constitutional rights through their enforcement of Minn. Stat. § 253B, under which all Plaintiffs and Class members are civilly committed to MSOP.

286. Non-criminal confinement must have a non-criminal purpose. The civil commitment statute mandates that during involuntary detention or commitment pursuant to Chapter 253B, the patient is entitled to all constitutionally required care and treatment. Plaintiffs and Class members are entitled to such treatment as will give them a realistic opportunity to meet the statutory requirements to be released from confinement, as determined by an appropriate mental health professional and that is within the scope of acceptable mental health treatment.

29585

287. The civil commitment standards under Minn. Stat. § 253B are inconsistently implemented, as evidenced by the variance in the number of Plaintiffs and Class members civilly committed to MSOP over time and over various geographic locations. This inconsistent implementation demonstrates that civil commitment determinations are not based on professional judgment. Rather, they are arbitrary and politically influenced.

288. The release standards are also inconsistent and inherently biased. The failure to release any Plaintiffs or Class members over the life of the MSOP program demonstrates that the treatment program is a result of orders from political leaders and is not based on professional judgment.

289. Defendants' implementation of Minn. Stat. § 253B violates Plaintiffs' and Class members' constitutional rights to due process protections. Additionally, the application of Minn. Stat § 253B to Plaintiffs and Class members is punitive, not therapeutic, in nature, rendering it unconstitutional.

290. The acts and omissions of Defendants render Minn. Stat. § 253B unconstitutional as applied.

291. Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

29585

**Count X**

**Minnesota Statute § 253B Violates the Equal Protection Clause
of the Fourteenth Amendment as Applied**

292.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

293.    The Fourteenth Amendment entitles people to equal protection under the law. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

294.    The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const.  amend. XIV, § 1.

295.    Decisions regarding civil commitment of sex offenders in Minnesota are made in a decentralized manner and this system leads to significant geographic variations in petition and commitment rates across the state, which is unexplained by the characteristics of offender and their crimes.

296.    The data collected by the Office of the Legislative Auditor shows disparity in how Minnesota's civil commitment statute is applied throughout the state without any rational basis for treating similarly situated individuals differently.

297.    The application of commitment procedures under Minn. Stat. §253B, which directly results in the loss of a fundamental right of freedom, is being applied differently to similarly-situated individuals, in violation of the clearly established equal protection rights under the Fourteenth Amendment.

298.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have

74

29585

been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count XI

## Violation of Court Ordered Treatment

299.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

300.    Civil commitment to the MSOP occurs after a judicial proceeding. When a judge ruled the Plaintiffs and Class members were SPP or SDP under Minn. Stat. § 253B, that is a determination that they must enter a secure treatment facility. Therefore, the court has ordered that Plaintiffs and Class members receive proper sex offender treatment.

301.    Plaintiffs and Class members are not receiving adequate treatment.

302.    Plaintiffs  and Class members spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are often far too low. Plaintiffs and Class members are not progressing through the treatment program and are instead getting stuck in the first two phases of treatment.

303.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual as well as their official capacity, were each aware of the policies and practices that were implemented at MSOP that prevented Plaintiffs and Class member

29585

from receiving treatment and did nothing to changes these policies and practices or to prevent this conduct from occurring and actively participated in such conduct.

304.    The acts and omissions of Defendants constitute a failure to satisfy court ordered treatment to Plaintiffs and Class members.

305.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and Class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

## Count XII

### Breach of Contract by Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert

306.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

307.    Defendants' failure to provide Plaintiffs and Class members the treatment contracted for in the Consent for Participation in Sex Offender Treatment form constitutes a breach of contract. Plaintiffs and Class members have been damaged as a direct and proximate result of Defendants' breach because they have not been provided adequate treatment and have been restrained indefinitely in the MSOP program.

308.    MSOP has breached its contract to provide treatment to the Plaintiffs and Class members who signed the form consenting to sex offender treatment. The type and

29585

amount of treatment provided and the staff that provides that treatment falls well below constitutional standards, well below contact standards and well below the reasonable performance of the treatment program created by MSOP's own policies.

309.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were each aware that each Plaintiff and Class member entered into a contract for treatment at the time they were civilly committed to MSOP.

310.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware of the failure to progress Plaintiffs and Class members through the different treatment phases to the point that they could be conditionally or unconditionally released.

311.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, actively participated in and supported the inadequate treatment policies as implemented by MSOP, which resulted in the failure to comply with contract to provide treatment by MSOP.

312.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware that the MSOP treatment program as implemented had only conditionally released a single person and had never unconditionally released anyone committed to MSOP.

313.    Yet Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, each failed to take action to

29585

change the inadequate treatment policies and practices at MSOP and, in fact, endorsed the use of the policies and practices by MSOP employees.

314.    The acts and omissions of Defendants constitute a breach of contract.

315.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

### Count XIII

### Tortious Interference with Contract and Intentional Violation of Minn. Stat. §253B.03, subd. 7 by Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert

316.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

317.    Upon commitment, each patient must sign a document entitled "Consent for Participation in Sex Offender Treatment." Patients can either sign the portion of the contract saying they consent to sex offender treatment or the portion that says they refuse to participate in treatment. The patient's Clinical Team Therapist then signs the contract as well.

318.    The contract provides that the patient's therapist has discussed the course of treatment at the MSOP, that the patient received information about the levels of care and

29585

stages of treatment, that the patient has received the goals and behavioral expectations at the MSOP, that upon completion of treatment the MSOP will support their petition for provisional discharge, that each stage of treatment has specific goals and behavioral expectations, that services such as education and vocation are provided, that failure to participate in treatment may prolong civil commitment status, that they will need to reveal information about past crimes, and that treatment officials must report any previously unreported child or vulnerable adult victims they learn of from the patient.

319.    Additionally, Minn. Stat. §253B.03, subd. 7 state that "A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary."

320.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were each aware that each Plaintiff and Class member entered into a contract for treatment at the time they were civilly committed to MSOP and that a person committed to MSOP has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to render further supervision unnecessary.

321.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware of the failure to progress Plaintiffs and Class members through the different treatment phases to the point that they could be conditionally or unconditionally released.

29585

322.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, actively participated in and supported the inadequate treatment policies as implemented by MSOP, which resulted in the failure to comply with contract to provide treatment by MSOP and an intentional violation of the requirements under Minn. Stat. §253B.03, subd. 7.

323.    Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, were aware that the MSOP treatment program as implemented had only conditionally released a single person and had never unconditionally released anyone committed to MSOP.

324.    Yet Defendants Jesson, Benson, Moser, Lundquist, Johnston and Hébert, in their individual capacity as well as their official capacity, each failed to take action to change the inadequate treatment policies and practices at MSOP described above, and, in fact, endorsed the use of the policies and practices by MSOP employees.

325.    Plaintiffs Karsjens, Gamble, DeVillion, Lonergan, Noyer, Rud, Barber, Bolte, Steiner, Braun, Thuringer, Daywitt, Foster, Hausfeld and Class members have been subject to and injured by these alleged violations and suffered damages as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiffs and class members will continue to be injured by and suffer damages as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

29585

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representative and Plaintiffs' counsel be appointed as counsel for the Class;

b.    That the unlawful conduct alleged herein be declared to be illegal and in violation of the federal and state constitutional, statutory and common law claims alleged herein;

c.    That the Court order Defendants to provide proper treatment, appropriate less restrictive alternatives, and in general operate the MSOP without an improper purpose of punishment;

d.    That Defendants be enjoined from engaging in the same or similar practices alleged herein;

e.    That Minn. Stat. § 253B be declared unconstitutional;

f.    That Plaintiffs and Class members recover actual or nominal damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and Class members;

g.    That Plaintiff and Class members receive pre-judgment and post-judgment interest as allowed by law;

29585

h.     That Plaintiff and Class members recover their costs of the suit, attorneys'

fees and expenses as allowed by law; and

i.     All other relief allowed by law and equity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury on all issues so triable.

Dated: August 8, 2013          s/Daniel E. Gustafson
                              Daniel E. Gustafson (#202241)
                              Karla M. Gluek (#238399)
                              David A. Goodwin (#386715)
                              Raina C. Borrelli (#392127)
                              **Gustafson Gluek PLLC**
                              Canadian Pacific Plaza
                              120 South Sixth Street, Suite 2600
                              Minneapolis, MN 55402
                              Telephone: (612) 333-8844
                              Fax: (612) 339-6622

                              ***Attorneys for Plaintiffs***

29585