# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld  and all others similarly situated,<br><br>                               Plaintiffs,<br><br>v.<br><br>Lucinda Jesson, Dennis Benson, Kevin Moser, Tom Lundquist, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their individual and official capacities,<br><br>                               Defendants. | Court File No. 11-cv-03659 (DWF/JJK)<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION FOR THE APPOINTMENT OF A SPECIAL MASTER TO OVERSEE THE MINNESOTA SEX OFFENDER PROGRAM** |

## INTRODUCTION

Plaintiffs allege that Defendants violate Plaintiffs' and Class members' constitutional rights by placing them in indefinite civil commitment with treatment that is so inadequate that it fails to bear some reasonable relation to the purpose for which the individual is committed.  Additionally, Plaintiffs allege that Defendants violate Plaintiffs' and Class members' statutory right, under Minn. Stat. §253B.03, Subd. 7, to receive proper care and treatment, best adapted, according to contemporary professional standards, to render further supervision unnecessary.

Because of these violations, Plaintiffs seek to have this Court:

(1)     Appoint a Special Master to oversee the Minnesota Sex Offender Program ("MSOP") program until such time as a constitutionally adequate program is established and systems are put in place to guarantee that the program continues to run in a constitutional manner;

(2)     Order that each Class member be immediately re-evaluated by an independent qualified sex offender expert (such as those individuals whom are appointed to the Program Evaluation Team previously appointed by this Court) in order to ensure that each Class member is correctly placed in the proper treatment phase at the MSOP; and

(3)     Order Defendants to immediately provide adequate staffing at MSOP (as determined by the Special Master) in order to provide each Class member with the proper treatment to allow that Class member the opportunity to progress in treatment to the point of rendering further supervision unnecessary.

## PROCEDURAL BACKGROUND

This case was originally filed on December 21, 2011 as a *pro se* case.  The undersigned counsel filed a Notice of Appearance on January 20, 2011.  Plaintiffs filed an Amended Complaint on March 15, 2012 alleging the following conduct by Defendants:  1) failure to provide treatment, 2) denial of right to be free from punishment, 3) denial of less-restrictive alternatives, 4) denial of right to be free from inhumane treatment, 5) denial of right to religious freedom, 6) unreasonable restrictions on speech and association, 7) unreasonable searches and seizures, 8) the civil commitment statute is unconstitutional as applied, 9) violation of court-ordered treatment, and 10) breach of contract.

On August 8, 2013, Plaintiffs filed a Second Amended Complaint. [*Karsjens* Dkt. #301] ("*Karsjens* Complaint").

29761

## <u>RELEVANT FACTUAL BACKGROUND</u>

The Minnesota Commitment and Treatment Act holds that a "person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, *to rendering further supervision unnecessary*." Minn. Stat. § 253B.03, Subd. 7. (emphasis added).

The MSOP treatment program is broken out into three phases. In Phase I, patients must learn how to comply with the MSOP facility's rules and learn basic treatment concepts. *Karsjens* Complaint at ¶ 75.  No sex offender-specific treatment whatsoever is provided in Phase I. *Id.*  In Phase II, patients must discuss and work through their sexual offenses and patterns of sexual abuse. In Phase III, which takes place at the St. Peter facility, the program focuses on community reintegration. This third phase consists of MSOP Supervised Integration, in which patients live in a secure area within the St. Peter Facility.  *Id.*

According to MSOP treatment protocol, Plaintiffs and Class members should move through the phases of the treatment program by following their individual treatment plans, participating in treatment, completing treatment assignments, and showing they have changed their thinking and behavior. Their progress is to be reviewed quarterly and annually.  *Id.* at ¶ 76

Patients are evaluated on a nine factor Goal Matrix that lays out the focus of each factor in each phase of the treatment program. The nine factors are: Group Behavior, Attitude to Change, Self-Monitoring, Thinking Errors, Pro-Social Problem Solving,

29761

3

Emotional Regulation, Interpersonal Skills, Sexuality, Cooperation with Rules and Supervision, Healthy Lifestyle, and Life Enrichment. See *Karsjens* Complaint at ¶ 77 (citing Report on the Evaluation of Treatment Phase Progression at the Minnesota Sex Offender Treatment Program at 3 (Dkt. #294, Ex. 294-1) ("Evaluator Report")). Patients are given a score from 1-5 on each category, with 1 being Deficient, 2 being Needs Attention, 3 being Satisfactory, 4 being Enhanced, and 5 being Proficient. *Karsjens* Complaint at ¶ 77.

The MSOP treatment program was designed to be completed within four years. *Id* at ¶ 78; *see also Matter of Linehan,* 557 N. W. 2d 171, 188 (Minn. 1996) *cert. granted, judgment vacated sub nom. Linehan v. Minnesota,* 522 U.S. 1011 (1997) (noting that "according to evidence introduced at Linehan's initial commitment hearing, each of the four phases [of the treatment program] will last approximately 8 months for model patients – those who complete the program's therapy and education requirements, satisfy the program's goals and behave consistent with the program standards.") As of January 1, 2012, sixty-four percent (64%) of MSOP patients were in Phase I, twenty-four percent (24%) were in Phase II, and twelve percent (12%) were in Phase III. *Id.* at ¶ 78. As no sex offender-specific treatment is provided for Phase I patients, the majority of MSOP patients are not provided any sex offender-specific treatment at all. *Id.* Additionally, seventy-five percent (75%) of MSOP patients have been civilly committed to the MSOP for between three years and ten years or more. *Id.* It was not until February of 2012 that the first patient in the history of the MSOP was deemed to have completed the treatment

29761

program, after commitment to the program for more than eighteen years, and be ready for

provisional discharge.  That patient is required to attend regular therapy as a provision of

his discharge. *Id.*

A. **Auditor's Report**

In March 2011, the Office of the Legislative Auditor for the State of Minnesota,

issued an Evaluation Report relating to the Civil Commitment of Sex Offenders.  See

Office of the Legislative Auditor, State of Minnesota, Evaluation Report: Civil

Commitment of Sex Offenders (March 2011) ("Auditor's Report"),

http://www.auditor.leg.state.mn.us/ped/pedrep/ccso.pdf (last visited August 13, 2013).

The Auditor's Report outlined staffing problems at all levels of the clinical system –

clinical leadership, clinical supervision, and clinician staffing.

According to the Auditor's Report, "[s]table leadership and a consistent treatment

program supports clients in progressing through a long-term treatment program."

Auditor's Report at p. 58.   However, MSOP "has had three executive directors and four

executive clinical directors in the last seven years." *Id.*  The Auditor's Report noted that

"[b]ecause of changes in MSOP's leadership and the treatment program, the program has

not been able to deliver consistent treatment to its residents." *Id.*  The Report also found

that "[m]aintaining consistent clinical leadership is essential to filling current vacancies,

retaining existing clinical staff, maintaining a long-term treatment program, establishing

consistent treatment expectations, and giving clients the hope of release that is essential

to maintaining motivation to complete treatment." *Id.* at p. 58-59. Such stability has been

29761

lacking at the MSOP. Since the Auditor's Report was issued in 2011, the MSOP has again changed Executive Directors.

The Auditor's Report also noted that staffing shortages at the clinical supervisor level has also been persistent:

> With a dearth of clinical supervisors, MSOP has been unable to assure that all clinicians are implementing a therapeutic style consistent with best practices or applying the treatment model in the way the clinical directors envision. Clinicians we interviewed at Moose Lake stated that they did not feel that everyone was "on the same page" in terms of administering the treatment model established by the current administration.

*Id*. at 60.

Prior to the Auditor's Report being issued, "[a]t one point, the facility had only two clinical supervisors and six clinical supervisor vacancies. When we interviewed one of these two supervisors, her caseload had recently decreased to 224 clients because a third clinical supervisor had just been hired. As of January 2011, four of eight clinical supervisor positions were filled." *Id.*

According to the Auditor's Report, the goal of the Executive Clinical Director was for clinicians to have eight clients; however, clinicians at Moose Lake had up to twenty-five clients on their case load.  *Id.*

> When caseloads are too high, clinicians may be less able to properly document progress in client files, submit necessary paperwork to advance a client (such as referrals for polygraphs), provide individual therapy, or observe and assist clients in their daily behaviors. High caseloads may also lead to delayed assessments of clients who are not progressing due to a learning disability or other cognitive difficulty.

*Id.*

29761

At the time the Auditor's Report was issued "17 of 68 [25%] nonsupervisory clinical positions were vacant. Sixteen of these vacancies were at the Moose Lake facility." *Id.* "Clinical understaffing has been a very serious problem, which has affected the ability of the program to deliver treatment to clients." *Id.*

The Auditor's Report identified a number of factors leading to the MSOP's inability to attract and retain qualified clinicians:

> First, MSOP clinicians have a different employee classification than [the Minnesota Department of Corrections] clinicians within their union, putting them at a competitive disadvantage. Maximum annual salaries for [the Minnesota Department of Correction's] clinicians can be up to about $10,000 more than MSOP maximum clinician salaries. Second, the federal and Wisconsin civil commitment facilities pay more than MSOP. Third, it is sometimes challenging to attract clinicians to work and live outside of the Twin Cities metropolitan area (or for clinicians' spouses to find work in these areas). Fourth, clinicians may not want to work for MSOP because of its reputation for program instability and not releasing any clients.

*Id.* at 61.

This is not a temporary problem but instead a persistent long term issue. All signs indicate that MSOP staff will continue to be stretched too thin in the future as the "number of civilly committed sex offenders is expected to nearly double in the next ten years." *Id.* at 5. There is no indication that staffing can possibly keep up with this explosive population growth, which will only exacerbate the growing treatment deficiencies at MSOP.

## B.    PET Report

On November 9, 2012, the Court ordered the creation of the MSOP Program Evaluation Team ("Evaluation Team"). [*Karsjens* Dkt. # 275]. The Evaluation Team

29761

7

identified several areas of concern that bear directly on this Motion because they reflect the MSOP's treatment deficiencies and concomitant lack of patient progression, including:

(1)     that of the patient files the Evaluation Team reviewed for individuals in Phase I of treatment, thirty percent (30%) of those individuals were in the wrong treatment phase when evaluated pursuant to MSOP's own policies;[1]

(2)     that the thresholds in place for progress within the treatment phases may be too high;

(3)     that the MSOP must establish criteria for movement from Phase III to Community Preparation Services ("CPS") and from CPS to Provisional Discharge;

(4)     that MSOP therapists applied inconsistent patient scoring; and

(5)     that "some therapists' notes indicated that large group size and frequent staff changes interfered with clinical progress."

Evaluation Report at p. 4-5.  [*Karsjens* Dkt #294-1].

These problems, in addition to others, lead the Evaluation Team to conclude that "[f]urther reviews should be dependent on MSOP's effectiveness in moving clients through the treatment phases, including Provisional Discharge." *Id.* at p. 7.  Since the Evaluation Report was issued in April, no patients have been granted Provisional or Full Discharge.

---

[1] Phase I constitutes the largest portion of the MSOP patient population (currently 350 of the 682 individuals according to the Minnesota Sex Offender Program Annual Performance Report 2012) ("2012 Performance Report"), https://edocs.dhs.state.mn.us/lfserver/Public/DHS-6677-ENG (last visited August 13, 2013).

29761

### C. 2012 Performance Report

Concerns regarding staffing levels and adequacy were again raised in the 2012 Performance Report.  The 2012 Performance Report states that "[a]lthough clinical staffing levels at Moose Lake had improved at the time of our last review in December 2011, clinical staffing levels at the site have since dropped, and this is a significant concern." 2012 Performance Report at p. 33.

> Frequent staff turnover and program growth, primarily at Moose Lake, has led to less experienced staff and frequent changes in clients' primary and group therapists. These problems have impacted therapeutic engagement negatively. As a result of low clinical staffing levels, group size is larger than ideal, which does not allow sufficient time to cover therapeutic assignments in a timely manner.

*Id.* at 37.

The 2012 Performance Report further noted that "[a]t the time of the present site visit, of the 54 clinical positions at Moose Lake, 16 positions [29.6%] were vacant. Of 11 clinical supervisor positions, two positions [18.2%] were vacant. Despite these staff vacancies, the program appears to continue to provide the expected number of treatment hours, but at the expense of increased group size." *Id.* at 41.

### D. Executive Order 03-10

In 2003, then Governor Pawlenty issued an Executive Order that states: "State agencies shall fulfill their responsibilities under Minnesota law in relation to persons who have been civilly committed as sexually dangerous persons or as persons with sexual psychopathic personalities with *the primary consideration of providing protection to the public.*" See Executive Order 03-10, "Providing Direction to State Agencies in Relation

29761

to Persons Civilly Committed Under Minnesota Law as Having Sexual Psychopathic Personalities or as Sexually Dangerous Persons" ("Executive Order") at p. 1 (emphasis added) attached to the Affidavit of Daniel E. Gustafson as Exhibit A.

In addition, Governor Pawlenty ordered that "State agencies will ensure that no person who has been civilly committed under Minnesota law as a sexually dangerous person or as a person with a sexual psychopathic personality is discharged into the community unless required by law or ordered by a court of competent jurisdiction." *See Id.*

Citing to no treatment authority whatsoever as the basis of this Executive Order, Governor Pawlenty also ordered that the "Commissioner of Human Services shall take all appropriate actions within his [or her] authority to ensure that persons who have been civilly committed as sexually dangerous persons or as persons with sexual psychopathic personalities are not allowed into the community on pass status, provisional discharge or otherwise unless required by law or ordered by a court of competent jurisdiction." *Id.*

Such sweeping and restrictive policies make clear that MSOP's primary objective is to detain and isolate Plaintiffs and the Class members, not to treat them in order to render further supervision unnecessary.

Collectively, these facts display a persistent pattern of inadequate treatment and staffing problems which have damaged the Plaintiffs and the Class by delaying their progress through the MSOP treatment program and thereby unconstitutionally depriving Plaintiffs and the Class of their liberty interests without due process.

29761

## ARGUMENT

The Courts have enumerated the critical showings for a Motion for a Preliminary Injunction as follows:

> (1)   Irreparable injury to the movant;
>
> (2)   The balance between the injury and the harm that the preliminary injunction will cause to the other parties;
>
> (3)   The movant's probability of success on the merits; and
>
> (4)   The public interest.

*See Vonage Holdings Corp v. Nebraska Public Service Commission,* 564 F.3d 900, 904 (8th Cir. 2009), (quoting *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.3d 109, 114 (8th Cir. 1981)); *Stuart Hall Co., Inc. v. Ampad Corp.,* 51 F.3d 780, 783 n. 2 (8th Cir. 1995) (citing *Calvin Klein Cosmetics Corp. v. Lenox Lab.,* 815 F.2d 500, 503 (8th Cir. 1987)).

"The burden of establishing the propriety of an injunction is on the movant." *Watkins, Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003), citing *Goff v. Harper,* 60 F.3d 518, 520 (8th Cir. 1995). "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Industries Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998) (citing *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 485-86 (8th Cir. 1993), and *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500, 503)).

29761

Further, the "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc., v. Lewis,* 346 F.3d at 844, (citing *Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996)). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Id.* (citation omitted).  In addition, "an injunction cannot issue if there is no chance of success on the merits [.]" *Mid-America Real Estate Co. v. Iowa Realty Co.,* 406 F.3d 969, 972 (8th Cir. 2005), (citing *Firefighters Local Union No. 1784 v. Stotts,* 457 U.S. 561, 589 (1984) (O'Connor, J., concurring), and *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 804 (7th Cir. 2002)).

The Plaintiffs satisfy each of the criteria for a preliminary injunction and as such, this motion should be granted.

## A.  Irreparable Injury To The Movant

Civil commitment involves a "massive curtailment of liberty" and implicates the due process clause of the Fourteenth Amendment.  *Welsch v. Likins,* 373 F. Supp. 487, 491 (D. Minn. 1974) (quoting *Humphrey v. Cady,* 405 U.S. 504, 509 (1972)). "Interference with the exercise of constitutional rights constitutes irreparable injury." *Maxam v. Lower Sioux Indian Cmty. of Minnesota*, 829 F. Supp. 277, 282 (D. Minn. 1993)(citing *Planned Parenthood v. Citizens for Com. Action,* 558 F.2d 861, 867 (8th Cir.1977); *Heritage Pub. Co. v. Fishman,* 634 F.Supp. 1489, 1497 (D. Minn.1986)). *See also Workman v. Greenwood Cmty. Sch. Corp.*, 1:10-CV-0293-SEB-TAB, 2010 WL 1780043, at *9 (S.D. Ind. Apr. 30, 2010) ("[I]t has repeatedly been recognized by the

29761

12

federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law." (quoting *Cohen v. Coahoma Cnty.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992)).  "The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement." *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992)(quoting *Vitek v. Jones,* 445 U.S. 480, 492 (1980)). Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.* at 80 (quoting *Youngberg v. Romero*, 457 U.S. 307, 316 (1982)).

Every day, Plaintiffs and the Class are harmed by the MSOP's ineffective and inadequate treatment. This inadequate treatment delays therapeutic progression for Plaintiffs and the Class, which results in Plaintiffs and the Class enduring unnecessary confinement in the form of unconstitutional preventative detention.

The Minnesota Commitment and Treatment Act holds that a "person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, *to rendering further supervision unnecessary*." Minn. Stat. § 253B, Subd. 7. (emphasis added). There is no dispute that in the entirety of its existence, the MSOP has been unable to provide the proper care and treatment to render further supervision unnecessary for even one single individual.  Indeed, in its response to the Evaluation Report, the MSOP conceded that it currently does not have the ability to treat Plaintiffs and the Class. The MSOP "agrees with the Evaluation Team's finding that large group size and frequent staff changes *may*

29761

13

*have affected the phase progression of its MSOP-Moose Lake clients*." The MSOP's

Responses to the Evaluation Report, at p. 4 (emphasis added)[*Karsjens* Dkt # 294-2].

Although the MSOP may not be overcrowded in the sense that it has empty beds, it is

overcrowded in that staffing is simply inadequate to satisfy the statutory mandate of

providing treatment that will render further supervision unnecessary.

In addition to the damage caused by staffing issued, there is evidence that Class

members are being improperly held in the initial treatment phase of the program longer

than is necessary.  Currently thirty percent (30%) of the sampled patients in Phase I of

treatment at MSOP are not placed in the proper treatment phase in accordance with

MSOP's own policies.  Evaluation Report at 4.[2] Applying a thirty percent (30%)

misplacement rate to the entire Phase I population means that one hundred and five (105)

Class members in Phase I are currently being wrongfully denied sex offender specific

therapy (as no sex offender specific treatment is provided in Phase I) further delaying

these individuals ability to get the proper care and treatment to render further supervision

unnecessary.

In *Brown v. Plata*, the Supreme Court addressed the problem of persistent

overcrowding in California prisons.  "For years the medical and mental health care

provided by California's prisons has fallen short of minimum constitutional requirements

and has failed to meet prisoners' basic health needs. Needless suffering and death have

---

[2] Since the Evaluation Report's findings of widespread patient misplacement were made
public in April, the MSOP has made no clear effort to have its population re-evaluated to
ensure proper treatment phase placement.

29761

been the well-documented result." *Brown v. Plata*, 131 S. Ct. 1910, 1923 (2011).  The

Supreme Court in *Brown v. Plata* recognized that "[a] prison that deprives prisoners of

basic sustenance, including adequate medical care, is incompatible with the concept of

human dignity and has no place in civilized society." *Id.* at 1928.

Here, Plaintiffs and the Class are not prisoners, but rather civil committees. The

same, if not stronger, protections should apply to Plaintiffs and the Class here.  *See*

*Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).  The Defendants' failure to provide

adequate staffing and their clear disregard for their own treatment protocol, which has

resulted in the improper delay in treatment for a significant portion of the population,

establishes a constitutional violation because "'[d]ue process requires that the nature of

commitment bear some reasonable relation to the purpose for which the individual is

committed.'"  *Thompson v. Ludeman et al.*, 11-cv-1704 (DWF/JJK) at p. 59 [Doc. No.

39] (*citing Foucha*, 504 U.S. at 79; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).  The

treatment conditions established by the Defendants result in unconstitutional care that

produces irreparable and ongoing injury.

### B.   The Balance Between The Injury And The Harm That The Preliminary Injunction Will Cause To The Other Parties

The second factor in determining whether to grant a preliminary injunction - the

balance between the current injury and the harm that the preliminary injunction will

cause the other parties - weighs heavily in favor of granting this preliminary injunction.

The Plaintiffs' and Class members' injuries are clear – they are currently involuntarily,

indeterminately civilly committed to a prison-like secure treatment facility. No MSOP

29761

15

patient has ever obtained full discharge from that program. Some of those patients have actively participated in treatment for over twenty years. Plaintiffs and the Class members exist under the "massive curtailment of liberty" inherent in civil commitment. *Welsch v. Likins*, 373 F. Supp. 487, 491 (D. Minn. 1974) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)).

Plaintiffs seek to have this Court appoint a Special Master to oversee the Minnesota Sex Offender Program ("MSOP") program until such time as a constitutionally adequate program is established and systems are put in place to guarantee that the program continues to run in a constitutional manner. *See Turay v. Seling*, Findings, Conclusions and Order, No C91-665 WD (W.D. Wash., Nov. 25, 1998), attached as Exhibit B to the Affidavit of Daniel E. Gustafson at p. 7 (recognizing that the Court had appointed a Special Master "to provide information and expert advice to defendants to assist them in complying promptly with the injunction … and to make periodic reports to the court in regard to defendants' compliance or non-compliance with the injunction."); *see also Turay v. Seling*, 108 F.Supp.2d 1148, 1153-54 (W.D. Wash. 2000) (again recognizing the appointment of the Special Master to oversee compliance of the various injunctions).

Plaintiffs also seek to have this Court mandate that each Class member be immediately re-evaluated by an independent qualified sex offender expert (such as those individuals who are members of the Phase Evaluation Team previously appointed by this Court) in order to ensure that each Class member is placed in the proper treatment phase

29761

16

at the MSOP.  Plaintiffs also move this Court for an order requiring Defendants to immediately provide adequate staffing at MSOP in order to provide each Class member with the proper treatment to allow that Class member the opportunity to progress in treatment to the point of rendering further supervision unnecessary.

Although this will impose a burden on the Defendants, as the Supreme Court has recognized, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown* at 1928-29. The same holds true in the context of civil commitment.

Staffing shortages at all levels has been a chronic persistent problem for MSOP, due in part perhaps to the remote location at Moose Lake. Plaintiffs and the Class members should not be denied their mandated treatment – and their opportunity to gain eventual discharge from the MSOP – because of the MSOP's own poor management decisions. For instance, staffing retention problems were well known when the MSOP recently approached its capacity limit at Moose Lake. Nevertheless, the MSOP simply expanded the facility there instead of building additional capacity at another location that may allow for better staff recruitment and retention.

In contrast to the MSOP, the Minnesota Security Hospital ("MSH"), which houses individuals who are found mentally ill and dangerous (though not a Sexually Dangerous Person or a Sexually Psychopathic Personality) under Minn. Stat. § 253B has managed to establish adequate staffing levels:

> The actual capacity [of the MSH] depends not only on the number of beds,
> but also on the number of staff. When we visited the Security Hospital in

29761

September 2012, administrators told us that they had a high number of very disruptive patients at that time. Disproportionate staff resources were used to manage these patients, meaning that the facility could not accommodate as many patients as the total number of beds.

Legislative Auditor, State of Minnesota, Evaluation Report: State-Operated

Human Services (February 2013) at p. 91, n. 1,

http://www.auditor.leg.state.mn.us/ped/pedrep/sos.pdf (last visited August 14, 2013).

Such limits on patient population are consistent with the Supreme Court's holding in

*Brown*:

> Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees. When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population.

*Brown* at 1929. The same holds true in the confines of a non-punitive secure treatment

facility.

The balance of Plaintiffs' and the Class members' injury in the deprivation of

sufficient treatment to render further supervision unnecessary compared to Defendants'

harm in providing that treatment weighs heavily in favor of granting this Motion.

**C.    The Movant's Probability Of Success On The Merits**

The mandates of the Minnesota Commitment and Treatment Act are clear –

patients have the "right to receive proper care and treatment, best adapted, according to

contemporary professional standards, to rendering further supervision unnecessary."

Minn. Stat. § 253B.03, Subd. 7.  Defendants' unqualified failure to comply with this

statute is manifest – not a single MSOP patient has ever been provided treatment that

29761

18

would render further supervision unnecessary.  Thus, Plaintiffs' claim under Minn. Stat. § 253B.03, Subd. 7 is likely to succeed.

*In re Blodgett* established that "[s]o long as civil commitment is programmed to provide treatment and periodic review, due process is provided." 510 N.W.2d 910, 916 (Minn. 1994).  *Blodgett* was decided shortly after the MSOP was established.  The MSOP's performance in the 19 years since that ruling demonstrates that the treatment offered by the MSOP is a sham. Shifting treatment goals and practices coupled with incessant staffing turnover reflect a program that is simply not intended to provide treatment that would render further supervision unnecessary.

"Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992).  In addition, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at 80 (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, (1990)).  Here, Plaintiffs and the Class are subject to the wrongful and arbitrary government action of preventative detention. Furthermore, the procedures to implement that action have proven manifestly unfair as demonstrated by the fact that the number of individuals that have been treated to the point of rendering further supervision unnecessary remains at zero.

 Plaintiffs assert that, even if the Court does not find that the failure to provide treatment as required by the statute is intentional, the treatment is, in fact, so deficient as

29761

19

to constitute a violation of the Due Process rights of the Plaintiffs and the Class. The

MSOP's failure to successfully treat a single individual in 19 years to the point where

further supervision is unnecessary constitutes just such an egregious and extraordinary

situation that shocks the conscience in violation of *Strutton v. Meade*, 668 F.3d 549, 558

(8th Cir. 2012).

The Report and Recommendation issued in *Thompson v. Ludeman et al.*, 11-cv-

1704 (DWF/JJK) at p. 59 [Doc. No. 39] provides further support for Plaintiffs' likelihood

of success on the merits. The *Thompson* Report and Recommendation addressed many of

the issues raised in this action and recommended that a number of claims survive the

motion to dismiss.

### D.   The Public Interest

The public interest weighs in favor of granting this preliminary injunction.

Plaintiffs and the Class seek to obtain the treatment guaranteed to them by statute and

ensure that they are not subject to unconstitutional preventative detention.  "It is always

in the public interest to protect constitutional rights. *Javinsky-Wenzek v. City of St. Louis

Park*, 829 F. Supp. 2d 787, 801 (D. Minn. 2011). The public interest also supports

restoring faith in an expensive and troubled program that has never successfully treated a

single person in its entire history. Finally, the public will be served if the MSOP begins to

provide adequate treatment because the steady current of litigation flowing from the

deficiencies will likely be reduced if patients are provided treatment that comports with

the contours of state statute and the Constitution.

29761

## CONCLUSION

Based on the foregoing reasoning, the Court should grant Plaintiffs' motion and:

(1)     Appoint a Special Master to oversee the Minnesota Sex Offender Program ("MSOP") program until such time as a constitutionally adequate program is established and systems are put in place to guarantee that the program continues to run in a constitutional manner;

(2)     Order that each Class member to be immediately re-evaluated by an independent qualified sex offender expert (such as those individuals whom are appointed to the Phase Evaluation Team previously appointed by this Court) in order to ensure that each Class member is correctly placed in the proper treatment phase at the MSOP; and

(3)     Order Defendants to immediately provide adequate staffing at MSOP (as determined by the Special Master) in order to provide each Class member with the proper treatment to allow that Class member the opportunity to progress in treatment to the point of rendering further supervision unnecessary.


Dated:  August 22, 2013                    Respectfully Submitted,

                                           s/Daniel E. Gustafson
                                           Daniel E. Gustafson (#202241)
                                           Karla M. Gluek (#238399)
                                           David A. Goodwin (#386715)
                                           Raina C. Borrelli (#392127)
                                           **Gustafson Gluek PLLC**
                                           Canadian Pacific Plaza
                                           120 South Sixth Street, Suite 2600
                                           Minneapolis, MN  55402
                                           Telephone: (612) 333-8844

                                           ***Attorneys for Plaintiffs***

29761