UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David
Leroy Gamble, Jr., Kevin John
DeVillion, Peter Gerard
Lonergan, James Matthew Noyer,
Sr., James John Rud, James Allen
Barber, Craig Allen Bolte, Dennis
Richard Steiner, Kaine Joseph
Braun, Brian Christopher John
Thuringer, Kenny S. Daywitt, and
Bradley Wayne Foster, and
Brian K. Hausfeld, and others
similarly situated,

    Plaintiffs,

 vs.

Lucinda Jesson, Dennis Benson,
Kevin Moser, Tom Lundquist, Nancy
Johnston, Jannine Hebert, and Ann
Zimmerman, in their individual and
official capacities,

    Defendants.

Civil File No. 11-cv-3659 (DWF/JJK)

**DEFENDANTS' MEMORANDUM OF
LAW IN SUPPORT OF THEIR JOINT
AND SEPARATE MOTION TO
DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT**

## INTRODUCTION

The above-captioned Defendants move the Court, pursuant to Fed. R. Civ.

P. 12(b)(1) and (6), for an Order dismissing Plaintiffs' 42 U.S.C. § 1983 Class Action

Second Amended Complaint with prejudice for lack of subject matter jurisdiction and

failure to state a claim upon which relief can be granted. Plaintiffs seek monetary and

equitable relief for alleged violations of their First, Fourth, and Fourteenth Amendment

rights under the U.S. Constitution, similar provisions under the Minnesota Constitution,

and State law. As shown below, Plaintiffs, on behalf of themselves and the Class, have

not alleged sufficient facts to support their claims.   Moreover, many of the claims of unconstitutional policies and practices at MSOP raised by Plaintiffs have been previously held constitutional by the Minnesota Federal District Court and the Eighth Circuit or are otherwise not actionable.   Consequently, Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

The Second Amended Complaint ("Second Amend. Compl.") in this certified class action sets forth claims concerning the alleged violation of Plaintiffs' and Class Members' rights under federal and state law.  [Doc. No. 301.]

## ARGUMENT

### I.     STANDARD OF REVIEW.

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party.   *See Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir. 2001).   To survive a motion to dismiss, however, a complaint must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."   *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   "The court may consider, in addition to the pleadings, materials embraced by the pleadings and materials that are part of the public

record."[1]  *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 805 (8th Cir. 2010) (internal quotations omitted).

## II. THE DEFENDANTS ARE ENTITLED TO ELEVENTH AMENDMENT IMMUNITY FROM MONETARY DAMAGES IN THEIR OFFICIAL CAPACITIES.

Although this matter has been certified as a class for equitable relief under Fed. R. Civ. P. 23(b)(2), Plaintiffs make a claim for monetary damages against the Defendants. (Second Amend. Compl. pp 11, 86.)  Plaintiffs' claim for money damages against the Defendants in their official capacities must be dismissed because this Court lacks subject matter jurisdiction to consider those claims.  "[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  A suit for damages is forbidden "even though individual officials are nominal defendants" because such a suit is construed, for Eleventh Amendment purposes, as one against the state.  *Id.*

> [A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . ..  As such, it is no different from a suit against the State itself.

*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

The immunity from suit protected by the Eleventh Amendment is a privilege that a state may waive.  *Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906).  The

---

[1] The Affidavit of Ricardo Figueroa ("Figueroa Aff.") has been separately submitted in connection with this Motion solely for the purpose of introducing exhibits consisting of public MSOP policies and Consent for Participation in Sex Offender Treatment forms that are referenced in, and necessarily embraced by, the Second Amended Complaint. *See Carter v. Taylor*, Civ. No. 07-4021 (DSD/AJB), 2008 WL 4527763 at *4 (D. Minn. Aug. 18, 2008).  Consequently, the Court need not convert this Motion into one for summary judgment, and the court may rely on these documents. *Id.*

Court will give effect to a State's waiver of Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Edelman*, 415 U.S. at 673.

Here, Congress did not abrogate, and the Minnesota Legislature has not waived, Minnesota's Eleventh Amendment immunity concerning the legal claims raised by Plaintiff. Minn. Stat. § 1.05 (2010) (waiving immunity only for certain types of claims not presented here); *DeGidio v. Perpich,* 612 F. Supp. 1383, 1389 (D. Minn. 1985). Consequently, Plaintiffs' claim for monetary damages against the Defendants in their official capacities must be dismissed as barred by the Eleventh Amendment.

## III.   THERE IS NO ALLEGED PERSONAL INVOLVEMENT BY EACH DEFENDANT.

To maintain a section 1983 claim, Plaintiffs must plead sufficient facts showing that each Defendant was personally involved in the alleged unconstitutional act. *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999). The doctrine of *respondent superior* does not apply to actions brought under section 1983. *See Iqbal*, 129 S. Ct. at 1948. Moreover, there is no vicarious liability for actions under section 1983. *See Beard v. Lockhart*, 716 F.2d 544, 545 (8th Cir. 1983). Further, because there is no vicarious liability, a section 1983 plaintiff seeking to establish direct liability of a government official in a supervisory role must allege "that [the] official fail[ed] to properly train, supervise, direct or control the actions of a subordinate who caused the injury." *Pearl v. Dobbs*, 649 F.2d 608, 609 (8th Cir. 1991). A section 1983 plaintiff must present more than "the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 129 S. Ct. at 1949.

Here, Plaintiffs fail to allege particular facts as to how each of the named Defendants personally participated in the alleged constitutional violations.[2]  In the section of the Second Amended Complaint describing the parties, Plaintiffs make the same "catchall" allegation against each Defendant in that they "implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class Members."   (Second Amend. Compl. pp. 8-10.)  Also, Plaintiffs generally assert that a group of Defendants were "aware" of alleged unconstitutional acts and "actively participated" in those acts without supporting facts as to when, where, and how each Defendant was plausibly involved in each of the alleged constitutional deprivations.  (*See e.g.* Amended Compl. ¶¶ 134, 157, 164, 175, 185.)  These are the kind of catchall allegations that the U.S Supreme Court has stated lack sufficient facts to survive a motion to dismiss.  *See Twombly*, 550 U.S. at 555-56 (2007) (pleading required a showing of entitlement to relief rather than a blanket assertion); *Atkins v. Northwest Airlines, Inc.*, 967 F.2d 1197, 1203 (8th Cir. 1992) (rejecting argument that broad "catchall" section in complaint was sufficient to state a cause of action); *Dede v. Gaudenzia DRC, Inc.*, Civ. No. 13-1381, 2013 WL 3380592 (E.D. PA. Jul. 8, 2013) (dismissing Eighth Amendment claim for failure to allege sufficient facts of direct personal involvement or actual knowledge on the part of

---

[2] Defendant Benson is no longer employed by the State.  As such, he is no longer a proper party for purposes of injunctive relief.  *See Glick v. Henderson*, 855 F.2d 536, 540-41 (8th Cir. 1988) (upholding dismissal of defendant no longer employed at prison because it would be impossible to grant injunctive relief).

Defendants in making blanket assertion that all named Defendants interfered with his treatment).

The lack of supporting facts against these policy-level Defendants leaves only bare assertions that fail to have facial plausibility to state a viable claim. *Iqbal*, 129 S. Ct. at 1949. For these reasons, Plaintiffs have failed to state an actionable claim against each of the Defendants in their individual capacities.

## IV. PLAINTIFFS HAVE FAILED TO STATE A FIRST AMENDMENT CLAIM.

In Counts VI and VII, Plaintiffs challenge various MSOP policies as violating Plaintiffs' First Amendment Rights. Courts, including the Eighth Circuit, have recognized that the civil commitment of dangerous persons [like Plaintiffs and Class Members] to State custody may involve a constitutionally permissible curtailment of their liberty interests. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). "Although an involuntarily committed patient of a state hospital is not a prisoner per se, [Plaintiffs'] confinement is subject to the same safety and security concerns as that of a prisoner." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). Thus, the guidelines set forth in *Turner v. Safley*, 482 U.S. 78, 85 (1987) as modified in this federal district are applicable to Plaintiffs' First Amendment claims. *See Semler*, 2010 WL 145275, at *8-9 (applying *Turner* as modified to MSOP patients' First Amendment claims). *Turner* identified four factors that are to be considered when evaluating a First Amendment challenge to institutional regulations, policies, and practices:

> (1)     whether there is a valid rational connection between the regulation and legitimate governmental interest it purports to further;

(2)     whether the inmate has an alternative means of exercising his constitutional right;

(3)     the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and

(4)     the absence of a ready alternative to the regulation.

*Turner,* 482 U.S. at 85.   *See also, Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004).   The *Turner* analysis addresses both a challenge to a policy on its face and as applied.   *See Semler*, 2010 WL 145275, at *9.

### A.     Plaintiffs Have Not Plead An Actionable Freedom of Speech Claim.

Plaintiffs assert infringement of their free speech rights by monitoring their telephone calls, high telephone rate charges, and the alleged censorship of mail, newspapers, and magazines.   (Amend Compl. pp. 56, 73-74.)   The right to free speech includes "the right to utter or to print, … the right to distribute, the right to receive, the right to read," and the freedom of inquiry and thought.   *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).   Although detainees retain their right to freedom of speech under the First Amendment, the right may be restricted.   *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979).

In this case, Plaintiffs allege that monitoring their telephone calls is a punitive policy.   (Second Amend. Compl. p. 56.)   But the monitoring of non-legal telephone calls is not violative of the First Amendment because it is reasonably related to MSOP's security interests in detecting and preventing illegal activity and maintaining a safe environment.   *Beaulieu v. Ludeman*, 690 F3d. 1017 (8th Cir. 2012) (citing *Semler v. Ludeman*, Civ. No. 09-0732 (ADM/SRN), 2008 WL 145275 *16 (D. Minn. Jan. 8,

2010)).  Privileged calls are not monitored and the monitoring of non-legal calls does not apply to clients in Community Preparation Services (Figueroa Aff. ¶ 2 Ex. 1, p. 1.). Hence, the MSOP Client Telephone Use Policy meets the *Turner* factors because it is rationally related to maintaining a safe and secure therapeutic environment. *Semler*, 2010 WL 145275 at *16.

Moreover, Plaintiffs' allegation that the rate charged to MSOP clients for making telephone calls is so high as to be prohibitive fails to state an actionable claim because MSOP clients do not have a First Amendment right to a specific rate for their telephone calls.  *Semler*, 2010 WL 145275 at *15 (*citing Beaulieu v. Ludeman*, 07-CV-1535 (JMR/JSM), 2008 WL 2498241 at *19 (D. Minn. Jun. 18, 2008)).

With respect to claims concerning the alleged censorship of certain articles from newspapers and magazines (Second Amend. Compl. p. 74), Plaintiffs have not sufficiently pled an actionable claim because they allege no set of particular facts, other than the bare contention that censorship occurs, supporting any Defendants' personal involvement in any alleged unconstitutional censorship.  *See Semler*, 2010 WL 145275 at *7 (dismissing similar claims for failure to allege any personal involvement by the supervisory defendants in the purposed constitutional violations).  In fact, MSOP's media policy allows clients to possess a wide variety of newspapers and magazines subject to their therapeutic needs.  (Figueroa Aff. ¶ 18 Ex. 17.)  Plaintiffs' have failed to create a plausible link between any Defendant and the alleged constitutional violation under § 1983, as required under *Twombly*.  550 U.S. at 570.

Plaintiffs also assert they are restricted in choosing particular suppliers.  (Second Amend. Compl. p. 47.)  But the Eighth Circuit has held that restrictions on the choice of vendors are *de minimus* restrictions that do not implicate constitutional rights. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 n.7 (8th Cir. 2006).

### B. Plaintiffs Have Not Plead An Actionable Freedom of Association Claim.

As a general matter, Plaintiffs do not enjoy the absolute right of freedom of association.  *See Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977); *Wingate v. Gage Cnty. Schl. Dist. No. 34*, 528 F.3d 1074, 1081 (8th Cir. 2008).  Courts have recognized that MSOP, as a secure treatment facility, has the ability to limit the assembly of individual civilly committed sex offenders who have been adjudicated as dangerous to the public.  *Semler*, 2010 WL 145275 at *14-15.  Thus, a policy that restricts associations when reasonably related to MSOP's legitimate security interests does not offend the First Amendment.  *Id.*

Here, MSOP movement, recreation, and yard use policies do not impose a blanket prohibition on client interactions or recreational activities.  (Figueroa Aff. ¶¶ 3-5, Exs. 2-4.)  Rather, movement and recreation restrictions that are imposed on clients meet the *Turner* factors because they are reasonably related to addressing security and behavioral issues.  Minn. R. 9515.3040, subp. 2(C) (MSOP is required to develop policies and procedures to "[p]revent abuse and predation among program participants."); *see also id.*, subp. 2(G) (requiring MSOP to develop policies and procedures that "[p]rovide a safe environment for staff, program participants, and visitors").  As a

consequence, MSOP's Client Movement, Recreation, and Yard Use Policies are rationally related to MSOP's legitimate interests of maintaining a safe therapeutic environment within the facility while providing means of association where possible.[3]

Similarly, MSOP's visitation policy does not impose unreasonable restrictions on clients' right to associate. (Second Amend. Compl. p. 53.) Minnesota law authorizes the Commissioner to limit visitation and other statutory rights as appropriate to maintain a safe and secure therapeutic environment. Minn. Stat. § 253B.185, subd. 7(b) (2012). Accordingly, MSOP's Visiting Policy provides clients the opportunity to receive visitors while ensuring a secure therapeutic environment. (Figueroa Aff. ¶ 6, Ex. 5, p. 1.) The policy specifically sets forth behaviors that may create a safety or security concern forming the basis for denying a visit and any such restrictions may be restored by addressing violations through treatment. *Id.* pp. 1, 4-5. And contrary to Plaintiffs' assertions, the Visiting and Client Search Policies allow for appropriate physical contact and requires a pat search, not a "strip search," to be conducted after a contact visitation in order to protect from contraband entering the facility. *Id.* p. 5; Figueroa Aff. ¶ 10, Ex. 9, pp. 1-2. Indeed, the Visiting Policy allows some physical contact even though MSOP clients do not have a constitutional right to contact visitation. *Id.* ¶ 6 p. 5; *See Harmon v. Auger*, 768 F.2d 270, 273 (8th Cir. 1995) (restrictions on visitation may include denial of contact, as there is no such liberty interest under the Fourteenth Amendment).

---

[3] In fact, the recent introduction of the Area Monitoring System ("AMS") provides clients with even more freedom of movement throughout the facility. (Figueroa Aff. ¶ 19 Ex. 18.)

In short, MSOP has the authority to keep visitation to a manageable level in order to maintain institutional security.  *Pell v. Procunier*, 417 U.S. 817, 827 (1974).   The limitations within MSOP's visiting policy are rational given the safety and security concerns related to contact visitation.  *See Senty-Haugen v. Goodno*, 462 F.3d at 891 (upholding restrictions on MSOP patients' contact with family members due to evidence that restrictions were related to security concerns).[4]

### C.     Plaintiffs Have Not Plead An Actionable Freedom of Religion Claim.

Plaintiffs allege that MSOP policies place restrictions on their religious rights by: monitoring their religious activities; not providing kosher or halal meals; placing restrictions on the religious items that may be worn or kept in their rooms; and only allowing annual religious feasts.  (Second Amend. Compl. p. 57-58.)  Here again, there are no facts pled to establish how each Defendant was personally involved in the alleged violation of Plaintiffs' religious rights.  *See Iqbal*, 129 S. Ct. at 1949.

In any event, to maintain a claim based on the First Amendment's "freedom of religion" clause, a plaintiff must plead that some policy or practice "substantially burdens his sincerely held religious belief."  *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997). *See also Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996)  "[I]n making a free exercise claim under 42 U.S.C. § 1983, the inmate must establish both the existence of a

---

[4] Plaintiffs have alternative means of communicating with others outside the facility that meet Plaintiffs' rights under the First Amendment.  *See e.g. Semler*, 2010 WL 145275 at *16 (MSOP patients may exercise their First Amendment rights through "having visitors or sending or receiving permitted mail, and they use the telephone pursuant to MSOP's policy").

sincerely held religious belief and the infringement upon that belief by the challenged act or regulation." *Hayes v. Long*, 72 F.3d 70, 73 (8th Cir. 1995).

Other than their conclusory assertion, Plaintiffs in this case fail to allege instances in which a Plaintiff or class member's sincerely held religious belief was infringed by an arbitrary denial of a requested religious meal.   In fact, MSOP's policy provides that "clients … are provided a reasonable … opportunity to observe their essential spiritual dietary practices … within budgetary and security constraints." (Figueroa Aff. ¶ 7, Ex. 6, p. 5.)

Moreover, Plaintiffs' right to religious freedom is not violated by the monitoring of religious services by MSOP staff.   *See Butter-Bey v. Frey*, 811 F.2d 449, 452 (8th Cir. 1987) (security guard presence at religious services does not, without more, violate religious freedoms).   There is no constitutional requirement that Plaintiffs and Class Members be allowed to attend religious services in a secure facility unmonitored. *See VanWyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009) (secured facility need not provide unlimited religious opportunities).   Similarly, restricting the number of religious items they may possess to five items does not violate Plaintiffs' religious rights.[5] *See Chambers v. Wood*, Civ. No. 3-95-598, 1999 WL 33832661 at *6 (D. Minn. Mar. 12, 1999) (finding that a five-item limit on religious items is not unreasonable for the purposes of promoting legitimate security interests).

---

[5] The MSOP has recently revised its Spiritual Practices Policy, 302.300, increasing the number of religious items per client to an unlimited amount.  (Figueroa Aff. ¶ 7 Ex. 6.)

### D.     Plaintiffs Have Not Plead An Actionable First Amendment Claim Regarding MSOP'S Mail Policy.

Plaintiffs' allegations concerning the alleged intentional and unnecessarily delayed delivery of mail (Second Amend. Compl. p. 38), or the searching of incoming and out-going mail, (*id.* p 47), are subject to dismissal because MSOP's mail policy (Figueroa Aff. ¶ 8, Ex. 7.) has been upheld as constitutional in light of the *Turner* factors.  The mail policy has the legitimate purpose of preventing the introduction of contraband and maintaining a safe and secure facility.  (Figueroa Aff. ¶ 8, Ex. 7. p. 1.)  MSOP's mail policy has already been upheld as constitutional by this District.  *Semler*, 2010 WL 145275 at *11.  Additionally, Plaintiffs again fail to allege facts that state an actionable claim against any of the Defendants.

The law regarding the opening of legal mail is well established, and has not been violated by Defendants.  "Privileged prisoner mail, that is mailed to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner."  *Jensen v. Klecker*, 648 F.2d 1179, 1182 (8th Cir. 1981) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).  *See also, Beaulieu v. Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012).  "Claims based on the opening of a prisoner's legal mail may be analyzed as violations of either the Sixth Amendment Right to Counsel, or the Fourteenth Amendment Right to Court Access."  *Thomsen v. Ross*, 368 F. Supp. 2d 961, 974 (D. Minn. 2005) (citing *Wolff*, 418 U.S. at 576.)  Under the First Amendment, the freedom to petition includes the right of access to the courts.  *See BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002) (citation omitted).  In order to state a claim for

denial of access to the courts, a plaintiff must demonstrate that he incurred actual injury; in other words, the plaintiff must show that the alleged deprivations actually hindered his efforts to pursue a legal claim. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007).

In this case, Plaintiffs have not alleged that they have incurred actual prejudice from any alleged viewing of their legal mail. Plaintiffs make no allegations that this alleged conduct "actually blocked [Plaintiffs'] access to filing a complaint, or caused a filed complaint to be deficient …" and, absent such allegations Plaintiffs legal mail claim is not actionable. *Beaulieu*, 60 F.3d at 1037 (internal quotation omitted). Similarly, Plaintiffs do not allege that the viewing of any legal mail by MSOP staff interfered with their case or caused a case to be resolved less favorably because of it. *See Thomsen*, 368 F. Supp. 2d at 974 (finding plaintiff's access to courts not hindered by alleged reading of his mail by jail officials).

## V.   PLAINTIFFS HAVE NOT PLEAD AN ACTIONABLE FOURTH AMENDMENT SEARCH AND SEIZURE CLAIM.

Plaintiffs' assertions of unreasonable searches and seizures in Count VIII of the Second Amended Complaint fail to state a claim upon which relief can be granted. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Involuntarily civilly committed persons have a Fourth Amendment right to be free from unreasonable seizures similar to that of pretrial detainees. *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009). While pretrial detainees retain "some Fourth Amendment rights upon commitment to a corrections facility," a search of a detainees'

personal items in his cell does not violate the Fourth Amendment.  *Bell*, 441 U.S. at 557-58; *see also Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984) (holding that prisoners have no legitimate expectation of privacy in their prison cells).

In dismissing a section 1983 complaint for failure to state actionable Fourth Amendment claims, this Court held in *Pyron v. Ludeman* that allegations of unconstitutional random room searches is not actionable as such room searches at MSOP are constitutional in light of legitimate safety and security concerns.  Civ. Nos. 10-3759, 10-4236 (PJS/JJG), 2011 WL 329353 at *6 (D. Minn. Jun. 6, 2011), report and recommendation adopted, 2011 WL 3290365 (D. Minn. July 29, 2011), affirmed, *Hollie v. Ludeman*, 450 Fed. Appx. 555 (8th Cir. Feb. 8, 2012) (unpublished).  MSOP's area search policy reasonably provides for room searches to be conducted on a random basis or on reasonable suspicion in order to prevent the introduction of contraband into the facility.  (Figueroa Aff. ¶ 9, Ex. 8, pp. 1-2.)  As this District has previously held, the same legitimate security concerns make MSOP's pat search policy, *Id.* ¶ 10, Ex. 9, p. 2, constitutional.  *Semler*, 2010 WL 145275 at *18-19.  These MSOP policies are rationally related to a legitimate safety and security interest that meet the balancing test set forth in *Bell v. Wolfish*, 441 U.S. at 558.

Similarly, Plaintiffs' allegation of unwarranted "window checks" raises no actionable constitutional claim.  Plaintiffs themselves acknowledge that the reason given for these checks is to prevent escape.  (Second Amend. Compl. p. 46)

Plaintiffs' allegations concerning unconstitutional unclothed visual body searches when entering or leaving the secured perimeter should similarly be dismissed.  (Second

Amend. Compl. pp. 45-46.). Due to MSOP clients' civil commitment to State custody as dangerous persons, their "liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). Thus, Plaintiffs' claim "turns in part on the extent to which this [c]ourt has sufficient expertise and information in the record to mandate, under the constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue." *Beaulieu*, 690 F.3d at 1028 (quoting *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 132 S. Ct. 1510, 1513 (2012)). Deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions. *Id.* at 1029 (citations omitted). The Eighth Circuit has also remarked that deference should be afforded to facility officials because the task of determining whether a policy is reasonably related to a legitimate security interest is "peculiarly within the province and professional expertise of corrections officials." *Id.* (quotation omitted).

Here, MSOP's search and transport policies have the clear goal of preventing escape, "control the entry of contraband into facilities," and to "manage threats to the safety and security of facilities, staff, clients, and public." (Figueroa Aff. ¶¶ 10-11, Exs. 9-10). These security interests have been found by the Eighth Circuit to provide justification for MSOP's unclothed visual body search policy. *Beaulieu,* 690 F.3d at 1029 (citing *Serna v. Goodno*, 567 F.3d 944, 953 (8th Cir. 2006)). Likewise, MSOP's policy concerning unclothed visual body searches before entering the high security area (Figueroa Aff. ¶ 17, Ex. 16.) is reasonable in view of these same safety and security concerns. *See e.g. Franklin v. Lockhart*, 883 F.2d 654, 656-57 (8th Cir. 1989) (policy

requiring visual body cavity searches of inmates on punitive status, in administrative segregation, and on protected custody was justified by security concerns); *Goff v. Nix*, 803 F.2d 358, 362-66 (8th Cir. 1986), *cert. denied* 484 U.S. 835, 1987 (regulation requiring visual body cavity examination of inmates leaving or entering segregation unit of maximum security facility upheld in light of security considerations).

Plaintiffs' challenge to the MSOP restraint policy (Second Amend. Compl. pp. 49-50) requiring handcuffing, use of a black box, and shackling of clients when they are transported outside of the secured perimeter, also does not amount to a Fourth Amendment claim. (Figueroa Aff. ¶ 12, Ex. 11.) While civilly committed individuals retain the right to be free from bodily restraint, *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982), the civil commitment of someone who is a safety risk to others necessarily entails some form of restraint. *Semler*, 2010 WL 145245, *26-27. The State "may not restrain residents except when and to the extent professional judgment deems this necessary to ensure safety." *Beaulieu*, 690 F.3d at 1032 (citing *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). MSOP administrators are not required to tailor their restraint policy to account for the least restrictive alternative available. *Id.* (citations omitted).

Here, the MSOP's restraint policy addresses security concerns such as smuggling contraband when a client is transported, preventing assault on the transporters or others, and preventing attempted escapes when clients are transported outside the secure perimeter. *See Semler,* 2010 WL 145275 at *27. Indeed, MSOP clients have previously attempted escape. *Senty-Haugen*, 462 F.3d at 882. MSOP's use of restraints during transport specifically articulates that the purpose of restraints is to preserve public safety.

(Figueroa Aff. ¶ 11, Ex. 10, p. 1.)  Also, the policy has exceptions, including that it does not apply to clients with privileges outside the secured perimeter and that it can be waived with the approval of the Facility Director for medical reasons.  *Id.*

## VI.   PLAINTIFFS HAVE FAILED TO ALLEGE AN ACTIONABLE FOURTEENTH AMENDMENT CLAIM FOR INADEQUATE TREATMENT.

In Counts I and III-VI, Plaintiffs allege violations of their Fourteenth Amendment rights under the Federal Constitution and the comparable provision of the Minnesota Constitution[6] by asserting that the Defendants have failed to provide adequate treatment, that Plaintiffs are subject to punitive conditions, and that Minnesota Statutes chapter 253B violates the Equal Protection Clause of the Fourteenth Amendment, as applied.  For the reasons set forth below, these claims should be dismissed for failure to state a claim upon which relief can be granted.

### A.   Procedural Due Process.

The Due Process Clause of the U.S. Constitution protects against the deprivation of life, liberty, or property without due process of law. U.S. Const. Amend. XIV.  To state a procedural due process claim, Plaintiffs must allege that they had a constitutionally-protected interest, and that they were deprived of that interest without due process of law.  *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990).

---

[6] Plaintiffs' claims for money damages under the Minnesota Constitution fails as a matter of law because there is no private right of action under the Minnesota Constitution. *See Riehm v. Engelking*, Civ. No. 06-293 (JRT/RLE), 2007 WL 37799 at *8 (D. Minn. Jan. 4, 2007) (unlike Section 1983, Minnesota has no statutory scheme providing for private actions based on violations of the Minnesota Constitution).

To the extent Plaintiffs' claims implicate procedural due process, a procedural due process claim is analyzed using a three-part balancing test.  *Matthews v. Eldridge*, 424 U.S. 319 (1976).  Under this test, a court considers whether the process adequately balances:  (1) the private interest; (2) the risk that the process will result in an erroneous deprivation of the private interest and the probable value of additional or substitute procedural safeguards; and (3) the State's interest.  *Id.* (citations omitted.)  The liberty and property interests of persons committed to state custody as dangerous persons are "considerably less than those held by members of free society."  *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

Due process requirements are flexible and specific to each particular situation. *Senty-Haugen*, 462 F.3d at 888.  "The most important mechanisms for insuring that due process has been provided are notice of the factual basis" leading to a deprivation and "a fair opportunity for rebuttal."  *Id.* (citing *Wilkinson v. Austin*, 545 U.S. 209 (2005)). Additionally, "[t]here is … a de minimus level of imposition with which the Constitution is not concerned."  *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979).

### 1.    There is no due process right to vocational work.

Plaintiffs' allegations regarding vocational work fail  to state an actionable claim because vocational work is not a fundamental right.  (Second Amend. Compl. pp. 53-55.) In order for Plaintiffs to have a viable due process claim, Plaintiffs must first show that they have a constitutionally protected liberty or property interest.  *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 626 (8th Cir. 1990), *cert. denied*, 498 U.S. 896 (1990). The Vocational Work Program at MSOP is governed by state law that strictly controls the

Program's finances and unlike commercial operations, MSOP does not operate as an "employer" in the traditional sense. *See Martin v. Benson*, 827 F. Supp. 2d 1022, 1029 (D. Minn. 2011). Vocational work assignments are based on a client's ability to perform a specific task and is also related to clients' treatment goals. (Figueroa Aff. ¶13, Ex. 12, pp. 2-3.) Plaintiffs have simply failed to allege facts supporting every Class Member's constitutionally-protected right to a certain wage or particular work assignment under federal law.

Nor does Minnesota law governing the vocational work program at MSOP create a fundamental right to employment or certain wages.[7] The statute gives the Commissioner discretion in setting the pay rate for vocational work participants and to deduct an amount of up to fifty percent from vocational wages to be used in making the program self-sufficient. Minn. Stat. § 246B.06, subd. 6 (2012). The statute does not mandate particular criteria to be used in vocational work assignments or wage deductions, other than a simple mathematical calculation, that implicates additional procedural due process protections. *Id.* Hence, Plaintiffs' claims concerning vocational work assignments and wage deductions should be dismissed.

---

[7] To the extent Plaintiffs rely on State law as creating a federally-protected interest, this allegation similarly fails because State law provides the Commissioner with discretion. As analyzed below under the subheading of Inadequate Treatment, federal due process claims based on the alleged violation of a state statute should be narrowly construed. *Strutton v. Meade,* 668 F.3d 549, 557 (8th Cir. 2012). A statute or regulation will give rise to a protected liberty or property interest when it contains particularized standards or criteria to guide decision makers and when it includes language mandating action and limiting agency discretion. *Jennings v. Lombardi*, 70 F.3d 994, 996 (8th Cir. 1995). The simple specification of a particular procedure does not create a Fourteenth Amendment liberty interest. *Williams v. Nix,* 1 F.3d 712, 717 (8th Cir. 1993) (citation omitted).

**2.      Plaintiffs have failed to state a due process claim regarding behavioral expectation reports.**

Plaintiffs allege that the disciplinary tool known as Behavioral Expectation Reports ("BER") violates their due process rights. (Second Amend. Compl. pp. 35-38.) But while Plaintiffs broadly claim that the BER disciplinary process is a "sham," Plaintiffs concede that they are provided with notice and the opportunity to be heard. (Second Amend. Compl. p. 37 ¶¶ 125-127.) Plaintiffs' only articulated criticism is that the hearing panel consists of "MSOP employees from various areas of treatment including clinical, security, and programming." *Id.* p. 37 ¶ 25. Lack of impartiality cannot be assumed simply because of internal administrative review. Plaintiffs do not allege any particular instance in which the hearing panel was biased. The MSOP behavioral expectations policy and handbook provide notice of acceptable behavior, disciplinary measures, and redress procedures for minor and major offenses that comply with procedural due process. (Figueroa Aff. ¶¶ 14-15, Exs. 13-14.) Plaintiffs' cannot survive a Motion to Dismiss based on the vague generality of potential bias. *Iqbal*, 129 S. Ct. at 1949 (conclusion not supported by factual content does not allow court to draw reasonable inference of misconduct alleged).

**3.      Plaintiffs have failed to state a due process claim regarding property limits.**

Plaintiffs' allegations concerning limitations on their property rights, computer access, and internet access are subject to dismissal. (Second Amend. Compl. pp. 51-52.) "No federal, state or local statute creates a property right for plaintiffs to possess computers and electronics, electronic toothbrushes, electronic fans, or unlimited amounts

of personal property and clothing." *Pyron*, 2011 WL 3293523 at *7 (quotation omitted).[8]

Consequently, if plaintiffs have no right to possess a computer, they have no right to

Internet access.  *Id.*  Indeed, under Minnesota law, the statutory rights of Plaintiffs and

class members to retain and use personal property may be reasonably limited to maintain

a safe, secure, and orderly therapeutic environment.  Minn. Stat. § 253B.185, subd. 7(b)

(2012).

Finally, all other alleged deprivations of Plaintiffs' property or liberty interests

implicating procedural due process rights cannot withstand a motion to dismiss because

clients are afforded adequate post-deprivation process and remedies.   Minn.

Stat. § 246B.03, subd. 3, establishes a grievance procedure for civilly committed sex

offenders to resolve their concerns and complaints.  *Pyron*, 2011 WL 3293523 at *7.

Moreover, Plaintiffs and Class Members may commence a state court action for claims

relating to property deprivations.   Thus, where a remedial process exists, neither

negligent nor intentional deprivations of their property or liberty interests will violate due

process. *Id.* (citing *Hudson*, 468 U.S. at 533.).

### B.     Plaintiffs Fail To Plead Violations Of Their Substantive Due Process.

In evaluating a substantive due process claim, courts first consider whether the

Plaintiff possessed a fundamental right arising under the Fourteenth Amendment, and

then determine whether Defendants' conduct deprived the Plaintiff of that right that was

"truly irrational … something more than … arbitrary, capricious, or in violation of state

---

[8] To the extent Plaintiffs allege a denial of access to the courts based on limited access to computers or a law library, this claim is not actionable because they fail to allege actual injury as a result of their limited access. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

law." *Creason v. City of Washington*, 435 F.3d 820, 824 (8th Cir. 2006) (quoting *Klein v. McGowan*, 198 F.3d 705, 710 (8th Cir. 1999) (internal quotation omitted); *Ganley v. Mpls. Park & Rec. Board*, 491 F.3d 743, 749 (8th Cir. 2007).   The Plaintiff must "articulate which fundamental right - one that is deeply rooted in this nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty not justice would exist if they were sacrificed - is at stake." *Ganley*, 491 F.3d at 749 (quotation omitted).

### 1.   Plaintiffs have failed to state a claim for inadequate treatment.

Plaintiffs allege in Count I that they have been denied their federal constitutional right to adequate treatment that provides them with a realistic opportunity for eventual release from civil commitment.  (Second Amend. Compl. pp. 61-63.)  But this is not the legal standard in the Eighth Circuit. *Strutton v. Meade,* 668 F.3d 549 (8th Cir. 2012).

*Strutton* involved a civilly committed sex offender who challenged the adequacy of his treatment.  The Eighth Circuit began its analysis by rejecting the approach adopted by other circuits-that the Fourteenth Amendment Due Process Clause requires states to provide civilly committed persons with mental health treatment that gives them a realistic opportunity to be cured and released. *Id.* (citations omitted).  Instead, the Court held that although "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." *Id.* (citing *Elizabeth M. v. Montenez,* 458 F.3d 779, 788 (8th Cir. 2006); *Bailey v. Gardebring,* 940 F.2d 1150, 1154 (8th Cir.

1991)).  The Court held that *Youngberg's* professional judgment standard does not apply to inadequate treatment claims and instead, such claims must be analyzed under the standard of whether the treatment offered was so arbitrary or egregious as to shock the conscience.  *Id.* at 557-58.  The *Strutton* court upheld the District Court's conclusion that while the treatment plaintiff received "may have been less than ideal, and perhaps inadequate by professional standards, it was not so lacking as to shock the conscience." *Id.* at 558.

Applying *Strutton,* Plaintiffs do not allege sufficient facts of arbitrary or egregious acts by any of the Defendants that rises to the level of conscience shocking conduct. Plaintiffs do not allege that they receive no treatment whatsoever.  To the contrary, Plaintiffs allege that they receive on average six hours of group therapy per week and one and one-half hours of psycho-educational modules per week.  (Second Amend. Compl. pp. 25-26 ¶ 88.)  Plaintiffs cite to the Legislator Auditor Report, which found that six hours of treatment is within the parameters of best practices, albeit on the "low end" as compared to other sex offender civil commitment programs.  *Id.* at p. 25 ¶ 87.  Plaintiffs' Second Amended Complaint therefore concedes that Plaintiffs are being offered a level of treatment that is within best practices.[9]  Applying the reasoning of *Sutton*, Plaintiffs own allegations fail to state an actionable claim because the treatment received is within established best practices.

---

[9] The Legislative Auditor Report goes further, stating that "MSOP's current model of treatment conforms to what current research suggests is most effective in reducing recidivism in sex offenders."  (Legislative Auditor Report, at 69 p. 57).  The Auditor Report further found that "the administration has taken client releases seriously … ." *Id.* at 83 p. 71.

Plaintiffs also cite to a recent evaluation of treatment phase progression at MSOP as a basis for alleging inadequate treatment.  (Second Amend. Compl. pp. 29-31.)  The MSOP Program Evaluation Team ("MPET") made findings and recommendations on several aspects of MSOP's treatment phase progression.  [Doc. No. 294-1.]  The MPET, however, did not specifically find that MSOP's treatment program is inadequate as compared to other sex offender treatment programs in the country or that the treatment provided was below best practices in the field.  *Id.*  While the MPET found that 30% of individuals in Phase I of a three-phase program were incorrectly placed, the MPET had no similar findings for clients in Phases II and III.  *Id.* p. 4.  In fact, the MPET found overall "that MSOP has followed their policies with respect to appropriate phase placement."  *Id.*  There are no factual findings in the MPET report supporting Plaintiffs' contention that the treatment provided at MSOP "shocks the conscience" and is therefore constitutionally inadequate.

Similarly, Plaintiffs' citation to the Minnesota Sex Offender Program Site Visit Report dated December 27, 2012 [Doc. No. 294-3.] lends no support for their inadequate treatment claim.  The MSOP Site Visit Report does not find or conclude that MSOP's treatment program is fundamentally inadequate.  To the contrary, the Site Visit Report

CASE 0:11-cv-03659-DWF-JJK   Document 331   Filed 09/09/13   Page 26 of 39

states that "the Program employs methods that have been consistently demonstrated to be effective with clients" and that "the treatment environment is safe, secure, and therapeutic." *Id.* pp. 8, 12.[10]

Plaintiffs' contention that no one has ever been fully discharged from the Program is also not an adequate basis to support their treatment claim. As held in *Strutton*, Plaintiffs and class members do not have a federally protected right to treatment that gives them an opportunity for eventual release. 668 F.3d at 557. In any event, while MSOP can make recommendations, none of the Defendants ultimately control who is released from the Program. Pursuant to Minnesota Statutes, Plaintiffs and Class Members can petition a Special Review Board for a reduction in custody that includes transfer to MSOP's Community Preparation Services ("CPS"), provisional discharge or full discharge from civil commitment. Minn. Stat. § 253B.19 (2012). The petitioner may further appeal a denial of his petition to a panel of three State Court judges who hold an evidentiary hearing and review the petition *de novo*. *Id.* Plaintiffs' claim regarding discharge does not discriminate between the Department, the Special Review Board, and the Judiciary's respective roles and fails to describe why the lack of provisionally

---

[10] Plaintiffs further allege that there is no sex offender-specific treatment provided in Phase I of the Program. (Second Amend. Compl. p. 22 ¶ 78.) But Plaintiffs do not allege that they are not provided with any sort of treatment whatsoever in Phase I and in fact there is behavioral treatment provided. Lack of sex offender-specific treatment in Phase I does not raise constitutional concerns because there exists no constitutional right to precisely tailored psychiatric treatment. *See Bailey v. Gardebring*, 940 F.2d 1150, 1155 (8th Cir. 1991) (holding that civilly committed person did not have a constitutional right to precisely tailored psychiatric treatment for pedophilia).

discharged clients, even if conscience shocking, is attributable solely to these named Defendants.

Plaintiffs' bare assertion that treatment staff are underqualified or unqualified to provide treatment is also insufficient to survive a motion to dismiss.  The federal constitution only requires such minimally adequate training that may be reasonable in light of the liberty interest in freedom from unreasonable restraint.  *Bailey v. Gardebring*, 940 F.2d 1150, 1154 (8th Cir. 1991).  More importantly, Plaintiffs themselves allege that as of 2010, MSOP requires new clinicians to "have master's degrees and be licensed or licensure-eligible."  (Second Amend. Compl. p. 27, ¶ 92.)  Taking this assertion as true, Plaintiffs have failed to state an actionable claim.  Plaintiffs also allege that their inadequate treatment claim is supported in some way by the lack of accreditation, but "[a]ccredidation by itself . . .  is not a litmus test for the constitutionality of the practices at the [MSOP]".  *Hargett v. Adams*, No. 02C1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005).

In Count II, Plaintiffs assert an inadequate treatment claim in violation of state law.  Plaintiffs claim for violation of their state statutory right to adequate treatment is not actionable under § 1983.  Plaintiffs do not have a remedy in federal court for violation of state law.  *See Alexander v. Petter*, 993 F.2d 1348, 1349 (8th Cir. 1993) (While § 1983 provides a remedy for violation of federal law, the Constitution does not provide a remedy for abuses of State power that do not violate Federal law).  The Eleventh Amendment similarly precludes money damages and injunctive relief against Defendants

for violation of state law.[11]   *See Pennhurst State Sch. Hosp. v. Halderman,* 465 U.S. 89, 106 (1984).  Hence, Count II should be dismissed.

> **2.     Plaintiffs have not stated an actionable constitutional violation relating to educational opportunities, inadequate meals, and double bunking.**

Plaintiffs' allegation that they are denied educational opportunities fails because Plaintiffs have no fundamental right to an education while in state custody. *See Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992).  Despite this, MSOP offers adult basic educational programs to all MSOP clients and offers the opportunity to obtain post-secondary education to those clients preparing for reintegration into society. (Figueroa Aff. ¶ 16, Ex. 15.)   Plaintiffs' Second Amended Complaint does not sufficiently allege or articulate why this policy is unconstitutional.  Similarly, Plaintiffs' allegation that they are deprived of adequate meals does not rise to the level of a constitutional violation.  Plaintiffs are entitled to be free from inhumane treatment and be provided with the basic necessities of life.  *See Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 215 (8th Cir. 1974).  But Plaintiffs have not alleged facts supporting a claim of inadequate diet, *Martin v. Sargent*, 780 F.2d 1334, 1338 8th Cir. 1985, or that the alleged nutritionally inadequate diet presented an immediate danger to their health or that their health suffered as a result of the food.  *Wishon*, 978 F.2d at 449.  Again, Plaintiffs' mere generalities are not constitutionally actionable under the standards recognized by this Circuit. *Iqbal,* 129 S. Ct. at 1949.

---

[11] This analysis applies to all claims for violations of State statute or common law.

Plaintiffs' allegation of unconstitutional double-bunking should be dismissed because the practice of double-bunking has been held to be constitutional.  *See Rhodes v. Chapman*, 452 U.S. 337, 346, 348-49 (1981) (concluding that double-celling amounts "[a]t most … to a theory that double celling inflicts pain," but not that it constitutes the "unnecessary and wanton infliction of pain.").  The Eighth Circuit, relying on *Rhodes*, similarly concluded that double-bunking did not amount to a constitutional violation as it did not evince a "wanton and unnecessary infliction of pain."  *Cody v. Hillard,* 930 F.2d 912, 914 (8th Cir. 1987).[12]

### 3.    Plaintiffs do not plead a constitutional claim for punishment.

In Counts III and V, Plaintiffs in essence claim that restrictions contained in various MSOP policies amount to unconstitutional punishment.  Plaintiffs' claims should be dismissed because they fail to allege that a fundamental constitutional right was violated or that any alleged conduct was so conscience-shocking as to be unconstitutional punishment.

"The Fourteenth Amendment guarantees substantive due process, which prevents the government from engaging in conduct that shocks the conscience or otherwise offends judicial notions of fairness, or is offensive to human dignity."  *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002) (quotation omitted).  "To establish a violation of

---

[12] Plaintiffs make the general assertion that there have been instances of violence among roommates and cite two specific instances in their Second Amended Complaint.  But these two instances do not support a viable claim of deliberate indifference to a *pervasive risk of harm* caused by or linked to double bunking.  *See Rhodes,* 452 U.S. at 347 (absent evidence "double celling" increased prison violence, not the type of deprivation evincing a desire to inflict wanton and unnecessary pain).

substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the "contemporary conscience."" *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007).

As a general matter, substantive due process is concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice of sadism rather than merely careless or unwise excess of zeal that amounted to brutal and inhumane abuse of official power that literally shocks the conscience. *Moran*, 296 F.3d at 647. "Conduct intended to injure in some way unjustifiable by *any* government interest is the sort of official action most likely to rise to the conscience-shocking level." *Norris*, 494 F.3d at 638 (emphasis added) (quotation omitted). Plaintiffs must allege that MSOP's policies are "truly irrational, that is something more than arbitrary, capricious, or in violation of state law." *Creason v. City of Washington*, 535 F.3d 820, 824 (8th Cir. 2006) (quotation omitted).

Here, the Defendants are permitted by Minnesota law to limit the statutory rights of civilly committed individuals "to maintain a therapeutic environment or the security of the facility or to protect the safety and well-being of patients, staff, and the public." Minn. Stat. § 253B.185, subd. 7(a). Limitations are permitted in the areas of personal privacy, private communications, personal-financial management, visitation, and group participation. *See* Minn. Stat. § 253B.185, subd. 7(b). As described above, the limitations and restrictions placed on Plaintiffs and Class Members at MSOP, a secure treatment facility, are reasonably related to MSOP's interests in maintaining a safe,

orderly, contraband-free, therapeutic environment.  *See Pyron*, 2011 WL 3293523 at *8. Other than conclusory assertions, Plaintiffs fail to allege sufficient facts to support a claim of unconstitutional conditions of confinement.

### C.     Inadequate Medical Treatment.

Plaintiffs' bald assertion that there are delays in filling prescriptions or in obtaining over-the-counter medications because MINNCOR is the exclusive provider fails to state an actionable claim because there are no particular allegations that any of the Defendants actually knew of a serious medical risk and deliberately disregarded that risk. *See Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006) (In pleading inadequate medical care, Plaintiff must show he suffered an objectively serious medical need that Defendants knew about and deliberately disregarded).   In the same vein, Plaintiffs' allegation that they are not provided with necessary insulin and other diabetic management care that allegedly has caused "suffering lasting negative effects" (Second Amend. Compl. p. 50 ¶ 167) fails to make a causal and plausible link between the Defendants and the alleged violation.   Consequently, these claims should be dismissed with prejudice.

### D.     Less Restrictive Alternatives.

In Count IV, Plaintiffs allege that they are not provided with less restrictive alternatives to MSOP's secure treatment facility in violation of the Fourteenth Amendment.   (Second Amend. Compl. pp. 67-68.)   This claim fails as a matter of law because there exists no "federal constitutional right to treatment in a least restrictive alternative setting."   *Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 and n. 5 (5th Cir. 1987).

Similarly, there is no right under Minnesota law requiring that commitment of sex offenders be made to the least-restrictive treatment program. *In re Senty-Haugen*, 583 N.W.2d 266, 269 (Minn. 1998) (holding that persons committed as a sexual psychopathic personality or sexually dangerous person had no statutory right to receive treatment in a less-restrictive program).

Moreover, as demonstrated above, Plaintiffs and Class Members who are already civilly committed have the ability to petition for a reduction in custody to a less restrictive alternative that includes transfer to CPS or a provisional or full discharge from civil commitment, which petitions are decided by a panel of Minnesota district court judges. Minn. Stat. § 253B.19 (2012). Thus, Plaintiffs have failed to state an actionable claim concerning the alleged denial of less restrictive alternatives to commitment at the MSOP secured facility.

## VII. MINNESOTA STATUTES CHAPTER 253B IS NOT UNCONSTITUTIONAL AS APPLIED.

In Count IX, Plaintiffs make the broad claim that Minnesota Statutes chapter 253B is punitive as applied because of inadequate treatment and its inconsistent application across various geographic locations. But this type of claim has been rejected by both the Minnesota Supreme Court and the U.S. Supreme Court.

In *In re Blodgett*, 510 N.W.2d 910 (Minn. 1994), the Minnesota Supreme Court held that the Civil Commitment Act did not violate either substantive due process or equal protection because the government has a compelling interest in the protection of members of the public from persons who have an uncontrollable impulse to sexually

assault. *Id.* at 914. The court further held that even when treatment is problematic, and it often is, the state's interest in the safety of others is no less legitimate and compelling. *Id.* The U.S. Supreme Court in *Kansas v. Hendricks*, 521 U.S. 346 (1997), ruled that the Kansas Sexually Violent Predator statute addressed the permissible civil purpose of public protection and rejected the claim that such confinement was a punitive purpose. *Id.* at 361, 363. The Court also noted that civil commitment statutes may permit indefinite detention, and such statutes do not necessarily need to provide access to treatment, whether or not those committed are amenable to treatment. *Id.* at 363, 366.

The U.S. Supreme Court revisited the principles of *Hendricks* in *Seling v. Young*, 531 U.S. 250 (2001). The issue in *Seling* was, in a double jeopardy challenge, whether civil commitment statutes may be challenged "as applied." The *Seling* court held that the statutory language in the civil commitment statutes is the only basis for determining whether there is punitive detention. The court rejected the "as applied" approach, stating that implementation of civil commitment statutes is immaterial to whether such commitment is punitive detention. *Id.* The civil nature of a confinement scheme cannot be altered based merely on vagaries in the implementation of the authorizing statute. *Id.* at 263.

Applying the above, Plaintiffs' claim that chapter 253B as applied is punitive because of inadequate treatment not leading to release is not actionable. As *Blodgett and Hendricks* indicate, these concerns are not enough to transform indefinite civil commitment into punitive detention. Additionally, initial civil commitment and reduction in custody statutes provide procedural protections and the opportunity for civil

committees to petition for release upon showing that the person is no longer in need of treatment and no longer a danger to the public. *See e.g.* Minn. Stat. §§ 253B.07, 253B.19, 253B.185.

Plaintiffs further allege that Minnesota Statutes chapter 253B violates the Equal Protection Clause of the Fourteenth Amendment, as applied, based primarily on variations in civil commitment rates across the State.   (Second Amend. Compl. pp. 79-80.)  Plaintiffs, however, have not sued the proper parties on this claim because the Defendants have no authority or control over initial civil commitment.  Under Minn. Stat. § 253B.185, civil commitment proceedings are initiated by the county attorney for the county in which the patient is present or where the conviction for which the person is incarcerated was entered if in the custody of the Commissioner of Corrections. *Id.*, subd. 1(b).  Upon filing, the district court shall commence civil commitment proceedings that includes the appointment of counsel and examiners.   Minn. Stat. § 253B.18, subd. 1(a).  The Defendants in this case have not enacted this statute and are not involved in the initial civil commitment process of sex offenders.  Consequently, Plaintiffs cannot seek equitable relief for an alleged invalid statute against Defendants in their official capacities. *See Frank v. Relin*, 1 F.3d 1317, 1327 (2nd Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989).  Moreover, Plaintiffs make no allegations as to why Defendants are personally liable for damages when they have no involvement in who gets committed to the MSOP program.

In any event, in order to prevail on an equal protection claim, Plaintiffs must show that the treatment they received was different from others who are similarly situated.

*Bogren v. Minnesota,* 236 F.3d 399, 408 (8th Cir. 2000).  Absent a threshold showing that plaintiffs are similarly situated to those who allegedly receive favorable treatment, Plaintiffs do not have a viable equal protection claim.  *Beaulieu v. Ludeman*, Civ. No. 07-CV-1535 (JMR/JSM), 2008 WL 2498241 at *1, 12 (D. Minn. Jun. 18, 2008) (quotation omitted).

Here, Plaintiffs' equal protection claim based on differences in civil commitment rates across the State fails to state a cognizable claim.  Plaintiffs fail to allege facts as to how persons civilly committed in different counties of the State under chapter 253B are all similarly situated for equal protection purposes.  *See Beaulieu*, 2008 WL 2498241 at *12 ("Absent a threshold showing that Plaintiffs are similarly situated to those who allegedly receive favorable treatment, Plaintiffs do not have a viable equal protection claim.").  Plaintiffs also fail to explain why there could or should be absolute consistency in the rates of commitment across counties.  Even if similarly situated, Minnesota's civil commitment statute sets the same standards applicable state-wide for civil commitment of a proposed sexual psychopathic personality or sexually dangerous person.  *See* Minn. Stat. §§ 253B.18; 253B.185 (2012).  Also, again, it is Minnesota district court judges who apply these statutory standards and decide commitment – not any of the Defendants in this case.

## VIII. PLAINTIFFS HAVE NOT ALLEGED A VIOLATION OF COURT ORDERED TREATMENT.

Plaintiffs' claim that the Defendants are violating their right to court-ordered treatment fails to state a viable claim for two reasons.[13]   First, a section 1983 claim cannot be maintained for violation of state law, policy, or a court order.  *Marler v. MO St. Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996); *Sullivan Treleven v. Univ. of Minn.*, 73 F.3d 816, 819 & n.4 (8th Cir. 1996).  Second, as demonstrated above, Plaintiffs do not have a fundamental right to adequate treatment that provides them with a realistic opportunity for release.  *Strutton*, 68 F.3d at 557-58.  Hence, this claim should be dismissed with prejudice.

## IX. THERE WAS NO BREACH OF CONTRACTS BY DEFENDANTS.

Plaintiffs' claim for breach of the consent form they signed to participate in treatment fails to state an actionable claim.  As demonstrated above, Plaintiffs themselves allege they are receiving treatment at the "low end" of best practices.  Additionally, there is no breach of contract because the consent form does not guarantee discharge from civil commitment upon achieving specified goals.  (Fig. Aff. ¶ 25, Exs. 24-36.)  Indeed, the consent form provides that a client who agrees to participate in sex offender treatment will be offered treatment so long as they are a client of MSOP.  *Id.*  The consent form also makes clear that treatment progression is based on demonstrating a reduced risk to

---

[13] As stated above, the Eleventh Amendment precludes imposing money damages and injunctive relief against Defendants for violation of State law.  *See Pennhurst*, 465 U.S. at 106.   For the sake of completeness, however, the Defendants are substantively responding to Plaintiffs' state law claims.

the public.  The consent form does not promise any particular outcome.  Hence, this claim is not actionable.

## X.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

Plaintiffs assertion that Defendants (except for Defendant Zimmerman) tortiously interfered with Plaintiffs' consent to treatment also fails.  Under Minnesota law, there are five elements to this claim:  "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.   The burden of proving sufficient justification for interference is upon the Defendant." *Furlev Sales and Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982) (citation omitted).

In this case, the MSOP consent to treatment form signed by clients who wish to participate in treatment is between the clients and the State.  A suit against Defendants in their official capacities is in effect one against the State.  *Edelman*, 415 U.S. at 663. (Second Amend. Comp. pp 83-84 ¶¶ 99-100.)  Because the contract at issue is with the State, Plaintiffs have failed to state a claim because a party cannot interfere with its own contract.  *See Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505-06 (Minn. 1991).   Tortious interference requires that the interfering party be a "third party." *See Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361, (Minn. 1998).   Consequently, Plaintiffs' reliance on tortious interference with an existing contract fails as a matter of law.

To the extent that Plaintiffs allege that these Defendants in their official capacities acted outside of the scope of their responsibilities, this claim also fails to state an actionable claim. Plaintiffs make no allegations about how Defendants acted outside the scope of their duties with respect to this claim. *Nordling*, 478 N.W.2d at 506.

## XI.   QUALIFIED IMMUNITY.

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). The two prongs of the qualified-immunity test-violation of a constitutional or statutory right and the clear establishment of that right at the time of the alleged misconduct-may be addressed by the court in either order. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

Here, and as demonstrated above, Plaintiffs have failed to state an actionable claim against the Defendants for violation of their constitutional rights. Consequently, the Defendants are entitled to qualified immunity, and the court need not consider whether any of the alleged rights were clearly established at the time of the purported violation. *See Johnson*, 658 F.3d at 827 (determination of whether right was clearly established unnecessary when no violation occurred.)

## CONCLUSION

For the forgoing reasons, Defendants respectfully ask this Court to dismiss Plaintiffs' Amended Complaint with prejudice for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

Dated:  September 9, 2013         Respectfully submitted,

s/**Ricardo Figueroa**

RICARDO FIGUEROA
Assistant Attorney General
Atty. Reg. No. 0282224
Attorney for Defendants

STEVEN H. ALPERT
Assistant Attorney General
Atty. Reg. No. 0001351
Attorney for Defendants

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone:  (651) 757-1233
TTY: (651) 296-1410
Fax:  (651) 282-5832
Email:  ricardo.figueroa@ag.state.mn.us