| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld, and all others similarly situated, | Civil No. 11-3659 (DWF/JJK) |

Plaintiffs,

v.

**MEMORANDUM**
**OPINION AND ORDER**

Lucinda Jesson, Dennis Benson, Kevin
Moser, Tom Lundquist, Nancy Johnston,
Jannine Hébert, and Ann Zimmerman,
in their individual and official capacities,

Defendants.

---

Daniel E. Gustafson, Esq., David A. Goodwin, Esq., Karla M. Gluek, Esq., and Raina Borrelli, Esq., Gustafson Gluek PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Ricardo Figueroa, Steven H. Alpert, and Max H. Kieley, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

Eric S. Janus, Esq., William Mitchell College of Law; and Teresa J. Nelson, Esq., ACLU of Minnesota, counsel for Amici Curiae.

---

## INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Declaratory Judgment

(Doc. No. 360), Plaintiffs' Motion for Preliminary Injunction to Provide Less Restrictive

Alternative Treatment Facilities and to Re-Evaluate Class Members (Doc. No. 364),

Plaintiffs' Motion for Preliminary Injunction for the Appointment of a Special Master to

Oversee the Minnesota Sex Offender Program (Doc. No. 368), and Defendants' Motion

to Dismiss Plaintiffs' Second Amended Complaint (Doc. No. 374).  For the reasons set

forth below, the Court grants Defendants' motion to dismiss only with respect to Count X

and denies Defendants' motion in all other respects; the Court denies Plaintiffs' motions

without prejudice at this early stage of the proceedings.[1]

## BACKGROUND

The fourteen named Plaintiffs in this matter are all civilly committed to the

Minnesota Sex Offender Program ("MSOP").  According to Plaintiffs, "MSOP is

intended to be a treatment facility," and "[a]ll persons civilly committed as SPP[2] or SDP[3]

---

[1]      The Court's concluding remarks may also be found below.  *See infra* Conclusion.

[2]      The "Minnesota Commitment and Treatment Act:  Sexually Dangerous Persons and Sexual Psychopathic Personalities" defines a sexual psychopathic personality ("SPP") as:
> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

Minn. Stat. § 253D.02, subd. 15 (formerly Minn. Stat. § 253B.02, subd. 18b).

[3]      The "Minnesota Commitment and Treatment Act:  Sexually Dangerous Persons and Sexual Psychopathic Personalities" defines a sexually dangerous person ("SDP") as:
> a person who:  (1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other

(Footnote Continued on Next Page)

enter the MSOP treatment program." (Doc. No. 301, Second. Am. Compl. ¶ 67.) The

commitment rate, policies, and standards for commitment for sex offenders in Minnesota

have changed over time. *See Thompson v. Ludeman*, Civ. No. 11-1704, Doc. No. 39

("*Thompson* R&R") at 35-39 (providing a comprehensive history of sex offender civil

commitment in Minnesota). And the population of MSOP clients has grown dramatically

since the program's inception.[4] *See id.*; (Second Am. Compl. ¶ 65.)

　　As alleged in the Complaint,[5] "[t]he only MSOP facilities are the secure treatment

locations at Moose Lake and St. Peter," and "MSOP does not provide for any less

restrictive alternatives to confinement at Moose Lake or St. Peter, such as halfway houses

or other less secure facilities." (Second Am. Compl. ¶ 68.) Plaintiffs allege, and

Defendants do not dispute, that "only two MSOP patients ha[ve] ever been placed on any

---

(Footnote Continued From Previous Page)

　　　　mental disorder or dysfunction; and (3) as a result, is likely to engage in
　　　　acts of harmful sexual conduct as defined in subdivision 8.
Minn. Stat. § 253D.02, subd. 16 (formerly Minn. Stat. § 253B.02, subd. 18c).

[4]　　　Relying on the Legislative Auditor's Report, Plaintiffs' Complaint alleges:
　　　　The population of people civilly committed to the MSOP has grown
　　　　dramatically since the program was started. In 1990, there were fewer than
　　　　thirty patients civilly committed as sex offenders. Legislative Auditor
　　　　Report at 4. That number grew to 149 in 2000 and to 575 in 2010. *Id.* The
　　　　Legislative Auditor Report projected that in 2020, there will be 1109 people
　　　　civilly committed to the MSOP based on the current growth trend in
　　　　commitments. *Id.*
(Second Am. Compl. ¶ 65 (citation formatting added).) According to Defendants,
"MSOP currently has 698 clients . . . ." (Doc. No. 385, Hébert Aff. ¶ 5.)

[5]　　　Throughout this opinion, the Court refers to Plaintiffs' Second Amended
Complaint (Doc. No. 301) as the "Complaint."

kind of provisional discharge" and that Defendants have "never unconditionally released anyone committed to MSOP." (*Id.* ¶¶ 114, 207, 323.) Based on these allegations, among others, Plaintiffs raise several challenges to MSOP and the Minnesota statutes governing civil commitment and treatment of sex offenders, Chapter 253B (recodified as Chapter 253D).

## I. Relevant History

In March 2011, the Office of the Legislative Auditor for the State of Minnesota ("OLA") issued an Evaluation Report on the Civil Commitment of Sex Offenders. (Office of the Legislative Auditor, State of Minnesota, Evaluation Report: Civil Commitment of Sex Offenders (2011) ("OLA Report"), *available at* http://www.auditor.leg.state.mn.us/ped/pedrep/ccso.pdf.) Plaintiffs' Complaint relies heavily on the findings of the OLA Report. (*See generally* Second Am. Compl. ¶¶ 57-209.) The summary of the findings of the OLA included that: "Minnesota's population of civilly committed sex offenders has grown significantly in the last decade and is the highest in the nation on a per capita basis"[6] (OLA Report at x); "[t]he costs of

---

[6]      The OLA Report further stated:
From 1990 to 2000, Minnesota's population of civilly committed offenders grew from less than 30 to 149. As of January 1, 2011, the number has grown to 656, including 605 at DHS facilities and 51 at Minnesota correctional facilities. In 2010, Minnesota had more civilly committed sex offenders than every state except California and Florida. In addition, Minnesota had by far the largest number of civilly committed sex offenders per capita in the country. Current projections indicate that, under current policies, significant growth is likely in the future. According to DHS, the number of civilly committed sex offenders at DHS facilities is expected to nearly double between 2010 and 2020.

(Footnote Continued on Next Page)

civil commitment in MSOP are high relative to incarceration and other alternatives"[7]

(*id.*); "[t]here is considerable variation in commitment practices, particularly among

prosecutors" (*id.* at xi); "Minnesota lacks reasonable alternatives to commitment at a high

security facility" (*id.*); "[w]ith the large influx of commitments since 2003, MSOP has

struggled to provide adequate treatment and maintain a therapeutic environment,

particularly at its Moose Lake facility"[8] (*id.* at xii); and "[n]o civilly committed sex

offender has ever been discharged from MSOP"[9] (*id.*).

---

(Footnote Continued From Previous Page)

(OLA Report at 1; *see also* Second Am. Compl. ¶ 65 (citing OLA Report at 4).)

[7]   According to the OLA Report, the "annual cost per resident in MSOP is $120,000,"
which is "at least three times the cost of incarcerating an inmate at a Minnesota
correctional facility."  (OLA Report at x.)

[8]   In that regard, the OLA Report found, among other things, that:
      Outside advocates and experts, MSOP clients, and some MSOP staff have
      complained that, historically and currently:  (1) some MSOP staff held
      disrespectful, negative, punitive, and untherapeutic attitudes towards
      clients; and (2) that the culture at the facilities was counter-therapeutic.  In
      our review of the records of clients who had been in the program for at least
      four years, we found evidence that clients were sometimes treated with
      suspicion, their reasonable frustrations were considered treatment problems,
      and they were sometimes punished for behavior that appeared to be normal.
      Under some past MSOP administrations, the program focused so much on
      client behaviors that any infraction could result in a client failing to
      progress or being sent backwards in treatment.  The program still struggles
      with staff who are overly suspicious of clients or who expect impossible
      perfection.  This can make progress in treatment difficult.
(OLA Report at 66.)

[9]   The OLA Report also noted that:  "Minnesota has a release standard for offenders
who are civilly committed that, in practice, is stricter than other states.  MSOP does not
(Footnote Continued on Next Page)

On July 24, 2012, this Court certified a class in this matter pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of "[a]ll patients currently civilly committed" to MSOP (together, "Plaintiffs" or the "class members"). (Doc. No. 203 at 11.)  The Court appointed the fourteen named Plaintiffs to serve as class representatives.  (*Id.* at 12.)

On August 15, 2012, the Court ordered that the Minnesota Department of Human Services ("DHS") Commissioner, Lucinda Jesson, create a Sex Offender Civil Commitment Advisory Task Force (the "Task Force") to "examine and provide recommended legislative proposals to the Commissioner" on each of the following topics:  (1) "[t]he civil commitment and referral process for sex offenders"; (2) "[s]ex offender civil commitment options that are less restrictive than placement in a secure treatment facility"; and (3) "[t]he standards and processes for the reduction in custody for civilly committed sex offenders."  (Doc. No. 208 at 2.)  The Task Force issued its final recommendations on December 2, 2013.  (Sex Offender Commitment Advisory Task Force, Final Report (2013) ("Task Force Report"), *available at* https://edocs.dhs.state.mn.us/lfserver/Public/DHS-6641B-ENG.)

On November 9, 2012, the Court ordered Commissioner Jesson to create an MSOP Program Evaluation Team ("MPET" or the "Evaluation Team") to "review the

---

(Footnote Continued From Previous Page)

support any discharges without completion of the treatment program.  Most states explicitly allow for discharges if an offender no longer meets the commitment criteria." (OLA Report at xii.)

treatment records of clients who have been participating for at least 36 months in a treatment phase and who have not yet advanced to the next treatment phase." (Doc. No. 275 ¶ 3.) The Evaluation Team was further tasked with determining "the need, scope, and frequency of any future MSOP treatment program evaluation." (*Id.* ¶ 5.) The Court appointed five individuals to serve as MPET members on December 13, 2012. (Doc. No. 281 at 2.) The Evaluation Team filed its Report with the Court on April 26, 2013. (Doc. No. 294-1, Report on the Evaluation of Treatment Phase Progression at the Minnesota Sex Offender Treatment Program (MSOP) ("MPET Report").)

The parties engaged in settlement negotiations throughout 2012 and 2013 without result.[10] On August 8, 2013, Plaintiffs filed a Second Amended Complaint in this matter. (*See generally* Second Am. Compl.)

On August 1, 2013, DHS issued a request for proposals for the development of "less restrictive but highly supervised placements for individuals who would be provisionally discharged after having been initially committed to a secure treatment

_____

[10]       During the 2013 legislative session, Senator Kathy Sheran introduced a bill, Senate File 1014, which included some provisions that would have implemented initial Task Force recommendations. SF 1014, 88th Leg., 2d Engrossment (Minn. 2013-2014), *available at* https://www.revisor.mn.gov/bills/text.php?number=SF1014&version=2&session=ls88&session_year=2013&session_number=0; (*see* Jesson Aff. ¶¶ 9-10.) While the bill passed the full Senate on May 14, 2013, with bipartisan support, the bill did not become law because the companion bill in the House of Representatives (House File 1139), authored by Representative Tina Liebling, did not pass the full House. (*See* Jesson Aff. ¶ 10); *SF 1014 Status in the Senate for the 88th Legislature (2013-2014)*, Minn. State Leg., https://www.revisor.mn.gov/bills/bill.php?b=senate&f=SF1014&ssn=0&y=2013.

facility." (Doc. No. 387, Jesson Aff. ¶ 16, Ex. C; *see* Doc. No. 367, Gustafson Aff. ¶ 3, Ex. A.)

On September 12, 2013, Commissioner Jesson sent a letter to state legislators identifying "a small group of [MSOP] clients who are low functioning and could be transferred to an existing DHS site" in Cambridge, Minnesota, which she expected "to become available in the spring of 2014 for use by MSOP later in 2014." (*See* Doc. No. 341 at 2 (quoting Jesson letter).)[11]

On November 13, 2013, Governor Mark Dayton directed that Commissioner Jesson "oppose any future petitions by sexual offenders for provisional release" and "suspend [DHS's] plans to transfer any sexual offenders to other tightly supervised facilities, such as Cambridge," until after the following conditions have been met:

> 1.    The Sex Offender Civil Commitment Advisory Task Force has issued its findings and recommendations . . . .
> 2.    The legislature in 2014 has had the opportunity to review existing statutes and make any necessary revisions to protect the public's safety:  the degrees of criminal sexual misconduct, the penalties for those crimes, the civil commitment of sexual offenders for extended treatment, the requirements for discharge, and the subsequent services, supervision, and public protection.  None of [DHS's] programs cited above [including

_____

[11]    Commissioner Jesson announced that she would recommend that the Supreme Court Appeals Panel ("SCAP") approve the transfer of six individuals with intellectual disabilities from MSOP's Moose Lake facility to the Minnesota Specialty Health System facility in Cambridge, Minnesota.  *See* Rupa Shenoy, *Some Sex Offenders Could Go to Less Secure Setting*, MPR News (Sept. 12, 2013), http://www.mprnews.org/story/2013/09/12/sex-offenders-could-go-to-less-secure-setting; *see also* Brad Schrade, *State Seeks to Move Some Sex Offenders to Less Secure Setting*, Star Trib. (Sept. 12, 2013), http://www.startribune.com/local/223495201.html ("Minnesota's sex-offender treatment program plans to move as many as a dozen low-functioning and ailing offenders from its high-security treatment campuses to a lower-security facility in Cambridge next year if the state receives court approval.").

provisional releases from MSOP] will resume until after the legislature has completed its work during the upcoming legislative session.

3.    The legislature and our administration have agreed to the additional facilities, programs, and staff necessary for this program's successful implementation and have provided sufficient funding for them.

(Doc. No. 371 ("Gustafson Aff. II") ¶ 4, Ex. B at 2-3; Jesson Aff. ¶ 19, Ex. D ("Dayton Letter") at 2-3.)

On December 6, 2013, the Court appointed four experts pursuant to Rule 706 of the Federal Rules of Evidence. (Doc. No. 393 at 1-2.) Thereafter, the parties submitted their respective proposals with respect to the work of the experts. (Doc. No. 421.) On January 22, 2014, the Court met with the experts, and on February 5, 2014, the Court received the experts' proposed plan of action. (Doc. No. 422.) The Court will address the responsibilities of the experts below.

## II.    Plaintiffs' Claims

Plaintiffs' Complaint asserts the following thirteen counts against Defendants: (1) Failure to Provide Treatment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (2) Failure to Provide Treatment in Violation of the Minnesota Civil Commitment and Treatment Act; (3) Denial of Right to be Free from Punishment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (4) Denial of Less Restrictive Alternative Confinement in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (5) Denial of Right to Be Free from Inhumane Treatment in Violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (6) Denial of the Right to

Religion and Religious Freedom in Violation of the First and Fourteenth Amendments to the United States Constitution; (7) Unreasonable Restriction of Free Speech and Free Association in Violation of the First Amendment to the United States Constitution and the Minnesota Constitution; (8) Unreasonable Searches and Seizures in Violation of the Fourth Amendment to the United States Constitution and the Minnesota Constitution; (9) Minnesota Statute § 253B is Unconstitutional As Applied; (10) Minnesota Statute § 253B Violates the Equal Protection Clause of the Fourteenth Amendment As Applied; (11) Violation of Court Ordered Treatment; (12) Breach of Contract by Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert; and (13) Tortious Interference with Contract and Intentional Violation of Minn. Stat. § 253B.03, subd. 7 by Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert.  (Second Am. Compl. ¶¶ 211-325.)

Defendants now move to dismiss, and Plaintiffs seek various forms of injunctive and declaratory relief.

## DISCUSSION

## I.      Motion to Dismiss

Defendants move for the dismissal of Plaintiffs' Complaint for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.  (Doc. No. 374 at 1-2.)  Defendants assert that, because Plaintiffs have failed to state a viable claim under 42 U.S.C. § 1983, Defendants are entitled to qualified immunity.  (*Id.* at 2.)

**A.     Legal Standard**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## B.    Plaintiffs' Claims

The Court evaluates each of Plaintiffs' thirteen claims in turn below.

### 1.    Claims Pertaining to Punitive Nature of Confinement

At the heart of Plaintiffs' Complaint in this action is the contention that Minnesota's civil commitment scheme for sex offenders constitutes a punitive system of preventive detention in violation of the due process requirements of the Fourteenth Amendment.  Plaintiffs assert several substantive due process claims in that regard. Repeatedly throughout their Complaint, Plaintiffs claim that due process requires "that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed," and that, while "[c]ivilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives," those restrictions must not be "tantamount to punishment as determined by reasonable professional judgment." (*E.g.*, Second Am. Compl. ¶¶ 228, 250.)  Plaintiffs maintain that "[c]onfinement that continues after the person no longer meets the statutory requirements for commitment violates due process." (*E.g.*, *id.* ¶ 250.)

With respect to Counts III, IV, and V, Plaintiffs contend that Defendants have violated the Fourteenth Amendment by denying Plaintiffs their substantive due process rights to less restrictive alternative confinement and to be free from punishment and

inhumane treatment. Count IX sets forth Plaintiffs' claim that the commitment statutes are unconstitutional as applied.[12]

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotation omitted); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (noting that the Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government") (internal quotation omitted). Indefinite commitment to MSOP unquestionably constitutes a "significant deprivation of liberty" that infringes upon one's fundamental right to be free from

---

[12]     Regarding the conditions of their confinement, Plaintiffs allege that, in 1994, "MSOP was operating in a hospital setting. Patients had individual rooms with their own mattress, bed, dresser, desk, and storage. Private bathrooms were available and toilets were not in the rooms. Patients were not locked in their rooms. . . ." (Second Am. Compl. ¶ 140.) Plaintiffs contend, however, that conditions changed and that, presently:

> [t]he MSOP facility at Moose Lake is laid out exactly like state prisons with cell units facing into a central courtyard where Plaintiffs and Class members may be observed from one central station. MSOP staff wears police-style uniforms. The newly designed and constructed living unit, Complex One, is designed just like a correctional facility.

(*Id.* ¶ 137.) Plaintiffs further allege that they "are double bunked in 9.5 x 15 ft. wet cells consisting of two metal bed frames with springless mattresses that are only 30 inches apart, small stainless steel desks, and a stainless steel toilet/sink combination unit fixed into the cell." (*Id.* ¶ 143.) Additionally, Plaintiffs describe that: "[c]ell doors are metal and only have a small viewing window. The two windows in each cell are only five inches wide. The only privacy when using the toilet is a movable screen." (*Id.* ¶ 144.) Plaintiffs claim that they "are locked in [their] cells every day from at least 9:45 p.m. until 6:25 a.m." (*Id.* ¶ 145.)

confinement.  *See Jones v. United States*, 463 U.S. 354, 361 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *see also Cooper v. Oklahoma*, 517 U.S. 348, 368-69 (1996) ("The requirement that the grounds for civil commitment be shown by clear and convincing evidence protects the individual's fundamental interest in liberty.").  Where the government acts in a systematic way (for example through combined legislative and executive action) to indefinitely confine a class of citizens in detention facilities—such as those of MSOP—the government action must be narrowly tailored to serve a compelling state interest in order to pass constitutional muster.[13]  *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (noting that, where legislation infringes upon a fundamental right, such legislation "must survive strict scrutiny—the law must be

_____

[13]    *Sacramento v. Lewis* distinguishes between the substantive due process standard applied to "abusive executive action" directed at an individual, such as the use of excessive force, and the standard applied to legislation that systematically impinges on a fundamental right.  *Compare Lewis*, 523 U.S. at 847 n.8 ("[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."), *with Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("[T]he Fourteenth Amendment forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (internal quotation omitted) (emphasis in original).

In this case, there may be particular actions of the executive (such as the administration of treatment) that may ultimately be analyzed under the "shocks the conscience" standard.  *See infra* Part I.B.2 (Failure to Provide Treatment Claims).  Whether the strict scrutiny or the "shocks the conscience" standard applies to a particular claim, however, an allegation of the denial of substantive due process "is to be tested by an appraisal of the totality of facts in a given case." *Lewis*, 523 U.S. at 850; *see also id.* ("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.").

'narrowly tailored to serve a compelling state interest'") (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  The Court acknowledges that it will thus be required to carefully analyze the purpose and effect of Minnesota's civil commitment scheme for sex offenders in this case.

The Supreme Court has made clear that civil commitment of individuals "who, by reason of a mental disease or mental abnormality, constitute a real, continuing, and serious danger to society," is permitted, "provided there is no object or purpose to punish."  *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997) (Kennedy, J., concurring) (citing *Addington v. Texas*, 441 U.S. 418, 426-27 (1979)); *see also Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring) ("We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.").  Where, notwithstanding a "civil label," a statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes."  *Hendricks*, 521 U.S. at 361; *see also Seling v. Young*, 531 U.S. 250, 261 (2001) ("A court will reject the legislature's manifest intent only where a party challenging the Act provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention.").  Therefore, a law whose objective is retribution or deterrence implicates criminal punishment.  *See Hendricks*, 521 U.S. at 361-62; *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (distinguishing "a dangerous sexual offender subject to civil commitment

'from other dangerous persons'" and finding such a distinction "necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment") (citations omitted). Moreover, "[i]f the object or purpose" of a civil commitment law is to provide treatment, "but the treatment provisions were adopted as a sham or mere pretext," such a scheme would indicate "the forbidden purpose to punish." *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring).

Furthermore, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). In Minnesota, as provided by statute, individuals are committed to MSOP for the purpose of treatment as SDPs and SPPs and have the right "to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary." Minn. Stat. § 253B.03, subd. 7; *see also* Minn. Stat. § 253D.02, subds. 15 & 16 (defining SPP and SDP).[14] Plaintiffs allege, however, that they have been subjected to conditions of confinement that are punitive in nature and antithetical to the purpose of their commitment.

With respect to the duration of a civil commitment, "the Constitution permits the Government . . . to confine [an individual] to a mental institution until such time as he has

---

[14]     Defendants acknowledge their obligation under Minnesota law "to maintain a therapeutic environment." (Doc. No. 376 at 29 (quoting Minn. Stat. § 253D.19, subd. 1 (formerly Minn. Stat. § 253B.185, subd. 7(a))).)

regained his sanity or is no longer a danger to himself or society." *Jones*, 463 U.S. at 370.

Thus, a civilly committed individual is entitled to release when he is no longer mentally

ill or dangerous. *See Foucha*, 504 U.S. at 77-78.[15] As a matter of due process, it is

"unconstitutional for a State to continue to confine a harmless, mentally ill person."[16]

*Foucha*, 504 U.S. at 77 (citing *O'Connor v. Donaldson*, 422 U.S. 563 (1975)). "Even if

the initial commitment was permissible," a civil commitment may not "constitutionally

---

[15] Discussing its previous holding in *Jones*, the Supreme Court stated in *Foucha*:
We held, however, that "(t)he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous," *id.*, at 368, 103 S. Ct., at 3052; *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer. We relied on *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L.Ed.2d 396 (1975), which held as a matter of due process that it was unconstitutional for a State to continue to confine a harmless, mentally ill person. Even if the initial commitment was permissible, "it could not constitutionally continue after that basis no longer existed." *Id.*, at 575, 95 S. Ct., at 2493. In the summary of our holdings in our opinion we stated that "the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones*, 463 U.S., at 368, 370, 103 S. Ct., at 3052, 3053. The court below was in error in characterizing the above language from *Jones* as merely an interpretation of the pertinent statutory law in the District of Columbia and as having no constitutional significance. In this case, Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. *O'Connor*, *supra*, 422 U.S., at 574-575, 95 S. Ct., at 2493-2494.
*Foucha*, 504 U.S. at 77-78 (footnote omitted).

[16] The Court notes that the term "harmless" may have little to no practical significance to treatment professionals tasked with evaluating whether a sex offender "is no longer a danger to himself or society." *See Foucha*, 504 U.S. at 77 (explaining that a "committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous").

continue after that basis no longer exist[s]." *Foucha*, 504 U.S. at 77 (citing *O'Connor*, 422 U.S. at 565). By that reasoning, an individual who no longer meets the criteria for commitment should be entitled to release.

Defendants contend that *Seling v. Young*, 531 U.S. 250 (2001), defeats Plaintiffs' claim that the civil commitment statutes are unconstitutional as applied because the Supreme Court, in *Seling*, rejected an as-applied challenge to a civil commitment statute. Unlike *Seling*, however, this case raises the question of the constitutionality of a state civil commitment scheme as applied to the entire sex offender population, not just to one individual.[17] *Contra Seling*, 531 U.S. at 264 ("The Court of Appeals recognized that the Act is civil, and treated respondent's claim as an individual, 'as-applied' challenge to the Act."). Additionally, Plaintiffs here have raised the question of whether the Minnesota civil commitment statutes have the "forbidden purpose" of punishment, despite their purported civil underpinnings. *See Hendricks*, 521 U.S. at 347, 368-69 (plurality opinion); *id.* at 371 (Kennedy, J., concurring); *see also Seling*, 531 U.S. at 264-65 (leaving open the question of what would happen if the lower courts had concluded that "[the committed individual's] allegations, if substantiated, would be sufficient to refute the Washington Supreme Court's conclusion that the Act is civil, and to require the release of all those confined under its authority."). In *Seling*, the Supreme Court assumed

---

[17] Plaintiffs in this case "challenge the constitutionality of the relevant statutes based on a repeated course of conduct over years for an entire class of individuals, not just their application to a single individual" as well as "the systemic failure of the legislative, executive and judicial branches of the State to rectify the continued deficiencies with the program and to protect the rights of Plaintiffs." (Doc. No. 389 at 16.)

the statute in question was civil, and expressed no opinion as to how allegations that conditions of confinement "are too restrictive, that the conditions are incompatible with treatment, and that the system is designed to result in indefinite confinement . . . would bear on a court determining in the first instance whether [a state's] confinement scheme is civil." *Seling*, 531 U.S. at 262-63. Moreover, the Supreme Court's holding in *Seling* was limited to an as-applied[18] challenge to a civil commitment statute on double jeopardy and *ex post facto* grounds. *Id.* at 263 (holding "that respondent cannot obtain release through an 'as-applied' challenge to the Washington Act on double jeopardy and *ex post facto* grounds" and finding an "as-applied" analysis to be "unworkable" in that context because "[s]uch an analysis would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the Double Jeopardy and *Ex Post Facto* Clauses").[19]

---

[18]    Justice Thomas, in his concurrence, questioned whether the claim at issue, wherein a committed sex offender "essentially contend[ed] that the actual conditions of confinement, notwithstanding the text of the statute, are punitive and incompatible with the Act's treatment purpose" constituted a veritable "as-applied" challenge. *Seling*, 531 U.S. at 271 (Thomas, J., concurring). Justice Thomas further stated:

> The majority adopts the Ninth Circuit's nomenclature and refers to respondent's claim as an "as-applied" challenge, but that label is at best misleading. Typically an "as-applied" challenge is a claim that a statute, "*by its own terms*, infringes constitutional freedoms in the circumstances of a particular case." In contrast, respondent's claim is not that [the Act] "by its own terms" is unconstitutional as applied to him, but rather that the statute is not being applied according to its terms at all.

*Id.* (citations omitted) (emphasis in original); *see id.* at 264 (majority opinion).

[19]    The Court acknowledged, however, that:

> The particular features of confinement may affect how a confinement scheme is evaluated to determine whether it is civil rather than punitive, but

(Footnote Continued on Next Page)

At the center of Plaintiffs' challenge to the Minnesota sex offender commitment scheme is the allegation that a commitment to MSOP essentially amounts to lifelong confinement, equivalent to a lifetime of criminal incarceration in a facility resembling, and run like, a medium to high security prison. Under such conditions, and assuming the allegations in the Complaint to be true, it appears that MSOP may very well be serving the constitutionally impermissible purposes of retribution and deterrence. Documents such as the OLA Report, combined with the Governor's directive that no class members be released, as well as Defendants' admission that no one has been fully discharged since the program's inception, lend substantial support to Plaintiffs' Complaint.

If, with the benefit of discovery (including reports by the Court-appointed experts), Plaintiffs are able to demonstrate that the commitment statutes are systematically applied in such a way as to indefinitely commit individual class members who are no longer dangerous, or that MSOP is administered as a punitive system despite its statutory treatment purpose, Plaintiffs will likely prove up their claims. The Court thus concludes, as did Magistrate Judge Jeffrey J. Keyes in *Thompson*, that if Plaintiffs "can show that, contrary to the purpose of the SDP/SPP commitment law, the nature of [their] commitment is punitive incarceration without any meaningful opportunity for

(Footnote Continued From Previous Page)

> it remains no less true that the query must be answered definitively. The civil nature of a confinement scheme cannot be altered based merely on vagaries in the implementation of the authorizing statute.

*Seling*, 531 U.S. at 263.

release, then [they have] a plausible claim that [their] fundamental liberty interest protected by the Fourteenth Amendment has been violated by arbitrary government action." *Thompson* R&R at 59.

Plaintiffs have plainly asserted, and sufficiently pled, viable claims regarding the punitive nature of their confinement. Therefore, the Court denies Defendants' motion insofar as it seeks dismissal of Counts III, IV, V, and IX. To be clear, should Plaintiffs prove up their claims, the statutes, as applied and implemented, are not likely to survive constitutional scrutiny.

### 2.    Failure to Provide Treatment Claims

Counts I, II, and XI of Plaintiffs' Second Amended Complaint assert various claims related to the right to treatment.[20]

---

[20]    Plaintiffs' Complaint contains the following allegations, among others, with respect to treatment:

The MSOP treatment program is broken out into three phases. In Phase I, patients must learn how to comply with the MSOP facility's rules and learn basic treatment concepts. No sex offender-specific treatment whatsoever is provided in Phase I. In Phase II, patients must discuss and work through their sexual offenses and patterns of sexual abuse. In Phase III, which takes place at the St. Peter facility, the program focuses on community reintegration. This third phase consists of MSOP Supervised Integration, in which patients live in a secure area within the St. Peter Facility. Patients may take accompanied outings off campus, and Community Preparation Services, in which patients live on campus in a house that is not within the secure perimeter. Throughout Phase III, patients are electronically monitored. . . .

The MSOP treatment program was designed to be completed within four years. As of January 1, 2012, 64% of MSOP patients were in Phase I, 24% were in Phase II, and 12% were in Phase III. As no sex offender-specific treatment is provided for Phase I patients, the majority of MSOP patients are not provided any sex offender specific treatment at all.

(Footnote Continued on Next Page)

Count I, in essence, alleges that Defendants have violated Plaintiffs' Fourteenth Amendment substantive due process right to treatment. In particular, Plaintiffs claim that "[b]ased on the policy and procedures created and implemented by Defendants," Plaintiffs "spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are often far too low."[21] (Second Am. Compl. ¶ 214.)

---

(Footnote Continued From Previous Page)

> Additionally, 75% of MSOP patients have been civilly committed to the MSOP for between three years and ten years or more. It was not until February of 2012 that the first patient in the history of the MSOP was deemed to have completed the treatment program, after commitment to the program for more than 18 years, and be ready for provisional discharge. That patient is required to attend regular therapy as a provision of his discharge. . . .
>
> The Legislative Auditor Report found that one factor that may explain why there has never been a discharge from the program is that "problems in the treatment program over the last ten years have likely affected the progress of some sex offenders." Legislative Auditor Report at xxi. . . .
>
> The Legislative Auditor Report also found that patients get stuck in Phase I of the program, which focuses on following rules and learning how to participate in treatment groups rather than addressing the patient's sexual offenses or how to prevent re-offending. This may be because the MSOP does not promote "positive treatment participation." Legislative Auditor Report at 64.

(Second. Am. Compl. ¶¶ 75, 78, 84-85.)

[21]     The OLA Report noted that "[t]he amount of treatment delivered at MSOP facilities is lower than at any other adult inpatient sex offender treatment program in the state." (OLA Report at 62.) Specifically, the OLA Report stated that the "six hours of group therapy per week" plus between one-and-a-half and two hours of "additional psychoeducational modules" provided at MSOP is less than the treatment provided at both the Department of Corrections Sex Offender Treatment Program and Alpha Human

(Footnote Continued on Next Page)

Rather than progressing through the phases of treatment, Plaintiffs allegedly remain "in the first two phases of treatment for years." (*Id.*) In sum, Plaintiffs appear to allege that, as implemented, MSOP's sequential, three-phased treatment system, with chutes-and-ladders type mechanisms for returning patients to earlier phases of the program, without periodic, independent review of their progress, has the effect of confinement to the facility for life, equivalent to permanent, criminal incarceration.

Defendants maintain that the proper legal standard to apply to Plaintiffs' inadequate treatment claim is whether "Defendants' treatment program is so arbitrary or egregious as to shock the conscience." (Doc. No. 376 at 22); *see Strutton v. Meade*, 668 F.3d 549, 557-58 (8th Cir. 2012). It is true that the Eighth Circuit concluded in *Strutton* that the plaintiff "[did] not have a fundamental due process right to sex offender treatment" and that, accordingly, the *Youngberg* "professional judgment" standard[22] did not apply to his treatment-related claims. *Strutton*, 668 F.3d at 557. The *Strutton* court rejected the rule in some circuits that due process requires that civilly committed

---

(Footnote Continued From Previous Page)

Services, which provide treatment averaging twelve hours per week and twenty-one hours per week, respectively. (*Id.* at 62-63.) In *Kansas v. Hendricks*, the State represented to the Supreme Court that individuals committed under the Act at issue in that case were "receiving in the neighborhood of '31- 1/2 hours of treatment per week.'" *Hendricks*, 521 U.S. at 368.

[22]     In *Youngberg*, the Supreme Court held that under the Fourteenth Amendment, "civilly committed individuals 'enjoy constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.'" *Strutton*, 668 F.3d at 557 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)).

individuals be provided "with access to mental health treatment that gives them a realistic opportunity to be cured and released,"[23] and instead noted that, "although the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, it has not recognized a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." *Id.* (internal quotation omitted). In *Strutton*, however, the plaintiff's claims were limited to his access to treatment; he neither raised a systemic challenge to the implementation of the program as a whole, nor did he allege that his confinement was punitive in nature. *See id.* at 558 (determining that "the temporary modifications in the treatment regimen of eliminating psychoeducational classes and increasing the size of process groups was neither arbitrary nor egregious").

Prior to *Strutton*, the Eighth Circuit applied the *Youngberg* professional judgment standard to a sex offender's right to treatment claims. *See Bailey v. Gardebring*, 940 F.2d 1150, 1153-54 (8th Cir. 1991). In *Bailey*, the Eighth Circuit determined that the plaintiff could succeed on his claim only if he could "show that the 'presumptively valid' decision of the hospital psychiatrists not to provide the sort of treatment" sought by the

---

[23]     *See, e.g.*, *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (holding that "the Fourteenth Amendment Due Process Clause requires states to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released") (citing *Ohlinger v. Watson*, 652 F.2d 775, 778 (9th Cir. 1980)).

While allegations pertaining to Plaintiffs' constitutional and statutory rights to treatment pervade the Complaint, the Court in no way implies that constitutionally adequate treatment requires that an individual actually be "cured" of his "mental disease or mental abnormality" or other psychological condition. *But see Foucha*, 504 U.S. at 77 (requiring release when a committed individual "has recovered his sanity or is no longer dangerous").

plaintiff was "'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Id.* at 1154 n.4 (quoting *Youngberg*, 457 U.S. at 323). Ultimately, the Eighth Circuit affirmed the district court's finding that there was "insufficient evidence for a reasonable factfinder to conclude that the DHS defendants' decisions were a substantial departure from accepted professional practice." *Bailey*, 940 F.2d at 1154 n.4 (internal quotation omitted).

While the Court need not decide the applicable standard for Plaintiffs' right to treatment claims (or whether a fundamental right is implicated here) at this juncture, the Court concludes that, regardless of the applicable standard, at this early stage of the proceedings, Plaintiffs have, at a minimum, alleged sufficient facts to survive a motion to dismiss. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'") (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937)). Even assuming, without deciding, that the *Strutton* "shocks the conscience" standard applies to Plaintiffs' right to treatment claims, when taken together with the allegations regarding the punitive nature of confinement and the lack of meaningful opportunity for release, Plaintiffs have, at a minimum, raised a serious question as to whether state action with respect to the class members committed to MSOP is "truly egregious and extraordinary." *See Strutton*, 668 F.3d at 557.

Indeed, when taken together, and if proven true, a fact-finder may very well conclude that the conditions of Plaintiffs' confinement, including the deficiencies in treatment, rise to the level of "shocking the conscience." *See Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002) ("Whether a substantive due process right exists is a question of law. . . . However, subject to certain presumptions, whether the plaintiff has presented sufficient evidence to support a claimed violation of a substantive due process right is a question for the fact-finder, here the jury."). As such, at this early stage, the Court finds that Count I states a valid due process claim for failure to provide treatment.

To the extent Plaintiffs assert that any inadequate treatment or failure to treat amounts to a violation of Minnesota statute or court order in Counts II and XI, Plaintiffs' claims also survive dismissal for similar reasons.

Count II alleges a state law violation of the right to treatment. Specifically, Plaintiffs contend that Defendants have unreasonably failed to provide the class members with "proper care and treatment, best adapted, according to contemporary professional standards, to rendering future supervision unnecessary" in contravention of the Minnesota Commitment and Treatment Act. (Second Am. Compl. ¶ 222 (quoting Minn. Stat. § 253B.03, subd. 7).)[24]

---

[24]     Count II of the Complaint further states:
         The Minnesota Civil Commitment and Treatment Act requires civilly
         committed sex offenders to be committed to a secure treatment facility.
         The statute promises that patients will receive individualized written
         program plans to be reviewed quarterly, periodic medical treatment and the
         right to receive proper care and treatment, best adapted, according to
                                                    (Footnote Continued on Next Page)

The Minnesota Commitment and Treatment Act guarantees civilly committed individuals a right to treatment consistent with contemporary professional standards. *See* Minn. Stat. § 253B.03, subd. 7 ("A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary."). Plaintiffs have undoubtedly raised a question of whether the treatment provided to them at MSOP satisfies the standard mandated by statute.[25]

Similarly, Count XI asserts that Plaintiffs "are not receiving adequate treatment," contrary to the judicial determination that, as SPPs or SDPs, they "must enter a secure treatment facility" for the purpose of receiving "proper sex offender treatment." (*See* Second Am. Compl. ¶¶ 300-01.)

While Count I is framed as a substantive due process claim, Counts II and XI expand upon Plaintiffs' underlying right to treatment claim. Plaintiffs support all three claims with the same fundamental factual allegations. With respect to those counts, the Complaint essentially alleges a pervasive denial of proper treatment at MSOP—that what

---

(Footnote Continued From Previous Page)

       contemporary professional standards, to rendering further supervision
       unnecessary. *See* Minn. Stat. §§ 253B.185, 253B.03, subd. 7.
(Second Am. Compl. ¶ 220 (citation formatting added).)

[25]     The Court notes that the right to treatment claim in *Strutton* invoked a slightly different statutory mandate. *See Strutton*, 668 F.3d at 557 ("Strutton's due process claim originates from the state statutory mandate to provide for Strutton's confinement 'for control, care and treatment until such time as [his] mental abnormality has so changed that [he] is safe to be at large.'") (quoting Mo. Rev. Stat. § 632.495(2)).

purports to be "treatment" by Defendants is, for all intents and purposes, a sham. Plaintiffs allege that such a systemic failure is not only inconsistent with due process, but is also contrary to statutory standards (and corresponding judicial orders) governing civil commitment. Noting the concerns raised by the OLA Report, as well as the MPET Report and the Task Force recommendations, and taking the allegations in the Complaint as true for purposes of the motion to dismiss, at a minimum, Plaintiffs have stated plausible claims pertaining to inadequate treatment. As such, Counts I, II, and XI survive dismissal, and the class members must be provided the opportunity to offer evidentiary support for those claims.

### 3. Equal Protection Claim

In Count X, Plaintiffs assert that the sex offender commitment statutes, as applied, violate the Equal Protection Clause of the Fourteenth Amendment. (Second Am. Compl. ¶¶ 292-98.) Specifically, Plaintiffs claim that "significant geographic variations in petition and commitment rates across the state" demonstrate that similarly situated individuals are treated differently, without a rational basis for such disparate treatment. (*See id.* ¶¶ 296-97; *see also* OLA Report at xi ("Among Minnesota's judicial districts, commitment rates vary significantly, with the percentage of referred offenders being committed varying from 34 to 67 percent.").)

To state an actionable equal protection claim, Plaintiffs must allege facts to show that they have been treated differently from similarly situated individuals. *See Bogren v. Minnesota*, 236 F.3d 399, 408 (8th Cir. 2000); *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) (stating that to sustain an equal protection claim, a plaintiff must

show that he belongs to a group that had been treated less favorably than others who are "similarly situated"); *see also Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) ("In order to establish such an equal protection claim, a prisoner must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a 'fundamental right.'"); *Beaulieu v. Ludeman*, Civ. No. 07-1535, 2008 WL 2498241, at *12 (D. Minn. June 18, 2008) ("Absent a threshold showing that plaintiffs are similarly situated to those who allegedly receive favorable treatment, plaintiffs do not have a viable equal protection claim.").

If the parties are similarly situated, and the alleged action infringes a fundamental right, strict scrutiny applies. *See, e.g.*, *Gavin v. Branstad*, 122 F.3d 1081, 1089 (8th Cir. 1997) ("Legislation that employs a suspect classification or impinges on a fundamental constitutional right merits stricter scrutiny and will survive only if it is narrowly tailored to serve a compelling governmental interest."). *But see, e.g.*, *Devoil-El v. Groose*, 160 F.3d 1184, 1187 (8th Cir. 1998) (noting that when a suspect classification (such as race) is implicated, "disparate impact alone, without the showing of intent to discriminate, will not trigger the strictest level of scrutiny"). If the alleged action does not impinge on a fundamental right or employ a suspect classification, rational basis review applies. *See, e.g.*, *Gavin*, 122 F.3d at 1090 ("Because neither a fundamental right nor a suspect classification is at issue here, we apply rational basis review and accord the immediate termination provisions 'a strong presumption of validity.'").

Here, Plaintiffs claim to have suffered an injury "because they have been committed while others with similar offenses and similar records have not, without any rational basis for this disparity." (Doc. No. 389 at 37.) Defendants, meanwhile, contend that Plaintiffs do not have standing to assert their equal protection claim.[26] (Doc. No. 376 at 32.) Defendants further allege that Plaintiffs have "failed to show that their own commitment was different from others who are similarly situated" and thus have not stated a viable equal protection claim.[27] (*Id.* at 34.) In addition, Defendants maintain that they are not responsible for initiating commitment proceedings at the outset and, therefore, are not the proper parties for Plaintiffs' equal protection claim. (*Id.* at 33 ("Even if Plaintiffs did have standing, Plaintiffs have not sued the proper parties on this claim because the Defendants have no authority or control over initial civil commitment.").)

---

[26] With respect to standing, Defendants allege:

In this case, Plaintiffs, who are currently civilly committed, have not alleged a causal connection between differing rates of civil commitment in various counties and any injury they have actually incurred and how a favorable decision would correct that injury. Because Plaintiffs and Class Members are currently civilly committed to MSOP, they are not and will not be subject to a petition for civil commitment, and any redress concerning upfront civil commitment rates would have no impact on their current status.

Thus, this claim should be dismissed for lack of standing.

(Doc. No. 376 at 33.)

[27] Defendants also submit that even if Plaintiffs satisfied the "similarly situated" requirement, "Minnesota's civil commitment statute sets the same standards applicable state-wide for civil commitment of a proposed [SPP] or [SDP]." (Doc. No. 376 at 34.)

Plaintiffs' equal protection claim appears to challenge the initial decision to pursue civil commitment—typically made by the appropriate county attorney's office, which files the petition for civil commitment in state district court—of each of the class members, as compared to the decision not to pursue commitment of other individuals. Plaintiffs do not allege, however, that the named Defendants[28] were in any way responsible for their commitment to MSOP at the outset. The Court therefore agrees that Plaintiffs have not asserted a viable claim against the named Defendants in this action.[29] As such, Count X of Plaintiffs' Complaint is properly dismissed.

### 4.  First Amendment Claims

In Counts VI and VII, respectively, Plaintiffs assert that Defendants have denied Plaintiffs their right to religious freedom and have unreasonably restricted Plaintiffs' freedoms of speech and association in violation of the First Amendment.

Defendants maintain that Plaintiffs' First Amendment claims are governed by the guidelines set forth in *Turner v. Safley*, 482 U.S. 78 (1987). (*See* Doc. No. 376 at 6-7); *see also Turner*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Plaintiffs dispute the applicability of *Turner* (which applies to claims asserted by prisoners), and argue for the modification of that standard as follows:

---

[28]    Each of the named Defendants is currently, or was previously, employed by DHS; Plaintiffs thus allege that each Defendant is responsible for various aspects of the operation of MSOP. (*See* Second Am. Compl. ¶¶ 29-37.)

[29]    The Court makes no determination, however, as to whether such a claim would be viable against any another party.

that any First Amendment restrictions on civilly committed individuals "must be reasonably related to 'legitimate therapeutic or institutional interests.'"  (Doc. No. 389 at 29 (quoting *Ivey v. Mooney*, Civ. No. 05-2666, 2008 WL 4527792, at *10 (D. Minn. Sept. 30, 2008)).)  While the Court need not conclusively resolve the issue of the precise, applicable standard today, the Court considers each of Plaintiffs' First Amendment claims in light of appropriate therapeutic interests as well as relevant safety and security concerns.  *Ivey*, 2008 WL 4527792, at *4-5 (applying "a version of the *Turner* test, moderated to account for the principles stated in *Senty-Haugen*" in order to determine whether an MSOP policy "is reasonably related to legitimate institutional and therapeutic interests"); *see Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (acknowledging that the liberty interests of individuals committed to state custody as dangerous persons "are considerably less than those held by members of free society," but that such individuals are "entitled to more considerate treatment and conditions of confinement" than prison inmates) (internal citations omitted); *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."); *Serna v. Goodno*, 567 F.3d 944, 953 (8th Cir. 2009), *cert. denied*, 558 U.S. 972 (2009) (finding that "governmental interests in running a state mental hospital are similar in material aspects to that of running a prison" because "[a]dministrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety" and concluding, therefore, that "the government may take steps to maintain security at its institutions where sexually violent

persons are confined"). *But see Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (applying the four-factor *Turner* test to a First Amendment claim asserted by civilly committed sex offenders where the parties agreed to its application).[30]

Count VI asserts a claim for denial of the right to religion and religious freedom. (Second Am. Compl. ¶¶ 255-63.) In particular, Plaintiffs allege that MSOP's policies, procedures, and practices cause Plaintiffs to be monitored during religious services and during private meetings with clergy, do not permit Plaintiffs "to wear religious apparel or possess certain religious property," and do not allow Plaintiffs to "communally celebrate their religious beliefs by having feasts." (*Id.* ¶ 259.) Plaintiffs further claim that Defendants do not provide the class members with Kosher or Halal meals. (*Id.* ¶ 197.) Plaintiffs contend that such policies and practices "are not related to a legitimate institutional or therapeutic interest" and thus constitute unreasonable restrictions on Plaintiffs' First Amendment rights. (*Id.* ¶¶ 260-61.)

In order to succeed on a claim asserted under the Free Exercise Clause of the First Amendment, Plaintiffs must ultimately establish that the challenged regulations place a "substantial burden" on Plaintiffs' ability to practice their religions. *See Patel*, 515 F.3d

---

[30]    The *Turner* factors include:
       (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest.

*Beaulieu*, 690 F.3d at 1039 (quoting *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989)).

at 813; *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) ("[A] person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief."). To substantially burden one's free exercise of religion, a regulation must: (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtail a person's ability to express adherence to his or her faith"; or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel*, 515 F.3d at 813 (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004)).

Defendants maintain that Plaintiffs have failed to plead an actionable freedom of religion claim because Plaintiffs have not identified specific instances in which any class member's "sincerely held religious belief was infringed by an arbitrary denial of a requested religious meal." (Doc. No. 376 at 11-12.) At this early stage of the proceedings, however, and when taken together with the other allegations regarding the conditions of Plaintiffs' confinement, the Court concludes that Plaintiffs have raised a plausible free exercise claim, regardless of whether the *Turner* standard or a modified *Turner* standard applies. *See Thompson* R&R at 85-86 ("Because Plaintiff has put Defendants on notice of a plausible Free Exercise Clause claim, Defendant's motion to dismiss in this respect should be denied and Plaintiff's claims based on a First Amendment violation of his rights to freedom of religion . . . should remain.").

Count VII asserts that Defendants have unreasonably restricted Plaintiffs' rights to free speech and free association. (Second Am. Compl. ¶¶ 264-72.) As with their

freedom of religion claim, Plaintiffs maintain that such restrictions "are not related to a legitimate institutional or therapeutic interest." (*Id.* ¶ 269.)

With respect to free speech, Plaintiffs allege that Defendants have limited Plaintiffs' phone use, have limited Plaintiffs' access to certain newspapers and magazines, and have removed or censored articles from newspapers and magazines. (*Id.* ¶¶ 267-68.) The right of freedom of speech "includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read" as well as "freedom of inquiry" and "freedom of thought." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). Still, "[a]ny form of involuntary confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech." *Beaulieu*, 690 F.3d at 1039.

Insofar as Plaintiffs challenge Defendants' phone use and censorship policies, Plaintiffs have not identified the specific policies at issue; nor is the Court able to ascertain, at this stage, whether such policies are "reasonably related to legitimate institutional and therapeutic interests under the *Turner* factors," modified, or otherwise. *See Thompson* R&R at 77-78. Nevertheless, in light of the allegations in the Complaint, Plaintiffs have raised a plausible claim that their First Amendment rights may be violated by overly restrictive policies, including those governing communication and censorship. *See id.* Accordingly, the Court denies Defendants' motion insofar as it seeks to dismiss Plaintiffs' free speech claims.

Plaintiffs also allege that Defendants have restricted Plaintiffs' freedom to associate with one another by limiting contact among the class members. (Second. Am. Compl. ¶ 266.)

While the Eighth Circuit has determined that the liberty interests of individuals committed to state custody as dangerous persons "are considerably less than those held by members of free society," the Eighth Circuit has also acknowledged that such individuals are "entitled to more considerate treatment and conditions of confinement" than prison inmates. *Senty-Haugen*, 462 F.3d at 886 (internal citations omitted). Although Plaintiffs' rights to freely associate are not unlimited, Plaintiffs no doubt retain, at a minimum, those First Amendment rights that are not inconsistent with legitimate security concerns. *See Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 132 (1977) (noting that while "numerous associational rights are necessarily curtailed by the realities of confinement," even a prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"). Equally, if not more important, however, are the therapeutic objectives of Plaintiffs' commitment to MSOP. *See id.* at 125. Thus, the Court must consider challenges to MSOP restrictions that allegedly inhibit First Amendment interests in light of the legitimate policies and goals of the commitment system, to whose custody and care Plaintiffs have been committed. *See id.* (finding that challenges to policies that inhibit prisoners' First Amendment rights "must be analyzed in terms of the legitimate policies and goals of the corrections system"); *see also* Minn. Admin. R. 9515.3080, subp. 1 ("The license holder must develop and follow policies and

procedures for maintaining a secure and orderly environment that is safe for persons in treatment and staff *and supportive of the treatment program*.") (emphasis added). As such, in evaluating MSOP's policies, the Court must not only take into account safety concerns, but must also consider whether such policies are "supportive of the treatment program." *See* Minn. Admin. R. 9515.3080, subp. 1; *Thompson* R&R at 80-82. Again, considering Plaintiffs' claims with respect to restrictions on their ability to freely associate in light of all of Plaintiffs' allegations regarding their conditions of confinement, the Court finds that Plaintiffs have stated a valid claim. The Court therefore denies Defendants' motion to the extent it seeks dismissal of Plaintiffs' freedom of association claim.

Each of Plaintiffs' First Amendment claims, as well as their other challenges to MSOP policies, arise from the broader allegation that their confinement in the program amounts to unconstitutional, criminal incarceration, despite the purported therapeutic purpose of the facilities and the commitment statutes. In essence, Plaintiffs contend that the conditions of their confinement, taken together, are inconsistent with a civil scheme, and have rendered MSOP punitive in nature. *Contra Seling*, 531 U.S. at 266 ("This case gives us no occasion to consider how the civil nature of a confinement scheme relates to other constitutional challenges, such as due process, or to consider the extent to which a court may look to actual conditions of confinement and implementation of the statute to determine in the first instance whether a confinement scheme is civil in nature.").

To determine whether MSOP's policies violate Plaintiffs' constitutional rights requires a balancing of fundamental liberties against institutional and therapeutic interests

that, without the benefit of independent expert assessment (as discussed below), the Court is not equipped to undertake at this early stage. At a minimum, however, Plaintiffs have articulated a viable claim that Defendants' policies unlawfully restrict their First Amendment rights. As such, Counts VI and VII survive dismissal at this point in the proceedings.

### 5. Unreasonable Search and Seizure Claim

Count VIII of Plaintiffs' Complaint asserts that Defendants have violated Plaintiffs' Fourth Amendment rights "through their search policies, procedures, and practices." (Second Am. Compl. ¶ 275.) Plaintiffs challenge Defendants' "random cell searches," "window checks," "strip searches," and "random pat downs." (*Id.* ¶¶ 276-78.)

"Involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Beaulieu*, 690 F.3d at 1017). To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979). In applying the balancing test, a court must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which the search is conducted. *Serna*, 567 F.3d at 949 (quoting *Bell*, 441 U.S. at 559). A court must defer to the judgment of the correctional (or institutional) officials "unless the record contains substantial evidence showing their policies are an

unnecessary or unjustified response to problems of institutional security." *Arnzen*, 713

F.3d at 373 (quoting *Beaulieu*, 690 F.3d at 1029).

In the past, the Eighth Circuit has upheld the use of strip searches for the purposes

of protecting the public, protecting transport teams, and preventing dangerous contraband

from entering MSOP. *See Arnzen*, 713 F.3d at 373 (citing *Beaulieu*, 690 F.3d

at 1027-30); *see also Serna*, 567 F.3d at 953. The Eighth Circuit, however, has also

recently considered "the availability of less intrusive techniques when assessing the

reasonableness of a challenged procedure," especially when "personal privacy" interests

"and dignity" are at stake. *Arnzen*, 713 F.3d at 373, 375 (affirming district court's

issuance of a preliminary injunction prohibiting staff from capturing images of civilly

committed sex offenders while they occupied single-person bathrooms); *see also Serna*,

567 F.3d at 955 ("[N]ot all search techniques may be swept under the rug of deference to

the detention-center decisionmakers[.]"). Importantly, here, Plaintiffs' Fourth

Amendment claim must be evaluated within the context of Plaintiffs' other allegations

regarding the unconstitutional, punitive nature of their confinement. To the extent

Plaintiffs challenge Defendants' use of shackles and handcuffs, such allegations are

relevant to their claims regarding the punitive nature and conditions of confinement.

*Contra Semler v. Ludeman*, Civ. No. 09-732, 2010 WL 145275, at *20-22, *26-27

(D. Minn. Jan. 8, 2010) (finding that MSOP's visual body search, room search, and

restraint policies were not unconstitutional on a motion to dismiss); *Pyron v. Ludeman*,

Civ. Nos. 10-3759 & 10-4236, 2011 WL 3293523, at *6 (D. Minn. June 6, 2011)

(dismissing a Fourth Amendment claim).

Defendants maintain that MSOP's search policies are related to legitimate safety and security concerns.  (*See* Doc. No. 376 at 16-17.)  A determination of the reasonableness of such searches, however, requires that a court consider and evaluate the unique characteristics of the search (or policy) in question.  *See Bell*, 441 U.S. at 559 ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."); *see also Thompson* R&R at 88 (noting that "the Supreme Court in *Bell* instructs that the balancing that needs to be done to determine the reasonableness of a search must be done on a case-by-case basis and requires at least some evidentiary record").

Considering Plaintiffs' Fourth Amendment claim in conjunction with Plaintiffs' other allegations surrounding the punitive nature of their confinement, the Court is unable to determine at this time "if the alleged search policies and searches conducted in this case are reasonable and appropriate."  *Thompson* R&R at 88-89.  *Contra Evenstad v. Herberg*, -- F. Supp. 2d --, Civ. No. 12-3179, 2014 WL 107718, at *5 (D. Minn. Jan. 10, 2014) (finding that "room searches are an 'appropriate security measure'" and that it was not unreasonable to require a civilly committed individual "to remain outside his room" while it was searched).  At this stage, the Court lacks specific details regarding the challenged searches and the particular policies at issue.  *See Thompson* R&R at 89 ("Facts relating to the scope of the searches, the manner in which they were conducted, the justifications for the searches, and the places in which they were conducted are yet to be developed.").  Taking the facts alleged in Plaintiffs' Complaint together, and assuming the allegations to be true for purposes of the instant motion, the Court concludes that

Plaintiffs have articulated a plausible Fourth Amendment claim. As such, the Court denies Defendants' motion insofar as it seeks dismissal of Count VIII.

### 6.    Contract-Related Claims

Counts XII and XIII assert claims of breach of contract, and tortious interference with contract, respectively, against Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert related to their alleged failure to provide adequate treatment.[31] Essentially, Plaintiffs argue that those Defendants "actively participated in and supported the inadequate treatment policies as implemented by MSOP, which resulted in the failure to comply with contract[s] to provide treatment by MSOP." (Second Am. Compl. ¶¶ 311, 322.)[32] Plaintiffs base their claims on the "Consent for Participation in Sex Offender Treatment" contract, which provides, among other things:

> that the patient's therapist has discussed the course of treatment at the MSOP, that the patient received information about the levels of care and stages of treatment, that the patient has received the goals and behavioral expectations at the MSOP, that upon completion of treatment the MSOP will support their petition for provisional discharge, that each stage of treatment has specific goals and behavioral expectations, that services such as education and vocation are provided . . . .

---

[31]    Count XIII also asserts that those Defendants intentionally violated Minn. Stat. § 253B.03, subd. 7. (Second Am. Compl. ¶ 322; *see id.* ¶ 319 (quoting Minn. Stat. § 253B.03, subd. 7 ("A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary.").)

[32]    Plaintiffs further claim that those Defendants were aware "of the failure to progress Plaintiffs and [c]lass members through the different treatment phases to the point that they could be conditionally or unconditionally released" and that "the MSOP treatment program as implemented had only conditionally released a single person and had never unconditionally released anyone committed to MSOP." (Second Am. Compl. ¶¶ 310, 312, 321, 323.)

(*Id.* ¶ 318; *see also* Doc. No. 377, Figueroa Aff. ¶ 19, Exs. 18-31.)

For the same reasons discussed above with respect to Plaintiffs' failure to provide treatment claims, the Court concludes that Plaintiffs have stated plausible contract-based claims at this stage of the proceedings.  Consequently, the Court denies Defendants' motion to dismiss with respect to Counts XII and XIII.

### 7.    Monetary Damages

Defendants argue that they are entitled to Eleventh Amendment immunity from monetary damages against them in their official capacities.  (Doc. No. 376 at 3.)  It appears from the Complaint, however, that Plaintiffs have limited their request for monetary damages to Defendants in their individual capacities.  (*See* Second Am. Compl. ¶¶ 12, 41.)  Nevertheless, to the extent Plaintiffs may seek any such monetary damages against Defendants in their official capacities, the Court agrees that monetary damages are not recoverable.  *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").  Any claim for monetary damages against Defendants in their individual capacities, however, remains.[33]

---

[33]    Defendants also argue that Plaintiffs have failed to plead, with particularity, facts to demonstrate the personal involvement of each of the named Defendants in the

(Footnote Continued on Next Page)

## II.     Experts

On December 6, 2013, the Court appointed Dr. Naomi Freeman, Ms. Deb

McCulloch, Dr. Michael Miner, and Dr. Robin Wilson as experts pursuant to Rule 706 of

the Federal Rules of Evidence.  (Doc. No. 393 at 1-2.)  The Court delineated the duties of

the experts as follows:

> • To advise the Court on professional standards of care and treatment of sex
> offenders, both within and outside large facilities;
> • To advise the Court on professional standards on conditions/rules
> regarding confinement/security within large facilities, such as [MSOP];
> • To advise the Court on experiences and programs among the states in this
> field;
> • To advise the Court on research on effectiveness of treatment, and on
> recidivism, in both large facilities and appropriate less restrictive programs;
> • To advise the Court regarding risk assessment and placement decisions
> for sex offenders;
> • To advise the Court [on] practices, rules, treatment, conditions, risk
> assessments, and the like at [MSOP], and the professional adequacy of care,
> treatment and confinement at the Program;
> • To advise the Court on any matters the experts believe are pertinent to
> understanding their findings and recommendations regarding the above
> duties;
> • To make recommendations to the Court regarding these matters, and to
> respond to any further inquiries by the Court.

(*Id.* ¶ 9.)

---

(Footnote Continued From Previous Page)

constitutional violations alleged in the Complaint.  (Doc. No. 376 at 4-5.)  The Court
finds, however, that Plaintiffs have alleged sufficient facts to survive a motion to dismiss
at this stage of the proceedings.

The parties submitted their respective proposals with respect to the work of the experts by letter. (Doc. No. 421.) Specifically, Plaintiffs propose that the experts focus their work on the following areas:

1. Evaluation of all Class members and make recommendations as to whether each Class member is in the correct treatment phase; whether the Class member should be recommended for provisional or full discharge and/or whether the Class member could be placed in a less restrictive treatment setting;

2. Review of the current treatment program at MSOP and how it is being implemented to determine whether the program on its face and as implemented meets the professional standard of care and treatment of sex offenders and make recommendations for any changes that should be made to the treatment program;

3. Review the current MSOP policies and practices with regard to the conditions of confinement to determine whether they satisfy the balance between security and a therapeutic environment and make recommendations for any changes that should be made to the conditions of confinement at both the Moose Lake and St. Peter facility; and

4. Provide the Court with recommendations as to less restrictive alternatives and how such facilities may operate.

(*Id.* at 3.) Plaintiffs further request that:

Consistent with the Court's broad mandate, the experts should look to other states that have civil commitment programs for sex offenders to provide guidance on alternative options. The experts should also have liberal access to the relevant people, policies, files, and assistance needed to satisfy their duty to the Court including access to the following information:

- **Review of Patient Files:** The experts shall be afforded full access to all patient files and related documentation to verify that the proper professional standards of care and treatment are being applied to all areas of patient care, including treatment, risk assessment, discipline, and client placement in the MSOP. The experts shall be afforded the opportunity to meet with clients - subject to client consent to such participation - to discuss client treatment files and treatment status.

- **Review of MSOP Policies:** The experts shall be afforded full access to all MSOP policy makers as well as all policies and related documentation to verify that professional standards of care and treatment are being applied to all areas of the MSOP, including client treatment and placement, conditions

of confinement, security, and any other matters the experts believe are pertinent to the discharge of their duties under the Expert Order.

- **Review of Conditions of Confinement:** The experts shall be afforded full access to review the current conditions of confinement and related policies and rules regarding the same within the MSOP in order to advise the Court on professional standards regarding the conditions of confinement that establish a therapeutic environment that provides adequate security for clients, staff, and visitors.

- **Review of the Treatment Program:** The experts shall be afforded full access to review all aspects of the current treatment program provided by the MSOP to verify that professional standards of care are being applied to client treatment. The review shall encompass the physical and psychological testing applied to clients, amount and format of treatment, applicable standards for progression and discharge, and any other matters the experts believe are pertinent to the discharge of their duties to the Court under the Expert Order.

- **Review of Less Restrictive Alternatives:** The experts shall review the current and proposed less restrictive alternative facilities and advise the Court on the professional standards of care in such facilities as well as the experiences of other states regarding the establishment and use of less restrictive alternatives and client placement in those less restrictive alternatives.

(*Id.* at 3-4 (emphasis in original).) Defendants, however, seek to limit the experts' work to preparing a report that addresses the following:

1. The current professional standards for the treatment of civilly committed sex offenders and the extent to which MSOP's program design reflects those standards;
2. How other civil commitment programs have reintegrated civilly committed sex offenders into the community, with particular attention to community relations; and,
3. How other states, if any, are providing treatment and management of lower-functioning civilly committed sex offenders in community settings.

(*Id.* at 4.) Defendants suggest that, following the issuance of the report, the Court may consider additional proposals by the parties for further expert work. (*Id.*)

Following the Court's meeting with the experts, the experts submitted their proposal to the Court, which requests a number of documents for their review, and further states, in relevant part:

**Panel of Experts Plan:**
- Review documentation listed below
- Once the panel is in receipt of documents, we will take a few weeks to review and then schedule a conference call to determine time frames and next steps
- Complete site visits to St. Peters [sic] and Moose Lake
- Interview patients and staff at each facility
- Complete chart reviews based on random sample . . . .

**Initial Scope of Panel Work:**
- The panel plans to review the MSOP treatment and screening program/process, not the individuals (i.e., residents) in the program.
- If while reviewing resident charts or interviewing residents the panel identifies glaring issues with a resident not receiving appropriate services, we will generally comment on that and make system recommendations to address the discovered issues. The goal of looking at resident charts and possibly interviewing residents, however, is [to] get an understanding of what is happening in the program so that it may be evaluated, not to make comments about an individual resident's risk or treatment progress. . . .

**Plan for Reviewing a Sample of Resident Charts:**
- The panel needs information from MSOP related to how residents are separated within the program - by ward, by phase, by treatment tracks and/or by specialized population (e.g., SPMI, psychopathy, juveniles/juvenile only offenders, intellectual disability)
  - o Please provide a total number of residents in each of the above groups
- Based on the above groups, members of the panel will review a proportion of resident charts. Although an exact number cannot be determined until further information is provided, the panel will aim to review 20% to 25% of resident charts. In smaller groups (e.g., the psychopathy track, juvenile charts, elderly charts) the panel may review a majority or all of the charts.
  - o Resident charts will be selected based on a stratified random sample insuring that there are sufficient charts within each strata to make meaningful conclusions and recommendations for important subgroups

(e.g., juveniles, elderly residents).

(Doc. No. 422 at 1, 3 (emphasis in original).)

The experts request a number of reference documents, including publicly available reports and documents related to this lawsuit, as well as MSOP evaluation reports and administrative directives and rules. (*Id.* at 1.) The experts also request copies of MSOP's policies and procedures, such as the following: organizational charts ("including job descriptions and qualifications for clinical/treatment staff and supervisors"); a program description ("including phase goals/treatment targets, treatment hours, treatment service plans, etc."); the patient/resident handbook; the treatment schedule (including "standard resident schedule for each phase of treatment"); the grievance policy/process; the behavioral management plans/policies; the admission process and policy; the referral for release and release process; the staff-to-patient ratios and staffing numbers; the staff training policies; the assessments used for the treatment process; templates for any forms and assessments utilized in the treatment process; and a chart map (including a list of documents that should be in each resident's chart). (*Id.* at 1-2.)

The Court hereby orders that the experts shall have complete and unrestricted access to the requested documents, as well as any other documents they may require for their evaluations and assessments, insofar as such documents exist.

In addition, while the experts seek to conduct initial chart reviews to "get an understanding of what is happening in the program so that it may be evaluated, not to make comments about an individual resident's risk or treatment progress," the Court finds that independent risk assessments and treatment recommendations for each of the

47

class members will ultimately be necessary in order for the Court to comprehensively evaluate Plaintiffs' claims, including whether the commitment statutes, as applied, and whether MSOP, as implemented, pass constitutional muster. Still, the Court recognizes that such a task is no small undertaking and will require a great deal of time and resources. The Court therefore approves the experts' plan "to review 20% to 25% of resident charts" at the outset, with the qualification that a complete and independent evaluation of each patient will ultimately be necessary.

The Court hereby directs the experts to address each of the issues identified in the experts' proposal, and the additional issues raised by the parties, as well as the following: (a) each class member's current level of dangerousness (current risk assessment), including whether each class member poses a "real, continuing, and serious danger to society"; (b) whether each class member is actually eligible for discharge under the applicable statutory provisions or otherwise no longer meets the statutory criteria for initial commitment; (c) whether each class member is placed in the proper treatment phase; (d) whether each class member would be a candidate for a less restrictive facility; and (e) the specific need and parameters for less restrictive alternative facilities.

With respect to less restrictive alternatives, in addition to developing proposals for any new in-patient facilities and issuing recommendations as to individual class member placement therein, the experts should also consider possible out-patient treatment options, including counseling, therapy, and support groups, and shall identify any class members who, in their professional judgment, are appropriate candidates for out-patient treatment.

The Court further directs that, when the experts commence their comprehensive evaluations, they start their evaluations with those individuals residing in the Assisted Living Unit, the Alternative Program Units, and the Young Adult Unit.

The Court notes that, on December 13, 2012, the Court approved James L. Haaven, M.A., William D. Murphy, Ph.D., Robert J. McGrath, M.A., Jill D. Stinson, Ph.D., and Christopher D. Kunkle, Psy.D., to serve as MPET members. (Doc. No. 281 at 2.) Part of the MPET's task was to review a random sampling of client treatment records, which it did. (Doc. No. 275; MPET Report.) As such, in performing their work, including the comprehensive evaluations of each class member, the experts may call upon the services of the above MPET members to help accomplish that task, or any other. The experts may also consult with and call upon Roberta Opheim, Minnesota State Ombudsman for Mental Health and Developmental Disabilities, in carrying out their duties, and shall have unrestricted access to do so.

The Court notes that its consideration of Plaintiffs' claims on the merits will require extensive evaluation of MSOP and in-depth assessments of the class members by the Court-appointed experts. The Court acknowledges, however, that such work on the part of the experts will likely take a substantial amount of time and require significant resources. As such, the experts may complete their review in a series of stages. As each stage proceeds, the findings of the experts may require that the experts adjust their evaluation approach in light of their findings. The Court therefore reserves the right to amend, alter, or supplement its expert orders as necessary.

### III.    Motion for Declaratory Judgment

Plaintiffs move for a declaratory judgment that the Minnesota statutes governing civil commitment and treatment of sex offenders are "unconstitutional as written and as applied." (Doc. No. 362 at 1.) Specifically, Plaintiffs argue that the discharge standard set forth by statute, and as applied by Defendants, has "made it all but impossible for any individual to be released from civil commitment," and has thus rendered commitment to MSOP "in essence a life sentence," in violation of due process. (*Id.* at 1-2.)

The Court has broad discretion to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The purpose of the Declaratory Judgment Act is to provide a remedy that will "minimize the danger of avoidable loss and the unnecessary accrual of damages." *Koch Eng'g Co. v. Monsanto Co.,* 621 F. Supp. 1204, 1206-07 (E.D. Mo. 1985) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2751 at 569 (1983)); *see Lancaster v. N. States Power Co.*, Civ. No. 11-619, 2011 WL 5444115, at *6 (D. Minn. Nov. 9, 2011); *Riedell Shoes, Inc. v. Adidas AG*, Civ. No. 11-251, 2011 WL 1868180, at *5 (D. Minn. May 16, 2011). A court may render a declaratory judgment "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juvenile Div.)*, 518 F.2d 1160, 1163-64 (8th Cir. 1975) (quoting E. Borchard, *Declaratory Judgments*, 299 (2d ed. 1941)).

Plaintiffs' due process challenge to the statutes is both facial[34] and as-applied. With respect to their as-applied challenge, Plaintiffs claim that the application of the statutory discharge standard to the class members is unconstitutional because, since the inception of the program, no one has been fully released from MSOP. (Doc. No. 362 at 14 ("[T]he discharge standard under Minn. Stat. § 253D, as applied to the hundreds of individuals committed under that statute, which since its inception has failed to require the release of even one individual, demonstrates that the statute as applied is unconstitutional.").) With respect to their facial challenge, Plaintiffs contend that "the discharge standard allows the State to continue civil commitment" of sex offenders, even after the offenders "no longer meet[] the statutory criteria for commitment." (*Id.* at 16.)

In further support of their facial challenge, Plaintiffs claim that "the commitment statute does not provide for a periodic and independent review," and the "lack of an automatic independent review makes the discharge statute unconstitutional on its face because, as written, the statute is not narrowly tailored to guarantee" that individuals are only confined so long as they "continue[] to need further inpatient treatment and supervision for [their] sexual disorder[s] and to pose a danger to the public." (Doc. No. 396 at 11, 12.) In this manner, Plaintiffs assert that "the statute on its face fails to

---

[34]    A "plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation omitted).

bear a reasonable relationship to the original reason for commitment" and is thus unconstitutional. (*Id.* at 12.)

While Plaintiffs take issue with the standard for release as written,[35] insofar as "[t]he discharge standard does not mirror the requirements of the commitment standard" (Doc. No. 362 at 4), Plaintiffs also challenge "the consistently ineffective application of the entire program to all [c]lass members," including the discharge criteria.[36] (Doc. No. 396 at 5, 7.) Central to Plaintiffs' as-applied constitutional challenge is the question of each class member's current level of dangerousness. The SPP and SDP statutes require that, in order to be committed as a sex offender, an individual, among other things, must be "dangerous to other persons" or "likely to engage in acts of harmful

---

[35]      The discharge statute states the following:
          A person who is committed as a sexually dangerous person or a person with a sexual psychopathic personality shall not be discharged unless it appears to the satisfaction of the judicial appeal panel, after a hearing and recommendation by a majority of the special review board, that the committed person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision.
          In determining whether a discharge shall be recommended, the special review board and judicial appeal panel shall consider whether specific conditions exist to provide a reasonable degree of protection to the public and to assist the committed person in adjusting to the community. If the desired conditions do not exist, the discharge shall not be granted.
Minn. Stat. § 253D.31.

[36]      In other words, an individual may be initially committed to MSOP on proof of satisfaction of the statutory SPP or SDP criteria (*see* Minn. Stat. §§ 253D.02, 253D.07), but Minn. Stat. § 253D.31 prohibits discharge unless a patient satisfies a higher standard, which requires that he demonstrate, among other things, that he "is capable of making an acceptable adjustment to open society." Minn. Stat. § 253D.31. Plaintiffs allege that this one-way door has resulted in essentially lifelong commitment.

sexual conduct." *See* Minn. Stat. § 253D.02, subd. 15 (formerly Minn. Stat. § 253B.02, subd. 18b); Minn. Stat. § 253D.02, subd. 16 (formerly Minn. Stat. § 253B.02, subd. 18c). Thus, inherent in Plaintiffs' Complaint is the allegation that individuals who are no longer dangerous continue to be confined at MSOP.[37] (*See, e.g.*, Second Am. Compl. ¶ 213 ("Confinement that continues after the person no longer meets the statutory requirements for commitment violates due process.").)

Defendants acknowledge that MSOP includes eight "specialty units" for certain individuals, including, among others, the "Alternative Program Units," the "Young Adult Unit," and the "Assisted Living Unit." (Doc. No. 380 at 12 (citing Hébert Aff. ¶¶ 85-86).)[38] According to Defendants, the Alternative Program Units house 112 patients "with compromised executive functioning, cognitive impairments, or traumatic brain injuries," who "lack ability to succeed in the conventional programming." (Doc. No. 380 at 12 (citing Hébert Aff. ¶ 86).) The Young Adult Unit houses twenty-four patients between the ages of eighteen and twenty-five, "who require specialized treatment programming due to emotional immaturity and vulnerability." (Doc. No. 380 at 12-13

---

[37]   Plaintiffs' briefs in support of their motion for declaratory judgment do not explicitly raise arguments regarding each class member's current level of "dangerousness"; Plaintiffs are thus by no means limited to such challenges.

[38]   "About 41 percent of patients currently reside in one of the eight specialty units, with the remaining 59 percent resid[ing] in general, non-specialty units." (Doc. No. 380 at 12 (citing Hébert Aff. ¶ 85).)

(citing Hébert Aff. ¶ 86).) Meanwhile, eighteen patients reside in the Assisted Living Unit. (Doc. No. 380 at 13 (citing Hébert Aff. ¶ 86).)[39]

It defies reason that individuals who are comatose or otherwise completely incapacitated would be considered so dangerous as to require continued confinement in a secure, prison-like facility. Moreover, an individual who refuses to participate in treatment, but is no longer dangerous, cannot constitutionally continue to be confined in such a facility. *See Foucha*, 504 U.S. at 77 (noting that a committed individual "may be held as long as he is both mentally ill and dangerous, but no longer" and that it is "unconstitutional for a State to continue to confine a harmless, mentally ill person"). Due process would dictate that, in order for the State to justify continued commitment, the basis for commitment must continue to exist. *See id.* ("Even if the initial commitment was permissible," a civil commitment may not "constitutionally continue after that basis no longer exist[s]."). At this stage of the proceedings, however, the record does not contain any current assessments of dangerousness or other commitment criteria particularized to any class member. Plaintiffs have not presented the Court with any evidence with which the Court (or the appropriate experts) may evaluate each class member's current level of dangerousness. As such, the extent to which each class member poses a "real, continuing, and serious danger to society" remains to be

---

[39] Notably, the MPET Report found that "[t]he current criteria for phase progression may need to be modified for certain populations of clients, including those persons with intellectual or developmental disabilities, severe and persistent mental illness, and significant cognitive impairment (e.g., dementia)." (MPET Report at 5.)

ascertained as this case proceeds.[40]  *See Hendricks*, 521 U.S. at 372 (Kennedy, J.,

concurring).

While the Court acknowledges the obvious potential for an ongoing harm to

Plaintiffs, and notes that declaratory relief may ultimately be appropriate, a decision on

the issue of the constitutionality of the Minnesota statutes governing civil commitment

and treatment of sex offenders is premature at this juncture.  While Plaintiffs' allegations

have no doubt called into deep question Minnesota's sex offender commitment scheme,

Plaintiffs have provided no factual or evidentiary support for the proposition that any

class member is actually eligible for discharge under the applicable statutory provisions

or otherwise no longer meets the statutory criteria for initial commitment.  The experts

will address that issue, as articulated above, in their assessments of each of the class

members.  At this early stage, and on the current record, however, the Court has no way

of evaluating Plaintiffs' discharge-related claims.[41]

---

[40]    It is unquestionable that commitment, at the outset, must be justified by law.
Similarly (as discussed above with regard to dangerousness), continued commitment
must also be justified.  A statute that—as written, as applied, or as implemented—renders
discharge from a sex offender civil commitment program more onerous than admission to
it, such that individuals who no longer meet commitment criteria remain confined, raises
grave due process questions.  In that regard, the Court expresses serious doubts as to the
constitutionality of Minnesota's sex offender commitment statutes and their
implementation through MSOP.

[41]    Defendants claim that "MSOP provides a risk assessment to the SRB [Special
Review Board] when a patient petitions for discharge or provisional discharge" (Doc.
No. 382 at 4 (citing Doc. No. 386, Allen Aff. ¶ 5)), however, Defendants do not purport
to procure periodic, independent assessments or otherwise evaluate whether a patient
continues to meet the initial commitment criteria, even after potentially decades of
confinement in the program, unlike most other States (*see* OLA Report at xii, 89-91).  *But*
(Footnote Continued on Next Page)

It is also deeply disturbing that only two individuals have been provisionally released since the program's inception (and not a single patient has been fully released from the program). That fact alone, however, is insufficient to carry Plaintiffs' burden on their motion. *See Fitz v. Dolyak*, 712 F.2d 330, 333 (8th Cir. 1983) ("Since a presumption of constitutionality attaches to state legislative enactments, a party seeking to challenge a statute under this standard bears a heavy burden.") (citations omitted). Still, should the discovery process reveal that the application of the sex offender commitment statutes to the class members has resulted in confinement that has been rendered punitive—contrary to the statutory treatment purpose of commitment—the Court will not hesitate to rule on Plaintiffs' claims at the proper time. As such, the Court denies the motion for declaratory judgment without prejudice.

---

(Footnote Continued From Previous Page)

*see* Minn. Stat. § 253B.03, subd. 5 ("A patient has the right to periodic medical assessment, including assessment of the medical necessity of continuing care . . . . The treatment facility shall assess the physical and mental condition of every patient as frequently as necessary, but not less often than annually."). Moreover, the OLA Report found that the "SRB relies on MSOP treatment team reports and . . . MSOP risk assessment[s] in making [its] recommendations to SCAP" and noted that "both SRB and SCAP probably rely greatly on MSOP's assessments of [its] clients." (OLA Report at 88.) The Task Force Report also recommended that "the Legislature modify current law to provide for biennial review of the continued commitment of committed individuals, including review of the placement of the committed individual, without requiring the individual to request that review." (Task Force Report at 16.) The Task Force further noted that "[s]ignificant modifications of the process by which the need for continued commitment is determined and the standards for evaluating that need will address the serious issues of duration of commitment and the absence of meaningful release from commitment." (*Id.*)

**IV.     Motions for Preliminary Injunction**

**A.      Legal Standard**

A court considers four primary factors in determining whether to issue a

preliminary injunction:  (1) the threat of irreparable harm to the moving party; (2) the

likelihood of the moving party's success on the merits; (3) the state of balance between

the alleged irreparable harm and the harm that granting the injunction would inflict on the

other party; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d

109, 113 (8th Cir. 1981).  This analysis was designed to determine whether the court

should intervene to preserve the status quo until it decides the merits of the case.  *Id.*  In

each case, the factors must be balanced to determine whether they tilt toward or away

from granting injunctive relief.  *See West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d

1219, 1222 (8th Cir. 1986).  A preliminary injunction is an extraordinary remedy.  *See*

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

The party requesting the injunctive relief bears the "complete burden" of proving all of

the factors listed above.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th

Cir. 1987).

**B.      Less Restrictive Alternatives & Re-Evaluation of Class Members**

Plaintiffs move for an injunction for the creation of less restrictive alternatives to

confinement at MSOP facilities, as well as a re-evaluation of each of the class members

to determine whether they are each placed in the proper treatment phase and whether they

should be placed in a less restrictive facility.  (Doc. No. 364 at 1; Doc. No. 368 at 2.)

To the extent Plaintiffs seek re-evaluation, the Court has appointed several expert witnesses and has assigned them several tasks, as set forth above. One such task is to conduct extensive evaluations, which will require independent assessments of each of the class members. Such evaluations shall include, but will not be limited to, whether each class member is "placed in the proper treatment phase" and whether each class member would be a candidate for a less restrictive facility. Thus, to the extent Plaintiffs move for a re-evaluation of each of the class members, the motion is now moot. The Court nonetheless reserves the right to revise, expand, or otherwise amend the scope of expert review in this matter as the case progresses.

With respect to less restrictive alternatives, Plaintiffs allege that "MSOP does not provide for any less restrictive alternatives to confinement at Moose Lake or St. Peter, such as halfway houses or other less secure facilities." (Second Am. Compl. ¶ 68.) Plaintiffs claim that MSOP's failure to provide a less restrictive alternative to confinement at those secure facilities violates due process. (*See generally id.* ¶¶ 241-48.) Plaintiffs further note that MSOP, as implemented, fails to account for the fact that not all class members "have the same level of security needs." (*Id.* ¶ 245.) Additionally, Plaintiffs observe that if a patient "no longer meets the statutory requirements for civil commitment, there is no less restrictive facility or program for [him] to enter." (*Id.*)

While it previously appeared that Commissioner Jesson was taking steps toward moving some class members to a less restrictive facility[42] and seeking proposals for the creation of additional less restrictive alternative facilities,[43] any such efforts were thwarted, or at least put on hold indeterminately, by Governor Dayton's November 13, 2013 Letter. (*See* Dayton Letter at 2 (directing that Commissioner Jesson "oppose any future petitions by sexual offenders for provisional release" and "suspend [DHS's] plans to transfer any sexual offenders to other tightly supervised facilities, such as Cambridge").) Indeed, this kind of executive conduct may be a principal source of DHS's struggle to translate into reality a program—complete with less restrictive alternative treatment facilities—that Plaintiffs say exists only on paper.[44]

---

[42] On September 12, 2013, Commissioner Jesson sent a letter to state legislators identifying "a small group of [MSOP] clients who are low functioning and could be transferred to an existing DHS site" in Cambridge, which she expected "to become available in the spring of 2014 for use by MSOP later in 2014." (*See* Doc. No. 341 at 2 (quoting Jesson letter).)

[43] On August 1, 2013, DHS issued a request for proposals for the development of "less restrictive but highly supervised placements for individuals who would be provisionally discharged after having been initially committed to a secure treatment facility." (Jesson Aff. ¶ 16, Ex. C.)

[44] Such political activism with respect to MSOP is not new. To be sure, Governor Pawlenty previously issued an Executive Order in 2003, directing that state agencies "ensure that no person who has been civilly committed under Minnesota law as a sexually dangerous person or as a person with a sexual psychopathic personality is discharged into the community," and that the DHS Commissioner "take all appropriate actions within his authority to ensure that persons who have been civilly committed as sexually dangerous persons or as persons with sexual psychopathic personalities are not allowed into the community on pass status, provisional discharge or otherwise," unless required by law or court order. (Gustafson Aff. II ¶ 3, Ex. A ("Pawlenty 2003 Executive Order") ¶¶ 2-3, *available at*

(Footnote Continued on Next Page)

To the extent Plaintiffs seek the immediate creation of less restrictive alternatives, the motion is premature nonetheless. Without a current assessment of each of the class members to determine the exact need for facilities alternative to Moose Lake and St. Peter, the Court has no way of establishing the specific parameters of such less restrictive facilities—for example, how many facilities might need to be created, how many individuals any such facility could and should house, what unique services each facility would provide, and the varied levels of security that each would necessitate.

The tasks of the Court-appointed experts, as delineated above, include an assessment of the specific need and parameters for any less restrictive alternative facilities. Of course, a determination of what features and services less restrictive alternatives to Moose Lake and St. Peter should have is directly related to expert evaluation of each of the class members, including dangerousness, which likely will require a current risk assessment for each of MSOP's approximately 700 clients. Once the experts have conducted and completed their evaluations, and the record has been adequately supplemented, the Court may then address the issues raised in Plaintiffs' motion on the merits and may thus determine what additional facilities are necessary and constitutionally required. As it stands now, however, at this early stage, Plaintiffs have not pointed to sufficient evidence to demonstrate that they are entitled to the immediate

---

(Footnote Continued From Previous Page)

http://www.leg.mn/archive/execorders/03-10.pdf.)  Governor Pawlenty further ordered that state agencies fulfill their responsibilities regarding SPPs and SDPs "with the primary consideration of providing protection to the public."  (*Id.* ¶ 1.)

creation of, and placement in, less restrictive alternative facilities. Having considered each of the relevant *Dataphase* factors, the Court concludes that Plaintiffs have not carried their burden of establishing that injunctive relief is warranted at this early stage of the proceedings. To be clear, however, the Court will not hesitate to order less restrictive alternatives if Plaintiffs establish that such facilities are constitutionally required. In light of the foregoing considerations, Plaintiffs' motion is denied without prejudice.

### C. Special Master

Plaintiffs have also moved for the appointment of a special master. Specifically, Plaintiffs "request a [s]pecial [m]aster to *oversee* the implementation of changes that will lead to a constitutional treatment program." (Doc. No. 398 at 18 (emphasis in original).) A court "may, in its discretion, make appointment of a Master to assist in any of the incidents of a proceeding before it, . . . so long as there is no infringement upon the right of trial by jury or any prejudice to other substantive right." *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956).

For the reasons articulated above, the Court has declined to rule on the constitutionality of MSOP, or its implementing statutes, at this time. The Court has further denied Plaintiffs' motions for injunctive relief. As such, any request for the appointment of a special master to oversee changes to the program is premature at this stage of the proceedings. The Court makes no determination, however, as to whether a special master may be required in the future and reserves the right to appoint such an

individual should the record, as developed, support such a need.  Consequently, the Court denies the motion without prejudice.[45]

## CONCLUSION

Having fully considered the pleadings and arguments of counsel, the Court concludes that each count of Plaintiffs' Complaint (with the exception of the equal protection claim) easily survives dismissal.  With respect to Plaintiffs' motions, the primary basis upon which Plaintiffs seek declaratory and injunctive relief is the inference that Plaintiffs suggest should be made from the fact that no one has ever been fully discharged from MSOP.  While that fact is certainly compelling, it, alone, is insufficient for the Court to grant the requested relief at this early stage of the proceedings.  Indeed, such a fact should not be taken lightly, and may indicate pervasive constitutional inadequacies of the program; the purpose of the discovery and expert review processes is to shed light on such claims.  Though Plaintiffs are not currently entitled to the injunctive and declaratory relief they seek, they may well be entitled to such relief if they establish, and prove true, the allegations set forth in the Complaint.

As is evident from the law cited throughout this opinion, Minnesota may not constitutionally confine individuals at MSOP for punishment or deterrent purposes.  Given the prison-like conditions described by Plaintiffs, and the lack of treatment and essentially no-exit regime alleged in this case, it may well be that, with a fully developed

---

[45]    Plaintiffs' assertions, if proven true, may well obligate the Court to appoint a special master, as other courts throughout the nation have done in similar cases.  At this juncture, however, such an appointment is premature for the reasons stated above.

record, the Court will find the totality of the MSOP system to be unacceptably and unconstitutionally punitive.  *See Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring).

In addition, one would expect that a non-punitive, civil commitment scheme would provide treatment for those committed because of a "mental disease or mental abnormality."  *See id.* at 372.  What is more, Minnesota law dictates that civilly committed individuals have "the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary."  Minn. Stat. § 253B.03, subd. 7.  If the evidence confirms Plaintiffs' contentions, and MSOP systemically fails to provide patients with appropriate treatment, whether because of a lack of qualified staff, a misguided approach, excessive restrictions, or some other reason, the Court, like others, will not hesitate to take strong remedial action.[46]

Likewise, despite "the object or purpose" of Minnesota's civil commitment law to provide treatment, if "the treatment provisions were adopted as a sham or mere pretext"

---

[46]      In one such example, the United States District Court for the Western District of Washington found that treatment professionals at Washington's sex offender program had "departed so substantially from professional minimal standards as to demonstrate that their decisions and practices were not . . . based on their professional judgment."  *Turay v. Seling*, 108 F. Supp. 2d 1148, 1159 (W.D. Wash. 2000).  The court initially issued an injunction based on conditions that included the following:  inadequate staffing, inadequate training of staff regarding the clinical mission of the facility, the lack of individualized treatment, the absence of arrangements for clients to transition to release, inadequate provisions to allow clients' families to participate in treatment, and a punitive treatment environment.  *See id.* at 1151 n.1.  The court ultimately required state officials to provide constitutionally adequate mental health treatment to sex offenders in the program and monitored their compliance over a thirteen-year time period.  *Id.* at 1152; *see also Turay v. Richards*, No. C91-0664RSM, 2007 WL 983132, at *5 (W.D. Wash. Mar. 23, 2007) (dissolving the injunction).

for continued detention, such a scheme would indicate "the forbidden purpose to punish." *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring). It is the treatment provisions of the statutory scheme that purportedly distinguish Minnesota's sex offender commitment law from criminal punishment. Therefore, individuals must be committed for the purpose of receiving treatment—not as retribution for their past criminal acts, however heinous, for which they have already served and completed their sentences. *See Crane*, 534 U.S. at 412 (distinguishing "a dangerous sexual offender subject to civil commitment from other dangerous persons" and finding such a distinction "necessary lest civil commitment become a mechanism for retribution or general deterrence—functions properly those of criminal law, not civil commitment") (internal quotations omitted); *see also Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring) ("If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function.").[47] (*But see* Pawlenty 2003 Executive Order ¶ 1

---

[47]    As more fully stated by Justice Kennedy in his consideration of the law at issue in *Hendricks*:

> Notwithstanding its civil attributes, the practical effect of the Kansas law may be to impose confinement for life. At this stage of medical knowledge, although future treatments cannot be predicted, psychiatrists or other professionals engaged in treating pedophilia may be reluctant to find measurable success in treatment even after a long period and may be unable to predict that no serious danger will come from release of the detainee.

> A common response to this may be, "A life term is exactly what the sentence should have been anyway," or, in the words of a Kansas task force member, "SO BE IT." Testimony of Jim Blaufuss, App. 503. The point, however, is not how long Hendricks and others like him should serve a criminal sentence. With his criminal record, after all, a life term may well have been the only sentence appropriate to protect society and vindicate the wrong. The concern instead is whether it is the criminal system or the civil

(Footnote Continued on Next Page)

(ordering that state agencies "fulfill their responsibilities" in relation to SPPs and SDPs "with the primary consideration of providing protection to the public").)

Plaintiffs charge that political maneuvering by various executive branch officials has played far too great a role in the administration of MSOP—in contravention of sound professional judgment and best practices; not only have Governors past and present issued executive directives prohibiting discharge from, and exercising control over, the system, but the Attorney General has also intervened in provisional release proceedings, which Plaintiffs suggest has politicized a process best left to treatment professionals in the field. Without in any way prejudging the outcome here, the Court must emphasize that politics and stigma cannot trump the fundamental rights of the class members who, pursuant to state law, have been civilly committed to receive treatment. To be sure, where state actors fail to remedy constitutional infirmities of statutes and programs such as those at issue here, the federal courts may be called upon to act in the interests of justice, as required by the evidence.

---

(Footnote Continued From Previous Page)

> system which should make the decision in the first place. If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function. These concerns persist whether the civil confinement statute is put on the books before or after the offense. We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.

*Hendricks*, 521 U.S. at 372-73 (Kennedy, J., concurring).

Today, the Court finds that it is constitutionally mandated that only individuals who constitute a "real, continuing, and serious danger to society" may continue to be civilly committed to MSOP. *See Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring). If the evidence demonstrates that MSOP systematically continues to confine individuals who are not "a real, continuing, and serious danger to society," then such confinement will be held unconstitutional. *See id.* Thus, the confinement of individuals with substantial medical or intellectual disabilities, who might never succeed in MSOP's program, or are otherwise unlikely to reoffend, may be called into serious question.

As this case proceeds, the Court will address the global challenge to the policies, conditions, and practices maintained by Defendants. That those committed and confined to MSOP are sex offenders, who may be subject to society's opprobrium, does not insulate the system from a fair and probing constitutional inquiry. If the program violates the Constitution, the Court will so find and act accordingly.

On the record currently before the Court, however, Plaintiffs have failed to demonstrate compelling circumstances sufficient to justify injunctive or declaratory relief at this time. The Court thus denies Plaintiffs' motions, but without prejudice to renewing their motions upon the completion of discovery. The Court cautions the parties that its rulings on the motions currently before it will not dictate any future rulings the Court may make with the benefit of a complete factual record. That is to say, the Court will not hesitate to change course with respect to the relief sought by Plaintiffs should discovery and expert review reveal evidentiary support for Plaintiffs' claims.

While the Court has limited its review of Defendants' motion to dismiss to the Complaint and matters of public record, and Plaintiffs' requests for injunctive relief to the record currently before the Court, it is worth noting that Plaintiffs and the amicus curiae reference commitment schemes established by other states and specialized research that indicate that the "vast majority" of sex offenders can be "safely managed in the community." (*See, e.g.*, Doc. No. 410, Nelson Aff. ¶ 2, Ex. 1 at 9.)[48] As a former Assistant County Attorney who prosecuted sexual assault and child sexual abuse cases, and as a former Minnesota District Court Judge who handled many such cases,[49] the undersigned is sensitive to the interests of all of the individuals affected by this matter, as well as the concerns of the public at large.[50]

---

[48]    As stated by Grant Duwe, Minnesota Department of Corrections Director of Research:

> [M]any high-risk sex offenders can be managed successfully in the community. The cost of civil commitment in a high-security facility also implies that this type of commitment should be reserved only for those offenders who have an inordinately high risk to sexually reoffend. Reducing the reliance on civil commitment in a high-security facility could involve fewer new commitments on the front end and more provisional discharges on the back end.

(Nelson Aff. ¶ 2, Ex. 1 at 9.)

[49]    The undersigned was also appointed to serve as a member of the Minnesota Attorney General's Task Force on the Prevention of Sexual Violence Against Women in 1988.

[50]    The Court has received various letters from not only victims and family members of victims of committed individuals, but also from family members of MSOP clients as well as individuals who claim to have experienced MSOP first-hand.

If the evidence requires it, the Court will act. But it is the Minnesota Legislature that is best equipped to develop policies and pass laws—within the limits of the Constitution—that both protect public safety and preserve the rights of the class.

The time for legislative action is now. Time and again, professional assessments have identified grave deficiencies in the program. Regardless of the claims raised in this case, and irrespective of the Court's ultimate rulings on any constitutional questions with which it is presented, the interests of justice require that substantial changes be made to Minnesota's sex offender civil commitment scheme.[51] Whether or not the system is constitutionally infirm, without prompt action on the part of the legislature and DHS, MSOP's reputation as one of the most draconian sex offender programs in existence will

---

[51]     If the legislature's public safety concerns stem from inadequate criminal penalties for crimes of sexual violence, criminal statutes may warrant revision as well. (*See, e.g.*, OLA Report at 46 ("The Legislature should consider providing indeterminate sentencing for some sex offenders. As a condition of their release, offenders could be required to successfully complete treatment in prison."); Task Force Report at 5 (noting the availability of "extended correctional supervision following release from confinement" for certain sexual offenses and expressing that "providing treatment to sex offenders while they are subject to the jurisdiction of the DOC appears to be effective and cost-effective, and expansion of those treatment programs should be examined carefully, regardless of any changes in sentencing laws for sexual offenses").)

    Moreover, separate from the issue of indeterminate sentencing, extended correctional supervision may, and often does, include GPS monitoring, treatment, curfews, alcohol and drug testing, and other conditions of release and supervision. *See, e.g.*, Minn. Stat. § 609.3455, subd. 8 (noting that conditions of release "may include successful completion of treatment and aftercare" program); Minn. Stat. § 244.05, subd. 6 (permitting imposition of conditions of release including random drug testing, house arrest, daily curfews, and electronic surveillance as well as participation in "an appropriate sex offender program").

continue.[52]  The program's systemic problems will only worsen as hundreds of additional

detainees are driven into MSOP over the next few years.[53]  The politicians of this great

State must now ask themselves if they will act to revise a system that is clearly broken, or

stand idly by and do nothing, simply awaiting Court intervention.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint

(Doc. No. [374]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     With respect to Plaintiffs' equal protection claim, the motion

is **GRANTED**.  Count X of Plaintiffs' Second Amended Complaint (Doc.

No. [301]) is thus **DISMISSED**.

b.     To the extent Plaintiffs may seek monetary damages against

Defendants in their official capacities, the motion is **GRANTED**.

---

[52]     Criticism of MSOP is not only domestic, but is international in reach.  Even Great Britain has refused to extradite a sex offender when the government would not guarantee that the suspect would be kept out of MSOP—a program the court deemed "far too draconian."  Maricella Miranda, *UK Court Blocks Eagan Sex-Crimes Suspect's Extradition*, Pioneer Press (June 28, 2012), http://www.twincities.com/ci_20961564/uk-court-blocks-minnesota-sex-crimes-suspects-extradition; *see* Ian Evans, *Britain Denies Extradition of Minnesota Sex Suspect*, Star Trib. (June 28, 2012), http://www.startribune.com/local/south/160704485.html (noting that London court found that a commitment to MSOP would be a "flagrant denial" of the suspect's human rights).

[53]     The OLA Report noted that "under current law and practices," the population of MSOP is projected to reach 1,109 by the year 2020.  (OLA Report at 4, 6 ("Expected growth from 2010 to 2020 is 93 percent under current law and practices.").)

c.    In all other respects, Defendants' motion is **DENIED**.

2.    Plaintiffs' Motion for Declaratory Judgment (Doc. No. [360]) is **DENIED WITHOUT PREJUDICE**.

3.    Plaintiffs' Motion for Preliminary Injunction to Provide Less Restrictive Alternative Treatment Facilities and to Re-Evaluate Class Members (Doc. No. [364]) is **DENIED WITHOUT PREJUDICE**.

4.    Plaintiffs' Motion for Preliminary Injunction for the Appointment of a Special Master to Oversee the Minnesota Sex Offender Program (Doc. No. [368]) is **DENIED WITHOUT PREJUDICE**.

5.    With respect to the experts appointed pursuant to Rule 706 of the Federal Rules of Evidence (*see* Doc. No. [393]), the Court orders the following:

a.    The experts' work shall include, but shall not be limited to:

i.    Evaluating all class members[54] and issuing reports and recommendations as to: (a) each class member's current level of dangerousness (current risk assessment), including whether each class member poses a "real, continuing, and serious danger to society"; (b) whether each class member is actually eligible for discharge under the applicable statutory provisions or otherwise no longer meets the statutory criteria for initial commitment (or should

---

[54]    The experts shall commence their comprehensive evaluations with those individuals residing in the Assisted Living Unit, the Alternative Program Units, and the Young Adult Unit.

otherwise be recommended for provisional or full discharge);

(c) whether each class member is placed in the appropriate phase of treatment; (d) whether each class member would be a candidate for a less restrictive facility; and (e) the specific need and parameters for less restrictive alternative facilities,[55] including the operation of such facilities;

    ii.        Reviewing the current treatment program at MSOP and its implementation to determine whether the program meets professional standards of care and treatment for sex offenders and issuing recommendations as to any changes that should be made to the treatment program; and

    iii.       Reviewing current MSOP policies and practices with regard to the conditions of confinement to determine whether they satisfy the balance between safety concerns and a therapeutic environment and making recommendations for any changes that should be made to the conditions of confinement at both the Moose Lake and St. Peter facility.

    iv.       The experts shall also report to the Court on the following:  (a) the current professional standards for the treatment of

---

[55]     In addition to developing proposals for any new in-patient facilities and issuing recommendations as to individual class member placement therein, the experts should also consider possible out-patient treatment options, and shall identify any class members who, in their professional judgment, are appropriate candidates for out-patient treatment.

civilly committed sex offenders and the extent to which MSOP's program design reflects those standards; (b) how other civil commitment programs have reintegrated civilly committed sex offenders into the community, with particular attention to community relations; and (c) how other states, if any, are providing treatment and management of lower-functioning civilly committed sex offenders in community settings.

b.      The experts' work shall begin with, but will in no way be limited to, the following:

i.      Reviewing MSOP treatment and screening program/process;

ii.      Conducting site visits to St. Peter and Moose Lake and interviewing patients and staff at each facility;

iii.      Reviewing 20% to 25% of resident charts, with the aim of reviewing 100% of charts for those individuals in the Assisted Living Unit, the Alternative Program Units, and the Young Adult Unit; and

iv.      Identifying residents who are not receiving appropriate services and making recommendations related thereto.

c.      In conducting their work, the experts shall have complete and unrestricted access to documents they may require, including the reference documents and MSOP policy documents set forth above as well as patient

files and clinical documents.

d.      Within fourteen (14) days of the date of this Order, and in the format requested by the experts, Defendants shall provide the experts with all of the reference documents and MSOP policies and procedures requested by the experts.  (*See* Doc. No. [422].)

e.      DHS, and all officials, staff, consultants, and contractors for DHS, are directed to provide the appointed experts with full and complete access to all residents and staff as well as all relevant information, documents, and records requested by the experts.  Such access shall include, but shall not be limited to, the following:

 i.      Access to all patient files and related documentation;

 ii.      Access to meet with, interview, or otherwise communicate with MSOP patients;

 iii.      Access to all MSOP policymakers as well as all policies and related documentation;

 iv.      Access to review the current conditions of confinement at MSOP and related policies and rules;

 v.      Access to review all aspects of the current treatment program provided by MSOP; and

 vi.      Access to privately meet with, interview, or otherwise communicate with DHS officials, staff, consultants, and contractors for DHS.

vii.     DHS shall also create and provide any aggregation or analysis of data requested by the appointed experts.

f.     In conducting their work, the experts may call upon the MPET members previously appointed by the Court (*see* Doc. No. [281]) as well as Roberta Opheim, Minnesota State Ombudsman for Mental Health and Developmental Disabilities, as necessary.

g.     The experts may convene meetings, confer with relevant individuals and groups, attend case-related court proceedings, and review all documents submitted to the Court.  The parties shall henceforth serve the experts with all such papers.

h.     The experts shall have *ex parte* access to the Court and its Technical Advisor for logistical and organizational purposes, subject to the limitations of Rule 706.

i.     To facilitate the integrity and effectiveness of the experts' work, their communications with one another and work product (such as draft documents, correspondence, e-mails, and conversations) shall be privileged, confidential, and not admissible.

j.     The experts' work will be overseen and coordinated by Magistrate Judge Jeffrey J. Keyes, with the assistance of the Court's Technical Advisor.

k.     The parties shall meet and confer, facilitated by the Court's Technical Advisor if necessary, to establish an interim budget deposit for the experts and a mechanism for payment.  Without prejudice to subsequent adjustment, such costs shall be initially allocated to Defendants.

Dated:  February 19, 2014                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge