1        UNITED STATES DISTRICT COURT

2        DISTRICT OF MINNESOTA

3    ------------------------------------------------------------
                                  )
4    Kevin Scott Karsjens, David  ) Case No. 11-CV-3659(DWF/JJK)
     Leroy Gamble, Jr., Kevin John )
5    DeVillion, Peter Gerard       )
     Lonergan, James Matthew Noyer,)
6    Sr., James John Rud, James    )
     Allen Barber, Craig Allen     )
7    Bolte, Dennis Richard Steiner,)
     Kaine Joseph Braun,           )
8    Christopher John Thuringer,   )
     Kenny S. Daywitt,             )
9    Bradley Wayne Foster, and     )
     Brian K. Hausfeld, and others )
10   similarly situated,           )
                                   )
11            Plaintiffs,          )
                                   )
12       vs.                       ) St. Paul, Minnesota
                                   ) July 14, 2014
13   Lucinda Jesson, Dennis Benson,) 9:40 a.m.
     Kevin Moser, Tom Lundquist,   )
14   Nancy Johnston, Jannine       )
     Hébert, and Ann Zimmerman,    )
15   in their individual and       )
     official capacities,          )
16                                 )
              Defendants.          )
17   ------------------------------------------------------------

18        BEFORE **THE HONORABLE DONOVAN W. FRANK**
19        UNITED STATES DISTRICT COURT JUDGE
          BEFORE **THE HONORABLE JEFFREY J. KEYES**
20     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

21           **EVIDENTIARY HEARING - DAY ONE**

22
     Official Court Reporter:  JEANNE M. ANDERSON, RMR-RPR
23                             Suite 146 U.S. Courthouse
                               316 North Robert Street
24                             St. Paul, Minnesota 55101

25          Proceedings recorded by mechanical stenography;
     transcript produced by computer.

```
 1     APPEARANCES:

 2

 3     For the Plaintiffs:        Gustafson Gluek PLLC
                                  DANIEL E. GUSTAFSON, ESQ.
 4                                KARLA M. GLUEK, ESQ.
                                  DAVID A. GOODWIN, ESQ.
 5                                RAINA BORRELLI, ESQ.
                                  120 South 6th Street, Suite 2600
 6                                Minneapolis, Minnesota 55402

 7

 8     For the Defendants:        Minnesota Attorney General's Office
                                  NATHAN A. BRENNAMAN, ESQ.
 9                                SCOTT H. IKEDA, ESQ.
                                  AARON WINTER, ESQ.
10                                445 Minnesota Street, Suite 1100
                                  St Paul, Minnesota 55101-2128
11

12              And

13                                Hennepin County Attorney's Office
                                  JOHN L. KIRWIN, ESQ.
14                                300 South 6th Street, Suite A-2000
                                  Minneapolis, Minnesota 55487
15

16

17

18

19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3                THE HONORABLE JUDGE FRANK:  You may all be seated.

4     Thank you.

5                I will first apologize for the late start.  Trying

6     to coordinate things with input from all parties and

7     including working with our own Court Security Officers,

8     Marshal's Service, parties.  But if someone is interested or

9     frustrated with that, then you should place it on my

10    shoulders, not anyone else's.

11               And we tried to -- we have an overflow courtroom

12    in the event so we don't deny access to individuals, even

13    though in a perfect situation we would have more seating.

14    We've arranged the other courtroom as we did the last time.

15               With that, before we kind of set the order of

16    events today, why don't we have introductions by respective

17    counsel.  We can start with Mr. Gustafson and counsel for

18    the Plaintiffs.

19               MR. GUSTAFSON:  Thank you.  Good morning,

20    Your Honors.  Dan Gustafson from Gustafson Gluek,

21    Minneapolis, on behalf of the Plaintiffs in the Class.  With

22    me are my partners, Karla Gluek, Raina Borrelli, David

23    Goodwin, Sarah Moen, and then just to Sarah's left is

24    Mr. Terhaar, and Ms. Minor from the MSOP.  And then on the

25    first bench, Your Honor, Ms. Bailey and Ms. Todd-Bense.  So

1    that's our team.

2           MR. BRENNAMAN:  Thank you, Your Honors.  Good

3    morning.  Nathan Brennaman from the Minnesota Attorney

4    General's Office here today on behalf of the Defendants in

5    the Karsjens Class action, and here today also on behalf of

6    the Commissioner as Respondent in the two habeas matters.

7           Although, I would like to note and as the Court is

8    aware, we have made a legal element that the evidentiary

9    hearing, at least insofar as the habeas petitions, should

10   not happen.  And my appearance today on behalf of

11   Commissioner Jesson, as Respondent, is not intended to be a

12   waiver of that legal argument.

13          THE HONORABLE JUDGE FRANK:  We'll discuss the

14   agenda.  We filed that order on July 10th, trying to set the

15   scope of it, and whether or not at a future time or within

16   any -- presumably tomorrow, any oral arguments on habeas,

17   obviously, that order says we will be receiving testimony

18   today on the 1983 action.  And obviously, that's objected to

19   by Plaintiff, but we'll make sure that the "W" word, waiver,

20   is not an issue for either Plaintiff or Defendant before we

21   close the record on this hearing, whether that closure comes

22   today or tomorrow.

23          MR. BRENNAMAN:  Okay, thank you, Your Honor.  I

24   just thought I would not it.  And I have here also with me

25   today, Scott Ikeda from the Minnesota Attorney General's

1    Office, and Aaron Winter.

2              Although I'll be doing most of the heavy lifting,

3    I think that they will be participating in helping out with

4    the hearing.  Thank you.

5              THE HONORABLE JUDGE FRANK:  Mr. Gustafson, I

6    thought you were trying to get up and head for the mike,

7    there.

8              MR. GUSTAFSON:  You saw me try to get out of my

9    seat, there.

10             I just wanted to say that we don't have any

11   objection to proceeding with the evidentiary hearing on the

12   1983 case first.  I think your Order makes clear that the

13   evidence is going to be preserved in the event that a habeas

14   evidentiary hearing is required or combined, or however we

15   might fashion it.

16             But we think that it's most efficient now to not

17   deal with the issues that habeas might -- that might arise

18   separately in the habeas cases.  And if we get to tomorrow

19   or the end of the day today and we have that argument and

20   Your Honors decide you want to hear that evidence, we're

21   prepared to go forward.

22             But, we agree with the state that we ought to

23   start with the 1983 evidence and see how it goes.

24             THE HONORABLE JUDGE FRANK:  Why don't we kind of

25   set the stage for today's -- the hearing's events.

1    First of all, before we call upon counsel to kind

2    of begin with a couple of inquiries on the current status of

3    the case with respect to -- and we'll be using names today,

4    but with respect to E.T. and R.B. -- we'll use the names out

5    of respect.  And I don't mean disrespect by using the

6    initials, initially.

7    One, as we touched on before and the Order

8    clarifies from July 10th, consolidation not unique to this

9    case means different things to different individuals.  But

10   there was never an intent by the Court to, when the cases

11   were related and then consolidated, they were consolidated

12   initially, like in many cases, for the limited purpose of

13   having two judicial officers manage the case.

14   Because many cases are consolidated and that

15   doesn't mean everything is joined in one hearing for one

16   trial.  And so we tried to set out in an order to clarify

17   how we will proceed in fairness to both parties, and that

18   Order was filed, as the parties know, and it was public on

19   July 10th.

20   Secondly, I don't think there's any confusion with

21   the parties, but sometimes people less familiar with Federal

22   Court.  They like to -- maybe the right word is speculate

23   about, well, why is both an Article III Judge and a

24   Magistrate Judge together up on the podium?  Not all that

25   unusual.

1            For example, for a number of you who have been in

2      the national cases and a number have had the multidistrict

3      litigation cases and other cases, we're doing it here

4      similarly to that, for this reason.  Whether issues come

5      up -- and we did it for the same reason last time -- it's

6      our goal, and that is one of the agenda items that we will

7      discuss at the end of the hearing about expediting and

8      moving up the final trial dates.  Frankly speaking, our goal

9      is to move them to sometime this fall, not next spring.

10            So, whether it is a discovery issue, which in our

11      District Magistrate Judges here or because Magistrate Judge

12      Keyes has been involved, as you know, for well over a couple

13      of years in the case, we felt that justice required and that

14      we could best serve all parties if we hear all issues.  So,

15      whether it's a discovery issue, it's a scheduling issue, we

16      are prepared to act on those -- unless you have something to

17      add to that, Judge Keyes?  So, that's really -- there's no

18      mystery to it, that is the purpose.

19            Now, we'll set the stage for today's events and

20      perhaps tomorrow.

21            We're going to first inquire of counsel.

22            (Cell phone interruption.)

23            THE HONORABLE MAGISTRATE JUDGE KEYES:  That's why

24      I should probably not be on the Bench.

25            THE HONORABLE JUDGE FRANK:  No contempt findings

1    today.

2            Now, it's interesting, since that happened, an

3    increasing number of federal courthouses across the country

4    and federal buildings have lockers as you come in downstairs

5    and lock up everybody's cell phones, iPads.  We try to take

6    a more what I'll call, pro-public, pro-lawyer approach.  And

7    we haven't had it backfire, although we've had a few people

8    call us to say, "Did you see the people taking pictures in

9    the back of the courtroom with their iPhones?"  Not to plug

10    one brand over another.

11            We have tried to work with parties, and we're

12    unified as a bench on this.  And so, hopefully, we'll

13    continue with that practice, but there is a trend across the

14    country to have lockers, or in some of the rural areas tell

15    you to go back to your car and lock them up.  We've tried to

16    avoid that and haven't had any miscarriage of justice, yet.

17            We'll be seeking an update before we begin the

18    testimonial piece of the case on the status of the two

19    individuals that are the focus of the hearing, an update on

20    their living situation, a discussion with counsel, which

21    isn't unique to this case, about if we can have an expedited

22    process for admission of exhibits for this particular

23    hearing.

24            Then, if counsel wish -- if respective counsel

25    wish, as you had a communication from my chambers at the end

1    of last week, if you, one or both, want to give any

2    introductory or opening statements; but, prior to that, the

3    intent of the Court -- and when we reach that point, we'll

4    give you a chance to put anything on the record.  But, with

5    or without objection, here is how we intend to proceed.

6            Since we have the four 706 experts here in the

7    courtroom, we would intend to call, the Court to call for a

8    narrative summary of their reports.

9            First, Dr. Robin Wilson, then Dr. Mike Miner, then

10   after those, set the background, even though they've all

11   four signed the 706 reports, then Dr. Naomi Freeman to

12   discuss Eric, and Deborah McCulloch to discuss Rhonda.

13           And we'd bring all four on without any inquiry by

14   counsel.  Then we'd stop, with or without a recess, and then

15   we'll proceed with the Attorney General's Office calling

16   each of the experts, if they choose, for any examination,

17   direct or cross, and that will be up to each counsel.

18           And I put it in that order, unless the parties

19   stipulate otherwise, because:  One, there was a request for

20   an evidentiary hearing; and two, separate from that, this is

21   happening pursuant to an Order to Show Cause.  That doesn't

22   mean anybody has switched to burden of proof, but we do it

23   in that order.

24           So that these individuals would give a narrative

25   summary of 706 experts in their respective roles to give

1    counsel a precise idea of, well, they all signed off on the

2    reports, but who interviewed whom and what was their

3    specific part of this if it varied amongst the four.

4         So, when we get to that -- and then when that

5    examination is done by counsel, then who -- if there are

6    issues about who then is going to be called by each

7    respective counsel, we'll proceed, accordingly.

8         And then as the agenda said, once all the

9    testimony has been received, I'll refer to it generically as

10   the Karsjens case.  Then we'd hear arguments on Plaintiffs'

11   Motion for an Aftercare Plan specific to the Karsjens case,

12   argument on the habeas petitions with a reference to

13   exhaustion of remedies, and then a discussion of filing of

14   redacted versions of documents and briefs, including making

15   completely unredacted versions available to the respective

16   County Attorneys consistent with their request and their

17   second amicus brief and notice provisions to them as the

18   cases proceed.  And then a discussion of scheduling.  And

19   what we mean by "scheduling" is moving up things, not moving

20   them back.

21        So, where that leaves us now is we would likely

22   first begin with an update on the SRB hearing that occurred

23   on July 2nd from each party, then an update on the living

24   situation of each party, then we'll proceed as we've

25   indicated.

 1              And then if there is an issue about order of

 2      presentation or how we have suggested that we'll be first

 3      having each of the four 706 experts come up, and then after

 4      the parties call them one at a time, our thought being that

 5      apart from the discussion of the Court to proceed in that

 6      fashion, it actually might assist counsel rather than

 7      stopping after each 706 expert and then examining so that

 8      you can see their respective roles in addition to what they

 9      have set forth in their report to the Court.

10              So, Mr. Gustafson, you stood up just a moment ago?

11              MR. GUSTAFSON:  I can't resist, Your Honor.

12              As I understand E.T.'s SRB situation, the SRB

13      ruled -- the hearing was on July 2nd.  I believe the SRB

14      ruled last Thursday or Friday.  They agreed that he should

15      be sent to CPS as requested by the Executive Director of the

16      MSOP, Nancy Johnston.  My understanding on where they are

17      currently is that their living arrangements have not

18      changed.

19              THE HONORABLE JUDGE FRANK:  Well, and just because

20      you mentioned it, that is in part the recommendation.  The

21      question I'm going to have is, actually, the SRB

22      recommendation is moving Eric Terhaar into a "modified

23      community preparation service program," and since he has

24      been in Phase I we have some questions:  Well, does that

25      mean, as Judge Keyes and I discussed earlier and he may have

1    a follow-up here, that there would have to be another

2    approach to the SRB Panel on community integration and

3    provisional discharge issues?

4            MR. GUSTAFSON:  We don't understand what that

5    language means, Your Honor.  As I understand it, there are

6    no SRB members on the witness lists.  That may not be right,

7    but I think that's correct.  So, I don't know what that

8    language means, but it clearly suggests that there are some

9    different plans in mind.

10           I think maybe perhaps Ms. Nancy Johnston might be

11   able to answer those questions, I don't know.  But as far as

12   I understand it, their living situation has not changed.

13           THE HONORABLE MAGISTRATE JUDGE KEYES:  And it

14   wouldn't change at least until the period of time runs for

15   the SCAP Panel to do anything about the SRB recommendations.

16   Is that right?

17           MR. GUSTAFSON:  That is my understanding is that

18   the SCAP Panel has to issue an order before Mr. Terhaar

19   could be moved.

20           With respect to -- I was just going to go on to

21   tell you what we were thinking about the exhibits and see if

22   that's acceptable.  When we exchanged the exhibit lists, we

23   went over the Defendants' exhibit list, and there were only

24   a few items that were not on our list.  We have some on ours

25   that aren't on theirs.

1          But, anyway, we ended up making one joint list

2     essentially which was filed last night, and the exhibits are

3     all marked, premarked as Exhibit 1, 2, 3, 4, without regard

4     to who offers them.

5          We don't think that there will be particular -- a

6     lot of objections about the exhibits.  I think that the safe

7     way to say it is the State's view of this hearing is more

8     limited than my view of this hearing, and so there will be

9     objections as to certain topics, and with that will come or

10    go some exhibits.

11         But, I don't think there will be much by way of

12    objections to specific exhibits once the Court has

13    determined that that topic is relevant for this hearing.

14    And we thought we would offer them as we went --

15         THE HONORABLE JUDGE FRANK:  All right.

16         MR. GUSTAFSON:  -- as opposed to pre-admitting

17    them.

18         MR. BRENNAMAN:  Thank you, Your Honor.  I have

19    nothing to add on the SRB or the recommendation.  The Court

20    appears to have that.  If the Court has questions about that

21    language that appears in that, we will have Nancy Johnston.

22    We plan to call her, and perhaps Jannine Hebert has

23    something to say about that, as well, but hopefully those

24    terms can get answered.

25         In terms of the SCAP process, under the statute at

1    this point, either the Commissioner or the County can

2    petition for rehearing with the SCAP within 30 days of the

3    issuance of the SRB recommendation.  My understanding is

4    that the Commissioner, even perhaps as early as today, will

5    be sending a letter to the Supreme Court Appeal Panel

6    indicating that she will not ask to petition for rehearing.

7    I don't know, I haven't talked to the county, but if the

8    county were to send in a similar letter expressing the

9    intent not to petition for rehearing, then the SCAP at that

10   point could issue an order granting the transfer.  But, it

11   does require an order from the SCAP.  So, a number of things

12   could happen, it's not completely in the control of the

13   Defendants in this case.

14           With regard to exhibits, I agree with him that for

15   many of them, especially the ones that deal with E.T. and

16   R.B., in particular, we're probably not going to have any

17   objections or problems with the admission of those

18   documents.

19           However, there are some categories of documents

20   that show up on the Plaintiffs' exhibit list that we do find

21   objectionable.  For instance, I think there are a number of

22   articles from Dean Eric Janus in Exhibits 89 through 93 that

23   we would object to.  We do not believe that Mr. Janus should

24   testify.  I don't know if you want my complete argument on

25   that subject right now or we can deal with it at the time.

1          THE HONORABLE JUDGE FRANK:  Why don't we sit tight

2     until we get to that.

3          MR. BRENNAMAN:  Okay.  But for the same reason

4     that he should not testify, his article should also not come

5     into the record on this evidentiary hearing.

6          Also, at Exhibit Nos. 78 through 87 are a number

7     of studies, and I was just asking Dan before this hearing,

8     we do not object to studies coming in to the extent they

9     have been referenced by the Rule 706 experts.  We think

10    that's appropriate and fair game to talk about that in the

11    context of their reports.  But, as I understand from Mr.

12    Gustafson, many of those studies are not referenced in the

13    Rule 706 experts' reports, and are just studies.

14         And I do, when we get to those, want to have a

15    conversation about how they relate, laying foundation,

16    authenticity, all of those things that normally come up with

17    evidence.  So the State's position is we do not agree in

18    advance that those should just come in.

19         Exhibit No. 77 is the Duvall papers that were

20    filed by the Attorney General's Office.  Those are already

21    in the record for the Karsjens Class Action case.  And so

22    they are already a part of the case.  I don't know what

23    relevance they might have to this evidentiary hearing.  So

24    we would object to those on the basis of relevance and

25    perhaps other things.  So, we don't agree in advance that

1    that should come in.

2           And then finally, Exhibits 58 through 74 are

3    emails between and among -- for the most part -- they are

4    other things, as well, between and among people at MSOP

5    about the SRB and SCAP process.  Again, I don't know that I

6    need to give my full argument now, but the State's position

7    on this hearing is that evidence about futility of the SRB,

8    the alleged futility of the SRB and the Supreme Court Appeal

9    Panel process is not relevant to this evidentiary hearing

10   about E.T. and R.B.  That's an argument related to the

11   habeas claims.  And as I've already described, the State

12   does not believe that we should be having an evidentiary

13   hearing that relates to the habeas claims.

14          Additionally, if they want to talk -- I mean, we

15   can talk about the SRB and SCAP process, but the State's

16   position is we should talk about it in the context of E.T.

17   and R.B.  And as we know, E.T. has already completed the SRB

18   process, you know, is moving to the SCAP process.  I think

19   we can have a conversation about him.  R.B. has not

20   petitioned, so she's not utilizing that process at this

21   time.  So, I don't know what the conversation would be with

22   regard to her.

23          But, the more general information about futility,

24   we believe, is a -- I'm sorry, the Department believes is

25   just an end-run around the State's legal argument about how

1    we should not be having an evidentiary hearing on the basis

2    of the habeas petitions.

3              So, that's our position on the exhibits.

4              THE HONORABLE JUDGE FRANK:  You may not have been

5    done yet, so maybe I was going to interrupt.

6              MR. BRENNAMAN:  Please.

7              THE HONORABLE JUDGE FRANK:  Two questions -- and I

8    can tell Judge Keyes probably has one or two, as well.

9              The first question -- and we may have touched on

10    this at the time of the last hearing.  Under what

11    circumstances can an individual, without going through the

12    SRB and SCAP process, be moved from Moose Lake to St. Peter?

13    Because we talked about one individual for health reasons

14    that had been moved without any hearings.  Under what -- are

15    there -- and moved where at St. Peter?  Are there

16    circumstances under which the Commissioner can say, we're

17    moving this person now to St. Peter?

18              MR. BRENNAMAN:  Yes, I believe under the statute

19    how it works is that the Department does have the authority

20    to move individuals within the secure facilities that they

21    operate.  And so those facilities are the Moose Lake

22    Facility and the St. Peter Facility.  So, without

23    approaching the SRB or the SCAP, it's my understanding that

24    the Department, that MSOP can make the decision to move how

25    they structure that environment and who moves where within

1    the secure environment.

2            Now, of course, that's subject to -- we're going

3    to want to talk to Nancy Johnston and Jannine Hebert about

4    what a good idea is, and is that a good idea, and so on and

5    so forth.  But my understanding is that unless they're

6    proposing to put someone outside of the secure facility, for

7    instance, and the community preparation services which is

8    the transfer facility, or to a private placement that's

9    outside of those two facilities, that would require them

10   utilizing the transfer provisional discharge and discharge

11   process under Chapter 253D.

12           Does that answer your question?

13           THE HONORABLE JUDGE FRANK:  Yes.  One other

14   question, and I think I can tell Judge Keyes has -- one

15   other question, and it may be fair for you to say, well,

16   perhaps that question should come at the end of the hearing

17   not at the beginning.  But it does relate to scope of the

18   hearing, even if everyone agreed on the scope with respect

19   to the 1983, versus the habeas.

20           Let's just say as a for instance that I would

21   conclude that E.T. is being unconstitutionally detained.

22   Separate from even if a habeas had not been filed, what are

23   the remedies that you and your client feel are available to

24   the Federal Court if I would make that finding at the

25   conclusion of this hearing or later on in the case?

1          I suppose in theory, the same question could be

2     asked if what if the Court determined that the Class was?

3     What remedies, given the issue that has come up with, well,

4     there's the habeas remedies, then there's the 1983 remedies,

5     what is your view as we go into this hearing on what the

6     remedy would be if the Court would make that finding?

7          MR. BRENNAMAN:  Sure.  And we've briefed these

8     issues extensively and I would encourage -- I would direct

9     the Court to that briefing because it will explain it in far

10    greater detail than I can right now.

11         But Defendants believe that the law is that in the

12    context of a Section 1983 action, the law is very clear, the

13    case is *Heck v. Humphrey*, that a -- and the *Pressier* case

14    both state that a Federal Court does not have the power to

15    release an individual who is in state custody.  That is only

16    a remedy that is available to a Federal Court under Federal

17    Law 2254, Habeas Corpus.

18         So, if the Judge intends to have a hearing today

19    in the Karsjens Class Action case, I think what we're

20    talking about, then, is not release from commitment, what

21    we're talking about is the Court does have, of course,

22    injunctive powers to issue injunctions against Defendants.

23    So, that is the type of relief that the judges have

24    available to them.  But, I think that the type of injunctive

25    relief that is ordered by the Court cannot include

1    situations or conditions that would amount to anything that

2    has to do with the fact or duration of the commitment, in

3    other words, getting out of commitment, because that is the

4    territory only of habeas corpus.

5            And insofar as habeas corpus, it sounds like maybe

6    we're not going to be talking about those issues at least

7    that much during this evidentiary hearing.  That is an area

8    of law I'm getting to know much better for the first part,

9    but also it's an area of law that has many rules and

10   technical obstacles, state exhaustion being one of them.

11   But, there are also a number of other rules about if you

12   have an evidentiary hearing, it can only be for such and

13   such purposes, not the sort of thing we're contemplating

14   here today.

15           So, we also -- Defendants' position -- I'm

16   sorry -- the Respondent Commissioner's position is that

17   relief on those habeas petitions is also improper at this

18   time.

19           THE HONORABLE JUDGE FRANK:  Did you have anything?

20           THE HONORABLE MAGISTRATE JUDGE KEYES:  I just have

21   a procedural one.

22           Would it make more sense to admit now all the

23   exhibits other than the ones to which the State reserves

24   objections so we don't have to waste time seriatim going

25   through this?  So in other words, all exhibits would be

1    admitted except for 89 to 93, 78 to 87, 77, and 58 to 74?
              (All exhibits provisionally admitted with the
2    exception of 58 to 74, 77 to 87 and 89 to 93.)

3              MR. BRENNAMAN:  State has no objection.

4              MR. GUSTAFSON:  Your Honor, we didn't go through

5    the exhibits with that kind of process in mind, so we

6    actually haven't looked at it.  But I'm fine with it.  If we

7    come to one that I really have to object to, we can go back

8    and revisit it.

9              THE HONORABLE JUDGE FRANK:  Here is maybe the way

10   we can handle that.  We'll provisionally receive them,

11   provisionally under Rule 104.  I'll just state in the event

12   we get to the end of the hearing, and whether it's

13   Respondent or Plaintiff saying, well, we didn't read that

14   exhibit, we won't reargue anything, but if you miss

15   something, because that sometimes happens in front of a --

16             MR. GUSTAFSON:  That is fine, Your Honor.

17             THE HONORABLE JUDGE FRANK:  -- jury.  Something

18   familiar we see so we can move through the witness and then

19   at the end saying, well, whether it's received for all

20   purposes -- so, we'll handle it in that way.

21             MR. GUSTAFSON:  That's fine, Your Honor.

22             THE HONORABLE JUDGE FRANK:  Now, absent anything

23   further by counsel, it would be our intent to -- yes?

24             MR. BRENNAMAN:  Did you intend to clarify the

25   issue about the use of the individuals' names?

1          THE HONORABLE JUDGE FRANK:  I'm assuming that

2     individuals, you can refer to them by name.  We're in a

3     public courtroom, and rather than speculate about how

4     everybody has figured out -- and so then I guess once we've

5     reached across that bridge, then it would be referring as

6     Mr. and Ms. to their last name.  There's always some

7     exceptions where a witness demands to be called by their

8     first name.

9          But, we're assuming that absent some compelling

10    reason that we should know, that we'll proceed with the use

11    of their names.  Mr. Gustafson?

12          MR. GUSTAFSON:  Ready for opening statements?

13          THE HONORABLE JUDGE FRANK:  Well, I thought what

14    we'd do is to give you an advantage, each of you, on -- it

15    might or might not affect -- I know the late Irving Younger

16    would say we're all supposed to have 99 percent of our

17    opening statements and closing arguments ready before trial.

18    I don't know if I was ever able to quite accomplish that.  I

19    don't know about you, Judge Keyes.

20          But what we thought we'd do is have each expert

21    come on and give their role and narrative summaries, and

22    then before each of you call them for whatever purpose you'd

23    like to call them individually, then give your opening

24    statements.  It may or may not affect something you say or

25    don't say, or it may or may not answer or raise a question.

1    It might be advantageous to both parties if we did it in

2    that fashion.

3              MR. GUSTAFSON:  Fine with me, Your Honor.

4              MR. BRENNAMAN:  The State would prefer to do

5    opening statements first.

6              THE HONORABLE JUDGE FRANK:  Why don't we just go

7    ahead with opening statements, then?  Now, it looked like,

8    whether you had chatted or not, the Plaintiff was going to

9    go first, and then second if that's agreed to by counsel,

10   we'll proceed with that.

11             So, what that would mean for the four of you,

12   we'll hear their opening statements and then with or without

13   a short recess.  We'll see where we're at, then we'll go in

14   that order in which we have them.

15             So, Mr. Gustafson?

16             MR. GUSTAFSON:  Thank you, Your Honors.

17             THE HONORABLE JUDGE FRANK:  And if we get to the

18   point, whether it's for a witness or opening statement, if

19   there's some exhibit up here, even though there's a plasma

20   screen there and all the lawyers have a screen, without any

21   intent to create mood lighting in here, I'll dial down the

22   light at a preset for the screen up here.

23                        OPENING STATEMENT

24             MR. GUSTAFSON:  Thank you, Your Honors.  Dan

25   Gustafson, again, on behalf of the Plaintiffs and the Class.

1          Mr. Eric Terhaar and Rhonda Bailey are both

2    civilly committed sex offenders in Minnesota; and therefore,

3    both members of the Class.

4          As you know, Plaintiffs in the Class allege

5    various constitutional claims, other claims including

6    Section 1983 claims for constitutional claims relating to

7    the Fourteenth -- related to violations of the Fourteenth

8    Amendment.

9          For purposes of today, there are really three main

10   constitutional arguments that may rise.  First, a failure of

11   treatment, second, that Minnesota statute Section 253B/D as

12   it was amended is unconstitutional as applied, particularly

13   with respect to Mr. Terhaar because it is punitive in

14   nature; that is, it detains people that are not either in

15   need of treatment or dangerous to society.

16         Second, that the statute doesn't provide any

17   meaningful opportunity for release; that is, the release

18   statute is being applied unconstitutionally under the law of

19   Minnesota, the *Call* case and the *Foucha* case out of the

20   United States Supreme Court.  Plaintiffs take the position

21   that there are two primary problems with the release

22   statute.

23         First of all, there's no independent review, as

24   you know, which was subject to another motion that

25   Plaintiffs have filed.  And secondly, there's no judicial

1    bypass system whereby a person who is in the situation that

2    Mr. Terhaar finds himself today; that is, where five

3    independent experts have found him not to be a danger to

4    society, there is no way for him to avoid the SRB/SCAP

5    process, which we will, depending on the Court's evidentiary

6    rulings, invoke testimony that can take two to three to four

7    to five years to follow that process before release can be

8    obtained.  And the lack of a judicial bypass, as is in the

9    case, for example, in the Wisconsin statute.  At any time a

10    person who is committed in Wisconsin can file a petition

11    with the committing court to be released because they no

12    longer satisfy the commitment criteria.

13            That's missing in the Minnesota statute.  There's

14    no independent review in the Minnesota statute.  As Your

15    Honors are well aware, had there not been the independent

16    review ordered by this Court in February of 2014 and these

17    four court-appointed experts had done the work we're going

18    to talk about today, Mr. Terhaar would still be in Moose

19    Lake unknown to the Court and unknown to the Plaintiffs as

20    someone who should not be -- continue to be restrained in

21    this way.

22            The third thing, of course -- and this deals more

23    with Ms. Bailey, is the lack of less restrictive

24    alternatives.  We've made that argument already.

25    Your Honors have heard arguments on it.  But, her case

1    presents testimony now that we expect will show that the

2    facilities and the treatment of Ms. Bailey are not

3    constitutionally adequate.

4            As I mentioned earlier, we think the habeas claims

5    for both Mr. Terhaar and Ms. Bailey don't need to be heard

6    today.  We think the evidence overlaps, and we'll have

7    argument on that tomorrow.  So, we don't intend to press any

8    of the evidence that we would otherwise bring at a habeas

9    hearing today, at least not before the Court hears argument

10   on the issues.

11           As you know, we didn't do any discovery with

12   respect to this evidentiary hearing with the exception that

13   we serve some depositions on written questions on the State,

14   and we had a telephone conversation with the four

15   court-appointed experts; but, we didn't take any

16   depositions.  So, I'm basing my comments on what I think the

17   evidence will show based on the affidavits and my

18   expectations of what the answers will be to some of the

19   questions that get provided.

20           First of all, with respect to the court-appointed

21   experts, I don't think there's any question that they're

22   highly qualified in the field of sex offender assessment and

23   evaluation.  They're well-educated, well-experienced, and I

24   don't think there's any question that they would qualify for

25   experts, even if the Court hadn't already appointed them.

1    They've offered these joint opinions on Mr. Terhaar and

2    Ms. Bailey, and let me just take them briefly in stride.

3            With respect to Mr. Terhaar, I don't think there's

4    any question that the experts unanimously believe

5    Mr. Terhaar should be released immediately without

6    conditions.  Both in their reports and in the conversations

7    we had on the teleconference, it was clear that they no

8    longer believe that he poses any danger -- or I shouldn't

9    say any danger -- that he poses an unreasonable danger to

10   society.  That's a test that must be satisfied by the State

11   of Minnesota.  They must demonstrate it by clear and

12   convincing evidence under the *Addington* case of the Supreme

13   Court.  I don't think there's any question about the

14   standard with respect to that.  And I think the expert

15   testimony, the unanimous expert testimony is that

16   Mr. Terhaar doesn't satisfy that standard.

17           There's some discussion, we expect, from those

18   experts with respect to why the actuarial tools that were

19   used to justify his initial commitment and the risk

20   assessments that have been done on him don't work

21   particularly well for juveniles.  We expect to hear

22   testimony that the recidivism rates for juveniles who commit

23   sex offenses are similar to the recidivism rates for

24   juveniles who don't, who have non-sex offenses.  And I think

25   we expect to hear from the experts that there is little

1    evidence to suggest that Mr. Terhaar is a risk.

2            We think Mr. Terhaar should be released and we

3    think this Court -- while we generally agree with the State

4    that Section 1983 does not give this Court the power to

5    unconditionally release Mr. Terhaar, that is a subject that

6    must be taken up by a habeas petition.  We do think the

7    Court has beyond injunctive powers.  We think the Court has

8    declaratory judgment powers to declare the statute either

9    facially or as applied to Mr. Terhaar to be

10   unconstitutional.  And that, of course, will set in motion a

11   series of events which will assist his release if, in fact,

12   habeas is the only remedy that he has.

13           With respect to Ms. Bailey, we think the 706

14   experts have properly evaluated her records.  And through

15   the interview with her and with some MSOP, -- it's not clear

16   to me whether it was an MSOP psychiatrist, Dr. Beth Johnson,

17   I believe her name was.  They had some interviews with her

18   that we're going to hear testimony that her placement in an

19   all-male facility is highly inappropriate; that her

20   treatment plan, while recognizing at times that she needs a

21   specific treatment plan related to her and her gender has

22   never been implemented.

23           There is some evidence in her treatment file that

24   they recognize that she suffers from an incredibly traumatic

25   childhood that has not been addressed, although the State

1     has recognized that problem, and that her treatment and

2     placement are actually not helping her, but hurting her.

3     And we think the failure to treat the trauma, and the

4     placement, living arrangements in an all-male sex offender

5     unit and taking group therapy with all men, we will hear the

6     experts say that that is not within the range of

7     professional standards.  She should be transferred to a

8     different living arrangement, and that she should be given a

9     different treatment plan.

10          We have one independent expert who was hired by

11    the State of Minnesota, Dr. Amanda Powers-Sawyer.

12    Essentially, she is a qualified sex offender assessment

13    expert.  She testifies with some frequency before the

14    District Court in Minnesota.  She's written articles on

15    juvenile offenders and recidivism rates.

16          I would say that her opinion essentially mirrors

17    the opinion of the 706 experts with respect to Mr. Terhaar.

18    She was not asked to evaluate Ms. Bailey, and the State did

19    not hire an independent expert to evaluate Ms. Bailey

20    separately from the Court's 706 experts.

21          The only other witness that we see from the

22    Plaintiffs' perspective is Executive Director of the MSOP,

23    Nancy Johnston.  This is where we get into an area of

24    disagreement with the State on the scope of this hearing.

25    We think the scope of this hearing -- the State has taken

1    the position -- and I won't make the long argument now --

2    but the State has taken the position that the discharge

3    procedures are adequate and can discharge the constitutional

4    rights of E.T. and -- I'm sorry, of Mr. Terhaar and Ms.

5    Bailey.

6         We take the position that the discharge procedures

7    are not adequate for the reasons I stated earlier, the lack

8    of an independent review, lack of a judicial bypass.  And we

9    intend to seek testimony from Ms. Johnston about the process

10   and the incredible lengthy delays that occur as the result

11   of that process.

12        We also intend to elicit testimony from Ms.

13   Johnston about what I think is a very novel, direct or

14   initiated petition with respect to Mr. Terhaar.  We think

15   it's unprecedented in that he's a Phase I -- he's in Phase I

16   and now seeking to move him to CPS.  I think the testimony

17   will be that's never been done before.

18        I think the testimony will also be that he wasn't

19   consulted about that petition.  His lawyer wasn't consulted

20   about that petition.  The Department did it on their own.  I

21   think the testimony will be that the Department did it in

22   response to this Court's Show Cause Order.

23        And as you know, from the record that's already

24   been produced as a result of the hearing two weeks ago or

25   so, the people within MSOP don't agree with that decision.

1    The treatment people have one view, the risk assessment

2    people have a different view, and the executive director has

3    yet a third view, and the independent experts all disagree

4    with them.

5            So, I think that we're going to hear about the

6    process that was undertaken to file that petition and get

7    some answers with respect to why it is that Ms. Johnston

8    filed that petition.

9            Let me just say, the filing of that petition and

10   the order by the SRB now precludes Mr. Terhaar under current

11   Minnesota law from filing another petition until this

12   petition process is complete.  So, until the SCAP Panel

13   rules and all Court of Appeals and Supreme Court decisions

14   are final, and then for a period of six months later he

15   can't file a contrary petition.  So, his right to petition

16   for automatic release has been taken away by the filing of

17   Ms. Johnston's petition or the ruling of the SRB on that

18   petition.

19           In addition, I think Ms. Johnston will testify

20   that the SCAP Panel cannot issue an order that is

21   inconsistent with the decisions, the issues that were

22   presented to the SRB Panel.  So, for example, the SRB

23   petition asked for a transfer to CPS.  It didn't ask for an

24   unconditional discharge.  So the SCAP Panel now cannot say,

25   well, we disagree with the SRB and we think that it should

1    unconditional discharge, because that was never presented to

2    the SRB Panel.  The best they could do is say, we disagree

3    and send it back for a new SRB hearing.  It's my

4    understanding, but we intend to ask Mrs. Johnston.

5            With respect to the evidence of the remaining

6    witnesses, we would expect to cross-examine the other

7    witnesses that the State calls, which we understand that

8    they expect to call Mr. Terhaar and Ms. Bailey,

9    Ms. Pascucci, Laura Herbert, I think it is, Dr. Hebert, and

10   perhaps several other MSOP people; but, we wouldn't offer

11   evidence with respect to that.

12           Your Honor, just very briefly, the law is clear on

13   this issue.  It's been settled for many years.  The State

14   cannot continue to hold Mr. Terhaar once it's determined

15   that he is no longer dangerous.  Under 1983, we have the

16   burden to raise a constitutional violation.  We've alleged

17   that in our Complaint.  We're going to put on evidence today

18   that suggests he's being held in violation of the Fourteenth

19   Amendment.

20           The standard is clear, the State has to prove it

21   by clear and convincing evidence that he still satisfies

22   those two elements, that he is in need of treatment and that

23   he is a danger to society or a risk to society.

24           And I suggest the evidence today, that it is

25   impossible for the State to carry that burden.  Whether you

1    characterize clear and convincing as 66 percent or 75

2    percent or 55 percent, something more than a preponderance,

3    something less than beyond a reasonable doubt, but in the

4    face of five independent experts who have no interest in the

5    outcome of this case, other than that they were asked to

6    provide their professional opinion, in the face of five

7    independent experts, I don't see how the State can carry

8    their burden.

9            And *Call* made clear -- *Call*, the Minnesota Supreme

10   Court case, 1995, made clear that the elements in the

11   Minnesota Discharge Statute, this adjustment to an open

12   society and this notion that you have completed treatment

13   that has been engraft upon this discharge procedure by the

14   MSOP, and the Minnesota Legislature cannot stand -- the *Call*

15   Court made clear that the only way that this discharge

16   practice is constitutional is if they read it to only

17   include the two factors from the *Foucha* case.

18           As I said, we have the burden of proof on the 1983

19   claim.  Once we raise those issues, the State has to prove

20   by clear and convincing evidence that the continued

21   commitment of Mr. Terhaar is satisfied by that.  And I

22   submit that they can't -- they can't satisfy that.

23           With respect to Ms. Bailey, of course you

24   understand, Judge, that our view is it's the professional

25   judgment standard of *Youngberg* and *Bailey* as adopted by the

1    Eighth Circuit; that such a substantial departure from

2    professional standards that judgment was not based on

3    professional judgment.  That's our view of the burden that

4    should be applied to Ms. Bailey with respect to her

5    treatment and placement.

6           We think that testimony will come again from Nancy

7    Johnston that move from the Minnesota Security Hospital to

8    the St. Peter Sex Offender was an administrative move that

9    was ordered in 2008 when Mr. Benson was the head of the

10   program.  It was not a decision that was made related to

11   their treatment.  It was administrative convenience and

12   coordination of the program so that all of the people

13   civilly committed by the sex offender would be in one place.

14          We don't think that satisfies *Youngberg*'s

15   professional judgment standard.  But, beyond that, even if

16   you buy the *Salerno* or *Strutton* shocks-the-conscience

17   standard, it shocks my conscience.  She's the only woman

18   being held with 22 male sex offenders.  And I don't think

19   that the State can sustain their burden, whether it's the

20   shocks-the-conscience standard or whether it's the

21   professional judgment standard, because I think the

22   testimony is that this kind of placement and this kind of

23   treatment is simply unacceptable.  It's outside of the

24   boundaries of any professional judgment.  And we think under

25   either standard, it wouldn't be appropriate.

1           Essentially, the State, and I think Dr. Hebert

2     will testify to this, perhaps Ms. Johnston, as well.  It's

3     not that they don't want to have a separate facility for

4     R.B., it's not that they don't want to tailor her program to

5     an all-female kind of setting.  They don't have the

6     facilities, which suggests it's because they don't have the

7     resources.  And I say that's not a professional judgment.

8     The lack of resources and putting someone together with men

9     in an inappropriate living and treatment situation because

10    of money, budgetary constraints or because of administrative

11    convenience or any reason other than the professional

12    judgment that that would be the appropriate treatment fails

13    the *Youngberg* standard, and I frankly say fails the

14    shocks-the-conscience standard.

15          At the end of the day, Your Honors, we're going to

16    ask you to declare that the discharge procedure for

17    Mr. Terhaar is constitutionally inadequate under the due

18    process clause of the Fourteenth Amendment, and that the

19    constitutional rights of Ms. Bailey are being violated under

20    the professional standard announced by the Supreme Court in

21    *Youngberg* and adopted by the Eighth Circuit in the *Bailey*

22    case.

23          THE HONORABLE JUDGE FRANK:  Thank you.

24          Whenever you're ready, counsel?

25                OPENING STATEMENT

1              MR. BRENNAMAN:  Thank you, Your Honors.  Nathan

2     Brennaman here again on behalf of the Defendants.

3              Well, Mr. Gustafson makes it all sound very black

4     and white, but I think what the evidence is going to show in

5     this hearing above all is that these are difficult issues.

6     They're complex issues regarding Mr. Terhaar and Ms. Bailey.

7              The Rule 706 experts' reports unquestionably

8     identify issues, but they aren't quite as detailed about

9     solutions and recommendations about what should happen with

10    Mr. Terhaar and Ms. Bailey.

11             For example, Ms. Bailey, she's housed with men.

12    The Rule 706 experts don't like that.  But they don't

13    identify a placement for her with women.  They don't --

14    either because they're unaware or it's not in their report,

15    but if they testify consistently with my conversation with

16    them the other day, they're not aware of another placement

17    in Minnesota that will take Ms. Bailey that is both secure

18    enough and has all of the treatment resources that are

19    needed for her care.

20             And so, Mr. Gustafson argues administrative

21    convenience and resources.  I don't think that anyone is

22    going to testify that resources are an issue, so far as I

23    can tell.  Obviously, the resources of the State are not

24    unlimited, but I don't think that that is going to be the

25    first argument that the Department makes.

1           In terms of administrative convenience, I think

2     that the Affidavit of Nancy Johnston was clear.  It's

3     already in the record of this case.  But, I believe her

4     testimony is going to be that when she was at MSH, she was

5     already housed with men.  She went from being housed with

6     men at MSH to being housed with men at MSOP.  So this

7     argument that that administrative decision to unify and get

8     all sex offenders together to provide cohesive sex offender

9     treatment to Ms. Bailey is not a grounds to say that there

10    was anything unconstitutional with her care.

11          So, the question for Ms. Bailey is not -- you

12    know, I think that the Department is willing to recognize

13    the downsides of this particular placement for Ms. Bailey.

14    And it's open to having a discussion about this.  In fact,

15    it's probably glad we are.  But there's down sides with any

16    placement, she shouldn't be placed with men; that's the

17    testimony of the Rule 706 experts.  I think everyone is

18    going to agree that she shouldn't be housed alone, that that

19    wouldn't be therapeutic for her.  And so, should she be

20    placed with women?  I think that's what the Rule 706 experts

21    are going to describe for us.

22          But, I think the testimony is also going to show

23    that that, too, carries some downsides.  For instance,

24    Ms. Bailey has offended against women that she has been

25    housed with in the past during times, periodic times during

1    her commitment.  And so, what type of additional security

2    measures do we need to be thinking about if she is going to

3    be placed with women.

4            Additionally, she is the only female civilly

5    committed sex offender in the State of Minnesota.  If she's

6    housed with women, she's very likely not going to be able to

7    be housed with female sex offenders, just because there

8    aren't very many female sex offenders in the State of

9    Minnesota.  So, that changes -- as the testimony of Jannine

10   Hebert will explain, that changes the treatment of

11   Ms. Bailey.  She goes from being in a place that provides

12   treatment, to a place that does not, and treatment either

13   has to come in to her or she needs to go out and get

14   treatment, and that is stressful.

15           I think that the testimony is going to come in

16   that Ms. Bailey -- you know, they have been making efforts

17   to put her in contact with other women within their ability

18   within the Minnesota Security Hospital, and in fact,

19   Ms. Bailey has asked that that stop because it's been too

20   stressful for her and it's triggering in her some of these

21   sexual offense feelings.  And so, that's Rhonda Bailey, and

22   I think the testimony is a little bit more complex than Mr.

23   Gustafson would have you believe.

24           With regard to Mr. Terhaar, the evidence will show

25   that he is getting treatment at the Minnesota Sex Offender

1     Program, and that that treatment, at least in part, has

2     helped his improvement.  And I think all the testimony will

3     show that he has improved over the past years, both through

4     that treatment and through him getting older and more

5     mature.

6            But, if the Rule 706 experts testify consistently

7     with my conversation with them on the phone the other day,

8     they're going to say that the primary problem with regard to

9     Eric Terhaar is he never should have been committed in the

10    first place.  So, it's not a problem with these Defendants,

11    it's a problem that juvenile offenders of this kind, it's

12    hard to measure risk -- and we're going to hear a lot about

13    that.  But juvenile offenders of this kind who have an

14    offense history from ages 10 to 14, you know, are not -- I

15    get the sense from the Rule 706 experts that they're going

16    to testify that MSOP just probably isn't the best placement

17    for them.

18           Now, I don't know that they're going to be able to

19    explain -- again, I'll make the same comment that Mr.

20    Gustafson did:  We're all sort of roaming around in the dark

21    here because of the short timeframes and limited ability of

22    us to develop the testimony prior to the hearing.  But I'm

23    not sure whether the Rule 706 experts are going to be able

24    to identify for us another better placement for Eric Terhaar

25    that was available to the committing Court at the time he

1    was committed.  We'll see.

2          But he was committed to MSOP.  MSOP has been

3    attempting to treat him, has been treating him, and that

4    treatment has in part, at least, has gotten him to this

5    point where the 706 experts believe that he should not be

6    there.

7          The Rule 706 experts report and the Plaintiffs'

8    counsel uses the dramatic language, "immediate unconditional

9    discharge," but I believe the evidence is going to show at

10   this hearing that nobody believes, not the Rule 706 experts

11   or anybody else, that that means that the front door of the

12   MSOP Moose Lake facility opens, he walks out, and there's no

13   plan, there's no structure, there's no support, there's no

14   nothing for Mr. Terhaar.

15         I think everyone is going to tell you, Judges,

16   that that is a bad idea.  He needs support, he's been

17   institutionalized since he's been 10 years old.  He doesn't

18   have many of the skills he needs to successfully reintegrate

19   into society.  He has -- I think the testimony will show --

20   he has continuing treatment needs.  He has employment needs.

21   He has housing needs.  He has financial needs.  He has --

22   and I think the testimony will show if it's consistent with

23   the ECRC report that just come out, that even Mr. Terhaar

24   himself has serious reservations about going out on his own,

25   even living at his father's house, which was suggested in

1    some of the papers that were filed prior to this hearing.

2             So, what is the structure that he needs?  What is

3    the structure that he wants?  What is the process for

4    reintegrating him back into society?  Now, the Defendants'

5    position is -- the defense -- if he's unconditionally

6    discharged, he's unconditionally discharged.  The

7    Commissioner loses, and that's the whole point.  The

8    Commissioner no longer has any control over Mr. Terhaar, and

9    the ability to provide him with those supports is extremely

10   limited.

11            The Department, in choosing transfer to CPS so

12   that they can start talking about provisional discharge is

13   an attempt for them to use the tools they have to

14   successfully reintegrate him into society.  Transfer is

15   appropriate because they can begin to talk, reintegrate him

16   outside the razor wire into society to have him go out, see

17   how he feels, come back, talk about it, start learning the

18   skills he's going to need to successfully reintegrate into

19   society, at which point they can start talking about

20   provisional discharge.

21            But if you take away those tools from the

22   Department, Your Honors, if you say, no, unconditional

23   discharge, well then, you know, this thing that everyone

24   seems to be saying needs to occur, transitioning, you're

25   going to take it out of the control of what the Department

1    is able to do.

2            The evidence is also going to show that to the

3    extent that the Rule 706 experts have identified problems,

4    they're not class-wide problems.  We're here talking today

5    about the only female committed sex offender in the State of

6    Minnesota and her placement among men.  That is a problem

7    that does not affect any other member of the Class.  And so,

8    to the extent that Mr. Gustafson wants to leverage this

9    hearing into class-wide arguments based on the entire Class,

10    that is sure an uphill battle.

11            To the extent of E.T., the primary problem that's

12    been identified by the Rule 706 experts is that he's a young

13    adult who only offended while he was -- his only criminal

14    sexual history is between the ages of 10 and 14.  And for an

15    individual like that, what I think they're saying -- I want

16    to ask them and have them say it themselves -- but for an

17    individual like that, MSOP may not be the best placement for

18    that individual, either.

19            And so, that again -- I want to ask the question,

20    I don't know if they've had a chance to review every single

21    person in the young adult program and whether Terhaar is the

22    only one or whether we can expect more reports coming.  So,

23    I don't know if that's a problem that exists for more than

24    just Eric Terhaar, but it sure doesn't apply to everybody in

25    the Class.  So, we're here today, we're having this

1    evidentiary hearing on these two individuals, but I don't

2    know how much the Court is going to learn about the

3    class-wide issues in the case.

4            Now, the Court -- I'd also like to talk about

5    scope and relief.  Those are the two things that Ms.

6    Schaffer e-mailed us about that we should touch on in the

7    opening statement.  We do believe that we should be talking

8    about E.T. and R.B..  There seems to be a consensus here

9    both among the Judges and Mr. Gustafson that that's the

10   scope of this.  We're not getting into the habeas issues,

11   but this just relates to E.T. and R.B. in the context of the

12   1983 case.

13           Mr. Gustafson, I know, wants to talk about the SRB

14   and SCAP process.  The State would object to that in terms

15   of scope.  We're here today on -- if we're here today, we're

16   here today on the Order to Show Cause and the Motion for

17   Immediate Transfer of R.B.  So, the Order to Show Cause is

18   just on E.T., and the Motion for Transfer of R.B. is just

19   about R.B..  We're not here today -- and Mr. Gustafson has

20   not brought any motion that as a procedural matter would

21   allow this Court or should -- you know, that would -- that

22   the Court should use to hear a broader discussion about the

23   issues of SRB and the Supreme Court Appeal Panel process.

24           So, we can certainly talk about Eric Terhaar's SRB

25   process that he just went through.  We can talk about the

1    Supreme Court Appeal Panel process that he's likely to

2    encounter, what the steps are, what the eventualities are

3    for him in that process.  You know, I don't know what we

4    would talk about on that in terms of Ms. Bailey, because she

5    does not currently have a petition for transfer or

6    provisional discharge -- or discharge.

7          So, there's nothing relevant on those topics to

8    talk about with regard to her.  So, we are consistently --

9    and what he's trying to do, I think, is, as I suggested just

10   beforehand is do -- you know, what he's trying to prove is

11   futility of the SRB and SCAP processes, and the reason he

12   wants to get evidence in on that is because that evidence is

13   directly related to the habeas petitions.  But if we're not

14   talking about the habeas petitions today, we're not talking

15   about the habeas petitions today.  We shouldn't be hearing

16   about futility of the SRB and Supreme Court Appeal Panel

17   processes.

18         With regard to relief, the Defendants would ask

19   the Court to withdraw the Order to Show Cause or resolve

20   that in some way and allow the transfer process to go

21   forward so that they can attempt to provide Mr. Terhaar with

22   a deliberate and responsible transition into society.

23         With regard to Ms. Bailey, I think the Defendants

24   are more open to have a conversation about it in the context

25   of this hearing.  If someone has a good idea about a

1    placement for her that makes sense, I think that the

2    Defendants are open to it.  And we're going to be asking a

3    lot of questions of the Rule 706 experts.

4         Frankly, the options open to the Department are

5    not that great.  They don't have control over transfer

6    provisional discharge and discharge, as the Court knows.  So

7    the options that they have available to them are options

8    within the St. Peter Campus.

9         Now, should she be housed with mentally ill and

10    dangerous and mentally-ill women who are vulnerable

11    themselves?  I don't know, that may have -- as I discussed

12    before, that may have positives, but it may also have

13    negatives.  So I think Jannine Hebert is the one who's

14    really going to be able to describe for us what the options

15    are, what the pros and cons of these options are and what

16    we're talking about in that regard.

17         And so, as far as the Plaintiffs' Motion to

18    Transfer R.B., you know, we're not really talking about

19    transfer, here.  If people keep using the language of the

20    statute, I mean, it would really be injunctive relief from

21    the Court to house her somewhere within a secure facility.

22    I think that's what's open to the Court.  So technically,

23    we're asking for denial of that motion, or at least denying

24    in part.

25         Finally, I'd like to touch on the use of the Rule

1    706 experts.  The Defendants are interested in getting --

2    the Rule 706 experts were appointed at a time in the case

3    when we were talking about the Class nature of the claims,

4    and that has evolved over time.  And I think the evidence is

5    going to be that the Rule 706 experts have gotten some

6    specific instruction from the Court to identify these type

7    of individuals who are not like others in the sense that

8    they should not be in the program or that they have

9    characteristics that make them unsuitable for Moose Lake.

10          And the Defendants would like that the Rule 706

11   experts are instead redirected to start talking about class

12   issues again.  Instead of talking -- their efforts have led

13   us today to be talking about the only woman in the program

14   and a juvenile offender in the program, people who are not

15   like anybody else in the Class.  Defendants understood that

16   when the Rule 706 experts were appointed, that they would be

17   looking at class-wide issues, issues that affected each

18   Class member equally.

19          I don't think that's what we're talking about here

20   today, and I don't think that that's the use of these Rule

21   706 experts.  These Rule 706 experts have been appointed in

22   the Karsjens case, which is a certified Class case.  They

23   should be looking at issues that apply equally to each Class

24   member, or we are going to have to start talking about

25   commonality issues again, subclasses, whatever the Court

1      wants to do.

2              But the other relief that the Defendants would ask

3      for is that the Court redirect the experts to start looking

4      at Class issues once more.  Thank you, Your Honors.

5              THE HONORABLE JUDGE FRANK:  I think -- we'll take

6      a recess, but I think that between questions by the Court

7      and the attorneys, you'll have ample time to ask them what

8      they're doing.  And so, we'll take a 15-minute recess and

9      we'll come back and hear from each of the four experts.

10             (Recess.)

11             THE HONORABLE JUDGE FRANK:  You may all be seated.

12     Thank you.

13             One issue that is unrelated to the -- I'll turn my

14     microphone on.  One issue that's unrelated to -- we'll be

15     now asking each of the 706 experts to take the stand

16     consistent with our introductions this morning.

17             One issue unrelated to everything that has

18     happened thus far today, but so that there's no

19     misunderstanding, regardless of who's in courtroom, when

20     we're at a recess, provided that it's acceptable to

21     Plaintiffs' counsel, if either Ms. Bailey or Mr. Terhaar

22     want to speak, whether it's with his father or concerned

23     person, if they -- as long as they can sit at counsel table

24     with counsel there, that's acceptable to the Court.  I just

25     talked to the deputy marshals -- to the marshals.  And so

1    that's -- if somebody needs additional guidance from the

2    Court, it's a nonissue, as far as we're concerned.

3                MR. GUSTAFSON:  Thank you, Your Honor.

4                THE HONORABLE JUDGE FRANK:  All right?  Then I

5    will call, would ask Dr. Robin Wilson to kind of walk

6    towards the witness stand.  Before you step in, I will

7    administer the oath to you.

8                (Witness sworn.)

9                And there is a step up there, if you'd please have

10   a seat behind the microphone?

11               THE WITNESS:  Thank you, sir.

12               THE HONORABLE JUDGE FRANK:  And these aren't the

13   fancy entertainer microphones, so you have to speak, stay

14   fairly close to the mike or it won't pick you up.

15               If you'd please state your full name and spell

16   your last name for the record?

17               THE WITNESS:  My name is Dr. Robin Wilson.  That's

18   W-i-l-s-o-n.

19               THE HONORABLE JUDGE FRANK:  And perhaps you could

20   very briefly give your background.  Our intent in having you

21   up there, unlike a non-706 witness, is to just briefly give

22   your background, and then in narrative fashion give an

23   overview of your involvement thus far in the case,

24   understanding that while I haven't taken part in the

25   conversations, the four of you have talked about kind of

1    explaining each of your roles so that, in other words, it's

2    not a situation where each of the four individuals are going

3    to get up and just repeat exactly the same thing.

4            But I did ask through Mr. Ferleger, so that

5    counsel's aware, what order -- Judge Keyes asked what order

6    would make the most sense before counsel decides to call one

7    or all of you when each of you have given your narrative

8    summary of your role or involvement.

9            So with that, unless you need more direction from

10   the Court, you may proceed.

11                        **ROBIN WILSON**

12           THE WITNESS:  Okay, thank you, Your Honor.

13           I am a psychologist by trade.  I received my Ph.D.

14   in psychology from the University of Toronto in 1996.  I

15   have been continuously licensed as a psychologist since

16   1997, first in the province of Ontario, and then in the

17   State of Florida.

18           I'm also Board Certified as a clinical

19   psychologist by the American Board of Professional -- the

20   American Board of Professional Psychology.  I am now

21   employed by myself as a private practitioner.  My most

22   recent employer from July of 2007 until June of 2011 was the

23   Florida Civil Commitment Center where I was employed as the

24   institution's Clinical Director.

25           Before I go into an overview of what the Rule 706

1    experts have been doing, I want to make it clear to the

2    Court that we are a team.  And that we have approached our

3    duties as a team.  And that we speak with one voice.  That

4    we do things by full consensus.  And that although each of

5    us may have had somewhat different aspects in each of the

6    two cases that we're speaking to today, that in the end, we

7    speak with one voice.

8              We were each approached in the fall of 2013 as to

9    whether or not we would agree to be put forward as potential

10   experts for this panel.  On December the 6th, you issued an

11   Order, Your Honor, that actually appointed us to this panel.

12   We met with you and with Judge Keyes on January 22nd, to be

13   given some general idea about what expectations were of us.

14   And then on the 20th of February, 2014, the Court issued an

15   order in which there were some very specific issues that we

16   were asked to explore.

17             THE HONORABLE JUDGE FRANK:  Would it be accurate

18   for us to say that we saw your input, and then that Order

19   that you've just referenced incorporates the discussion that

20   we had earlier?  In other words, the Order that followed

21   that get-together to make sure that we got into the Order.

22   So, in other words, what discussions were there, then it

23   showed up in that Court Order that now, of course, is

24   public?

25             THE WITNESS:  Yes, sir.  And the two major

1    components were that we were to do an entire evaluation of

2    the entire program.  And you also asked us to evaluate

3    individual cases, and that you asked us to focus at first on

4    certain subcategories within the Class, those being -- those

5    being the residents of the MSOP who have no adult

6    convictions, who have severe and persistent mental illness,

7    who have intellectual or other cognitive limitations, and

8    those who were elderly and perhaps were experiencing some

9    symptoms of age.

10         In -- I'm just getting my time frame straight.

11   So, in the week of March 31st, we met as a team.  With the

12   exception of Dr. Miner who had a previous engagement, we

13   traveled to the St. Peter Facility to begin our process.  We

14   had a tour of the facility at first.  And I should note, we

15   had a large amount of documentation that we asked for that

16   was provided by the State so that we could review those

17   documents prior to going to the St. Peter Facility.

18         Once at the St. Peter facility, as I said, we had

19   a tour of most of the facility, during which time we were

20   able to see the conditions of confinement, to see what sort

21   of options were there for leisure or occupational stuff.  We

22   saw some of the group rooms, some of the residents also

23   allowed us to inspect their rooms to see what sort of, what

24   sort of quarters they had.

25         We also had an opportunity to meet with the

1    administrative staff to ask some questions and to ask of

2    them for lists of certain types of people who were being

3    held at the St. Peter facility.  And we also, in advance of

4    our going to Moose Lake, asked for some lists of certain

5    types of people who were being held at the Moose Lake

6    facility, as well.

7            During our tour, we had incidental contact with

8    some of the residents.  We were able to ask them certain

9    questions in a more sort of ad hoc sort of framework.  Once

10   we got the lists from the administration, we were able to

11   start to identify some people we might want to interview,

12   and that process was generally one of first going through

13   the file material.

14           And our process has been this.  We essentially

15   divvied up the lists such that each of us would look at a

16   subset of that total list, and then in any circumstance

17   where we believed that a case merited some further

18   evaluation, that case was passed on to a second member of

19   our team.

20           If both of the members of the team believed that

21   this was something that needed further evaluation still,

22   then we asked to do an interview with the client.  And based

23   on that interview, we then decided whether or not we would

24   speak to staff, as well.

25           During our time at the St. Peter Facility, we

1    became aware of one female, and we were immediately

2    interested to do further evaluation on her.  I won't speak

3    generally to that, one of my friends will do so.

4              So, we were there from March 31st until April 3rd,

5    I believe.  Following that meeting, we had a conference call

6    with the Court to provide some feedback as to our initial

7    findings.  On that basis, the Court asked us to consider

8    whether we would identify what the Court referred to as

9    bellwether cases, those being cases where there was an

10   individual where the Court may be able, where the Court

11   might be able to make some motions in advance of the full

12   processing of this proceedings.

13             We spent some time with Ms. Bailey.  We were able

14   to interview her with the exception of actually Dr. Miner

15   who was not on site.  We as a group then proceeded to write

16   a report on her, which we did not file until later.

17             On -- between April -- from April 28th to May 1st,

18   we made a trip to the Moose Lake facility, and we engaged in

19   more or less the same process.  We were able to go through

20   file materials, most of these being through the Phoenix

21   Online system.  And in that process we were looking at those

22   groups that I spoke about before, those -- most

23   specifically, we were looking at those individuals who had

24   no adult convictions.

25             During our tour of the Moose Lake Facility, we had

1    incidental contact with a number of the residents.  In the

2    course of that process, we were introduced to Mr. Terhaar.

3    After having spoken with him, we decided that he was one of

4    the ones that we would look further into with respect to his

5    file material, and then we also interviewed him and members

6    of his clinical team.

7            During our time at Moose Lake, we also interviewed

8    a number of different staff members.  We tried to have a

9    broad, broad representation of the sorts of staff who are at

10   the Moose Lake Facility, so we spoke to, we spoke to some of

11   the clinical administrative staff, some of the actual

12   clinicians, themselves.  We spoke to some of the security

13   staff, and as I said we had a tour of, I think, pretty much

14   most of the facility.

15           We also had time to walk around to several of the

16   dorms or the units, whatever they're called, and to, again,

17   have some incidental contact with a number of the actual

18   residents of the Moose Lake Facility.

19           So, we -- through that process, we saw a number of

20   people who are reasonably similar to Mr. Terhaar, and

21   there's no particular rhyme or reason as to why we wrote the

22   report on him first.  We anticipate submitting further

23   reports on other members of the Class who are in a similar

24   position to him.  So, it would be unfair to suggest that we

25   just kind of singled him out.  He just happens to be the

1       first person that we have written a report on.  We

2       anticipate filing similar reports on people who are in more

3       or less the same both.

4               So we filed our report on Mr. Terhaar on May the

5       18th, and we filed a report on Ms. Bailey on June the 4th.

6       We met with the Court on June 9th to speak further about our

7       process, and then following that meeting we traveled to

8       Moose Lake for further interviews and further work of the

9       same sort that I have already mentioned.

10              The evaluation of the entire process that is in

11      place at the MSOP, the sort of problematic aspects is a very

12      large task.  We are in the process of preparing a report

13      that will speak to the issues that surround kind of

14      conditions of confinement, the sort of treatment being

15      offered, instant opportunities for various programming for

16      various programmatic openings and also aspects of the

17      process for potential release.  That is not necessarily

18      everything, but we will file a comprehensive report which we

19      anticipate to file with the Court by the end of August.

20              So, it's not that we've spent our time there, you

21      know, looking at individual cases.  That has been part of

22      our process, but the other aspect of our process is to learn

23      as much about the MSOP as we can so that we can file a

24      comprehensive report that speaks to those larger issues.

25      And as I said, we anticipate filing that with the Court by

1    the end of August.

2         With respect to individual reports on other

3    members of the Class where we believe there are issues with

4    their confinement, we anticipate filing further reports

5    probably within the same time frame.

6         So, at this point, we see our task as being

7    twofold, as was set out in the Order from the Court on the

8    23rd of February.  One is to do a program evaluation of the

9    entire MSOP, which we are engaging in and which we continue

10    to do.  We will be at the St. Peter Facility in the first

11    week of August to continue that process.  And as I said, we

12    anticipate filing that report with the Court by the end of

13    August.

14         We also continue to review individual cases to

15    identify whether or not there are people in similar

16    circumstances to Mr. Terhaar or to Ms. Bailey.  And again, I

17    won't speak specifically to either one of those two cases,

18    that will be the task of one of my colleagues.

19         So, at this point, that's a general overview of

20    what we've been doing as team.  But I do want to emphasize

21    once again that we are a team, and that we speak with one

22    voice, and that we have been working very closely together

23    with one another.

24         THE HONORABLE JUDGE FRANK:  All right.  Obviously

25    it is your right to have one or both attorneys return you to

1    the stand, you may step down.

2              THE WITNESS:  Thank you Your Honor.

3              (Witness stepped down.)

4              THE HONORABLE JUDGE FRANK:  We'll now call upon

5    Dr. Mike Miner.

6              (Witness sworn.)

7              THE HONORABLE JUDGE FRANK:  There is a step up

8    there, if you would, please state your full name and spell

9    your last name, please, for the record.

10             THE WITNESS:  Michael Miner, M-i-n-e-r.

11             THE HONORABLE JUDGE FRANK:  I think you were here

12   when I suggested to your colleague kind of how to go forward

13   with your narrative summary, so unless you have questions

14   for the Court, you can proceed.

15                        **MICHAEL MINER**

16             THE WITNESS:  All right.  So I received my Ph.D.

17   from St. Louis University in 1984.  And joined the staff of

18   California Sex Offender Treatment and Evaluation Project in

19   1986 as their on-site Head of Research.  I've been at the

20   University of Minnesota now since 1992.  I am a professor.

21   I'm in the Program in Human Sexuality, which is part of the

22   Department of Family Medicine and Community Health.

23             Since joining the staff at the Program in Human

24   Sexuality, I have been involved in outpatient sex offender

25   treatment, doing a variety of assessment tasks for a range

1    of issues pertaining to sex offender assessment and

2    management.  And I conduct research into risk assessment,

3    predictors of sexual abusive behavior in adolescent males,

4    and hypersexual behavior.  My research is federally funded,

5    starting with the Office of Juvenile Justice and Delinquency

6    Prevention, National Institute of Justice and the National

7    Institute of Mental Health.

8            So, I'm going to kind of -- I want to reiterate

9    what Dr. Wilson said, and that is that we as a group have

10    reviewed all of the records, have worked together to develop

11    and write the reports that are submitted, and we do speak as

12    one voice.  I'm going to hit some just kind of basic issues

13    around juvenile sex offender risk of juvenile sex offenders

14    and the idea of sexually reactive children.

15            The reason I'm doing this is that as we look at

16    various reports, we acknowledge that the group of residents

17    who have no adult crimes and whose behavior was simply where

18    it was all as juveniles, they're a very specific group of

19    individuals.  And they present a very specific set of

20    issues, issues and challenges in terms of risk assessment

21    and in terms of treatment.

22            We know a few things, and there are two different

23    groups here that are really important to understand, and one

24    is the concept of the sexually reactive child, which is the

25    prepubescent or 10 to, you know, prepubescent individual

1    under 12 years old.  And what we've learned from research by

2    Mark Chaffin and others is that they're very unlikely to go

3    on and commit adult crimes, and also that interventions need

4    to be ecological.  They need to focus on the entire

5    constellation, and they should not necessarily be specific

6    to sexual behavior or what we are classically calling sex

7    offender treatment.

8           When we talk about adolescent sex offenders,

9    again, one of the interesting pieces of research is that in

10   general, having committed a sexual crime as an adolescent

11   does not predict whether or not one will commit a sexual

12   crime as an adult.  In fact, in most studies, adolescent sex

13   offenders are no more likely to go on to commit sexual

14   offenses as an adult than any another kind of delinquent.

15   What seems to be predictive is the number of adjudications

16   for delinquency that take place.

17          Research, ongoing research indicates that there

18   are more similarities between kids who commit sex crimes

19   than kids who commit other types of criminal behavior.  And

20   we know from Moffitt's research and other longitudinal

21   studies that in general, adolescents desist, and that the

22   prime age group for delinquent behavior is between about 15

23   and 17, and after that, the behavior tends to dissipate.

24          And that presents a very particular problem in

25   using adult assessment procedures with individuals whose

1    behavior took place in childhood and adolescence.  Because

2    one of the rely interesting aspects of that is in an adult

3    assessment, if you're under 25, you are more at risk to

4    re-offend.  In an adolescent offender, as you age from 16

5    through 18 through 25, your risk for re-offending actually

6    decreases.  And so there is a very -- there's a reciprocal

7    aspect of risk in terms of age, depending on whether your

8    behavior took place in childhood or adolescence, or whether

9    your behavior took place in adulthood or whether it happened

10   in both places.  And that's particularly important as we

11   look at especially Mr. Terhaar's case.  But, also, when we

12   talk about sexually reactive children, that's really

13   important as we look at Ms. Bailey.

14          The other aspect here is treatment, and speaking

15   to what's appropriate treatment for an individual whose

16   behavior is problematic, but rather not particularly

17   inappropriate for age.  And again, as the field has matured,

18   what the research is showing and what appears to be the most

19   effective is to look at things from a much more ecological

20   perspective, and that what we are specifically calling sex

21   offender treatment is less effective apparently, or

22   certainly the field working with juveniles is moving away

23   from "sex offenders specific treatment" to more

24   ecologically-based treatment like multisystemic therapy.

25   And all of that kind of bears on what is appropriate in the

1    situations that we're addressing here.  I will defer to my

2    colleagues for the specifics of the two cases, and I think

3    that's as far as I need to go.

4            THE HONORABLE JUDGE FRANK:  All right.  Subject,

5    again, to one or both counsel calling you, please have a

6    seat, and we will move on to Dr. Naomi Freeman.

7            (Witness stepped down.)

8            (Witness sworn.)

9            THE HONORABLE JUDGE FRANK:  There is a step up as

10   you probably heard me say, there.  And once you're situated

11   there, if you'd state your full name and spell your last

12   name, please?

13           THE WITNESS:  My full name is Naomi Freeman, last

14   name is F-r-e-e-m-a-n.

15           THE HONORABLE JUDGE FRANK:  And unless you need

16   further direction from me in light of, you've been here, as

17   I have explained how we'd begin with each of your

18   colleagues, you may proceed.

19                         **NAOMI FREEMAN**

20           THE WITNESS:  Thank you.  I received a Ph.D. from

21   the University of Albany in 2008.  My current position is

22   I'm Deputy Director for the New York State Office of Mental

23   Health, the Division of Forensic Services.  In that

24   capacity, I manage, direct, oversee all mental health

25   services for any justice-involved individual.  That includes

1       the New York State Sex Offender Civil Management Program.

2       We are charged with both the implementation and operation of

3       the full program in New York State.

4              I'm going to talk briefly about our summary that

5       we wrote regarding Mr. Eric Terhaar.  As has been reported

6       in both the records and the documents that were filed for

7       today's proceeding, Mr. Terhaar does not have any

8       convictions as an adult.  His offenses occurred between the

9       ages of 10 and 14 years old.  There are also some additional

10      allegations in the records about incidences that might have

11      occurred between the ages of 14 and 17.

12             Mr. Terhaar has displayed numerous behavioral

13      problems during his adolescence and he was in numerous

14      different juvenile facilities and placements throughout his

15      childhood.  Within those programs, he participated in a

16      number of sex offender treatment programs, those

17      comprehensively at the Mille Lacs Academy between 2005 and

18      2006.  At that time, he did write a full sexual history and

19      a relapse prevention plan.

20             He also participated and passed a polygraph

21      examination.  And a treatment staff at the end of 2006 felt

22      that his discharge was needed, as at that time they felt

23      they were warehousing him, and that he should be released to

24      the community so that he could gain some real world

25      experiences.  At that time, he did address 15 of the

1    treatment goals as well as eight of his victimization goals.

2         In 2009 at the age of 19, Mr. Terhaar stipulated

3    to civil confinement at MSOP.  So, after reviewing numerous

4    records as Robin said, as well as interviewing him on April

5    30th, the panel unanimously agrees that he needs to be

6    unconditionally discharged from MSOP.

7         He has file records and file material to indicate

8    that he demonstrates an ability to control his sexual

9    impulses.  He has developed skills to curb his anger, as

10   well as effectively manage his emotions.  He has normal age

11   appropriate sexual interests, and he has gained insight into

12   his offending, as well as some of the trauma in which he

13   experienced as a youth.  As such, we believe that he needs

14   to be unconditionally discharged from MSOP.

15        I'd like to also point out that the panel does not

16   support the movement to CPS as recommended by MSOP -- excuse

17   me.  Rather, the panel believes that the life skills, the

18   case management, the outpatient treatment services that

19   Mr. Terhaar needs in order to adjust and reintegrate back to

20   the community would be better received in the community by

21   local services similar to any citizen or young adult would

22   receive in the community.  We also believe that those

23   services would be better received provided by local supports

24   than in CPS.

25        Now I'm going to switch gears a little bit and

1    speak to the research regarding female sex offenders.  What

2    I didn't mention when I discussed by education and

3    experience is that I have published with regards to the

4    effectiveness of sex offender public policies, as well as

5    female sex offenders.

6         So what we know about women who engage in sex

7    offending is that they appear to constitute about 5 percent

8    of all sexual offenses.  That when you look at the

9    recidivism research, the five-year recidivism rate for males

10   is roughly 10 to 15 percent, whereas the five-year

11   recidivism rate for females is anywhere between 1 percent

12   and 3 percent.  This discrepancy in the rates is not unique

13   just to sex offending.  And in fact, we see that in the

14   research with regards to female general offenders, as well

15   as male general offenders.

16        Research has also known that most female sex

17   offenders suffer from high rates of childhood sexual abuse

18   and trauma.  And, in fact, these rates are even higher when

19   you compare female sex offenders to female general

20   offenders.  Because of this, their offenses tend to be

21   driven by different factors than male sex offenders, and

22   their interventions require different approaches and

23   different treatment approaches than males, and in fact, they

24   need to be gender specific to deal with the issues these

25   women have experienced.

1          Risk measures designed for male sex offenders are

2     also not appropriate for female sex offenders.  That is

3     because the risk factors with regard to female sex offenders

4     are different.  It's also because the instruments -- two

5     reasons, the instruments were validated with the female

6     sample, nor do they theoretically or conceptually make

7     sense.

8          So, for example, in the male instruments, the

9     Static-99, for example, living with an intimate partner is

10    actually considered somewhat of a protective factor for

11    adult male sex offenders, whereas there is some theoretical

12    thought that for females, this could actually be a risk

13    factor given that many females actually engage in sexual

14    offending with their co-accomplice who's often a male in

15    some type of coercive environment.

16         Another example would be with regards to having a

17    male victim.  This is a risk factor for males, as it might

18    show a tendency toward sexual deviance, it would not be a

19    risk factor for females.

20         So, overall, the literature shows that relative to

21    male sex offenders, the female recidivism rate is

22    significantly lower, and that they do require very different

23    gender specific interventions and treatment approaches.

24         And I'm going to turn it over to my colleague.

25         THE HONORABLE JUDGE FRANK:  Thank you.

```
 1            I will now call upon Ms. Deborah McCulloch.
 2            (Witness sworn.)
 3            THE HONORABLE JUDGE FRANK:  As you probably heard
 4    me say, there is a step up there.
 5            If you would please state your full name, spell
 6    your last name.
 7            THE WITNESS:  Deborah Jean McCulloch,
 8    M-c-C-u-l-l-o-c-h.
 9            THE HONORABLE JUDGE FRANK:  And unless you need me
10    to repeat or go through some of the directions of any of
11    your colleagues, you can proceed.
12                       DEBORAH McCULLOCH
13            THE WITNESS:  All right.  I received my Master's
14    Degree in Social Work from the University of Wisconsin,
15    Madison in 1992.  I also hold a Certificate in Women's
16    Studies and in Criminal Justice from the University of
17    Wisconsin, Madison.
18            I've been licensed as a clinical social worker in
19    Wisconsin since 1994.  My career has really -- well, been
20    focused on forensic mental health.  I have worked at both
21    state hospitals in the State of Wisconsin in the forensic
22    programs as a clinician, as a manager and as a deputy
23    director of one of the facilities.
24            Since 1999, I have been involved with Wisconsin's
25    Sexually Violent Persons Law which passed in 1994, including
```

1    developing and implementing release plans.  I am currently

2    the Director of Wisconsin's SVP Program, which includes

3    research, evaluation, court evaluation, inpatient and

4    outpatient treatment, medical treatment, the statewide

5    supervised release program and discharge.

6            We have a current population of about 400 SVPs in

7    Wisconsin, which have included over 100 discharges and over

8    100 supervised releases.

9            So, I'll talk a bit about Ms. Bailey.  In April,

10   Drs. Freeman, myself and Dr. Wilson visited the St. Peter

11   Campus, and we were very surprised to learn that there was a

12   sole female at St. Peter on a male unit in male treatment

13   groups.  And we decided at that time that we needed to look

14   into that a bit further.

15           I wanted to add also to what Dr. Wilson stated,

16   and that is, prior to both of our visits at St. Peter and at

17   Moose Lake, various members of our team met with the

18   ombudsman's office at both facilities.

19           So, we did a brief record review when we were at

20   St. Peter, and we made the mistake of asking for

21   Ms. Bailey's entire record, which came on a skid.  We have

22   not reviewed her entire record.  She's been committed since

23   1993 and her records are extensive.

24           We were struck by her traumatic history.  We were

25   struck by her comprehensive diagnosis, including many

1    paraphilias, which is surprising given that she's a woman

2    and having numerous paraphilias.

3         THE HONORABLE MAGISTRATE JUDGE KEYES:  Would you

4    define that diagnoses, please?

5         THE WITNESS:  Diagnoses including -- I have to

6    think about which diagnosis.  I don't have them written down

7    here; but, yes, deviant sexual arousal to children, to

8    violence, those kinds of things refer to paraphilias.

9         We interviewed Ms. Bailey and others at St. Peter

10   when we visited.  We were also struck by the reactive nature

11   of her offending.  We discussed further as a team, included

12   Dr. Miner in our discussion, that we would look further at

13   Ms. Bailey's case.

14        We did an extensive record review.  Again, we did

15   not read the entire record, reviewed the research related to

16   female sex offenders, drafted a report relative to our

17   findings.  And as Dr. Wilson stated, by consensus we

18   reviewed, revised and submitted that report, recommending

19   that Ms. Bailey be transferred from her current situation,

20   and to consider provisional discharge.

21        We also interviewed Dr. Beth Johnson who was the

22   psychiatrist at the time, and we interviewed her by video

23   conference.  I did want to point out that on page 4 of our

24   report that we submitted, there is one correction.  That

25   there is a reference that the MSOP or when she was at the

1    state hospital, there were numerous references to

2    specialized treatment, needing specialized treatment,

3    needing medications to address her hypersexuality.  And

4    there were references to Depo-Provera.  That was never

5    started according to my record review, and there's a

6    reference that it had been started.

7            So, contrary to standard practice and across the

8    field, we made a unanimous recommendation, standard practice

9    meaning that women and men are separate, they have separate

10   living conditions.  While there are co-ed situations, those

11   co-ed situations don't include one woman and the rest are

12   men, and this is found in prisons, the military, college

13   campuses, camps, et cetera.  So we were struck by the fact

14   that Ms. Bailey was the sole woman in a large program of all

15   men.  And that from our perspective, that was contrary to

16   the standard of practice.

17           We questioned her meeting the criteria for

18   commitment, given the research about risk for re-offense;

19   however, we did not recommend complete discharge, we

20   recommended that provisional discharge be considered.

21           From our perspective, we believe that Ms. Bailey's

22   condition is negatively affected by her placement at the

23   MSOP, that the treatment for female sex offenders -- again,

24   there's not a lot of literature; however, the field in

25   general, including female offenders, is really focusing on

1    psychological functioning rather than focusing on sex

2    offending or sex offender-specific treatment.

3         So, that would include addressing psychiatric

4    issues, trauma issues, healthy sexuality, developing

5    relationships and boundaries, and then also addressing

6    general criminality.  And these are areas that we believe

7    could be addressed in a community-based facility or setting.

8         We also recommend supportive services.  So, there

9    are three areas that we believe that should be addressed

10    relative to a transfer of Ms. Bailey.  Again, the

11    psychological functioning of Ms. Bailey, the general

12    criminality and supportive services.

13         We also agree that the situation about placement

14    is very complex, both Drs. Freeman and myself have extensive

15    experience in placing and developing placements for

16    high-risk offenders, whether they're sex offenders or

17    high-risk offenders who have otherwise committed offenses

18    and are -- either the community reaction or political

19    reaction to their placement.  And we believe that that can

20    occur.  And from our experience, sometimes that includes

21    developing the services rather than seeking out existing

22    services, but developing the services to meet that person's

23    need.  And that's all.

24         THE HONORABLE JUDGE FRANK:  Subject to the right

25    of each attorney to call you, thank you.

1           My suggestion to Counsel, absent, you know,

2    something I may be unaware of, is this may be a logical

3    place to take a noon break of say an hour and 15 minutes,

4    that will give people a chance that are returning to leave

5    the building and come back if they wish for noontime lunch.

6           Would that be acceptable to the Plaintiffs?

7           MR. GUSTAFSON:  Of course, Your Honor.

8           THE HONORABLE JUDGE FRANK:  For the Defendants?

9           MR. BRENNAMAN:  Of course, Your Honor.

10          THE HONORABLE JUDGE FRANK:  Then for anybody in

11   the courtroom that didn't hear, we'll stand in recess until

12   1:15.  And it was our intent, then, that the Respondents or

13   Defendants would then begin with the initial inquiry of one

14   or all of the 706 experts, or do you call them -- and

15   whether that's in the classic sense of direct or

16   cross-examination, will be up to each respective counsel.

17   And then you would follow up, Mr. Gustafson, absent an

18   objection from either one of you.  That order of inquiry?

19          MR. GUSTAFSON:  Fine by me.

20          MR. BRENNAMAN:  Yes, Your Honor.

21          THE HONORABLE JUDGE FRANK:  All right.  So we will

22   stand in recess until 1:15.

23          (Noon recess.)

24          THE HONORABLE JUDGE FRANK:  You may be seated.

25   You may proceed, Counsel.

1          MR. BRENNAMAN:  Thank you, Your Honor.  The

2     Defendants call Dr. Robin Wilson to the stand.

3          THE HONORABLE JUDGE FRANK:  I just remind you,

4     Doctor, you remain under oath, so if you'd please take the

5     stand?

6          THE WITNESS:  Yes, sir.

7                          **ROBIN WILSON**

8                       **CROSS-EXAMINATION**

9     **BY MR. BRENNAMAN:**

10    Q.  Good afternoon, Dr. Wilson.  I am Nate Brennaman, again.

11    I work at the Attorney General's Office.  I am here on

12    behalf of the Karsjens Defendants.

13    A.  Okay.

14    Q.  I won't ask you much about qualifications, except with

15    regard to these reports on Mr. Terhaar and Ms. Bailey, are

16    these the type of reports that -- have you produced reports

17    of that type in your career as a normal course?

18    A.  Not specifically within the context of a Class Action

19    lawsuit, but certainly I've done many, many evaluations of

20    sex offenders over my career.

21    Q.  Are you a forensic evaluator?

22    A.  Can you define the term?

23    Q.  Well --

24    A.  I think I can be a little -- I do sex offender

25    evaluations for the State of Florida for both the Office of

1    the Public Attorney -- or sorry -- of the Public Defender

2    and also the State's Attorney.

3    Q.  And are you trained in using many of the typical

4    actuarial tools --

5    A.  Yes.

6    Q.  -- for the evaluation of risk for sex offenders?

7    A.  Yes, and I'm a certified master trainer for three of

8    those tools.

9    Q.  Thank you.

10           I'd like to ask you more questions about the

11   process which was your testimony when we first began.

12           It sounds like you met with the Judges on about

13   January 22nd, is that right?  I think that's what you said.

14   A.  I can't tell you precisely.

15           Yes, we met with the judges on the 22nd of

16   January.

17   Q.  Who was at that meeting?

18   A.  The four of us, Mr. Ferleger, both of the judges, and --

19   I'm sorry, I don't know the names of some of the other

20   people, but they're here in the courtroom.

21   Q.  Court staff, to --

22   A.  Yes.

23   Q.  -- your knowledge?

24   A.  And I believe some, some of Judge Frank's staff.

25   Q.  Were any of the parties to the case or their attorneys

1    present?

2    A.  No.

3    Q.  And what was discussed at that meeting?

4    A.  We talked mostly about procedure.  We've had a number of

5    questions of the Judges in terms of being able to understand

6    what their expectations were of us to make sure that we were

7    responding to the Court's issues, and mostly kind of

8    clarification stuff.

9    Q.  And I think your testimony was that the contents of that

10   discussion were memorialized in the February 20th Order that

11   the Court issued, is that a correct recreation of your

12   testimony?

13   A.  From the January 22nd meeting, yes.

14   Q.  Was it in the January 22nd meeting that the courts used

15   this term, bellwether individual?

16   A.  I don't remember whether it was specifically that

17   meeting or a subsequent one.

18   Q.  And the subsequent one would have been -- I believe you

19   said there was a meeting in early April after you visited

20   the MSOP St. Peter Site, is that correct?

21   A.  Yes.  Actually, we had a conference call with the Judges

22   on April the 7th, and I believe that topic came up at that

23   time -- excuse me.

24   Q.  And who was on the phone in that conference call, to

25   your knowledge?

1    A.   The four of us, I believe Mr. Ferleger was there, but

2    I'm not positive of that, and both Judges Frank and Keyes.

3    Q.   Okay.  And what was discussed during that meeting?

4    A.   We gave an update on our meeting to St. Peter.  We

5    wanted to inform the Judges what we had seen so far, to

6    highlight some of the issues that we were -- some of the

7    issues that were emerging, and also to get some further

8    clarification about how extensive they wanted us to be in

9    our reviews of the individual cases.

10   Q.   Were any of the parties or the parties' attorneys on

11   that conference call?

12   A.   No, no.

13   Q.   And was it on that conference call, then, that they

14   spoke to you of this term, bellwether individual?

15   A.   I believe so, yes.

16   Q.   What did you understand to be the instruction?  What

17   does that term encapsulate or mean?

18   A.   We actually spent a lot of time getting clarification

19   from Judge Frank at that point.  What Judge Frank had asked

20   us to do is to, within these certain subgroups of people

21   that he asked us to focus on first, he wondered whether or

22   not there were any specific individuals that we might --

23   that we might ascertain would merit some further

24   investigation or might actually be someone that could be

25   either recommended for release or for some sort of a change

1   in circumstances.

2   Q.  Besides release and change in circumstances, what did

3   you believe was your instruction from the Court in terms of

4   finding a Bellwether individual?  Were those the only two

5   criteria, someone who was entitled to release or someone who

6   was entitled to a change in circumstances?  Or were there

7   other criteria that you were looking for?

8   A.  I don't recall that there were other specific criteria

9   beyond that; that within these certain subgroups within the

10  Class, the Judges were interested in whether or not there

11  were any individual cases that might serve as an example.

12  And that's how I think we understood the term "bellwether."

13  Q.  An individual whose circumstances were such that they

14  would serve as an example to who or for what purpose?

15  A.  To the Court, as to whether or not that person could

16  have their circumstances changed.

17  Q.  Okay.  So, did you interpret that instruction to be the

18  Court wanted you to find someone that the Court could use as

19  an example?  I don't know what you mean by use as an

20  example.

21  A.  I'm sorry if I'm not being clear.

22          So, the process was that we were -- in the Order

23  that the Judge made February 20th, there was instruction for

24  us to essentially evaluate all of the residents of the MSOP.

25          In our discussions with the Judge outside of the

1    Order, he had asked us to focus, specifically, on certain

2    subgroups, as I spoke to earlier.  One of those subgroups

3    was the men who had not had any adult charges.

4            And the Judge asked us whether or not within that

5    group if we found anyone where we believed that person was

6    being held at the MSOP and could potentially be either

7    released to the community or could be moved to some other

8    place.  Would we be able to write a report that would sort

9    of highlight some of those issues.

10   Q.  Okay.  And did you -- you undertook, then, a study of

11   the Assisted Living Unit, the Alternative Program, and the

12   Young Adult Program at MSOP?

13   A.  Yes.

14   Q.  Is that right?

15           Did you do -- and I understand there were sort of

16   two levels of the review of these files.  One was sort of a

17   cursory review to see if there was an indicia of problems,

18   is that --

19   A.  Yes.

20   Q.  -- correct to say?

21   A.  Yes.

22   Q.  And then if there were indicia of problems on that

23   cursory review, I understood from the testimony of the Rule

24   706 experts that you would do a more thorough review.  And

25   then if you felt there were problems, it would go to another

1    one of the Rule 706 experts to do a review; is that correct?

2    A.  Yes.

3    Q.  And did you review all of the individuals in those three

4    programs?  Again, the Young Adult Program, the Alternative

5    Program and the Assisted Living Unit?

6    A.  We have not completed our review of all of those members

7    at this point.

8    Q.  Okay.  Can you give me a sense of how far along you are?

9    Let's take the Young Adult Unit, first.  How many people are

10   in that Unit, do you know?

11   A.  I couldn't give you an exact off the top of my head.  My

12   guess is that we've seen between 15 to 20 members of that

13   group in an actual interview.  In terms of reviewing their

14   files, I believe we've done a cursory review of most or all

15   of them.

16   Q.  And how many at this point are going to get that second

17   level of review?

18   A.  I believe once that we've actually started that process

19   on, probably about six or eight.

20   Q.  In the Alternative Program, do you have any idea how

21   many individuals are in that program?

22   A.  Not off the top of my head, no.

23   Q.  Would it surprise you if I told you that there were

24   approximately 120 individuals in that program?

25   A.  It would not.

1    Q.   Okay.  How many do you think that you've done a cursory

2    review of?  And I mean by "you," you know, among the --

3    A.   Speaking --

4    Q.   -- four of the team --

5    A.   -- about me, or the whole team?

6              At this point, not very many.  We've not gotten to

7    that point yet.  We're still pretty early in our process of

8    reviewing cases.

9    Q.   So, a dozen?  A few dozen?

10   A.   Perhaps a dozen.

11   Q.   How about the Assisted Living Unit?

12   A.   Probably about the same.

13   Q.   And approximately, do you know how many people are in

14   the Assisted Living Unit?

15   A.   Not off the top of my head, no.

16   Q.   If I said 25, would that surprise you?

17   A.   No.

18   Q.   Does that sound about right?

19   A.   Sure, yes.

20   Q.   The way the process you've described is structured, is

21   it possible for you to write a report on an individual who

22   is in the correct placement and receiving the correct

23   treatment at MSOP?

24   A.   Yes.

25   Q.   Okay, and describe to me the circumstances under which

1    that report would get written.

2    A.   We review the file material.  We interview the client.

3    And we interview some members of that client's clinical

4    team.

5    Q.   But if I understand your testimony correctly,

6    Dr. Wilson, what you just said is that you were instructed

7    by the Court to review files to find problems with either

8    placement or commitment, period.  And so, if someone is

9    placed in the right place and is receiving the correct

10   treatment, isn't it true that you would do a cursory look at

11   that file and then put it aside and move to the next file in

12   order to -- because you're looking for ones for which there

13   are a problem?

14   A.   Yes.

15   Q.   So, that is correct?

16   A.   Yes.

17   Q.   And so, you're not actually going to be writing any

18   individualized reports about committed individuals at MSOP

19   who are both in the right placement, in the right phase of

20   treatment and receiving the proper treatment for their

21   treatment phase; is that right?

22   A.   Yes.  Sorry, I may have misheard you the first time.

23   Q.   In terms of the more global report that you're working

24   on, or I don't think the word global was used -- the broader

25   report about the program.  What instruction did you receive

1    about doing that report from the Court?

2    A.   The Court asked us to essentially evaluate all aspects

3    of the MSOP.

4    Q.   And so, is that report likely to cull out specific

5    individuals?  Or is that report going to talk more broadly

6    about treatment and conditions?

7    A.   It's going to talk more broadly about treatment and the

8    conditions.

9    Q.   Anything else?

10   A.   It may make some commentary about the legal framework,

11   as well.

12   Q.   Anything beyond that?

13   A.   Without reviewing my notes, it's hard to be fully

14   comprehensive, but we're looking at all aspects of the MSOP.

15   Q.   Is the intent to review the files of all 700 individuals

16   prior to completing that more comprehensive report?

17   A.   I don't believe we'll be able to have done that.

18   Q.   How many do you think that you'll be able to review?

19   A.   To have reviewed the files, even at the so-called

20   cursory level, my guess is that we will not have been

21   through more than about 25 percent of the full population of

22   the MSOP.

23   Q.   How much longer does it take to do a more in-depth

24   review than it does a cursory review?  So, for instance,

25   what do you look at when you do a cursory review of a file?

1    A.  We're looking at the reports that were used to civilly

2    commit them in the first place.  We look at the

3    individualized treatment plans as the individual has moved

4    forward throughout the program.  We look at the -- if there

5    are any psychiatric kinds of evaluations that have been

6    done, all of the annuals, psychological reviews, we look at

7    the behavior reports.

8         We're essentially looking for indications within

9    the record of how the individual has been doing.  Are they

10   in treatment?  What phase of treatment are they in?  Are the

11   treatment plans individualized to the individual needs of

12   the client?  That would be the kind of -- that would be the

13   cursory review.

14        And in most cases, that would take us about an

15   hour or so, an hour to an hour and a half.  And if there

16   were indications within the material that we had reviewed at

17   that level, that the individual might require some further

18   investigation, then we would go through the file more

19   intensively.  And if the individual who had done that

20   process was of a mind that this is someone who may be, who

21   may be inappropriately placed or being inappropriately

22   treated, then we would pass the file on to one of the other

23   members of the team for them to engage in a similar process.

24   Q.  So, if the cursory process takes an hour, how much more

25   time do you think the in-depth process takes for the

1    person -- let's say for now, for the person who did the

2    cursory review, how much more time do you spend on the file

3    to do the more in-depth review?

4    A.  I can't speak to the other members of my team, but for

5    myself, I would say that that file review would take more in

6    the neighborhood of about three to four hours.

7    Q.  How much time have you been spending as a Rule 706

8    expert on those -- you know, give me a comparison.  How much

9    percentage of your time have you spent on the cursory

10   reviews and how much time have you spent on the in-depth

11   reviews?

12   A.  We've front-loaded it with the cursory reviews so as to

13   be able to get through more of the files.  The in-depth

14   reviews, because they take so much more time, those have not

15   been the principal focus.

16          The principal focus has been to try to get through

17   as many of the cases as possible.

18   Q.  Can you ballpark it for me in terms of the amount of

19   time you've spent on the cursory reviews versus the in-depth

20   reviews?  Is it 50/50, you think, at this point

21   understanding that you've front-loaded it with the cursory

22   reviews?  Give me a sense of that, if you would.

23   A.  Well, in our time on site, I think it would probably be

24   reasonable to say that we've spent half of our time looking

25   at file materials and half of our time interviewing staff

1    and sort of -- and observing aspects of the actual program,

2    like the dorms, the food service, medical areas, things like

3    that.

4            In terms of how much time we've spent doing file

5    review, as opposed to the in-depth review, I'd say probably

6    75 percent of our time has been doing cursory reviews and

7    about one-quarter of the time doing the more intensive

8    reviews.

9    Q.  For the cursory reviews, just so I am understanding it

10   correctly, you only looked at certain individuals within the

11   Young Adult, Alternative Program, and Assisted Living Units,

12   right?  You haven't looked, even at a cursory level, at

13   individuals who live outside of any of those units, is that

14   right?

15   A.  No, we have not.

16   Q.  You have not done a review of those other people?

17   A.  No, we've been focusing on the areas the Judge asked us

18   to look at first.

19   Q.  So just so I'm understanding, you've gotten through 15

20   to 20 people in the Young Adult Program, about a dozen in

21   the Alternative Program, and about a dozen or so in the

22   Assisted Living Program?

23   A.  I think I said that we've been through the files on a

24   cursory level for, I believe, almost all of the young adult

25   folks, and that the other two groups, much less at this

1    point.

2    Q.  How many young adults do you believe you'd be writing

3    reports on?

4    A.  I'm not sure.

5    Q.  Less than ten?

6    A.  Probably more than ten would be my guess.

7    Q.  And these -- the reports you have on -- and so when

8    you're doing, then, your comprehensive report, I mean, what

9    do you hope to achieve?  At the time you write that report,

10   what do the experts want to have looked at and spent most of

11   their time on?  Are you going to do more cursory reviews or

12   are you going to do more in-depth reviews?  Tell me sort of

13   what goes into the writing of that report and what you are

14   hoping to achieve, to have looked at at that point in time.

15   A.  In going through all of the members or in going through

16   all of the members of the Class, regardless of which subset

17   they fit into, it's my expectation that the majority of our

18   reviews will be of the cursory type.

19   Q.  And why wouldn't you go into more depth on an individual

20   who is correctly placed?  Is that just not the instruction

21   you've been given?

22   A.  That's not the instruction we've been given.

23   Q.  You mentioned that you also met with the Court on June

24   9th.  Was that a face-to-face meeting or a telephone

25   meeting?

```
1    A.  Face-to-face.

2    Q.  And who was at that meeting?

3    A.  Both of the Judges, the four of us, Mr. Ferleger and

4    some of the Court staff.

5    Q.  Were any of the parties or parties' attorneys at that

6    meeting?

7    A.  No.

8    Q.  And what did you discuss at that meeting?

9    A.  We talked about the two reports that we had filed, the

10   report for Ms. Bailey, and the one for Mr. -- for

11   Mr. Terhaar.  We also spoke with the Judges.  We, as a

12   group, have had some concerns about the prospect of having

13   to review every single case file.

14           We were meeting in some respects to kind of

15   advocate for a randomized sample so as to not be reviewing

16   quite as many cases.  I think I could speak for all four of

17   us that we all have full-time jobs outside of this, and this

18   is becoming a full-time job over and above that.  And it's

19   having some effects on both our professional and our

20   personal lives.  And we wanted to see whether or not there

21   was an expedited process that we may be able to do to

22   respond to the Court's intents, but at the same time, be

23   able to function.

24   Q.  And what did the Court tell you?  Did he give you

25   additional instruction in that regard?
```

1    A.  At this point, I believe the judges wanted to see what

2    would happen with the two cases that we had given them so

3    far, and I don't believe we've had any finite instruction

4    beyond that.

5    Q.  So, take a wait-and-see approach?

6    A.  Yes.

7    Q.  Okay.  Did you receive any other instruction from the

8    Court at that meeting about how you were doing the reports

9    or the timing of the reports?  Did you talk at all about

10   when the bigger report would be done?

11   A.  We did speak about when the bigger report would be

12   completed.

13   Q.  Did you get any instructions from the Court on that

14   score?

15   A.  We did.  They asked us to have it finished by the end of

16   August.

17   Q.  Do you think that is achievable?

18   A.  I hope so.  I'm the one who will write the shell of it,

19   and then the rest of the panel will make their inputs, and I

20   think that we should be able to do that within the

21   timeframe.

22   Q.  And again, what -- I mean, how many of the -- how many

23   individuals' files at MSOP do you think you'll be able to

24   look at and include them in your analysis when you do that

25   bigger report at the end of August?

1    A.  I think I've said already that probably about

2    one-quarter of them.

3    Q.  And you know you said that you're front-end --

4    front-loading cursory reviews.  But, at the end of the day

5    when you're done with all of the reviews, let's say you do

6    end up doing 25 percent, do you have a sense of how much

7    time will have been spent at that point looking to the more

8    individualized reviews on files that appear to have problems

9    and how much time will have been spent on the cursory

10   reviews?

11   A.  I would say somewhere in the neighborhood of about

12   three-quarters would be cursory reviews and about

13   one-quarter would be the in-depth reviews.

14   Q.  Okay.

15   A.  And I think I should be clear about what I mean when I'm

16   saying an actual cursory review.  It's not that we're

17   reviewing one or two documents on the person, and then sort

18   of moving on to the next one.  We're essentially going

19   through enough of the file material to have a good sense of

20   who this person is, what it is that they've done, you know,

21   over their lifetime with respect to offending, what they've

22   done since they've arrived at the MSOP, what phase they're

23   in, what kind of things are they doing in treatment, and

24   what sort of behavioral issues they may have been

25   experienced, as well.

1    Q.  Okay.  And if you do that type of a review, again, and

2    find somebody who doesn't appear to have any problems,

3    they're in the right placement, getting the right treatment,

4    they seem to be appropriately at MSOP and they're moving

5    through treatment, then you put that one aside, right?

6    A.  Yes.

7    Q.  And then if there's any indicia of a problem, that's the

8    one that gets the bigger of you?

9    A.  Yes, that's correct.

10   Q.  I note that on the May 18, 2014 report on Eric

11   Terhaar -- that's the date on it.  On that date, was that

12   the date it was completed by the experts?

13   A.  I'm not sure of that.  We worked on the report probably

14   for about two or three weeks.  Because there are four of us,

15   one person wrote the shell of the report, and then each one

16   of us added to it, made some changes, either added things,

17   took things away.  So, between the four of us it went back

18   and forth for, I think, probably two or three weeks.  Then

19   we finalized the report and sent it on to the Judges.

20            I don't know whether or not the last person who

21   did anything to it did it on actually May 18th or whether it

22   was May 15th, but --

23   Q.  Do you remember, did you send the report to the Judges,

24   then, on May 18th, or was it some other date?

25   A.  I don't remember specifically who we sent it to.  I

1  think we got some guidance from the Court as to where that

2  should be sent.  And I think there was some issue around

3  making sure that all parties got it at the same time.  So, I

4  don't remember specifically who we sent it to, but it was

5  someone that we were told to send it to.

6  Q.  So, you don't -- okay.

7        So, do you remember, did you send it

8  simultaneously to the Court and all parties?

9  A.  I don't know.

10 Q.  Okay.  Would it surprise you to learn that the parties

11 got it on May 30th?

12 A.  No.

13 Q.  Okay.  But, you believe you may have gotten instructions

14 from the Court to send it just to them?

15 A.  I have some memory of the fact that it needed to go to

16 everyone at the same time, but then again -- you know, once

17 again, I'm not sure exactly who we sent it to.  I'm not even

18 sure that I was the one who sent it, specifically.  But,

19 where it got sent to was where we were told to send it to.

20        MR. BRENNAMAN:  Can I refresh the witness'

21 recollection of the document, Your Honor?

22        THE HONORABLE JUDGE FRANK:  All right.

23        If you're not going to use the screen -- sorry.

24        MR. BRENNAMAN:  Do you want a copy?  I'm showing

25 you the -- I can use the screen.

1              THE HONORABLE JUDGE FRANK:  We'll dial it down,

2     then, so that --

3              MR. BRENNAMAN:  It was on, sorry.

4              Maybe it will come up and maybe it won't.

5     BY MR. BRENNAMAN:

6     Q.  I've handed you the Order of Appointing Experts under

7     Rule 706 of the Federal Rules of Evidence.  This is the

8     Order.  Have you seen that document?

9     A.  Yes, I have.

10    Q.  You seem to recall that there was instruction at some

11    point that the reports be sent simultaneously to the Court

12    and the parties.  I'd like you to look at paragraph 6.

13    A.  Yes.

14    Q.  Does that refresh your recollection about where you may

15    have received that instruction?

16    A.  Yes.

17    Q.  Could you read paragraph 6 for everyone?

18    A.  "Pursuant to Federal Rule of Evidence 706(b)(1), the

19    experts shall submit their findings and recommendations to

20    the Court and to the parties simultaneously."

21             MR. BRENNAMAN:  At this point, Your Honors, I

22    would like to object to the use of the Rule 706 experts in

23    this case and preserve that objection for the record if I

24    could.

25             Rule 706(b) says that "The Court must inform the

1    expert" -- I'm sorry -- "The Court must inform the expert of

2    the expert's duties.  The Court may do so in writing and

3    have a copy filed with the clerk, or may do so orally at a

4    conference in which the parties have an opportunity to

5    participate."

6         And the testimony of this expert is that there

7    have been meetings with the Court in which instructions were

8    given by the Court to the experts and the parties were not

9    aware of it.  And the Defendants object to the use of -- to

10   the instruction being given outside of their presence in

11   that way, contrary to Rule 706.

12        I also object that contrary to the Court's own

13   order in paragraph 6 of submitting findings and

14   recommendations to the Court and the parties simultaneously,

15   the Defendants in this case did not receive the report on

16   Eric Terhaar until May 30th.

17        THE HONORABLE JUDGE FRANK:  What, specifically,

18   are you stating, Counsel?  In other words, the directive of

19   the parties is in the -- the directive of the Court is in

20   the Order that reflects what the experts were to do.  So,

21   what specifically are you alleging is the prejudice to your

22   clients?

23        MR. BRENNAMAN:  Well, these -- when these experts

24   were first appointed and the Order appointing the experts,

25   it was by agreement of the parties.  I think you remember

1    that the parties recommended experts to the Court and the

2    Court appointed all four of the experts that were

3    recommended.

4              And there was a discussion at that point in time

5    about what the scope and work of the experts would be, and

6    it had to do with issues related to Class claims, claims

7    that were common to all Class members.

8              It sounds like there was a meeting on January

9    22nd.  And we received the Court's February 20th Order in

10   which the direction being given to the experts became more

11   specific to look at specific areas, and individuals within

12   the program.  I guess --

13             THE HONORABLE JUDGE FRANK:  You're referring to

14   this Order that's up here, correct?

15             MR. BRENNAMAN:  This is not the February 20th

16   Order.  I believe it is the December 6, 2013 order that

17   first appointed the Rule 706 experts.

18             THE HONORABLE JUDGE FRANK:  And then the next

19   Order set out those specific categories of individuals.

20             MR. BRENNAMAN:  That's right, look at the Assisted

21   Living Unit, the Young Adult Program, the Alternative

22   Program and so on.

23             The Defendants' concern is that since February

24   20th, there's been, it sounds like, at least, two meetings

25   in which a process has been developed whereby individual

1    reviews of files are going to be done in these three

2    programs.  But, it's a program set up to only report on

3    problems and bad placements within the program.  There's

4    never going to be a report, as I understand it, that's going

5    to be produced which talks about the individuals who are

6    properly placed or the correct treatment that's being given,

7    or individuals who have been receiving good treatment.

8        The Court has instead instructed these experts to

9    embark on a system that is designed to identify only

10   individuals who are supportive to the Plaintiffs' case, to

11   the extent that they are supportive to the Plaintiffs' case.

12       THE HONORABLE JUDGE FRANK:  Well, there seems to

13   be a misunderstanding of the term -- a serious

14   misunderstanding of the term bellwether.  Bellwether is a

15   very common phrase used to -- in national class actions and

16   in MDL cases, it's the most popular, you could look on the

17   complex section on civil litigation.  And the phrase means

18   representative cases, because the idea is if an individual

19   or a class isn't truly representative of the whole class,

20   it's meaningless to all the lawyers on both sides.

21       So, we may want to ask the good doctor whether it

22   jogs his memory when the -- whether they were so upset with

23   what they saw, they came to us -- the word release focus --

24   or did not come from the -- did not come from the Court,

25   that would be contrary to bellwether.  That when they saw

1    Mr. Terhaar and Ms. Bailey, they specifically raised them

2    because the bellwether concept is representative people of

3    the 700 consistent with the Order that we did.

4            So, if there is some other criteria about people

5    ready for release, I'm unfamiliar with it.

6            Are you familiar with it, Judge Keyes?

7            THE HONORABLE MAGISTRATE JUDGE KEYES:  No, I think

8    that's right.

9            THE HONORABLE JUDGE FRANK:  I'm unfamiliar with

10   that criteria, because it would, number one, be contrary to

11   the concept of bellwether.  And then there might be a

12   separate issue you've touched on, and that is the -- and

13   maybe it'll come out this afternoon -- about how long it

14   would take if the Bellwether or another -- the phrase is

15   representative cases aren't used randomly selected or

16   otherwise, but then it's hard to get representative cases

17   that are typical of the folks in there, is the cost and the

18   length of doing 700 people, which I believe is something

19   that the experts may have brought to everybody's attention,

20   as well.

21           But, that's why I raised the issue I did, because

22   it seems to be what's being suggested is quite contrary to

23   the overall concept of bellwether and representative cases.

24   Because you would be correct, if there was some direction to

25   look at people eligible for release, that wouldn't be a

1    bellwether -- would not be a bellwether, or as the phrase is

2    used, representative case.

3              So, that's where the phrase bellwether comes from,

4    because you may be familiar, it's commonly used in class

5    action litigation and MDL litigation across the country, and

6    pretty much all cases to try to save time and money for all

7    parties on all sides of the case.  And admittedly, if

8    they're not truly representative cases, that it doesn't

9    serve the purpose of a bellwether case.  But more than

10   people wanted to know about bellwether.  And I don't know if

11   maybe there was something else you wanted on the record for

12   your client, I'm not certain, but --

13             MR. BRENNAMAN:  No, I just wanted to preserve that

14   objection and make sure that we -- now having heard what

15   this process is for the first time after that testimony, the

16   Defendants, you know, are not accepting and waiving the

17   ability to object to it.

18             THE HONORABLE JUDGE FRANK:  All right.

19             THE WITNESS:  Sir, can I respond to your comments?

20             THE HONORABLE JUDGE FRANK:  Oh, sure.

21             THE WITNESS:  It would be my position that

22   Mr. Terhaar is one of many people of his sort at the MSOP.

23   And that it would be the panel's belief that most of the --

24   most of the residents who have no adult charges would be in

25   the same position as he.

1           So, as the Judge has defined the term bellwether,

2    I believe Mr. Terhaar meets that definition.

3    BY MR. BRENNAMAN:

4    Q.  Okay, and I wanted to -- I don't have a lot more

5    questions for you, Mr. Wilson, but I did want to ask you a

6    few questions about Mr. Terhaar and Ms. Bailey.  I think

7    I'll focus most of my questioning to the individuals who

8    sort of structure it the way the Court has structured it

9    just so we don't get into too much repetition and so on.

10           Do you believe Mr. Terhaar should have been

11    civilly committed?

12    A.  No.

13    Q.  Mr. Terhaar -- are you aware he stipulated to civil

14    commitment, though, is that right?

15    A.  Yes, I know that.

16    Q.  Do you believe that Mr. Terhaar at the time he was

17    committed needed any supports or care or treatment?

18    A.  Yes.

19    Q.  Was he -- did he continue to be a security risk, in

20    particular, to individuals and children who were younger

21    than him and more vulnerable than him?

22    A.  Maybe.

23    Q.  Do you know what options were available to the

24    committing courts besides MSOP that would have provided the

25    well of supports and care and treatment and protection to

1    the public that would have been adequate for Mr. Terhaar?

2    A.  No.

3    Q.  With regard to Ms. Bailey -- I'm sorry -- still on

4    Mr. Terhaar.

5            Does Mr. Terhaar receive treatment at MSOP?

6    A.  Yes.

7    Q.  I know that there are some statements in the report that

8    the treatment that he receives may not be -- may be able to

9    be improved through doing some additional trauma-related

10   treatment; but, by and large and aside from that

11   trauma-related issue, is the treatment that he's receiving

12   appropriate for the type of -- where he's at?

13   A.  No.

14   Q.  And how is it not appropriate?

15   A.  I believe he never should have been there in the first

16   place.  So, the treatment he's being offered, I would argue,

17   is inappropriate to him in that he doesn't need intensive

18   sex offender treatment, which is what he's in.  And that

19   really what he ought to be getting is the sort of support

20   and counseling that would assist him in being able to

21   develop a life out on the street.

22   Q.  Isn't that a matter of placement, though, more, rather

23   than treatment?  Your position is he's in the wrong

24   placement, is that right?

25   A.  Yes.

1    Q.  I guess aside from that issue, then, I mean, given the

2    tools that MSOP has, is it trying to do what it can do for

3    Mr. Terhaar, given the placement that he's in?

4    A.  In our field there are some general principles that we

5    should adhere to with respect to making sure that people do

6    as well as they can within the programming they're offered.

7         The first of those principles is called the risk

8    principle.  It says that the level of intensity of treatment

9    should match the level of risk posed by the individual.  I

10   don't believe that Mr. Terhaar poses a high risk to

11   re-offend; therefore, it's inappropriate to place him in a

12   treatment program that is of high intensity.

13        The second principle is the need principle, says

14   that we have to specifically target those areas that

15   actually contribute to that risk.  Given that Mr. Terhaar is

16   not at high risk to sexually offend, I'm not sure that he

17   should be in a sex offender treatment program at all.

18        Some of the things that he would be receiving at

19   the MSOP, which are not the specific targets of the sex

20   offender treatment program are things that are likely

21   helping him, but those are the sorts of things he could

22   receive in a number of different places and perhaps better

23   in a place that was not a high-intensity sex offender

24   treatment program.

25        The third of those principles is the principle

1    with respect to treatment responsivity, which means that the

2    program should be responsive to the individual.

3            I don't believe that Mr. Terhaar has been well

4    served by his placement at the MSOP.  I think that the

5    environment has probably, probably inhibited him from

6    becoming more mature and from being able to develop the

7    sorts of skills and -- skills and understandings of what it

8    would be to be a young adult living in -- living in the

9    community.  So, I think, all around, his placement at the

10   MSOP breaks pretty much every rule that the research tells

11   us we should follow.

12   Q.  Okay.  And again, though, these Defendants run the

13   program.  You'd agree with me, wouldn't you, that they did

14   not play a role in the commitment of Mr. Terhaar?

15   A.  No.

16   Q.  They received Mr. Terhaar once he was committed.  Do you

17   agree with me?

18   A.  Yes.

19   Q.  Do you feel like under those circumstances these

20   Defendants in this case, aside from the decision to place

21   him in the program, have done their best to provide the

22   treatment they can provide him to improve him?  And you've

23   just testified that he has improved at least in part because

24   of the treatment.

25   A.  From an ethical standpoint -- and I'll speak for myself

1    as someone who was the clinical director of a program not

2    dissimilar to this one.  If there was someone within my

3    program that I believed didn't belong there, then I would do

4    my best to see that that was brought to light.

5            In this case, I'm not sure why Mr. Terhaar is

6    still there.  I'm not sure why he was ever there in the

7    first place, outside of the fact that that was what the

8    Court decided.  I believe that process was also flawed.

9    Q.  Okay.  With regard to Ms. Bailey, I get the sense from

10   your report it's a similar problem, it's all about

11   placement.  She should not be placed with men.  Is that the

12   gist of the problem with Ms. Bailey?

13   A.  Yes.

14   Q.  Is the program attempting to provide treatment to

15   Ms. Bailey?

16   A.  I believe they are attempting to provide treatment to

17   Ms. Bailey.

18   Q.  And is the treatment that they're attempting to provide

19   her appropriate from a clinical standpoint?

20   A.  No.

21   Q.  And what are the reasons it is not?

22   A.  She's in a group with a bunch of men.  She's focusing on

23   issues that are fundamentally issues for men.  She's housed

24   in a unit with men.  All of the research with respect to

25   female sex offenders is very clear that they are different

1    from men.  In any circumstance where she's being treated

2    with men and also living with men in a program designed for

3    men is fundamentally inappropriate.

4    Q.  Okay.  You're aware, aren't you, that she is the only

5    committed female sex offender in the State of Minnesota?

6    A.  Yes.

7    Q.  And that there are just not that many female sex

8    offenders to begin with, but especially in the State of

9    Minnesota; is that right?

10   A.  Yes.

11   Q.  And so, is placement with other female sex offenders, do

12   you know of a placement where she could be housed with other

13   female sex offenders?

14   A.  No.

15   Q.  Do you know of any placement outside of MSOP to which

16   she could be provisionally discharged that would be

17   appropriate for her, the needs of public safety and for all

18   of the diverse treatment that she needs as reported in your

19   report?

20   A.  No.

21   Q.  But as I understand it, is it appropriate for her to be

22   housed with mentally ill individuals and mentally ill and

23   dangerous individuals in a location on the St. Peter Campus?

24   A.  It may be.

25   Q.  And what criteria do you feel would need to be in place

1   for that to be a situation that would work?

2   A.  There would need to be individualized treatment for her

3   that matched those three principles that I just spoke to.

4   To the extent that there are -- that there are clinical

5   staff who can work with her with respect to sexual issues,

6   with respect to trauma, with respect to female-specific

7   sorts of issues, if those services were available at the

8   Minnesota State Hospital, that would be acceptable.

9   Q.  Do you know whether they are?

10  A.  No, I don't.

11  Q.  Do you know whether any of the mentally ill or mentally

12  ill and dangerous women housed at the Minnesota Security

13  Hospital on the St. Peter Campus have issues that overlap

14  with Ms. Bailey, such that those resources may exist?

15  A.  I don't know specifically because I don't know those

16  cases.  It would be extraordinary for Ms. Bailey to be the

17  only sexually reactive woman in the State of Minnesota.

18  Q.  I'd like to talk to you about the standards you used

19  when reviewing these individuals or the standard that you

20  are using.  I notice that both reports use the language of

21  Chapter 253D and the language of transfer, provisional

22  discharge and discharge.

23        When you were going through these files and

24  looking at the files, were you using the statutory text for

25  those transfer, provisional discharge and discharge

1      provisions as the standard by which you were measuring

2      whether any individual should be released or moved?

3      A.  We were informed by them, I don't know that we

4      explicitly adhered to them in all circumstances.

5      Q.  What standard do you apply?

6      A.  Whether or not the individual posed a -- was sexually

7      dangerous and posed an inordinate amount of danger to the

8      community, and whether or not they were receiving the

9      treatment that was best suited to address their issues.

10     Q.  Okay.  But, you said for both Mr. Terhaar and

11     Ms. Bailey, that you don't -- well, that you didn't know of

12     a place, you don't know of a placement for Ms. Bailey that

13     exists outside MSOP, and at the time of his commitment, at

14     least, you don't know of any placement for him.

15              Do you have a good sense of different placements

16     that are available in the State of Minnesota for these

17     individuals that would be both willing to accept individuals

18     and provide the type of public safety and treatment that's

19     needed to care for those individuals?

20     A.  No.

21     Q.  When I spoke to the four -- with the four of you last

22     week, you also talked about a constitutional standard.  Is

23     that -- I can't remember which of you said that because it

24     was a little hard to pick up voices on the phone.  But do

25     you believe you are also being informed by an idea about a

1    constitutional standard?  What is your understanding of

2    that?

3    A.  I believe it was Dr. Freeman, although she may kill me

4    for having said so.  And yes, we are informed by the Supreme

5    Court's -- by the Supreme Court's judgments on the civil

6    commitment issue.

7    Q.  Okay.  And have you read those decisions?

8    A.  Not recently; but yes, as someone who is the clinical

9    director of a civil commitment program and who has written

10   somewhat extensively on the issue, I have a general

11   understanding.

12   Q.  And what is your understanding of that constitutional

13   standard?

14   A.  That the individuals who are civilly -- who are civilly

15   committed should not be there simply for the purpose of

16   preventative detention, that they should be receiving

17   treatment that is intended to address the issues that had

18   them civilly committed in the first place, such that once

19   they are no longer a danger to the community, that they can

20   be returned to the community.

21   Q.  And did you get any direction from the Court about what

22   standard to apply when reviewing these files, as a legal

23   matter?

24   A.  I don't believe so.

25            MR. BRENNAMAN:  No further questions for

1    Dr. Wilson, Your Honors.

2            THE HONORABLE JUDGE FRANK:  All right.

3            Mr. Gustafson?

4            MR. GUSTAFSON:  Thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6    **BY MR. GUSTAFSON:**

7    Q.  Good afternoon, Dr. Wilson.  I'm Dan Gustafson.  I'm one

8    of the lawyers for the Plaintiffs in the Class.  Thank you

9    for helping the Court and the parties with this case.

10            Earlier in response to questions from counsel, you

11   had suggested that the Judge was looking for cases that

12   suggested a release or change in custody.  Did the Judges'

13   comments refresh your recollection on that?

14   A.  Yes.

15   Q.  Tell me what you recall.

16   A.  The issue was one of trying to be expedient, to try to,

17   you know, sort of have a sense of what the case was within

18   these certain sub-groupings.  And if there were individual

19   cases that would be representative of the sort of larger

20   group of them, could we write a report on those that would

21   assist the Court in moving forward.

22   Q.  And I take it from your conversations with the Court

23   that the Judge never told you what kind of an opinion to

24   reach on any of these individuals, is that right?

25   A.  No, absolutely not.

1    Q.  No one from the Court or the Court's staff or anyone

2    else ever suggested that you should come to any certain

3    conclusion about anybody, correct?

4    A.  No.

5    Q.  All of the conclusions that you reached with respect to

6    Mr. Terhaar and Ms. Bailey, those are all your own opinions,

7    they're not influenced by anything the Court said, is that

8    right?

9    A.  No.

10   Q.  And there's been a line of questions that were asked of

11   you with respect to whether you knew of alternative

12   placements for either Mr. Terhaar or Ms. Bailey.  That was

13   not part of your task from the Court, was it, to find

14   alternate placements for people?

15   A.  No.

16   Q.  Were you asked by the Court to survey the potential

17   placements within the State of Minnesota to see if there

18   were alternative placements that might be available for

19   people who were inappropriately placed at MSOP?

20   A.  No.

21   Q.  I take it that if you were asked by the Court, you could

22   create for Ms. Bailey a residential situation and a

23   treatment situation that would satisfy your professional

24   opinion about what was necessary for her.

25   A.  Yes.

1    Q.  For example, if the State provided sufficient funds, you

2    could find a living arrangement that would satisfy your

3    professional opinion about what she needed?

4    A.  I imagine we could, yeah.

5    Q.  I mean, you could create one.

6    A.  Oh, yes, absolutely.

7    Q.  And with respect to the treatment that you believe

8    Ms. Bailey needs, given the sufficient funds from the State

9    of Minnesota, you could create a treatment program that

10   would fit within what you believe, in your professional

11   opinion, she needs?

12   A.  Yes.

13   Q.  Is it the case that when you reviewed Mr. Terhaar's

14   file, that you were shocked to find him at MSOP?

15   A.  Yes.

16   Q.  And with Ms. Bailey, were you shocked to find her

17   treated in the manner in which she was treated from a

18   treatment standpoint and from a living standpoint?

19   A.  Yes.

20   Q.  And you brought those two cases to the Judges' -- or to

21   the Courts' attention because you thought they needed

22   immediate action, is that fair?

23   A.  Yes.

24   Q.  Do you understand -- I think you mentioned earlier -- do

25   you understand that there are numerous additional

1    juvenile-only offenders at MSOP that fall into the same

2    basic category as Mr. Terhaar?

3    A.  Yes.

4    Q.  And that Mr. Terhaar's case is not an extreme outlier,

5    but rather is representative of the cases that you will be

6    reporting on with respect to those juveniles?

7    A.  Yes.

8    Q.  You understand that Mr. Terhaar was not committed by the

9    Court after a trial, but rather stipulated to his

10   commitment?

11   A.  Yes.

12   Q.  Did you talk to him about that stipulation, that

13   agreement to be committed?

14   A.  Not extensively.

15   Q.  Do you have an understanding that he was told that if he

16   did not admit to the commitment, that he would be found both

17   a sexually dangerous person and a sexually psychopathic

18   personality?

19   A.  I don't know that we knew that.

20   Q.  You don't recall that coming up in your interview?

21   A.  No.

22   Q.  Do you recall him telling you that they had talked to

23   him, that if he stipulated to that commitment, that he would

24   only be at MSOP for a certain length of time?

25   A.  I don't know that we knew that.

1    Q.  Do you understand that Minnesota law provides for less

2    restrictive alternatives if the person being committed can

3    demonstrate that their needs could be met there both from a

4    treatment and security standpoint?

5    A.  Yes.

6    Q.  Do you understand that the State of Minnesota has never

7    provided any less restrictive alternatives for people to be

8    committed other than the high security MSOP and St. Peter

9    facilities?

10   A.  That's my understanding.

11   Q.  Okay.  With respect to the petition from Ms. Johnston

12   for Mr. Terhaar to go to the CPS Program, you don't

13   disagree, I take it, that Mr. Terhaar could benefit from an

14   aftercare plan once he is released?

15   A.  We believe he needs one, yes.

16   Q.  Right.  And by "aftercare plan," I mean things like

17   financial assistance, a place to live, help getting a job,

18   learning how to use an iPhone, those kinds of things that

19   normally would have occurred in his life had he not been

20   committed?

21   A.  Yes.  We also believe that he could use some aftercare

22   counseling, and where appropriate, potentially some

23   psychological treatment, maybe some psychiatric care.  That

24   would depend on his circumstances once he -- when and if he

25   was released to the community.

1   Q.  You understand Minnesota law requires that kind of

2   aftercare?

3   A.  Yes.

4   Q.  And that aftercare you're supportive of, but the reason,

5   I take it, you're not supportive of CPS is because you don't

6   think that he needs any further custody or control by the

7   Sex Offender Program?

8   A.  That's correct.

9           MR. GUSTAFSON:  I have nothing further,

10  Your Honor, thank you.

11          Thank you, Dr. Wilson.

12          THE WITNESS:  Thank you.

13          THE HONORABLE JUDGE FRANK:  Additional questions,

14  Counsel, if you wish?

15          MR. BRENNAMAN:  Nothing further, Your Honor.  I

16  had some more about R.B., but maybe we'll give one of the

17  other experts a chance.

18          THE HONORABLE JUDGE FRANK:  You may step down,

19  sir.

20          THE WITNESS:  Thank you.

21          (Witness excused.)

22          THE HONORABLE JUDGE FRANK:  You may call the next

23  expert, if you wish.

24          MR. BRENNAMAN:  Defendants call Deb McCulloch to

25  the stand.

1          THE HONORABLE JUDGE FRANK:  As you head for the

2     stand, I'll just remind you that you remain under oath from

3     this morning.

4          (Witness previously sworn.)

5          Whenever you're ready, counsel, you may inquire.

6          MR. BRENNAMAN:  May I approach, Your Honor?

7          THE HONORABLE JUDGE FRANK:  You may.

8                         **DEBORAH McCULLOCH**

9                         **RECROSS EXAMINATION**

10    **BY MR. BRENNAMAN:**

11    Q.  Good afternoon, Ms. McCulloch.  Is it Ms. or Doctor?

12    A.  Ms.

13    Q.  Okay, Ms. McCulloch.

14          Maybe the first thing, I put in front of you, a

15    document that's entitled, "Summary of Rhonda L. Bailey,

16    Transfer of Provisional Discharge recommended June 4th,

17    2014."  Is this the report of the Rule 706 experts on Rhonda

18    Bailey?

19    A.  It is.

20          MR. BRENNAMAN:  The State would ask that Exhibit

21    No. 45, the Rule 706 experts' report on Rhonda Bailey be

22    admitted.

23          MR. GUSTAFSON:  Your Honor, I was under the

24    understanding all of the exhibits were provisionally

25    admitted so that we didn't have to move them.

1          THE HONORABLE JUDGE FRANK:  Just to make sure,

2     it's provisionally received.

3          (Exhibit 45 was provisionally received.)

4     BY MR. BRENNAMAN:

5     Q.  So, as you heard Dr. Wilson testify, I'm sure you're

6     aware also that Ms. Bailey is the only committed female sex

7     offender in the Minnesota Sex Offender Program, is that

8     right?

9     A.  Yes.

10    Q.  And she's currently housed in the MSOP Alternative

11    Program Unit, is that right?

12    A.  Yes.

13    Q.  And that program is designed for individuals of low

14    cognitive functioning, is that correct?

15    A.  That's my understanding.

16    Q.  And what is your understanding of how she got there in

17    2008?  We heard in the opening statement from Plaintiffs'

18    counsel talk of this change whereby people were moved from

19    the Minnesota Security Hospital to the MSOP.  Can you

20    describe what your understanding of that move was?

21    A.  My understanding was that when, I believe it was,

22    Mr. Benson was appointed to oversee the program, that an

23    administrative decision was made that all of the, I think it

24    was, 33 committed persons would move to the MSOP.

25    Q.  And who were those?  What was the composition of those

1   33 committed persons?  Did they all have something in common

2   that caused them to be housed at the security hospital

3   rather than at MSOP?

4   A.  My assumption is they were at the secure hospital

5   because forensic issues related to sex offending, but also

6   that they had mental health or cognitive disabilities that

7   required specialized services.

8   Q.  Do you know when she was at the Special Needs Program at

9   the security hospital prior to coming to MSOP, whether she

10  was living with females or males?

11  A.  I think it was both.

12  Q.  Both in the sense of it was a co-ed floor --

13  A.  Yes.

14  Q.  -- or that she moved from time to time to female-only

15  placements and male-only placements, do you know?

16  A.  I would have to look at my notes.  I reviewed a lot of

17  records and she moved a lot.

18  Q.  Okay.  But your testimony is you think the Special Needs

19  Program may have been a co-ed unit, is that right?

20  A.  Co-ed, or there were times when she could have been

21  placed just with women on a unit, I'm not sure.

22  Q.  You don't dispute, do you, that Ms. Bailey continues to

23  need care in a secure treatment facility; do you?

24  A.  I don't agree.

25  Q.  Okay.  What level of security and treatment does she

1    need at a placement?

2    A.  From my perspective, Ms. Bailey would be able to live in

3    a community, in a community-based residential or a community

4    adult foster care.  There are multiple -- I'm not sure about

5    Minnesota's specific licensed facilities, I'm more familiar

6    with Wisconsin's.  But I'm sure they're relatively similar

7    in that she would be in a secure -- not a secured setting

8    but a supervised setting, as well as at least initially that

9    she would be constantly supervised when she would be outside

10    of the residence.

11    Q.  And what level of supervision would she need while she

12    was in the residence?

13    A.  It would depend on all the circumstances, who else lives

14    there, who -- you know, what kind of living setting it is.

15    Q.  It's my understanding that the Rule 706 experts believe

16    that she should either live where there are both women and

17    men or where there are women.  Is that a fair

18    characterization?

19    A.  I think that from my perspective and the discussion was

20    that she should be living in a place where she's not alone,

21    but that would benefit from having other women that she

22    would be living with.

23    Q.  Let's say she was living with other women.  What type of

24    supervision would be needed in that type of setting for her?

25    A.  Well, I can only compare it to my familiarity with

1    settings in Wisconsin for similar people, although they may

2    be men or women, and those might be supervised apartments,

3    they might be transitional living facilities, they might be

4    community-based residential facilities.

5            In Ms. Bailey's case, it may mean that if she were

6    in a community-based residential facility, for example, that

7    her room -- there would be a wait staff 24 hours -- but her

8    room and other rooms would be alarmed so that staff would be

9    alerted at night, for example.  But that she would be under

10   supervision, meaning visual supervision by staff, and then

11   transition progressively to less supervision as she

12   progresses.

13   Q.  And as I understand it Ms. Bailey -- can you tell us

14   more about how she presents as a sexual offender?  As I

15   understand it, she offends against minors, children, but

16   also offends against other women, is that correct?  And

17   could you sort of tell us more about how she's presenting as

18   a sex offender?

19   A.  Sure.  So, I would characterize her as being reactive in

20   that relative to her sexual offending is her experience as a

21   very traumatized young child into her adulthood, and having

22   no other experience, sexually or in relationships.  So that

23   when she is, for example, in a setting where there are other

24   adults, where there is discussion about sexual behavior,

25   that she can be flirtatious not only with other patients or

1    clients, but also with staff.  She is very sexually

2    preoccupied.

3            Can I -- I'm really uncomfortable with another

4    client being in the Court and having two clients just

5    because of confidentiality.  I just feel very uncomfortable

6    as a clinician talking about one client with another client

7    in the courtroom.  I can answer your questions, I just want

8    to make sure the Court is aware that I'm uncomfortable about

9    that.

10           MR. GUSTAFSON:  Your Honor, we would have no

11   objection with Mr. Terhaar waiting outside of the courtroom

12   while we have the testimony about Ms. Bailey.  I think

13   that's a good suggestion.

14           MR. BRENNAMAN:  Whatever the Court wants to do.

15           THE HONORABLE JUDGE FRANK:  Then I think we might

16   utilize -- outside of the courtroom might mean utilizing

17   the -- this exit here, if we wish?  Why don't we do that,

18   counsel?  Why don't we -- we can do that at this time.

19           Rather than -- let's just take a 15-minute recess

20   right here.  It's a little early in the afternoon.  Let's

21   take fifteen minutes, here, and we'll see you back in

22   fifteen.  You may step down.

23           Counsel, we will need help from the deputy

24   marshals -- oh, sorry.  We'll stand in recess for fifteen

25   minutes.

1           You may step down.

2           THE WITNESS:  Can I leave this here?

3           THE HONORABLE JUDGE FRANK:  Yes, you can leave it

4    all there.  We'll see you in fifteen.

5           (Recess.)

6           THE HONORABLE JUDGE FRANK:  You may all be seated,

7    thank you.

8           Whenever you're ready, counsel.

9    BY MR. BRENNAMAN:

10   Q.  Ms. McCulloch, you were telling me about R.B.'s

11   presentation.  Before we do that, though, I got a little

12   ahead of myself.  Can I go back?

13          I'd like to ask if you agreed with the testimony

14   of Dr. Wilson.

15   A.  It depends on which part.

16   Q.  Let's go through it.

17          In the parts where he was talking about process,

18   did you agree with Dr. Wilson?

19   A.  The process?  Uh-huh.

20   Q.  And then --

21   A.  With the exception of -- I think that the cases that we

22   distributed amongst ourselves, we spent far more time on

23   reviewing those in-depth.  And there were many more of them.

24   Q.  Okay.  And so what percentage of your time do you feel

25   like you've spent on the cursory review and how much time

1    have you spent on doing the in-depth review?

2    A.  I think I've done much less cursory review and much more

3    time in the in-depth reviews.

4    Q.  Okay.  Can you give me sort of relative percentages of

5    time spent?

6    A.  I would say maybe 25 percent of my time doing cursory

7    reviews, and much more of my time doing in-depth reviews.

8    Q.  And, again, the in-depth reviews, in your understanding,

9    are reviews on files in which it was determined during the

10    cursory review phase that there was a problem either with

11    placements or the fact of commitment in the MSOP program, is

12    that right?

13    A.  Actually, no.

14    Q.  Okay, what?

15    A.  So, prior to our going to Moose Lake last time, we took

16    the list of juvenile-only, which I refer to juvenile-only

17    offenders, as well as a list of men with either a 25-bed

18    unit -- I forgot what it's called -- but physical

19    limitations or elderly.

20    Q.  Assisted Living Unit?

21    A.  Yes, uh-huh.  And I believe it was Naomi or one of us, I

22    can't remember who.  Actually, it was Mike, who took that

23    list and divvied those names up.  And then we did reviews of

24    those cases, regardless of whether we thought there may be a

25    problem or not.  And we reviewed all of those cases.

1    Q.  An in-depth review?

2    A.  An in-depth review.

3    Q.  Okay.  There was --

4    A.  Now, I wouldn't say that it was an in-depth review in

5    that there's a difference from my perspective between an

6    in-depth review and then a review to do a report.  We did

7    not do reports or assign anybody specifically to write a

8    report.  So that would take really considerably more time.

9    Q.  Okay.  So what I hear you saying is that contrary to

10   what Dr. Wilson was telling me, he was describing a process

11   where 25 percent of the files were going to get a cursory

12   review.  And then if one of these two conditions exist,

13   either wrong placement or fact of commitment was bad, there

14   was going to be an in-depth review done.  What I hear you

15   telling me is there was some subset of files that it was

16   just determined right from the get-go you'd just start by

17   doing an in-depth review, is that --

18   A.  Uh-huh.

19   Q.  -- is that what you are telling me?

20   A.  Yes.  I think especially when we made our visits, we had

21   names from MSOP, from the ombudsman's office, et cetera,

22   that we looked at some of those cases as a cursory while we

23   were all together in meeting, and looking at enough

24   information, that we would then share it with somebody else

25   on the panel, and then making a determination from that

1   whether we would look at those in more depth.  The others

2   that we looked in more depth, we assigned amongst the group.

3   Q.  And when you were looking in more depth, it was still

4   focused around these two different areas, right?  Either

5   because someone had this juvenile offense history, they

6   shouldn't be in the program, or maybe they should be in the

7   program, but they're not in the right placement, they should

8   be somewhere else.  Those were the two things you were

9   focusing on?

10  A.  I would characterize it as looking at vulnerable

11  populations.  So, persons with severe mental illness,

12  persons with intellectual disabilities, persons with serious

13  medical issues or that maybe have dementia or other medical

14  conditions, and then also the juvenile-only offenders,

15  meaning those that do not have any adult convictions, just

16  juvenile adjudications.

17  Q.  Okay.  And what is the issue with the mental illness --

18  I'm sorry -- so Dr. Wilson told me that when he was doing a

19  cursory review of a file, he was mostly looking at placement

20  and commitment, you know, to see whether an in-depth review.

21          Are you talking -- are you saying that severe

22  mental illness or untreated, in addition to the

23  juvenile-only history, were factors you considered when

24  looking at those two criteria?

25  A.  Correct, because when we're looking at the whole

1    program, again, sort of in terms of what Dr. Wilson talked

2    about, risk needs responsivity, we're looking at

3    particularly those people who have different needs that are

4    not what some people call sex offender treatment specific.

5    But they're treatment-interfering factors.  And there are

6    other needs that persons who commit sex offenses have that

7    isn't sex offender treatment.

8    Q.  Dr. Wilson also talked to me about the instruction that

9    the four of you had received from the Court.  Did you feel

10   like he accurately testified about that, and do you agree

11   with him about what that instruction was?

12   A.  I would say that the instruction was from the Court to

13   focus particularly on those populations, and I believe the

14   Court Order also identified those specific populations for

15   us to focus on.

16        I would also say when thinking about in terms of

17   bellwether cases, I think my understanding really was

18   representative, that's the word I had in my head was

19   representative cases.

20   Q.  Okay, but when you're looking at a particular file, what

21   makes you think it might be a bellwether file,

22   representative of what fact?  Of a -- it sounds like from

23   what Dr. Wilson was testifying about, it was representative

24   of a type of problem.  For instance, the juvenile-only

25   offenders.  Mr. Terhaar, as I understand from the testimony

1    so far, may be representative of a problem with

2    juvenile-only offenders being committed to this treatment

3    facility; is that right?  It's representative of a problem?

4    A.   Representative of looking at the standards relative to

5    risk needs responsivity when it comes to treatment, but also

6    keeping in mind the standards in *Hendricks* relative to

7    having a disorder, as well as a standard of how high a

8    person's risk is to re-offend.  Not that they would have no

9    risk, but they're more likely than not to re-offend.  And

10   then looking at the research that informs and helps

11   psychologists, in particular, evaluate risk with actuarial

12   instruments.

13   Q.   So representative of people who are either not in the

14   right placement at MSOP or who should not have been

15   committed to MSOP?

16   A.   Yes, uh-huh.

17   Q.   Do you remember who the report on Eric Terhaar was

18   submitted to?  Dr. Wilson did not remember.  It's dated May

19   18th.  You'll remember, possibly.  Was that submitted

20   directly to the Court or was that submitted to the parties,

21   as well?

22   A.   I believe our direction was, and I believe both reports

23   were submitted to Mr. Ferlager's office for dissemination.

24   Q.   Okay.  And do you know what date Mr. Ferleger submitted

25   those to the parties?

1    A.  I do not.

2    Q.  Getting back, then, to the presentation -- how -- you

3    were telling me -- and why don't you just continue, now that

4    we have things worked out, the presentation of R.B..  You

5    were telling me more about her sexual offending and how

6    she's currently presenting from a clinical standpoint.

7    A.  From a clinical standpoint she represented to us,

8    especially when we interviewed her and then reviewed her

9    records, that many of her behaviors are what we would refer

10   to as reactive to her own trauma, sexual trauma, physical

11   trauma, psychological trauma as a child and into her

12   adulthood.

13          And so, engaging in those behaviors, which are

14   problematic, of course, but also that there are areas that I

15   would refer to and others would refer to as

16   treatment-interfering factors, dealing with that trauma

17   before you can get to some of the other areas about

18   offending or what is an appropriate sexual relationship.

19   Q.  Do you -- would you agree that Ms. Bailey is still at

20   risk to re-offend?

21   A.  Do I believe she's a risk to re-offend?

22   Q.  Yes.

23   A.  I believe that Ms. Bailey presents risks.

24   Q.  And how would you describe those risks?

25   A.  When you say "risk to re-offend," do I believe she has

1    risks to offend?  Yes.  I believe she has some criminogenic

2    needs.  I believe that she has some risks.  And I think that

3    those can be ameliorated and/or there are protective factors

4    that can be put in place for her not to have those factors

5    be present.

6    Q.  Turning to treatment, does Ms. Bailey receive treatment

7    at MSOP?

8    A.  She does.

9    Q.  Does that -- one of the criticisms of your report, as I

10   understand it, is it does not -- the treatment that she

11   receives at MSOP does not focus or focus enough on the fact

12   that she is a woman.  Is it your opinion, though, that the

13   program does not pay any attention to the fact that she is a

14   woman in the type of treatment they provide to her?

15   A.  I wouldn't say they don't pay any attention.  No, of

16   course not.

17   Q.  What are they doing in terms of her treatment that

18   acknowledges her gender and incorporates that into her

19   treatment?

20   A.  I believe she's provided some individualized treatment

21   with a treatment provider.

22   Q.  Of what nature?

23   A.  Individual psychotherapy.

24   Q.  Okay.  Do you -- and that's --

25   A.  So it's one on one.  So, it's her and a therapist.

1    Q.  Is there anything else the program does to provide her

2    treatment that's tailored to her gender, amongst other

3    factors that are going on with her, the treatment that she

4    needs?

5    A.  Not that I would -- no, not specifically.

6    Q.  Tell me more about the -- I know that Ms. Freeman also

7    testified about this, initially, but are there established

8    best practices regarding the treatment of female sex

9    offenders?

10   A.  I wouldn't say that I'm aware that there are

11   specifically best practices for female sex offenders.  I

12   would say that there are a number of best practices when

13   working with this population of women and men, for that

14   matter.

15          One of those standards really is that discharge

16   planning, for example, starts on admission, not at the end

17   of confinement, but starts at the beginning to prepare

18   people for living in the community.

19          With regards to working with women, in particular,

20   women who have offended sexually, I testified earlier to

21   addressing those psychological factors, as well as

22   criminogenic needs, and then also supportive therapy -- or

23   supportive services -- excuse me.

24   Q.  Is the lack of established best practices related to the

25   fact that there are so few female sex offenders, and

1    therefore there is just not the type of empirical data that

2    there is, for instance, compared to male sex offenders?  Is

3    that -- is that part of the issue?

4    A.  I think that can be part of the issue.

5    Q.  Are there any other factors?

6    A.  Well, I think that most of the research has been done on

7    men and risk that men pose and risk that can be ameliorated

8    with treatment and specific focus on treatment to risks.  I

9    think that there are very few women, and so then there's not

10    that research basis.  But I think there are standards of

11    practice working with women who have boundary issues,

12    reactive issues, trauma issues.

13    Q.  Would you agree with me that there are overlapping

14    principles, at least, between the treatment of male sex

15    offenders and the treatment of female sex offenders, that

16    there are some principles about treatment of sex offenders

17    that apply to each group?

18    A.  There may be some.

19    Q.  Okay.  Can you think of any?  Can you describe what

20    those might be?

21    A.  No, actually, I couldn't.

22    Q.  So, are you changing your answer, are there none?

23    A.  Because I can't come up with any, that doesn't mean I

24    don't necessarily think there aren't any.  I think there are

25    probably some that there are commonalities.  But there is

1    such a small risk to re-offend, it's near impossible to

2    identify what those specifically are as they apply to women.

3    I know Dr. Freeman can answer that much more clearly than I

4    can.

5    Q.  Is that -- the risks -- I'm forgetting the exact number

6    in your report, but I believe that you note at one point the

7    risk of re-offense is only 1 or 2 percent for females?

8    A.  Right.

9    Q.  Is that Ms. Bailey's risk of re-offense, just 2 percent?

10   A.  Well, I don't know that we look at a percentage, but

11   clearly, when we're talking about more likely than not to

12   re-offend, a person would need to be higher than 50 percent

13   to re-offend.

14   Q.  Ms. Bailey has re-offended after being in placement,

15   isn't that correct, or during placements?  Is that your

16   understanding?

17   A.  Having had sexual contact with other vulnerable people,

18   yes.  I'm not aware that she was charged with any other

19   sexual offenses.  I don't recall, anyway.

20   Q.  Maybe if you turn to page 3 of your report.  You say in

21   the second and third paragraph in 1990 -- I'm reading from

22   the second sentence of the second complete paragraph.  "In

23   1997, Ms. Bailey was returned to prison and served the

24   remainder of her prison sentence for violating the

25   conditions of her 20 years' probation when she sexually

1  abused a vulnerable female adult patient at MSA, it's the

2  Minnesota Security Hospital."

3  So, is that what you understand?  So, she wasn't

4  criminally charged, but her probation was revoked and she

5  was returned to prison, is that --

6  A.  She was returned to prison as a probation violation, as

7  I understand it.

8  Q.  Does the program take appropriate steps to ensure

9  Ms. Bailey's safety in her current placement?

10  A.  Protecting her physical safety?

11  Q.  Yes.

12  A.  I know they do take some precautions, that she's

13  supervised directly at all times except when she's in her

14  room locked.

15  Q.  You note in your report that R.B. has expressed safety

16  concerns, a couple of questions about that.

17  First, do you know of her having been assaulted,

18  or hit, or threatened by any other client at MSOP while

19  she's been there?

20  A.  Assaulted or threatened?  Not that I'm aware of.

21  Q.  The concerns that R.B. expressed to you during the

22  interview, what were those about her safety?

23  A.  She talked about her concerns relative to knowing that

24  there were new clients coming from Moose Lake to St. Peter,

25  and concerns about not knowing who those men are, what their

1  histories are, their capabilities.  She was concerned about

2  a whole group of men coming to St. Peter and feeling

3  frightened about that.

4       She also expressed that her group members or some

5  of her group members have been progressing, so that they

6  would move, perhaps, to either another unit or another phase

7  in treatment; and therefore, then, new men would be

8  introduced to her group.  And she was worried about that and

9  concerned about that.

10  Q.  Aside from placement among men, could you explain to me

11  in more detail the deficiencies you identify in your report

12  about the treatment that Ms. Bailey is receiving?

13  A.  Throughout the record, there are numerous references to

14  a specialized treatment plan and making reference -- these

15  are particularly the psychiatric notes and review, and

16  making reference to needing to develop a specialized plan

17  for her, repeated references to looking at medical

18  intervention or pharmacological interventions because she

19  was harming herself with excessive masturbation, for

20  example.  But throughout that record, I didn't find where

21  those specific interventions were operationalized.

22  Q.  Do you know that they were not for sure?

23  A.  No.

24  Q.  Besides the specialized treatment plan and the

25  psychiatric treatment plan, you talked about this type of

1    treatment, EMDR.  Could you explain a little bit more what

2    that is?  I understand from your report that that's a

3    recommended form of treatment that Ms. Bailey receive that

4    she is not receiving.

5              Is that typical in a sex offender program?

6              I'll stop there.  That's too long a question.

7              Just tell me more about EMDR, if you would.

8    A.  I'm not trained in EMDR, but it is a recognized

9    treatment for people with PTSD or other trauma issues.  Eye

10   movement -- I have to write it down -- Eye Movement

11   Desensitization Reprocessing.

12             I don't know if it's a standard treatment, but we

13   also referred to DBT, Dialectical Behavior Treatment or

14   therapy.  That is a standard for -- that can be used, skills

15   training and so forth for people that have some of those

16   issues.  We offer that in our program.

17   Q.  And when you say "those issues," you mean those types of

18   treatment are focused on trauma-related care?

19   A.  Yes.  Yes.

20   Q.  So it's not sex offender-specific types of treatment,

21   it's more directed towards trauma and care, am I

22   understanding that correctly?

23   A.  Right.  When you look at the population of, you know,

24   civilly-committed sex offenders and you are talking about

25   being responsive to their needs, there are a good number of

1  them that have trauma histories and behavioral issues

2  related to that, emotional dysregulation, those kinds of

3  things.  That, you need to address, in order for them to

4  successfully participate in the sex offender portion of the

5  programming because it interferes with treatment.

6  Q.  So, the report concludes that Ms. Bailey should not be

7  housed among men.

8       Do you have a recommended placement for her?

9  A.  A specific recommended placement for her?  No.  I would

10  recommend that if one doesn't exist, I'm assuming that there

11  are many people in Minnesota that work for the Department or

12  work for her county that would be able to look into whether

13  something exists.  And I am not saying and I don't think the

14  panel is saying she needs to be with other sex offenders,

15  but with other people who need her level of services; that

16  if one doesn't exist, that one could be created for her,

17  building the services around her.

18  Q.  When you say "need her level of services," I guess I

19  don't understand what that incorporates.  I understand that

20  the treatment of Ms. Bailey is complex.

21  A.  Yes.

22  Q.  It involves sex offender issues, but it also involves

23  these trauma issues, it also involves -- I don't know.

24  Maybe you can explain more of that to us.

25       But I mean, how much on the same level do people

1    need to be in?  Is there anyone like that?  I'm just not

2    understanding what type of other patients it would be

3    appropriate to house Ms. Bailey with?

4    A.  Well, I wouldn't necessarily say she needs to be with

5    other patients.  There may be settings in which she could

6    live with other people that would be supportive and provide

7    her with those services and supervision.  I would find it

8    hard to believe that there aren't other women, or men, for

9    that matter, men and women who have intellectual

10   disabilities that have serious sexual boundaries, for

11   example, or that have psychiatric issues or trauma issues.

12   Q.  So, when we're talking about alternative placements,

13   we're talking about -- one way to divide it up is what's

14   within the Department of Human Services' control and then

15   private placements?

16   A.  Uh-huh.

17   Q.  Are you aware of any private placements that would be

18   willing to accept Ms. Bailey, given the type of treatment

19   she needs and the supervision levels that she needs?

20   A.  I didn't look at what is available in the State of

21   Minnesota or make any referrals.

22   Q.  If you could turn to page -- I'm sorry -- so speaking,

23   then, in terms of what is within the Department's control --

24   A.  Uh-huh?

25   Q.  I mean, what -- at the St. Peter Facility, as I

1    understand it, there are other populations of women.  I

2    don't know the extent to which they're co-ed populations,

3    but would it be appropriate -- the populations that I know

4    of there are mentally ill women and mentally ill and

5    dangerous women.

6            What are the issues with placing Ms. Bailey in

7    a -- in a setting with individuals who have those diagnoses

8    or those commitment status, I guess, is what those are?

9    A.  Right, it would be from my perspective that wherever

10   Ms. Bailey would be placed, whether it would be in one of

11   those settings where there are other women, that she would

12   need a specialized program, that she would need specialized

13   services that probably don't exist in those programs anymore

14   than they exist at the MSOP.  They would need to be provided

15   to her, perhaps from an outside agency or through a

16   specialized program that the staff could provide for her.

17   Q.  What is -- you talked a little bit about the level of

18   supervision, but I just want to make sure I'm understanding

19   you.  Because, you know, we did have this event, it looks

20   like, in 1997 where there was some sexual contact that led

21   to the revocation of her probation.

22           If she were housed with vulnerable women -- and I

23   think in Minnesota by definition, mentally ill, committed

24   women and mentally ill and dangerous committed women are de

25   facto considered vulnerable individuals.  If she was housed

JEANNE M. ANDERSON, RMR-RPR
(651) 848-1221

1    with them, does that change the level of treatment and

2    supervision that you believe she would need?

3    A.  Well, I would -- using a clinical term rather than a

4    legal term, I would say that she's also vulnerable.  And

5    that the services would be dependent on who else was there

6    and what kinds of supervision, that whether she had sexual

7    boundary issues or some other issues, when people live

8    together that have histories of either violence or

9    compensation with mental illness, those kinds of issues that

10   come up, substance abuse, the program then is tailored to

11   what risks they present to the community they're living in.

12   Q.  And so, there's a mention of this -- I can't remember

13   now if it's in your report.  You're aware of the Shakopee

14   program, though?  It seems to be a program held at the

15   Shakopee Prison that deals with -- not committed female sex

16   offenders, but sex offender treatment in the Shakopee

17   Program.

18            Now, is the suggestion that that could be part of

19   the treatment for Ms. Bailey, is that realistic, or does the

20   fact that that occurs -- does the type of treatment there --

21   would it even be helpful to her?

22   A.  I know little to nothing about the Shakopee Program.  I

23   would have to look at the program.  There are lots of

24   correctional programs that don't necessarily meet the

25   standards or programming needs of sex offenders.

1   Q.  So, how would this work?  Let's say a placement was

2   created for her in the St. Peter Campus and she was housed

3   with other women, possibly mentally ill, mentally ill and

4   dangerous women.  Would she go somewhere for treatment or

5   would the treatment come to her?  Does it matter as a

6   functional matter?

7   A.  When I think about treatment for persons like

8   Ms. Bailey, really everything people are doing is treatment

9   and not just a session three times a week, or whatever that

10  might be.  So, some of that treatment and those activities

11  that she would engage in would be in a community, and

12  perhaps there might be somebody who, for example, if they

13  don't have a staff and they decide, determine that she would

14  be appropriate for EMDR, perhaps a person would be coming

15  there to provide that.  It would be, I think, ideal to have

16  a mixture of that.

17  Q.  Well, that is interesting because -- and so treatment is

18  more of a holistic thing?

19  A.  Yeah.

20  Q.  It's your environment that you're surrounded with sort

21  of the entire time.  But that seems to me to be part of the

22  problem, here, there is no other sex offender female

23  population that she can do that with such that the entire

24  environment is created around treating her sex offender

25  issues.

1          If she's housed, for example, again with mentally

2    ill, mentally ill and dangerous women, is it possible to

3    create the environment that fulfills the treatment needs of

4    all those people so there's sort of full-time treatment

5    going on all the time?  I mean, I'm just trying to think

6    about this.

7    A.  Well, what I would say is relative to Ms. Bailey, the

8    focus wouldn't necessarily be or be appropriate to focus

9    specifically on sex offending, but all those other issues

10   that lower risk to offend or sexually offend.

11   Q.  What are those?

12   A.  Addressing her trauma, addressing her issues with

13   relationships and boundaries.  I think looking at

14   psychiatric issues and physical health needs, that she is

15   very sexually preoccupied and excessively masturbates, for

16   example, looking at those individual issues with her and

17   addressing those individually with her.

18   Q.  And aside from the psychiatric issues that we talked

19   about before in terms of the MSOP treatment, do you feel

20   that the treatment she's getting at MSOP, aside from the

21   fact that she's with men, is still attempting to address

22   those different issues?

23   A.  No.

24   Q.  And how is it deficient?

25   A.  I didn't see in the records that the specific issues

1    that she identifies and that we identified related to having

2    trauma issues and what I would characterize as meeting quite

3    a few of the symptoms, if not the diagnosis for PTSD, I

4    didn't see that that was specifically being treated.

5    Q.  So, Ms. Bailey was committed in 1993 --

6    A.  Yes.

7    Q.  -- is that your understanding?

8              Are you aware that the Minnesota Sex Offender

9    Program has been under some scrutiny for some time?  Are you

10   aware that there are, in this case, in fact, the MPET -- the

11   MPET team came and evaluated the program.  And I think three

12   of those individuals have been evaluated in the program for

13   years.  Do you know that?

14   A.  I've been aware that there have been concerns with the

15   Minnesota program for a long time, because I live next door

16   in Wisconsin.  And many people from the program, the

17   Legislature and others from Minnesota have come to visit our

18   program.  So, I'm aware of the concerns of the program, as

19   well, and their inability to help foster people's releases,

20   for example.

21             I'm also aware that the sheer numbers that are

22   committed in Minnesota are an anomaly, making it, I think,

23   really very difficult for the program to provide the

24   individualized services for people to progress through

25   treatment.

1    Q.  So, the MPET, the group that I was talking about before

2    is made up of five individuals, James Haaven, Christopher

3    Kunkle, Robert McGrath, William Murphy and Jill Stinson.

4              Are you familiar with these individuals?

5    A.  Yes.

6    Q.  Are they experts in the field?

7    A.  Yes.

8    Q.  And of those -- well, my question is, she's been

9    committed to -- she has been at MSOP since 2008; isn't that

10   right?

11   A.  Pardon?  Yes.

12   Q.  And the program has been under heavy scrutiny for some

13   time, as you just testified?

14   A.  Yes.

15   Q.  Why is it that you think that it's just now that someone

16   -- to your knowledge, has MSOP been hiding Ms. Bailey or

17   concealing her identity or gender from people?

18   A.  I highly doubt it that they've been hiding her.  I have

19   made -- I would have to look back at my records, but I have

20   had a lot of contact with the Minnesota Program over the

21   years, and I was shocked to find out there was a woman in

22   the program.  I had no idea.  And only because we visited

23   the facility and that particular unit did I become aware

24   that there was a woman in the program in the facility.

25   Q.  And, I mean, do you think that's just the case that --

1    why do you think it is that no one has ever raised this

2    before?  She's been there for such a long time.

3    A.  I don't know.  I would be happy to ask all five of them.

4    I'm not sure that that's what they were looking at, either,

5    individual --

6              MR. BRENNAMAN:  No further questions, Your Honor.

7              THE HONORABLE JUDGE FRANK:  Mr. Gustafson?

8              MR. GUSTAFSON:  Thank you, Your Honor.

9                        **DIRECT EXAMINATION**

10   **BY MR. GUSTAFSON:**

11   Q.  Thank you, Ms. McCulloch, for taking the time to help us

12   here in Minnesota by being one of the court-appointed

13   experts.

14              You were asked some questions about whether you

15   were aware of any programs that would take Ms. Bailey.  That

16   was not something that you were asked to do by the Court,

17   was it, to find a new placement for her?

18   A.  No.

19   Q.  Are you aware of placements in Wisconsin that would be

20   suitable if she were in Wisconsin's Program?

21   A.  What I can say about that is that there are -- if I can

22   talk about my experience in Wisconsin and people like

23   Ms. Bailey, that there are -- we, first of all, have never

24   had a female referred to our SVP Program.

25              We actually advocated and had our law specifically

1    state that were a female referred or committed, that she

2    would be placed in one of our female forensic programs.

3            And so Ms. Bailey, aside her needs, meaning, you

4    know, her cognitive disabilities, her perhaps mental health

5    needs, treatment needs, supervision, transition in the

6    community, do I believe that there are facilities in

7    Wisconsin?  There may be, I'm familiar with people like Ms.

8    Bailey who are men who are in facilities and actually

9    licensed CBRFs or Community-Based Residential Facilities, as

10   well as adult foster homes, as well as supported apartments.

11           We place people in the community in Wisconsin that

12   are SVPs that are like Ms. Bailey, except for their gender,

13   specific to some of those needs.

14   Q.  I take it, like I asked Dr. Wilson, that if you were

15   asked by the Court, you could design a program that could be

16   created that would satisfy your professional opinion of how

17   Ms. Bailey ought to be housed and treated?

18   A.  Yes.

19   Q.  There's no doubt that the right kind of setting could be

20   provided if funds were available, is that right?

21   A.  Yes.

22   Q.  And I wanted to ask you a question.  You used the term

23   reactive several times in your testimony and in your

24   cross-examination by the government.  Can you tell me a

25   little bit more about what you mean by "reactive"?

1    A.  I think Dr. Miner also referred to reactive when he was

2    referring to juvenile offenders.  And I also wouldn't say

3    I'm the best person on the panel to describe this

4    specifically, but that she experienced the behaviors as a

5    youth, as a child, as an adolescent into her adulthood of

6    the behaviors, then, that she engaged in with others,

7    reacting to those same behaviors that were basically done to

8    her.

9    Q.  I take it that you mean by that that many of her

10   sexual -- sex offending, is a reaction to the trauma that

11   she suffered as a child, is that a fair characterization?

12   A.  I think that it's a factor, yes.

13   Q.  And that's why you think that treating her trauma is so

14   important?

15   A.  I do think it's very important.

16   Q.  And that's one of the things that you didn't see in the

17   records that you thought you would see when you looked at

18   her treatment records?  You didn't see a focus on that

19   trauma treatment?

20   A.  Correct.

21   Q.  You mentioned earlier that you were shocked to find out

22   that there was a woman in the program.  I take it you were

23   even more shocked to find out she was being housed all with

24   men?

25   A.  That's true.

1    Q.  And that she was being put in group therapy.  You were

2    shocked to find out that her group therapy was all with male

3    offenders.

4    A.  Yes.

5    Q.  Is it your opinion that her risk to offend in the future

6    is being exacerbated by the treatment failures of the MSOP?

7    A.  Can you say that again?

8    Q.  Sure, I'll try.

9    A.  Uh-huh.

10    Q.  Do you believe -- in your professional opinion, do you

11    believe that Ms. Bailey's risk of offending in the future is

12    being exacerbated -- the potential of her risk of offending

13    in the future is being exacerbated by her current treatment

14    and living conditions?

15    A.  I believe that rather than making her better, she has --

16    her issues have been prolonged.

17    Q.  You mentioned earlier that discharge planning should

18    begin at the start, I think were the words you used, so that

19    the treatment and facilities that house someone are working

20    towards the day in which someone will be discharged.  Do you

21    see that in the Minnesota system?

22    A.  No.

23    Q.  You also had some questions about best practices,

24    whether they're because of a lack of women sex offenders in

25    the country, that there haven't been established best

1    practices.  Do you recall that, those questions?

2    A.   From my understanding of the literature, the practices

3    that are described -- and again, Dr. Freeman can speak to

4    this much more clearly than I can -- is that the focus would

5    be on those psychological health needs, as well as

6    criminogenic needs and supportive services, rather than

7    focusing on what that person did that was considered a

8    sexual offense.

9    Q.   Did you see anything in the record that suggested to you

10   the 2008 move from the Minnesota State Hospital where

11   Ms. Bailey was housed to the MSOP Unit was anything other

12   than an administrative decision?

13   A.   No, I understood that she was one of a group, and

14   because of her legal status, she was moved.

15   Q.   Did you see anything in her treatment records that

16   suggested it would be better for her treatment if she was

17   moved to the MSOP Facility out of the Minnesota State

18   Hospital?

19   A.   No.

20   Q.   Minnesota Security Hospital -- I'm sorry.

21        Did you see the exercise of any professional

22   judgment with respect to that move as it related to

23   Ms. Bailey's treatment or condition?

24   A.   I think that the people that were working with her were

25   helping her, at least for a short period of time, to prepare

1    to move.

2              As far as developing a program for her prior to

3    her admission, I didn't see that in the record.  I do

4    believe and I think that the program takes it very seriously

5    that she is the only female in her unit; and therefore, put

6    together measures to help protect her safety from other

7    people, men, sex offenders on the unit.

8    Q.  They took steps to protect her safety, but they didn't

9    take steps to protect her mental health, did they?

10   A.  I do not believe that that was considered.

11   Q.  In your professional judgment, does the treatment of

12   Ms. Bailey satisfy the standards of acceptable treatment for

13   women who are committed as sex offenders?

14   A.  There's so few women committed as sex offenders, I don't

15   believe that -- if I could, I don't believe that the program

16   meets her clinical needs.

17   Q.  And I just want to go through what it is that you think

18   should happen.

19              You think she should be moved to a community-based

20   setting, is that right?

21   A.  I think she should move to a setting where she's not

22   in -- whether it's secure or supervised, I believe she needs

23   a structured, supervised setting that helps her transition

24   to as much independence as she is capable of, that addresses

25   all of her needs, her treatment needs.

1    Q.  And when you talk about those treatment needs, that's

2    what you talked about in your testimony, the trauma and the

3    things like that?

4    A.  Trauma, as well as her physical health needs, her mental

5    health needs.

6    Q.  In Wisconsin, you have a statute that requires an annual

7    review of all of the committed sex offenders, is that right?

8    A.  That's correct.

9    Q.  You also have a provision in the statute that provides

10   for a judicial bypass, rather than for a supervised release

11   program, correct?

12            Let me try again.  That wasn't a very good

13   question, I'll try it again.

14            You can be released from the program by going

15   through a supervised release-type process in Wisconsin,

16   correct?

17   A.  When you say "released," we refer to that as discharged.

18   So, we have inpatient commitment, we have outpatient

19   commitment, which is the supervised release program, and

20   then discharged where you're no longer committed to the

21   Department.

22   Q.  If you're committed, you can petition to go on

23   supervised release, correct?

24   A.  That's correct.

25   Q.  But you can also go to the court at any time and ask to

1    be discharged, correct?

2    A.  A person can petition at any time for discharge.

3            MR. GUSTAFSON:  Thank you.  I don't have any

4    further questions, Your Honor.

5            THE HONORABLE JUDGE FRANK:  Additional questions,

6    counsel?

7            MR. BRENNAMAN:  A little bit of follow-up.

8            THE HONORABLE JUDGE FRANK:  All right.

9            MR. BRENNAMAN:  May I approach, Your Honor?

10            THE HONORABLE JUDGE FRANK:  You may.

11                    **RECROSS EXAMINATION**

12    **BY MR. BRENNAMAN:**

13    Q.  The Department has been making efforts, I think

14    recently, to introduce Ms. Bailey to other females on the

15    St. Peter campus.  Are you aware of that?

16    A.  Recently?  No.

17    Q.  Could you look at -- I put in front of you the Affidavit

18    of Jannine Hebert.

19            MR. BRENNAMAN:  I think the parties have

20    stipulated to using previous filings in the case,

21    Your Honors, and I would ask for admission of this.

22            MR. GUSTAFSON:  No objection, Your Honor.

23            THE HONORABLE JUDGE FRANK:  That exhibit number

24    is?

25            MR. BRENNAMAN:  42.

1           THE HONORABLE JUDGE FRANK:  That's received.

2           (Exhibit 42 is received.)

3    BY MR. BRENNAMAN:

4    Q.  If you could look at paragraph 5 of the document?

5    A.  I'm sorry, which page?

6    Q.  Paragraph 5 starts on page 2 and goes to page 3.

7           Turning to page 3, the second full sentence, it

8    states, "Ms. Bailey has also previously participated in

9    staff-escorted privileges during which she engaged with

10   female patients at the Minnesota Security Hospital."

11          Do you remember seeing any reference to that

12   activity in her --

13   A.  Yes.

14   Q.  -- treatment records?

15          And this is an Affidavit of Jannine Hebert, who is

16   the Clinical Director at MSOP.  Are you --

17   A.  Yes.

18   Q.  -- familiar with Jannine --

19   A.  Yes.

20   Q.  -- Hebert?

21          She states at the end of her paragraph, number 5,

22   "However, as Ms. Bailey's liberty increased, the heightened

23   external stimulus resulted in increased sexually deviant

24   fantasies that made her uncomfortable.  Ms. Bailey

25   subsequently requested to suspend these outings and MSOP

1    staff, due to safety concerns, agreed to this request."

2              Do you have any reason to believe that statement

3    is not correct?

4    A.  No.

5    Q.  Is that reflected in the documents that you looked at?

6    A.  No.

7    Q.  You answered previously that the reference to

8    staff-escorted privileges was -- was that referenced in the

9    documents?

10   A.  In the documents that I read?

11   Q.  That you reviewed from Ms. Bailey's file.

12   A.  Yes, uh-huh.

13   Q.  Are you saying, then, that the subsequent part of not

14   going on those outings anymore was not part of the records?

15   A.  No, I'm aware -- I was aware of those escorts, and I was

16   also aware of why they ended.  And I wasn't surprised that

17   she had those reactions.

18   Q.  Okay.  Well, it seems like the type of placements you're

19   talking about, the confusing thing for me is that those

20   placements seem to be of such a nature that it might lead to

21   the same sort of external stimulus, increased sexual deviant

22   fantasies, etc.

23              And so, was there any concern about that when

24   moving her to a new placement?

25   A.  There's concern particularly because she's not receiving

1    the treatment that would address that.  So I didn't see in

2    the records specifically that she's offered behavior

3    treatment, for example, for deviant sexual arousal and

4    deviant sexual interests.  And so, those things need to be

5    addressed in her treatment.

6    Q.  You answered one of Mr. Gustafson's questions that they

7    were taking no steps to protect her mental health.  Is

8    that -- is the program really taking no steps to protect her

9    mental health?

10   A.  I don't think I said no steps were taken to protect her

11   mental health.

12   Q.  Well -- I'm sorry, go ahead.

13   A.  What I understood the question to mean was when she was

14   transferred, was her mental health and treatment needs

15   considered?  And I said, no, that they weren't the primary

16   consideration.

17           MR. BRENNAMAN:  May I approach, Your Honor?

18           THE HONORABLE JUDGE FRANK:  You may.

19   BY MR. BRENNAMAN:

20   Q.  I put in front of you a document that's filed in this

21   case, it's the Affidavit of Nancy Johnston.  If you look at

22   paragraph 3 of that Affidavit and please read that to

23   yourself, I would like to ask you a question about it.

24   A.  (Witness complied.)

25   Q.  So, getting to this question of the administrative

1    change and why it was done, that paragraph notes two

2    purposes.  "Bringing all sexually-committed sex offenders

3    together to provide specialized and consistent sex offender

4    treatment" is the first reason, and "reducing potential risk

5    posed to other not MSOP clients."

6         Do you -- are those valid bases for the type of

7    movement that was made in your mind?

8    A.  I think it's valid for some of the clients, but I don't

9    think it applies to Ms. Bailey.

10   Q.  And why not?

11   A.  Because when referring to a consistent treatment

12   program, she should be part of the treatment program applied

13   to the hundreds of men; but an individualized program for

14   her which could be provided elsewhere, as well as if the

15   safety measures that MSOP has put in place at the MSOP were

16   in place at the other facility, their concerns regarding the

17   other clients would have been addressed there.

18   Q.  When you interviewed Ms. Bailey, did you talk to her

19   about the other clients in the Alternative Program, and in

20   particular, her participation in group?

21   A.  Yes.

22   Q.  And what did she communicate about that?

23   A.  I'd have to look at my notes, but one of the things that

24   she talked about was that she gets in trouble -- I'm not

25   sure if those are her exact words, because of some of the

1    men in her treatment, that there are boundaries meaning, you

2    know, they flirt or they have -- I'm not sure how they're

3    characterized, necessarily, but almost, you know, where she

4    and a man on her unit or in her group are attracted to each

5    other.  And that gets her, quote, "in trouble."

6    Q.  Did you get the sense that -- actually, turn back to

7    Jannine Hebert's Affidavit.  Paragraph 9, page 5.

8          Ms. Hebert, at the end of paragraph 9 on page 5,

9    states that "Ms. Bailey has spoken eloquently of" -- this is

10    Jannine Hebert's Affidavit, and she indicates that

11    "Ms. Bailey has spoken eloquently of the benefits she has

12    received from participating in group, this group referring

13    to her fellow group members as her brothers."

14          Did you get the sense in your interview with

15    Ms. Bailey that she derives support from the other male

16    group members that she's with, at least from some of them?

17    A.  I believe she does from some of them.

18          MR. BRENNAMAN:  No further questions, Your Honor.

19          THE HONORABLE JUDGE FRANK:  Mr. Gustafson?

20          MR. GUSTAFSON:  Nothing further, Your Honor.

21          THE HONORABLE JUDGE FRANK:  You may step down.

22    Thank you.

23          You may proceed with the next expert.

24          (Witness excused.)

25          MR. BRENNAMAN:  The Defendants call Dr. Miner.

1            THE HONORABLE JUDGE FRANK:  Why don't you go ahead

2    and I'll have them bring out Mr. Eric Terhaar.

3            I'll just indicate before we begin that you're

4    under oath from this morning, then we'll just -- wait just a

5    moment, they'll be coming up shortly.

6            (Previously sworn.)

7                        **MICHAEL MINER**

8                     **CROSS EXAMINATION**

9    **BY MR. BRENNAMAN:**

10   Q.  Dr. Miner, hello.

11   A.  Hi.

12   Q.  I would first like to ask you whether -- I know you were

13   here listening to the testimony of the other Rule 706

14   experts.

15   A.  Uh-huh.

16   Q.  And let's start with Dr. Robin Wilson.

17            Do you agree with his testimony?

18   A.  For the most part.  I mean, I would clarify along the

19   lines of Ms. McCulloch that, in fact, the distinction

20   between what is a -- I don't remember the terms -- the

21   cursory versus the more thorough review is probably more

22   semantic than actual, because we do spend a considerable

23   amount of time with all of them.

24            I'd also kind of clarified that in general we're

25   going through files in order to understand what's happening

1   within the program and be able to characterize it from the

2   individual client perspective.  And in doing that, we

3   identify certain clients that we think either were in the

4   wrong setting or were not having their needs met.

5   Q.  Okay.  But so far you've only been looking at the three

6   programs, right?  The alternative --

7   A.  Right, we have not started to look at the general

8   population.

9   Q.  When do you anticipate that you'll start doing that?

10  A.  I'm hoping -- I mean, I'm guessing sometime by the end

11  of the summer.

12  Q.  Okay.  If you are to produce a general report on the

13  entire program, though, would you have the opportunity to

14  look at any files of any offenders who's not in one of those

15  three groups?

16  A.  I'm not sure that we would be able to do that.  I mean,

17  we have been focusing -- we've been focusing as was

18  requested on the -- those who have juvenile-only offenses,

19  those who are in the Assisted Living Program, those who are

20  on the Mental Health Program and the Alternative Program.

21  That's where we have been focusing so far in trying to kind

22  of understand how those procedures -- how those particular

23  clients are being treated -- or residents.

24          We have reviewed all of the documentation

25  regarding the program, as a whole.  We've also talked to

1    staff from administrators on down about the program as a

2    whole.

3              So, I think we have a fairly reasonable idea of

4    how the program is designed to work and in some cases how it

5    is working.  But, we certainly don't have the in-depth

6    review of patient records.  I mean, we have -- we have

7    toured the facilities and we have talked to clients on the

8    wards, units, whatever they're called.  But, we probably

9    will not have a random sample done when we present our

10   report in August.

11   Q.  Well, that's not what I was getting at.  It sounds like

12   from your testimony that you're telling me right now, you

13   may not even look at any files that are not of individuals

14   who reside in one of these three programs, the Young Adult

15   Program, the Alternative Program and the Assisted Living

16   Program?

17   A.  I can't say that for sure.  I can say that what our plan

18   is at the moment, we have divided up those who were in the

19   Young Adult Program, the Assisted Living Program and the

20   Mental Health Program, and have reviewed those records.  And

21   that currently we have divided up those in the Alternative

22   Program and we are going to be reviewing them prior to our

23   visit in August.  Where we go from there, I can't tell you

24   today.

25   Q.  Okay, but that review may take through the end of

1 August?

2 A. Probably -- no, I think we all planned to have the

3 current patients that we've been assigned reviewed before we

4 go to St. Peter at the beginning of August.

5 Q. And that would be all of the patients, then, in those

6 three units?

7 A. Probably not all of them, but a good number of them.

8 Q. Okay.  Would you agree with me that you can derive by

9 looking at these files a sense of the treatment that's being

10 provided to the committed individuals at the MSOP Program,

11 right?

12 A. That by reviewing the file -- I mean, the information in

13 the files provide a certain amount of information about

14 what's happening with a particular individual and how a

15 particular individual is responding.  They're clearly not

16 the end-all.  They clearly don't provide you with all of the

17 information about what's going on in treatment.

18 Q. But it does provide you with information about

19 treatment?  That was my question.

20 A. Certainly.

21 Q. And as I understand it, the general report that you're

22 going to be producing at the end of August deals in part, at

23 least, with the treatment that is provided by MSOP; is that

24 right?

25 A. Certainly.

1    Q.  Did you -- I'm sure you were attending to the testimony

2    of Ms. McCulloch?

3    A.  Uh-huh.

4    Q.  Did you agree with her testimony regarding Ms. Bailey?

5    A.  Yes.  For the most part, yeah.

6    Q.  Did you hear anything that you did not agree with?

7    A.  No.

8    Q.  I'd like to talk to you about Mr. Terhaar.

9    A.  Is Ms. Bailey here?  I think we should --

10   Q.  I was just looking.

11   A.  I think we should afford Mr. Terhaar the same privacy.

12   Q.  I don't see her now, though.  If she comes back, we'll

13   take measures.

14           THE HONORABLE JUDGE FRANK:  Which is right about

15   now.

16           MR. BRENNAMAN:  What's that?

17           THE HONORABLE JUDGE FRANK:  It's right about now,

18   Counsel.

19           MR. BRENNAMAN:  Well, I was going to launch into

20   questioning about Mr. Terhaar, so --

21           THE HONORABLE JUDGE FRANK:  I think the concern is

22   out of the same -- the concern that was raised earlier?

23           THE WITNESS:  Right.

24           MR. GUSTAFSON:  We agree, Your Honor.

25           MR. BRENNAMAN:  No objection.

1          MR. GUSTAFSON:  This testimony is going to be

2     about Mr. Terhaar, so would you and Ms. Bailey, please step

3     out of the room?

4          Thank you.

5          THE HONORABLE JUDGE FRANK:  Thank you.

6          Whenever you're ready, Counsel.

7          MR. BRENNAMAN:  Yes.

8     BY MR. BRENNAMAN:

9     Q.  Did you review Mr. Terhaar's commitment records as a

10    part of your review of his files?

11    A.  Yes, I did.

12    Q.  Do you believe that Mr. Terhaar should have been

13    committed to MSOP?

14    A.  No, I don't.

15         MR. BRENNAMAN:  May I approach, Your Honor?

16         THE HONORABLE JUDGE FRANK:  You may.

17    BY MR. BRENNAMAN:

18    Q.  I just handed you two reports done before and at the

19    time of Mr. Terhaar's commitments.  One of them is from Dr.

20    James Gilbertson and one of them is from Dr. Marshall.

21         Have you reviewed these reports?

22    A.  Yes, I have.

23    Q.  Do both of them opine that Mr. Terhaar meets the

24    criteria for sexually dangerous person and sexually

25    psychopathic personality?  Do you agree with the conclusions

1    that these two doctors reached?

2    A.  No, I don't.

3    Q.  What is it that you don't agree with?

4    A.  I believe that Dr. Marshall inappropriately used a

5    variety of instruments that are designed for men who have

6    committed adult sex crimes in reaching many of her

7    conclusions about risk.

8            And I believe that Dr. Gilbertson, while not using

9    those particular tools, again used risk factors that have

10   been shown to predict sexual re-offending in adult

11   populations, but have not been shown to predict sexual

12   re-offending in adolescent or prepubescent populations.

13   Q.  And what -- can you turn to page 7 of the report?

14   A.  Which report?

15   Q.  The Gilbertson report?

16   A.  The Gilbertson report, okay.

17   Q.  Dr. Gilbertson's report indicates that -- the first

18   highlighted paragraph there, "It is my opinion that

19   Mr. Terhaar's historical and dynamic risk factors clearly

20   indicate that he is at high risk to sexually re-offend

21   without further intervention and treatment."

22            Was it is wrong for Mr. Gilbertson to look at

23   historical risk factors?

24   A.  It depends on which historical risk factors you look at.

25   Q.  Which ones should he not have looked at?

1    A.  Well, the research with individuals who commit crimes as

2    juveniles, basically indicate that the factors that predict

3    re-offense don't necessarily predict sexual re-offense, but

4    are about delinquency.  And so those factors that are

5    related to delinquency are reasonable in terms of predicting

6    juvenile delinquent behavior, but are not useful in

7    predicting adult offending behavior.

8         Those factors that have been used for adult

9    offending behavior generally are not useful when looking at

10   juveniles, because they just don't apply.

11   Q.  Is Mr. Gilbertson's report detailed enough for you to

12   tell whether he looked at, in your opinion, the correct

13   historical factors, but not the incorrect historical

14   factors, risk factors?

15   A.  I believe I've actually highlighted that, so let me go

16   back and look.

17        Oh, yes.  So, what we have here, it's all on

18   page 6.  He's outlining the factors that he's looked at.

19   And what you see is that those that are highlighted, in

20   general -- in general, what these are, again, are general

21   delinquency risk factors and not specific to sex offending.

22   And there's no available research that ties any of these

23   particular factors -- there's nothing in this research that

24   would indicate that someone whose sexual offenses occurred

25   between the ages of 10 and 14 would then be a risk as an

1    adult.  The research doesn't support making that leap, which

2    is what Dr. Gilbertson has done.

3    Q.  Tell me about the dynamic risk factors.  And is it

4    inappropriate to look at dynamic risk factors when --

5    A.  I think these are a combination of both static and

6    dynamic risk factors.  I mean, again, I think we're caught

7    in -- I think in making this determination, it's hard to

8    look at dynamic risk factors with an individual who has been

9    in controlled settings through most of their adolescence.

10   Q.  But isn't it relevant that even in controlled settings,

11   Mr. Terhaar has -- is a frequent -- and we can get into this

12   later in the testimony -- frequent rule breaker, assaultive

13   behavior, and so on and so forth?

14   A.  I mean, there are certainly concerns about his behavior

15   and how he -- and his interpersonal interactions and his

16   interpersonal skills, and all of those are of concern and

17   may, in fact, be of concern if you are looking at a

18   generalized concern about antisocial behavior.  But, if

19   we're talking particularly about sexual acting out, the data

20   doesn't support these as particular risk factors for

21   sexually acting out.

22          Clearly, Mr. Terhaar was a troubled youth and has

23   had many problems in his placements.  I think part of the

24   problem here is that very early in life, he was identified

25   as a, quote, "sex offender" and channeled into a series of

1    interventions that may not have been appropriate for his

2    particular treatment needs.

3    Q.  With the second highlighted paragraph there -- I'll just

4    read from it -- "I did not see him as available for an

5    outpatient sex offender treatment program."

6         Do you have any basis upon which to dispute that

7    sentence?  Do you know what type of outpatient sex offender

8    treatment programs were available which led Dr. Gilbertson

9    to make that statement?

10   A.  I would agree that there was not an available outpatient

11   sex offender treatment program.  I would also say that I

12   don't think there was a need for an outpatient sex offender

13   treatment program.

14   Q.  And what was there a need for?

15   A.  There is a need for a program to address his childhood

16   trauma, to address his abandonment issues, to address his

17   inability to interact in social situations, to provide an

18   environment that was supportive and allowed him to learn

19   adequate skills to be self-sufficient and live in the

20   community.

21   Q.  Beyond that --

22   A.  Excuse me.

23   Q.  I didn't mean to cut you off.  I thought you were done.

24   A.  That's all right.

25   Q.  What type of program would that have been?  Was he in

1    need of -- before I ask that question, the second sentence,

2    then, "He has been unable to sustain himself in a

3    residential community placement."  You agree, don't you,

4    Doctor, from looking at his records, that he had a hard time

5    maintaining placements because of his assaults, absconding,

6    all sorts of issues?

7    A.  Yeah, he had a very rough time in placement, as a child

8    and as an adolescent.

9    Q.  And so the type of placement that you saw would have

10   been appropriate for him, would it have been another

11   residential placement?  Would it have been another

12   structured setting?  And how would that have happened?  He's

13   now 19 and he's 19 when this is happening.

14   A.  Right.  I don't know what is available at that point.  I

15   know that in Minnesota, a lot of juveniles -- a lot of folks

16   age out of the juvenile system and most of them are not

17   civilly committed.  So, I assume that there are programs and

18   there are processes that help these young men.

19        And I think something could have been developed.

20   I don't know exactly what it would be.  It's certainly --

21   drawing on some of the work from multisystemic therapy, we

22   know how to intervene on serious juvenile delinquency

23   problems, although I'm not clear that's what was going on

24   here, either.

25   Q.  And so, he is committed?

1    A.  Right.

2    Q.  He's committed to MSOP.  And the Defendants in this

3    case, you understand, are the individuals who operate the

4    Minnesota Sex Offender Program, right?

5    A.  Right.

6    Q.  So you understand that they were not involved in the

7    commitment of Mr. Terhaar, but they received him upon

8    commitment; do you understand that?

9    A.  Yeah.  No, I understand that, yes.

10   Q.  In your experience, is it the role of a clinician upon

11   receiving a committed individual -- well, are you a

12   clinician or are you an academic?  Can I ask you a little

13   more about your qualifications?

14   A.  Yes and yes.

15   Q.  You are both?

16   A.  I am both.  Yes, I do have a clinical practice.

17   Q.  Thank you.

18           In your experience, is it the role of a clinician

19   upon receiving a committed individual to second-guess the

20   legal determination made by the Judge that the particular

21   individual should be committed?

22   A.  The role of a clinician in receiving a patient is to do

23   a thorough assessment and determine what their needs are and

24   whether they are appropriately placed.  And in a setting

25   such as this, whether they are appropriately placed does

1    involve a review of what the Court chose to do.

2    Q.  So, in your view, then, was it MSOP's duty, upon

3    receiving Mr. Terhaar, to do that type of thorough

4    assessment, and if they did believe that he had been

5    inappropriately committed, to petition for his discharge?

6    Is that what should have happened in your mind?

7    A.  I would certainly -- I mean, I know that that's not what

8    was done, but I think it would -- I think it's a reasonable

9    practice that if someone comes in your front door that you

10   do not believe should be there, that you do what you can to

11   rectify that.

12   Q.  Okay.  Is it also their duty to treat him?

13   A.  As best they can, certainly.

14   Q.  And do you feel that they have been treating him as best

15   they can?

16   A.  I think he's benefited from what he's received.  I think

17   there are major holes in the treatment that he has received.

18   I don't -- as I said, I don't believe that sex offenders'

19   specific treatment as defined by MSOP and by many of us in

20   the field is really the best intervention for someone like

21   Mr. Terhaar.

22         But, you know, so with those caveats, I think

23   they've done -- you know, he certainly has benefited from

24   his time there.  He has matured.  Now, whether he would have

25   matured -- whether his maturation would have been different

1    and quicker and whether he would have learned more if he was

2    in a community setting versus MSOP is something that we

3    could discuss or conjecture.

4    Q.  Can I go back to some testimony we heard before from

5    Dr. Wilson about the standard that's applied when you're

6    looking at these files and these issues?

7    A.  Sure.

8    Q.  When you look at a file --

9    A.  Uh-huh.

10   Q.  -- on instructions of the Court, what standard are you

11   using?  I, again, note that on Mr. Terhaar's

12   recommendation --

13   A.  Right.

14   Q.  -- it uses the language of Chapter 253D.  Are those the

15   standard that you had in mind?

16   A.  We're not looking specifically at the standards set out

17   by statute for discharge from MSOP.  What we are looking

18   at -- at least what I'm looking at, I won't speak for all

19   four of us -- what I'm looking at is the reasonableness of

20   what has been done here, and the extent to which a

21   particular -- you know, the extent to which the intervention

22   is being provided or appropriate for what the needs are that

23   are expressed in the various reports that are available to

24   me.

25              The extent to which -- in looking at the initial

1    reports, they appear to adequately address the statutory

2    issues, and at this point, to what extent does this

3    individual need the level of confinement that exists at the

4    MSOP.

5    Q.  The Rule 706 experts' use in their report on Mr. Terhaar

6    the language, "unconditional discharge."  From a clinical

7    perspective, would it be advisable to send Mr. Terhaar

8    unsupported into society given his institutionalization for

9    --

10   A.  We are in no way suggesting that Mr. Terhaar would not

11   benefit and does not need supports.  In fact, we believe

12   that he does.  What we do not believe he needs are

13   conditions.

14   Q.  And what's the difference in your mind?

15   A.  Supports are those services that will allow him -- that

16   will move him forward and allow him to meet his needs, to

17   grow emotionally, psychologically, socially, that will help

18   him adequately adapt to the community that will help him

19   move forward in life.  Conditions are things that can get

20   him violated back into the system.

21   Q.  Okay.  And by -- conditions are used in a provisional

22   discharge-type situation, isn't that right?  Is that what

23   you're referring to?

24   A.  Well, they are used in a provisional discharge, yes.

25   Q.  And the reason for those, as I understand it, and I'd

1    like your view, is to be able to insure that a transition --

2    ensure the behavior, the compliant behavior of an individual

3    who is under those conditions because of the threat of

4    bringing back, isn't that right?

5    A.  It's about compliance, yes.

6    Q.  And would you agree with me that if there's no

7    conditions, if unconditional discharge happens, that the

8    Department is going to have no way of controlling

9    Mr. Terhaar's behavior?  That's the entire point of a

10   provisional discharge.

11   A.  Exactly, exactly.

12   Q.  I'd like to get into what type of support structure and

13   treatment you believe Mr. Terhaar will need in the event

14   that he is unconditionally discharged.  Maybe let's talk in

15   terms of just the basics.  Housing?

16   A.  He certainly needs a support place to live.  He needs to

17   be able to develop supportive family and friends.  He would

18   benefit from psychotherapy to help him address his trauma

19   issues and put his issues with anger into the context of his

20   developmental traumas.  He certainly needs vocational

21   training that will help him -- or at least help in obtaining

22   employment.  And some type of case management wouldn't be a

23   bad thing, either.

24   Q.  And who should provide that case management?

25   A.  Again, I would assume that the county or local

1    jurisdiction has some mechanism to do that.

2    Q.  What's involved in case management?  Is that just a

3    resource to Mr.  Terhaar or is that someone who checks up

4    and --

5    A.  I would view it as a resource for Mr. Terhaar to help

6    him marshal all of things that he needs.

7    Q.  There's been a suggestion with the housing that he might

8    live with his father --

9    A.  Uh-huh?

10   Q.  -- would that be an appropriate housing placement?  I

11   guess I'd like to ask you short-term, but long-term?

12   A.  I think short-term, it's very appropriate placement.  I

13   think like any young man, he will be working towards much

14   more independent living, I think.  Yeah, so --

15   Q.  How about long-term?

16   A.  Long-term, one would hope that Mr. Terhaar learns -- is

17   able to support himself, to, you know, learn to do the basic

18   things that we all need to learn to do to live on our own,

19   and that he ultimately will be able to do that.  And he

20   will, of course, require some help in doing that.

21   Q.  You interviewed Mr. Terhaar, is that right?

22   A.  Yeah, we did that as a group.

23   Q.  Did he say where he wanted to live at that point?

24   A.  He indicated that he would like to live with his -- with

25   his father.

1    Q.  I'm sorry?

2    A.  He said he indicated that he'd like to live with his

3    father, his adoptive father.

4    Q.  And we're hoping to hear from Mr. Terhaar -- Eric

5    Terhaar's father --

6             THE HONORABLE MAGISTRATE JUDGE KEYES:

7    Mr. Brennaman, could you raise your voice a little bit?  My

8    hearing is not as sharp as Judge Frank's, so -- maybe toward

9    the end of the day, too, i think we're --

10            THE HONORABLE JUDGE FRANK:  And I'm sure my Court

11   Reporter is going to thank you, Judge Keyes, the mikes

12   aren't the best there.

13            MR. BRENNAMAN:  I can't -- I'm sorry, Your Honor.

14   May I approach?

15            THE HONORABLE JUDGE FRANK:  You may.

16   BY MR. BRENNAMAN:

17   Q.  I'm showing you what has been marked as Exhibit No. 103.

18   This is a report of the end of confinement review committee

19   and this just occurred -- the meeting date was July 7th in

20   this report.  I don't now see if it's dated, but it came out

21   after that.

22            Could you turn to the second page for me and read

23   the last paragraph on the second page?

24   A.  Last paragraph.  "His adoptive father's residence is a

25   possible placement if returned to the community.  Living in

1     that residence is a brother and another sibling who

2     Mr. Terhaar is not certain which sibling it is; both are

3     adults.  It's unknown if those living with his adoptive

4     father were Mr. Terhaar's victims.  Mr. Terhaar does not see

5     his father's residence as a realistic

6     possibility/opportunity if released back to the community,

7     stating he does not have the living skills for being in

8     society as a result of being institutionalized most of his

9     life.  A group home or halfway house is a place he could

10    learn the skills he needs to live in society."

11    Q.  Is that description consistent with the conversation you

12    had with him during the interview?

13    A.  Consistent with the conversation we had with

14    Mr. Terhaar?

15    Q.  During your interview with him.

16    A.  When we -- my recollection of that interview is that he

17    was talking about residing with his father upon release.

18    Q.  Maybe we'll get more clarification on that as the

19    hearing goes on.

20          In terms of treatment and care, continuing

21    treatment and care of Mr. Terhaar, is any needed?  And if it

22    is, could you explain that?

23    A.  Yeah, again, I think we're talking about an individual

24    who has been, you know, in some kind of residential

25    placement pretty much since he was 14 years old.  You know,

1    we're now ten years later.  He certainly is going to need

2    support to learn to live in the community.  One of the

3    positions -- one of the jobs I had when I worked in

4    California was to do one year follow-ups from guys that were

5    released from Atascadero State Hospital.  And I think one of

6    those men describes the adjustment to the community the best

7    of anyone that I've ever experienced.  He looked at me and

8    he said, "You know, Mike, it wasn't the big things.  It

9    wasn't the housing.  It wasn't the employment.  It was the

10   little things."  He said, "I went to the pharmacy with my

11   used tube of toothpaste and they wouldn't give me a new

12   one."

13           And I think that describes the process, for me,

14   better than anyone, better than I could do it myself.

15   It's -- of course, anyone coming out of an institution is

16   going to need the supports and the -- to learn to live

17   outside of an institution, how to do the little things, how

18   to cook a meal, how to go to the grocery store, how to use a

19   cell phone.  You know, money comes out of the wall, now.  It

20   didn't come out of the wall many years ago.  So, there are

21   all of these little things that are going to be required.

22           And then there's the psychological factors that

23   have caused him problems in the past.  And if left

24   untreated, are likely to cause him problems in the future.

25   And those need to be addressed through probably individual

1    psychotherapy, maybe group psychotherapy.

2    Q.  Is there any other type of treatment he might need to

3    address those issues?

4    A.  I'm not quite sure what you mean.

5    Q.  Well --

6    A.  I mean --

7    Q.  -- you mentioned two.  Is that it?

8    A.  Well, certainly looking at -- you know, looking at

9    psychiatric issues, looking at medication issues, there may

10   be some health issues given that there's some indication of

11   an atypical fetal alcohol syndrome.

12            We certainly want to look -- you certainly want to

13   have someone take a look at how that's going to impact his

14   behavior and provide him with some skills to deal with that.

15   So, yeah, there are things that need to be done.

16   Q.  Well, and I guess the question is, who is responsible

17   for doing those things?  Would you agree with me, for

18   example, that if he is unconditionally discharged, MSOP is

19   not going to be able to insure that he goes to his treatment

20   sessions, for example?

21   A.  Right.  If he is unconditionally discharged, MSOP will

22   not be able to compel him to do things.

23   Q.  And won't be able to compel him to take his medications,

24   won't be able to compel him to act in a manner that's

25   consistent with public safety, won't be able to compel him

1    --

2    A.   Well, and I agree that they will not be able to compel

3    him to do these things.  I think our opinion is that he is

4    in a place where he will -- that he more likely than not

5    will do these things and he does not need to be compelled.

6    Q.   Sure.  And he -- you know by now from listening today

7    and I'm sure you knew beforehand, that the position of the

8    Department is, instead of unconditional discharge, to

9    transfer Mr. Terhaar and work through the transition issues

10   through -- would you agree with me that the community

11   preparation services is the environment and the tool that

12   MSOP has to affect a transition?

13   A.   That is their program for transition, yes.

14   Q.   And do you see their petition for Mr. Terhaar into that

15   program as their way that they have the ability to

16   transition someone back into the society?

17   A.   Well, it's the program that they have in place to

18   transition folks back into society.  How effective it is

19   seems up in the air.

20   Q.   Would you agree with me that if Mr. Terhaar is

21   unconditionally discharged, though, MSOP does not have these

22   tools available to them to help with his transition into

23   society?

24   A.   I think the problem that we're talking about here is

25   kind of going back to Ms. McCulloch's statement, that

1    release planning needs to start at the beginning of

2    treatment and not wait until the end.

3              So, what you're talking about here is that there

4    has been no plan in place or plan developed over the five

5    years that Mr. Terhaar has been in treatment; and therefore,

6    we are left to try to understand how we're going to do it if

7    the Court decides that he should be.

8    Q.  What's your recommendation?  I know that the father has

9    indicated that is willing to provide --

10   A.  Uh-huh.

11   Q.  -- some support, and we may hear more about that --

12   A.  Right.

13   Q.  -- as this hearing goes on.

14             Beyond that, I don't know.  I mean, MSOP is

15   willing to provide some aftercare.  We put in a filing that

16   indicates that; but, it's limited, as we've been talking

17   about, because if he's unconditionally discharged, they

18   don't have the power to --

19   A.  Right.

20   Q.  -- enforce anything.

21             So, who is going to teach Mr. Terhaar the regular

22   everyday things?  I mean, is this known to you?

23   A.  I'm not that familiar with the specific services

24   available.  I do have clients that are -- you know, that

25   receive job placement services through their counties of

1    residence.  I have clients who are in supervised living

2    situations through their counties of residence.  Certainly,

3    there are mental health services available, so I think there

4    are social services available through counties of residence.

5    Q.  Have you communicated with the county at all about

6    Mr. Terhaar?

7    A.  I have not.

8    Q.  I'd like to talk more about treatment that he is

9    receiving at the Minnesota Sex Offender Program -- is this

10   reverberating, or is that just me?

11   A.  I heard something reverberate back, as well.

12   Q.  Is Mr. Terhaar's placement in the Young Adult Unit of

13   the Minnesota Sex Offender Program appropriate?

14   A.  I think given that he is in the Minnesota Sex Offender

15   Program, that that is the best placement for him.

16   Q.  What do you understand is the purpose of that unit?

17   A.  You know, I can't speak articulately about it, but it's

18   to provide -- my understanding is that it's to provide the

19   younger residents with a supportive environment, and in some

20   respects to protect them from the general population, to not

21   put them -- not to put them in kind of a sink or swim into

22   the general population.

23   Q.  There's been some suggestion that, you know, what a bad

24   thing it is that these young adults are being thrown into

25   this program with other sex offenders, and the idea is that

1    maybe they fall prey to the other sex offenders.  Is there

2    any evidence in Mr. Terhaar's record that that has happened

3    to him and that he's been victimized or threatened by other

4    clients at MSOP?

5    A.  I think so, but I can't tell you exactly.  I have read

6    through the record, but I don't recall a specific incident.

7    Q.  Okay.  Well, what makes you think so?

8    A.  I thought that -- I just have this kind of a recall of

9    a -- of some discussion around threats and maybe sexual

10   coercion from another client.  But, again, I'm not totally

11   positive on this and I don't want to run to the bank with

12   it.

13   Q.  Well, if you remember, let me know.

14   A.  Yeah.

15   Q.  We will be going through, later, some specific examples,

16   as well.  So, maybe that will refresh your recollection.

17   A.  Okay.

18   Q.  So, you said before that E.T. is receiving treatment at

19   MSOP.  Is he improving, at least in part, because of that

20   treatment he's been receiving?

21   A.  I mean, he certainly in his interview, you know, told us

22   of the benefits that he believes he's received from being in

23   treatment from MSOP.  I think the records indicate some

24   improvements in impulsivity, in anger management, and kind

25   of understanding some underlying issues that lead to his

1    behavior.  So, yeah, certainly, I think he's benefited from

2    some of what he -- that he has had some benefit from what he

3    has received.

4            MR. BRENNAMAN:  May I approach, Your Honor?

5            THE HONORABLE JUDGE FRANK:  You may.

6    BY MR. BRENNAMAN:

7    Q.  I just handed you the report on Eric Terhaar dated

8    May 18th --

9    A.  Uh-huh.

10   Q.  -- 2014.

11           This is the report that you and the three other

12   experts offered --

13   A.  Right.

14   Q.  -- is that right?

15   A.  Yes.

16   Q.  The report suggests that he has been able to regulate

17   more effectively his behavior and emotions.  Is that in part

18   due to the treatment he has received at MSOP?

19   A.  I am sure that it is in part due to the treatment he's

20   received at MSOP.

21   Q.  I understand there are some criticisms about not

22   incorporating trauma-informed care in your report, but

23   besides that and besides -- I know you object in general to

24   the placement and the secured treatment facility; but, aside

25   from those things, is the treatment that MSOP is providing

1    appropriate for Mr. Terhaar?

2    A.  I don't think so, no.

3    Q.  Tell me why.

4    A.  I think it is sex offender-specific treatment.  It

5    involves looking at cycles and being -- and specifically

6    looking at one's sexually-offending behavior and taking

7    responsibility for that.

8            And again, I would say that we're talking about

9    the behavior of a 10-year-old.  And to characterize the

10   behavior of a 10-year-old in the same way as the behavior of

11   a 35 year-old seems to me to be inappropriate.  And to

12   provide a structured sex offender treatment program to

13   someone whose sexual-offending behavior was done at the age

14   of 10 seems to me to be inappropriate.  Which is not to say

15   that he doesn't benefit from some of what he is offered.

16   Q.  What treatment is he receiving that's helping him

17   regulate his behavior and emotions?

18   A.  Well, I'm guessing there are some modules that are

19   addressing anger management, and there are some modules that

20   address kind of general behavioral control.  And I'm sure

21   that those are helpful.

22   Q.  Well, you say you're guessing.  I mean, you have

23   reviewed Mr. Terhaar's file, right?

24   A.  Right.

25   Q.  Have you seen --

1    A.  I mean, there are modules in the program that address

2    those things and he has benefited from doing those things.

3         MR. BRENNAMAN:  What time did the Court intend to

4    go to?  I was going to launch into a new sort of

5    exhibit-intensive line of questioning.

6         THE HONORABLE JUDGE FRANK:  What -- Mr. Gustafson

7    is standing, I was about to ask opposing counsel how much

8    time he'd estimate he had left.

9         What were you going to say, Mr. Gustafson?

10        MR. GUSTAFSON:  I was going to say that I thought

11   we should really try hard to finish these 706 experts today

12   so they don't have to stay over.

13        THE HONORABLE JUDGE FRANK:  Well, they're staying

14   over either way.  I think one or more has a noon deadline

15   tomorrow to be on an airplane.  But, they're staying over

16   either way.

17        About how much time do you have left, do you

18   estimate, ballpark?

19        MR. BRENNAMAN:  I may have a half an hour left.

20        THE HONORABLE JUDGE FRANK:  Yeah, I think what

21   we'll do is -- and that way, we can take a couple of things

22   up with counsel, we'll recess here.

23        I think I understood correctly through Mr.

24   Ferleger and others that -- I think one of you had the noon

25   deadline tomorrow, but you were all planning on staying and

1      enjoy this unseasonably cold weather here in Minnesota.

2               THE WITNESS:  And I am local, so --

3               THE HONORABLE MAGISTRATE JUDGE KEYES:  What

4      witnesses do you anticipate calling, Mr. Brennaman, after

5      the experts?

6               MR. BRENNAMAN:  We would like to call Mr. Terhaar

7      and Ms. Bailey just for some short testimony.  We'd like to

8      ask what their preferences are.  I think that's appropriate

9      in this type of proceeding, and ask some other questions.

10     But, I don't expect that to take very long at all.

11              We wish to call Nancy Johnston and Jannine Hebert

12     to articulate the Department's position on transfer of

13     Ms. Bailey and discharge of Eric Terhaar.

14              And then possibly, depending on the time, we have

15     some other clinical people who can talk in more detail about

16     the treatment that is being given to Ms. Bailey and Mr.

17     Terhaar, but that's sort of time permitting.

18              I'd also like to hear from Mr. Terhaar's father,

19     there's this issue of support that we're grappling with here

20     and I think it would be nice to hear from him.

21              THE HONORABLE MAGISTRATE JUDGE KEYES:  How about

22     you, Mr. Gustafson?  Hearing that, are you going to have any

23     other witnesses other than cross-examining or examining

24     those witnesses?

25              MR. GUSTAFSON:  The only witnesses that he didn't

 1    mention that I thought would testify are his experts who say

 2    that Mr. Terhaar and Ms. Bailey should not be transferred.

 3    They have an independent expert, Dr. --

 4              THE HONORABLE JUDGE FRANK:  Powers-Sawyer?

 5              MR. GUSTAFSON:  Yes, and Dr. Ann Pascucci who did

 6    the risk assessment with Dr. Laura Herbert.  So, if they

 7    don't call them, we may call them.  Otherwise, I think that

 8    that probably covers it.

 9              THE HONORABLE JUDGE FRANK:  So then knowing that

10    we had two days set aside, is it realistic as we leave here

11    this afternoon that we will conclude by five o'clock

12    tomorrow?

13              MR. GUSTAFSON:  I believe it is realistic,

14    Your Honor.  I thought we'd get farther today.

15              MR. BRENNAMAN:  It might be a little tight,

16    Your Honor, but we can try.

17              (Discussion off the record.)

18              THE HONORABLE JUDGE FRANK:  You may step down,

19    then.  We'll stand in recess for all the folks in the

20    courtroom until 9:00 tomorrow morning.  We would like to

21    visit at sidebar with counsel before you leave, here.  We'll

22    let kind of the folks exit.  And -- I'm sorry, come in --

23    thank you -- at 9:00 tomorrow morning.

24              But, check in with us before everybody leaves,

25    because one of our questions to counsel may affect who's

1    here tomorrow and who's not.

2         (Witness excused.)

3         THE MARSHAL:  You want me to bring her in?

4         THE HONORABLE JUDGE FRANK:  Okay, that's fine.

5         Before your clients leave, we probably would like

6    to talk with counsel up here.

7         (At the bench.)

8         THE HONORABLE JUDGE FRANK:  The inquiry that we

9    have, and you can follow up in case you have any, is

10   separate from the issue of whether you want the two

11   Plaintiffs here, we are trying to understand what the

12   relevance would be of calling either Ms. Bailey or

13   Mr. Terhaar.

14        Neither one of us can -- and I can't envision any

15   circumstance for what they have to say is particularly, in

16   light of -- either they said what they said to the experts

17   and the other staff that may be called or they didn't.  What

18   they would -- what they would have to say, it would not be

19   outcome determinative in any way.

20        MR. GUSTAFSON:  Your Honor, we didn't intend to

21   call them.  We don't think their testimony has any

22   relevance.  What they think or what they want is irrelevant.

23   They're under commitment by Court Order.  And whether they

24   satisfy the constitutional standards and all the rest of it

25   doesn't have anything to do with what they want, what they

1    think, where they're going to live or anything else.

2         MR. BRENNAMAN:  I guess I disagree.  I mean, it's

3    customary in the state law process to hear from committed

4    individuals to hear what they're thinking, what they think

5    about their placement, their treatment, what they

6    understand.

7         You know, in this case, we have Mr. Terhaar, we

8    have testimony now that's completely contradictory about

9    what he wants, where he wants to stay.  He told them in the

10   interview, the experts, that he wants to stay with his

11   father.  He's told the ECRC Board, apparently, that he

12   didn't want to live with his father and that he felt like he

13   needed to be in a structured situation like a halfway house

14   or something like that.

15        So, where is he going to stay?  What are the

16   conditions going to be?  What does he want?

17        THE HONORABLE JUDGE FRANK:  Let me suggest this

18   and you can follow up.  I almost raised this at the last

19   hearing.  It seems like there's a constitutional disconnect

20   here because it seems to me that the real issue is the

21   constitutionality issue with respect to their confinement.

22        And really, it really becomes a problem for the

23   Court, not them, not you, but the Court and what happens, if

24   anything, if we come your way on that, because then we have

25   motions for aftercare, we have motions that -- really, what

1    the Dad thinks or either of these people think really don't

2    have much to do with anything.  Because on the assumption

3    that if we came your way on the confinement issue, that

4    we're going to then go ahead and make a decision without

5    some -- an extensive evaluation of, well, what are the -- I

6    mean, there are a number of cases around the country where,

7    in those rare cases where the judge stepped in in a 1983

8    context, not habeas, that there was a -- they had to

9    evaluate, well, where do we go from here?  Because the

10   likelihood that no matter what Dad says or Mr. Terhaar says

11   that the Court's going to say:  You're on your own, now.

12   It's not going to happen, whether we have to face that issue

13   here or down the road with one or more Class members.

14           But Judge Keyes?

15           THE HONORABLE MAGISTRATE JUDGE KEYES:  It seems to

16   me that my concern is that the real core issue here with the

17   experts saying is -- and the issue is, is he dangerous

18   and/or is she dangerous?  I mean, that's really the core in

19   terms of can you continue to confine somebody if you

20   conclude that they're not a danger?

21           I don't see how -- I don't see that it would be

22   anything productive to try to cross-examine these two

23   individuals about their dangerousness.  I take it that's not

24   what you intend to do.

25           MR. BRENNAMAN:  No.  Well, I think we would get

1    into it, though, if he denies -- you know, I think these

2    experts downplay his assaults that he committed at MSOP.  I

3    mean, we would ask him about those.  And then if he wouldn't

4    admit to them, we would put in evidence and ask him to

5    explain what was causing that.

6            We didn't, and I think he would admit to it, and

7    maybe have a story to tell about how he's getting better.

8    But, I think some evidence on dangerousness would be in

9    order on him --

10           MR. GUSTAFSON:  I totally disagree, Your Honor.

11   This is not an issue.  This is an issue in which the State

12   takes the position all the time that this is a matter of

13   expert testimony.  The person at the SRB hearing is not put

14   under oath.  Eric Terhaar was not put under oath at the SRB

15   hearing.

16           MR. BRENNAMAN:  Was anybody?

17           MR. GUSTAFSON:  No, nobody was put under oath.  He

18   was not asked questions about his behavior.  He's not asked

19   questions about -- he is asked questions about his aftercare

20   plan.

21           There is nothing in this hearing that requires the

22   testimony of either of these individuals.  And the State

23   just wants to call into question whether the experts did an

24   adequate review.  That's what cross-examining of the experts

25   is for.

1           If Eric Terhaar denies that he got into a fight on

2    January 5th of blah, blah, blah, a year ago, are they going

3    to call somebody from the MSOP to testify to the fight?

4           THE HONORABLE JUDGE FRANK:  I assume these things

5    are either in the records or they're not.

6           MR. GUSTAFSON:  They are in the record.  There's

7    just no reason to have this testimony.

8           THE HONORABLE MAGISTRATE JUDGE KEYES:  And I don't

9    think there's any fact dispute or contest about whether

10   those incidents occurred.  They're all a matter of the

11   history that's in the record, right?

12          MR. GUSTAFSON:  If they call him, we're going to

13   challenge whether some of those things are accurate; but,

14   there's no real need to.  The experts had his file.  They

15   considered it.  And they still think he doesn't satisfy the

16   standard to be held.  So, I don't think it adds anything to

17   it, whether he denies it or agrees to it.

18          MR. BRENNAMAN:  Well, I'm thinking of one issue

19   that might come up is the issue of, you know, they downplay

20   his sexual offense history after age 14; but, at age 17, he

21   was masturbating in a car next to a 4-year-old granddaughter

22   of his foster mom.

23          Now, he claims he was just adjusting himself and

24   they seem to have taken that on face value that he was just

25   adjusting himself.  Well, the fact is, he admitted to it

1     later, and I think he'd admit to it now.

2               MR. GUSTAFSON:  Well, you know, that's an issue

3     you should have taken up with the experts, and maybe you

4     will tomorrow with the experts, because they're the ones who

5     you're actually questioning their opinion --

6               MR. BRENNAMAN:  Yeah, and they'll say we think he

7     adjusted himself.

8               THE COURT:  One person at a time, please.

9               MR. BRENNAMAN:  And how do I contradict that if I

10    don't have Eric Terhaar --

11              MR. GUSTAFSON:  My point is that you should ask

12    the experts that first, because they'll tell you it doesn't

13    make any difference.  And then it won't make any difference.

14    That's why I think that this testimony should not be

15    allowed.

16              I mean, if you want to -- if you want to reserve

17    judgment, Your Honor, until after the experts have

18    testified, I suspect we could do it that way, but in the

19    end, I think that I could elicit testimony from all four of

20    the experts that any of these minor factual disputes that

21    counsel for the State is talking about don't matter in their

22    opinion.  That even if he did -- even if he was masturbating

23    in the back seat of the car at age 17, he wasn't an

24    adjudicated delinquent for it.  And it wouldn't change their

25    opinion.  That's the question that should be asked of the

1    experts.

2            But in any event, I don't think that E.T. --

3    Mr. Terhaar or Ms. Bailey can offer a single thing to the

4    question of whether their 1983 claim on a constitutional

5    violation has validity.

6            THE HONORABLE JUDGE FRANK:  Let me ask you this

7    before I hear from counsel.

8            Can I assume that apart from whether there was any

9    intent of anybody to call them, that you felt it was

10    important they be here?  Or was it over your objection, or

11    do you have a view?

12            MR. GUSTAFSON:  No, no, we agreed to have them

13    here.  We both talked about whether we might call them or

14    not, and it wasn't clear to me now.  Now, I just don't see

15    it as necessary, but we wanted him to be here to see the

16    process, in any event.

17            THE HONORABLE JUDGE FRANK:  Judge Keyes, it seems

18    to me that we could -- even though I think it's going to be

19    an uphill battle, and I don't think irrespective of anything

20    they say it's going to be outcome determinative one way or

21    the other, because the experts and the records are what they

22    are and this is not a commitment hearing.

23            But one suggestion you had since you're going to

24    be here anyway tomorrow is let's see when we're done with

25    the experts and where the AG's Office is at, where you're

1    at, and then -- and the scope of the examination, then, in

2    fairness to -- since this is the first you've heard this

3    from us, we can take that up without delaying anything

4    tomorrow when the context of it is clear to both of you,

5    without agreeing --

6             THE HONORABLE MAGISTRATE JUDGE KEYES:  One of the

7    things I think that we have to consider, we'll all have to

8    consider is the traumatization of these individuals to be in

9    a Federal Court and to be examined about these things in

10   public.

11            And while it may -- if it was always -- if it was

12   essential or necessary to a case, that's one thing.  But, if

13   it's not, then whatever responsibility we have to further

14   harm them by simply exposing them to examination that may

15   not be necessary, I think that to me, anyway, it would have

16   to be a high threshold showing that it was necessary.

17            MR. GUSTAFSON:  And I think that's particularly

18   true for Ms. Bailey, as opposed to Mr. Terhaar.  I mean, I

19   think she's much more vulnerable in that regard for obvious

20   reasons in the file.

21            THE HONORABLE JUDGE FRANK:  If the reports are

22   semi-accurate on her about her intellectual disability, I

23   have doubts how much she even understood today.  But, I

24   guess we will leave that -- what I've read about her mental,

25   apart from the sex offense issue.

1        MR. BRENNAMAN:  We're sensitive about, Your Honor,

2    the stress that this puts on them, and so on.  Especially, I

3    agree with respect to Ms. Bailey.  That is why we only had a

4    few questions for her.  We just want to know about her

5    situation, whether she feels safe, where she wants to be,

6    you know, and then she's off the stand.  And even if that's

7    too stressful, I don't want to make it an ordeal for her.

8        THE HONORABLE JUDGE FRANK:  So, why don't we, with

9    a promise from us, so we can hear you out, whether it's an

10   additional 104 brief offer of proof, I'll make a promise

11   that we'll make the record clear before we say yes, no,

12   tomorrow at the appropriate time?

13       MR. GUSTAFSON:  I'm optimistic that we'll finish

14   tomorrow.  Partly, I'm optimistic because I have a

15   commitment on Wednesday.

16       THE HONORABLE JUDGE FRANK:  I have court all day

17   Wednesday.

18       MR. GUSTAFSON:  I can't continue on Wednesday.  I

19   really think we need to wrap it up tomorrow, so I hope we'll

20   all be as efficient as we can.

21       MR. BRENNAMAN:  I am almost about a half an hour

22   left with regard to E.T..

23       MR. GUSTAFSON:  Are you going to call Dr. Freeman?

24       MR. BRENNAMAN:  I will, but it mostly will be to

25   ask agreement with the other things.  I don't have new

1    territory to cover with her, so I'm hoping --

2              THE HONORABLE JUDGE FRANK:  It's up to you, you

3    can leave whatever you want in here.  We'll lock the doors

4    when everybody leaves.  You can leave it in here and we'll

5    lock up the door.  And they'll all be back tomorrow, so

6    they're free to -- well, as long as --

7              THE MARSHAL:  I just want to know what time you

8    want us.

9              THE HONORABLE JUDGE FRANK:  9:00, unless counsel

10   needs to see them.

11             MR. GUSTAFSON:  8:55 is fine.  Thank you, Your

12   Honor.

13             MR. BRENNAMAN:  Thank you.

14             MR. IKEDA:  Thank you.

15             (Evening recess.)

16

17                          *    *    *

18

19             I, Jeanne M. Anderson, certify that the foregoing

20   is a correct transcript from the record of proceedings in

21   the above-entitled matter.

22

23

24             Certified by:  <u>  s/ Jeanne M. Anderson  </u>
                              Jeanne M. Anderson, RMR-RPR
25                            Official Court Reporter

1                        **I N D E X**

2    OPENING STATEMENT BY MR. GUSTAFSON          Page  23
     OPENING STATEMENT BY MR. BRENNAMAN          Page  36

3

4    **Rule 706 Expert Witnesses:**

5        **ROBIN WILSON**                                Page  49

6        **MICHAEL MINER**                               Page  57

7        **NAOMI FREEMAN**                               Page  61

8        **DEBORAH McCULLOCH**                           Page  66

9

10

11       **ROBIN WILSON**

12           Cross Examination by Mr. Brennaman      Page  72
             Direct Examination by Mr. Gustafson     Page 106

13

14       **DEBORAH McCULLOCH**

15           Cross Examination by Mr. Brennaman    Page 112
             Direct Examination by Mr. Gustafson   Page 140
16           Recross Examination by Mr. Brennaman  Page 147

17

18       **MICHAEL MINER**

             Cross Examination by Mr. Brennaman    Page 153
19

20                       **EXHIBITS**

21        Exhibits:                    Page Received:

22    All exhibits provisionally
      Admitted with the exception of
23    58 to 74, 77 to 87 and 89 to 93          21

24
                  42                      148
25                45                      113

JEANNE M. ANDERSON, RMR-RPR
(651) 848-1221