| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld, and all others similarly situated, | Civil No. 11-3659 (DWF/JJK) |

Plaintiffs,

v.

**MEMORANDUM**
**OPINION AND ORDER**

Lucinda Jesson, Dennis Benson, Kevin
Moser, Tom Lundquist, Nancy Johnston,
Jannine Hébert, and Ann Zimmerman,
in their individual and official capacities,

Defendants.

---

Daniel E. Gustafson, Esq., David A. Goodwin, Esq., Karla M. Gluek, Esq., and Raina Borrelli, Esq., Gustafson Gluek PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Ricardo Figueroa, Scott H. Ikeda, and Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

Eric S. Janus, Esq., William Mitchell College of Law; and Teresa J. Nelson, Esq., ACLU of Minnesota, counsel for Amici Curiae.

John L. Kirwin, Esq., Assistant Hennepin County Attorney, Hennepin County Attorney's Office, counsel for Amicus Curiae.

---

**INTRODUCTION**

This matter is before the Court on its June 2, 2014 Order to Show Cause (Doc. No. 468), Plaintiffs' Motion for Declaratory Judgment and to Immediately Discharge E.T. from Civil Commitment (Doc. No. 469), and Plaintiffs' Motion to Immediately Transfer R.B. to an Appropriate Treatment Facility (Doc. No. 478). For the reasons set forth below, the Court denies Plaintiffs' motions without prejudice but expedites this class action case for trial.

**BACKGROUND**[1]

Plaintiffs filed this class action case on behalf of all individuals civilly committed to the Minnesota Sex Offender Program ("MSOP"), raising several challenges to MSOP and the Minnesota statutes governing civil commitment and treatment of sex offenders, Chapter 253B (recodified as Chapter 253D). (*See* Doc. No. 1, Compl.; Doc. No. 301, Am. Compl.) On July 24, 2012, the Court certified a class in this matter pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of "[a]ll patients currently civilly committed" to MSOP (together, "Plaintiffs" or the "class members"). (Doc. No. 203 at 11.)

The Court's Order to Show Cause and Plaintiffs' two motions referenced above were prompted by the work of the court-appointed Rule 706 experts, specifically two

---

[1]      The following is a summary of facts relevant to the pending motions before the Court. A more full summary of facts underlying this class action case can be found in the Court's February 20, 2014 Memorandum Opinion and Order (Doc. No. 427). This Order was dated February 19, 2014, docketed on ECF on February 20, 2014, and is hereinafter referred to as the February 20, 2014 Order to avoid confusion.

interim reports produced by the Rule 706 experts relating to class members Eric Terhaar and Rhonda Bailey.

As the record reflects, after various motions were filed in this matter, on October 25, 2013, the Court "acknowledge[d] the need for experts in this case in order to fully and properly litigate the claims at issue," granted Plaintiffs' request to the extent it sought the appointment of expert witnesses pursuant to Rule 706 of the Federal Rules of Evidence, and requested nominations for such experts from the parties. (Doc. No. 354 at 3, 4.) On December 6, 2013, the Court appointed four experts pursuant to Rule 706. (Doc. No. 393 at ¶ 2.) These four experts were jointly nominated by the parties. (*Id.*) The Court's December 6, 2013 Order generally described the duties of the experts and stated that the Court expected "the experts to confer as soon as possible and to suggest a methodology, areas of concentration, and division of labor, together with an expedited timetable for submission of their findings to the Court." (*Id.* ¶¶ 4, 9.) Thereafter, the parties submitted their respective proposals with regard to the work of the experts, and on January 22, 2014, the Court met with the experts. (*See* Doc. No. 421.) On February 5, 2014, the Court received the experts' proposed plan of action, in which the experts proposed, among other things, to conduct initial chart reviews to "get an understanding of what is happening in the program so that it may be evaluated, not to make comments about an individual resident's risk or treatment progress." (Doc. No. 422.)

At that time, a motion to dismiss and motions by Plaintiffs requesting various forms of injunctive and declaratory relief were pending. On February 19, 2014, the Court ruled on the motions, and in doing so, pointed out that this case involves alleged systemic

problems with MSOP and the systematic application of commitment statutes to the class members, and further stated that specific discovery may enlighten the Court on the issues before it. (Doc. No. 427 at 20 ("If, with the benefit of discovery (including reports by the Court-appointed experts), Plaintiffs are able to demonstrate that the commitment statutes are systematically applied in such a way as to indefinitely commit individual class members who are no longer dangerous, or that MSOP is administered as a punitive system despite its statutory treatment purpose, Plaintiffs will likely prove up their claims.").) The evidence before the Court included both the March 2011 Evaluation Report on the Civil Commitment of Sex Offenders by the Office of the Legislative Auditor for the State of Minnesota ("OLA") (Office of the Legislative Auditor, State of Minnesota, Evaluation Report: Civil Commitment of Sex Offenders (2011) ("OLA Report"), *available at* http://www.auditor.leg.state.mn.us/ped/pedrep/ ccso.pdf), and the Sex Offender Civil Commitment Advisory Task Force's (the "Task Force") final recommendations dated December 2, 2013. (Sex Offender Commitment Advisory Task Force, Final Report (2013) ("Task Force Report"), *available at* https://edocs.dhs.state.mn. us/lfserver/Public/DHS-6641B-ENG.) Both reports indicate there may be systemic problems with MSOP and its application of the commitment statutes. For example, the Task Force Report states that "[t]here is broad consensus that the current system of civil commitment of sex offenders in Minnesota captures too many people and keeps many of them too long" (Task Force Report at 1), and makes several recommendations. (*See* Task Force Report at 5-16.) The Task Force also states that "[u]nder current law all offenders committed to MSOP are presumptively placed in the highest level of security. The result

4

is that some offenders, while meeting the criteria for commitment, may be needlessly confined in the most secure facilities, when both public safety and the need for effective treatment might be better served in a less restrictive environment"; and "[t]he need for continued commitment and the propriety of placement must be reviewed on a regular basis, without demand or request by the committed individual." (*Id.* at 3.) The summary of the findings of the OLA includes that: "Minnesota's population of civilly committed sex offenders has grown significantly in the last decade and is the highest in the nation on a per capita basis" (OLA Report at x); "[t]he costs of civil commitment in MSOP are high relative to incarceration and other alternatives"[2] (*id.*); "[t]here is considerable variation in commitment practices, particularly among prosecutors" (*id.* at xi); "Minnesota lacks reasonable alternatives to commitment at a high security facility" (*id.*); "[w]ith the large influx of commitments since 2003, MSOP has struggled to provide adequate treatment and maintain a therapeutic environment, particularly at its Moose Lake facility" (*id.* at xii); and "[n]o civilly committed sex offender has ever been discharged from MSOP" (*id.*). The OLA Report also notes that "Minnesota has a release standard for offenders who are civilly committed that, in practice, is stricter than other states. MSOP does not support any discharges without completion of the treatment program. Most states explicitly allow for discharges if an offender no longer meets the commitment criteria." (OLA Report at xii.)

---

[2]    According to the OLA Report, the "annual cost per resident in MSOP is $120,000," which is "at least three times the cost of incarcerating an inmate at a Minnesota correctional facility." (OLA Report at x.)

The Court therefore contemplated that the work of the Court-appointed experts would help the Court determine whether there are such systemic problems. (Doc. No. 427 at 20.) Accordingly, the Court more specifically set forth what the Rule 706 experts' work should include—at a minimum—so that information relevant to such determination would be available to the Court. (*Id.* at 70-74.) For example, the Court ordered that the experts' work would include:

> ii. Reviewing the current treatment program at MSOP and its implementation to determine whether the program meets professional standards of care and treatment for sex offenders and issuing recommendations as to any changes that should be made to the treatment program; and

> iii. Reviewing current MSOP policies and practices with regard to the conditions of confinement to determine whether they satisfy the balance between safety concerns and a therapeutic environment and making recommendations for any changes that should be made to the conditions of confinement at both the Moose Lake and St. Peter facilit[ies].

> iv. The experts shall also report to the Court on the following: (a) the current professional standards for the treatment of civilly committed sex offenders and the extent to which MSOP's program design reflects those standards; (b) how other civil commitment programs have reintegrated civilly committed sex offenders into the community, with particular attention to community relations; and (c) how other states, if any, are providing treatment and management of lower-functioning civilly committed sex offenders in community settings.

(Doc. No. 427 at 71-72.) In addition, expanding on what the Rule 706 experts had proposed, the Court asked the experts to:

> [e]valuat[e] all class members[] and issu[e] reports and recommendations as to: (a) each class member's current level of dangerousness (current risk assessment), including whether each class member poses a "real, continuing, and serious danger to society"; (b) whether each class member is actually eligible for discharge under the applicable statutory provisions or

> otherwise no longer meets the statutory criteria for initial commitment (or should otherwise be recommended for provisional or full discharge); (c) whether each class member is placed in the appropriate phase of treatment; (d) whether each class member would be a candidate for a less restrictive facility; and (e) the specific need and parameters for less restrictive alternative facilities,[] including the operation of such facilities[.]

(Doc. No. 427 at 70-71.)  The Court explained that "independent risk assessments and treatment recommendations for each of the class members [would] ultimately be necessary in order for the Court to comprehensively evaluate Plaintiffs' claims, including whether the commitment statutes, as applied, and whether MSOP, as implemented, pass constitutional muster."  (Doc. No. 427 at 47-48.)

The Court ordered that the experts begin their work by "[r]eviewing MSOP treatment and screening program/process"; "[c]onducting site visits to St. Peter and Moose Lake and interviewing patients and staff at each facility"; "[r]eviewing 20% to 25% of resident charts, with the aim of reviewing 100% of charts for those individuals in the Assisted Living Unit, the Alternative Program Units, and the Young Adult Unit"; and "[i]dentifying residents who are not receiving appropriate services and making recommendations related thereto."  (Doc. No. 427 at 72.)  With respect to the chart reviews, the Court ordered the experts to prioritize their evaluations of those individuals residing in the Young Adult Unit, the Assisted Living Unit, and the Alternative Program Units.  (*Id*. at 70 n.54, 72.)

Prioritizing the evaluations of these individuals, for the purpose of identifying potential bellwether issues, was supported by both the OLA and the Task Force Reports. The OLA Report states, for example, that:

- ". . . MSOP clinical management agreed that some low functioning[3] individuals in the MSOP alternative program in St. Peter could be managed in group homes specifically designed for low functioning sex offenders. Elderly individuals with numerous medical problems and physical disabilities are also being committed and sent to MSOP facilities and placed in an assisted living unit when appropriate. Most recently, an 88-year-old was committed and sent to an MSOP facility. Some of these individuals may be suitable for an alternative commitment setting." (OLA Report at 43-44.)

- "Generally in our file reviews and interviews, we found that there were concerns that some clients with cognitive deficits and those with psychiatric issues did not have their needs met by the program." (*Id.* at 79.)

- "The lowest functioning alternative program clients may not have the cognitive skills to complete the MSOP treatment program." (*Id.* at 79.)

- "The MSOP administration separated from DHS's State Operated Services division in 2008, and low functioning MSOP clients who had been treated at Special Needs Services were moved back to MSOP in the newly created alternative program. The decision to move these clients back to MSOP was made without executive level clinical input. The decision was made by the MSOP executive director during a time when there was neither an executive clinical director for the program nor a clinical director on the St. Peter campus." (*Id.* at 80-81.)

- "The program has not yet developed and implemented an alternative release path for low functioning alternative program clients." (*Id.* at 82.)

- "Some low functioning alternative program clients likely do not need the same level of security as other MSOP clients." (*Id.* at 82.)

---

3       The Court notes that the term "low functioning" is not the Court's term, but that used by the Office of the Legislative Auditor and perhaps, as reported, MSOP clinical management. The term "low functioning" is not a useful or descriptive term for any individual. Its imprecision leaves biased impressions and feeds stereotypes about the people who are being referenced. In the Court's many years of personal and professional experience working with disability issues in cases and people with various disabilities, the Court notes that this terminology does not appear or is recognized in the professional literature. Individuals who are not progressing through the program levels at MSOP may be experiencing a range of conditions such as a learning disability, some type of intellectual disability, or some co-occurring conditions.

- "There are clients who, due to age or disability, could likely be managed in alternative settings to MSOP facilities." (*Id.* at 88.)

- "We read some files of clients whose crimes were exclusively against other children when they themselves were juveniles. These clients were sometimes originally given diagnoses of pedophilia. Some clients in this situation have had their diagnoses changed because, as adults, they do not have a persistent attraction to children." (*Id.* at 89.)

The OLA Report includes the following recommendations:

- "MSOP should reassess its existing residents to determine which residents would be suitable for placement in an alternative setting. The plan presented to the 2012 Legislature should provide information on this reassessment, including the rationale for determining why certain types of residents would be suitable for an alternative commitment setting and a detailed description of the alternative settings being proposed for various groups." (OLA Report at 46.) The OLA noted that "[s]ome might argue that outside experts should be used to do this assessment, since they might be more objective in their assessments." (*Id.*)

- "MSOP should develop and implement a plan for identifying when certain low functioning alternative program clients who are not cognitively able to complete treatment can be managed in a less restrictive setting. MSOP should petition the Special Review Board (SRB) for transfer or provisional discharge of these clients to an alternative setting." (*Id.* at 83.)

- "MSOP should develop and implement a plan for managing transferred or provisionally discharged low functioning alternative program clients in an alternative setting." (*Id.* at 83.)

Also, in its final recommendations, the Task Force states the following:

> Civil commitment of persons whose offending behavior occurred while a juvenile and individuals with developmental disabilities present special issues that are not adequately addressed by current law and practices. Special criteria and/or procedures should be developed to ensure such persons are appropriately treated in the commitment system.

(Task Force Report at 3-4.)  The Task Force also states that "[n]o person should be civilly

committed based solely on behavior that occurred while that person was a juvenile."  (*Id.*

at 4.)

In commencing their work pursuant to the Court's February 20, 2014 Order, the

Rule 706 experts toured the MSOP facilities, began interviewing patients and staff at

each facility, and began their review of case files.  After learning of Terhaar's and

Bailey's situations, and after reviewing Terhaar's and Bailey's files, the Rule 706 experts

agreed that Terhaar's and Bailey's cases should be brought to the Court's attention

(consistent with the February 20, 2014 Order).[4]  (*See* Doc. No. 427 at 72 ("The experts'

work shall begin with, but will in no way be limited to, the following: . . . iv. Identifying

residents who are not receiving appropriate services and making recommendations

related thereto.").)  After raising their concerns with respect to Terhaar and Bailey

specifically, and identifying those individuals as being in need of immediate court action,

the Rule 706 experts volunteered to draft interim written reports on Terhaar and Bailey,

explaining their findings and conclusions to the Court and respective counsel.  Upon

---

[4]     The Rule 706 experts testified that they were shocked to find that Terhaar was at
MSOP and they were shocked to find Bailey's situation with respect to her treatment and
her living conditions.  Consequently, they brought these two cases to the Court's
attention because the experts thought they needed immediate action.  (Doc. No. 569
("July 14 Tr.") at 108, 139, 142-43.)

receipt, the interim reports were promptly provided simultaneously to the parties by the Court's Technical Adviser.[5]

In their report dated May 18, 2014, the Rule 706 experts provide a summary and discharge recommendation for Terhaar. (Doc. No. 468, Ex. 1.) The experts explain that Terhaar has "no adult criminal history" and was 19 years old when committed to MSOP. (*Id.* at 1.) According to the experts, Terhaar's commitment to MSOP "was as a result of behavior that he engaged in between the ages of 10 and 14." (*Id.*) Terhaar's file also apparently makes reference to incidents that occurred while he was in juvenile placement facilities, and for which no charges were filed against him. (*See id.* at 1-2.) The experts opine that it "is likely" that Terhaar's "history of general delinquency," including "fighting, running away," and "engaging in rule violating behaviors," contributed to his commitment to MSOP. (*Id.* at 2.) In their report, the experts ultimately conclude that:

> Mr. Terhaar has no adult criminal history. The sexual offending behavior leading to his indefinite placement at MSOP occurred while he was a juvenile only. There is good reason to believe that these sexual offenses were influenced by his own history of sexual victimization and a lack of understanding as to how to deal with his trauma. These and other problematic behaviors were likely exacerbated by his ADHD status and untreated complex trauma. Overall, there is little evidence to suggest that Mr. Terhaar is a dangerous sexual offender who poses a significant risk to public safety. As such, the panel unanimously agrees that Mr. Terhaar should be unconditionally discharged from MSOP.

(*Id.* at 4.) The experts further identify a family member with whom Terhaar would be welcome to live and work upon discharge. (*Id.*) Additionally, the experts state that

---

[5]     The report on Terhaar was received first and provided to the parties on May 30, 2014. Thereafter, the report on Bailey was received and provided to the parties on or about June 6, 2014.

Terhaar "has been medication compliant since arriving at MSOP." (*Id.* at 2.) They also note that "[i]t appears that Mr. Terhaar completed treatment related to his sexual offending history prior to placement at MSOP" and that "[i]t is unlikely that he requires additional intervention in this regard." (*Id.*)

In support of their conclusions, the experts discuss Terhaar's pertinent history and treatment participation at MSOP. (*Id.* at 2-3.) The experts also highlight risk assessment processes for juveniles and state the following:

> The literature on sexual offender risk assessment is clear that juveniles are not just "small adults"; specialized tools and methods are required for use with this population. Research also shows a strong effect of aging on risk in the juvenile population, in that most sexual offending committed by juveniles is linked more to development than to deviance, *per se*. Use of actuarial methods is common amongst adult sexual offenders, but the literature is cautionary with respect to the use of such methods with youth. In particular, those tools that have been developed for use with juveniles have only short-term predictive validity; there are no tools in common use that profess to provide long-term predictive validity in juveniles.

> It is also important to note that research on juvenile sexual offenders suggests that they have low recidivism rates and that they are more similar to other justice-involved juveniles than adult sexual offenders. In fact, most juveniles who engage in sexually abusive behaviors do not continue to offend sexually during adulthood (only 4.3% are arrested for a sexual offense as an adult). This finding is most likely due to the fact that juvenile offending behaviors are driven by different issues than those that drive adults to commit sexual offenses (e.g., more opportunistic than predatory, curiosity based, related to social problems, less compulsive). Moreover, juveniles are more amenable to change than adults and, as such, those who engage in sexually abusive behaviors during youth are more responsive to interventions.

(*Id.* at 3.)[6]

---

[6]    The Young Adult Unit houses twenty-four patients between the ages of eighteen and twenty-five, "who require specialized treatment programming due to emotional

(Footnote Continued on Next Page)

In a report dated June 4, 2014, the Rule 706 experts provide a summary and recommendation for transfer or provisional discharge for Rhonda Bailey, the only woman civilly committed to MSOP. (Doc. No. 481, Gustafson Decl. ¶ 3, Ex. A.) Bailey has been committed since 1993, and since 2008, she has been housed on the St. Peter campus of MSOP as the only female on a unit of all male high risk sexual offenders.[7] (*Id.* at 1.) As it stands, she "attends sex offender treatment and other programming and activities in groups in which she is the only female." (*Id.*)

According to the experts, Bailey's "sexual offending is no doubt in reaction to the severe emotional, physical, psychological, and sexual abuse she experienced as a child, adolescent, and young adult." (*Id.* at 6.) The experts explain Bailey's "chaotic and extremely traumatic upbringing," including that she was physically and sexually abused by several of her male family members beginning at the age of five or six. (*Id.* at 1.) While at MSOP, the experts point out that Bailey has been consistently diagnosed with multiple paraphilias. (*Id.* at 3.) She has also been "diagnosed with Intellectual Disability (previously diagnosed as Mild Mental Retardation), . . . has a full scale IQ of 66," and

---

(Footnote Continued From Previous Page)

immaturity and vulnerability." (Doc. No. 380 at 12-13 (citing Doc. No. 385, Hébert Aff. ¶ 86).)

[7]     In 2008, the Department functionally separated MSOP from State Operated Services, and as a result, thirty-three MSOP clients who had been placed at the Minnesota Security Hospital ("MSH") because they experience varying degrees of cognitive impairment, including Bailey, were moved from the Special Needs Services division of the MSH to MSOP. (Doc. No. 496, Johnston Aff. ¶¶ 2-4.)

"has a long history of depression dating to age seven or eight." (*Id.*) The experts also

acknowledge the difficulties that Bailey presents, including that "[s]he has poor

boundaries with peers and with staff," she has been "viewed by various staff as

'predatory' relative to sexual contact with 'vulnerable' male and female adult patients in

shared secure treatment settings," "[s]he engages in sexualized and aggressive

interactions with her peers and staff, including sexually assaulting other adult clients by

engaging in oral sex and intercourse while at MHS and sexually grabbing or touching

peers at MSOP." (*Id.* at 4.)

> The experts note, however, that:
>
> [t]here appears to be no case conceptualization in the record that recognizes
> that Ms. Bailey's years of sexual abuse and trauma may have greatly
> impacted or resulted in her sexualized behavior as an adult. According to
> Ms. Bailey's report and in review of the record spanning over two decades,
> she has not had the opportunity to address the years of neglect, physical,
> and sexual abuse and the associated trauma she experienced as a child.

(*Id.* at 2.) The experts also note that "[t]hroughout her records, and in our interview,

[Bailey] reported symptoms consistent with Post Traumatic Stress Disorder (PTSD), but

only recently has this diagnosis been explored by the MSOP psychiatrist." (*Id.* at 4.) In

addition, they state that "[t]here is no evidence to suggest that there has been any

consultation or incorporation of specialized sexual offender treatment for females, or

references that procedures supported by contemporary research and practice have been

implemented." (*Id.* at 5.) The experts also met with then MSOP psychiatrist Dr. Beth

Johnson, who reported that Bailey was "a 'delight' to work with and that she believed

that she was not properly treated for her trauma." (*Id.*)

The experts state that "[r]esearch suggests that the risk factors and protective factors we know to be related to male sexual offenders may not be relevant to female sexual offenders," and opine that "the treatment program (and [Bailey's] attendance with male sexual offenders) is not adequately addressing her issues or criminogenic needs." (*Id.* at 5-6.) In support, the experts highlight the risk assessment differences between men and women:

> The literature on sexual offender risk assessment is clear that women are different from their male counterparts. Research suggests that female sexual offenders account for 2% to 5% of all sexual offenders. As a group, male sexual offenders sexually reoffend at an average rate of approximately 15% over five to seven years of follow-up in the community (Hanson & Morton-Bourgon, 2005). In comparison, female sexual offenders sexually reoffend at about 2% on average, over a similar time period (Cortoni et al., 2010). At present, there are no specialized tools or methods for use with this population beyond measures of general psychological functioning and risk for general criminality (e.g., LSI-R, LS-CMI). Although use of actuarial methods is common amongst male sexual offenders, there is no literature supporting the use of such methods with females. The development or use of one would suffer from severe limitations/inaccuracy given the extremely low base rates of female sexual offender recidivism. Additionally, frameworks for sexual psychodiagnostics (e.g., paraphilias, as defined by DSM-5) are almost entirely driven by behavioral concerns in men.

(*Id.* at 7.) The experts also note that "the standard across programs, including civil commitment programs like MSOP, is to separate men and women in the environment and in treatment."[8] (*Id.*) The experts state that:

---

[8]    The experts note that at MSOP, particularly in Phase II where Bailey is, "group members shar[e] the details of their offending, which may trigger symptoms of Ms. Bailey's PTSD." (*Id.*) They also note that "[t]here is no evidence that the clinical staff at MSOP have received specialized training for working with female sexual abusers, including the treatment approach that might be most effective." (*Id.*)

> While not entirely impossible, it is highly unlikely that a female would be in possession of not one, but five separate paraphilias . . . , as stated in her current diagnoses in the MSOP record. Rather, there are clearly other possibilities regarding the etiology of Ms. Bailey's sexual difficulties, including, as her psychiatrist Dr. Johnson suggests, an untreated bipolar disorder. All available empirical evidence leads to questions about whether someone like Ms. Bailey meets criteria for civil commitment and to concerns that the current treatment program not only fails to meet her needs, but is iatrogenic due to her trauma history and probable PTSD.

(*Id.*) The experts also opine that Bailey "would greatly benefit from trauma-specific and gender-specific assessment and treatment designed to address her history of sexual victimization and the losses she has experienced . . . , in addition to opportunities for gender sensitive socialization," and that "[s]he may benefit from EMDR and/or Dialectical Behavior Therapy (DBT), as specific interventions for addressing PTSD or other trauma symptoms and emotion regulation and self-injurious behavior, respectively." (*Id.* at 6.) While they agree that Bailey "remains at high risk for future sexually inappropriate conduct," and that "the risk she poses continues to require management and supervision," they have "grave concerns . . . regarding the means by which Ms. Bailey's clinical presentation and risk are currently being addressed and managed." (*Id.*)

Ultimately, the Rule 706 experts conclude that "Ms. Bailey's current housing and treatment scenario is unprecedented in contemporary sexual offender treatment and management; even more so in regard to sexual offender civil commitment." (*Id.* at 7.) They have "exceptionally grave concerns that Ms. Bailey is being housed and treated in a

facility built for men and populated by men."[9]  (*Id.*)  They, as a unanimous group, opine

that "if appropriate treatment was provided in a non-all-male setting, and she was

correctly medicated, Ms. Bailey may be able to be managed in a less secure setting."  (*Id.*

at 6.)  The experts opine that she "is quite inappropriately placed at the MSOP St. Peter

site," and they "believe strongly that she should be relocated to a facility where she can

receive care and treatment that is sensitive to both her gender and her clinical

presentation."  (*Id.* at 8.)  In addition, they opine that "[c]ontinued placement at MSOP is

iatrogenic to Ms. Bailey, in that this placement likely exacerbates, rather than ameliorates,

the issues that influence her inappropriate sexual behavior."  (*Id.*)  They unanimously

recommend that Bailey be transferred or provisionally discharged from MSOP "to a

supervised treatment setting that can meet her special needs for treatment (e.g., sexual

offending, personal victimization, trauma, mental health maintenance) that is gender

responsive, trauma informed, and that provides for socialization opportunities and

relationship development with other women." (*Id.* at 1.)  They also recommend that "it

would be ideal if the alternate setting could provide gender-specific sexual offender

treatment either individually or in group, but not with male sexual offenders.  (*Id.*)

     In light of the interim report with respect to Terhaar, as well as the Court's prior

order on Defendants' motion to dismiss and Plaintiffs' requests for injunctive and

declaratory relief (Doc. No. 427), on June 2, 2014, the Court ordered Defendants to show

---

[9]      The experts note that the Standard Minimum Rules for the Treatment of Prisoners
(SMR) of the United Nations, to which the United States is a signatory, state that women
should be detained separate from men.  (*Id.* at 8.)

cause why Terhaar's continued confinement is not unconstitutional and why Terhaar should not be immediately and unconditionally discharged from MSOP, as unanimously recommended by the Rule 706 experts. (Doc. No. 468.) On June 4, 2014, Plaintiffs filed a Motion for Declaratory Judgment and to Immediately Discharge E.T. from Civil Commitment. (Doc. No. 469.) Then, upon receipt of the experts' report on Bailey, Plaintiffs filed a Motion to Immediately Transfer R.B. to an Appropriate Treatment Facility. (Doc. No. 478.) Plaintiffs' counsel also filed separate habeas petitions on behalf of Terhaar and Bailey seeking Terhaar's immediate and unconditional discharge from MSOP and Bailey's immediate transfer "from MSOP to a structured, supervised residential facility where she can begin to address her issues in a more appropriate and clinically relevant environment[.]" (Civil No. 14-2002, Doc. No. 1; Civil No. 14-2362, Doc. No. 1.)

At some point after receiving the Rule 706 experts' report on Terhaar, MSOP's internal licensed psychologists Anne Pascucci and Lauren Herbert jointly prepared a Sexual Violence Risk Assessment Report, which issued on June 10, 2014. (Doc. No. 486, Johnston Aff. ¶ 7, at Ex. 2.) Pascucci and Herbert concluded that Terhaar does not meet the statutory requirements for being unconditionally discharged from MSOP. (*Id.* at 21.) Terhaar's Treatment Team also produced a report dated June 10, 2014, which concludes that "[p]lacement in a setting outside the secure perimeter, similar to Community Preparation Services, that maintains adequate structure and supervision while providing opportunities for gradual reintegration to society would be appropriate." (Doc. No. 486, Johnston Aff. ¶ 6, Ex. 1 at 9.)

After the Court's Order to Show Cause, the Commissioner requested that

independent licensed psychologist Amanda Powers-Sawyer evaluate Terhaar and provide

an opinion on his suitability for discharge from commitment. (Doc. No. 485 at 16.)

Dr. Powers-Sawyer issued a report dated June 10, 2014, concluding that:

> it is [her] professional opinion that Mr. Terhaar meets criteria for
> unconditional discharge from MSOP evidenced by not meeting statutory
> criteria for posing a level of dangerousness to the public with respect to
> sexual matters. He is not in need of residential adult sex offender treatment
> and supervision. He is capable of making an acceptable adjustment to
> society. He may benefit from ongoing individual psychotherapy on an
> outpatient basis to continue addressing symptoms related to posttraumatic
> stress disorder.

(Doc. No. 486, Johnston Aff. ¶ 8, Ex. 3 at 12-13.)

On June 10, 2014, MSOP Executive Director Nancy Johnston petitioned for

Terhaar's transfer to Community Preparation Service ("CPS"), a highly supervised,

unlocked facility within MSOP that is designed to provide clients in the advanced stages

of treatment the opportunity to prepare for successful reintegration into the community.

(*See* Doc. No. 486, Johnston Aff. ¶ 9, Ex. 4; Doc. No. 385, Hébert Aff. ¶ 44.)[10] Johnston

later testified that she petitioned the SRB in response to the Rule 706 experts' report.

---

[10]     A hearing was held by the Special Review Board ("SRB") on this petition on
July 2, 2014, and the SRB issued its decision on July 8, 2014, recommending to the
Minnesota Supreme Court Appeal Panel ("SCAP") that Terhaar be immediately placed
"into a modified Community Preparation Services program adapted to his particular
needs and sufficiently monitored to provide a reasonable degree of public safety." (Doc.
No. 559, July 14-15 Hr'g, Ex. 96.) Johnston testified that if all goes well and Terhaar is
transferred to CPS after approval from the SCAP, and that if his initial month or so of
transition goes well, that she would initiate a new petition for Terhaar requesting his
provisional discharge. (*Id.* at 328.) She estimated, again if all goes well, that this petition
for provisional discharge would be initiated this year, in 2014. (*Id.* at 329.)

(Doc. No. 570 ("July 15 Tr.") at 307-08.)  She explained that the petition for Terhaar was unusual and that it was not normal for MSOP to support a petition for someone in Phase I to be moved to CPS; in fact, this was the only request for reduction in custody of this kind that she was aware of.  (*Id.* at 312, 324-25.)  Johnston also testified that she "do[es] not disagree" with the Rule 706 experts' opinion that Terhaar is a low risk to sexually re-offend.  (*Id.* at 336.)

On June 11, 2014, the day after Johnston petitioned for Terhaar's transfer to CPS, Pascucci and Herbert issued a Sexual Violence Risk Assessment Addendum, in which they additionally opined that Terhaar does not meet the statutory requirements for a reduction in custody to transfer to CPS, thus taking a position contrary to MSOP Executive Director Johnson.  (Doc. No. 491, Brennaman Supp. Aff. ¶ 2, Ex. A.)

The Court held a Show Cause hearing and a hearing on Plaintiffs' motions on June 25, 2014, wherein counsel for both sides argued their respective positions.  (Doc. No. 549.)  Defendants maintained that Terhaar "is still a danger to the public, he is still in need of inpatient treatment and supervision, and is not yet capable of making an acceptable adjustment to open society."  (Doc. No. 485 at 1.)  Therefore, they oppose unconditional discharge for Terhaar at this time.  (*Id.* at 2.)  Defendants asked the Court to allow the Minnesota statutory process for reduction in custody and discharge from commitment to be followed and requested the opportunity to explore the basis of the Rule 706 experts' report in an evidentiary hearing.  (Doc. No. 485 at 3.)  Consistent with the Court's remarks from the bench, the Court set an evidentiary hearing for July 14-15, 2014, to allow the parties to explore the basis of the reports and affidavits filed on Terhaar and

Bailey and to present other evidence relating to the experts' reports. (Doc. Nos. 516, 550.)

On July 14-15, 2014, the Court held the evidentiary hearing and it received testimony from the Rule 706 experts and Executive Director Nancy Johnston, and received exhibits into evidence. (Doc. Nos. 557, 558, 559.)[11]

## DISCUSSION

### Motions Regarding Eric Terhaar

On June 4, 2014—two days after the Court ordered Defendants to show cause why Terhaar's continued confinement is not unconstitutional and why Terhaar should not be immediately and unconditionally discharged from MSOP—Plaintiffs renewed their motion for a declaratory judgment to the extent that they assert that Minn. Stat. § 253D is unconstitutional as applied because it does not contain a requirement for any automatic independent review of an individual's need to be civilly committed.[12] (Doc. No. 470 at 2.) Specifically, Plaintiffs requested in their new motion an order requiring "(1) Defendants to immediately develop, and by June 1, 2015, implement, a policy providing for automatic and independent annual reviews of each Class member to

---

[11]     On July 2, 2014, Plaintiffs filed a Motion for the Creation of an Aftercare Plan for E.T. Pursuant to Minn. Stat. § 253D.35 (Doc. No. 526). Although the Court had originally intended to hear argument on July 15, 2014 on this motion, as well as on the habeas petitions, the Court indicated from the bench that it would take up those matters at a different time and allowed for supplemental briefing on Plaintiffs' Motion for the Creation of an Aftercare Plan for E.T.

[12]     Plaintiffs originally filed a Motion for Declaratory Judgment on November 19, 2013 (Doc. No. 360), which was denied without prejudice in the Court's February 20, 2014 Order. (Doc. No. 427 at 70.)

determine the need for continued commitment, and; (2) the immediate discharge of Mr. Terhaar from his civil commitment." (*Id.* at 3.) At the hearings, however, Plaintiffs' counsel clarified that he was only requesting a declaratory judgment at this time stating that Terhaar's continued detention at MSOP is unconstitutional and that he would reserve his arguments for a broader declaratory judgment request that would affect other class members at a later time. (July 15 Tr. at 354-56.) Plaintiffs' counsel also indicated that he was now only seeking a declaration of unconstitutionality and that he was not seeking an order requiring immediate discharge of Terhaar since it was his belief that such relief could only be granted through the habeas petition. (*Id.* at 354-55.) Regardless of how Plaintiffs' have limited their declaratory request, Defendants have opposed Plaintiffs' motion asserting various arguments for why declaratory relief is inappropriate and have argued that they have properly responded to the Court's Show Cause Order. (*See generally* Doc. Nos. 485, 509.)

The Declaratory Judgment Act provides in pertinent part that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, it is well-settled "that district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *see also, e.g.*, *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 126 (1968) (affirming that the

exercise of the power to grant declaratory judgments is discretionary); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942). The Supreme Court has explained that "[s]ince its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," and the Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton*, 515 U.S. at 286–87 (internal quotations omitted). "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id.* at 288.

Plaintiffs argue that, "[b]ased on the findings of the Rule 706 experts, who unanimously found that Mr. Terhaar is not a dangerous sexual offender and does not pose a significant risk to public safety, Mr. Terhaar no longer meets the constitutionally required criteria for civil commitment and his ongoing commitment violates his fundamental due process right to liberty." (Doc. No. 470 at 17.) With respect to the duration of a civil commitment, "the Constitution permits the Government . . . to confine [an individual] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones v. United States*, 463 U.S. 354, 370 (1983). Thus, as the Supreme Court held in *Foucha*, when a civilly committed person is no longer dangerous, he must be released. *See Foucha v. Louisiana*, 504 U.S. 71, 77-78

(1992).[13]  The continued confinement of a person who is not dangerous and in need of

further treatment renders the confinement not reasonably related to the stated purpose for

---

[13]    Discussing its previous holding in *Jones*, the Supreme Court stated in *Foucha*:

> We held, however, that "(t)he committed acquittee is entitled to release
> when he has recovered his sanity or is no longer dangerous," *id.*, at 368,
> 103 S. Ct., at 3052; *i.e.*, the acquittee may be held as long as he is both
> mentally ill and dangerous, but no longer.  We relied on *O'Connor v.
> Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L.Ed.2d 396 (1975), which
> held as a matter of due process that it was unconstitutional for a State to
> continue to confine a harmless, mentally ill person.  Even if the initial
> commitment was permissible, "it could not constitutionally continue after
> that basis no longer existed." *Id.*, at 575, 95 S. Ct., at 2493.  In the
> summary of our holdings in our opinion we stated that "the Constitution
> permits the Government, on the basis of the insanity judgment, to confine
> him to a mental institution until such time as he has regained his sanity or is
> no longer a danger to himself or society." *Jones*, 463 U.S., at 368, 370, 103
> S. Ct., at 3052, 3053.  The court below was in error in characterizing the
> above language from *Jones* as merely an interpretation of the pertinent
> statutory law in the District of Columbia and as having no constitutional
> significance.  In this case, Louisiana does not contend that Foucha was
> mentally ill at the time of the trial court's hearing.  Thus, the basis for
> holding Foucha in a psychiatric facility as an insanity acquittee has
> disappeared, and the State is no longer entitled to hold him on that basis.
> *O'Connor*, *supra*, 422 U.S., at 574-575, 95 S. Ct., at 2493-2494.

*Foucha*, 504 U.S. at 77-78 (footnote omitted).

In Minnesota, a patient cannot be completely discharged from MSOP unless "it
appears to the satisfaction of the judicial appeal panel, after hearing and recommendation
by a majority of the SRB, that the committed person is capable of making an acceptable
adjustment to open society, is no longer dangerous to the public, and is no longer in need
of inpatient treatment and supervision."  Minn. Stat. § 253D.31.  The Minnesota Supreme
Court has found that the discharge provisions of the civil commitment statutes to be
constitutional, but stated that a person can only be "confined for only so long as he or she
continues both to need further inpatient treatment and supervision for his sexual disorder
and to pose a danger to the public." *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995).
In other words, the Minnesota Supreme Court has indicated that discharge must be
granted if the individual is either no longer dangerous to the public or no longer suffers

(Footnote Continued on Next Page)

the commitment.  *See Kansas v. Hendricks*, 521 U.S. 346, 357 (1997) (citing *Foucha*, 504 U.S. at 80).  "Even if the initial commitment was permissible," a civil commitment may not "constitutionally continue after that basis no longer exist[s]."  *Foucha*, 504 U.S. at 77 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 565 (1975)).  By that reasoning, an individual who no longer meets the criteria for commitment should be entitled to release.

The court-appointed Rule 706 experts, who are unquestionably experienced in the field of sex offender civil commitment and treatment and who did a complete review of Terhaar's treatment file, which includes risk assessments and treatment information, unanimously agreed that it is unlikely that Terhaar requires further treatment at the MSOP and that "there is little evidence to suggest that Mr. Terhaar is a dangerous sexual offender who poses a significant risk to public safety."  (Doc. No. 468, Ex. 1 at 2, 4.)  Their testimony confirms the same.  (July 14 Tr. at 63, 99, 179; July 15 Tr. at 198, 221, 248-50.)  The experts specifically recommend that Terhaar "should be unconditionally discharged from MSOP."  (Doc. No. 468, Ex. 1 at 4; July 14 Tr. at 63.)  In addition, as her report reflects, independent licensed psychologist Amanda Powers-Sawyer agrees

---

(Footnote Continued From Previous Page)

from a mental condition requiring treatment.  (*Id.*)  This is consistent with *Foucha* and this Court's comments in its February 20, 2014 Order, stating that "it is constitutionally mandated that only individuals who constitute a 'real, continuing, and serious danger to society' may continue to be civilly committed to MSOP."  (Doc. 427 at 66 (citing *Hendricks*, 521 U.S. at 372).)  In addition, as this Court previously stated, "If the evidence demonstrates that MSOP systematically continues to confine individuals who are not 'a real, continuing, and serious danger to society,' then such confinement will be held unconstitutional."  (*Id.*)

with the Rule 706 experts' conclusions. (Doc. No. 486, Johnston Aff. ¶ 8, Ex. 3.) However, although not called to testify at the July 14-15, 2014 hearing,[14] the record does reflect that MSOP's internal licensed psychologists Anne Pascucci and Lauren Herbert jointly prepared a Sexual Violence Risk Assessment Report, in which they concluded that Terhaar does not meet the statutory requirements for being unconditionally discharged from MSOP. (Doc. No. 486, Johnston Aff. ¶ 7, Ex. 2 at 21.) But, at the hearing, MSOP Executive Director Johnston testified that she did not disagree with the experts who said that Terhaar was low risk for sexual reoffending, and she petitioned for his movement to CPS. (July 15 Tr. at 336.)

Although the evidence in the record thus far relating to Terhaar's confinement is quite compelling in his favor, the Court is reminded that the case pending before the Court is a Rule 23(b)(2) class-action case in which broad-based relief on behalf of the entire class is sought.[15] At present, liability has not yet been determined and the record has not yet been fully developed to support a declaration of unconstitutionality as to the

---

[14]     The Court notes that Defendants were not required to call witnesses in support of their position at the evidentiary hearing. The purpose of the hearing was for the parties to probe the various report and affidavit signatories as to the basis for their opinions. (Doc. No. 550 ("The evidentiary hearing scheduled for July 14 and 15, 2014, is limited in scope to evidence relating to the opinions of all individuals, including the Rule 706 experts, who have issued reports or filed affidavits on E.T. and R.B. in relation to the Karsjens § 1983 action.").)

[15]     Fed. R. Civ. P. 23(b)(2) states: "A class action may be maintained if Rule 23(a) is satisfied and if:  . . . (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"

commitment statutes' application to the presently defined class. While a district court has some discretion to order individual relief in a Rule 23(b)(2) class action, such individual determinations should be "incidental to class-wide issues." *Marshall v. Kirkland*, 602 F.2d 1282, 1295 (8th Cir. 1979). Usually this means that, in appropriate cases, a district court may "conduct additional proceedings *after* the liability phase of the trial to determine the scope of individual relief." *Id.* at 1296 (emphasis added) (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361 (1977)).

In addition, a court may render a declaratory judgment "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juvenile Div.)*, 518 F.2d 1160, 1163-64 (8th Cir. 1975) (quoting E. Borchard, *Declaratory Judgments*, 299 (2d ed. 1941)). Here, issuing a declaration that Terhaar's confinement is unconstitutional would not afford relief to the defined class, nor would it clarify or settle the issue of whether there are systemic problems with MSOP and its application of the commitment statutes.[16] Under these circumstances, the issuance of the

---

[16]     Although the evidence regarding Terhaar does not settle the issue, it does provide evidence supporting Plaintiffs' claim that the commitment statutes, because they fail to provide for an independent annual review of whether class members continue to meet the statutory requirements for commitment, result in a violation of the due process rights of those class members who continue to be committed to MSOP when they no longer meet the commitment criteria. As the Task Force noted, the "opportunity for periodic review of the need for continued confinement and commitment is critical to upholding civil commitment in light of a due process challenge." (Task Force Report at 14 (citing *In re*

(Footnote Continued on Next Page)

requested declaratory judgment would not serve the Act's intended purpose.  Further, by granting Plaintiffs' declaratory judgment motion with respect to Terhaar, the Court would not be providing "a comprehensive solution of the general conflict." *Hypro, Inc. v. Seeger-Wanner Corp.*, 292 F. Supp. 342, 344 (D. Minn. 1968) (stating that when determining whether to dismiss or stay a declaratory judgment action which is potentially cumulative of other litigation, "a court should seek to determine which of the two actions will serve best the needs of the parties by providing a comprehensive solution of the general conflict"); *see also id.* at 345 (stating that factors to be considered are "of judicial economy, informal comity between courts, cost and convenience to the litigants, and the possibility of vexatious conflict and overlap of multiple determinations of the same dispute").  In other words, the Court declines to exercise its discretion to grant specific relief to Terhaar at this time based on his individualized risk assessment because declaring his confinement unconstitutional would not "generate common answers apt to drive the resolution of this litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotations omitted).

Another reason why the Court declines to enter a declaration at this time is because it appears that an expedited petition for reduction of custody process is underway.  MSOP is supporting a petition for Terhaar's reduction in custody to CPS.  If,

---

(Footnote Continued From Previous Page)

*Blodgett*, 510 N.W.2d 910, 916 (Minn. 1994).)  The ultimate resolution of this claim, of course, will depend on a full presentation of all the evidence at the trial on the merits.

after Terhaar is transferred to CPS, the Executive Director files a petition supporting

Terhaar's unconditional discharge from MSOP, presumably an adequate remedy would

be had.  In other words, a determination by the SCAP approving Terhaar's discharge

would make unnecessary a declaratory judgment as to the constitutionality of Terhaar's

confinement.[17]  In addition, Plaintiffs' counsel has indicated that he may be initiating a

state habeas action on behalf of Terhaar as well.  "The existence of another adequate

remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R.

Civ. P. 57.  However, "a court, 'in the exercise of the discretion that it always has in

determining whether to give a declaratory judgment, may properly refuse declaratory

relief if the alternative remedy is better or more effective.'"  *Angora Enters., Inc. v.*

---

[17]     The Court notes that the Executive Director of MSOP testified that she, if all goes well with Terhaar's transition to CPS, would start the petitioning process for Terhaar to be provisionally discharged in 2014, not unconditionally discharged.  Everyone, including Defendants, Plaintiffs, the Rule 706 experts, and the Court, is in agreement that Terhaar, who has been institutionalized since he was approximately ten years old, will need individualized transition services to help best reintegrate him into his community.  The dispute lies in whether Terhaar should receive those services from community providers outside of MSOP's control, or whether Terhaar should receive those services from MSOP while housed at CPS.  However, nothing precludes the Executive Director from reevaluating the situation upon Terhaar's reduction in custody to CPS to determine that a petition for unconditional discharge would be more appropriate, especially after an aftercare plan is developed that includes community services appropriate for Terhaar.

Defendants oppose Plaintiffs' Motion for the Creation of an Aftercare Plan for E.T. Pursuant to Minn. Stat. § 253D.35 (Doc. No. 526), to the extent that they disagree with any legal merit to the motion.  However, they have agreed, nonetheless, to provide aftercare.  (Doc. No. 539 at 1-2, 7; Doc. No. 567 at 5.)  Therefore, it appears that Plaintiffs' motion is moot.  Nonetheless, if Defendants do not create an aftercare plan for Terhaar as they have represented that they will, Plaintiffs can renew their motion. Therefore, Plaintiffs' Motion for the Creation of an Aftercare Plan for E.T. Pursuant to Minn. Stat. § 253D.35 (Doc. No. 526), is denied without prejudice as moot.

*Condo. Ass'n of Lakeside Vill., Inc.*, 796 F.2d 384, 387–88 (11th Cir. 1986) (quoting 10A

C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure 2d* § 2758); *accord*

*MacMillan–Bloedel, Inc. v. Firemen's Ins. Co. of Newark*, 558 F. Supp. 596, 599 (S.D.

Ala. 1983) ("Where another remedy would be a more effective or appropriate remedy,

the court may properly decline to assume jurisdiction."); *see also Cunningham Bros. v.*

*Bail*, 407 F.2d 1165, 1168 (7th Cir. 1969) (concluding that more effective relief was

obtainable by other procedures); *New York Life Ins. Co. v. Roe*, 102 F.2d 28, 31 (8th Cir.

1939) (denying declaratory relief where traditional remedy was available).  The pendency

of Terhaar's current petition, and MSOP's affirmance that it will support a future,

expedited petition for discharge, does present a more effective and efficient forum for the

resolution of Terhaar's particular situation.  *Cf. United States Fidelity and Guaranty Co.*

*v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263-64  (8th Cir. 1994) (concluding district court

did not abuse its discretion in deciding to abstain from declaratory-judgment action when

parallel state-court action was pending); *Travelers Indem. Co. v. Winmill*, 294 F. Supp.

394, 397 (D. Minn. 1968) ("The problem [of determining whether to exercise a court's

declaratory judgment discretion] should be appraised in the light of common sense,

having regard to federal-state relations, comity between courts of concurrent jurisdiction,

the potentials of the respective systems for expert and comprehensive solution, and

factors such as cost and convenience to the public as well as to the parties.").  If MSOP

was not in agreement to expedite this matter, and if the state process itself was not

proceeding expeditiously with respect to moving Terhaar along, then this Court might be

deciding this issue differently.  Therefore, in the event that Terhaar's petitions are not

expedited, the Court will not hesitate to either set a firm time limit or take up Terhaar's relief petition immediately after trial, which itself will be expedited as explained further below. Accordingly, the Court declines to exercise its discretion in issuing a declaration at this time and denies Plaintiffs' motion for declaratory judgment without prejudice.

### Motion Regarding Rhonda Bailey

After receipt of the Rule 706 experts' report on Rhonda Bailey, Plaintiffs' counsel filed a "Motion to Immediately Transfer R.B. to an Appropriate Treatment Facility." (Doc. No. 478.) This motion was later amended to clarify that Plaintiffs are requesting through this motion an order "declaring that Rhonda Bailey is being held in an unconstitutional manner[.]" (Doc. No. 578 at 2.) Plaintiffs' motion raises two primary issues. First, whether it is constitutional for Defendants to not provide a less restrictive alternative for Bailey's confinement. As alleged in the Second Amended Complaint, "[t]he only MSOP facilities are the secure treatment locations at Moose Lake and St. Peter," and "MSOP does not provide for any less restrictive alternatives to confinement at Moose Lake or St. Peter, such as halfway houses or other less secure facilities." (Doc. No. 301, Second Am. Compl. ¶ 68.) And second, Plaintiffs' motion raises the issue of whether the treatment provided to Bailey is so inadequate that it violates her constitutional rights.[18]

---

[18]     Defendants continue to maintain that the proper legal standard to apply to Plaintiffs' inadequate treatment claims is whether "MSOP's treatment of a particular patient 'shocks the conscience.'" (Doc. No. 495 at 10); *see Strutton v. Meade*, 668 F.3d 549, 557-58 (8th Cir. 2012). As the Court has previously noted, prior to *Strutton*, the Eighth Circuit applied the *Youngberg* professional judgment standard to a sex offender's

(Footnote Continued on Next Page)

In response to Plaintiffs' motion, Defendants assert that they believe the

Department has provided Bailey with appropriate sex-offender treatment and care while

at MSOP. (Doc. No. 495 at 1.) At the same time, however, Defendants also represent

that they are "willing to make improvements to [Bailey's] care and treatment based on

the Rule 706 Experts Report, and ha[ve] reached out to experts in the field of female

sex-offender treatment to find ways to provide better treatment and care to [Bailey] in her

current placement," and they are "willing to explore options to transfer [Bailey] to

---

(Footnote Continued From Previous Page)

right to treatment claims. *See Bailey v. Gardebring*, 940 F.2d 1150, 1153-54 (8th Cir. 1991). Again, the Court need not decide the applicable standard for Plaintiffs' right to treatment claims at this time. However, the Court does note that, regardless of the applicable standard, the record before the Court at this time does contain evidence supporting both standards. (*See* Doc. No. 481, Gustafson Decl. ¶ 3, Ex. A (Rule 706 expert report on Bailey) at 5 ("There is no evidence to suggest that there has been any consultation or incorporation of specialized sexual offender treatment for females, or references that procedures supported by contemporary research and practice have been implemented."); *id.* at 6 (stating they have "grave concerns . . . regarding the means by which Ms. Bailey's clinical presentation and risk are currently being addressed and managed"); *id.* at 7 ("[T]he standard across programs, including civil commitment programs like MSOP, is to separate men and women in the environment and in treatment."); *id.* at 7 (concluding that "Ms. Bailey's current housing and treatment scenario is unprecedented in contemporary sexual offender treatment and management; even more so in regard to sexual offender civil commitment"); *id.* at 8 (opining that Bailey "is quite inappropriately placed at the MSOP St. Peter site" and "[c]ontinued placement at MSOP is iatrogenic to Ms. Bailey, in that this placement likely exacerbates, rather than ameliorates, the issues that influence her inappropriate sexual behavior," and stating they "believe strongly that she should be relocated to a facility where she can receive care and treatment that is sensitive to both her gender and her clinical presentation"); *see also* July 14 Tr. at 108, 139, 142-43 (testifying that the Rule 706 experts were shocked to find Bailey's situation with respect to her treatment and her living conditions).)

another facility."[19]  (*Id.* at 1-2)  They note that they do not believe that there are "suitable

transfer options at this time that meet both [Bailey's] treatment and safety needs."  (*Id.* at

2.)

The Rule 706 experts testified that if they were asked to, and if the State provided

sufficient funds, they could create or find a residential and treatment situation for Bailey

that would satisfy their professional opinion of what is needed for her.  (July 14 Tr. at

107-08, 132, 141.)  And counsel for Defendants reiterated their "willingness to have a

conversation . . . about different placement for Ms. Bailey," and stated that they

continued to reach out to various experts on female sex offender treatment.  (July 15

Tr. at 367-68.)  After the hearings, counsel for both parties have continued to talk about

reaching an agreement on the proper placement and treatment for Bailey, and Defendants'

counsel has notified the Court that they are, in fact, consulting with experts in the field of

female sex offender treatment as to what would be the most appropriate placement and

treatment for Bailey.  In light of these pending discussions, and the likelihood that an

agreement on Bailey's transfer (or provisional discharge) would moot Plaintiffs' pending

motion with regard to Bailey, the Court denies the motion at this time without prejudice

(and stays Bailey's habeas case) to allow the parties an opportunity to find a just

resolution that would appropriately meet Bailey's individual residential and treatment

---

[19]     The Court notes its frustration with the fact that Defendants are only now
"reaching out" and "exploring options" for Bailey, after receiving the Rule 706 expert
report and Plaintiffs' motion, when Bailey has been in their treatment program for over
twenty years.

needs.  If an agreement is not reached in a timely manner, the Court will, like with

Terhaar, take up Bailey's relief petition immediately after trial.

## CONCLUSION

Although Defendants were responsive to the experts' discovery of the fact that a

juvenile offender like Terhaar was being held indefinitely at MSOP despite, in the experts'

opinion, his lack of dangerousness or need for sex offender treatment, this does not

explain how this troubling state of affairs came about.  It is obvious that but for this

litigation, Terhaar, who was stuck with hundreds of other persons in Phase I of MSOP,

would likely have languished for years in the prison-like environment of

MSOP-Moose Lake without any realistic hope of gaining his freedom.[20]  And of course it

is of great concern to the Court that this may not be an aberrant case of system failure but

is symptomatic of a larger systemic problem of constitutional concern.  This concern is

heightened by the experts' opinion about the grossly inadequate—even shocking—

---

[20]     The Court notes its growing concern that MSOP is perhaps not doing its part in making sure people are properly placed in various phases of its program, as the experts testified that Terhaar's case is "not an extreme outlier, but rather is representative of the cases that [the experts] will be reporting on with respect to . . . juveniles."  (July 14 Tr. at 109, 123; July 15 Tr. at 216.)  The OLA Report points out that, in March 2011, when the Report was issued, "[o]nly 7 percent of MSOP clients are in the last of the program's three phases of treatment."  (OLA Report at 71.)  Further, the Court's concern is supported by the Task Force Report, as the Task Force stated that it was "acutely aware that one of the most striking features of the MSOP as it has operated over time is the negligible number of releases from the program."  (Task Force Report at 16.)  The Task Force also said that "[s]ignificant modifications of the process by which the need for continued commitment is determined and the standards for evaluating that need will address the serious issues of duration of commitment and the absence of meaningful release from commitment."  (*Id.*)

treatment of Bailey, the lone female sex offender in the otherwise all male MSOP. The Court also is mindful of the fact that Defendants have not presented their own evidence at trial to defend the constitutionality of MSOP, and the Court is keenly aware of its responsibility not to prejudge the merits of this class action. But the Court is obligated pursuant to the Federal Rules of Civil Procedure to expedite the trial on the merits and allow a full record on the important constitutional issues affecting this certified class to be developed. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2950 (3d ed. 2014) ("It long has been recognized that an accelerated trial on the merits often is appropriate when a preliminary injunction has been requested.[] If a Rule 65(a) injunction is . . . denied, a quick disposition of the merits shortens the period in which plaintiff may be threatened by irreparable harm. In either situation the urgency that is characteristic of cases involving preliminary-injunction applications makes a rapid determination of the merits especially important.") Therefore, counsel for the parties are required to attend the scheduling conference set for August 21, 2014, with 2014 trial dates in mind.

While the Court will exercise its discretion to decline entering any declaratory judgment at this time, it will, if necessary, "conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Marshall*, 602 F.2d at 1296 (quotations omitted). And it will do so promptly. The Court recognizes that while some injunctive relief may ultimately be awarded to both the class and individual members of the class, ultimate release from the detention at the MSOP may be required through habeas or procedures that may be mandated under 42 U.S.C. § 1983. Civil rights

actions such as this one are an appropriate vehicle for challenges to civil commitment

statutes, and declaratory and prospective injunctive reliefs are available in such cases. [21]

---

[21]       Simply put, Courts have allowed a § 1983 challenge when "'release was neither asked nor ordered.'" *Chancery Clerk of Chickasaw County v. Wallace*, 646 F.2d 151, 157 (5th Cir. 1981) (quoting *Gerstein v. Pugh*, 420 U.S. 103, n.6 (1975) ("Because release was neither asked nor ordered, the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy.")); *see also Goldy v. Beal*, 429 F. Supp. 640, 644 (M.D. Pa. 1976) ("Because plaintiffs in this case do not request release from custody, they are not required to proceed by habeas corpus."). And in a challenge to a civil commitment statute, plaintiffs may seek a declaration that the statute under which they were committed is unconstitutional and an injunction enjoining defendants from enforcing and executing the statute in its present version. *See Goldy*, 429 F. Supp. at 645-46. Such was the case in *Wallace*, as the Fifth Circuit explained:

> What the plaintiffs ask in this case is a constitutional evaluation under § 1983 of the procedures under which they were committed to state mental institutions and under which they are now held in state mental institutions. If constitutional defects in such procedures are found, then by virtue of the declaratory judgment which plaintiffs seek, each confined class member would become entitled to a review of his ongoing confinement under corrected procedures. If the District Court finds aspects of the Mississippi commitment procedures unconstitutional, it can suggest the basic constitutional requirements which must be met in dealing with involuntary confinement in mental institutions. If the appropriate legislative body does not within a reasonable time provide such procedures the District Court may entertain applications for relief.

646 F.2d at 158.

      In addition, the line of cases after *Preiser v. Rodriguez*, 411 U.S. 475 (1973), has demarcated relief that is available under § 1983 to individuals confined by the state under procedures claimed to be constitutionally infirm. *E.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005) ("[P]risoner's claim for an injunction barring *future* unconstitutional procedures did *not* fall within habeas' exclusive domain." (citing *Edwards v. Balisok*, 520 U.S. 641, 648 (1997)); *id.* at 82 (stating that the § 1983 prisoner action that would result in new parole hearing or new eligibility review may proceed because it would not "necessarily spell speedier release"); *Heck v. Humphrey*, 512 U.S. 477, 482-83 (1994) (stating that a § 1983 action that would not determine the invalidity of an outstanding criminal judgment may proceed to challenge "wrong procedures" on denial of good-time

(Footnote Continued on Next Page)

Yet, by both expediting the trial, and by allowing the state petitioning process to go forward (on an expedited track as has been requested by the parties), relief through habeas may ultimately be mooted. Federal habeas, however, may be necessary if either the relief is not mooted or if the State does not proceed with speed. It may also be that, apart from habeas, declaratory and prospective injunctive relief may be granted regarding the constitutionality of the Minnesota sex offender commitment statutes on their face or as applied. Because of the various tracks underway that will directly address relief for Terhaar and Bailey, the Court now stays the federal habeas cases (Civ. No. 14-2002 (DWF/JJK) and Civ. No. 14-2362 (DWF/JJK)), so as not to interfere with the class-action trial and state processes. The Court will lift the stay in those federal habeas cases later if needed to provide adequate remedies for Terhaar or Bailey.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion for Declaratory Judgment and to Immediately Discharge E.T. from Civil Commitment (Doc. No. [469]) is **DENIED WITHOUT PREJUDICE**;

---

(Footnote Continued From Previous Page)

credits); *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (permitting inmates to use § 1983 to obtain a declaration that disciplinary procedures are invalid, and "by way of ancillary relief[,] an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations").

2.      Plaintiffs' Motion for the Creation of an Aftercare Plan for E.T. Pursuant to Minn. Stat. § 253D.35 (Doc. No. [526]) is **DENIED WITHOUT PREJUDICE**;

3.      Plaintiffs' Amended Motion for Declaratory Judgment and to Immediately Transfer R.B. to an Appropriate Treatment Facility (Doc. No. [578]) is **DENIED WITHOUT PREJUDICE**;

4.      Eric Terhaar's federal habeas case (Civ. No. 14-2002 (DWF/JJK)) is **STAYED**;

5.      Rhonda Bailey's federal habeas case (Civ. No. 14-2362 (DWF/JJK)) is **STAYED**;

6.      The parties shall meet with the Court on **August 21, 2014**, as previously scheduled (*see* Doc. No. 566), to discuss moving the trial date in this case to a date in 2014.


Dated:  August 11, 2014                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge