**DATE:**     November 17, 2014

**TO:**       Honorable Judge Donovan W. Frank
             Honorable Magistrate Judge Jeffery J. Keyes

**FROM:**     Naomi J. Freeman, PhD
             Michael H. Miner, PhD, LP
             Deborah J. McCulloch, MSSW, LCSW
             Robin J. Wilson, PhD, ABPB
             (The Panel)

**RE:**       Rule 706 Expert Report and Recommendations
             Civil No. 11-3659 (DWF/JJK)

On December 6, 2013 the Court appointed Dr. Naomi J. Freeman, Dr. Michael H. Miner, Ms. Deborah J. McCulloch and Dr. Robin J. Wilson as experts pursuant to Rule 706 of the Federal Rules of Evidence. The following report and its recommendations are the unanimous findings and opinions of the R-706 Experts; hereafter, referred to as "the Panel."

In this report, the Panel addresses a multitude of issues, which necessitated that individual components of the program be explored separately. These components include:

- Evaluations and file reviews of class members, with a focus on "special groups" (i.e., juvenile-only offenders, clients with severe mental illness, clients in assisted living, clients with intellectual disabilities and cognitive limitations)
- Current professional standards for the treatment of civilly committed sexual offenders
- Review of MSOP policies and practices
- Community release experiences of other sexual offender civil commitment programs
- Legislative framework

Because some of the underlying issues at MSOP traverse these individual components, there is necessarily a degree of repetition of findings. The Panel believes that even though there is overlap among its observations, it is nonetheless important to paint a complete picture of the strengths and weaknesses for each component. In order to present these analyses, and owing to the complex nature of the issues at hand, the Panel has chosen to use narrative discussion, rather than simple metrics to make its points.

It is the intent of the Panel to present a balanced appraisal of the MSOP, with both praise and constructive criticism. Although we have certainly identified areas in need of attention, we have also noted many areas of particular strength in the program, including its staff and focus on specific programmatic issues. It is the Panel's sincere hope that comments made in the proceeding report will assist Minnesota in refining its sexual offender civil commitment policies and procedures, with an aim towards providing humane and evidence-based clinical services to civilly committed clients, while maintaining a high degree of public safety.

The following information and tasks were relied on to compose a comprehensive review of the MSOP and inform the Panel's findings, opinions, and recommendations, as ordered by the Court.

The Court delineated the duties of the Panel as follows:
- To advise the Court on professional standards of care and treatment of sexual offenders, both within and outside large facilities;
- To advise the Court on professional standards on conditions/rules regarding confinement/security within large facilities such as [MSOP];
- To advise the Court on experiences and programs among the states in this field;
- To advise the Court on research on effectiveness of treatment, and on recidivism, in both large facilities and appropriate less restrictive programs;
- To advise the Court regarding risk assessment and placement decisions for sexual offenders;
- To advise the Court [on] practices, rules, treatment, conditions, risk assessments, and the like at [MSOP], and the professional adequacy of care, treatment and the confinement at the Program;
- To advise the Court on any matters the experts believe are pertinent to understanding their findings and recommendations regarding the above duties; and
- To make recommendations to the Court regarding these matters, and to respond to any further inquiries by the Court.

On February 19, 2014 the Court ordered the following:
a. The experts' work shall include, but shall not be limited to:
i. Evaluating all class members and issuing reports and recommendations as to:  (a) each class members' current level of dangerousness (current risk assessment), including whether each class member poses a "real, continuing, and serious danger to society";
a. whether each class member is actually eligible for discharge under the applicable statutory provisions or otherwise no longer meets the statutory

          criteria for initial commitment (or should otherwise be recommended for provisional or full discharge);

      b.   whether each class member would be a candidate for a less restrictive facility; and

      c.   the specific need and parameter for less restrictive alternative facilities, including the operation of such facilities;

ii.  Reviewing the current treatment program at MSOP and its implementation to determine whether the program meets professional standards of care and treatment for sexual offenders and issuing recommendations as to any changes that should be made to the treatment program; and

iii.  Reviewing current MSOP policies and practices with regard to the conditions of confinement to determine whether they satisfy the balance between safety concerns and a therapeutic environment and making recommendations for any changes that should be made to the conditions of confinement at both the Moose Lake and St. Peter facility.

iv.  The experts shall report to the Court on the following:

      a.   the current professional standards for the treatment of civilly committed sex offenders and the extent to which MSOP's program design reflects those standards;

      b.   how other civil commitment programs have reintegrated civilly committed sexual offenders into the community, with particular attention to community relations; and

      c.   how other states, if any, are providing treatment and management of 'lower-functioning' civilly committed sexual offenders in community settings.

In order to complete the duties delineated by the Court, the Panel completed the following review of documents (not an all-inclusive list):

- Minnesota (MN) Civil Confinement laws and statutes
- MPET Report 02/13/2013
- Civil Commitment Advisory Task Force Reports 12/03/2012, 12/04/2013
- Office of Legislative Auditor (OLA) Report March 2011
- Class action lawsuit documents
- MN Client Rights laws
- MSOP Site Visit Reports 2009, 2010, 2011, 2012
- MSOP Position Descriptions and Minimum Qualifications
- MSOP Staffing and Organization Charts
- MSOP Meetings and Committees
- MSOP Program – Clinician's Guide, Matrix Scoring Manual, Theory Manual

- MSOP Client Handbooks and General Client Information
- Weekly schedules at Moose Lake and St. Peter
- MSOP Policies and Procedures
- MSOP Staff Training and Development Policies
- MSOP Security Guidelines, Policies and Procedures
- MSOP Templates for Clinical Reports

The Panel completed the following review of MSOP client records (all figures approximate):
- 25% of resident charts
- 90% of resident charts in the Assisted Living Unit, persons with Severe Mental Illness, and Alternative Program Units
- 90% of resident charts of juvenile-only offenders (no adult convictions)

The Panel conducted the following site visits:
- St. Peter April 1-2, 2014 and August 4-6, 2014
- Moose Lake April 29-May 1, 2014 and June 10-12, 2014
- MSOP Administration August 4, 2014

The Panel met with the Ombudsman staff:
- Ms. Roberta Opheim and Ms. Chris Michel March 31, 2014
- Ms. Roberta Opheim and Mr. Michael Woods April 28, 2014

The Panel reviewed other state programs through data collected by the Sex Offender Civil Commitment Programs Network (SOCCPN) Annual Surveys 2008 – 2014 (http://www.soccpn.org/) and professional contact with other civil commitment programs administration and clinical staff.

Members of the Panel are directly familiar with the following civil commitment programs; now including Minnesota's MSOP:
- Wisconsin Sexually Violent Person Program
- New York Civil Confinement Program
- Florida Sexually Violent Predator Program

Members of the Panel are generally familiar with the following civil commitment programs through either site visits, review of program materials or consultation:
- Federal Civil Commitment Program
- Iowa Civil Commitment Unit for Sexual Offenders

- Illinois Civil Commitment Program
- Missouri Sex Offender Rehabilitation and Treatment Services
- Texas Civil Commitment Program
- Kansas Sexual Predator Treatment Program
- New Jersey Civil Commitment Program

## ABRIDGED RECOMMENDATIONS – SUMMARY

The following is an abridged synopsis of many of the recommendations made by the Panel regarding the Minnesota Sex Offender Program (MSOP). Additional information regarding these recommendations can be found in the text of the report. This listing does not comprise a full or comprehensive representation of the Panel's recommendations, but is provided as a quick reference. Several other important recommendations are included in the text of the report.

1. The Panel recommends that changes be made to the Minnesota Civil Commitment statute in order to ensure that SOCC is reserved for those people who have sexually offended who are truly the most dangerous and are at highest risk to reoffend.
2. The Panel agrees with the Task Force's conclusions regarding civil commitment screening and advocates for a centralized screening process, as well as the development of clearer and standardized commitment criteria.
3. The Panel recommends that a specialized group of defense attorneys should be trained to obtain the expertise necessary to appropriately litigate SOCC cases. Likewise, training is needed for county attorneys and Judges who hear SOCC cases.
4. The Panel recommends that Department of Human Services and its Ombudsman's Office actively engage, educate, and collaborate with advocacy groups within its agency and around the state to encourage support and advocacy for clients who may not meet commitment criteria and those in need of substantial community services and support and to encourage counties to take collaborative responsibility for these clients from their respective counties and for whom they are financially responsible.
5. The Panel believes that the program may benefit from formal accreditation, either by JCAHO, CARF, or another national/international accreditation agency. Although the feedback provided by external experts (e.g., Haaven, McGrath, and Murphy) has no doubt been helpful, accreditation would provide another layer of professional and programmatic accountability.
6. The Panel recommends that action be taken to expedite the transfer of the single female client out of the MSOP to an environment where she can receive appropriate gender-sensitive treatment, while being provided with direct supervision that emphasizes both her safety and that of the community.

7.  The Panel recommends that individual evaluations be completed on each member of the class, to determine if they continue to meet criteria for placement at the MSOP.

8.  The Panel recommends that, on an ongoing basis, MSOP administration establish procedures to evaluate all recently admitted clients to ensure commitment standards are met – if MSOP clinical teams do not believe a client meets standards, they should petition for immediate release.

9.  The Panel recommends that MSOP administration begin proactively assessing the petition readiness of each current MSOP client, and that this process be undertaken in a clinically and scientifically defensible manner. The Panel strongly believes that these evaluations should begin with those clients with no adult sexual offenses, as most, if not all, of them should have never been committed.

10. The Panel very strongly recommends that MSOP administration ensure that discharge planning begins on admission. Currently, there is no clear process for discharge planning and it appears that discharge planning only occurs once clients have advanced to Phase Three and have garnered staff support for release from the program. In the Panel's opinion, preparation for release should begin as soon as the client arrives at MSOP.

11. The Panel recommends that all clients be afforded periodic evaluations that would meet general standards for forensic risk assessment and clinical review in sexual offender civil commitment (SOCC) settings. Ideally, these reviews would occur at least annually.

12. The Panel recommends that MSOP be authorized to move clients to CPS, without SRB and SCAP approval, when the treatment team deems such a move to be clinically appropriate.

13. The Panel recommends that the statute be changed to eliminate the SRB from the discharge process. In the alternative, MSOP administration should work with DHS leadership to create separate SRBs to specifically hear SOCC cases. Given the large number of individuals committed to MSOP, MSOP administration should also advocate for these SRBs to meet more than once a week, at least until the backlog of cases is addressed.

14. The Panel recommends that firm timeframes be established in which the court system (e.g., the SCAP) need to make decisions regarding discharge. Currently, the process can take years to complete – in which time clients may decompensate due to feelings of hopelessness.

15. The Panel recommends that DHS and MSOP administration plan and develop community resources through expanded community relations in preparation for meeting the complex needs of the diverse client population. Although most of the men in CPS and Phase Three will not need placement in contracted mini-institutions, group homes, or other structured facilities to ensure successful placement on provisional discharge, it is conceivable that many members of the specialized populations will ultimately achieve release and will require accommodations for both residential and aftercare services.

16.   The Panel recommends that clear, objective standards be established for expected behaviors while in the community under provisional discharge.

17.   The Panel recommends that unescorted access to appropriate services be both allowed and encouraged. Overall, with the exception of specified community conditions, MSOP clients should be able to live in the community similar to those under other forms of community supervision.

18.   The Panel recommends that MSOP administration provide opportunities for additional and ongoing staff development in recognizing, diagnosing, treating, and working with specialized populations; especially persons with intellectual disabilities, traumatic brain injury, general and complex trauma, and persons with serious mental illness; and that it applies this to developing and implementing more responsive programming for these individuals.

19.   The Panel recommends that MSOP administration ensure adequate training in sexual psychodiagnostics for all staff who work with clients, and that current client diagnostic profiles be re-evaluated for accuracy and consistency using DSM-5 criteria.

20.   The Panel recommends that greater attention be paid to programming seeking to address deviant sexual interests. Current practices appear rudimentary and in need of augmentation.

21.   The Panel recommends that staff receive training in relevant interventions regarding management of problematic clients in order to help them develop better ways to cope with their realities. Of particular pertinence would be the differentiation of psychiatric conditions from purely behavioral motivations.

22.   The Panel recommends that MSOP clinical staff consider utilizing principles of applied behavioral analysis to highlight root causes of behavior and the functional aspects of acting out.

23.   The Panel recommends that MSOP administration ensure consistent clinical oversight, training, and supervision of all unit and clinical staff. This is especially pertinent for those staff with lesser experience, but attention to this for all staff will ensure that treatment quality can be maintained and client progression can be maximized.

24.   The Panel recommends that, in order to assist clinicians in composing treatment plans, MSOP administration should obtain additional records on clients referred to the program. These records would include a comprehensive criminal history and documentation from the MN DOC initial risk assessment review, as well as any available mental health, substance abuse, sexual offender treatment, and incarceration disciplinary history records.

25.   The Panel recommends that MSOP administration strive to ensure that assessment tools and measures used with clients be specifically applicable given individual client characteristics.

26. The Panel recommends that the treatment progress review process be expanded to include more explicit participation of the client, including comments in his/her own words.

27. The Panel found that programming appeared to focus primarily on sexual behavior issues, with inadequate attention to other important need areas, such as substance abuse, mental health, emotions regulation, trauma-informed treatment, etc. The Panel recommends that MSOP administration consider broadening the focus of the program to include attention to other psychologically meaningful risk factors.

28. The Panel asserts that rigidly adhering to the Matrix model fails to recognize the very complex and individualized treatment needs of special needs clients, which will invariably interfere with treatment progress, particularly as it is defined by the program.

29. The Panel recommends that MSOP administration and clinical staff review special needs clients on a routine basis to determine barriers to treatment progression and steps that can be taken to help motivate, encourage, and advance these clients in treatment.

30. The Panel strongly recommends that MSOP administration pay particular attention to the availability and practical implementation of psychiatric services. The Panel opines that psychiatric care at the MSOP is currently inadequate to meet the needs of its clientele.

31. The Panel recommends greater integration of psychiatry in the clinical services offered to MSOP clients.

32. The Panel recommends that all residents on the Nova Unit be assessed regarding the nature and extent of their mental illness and the association between their psychiatric symptoms and their sexual offending behavior.

33. The Panel recommends that MSOP administration and clinical leadership review the circumstances of clients who have not progressed in treatment (i.e., have been in the same treatment phase for more than 18 months), or who are non-participants, and develop and implement ways to motivate, engage, and advance these clients in treatment.

34. The Panel recommends that polygraph and PPG evaluations not be required for treatment progression.

35. The Panel recommends that clients not be moved back in treatment based on behavioral reports unless the BER is directly tied to their sexual offending behavior. The privilege system should be separated from treatment progression.

36. The Panel recommends that MSOP administration continue to support and expand innovative vocational and community preparation services to assist clients in developing important protective factors.

37. The Panel expresses grave concern for the personal safety of vulnerable clients. Over and above these concerns, the Panel expresses similarly grave concerns regarding the procedures by which clients are determined to be "vulnerable." Notwithstanding

legislative definitions, there are clearly practical considerations regarding risk to certain clients posed by more antisocially inclined and those who engage in predatory behavior at MSOP.

38. The Panel recommends that MSOP administration and clinical leadership pay particular attention to roommate selection, given the potential for abuse of younger, vulnerable, or special needs clients.

39. The Panel recommends that MSOP administration implement safer and more therapeutic alternatives to administrative/solitary confinement.

40. The Panel recommends that MSOP administration consider having Security Counselors located on the units wear a different uniform. In the alternative, uniforms could be based on post assignments.

41. The Panel recommends that clear, objective standards for both the privilege system and the treatment progression system be developed and that MSOP administration should be mindful of the fact that obtaining BERs is a common occurrence for individuals living within SOCC facilities.

42. The Panel recommends recognition and celebration of the innovative programming in the areas of education, therapeutic recreation, and diverse vocational opportunities.

43. The Panel recommends recognition of the near impossible challenge of recruiting, hiring, retaining, training, and supervising professional and front line staff for an extremely large facility with a very diverse specialized population in a rural community.

44. The Panel recommends recognition that the MSOP, especially in Moose Lake, includes many clients who may no longer or never did clinically or legally meet the criteria for civil commitment but who are, nonetheless provided with adequate treatment in keeping with the characteristics and resources necessary to be placed in convention programming.


## SECTION 1: REVIEW PROCESS

The panel made two visits to the St. Peter facility (04/01-04/02/2014 and 08/04-08/06/2014) and two visits to the Moose Lake facility (04/29-05/01/2014 and 06/10-06/12/2014), during which time they met with members of senior administration, clinical staff, security staff, medical/nursing staff, programs staff, and others. The Panel also reviewed the majority of the clinical records of clients at both facilities, with specific attention paid to the following groups:

- Clients committed with no adult sexual criminal history
- Clients on the Nova Unit and others with severe mental illness (SMI)
- Clients on the Assisted Living Unit
- Clients in the Alternative Treatment Program

In reviewing client records, the Panel used the following methodology. Files were divided amongst the Panel members. Each file was first given a cursory review, during which key documents were accessed. If documentation supported the client's present commitment status and placement in treatment, then the file review was terminated. If the cursory review suggested that there were issues with the client's current commitment status and/or placement in treatment, then a more thorough review of the file was conducted. If, at the end of the thorough file review, the Panel member believed that the client's status was problematic, then the file was passed on to another member of the Panel for secondary review. In some cases, the Panel decided to interview the client in question personally.

### SECTION 2: EVALUATION OF CLASS MEMBERS

Presently, there are 721 individuals detained within the Minnesota Sex Offender Program (MSOP).  The Panel's review of client charts required between 30 minutes and four hours per chart, the vast majority taking between three and four hours.  It was, therefore, decided that it would be impossible for the Panel to review all class members and determine their current level of dangerousness, their current eligibility for discharge, and their eligibility for provisional discharge.  Consequently, with the consent of Judges Frank and Keyes, the Panel reviewed a subset of class members.  The subset consisted of 191 clients whose charts were reviewed, and 39 clients who were interviewed by the Panel.  The Panel did not keep a complete record of those clients with whom they interacted on facility units and common areas. As such, the Panel talked to more clients than reported above.  It is important to note that while the Panel endeavored to be careful and thorough in its reviews of client records, those reviews should by no means be regarded as sufficient for forensic risk assessment purposes. Ultimately, the Panel will recommend that all clients be afforded periodic evaluations that would meet general standards for forensic risk assessment and clinical review in sexual offender civil commitment (SOCC) settings.

According to the 2014 SOCCPN Survey (Schneider, Jackson, D'Orazio, Hébert, & McCulloch, 2014), most sexual offender civil commitment (SOCC) programs maintain different treatment tracks for clients depending on secondary factors such as intellectual status, personality orientation, mental health status, and behavioral issues (among others). Similarly, the MSOP also identifies several "special populations" receiving services that are different than those received by "conventional" clients.  However, although some cases may be easily triaged into one group or another, the precise means by which such decisions are made at MSOP is not clear. Of particular concern, it appeared that there were some clients in specialized units who were malingering and, as such, were inappropriately placed. In other circumstances, it

appeared that some clients with significant needs were in the conventional track who may be better placed in one of the specialized tracks.

The Panel's review initially focused on four groups of clients who represent special populations and present unique challenges in terms of service provision and risk assessment:  (1) clients committed with no adult sexual criminal history; (2) clients with severe mental illness (SMI); (3) clients on the Assisted Living Unit; and (4) clients in the Alternative Treatment Program (e.g., intellectual and other cognitive processing disabilities).  The Panel also reviewed records of individuals in the conventional treatment program.  During tours of the St. Peter and Moose Lake facilities, the Panel met informally with clients on the living units, most of which were in the conventional program.  The Panel also reviewed records of select individuals housed in the Community Preparation Services (CPS) unit, visited that unit on several occasions, and talked to the majority of clients housed there.

**Clients with No Adult Sexual Criminal History**
According to file materials provided to the Panel in May 2014, there are 62 individuals confined in the MSOP who have no adult criminal convictions for sexual offenses and are committed due to behavior they engaged in solely as juveniles.  Some of these clients are housed on a special unit at the Moose Lake facility that includes clients under the age of 25 years and a small number of older clients who are there to serve as "role models."  The rest of those with juvenile-only offenses are housed throughout the Moose Lake and St. Peter facilities depending on their level of treatment participation and their treatment phase placement.  Sixty-one of these individuals' charts were reviewed and 11 were individually interviewed.

- *Level of Dangerousness – Current Risk Assessment*

There are numerous problems with assessing the level of dangerousness of adolescents (and those adults whose offenses were committed solely while juveniles) with sexual or other behavioral problems.  The Panel referred Eric Terhaar to the Court as an example of the individuals in the class who comprise this special subgroup.  Many of the issues associated with assessing risk for sexual reoffending in juveniles were discussed during the Court hearing on July 14 and 15, 2014.

Other concerns become obvious to the Panel when reviewing the records of the individuals in this subgroup of clients with juvenile-only sexual offenses, as well as in discussions with representative clients. In general, it appears that the common theme for individuals in this subgroup of the class is that they were problematic children with histories of abuse – sexual and otherwise – and neglect.  These individuals were often removed from their homes and experienced numerous placements (e.g., foster care, group homes, and institutions) during

childhood and adolescence.  Although as children and adolescents they engaged in a range of problematic sexual behavior, other developmentally common behaviors were often viewed as "reoffending" because they had previously been labeled as "sexual offenders" at an early age (e.g., one client's touching the breasts of a female peer during a touch football game).  At other times, the client's sexually inappropriate conduct mirrored behavior in which they were forced to engage when they were sexually abused by others.  For instance, one client, whose father and uncle are both committed to the MSOP, was adjudicated delinquent for sexual behavior with his sister – the very same behavior that his father had coerced him to engage in previously. Simply put, it appeared that as soon as a juvenile was labeled a "sex offender," virtually all other sexual behavior – appropriate or otherwise, and regardless of cause or origin – was viewed through that lens. Consequently, many behaviors that would have been largely ignored in a "normal" teenager have been seen as risk-enhancing in those with a "sex offender" label.

Another common theme is that the clients in this subgroup appear to have been committed to the MSOP because they had reached 19 years of age, could no longer be kept in juvenile detention, and had consistently presented with behavior problems during juvenile placements. These problems in some cases included sexual behavior with peers in placement, either consensual or coerced, but more often involved non-sexual behaviors such as absconding from placement, persistent rule breaking, and/or violent behavior.  Their sexual conduct was used to substantiate a need for civil commitment in a situation in which officials seemingly did not know what else to do with them.  If these young clients had been adjudicated delinquent for a non-sexual violent crime, they likely would have been provided with community supports and integration services rather than being civilly committed.

There are no techniques currently available for conducting an assessment of long-term risk in people with juvenile-only sexual offending behavior (Fanniff & Letourneau, 2012; Hempel et al., 2013).  The assessment tools used for adolescents, most commonly the ERASOR, JSOAP-II, and the JSORRAT-II, do not appear to have adequate predictive validity to assess the reoffending risk of an adolescent transitioning into adulthood.  The extant literature indicates that the vast majority of juvenile delinquent boys, including boys who have sexually offended, mature out of deviant behavior as they move from mid-adolescence into young adulthood (Miner, 2002; Moffitt, 1993; Vandiver, 2006).  In fact, the adult offending rates of young clients who have committed a sexual offense as an adolescent is approximately 5%, which makes identifying high risk boys practically impossible. Caldwell (2010) has further shown that, of those adolescents who do sexually reoffend, most of them do so while still adolescents.

Reviews of the records of the juvenile only clients indicate that many of the evaluators assigned during the commitment process did not understand the nuances of assessing this special

population.  In many cases, adult actuarial risk assessment instruments (ARAIs; e.g., Static-99/Static-99R, MnSOST-R) were used to inform the Court about the individual's risk for sexual violence.  In other cases, adult diagnostic instruments, such as the Psychopathy Checklist – Revised (PCL-R), were used to assess personality characteristics.  The use of adult tools with this population seemed to result in inappropriate assumptions leading to misclassification of level of risk for future sexual violence, as well as age-inappropriate understanding of the personality characteristics that influence this risk.  The major concern in using adult instrumentation is that these tools fail to consider the differences between adolescent and adult development and behavior.  For example, the Static-99R includes three items (age, history of committed relationships, and having male victims) that would be expected to perform differently in adult and juvenile populations.  As stated earlier, adolescents tend to desist from deviant behavior as they age from mid-adolescence to early adulthood.  Thus, being in the age range 19-25 is a protective factor for male adolescents who offended only as juveniles (i.e., without an adult sexual offense history), while being in this age range would be regarded as a risk factor for those who have committed adult criminal behavior.  Similarly, the item regarding living with a romantic partner for at least two years clearly has different implications for a late teenager than for an adult.  This item is intended to highlight risk inherent in male adults with an inability to develop and maintain age-appropriate intimate relationships; however, such difficulties would be expected and normal in a young person (19-25) and especially for those in juvenile or other placements where cohabitating with a romantic partner is impossible.  Finally, although known to be a robust risk indicator in adult samples, at least one study has shown that having male victims is not a risk factor for sexual reoffending in adolescent samples (Miner, 2002).

- *Eligibility for Discharge*

Given the concerns noted above, it is likely that most of those individuals civilly committed at the MSOP because of juvenile-only sexual offending behavior, and who have no history of adult sexual criminal behavior, would be eligible for discharge.  Notwithstanding this likelihood, it is probable that many of these individuals will have displayed behavior within the MSOP that presents concerns about their ability to function appropriately in the community.  It would be important to take into consideration the level of maturity of these individuals and the extent to which their acting out in the MSOP can be attributed to the situation in which they have been placed.  The MSOP climate is characterized by high levels of learned helplessness and hopelessness, both on the part of the clients and the staff.  There is a ubiquitous belief that clients cannot achieve release, which likely affects both staff and client behavior. For clients, they may see that there are no major consequences to their rule breaking; neither do they see any reward for prosocial behavior.  Additionally, custody facilities have a culture of their own, quite different than the community. Violence or other rule-breaking behaviors are often required in order to maintain personal safety and social position (i.e., the best defense is a good

offense). When these factors are combined with the general lack of maturity, increased impulsivity, and the negative influence of others at MSOP who are criminally diverse, the immediate assumption is that these clients, if released, would present undue risk for inappropriate conduct in the community. It also bears restating that many of these clients have personal histories of developmental abuse, which influences their responses in situations of perceived risk. Clients interviewed by the Panel described concerns about their safety, with some characterizing themselves as potential victims (of sexual assault and other untoward behavior) of the many adults confined at MSOP with histories of victimizing young males.  This concern was expressed most often by those who were approaching age 25 years, when they would no longer be eligible to reside on the young adult unit.  The violent behavior of some of these young clients may be viewed as a proactive attempt to prevent victimization, projecting an image of toughness and dangerousness that would make them seem less vulnerable and, thus, less likely to be coerced and victimized. Overall, the reality is that most negative behavior displayed in the facility by this group of juvenile-only clients is situational and will be a poor predictor of behavior in the community.

- *Eligibility for Provisional Discharge*

The Panel opines that the majority of these individuals with juvenile-only offending should not have been civilly committed in the first place and, if they had been appropriately assessed, they would not have met criteria for commitment. Further, because there is no mechanism in the Minnesota sex offender civil commitment (SOCC) statute that requires regular assessment, none of these commitments have been "corrected" through court release processes. As such, it is the opinion of the Panel that the majority of individuals in this subgroup would be eligible for discharge.

The Panel acknowledges that there is a potential advantage to provisional discharge for these clients, in that the MSOP could provide supports and services needed to maximize their success. Most of the clients in this group have poor academic histories and no job experience outside the institution. They also have rarely, if ever, had the opportunity to develop intimate, romantic relationships. These individuals have few independent living skills, due mostly to the fact that, prior to placement at MSOP, they were never old enough to live independently in the community or be provided with independent living skill-building opportunities in other settings or at the MSOP.  This lack of skills places most of this subgroup of class members at risk for community failure, even though they are unlikely to commit new sexual offenses. Thus, these individuals would require social services support, and it is the opinion of the Panel that the Minnesota Department of Human Services (DHS) and the responsible counties have an obligation to provide these clients with the necessary supportive services to ensure their successful transition to the community and to productive lives.

The Panel has reservations, however, about the use of provisional discharge with these clients. It is the Panel's opinion that these clients are unlikely to pose a significant risk for sexual re-offense in the community. Further, there are potential iatrogenic effects (i.e., harmful side-effects from attempts to intervene) associated with continuing to label them as sexually dangerous. In general practice, people who have sexually offended who are conditionally released to the community are often subject to re-institutionalization following violation of their release conditions (e.g., curfew violations, drinking, association with prohibited others). The Panel has asserted above that many or most of these juvenile-only clients should never have been committed in the first place. To have them risk a return to custody as a consequence of common age-related activities, simply because they are on provisional release is unrelated to the purpose of SOCC – to prevent future sexual violence. This is especially so if we consider that some of the skills development they would have required to be fully functioning young adults was precluded by their early entry to the criminal justice system and was compounded by their placement at MSOP. As such, the Panel reiterates that DHS and the applicable county should assume responsibility for the safe and humane discharge of these clients, but that return to custody should be reserved only for those clients who subsequently engage in new criminal conduct (as would be the case for any other person of their age in the community).

**Clients with Severe Mental Illness (SMI)**
The literature on criminal behavior includes a sub-focus on crimes committed by people with mental health conditions. These conditions include a variety of presentations, including schizophrenia, major depression, schizo-affective disorder and its sub-types, and other conditions including marked difficulties in maintaining safety, appropriate lifestyle balance, and self-determination. Additionally, many of these clients have been adjudged as presenting significant risk for harm to themselves or others as a consequence of their mental health issues.

According to information provided to the Panel, there are 23 clients with severe mental health conditions housed on the Nova Unit, which is designated for the SMI population.  The Panel reviewed 19 of the charts maintained on SMI clients. It should be noted that it is likely that there are other clients at MSOP with significant psychiatric disorders who are not housed on the Nova Unit and who may not have been identified as SMI.  The limited psychiatry services available within the MSOP (see later section of this report) and the MSOP's narrow focus of training and attention on treatment for problematic sexual behavior likely contributes to a culture wherein mental health disorders are not appropriately identified or understood by many MSOP staff, including clinical staff.  This appears to have led to this subpopulation having significant difficulty in consistently participating in core group treatment, being psychiatrically underserved or inappropriately treated. The Panel encountered a number of situations in which

symptoms of mental illness were viewed as "attention seeking" behaviors by MSOP staff (e.g., acting out for secondary gain). While this is possible in some situations, it often appeared to be the only option considered by staff when other explanations were also available (e.g., symptoms of mental illness). The Panel's experience in other forensic mental health and civil commitment environments (FL, NY, and WI) is that clients typically have complex presentations requiring a more nuanced and comprehensive approach and understanding – often including enhanced clinical training and supervision. Integration of psychiatric services also appears to be limited in MSOP programming. An increase in psychiatric perspectives in team meetings and the like would serve to broaden understanding of client difficulties.

- *Level of Dangerousness – Current Risk Assessment*

Dangerousness in the SMI subgroup is related to at least two factors that do not appear to be well considered in the application of the MSOP treatment model, or in the methods used to assess risk for future sexual offending behavior: (1) the degree to which the individual's sexual behavior is directly influenced by mental illness, and (2) what appears to be a number of clients housed on the Nova Unit who are malingering.

Regarding the latter factor, the often hopeless climate at the Moose Lake facility (described in detail later in this report) appears to motivate a certain number of individuals to malinger mental illness so they can be housed on the Nova Unit. That is, for many clients, the living situation on the Nova Unit is considered superior to that on the traditional units. The Nova Unit is smaller and all residents have private rooms; thus, there are considerable ulterior motives to being seen as having significant mental health issues. Although the Panel did not conduct mental status examinations or detailed psychological or psychiatric assessments, observations of clients on the Nova Unit indicated that there are some individuals housed on the Nova Unit who are probably not experiencing significant psychiatric symptoms. However, this perspective must be balanced against another trend apparent in interviews with clients and MSOP staff. That is, throughout the Panel's interviews with staff and clients, there was a marked tendency on the part of staff to view potentially legitimate suicidal behavior as parasuicidal and attention-seeking, akin to the aforementioned tendency to see many instances of inappropriate or self-injurious conduct as simple acting out for secondary gain. It bears mentioning that many so-called parasuicidal clients end up killing themselves; particularly in bleak environments such as SOCC. MSOP clinical staff might consider applying principles of applied behavioral analysis to highlight root causes of behavior and the functional aspects of acting out.

These two trends highlight a need for broader clinical training at MSOP, in addition to recruitment and retention of staff with specialized knowledge and experience in working with clients with mental health issues. The Panel noted that the Nova Unit did not have staff with

specialized training in treating and identifying severe psychopathology. Further, there was no apparent emphasis on these issues in the training provided to MSOP staff.  In fact, training focused narrowly on treatment and assessment for people who have sexually offended.  There appeared to be little recognition and understanding of the complexity and heterogeneity of the problems and issues presented by clients committed to the MSOP.

Risk assessment in people with severe mental illness is complicated in that research has found that mentally ill individuals are not usually violent, a reality that is in stark contrast to commonly held beliefs of nonprofessionals and members of the public.  Risk assessment studies have highlighted inconsistencies in the degree of dangerousness posed by psychiatric clients (Banks et al., 2004; Harris & Lurigio, 2007; Newton et al., 2012; Quinsey, Harris, Rice, & Cormier, 2006; Steadman et al., 2000; Swogger et al., 2011).  SMI clients at the MSOP, however, represent a special sub-population of the larger group of people who are mentally ill, in that they have histories of sexual offending.  Currently, the MSOP program does not appear to consider the possibility that the sexual offending of the individuals with SMI may be directly related to the hallucinations and/or delusions symptomatic of their illness and, thus, if these symptoms were controlled and protective factors were enhanced, the client might be unlikely to commit further sexual violence.

Risk assessment processes must consider the possible relationship between mental health conditions and sexually offending behavior.  None of the risk assessment tools currently used by the MSOP (e.g., Static-99R and Stable/Acute-2007) explicitly assess this possible interaction. This raises issues regarding applicability of tools. Regardless of the particular measure used, risk assessment for this subgroup requires the evaluator to consider how control of the delusions and/or hallucinations experienced by the individual may have influenced their sexually inappropriate conduct.  The narrow focus of the treatment services offered by the MSOP (which emphasizes developing offending cycles, controlling deviant arousal, and learning coping skills for offending risks) is unlikely to impact the psychiatric symptoms of the SMI clients. Therefore, the focus of treatment for at least some SMI clients may be better placed on adherence to prescribed medication and dealing with the symptoms related to their mental illness.  Of particular importance regarding treatment responsivity, it is likely that many SMI clients will experience great difficulties in meeting the Matrix Goals that guide progress through the MSOP system.

- *Eligibility for Discharge*

The Panel's review of the SMI population did not reveal anyone that the Panel would recommend for discharge.  In general, it did not appear that the program on the Nova Unit was either helping the SMI clients to control their mental illness or sufficiently identifying those

clients who were malingering.  It is likely that SMI clients are unlikely to benefit from the MSOP treatment program as it is currently designed and these clients probably would not be able to meet criteria for phase movement within the currently outlined program and Matrix Goals. Development of appropriate services for SMI clients would require more precision regarding both the Need and Responsivity principles of the RNR model, which the MSOP identifies as being one of its theoretical underpinnings.

- *Eligibility for Provisional Discharge*

Given the lack of appropriate treatment resources to meet the need and responsivity aspects of this sub-population, there are likely few clients who would be currently appropriate for a less restrictive environment.  However, there is a need to re-think the placement of those clients with severe mental illness.  The current psychiatric resources are insufficient to meet the needs of this population and, consequently, it is unlikely that the MSOP will be able to develop appropriate levels of psychiatric care given those inadequate resources. The MSOP has attempted to recruit a full-time psychiatrist, but has been unsuccessful. It is not clear if a full time psychiatrist would even be sufficient to serve the large population in the MSOP, without a comprehensive assessment of those in need of psychiatric services. Thus, it may be that this population could be more appropriately placed and treated within the Minnesota Security Hospital or in community mental health programs. Through its involvement with other SOCC programs around the country, the Panel is aware that psychiatric services are often more widely available than is currently the case at MSOP (e.g., FL, MO, NJ, NY, WI).

Overall, the Panel recommends that residents on the Nova Unit be assessed regarding the nature and extent of their mental illness and the association between their psychiatric symptoms and their sexual offending behavior.  Those whose behavior appears to be caused by their thought disorder might be provisionally discharged to the Security Hospital or to community mental health programs, which may better meet their treatment needs.

**Clients in Assisted Living**

The Panel visited the Beta Unit at Moose Lake, which is the Assisted Living Unit that houses individuals who have physical disabilities with needs that cannot be accommodated on conventional units.  Clients on this unit include elderly individuals and others with brittle chronic disorders and ambulatory disabilities.  Despite these conditions, there are no nursing or medical staff assigned to the Assisted Living Unit and it is not clear what specialized training, if any, is provided to the security counselors assigned to this unit. Although the unit is in close proximity to the health clinic, the Panel is concerned that the lack of trained medical personnel on the unit may put clients at risk.  Many of these clients have severe illnesses and disabilities and present as quite frail.  It is not clear that the staff on the units are prepared to intervene if

clients have acute incidents, such as cardiac arrest, seizure, or stroke.  It is also not clear that unit staff have the training to identify when clients with chronic illness are in acute distress or in need of immediate medical attention. Treatment activities are not provided on this unit; thus, in order to participate in the treatment program, the residents of this unit must transfer to the other MSOP building, which can be difficult given their disabilities and medical frailty.

- *Level of Dangerousness – Current Risk Assessment*

Dangerousness in these clients is related less to standard sexual offender risk factors and more to their infirmity.  Actuarial risk assessment instruments (ARAIs) currently in use at MSOP are likely to over-estimate the risk of individuals in assisted living, in that their level of risk is mediated (and may be ameliorated) by their physical abilities (or lack thereof).  Many of the individuals on this unit are physically limited to the extent that regardless of risk assessed by static and dynamic risk instruments, their actual potential to engage in sexually violent behavior is substantially mitigated.  For example, the Panel interviewed a client whose Parkinson's disease is so severe that he is generally confined to a wheelchair and has little control over his tremors.  It is unlikely that someone with this level of Parkinson's symptoms is capable of sexually violent behavior.  This unit also includes individuals with severe COPD, heart disease, and other chronic disorders.  As these clients physically (and, in some cases, mentally – e.g., dementia) decompensate, their level of risk may certainly reach a point where it no longer meets criteria for civil commitment as a sexually violent person.

- *Eligibility for Discharge*

Many of the clients on the Assisted Living Unit are physically limited, rendering them less likely to pose a significant risk to commit a sexually violent offense, and thus may not meet criteria for continued civil commitment at the MSOP.  The individuals on this unit require assisted living care and, if discharged, many will require placement in assisted living residences and/or other community support services.  It may be that significant numbers of these clients could live in transitional living residences or may even be able to live independently if they were provided with case management services and transportation to appointments and other services. It may be very difficult, however, to find facilities that will accept MSOP clients, due to Minnesota laws with respect to placement of people who have sexually offended in health care facilities or may pose a risk to other vulnerable clients in facilities.  This may require DHS to consider developing options for assisted care for provisionally discharged clients with such limitations and needs. It is also likely that as individuals become more disabled, they could be discharged to the forensic nursing home on the St. Peter campus and it certainly would seem reasonable that clients in end of life stages and in need of hospice care could be discharged to supportive family or community based hospice services.

- *Eligibility for Provisional Discharge*

If appropriate resources are identified, provisional discharge may be the most reasonable alternative for this population.  Due to their compromised medical status, they are likely to experience significant challenges in attending, participating in, and benefitting from sexual behavior treatment as currently provided by the MSOP without significant modifications. Currently, there are few modifications made for this population, other than having staff assist with transporting them to group activities, and the Panel's review of records and interviews with clients indicated that their inability to attend or participate in treatment is "held against" them and is reflected in their inability to progress in treatment phases.  As noted above, this subgroup's risk is likely more related to level of physical functioning than to standard sexual offender risk factors. As such, this subgroup's risk should be assessed, taking into account their physical limitations, and appropriate community placements should be explored and provided for those clients who no longer meet the statutory requirements for civil commitment at the MSOP.

**Clients in the Alternative Program**

According to documents provided to the Panel, clients are assigned to the Alternative Program when they are determined to have comorbid disorders with significant barriers to successful participation in the conventional treatment program, most often seen in limited intellectual functioning, but also including clients with cognitive limitations, mental illness, and hearing deficits.  Those clients assigned to the Alternative Program require special accommodations. The specific criteria for assignment to this program are unclear. The Panel's review of client records (augmented by client interviews) identified individuals with borderline functioning on conventional units. Additionally, the Panel identified at least one Alternative Program client (whose records were reviewed and he was interviewed by the Panel) who appeared to be malingering and achieving secondary gains through his ability to manipulate peers with limited intellectual and cognitive functioning.

- *Level of Dangerousness – Current Risk Assessment*

Interviews with MSOP treatment and supervisory staff indicated that the treatment goals and criteria for phase advancement used for clients in the Alternative Program are the same as those for anyone else in the MSOP.  These criteria appear appropriate for some of those being treated in this program, but the majority of those assigned to this special program appear to have significant comorbid disorders and cognitive deficits that influence their functional capacity.  That is, many of the clients have diagnoses of moderate, mild, or borderline intellectual disability.  These individuals are very likely to have limitations in their ability to benefit from the cognitive behavioral interventions at the MSOP, even with modifications made by MSOP staff (which was not always evident).  In fact, many of the treatment reports reviewed

by the Panel acknowledged that these clients were not benefiting from the program. For example, one report stated, "the client does not appear to understand the treatment, but he tries hard." In spite of this acknowledgement, there was no evidence in the records that staff took steps to modify the program so that clients with special needs could advance in treatment. This represents a fundamental failure to adequately address the treatment responsivity needs of these clients.

Risk assessment in this population likely must go beyond the standard tools used by risk assessment staff (e.g., the Static-99R and Stable-2007) and include measures of functional capacity and/or a specialized tool such as the ARMIDILO-S (Blacker et al., 2011; Lofthouse et al., 2013), which is designed specifically to assess dynamic risk in clients with intellectual disabilities and sexual offense histories. Additionally, it should be noted that there is one woman who is confined and in the Alternative Program (see report submitted to the Court in June 2014). To date, there are no empirically supported instruments or methods for predicting re-offense potential or dangerousness in women with histories of sexual offending, severe mental disorders, and/or intellectual disabilities. The Panel did not conduct complete risk assessments on those clients whose charts were reviewed and who were individually interviewed. Reviews of these clients, however, indicated that progression between treatment phases within the Alternative Program is related more to the individual's likability, rule compliance, and deference to staff than to meaningful treatment benefit. The modifications made in the treatment program appear less oriented to assisting clients in internalizing concepts than to learning terminology and general concepts. In interviews conducted by the Panel, it was clear that many Alternative Program clients could regurgitate complicated terms and treatment jargon, but there was little indication of meaningful understanding of those concepts and their application. Some clients were simply unable to read the Matrix Factors pocket cards with which they had been provided, while others could read them but demonstrated a profound lack of understanding of the concepts.

- *Eligibility for Discharge*

The Panel's review of the clients in the Alternative Program indicated that few would be eligible for a complete discharge. If some clients were ultimately properly assessed and found not to meet commitment criteria, they would no doubt need alternative protective placement and services. Indeed, most clients in the Alternative Program have significant functional disabilities that would require supports and services in the community. Although many of these individuals may never be capable of independent living, it is likely that, with appropriate supports and treatment, some of the clients in the Alternative Program could progress to supported living or adult foster care. However, these decisions would require a thorough

evaluation of each individual's functional capacity, which was not available in most of the records reviewed by the Panel.

- *Eligibility for Provisional Discharge*

It is likely that many of the clients in the Alternative Program could be treated in a less restrictive environment. The Panel's reviews indicated that many of those with intellectual disabilities likely did not pose a significant risk to the public at the time of their commitment. Due to their diminished intellectual capacity, these clients committed offenses against children and other vulnerable adults and did not have the ability and skills to control their sexual impulses.  It is likely that many of them did not understand their sexual urges and due to their life situations, had readily available child or other vulnerable victims. It is possible that some clients with intellectual disabilities with histories of sexual offending were referred to MSOP due to housing and service limitations. As with the SMI clientele, it was not clear to the Panel that evaluations leading to MSOP placement had fully appreciated the sometimes complicated interaction between intellectual status and prosocial decision-making, especially regarding socio-sexual knowledge and attitudes.

The one female client at MSOP, who was referred to the Court in June, is representative of persons in this population who should be considered for provisional discharge.  While these individuals will require supervision, treatment services, and supportive environments in the community, they are likely to flourish with appropriate programming in less restrictive residential settings and, as such, do not require the high level of security of the MSOP.  Many of these individuals may never be able to live independently, but some clients could be maintained long-term in appropriate supportive living community settings, or adult foster situations.  Some Alternative Program clients will likely be able to transition over time to more independent living, with appropriate employment and independent living services.

### SECTION 3: CURRENT PROFESSIONAL STANDARDS FOR THE TREATMENT OF CIVILLY COMMITTED SEXUAL OFFENDERS

**Correctional Programming**

Treatment and intervention options for people who engage in criminal behavior have varied over the past century or more. Much of the scientific and popular discussion has focused on whether or not such methods lead to greater offender successes upon release to the community – often measured in terms of rearrest or reconviction rates, post-release. In 1974, Martinson published a large-scale review of correctional treatment programs, finding no significant differences in reoffending between program completers and those who did not

engage in treatment. Martinson's findings were the basis for a "nothing works" perspective that has persisted into contemporary perspectives and literature.

Regarding sexual offending and treatment options, a similar report was published in 1989, asserting that psychotherapeutic interventions for these clients were equally unhelpful or inconclusive (Furby, Weinrott, & Blackshaw, 1989). Subsequent reviews of the "success" of treatment programming for people who have sexually offended have been generally positive (Hanson, Bourgon, Helmus, & Hodgson, 2009; Lösel & Schmucker, 2005), with reductions in reoffending due to treatment participation being generally in the 40% range. Nonetheless, differences of opinion remain as to the true effectiveness of treatment and many in the field have called for further investigation using more sophisticated research methods (e.g., randomized clinical trials [RCT], see Seto, Marques, Harris, Chaffin, Lalumière, Miner, Berliner, Rice, Lieb, & Quinsey, 2008).

In answer to broadly applied "nothing works" claims, criminological researchers have sought to demonstrate that interventions can reduce reoffending, but that certain rules or principles have to be followed. One particular model grew from research conducted in Canada by Andrews and Bonta (2010). These researchers produced meta-analytic reviews of programs demonstrating positive outcomes and concluded that significant reductions in reoffending could be achieved if program providers followed three relatively simple principles:

- **Risk Principle:**  Interventions should match the degree of risk posed by clients. That is, high risk clients should be referred to high intensity programming, while lower risk clients should be referred to low intensity programming, if they are referred to programming at all.
- **Need Principle:**  Interventions for persons engaging in criminal behavior must focus on criminogenic needs (i.e., their individual issues that led to their involvement in criminal behavior).
- **Responsivity Principle:**  Interventions must be individualized to the extent that client characteristics are taken into consideration (e.g., learning style, motivation, intellectual abilities, etc.).

The Risk-Need-Responsivity (RNR) model forms part of the Andrews and Bonta (2010) Psychology of Criminal Conduct, which is a complex theoretical approach to risk management and application of treatment interventions in the service of community safety and client self-efficacy. The RNR model has become the pre-eminent model of effective correctional interventions in most western jurisdictions and elsewhere around the world.

**Interventions for People who Sexually Offend**

Laws and Marshall (2003; Marshall & Laws, 2003) provide an excellent summary of the history of treatment for people who have sexually offended. Early efforts to treat people who have sexually offended tended to be similar to treatment methods for other mental health conditions. For instance, when treatments for mental illness were psychodynamic in nature so, too, were treatments for problematic sexual behavior. Similarly, the advent of behavioral, cognitive and, ultimately, cognitive-behavioral methods led to adaptations for treating people in trouble with the law, including those who sexually offended.

Prior to the mid-1980s, there was no generally accepted model of treatment specifically designed for addressing the clinical needs of people with sexual offending histories. In the mid-1980s, clinicians working in California and the Pacific Northwest (see Laws, 1989) noted similarities between the clinical presentations of people with substance abuse problems and those with sexual offending histories. These practitioners theorized that interventions designed to address substance abuse might be adapted to address sexual behavior problems. The Relapse Prevention model (RP – Marlatt & Gordon, 1985), which was developed for the treatment of alcohol and substance abuse was adapted and became the first broadly accepted model applied to the treatment of sexual offending behavior.

By the mid-1990s, however, many practitioners were noticing difficulties in the application of the RP model to sexual offending. Soon, reports from California's Sex Offender Treatment and Evaluation Project (see Marques, Wiederanders, Day, Nelson, & van Ommeren, 2005) suggested that treatment following the RP model was not successful at reducing rates of sexual reoffending. On this basis, revisions to treatment methods were made focusing primarily on strength-based models with a holistic approach (see Marshall, Marshall, Serran, & O'Brien, 2011). The current, widely endorsed Good Lives Model (GLM – Yates, Prescott, & Ward, 2010) is one example of a strength-based model; although there are others. GLM theory asserts that all people strive to achieve certain "human goods" (or common life goals – e.g., knowledge, friendship, community, happiness/pleasure), but that some people do so in maladaptive ways due ostensibly to problems in self-regulation. The GLM suggests that successfully-treated clients strive to be healthy, productive, and free of risk as a natural consequence of the stability that comes with leading a "good life".

**Treatment for Persons at High Risk to Sexually Reoffend**

At present, intensive treatment for people who have sexually offended is not consistently available across the United States to clients serving the incarceration portion of their sentences. Some states are noteworthy in their efforts to make prison-based programming available (e.g., ME, MN, NY, and VT, among others); however, it remains true that not all such offenders will

have access to treatment while incarcerated.  Notwithstanding jurisdictional differences, many institutional treatment programs in prison are psychoeducational in nature and unlikely to fully adhere to the RNR principles noted above.

Many jurisdictions (20 states and the federal government) have established civil procedures for the involuntary, indeterminate commitment of some people who have sexually offended in secure treatment facilities post-incarceration. Sexual offender civil commitment (SOCC) has become a particularly contentious issue in both the clinical and public policy domains (see Janus, 2006; LaFond, 2005), with several programs having been the subject of class action lawsuits centered on the legitimacy of their existence and/or the constitutionality of the procedures and treatment processes inherent in such programs.

**Treatment in Sexual Offender Civil Commitment Centers**
The United States Supreme Court has consistently ruled that SOCC is constitutional as long as its purpose is not simply preventive detention. That is, SOCC programs must offer treatment programming that, if successfully completed, can lead to civilly committed persons being released back to the community.  The means by which individual SOCC programs accomplish this goal of community release varies across jurisdictions. According to a recent survey conducted by the Sex Offender Civil Commitment Programs Network (hereafter referred to as the 2014 SOCCPN Survey – see Schneider, Jackson, D'Orazio, Hébert, & McCulloch, 2014), not all SOCC programs include a "step-down" or less restrictive alternative (e.g., conditional release, placement in a halfway house). Across 17 programs reporting, numbers of clients conditionally released varies from one to 114; whereas unconditional releases range from zero to over 350 (Schneider et al., 2014). According to information provided by MSOP to the 2014 SOCCPN Survey, MSOP has conditionally released two individuals since 1994, one of whom was ultimately returned to the program after being unsuccessful in the community (i.e., he incurred technical violations).

The majority of civil commitment treatment programs identify their major theoretical underpinnings (or "organizing principles") as Risk-Need-Responsivity (65% of 15 programs reporting) and cognitive-behavioral (47%), with GLM (41%), integrated (33%), and RP (29%) being somewhat less often noted.[1] Within those theoretical frameworks, the following approaches are noted:  process groups (100% of 16 programs reporting), attention to dynamic risk factors (81%), focus on self-regulation (69%), organized milieu (81%), motivational interviewing (81%), dialectical behavior therapy (69%), and strength-based approaches (75%). These distinctions may be overlapping in some programs.

---

[1] For all intents and purposes, both GLM and RP might be characterized as cognitive-behavioral in nature, which may also apply to "integrated".

Information provided by MSOP to the 2014 SOCCPN Survey (Schneider et al., 2014) reports that the organizing principles of the MSOP treatment program are Good Lives, RNR, and cognitive-behavioral therapy. Within those organizing principles, MSOP identifies the following approaches as being utilized:  sexual offender process group, dynamic factor risk management, self-regulation, organized milieu/therapeutic community, motivational interviewing, dialectical behavior therapy, and strength-based approach. During visits to the MSOP sites, and in discussions with MSOP administration, staff, and clients, it was unclear whether all identified processes were actually being currently implemented. Specifically, the Panel noted inconsistent application of the Responsivity Principle and identified situations in which motivational interviewing techniques were not consistently used.

- *Identifying Targets for Treatment*

Adherence to the Risk and Need principles of RNR requires that comprehensive assessments be completed prior to commencement of treatment. Such evaluations typically include static risk factors (using actuarial risk assessment instruments – ARAIs), dynamic risk factors (or criminogenic needs), sexual history and relationships, cognitive functioning, personality structure, general mental health, physical health, alcohol and substance abuse, social supports, and other psychologically meaningful variables (see Mann, Hanson, & Thornton, 2010). Most SOCC programs conduct a formal pre-treatment evaluation to determine appropriate treatment targets (10 of 16 programs reporting; see Schneider et al., 2014). Over and above use of ARAIs (e.g., Static-99R, MnSOST), evaluations in SOCC settings typically review intellectual status ($N$ = 10) and personality orientation ($N$ = 8; possibly including evaluation of psychopathy [$N$ = 2]). Information provided by MSOP to the 2014 SOCCPN Survey indicates that tests of sexuality, personality, and cognitive abilities are used to identify targets for treatment.  However, the Panel observed in client records that psychological assessments were conducted sporadically and appeared to have little effect on identifying treatment targets, therapeutic goals, phase placement, or responsive intervention strategies.

- *Mode of Treatment*

Throughout the United States, it is common for treatment offered to people who have sexually offended to consist of group psychotherapy. Best practice suggests that groups meet regularly and that they be of a certain size (membership) and length (duration), in addition to being ideally co-facilitated by one male and one female therapist. According to Schneider et al. (2014), the average time in SOCC treatment per week is 16 hours (range = 3.0 – 34.0 hours, $N$ = 15), with groups typically meeting three times per week for 90 minutes to two hours ($N$ = 11). Group treatment is the norm, with modal group size usually being 8-9 participants with two

facilitators ($N$ = 17). Individual treatment is available in most SOCC programs (13 of 14 programs reporting), but is typically offered on a case by case basis (84.6%).

The MSOP Theory Manual notes that the primary mode of intervention at MSOP is group therapy, either in core therapy groups or psychoeducational and content groups. Data provided to the 2014 SOCCPN Survey indicate that MSOP clients are in treatment an average of 8-11 hours per week, with "treatment" consisting of core groups, psychoeducational modules, recreational/vocational programming, educational programming, individual treatment, and community meetings. At times, discussions with clients conflicted with data provided by MSOP. The 2011 Report of the Legislative Auditors Office indicated that MSOP clients received an average of 7 ½ hours of core group and psychoeducational modules per week.  MSOP core groups are spread over two to three sessions weekly, each lasting approximately two hours. Group size was reported to be 8-10 participants in core groups, with co-facilitation as the norm. Non-core groups – referred to in MSOP nomenclature as "psychoeducational modules" – are not necessarily co-facilitated (partially because of staffing difficulties) and group size is larger. Although not ideal, this occurrence is not uncommon in psychoeducational programming within SOCC programs (e.g., psychoeducational groups in Florida may have as many as 20 participants with one facilitator). All MSOP clients are noted as having one hour per month of individual contact with their primary therapist. Some clients may also meet individually with a treatment psychologist, "if clinically indicated."  Interviews with MSOP clients conducted by the Panel suggested that this is not always the case and the 2012 MSOP Evaluation Report (Haaven, McGrath, & Murphy, 2012) indicates that "individual therapy is not provided at Moose Lake for Phase Two clients." Treatment is likely to be more successful when there is a therapeutic alliance. That is, clients benefit from having a meaningful primary point of contact and there is agreement between the client and program regarding the goals and tasks of treatment.

- *Treatment Programming*

Treatment programming for clients in SOCC facilities shares many elements in common with sexual offender treatment generally, but also includes approaches and methods unique to this population, as most SOCC clients represent a high risk to reoffend and present with high levels of criminogenic need. Owing to their complex clinical and risk presentations, SOCC clients receive intensive, long-term interventions often lasting several years (e.g., typical time in SOCC treatment, from start to finish, is approximately five to seven years, but this appears to vary broadly across programs).

Contemporary treatment approaches for people who have sexually offended – including those in SOCC programs – have emphasized a holistic approach, in which both general and sexual self-regulation are important target domains for intervention. The types of interventions considered

to be "treatment" in the Schneider et al. (2014) review varied from program to program, with all programs including "core" groups (i.e., sexual behavior process treatment), with other facets including psychoeducational modules (13 of 16 programs reporting), individual therapy (11/16), community meetings (9/15), recreation and vocation (9/16), and educational (5/16). Information provided in Schneider et al. (2014) also details the types of vocational programming available to program participants across jurisdictions (e.g., custodial, landscaping, culinary, small engine repair, carpentry, information technology, and medical billing/coding). In their comprehensive psychology of criminal conduct, Andrews and Bonta (2010) reported that successful programs are those that have a well-defined theoretical structure, as well as a guide or manual to ensure fidelity to the model and to prevent programmatic drift. All 16 programs reporting in Schneider et al. (2014) reported having a written program description, while 11 also had a specific treatment manual. Eight of fifteen programs noted that at least 50% of their treatment programming had a manual to direct interventions.

The MSOP has created three documents that, together, could be considered an overall "manual" for treatment: 1) a Theory Manual, 2) a Clinician's Guide, and 3) a Matrix Scoring Manual. MSOP indicates that 75% or greater of the treatment offered to clients is structured or delivered from these manuals. Each of these documents is well written and includes a wealth of information for program staff and those reviewing the program. The Theory Manual notes client willingness to change as the single most important factor in treatment, and highlights the Stages of Change model as a means to characterize client orientation towards change. Skill acquisition, rehearsal, and enactment are highlighted as important for clients to be able to make changes and maintain new behaviors. The Theory Manual emphasizes self-regulation and the importance of identifying pathways to reoffending as a means to tailor interventions to the individualized needs of clients. The manual states that group therapy is the most effective environment for clients at different stages of change to interact, support, and to challenge one another. These documents provide information and guidelines for clinical staff that are consistent with general thinking in the literature and practice regarding treatment for people who have sexually offended.

Treatment interventions organized by phases or modules are common amongst jurisdictions with SOCC programs. The number of phases varies from program to program, but is typically either three or four. In a four-phase model, the first phase of SOCC treatment typically focuses on readiness and motivation for change, and problem-solving skills development (sometimes including adherence to institutional rules and codes of conduct). Most programming in Phase One is psychoeducational in nature and may include various modules aimed at particular skill sets. Some problem-solving programs used in Phase One have included specific published programs (e.g., *Moral Reconation Therapy* [MRT] – Little & Robinson, 1988; Little, Robinson,

Burnett, & Swan, 1999; *Thinking for a Change* [US Bureau of Prisons] – Glick, Bush, & Taymans, 1997) while treatment readiness programs may include specific motivation enhancement curricula (e.g., *Treatment Readiness for You* [TRY] – Cullen & Wilson, 2003; *Awakening Motivation for Difficult Changes* – Prescott & Wilson, 2013).

Phase Two of SOCC treatment is typically where the greatest amount of focus is placed on the client's history of sexual offending and other problematic cognitions and behaviors. Generally, clients develop an agreed upon and comprehensive identification of the main factors that contributed to their past offending. This requires significant disclosure of prior offending behavior on the part of clients and may be facilitated by sexual history polygraph evaluations. The goal of such programming is to increase awareness of deficits in emotional coping and specific problematic feeling states, acknowledgement and reduction of deviant sexual arousal/interest, and verbalization of events and behaviors that comprised sexual offenses – ultimately leading to the development of self-awareness interventions and new coping strategies.

Phase Three typically focuses on the development of new ways of thinking and behaving, keeping in mind former vulnerabilities and patterns of thought and behavior. Clients seek to reliably control psychologically meaningful risk factors, while learning to emphasize protective factors (i.e., individual qualities and life circumstances that serve to reduce risk). Many programs use the "old me, new me" approach, especially in subpopulations of persons with intellectual disabilities, advocated Haaven, Little, and Petre-Miller (1990) that is regarded as a precursor to programming emphasizing a "good lives" approach. Also during Phase Three, clients often focus on the development of prosocial and enhanced interpersonal skills, emphasizing emotional awareness.  By the end of Phase Three, clients are expected to have identified personal and environmental contributors to risk and to have devised and rehearsed means by which to address these concerns in prosocial ways, emphasizing the development of balanced and self-determined lifestyles.

In many SOCC programs, Phase Four comprises a maintenance phase, wherein clients continue to practice new learning and skills in a supportive environment (either within the institution or on conditional release). Part of the Phase Four agenda is preparation for and integration to release. Clients finalize their release plans and develop contacts with community treatment professionals, social service agencies, and individuals who will assist them in establishing stable lives in the community. Although some SOCC programs do not have step-down or less restrictive options, this does not preclude the inclusion of a maintenance phase.

- *Phase Model at MSOP*

The MSOP program is largely in line with the majority of other SOCC programs, in that it employs a phase model of treatment; in this case, three phases (Phases Two and Three, described above, are subsumed under Phase Two in the MSOP model). At the MSOP, Phase One emphasizes learning to comply with facility rules and expectations, as well as providing an introduction to basic treatment concepts. The MSOP curriculum, however, does not include any "sex offender specific" treatment during this phase. Goals include general orientation to the program, greater emotional management, increasing treatment engagement (i.e., motivation to change), and building self-management skills. In reference to the Stages of Change model (DiClemente & Prochaska, 1998), Phase One deals with issues in the *precontemplation* and *contemplation* stages of change, during which clients use introspection to identify problems and take responsibility for their actions, in addition to receiving external feedback and guidance from program staff and peers in therapy groups and on living units. Maintenance polygraph evaluations are completed (and required) to ensure compliance with facility rules. It should be noted that the panel did not observe any indication that there was an initial assessment of the client's current stage of change to inform initial phase placement, nor does the Theory Manual or Clinicians Guide describe such an assessment.  It is likely that not all clients are in the precontemplative or contemplative stage of change at intake into MSOP. Further, stages of change may be somewhat fluid, depending on the focus of inquiry. For instance, clients may be fully prepared to deal with issues of substance abuse (i.e., action), but still resist focus on issues of sexual behavior (i.e., precontemplation or contemplation). With a more nuanced approach to stages of change, it may well be that those clients at more advanced stages of change could either be immediately assigned to Phase Two or be placed in a short-term orientation phase that would expedite movement to Phase Two.

Phase Two of the MSOP program focuses on discussion and exploration of the client's history of sexual offending behavior and maladaptive patterns of behavior, along with the motivations for those behaviors – the goal being to develop adaptive coping strategies to avoid future engagement in sexually offensive conduct. This includes emphasis on disclosure, identification of abuse patterns and schemas, skill acquisition, and awareness of self and others (Hébert, 2014). Program staffs assist clients in developing a relapse prevention plan that requires a new understanding of past life experiences, interpersonal attachments, sexual self-regulation, and management of emotion. This plan leads to a greater understanding of compensatory mechanisms required to manage problematic cognitions, emotional states, and behaviors that may contribute to offending. Specialized testing during this phase includes full disclosure and maintenance polygraph evaluations, in addition to assessment of sexual arousal and interest (using either PPG or Abel Assessment). According to Hébert (2014), Phase Two focuses on the *contemplation*, *preparation*, and *action* stages of change; however, as noted above, it was not

always clear to the Panel that program staff had specifically assessed clients in regard to their current stage of change or if treatment goals were personally meaningful to clients.

In Phase Three of the MSOP program, clients work on applying skills learned in Phase Two to daily life, while demonstrating consistent utilization of pro-social coping strategies (Hébert, 2014). Clients in Phase Three also begin their focus on community reintegration and the process of deinstitutionalization through a process of restructuring their self-image as someone who can lead a meaningful and non-offending prosocial life. Clients in Phase Three are considered to be in the *maintenance* stage of change and, as such, are afforded much greater privileges. Specialized assessments (e.g., polygraph, PPG) are used as subscribed or on an as-needed basis. Although Phases One and Two can be completed at either the Moose Lake or St. Peter locations (depending on treatment track), all Phase Three treatment is offered at the St. Peter site.  During Phase Three, clients reside in a secure area, but may be allowed supervised access to the community to attend meetings or other functions aimed at increasing reintegration potential. Some Phase Three clients are assigned to Community Preparation Services, in which they live in a separate unit on the St. Peter site that is not within the secure perimeter. Although nearly all MSOP clients wear electronic monitoring ankle bracelets, Global Positioning Satellite monitoring is also required for all clients in Phase Three.

Programming at the MSOP is aimed at developing and maintaining meaningful change in a variety of domains, known as Matrix Factors:

- Group behavior
- Attitude toward change
- Self-monitoring
- Thinking errors
- Emotional regulation
- Interpersonal skills
- Sexuality
- Cooperation with rules/supervision
- Prosocial problem solving
- Productive use of time
- Healthy sexuality
- Life enrichment

As clients move through the phases of the MSOP program, they are expected to show greater application of the concepts contained in the Matrix Factors. Matrix Factors are tailored to each treatment phase, and the Theory Manual contains an elaborate Goal Matrix that

comprehensively outlines expectations and goals that become progressively more sophisticated as clients advance through the phases.

- *Treatment Progress Review*

Traditional approaches to measuring treatment success have relied on rates of reoffending, post-release – with lower rates of reoffending suggesting that treatment had been successful. This process provides an indication of program success, but does not provide a mechanism for assessing the success of individuals receiving treatment.  Contemporary approaches, however, have stressed the need to measure "in-treatment" change (Hanson et al., 2007; Hanson & Yates, 2013; Mann et al., 2010). That is, incremental changes on psychologically meaningful risk factors measured at frequent intervals while clients are in programming provide an important running commentary on how well clients are attending to the curricula and whether or not they are able to incorporate new learning into their daily lives. There are several means by which to measure in-treatment change, including goal attainment scaling (Barrett, Wilson, & Long, 2003; Hogue, 1994; Stirpe, Wilson, & Long, 2002), use of dynamic risk scales (e.g., Stable-2007 – Hanson et al., 2007), and other checklists created for specific purposes in individual programs. Information gathered from measures of in-treatment change is important for updating and revising client treatment plans.

According to Schneider et al. (2014), 9 out of 16 programs update the treatment plans of clients on a biannual basis, with the remainder doing so either quarterly (6 of 16 programs), or annually (2 of 16 programs).  Six of seventeen programs reported conducting annual progress reviews, while others conduct such reviews on a quarterly (5 of 17 programs), biannually (4 of 17 programs), or monthly (1 of 17 programs) basis. Treatment progress reviews are typically distinct from forensic evaluations (15 of 16 programs reporting), with the treatment team or clinician being the one to complete the review in most cases (13 of 16 programs). The most common method of assessing treatment progress is using clinical judgment (100% of 16 programs reporting); although use of checklists (12 of 17 programs) and structured assessment protocols (7 of 16 programs) was also reported. Treatment progress reviews tend to focus on observable changes in behavior (100% of 16 programs reporting), performance on assignments and reaching learning objectives (93.7%), reductions in known dynamic risk factors (81.3%; using Stable/Acute-2007, SOTIPS, VRS:SO, or stages of change), evaluations using polygraphs (62.5%), and attention to sexual arousal and interest (ranging from 37.5% to 56.3%, via either penile plethysmography [PPG], behavior modification, or use of antiandrogen medications).

According to Hébert (2014) and data provided to the 2014 SOCCPN Survey, treatment progress reviews at MSOP are completed by the clinical team on a quarterly basis with input from therapeutic recreation, education, vocation, health services, and operations. These reviews

include case formulation, a summary of participation in group treatment, ratings on Matrix Factors, progress on individualized treatment plan goals, and information gathered from specialized assessments (e.g., polygraph, sexual arousal/interest, and other psychological testing). Annual progress reviews are also conducted by clinical staff at the MSOP, with the intent to review progress over the past year and to identify goals for the coming year, which are incorporated into the client's Individual Treatment Plan. Treatment plans are revised on an annual basis. Data provided to the 2014 SOCCPN Survey state that MSOP does not use a particular standardized/published measure to assessment treatment progress; however, interviews the panel conducted with staff suggested that Stable-2007 and Acute-2007 (Hanson, Harris, Scott, & Helmus, 2007) are being used to assess clients in some regards (e.g., risk assessments).  Haavan et al. (2012) and an expert panel that reviewed MSOP client records in February 2013, that included Haavan et al. and additional experts, noted problems with the reliability of clinicians' ratings of the Matrix used by MSOP to assess client progress and make phase advancement decisions.

It is important to distinguish clinically based annual reviews from those that might be completed for the purposes of reestablishing (or refuting) continued eligibility for civil commitment (i.e., "forensic reviews"). Forensic reviews are conducted annually in 13 of 16 programs reporting (Schneider et al., 2014), with each of these programs noting that forensic evaluators have no treatment responsibilities. Twelve of thirteen programs reported using the Static-99R in their forensic reviews, with lesser use of the SRA-FV (3 of 13 programs) and "other" measures (e.g., VRS:SO).

Sex Offender Risk Assessments (i.e., forensic reviews) at the MSOP are conducted only as part of the petitioning process (Hébert, 2014). These assessments are conducted by MSOP forensic psychologists who are not part of the treatment team; however, information gathered during the risk assessment process can be used in treatment planning. In comparison to most other SOCC programs, in which periodic reviews of civil commitment status are conducted on a set periodic basis (e.g., annually), it is unusual and of great concern to the Panel that assessments of this sort are only completed at MSOP when a client is actually petitioning for release or movement to CPS.

- *Attention to Responsivity Concerns*

The Responsivity principle (Andrews & Bonta, 2010) decrees that programming should take into consideration idiosyncratic elements of the clients in treatment (e.g., differences in learning style, cognitive abilities, motivation, mental health, etc.). Although it is admittedly difficult to completely individualize the interventions in programs using group treatment as the primary mode of service delivery, there are ways in which to increase client responsivity. One obvious

way to do so is by creating specialized treatment tracks that group together offenders sharing similar attributes. According to Schneider et al. (2014), the most common specialized tracks found in SOCC programming are special needs (e.g., intellectual disability, low cognitive functioning; 13 of 16 programs reporting), severe mental illness (SMI, 10 of 16 programs), behavioral issues (8 of 16 programs), psychopathy (5 of 16 programs), and young adults (2 of 16 programs). Some programs (e.g., Florida) collapse behavioral issues and psychopathy together into one track.

The MSOP Theory Manual notes that several "specialty programs" are available to clients at MSOP:

- *Admissions*, for newly admitted clients
- *Assisting Living Unit*, for clients who are medically compromised and require specialized care
- *Behavior Therapy Unit*, for disruptive clients
- *Corrective Thinking Unit*, for clients with high levels of entrenched antisociality
- *Mental Health Unit*, for clients with significant mental health diagnoses or personality disorders leading to emotional instability and risk for self-injurious behaviors
- *Young Adult Unit*, for clients under 25 years of age who do not meet criteria for placement in alternative or corrective thinking programming

Information provided by MSOP to the 2014 SOCCPN Survey indicates that program tracks are available for young adults, behavioral issues, and mentally ill residents. Although not indicated in survey responses (an option was available),  the Theory Manual suggests that alternative programming is available for clients who experience difficulty in conventional programming, due to intellectual disability or other presentations including decreased abilities in receptive or expressive language. Concomitant psychiatric issues may also be present and contribute to clients' difficulties in negotiating conventional programming. Matrix Factors for the alternative program are noted as being the same as those used in conventional programming; however, the approach to treatment is modified so as to better respond to these clients' treatment needs. The Alternative Program is located entirely at the St. Peter facility.

The MSOP Theory Manual acknowledges that clients in the Alternative Program require specialized care and that they may take longer to learn and retain treatment concepts. Individualization is also noted as an important aspect of this treatment track. Group therapy sessions include simplified language, arts based approaches to complement and reinforce verbal interactions, greater reliance on role play and other experience-based opportunities, and

a balance of teaching, processing, practice, and strategic use of breaks. Repetition and greater reliance on visual cues are also noted as important components.

Overall, the Alternative Program as described in the Theory Manual is in line with similar programs offered in other SOCC settings. During visits to the St. Peter facility by the Panel, however, there were several examples that suggested that the theory is not necessarily making it into practice. In several instances, clients in the Alternative Program were asked to describe their Matrix goals. In each case, and as noted earlier in this report, the client being interviewed was asked to show the panel his/her Matrix Factors pocket cards, but was unable to read the materials or to describe how he/she was working to achieve the goals or was able to describe the concepts in any meaningful way. One client had a self-made modified Matrix Factors pocket card, but was unable to adequately describe the concepts contained therein.

The 2012 MSOP Evaluation Report (Haaven, McGrath, & Murphy, 2012) notes that the program has experienced difficulty in moving clients through the treatment phases, particularly between Phases Two and Three. Haaven and colleagues opined that program staff may have overly high expectations, leading to fewer client advancements. They also emphasized the need to focus more on skill building and practice than therapeutic processing. Overall, Haaven and colleagues reported that clients and staff in the MSOP were feeling "demoralized" about the lack of clients "getting out". This "demoralization" represents an important treatment interfering factor, in that it has promoted a culture of learned helplessness, in which staff and clients alike have come to believe that phase advancement leading to community discharge is a virtually unattainable goal. These same observations were made by the Panel.

- *Programming for Women*

MSOP currently has one female SOCC client. This client is currently housed and treated on the same unit at St. Peter as her male peers. Although information provided to the 2014 SOCCPN Survey states that gender-sensitive programming is available at MSOP, this was not in evidence when the Panel was on site. In a separate report to the Court, the Panel expressed grave concerns about the clinical and residential circumstances faced by this woman. The literature is clear that females who engage in sexual offending behavior are "different" from their male counterparts, to the extent that they require treatment interventions that are responsive to gender-specific concerns (see Cortoni, Hanson, & Coache, 2010). Additionally, the *United Nations Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders* (2010) assert that women be afforded gender-sensitive care, including housing and treatment, among other considerations.

According to the 2014 SOCCPN Survey, six programs reported having female civilly committed clients. Two programs noted that female clients were placed in the same facility as male clients, but only one of these programs reported that treatment was offered individually (i.e., not with male participants). Of the four remaining programs, three place female clients in a different facility and one program places females individually in the community. Of those programs reporting, only five commented on the treatment offered. Three programs do not offer gender-specific treatment to female clients, while two do.

- *Skill Building and other Opportunities*

With the advent of holistic and strength-based approaches (see Marshall et al., 2010) in the treatment for people who have sexually offended, there has been a greater appreciation of the need to focus on lifestyle balance and not solely on deviant behavior. In building comprehensive therapeutic options for SOCC clients, it has become important to provide other opportunities for skill building and increased prosocial competence. The 2014 SOCCPN Survey highlighted a variety of extra-curricular program options available in many SOCC settings.

In keeping with its stated adherence to principles of the Good Lives Model, the MSOP has a well-developed cadre of program opportunities beyond involvement in "core groups" (i.e., sexual behavior process treatment). Indeed, it is in this particular area that MSOP shines brightest. The Panel was particularly impressed by the MSOP's education, vocation, and therapeutic recreation departments. Each campus has superior availability of education materials, equipment, and opportunities for instruction. Clients are able to seek high school diplomas, as well as take college level courses. The vocational programs at both campuses would likely be the envy of any correctional or forensic treatment facility in the country. Clients are clearly able to develop both skills and competencies in a number of different employment areas. The agriculture programs (e.g., fish farm and vegetable gardening) were simply fascinating. As to therapeutic recreation, each facility has a bright and well-appointed gymnasium with trained recreation staff. Further, each campus has large outdoor areas available for team sports and other functions. Outdoor sports equipment is also widely available at both campuses.

**Treatment Completion**

The concept of "treatment completion" as it applies to people who have sexually offended is complex and controversial. At present, there is no agreed-upon standard by which to appraise any individual client as having completed treatment. Part of this difficulty appears to be political in nature, in that few individuals or authorities are willing to state that a particular sexual offender has finished treatment. There are also clinical concerns regarding defining treatment completion for persons experiencing behavioral difficulties. Treatments for medical

infirmities (e.g., bacterial infections, broken bones) are much easier to characterize as
"complete", than are the treatments for psychological conditions (e.g., personality disorders,
impulse control issues, patterns of aberrant behavior).

Most SOCC clients come into treatment having completed intake evaluations that identify
important treatment targets. Through participation in treatment, sexual offender clients are
able to gain an understanding of prior attitudinal and behavioral difficulties to the extent that
they can develop new ways of thinking and behaving that, theoretically, will help them to avoid
engaging in future sexually abusive conduct. Through the use of measures of in-treatment
change, clinical staff are able to rate clients on important risk and protective factors to assess
whether pro-treatment and prosocial gains are being made and maintained. There is no
ultimate measure, however, of whether or not new skills and understanding will endure, other
than the client's long-term efficacy upon release to the community.

Notwithstanding the preceding, SOCC treatment programming must have a reasonable end
point. Some programs (e.g., Florida) have constructed language such as "maximum treatment
benefit" to signify that clients have achieved significant mastery of the program's curricula and
that, to the extent that they are able, there is nothing left for staff to convey to the client via
programming. Other programs (e.g., Wisconsin) have statutorily defined language such as
"significant progress in treatment" to signify clients who have sufficiently achieved inpatient
treatment goals and they should be considered for supervised release in the community. Some
SOCC programs have particular components that must be successfully completed prior to
consideration for release, which may include positive outcomes on specialized testing,
successful presentation to a quasi-judicial panel, or agreement by experts that the client has
made "changes". Other programs (e.g., New York) release clients if they demonstrate through
some treatment completion or no treatment at all that they no longer meet the statutory
dangerousness requirements, regardless of the phase of treatment.

In order to be deemed to have "completed" treatment, participants in most SOCC programs
must disclose a sexual offense history that is at least reasonably consistent with official records
(Schneider et al., 2014); although several programs require participants to disclose all instances
of sexually offensive behavior including uncharged offenses. A majority of SOCC programs
require that clients "pass" a full disclosure polygraph before they can be considered finished in
treatment.

According to information provided to the 2014 SOCCPN Survey, MSOP has no nomenclature to
describe treatment completion. In order for a client at MSOP to be judged as ready for possible
release, the client's clinical team must agree that he/she has achieved consistent mastery on

the Matrix Factors, coding of which previous reviewers and evaluators have found to be unreliable. At that point, the clinical team may support or recommend that the client petition for release; although the client can do this on his/her own. The MSOP Theory Manual states that all clients have the right to petition every six months for a decrease in custody, provisional discharge, or full discharge.  Once the petition has been filed, there are two steps the client must take: 1) presentation to a Special Review Board (SRB) consisting of professionals appointed by the Commissioner of the Department of Human Services, whose recommendations are then conveyed to 2) the Minnesota Supreme Court Appeals Panel (SCAP), which is made up of three judges who have the responsibility to make the final determination as to the petition. Currently, only two individuals have successfully made it through both these steps, with one client ultimately being returned to MSOP after experiencing problems in the community (i.e., technical violations) and the other currently living in the community under conditional release supervision conditions. To date, no one has ever been unconditionally discharged from MSOP.

## Effectiveness of Treatment for People who have Sexually Offended

As noted in the introduction to this section, controversy remains regarding the extent to which treatment for people who have sexually offended is able to both reduce reoffending and increase the reintegration potential of treated clients. Meta-analytic reviews (e.g., Hanson et al., 2009; Losel & Schmucker, 2005) have identified a consistent effect of treatment, noting that treated clients tend to reoffend 40% less often than their untreated counterparts. However, these positive findings are tempered by an acknowledgement that studies of treatment efficacy are often conducted in less than optimal scientific circumstances. There remains debate as to the need for randomized clinical trials (see Seto et al., 2007), which proponents state are necessary to truly assess the relative benefits of treatment participation. Nonetheless, it is relatively clear that engagement in treatment with a strong theoretical underpinning is better than no treatment at all and, on that basis, programs must continue to offer quality therapeutic interventions to their clients.

## Rates of Reoffending

Rates of sexual reoffending in people who have sexually offended have been on the decline for the past quarter century (Finkelhor & Jones, 2006). It is also important to note, however, that all estimates of recidivism must be evaluated with the knowledge that underreporting of sexual offending represents an important complicating factor. Nonetheless, it is likely more difficult for identified offenders to engage in new offenses than it is for unidentified offenders to continue to engage in their offending – meaning that the issue of underreporting will be less of a factor in gauging reoffending versus the prevalence of sexual abuse generally.

Hanson and Morton-Bourgon (2004) presented an important meta-analytic review of the predictors of sexual reoffending, in which they also provided an average rate of sexually reoffending of 13.7% over 5-6 years of follow-up. Subsequent reviews have suggested that sexual reoffense rates around the United States are approximately 10% within 10 years of follow-up. Studies of primarily higher risk offenders have tended to produce higher relative rates of sexual reoffending; however, contemporary findings in SOCC outcome research have suggested that clients released from civil commitment are at no greater risk to sexually reoffend than those who were not civilly committed (see Carr et al., 2012; Wilson et al., 2012). In a recent meta-analytic review, Hanson and associates (2014) found that most instances of sexual reoffending are likely to happen shortly following release to the community (i.e., within the first 3-5 years) and that, with each successive 5-year period in the community post-release, risk for future sexual reoffending was reduced by half.

**Recommendations**

The MSOP Theory Manual and responses sent to the 2014 SOCCPN Survey identify the RNR model as being one of the foundational or organizing principles of its treatment program. However, there appears to be issues regarding implementation. This is most pronounced with respect to Responsivity; especially for special needs (intellectual disabilities, SMI) and female clients. The Theory Manual describes basic modifications that would need to be made in order to better respond to the treatment needs of clients with intellectual or other cognitive deficits; however, the Panel could find no convincing evidence that adequate accommodations or program modifications are actually made. This was also true in programming for clients with SMI; particularly regarding the availability of integrated mental health services (i.e., psychiatry). Similarly, conflicting information is provided regarding treatment for women at the MSOP. Although statements have been made (e.g., information provided to SOCCPN) that gender-sensitive treatment is available, the Panel could find no convincing evidence that such services are actually being provided. Indeed, it was clear that the female MSOP client is both housed and treated with male clients.

The Panel recommends that MSOP develop and implement treatment curricula specific to special needs clients, which would include virtually all clients not currently in conventional programming. The Panel previously recommended that the female client be transferred to a more suitable facility; however, if she is to remain at MSOP, we recommend MSOP develop and implement gender-specific programming. Additionally, it is likely that this client will require additional gender-sensitive accommodations.

Treatment progress review at the MSOP is almost entirely driven by the Matrix Factors which, to be fair, are factors demonstrated in the literature as being worthy of consideration (see

Hanson & Yates, 2013; Mann, Hanson, & Thornton, 2010). However, notwithstanding comments already made regarding treatment responsivity concerns, the Panel recommends that the treatment progress review process be expanded to include more explicit participation of the client, including comments in his/her own words. Greater individualization of this process would assist clients in taking more responsibility for their progress in treatment, and would potentially go a long way towards lessening the feelings of helplessness expressed by many clients interviewed by the Panel. It will also be important for clinical staff to avoid the use of paradoxical language (see Prescott & Wilson, 2011) in interactions with clients and in creating treatment goals. Examples of this language include: "you need to be more motivated to change"; "seriously exploring your life and questioning your actions is a part of treatment; seriously questioning your treatment program may be viewed as resistance and failure to progress"; and "it is our [treatment staff] job to point out your thinking errors; however, it is not acceptable for you [the client] to observe when we are using thinking errors".

Forensic assessment of MSOP clients is conducted by staff who are independent of the treatment team. These assessments utilize several tools commonly used in the evaluation of risk to sexually reoffend, including the Static-99R and Stable/Acute-2007. Although the Panel agrees that use of structured, empirically supported processes is commendable, there are potential implementation difficulties associated with the assessment team's current use of certain tools. Specifically regarding the Stable-2007, the assessment team provides scores to stakeholders that are likely to be misleading. The Stable-2007 is comprised of 13 dynamic risk factors in five sections. These risk factors have been more than adequately described in the literature as being of assistance in gauging the ongoing risk posed by people who have sexually offended (see Hanson et al., 2007; Hanson & Yates, 2013; Mann et al., 2010).

The Stable-2007 – as an instrument – has only been standardized on community samples, meaning that use of this tool in an institutional setting will require some modification, along with a degree of caution in interpretation. This is not currently happening at MSOP. For example, two items on the Stable-2007 would be quite difficult to score for institutionalized clients: 1) significant social influences (this item addresses the balance between prosocial and antisocial influences, and would be very difficult to appraise in an institutional environment where almost all contacts and relationships the client has are with other persons with criminal histories), and 2) relationship stability (this item addresses the client's ability to maintain a stable and rewarding intimate relationship with an age-appropriate partner, which is obviously very difficult to rate in a person confined to an institution). The Panel was able to observe three SRB hearings, in which the assessment team representative presented scores on the Stable-2007. In each of these hearings, the client's inability to address these two items was included as part of the discussion about increased risk attributable to dynamic predictors. The Panel

recommends that the assessment team give better consideration to the applicability of some dynamic predictors in its assessments of clients during forensic reviews or in petitions to the SRB/SCAP.

Similar to the issue noted in the preceding paragrahs, it was apparent to the Panel during reviews of client records that other problems exist regarding applicability of tools. Specifically, assessments of MSOP clients with juvenile-only sexual offense histories often included reference to diagnostic and risk assessment tools designed specifically for use in the assessments of adults. The Panel recommends that MSOP administration strive to ensure that assessment tools and measures used with clients be specifically applicable given individual client characteristics. This would also apply to tools and measures created specifically for special populations (e.g., use of the ARMIDILO-S with for clients with intellectual disabilities, or the SORAG for clients with SMI).

Case conceptualization for treatment planning purposes requires a comprehensive review of all pertinent risk and case management factors. Although the majority of treatment for people who have sexually offended is offered in a group psychotherapy format, it is still critically important that individual client needs be considered in the treatment planning process, in keeping with the Need principle of the RNR model. In working with clients exhibiting inappropriate sexual behavior, it is important to consider the influence of problems in sexual self-regulation (Hanson et al., 2007; Hanson & Yates, 2013). Possession of sexually deviant interests represents a particularly robust predictor of reoffense (Hanson & Morton-Bourgon, 2004), which requires assessors to consider the presence of paraphilic interests or preferences. In reviewing client records, the Panel was concerned regarding the number of paraphilia diagnoses proffered, as well as the lack of documentation supporting the diagnostic process. The Panel recommends that MSOP administration ensure adequate training in sexual psychodiagnostics for all staff who work with clients, and that current client diagnostic profiles be re-evaluated for accuracy and consistency using DSM-5 criteria.

### SECTION 4: REVIEW OF MSOP POLICIES AND PRACTICES

The Panel visited both the St. Peter and Moose Lake MSOP sites twice, including several days on site for each visit (St. Peter: April 1-2, 2014 and August 4-6, 2014; Moose Lake: April 29-May 1, 2014 and June 10-12, 2014). The Panel also met with MSOP Administrators at the DHS central office in St. Paul on August 4, 2014. Site visits included a review of the program, a complete tour of each facility and its grounds, informal meetings with staff and clients on the units and throughout each facility, formal interviewing of staff and clients, and a review of client records and MSOP documents. The MSOP provided the Panel with unfettered access to information,

staff, clients, and records – the latter including electronic remote access to client records. Administrators and staff at both facilities were friendly, extremely helpful, and gracious to the Panel. Each facility provided the Panel with excellent resources including space, computers, supplies, refreshments, and security escorts whenever needed or requested.

The St. Peter and Moose Lake facilities are different in terms of the conditions, culture, environment, and the client population and programming. Accordingly, the specific conditions of confinement relative to each facility are described separately, as is the balance of safety concerns/security and therapeutic environment in general.

**Observations of St. Peter**

St. Peter is on the grounds of a Department of Health Service's campus, which includes state programs other than the MSOP, such as the Minnesota Security Hospital and the forensic nursing home. Upon entering the campus, there is a staffed security gate that requires photo identification and official notification of persons' permission to enter the grounds and the purpose and location of the visit. The staff at the security gate are dressed casually and are not employees of the MSOP.

The MSOP at St. Peter includes several buildings and, as of August 2014, primarily houses 222 clients. These clients are in a variety of program streams, according to specific aspects of their presentations:

- Clients with intellectual disabilities in the Alternative Program
- Clients with severe mental illness (SMI)
- Clients with other disabilities requiring special accommodation (e.g., the Panel met with a deaf client who was in the Alternative Program, although his intellectual capacity appeared normal)
- Clients in Phase Three of treatment
- Clients participating in Community Preparation Services (CPS)

These populations seem to be mostly exclusive of one another, in that Phase Three and CPS did not appear to include many clients with disabilities.

- *Conditions of Confinement*

St. Peter is an older facility, with the appearance, accommodations, and environment resembling a state mental health or forensic hospital. The overall buildings and grounds are clean and well maintained. The main facility is surrounded by a secure perimeter and has secure entrance and exit procedures. The grounds at St. Peter are nicely groomed and include

walking paths, outdoor recreation equipment and social gathering furniture and places, and several areas for outdoor gardening. The units are relatively small with approximately 25 living on the units in mostly shared rooms with dorm-like furniture and personal property. The space and the environment of individual rooms are adequate and most rooms include windows. The clients wear street clothes and are provided with adequate supplies to maintain activities of daily living and grooming. The units include accessible space for front line staff (Security Counselors) where they congregate, conduct tasks and documentation, which looks much like a nurse's station in a hospital setting. Security Counselors wear uniforms that have a law enforcement or corrections officer appearance, including the older model microphone radio on the shoulder. The Panel was informed that the MSOP uniforms have been changed to look less like police or correctional uniforms by removing the patches that are commonly worn by officers. Additionally, there are reportedly plans to replace current uniforms with khakis and polo shirts, at least in certain locations on the campuses. On and off the units, the buildings include staff offices; group space; social gathering space with TVs, other entertainment equipment, and supplies for leisure activities; comfortable furniture; plants; and other home-like amenities.

- *Programming*

The climate at St. Peter is positive and quiet; however, it was nonetheless active, with lots of client and staff interaction. Staff appear to have good therapeutic relationships, are caring, compassionate and committed to their work. Clinical and front line staff at St. Peter seem to be experienced and clinically astute relative to a broader range of client needs and strengths, with some recognition of client's limitations and individualized needs. Many St. Peter staff expressed appreciation for working in what they perceived to be a therapeutic environment. There is more than adequate access to vocational and work opportunities, therapeutic recreation, education and library services, a nicely remodeled food service area, leisure activities, and supplies for indoor and outdoor activities and recreation.

The clients at St. Peter in Phase Three are primarily in conventional treatment programming. During informal and formal interviews with clients, many expressed frustration with not being able to move more rapidly to CPS. They expressed concerns regarding repetition of program elements, leading to what they perceived as an inordinate length of treatment programming. Concerns were also expressed with respect to setbacks they have had in treatment, which were characterized as often leading to "starting over." Most staff seemed to empathize with client frustrations and, therefore, interact in a way that supports coping and encouragement.

The Panel opines that most clients who have consistently completed the program elements necessary to be in and maintain Phase Three status could function well and benefit from the

same environment and services offered on CPS. These clients seem to spend an unnecessary length of time in Phase Three prior to progression to CPS. This delay appears to be a result of a pervasive belief on the part of MSOP administration and staff that it is not their responsibility to proactively petition and rigorously advocate for clients to advance in phases and to CPS. There is a shared belief of having no control because the structure of the law and its processes have created the inability to release clients. However, staff and administrators also recognize the limited space on CPS and have worked diligently to get authorization to expand this space. There also appear to be stringent and perhaps unrealistic expectations for phase movement, leading to a degree of learned helplessness that appears to be greatly influenced by the historical fact that exceptionally few clients (i.e., two, but only one remains in the community) have ever been released from MSOP in its 20 year history. While the space serving Phase Three clients who are not in CPS is relatively pleasant, it is much more "institutional" than the CPS. Staff who work with these Phase Three clients seem challenged to keep the men motivated to continue their progress through treatment. Staff appear sympathetic to the legal logjam of clients who could be placed in a community setting. They also appear to empathize with clients who protest that their hard work in treatment does not logically lead to provisional discharge.

The Panel reviewed most of the records of clients in the Alternative Program and met with a subset of those clients. Many of these clients (one of whom is female) have intellectual disabilities, while others have brain injuries and some have concomitant serious mental illnesses. During visits to both St. Peter and Moose Lake, the Panel observed clients with complex diagnostic presentations and treatment needs. Some clients were so psychiatrically decompensated and disorganized in thought (particularly at Moose Lake) that they were unable to communicate or interact with the Panel in a meaningful way. For some of these clients, the Panel concluded they may never be able to meet the established criteria to progress through the phases of treatment. As noted earlier, this lack of progression appears attributable to implementation of the MSOP treatment program, which seems to be currently offered as a "one size fits all" model. It is the Panel's opinion that these clients neither have the understanding nor the functional ability to ever petition on their own behalf and, for some, it is hard to conceive that they were sufficiently competent to participate in their own defense when initially convicted or civilly committed.

Some staff at St. Peter candidly expressed to the Panel frustration with certain programmatic elements. This frustration was especially apparent regarding the difficulties inherent in working with clients who feel hopeless about ever being able to return to the community. Some staff also expressed frustration with clinical leadership's direction to rigidly adhere to the Matrix model and MSOP clinical lexicon, which they perceive as being inadequately modified and consequently inaccessible to many clients with special needs. These staff work with clients who

are unable to understand or internalize concepts, which can be quite pervasive in clients of this sort. To their credit, the St. Peter staff work compassionately with this population and appear to do what they can within the constraints. The Panel asserts that rigidly adhering to the Matrix model fails to recognize the very complex and individualized treatment needs of special needs clients, which will invariably interfere with treatment progress, particularly as it is defined by the program. Clinical staff and clinical supervisors do not appear to be supported or encouraged to appropriately modify the treatment offered in order to appropriately respond to the individual and complex needs of these clients. From a clinical point of view, this population seems to be administratively unrecognized, misunderstood, and inappropriately served (or underserved). It was clear to the Panel that staff who work with these clients have genuine and compassionate concern for the wellbeing and future aspirations of their clients, in spite of feeling unsupported in their attempts to advocate for programmatic changes.

- *Community Preparation Services*

The residential and program areas for clients in CPS are pleasant and as home-like as most community-based residential facilities or group homes. The furniture, décor, environment, unit amenities, and outdoor spaces are comparatively outstanding. The kitchen facilities, common areas, and access to personal property are beyond adequate. Further, the on-grounds access, vocational opportunities, and community-based opportunities (including community treatment) provided to this group of clients are superior to any sexual offender civil commitment (SOCC) program of which the Panel is aware.

The men on CPS all appear to be functioning responsibly and independently and at a high level – cognitively, emotionally, and interpersonally. Although some of the rooms on CPS are quite cramped, they are reasonably similar to shared accommodations in other clinical care settings or, perhaps, a crowded campus dorm room. Clients are casually and appropriately dressed. They interacted in an appropriate manner with the Panel and spoke highly of the staff and the amenities of their spaces, relative to other spaces on the St. Peter campus. All clients noted that the facilities and opportunities at St. Peter are substantially superior to their experiences at Moose Lake. Clients expressed strong motivation to maintain positive behavior, and demonstrated recognitions that if they did not, they would "have a lot to lose." Staff on CPS are easily accessible, relaxed but aware, socially interactive with the clients, and display a positive attitude. The Panel commends MSOP in its plans and actions to expand CPS to accommodate more clients who have progressed through treatment and who have been able to maintain positive behavior and garner the trust and respect of staff. It was encouraging to the Panel that when these clients are escorted by staff in the community, the staff wear street clothes, in recognition of the stigma and negative attention that would otherwise come from MSOP uniformed staff escorts.

The CPS program, the Director of the re-entry program, and its staff are to be commended for developing innovative programming and a therapeutic environment that should be the envy of other SOCC programs. As noted earlier, the vocational opportunities offered at St. Peter are excellent. CPS offers relevant, creative programming on-campus and in the community. The living environment helps the men to responsibly manage their risks and develop prosocial relationships and independent living skills. The MSOP has been able to access necessary resources to develop and expand its programming through multiple community and other agency contacts. They have developed positive professional relationships with stakeholders in the communities they access with their clients and have been vigilant with respect to community safety and risk mitigation. The staff and program administrators make reasonable risk management decisions to provide an environment and relevant community experiences close to provisional discharge and, in some ways, exceeding the experience of many states' conditional release programs.

The clients at St. Peter expressed concerns about security measures used for surveillance and monitoring of movement, which include electronic devices worn at the ankle. Clients on CPS wear not only the on-campus electronic devices; they also wear Global Positioning Satellite (GPS) tracking devices. Most clients appear to recognize that these measures are used to enhance balance between security and the therapeutic opportunities and access they have on and off campus. Some clients complained about a general lack of free movement and what they perceive to be an "institutionalized" atmosphere; however, other clients (and this Panel) recognized that MSOP administration and St. Peter staff have made numerous modifications to the facility in order to improve the therapeutic environment leading to enhancement in opportunities for clients to engage in numerous and varied activities.

- *Barriers to Release from St. Peter*

The most powerful and reasonable grievance of the clients in CPS and in Phase Three of the treatment program is the lengthy process associated with obtaining release to the community. Most clients perceive this as a seemingly impossible hurdle, despite years of preparation to live responsibly in the community, including reduced risk to re-offend achieved via extraordinarily lengthy program participation and successful adherence to treatment expectations. One particular impediment to timely release appears to center on the inordinately complicated and lengthy processes surrounding presentation of clients to the SRB and recommendation to SCAP. In some cases, this process can take several months to years to complete, which adds immeasurably to the sense of helplessness enunciated by both clients and staff (this concern is also discussed at length in the community release and legislative framework sections of this report).

Although the St. Peter site includes a therapeutic environment, supportive staff, and exceptional and relevant opportunities for clients to prepare to safely re-integrate in the community, there is rampant hopelessness on the part of the clients and the staff. This is combined with despair and resentment of the state legislature and justice system, which they perceive as being unable to act accordingly to balance client civil liberties and public safety. Notwithstanding, the Panel was surprised to find that staff and clients remain positive, committed, resilient, and hopeful that the federal court will intervene to improve these shortcomings.

The Panel specifically asked many clients and some staff at St. Peter what they would want the Court to know if they were able to speak on their own behalf. Generally, clients want the Court to know that they are desperate and that their only hope is that someone in a position of authority will recognize their collective experience of the implementation of the SOCC law in Minnesota and do "something" to "fix it."  Clients demonstrated understanding of the harm they caused through their sexual offending and the concerns the public has about their release; however, they also highlighted the significant treatment gains they have made. Many clients have been in treatment for 15 years or longer. All clients interviewed by the Panel expressed a desire to have an opportunity to be contributing members of society. Sadly, some elderly clients expressed grave concerns that they would die at MSOP. Overall, clients expressed feelings of helplessness and hopelessness, believing that the "program has no end." Many clients seemed confused and unclear as to what would need to be done to achieve release.

Generally, staff conveyed that they want the Court [and the Panel] and the community to know that they are doing their very best to provide quality treatment to a difficult, diverse, and extraordinarily large population that continues to grow, but never gets out. Supervisors interviewed by the Panel added that they would like others to know that they are doing their very best to hire, train, clinically supervise, and manage a large and disproportionately inexperienced staff. The Panel validated both client and staff feelings.

**Recommendations for St. Peter**
The Panel recommends that action be taken to expedite the transfer of the single female client out of the MSOP to an environment where she can receive appropriate gender-sensitive treatment, while being provided with direct supervision that emphasizes both her safety and that of the community (see documents already submitted to the Court for additional details on this recommendation).

The Panel recommends that MSOP provide opportunities for additional and ongoing staff development in recognizing, diagnosing, treating, and working with specialized populations; especially persons with intellectual disabilities, traumatic brain injury, general and complex trauma, and persons with serious mental illness; and that it applies this to developing and implementing more responsive programming for these individuals.

The Panel recommends that clinical administration develop mechanisms to accommodate the diverse and complex treatment needs of subgroups of clients, especially regarding treatment responsivity concerns for clients with intellectual disabilities, diminished cognitive abilities, and SMI.

The Panel recommends that MSOP administration provide additional support and encouragement to staff, especially those staff who have experience working with special populations in other settings, to creatively tailor the treatment programming, curricula, and methods to meet individual client needs, including developing truly individualized treatment plans.

The Panel recommends that MSOP administration support through allocation of resources to the integration in practice of medical and insufficient psychiatric treatment with the sexual offender treatment programming in recognition of treating clients holistically. The Panel recommends that MSOP administration consider experienced executive clinical oversight of the assessment, treatment and staff development of programming for patients with severe comorbid disorders; in collaboration with current executive oversight of the sexual offender treatment program and executive oversight of health services.

The Panel recommends that the MSOP ensure that all staff receive appropriate clinical supervision and support from professionals who are experienced in working with specialized populations.

The Panel recommends that MSOP administration and staff continue to strongly advocate (and assist in petitioning) for the many clients at St. Peter who could be placed in a less restrictive environment, either on grounds (CPS) or in the community. The Panel recommends further that MSOP administration and staff approach the petitioning process in a proactive manner (i.e., recommendation should be made at the first point that it becomes clear that the client likely does not continue to meet commitment criteria). This would include petitions for movement to CPS, provisional discharge, and full discharge as appropriate.

The Panel recommends that MSOP administration continue to support and expand innovative vocational and community preparation services to assist clients in developing important protective factors.

The Panel recommends that the DHS and its partners publicly recognize and celebrate the individual and program-wide innovation and successes of the MSOP, in spite of the enormous barriers.

The Panel recommends that DHS and MSOP administration plan and develop community resources through expanded community relations in preparation for meeting the complex needs of the diverse client population. Although most of the clients in CPS and Phase Three will not need placement in contracted mini-institutions, group homes, or other structured facilities to ensure successful placement on provisional discharge, it is conceivable that many members of the specialized populations will ultimately achieve release and will require accommodations for both residential and aftercare services.

The Panel recommends that St. Peter administration consider alternatives to mass movement for meals and medications, as well as other de-institutionalizing practices whenever possible and practical.

The Panel strongly recommends that MSOP administration pay particular attention to the availability and practical implementation of psychiatric services. The Panel opines that psychiatric care at the MSOP is currently inadequate to meet the needs of its clientele. Ideally, a full-time psychiatrist (or equivalent) and complementary psychiatric and psychological services should be available above and beyond the current services provided by the particularly diligent but clearly overburdened psychiatric nurse practitioner. The Panel recognizes the difficulty and scarcity of psychiatrists in general and even more so with the population. Accordingly, exceptional and creative approaches must be supported by the DHS in order to meet the psychiatric needs of its committed clients and integration with the sexual offender treatment program.

**Observations of Moose Lake**
Moose Lake is a very large, relatively new facility housing nearly 500 men as of August 2014. The vast majority of the SOCC population is at Moose Lake, including nearly all new admissions to the MSOP.

- *Conditions of Confinement*

The Moose Lake campus was built specifically for the MSOP and stands alone in that, unlike St. Peter, it does not share its campus with any other programs or facilities. There are several buildings on the Moose Lake campus, which has a much more prison-like environment than either St. Peter or other traditional forensic treatment facilities. Its prison-like physical environment, however, is not unlike some other SOCC facilities but, in contrast, it is much bigger and has larger units than many other SOCC facilities. This likely reflects the higher census relative to other SOCC programs. There is a high security perimeter surrounding the entire facility grounds, which is similar to some other SOCC settings but not all. There is one entrance and exit of the secure perimeter through secure sally ports, which are staffed by security. Like most secure facilities, a central security area processes all entrances and exits of staff, visitors, vendors, law enforcement, or other client transport. The staff who enforce the entrance and exit procedures also control and enforce contraband being introduced into the secure perimeter through its mail and property policies and procedures. Like most secure facilities, there is a client "count" done several times a day to ensure all clients are accounted for. The facility, grounds, and outdoor spaces at Moose Lake are clean, well maintained, and abundant. The open common areas of the facility have the appearance and relative feel of a community college, including loud corridors during open movement times.

Like St. Peter, the clients at Moose Lake wear street clothes and are provided with adequate supplies to maintain activities of daily living and grooming. The units are supervised by Security Counselors who are present at a front desk and who make unit rounds. Compared to St. Peter, the Panel observed significantly less staff-client interaction at the Moose Lake facility. As at St. Peter, Security Counselors wear uniforms that have a law enforcement or corrections officer appearance, including the older model microphone radio on the shoulder. The Panel did not observe offices or a clinical presence on any of the units. Some units are exceptionally large (two 98 bed units, three 68 bed units), while the other regular housing units, including the specialized units (i.e., Behavioral, Young Adults, Assisted Living, and SMI units) consist of 25 beds. Nearly all the clients at Moose Lake are double bunked, with the exception of clients living on one of the specialized units. Double bunking is not uncommon at other SOCC facilities, but it is not optimal and can be extremely difficult to manage, given the assaultive history of many of its clients and the presence of vulnerable clients. As is common in many institutional settings, sexual liaisons between clients (abusive or consensual) can be difficult to manage in a double bunking scenario. Civil commitment administrators generally agree that double bunking can be counter-therapeutic for this population, but bed space demands may require it.

The units at Moose Lake are well lit and some have natural light. They are well maintained and clean, and due to their large populations can be acoustically loud, which can be disruptive in a treatment environment, particularly for clients with special needs and histories of trauma. Each

unit has small televisions and other entertainment equipment, supplies for activities, adequate furniture and amenities, small spaces adjacent to the units for clinical and other staff to meet with clients, access to telephones including a nice feature that provides a line for incoming calls where clients' families and other contacts can leave brief messages, access to computers without internet but including a great deal of relevant information for clients to easily access, and a social gathering space.

The client rooms at Moose Lake are cramped given double bunking; however, the Panel agreed that the space was adequate given the operational need for double bunking and the facility has provided creative space saving storage for its clients. The facility has also provided "privacy screens" to be used between client spaces. Some clients choose to use these, especially at night, while others do not because it adds to already existing space limitations. The rooms have adequate furniture, with average to above average (compared to other SOCC programs) allowable personal property. However, each room has small, narrow windows and an in-room toilet with no provisions for privacy, which are much like prison cells.

Off the units, the wide hallways are nicely decorated with impressive artworks made by clients in the workshop. There is adequate cafeteria space, and when members of the Panel shared lunch with a group of clients, the fare was consistent with most institutional food, but was nonetheless quite palatable. Notwithstanding the Panel's impressions, like most institutions, the clients complained about the food.  Considering the size of the population, there is a relatively small health services area with what appeared to be a very busy nursing staff. There is an area for administration of medications, where clients receive medications that they do not self-administer in their rooms. There are private staff offices throughout the facility, as well as live plants that, like the art, signify ways in which MSOP has made efforts to reduce the institutional feel of the environment. In the open corridors there are nicely furnished social gathering spaces for the clients who move about much more freely than in most SOCC facilities. The clients wear electronic monitoring devices for surveillance of movement, which allows for the relatively greater open movement throughout the facility. On and off the units there are vending machines that use script, rather than currency, which is consistent with many other SOCC programs.

One disconcerting aspect of the environment is that the group rooms where treatment takes place have large exposed glass windows. Though this is likely a feature implemented for safety, it exposes the groups and clients to everyone who walks by, which undoubtedly can be distracting, especially for those clients with attention issues, learning disabilities, and other special needs. The rooms themselves are typical group rooms with group facilitators and clients sitting primarily in a circle in relatively comfortable furniture. Compared to other treatment

facilities, the walls in the group rooms that the Panel viewed seemed rather austere, with few or no posters or visual aids that indicate or reinforce the treatment concepts. Within its generous footprint, Moose Lake has extensive space and opportunities that many SOCC facilities do not have, including several large outdoor spaces for recreation and other outdoor activity. Other examples include music rooms where clients can play an array of musical instruments, a ceramics area, game rooms and other spaces for arts/crafts and other leisure activities, gym and fitness space, and an extensive and very well resourced and utilized vocational programming space. Moose Lake offers various relevant educational and vocational opportunities that impressed the Panel in innovation and obvious outreach with other agencies. Gaining relevant, transferrable work skills is an important protective factor for release that is supported and emphasized at both Moose Lake and St. Peter. These areas can serve as a model to other SOCC programs and the Panel recommends broad recognition of the MSOP in this area.

Despite the relatively pleasant conditions of confinement and opportunities for a variety of activities, the emotional climate at Moose Lake is replete with negativity, despair, and hopelessness. The clients are understandably and vocally unhappy about their detention at Moose Lake. The most commonly enunciated sentiments were that clients perceive their confinement to be a "life sentence" and MSOP as "a place where you can never leave." There was some jubilation on the part of staff and clients about a group of men who had progressed in treatment and were shortly being transferred to St. Peter. The clients make references to St. Peter in ways that make it sound like "heaven," whereas many clients perceive that they are in "hell," some describing Moose Lake as "worse than prison." Although most have never seen or been in St. Peter, they hear from other clients and staff about all the positive things at St. Peter and have the perception of it being the place that leads to release, but they will never get there or get out. These views are not uncommon in many SOCC programs, especially those with more than one facility. Clients at Moose Lake expressed a great many grievances about treatment being repetitive, staff seeking perfection, and the program not recognizing previous accomplishments.  The clients also complained the program did not build on client gains when there is a setback similar to a "relapse." Consequently, they perceive the MSOP as punitive rather than therapeutic. This perspective has been noted in the broader literature regarding treatment for people who have sexually offended. There appears to be an intense balancing act required of treatment providers, in which the goal is to ensure that client needs remain primary and that treatment does not become part of the punishment (e.g., Glaser, 2010).

As the Panel moved about the facility under escort and went on to all the units, we were approached by many clients eager to meet with us, to tell us their stories, to complain, to make sure we "get the real story," and to ask about "the case" or how other SOCC programs manage

similar issues. The Panel met informally with a number of clients in this manner, some of whom expressed genuine concerns about their personal situation, while others clearly embellished their circumstances (as was apparent in subsequent records reviews). Quite often, clients approached Panel members not about themselves, but to express grave concerns about specific clients who they believed were being mistreated, untreated, or whose vulnerabilities were not– in their view – being appropriately managed. The Panel was impressed by the humanism and compassion demonstrated by these clients. Some of these "vulnerable" clients were also clients about whom the Ombudsman's office also expressed concern.  The Panel made a point to meet with a number of the clients who were identified and also reviewed their records.

The conditions at Moose Lake are not optimal because of the large units and corrections-like processes. The Panel opines that most administrative and clinical staff would likely agree that these realities make for a less than therapeutic milieu. Physically or otherwise, substantially changing the large structured units is out of the control of the MSOP, short of a serious decline in population that would, at the very least, allow for single rooms. Nonetheless, there may be ways that the MSOP can improve in this area, without compromising safety and security, which will be discussed in the recommendations.

- *Programming*

While the programmatic materials (e.g., Theory Manual) provided to the Panel indicated that treatment is individualized, many plans reviewed by the Panel contained boilerplate language that was not often altered to describe the individualized needs of each client or the interventions used to address these needs. There were also contradictions within treatment plans.  For example, there were several Annual Treatment Reviews that indicated clients were not taking medication, yet also indicated that they were 100% compliant with the self-administered medication program. In another example, clients who were approved for a certain number of hours of vocational programming in one document had this contradicted in another document stating that the client was not approved for vocational hours. The lack of specific language was also noted in the Annual and Quarterly Treatment Reviews that include numeric Matrix Factors scoring. A general concern the Panel identified was that these reports were heavily weighted by Matrix Factors, but actually gave little information about why the client is in the current phase or where he/she is at in addressing the factors. In this same vein, when reviewing client records, the Panel noted a lack of specifics in treatment documentation. In particular, it was difficult to discern how long clients had been in the current treatment phase or why some clients were not participating in treatment. Additionally, review of these treatment reports revealed that some clients received high marks on all Matrix Factors, but no narrative was provided to explain why the client remained in the current treatment phase, when the client would be advanced to the next treatment phase, or the steps clients would

need to take for phase progression. Although this observation also applies to the St. Peter facility, the limitations in treatment documentation were more prevalent at Moose Lake, perhaps because of the large population or because of less experienced staff.

The Panel agrees with the Task Force that noted staff (especially at Moose Lake) lack sufficient clinical oversight and expertise in the assessment, treatment, and management of diverse people who have sexually offended, which impacts the quality of treatment provided at Moose Lake. Additionally, there are many clients not participating in treatment at Moose Lake, including numbers who are reported as technically in treatment through their signature on a consent form, but not in any demonstrative way meaningfully engaged or who are "stuck" and have been in the same phase of treatment for a significant period of time. By example, the Panel earlier recommended the unconditional release of Eric Terhaar, who is representative of a subgroup of clients and has been at MSOP for more than five years, but remains in Phase One. MSOP administration and clinical staff should review these types of clients on a routine basis to determine barriers to treatment progression and steps that can be taken to help motivate, encourage, and advance these clients in treatment. In addition, staff should be empowered to proactively recommend clients for treatment progression when clinically appropriate. Interviews with clinical staff indicated that specific training regarding phase movement has not been consistently provided and, in fact, some clinical staff were unsure about their role in phase progression decisions.

The Panel opines that the clients who have no serious barriers or vulnerabilities (i.e., "conventional") are generally well served by the MSOP treatment and institutional management framework. However, clients with specialized needs (e.g., intellectual disabilities, fragile health concerns, serious mental illness, suicidal and parasuicidal behaviors, complex trauma, brain injuries, and serious learning disabilities that interfere with treatment) appear to suffer from a lack of attention to issues of responsivity in both treatment and other opportunities. Indeed, with specific reference to suicidal and parasuicidal behaviors, it was the Panel's impression (and as noted earlier) that these potentially serious behaviors are too often minimized by staff as attention-seeking or bad behavior for secondary gain. Although it may be true that many of these clients suffer from Borderline and other personality disorders, MSOP administration and staff should be aware that some parasuicidal clients do ultimately die from their "attention-seeking" behaviors. Generally, the Panel recommends that staff receive training in relevant interventions regarding management of problematic clients in order to help them develop better ways to cope with their realities. Information provided to the 2014 SOCCPN Survey suggested that MSOP was utilizing dialectical behavior therapy techniques; however, the Panel could find no clear evidence that such methods were in current use. Further, MSOP espouses widespread application of motivational interviewing techniques,

however, the Panel did not witness such methods used in client and staff interactions or in its application to treatment planning.

Whether they are engaged, minimally engaged, or not in sexual offender treatment at all, clients at Moose Lake who have the serious barriers to treatment participation or who possess any of the vulnerabilities listed above do not fare as well in the MSOP treatment program as their conventional peers. Further, some of these clients have not been appropriately identified, diagnosed, properly treated, or provided with direct assistance and advocacy. This impacts their options for proper placement within the MSOP, pursuit of provisional discharge, or petitioning for a more clinically appropriate legal status. By providing inadequate psychiatric treatment, many clients are being inappropriately served by the MSOP. Remedies could include pursuing court-ordered medications when appropriate and better acknowledgement of responsivity concerns in appropriately responding to potentially self-injurious behavior or what the MSOP characterizes as behavior for "secondary gain." Too often, staff robotically referred to such conduct as "behavioral" when there was sufficient cause to at least consider underlying psychiatric concerns. It may be that staff have become accustomed to having inadequate psychiatric support and understanding.

The Panel was particularly concerned about the use of long periods of isolation in rooms in secluded units, which is used in response to aggressive, threatening or self-harming behavior. It was observed by the panel and was documented in records that this intervention is often used with clients who have severe mental illness. Consistent with the more correction-like environment of Moose Lake, until recently this isolation area was referred to as the High Security Area. The isolation unit a Moose Lake resembles the physical layout of Special Housing Units in maximum security prisons. This isolation area is inconsistent with other SOCC programs, many of which take a mental health approach to isolation and require a physician order for the continued placement of clients in isolation areas. The Panel did not observe or find in its record reviews the use of behavior management plans or other more effective and humane alternatives to what amounts to segregation. Alternatives include providing clear and specific direction to staff about what interventions should be used [and what should be avoided] when working with individuals who engage in repeated dangerous behaviors. Effective alternatives often require more individualized interventions with clients and require more time and supervision to ensure fidelity in implementing individualized plans. The current administrative and programmatic structure with no executive leadership and oversight with specialized experience  in psychiatric or mental health services in the MSOP, makes it more difficult for staff to recognize the harm of isolation or to identify and develop alternatives.

**Recommendations for Moose Lake**

The Panel recommends that MSOP administration and clinical leadership review the circumstances of clients who have not progressed in treatment (i.e., have been in the same treatment phase for more than 18 months), or who are non-participants, and develop and implement ways to motivate, engage, and advance these clients in treatment. Additionally, these reviews will allow MSOP administration the opportunity to ensure that the program policies and procedures are being implemented with fidelity to the Theory Manual or whether staff training or other implementation issues need to be addressed.

The Panel recommends that MSOP administration and clinical leadership pay particular attention to roommate selection, given the concerns noted above.

The Panel recommends that MSOP administration provide additional and ongoing clinical and unit staff development in the recognition, assessment, treatment, response and management of clients with special needs; especially persons with serious mental illness, limitations in cognitive functioning, various personality disorders or age-related medical concerns.

The Panel recommends that MSOP administration ensure consistent experienced clinical oversight, training, and supervision of all unit and clinical staff. This is especially pertinent for those staff with lesser experience, but attention to this for all staff will ensure that treatment quality can be maintained and client progression can be maximized.

The Panel expresses grave concern for the personal safety of vulnerable clients. Over and above these concerns, the Panel expresses similarly grave concerns regarding the procedures by which clients are determined to be "vulnerable." Notwithstanding legislative definitions, there are clearly practical considerations regarding risk to certain clients posed by more antisocially inclined and those who engage in predatory behavior at MSOP. On several occasions, the Panel either discovered or was made aware of situations in which "vulnerable" clients were being taken advantage of by stronger, more deviant and antisocially inclined clients.

The Panel recommends recognition and celebration of the innovative programming in the areas of education, therapeutic recreation and diverse vocational opportunities.

The Panel recommends recognition of the near impossible challenge of recruiting, hiring, retaining, training, and supervising professional and front line staff for an extremely large facility with a very diverse specialized population in a rural community.

The Panel recommends recognition that the MSOP, especially in Moose Lake, includes many clients who may no longer or never did clinically or legally meet the criteria for civil

commitment, but nonetheless are providing adequate treatment to those who have the characteristics and resources to be placed appropriately in convention programming.

The Panel recommends that DHS and its Ombudsman's office actively engage, educate and collaborate with advocacy groups within its agency and around the state to encourage support and advocacy for clients who may not meet commitment criteria and those in need of substantial community services and support and to encourage counties take collaborative responsibility for these clients from their respective counties and for whom they are financially responsible. The Panel recommends that responsible county agencies recognize that these clients in pre-commitment and commitment status are residents of their counties with diverse and comorbid conditions who have sexually offended.

The Panel recommends that MSOP administration implement safer and more therapeutic alternatives to administrative/solitary confinement.

**Balance of Safety Concerns and Therapeutic Environment**
For the most part, MSOP administration and staff at Moose Lake and St. Peter maintains reasonable policies and practices that balance security with promotion of a therapeutic environment. Developing and maintaining a culture that balances safety concerns and a therapeutic environment is a difficult challenge that often involves compromise among departments with different perspectives. It is particularly challenging in large institutions that serve diverse populations, like Moose Lake. The MSOP does a fairly good job of this, while striving for continuous improvements. The MSOP Program's rules, policies and practices with regard to mail, movement, searches, property and phones are mostly standard in comparison to other SOCC programs and institutions.

Like many SOCC programs, however, improvements to the therapeutic environment and culture can be achieved through sustained and substantiated consistent use of social engagement methods, such as Motivational Interviewing (MI). Implementing MI practices and extinguishing staff interactions that are not MI adherent, program-wide, would increase the quality of interpersonal and clinical engagement for all staff. Also, like most other SOCC programs and institutions, the MSOP could continuously improve the balance of security and a therapeutic environment and maintain a therapeutic alliance (usually defined as having agreement on the nature of the relationship between provider and client, as well as on the goals and tasks of treatment) with its clients by continuously examining its policies and practices to ensure the basis for these are evidence-based. One such practice and policy that could be examined at Moose Lake, and have an immediate effect on the therapeutic environment, would be to ensure that Behavior Expectation Reports (BERs) are only issued by

staff when other therapeutic interventions fail and that when they are issued, there is a reasonable review of consistent application of their use. Further in its review of BERs, the MSOP could establish processes whereby there is clinical review of BERs to make a determination when behavior is volitional or is related to a person's mental illness, intellectual disability, trauma reaction or other psychological factors with recommendations regarding response or disposition of the BER.

Other practices in the recommendations section of this report may also help with improving the therapeutic environment. The Panel believes that the single most positive way to improve the therapeutic environment of the MSOP would be for all concerned (MSOP administration, all staff, and clients) to see more people being released. Such a reality would breed hope that there is a reasonable path for release, through successful treatment and petitioning; and discharge may correct referrals and commitments that occurred in previous years.

**Recommendations for MSOP**

The Panel's observations, interviews, and record reviews of many of the clients at St. Peter and Moose Lake confirmed that MSOP has a very diverse client population with a multitude of complex clinical and case management needs. The Panel opines that the MSOP has insufficient resources to address the primary medical and psychiatric clinical supervision and care of its client population, resulting in the needs of the client population being inadequately addressed. Other than prescribing and monitoring medication, it is unclear what services or programming is being provided to assist clients with mental illness and physical challenges or its recognition of their unique needs. Without adequate diagnostics and proactive medical or psychiatric case management, it is likely that there are other clients who would benefit from attention, but who are presently unidentified. Additionally, enhanced services are needed to assist the numerous clients refusing medication understand why medication management is important for their treatment progress. The current level of staffing is inadequate to meet the needs of this large, complex population.  At a minimum, MSOP administration should seriously consider expanding its psychiatric staff roster, including securing a full-time psychiatrist and providing additional support to the overburdened psychiatric nurse practitioner already on staff.

The Panel recommends that MSOP administration arrange for additional staff training in differential clinical diagnostics, as well as treatment planning and attention to individual responsivity concerns. The Panel's review of client records indicated that diagnoses are offered, but there are few documents to either underscore the diagnostic process or to provide the source or evidence of the diagnoses.  In fact, it appears that clients are over-diagnosed, especially given the prevalence of numerous paraphilic diagnoses. By example, paraphilias are known to be exceptionally rare in women, yet Ms. Bailey has been diagnosed with several.

The Panel recommends that MSOP administration more closely ensure attention to RNR prescriptions identified as important in the Theory Manual. Specifically, greater attention is required in addressing client responsivity issues. For example, the language of the program is overly intellectual and likely too complicated for many of the clients; particularly those with intellectual or other cognitive processing limitations, which is likely to comprise a significant proportion of the clients. The Panel recommends that MSOP administration either compose a separate handbook for lower functioning clients, or revise the current version so as to be accessible by all. Moreover, the Panel is of the opinion that many treatment memos and letters to clients are unlikely to be understood by the clients to whom they are addressed, as they contain advanced language that may not be understood by the majority of MSOP clients. Indeed, on occasion, Panel members also had difficulty understanding the content of some clinical documentation.

The Panel recommends programming tailored to meet the needs of individuals; especially in consideration of the responsivity concerns noted above and elsewhere in this report. For example, it appears that the same Matrix Factors are applied wholesale to all clients, in a potentially cookie-cutter fashion. Instead, comprehensive assessments should be completed for each client to identify specific risk factors and individualized treatment needs, which should then be conveyed in language that the client can understand and address in treatment.

The Panel found little evidence of client participation in the treatment planning process. The Panel recommends more client centered treatment plans that are more collaborative and include information and input obtained directly from clients, preferably in their own words. This would increase treatment responsivity while also ensuring that goals are truly individualized and meaningful to clients.

The Panel recommends that greater attention be paid to programming seeking to address deviant sexual interests. Current practices appear rudimentary and in need of augmentation.

The Panel found that programming appeared to focus primarily on sexual behavior issues, with inadequate attention to other important need areas, such as substance abuse, mental health, emotions regulation, trauma-informed treatment, etc. The Panel recommends that MSOP administration consider broadening the focus of the program to include attention to other psychologically meaningful risk factors (see Mann, Hanson, & Thornton, 2010).

The Panel believes that the program may benefit from formal accreditation, either by JCAHO, CARF, or another national/international accreditation agency. Although the feedback provided

by external experts (e.g., Haaven, McGrath, and Murphy) has no doubt been helpful, accreditation would provide another layer of professional and programmatic accountability. If SOCCPN follows through on plans to develop standards for SOCC, this accreditation might also be an option.

The Panel recommends that, in order to assist clinicians in composing treatment plans, MSOP administration should obtain additional records on clients referred to the program. These records would include a comprehensive criminal history and documentation from the MN Department of Corrections initial risk assessment review, as well as any available mental health, substance abuse, sexual offender treatment, and incarceration disciplinary history records.

The Panel very strongly recommends that MSOP administration ensure that discharge planning begins on admission. Currently, there is no clear process for discharge planning and it appears that discharge planning only occurs once clients have advanced to Phase Three and have garnered staff support for release from the program. MSOP administration and staff should consider assisting clients prepare discharge plans, even if they are not in support of the client's release so that awareness, community safety, and the client's well-being can be maximized. In the Panel's opinion, preparation for release should begin as soon as the client arrives at MSOP.

The Panel recommends that MSOP administration consider having Security Counselors located on the units wear a different uniform. In the alternative, uniforms could be based on post assignments.  At present, it seems incongruent that security staff controlling entry to the grounds is more casually dressed than staff on the units who are expected to therapeutically interact with clients. Additionally, MSOP should consider replacing older model radios with shoulder mounted microphones with radios that appear less prison-like or militaristic.

## SECTION 5: COMMUNITY RELEASE EXPERIENCES OF OTHER SEXUAL OFFENDER CIVIL COMMITMENT PROGRAMS

The literature regarding treatment for people who have committed non-sexual offenses has suggested that interventions offered in the community are generally more effective than those delivered in institutional settings (Andrews & Bonta, 2010; Gendreau, French, & Taylor, 2002; Lipsey & Cullen, 2007). The research is inconclusive, however, as to whether community-based treatment is more effective at reducing recidivism than institutional-based treatment, and vice versa, for people who have sexually offended. This is due mostly to a relative dearth of rigorous, high quality research into the effectiveness of treatment for people who have sexually offended. Research by Polizzi, MacKenzie, and Hickman (1999) determined that community treatment programs for people who have sexually offended were more effective than those

delivered in residential settings; however, Hanson and colleagues (2002) found no statistically significant differences in the sexual recidivism rates between community and residential treatment. The setting of sexual offender treatment was again tested by Hanson and colleagues in a 2009 meta-analysis. Although there was no significant difference between the community and institution-based treatment, Hanson concluded that, "the sex offender literature does not provide strong tests of whether program location matters given that no studies have directly compared the same treatment in both settings" (2009, p. 885). Overall, the research suggests that people who have sexually offended who received community treatment after release were less likely to recidivate than those whose treatment ended at release (14% and 35% respectively; McGrath, Cumming, Livingston, & Hoke, 2003; see also Wilson, Cortoni, Picheca, Stirpe, & Nunes, 2009). Although additional research is needed in this area before conclusive findings can be determined, it is important to note that (at the very least) community treatment appears to be just as effective in reducing recidivism as inpatient treatment. Community treatment also has the benefit of being significantly less expensive than inpatient treatment; it enhances pro-social supports and family relationships, allows for work opportunities, and provides for real-world opportunities to immediately apply the skills learned in treatment, instead of the artificial environment created in residential treatment settings.

Best practices for managing people who have sexually offended in the community suggest that collaborative, multidisciplinary approaches to sexual behavior management offers promising results for ensuring victim and community safety. Different strategies for safely managing people who have sexually offended in the community may include the use of the Containment Model approach, intensive probation/parole supervision, and the establishment of support systems such as Circles of Support and Accountability (CoSA, see Wilson & McWhinnie, 2013). Supervision is most effective when supervising officers receive specialized training in sexual offender management, assessment, and treatment (Wilson et al., 2009). Specialized supervision for people who have sexually offended is necessary because traditional supervision practices do not necessarily address the high-risk factors associated with some people who have sexually offended. For example, traditional supervision officers may not have received specific training that would enhance their understanding of the risk factors and dynamics related to sexual offending, which may impact an officer's ability to intervene with or interpret any pre-offense behaviors. Additionally, it is important to limit the amount of cases each supervision officer receives in order for officers to better manage and monitor people who have sexually offended adjustment to the community.

**Sexual Offender Civil Commitment (SOCC) Programs**
It is a fundamental principle in mental health treatment that individuals should be treated in the least restrictive environment to ensure that infringement on individual liberties is kept at a

minimum. These least restrictive means apply to the setting in which treatment is provided as well as the types of interventions that are employed. Therefore, it is imperative for mental health providers to consider how best to provide care and treatment to individuals in need of services, while also ensuring that all interventions are provided in the least restrictive environment. In recent years, the use of least restrictive alternatives has been extended beyond the traditional mental health system to include applications within SOCC setting.

As noted earlier, there are 21 jurisdictions (20 states and the federal government) that have enacted SOCC laws as a means to protect communities and ensure treatment is provided (after completion of criminal justice sentences) to the highest risk people who have sexually offended. To ensure that high-risk people who have sexually offended receive treatment in the least restrictive means possible, several SOCC states have implemented conditional release programs (e.g., Wisconsin, Virginia), where people who have sexually offended are released from confinement into the community under supervised conditions. New York and Texas are the only states that statutorily authorize the placement of civilly managed people who have sexually offended directly into the community (bypassing SOCC). New York State's law provides for either confinement in secure treatment (i.e., inpatient SOCC) or, depending on a dangerousness determination, management in the community under a Strict and Intensive Supervision and Treatment (SIST) order. The Texas statute provides for only community-based civil management of people who have sexually offended. Other states, like Wisconsin, have conditional release programs for individuals who are first civilly confined in an inpatient treatment facility and subsequently released to the community. These approaches provide for less restrictive alternatives by allowing high-risk people who have sexually offended to receive needed services and supports in the community with the goal of successful reintegration into the community. Appendix 1 provides detailed descriptions of New York's Strict and Intensive Supervision and Treatment (SIST) community program, Texas' community civil commitment program, and Wisconsin's community release programs. Florida's program is also outlined, as it provides an example of how SOCCs can release clients without the implementation of a formal community release program.

## Challenges to the Implementation of Community Release Programs

Although community release programs can provide cost-effective approaches and assist SOCC clients in successfully reintegrating into the community, many states have experienced challenges in the implementation of these programs. For example, sexual behavior treatment services are absent in many communities where SOCC clients reside. This lack of appropriate treatment in various counties creates barriers in the release of clients into the community. Some clients live in rural locations. As such, due to the distances between where they reside and where treatment services are available, mass transportation is not always available or

practical. To resolve these issues, SOCC community release programs has either paid for transportation services to ensure clients can attend needed treatment services or have worked with community providers to travel to the remote locations in which the clients reside. On the other hand, other programs (e.g., Texas) only allow civilly committed people who have sexually offended to reside in certain select metropolitan areas where approved community residential facilities are located.

Housing and nursing home placements are also significant challenges in the development of discharge/community release plans. Many counties and municipalities have residency restrictions for people who have sexually offended, which can result in many clients residing in either shelters or having no residence at the time of their initial release into the community. In addition, it remains extremely difficult to secure services for medically compromised respondents, as nursing homes are reluctant to accept people who have sexually offended and few states have designated forensic nursing homes that are willing to accept high-risk people who have sexually offended.

Additionally, as more clients are released to the community, it becomes increasing difficult to secure qualified community treatment providers with experience in working with people who have sexually offended and who also adhere to evidence-based best practices. One way New York State has dealt with this issue is to provide numerous resources to ensure SIST providers meet treatment and best practice expectations. For example, the SIST team provides training on the assessment and treatment of people who have sexually offended, holds clinical consultations, and provides access to a quarterly newsletter that summarizes current empirical research in the field.  Additionally, in an effort to improve SIST processes and enhance treatment offered, the SIST team created a SIST Community Treatment Provider Survey as a means to collect data about community treatment programs that are working with SIST clients. Results of the survey are used to improve the delivery of services crucial to successful treatment outcomes for this population and design training programs to ensure SIST providers maintain their training in the implementation of best practices.

In most communities, high-risk people who have sexually offended are not often welcomed after release. Significant community resistance and fear regarding community safety typically accompanies the release of a high-risk person who has sexually offended. One approach to address this issue is to have several in-person discussions with community-based treatment providers, probation/parole officers, county mental health clinics, case management agencies, substance abuse clinics, concerned community members, and county executives to provide information regarding civil commitment and community release/less restrictive alternative programs. These discussions both inform the community about SOCC and risk, as well as

provide an opportunity to begin a dialogue about the roles and responsibilities of stakeholders (e.g., community services, treatment providers). These in-person discussions are invaluable, as they help to calm fears, educate community members and stakeholders about risk, build the working relationships needed to create effective management teams, and serve as a platform to brainstorm innovative solutions to long-standing community obstacles. For example, in New York State, these in-person meetings revealed that some mental health clinics were concerned about SIST clients waiting in the general waiting area with other clients. As a result of this concern, OMH suggested that clinics develop scheduling systems for SIST clients so that they receive either the first or last appointment of the day.

Open communication with providers and county agencies should remain constant in order to quickly address fears, problem-solve, and provide support regarding specific people who have sexually offended returning to the community. Although resistance to high-risk people who have sexually offended returning to communities will likely remain, the collaborative relationships developed through these community discussions reassure agencies and providers that they are not alone; all agencies share responsibility for each case.  Further, as more individuals are released and make successful transitions to the community without re-offending, the concern and fear are likely to dissipate.

**MSOP Community Preparation Services and Provisional Discharge**
Although many SOCC states offer some form of conditional release, Community Preparation Services (CPS) is unique to the Minnesota program. According to MSOP Policy 602.010, the goal of CPS is to "support clients in maintaining personal accountability, respect for others, and community responsibility while they participate in the reintegration opportunities offered at Community Preparation Services (CPS)." CPS allows clients to live outside of the secured perimeter, yet still on the grounds of MSOP. It provides opportunities for supervised and unsupervised movement on the MSOP campus as well as supervised activities in the community.

According to MSOP CPS policy, clients in CPS progress through a three stage system. Stage 1, which should last a minimum of one month, includes an orientation process. Clients in this Stage have not yet earned any off-campus or solo privileges. Stage 2, which lasts a minimum of three months, provides clients opportunities to attend community outings with MSOP staff and other peers, volunteer on campus, and participate in independent on-campus activities. Provisional discharge planning begins in Stage 2, unless clients have not yet progressed to Phase III of the treatment program. Stage 3 of the program provides for solo community visits with one MSOP staff member, participation in community supports (e.g., AA, NA, SA), off campus trips more than 30 miles from the facility, the commencement of outpatient sexual

offender treatment, and finalizing provisional discharge plans. Currently, only two clients out of more than 700 have successfully transitioned from CPS to provisional discharge, while other clients have remained in CPS for significant periods of time (more than half of the CPS clients have been there for over two years).

In speaking with CPS clients, many are unclear about how to progress from Stage 1 to Stage 3 of the process. They mentioned that the criteria were unclear for both progression through CPS and for provisional discharge decisions. Additionally, many clients expressed hopelessness regarding their likelihood of ever progressing to provisional discharge and many believed that unconditional discharge was not a realistic option (as no MSOP client has ever been unconditionally discharged during the 20 years MSOP has existed). Although the stated goal of CPS is to provide a gradual reintroduction to life in the community, clients noted that the process may be too gradual, and life in the community appears unattainable. CPS clients also expressed a desire to have prolonged opportunities in the community, which they believed would assist in their successful reintegration.

CPS affords clients who have been institutionalized for significant periods of time the opportunity to slowly transition into the community.  Once released to provisional discharge, clients will most likely be placed in a halfway house, as placement into independent living situations can only be approved once it has been determined clients have adjusted to community living. For the first 30 days post release, clients on provisional discharge have daily face-to-face contact with their reintegration specialists. Clients are escorted, by the reintegration specialist, to all trips into the community (i.e., although living in the community, clients under provisional discharge are not able to live their approved residence without being escorted by MSOP staff). The conditions of discharge (e.g., GPS monitoring, regular supervision checks, random drug tests, room searches, curfews) and levels of supervision are reassessed quarterly and changes are made based on the client's progress. Clients are encouraged to obtain employment, if appropriate. If clients are unable to work, MSOP will provide financial support for housing, utilities, food, and other essentials. Interviews with clients indicated that there is a perception that CPS clients may have more freedom and privileges than the one client living in the community (in a halfway house) under provisional discharge.

Based on interviews with clients and staff and the a thorough review of records and policies, the Panel opines that there are several improvements that could be made to increase the effectiveness of CPS to successfully transition clients into the community and, once in the community, to make provisional discharge as effective as possible. Based on the experiences of other states, as well as its comprehensive review of MSOP's program, the Panel offers the following recommendations:

***Reduce Time-Frames for Community Release***

Community release programs, such as MSOP's CPS and those described in Appendix 1, can provide a less restrictive alternative to inpatient SOCC and provide high-risk people who have sexually offended with the needed supports to successfully reintegrate into the community. Similar to inpatient SOCC programs, however, it is important that these programs have built-in time-frames for assessments regarding the intensity of the interventions, as well as risk determinations regarding whether continued placement is still needed. There is some research to suggest that if SOCC clients remain in treatment for too long, it can be counter-productive and result in diminished return (i.e., iatrogenic effects). In other words, too much treatment may actually make people worse (see Andrews & Bonta, 2010). Although there is no standard length of time that yields optimal treatment benefits for all people who have sexually offended, treatment length should be dictated by each client's individual needs. It is essential, therefore, that treatment benefits are evaluated at set time periods so that treatment dosage does not become counter-productive, clients do not begin to experience feelings of hopelessness, and the additional treatment results in no (or minimal) enhanced value.

Although there are few empirical studies investigating the issue of treatment dosage for people who have sexually offended, that which does exist (see Mailloux, Abracen, et al., 2003) suggests that programs are often longer than necessary. In 2009, the Safer Society Foundation conducted a survey of community and residential sexual offender treatment programs throughout the United States and Canada (McGrath et al., 2009). The survey identified trends in the sexual offender management field and reported on the best current practices in assessing, treating, and managing sexual abusers. The Safer Society survey identified that current community-based treatment programs average two years to complete, with an additional year or longer of aftercare services. Clients in residentially based programs typically require an extra year to successfully complete treatment.  Programs in Canada are typically one-half the length of programs in the USA, with no apparent extra decrease in reoffense rates associated with the longer US timeframes (see Wilson, Looman, Abracen, & Pake, 2012).

Not only are established time-frames and treatment dosage issues important to consider for length of stay at CPS, they are also important if (and when) MSOP begins to provisionally discharge clients into the community. In a longitudinal study of 4,724 people who have sexually offended, Harris and Hanson (2004) found that the longer people who have sexually offended remained offense-free in the community, the lower their risk for sexual recidivism. Specifically, clients in the 2004 study who were offense-free in the community had sexual recidivism rates (i.e., re-arrest or re-conviction) of 12% after 5 years and 9% after 10 years offense-free (compared to a 20% recidivism rate from time of release at a 10 year follow-up). When

rearrests do occur, research has consistently shown that they are more likely to happen within the first few years after release. For example, Langton, Schmitt, and Durose (2003) found that at a three year follow-up period, 40% of re-arrests for a sexual offense ($n$ = 517; $N$ =9,691) occurred in the first year post release. An additional 34% of re-arrests occurred in the second year, and 26% in the third year following release into the community. A study conducted by the Minnesota Department of Corrections (2007), with an average follow-up period of 8.4 years (range from 3 to 16 years), found that 79% of sexual re-arrests occurred in the first 5 years post release. More precisely, 27% of sexual re-arrests occurred in the first year post release compared to 20% in year two and 15% in year three.

More recently, Hanson and colleagues (2014) examined 7,740 people who have sexually offended over a 20 year period to determine the extent to which high-risk people who have sexually offended remain high-risk once in the community. Results indicated that recidivism rates were cut in half for each 5-year period clients remained offense-free in the community. Overall, Hanson and colleagues (2014, p. 15) concluded that "sex offenders who remain offense-free could eventually cross a 'redemption' threshold in terms of recidivism risk, such that their current risk for sexual crime becomes indistinguishable from the risk presented by nonsex offenders." In practical terms, the Hanson et al. (2014) study suggests that there is a limit to the degree of post-release management necessary. If clients can remain offense free in the community for 10 years, their likelihood of reoffending is substantially reduced. This suggests that measures like lifetime supervision or terms of probation beyond 10 years are unnecessary and unlikely to provide a worthy return on investment.

The majority of other SOCC states have successfully released clients to community conditional release programs within reasonable time frames with few documented sexual or violent reoffenses. For example, since their inception in 1994, Wisconsin has released 114 clients to its conditional release program, while Virginia (whose statute was enacted in 2001) has released 102 and New Jersey has released 111 since its law was passed in 1999. Additionally, and as mentioned earlier, New York State has released 181 clients to the community under SIST since its enactment in April 2007. Not only have other states successfully released high-risk people who have sexually offended to the community, many states have also unconditionally discharged clients from either SOCC programs or from community conditional release programs with few documented sexual or violent reoffenses by those released.  According to the 2014 SOCCPN survey, Wisconsin has unconditionally discharged 118 clients, California has unconditionally discharged 181 clients, and Massachusetts has unconditionally discharged 186 clients. On average, clients are in the community under conditional release programs for 2.84 years (range = 2.25 to 3.37 years) prior to their unconditional discharge. The experiences of these states provide evidence that the establishment of time-frames and the release of clients

to community programs as well as unconditional discharge from civil management is possible while still ensuring public safety.

Even among states with no conditional discharge framework, such as Florida, there is evidence that adequate preparation for release can still lead to positive outcomes. Since 2008, Florida has unconditionally released 40 SOCC clients who reached maximum benefit of treatment, with a sexual reoffense rate of less than 5%.

Given these empirical findings and the experiences of other SOCC states, it is clear that the intensity of interventions should decline the longer people who have sexually offended remain offense-free in the community.  As such, the Panel recommends that built-in time frames for assessment be implemented to ensure that CPS and provisional discharge do not become life sentences for MSOP clients. Rather, clients should progress from CPS to provisional discharge to unconditional discharge within a reasonable time frame that is consistent with the empirical research, experiences of other states, and with each client's individual risk and needs.

### *Implement Routine Assessments and Actively Petition for Client Discharge*
The Panel recommends that clear standards for discharge be established and that clients be objectively assessed against those standards on a routine basis (e.g., at least yearly). While in CPS, clients should be assessed annually to determine whether they are ready for provisional discharge or whether continued time in CPS is warranted. Once provisionally discharged, clients should be assessed every two years to determine whether they continue to meet the statutory criteria or whether they are ready to be unconditionally discharged. Most SOCC states have provisions in place that require all clients to be evaluated on an annual basis. In order to be consistent with best-practices, as well as the empirical literature, annual reviews for CPS clients and reviews every two years for provisionally discharged clients should be implemented.

These assessments should be completed by independent examiners, not by MSOP treatment staff, as research suggests that those treating the individual may be somewhat biased in providing risk determinations. Research has also reliably shown that actuarial risk assessment procedures are more accurate at predicting risk than empirically guided clinical judgment (Grove, Zald, Lebow, Snitz, & Nelson, 2000). As Doren (2005) noted, simply because treatment providers have a greater volume of information about people who have sexually offended does not mean they have greater accuracy in conducting risk assessments. In fact, treatment providers may depend on past experiences (both positive and negative) or previous opinions/feelings about the offender when completing the assessment compared to independent examiners who rely on file information and hold more objective opinions about the offender. Moreover, when treatment providers complete risk assessments they are, in

essence, evaluating the impact of their own participation in the offender's treatment, which could lead to significant bias. Overall, treatment providers and forensic examiners have distinct roles in the treatment and legal processes. Mixing these roles presents a potential conflict of interest that may interfere with the objectivity of the risk assessment, as well as the effectiveness of the therapeutic alliance (Greenberg & Shuman, 2007).

Once an assessment is completed by an independent examiner, MSOP should take a more active role in petitioning for progression to CPS; the onus is currently on the client to petition. MSOP should also take an active role in petitioning for provisional discharge from CPS for those MSOP clients who are ready to transition to community-living, as well as for unconditional discharge for those clients already in the community under provisional discharge. Although the law does not require such involvement by MSOP administration, it also does not prevent it. Taking an active role in petitioning is important for several reasons: (1) some clients may not have the cognitive ability to understand the discharge/petitioning process; (2) current mental health practices require practitioners to ensure clients are treated in the least restrictive environment; (3) MSOP administration has an ethical obligation to release individuals who no longer meet the criteria for SOCC in order to ensure that client civil liberties are protected; and (4) research indicates that the intensity and targets of interventions should match the risk and needs of clients – allowing clients to receive too much treatment for too long may actually jeopardize public safety.

### *Modify the Standards for Treatment Progress*
Based on client file reviews and interviews with MSOP staff and clients, it appears that treatment progress is currently impeded by unrealistic expectations for client behavior. That is, behavior expectation reports (BERs) are routinely given for behavior that may violate facility rules, but is not directly tied to a client's risk for future sexual offending. Although the use of BERs is a consistent practice across SOCC programs, they should not be used as a means to delay treatment progress, unless the behavior is directly related to the client's pattern of sexual offending. Two separate systems should be established: (1) a privileging system that dictates such things as the amount of personal items clients are able to have in their rooms or the extent of freedom of movement around the facility, and (2) a treatment progression system that outlines how clients are promoted or demoted in treatment phases. Technical violations, such as running in the hall, wearing non-approved clothing, or tardiness should be addressed through the privileging system and should not affect how and when clients progress in treatment. More substantial violations that are directly tied to a client's sexual offending should be addressed in treatment and may impact how quickly (or slowly) the client progresses to the next phase of treatment. Currently, MSOP prohibits clients from moving forward in treatment, fails to support clients in their petitions for advancements to CPS or provisional discharge, and

(at times) demotes clients in treatment phases due to technical violations that are not directly tied to clients' sexual offending. The Panel recommends that clear, objective standards for both the privilege system and the treatment progression system be developed and that MSOP administration should be mindful of the fact that obtaining BERs is a common occurrence for individuals living within SOCC facilities. Although these BERs may represent rule-violating behavior that needs to be addressed to ensure a safe and structured inpatient living environment, they often have little to do with the risk MSOP clients present to commit future sexual offenses.  Further, the current conflation of privilege and treatment progression procedures exacerbates an already hostile environment in which clients see no hope for release from confinement and, thus, have little motivation to constrain their behavior.

Similarly, the Panel recommends that clear, objective standards also be established for expected behaviors while in the community under provisional discharge. Only serious or repeated violations that have previously been addressed through graduated responses should result in removal from community placement. These violations should be directly tied to the client's sexual offending. The graduated responses should increase in intensity and be matched to the individual risk and needs if the client's rule-violating behavior continues. The goal should always be to keep clients safely in the community, while also ensuring public safety.

### *Expand the Use of Traditional Community Resources*
The extant research indicates that when people who have sexually offended are provided with resources for stable housing, establish prosocial support groups, create intimate relationships, and secure employment, they are less likely to re-offend (e.g., Hanson & Harris, 2000; Hanson et al., 2007; Hanson & Morton-Bourgon, 2005; Willis & Grace, 2008, 2009).  Currently, MSOP has sought contracts/proposals from community resources to provide all of these services to released clients within one housing structure. Although providing people who have sexually offended with the tools for successful re-integration to the community is a critical component of decreasing future sexual offending, not all services need to be obtained by contracts with MSOP. Once released, clients should be allowed to live in approved private residences, motels/hotels, supportive housing, shelters, or any other housing that meets the client's individual treatment needs (similar to traditional parolees or pro-social individuals). It is not necessary for all clients to be placed in halfway houses or community group homes who have contracted with MSOP to provide services. As demonstrated by other SOCC community release programs, clients can successfully reintegrate into the community via regular mechanisms, such as living alone or in other available housing options and by receiving treatment services through numerous community providers.

Moreover, not all treatment services need to be provided through integrated services (i.e., one location that provides all needed services including case management, housing, and treatment services). Instead, MSOP should consider contracting with individual community providers for treatment services and case management, similar to how the SIST program operates in New York State and the community release program in Wisconsin. Clients released under provisional discharge should be afforded freedom of movement in the community. In fact, reintegration is most successful when clients have opportunities to practice the skills learned in SOCC treatment. As such, clients need opportunities to move freely in the community and make real-world life decisions like other pro-social community members. Therefore, the Panel recommends that unescorted access to appropriate services be both allowed and encouraged. Overall, with the exception of specified community conditions, MSOP clients should be able to live in the community similar to those under other forms of community supervision.

### *Provide funding for sexual offender treatment*

External funds are often limited for people who have sexually offended and, therefore, many such clients in need of treatment services are unable to access treatment due to financial difficulties. Often clients have difficulty finding both affordable housing and adequate employment to financially support themselves, which does not allow for expendable finances to provide for sexual behavior treatment. People who have sexually offended who receive treatment generally have lower instances of sexual recidivism when compared to those who drop out of treatment and those who never attended treatment, highlighting the importance of accessibility to treatment. If people who have sexually offended cannot afford treatment, their potential for successful reintegration in the community may be compromised. As such, it is imperative that MSOP and other state SOCC programs provide funding to pay for treatment services as well as transportation services to ensure clients attend needed treatment appointments.

It is important, however, for clients in the community to *invest* in their treatment, which includes accepting the financial responsibility associated with treatment (as would be expected of any productive member of society). Experience in other community release programs shows that the majority of clients eventually locate stable employment and, when this occurs, treatment providers should be encouraged to require clients to contribute toward their treatment, even if the contribution is nominal. If the client is unable to pay for treatment, however, there should be no negative impacts on the client or his/her course of treatment. In New York, for example, if SIST clients are unable to pay for treatment services, the state will cover all transportation and treatment fees. This solution allows clients to remain in the community and receive needed treatment in a less restrictive environment, while still spending far less money than confining the client in a secure, inpatient treatment facility.

**Develop Circles of Support and Accountability.** Although the literature demonstrates that the majority of people who have sexually offended can and do return to the community without engaging in further sexual violence, legislators and the judiciary are often reluctant to release clients over fears that they will be held responsible if reoffending occurs. In simple terms, Judges are reluctant to release SOCC clients because they are unsure what the post-release outcome will be and, because of this lack of surety, they remain reluctant to release clients. With a few exceptions, many SOCC programs have released relatively few clients. Even those clients who have arguably made significant treatment gains have not been released by these programs. In fact, MSOP has conditionally released only two clients in its history; one of whom was ultimately returned to the facility following technical violations of his release conditions.

One important dynamic risk factor in need of attention, post-release, is social isolation. Many SOCC clients lack appropriate prosocial support in the community, often because of long histories of antisocial behavior and poor social skills. Although the majority of SOCC clients returning to the community will have some form of community supervision or monitoring, these measures are likely inadequate in fully assisting released clients in the task of community reintegration. Research indicates that poor planning, both pre- and post-release, can have a significant detrimental effect on client success in the community (Willis & Grace, 2008, 2009).

Circles of Support and Accountability (CoSA—see Wilson & McWhinnie, 2013) is a model of professionally supported volunteerism, in which trained community members volunteer to provide support and an accountability framework to a released high-risk/need sexual offender. The model consists of two concentric circles. The inner circle is comprised of the released offender (known as a core member) and four to six trained volunteers. This circle meets regularly to discuss events occurring in the core member's life and to provide support and guidance where needed. The outer circle is comprised of local professionals (e.g., treatment providers, case managers, probation/parole staff, and local law enforcement). These professionals provide support to the inner circle such that, if the inner circle should encounter situations beyond their expertise (e.g., renewed deviant fantasies, other clinical issues), they can access the outer circle for guidance and/or additional service.

The CoSA model has been shown to be effective in significantly reducing recidivism rates in high-risk/need people who have sexually offended, with studies having been completed in Canada (Wilson, Cortoni, & McWhinnie, 2009; Wilson, Picheca, & Prinzo, 2007), the United Kingdom (Bates, Williams, Wilson, & Wilson, 2013) and, most pertinently, Minnesota (Duwe, 2013). For several years, the Minnesota Department of Corrections has sponsored a successful CoSA project for its clients on community supervision. Using a randomized comparison design,

Duwe's (2013) research showed that MN-CoSA recipients were 62% less likely to be rearrested, 72% less likely to be revoked for a technical violation, and 84% less likely to be reincarcerated for any reason. Additionally, Duwe demonstrated a cost-benefit ratio of 1.82, meaning that for every dollar the MN-DOC spends on CoSA, they receive back $1.82 in community safety.

The MN-CoSA experience shows that this model can work in Minnesota, and there is no reason to believe that it could not also be used with clients released from the MSOP. At present, MSOP has no framework for a less restrictive alternative, nor does it have services available to assist clients in the task of community reintegration should they achieve release. The Panel recommends that MSOP liaise with officials from the MN-CoSA program to explore options for implementing a similar CoSA initiative for MSOP clients.

**Reconfigure the SRB and SCAP Processes**

It is the Panel's opinion that statutory processes should provide guidance towards rather than barriers to release. The current process of progression between Phases and movement to CPS and provisional discharge is cumbersome and difficult for clients to negotiate.  The panel observed three SRB hearings. The SRB hearings appeared to place the burden on the client to show that he/she was ready for the progression being requested, rather than on the State to show that the current level of confinement was appropriate.  MSOP treatment team and risk assessment staff presented their findings, while the client had no expert present in any of the three hearings that the panel observed.  The purpose of the SRB is not clear; especially given that SRB findings are advisory and not binding on the SCAP.  Given the need for judicial review of provisional or full discharge, or a change in level of confinement, it would be more efficient if the SRB step was eliminated and petitions went directly to judicial review.  This is the case in other SOCC states.

**Conclusion**

Community release programs provide less restrictive alternatives to SOCC, as well as the flexibility needed to address the comprehensive reintegration efforts and clinical needs of certain people who have sexually offended while also providing increased public protection. While SOCC is an important tool to have available, the cost of providing care to people who have sexually offended within secure treatment facilities remains high. Although costs per program differ, most states spend, on average, $94,000 per client per year for inpatient SOCC with several states spend well over $100,000 per client per year (Gookin, 2007). Community release programs, however, cost approximately $30,000 per client per year. Although additional research is needed, community treatment programs appear to be just as effective in managing people who have sexually offended as residential programs. The experiences of many other states engaged in the civil commitment of people who have sexually offended suggest

that, absent careful planning and innovative programming, the civilly committed population will continue to grow. Experiences of those states that offer community release programs suggest that these models may be an effective way to ensure the successful community management of high-risk people who have sexually offended.

## SECTION 6: LEGISLATIVE FRAMEWORK

After a comprehensive review of MSOP policies and procedures, interviews with clients and staff, and reviews of client clinical records, the Panel opines that changes are needed to the Minnesota Civil Commitment statute in order to ensure that sexual offender civil commitment (SOCC) is reserved for those people who have sexually offended who are the most dangerous and are truly at high risk to reoffend.

**Standards of Commitment**

Most SOCC states have statutes that contain language requiring committed individuals to suffer from a predisposing condition that result in sexual offending and serious difficulty controlling that predisposition. These criteria are consistent with those espoused by the courts in *Kansas v. Hendricks* (1997) and *Kansas v. Crane* (2002), which required a lack of volitional control coupled with sexual dangerousness.

To be civilly committed in Minnesota, individuals can be found to be a Sexually Dangerous Person (SDP) or a Sexual Psychopathic Personality (SPP).[2] The criteria for SDP, as currently defined, could include a significant portion of the sexual offending population, as it does not require an inability to control sexual impulses – a common requirement for SOCC in most states. Moreover, and unlike most SOCC states, the law does not require an individual to have a conviction for a sexual offense – rather it merely requires that the offender engaged in "harmful sexual conduct," which is defined as sexual conduct with a substantial likelihood of serious physical or emotional harm to another. This definition is inclusive of many sexual offenses, as defined in subdivision 8(b), including criminal sexual conduct, sexually motivated assault, and incest. These definitions appear to be more inclusive than standards of commitment in other SOCC states. As such, it appears that lower risk offenders are being civilly confined within the MSOP at a higher rate than in other states. Currently, Minnesota has 721

---

[2] SDP is defined as "a person who (1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 8." A SPP is defined as "the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons."

civilly committed individuals– a number that, per capita, is significantly higher than any other SOCC state. According to the 2014 SOCCPN survey (Schneider et al., 2014), Minnesota's civil commitment rate, per million, is 128.6, while the next highest state, North Dakota, has a commitment rate (per million) of 77.8. California and New York have a commitment rate of 15 per million, while Florida's is 29 and Wisconsin has a commitment rate (per million) of 53.7. Additionally, most SOCC states recommend 3% to 4% of all cases reviewed for civil commitment consideration, with 1% to 2% ultimately being civilly committed. However, assessment data from Minnesota indicate that 9% of cases screened are referred to the County Attorney for civil commitment (and County Attorneys have the ability to file civil commitment petitions for cases not referred to them, which suggests that the percentage may be even higher). Both the per capita rates and the screening and commitment numbers support the Panel's observation that there are individuals currently committed who likely do not meet commitment criteria. These numbers highlight issues with both the screening and assessment process, as well as the standards for commitment.

Overall, the Panel agrees with the Task Force's conclusions regarding civil commitment screening and advocates for a centralized screening process, as well as the development of clearer and standardized commitment criteria (see the Task Force report for additional information). Additionally, the Panel suggests that the ability for County Attorneys to file commitment petitions without a referral from the centralized screening unit be omitted from the statute. This latter point is based on the 2011 report of the Office of the Legislative Auditor (OLA) conclusions that there are significant geographic differences in the commitment rates. Geographic location (i.e., county where commitment petition is filed) should have no effect on commitment standards if the standard is truly based on risk to reoffend. Given the large difference in per capita rates between Minnesota and other SOCC states, as well as the OLA conclusions regarding geographic disparities, it is evident that risk to sexually reoffend is not the current commitment criteria.

Regardless of whether changes are made to the current commitment screening and petitioning process, the Panel recommends that MSOP assess all newly admitted clients to ensure that they truly meet the commitment standards. If these assessed individuals are determined to not be dangerous enough for commitment, then MSOP should petition for discharge on behalf of the client.

**Standards for Discharge**

Perhaps even more concerning than the overly inclusive commitment criteria, is the fact that the standards for discharge or advancement to CPS and provisional discharge appear to be more stringent than the standards for initial commitment. In its 20 year history, only two

individuals have been provisionally discharged from MSOP and no clients have been unconditionally discharged. These statistics are in stark contrast to other SOCC states that have released numerous clients. Many of these states have had SOCC laws for a much shorter time than Minnesota (see the Community Release section of this report and Appendix 1 for more information).

Not only do the discharge standards appear to be more rigorous than initial commitment standards, the current release process in Minnesota is also overly burdensome and inefficient. In order to be discharged or advanced to CPS, clients (on their own) must petition the Special Review Board (SRB).[3] The SRB holds a hearing and then makes a recommendation to the Supreme Court Appeals Panel (SCAP), which has the authority to advance clients to CPS, place them on provisional discharge, or grant unconditional discharge. Although the SCAP can adopt the SRB's recommendation, it also has the authority to hold its own hearings. This system for reduction in custody is unique to Minnesota and differs significantly from other SOCC states. Instead of a bifurcated reduction in custody process, most states require clients to be evaluated on an annual or every two years basis to determine whether clients continue to meet commitment criteria. A hearing is then held, in which the state typically has the burden to show (usually by clear and convincing evidence) that the client continues to require civil commitment. These hearings are held within reasonable time-frames of the annual reviews as to ensure that clients not meeting commitment criteria are not detained longer than necessary.

Minnesota's current process is not only burdensome, in that it involves clients petitioning to two separate boards – one of which has no authority to grant the reduction in custody – it results in lengthy delays in discharge decisions. As of June 2014, approximately 105 Special Review Board (SRB) petitions were pending decision and 48 petitions were pending a Supreme Court Appeals Panel (SCAP) decision. There are an additional 63 cases pending a SRB hearing date, as the SRB only meets once a week to hear these cases. The petitions for some of these cases were filed as long ago as July 2013. On average, for petitions filed after January 2010, clients waited 224.3 days for the SRB to hear their petition. Minnesota statute requires a SRB decision within 90 days of the hearing, but there is no statutory time limit for the SCAP hearing or decision. The Panel was unable to obtain information on the average number of days for the SRB to make a decision or the average time it takes after an SRB decision for the SCAP to meet and hear the case. It is clear, however, that there is a lengthy delay from initial petition to final decision that appears to exceed 12 months. The Panel believes that this delay is unacceptable and results in significant consequences to both the clients and the program, not the least of which is a perpetuation of the ubiquitous perception that there is no reasonable process for

---

[3] The difficulties clients have petitioning on their own is evidenced by the fact that 441 clients have not petitioned the SRB, despite the reality that clients have been at MSOP for an average of 9.6 years

achieving release of any kind from MSOP. Of the 401 petitions filed between January 1, 2010 and June 30, 2014 to the SRB, only 26 petitions for transfer have been approved, 8 have been approved for provisional discharge and none have been approved for discharge. Only one client was provisionally discharged to the community during this period.

Another concern with the Special Review Board (SRB) is that it is comprised of experts in mental illness (it is the same board that hears Mentally Ill and Dangerous [MI&D] cases) – not experts in sexual offender risk assessment and treatment. If the SRB is necessary which, as noted above, may not be the case, then it should be comprised of people with specific expertise in this field. Moreover, MSOP administration should work with DHS leadership to create separate SRBs to specifically hear SOCC cases. Given the large number of individuals committed to MSOP, MSOP administration should also advocate for these SRBs to meet more than once a week, at least until the backlog of cases is addressed.

Overall, the Panel agrees with the Task Force's analysis and recommendations regarding the current commitment and discharge process. Currently, the legislative framework appears to make even transfer to CPS almost impossible and appears to effectively prevent provisional or unconditional discharge. Once clients have successfully navigated this complicated system and received approval for provisional discharge, which has only happened twice in MSOP's 20 year history, any changes to the provisional discharge plan have to be approved by the SRB and SCAP. These SRB and SCAP processes appear to be unnecessarily cumbersome and, in many cases, likely redundant given the types of changes that might be considered (e.g., changes in residence, employment) and that could likely be managed by community supervision agents without SRB or SCAP input.

In order to achieve release of any kind, clients must be supported by the program, satisfy the SRB, enjoy the support of the Commissioner, and successfully convince the SCAP that they are ready for return to the community. The process is unnecessarily bureaucratic and invites political intervention. Additionally, there are too many steps to release, which leads to lengthy wait times, few (if any) releases, and creates or reinforces feelings of hopelessness for clients and staff. Interviews and record reviews demonstrated that clients are experiencing clear signs of hopelessness. The Panel recommends that MSOP be authorized to move clients to CPS, without SRB and SCAP approval, when the treatment team deems such a move to be clinically appropriate. Provisional discharge and unconditional discharge decisions should be submitted to the same Judges who presided over the initial civil commitment hearings. The SRB and SCAP should be eliminated from the process, as these steps provide unnecessary obstacles to the release process and, in practical experience, result in clients being held longer than is clinically appropriate.

The Panel recommends that all clients be assessed annually in order for their risk to be evaluated and determinations be considered regarding less restrictive placements. These evaluations should be conducted by the assessment unit and not by those who serve on the treatment team. Moreover, once each assessment is completed, mandatory annual access to court hearings should be available to clients and assistance should be provided to those clients with special needs to petition the court.  These evaluations should be implemented immediately, as there is nothing in the current law that prohibits MSOP from implementing this process and petitioning on behalf of the clients for release.

Indeed, and as noted previously, there appears to be a culture of learned helplessness at MSOP, in which administration and treatment staff, along with clients, believe that release is unattainable and that there is little that they can do – believing that the problem is either legislative or with DHS management. Consequently, it appears to the Panel that MSOP administration has assessed the problems regarding discharge as being beyond their reach or sphere of influence. With the federal class action lawsuit currently underway, it appears that most everyone in Minnesota is "waiting" for someone else to fix the problem, when each stakeholder likely has the capacity and/or authority to do something now. To reiterate, there is nothing in current policy or procedure guidelines to prohibit MSOP from proactively filing petitions for CPS, provisional discharge, or unconditional discharge for clients who merit such placements – they just do not do it.

At present, there are several clients who appear ready for provisional discharge, and there are likely many more who could be transferred to facilities that might better attend to their individualized needs. The Panel recommends that MSOP administration begin proactively assessing the petition readiness of each current MSOP client, and that this process be undertaken in a clinically and scientifically defensible manner. By way of example, the Panel has previously recommended the unconditional release of MSOP client Eric Terhaar. This recommendation was upheld in an evaluation conducted by a further expert retained by the program (Dr. A. Powers-Sawyer). Inconceivably, the treatment team and MSOP evaluators still failed to see Mr. Terhaar as being ready for presentation to the SRB, ultimately requiring intervention by the program's Executive Director.

In addition, the Panel believes that the legal representation received by clients is insufficient. It is recommended that a specialized group of defense attorneys be trained to obtain the expertise necessary to appropriately litigate SOCC cases. During interviews with clients, many expressed concern that their legal representatives had no experience or specialized knowledge in standards of sexual offender risk assessment or treatment. Additional training for defense counsel should be considered and/or appointing dedicated attorneys for SOCC cases should be

considered.  For example, the Panel was surprised by the number of clients stipulating to commitment whose controlling offense was committed as a juvenile and who had no adult criminal history.  Likewise, training is needed for county attorneys and Judges who hear SOCC cases. State or county funds need to be made available so that defense attorneys can hire independent experts for all legal proceedings – including initial commitment, SRB hearing, and SCAP hearings. The current process, in which the state has what appears to be unlimited resources to hire experts, creates an uneven (and likely unfair) playing field. Legal proceedings need to be fair to both parties and, as such, both the county and the defense should have equal resources to hire experts.

## SECTION 7: CONCLUDING REMARKS

In this report, the Panel has addressed a great many topics and issues regarding provision of sexual offender civil commitment treatment and risk management services in Minnesota and elsewhere. It was the Panel's intent to be as thorough and comprehensive as possible. Programs like the MSOP are necessarily complex, often with competing interests (e.g., clinical service delivery vs. maintenance of security). Also typical of programs of this size and scope, the devil is in the details – in that macro issues tend to be influenced greatly by micro elements. For example, the MSOP treatment program includes many of the aspects that the literature suggests are important; however, issues arise more in implementation and fidelity than in theory.

Clearly, there are issues to be addressed in making the MSOP the best program of its type in the nation. The Panel would like to stress that no program of this type is without flaws. It is our sincere hope that we have balanced constructive feedback with praise for policies and practices that are contributing to client health and community safety. The Panel also concludes that, even if the MSOP program were the best of its type, the current legislative and commitment and release framework would continue to call into question whether the intent is to provide treatment to assist people in reducing their risk to sexually reoffend so that they can be more safely released to the community or if the intent is to provide for a lifetime of confinement for certain people who have sexually offended. The Panel agrees that there is a great deal of opportunity in Minnesota for political courage, while at the same time there is opportunity for program improvement.

In closing, the Panel thanks the court for the opportunity to complete this important work and to share our findings in the hope that Minnesota can continue in its quest to provide quality treatment services to high risk people who have sexually offended in order to reduce and prevent sexual violence, while balancing the protection of individual civil liberties and ensuring

the implementation of such meets the standards of constitutionality.  We hope the commentary and recommendations enclosed herein are of assistance to the court as deliberations continue in this important matter.

Respectfully submitted,

Naomi J. Freeman, Ph.D.                         Deborah J. McCulloch, M.S.S.W.

Michael H. Miner, Ph.D.                         Robin J. Wilson, Ph.D., ABPP

## APPENDIX 1: COMMUNITY RELEASE PROGRAM EXAMPLES

**New York's Experience with Community Release**

Under the Sex Offender Management and Treatment Act (SOMTA), the New York Office of Mental Health (OMH) is required to evaluate and recommend individuals for sexual offender civil commitment (SOCC) and provide treatment to individuals found by the court to be in need of SOCC. Designated agencies (e.g., Department of Corrections and Community Supervision, Office for People with Developmental Disabilities, and the OMH) refer qualifying people who have sexually offended to OMH 180 days prior to a pending release date. Clinical staff (i.e., licensed social workers and licensed psychologists) employed by OMH complete thorough evaluations of referred clients, including use of actuarial risk assessment instruments (ARAIs; e.g., Static-99R) and a comprehensive review of criminal history, mental health, substance abuse, sexual offender treatment, and institutional and prior supervision conduct records. A multi-tier review process results in high-risk people who have sexually offended being referred to psychiatric examiners (i.e., licensed psychologists) who conduct detailed psychological examinations to assess for a mental abnormality[4] (NYS Office of Mental Health, 2008, 2013).

All risk assessment staff, including the psychiatric examiners, are employed by OMH. The use of state employees ensures that all clinical staff receives extensive and thorough training in the state's legal definition of mental abnormality, current research regarding assessment and risk, and evidence-based techniques for interviewing and assessing people who have sexually offended. Although these staff are state employees, the statute mandates independent judgment by those involved in the SOCC screening and assessment process and requires that they be free to exercise independent professional judgment without pressure of retaliation for the exercise of that judgment from any source (MHL§10.05(a)). Ultimately, the clinical team makes a determination regarding the need for SOCC. This decision is based on scores on ARAIs, a comprehensive record review, and the findings by the psychiatric examiner regarding the presence of a mental abnormality. High-risk people who have sexually offended with mental abnormalities are referred to a specialized bureau within the Office of the Attorney General (OAG), who litigates these cases statewide (for additional information on the NYS risk assessment process see Freeman & Sandler, 2012). The OAG files a petition to show cause that the offender suffers from a mental abnormality. The OAG can only file petitions for those high-risk people who have been referred by the clinical team at OMH.  At the time the petition is filed, a Mental Hygiene Legal Services (MHLS; a state agency) attorney is assigned to the

---

[4] In New York State, a mental abnormality is defined as a congenital or acquired condition, disease, or disorder that affects the emotional, cognitive or volitional capacity of a person that predisposes him or her to the commission of conduct constituting a sexual offense and that results in that person having serious difficulty in controlling such conduct.

respondent, unless the respondent elects (and has the financial means) to hire his own private attorney. The assigned Attorneys General, who litigate SOCC cases, as well as the assigned MHLS attorneys, have received extensive training in SOCC and the management of people who have sexually offended.

Individuals recommended for SOCC have the right to a trial by jury, or to have the trial heard by a judge, if a jury trial is waived. The burden of proof, placed upon the Office of the Attorney General (OAG), is one of "clear and convincing evidence". The SOCC trial is bifurcated – the first phase of the trial determines the presence of a mental abnormality, while the second phase addresses dangerousness. The OMH psychiatric examiner is required to testify in all court proceedings as to his/her finding of mental abnormality as well as his/her assessment of current dangerousness. Additionally, MHLS may have retained its own psychiatric expert to assess the respondent and, if so, that expert may also testify. The OAG may also retain a psychiatric expert (other than the OMH psychiatric examiner), who may also testify. State funds are used to pay for all psychiatric experts, including those hired by MHLS on behalf of the respondents.

If a respondent is found to suffer from a mental abnormality in the first phase of the trial, he will be civilly managed, either in a secure treatment facility or in the community on SIST. This decision is made by the Judge in the second phase of the trial. It is also during this phase of the trial that the trial judge must determine whether the respondent is a dangerous enough to require confinement or may be managed in the community on SIST. A respondent deemed dangerous and requiring confinement is defined as a detained sexual offender suffering from a mental abnormality involving such a strong predisposition to commit sexual offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sexual offenses if not confined to a secure treatment facility. A respondent requiring SIST is a detained sexual offender who suffers from a mental abnormality, but is not a dangerous sexual offender requiring confinement.[5]  As with the earlier phase of the trial, the standard of proof for the dangerousness determination is one of "clear and convincing evidence." This second phase will also include testimony by the OMH psychiatric examiner and will often include testimony from both the MHLS and OAG experts who opine on the respondent's dangerousness.

As in other SOCC jurisdictions, court proceedings in New York State are highly litigious. Even when a finding of mental abnormality is sustained, courts require significant evidence and

---

[5] It is important to note that all respondents referred for civil management have already been determined to be high risk by the OMH risk assessment and record review clinical staff. The dangerous determination is separate from the initial determination of risk made by the screening and assessment staff.

convincing expert testimony to place an individual in a secure treatment facility rather than in the community under SIST. In total, there have been 452 findings of civil management since the law was passed in April 2007. As reported to the panel through an email inquiry, of the 452 cases, 327 have resulted in confinement in a secure treatment facility, while 125 have been placed directly to SIST directly to SIST (bypassing inpatient SOCC). These decisions are not static, however, as civilly managed individuals may violate their SIST conditions and be ordered to inpatient SOCC, and those confined may be released to the community under a SIST order.

New York's SIST program is unique in that people who have sexually offended can be court ordered directly to the community under a SIST order, bypassing inpatient SOCC, or (similar to conditional release programs in other states) people who have sexually offended can be released from inpatient SOCC to SIST. The primary goal of SIST is to successfully manage, in the community, people who have sexually offended who are determined to suffer from mental abnormalities that predispose them to commit sexual offenses, but who are not deemed dangerous enough to require SOCC (NYS Office of Mental Health, 2008, 2013). SIST was developed based on the recognition that inpatient hospitalization (i.e., SOCC) should be only one response to manage high-risk people who have sexually offended and that there should be a less restrictive option – something between traditional criminal justice community supervision and SOCC – for people who have sexually offended with mental abnormalities who require specialized care, but who do not rise to the level of dangerousness that they require inpatient confinement.

Under New York State's law (SOMTA, 2007), SIST provides people who have sexually offended with mental abnormalities a unique opportunity to maintain themselves in the community with the assistance of intensive supervision conditions and comprehensive treatment requirements. Supervision is provided by the NYS Department of Corrections and Community Supervision (DOCCS), while treatment plans are developed and overseen by the NYS Office of Mental Health (OMH; the same agency that operates inpatient SOCC treatment facilities and completes sexual offender risk assessments to determine who is most appropriate for civil management).

When a sexual offender is court ordered to SIST, he agrees to abide by specific court-ordered conditions, which are typically recommended by both the NYS OMH and DOCCS. These conditions could include, but are not limited to, global positioning satellite (GPS) tracking, polygraph monitoring, curfews, prohibited contact with identified and potential victims, abstaining from the use of alcohol and illicit drugs, no possession of pornography, and attendance and participation in treatment. People who have sexually offended placed on SIST often participate in multiple treatment programs in the community (e.g., sexual offender treatment, anger management, substance abuse treatment, mental health services, case

management). These treatment services are provided via contracts between OMH and community treatment providers to ensure that all treatment needs are met. Housing options are investigated and approved by DOCCS to ensure that no residency restriction laws are violated and that the housing options do not put the offender (or potential) victims at risk. Similar to traditional parolees, most SIST clients reside in hotels/motels, private residences, supportive housing, or shelters. SIST clients have significant freedom of movement, although some restrictions are placed on their whereabouts (e.g., those with child victims are prohibited from parks and other places where children congregate). Although freedom of movement is provided and SIST clients are encouraged to seek employment, extensive supervision conditions are enforced. In fact, SIST parole officers have lower caseload ratios of 1 officer to 10 clients (instead of the traditional 1 officer to 25 clients for regular sexual offender caseloads) to ensure that intensive supervision is provided. As SIST clients remain in the community safely, some conditions may be lifted (e.g., having a cell phone, driving a car).

Prior to releasing a client to SIST, the OMH SIST team facilitates reintegration conference calls between the parole officer, community sexual offender treatment provider, and inpatient clinicians[6] to review discharge plans (e.g., ensure the client will be released with a two-week supply of needed medication [if applicable], a medication grant application[7] is completed and approved, medical appointments scheduled with a primary care physician, needed prescriptions are provided, treatment appointments and other needed assessments are scheduled) and to ensure that entitlement and/or disability applications have been completed (e.g., health insurance, disability, housing applications). These calls also provide an opportunity for the community treatment providers to learn from the inpatient clinicians and to discuss any relevant treatment issues (e.g., treatment progress, factors that interfere with the treatment process, issues that require additional/more intensive work). The goal of these reintegration calls is to ensure a seamless transition to the community, while maintaining continuity in treatment services.

Once the client is released into the community[8], OMH, DOCCS, and the community treatment providers meet monthly to review the client's progress on SIST. These meetings provide a

---

[6] The inpatient clinicians are either OMH staff at a secure treatment facility or DOCCS staff, depending on where the client is confined at the time the SIST order is issued by the courts. Some clients are transferred to a secure treatment facility after a probable cause finding, while others remain in DOCCS custody pending the civil management trial.

[7] Currently, many individuals who leave jail, prison, or hospital receive only limited supplies of medication until they qualify for Medicaid. The Medication Grant program provides funding to counties to pay for the individual's mental health medications and services related to providing medication during their pendency of a Medicaid determination.

[8] All SIST clients return to the county in which they were originally convicted for their sexual offense. This county is typically their county of residence.

valuable opportunity for the assigned SIST parole officer, sexual offender treatment provider, and (if applicable) the mental health and substance abuse treatment providers as well as the case managers to discuss any pressing issues and review the client's treatment progress and compliance with SIST conditions. The monthly meetings are also used to discuss how the client's risk factors are being addressed in treatment, as well as his level of progress toward addressing those factors. During these monthly meetings, the sexual offender treatment provider discusses the offender's general compliance with supervision and treatment, his reaction to treatment, and his ability to identify risk-related concepts in himself and others in the treatment group. If the SIST client does not have the cognitive ability to understand treatment concepts, further steps (e.g., consulting with agencies specializing in this population, contracting for additional services, providing individualized treatment) are discussed to ensure this responsivity issue is addressed. Additionally, during these meetings the SIST parole officer comments on the client's overall general behavior while in the community, which may include activities he is engaged in during his free time (e.g., employment, relationships, police contacts). If the client is unemployed, the SIST parole officer comments on what steps the client is taking to find/obtain a job including the number of applications he has submitted during the past month. The team also discusses whether the client has experienced any adverse community reactions (e.g., harassment by community members, stigmatizing events) as well as other factors that may interfere with treatment progress and/or the client's ability to reintegrate and remain successfully in the community. Overall, the monthly meetings provide an opportunity for all stakeholders involved in the community management of the SIST client to adjust the level and intensity of interventions, as the individual experiences and risk factors of each SIST client changes.

Team work and coordination is an integral part of the SIST case monitoring process. OMH, DOCCS, and the community treatment providers work closely together on a daily basis to ensure that the client is successfully reintegrating into the community. Although differences of opinion on how to provide services may occur (as every stakeholder has a slightly different philosophy on how to manage a particular situation and comes from a slightly different perspective), all stakeholders try to focus on the fact that they are working together to achieve the same goal: successfully managing the SIST client in the community. As such, through ongoing collaboration and coordination, the entire SIST treatment team is able to make immediate recommendations for adjustments to the supervision and/or treatment plan that are consistent with the client's needs.

If a SIST client seriously or repeatedly violates the conditions of the SIST order, he is taken into custody and a psychiatric evaluation – completed by independent psychiatric examiners employed by OMH – must occur within five days. One purpose of the psychiatric evaluation is

to determine whether modifications are needed to the SIST treatment and supervision plan or whether the client is dangerous and in need of confinement. As mentioned earlier, the goal is to protect public safety while ensuring that high-risk people who have sexually offended are provided care and treatment in the least restrictive means possible. As such, the psychiatric examiner assesses whether the SIST client's rule violating behavior is directly tied to his sexual offending behavior or whether graduated sanctions could be employed to hold the SIST client accountable for his behavior, while keeping him safely in the community. Once the psychiatric evaluation is completed, it is forwarded to the Office of the Attorney General who files either a petition for confinement or a petition to modify the SIST conditions. Ultimately, and after a SIST violation hearing, a Judge determines whether confinement is needed or whether the SIST client can continue to be safely managed in the community.

SIST clients may be evaluated every two years to determine whether discharge from SIST is appropriate. These evaluations are completed by the same independent psychiatric examiners who complete the SIST violation reviews and the initial mental abnormality evaluations. The purpose of these evaluations is to ensure the SIST client continues to have a mental abnormality or determine that the client can be released from SIST. Again, these evaluations are provided to the Office of the Attorney General who submits the recommendation to the court. Regardless of the recommendation, each SIST client is afforded a hearing in which a Judge determines whether release from SIST is warranted. As of September 2014, 29 clients have been discharged from SIST. On average, they had been in the community for 3.7 years prior to discharge from SIST. None of the 29 individuals released from SIST have been arrested for a new sexual offense (SOCCPN Survey, 2014).

Since the enactment of SOMTA and the implementation of SIST in April 2007, 181 clients have been court ordered to SIST; 125 of whom were court ordered directly to SIST, bypassing SOCC, and 56 were released from SOCC to SIST (SOCCPN Survey, 2014). Of the 181 clients who have been in the community under SIST, only 4 (2.2%) have been charged with new sexual offenses while on SIST. Estimates indicate that SIST costs approximately $30,000 per client per year (for treatment reimbursed by OMH and supervision provided by DOOCS). Overall, New York's SIST program provides a less restrictive alternative to inpatient SOCC that provides high-risk people who have sexually offended opportunities to reintegrate into the community while receiving intensive supervision and treatment and ensuring public safety (for additional information on SIST, see Thomas, Freeman, & Sandler, 2013).

**Texas' Experience with Community Release**

Texas is the only state that does not provide for inpatient SOCC. Instead, all civilly managed high-risk people who have sexually offended[9] are placed in the community. In practice, however, Texas often utilizes state hospitals, local jails, and other correctional facilities as community residences for the purpose of SOCC. All civilly committed people who have sexually offended reside in a few major metropolitan areas where approved residential treatment facilities are located. Once released, people who have sexually offended and managed under the Texas SOCC program are equipped with a GPS bracelet, assigned a case manager, required to participate in polygraph examinations, and are referred for all needed/required treatment services (e.g., substance abuse, sexual offender, family therapy, PPG administration; OSVPTP, 2011). People who have sexually offended under Texas' program are required to pay for their own treatment services and GPS tracking, if they have the funds available. They are also restricted from having contact with potential or previous victims, are not allowed within 1000 feet of areas where children congregate, and they must abide by all written supervision requirements, which includes participation in urinalysis/hair testing.

Unlike individuals in the community under New York's SIST initiative who have considerable freedom of movement, people who have sexually offended in Texas are constantly supervised by their case managers. Case managers have a standard caseload of 14 people who have sexually offended and, at a minimum, have contact with clients one time per week. Each day, clients must complete and submit to their case manager a Daily Activity Schedule. All activities are supervised and any non-approved changes to the schedule could result in a violation, which is a 3rd degree felony. Overall, approximately 40% of people who have sexually offended in the Texas program have violated their conditions of commitment in the community and have returned to prison (Texas Civil Commitment, 2012).

The Texas statute allows SOCC clients to petition the court for release annually. It also provides for bi-annual reviews, in which a Judge determines whether modifications to the community release order are required or whether the offender no longer meets the standards for community placement under the SOCC initiative. The burden of proof is placed on the state to prove beyond a reasonable doubt that the individual still continues to have a behavioral abnormality that requires SOCC in the community. Estimates indicate that Texas spends, on average, $28,000 per offender per year. The number of individuals able to be civilly managed

---

[9] "The legislation finds that a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence" (OSVPTP, p. 2).

under the Texas program is driven by fiscal allocations. Since the enactment of Texas' civil commitment program in 2001, funds were available to civilly commit 7 to 14 people who have sexually offended each year. Additional funding was provided in 2010, which resulted in an increase of 37 to 47 civil commitments per year.  As of 2012, no SOCC clients had been released from the Texas program (Texas Civil Commitment, 2012).

**Florida's Experience with Community Release**

At present, Florida has no legislative framework for the supervised community release of people deemed to be sexually violent predators, nor does it currently have a less restrictive alternative. All persons deemed SVPs must be placed at the Florida Civil Commitment Center (FCCC), barring temporary placement at a forensic treatment center for competency restoration or other severe mental health issues beyond the scope of FCCC's clinical services. Plans to develop post-release supervision and step-down procedures have been suggested for many years by both the Department of Children and Families and the Office of Public Policy Analysis and Government Accountability, but no movement has been seen in the legislature. Notwithstanding the lack of a post-release framework, Florida continues to release clients from its SOCC program. Releases come in a variety of forms:

- Detained residents may be released to the community if they are not deemed to be sexually violent predators at trial. This is the most common form of release. Carr, Schlank, and Parker (2013) noted that 366 detainees had been released in FL during the 14 year history of the program.
- Civilly committed residents may negotiate settlement or "stipulated" agreements with the State's Attorney, resulting in the release of the client to the community on an abatement of commitment, with the understanding that any subsequent sexually inappropriate conduct will result in an immediate return to civil commitment status, without the usual commitment procedures. Carr et al. (2013) reported that 166 settlement agreements have been issued since the program's inception.
- Civilly committed residents may petition for release at any point during their commitment prior to treatment completion. If probable cause is found that the client has substantially changed and the committing court finds that they no longer meet the threshold for placement at the FCCC, the client is released. According to Carr et al. (2013), 100 clients have been released by the court under this process.
- Civilly committed residents may be released if FCCC program staff deem them to have reached maximum benefit of treatment and the court confirms that, as a consequence of their involvement in treatment, they no longer meet criteria for commitment. Approximately 40 committed FCCC residents have been released as having reached maximum benefit of treatment since 2008.

- Other release possibilities exist (e.g., compassionate release for health purposes, the original placement is deemed inappropriate by law). This is a relatively uncommon form of release in FL

Upon release to the community, some former FCCC residents may still have residual terms of probation left to serve. In such cases, regular sexual offender probation supervision will ensue, which in Florida includes mandatory participation in community based treatment. Not all released clients, however, will have residual probation to serve. In some cases, lawyers for the State's Attorney and the Public Defender will negotiate a "stipulated agreement" in which the State agrees to release the client to the community on an abatement of commitment, with the understanding that any subsequent sexually inappropriate conduct will result in an immediate return to civil commitment status, without the usual commitment procedures. These stipulated agreements have proven helpful and effective in the Florida experience; however, they have no firm standing in law and are essentially a "gentleman's agreement" between the State and the client.

Because there is no facilitated step-down process for release in Florida, there are no aftercare services made available to clients returning to the community. As such, clients in treatment must work closely with clinical staff to establish a comprehensive and concrete release plan to ensure a safe and smooth transition. Release planning at the FCCC begins shortly after intake, with enhanced efforts at discharge planning occurring during Phases Three and Four of treatment. Some jurisdictions in Florida have established residential services opportunities (e.g., sexual offender trailer parks) that may also include clinical support services; however, most persons released from the FCCC will need to rely on their own support and accountability frameworks.

A recent report to the Florida legislature (Carr, Schlank, & Parker, 2013) noted that post-release sexual recidivism rates of former residents of the FCCC (regardless of the reason for release) are far lower than expected given actuarial projections (5.2% were charged or convicted for a new sexually motivated offense within five years post-release; 13.7% within 10 years). For those residents released to the community having achieved maximum benefit of treatment, the sexual recidivism rate is less than 5% (see Wilson, Looman, Abracen, & Pake, 2012).

**Wisconsin's Experience with Community Release**
Wisconsin's Sexually Violent Persons (SVP) Law (Chapter 980) was enacted in 1994. Wisconsin's first Supervised Release (SR) client was placed in the community in 1995. Initially Chapter 980 provided a direct court supervised release option similar to New York's, but that option was repealed in 1999. To date, Wisconsin has made 129 supervised release placements from its civil

commitment institutions in communities throughout the state. Approximately one-third are currently placed in the community on SR, approximately one-third have been discharged (no longer committed), and approximately one-third have had their SR revoked by the Court and have returned to the Sand Ridge Secure Treatment Center (SRSTC).

The SOCC process in Wisconsin refers only those who are currently in the custody (prison or mental health institution) of the Department of Corrections (DOC) or Department of Human Services (DHS) for a qualifying sexual offense; are deemed to have a mental disorder that predisposes them to commit future acts of sexual violence; and who are more likely than not to sexually reoffend in their lifetime. In Wisconsin, this represents about 3% of the sex offender population released from DOC and DHS. Within 90 days prior to scheduled discharge, these agencies complete comprehensive forensic examinations prior to referral for commitment to the Department of Justice and the County District Attorney. Although the specialized psychologists who complete these examinations are employees of each department, their evaluations are considered independent professional opinions, thereby disconnecting them from political or departmental influences. Wisconsin's commitment and release process includes the provision of an independent expert evaluation for the defense, funded by the county of conviction. The Court and prosecutor may also acquire an independent evaluation. Upon referral for commitment in Wisconsin, clients are detained and placed on inpatient status for treatment at SRSTC for an indeterminate commitment period prior to Supervised Release or Discharge. Presently, there are 362 clients detained or committed at SRSTC. After a court civilly commits a person to the DHS, Chapter 980 mandates that DHS complete and submit an annual report to the committing court and parties. This report includes a forensic examination completed by the same unit of specialized psychologist employed by DHS and it offers opinions to the Court whether the person continues to meet criteria for commitment and whether the person meets criteria for Supervised Release. The annual report also includes a comprehensive Treatment Progress Report that offers treatment progress information and may include an opinion by the treatment team, including a treatment evaluator, whether the person meets criteria for Supervised Release. When a person is on Supervised Release, an annual examination is submitted to the Court to opine whether the person continues to meet criteria for commitment (in the community).

Wisconsin legislation requires that when annual reports are submitted to the court, the reports must be presented to the civilly committed person and petitions for Discharge and Supervised Release are presented with assistance, from SRSRC staff, in petitioning the Court. Clients may petition for Supervised Release annually, but may petition the Court for discharge at any time. All Chapter 980 civil commitment decisions regarding commitment or discharge are determined

by a Circuit Court Judge (an elected official of the county) or a jury. All decisions regarding Supervised Release, including revocations, are determined by the committing court judge.

Upon the Court's receipt of a petition for Supervised Release (SR), the client is provided with defense counsel, most often provided by a Wisconsin Public Defender because most clients are indigent. Most civil commitment trials in Wisconsin are prosecuted by county prosecutors who specialize in these cases or Department of Justice prosecutors, also who also specialize in these cases. Similarly, public and private defense counsel who represents persons in sex offender civil commitment cases also tends to specialize in these matters. This specialization, in addition to the defendants'/clients' access to their own experts, means that the state, the defendant/client, and the Court are competently served by expertise and specialized knowledge regarding the complex science involved in these cases.

The Supervised Release statutory criteria require that (1) The person is making significant progress in treatment and the person's progress can be sustained while on supervised release, (2) It is substantially probable that the person will not engage in an act of sexual violence while on supervised release, (3) Treatment that meets the person's needs and a qualified provider of the treatment are reasonably available, (4) The person can be reasonably expected to comply with his or her treatment requirements and with all of his or her conditions or rules of supervised release that are imposed by the court or by the department, and (5) A reasonable level of resources can provide for the level of residential placement, supervision, and ongoing treatment needs that are required for the safe management of the person while on supervised release. Significant progress in treatment is statutorily defined and the treatment and evaluation programs have operationalized this definition which is applied in the annual reports.

When a Court determines that the person meets criteria for SR, the Court orders the DHS to submit a Supervised Release Plan to the court within 90 days. A critical component of the statute, and subsequently the court order for supervised release, is the identification of the county into which the person will be placed. The county of placement is almost always the client's county of residence, which is statutorily defined. The reason this identification and placement is a critical component of Wisconsin's Supervised Release Program is presented later in this report.

The SRSTC program staff closely monitors each court petition and often present expert court testimony. Although these cases are vigorously prosecuted and defended in Wisconsin, there is often a collaboration of parties when there is an agreed outcome, such as an order for SR. In these cases, the parties communicate with the relevant DHS administrator in advance of presenting stipulated agreements for SR before the court. In such circumstances, the SR

Program and the SRSTC staff immediately develop and implement release plans with the individual.

It should be noted that in the Wisconsin Program at SRSTC, release planning begins upon admission and continues throughout inpatient treatment. Releases from SRSTC can occur at any time during a person's placement, including release if the case is dismissed rather than committed by the court; release if the Court determines the person no longer meets commitment criteria and must be discharged; and release to Supervised Release, which can occur during any phase of the treatment program or even for persons who decline treatment. Planning for discharge upon admission is a standard of practice for inpatient settings. Such planning at Sand Ridge ensure that patients and staff are continuously planning for release, are targeting community reintegration issues in treatment and are at least minimally prepared for the possibility of release or discharge by the court. In addition to SR Program staff, the program employs an Agency Liaison who, with assigned social workers and the client's inpatient treatment team, assists clients in developing release plans and in making referrals and connections with support services and persons in the community.

Upon receipt of a court order for an SR plan, the client is assessed for placement compatibility and appropriateness and typically placed on the Transitional Living Unit (TLU) – a specialized residential unit designed to mimic many of the features of SR clients' first year experiences in the community. For example, unlike all other SRSTC living units, the TLU is not constantly staffed, although it is closely monitored. Specialized services are provided by staff including 90 or more days of community preparation assessment and services such as advanced independent living skills, application and adherence to SR rules, and support and accountability in collaboration with clients' inpatient and SR community teams.

Wisconsin statutes mandate that the SR Plan include the proposed residence, supervision, and sex offender treatment and/or other counseling, medication, community support services, vocational services, alcohol or other drug abuse treatment, and anti-androgen or equivalent treatment if appropriate and recommended. The process is bifurcated so that after the SR Plan is submitted to the Court; and if the Court is satisfied that the plan meets the treatment needs of the client and the safety needs of the community, the Court orders the person to be released on Supervised Release to the community. The order typically provides 30 days for placement to occur so services can be properly in place, and that appropriate training of community staff is complete, and so community notification can be accomplished.

Wisconsin's program has developed a comprehensive Supervised Release Program that can be implemented statewide in each of its 72 counties. The program develops and provides all

components required in the SR Plan and is individualized to meet each client's needs, including clients with intellectual disabilities, traumatic brain injuries, serious mental illness, and various physical disabilities. The DHS Supervised Release Program Manager oversees the administration of the program, supervises its staff, and manages its contracts. Three Supervised Release Specialists are geographically located to cover the entire state. Each serves as the lead community supervision and treatment team member and case manager for each SR client and provides assistance in accessing community resources.

Supervision of clients in the community under SR is provided by the community supervision and treatment team, in collaboration with other contracted entities. The team is comprised of the client and the following three professionals: (1) The Supervised Release Specialist; (2) the DHS contracted Department of Corrections' Probation and Parole Agent; and (3) a sex offender treatment provider. Supervision services and strategies include the use of polygraph testing, active Global Positioning System (GPS) tracking, radio frequency tracking for some clients, random urinalysis as appropriate, weekly supervision meetings, and random in-home monitoring by a contracted agency. Pursuant to statute, all clients who are in the first year of SR must be directly supervised when they leave their residence and can leave the residence solely for statutorily authorized activities which include employment, volunteer services, education, exercise, medical and other appointments, religious services, and specific personal needs such as shopping. These chaperones are contracted by DHS.

Community-based treatment for people who have sexually offended is provided through a DHS contract with a Clinical Manager whose agency sub-contracts with a network of specially trained and experienced sexual offender treatment providers who are located throughout Wisconsin. Through its contract, these outpatient treatment providers are vetted and trained by the Program. The Program and its medical and psychiatric services providers work closely with community providers for follow-up and continuity of care if the person is prescribed psychotropic medications or anti-androgen or other medications that address sexual behavior treatment needs. This collaboration is critical because there are few physicians who are familiar or comfortable with prescribing and monitoring medications for libido reduction. Psychotropic and any other medications that are related to the client's offending or treatment are funded by the SR Program. Other medications and medical services are obtained for the client, with the assistance of his team through local community and (sometimes) county resources, and through available entitlement programs.

In order to ensure SR plans are individualized to meet clients' needs, community support services, including in-home services, is provided by a contracted agency that specializes in supported living services and is experienced in working with persons in the community with

serious mental illness and intellectual and/or physical disabilities. This service is available statewide and is provided to clients who require assistance with daily living skills and other support services for their special needs. When applicable, alcohol and other drug abuse treatment and support services are provided by contracted, certified professionals.

Vocational services are primarily provided by the Wisconsin Job Center, which has locations throughout the State. Clients who are able to be employed are expected to seek and obtain employment and are provided assistance by their teams. Employment opportunities for these individuals can be limited due to their status and stigma. Nonetheless, through collaboration with employers, the SR Program has been successful in assisting clients in obtaining competitive employment throughout the state. As clients obtain funds through employment, or through other means such as entitlement programs, they are required to contribute toward their costs of care.

Residential placement and services is the most challenging and controversial component of the SR plan. In Wisconsin, clients on SR are most often placed in freestanding single-resident homes. On occasion, when necessary and available, clients are placed in community-based residential facilities (group homes). DHS has developed a policy that establishes guidelines for locating, securing, and approving appropriate residences for clients, all of which are subsequently included in the plan submitted to the court.  This policy, and many previous years' practices, has been highly effective in placing all persons, with one exception, in appropriate housing in communities around Wisconsin pursuant to the Court's order, ensuring a uniform approach across the state.

Presently there are 39 individuals placed on Supervised Release in communities around Wisconsin and there are 10 persons at SRSTC with court orders in various stages of plan development and implementation.

- *Acquisition of Residence for Placement in Wisconsin*

The DHS does not have the statutory authority to purchase properties for the SR program, so it seeks rental properties that are primarily single resident homes. Through its years of experience in developing residences for this population, the program has learned that the most successful placements occur in single resident homes, if the person is minimally capable of independent living. When searching for an appropriate residence, the SR program faces many barriers, including (1) local municipal ordinances that limit where registered sexual offenders may reside; (2) limited properties that meet the program's criteria; (3) property owners who refuse or who are reluctant to rent to DHS for this purpose; and (4) community negative responses to these residences and the return of a person to the community who has sexually offended and is

civilly committed. The very limited number of property owners willing to rent to DHS for placements results in inflated rental prices.  How the Wisconsin program mitigates the public relations barriers is addressed later in this report. Following a Wisconsin Legislative Audit Bureau of the Supervised Release Program and to attempt to address inflated rental costs, the DHS recently issued a request for proposals to solicit potential firms interested in providing rental housing to clients on SR throughout the state. Unfortunately, only two firms responded.

The SR Program uses a wide variety of strategies to locate suitable residences for clients on SR. These strategies include, but are not limited to (1) placing two clients in one existing residence if they are clinically and otherwise compatible and are from the same county of residence; (2) developing working relationships with firms and property owners who understand the needs of the program and recognize the public relations risks of renting to the program; and (3) searching and posting ads to locate residences. As a last resort due to cost, the program utilizes firms that assume financial risk by purchasing specific identified properties to then rent to the DHS. When a residence has been identified through any of these means, the DHS conducts a comprehensive assessment on the residence, utilizing numerous technologies and resources in communities. The residence assessment considers local ordinances and the proximity of numerous entities including schools, parks, licensed child care centers, foster homes, and other places where children or other vulnerable populations may congregate.  The exhaustive search and assessment results in a report that includes narrative detailing consultations with local stakeholders, such as Probation/Parole Agents and local law enforcement, and maps and lists illustrating the residence and its geographic relationship to any potential entities of concern. The residence search report is often presented in court as evidence when the court is reviewing the SR plan for approval.  Typically an SR Specialist reviews 50 residences before a viable one is identified. Documentation in the report regarding the exhaustive search includes information about residences considered but not approved.

- *Addressing concerns of the community through education and public relations*
Community notification in Wisconsin provides local law enforcement with the authority and responsibility to determine and implement community notification of certain people who have sexually offended, including those who have been civilly committee and are placed on Supervised Release or discharged to the community. When a Court approves a Supervised Release Plan, the DHS issues a Special Bulletin Notification (SBN) to local law enforcement, including applicable Chiefs of Police and county Sheriffs in the jurisdiction of placement, to notify them of the upcoming release. The SBN prompts law enforcement to make a determination regarding community notification of the placement of certain sexual offenders in the community. Local law enforcement in Wisconsin often utilizes a Core Team approach, which includes a multi-disciplinary team of stakeholders that assists law enforcement in

determining the level of community notification. Members, in addition to law enforcement, may include Probation and Parole Agents, Sex Offender Registration Specialists, victim advocates, prosecutors, case managers, and others. The Core Team meets to review the information provided in the SBN and collateral information to recommend the level of notification and develops a plan to implement the notification. When the person being released is civilly committed, representatives from DHS participate in the Core Team meetings to provide information and to assist in the notification plan as determined by law enforcement. Notification levels range from targeted notification to certain schools and neighbors via flyers, to notification via media release and/or a public community notification meeting.  The level of notification is determined by the law enforcement agency of jurisdiction. The determination of notification plans varies across the state based on previous experience of that law enforcement agency in its community, as well as the client being released. In Wisconsin, a public community notification meeting is held in a majority of SR placements, while others include some other form of community notification such as door-to-door flyer distribution or press releases to the media.

- *Community Notification Meetings as Public Relations*

Community notification meetings are led by law enforcement professionals, and typically include as speakers representatives from the SR Program, DOC Community Corrections, the Sex Offender Registration Program, and sometimes include prosecutors and victim-witness coordinators. Law enforcement officers typically staff these meetings to promote order and civility. Attendance at these meetings can range from a handful to hundreds of community members.

Community notification meetings typically begin with opening remarks by a law enforcement professional, who informs the audience that the purpose of the meeting is to provide information, not to debate the merits of the court's decision to place the individual in the local community. The law enforcement representative informs the audience that the client is not wanted by the police and vigilantism is a crime. This is typically followed by a presentation by the Sex Offender Release Program representative, who provides relevant information about the Sex Offender Registry, and sometimes provides information about ways community members can reduce their and their children's vulnerability to sexual assault.  The DHS representative explains how SR residences are identified and determined; describes the SR process; describes the client's life on SR, explains the extensive safety and security measures used to monitor the client and protect the public, discusses the costs of SR and the expected client contribution to such costs; and unless provided by another presenter, presents brief information about the client's offense history. The DOC representative describes its supervision of the client and the Global Positioning System (GPS). As noted, prosecutors and victim-witness representatives

sometimes present at community notification meetings, in which case some of the aforementioned content is provided by them. For example, the prosecutor might describe the client's offense history, and the victim-witness representative might describe protective behaviors intended to reduce sexual offense victimization and vulnerability. Throughout the meeting, order is maintained by law enforcement and, if necessary, unruly citizens are asked to leave.  To reduce spontaneous outcries by audience members, attendees are not permitted to ask questions from the floor, but rather are provided with notecards upon which to write their questions, which are addressed by presenters during the meeting. DHS has collected these community notification meeting questions over the past four years and has compiled a list of FAQs to inform the content of subsequent meetings. The structure and content of these meetings are similar in most states.

Although community notification meetings have certain limitations that some might consider barriers to placement, they also have substantial benefits in implementing the sex offender civil commitment program and placing persons in the community on SR. Such benefits include providing relevant and factual information to a citizens and media in attendance. They educate citizens about sexual violence prevention measures they can employ to reduce the likelihood of sexual victimization. They provide information about sexual offender civil commitment laws and processes, including the extensive supervision and surveillance SR clients are subjected to. At a person-to-person level, community notification meetings provide concerned citizens with opportunities to interact directly with relevant law enforcement, DHS, DOC and other professionals who become known potential contacts should subsequent questions or problems arise after the meeting or after the community placement. Frequently SR Program staff are informed of issues by community members which can result in modifications of the client's SR management. For example, if next-door neighbors are particularly concerned about their children being watched by an SR client, windows on that side of the SR residence can be altered from transparent to translucent. SR clients are typically placed within a week following community notification.

The primary goals of the SR Program are community safety and transitioning clients from institutional placement to comprehensively supervised community living. SR is viewed as an appropriate interim step toward ultimate discharge from civil commitment. These goals are met through an intensive process of placing, treating, and monitoring clients on SR utilizing a collaborative team approach.

- *Public Relations*

Like most states that place persons who have sexually offended the community, Wisconsin's program has experienced political resistance, public outcry and sensationalized media which

perpetuates myths about sexual offending and sexual offenders. These responses and fears are understandable and the program has taken the position that it is responsible for providing education and information whenever the opportunity arises in order to dispel myths and provide accurate information about safety measures that can be employed to reduce vulnerability to sexual assault. Accordingly, in addition to developing relationships and resources with stakeholders around the state through the community notification process, the Wisconsin program employs a number of other strategies to provide information that helps ensure the program can implement court orders for SR placement and helps to provide awareness and education about sexual violence prevention. Some of these strategies include the programs executive staff being responsive to the media through the DHS public information office, including vetting and participating in media educational series regarding civil commitment in Wisconsin. Further, the program is responsive to legislative inquiries and providing testimony whenever requested.

An important factor regarding release placements that is presented to communities, stakeholders, media and others is that persons who are civilly committed are returned to their counties of residence. The program has found that it is critical to citizens and stakeholders of any given county to hear that the court's order is to return sexual offenders they consider "their own" and not others from other counties. This can serve to provide a sense of fairness, but it is not the panacea of accepting the return of persons who sexually offend in communities and the program continues to be challenged with developing and implementing SR plans to return civilly committed sexual offenders to the community.

- *Life on Supervised Release*

As noted, by Wisconsin statute SR clients are required to remain in their residences except for a limited number of approved outings during the client's first year on SR. These outings are supervised by a staff escort anytime the client leaves the residence, even to be in the yard. All activities outside the client's residence must be approved and are scheduled in advance, except for emergencies. The program employs a number of strategies to address the isolation that occurs during this time period. Additional features of SR include mandatory participation in sex offender treatment, typically weekly in individual sessions. All relationships, contacts and visitors with SR clients must be approved. All SR clients are subject to periodic polygraph testing for rules compliance and contracted monitors conduct random visits to SR clients' residences to verify the client's presence in the residence, that there are no unapproved visitors, and that the client appears to be in compliance with SR rules and restrictions. All SR clients are monitored by active GPS, ensuring their whereabouts are known. SR clients typically are seen weekly by their DOC agent, and regularly by the SR Specialist. The SR community team works with the client to

promote success on SR, including where appropriate obtaining vocational education and competitive community employment.

The community team assists clients and provides referrals for developing plans for discharge while the person is on SR. For those clients who are ultimately discharged from their commitment and subsequently no longer on supervised release, the average length of stay in the community before discharge is approximately three years.

- *Revocation of Supervised Release*

Wisconsin statute provides that a person on Supervised Release remains in the care, custody and control of the DHS and as such has the authority to detain clients in custody if it believes the person has violated rules or is a threat to the safety of others. If an SR client's misbehavior involves serious or persistent rules violations, offense-related behaviors, or commissions of crimes, the DHS petitions the Court for revocation of the client's SR. As noted this has occurred in approximately one-third of SR placements. Typically SR revocation has been pursued due to repeated and serious rules violations, often after other interventions have been attempted. Examples of other interventions include increasing the frequency of treatment sessions, focusing treatment specifically on decision-making related to the rules violations, increasing supervision intensity, and restricting community activities. SR revocation is not pursued for minor rules violations and the law requires that the DHS manage the person in the least restrictive manner as appropriate to the person and often alternatives to revocation are pursued and approved by the Court. Rules violations often come to light due to GPS monitoring, random residence checks, staff reports of questionable misbehavior, or other sources of information. Very rarely SR revocation has resulted from the alleged commission of new crimes. DHS pursues SR revocation when a client's misbehaviors are determined to be of sufficient severity that the person can no longer be managed safely in the community.  SR revocation is determined by the court following a hearing where the state argues for revocation and clients, through their attorneys, typically argue against revocation or propose alternatives to revocation. Such alternatives have been utilized and typically involve the client returning to SRSTC for a period of several months to two years, during which the person is required to achieve goals and benchmarks related to the reasons the SR revocation had been considered. If the person meets these benchmarks during a defined period, they are typically is returned to SR community placement. If the person fails to meet these requirements, the SR is revoked by the court and the person is returned to Sand Ridge. For the court to order SR revocation the court must find by clear and convincing evidence that a rule or condition has been violated or there is a risk to the safety of others.

- *Wisconsin's Experience of Revocation and Discharge*

Since 1995, there have been 44 revocations of persons on supervised release; six of these were repeat revocations. In other words, 12 of the revocations applied to six people. Also since 1995, there have been 38 discharges from commitment following SR. The structure of the program provides a great deal of opportunity to detect whether the person on SR is engaging in misbehavior and risky behavior; however this is not a guarantee and has resulted in some failures including the commission of some new sexual offenses while on SR or after discharge from SR. It is estimated that the re-offense rate of this very small number of cases is about 4%.

**REFERENCES**

American Civil Liberties Union (2014, August). *The dangerous overuse of solitary confinement in the United States. ACLU Briefing Paper*. New York: self.

Andrews, D. A., & Bonta, J. (2006). *The psychology of criminal conduct* (4th ed.). Newark, NJ: LexisNexis/Anderson.

Andrews, D.A., & Bonta, J. (2010). *The psychology of criminal conduct.* 5th Ed. Cincinnati, OH: Anderson.

Baldwin, S. A., Berkeljon, A., Atkins, D. C., Olsen, J., & Neilson, S. (2009). Rates of change in naturalistic psychotherapy: Contrasting dosage effect and good enough level models of change. *Journal of Consulting and Clinical Psychology, 73,* 201-211.

Banks, S., Robbins, P.C., Silver, E., Vesselinov, R., Steadman, H.J., Monahan, J., Mulvey, E.P. Appelbaum, P.S., Grisso, T., & Roth, L.H. (2004). A multiple-models approach to violence risk assessment among people with mental disorder. *Criminal Justice and Behavior, 31*, 324-340.

Barrett, M., Wilson, R.J., & Long, C. (2003). Measuring motivation to change in sexual offenders from institutional intake to community treatment. *Sexual Abuse: A Journal of Research and Treatment*, *15*, 269-283.

Bates, A., Williams, D., Wilson, C., & Wilson, R.J. (2013). Circles South-East: The first ten years 2002-2012. *International Journal of Offender Therapy and Comparative Criminology 58,* 861-885.

Blacker, J., Beech, A.R., Wilcox, D.T., & Boer, D.P. (2011). The assessment of dynamic risk and recidivism in a sample of special needs sexual offenders *Psychology, Crime & Law, 17*, 75-92.

Bulman, P., Garcia, M., & Hernon, J. (2012). Study raises questions about psychological effects of solitary confinement. *NIJ Journal, 269*.

Bush, J., & Taymans, J. (1997). *Thinking for a change.* Washington, DC: National Institute of Corrections.

Caldwell, M.F. (2010). Study characteristics and recidivism base rates in juvenile sex offender recidivism. *International Journal of Offender Therapy and Comparative Criminology, 54*, 197-212.

Carr, C.J., Schlank, A., & Parker, K.C. (2013). Review of Florida's Sexually Violent Predator Program Office, September 23, 2013.

Council on Sex Offender Treatment (2010, December). *Bienial report regarding the Council on Sex Offender Treatment: September 1, 2008-August 31, 2010.* Austin, TX: self.

Cortoni, F., Hanson, R.K., & Coache, M.-E. (2010). The recidivism rates of female sexual offenders are low: A meta-analysis. *Sexual Abuse: A Journal of Research & Treatment, 22,* 387-401.

Cullen, M. & Wilson, R.J. (2003). T*RY – Treatment readiness for you: A workbook for sexual offenders.* Lanham, MD: American Corrections Association.

DiClemente, C.C. & Prochaska, J.O. (1998). Toward a comprehensive, transtheoretical model of change: Stages of change and addictive behaviors. In W. R. Miller & N. Heather (Eds.), *Treating addictive behaviors: Applied clinical psychology* (2nd ed., pp. 3-24). New York: Springer.

D'Orazio, D.M., Arkowitz, S., Adams, J., and Maram, W. (2009). *The California sexually violent predator statute: History, description and areas for improvement. An informational guide for the citizens, professionals and legislators of California*. Sacramento, CA: California Coalition on Sexual Offending.

Doren, D. M. (2005). What weight should courts give treaters' testimony concerning recidivism risk? *Sex Offender Law Report, 3*, 1-2, 15.

Duwe, G. (2013). Can Circles of Support and Accountability work in the United States? Preliminary results from a randomized experiment in Minnesota. *Sexual Abuse: A Journal of Research and Treatment, 25*, 143-165.

Elwood, R.W., Doren, D.M., and Thornton, D. (2010). Diagnostic and risk profiles of men detained under Wisconsin's sexually violent person law. *International Journal of Offender Therapy and Comparative Criminology, 54*, 187-196.

Fanniff, A.M., & Letourneau, E.J. (2012). Another piece of the puzzle: Psychometric properties of the J-SOAP-II. *Sexual Abuse: A Journal of Research and Treatment, 24*, 378-408.

Finkelhor, D. & Jones, L. (2006). Why have child maltreatment and child victimization declined? *Journal of Social Issues, 62,* 685-716.

Freeman, N. J., & Sandler, J. C. (2012). Civil management in New York State: A closer look at the risk assessment and screening process. *Sex Offender Law Report, 13.*

Furby, L., Weinrott, M.R., & Blackshaw, L. (1989). Sex offender recidivism: A review. *Psychological Bulletin, 105,* 3-30.

Gendreau, P., French, S., & Taylor, A. (2002). *What works (what doesn't) revised 2002: The principles of effective correctional treatment.* Unpublished manuscript. University of New Brunswick, St. John, New Brunswick, Canada.

Glaser, B. (2010). Sex offender programmes: New technology coping with old ethics. *Journal of Sexual Aggression, 16,* 261-274.

Glick, B., Bush, J., & Taymans, J. (1997). *Thinking for a change.* Washington, DC: National Institute of Corrections.

Gookin, K. (2007). *Comparison of state laws authorizing involuntary commitment of sexually violent predators: 2006 update, revised.* Olympia, WA: Washington State Institute for Public Policy.

Greenberg, S. A., & Shuman, D. W. (2007). When worlds collide: Therapeutic and forensic roles. *Professional Psychology: Research and Practice, 38*, 129-132.

Grove, W. M., Zald, D. H., Lebow, B. S., Snitz, B. E., & Nelson, C. (2000). Clinical versus mechanical prediction: A meta-analysis. *Psychological Assessment, 12*, 19-30.

Haaven, J.L., Little, R., & Petre-Miller, D. (1990). *Treating intellectual disabled sex offenders: A model residential program*. Orwell, VT: Safer Society.

Hanson, R.K., Bourgon, G., Helmus, L., & Hodgson, S. (2009). The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis. *Criminal Justice and Behavior, 36,* 865-891.

Hanson, R. K., Gordon, A., Harris, A. J. R., Marques, J. K., Murphy, W., Quinsey, V. L., & Seto, M. C. (2002). First report of the collaborative outcome project on the effectiveness of psychological treatment for sex offenders. *Sex Abuse: A Journal of Research and Treatment*, *14*, 169-194.

Hanson, R. K., Harris, A. J. R., Helmus, L., & Thornton, D. (2014). High-risk sex offenders may not be high risk forever. *Journal of Interpersonal Violence.* Online first.

Hanson, R.K., Harris, A.J.R., Scott, T.L., & Helmus, L. (2007). *Assessing the risk of sex offenders on community supervision: The Dynamic Supervision Project.*  [User Report 2007 ON: Public Safety Canada.-05] Ottawa, ON: Public Safety Canada.

Hanson, K. & Morton-Bourgon, K. (2004). *Predictors of sexual recidivism: An updated meta-analysis.* Ottawa, ON: Public Safety Canada.

Hanson, R.K. & Yates, P.M. (2013). Psychological treatment of sex offenders. *Current Psychiatry Reports, 15*: 348.

Harris, A. J. R., & Hanson, R. K.  (2004). *Sex Offender Recidivism: A Simple Question*. (No. 2004-03). Ottawa: Public Safety and Emergency Preparedness Canada.

Harris, A., & Lurigio, A.J. (2007). Mental illness and violence: A brief review of research and assessment strategies. *Aggression and Violent Behavior, 12*, 542-551.

Hébert, J. (2014). Data provided by MSOP to the 2014 SOCCPN Annual Survey.

Hempel, I., Buck, N., Cima, M., & van Marle, H. (2013). Review of risk assessment instruments for juvenile sex offenders: What is next? *International Journal of Offender Therapy and Comparative Criminology, 57*, 208-228.

Hiscox, S.P., Witt, P.H. & Haran, S.J. (2007). Juvenile risk assessment scale (JRAS): A predictive validity study. *The Journal of Psychiatry and Law, 35*, 503-539.

Hogue, T.E. (1994). Goal Attainment Scaling: A measure of clinical impact and risk assessment. *Issues in Criminological and Legal Psychology, 21*, 96-102.

Janus, E. S. (2006). *Failure to Protect: America's Sexual Predator Laws and the Rise of the Preventive State.* Ithaca, NY: Cornell University Press.

Kansas Department of Social and Rehabilitative Services (2009). *Overview of sexual predator treatment program and expansion.* Topeka, KS: self.

La Fond, J.Q. (2005). *Preventing sexual violence: How society should cope with sex offenders.* Washington, D.C.: American Psychological Association.

Langan, P. A., Schmitt, E. L., & Durose, M. R. (2003). *Recidivism of sex offenders released from prison in 1994*. Washington, DC: U.S. Department of Justice, Bureau of Justice.

Laub, J. H., & Sampson, R. J. (2001). Understanding desistance from crime. *Crime and Justice, 28*, 1-69.

Laws, D.R. (1989). *Relapse prevention with sex offenders.* New York: Guilford.

Laws, D.R. & Marshall, W.L. (2003). A brief history of behavioral and cognitive behavioral approaches to sexual offenders: Part 1. Early developments. *Sexual Abuse: A Journal of Research and Treatment, 15,* 75-92.

Legislative Auditors Bureau (2013, August). *Supervised release placements and expenditures: Department of Health Services (Report 13-12)*. Madison, WI: State of Wisconsin Legislative Auditors Bureau

Lieb, R., & Nelson, C. (2001). Treatment programs for sexually violent predators - A review of states. In A. Schlank (Ed.), *The sexual predator: Volume II: Legal issues, clinical issues, and special populations* (pp. 5-1-5-24). Kingston, NJ: Civic Research Institute.

Lipsey, M. W., & Cullen, F. T. (2007). The effectiveness of correctional rehabilitation: A review of systematic reviews. *Annual Review of Law and Social Science, 3*, 297-320.

Little, G.L., & Robinson, K.D. (1988). Moral Reconation Therapy: A systematic step-by-step treatment system for treatment resistant clients. *Psychological Reports, 62,* 135-151.

Little, G.L., Robinson, K.D, Burnette, K.D. & Swan, S. (1999). Successful ten-year outcome data on MRT®-treated felony offenders: Treated offenders show significantly lower reincarceration in each year. *Cognitive-Behavioral Treatment Review, 5,* 1-3.

Lofthouse, R.E., Lindsay, W.R., Totsika, V., Hastings, R.P., Boer, D.P., & Haaven, J. E. (2013). Prospective dynamic assessment of risk of sexual reoffending in individuals with an intellectual disability and a history of sexual offending behaviour.  *Journal of Applied Research in Intellectual Disabilities, 26*, 394-403.

Lösel, F., & Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1,* 117-146.

Mailloux, D.L., Aabracen, J.,Serin, R., Cousineau, C., Malcolm, B., & Looman, J. (2003). Dosage of treatment to sexual offenders: Are we overprescribing? *International Journal of Offender Therapy and Comparative Criminology, 47*, 171-184.

Mann, R.E., Hanson, R.K., & Thornton, D. (2010). Assessing risk for sexual recidivism: Some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22*(2), 191-217.

Marlatt, G.A. & Gordon, J.R. (1985). Relapse prevention: Maintenance strategies in the treatment of addictive behaviors. New York: Guilford Press.

Marques, J. K.,Wiederanders, M., Day, D. M., Nelson, C., & van Ommeren, A. (2005). Effects of a relapse prevention program on sexual recidivism: Final results from California's sex offender treatment and evaluation project (SOTEP). *Sexual Abuse: A Journal of Research of Research and Treatment*, *17*, 79-107.

Marshall, W.L. & Laws, D.R. (2003). A brief history of behavioral and cognitive behavioral approaches to sexual offenders: Part 2. The modern era. Sexual Abuse, 15, 93-120.

Marshall, W.L., Marshall, L.E., Serran, G.A., O'Brien, M.D. (2011). *Rehabilitating sexual offenders: A strength-based approach.* Washington, DC: American Psychological Association.

Martinson, R. (1974). Nothing works: Questions and answers about prison reform. *The Public Interest, 35,* 22-54.

McGrath, R. J., Cumming, G. F., Burchard, B. L., Zeoli, S., & Ellerby, L. (2010). *Current Practices and Emerging Trends in Sexual Abuser Management: The Safer Society 2009 North American Survey*. Brandon, Vermont: Safer Society Press.

McGrath, R. J., Cumming, G., Livingston, J. A., & Hoke, S. E. (2003). Outcome of a treatment program for adult sex offenders: From prison to community. *Journal of Interpersonal Violence*, *18*, 3-17.

McLawsen, J.E., Scalora, M.J., & Darrow, C. (2012). Civilly committed sex offenders: A description and interstate comparison of populations. *Psychology, Public Policy, and Law, 18*, 453-476.

Mercado, C.C., Jeglic, E., Markus, K., Hanson, R.K., & Levenson, J. (2013, January). *Sex offender management, treatment and civil commitment: An evidence based analysis aimed at reducing sexual violence. Final Report.* Available from NCJRS (doc no. 243551)

Mercado, C. C., Elbogen, E. B., Scalora, M., & Tomkins, A. (2001). Judgments of dangerousness: Are sex offenders assessed differently that civil psychiatric patients? *Psychiatry, Psychology and Law, 8*, 146-153.

Miner, M.H. (2002). Factors associated with recidivism in juveniles: An analysis of serious juvenile sex offenders. *Journal of Research in Crime and Delinquency, 39*, 421-436.

Minnesota Department of Corrections. (2007). *Sex Offender Recidivism in Minnesota.* St Paul, MN: Author.

Newton, V.M., Elbogen, E.B., Brown, C.L., Snyder, J., & Barrick, A.L. (2012). Clinical decision-making about inpatient violence risk at admission to a public-sector acute psychiatric hospital. *Journal of the American Academy of Psychiatry and Law, 40*, 206-214.

NYS Office of Mental Health (2008). Annual report on the implementation of Mental Hygiene Article 10: Sex Offender Management and Treatment Act 2007. Retrieved from http://www.omh.ny.gov/omhweb/forensic/bsoect/

NYS Office of Mental Health (2013). Annual report on the implementation of Mental Hygiene Article 10: Sex Offender Management and Treatment Act 2007. Retrieved from http://www.omh.ny.gov/omhweb/forensic/bsoect/

Outpatient Sexually Violent Predator Treatment Program (OSVPTP). (2011). *Texas Civil Commitment – Outpatient sexually violent predator treatment program, Health & Safety Code, Chapter 841.*

Polizzi, D. M., MacKenzie, D. L., & Hickman, L. J. (1999). What works in adult sex offender treatment? A review of prison and non-prison-based treatment programs. *International Journal of Offender Therapy and Comparative Criminology, 43*, 357-374.

Prescott, D.S. & Wilson, R.J. (2011). Paradoxical and double-bind communication in treatment for persons who sexually offend. *Journal of Sexual Aggression, 18*, 233-246.

Prescott, D.S. & Wilson, R.J. (2013). *Awakening motivation for difficult changes.* Holyoke, MA: NEARI Press.

Quinsey, V. L., Harris, G. T., Rice, M. E. and Cormier, C. A. (2005). *Violent offenders: Appraising and managing risk* (2nd edn). Washington, DC: American Psychological Association.

Schlank, A., Harry, R., & Farnsworth, M. (1999). The Minnesota sex offender program. In A. Schlank & F. Cohen (Eds.), *The sexual predator: Law policy, evaluation, and treatment* (pp. 10-1-10-17). Kingston, NJ: Civic Research Institute.

Schneider, J., Jackson, R., D'Orazio, D., Hébert, J., & McCulloch, D. (2014). *SOCCPN annual survey of sex offender civil commitment programs 2014.*

Seto, M.C., Marques, J.K., Harris, G.T., Chaffin, M., Lalumière, M.L., Miner, M.H., Berliner, L., Rice, M.E., Lieb, R., & Quinsey, V.L. (2008). Good science and progress in sex offender treatment are intertwined: A response to Marshall and Marshall (2007). *Sexual Abuse: A Journal of Research and Treatment, 20*, 247-255.

Sex Offender Management and Treatment Act (SOMTA), Mental Hygiene Law, Article 10 (2007).

Steadman, H.J., Silver, E., Monahan, J., Appelbaum, P.S., Robbin, P.C., Mulvey, E.P., Grisso, T., Roth, L.H., & Banks, S. (2000). A classification tree approach to the development of actuarial violence risk assessment tools *Law and Human Behavior, 24*, 83-100.

Stirpe, T., Wilson, R.J., & Long, C. (2001). Goal attainment scaling with sexual offenders: A measure of clinical impact at post treatment and at community follow-up. *Sexual Abuse: A Journal of Research and Treatment*, *13*, 65-77.

Stojkovic, S., & Farkas, M.A. (2014). So you want to find a transitional house for sexually violent persons: An account of political failure. *Criminal Justice Policy Review, 25*, 659-682.

Swogger, M.T., Walsh, Z., Homaifar, B.Y., Caine, E.D., & Conner, K.R. (2012). Predicting self- and other-directed vilence among discharged psychiatric patients: The roles of anger and psychopathic traits. *Psychological Medicine, 42*, 371-379.

Texas Civil Commitment: Outpatient Sexually Violent Predator Treatment Program. (2012). *Presentation at the Sex Offender Civil Commitment in Minnesota: Challenges and Opportunities conference.* William Mitchell College of Law.

Thomas, N. C., Freeman, N. J., & Sandler, J. C. (2013). Civil management in New York State: A closer look at Strict and Intensive Supervision and Treatment (SIST*). Sex Offender Law Report, 14.*

Vandiver, D.M. (2006). A prospective analysis of juvenile male sex offenders: Characteristics and recidivism rates as adults. *Journal of Interpersonal Violence, 21*, 673-688.

Washington State Institute for Public Policy (2007, August). *Comparison of State lows authorizing involuntary commitment of sexually violent predators: 2006 update*. Olympia, CA: self.

Willis, G. M. and Grace, R. C. (2008). The quality of community reintegration planning for child molesters: Effects on sexual recidivism. *Sexual Abuse: A Journal of Research and Treatment*, 20(2), 218–240.

Willis, G.M. & Grace, R.C. (2009). Assessment of community reintegration planning for sex offenders: Poor planning predicts recidivism. *Criminal Justice and Behavior, 36,* 494-512.

Wilson, R.J., Cortoni, F., Picheca, J.E., Stirpe, T.S., & Nunes, K. (2009). *Community-based sexual offender maintenance treatment programming: An evaluation*. [Research Report R-188] Ottawa, ON: Correctional Service Canada.

Wilson, R. J., Cortoni, F., and McWhinnie, A. J. (2009). Circles of Support & Accountability: A Canadian national replication of outcome findings. *Sexual Abuse: A Journal of Research & Treatment,* 21(4), 412-430.

Wilson, R.J., Looman, J., Abracen, J., & Pake, D.R. (2012). Comparing sexual offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center. *International Journal of Offender Therapy and Comparative Criminology, 57,* 377-395.

Wilson, R.J., & McWhinnie, A.J. (2013). Putting the "community" back in community risk management of persons who have sexually abused. *International Journal of Behavioral Consultation and Therapy, 8,* 79-87.

Wilson, R.J., Picheca, J.E., & Prinzo, M. (2007). Evaluating the effectiveness of professionally facilitated volunteerism in the community-based management of high risk sexual offenders: Part two—A comparison of recidivism rates. *Howard Journal of Criminal Justice, 46,* 327-337.

Wisconsin State Statutes. *Sexually violent person commitment.* Chapter 980.

Yates, P. M., Prescott, D. S., & Ward, T. (2010). *Applying the Good Lives and Self Regulation Models to sex offender treatment: a practical guide for clinicians*. Brandon, VT: Safer Society Press.