# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld, and all others similarly situated,

Civil No. 11-3659 (DWF/JJK)

Plaintiffs,

v.

**MEMORANDUM OPINION AND ORDER**

Lucinda Jesson, Dennis Benson, Kevin Moser, Tom Lundquist, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their official capacities,

Defendants.

---

Daniel E. Gustafson, Esq., Karla M. Gluek, Esq., David A. Goodwin, Esq., and Raina Borrelli, Esq., Gustafson Gluek PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Scott H. Ikeda, Adam H. Welle, and Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on Defendants' Partial Motion to Dismiss the Third

Amended Complaint (Doc. No. 651) and Defendants' Motion for Summary Judgment

(Doc. No. 719).  For the reasons set forth below, the Court denies both motions.[1]

## BACKGROUND

### I.    The Minnesota Sex Offender Program

Under the Minnesota Commitment and Treatment Act:  Sexually Dangerous Persons and Sexual Psychopathic Personalities ("the MCTA"), an individual who is determined by a court to be a "sexually dangerous person"[2] ("SDP") or to have a "sexual psychopathic personality"[3] ("SPP") is committed to a "secure treatment facility,"[4] unless a less restrictive program meets treatment and public safety requirements.  *See* Minn. Stat. § 253D.07, subd. 3.  Pursuant to the MCTA, persons committed as an SDP or SPP are

---

[1]    The Court's concluding remarks may also be found below.  *See infra* Conclusion.

[2]    "Sexually dangerous person" is defined as a person who:  "(1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 8."  Minn. Stat. § 253D.02, subd. 16.

[3]    "Sexual psychopathic personality" is defined as "the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which renders the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons."  Minn. Stat. § 253D.02, subd. 15.

[4]    "Secure treatment facility" is defined as "the Minnesota sex offender program facility in Moose Lake and any portion of the Minnesota sex offender program operated by the Minnesota sex offender program at the Minnesota Security Hospital, but does not include services or programs administered by the Minnesota sex offender program outside a secure environment."  Minn. Stat. § 253D.02, subd. 13.

placed in the Minnesota Sex Offender Program ("MSOP"), which was established under the purview of the Commissioner of Human Services to "provide specialized sex offender assessment, diagnosis, care, treatment, supervision, and other services to civilly committed sex offenders." *See* Minn. Stat. § 246B.02.

MSOP, which operates facilities in Moose Lake and St. Peter, Minnesota, offers residents sex offender treatment in a three-phase program of indeterminate length.[5] (*See* Doc. No. 726 ("Hébert Aff.") ¶ 23; 706 Report at 5, 30-31, 59-60; Doc. No. 757 ("Gustafson Decl.") ¶ 4, Ex. 2 ("Richardson Dep.") at 10.) All residents start the treatment program in Phase One.[6] (*See* Gustafson Decl. ¶ 5, Ex. 3 ("Puffer Dep.") at 21.) In Phase One, residents are introduced to treatment concepts and self-management, with an emphasis on behavioral control.[7] (*See* Hébert Aff. ¶¶ 33, 38; 706 Report at 30.)

---

[5] Plaintiffs challenge the adequacy and effectiveness of MSOP's three-phase treatment program, which they describe as "preventative detention under the guise of treatment." (*See* Third Am. Compl. at 1-2, 49, 96.) Plaintiffs' challenges are bolstered by critical findings in the OLA Report and the 706 Expert Report with respect to the treatment program. (*See, e.g.*, Gustafson Decl. ¶ 4, Ex. 1 ("OLA Report"), at 12 (finding that "MSOP has struggled to provide adequate treatment and maintain a therapeutic environment"); Doc. No. 658 ("706 Report") at 13 (finding that "MSOP['s] climate is characterized by high levels of learned helplessness and hopelessness, both on the part of the clients and the staff").)

[6] According to Plaintiffs, MSOP does not conduct any assessment or evaluation of residents to consider the appropriate initial treatment placement phase or location. (*See* Doc. No. 741 at 3.)

[7] Plaintiffs contend that in Phase One, residents "learn how to comply with the MSOP facility's rules and learn basic treatment concepts," but receive "[n]o sex offender-specific treatment whatsoever." (Third Am. Compl. at 20; *see also* OLA Report at 76 (reporting that residents may be stuck in Phase One, which focuses on

(Footnote Continued on Next Page)

During Phase Two, residents work to understand triggers to their sexual abuse offenses and develop strategies to identify and manage the thinking errors that contribute to problem activities. (*See* Hébert Aff. ¶¶ 47-50; 706 Report at 30.) Phase Three focuses on community reintegration and is designed to gradually expose residents to new environments through community activities and interactions. (*See* Hébert Aff. ¶¶ 55-58; 706 Report at 31; Puffer Dep. at 14.) Residents must meet the requirements of each phase to progress through the treatment program. (*See* Doc. No. 294, Attach. 1 ("MPET Report") at 4-5; Puffer Dep. at 22.) MSOP does not recommend any discharges without completion of the three-phase treatment program. (*See* OLA Report at 12, 32-33, 100; Gustafson Decl. ¶ 15, Ex. 13 ("Carabello Dep.") at 28.)

MSOP conducts quarterly and annual treatment progress reviews for each resident. (*See* Hébert Aff. ¶¶ 25, 59, 62, 65; 706 Report at 32-33; Gustafson Decl. ¶ 7, Ex. 5 ("Johnston Dep.") at 13.) MSOP only conducts risk assessments for residents petitioning for discharge or transfer to a less restrictive setting.[8] (*See* Hébert Aff. ¶ 92; 706 Report at 33; Gustafson Decl. ¶ 6, Ex. 4 ("Hébert Dep.") at 34; Gustafson Decl. ¶ 12, Ex. 10

---

(Footnote Continued From Previous Page)

following rules and learning how to participate in treatment groups rather than addressing the resident's sexual offenses or how to prevent re-offending).)

[8] According to Plaintiffs, the alleged unconstitutional detainment of residents occurs, in part, because "there are no risk assessments performed (independent or otherwise) at the time of initial commitment or on a regular periodic basis during Plaintiffs' commitment" and because "the risk assessments that are provided are often performed inappropriately and may be biased." (*Id.* at 26; *see also* Doc. No. 427 at 55-56 n.41.)

("Elsen Dep.") at 13-14.) A special review board and a judicial appeal panel evaluate the risk assessments in order to determine whether a given resident should remain committed in a secure facility. (*See* Hébert Aff. ¶¶ 62, 95, 102; Johnston Dep. at 35.)

MSOP has enacted a variety of policies and procedures to assist with implementing the complexities and nuances of the program. These policies and procedures were promulgated by the Commissioner of Human Services pursuant to the MCTA's legislative directive to "adopt rules to govern the operation, maintenance, and licensure" of secure treatment facilities operated by MSOP for a person committed as an SPP or SDP. *See* Minn. Stat. § 246B.04, subd. 1. Such policies include, for example, the Client Mail Policy (Johnston Aff. ¶ 29, Ex. 8) and the Use of Force and Restraints Policy (Johnston Aff. ¶ 32, Ex. 12).

Since the creation of MSOP in 1994, the number of civilly committed sex offenders has grown significantly. Currently, 721 individuals are committed in the Minnesota Sex Offender Program (MSOP).[9] (706 Report at 10.) In 1990, there were less than 30 civilly committed sex offenders in Minnesota; by 2000, there were 149 sex

---

[9] This number, per capita, is "significantly higher than any other SOCC [sexual offender civil commitment] state." (706 Report at 74-75.) Of the 721 confined individuals, "there are 23 clients with severe mental health conditions" (*id.* at 15) and "there are 62 individuals confined in []MSOP who have no adult criminal convictions for sexual offenses and are committed due to behavior they engaged in solely as juveniles" (*id.* at 11).

offenders in MSOP; by 2010, there were 575 sex offenders in MSOP;[10] and the state

projects that the number of civilly committed sex offenders will grow to 1,215 by 2022.

(*See* OLA Report at 15-16.)  This rapid growth in the number of confined sex offenders is

due in part to the fact that no civilly committed sex offender has ever been fully

discharged from MSOP since the program began twenty-one years ago.[11]  (Doc. No. 724

("Brennaman Aff.") ¶ 22, Ex. 21 ("Rybroek Report") at 104-05; OLA Report at 3, 9, 31;

706 Report at 38, 44, 75.)

As the OLA Report notes, civil commitment in secure facilities is costly.  The

Minnesota Department of Human Services (DHS) spends $120,000 per year to house and

treat a civilly committed sex offender in a secure facility.  (OLA Report at 13.)  The cost

is approximately three times the cost of incarcerating inmates at Minnesota's correctional

facilities.  (*Id*.)  According to Defendants, the average annual cost per MSOP resident for

2014 was $116,070.  (Gustafson Decl. ¶ 17, Ex. 15 ("Defs.' Answer to Plfs.' Requests for

Admission"), at 95.)

## II.   Procedural History

On December 21, 2011, Plaintiffs, all civilly committed at the MSOP Moose Lake

---

[10]    "In 2010, Minnesota had more civilly committed sex offenders than every state
except California and Florida."  (*Id*.)

[11]    Plaintiffs contend, and Defendants do not dispute, that "[o]nly three individuals
have been provisionally discharged, and one [discharge] was immediately revoked."  (*Id*.
at 2.)  According to Plaintiffs, "to date, MSOP has never supported a petition for full
discharge."  (*Id*. at 8.)  Defendants offer no explanation for these statistics in their briefs.
(*See* Doc. No. 653; Doc. No. 721.)

facility, filed a 42 U.S.C. § 1983 complaint against various state employees[12] for violations of their constitutional and statutory rights. (*See* Doc. No. 1 ("Compl.").) In their Complaint, Plaintiffs identify numerous policies, procedures, and conditions of confinement that they claim, when considered cumulatively and in context, violate their constitutional rights. (*See generally id.*) Plaintiffs filed an Amended Complaint on March 15, 2012. (*See* Doc. No. 151 ("Am. Compl.").)

On July 24, 2012, this Court certified a class in this matter pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. (Doc. No. 203 at 11.) The class consists of "[a]ll patients currently civilly committed" to MSOP (together, "Plaintiffs" or the "Class Members"). (*Id.*) The Court appointed the fourteen named Plaintiffs to serve as class representatives. (*Id.* at 12.)

On August 15, 2012, the Court ordered the Commissioner of the Department of Human Services ("DHS"), Lucinda Jesson, to create a Sex Offender Civil Commitment Advisory Task Force (the "Task Force") to "examine and provide recommended legislative proposals to the Commissioner" on each of the following topics: (1) "[t]he civil commitment and referral process for sex offenders"; (2) "[s]ex offender civil commitment options that are less restrictive than placement in a secure treatment

---

[12] The state employee defendants now include: Lucinda Jesson, the Commissioner of DHS; Dennis Benson, the Executive Director of MSOP from 2008 to 2012 and a member of the clinical team; Kevin Moser, the Director of MSOP; Tom Lundquist, the Clinical Director of MSOP; Nancy Johnston, the Executive Director of MSOP; Jannine Hébert, the Executive Clinical Director of MSOP; and Ann Zimmerman, the Security Director of MSOP. (Doc. No. 635 ("Third Am. Compl.") at 10-12.)

facility"; and (3) "[t]he standards and processes for the reduction in custody for civilly committed sex offenders." (Doc. No. 208 at 2.) The Task Force issued its final recommendations on December 2, 2013. (Sex Offender Commitment Advisory Task Force, Final Report (2013) ("Task Force Report"), *available at* https://edocs.dhs.state.mn.us/lfserver/Public/DHS-6641B-ENG.)

On November 9, 2012, the Court ordered Commissioner Jesson to create a MSOP Program Evaluation Team ("MPET") to "review the treatment records of clients who have been participating for at least 36 months in a treatment phase and who have not yet advanced to the next treatment phase." (Doc. No. 275 at 3.) MPET was further assigned to determine "the need, scope, and frequency of any future MSOP treatment program evaluation." (*Id.* at 5.) The Court appointed five individuals to serve as MPET members on December 13, 2012. (Doc. No. 281 at 2.) MPET filed its report with the Court on April 26, 2013. (*See* MPET Report.)

On August 1, 2013, DHS issued a request for proposals for the development of "less restrictive but highly supervised placements for individuals who would be provisionally discharged after having been initially committed to a secure treatment facility." (Doc. No. 387 ("Jesson Aff.") ¶ 16, Ex. C ("Request for Proposals").)

On August 8, 2013, Plaintiffs filed a Second Amended Complaint. (*See* Doc. No. 301 ("Second Am. Compl.").)

On September 12, 2013, in a letter to state legislators, Commissioner Jesson identified "a small group of [MSOP] clients who are low functioning and could be

transferred to an existing DHS site" in Cambridge, Minnesota in 2014.  (*See* Doc.

No. 341 at 2.)[13]

On November 13, 2013, Governor Mark Dayton directed that Commissioner

Jesson "oppose any future petitions by sexual offenders for provisional release" and

"suspend [DHS's] plans to transfer any sexual offenders to other tightly supervised

facilities, such as Cambridge," until after the following conditions have been met:

> 1.      The Sex Offender Civil Commitment Advisory Task Force has issued its findings and recommendations . . . .
> 2.      The legislature in 2014 has had the opportunity to review existing statutes and make any necessary revisions to protect the public's safety:  the degrees of criminal sexual misconduct, the penalties for those crimes, the civil commitment of sexual offenders for extended treatment, the requirements for discharge, and the subsequent services, supervision, and public protection.  None of [DHS's] programs cited above [including provisional releases from MSOP] will resume until after the legislature has completed its work during the upcoming legislative session.
> 3.      The legislature and our administration have agreed to the additional facilities, programs, and staff necessary for this program's successful implementation and have provided sufficient funding for them.

(Doc. No. 371 ("Gustafson Aff.") ¶ 4, Ex. B, at 2-3; Jesson Aff. ¶ 19, Ex. D, at 2-3.)

On November 19, 2013, Defendants moved to dismiss Plaintiffs' Second

Amended Complaint.  (Doc. No. 347.)  The Court denied Defendants' motion to dismiss

---

[13]      Commissioner Jesson announced that she would recommend the approval of the transfer requests of six individuals with intellectual disabilities from MSOP's Moose Lake facility to the Minnesota Specialty Health System facility in Cambridge, Minnesota.  *See* Rupa Shenoy, *Some Sex Offenders Could Go to Less Secure Setting*, MPR News (Sept. 12, 2013), http://www.mprnews.org/story/2013/09/12/sex-offenders-could-go-to-less-secure-setting.

except with respect to Plaintiffs' equal protection claim, which was dismissed. (Doc. No. 427.)

On December 6, 2013, the Court appointed four experts pursuant to Rule 706 of the Federal Rules of Evidence ("706 Experts"). (*See* Doc. No. 393 at 1-2.) The parties submitted their respective proposals regarding the scope of the experts' work. (*See* Doc. No. 421.) On January 22, 2014, the Court met with the 706 Experts, and on February 5, 2014, the Court received their proposed plan of action. (Doc. No. 422.) After months of research and analysis, the 706 Experts presented the Court with their report and recommendations ("706 Report"), which contains over 100 pages of their findings and opinions regarding MSOP. (*See generally* 706 Report.)

On October 28, 2014, Plaintiffs filed a Third Amended Complaint. (*See* Doc. No. 635.) In their Third Amended Complaint, Plaintiffs raise several challenges to MSOP and the MCTA. (*See id.*) Specifically, Plaintiffs assert the following thirteen claims: (I) Minnesota Statute § 253D is facially unconstitutional; (II) Minnesota Statute § 253D is unconstitutional as applied; (III) Defendants have failed to provide treatment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (IV) Defendants have failed to provide treatment in violation of the MCTA; (V) Defendants have denied Plaintiffs the right to be free from punishment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VI) Defendants have denied Plaintiffs the right to less restrictive alternative confinement in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VII) Defendants have denied

Plaintiffs the right to be free from inhumane treatment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VIII) Defendants have denied Plaintiffs the right to religion and religious freedom in violation of the First and Fourteenth Amendments to the United States Constitution; (IX) Defendants have unreasonably restricted free speech and free association in violation of the First Amendment to the United States Constitution and the Minnesota Constitution; (X) Defendants have conducted unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution and the Minnesota Constitution; (XI) Defendants have violated court ordered treatment; (XII) Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert have breached Plaintiffs' contractual rights; and (XIII) Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert have tortiously interfered with contractual rights and have intentionally violated Minn. Stat. § 253B.03, subd. 7. (*Id.* at 59-84.) Plaintiffs seek declaratory and injunctive relief on behalf of the Class. (*Id.* at 85 ("Prayer for Relief").)

Defendants now move for dismissal of Counts I and II and for summary judgment with respect to all counts. (*See* Doc. No. 651; Doc. No. 719.)

## DISCUSSION

## I. Partial Motion to Dismiss

### A. Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th

Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

### B.     Counts I and II

Defendants first move to dismiss the "new" claims in Counts I and II of Plaintiffs' Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Doc. No. 651.) Defendants attempt to distinguish their present motion from their earlier motion to dismiss Plaintiffs' Second Amended Complaint (Doc. No. 347), which was denied in most respects in the Court's February 19, 2014 Order

(Doc. No. 427),[14] by asserting that the Third Amended Complaint contains an additional claim that Minn. Stat. § 253D is facially unconstitutional.  (*See* Doc. No. 653 at 3.) Defendants further assert that the counts at issue are different because "Count II now alleges that Minn. Stat. § 253D is unconstitutional 'as applied' because the statute violates constitutional rights through Defendants 'enforcement' of its provisions."  (*Id.* at 16-17.)

Plaintiffs counter that the Third Amended Complaint "simply does not allege new claims," but "[r]ather, in order to clarify the claims in the [Third Amended Complaint], Plaintiffs made nearly identical as-applied and facial challenges that address issues Defendants have known about for years."  (Doc. No. 707 at 4.)  According to Plaintiffs, "[t]hese are not new, separate and distinct claims"; "merely because Plaintiffs chose to clarify the issues by including separate as-applied and facial challenges, two distinct legal claims are not created."  (*Id.* at 4-5.)  Moreover, Plaintiffs contend that "[t]he claims set forth in Counts I and II in the [Third Amended Complaint] have already been ruled on by the Court," and "[i]n an attempt to circumvent the Court's prior denial of dismissal, Defendants mischaracterize the amendments to Plaintiffs' [Third Amended Complaint] as 'new claims.'"  (*Id.* at 3.)  In support of this argument, Plaintiffs observe that, "[i]n [Defendants'] objection to Plaintiffs' Motion for Leave to File a Third Amended Complaint, Defendants argued, as they do now, that the [Third Amended Complaint]

---

[14]     In its February 19, 2014 Order, the Court denied Defendants' motion with respect to all counts except for Plaintiffs' equal protection claim.  (*See* Doc. No. 437 at 69-70.)

'includes a new facial challenge to the commitment statute,' and that 'Plaintiffs' 'as applied' challenge has been largely rewritten.'" (*Id.* (quoting Defendants' response brief and hearing transcript).) Plaintiffs note that the Magistrate Judge, having seen the proposed amendments in the Third Amended Complaint, disagreed, stating:

> I conclude that there are no new claims asserted in this amended complaint. The Fourteenth Amendment due process claim has obviously been in this case from the very beginning. There . . . was no need for the plaintiffs to separate out an as-applied or facial challenge separate claim within the case. They have now – as a result of developments in the case, this new complaint adds specificity with respect to the challenge to the constitutionality of the MSOP program, but it does not in any way raise new claims in a fashion that would prejudice the defendants or require any delay in these proceedings. So the motion is granted.

(*Id.* at 4 (quoting the hearing transcript).) Finally, Plaintiffs contend that "Defendants filed objections to Judge Keyes' ruling, which were overruled by Judge Frank, who found that Judge Keyes' order granting Plaintiffs' motion for leave to amend the complaint was not 'clearly erroneous or contrary to law.'" (*Id.* (quoting Doc. No. 665 ("Dec. 2014 Order")).)

The Court concludes, as did Magistrate Judge Keyes, that the Third Amended Complaint does not allege new claims. Because the Court finds that the Third Amended Complaint does not add any new claims, and because the Court has already addressed Defendants' motion to dismiss Plaintiffs' Second Amended Complaint with respect to the issues presented here, there is no need for the Court to revisit the issue at length at this time. Therefore, the present motion to dismiss is denied.

## II.    Motion for Summary Judgment[15]

### A.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

---

[15]     In their reply brief, Defendants broadly assert that "the named Plaintiffs' apparent inability or unwillingness to establish any injury to themselves is fatal to their claims" under doctrines of standing.  (*See* Doc. No. 760 at 2-3.)  The Court finds that Plaintiffs have presented sufficient evidence to establish injury in fact for the purposes of determining standing in this case.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that to support standing at the summary judgment stage, a plaintiff must only "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken as true").

supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## B. Fourteenth Amendment Claims

In the Third Amended Complaint, Plaintiffs raise several challenges to MSOP and the MCTA under the Fourteenth Amendment to the United States Constitution. (*See, e.g.*, Third Am. Compl. at 6-7.) Plaintiffs base their challenges on a multitude of policies, procedures, and conditions of confinement that they claim, when considered in total, violate their Fourteenth Amendment due process rights.

### 1. Section 253D Facial and As-Applied Claims

Plaintiffs assert in Counts I and II that Minn. Stat. § 253D is "unconstitutional as written and as applied" because the nature and duration of commitment under the statute is not reasonably related or narrowly tailored to the purpose of confinement. (*Id.* at 1.) Plaintiffs argue that "[g]iven the abject failure of [MSOP] to fulfill its constitutional and statutory mandate to treat and reintegrate Plaintiffs back into society, this Court should declare the statute – on its face and as applied – unconstitutional as a matter of law." (*See* Doc. No. 741 at 1.)

First, with respect to their facial challenge, Plaintiffs argue that they "face a completely dysfunctional statutory reduction in custody process." (*Id.* at 10.) Plaintiffs present evidence that the statute does not contain a requirement for any independent periodic risk assessments; does not contain a requirement that the State petition for a reduction in custody for committed individuals who meet the statutory requirements for

such a reduction in custody; does not contain a requirement for the discharge of committed individuals who are no longer dangerous and/or no longer in need of inpatient treatment for a sexual disorder; and does not contain a requirement for a judicial by-pass in the reduction in custody process. (*See id.* at 10-21 (citing Minn. Stat. § 253D; Minn. Stat. § 253B.03, subd. 5); *see also, e.g.*, OLA Report at 16; Task Force Report at 16; Puffer Dep. at 21, 58; Gustafson Decl. ¶ 31, Ex. 29 ("Barry Dep.") at 101; Gustafson Decl. ¶ 89, Ex. 87 ("2013 Brand E-mail") at 3-5; Doc. No. 756 ("Thuringer Decl.") ¶ 18.)

Defendants contend that they are entitled to summary judgment with respect to Plaintiffs' facial challenge because "Chapter 253D clearly meets due process standards." (Doc. No. 721 at 70.) Defendants assert that "Plaintiffs' claimed deficiencies could never amount to violations of Substantive Due Process" because "[t]he statute has been deemed constitutional by previous courts and Plaintiffs are unable to mount a factual or legal attack on its application to them." (*Id.* at 73.) Defendants further assert that "[t]he statute also features significant Procedural Due Process for MSOP clients wishing to petition for discharge." (*Id.* at 74.)

Plaintiffs, on the other hand, argue that Defendants' motion for summary judgment should be denied because "Defendants have not shown sufficient undisputed material facts demonstrating that Minn. Stat. § 253D is narrowly tailored to the purposes of protecting the public and providing treatment to Class members." (Doc. No. 741 at 18.) Plaintiffs further contend that, contrary to Defendants assertions, "[n]o Minnesota state court has faced the question raised here – that Minn. Stat. § 253D fails to provide for periodic, independent assessments, to make sure a committed individual continues to

meet the criteria for confinement or whether the discharge criteria, on the statute's face, are reasonably related to the purposes of confinement." (*Id.* at 19.) Finally, Plaintiffs argue that "Minn. Stat. § 253D is unconstitutional in all applications because it fails, on its face, to require regular independent risk assessments and makes no provision for a judicial bypass to the reduction in custody process." (*Id.* at 20 (citing Barry Dep.).)

The Court concludes that Defendants have failed to demonstrate that they are entitled to judgment as a matter of law with respect to Plaintiffs' facial challenge to section 253D. *See Enter. Bank*, 92 F.3d at 747. The record before the Court indicates that, at a minimum, Plaintiffs have presented sufficient evidence to allow a reasonable factfinder to conclude that the statute is unconstitutional on its face. (*See, e.g.*, Thuringer Decl. ¶ 18; Doc. No. 753 ("Noyer Decl.") ¶ 16; 706 Report at 6, 33, 86; Johnston Dep. at 10-11; Gustafson Decl. ¶ 33, Ex. 31 ("Fox Dep."), at 141-42; Barry Dep. at 101-02.) Therefore, the Court denies Defendants' motion for summary judgment with respect to Count I.

Second, with respect to their as-applied challenge, Plaintiffs contend that the application of section 253D to Plaintiffs and Class Members is unconstitutional under the Due Process Clause. (*See* Third Am. Compl. at 60-64.) Specifically, Plaintiffs contend that the statute is unconstitutional because: (i) its application to Plaintiffs and Class Members is punitive, not therapeutic, in nature; (ii) Defendants do not provide periodic independent reviews or regular internal reviews of Plaintiffs and Class Members; (iii) Defendants do not automatically petition for a reduction in custody or the discharge of committed individuals who meet the statutory requirements for such a reduction in

custody or who are no longer dangerous and/or in no longer need of inpatient treatment for a sexual disorder; (iv) Defendants do not provide an assessment at the time the individual is first civilly committed to MSOP to determine what phase of the treatment program or facility the individual should be placed in; and (v) Defendants do not provide a less restrictive alternative to confinement at a MSOP secure facility.  (*See id.*)

Defendants argue that they are entitled to summary judgment for Plaintiffs' as-applied challenges because "[t]he evidence affirms that DHS and MSOP officials have applied the statute correctly and Plaintiffs received due process."  (Doc. No. 721 at 74.) Defendants contend that DHS officials "follow the procedures in the statute" and that "Plaintiffs cannot point to any procedural irregularities."  (*Id.* at 75.)

Plaintiffs, on the other hand, contend that Defendants' motion for summary judgment should be denied with respect to Count II because "it is clear that Defendants have failed to meet their burden of demonstrating that there are no genuine issues of material facts in dispute regarding the constitutionality of Minn. Stat. § 253D as it is applied."  (Doc. No. 741 at 24.)  Plaintiffs assert in part that, "issues relating to the risk assessments, or lack thereof, and the improper application of the []risk tools, raise genuine issues of material fact as to whether Minn. Stat. § 253D is unconstitutional as applied."  (*Id.* at 31.)  For example, Plaintiffs argue that evidence of MSOP's failure to conduct regular risk assessments "alone is sufficient to create a genuine issue of material fact as to whether the statute is being applied unconstitutionally."  (*Id.* at 27; *see also* 706 Report at 11-22, 33; OLA Report at 56; Task Force Report at 3-4.)

As discussed more in depth below in section II.B.3, the Court concludes that Defendants have failed to meet their burden of showing that there are no genuine issues of material fact for trial. *See Enter. Bank*, 92 F.3d at 747. The record before the Court indicates that, at a minimum, Plaintiffs have presented sufficient evidence to allow a reasonable factfinder to conclude that the statute is unconstitutional as applied. (*See, e.g.*, Doc. No. 749 ("Gamble Decl."); Foster Decl.; Gustafson Decl. ¶ 19, Ex. 17 ("Benson Dep."), at 183-85; Gustafson Decl. ¶ 25, Ex. 23 ("Berg Dep."), at 17; Barry Dep. at 64; 706 Report at 11-23, 33, 40, 77.) Therefore, the Court denies Defendants' motion for summary judgment with respect to Count II.

### 2. Failure to Provide Treatment Claims

Counts III, IV, and XI of Plaintiffs' Third Amended Complaint assert various claims related to the right to treatment. (*See* Third Am. Compl. at 64-67, 79-80.) Count III, in essence, alleges that Defendants have violated Plaintiffs' Fourteenth Amendment substantive due process right to treatment. (*See id.* at 64-66.) In particular, Plaintiffs claim that "[b]ased on the policy and procedures created and implemented by Defendants," Plaintiffs "spend no more than six or seven hours per week in treatment, their treatment plans are not detailed and individualized, the treatment staff is not qualified to treat sex offenders, and staffing levels are often far too low." (*Id.* at 80.) Rather than progressing through the phases of treatment, Plaintiffs remain "in the first two phases of treatment for years." (*Id.*) In sum, Plaintiffs argue that, as implemented, MSOP's sequential, three-phased treatment system, with chutes-and-ladders type mechanisms for returning patients to earlier phases of the program, without periodic,

independent review of their progress, has the effect of confinement to the facility for life, equivalent to permanent, criminal incarceration. (*See generally id.* at 64-66.)

The parties dispute the applicable legal standard for Plaintiffs' inadequate treatment claims. Defendants contend that the proper standard is whether MSOP's treatment of a particular patient "shocks the conscience." (*See* Doc. No. 721 at 47 (citing *Strutton v. Meade*, 668 F.3d 549, 557-58 (8th Cir. 2012)[16].) Plaintiffs contend that the "professional judgment standard" should apply in analyzing whether their due process rights were violated. (*See* Doc. No. 741 at 44-45 (citing *Youngberg v. Romeo*, 457 U.S. 307, 320-22 (1982)[17].)

---

[16]     In *Strutton*, the Eighth Circuit assessed whether the challenged state action was "so arbitrary or egregious as to shock the conscience" and concluded that the plaintiff "[did] not have a fundamental due process right to sex offender treatment." *Strutton*, 668 F.3d at 557-58.

[17]     In *Youngberg*, the Supreme Court analyzed whether the state action at issue was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. The Supreme Court held that under the Fourteenth Amendment, "civilly committed individuals 'enjoy constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by the interests." *Id.* at 324.
     Prior to *Strutton*, the Eighth Circuit applied the *Youngberg* professional judgment standard to a sex offender's right to treatment claims. *See Bailey v. Gardebring*, 940 F.2d 1150, 1153-54 (8th Cir. 1991). In *Strutton*, the Eighth Circuit concluded that the *Youngberg* standard did not apply to the plaintiff's treatment-related claims. *Strutton*, 668 F.3d at 557. However, as this Court has noted in previous orders, "the right to treatment claim in *Strutton* invoked a slightly different statutory mandate" (Doc. No. 427 at 27 n.25 (citing *Strutton*, 668 F.3d at 557)), and "the plaintiff's claims [in *Strutton*] were limited to his access to treatment; he neither raised a systemic challenge to the implementation of the program as a whole, nor did he allege that his confinement was punitive in nature" (Doc. No. 427 at 24 (citing *Strutton*, 668 F.3d at 558)).

The Court concludes that the record contains evidence that could support a finding for Plaintiffs under either standard. (*See, e.g.*, Hébert Aff. ¶¶ 16-19, 125; Puffer Dep. at 130-32; 706 Report at 8, 26, 40, 53-54, 59; Berg Dep. at 15; Gustafson Decl. ¶ 9, Ex. 7 ("Barbo Dep.") at 49; Fox Dep. at 149; Gustafson Decl. ¶ 36, Ex. 34 ("Wilson Dep.") at 5.) Even assuming, without deciding, that the *Strutton* "shocks the conscience" standard applies to Plaintiffs' right to treatment claims, when taken together with Plaintiffs' evidence regarding the punitive nature of confinement and the lack of meaningful opportunity for release, Plaintiffs have, at a minimum, raised a genuine issue of material fact as to whether state action with respect to the class members committed to MSOP is "truly conscience-shocking." *See Strutton*, 668 F.3d at 556.

To the extent Plaintiffs assert that any inadequate treatment or failure to treat amounts to a violation of a Minnesota statute or court order in Counts IV and XI, Plaintiffs' claims also survive summary judgment for similar reasons. In Count IV, Plaintiffs allege a statutory violation of the right to treatment. (*See* Third Am. Compl. at 66-67.) Specifically, Plaintiffs contend that Defendants have unreasonably failed to provide Class Members with "proper care and treatment, best adapted, according to contemporary professional standards, to rendering future supervision unnecessary" in contravention of the MCTA.[18] (*Id.* at 67 (quoting Minn. Stat. § 253B.03, subd. 7).)

---

[18] The MCTA guarantees civilly committed individuals a right to treatment consistent with contemporary professional standards. *See* Minn. Stat. § 253B.03, subd. 7 ("A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering

(Footnote Continued on Next Page)

Similarly, Count XI asserts that Plaintiffs "are not receiving adequate treatment," contrary to the judicial determination that, as SPPs or SDPs, they "must enter a secure treatment facility" for the purpose of receiving "proper sex offender treatment." (*See* Third Am. Compl. at 79.) Counts IV and XI are supported by the same fundamental facts as Count III, which Plaintiffs argue shows a pervasive denial of proper treatment at MSOP. According to Plaintiffs, such a systemic failure is not only inconsistent with due process, but is also contrary to statutory standards and corresponding judicial orders governing civil commitment. (*See id.* at 64-67, 79-80.)

The Court concludes that that Defendants have failed to meet their burden of showing that there are no genuine issues of material fact pertaining to Plaintiffs' inadequate treatment claims. *See Enter. Bank*, 92 F.3d at 747. Noting the concerns and recommendations raised in the 706 Report, OLA Report, MPET Report, and Task Force Report, and construing the facts in the light most favorable to the nonmoving party, the Court finds that, at a minimum, Plaintiffs have presented sufficient evidence to survive a motion for summary judgment. As such, summary judgment with respect to Counts III, IV, and XI is denied.

---

(Footnote Continued From Previous Page)

further supervision unnecessary."). Plaintiffs have raised a genuine issue of material fact as to whether the treatment provided to them at MSOP satisfies the standard mandated by statute because they present evidence that, for example, MSOP has failed to appropriately progress Plaintiffs through treatment. (*See, e.g.*, 706 Report at 37, 44; MPET Report at 4.)

### 3. Claims Pertaining to Punitive Nature of Confinement

At the heart of Plaintiffs' Third Amended Complaint is the contention that Minnesota's civil commitment scheme for sex offenders constitutes a punitive system of preventive detention in violation of the due process requirements of the Fourteenth Amendment. In Counts II, V, VI, and VII, Plaintiffs contend that Defendants have denied Plaintiffs and Class Members their substantive due process rights to less restrictive alternative confinement and to be free from punishment and inhumane treatment. (*See* Third Am. Compl. at 60-61, 67-73.) Repeatedly throughout their Third Amended Complaint, Plaintiffs claim that due process requires "that the conditions and duration of confinement have some reasonable relation to the purpose for which persons are committed," and that, while "[c]ivilly committed persons may be subjected to liberty restrictions reasonably related to legitimate government objectives," those restrictions must not be "tantamount to punishment as determined by reasonable professional judgment." (*See, e.g.*, *id.* at 64-65.) Plaintiffs maintain that "[c]onfinement that continues after the person no longer meets the statutory requirements for commitment violates due process." (*Id.* at 64-65, 71.)

Indefinite commitment to MSOP constitutes a "significant deprivation of liberty" that infringes upon one's fundamental right to be free from confinement, and therefore requires due process protection. *See Jones v. United States*, 463 U.S. 354, 361 (1983); *see also Cooper v. Oklahoma*, 517 U.S. 348, 368-69 (1996) ("The requirement that the grounds for civil commitment be shown by clear and convincing evidence protects the individual's fundamental interest in liberty."). Where the government acts in a

systematic way, such as combining legislative and executive action, to indefinitely

confine a class of citizens in detention facilities like the MSOP facilities, the government

action must be narrowly tailored to serve a compelling state interest in order to pass

constitutional muster.[19] *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir.

2012) (noting that, where legislation infringes upon a fundamental right, such legislation

"must survive strict scrutiny—the law must be 'narrowly tailored to serve a compelling

state interest'") (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  The Court will, after

receiving all evidence at trial, carefully analyze the purpose and effect of Minnesota's

civil commitment scheme for sex offenders in this case.

     The Supreme Court has made clear that civil commitment of individuals "who, by

reason of a mental disease or mental abnormality, constitute a real, continuing, and

---

[19]     *Sacramento v. Lewis* distinguishes between the substantive due process standard applied to "abusive executive action" directed at an individual, such as the use of excessive force, and the standard applied to legislation that systematically impinges on a fundamental right.  *Compare Lewis*, 523 U.S. 833, 847 n.8 (1998) ("[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."), *with Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("[T]he Fourteenth Amendment forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (internal quotation omitted) (emphasis in original).
     In this case, there may be particular actions of the executive (such as the administration of treatment) that may ultimately be analyzed under the "shocks the conscience" standard.  Whether the strict scrutiny or the "shocks the conscience" standard applies to a particular claim, however, an allegation of the denial of substantive due process "is to be tested by an appraisal of the totality of facts in a given case." *Lewis*, 523 U.S. at 850; *see also id.* ("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.").

serious danger to society," is permitted, "provided there is no object or purpose to punish." *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997) (Kennedy, J., concurring) (citing *Addington v. Texas*, 441 U.S. 418, 426-27 (1979)); *see also Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring) ("We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone."). Where, notwithstanding a "civil label," a statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes." *Hendricks*, 521 U.S. at 361; *see also Seling v. Young*, 531 U.S. 250, 261 (2001). Therefore, a law whose objective is retribution or deterrence implicates criminal punishment. *See Hendricks*, 521 U.S. at 361-62; *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (distinguishing "a dangerous sexual offender subject to civil commitment 'from other dangerous persons'" and finding such a distinction "necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment") (citations omitted). Moreover, "[i]f the object or purpose" of a civil commitment law is to provide treatment, "but the treatment provisions were adopted as a sham or mere pretext," such a scheme would indicate "the forbidden purpose to punish." *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring).

Furthermore, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v.*

*Louisiana*, 504 U.S. 71, 79 (1992); *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972). In Minnesota, as provided by statute, SDPs and SPPs are committed to MSOP for the purpose of treatment, and those individuals have the right "to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary." Minn. Stat. § 253B.03, subd. 7. Plaintiffs have presented evidence, however, that they have been subjected to conditions of confinement that are potentially punitive in nature and are antithetical to the purpose of their commitment.

With respect to the duration of a civil commitment, "the Constitution permits the Government . . . to confine [an individual] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones*, 463 U.S. at 370. Accordingly, a civilly committed individual is entitled to release when he is no longer mentally ill or dangerous. *See Foucha*, 504 U.S. at 77-78 (stating that under the Supreme Court's ruling in *Jones*, a "committed acquittee may be held as along as he is both mentally ill and dangerous, but no longer"). As a matter of due process, it is "unconstitutional for a State to continue to confine a harmless, mentally ill person."[20] *Id.* at 77 (citing *O'Connor v. Donaldson*, 422 U.S. 563 (1975)). "Even if the initial commitment was permissible," a civil commitment may not "constitutionally continue

---

[20] The Court notes that the term "harmless" may have little to no practical significance to treatment professionals tasked with evaluating whether a sex offender "is no longer a danger to himself or society." *See Foucha*, 504 U.S. at 77 (explaining that a "committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous").

after that basis no longer exist[s]." *Foucha*, 504 U.S. at 77 (citing *O'Connor*, 422 U.S. at 565). Under that reasoning, an individual who no longer meets the criteria for commitment should be entitled to release.

Defendants contend that *Seling v. Young*, 531 U.S. 250 (2001), defeats Plaintiffs' claim that the civil commitment statutes are unconstitutional as applied because the Supreme Court rejected an as-applied challenge to a civil commitment statute. Unlike *Seling*, however, this case raises the question of the constitutionality of a state civil commitment scheme as applied to the entire sex offender population, not just to one individual.[21] *Contra Seling*, 531 U.S. at 264 ("The Court of Appeals recognized that the Act is civil, and treated respondent's claim as an individual, 'as-applied' challenge to the Act."). Additionally, Plaintiffs here have raised the question of whether the Minnesota civil commitment statutes have the "forbidden purpose" of punishment, despite their purported civil underpinnings. *See Hendricks*, 521 U.S. at 347, 368-69 (plurality opinion); *id.* at 371 (Kennedy, J., concurring); *see also Seling*, 531 U.S. at 264-65 (leaving open the question of what would happen if the lower courts had concluded that "[the committed individual's] allegations, if substantiated, would be sufficient to refute the Washington Supreme Court's conclusion that the Act is civil, and to require the release of all those confined under its authority"). In *Seling*, the Supreme Court assumed

---

[21]    Plaintiffs in this case challenge the constitutionality of the relevant statutes based on a "lengthy history of constitutional violations" for an entire class of individuals who experienced a "systemic failure to provide due process rights." (Doc. No. 741 at 2, 45, 95.)

the statute in question was civil, and expressed no opinion as to how allegations that conditions of confinement "are too restrictive, that the conditions are incompatible with treatment, and that the system is designed to result in indefinite confinement . . . would bear on a court determining in the first instance whether [a state's] confinement scheme is civil." *Seling*, 531 U.S. at 262-63. Moreover, the Supreme Court's holding in *Seling* was limited to an as-applied[22] challenge to a civil commitment statute on double jeopardy and *ex post facto* grounds. *Id.* at 263 (holding "that respondent cannot obtain release through an 'as-applied' challenge to the Washington Act on double jeopardy and *ex post facto* grounds" and finding an "as-applied" analysis to be "unworkable" in that context because "[s]uch an analysis would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the Double Jeopardy and *Ex Post Facto* Clauses").[23]

---

[22]    Justice Thomas, in his concurrence, questioned whether the claim at issue, wherein a committed sex offender "essentially contend[ed] that the actual conditions of confinement, notwithstanding the text of the statute, are punitive and incompatible with the Act's treatment purpose" constituted a veritable "as-applied" challenge. *Seling*, 531 U.S. at 271 (Thomas, J., concurring). Justice Thomas further stated:

> The majority adopts the Ninth Circuit's nomenclature and refers to respondent's claim as an "as-applied" challenge, but that label is at best misleading. Typically an "as-applied" challenge is a claim that a statute, "*by its own terms*," infringes constitutional freedoms in the circumstances of a particular case." In contrast, respondent's claim is not that [the Act] "by its own terms" is unconstitutional as applied to him, but rather that the statute is not being applied according to its terms at all.

*Id.* (citations omitted) (emphasis in original); *see id.* at 264 (majority opinion).

[23]    The Court acknowledged, however, that "the particular features of confinement may affect how a confinement scheme is evaluated to determine whether it is civil rather

(Footnote Continued on Next Page)

At the center of Plaintiffs' challenge to the Minnesota sex offender commitment scheme is the allegation that a commitment to MSOP essentially amounts to lifelong confinement, equivalent to a lifetime of criminal incarceration in a facility resembling, and run like, a medium to high security prison.  (*See generally* Third Am. Compl.)  Under such conditions, which are supported by facts presented by Plaintiffs, it appears that MSOP may very well be serving the constitutionally impermissible purposes of retribution and deterrence.  (*See, e.g.*, 706 Report at 50-60; OLA Report at 75-82.) Documents such as the OLA Report, combined with the Governor's directive that no class members be released, as well as Defendants' admission that no one has been fully discharged since the program's inception, lend substantial support to Plaintiffs' challenges.

With respect to less restrictive alternatives, in Count VI, Plaintiffs allege that MSOP "does not provide for a less restrictive alternative to confinement at a MSOP secure facility."  (Third Am. Compl. at 18.)  According to Plaintiffs, "[t]he only MSOP facilities are the secure treatment locations at Moose Lake and St. Peter" and "MSOP does not provide for any less restrictive alternatives to confinement at Moose Lake or

(Footnote Continued From Previous Page)

than punitive, but it remains no less true that the query must be answered definitively." *Seling*, 531 U.S. at 263.

St. Peter, such as halfway houses or other less secure facilities."[24] (*Id.*) Plaintiffs claim that MSOP's failure to provide a less restrictive alternative to confinement at those secure facilities violates due process. (*See generally id.* at 70-72.) Plaintiffs further note that MSOP, as implemented, fails to account for the fact that not all class members "have the same level of security needs." (*Id.* at 71.) Additionally, Plaintiffs observe that if a resident "no longer meets the statutory requirements for civil commitment, there is no less restrictive facility or program for [him or her] to enter." (*Id.*) Moreover, Plaintiffs also argue that even if there was such a less restrictive facility or program for a resident to enter, "there is no judicial bypass available that could provide prompt relief" for residents that no longer satisfy the commitment criteria. (*Id.* at 10.)

The Court concludes that Defendants have failed to meet their burden of showing that there is no genuine dispute of material fact to warrant summary judgment on Plaintiffs' punitive nature of confinement claims. *See Enter. Bank*, 92 F.3d at 747. The record before the Court indicates that Plaintiffs have presented sufficient evidence to allow a reasonable factfinder to conclude that the civil commitment system is unconstitutionally punitive in nature. (*See, e.g.*, Doc. No. 743 ("Barber Decl.") ¶ 32; Doc. No. 755 ("Steiner Decl.") ¶ 32; 706 Report at 50; Rybroek Report; Gustafson Decl. ¶ 16, Ex. 14 ("Cauley Report") at 67; Carabello Dep. at 35; Benson Dep. at 190.)

---

[24]     Although Defendants argue that Community Preparation Services ("CPS") constitutes a less restrictive alternative to confinement (*see, e.g.*, Hébert Aff. ¶ 85), Plaintiffs point out that residents must complete all three phases of treatment before they become eligible for placement in CPS. (*See* Doc. No. 741 at 32, 42.)

Therefore, the Court denies Defendants' motion insofar as it seeks dismissal of Counts II, V, VI, and VII.

## C.    First Amendment Claims

In Counts VIII and IX, respectively, Plaintiffs assert that Defendants have impinged upon their right to religious freedom and have unreasonably restricted Plaintiffs' freedom of speech and association in violation of the First Amendment.  (*See* Third Am. Compl. at 74-76.)

### 1.    Count VIII

In order to succeed on a claim asserted under the Free Exercise Clause of the First Amendment, Plaintiffs must ultimately establish that the challenged regulations place a "substantial burden" on Plaintiffs' ability to practice their religion.  *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); *see also Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) ("[A] person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief.").  To substantially burden one's free exercise of religion, a regulation must:  (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtail a person's ability to express adherence to his or her faith"; or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."  *Patel*, 515 F.3d at 813 (quoting *Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 988 (8th Cir. 2004)).

Defendants maintain that they are entitled to summary judgment on Plaintiffs'

freedom of religion claim because Plaintiffs have not identified specific instances in which any class member's "sincere religious belief" was "substantially infringed" by a MSOP policy or practice. (*See* Doc. No. 721 at 56-57.)

Plaintiffs argue that "based on the policy and procedures created and implemented by Defendants, they are violating Plaintiffs' and Class members' rights to religious freedom through the MSOP's policies, procedures, and practices." (Doc. No. 741 at 74.) Plaintiffs further argue that their free exercise claim "should not be dismissed on summary judgment [] because disputed material facts are present." (*Id.* at 75.) Plaintiffs contend that the record is replete with examples of how MSOP's policies and practices restrict Plaintiffs "in when and where they may worship" and "limit Plaintiffs' ability to practice their sincerely held religious beliefs." (*Id.* at 88-89.) For example, Plaintiffs present evidence that named Plaintiffs and Class Members were denied "the use of unit team rooms for regular religious studies that had been occurring for years," (*id.* at 74 (citing Doc. No. 724 ("Brennaman Aff.") ¶ 19, Ex. 18 ("Pls. Third Supp. Resp. to Defs. Interrog."))), and that a named Plaintiff "received a [behavioral expectation report] for practicing his religion and having his bible out in a group room" (*id.* (citing Doc. No. 748 ("Foster Decl.") ¶ 34).) Plaintiffs argue that such policies and practices "are not related to a legitimate institutional or therapeutic interest" and thus constitute unreasonable restrictions on Plaintiffs' First Amendment rights. (Doc. No. 741 at 75.)

The Court concludes that Defendants have failed to meet their burden of proving that there are no genuine issues of material fact for trial. *See Enter. Bank*, 92 F.3d at 747. The record before the Court indicates that Plaintiffs have presented sufficient evidence to

support their free exercise claim and to proceed to trial.  (*See, e.g.*, Gustafson Decl. ¶ 77, Ex. 75 ("Daywitt Dep."), at 239-40; Gustafson ¶ 76, Ex. 74 ("DeVillion Dep.") at 212; Gustafson Decl. ¶ 46, Ex. 44 ("Bolte Dep."), at 271, 285; Gluek Decl. ¶ 11, Ex. 9 ("Barber Dep.") at 11.)  Therefore, the Court denies Defendants' motion for summary judgment with respect to Count VIII.[25]

### 2.    Count IX

The right to free speech includes "the right to utter or to print, . . . the right to distribute, the right to receive, the right to read," and the freedom to exercise inquiry and thought.  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).  The right of association includes "more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other means."  *See id.* at 483.  Although civilly committed individuals are entitled to these First Amendment protections, "[a]ny form of involuntary confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012).

Defendants argue that they are entitled to summary judgment on Count IX based on *Turner v. Safley*, 482 U.S. 78 (1987).  (*See* Doc. No. 721 at 57-58; *see also Turner*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights,

---

[25]    However, if the record established at trial is as suggested by Defendants, the Court notes that it is doubtful whether Plaintiffs will prevail on their free exercise clause claims.

the regulation is valid if it is reasonably related to legitimate penological interests." [26]).)

Plaintiffs dispute the applicability of *Turner*, which relates to claims asserted by prisoners, and argue that any First Amendment restrictions on civilly committed individuals "must be reasonably related to 'legitimate therapeutic or institutional interests.'" (Doc. No. 741 at 74 (quoting *Ivey v. Mooney*, Civ. No. 05-2666, 2008 WL 4527792, at *10 (D. Minn. Sept. 30, 2008)).) However, Plaintiffs contend that Count IX should not be dismissed on summary judgment under either standard because genuine issues of material fact exist. (*See* Doc. No. 741 at 75-76.)

Plaintiffs assert that Defendants have unreasonably restricted Plaintiffs' rights to free speech and free association. (Third Am. Compl. at 76-77.) Plaintiffs contend that "based on the policy and procedures created and implemented by Defendants, they have limited Plaintiffs' and Class members' access to certain newspapers and magazines and remove or censor articles from the newspapers and magazines that are provided" and have "limited the ability of Plaintiffs and Class members to use the phone by charging a prohibitively high amount for phone use." (*Id.* at 76.) Plaintiffs also contend that Defendants have restricted Plaintiffs' freedom to associate with one another by "limiting

---

[26]    In *Turner*, the Supreme Court concluded that when determining whether a prohibition on a constitutional right is reasonable, a court must consider four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising the right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives that would fully accommodate the prisoners' rights at *de minimis* cost to the valid penological interest. *See Turner*, 482 U.S. at 89-90.

contact among Plaintiffs and Class members, as well as other patients." (*Id.*) As with their freedom of religion claim, Plaintiffs maintain that such restrictions "are not related to a legitimate institutional or therapeutic interest." (*Id.* at 77.)

Regardless of the applicable standard, the Court determines that there is a material dispute of fact and law to preclude granting summary judgment in Defendants' favor on Plaintiffs' Count IX freedom of speech and association claims. *See Enter. Bank*, 92 F.3d at 747. Moreover, considering Plaintiffs' claims with respect to restrictions on their ability to freely associate and speak and in light of all of Plaintiffs' allegations regarding their conditions of confinement, the Court finds that Plaintiffs have presented sufficient evidence to support a claim that survives summary judgment. (*See, e.g.*, Bolte Dep. at 305-06; Gustafson Decl. ¶ 62, Ex. 60 ("Noyer Dep."), at 161-66; Gustafson Decl. ¶ 68, Ex. 66 ("Thuringer Dep."), at 12; Gustafson Decl. ¶ 55, Ex. 53 ("Michaels Dep."), at 12.) Accordingly, the Court denies Defendants' motion insofar as it seeks summary judgment on Count IX of Plaintiffs' Third Amended Complaint.[27]

### D. Unreasonable Search and Seizure Claim

Plaintiffs assert several Fourth Amendment challenges against Defendants in Count X of their Third Amended Complaint. (Third Am. Compl. at 77-79.) Plaintiffs challenge Defendants' "use of restraints," "random cell searches," daily "window checks," "strip searches," and "random pat downs." (*Id.* at 46-47, 78.)

---

[27] However, the Court again observes that, if the record at trial is as Defendants suggest, Plaintiffs are unlikely to prevail on Count IX.

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "Involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Beaulieu*, 690 F.3d at 1017). To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979). In applying this balancing test, a court must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which the search is conducted. *See id.* at 559; *Serna v. Goodno*, 567 F.3d 944, 949 (8th Cir. 2009) (quoting the *Bell* balancing test). A court must defer to the judgment of the correctional (or institutional) officials "unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of institutional security." *Arnzen*, 713 F.3d at 373 (quoting *Beaulieu*, 690 F.3d at 1029).

Defendants argue that they are entitled to summary judgment on Defendants' unreasonable search and seizure claim because the claim is unsupported by facts or law. (*See* Doc. No. 721.) In support of this argument, Defendants contend that: (1) the Supreme Court in *Bell* recognized the constitutionality of a similar type of room searches as used by MSOP employees, which "are designed to deter the possession of contraband and preserve a safe, secure, and therapeutic environment for MSOP staff and clients" (*id.*

at 51); (2) the District Court in *Semler v. Ludeman*, No. 09-0732, 2010 WL 145275, at *6, *16-19 (D. Minn. Jan. 8, 2010) upheld the constitutionality of MSOP's room search and pat-search policies (Doc. No. 721 at 51); and (3) the Eighth Circuit in *Beaulieu* upheld MSOP's unclothed visual body searches and MSOP's policy regarding the use of restraints (*id.* at 55). Relying on these cases, Defendants maintain that MSOP's search policies are related to legitimate safety and security concerns, and, therefore, Plaintiffs' Fourth Amendment claims should be dismissed because any searches were reasonable. (*See id.* at 53-55.)

Plaintiffs, on the other hand, contend that summary judgment should be denied with respect to their Fourth Amendment claim. Plaintiffs maintain that "[n]one of the cases cited by Defendants relating to decisions regarding specific search and seizure policies at the MSOP addressed whether the policies were appropriately applied to all MSOP patients or whether application on an individual basis would be less restrictive." (*See* Doc. No. 741 at 77.) Plaintiffs further contend that, although it is true that specific policies and practices of MSOP viewed in isolation have been found constitutional, "it is these policies and practices in combination rather than in isolation that renders the MSOP punitive as it is applied, along with the fact that they are applied uniformly to all Plaintiffs without regard for individual treatment needs or risk levels." (*See id.* at 82.)

The Court concludes that a material dispute of fact exists to preclude summary judgment on Plaintiffs' Count X unreasonable search and seizure claim. *See Enter. Bank*, 92 F.3d at 747. Considering Plaintiffs' Fourth Amendment claim in conjunction with other evidence presented by Plaintiffs surrounding the punitive nature of their

confinement, the Court determines that a genuine issue of material fact exists as to whether the search policies in this case are reasonable and appropriate. (*See, e.g.*, DeVillion Dep. at 210-11; Gustafson Decl. ¶ 71, Ex. 69 ("Braun Dep."), at 74, 77; Barber Dep. at 147; Noyer Dep. at 159-60, 166, 171-72; Gustafson Decl. ¶ 64, Ex. 62 ("Gamble Dep."), at 203.) As such, the Court denies Defendants' motion insofar as it seeks summary judgment with respect to Count X.

### E.    Contract-Related Claims

In Counts XII and XIII of their Third Amended Complaint, Plaintiffs assert claims of breach of contract, and tortious interference with contract, respectively, against Defendants Jesson, Benson, Moser, Lundquist, Johnston, and Hébert related to their alleged failure to provide adequate treatment.[28] (*See* Third Am. Compl. at 80-84.) Plaintiffs, in essence, argue that those Defendants "actively participated in and supported the inadequate treatment policies as implemented by MSOP, which resulted in the failure to comply with contract[s] to provide treatment by MSOP." (*Id.* at 81, 84.)[29] Plaintiffs

---

[28]    Count XIII also asserts that those Defendants intentionally violated Minn. Stat. § 253B.03, subd. 7. (Third Am. Compl. at 84; *see id.* at 83 (quoting Minn. Stat. § 253B.03, subd. 7 ("A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary.")).)

[29]    Plaintiffs further claim that those Defendants were aware "of the failure to progress Plaintiffs and [c]lass members through the different treatment phases to the point that they could be conditionally or unconditionally released" and that "the MSOP treatment program as implemented had only conditionally released a single person and had never unconditionally released anyone committed to MSOP." (Third Am. Compl. at 34, 81, 83-84.)

base their claims on a one-page signed document entitled, "Consent for Participation in Sex Offender Treatment," which provides, among other things:

> [T]hat the patient's therapist has discussed the course of treatment at the MSOP, that the patient received information about the levels of care and stages of treatment, []the patient has received the goals and behavioral expectations at the MSOP, that upon completion of treatment the MSOP will support their petition for provisional discharge, that each stage of treatment has specific goals and behavioral expectations, that services such as education and vocation are provided . . . .

(*Id.* at 19-20; Doc. No. 742 ("Gluek Decl.") ¶ 30, Ex. 28 ("Consent for Treatment").)

Defendants argue that they are entitled to summary judgment on Plaintiffs' breach of contract claims because Counts XII and XIII are not actionable under *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), because such claims would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." (*See* Doc. No. 721 at 76-77 (citing *Pennhurst*, 465 U.S. at 90).) Defendants further argue that summary judgment should be granted on Plaintiffs' breach of contract claims because there was no enforceable contract. (*Id.*) Specifically, Defendants contend that "Plaintiffs provided no legal consideration" because "[t]he consent form gives clients the option to choose to either participate or not participate in treatment." (*Id.*) Defendants maintain that "[w]ithout a contract, Plaintiffs' contract and tortious interference claims must fail." (*Id.*)

Plaintiffs maintain that Defendants have failed to meet their burden in showing that there is no genuine issue of material fact in dispute with respect to Counts XII and XIII. (*See* Doc. No. 741 at 96.) Plaintiffs argue that because they "identified genuine issues of material fact as to whether the MSOP's treatment program provides the

treatment contemplated by the treatment contract signed by Plaintiffs," Defendants'
motion for summary judgment should be denied.  (*Id.* at 97.)

For similar reasons discussed above with respect to Plaintiffs' inadequate
treatment claims, the Court concludes that the evidence presents a genuine issue of
material fact to preclude summary judgment on Plaintiffs' breach of contract and tortious
interference claims.  *See Enter. Bank*, 92 F.3d at 747.  Therefore, the Court denies
Defendants' motion for summary judgment with respect to Counts XII and XIII.

## CONCLUSION

The Court and the parties can perhaps agree that this case is multifaceted.
However, whether the parties deem this case multifaceted or not, we are at a
constitutional crossroad.  The question and challenge to each party before this Court is
what will be their next step.

Not only does this case address the rights of those populations in our society that
are most disliked and feared (and a number of individuals who are vulnerable), but it also
heightens the concerns and fears of the public at large.

As this Court has previously stated in its February 19, 2014 Order, as an Assistant
County Attorney who prosecuted many sexual assault and child sexual abuse cases, and
as a former Minnesota State Judge who handled many such cases, the undersigned is
sensitive to the interests of all individuals affected by this case, which includes not only

the public at large[30] and the Class Members, but also family members of MSOP residents and victims and family members of victims of the community, as well as all citizens of the State of Minnesota.  (*See* Doc. No. 427 at 67.)  Moreover, the record before the Court highlights both the best and the worst of the three branches of our government.  At a minimum, the evidence has shown that, to date, the executive and legislative branches in Minnesota have let politics, rather than the rule of law and the rights of "all" of their citizens guide their decisions.  In a situation such as this, the federal court may have to step in to protect the rights of Plaintiffs.  *See United States v. Will*, 449 U.S. 200, 218 (1980) (stating that the role of an Article III judge is to safeguard a litigant's "right to have claims decided by judges who are free from potential domination by other branches of government").

However, regardless of the claims raised in this case, and irrespective of the Court's ultimate rulings on any constitutional questions with which it is presented, the interests of justice require that substantial changes be made to Minnesota's sex offender civil commitment scheme.  In the context of Governor Mark Dayton's recent budget proposal and the Minnesota legislature's recent introduction of a bill to modify provisions related to the MCTA and MSOP, the Court observes that the State of Minnesota is presented with a unique opportunity to address and resolve the problems that not only Plaintiffs, but many others, including experts, auditors, and others knowledgeable on the

---

[30]     The Court has received dozens of letters from not only victims and family members of victims of civilly committed individuals, but also from family members of MSOP clients as well as individuals who claim to have experienced MSOP first-hand.

subject, have identified in MSOP, which the state should not ignore.  Furthermore, many of the systemic problems that Plaintiffs have identified, such as the lack of independent periodic risk assessments, may be implemented without legislative action and without any costs to taxpayers, as confirmed in the OLA Report and the Task Force Report.  This is especially the case, given the fact that the parties could agree to prioritize the evaluation of Class Members, starting with, for example, the most vulnerable Class Members, such as the elderly, the severely mentally ill, those with cognitive limitations, and those with no adult convictions.

It is difficult for the Court to understand why the parties have not resolved this case in a manner that would address clients' concerns, serve the public interest, promote public safety, and serve the interests of justice for all concerned.  Justice requires no less.

### ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Partial Motion to Dismiss the Third Amended Complaint (Doc. No. [651]) is **DENIED**.

2.      Defendants' Motion for Summary Judgment (Doc. No. [719]) is **DENIED.**


Date:  February 2, 2015                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge