## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld  and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Lucinda Jesson, Dennis Benson, Kevin Moser, Tom Lundquist, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their individual and official capacities, <br><br> Defendants. | Court File No. 11-cv-03659 (DWF/JJK) <br><br><br> **PLAINTIFFS' CLOSING ARGUMENT; PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.     CLOSING ARGUMENT[1]

The evidence in this case is clear:  Minn. Stat. §253D is unconstitutional on its face and as applied by these Defendants for numerous reasons.  Of course, the key fact that overwhelms all others is that "no one ever gets out."  In the more than 20 years since the current statute was enacted, not one single person has been successfully treated for

---

[1] As the Court is aware, Plaintiffs' Counts IV, XI, XII, and XIII (the state law claims) are the subject of an appeal by Defendants of the Court's Order denying Defendants' motion for summary judgment on those counts. Plaintiffs intend to dismiss each of these counts and are working with Defendants to determine the best procedure to do so.

the purpose of "rendering further supervision unnecessary" (i.e. fully discharged from the program) which is the primary requirement of the statute.  Thus, the overarching failure of the statute (and the program that applies the statute) is that it cannot satisfy the requirement that it be narrowly tailored to the purposes for which it commits people – treatment to render further supervision unnecessary.  That is the key issue in this case because this statute and the program that applies it delays, and therefore deprives, Class Members of their liberty – undoubtedly a fundamental right under the United States Constitution.

The Fourteenth Amendment provides that neither the United State nor state governments shall deprive any person "of life, liberty or property without due process of law."  U.S. CONST. amend. XIV. When a fundamental right is involved, the court must analyze the claims under a "strict scrutiny" standard.  *See, e.g.*, *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 462 (1983) (noting that the Supreme Court has recognized that "strict judicial scrutiny" is applied only when legislation may be said to have "'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental personal right or liberty**.**" (citing *Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 37, 38 (1973)), *overruled by Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992);  *see also Friends of Lake View Sch. Dist. Inc. No. 25 of Phillips Cnty. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009) (listing plaintiff's claims of violations of fundamental rights); *Doe v. Miller*, 405 F.3d 700, 709 (8th Cir. 2005) (same).

It is clear, here, that the fundamental right to liberty is involved. In regard to this very civil commitment program, the Minnesota Supreme Court has found, "[t]o live one's life free of physical restraint by the state is a fundamental right; curtailment of a person's liberty is entitled to substantive due process protection." *See In re Blodgett*, 510 N.W.2d 910, 914 (1994) (citing *Foucha v. Louisiana*, 504 U.S.71 (1992); *Jones v. United States*, 463 U.S. 354, 361 (1983)). The Supreme Court has made clear that involuntary commitment statutes can only be upheld where the "confinement takes place pursuant to proper procedures and evidentiary standards" and the confinement is narrowly tailored to the purpose for which the person is committed. *Kansas v. Hendricks*, 521 U.S. 346, 357 (citing *Foucha*, 504 U.S. at 80). This Court agreed when it stated, "where the government acts in a systematic way, such as combining legislative and executive action, to indefinitely confine a class of citizens in detention facilities like the MSOP facilities, the government action must be narrowly tailored to serve a compelling state interest in order to pass constitutional muster." *Karsjens* Doc. No. 828 ("Feb 2, 2015 Order") (citing *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (concluding that where legislation infringes upon a fundamental right, such legislation "must survive strict scrutiny – the law must be 'narrowly tailored to serve a compelling state interest'" (quoting *Reno v. Flores,* 507 U.S. 292, 302 (1993)).

Because strict scrutiny applies, the burden is on the Defendants [as agents of the State] to demonstrate that the law "advances a compelling state interest and is narrowly tailored to serve that interest." *See Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (citations omitted); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir.

3

2003) (citing *Graham v. Richardson*, 403 U.S. 365, 376 (1971)). Defendants in this case have not and cannot meet that burden.

This standard applies to each claim Plaintiffs make here because all of their claims arise from Defendants' actions (or lack of actions) that ultimately delay and therefore deny Class members their liberty.  For example, the constitutional claims relating to treatment are founded on MSOP's failures, as implemented, that impede Class members' right to liberty because it delays their ultimate discharge.

Although Defendants would like the Court to apply the "shocks the conscience" standard – this is not the correct test for a fundamental rights case and that argument misstates the law.  The Supreme Court in *U.S. v. Salerno*, 481 U.S. 739 (1987) made clear that substantive due process analysis has two prongs that prevents the government from engaging in conduct that (1) shocks the conscience or (2) interferes with rights implicit in the concept of ordered liberty.  *See Salerno*, 481 U.S. at 746.  The Tenth Circuit made this crystal clear in *Seegmiller v. LaVerkin City* case, *see* 528 F.3d 762 (2008), which discusses the difference between these two standards and clearly explains that when a fundamental interest is at stake, as is the case here, the infringement must be narrowly tailored to serve a compelling state interest.  *See Seegmiller*, 528 F.3d 762.

When the Court applies this standard to the evidence presented at trial, there can be no other outcome than to find that Minn. Stat. §253D is unconstitutional on its face and as applied.

### A.  <u>The Statute Is Unconstitutional On Its Face.</u>

With regard to the claims relating to whether Minn. Stat. §253D is

unconstitutional on its face, the Court must determine either "that no set of circumstances

exists under which [the statute] would be valid" or that "the statute lacks any plainly

legitimate sweep." *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 685 (8th Cir.

2012) (citations omitted). Whatever the difference in the meaning of those standards,

Plaintiffs assert that because of the fundamental failures of the statute and its

implementation, Plaintiffs have easily satisfied either standard.

Construing the statute at issue here, there Minnesota Supreme Court has held that

individuals may be "confined for only as long as he or she continues both to need further

inpatient treatment and supervision for his sexual disorder and to pose a danger to the

public." *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995).  There are several reasons

that the statute is unconstitutional on its face as alleged in Count I.

First, it is undisputed that the statute fails to require regular (independent or

otherwise) risk assessments to determine if Class members continue to meet requirements

for continued commitment.  (*See generally* Minn. Stat. §253D; *see e.g.* Peterson- Vol. 7,

1390:4-5; Puffer- Vol. 7, 1522:4-7; Johnston- Vol. 13, 2935:3-5; Elsen- Vol. 7, 1341:22-

25).  It is also undisputed that without a current risk assessment (which are admittedly

only valid for one year), it is not possible to know whether any Class Member meets the

standard for continued commitment. (*See e.g.* Puffer- Vol. 7, 1526:6-11; Hébert - Vol. 10,

2402:1-5).  The evidence is also clear that because there is no required periodic (annual)

risk assessment, the current commitment status of hundreds of Plaintiffs have never been

reviewed to determine if they continue to meet the commitment standards, and, for hundreds more, no recent risk assessment has been completed.  (*See e.g.* Plf. Ex. 178 at Question 6; Johnston- Vol. 13, 2976:1-5).  Finally, it is undisputed that MSOP knows that there are Plaintiffs who meet the reduction in custody criteria or no longer meet the commitment criteria but who continue to be confined. (*See e.g.* McCulloch, Vol. 2-255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1; Plf. Ex. 184 at 43; Hébert- Vol. 12, 2708:1-6).

As such, the statute on its face cannot possibly be narrowly tailored for the purposes for which one was committed if there is no method by which to assure that the continued commitment of Class Members meets the statutory and constitutional criteria.

Second, the statute is facially unconstitutional because it fails to provide a judicial bypass to the statutory reduction in custody process.  (*See generally* Minn. Stat. §253D). Minn. Stat. §253D provides for a single process to obtain transfer, provisional release or full discharge.  That process is fatally flawed and unconstitutionally implemented.

The undisputed evidence presented at trial overwhelmingly confirmed that the Special Review Board ("SRB") and Supreme Court Appeal Panel ("SCAP") process takes far too long, is burdened with difficult, biased and cumbersome procedures and denies clients services necessary to navigate the process. (*See e.g.* Barry- Vol. 23:5141:10-16; Barry- Vol. 23, 5142:8-12; Plf. Ex. 225 at 73; Fox- Vol. 7, 1590:17-20, 1570:25-1591:1).  The process, from filing the initial petition to receiving a final SCAP decision, often takes in the neighborhood of 400 days. (See Plf. Ex. 252). The reasons for these problems are many. There are not enough SRB members, (*see e.g.* Jesson- Vol. 5,

947:3-7) and therefore, not enough hearings to meet the demand.  There are often not enough MSOP staff to complete the reports needed by the SRB and SCAP, (*See e.g.* Berg- Vol. 7, 1501:10-16; Puffer- Vol. 7, 1549:4-10; Plf. Ex. 100) and the system design builds in delays as the SRB is an unnecessary step.  (*See e.g.* Plf. Ex. 225 at 46; Barry – Vol. 23, 5121:2-8).  Additionally, it is clear from the evidence that the SRB in most cases follows the recommendations of the MSOP (*see e.g.* Plf. Ex. 184 at 88; Johnston- Vol. 2995:18-21; Barry- Vol. 23, 5153:8-18), yet at the SRB stage, Class Members are not entitled to independent medical professional assistance or allowed to raise many types of claims – including Constitutional claims.

Even when MSOP agrees that a Plaintiff meets the criteria for a reduction in custody, it cannot bypass the SRB and SCAP process (*see generally*, Minn. Stat. §253D), although it can expedite part of the SRB process. (*See e.g.* Plf. Ex. 314). Thus, the evidence is clear that there are Plaintiffs who meet the constitutional criteria for discharge and yet they remain civilly committed for many months and even years winding their way through the inefficient and politically charged SRB/SCAP process.  And neither the habeas process nor a Rule 60 motion provide sufficient judicial by-pass to avoid a declaration that the statue is unconstitutional because neither provide the right to counsel or the right to medical professional help to Class Members seeking those alternative avenues.  (*See e.g.* Nicolaison- Vol. 23, 5036:9-16, 5036:20-22). The failure of the statute to provide for an adequate judicial by-pass process by which someone who satisfies the discharge standard can obtain release from commitment in a reasonable time period

demonstrates that the statute on its face is not narrowly tailored for the purpose for which someone was committed.

Third, the statute is unconstitutional on its face because there is no requirement that the State take affirmative action (such as to petition for reduction of custody) to seek the transfer or release of those Class Members that the MSOP knows or reasonably believes no longer satisfy the criteria for continuing confinement. (*See generally* Minn. Stat. §253D).

With perhaps rare exception, the evidence demonstrated that even when the MSOP is aware of Plaintiffs who they believe should be discharged or treated in a less restrictive setting, they do not take affirmative steps or petition for the discharge or reduction in custody of those individuals. (*See e.g.* Hébert - Vol. 12, 2708:7-12).  To be narrowly tailored, or even reasonably related, to the purpose of commitment, the statute must require the MSOP to take affirmative action (such as file a petition on behalf of a patient, particularly given the diminished capacity of many of the Class Members) any time it has reason to believe that the patient meets the criteria for a reduction in custody or no longer meets the commitment criteria.

The failure of Minn. Stat. §253D to require (1) periodic risk assessments; (2) a judicial by-pass process and (3) that MSOP take affirmative action to petition for individuals who it has reason to believe no longer satisfy the criteria for continued commitment.  Accordingly, the statute is unconstitutional on its face because no application of the statute provides these necessary constitutional protections, and the lack of these constitutional protections renders the statute not narrowly tailored or reasonably

related to the purposes of the statute. *See Phelps-Roper*, 697 F.3d at 685 (quoting *United States v. Stevens*, 559 U.S. 460 ((2010)).  The Court should declare the statute unconstitutional on its face under Count I.

### B. Minn. Stat. § 253d Is Unconstitutional As Applied.

Plaintiffs' claims in Counts II, III, V, VI, and VII all allege that Minn. Stat. §253D is unconstitutional as it is applied.  Plaintiffs allege that Defendants apply Minn. Stat. §253D in a manner that results in Plaintiffs being confined to the MSOP beyond such a time as they either meet the statutory reduction in custody criteria or no longer satisfy the constitutional standards for continued commitment.  But the evidence at trial was that the Defendants could have changed the program even under the current statute.  As such, the statute, as applied, is not narrowly tailored to serve a compelling state interest and is "so punitive either in purpose or effect at to negate the State's intention that it be deemed civil." *See Hendricks,* 521 U.S. at 361.

First, as noted above, because Defendants do not do regular risk assessments of each Class member, they admit that they do not know which Class members currently committed to MSOP in fact are in need of further inpatient treatment and supervision for his sexual disorder or whether they continue to pose a danger to the public.  (*See e.g.* Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18).  But, they do know that there are certain individuals are being held beyond such a time as (1) they need further inpatient treatment and supervision for a sexual disorder or (2) that they pose a danger to the public, and therefore, under *Call*, the statutory discharge standard is not being applied in a constitutional manner.  (*See e.g.* Hébert- Vol. 12, 2708:1-6; White-

Vol. 9, 1965:15-25, 1966:6-9, 14; Wilson- Vol. 3, 663:9-11; Miner- Vol. 5, 1078:5-9).

Although the statute does not require regular risk assessments, nothing in the law

prohibits the MSOP from doing risk assessments at any other time. (Hébert - Vol. 10,

2392:3-6; Hébert- Vol. 10, 2393:10-13; Barry- Vol. 23, 5154:1-5).

Second, Defendants also do not do risk assessments upon initial commitment.

This is important because as the testimony has shown there are individual who are being

committed who should not be (1) committed in the first place, (*see e.g.* Plf. Ex. 184 at x;

Benson Depo. 114:8-21; Plf. Ex. 225 at 6; Plf. Ex. 41 at 4; McCulloch- Vol. 1, 122:4-16)

– like the juvenile only individuals; or  (2) could be served in a less restrictive facility.

(*See e.g.* Benson Depo. 101:6-9).

The failure to do these risk assessments either at initial commitment or on a

regular basis all but guarantees that there will be individuals who satisfy the discharge

standard but remain committed at MSOP.  This cannot possibly satisfy the narrowly

tailored test.

Additionally, although Defendants suggested at trial that they have started to do

"rolling risk assessments," these proposed cures are woefully inadequate.  First, they

have not actually hired any risk assessors beyond the vacancies that already existed in the

assessment department in order to implement this plan. (Hébert- Vol. 10, 2397:8-13,

2398:3-7).  Second, the plan to do one or two risk assessments per month outside the

petition process,  (Hébert - Vol. 10, 2399:10-15; Johnston- Vol. 13, 3054:14-18), means

it would take 30 to 60 years to assess all Class Members currently committed to the

MSOP. (Hébert - Vol. 10, 2400:10-15).  This clearly cannot satisfy the constitutional standard

Third, even when someone petitions and a risk assessment is done, the risk assessments present serious flaws – which results in further delay of release.  First, because of the administrative structure and involvement of others outside the risk assessment department, the risk assessments are not independent.  (*See e.g.* Plf. Ex. 184 at 91; Hébert - Vol. 10, 2392:7-9, 16-18; Hébert - Vol. 9, 2127:22-23; Hébert - Vol. 9, 2127:20-23; Hébert - Vol. 9, 2131:10-12; Hébert- Vol. 9, 2129:24-2130:2; Hébert- Vol. 9, 2130:19-25; Hébert- Vol. 9, 2131:23-2132:2).  Second, a serious question is raised about whether MSOP actually conducts the risk assessment using proper risk assessments tools.  (*See e.g.* Herbert- Vol. 24, 5241:16-20; Herbert- Vol. 24, 5242:16-21; Hébert, Vol. 9, 2159:4-7, 14-22; Freeman- Vol. 4, 769:3-5; Caldwell- Vol. 11, 2508:6-15).  There are also serious concerns with respect to the risk assessments of the specialty populations. (Plf. Ex. 225 at 21; Miner- Vol. 6, 1123:5-14; Hébert - Vol. 10, 2387:1-4; Plf. Ex. 225 at 19).  Finally, it appears from the evidence that the risk assessors at MSOP may not have been applying the correct legal standard when opining on whether an individual meets the criteria for transfer, provisional discharge or discharge.  (*See e.g.* Pascucci- Vol. 8, 1647:22-1648:5; 1648:14-24; Jones Depo. 62:5-15; Jones Depo. 31:21-23; Jones Depo. 31:21-24).

Fourth, as discussed more fully above, the evidence shows that even when the MSOP is aware of Plaintiffs, who they reasonably believe should be discharged, they do not petition for the discharge or reduction in custody of those individuals.  (*See e.g.*

Hébert - Vol. 12, 2708:7-12).  There is no policy or practice at the MSOP that requires MSOP to file a petition on a Class Member's behalf if the MSOP reasonably believes that the Class Member no longer satisfies the criteria for commitment. (Johnston-Vol. 13, 2962:9-15).  In fact, it is the policy of the MSOP that they would not petition on behalf of Class Members. (Freeman- Vol. 4, 788:19-25).  The MSOP admits that they have only filed petitions for a reduction in custody for seven individuals in its 20-year history and that resulted from exceptional circumstances (i.e. Eric Terhaar and the Cambridge Six). (*See. e.g.* Plf. Ex. 178 at Question 3; Fox- Vol. 7, 1590:4-7).

Fifth, the treatment program, as implemented by Defendants, delays progression through the treatment phases, and because progression to Phase III is, for all practical purposes, required for MSOP support of any reduction in custody from civil commitment, these delays ultimately deny Class Members' release (liberty).

This aspect of the case was the focus of much of the trial and Defendants spent many days of testimony seeking to establish that the MSOP treatment program followed "best practices" and the choices made resulted from the exercise of "professional judgment."   But relying of that evidence misperceives Plaintiffs' claim here and the law applicable to the claims for which Plaintiffs seek declaratory relief.  Plaintiffs' claim – as it relates to treatment – is not that the treatment program is improperly designed but rather that the flaws in the program cause delays in treatment progression that (because of the need to progress to Phase III to obtain MSOP support) those delays cause Class Members to be denied liberty longer than without those delays.

Ironically, despite the fact that most of this evidence does not actually go to defending against Plaintiffs' claims, Defendants' testimony about what constitutes "best practices" and that the program as implemented follows "best practices," or exercises "professional judgment," demonstrated that the key areas where Plaintiffs contend delays result are areas in which the evidence showed that Defendants failed to follow "best practices" or exercise "professional judgment." (*See e.g.* Hébert - Vol. 10, 2379:8-2380:5; Fox-Vol. 19, 4232:6-19; Puffer- Vol. 20, 4413:13-22 (testifying that "best practices" often included "common practice.")

For example, although it is clear from the evidence that the overwhelming majority of states (civil commitment programs) require regular risk assessments of all civilly committed sex offenders, Minnesota does not even though it could.  (*See e.g.* Plf. Ex. 228 at 48 (2014 SOCCPN survey reporting that 13 of 15 programs reporting perform risk assessments annually and that one program performs forensic risk assessments every ten months); McCulloch- Vol. 1, 57:20-24 (discussing Wisconsin); Freeman-Vol. 4, 705:1-2 (discussing New York).  Similarly, while most other states allow patients to petition for discharge any time (judicial bypass) and/or file a petition for individuals who they reasonably believe should be discharged, (*see e.g.* McCulloch- Vol. 1, 58:16-20, 63:14-19; Freeman- Vol. 4, 764:2-12), Minnesota fails to follow those practices even though it could.  While other states have a process by which formal review of patients who have been in a treatment phase for an extended period, (Freeman- Vol. 4, 805:8-21), as discussed above, Minnesota does not. The "Matrix factors" that form the foundation of the MSOP program are not used by any other program in the same way as Minnesota

(Freeman- Vol. 5, 1026:4-9; Cauley- Vol. 10, 2221:12-14; Hébert - Vol. 12, 2747:21-24), and the BER system – with its procedural flaws and impediment to phase progression stands as an outlier in the civil commitment community. (Freeman- Vol. 4, 803:7-804:5).

Finally, and most importantly, Minnesota has never fully discharged anyone from MSOP since the current program was created, (Plf. Ex. 184 at 4), and only three Class Members have ever been provisionally discharged- one of whom was returned for a violation for his release conditions and died at MSOP. (Berg- Vol. 7, 1502:10-12; Hébert- Vol. 12, 2800:9-11). This is shocking, especially in comparison to other states. (McCulloch- Vol. 1, 54:4-6; McCulloch- Vol. 1, 54:16-19; Freeman- Vol. 4, 773:18-19; Freeman- Vol. 4, 778:8-10; Freeman- Vol. 4, 778:11-13). Despite retaining experts and producing a report on "best practices" (i.e. "common practices"), Defendants did not call their expert witnesses because Defendants apparently knew – on the key issues that directly affect the liberty rights of Class members – they fail to follow best practices. All of the failures of the treatment program lead to further delays in deprivation of Class members' fundamental liberty right.

The evidence demonstrates that prior to 2009 the treatment program was broken, resulting in delays in Class Members' ability to move through the program. (*See e.g.* Benson Depo. 23:6-9; Benson Depo. 55:3-8; Benson Depo. 55:23-25; Hébert- Vol. 17, 3882:3-22). When the new administration came, they had to restructure the program and developed the current version of the treatment program. (*See e.g.* Hébert- Vol. 17, 3882:3-22; See e.g. Hébert- Vol. 17, 3884:23-3885:7). This further delayed Class Members' progression in treatment as it was essentially starting the treatment program

14

over.  (*See e.g.* Benson Depo. 62:12-16; White- Vol. 9, 1967:20-1968:2; Steiner- Vol. 6, 1233:20-22, 1243:10-13; Benson Depo. 63:1-2).

The current treatment program, unfortunately, did not solve the problem.  Many aspects of the current program, as implemented, delay Class Members' progression through the treatment program, which ultimately delays their release, including the following:  (1) insufficient staffing; (2) the Matrix factors, as implemented, delay progression through treatment; (3) the BER system, as implemented, delays progression through treatment; and (4) there is no system in place to ensure that Class Members who are not progressing through the treatment phases in a timely manner are reviewed.

Maintaining clinical staffing has been a consistent failing at the MSOP.  (*See e.g.* Plf. Ex. 25 at 8; Plf. Ex. 184 at 60; Plf. Ex. 43 at 10; Berg- Vol. 20, 4594:20 – 4595:1; Fox-Vol. 19, 4255:23-4256:3).  The testimony at trial, as well as the documents in evidence, makes clear that staff turnover negatively affects treatment progression.  (*See e.g.* McCulloch- Vol. 1, 108:6-13; Hébert- Vol. 12, 2816:6-14; Wilson- Vol. 3, 527:20-528:13; White- Vol. 9, 1968:25-1969:7).

Additionally, the MSOP's application of the Matrix factors has led to delays in treatment progression.  The Matrix factors were developed and implemented by MSOP – something that was not previously used and is not used in the same way by any other program in the country.  (*See e.g.* Hébert - Vol. 12, 2745:22-25; Freeman- Vol. 5, 1026:4-9; Cauley- Vol. 10, 2221:12-14; Hébert - Vol. 12, 2747:21-24). For years, outside evaluators have told MSOP that there was confusion regarding how the Matrix factors were to be used, there were inconsistencies with the application of the Matrix factors, the

Matrix factors are subjectively applied and the standards for phase progression were too high.  (*See e.g.* Plf. Ex. 225 at 38; Plf. Ex. 184 at 75; Plf. Ex. 46 at 5; Plf. Ex. 43 at 2, 7; Plf. Ex. 48 at 4-5).  This is a problem because the Matrix factors form the basis of the MSOP's treatment program and are an essential element in determining progression through the MSOP's treatment phases.  (Plf. Ex. 225 at 31; Def. Ex. 2 at 16-17).  It is clear that if the Matrix factors are incorrectly applied such that treatment was delayed, the individual would be injured by that because the MSOP uses treatment progression to determine whether to support Class Members for reduction in custody. (Miner- Vol. 6, 1210:6-14).

The BER policy, as implemented, is another means by which the current treatment program further delays Class Members' progression through treatment.   Pursuant to MSOP phase progression policy, a Class Member cannot progress to the next phase of treatment if they have a certain number of behavioral expectation reports (BERs). (Def. Ex. 2 at 16-17).  Both major and minor BERs can affect treatment progression. (*See e.g.* Hébert - Vol. 12, 2772:3-5; Def. Ex. 2; Berg- Vol. 7, 1512:16-18).  For major BERs, although Class members are entitled to a hearing, they cannot have legal representation or call witnesses, the hearings are run by the staff and can only be appealed internally.  (*See e.g.* Def. Ex. 48; Bolte- Vol. 8, 1742:11-17).  For minor BERs, which can also be used to hold back a Class member's treatment progress, the Class member is not even entitled to a hearing.  (*See e.g.* Def. Ex. 48; Bolte- Vol. 8, 1742:1-5).

Defendants have no system or policy in place to ensure that Class members who are not progressing through the treatment phases in a timely manner are reviewed through

the MSOP clinical hierarchy or through an outside review. (Plf. Ex. 48 at 6; Hébert - Vol. 12, 2808:16-20; Plf. Ex. 225 at 8; McCulloch- Vol. 1, 106:21-24).  Again, because MSOP will not support anyone for discharge (provisional or full) unless they have completed the treatment program, this failure to ensure that people are moving through the program further delays ultimate release.  (*See e.g.* Def. Ex. 7; Berg- Vol. 7, 1516:17-21; Fox- Vol. 7, 1588:20-23; Johnston- Vol. 13, 2986:19-22).

The right to treatment for the purpose of "rendering future supervision unnecessary" and the detailed requirements of the statute with respect to treatment dimensions creates a "property" right in Class Members that requires constitutional protection.  *See* Minn. Stat. § 253B.03, subd 7 (detailing right to treatment, best adapted to contemporary professional standards, rendering future supervision unnecessary and detailing the specifics of what that treatment must encompass including a written plan of treatment, specific goals and treatment timelines).  This specificity creates a constitutionally protectable property right in Class Members.  *See Board of Regents v. Roth,* 408 U.S. 564, 577 (1972) (explaining that "[p]roperty interests [for purposes of constitutional claims] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); *see also Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011); *see also Szajner v. Rochester Pub. Sch.*, Civil No. 13-2417 DWF/SER, 2015 WL 632147, at *6 (D. Minn. Feb. 13, 2015) (citing *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1089 (8th Cir. 2014)).

Even when "government action depriving a person of life, liberty or property survives substantive due process scrutiny, it must still be implemented in a fair manner....This requirement has traditionally been referred to as 'procedural' due process." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Generally, procedural due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Bus. Commc'ns, Inc. v. U.S. Dept. of Educ.*, 739 F.3d 374, 380 (8th Cir. 2013) (quoting *Mathews*, 424 U.S. at 333); *Mickelson v. Cnty. of Ramsey*, Civil No. 13-CV-2911 (SRN/FLN), 2014 WL 4232284, at *5 (D. Minn. Aug. 26, 2014) (quoting *Booker v. City of Saint Paul*, 762 F.3d 730, 735 (8th Cir. 2014)).

It is clear from the evidence that MSOP, with rare exception, will not support a Class member for provisional or full discharge unless they have gone through the treatment program. (McCulloch- Vol. 1, 174:7-11; Def. Ex. 7; Jesson- Vol. 5, 966:18-25; Berg- Vol. 7, 1516:17-21; Fox- Vol. 7, 1588:20-23; Johnston- Vol. 13, 2986:19-22). And it is clear that the SRB and SCAP, with rare exception, will not grant provisional discharge or discharge without MSOP support. (Barbo- Vol 20, 4564:8-24; Barry- Vol. 23, 5153:8-18). As such, due process is required for any action taken by Defendants that further denies Class members their fundamental liberty rights as well as their property right to treatment, best adapted, "to render further supervision unnecessary."  Defendants' failure to provide sufficient due process, especially with regard to the "BER" process and "phase progression" process, result in the implementation of  Minn. Stat. §253D not meeting constitutional standards.

18

So, despite many of the good changes that have been implemented by MSOP and these Defendants in recent years (resulting in what appears to be better movement through the phases and therefore toward eventual release), there remain some policies and practices in the treatment program, implemented by the Defendants, that delay progression and ultimately discharge from civil commitment. These policies and practices must be viewed under the narrowly tailored standard as they directly affect one's fundamental right to liberty. When viewed under this lens, the statute as applied must be declared unconstitutional for the reasons set forth above.

Sixth, the statute is unconstitutional as applied because of constitutional shortcomings of the reduction in custody process. As noted above with regard to the failure to provide for a judicial by-pass, the SRB and SCAP process can take years. (*See e.g.* Barry- Vol. 23:5141:10-16). Defendants could take steps to alleviate some of these delays but to date have not. The evidence is clear that part of the failure by Minnesota to release many Class members to the community is because of resources at the SRB and SCAP, and the discharge process itself. (Johnston- Vol. 13, 2938:12-2939:1; Benson Depo. 68:2-70:16). Defendants control the SRB in many respects; including determining the number of SRB members, (*see e.g.* Plf. Ex. 178 at Question 11), training of SRB members (*see e.g.* Johnston- Vol. 15, 3241:16-22; Barry- Vol. 23, 5148:2-7); appointment of members to the SRB, (Plf. Ex. 178 at Question 11), and scheduling of hearings (*see e.g.* Plf. Ex. 178 at Question 12). Additionally, the SRB nearly always follows the MSOP's recommendation. (Barry- Vol. 23, 5153:8-18). The evidence is also undisputed that petitions for a provisional discharge must be accompanied by a

19

provisional discharge plan. (Fox- Vol. 7, 1593:17-18, 22-23; Johnston- Vol. 13, 2984:25-2985:2). It has been the MSOP's practice to not help Class members in Phase I or II of treatment with provisional discharge plans- only Class members in Phase III. (Johnston- Vol. 13, 2985:3-9).

The practice and policies implemented by the Defendants with regard to the discharge process further delay Class members' ultimate discharge from the program.  As such, they cannot be found to be narrowly tailored to the purpose of commitment and, Minn. Stat. §253D, as applied, should be declared unconstitutional.

### C.  The Failure To Provide For Less Restrictive Alternative Renders Minn. Stat. § 253D Unconstitutional As Applied.

Count II and Count VI allege that Defendants' failure to provide less restrictive alternative confinement options violate the Fourteenth Amendment, and thus renders Minn. Stat. § 253D unconstitutional as applied.  The evidence that supports these claims also supports the conclusion that the confinement under Minn. Stat. 253D is preventative detention and punitive in nature.

In the context of civil commitment, the law is settled that due process requires that people who are subject to involuntary commitment must be treated in the least restrictive setting.  *See Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (finding that even where a legitimate government purpose exists, that purpose cannot be pursued in a manner that broadly limits fundamental personal liberties when it could be more narrowly achieved); *see also e.g., Healey v. Murphy*, Civil Action Nos. 01-11099-NG, 04-30177-NG, 2011 WL 2693688 at * 5 (D. Mass. July 8, 2011) (declining to grant motion for summary

20

judgment of a claim by a civilly committed sex offender about the right to a less

restrictive alternative, finding that when looking at the conditions of confinement as a

whole, plaintiff had plead an adequate claim that they were unnecessarily punitive);

*Foucha*, 504 U.S. at 79.   In fact, Minnesota's commitment statute explicitly provides that

patients may be placed in a less restrictive setting upon commitment (although it

impermissibly places the burden on the patient to demonstrate) and that they may petition

for transfer to a less restrictive setting. Minn. Stat. §253D.07, subd. 3; Minn. Stat.

§253D.29-30.   As the 706 experts and others observed, "[i]t is a fundamental principle in

mental health treatment that individuals should be treated in the least restrictive

environment to ensure that infringement on individual liberties is kept at a minimum."

(Plf. Ex. 225 at 61-62).   If Class members can be safely managed in the community, then

they need to be managed in the community. (*See e.g.* Freeman- Vol. 4, 736:7-22).

DHS officials as well as MSOP executive and staff all admitted that there are

individuals civilly committed to Moose Lake and St. Peter that could be served in less

restrictive alternatives.  (*See e.g.* Plf. Ex. 313; Johnston- Vol. 13, 3013:25-3014:9;

Hébert- Vol. 12, 2697:1-4).  However, until very recently there were not less restrictive

alternatives (aside from CPS) in which to place individuals.  Even now, there exists only

a very limited number of beds available in the alternative placement options that DHS has

contracted with.  (*See e.g.* Jesson- Vol. 5, 923:2-6, 924:7-15; Johnston- Vol. 13, 3033:23-

3034:4).  Additionally, there is no alternative placement option at the time of initial

commitment.  (*See e.g.* Fox- Vol. 7, 1600:7-10; Benson Depo. 134:14-135:3).  The

failure of Defendants to ensure that Class members confinement is narrowly tailored to

the purpose for which they were committed renders Minn. Stat. §253D unconstitutional as applied.

Based on all of the arguments and evidence set forth above, the Court must declare Minn. Stat. §253D unconstitutional.  When a statute on its face or as applied fails to have the proper checks and balances and does not have the proper constitutional safeguards it becomes punitive.  Defendants do not know which Class members continue to satisfy the commitment standard and which Class members satisfy the discharge standard.  And yet they do nothing to find out.  Defendants do know that there are Class members who could be safely served in the community or in less restrictive facilities.  And yet they do nothing to move them to different facilities.  Defendants know that the policies and practices have delayed Class members' progression through treatment and ultimately delayed their discharge.  They have known about these problems for years and yet, only recently, have they tried to address these issues.

As the Minnesota Supreme Court has found, "[t]o live one's life free of physical restraint by the state is a fundamental right; curtailment of a person's liberty is entitled to substantive due process protection."  *See In re Blodgett*, 510 N.W.2d at 914 (citing *Foucha*, 504 U.S. 71; *Jones*, 463 U.S. at 361).  The Minnesota Supreme Court has held that individuals may be "confined for only as long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the public."  *Call*, 535 N.W.2d at 319.  The statute, on its face and as applied, does not satisfy either of these constitutional underpinnings.

As such, based on all of the evidence at trial, the statute, on its face and as applied, simply cannot be found to be narrowly tailored for the purpose of commitment and must be declared unconstitutional.

## II.   PROPOSED FINDINGS OF FACT

### A. PROCEDURAL HISTORY

1.      Plaintiffs are all currently civilly committed to the Minnesota Sex Offender Program ("MSOP") at Moose Lake, Minnesota pursuant to Minn. Stat. § 253D. Several of the patients in the MSOP filed federal complaints against various state employees associated with the MSOP. (*Karsjens* Doc. No. 203 at 2). The complaints alleged violations of the patients' civil rights pursuant to 28 U.S.C. § 1983 and other statutes. *Id.*

2.      On January 12, 2012, the Court referred these cases to the Minnesota Chapter of the Federal Bar Association's Pro Se Project. On January 20, 2012, Gustafson Gluek PLLC filed Notices of Appearance in *Thompson v. Ludeman, et al.*, 11-CV-01704 (DWF/JJK) ("Thompson") and *Karsjens et al., v. Minnesota Department of Human Services, et al.*, 11-CV-0359 (DWF/JSM) ("*Karsjens*"). (*Karsjens* Doc. No. 138; *Thompson* Doc. No. 41).

3.      On January 25, 2012, Chief Judge Davis issued an Order (*Karsjens* Doc. No. 142) staying all of the *pro se* MSOP cases with the exception of the *Thompson* and *Karsjens* actions pending the resolution of the outstanding Motion for Class Certification filed in the *Karsjens* case (*Karsjens* Doc. No. 24). On February 6, 2012, Chief Judge Davis issued an Amended Order (*Karsjens* Doc. No. 145) applying the stay to additional MSOP cases that were unintentionally omitted from his previous order.

23

4.      On February 8, 2012, the Court issued an Order (*Karsjens* Doc. No. 146) staying the *Thompson* litigation until further notice, and setting a deadline for filing an Amended Complaint in the *Karsjens* action by February 29, 2012.  On February 29, 2012, the Court issued an Order (*Karsjens* Doc. No. 149), pursuant to the stipulation of the parties, amending the deadline for filing an Amended Complaint in this action to March 15, 2012.

5.      On March 15, 2012, Plaintiffs filed the First Amended Complaint against Defendants.  (*Karsjens* Doc. No. 151).

6.      On June 28, 2012, Plaintiffs moved to have an injunctive Class certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure (*Karsjens* Doc. No. 171).

7.      On July 24, 2012, the Court issued an Order certifying the Class defined as "All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat., §253B." (*Karsjens* Doc. No.  203).

8.      On August 15, 2012, the Court ordered the establishment of the Sex Offender Civil Commitment Task Force ("Task Force"). (*Karsjens* Doc. No. 208).

9.      The Sex Offender Civil Commitment Task Force was directed to examine and provide recommended legislative proposals to the Commissioner of Human Services on topics related to the civil commitment process, less restrictive alternative options, and standards and processes for the reduction in custody for individuals who are currently in custody as civilly committed sex offenders.  (*Karsjens* Doc. No. 208 at 2).

10.     On September 21, 2012, Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint (*Karsjens* Doc. No. 243) and a hearing date was set for November 29, 2012.  That motion, along with Plaintiffs' Motion for Payment of Fees and Costs, were withdrawn. (*Karsjens* Doc. No. 276).

11.     In addition to the Task Force, on November 9, 2012, this Court ordered the creation of the MSOP Program Evaluation Team ("PET Team"). (*Karsjens* Doc. No. 275).

12.     The Court directed the focus of the PET Team to address possible program issues associated with the phase progression of civilly committed individuals. (*Karsjens* Doc. No. 275 at 3).

13.     The Court also ordered the establishment of a Committee of MSOP patients, staff, and respective counsel to meet and confer on issues relating to the conditions of confinement at the MSOP. (*Karsjens* Doc. No. 290).

14.     On June 20, 2013, the Court issued an Order setting a deadline of August 8, 2013, for Plaintiffs to file a Second Amended Complaint.  (*Karsjens* Doc. No. 298).

15.     Plaintiffs filed their Second Amended Complaint on August 8, 2013. (*Karsjens* Doc. No. 301).

16.     On November 19, 2014, the Defendants filed a Motion to Dismiss the Second Amended Complaint. (*Karsjens* Doc. No. 374). Plaintiffs filed various motions for declaratory judgment and preliminary injunctions.  (*Karsjens* Doc. Nos. 360, 364, 368).

17.     On February 20, 2014, the Court denied Defendants' motion to dismiss except with respect to Count X and denied Plaintiffs' motions without prejudice. (*Karsjens* Doc. No. 427 (the "Feb. 20, 2014 Order")).

18.     On December 6, 2013, the Court appointed four experts pursuant to Rule 706 of the Federal Rules of Evidence (the "706 Experts").  (*Karsjens* Doc. No. 393 at 1-2). Thereafter, the parties submitted their respective proposals with respect to the work of the Rule 706 Experts. (*Karsjens* Doc. No. 421). On January 22, 2014, the Court met with the Rule 706 Experts, and on February 5, 2014, the Court received the 706 Experts' proposed plan of action. (*Karsjens* Doc. No. 422). The Court further specified the Rule 706 Experts' duties in its February 20, 2014 Order.  (*Karsjens* Doc. No. 427).

19.      On May 18, 2014, the Rule 706 Experts issued a report relating to a specific individual, Eric Terhaar, who is currently committed to MSOP and provided a summary of their findings and a recommendation for full discharge for Terhaar. (*Karsjens* Doc. No. 471-1 ("706 Report re: E.T")).

20.     Shortly thereafter, on June 4, 2014, the Rule 706 Experts issued a report relating to another individual civilly committed at MSOP, Rhonda Bailey.  Again, they provided a summary of their findings and a recommendation that Ms. Bailey be transferred or provisionally discharged from the MSOP to a supervised treatment setting that can meet her individual treatment needs. (*Karsjens* Doc. No. 481-1("706 Report re: R.B.)).

21.     On June 2, 2014, the Court ordered Defendants to show cause why Terhaar's continued confinement is not unconstitutional and why Terhaar should not be

immediately and unconditionally discharged from MSOP, as unanimously recommended by the Rule 706 experts. (*Karsjens* Doc. No. 468).

22.     On June 4, 2014, Plaintiffs filed a Motion for Declaratory Judgment and to Immediately Discharge Terhaar from Civil Commitment. (*Karsjens* Doc. No. 469). Then, upon receipt of the experts' report on Bailey, Plaintiffs filed a Motion to Immediately Transfer Rhonda Bailey to an Appropriate Treatment Facility. (*Karsjens* Doc. No. 478).

23.     On August 11, 2014, the Court denied Plaintiffs' Motion for Declaratory Judgment and to Immediately Discharge Mr. Terhaar from Civil Commitment, in part because to grant specific relief to Mr. Terhaar would not "generate common answers apt to drive the resolution of this litigation," and in part because "it appears that an expedited petition for reduction of custody process is underway." (*Karsjens* Doc. No. 580 at p. 28 (citations omitted)).  The Court also denied Plaintiffs' Motion to Immediately Transfer Ms. Bailey to an Appropriate Treatment Facility, stating that it would "allow the parties an opportunity to find a just resolution that would appropriately meet Bailey's individual residential and treatment needs." (*Karsjens* Doc. No. 580 at p. 33).

24.     On August 25, 2014, the Court directed the Rule 706 Experts to complete their report by November 15, 2014.  (*Karsjens* Doc. No. 587).

25.     On September 9, 2014, after briefing by the Parties, the Court Ordered that the first phase of trial would be conducted as a bench trial.  (*Karsjens* Doc. No. 598).

26.     Defendants filed a mandamus petition with the Eighth Circuit asking that the September 9, 2014, Order be vacated and that the district court be directed to grant Defendants' request for a jury trial. (*Karsjens v. Jesson*, 14-3155 (8th Cir. Oct. 1, 2014)).

27.     Plaintiffs opposed Defendants' mandamus petition. (*Karsjens v. Jesson*, 14-3155 (8th Cir. Oct. 15, 2014).

28.     The Eighth Circuit denied Defendants' petition. *Karsjens v. Jesson*, 14-3155 (8th Cir. Nov. 6, 2014).

29.     On September 10, 2014, the Court issued an Amended Scheduling Order requiring non-expert discovery to be completed by November 14, 2014, the Parties Expert discovery was to be completed by December 23, 2014, and setting a trial ready date of February 9, 2014.  (*Karsjens* Doc. No. 600).

30.     Over the course of the next few months the Parties undertook discovery through many depositions and the exchange of written discovery as well as the exchange of expert reports.

31.     Plaintiffs made a motion to amend the pleadings, and on October 28, 2014, after briefing and a hearing, the Court granted Plaintiffs' Motion to Amend. (*Karsjens* Doc. No. 637).

32.     Plaintiffs filed their Third Amended Complaint on October 28, 2014. (*Karsjens* Doc. No. 635 ("TAC")).

33.     On November 12, 2014, Defendants filed a Partial Motion to Dismiss Plaintiff' Third Amended Complaint.  (*Karsjens* Doc. No. 653).

34.     On November 17, 2014, the 706 Experts filed their final Expert Report and Recommendations. (*Karsjens* Doc. No. 658).

35.     On November 20, 2014, the Court issued a clarifying Order that the hearing on the Motion to Dismiss would take place on January 14, 2015 with any other dispositive motions.  (*Karsjens* Doc. No. 660).

36.     On December 16, 2014, Plaintiffs filed their Opposition to Defendants' Partial Motion to Dismiss.  (*Karsjens* Doc. No. 707).

37.     On December 23, 2014, Defendants filed a Motion for Summary Judgment. (*Karsjens* Doc. No. 719).

38.     On January, 6, 2015, Plaintiffs filed their Opposition to Defendants' Summary Judgment Motion.  (*Karsjens* Doc. No. 741).

39.     Defendants filed their Reply to Plaintiffs' Opposition to Defendants' Summary Judgment Motion on January 9, 2015 (*Karsjens* Doc. No. 760).

40.     On January 14, 2015, the Court held a hearing on the Motion to Dismiss and the Motion for Summary Judgment.

41.     On January 28, 2015, Defendants filed motions *in limine* to exclude Plaintiffs' experts Dr. Cauley, Dr. Caldwell, and Dr. VanRybroek. (*Karsjens* Doc. Nos. 777, 779, 781). Defendants also filed motions *in limine* to exclude previously undisclosed witnesses, to exclude evidence unrelated to official capacity, claims, to exclude evidence related to the Sex Offender Civil Commitment Advisory Task Force, and to exclude evidence of non-classwide issues. (*Karsjens* Doc. Nos. 783, 785, 787, 789).

42.     On January 28, 2015, Plaintiffs filed a motion in limine to exclude evidence relating to Plaintiffs' past sexual offenses. (*Karsjens* Doc. No. 798).

43.     On February 2, 2015, the Court issued an Order denying Defendants' Motion to Dismiss the Third Amended Complaint and denying Defendants' Motion for Summary Judgment. (*Karsjens*, Doc. No. 828).

44.     On February 3, 2015, the Court held a pretrial conference in this matter and heard argument regarding Plaintiffs' and Defendants' motions *in limine*. (*Karsjens* Doc. No. 831).

45.     On February 5, 2015, the Court issued an Order denying each of the motions *in limine*. (*Karsjens* Doc. No. 832).

46.     From February 9, 2015, through March 18, 2015, the Court held a bench trial regarding the Phase One issues. (*Karsjens* Doc. Nos.839, 847, 848, 851, 852, 860, 861, 862, 865, 866, 869, 870, 871, 872, 883, 884, 885, 887, 888, 892, 893, 902, 906, 907, 908).

47.     On March 2, 2015, Defendants filed a Notice of Appeal to the Eighth Circuit of the Court's February 2, 2015 Order denying Defendants' Motion for Summary Judgment on Counts IV, XI, XII, and XIII on the grounds that Defendants are immune from suit. (*Karsjens* Doc. No. 880).

48.     A briefing schedule for the appeal was set whereby Appellants' brief is due on April 28, 2015, Appellees' brief is due thirty days later, and the Appellants' reply brief is due fourteen days after Appellees' brief is filed. (*Karsjens et al. v. Jesson et al.*, 15-1500 (8th Cir.).

## B. PARTIES

### 1. Plaintiffs

49.     Plaintiff Kevin Scott Karsjens is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Karjsens was committed in 2010. (Def. Ex. 102). The petition to commit Mr. Karsjens was filed on the last day of his incarceration, and he lived at his home between the time his petition was filed and the time he was committed and did not commit any crimes. (Karsjens- Vol. 16, 3602:9-20). Mr. Karsjens is currently in Phase I of the MSOP's treatment program. (Def. Ex. 108). He has never been in any other treatment phase. (Karsjens- Vol. 16, 3603:24-3604:1). Mr. Karsjens has been and continues to be injured by the acts and omissions of Defendants.  (Third Amend. Compl. (TAC) ¶ 20).

50.     Plaintiff David LeRoy Gamble, Jr. is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants.  (TAC ¶21).

51.     Plaintiff Kevin John DeVillion is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶22).

52.     Plaintiff Peter Gerard Lonergan is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Lonergan was committed to the MSOP in 2008. (Def. Ex. 160). Mr.

Lonergan is currently in Phase I of the MSOP's treatment program and he has never been in any other treatment phase. (Lonergan- Vol. 17, 3775:23-25). He has been and continues to be injured by the acts and omissions of Defendants.  (TAC ¶23).

53.     Plaintiff James Matthew Noyer, Sr., is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶24).

54.     Plaintiff James John Rud is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Rud has been committed to the MSOP since 2010. (Rud- Vol. 17, 3802:24-25). Mr. Rud is currently in Phase II of the MSOP's treatment program. (Rud- Vol. 17, 3823:10-11). He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶25).

55.     Plaintiff James Allen Barber is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶26).

56.     Plaintiff Craig Allen Bolte is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Bolte has been committed to the MSOP since June of 2006. (Bolte- Vol. 8, 1714:6-7). Mr. Bolte was committed at the age of 19 directly from a juvenile placement. (Bolte- Vol. 8, 1714:8-9, 1715:13-16). Mr. Bolte has no adult convictions for sex

offenses. (Bolte- Vol. 8, 1715:17-19). Mr. Bolte's only sexual charge was a criminal sexual conduct in the second degree as a juvenile. (Bolte- Vol. 8, 1715:20-25). Mr. Bolte has been placed in institutional settings for much of his life. (Bolte- Vol. 8, 1720:19-21). Mr. Bolte is currently in Phase II of the MSOP's treatment program. (Bolte- Vol. 8, 1770:15-16). Prior to that, he was in Phase I from until 2012. (Bolte- Vol. 8, 1770:18-19). He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶27).

57.     Plaintiff Dennis Richard Steiner is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Steiner has been committed to the MSOP for 23 years. (Steiner- Vol. 6, 1221:11-13). Mr. Steiner stipulated to his commitment to the MSOP. (Plf. Exs. 222, 223). At the time of his commitment he was told he would be committed for three to four years. (Steiner- Vol. 6, 1223:7-11, 1224:1-8; Plf. Ex. 348). Mr. Steiner is currently in Phase II of the MSOP's treatment program. (Steiner- Vol. 6, 1264:17-18). He has been and continues to be injured by the acts and omissions of Defendants.  (TAC ¶28).

58.     Plaintiff Kaine Joseph Braun is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶29).

59.     Plaintiff Christopher John Thuringer is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Thuringer is in Phase I of the MSOP's treatment program and has

been in that phase throughout his commitment. (Thuringer- Vol. 8, 1871:8-14). He has been and continues to be injured by the acts and omissions of Defendants.  (TAC ¶30).

60.    Plaintiff Bradley Wayne Foster is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. Mr. Foster is 44 years old. (Foster- Vol. 12, 2833:12-13). Mr. Foster's last charged sexual offense was in 1993 when he was 22 years old. (Foster- Vol. 12, 2833:24-2834:3). Mr. Foster was committed to the MSOP in 2006. (Foster- Vol. 12, 2834:4-5). Mr. Foster was committed when he was about to complete his conditional release. (Foster- Vol. 12, 2842:20-2843:1). Mr. Foster had two violations of his parole, neither of which involved sexual contact. (Foster- Vol. 12, 2837:6-10). Mr. Foster was referred for civil commitment in 2004 after serving prison time for one of his conditional release revocations, but the county decided not to pursue commitment. (Foster- Vol. 12, 2842:12-16). Mr. Foster is currently in Phase II of the MSOP's treatment program. (Foster- Vol. 12, 2848:15-16). He has been and continues to be injured by the acts and omissions of Defendants.  (TAC ¶32).

61.    Plaintiff Brian K. Hausfeld is civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services for an indefinite period of time. He has been and continues to be injured by the acts and omissions of Defendants. (TAC ¶33).

62.    The 14 named Plaintiffs adequately represent the interests of a Fed. R. Civ. P. 23(b)(2) Class that this Court certified on July 24, 2012.  (*Karsjens* Doc. No.  203).

63.     Each named Plaintiff has been harmed by ineffective treatment at the MSOP because of the difficulty of phase advancement, the lack of regular risk assessments, and the fact that no one knows whether they continue to meet criteria for commitment to the MSOP. (Miner- Vol. 6, 1126:23-1127:5).

64.     The Plaintiff Class at issue in this matter is defined as: All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat. §253B. *Id.*

65.     Currently, there are approximately 714 individuals detained within the MSOP.  (Johnston- Vol. 13, 3209:5).

66.     This number of individuals committed to the MSOP represents a dramatic growth of individuals civilly committed to the MSOP.  "The total number of civilly committed sex offenders has grown from less than 30 in 1990 to 149 in 2000 and 575 in 2010." (Plf. Ex. 184 at 3).

67.     Further, the projections for ongoing growth in the MSOP's committed population show that this trend of increased commitments will only continue.  In fact, Defendants projected in the November 2011 Forecast for MSOP's Facility Census that MSOP's population would be 1010 by 2018, and that MSOP's February 2013 Facility Population Projection Forecast projected that MSOP's population would be 995 as of June 30, 2018. (Plf. Ex. 123, Admis. 4).

## 2.  Defendants

68.     Defendant Lucinda Jesson is the Commissioner of the Minnesota Department of Human Services ("DHS"). She has been the Commissioner since January

of 2011. (Jesson- Vol. 5, 912:507). She and the DHS are ultimately responsible for operating the MSOP. (Jesson- Vol. 5, 912:18-20). Defendant Jesson, in her official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class Members. (TAC ¶34).

69.     Defendant Dennis Benson was the Executive Director of MSOP from 2008 to 2012. (Benson Depo. 12:25-13:2). As Executive Director, Mr. Benson was responsible for developing a program that was defendable and not a prison environment. (Benson Depo. 25:22-26:2). Defendant Benson, in his official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class Members.  (TAC ¶35).

70.     Defendant Kevin Moser is the Director of MSOP. Defendant Moser, in his official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class Members.  (TAC ¶36).

71.     Defendant Tom Lundquist is the Clinical Director of MSOP. Defendant Lundquist, in his official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class Members.  (TAC ¶37).

72.     Defendant Ann Zimmerman is the Security Director of MSOP. Defendant Zimmerman, in her official capacity, implemented, retained and carried out policies

through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and the Class Members.  (TAC ¶38).

73.     Defendant Nancy Johnston is the current Executive Director of MSOP. Defendant Johnston, in her official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class Members.  (TAC ¶39). Ms. Johnston has been the Executive Director of the MSOP since June 2012. (Johnston- Vol. 13, 2933:1-3). As Executive Director, Ms. Johnston is responsible for the oversight and delivery of all the programming at the MSOP and the entire MSOP operation (Johnston- Vol. 13, 2933:22-2934:3). Ms. Johnston has the authority to change how the MSOP operates. (Johnston-Vol. 13, 2934:7-9).

74.     Defendant Jannine Hébert is the Executive Clinical Director of MSOP. Defendant Hébert, in her official capacity, implemented, retained and carried out policies through the MSOP that violated the constitutional, statutory, and common law rights of Plaintiffs and Class Members.  (TAC ¶40). Ms. Hébert  has been the Executive Clinical Director at the MSOP since July of 2008. (Hébert - Vol. 9, 2121:20-24). Prior to coming to the MSOP Ms. Hébert was the associate director of behavioral health at the Minnesota DOC. (Hébert - Vol. 9, 2122:

**C. 706 EXPERTS**

75.     The Court appointed four experts- Dr. Naomi Freeman, Ms. Deb McCulloch, Dr. Robin Wilson, and Dr. Michael Miner- pursuant to Rule 706 on

December 6, 2015. (*Karsjens*, Doc. No. 393). The parties jointly nominated these four experts. (*Id.* at 1).

76.     Dr. Freeman is currently the Deputy Director for the Division of Forensic Services for the New York State Office of Mental Health. (Plf. Ex. 213; Freeman- Vol. 4, 700:12-14). She has held this role since June of 2012. (Plf. Ex. 213; Freeman- Vol. 4, 700:15-16). As Deputy Director, Dr. Freeman is in charge of all mental health services for individuals who are justice involved in New York, including those who are civilly committed as sex offenders under New York State's Civil Management law. (Freeman- Vol. 4, 700:19-701:6). This involves conducting all risk assessments of civilly committed offenders and operating the strict and intensive supervision and treatment ("SIST") program. (Freeman- Vol. 4, 701:4-18). Dr. Freeman also makes reduction in custody recommendations based on the annual reviews committed individuals receive pursuant to statute. (Freeman- Vol. 4, 705:8-15)

77.     Prior to this position, Dr. Freeman was the bureau director for the sex offender assessment and treatment unit for the Division of Forensic Services. (Plf. Ex. 213; Freeman- Vol. 4, 702:13-16). This position involved managing both risk assessments and treatment, including the strict and intensive supervision and treatment program. (Freeman- Vol. 4, 702:16-20, 703:7-24).

78.     In 2007, Dr. Freeman was hired by the New York State Office of Mental Health and she put together the risk assessment unit to evaluate all sex offenders and determine who was appropriate for civil management. (Freeman- Vol. 4, 704:5-11).

79.     Dr. Freeman has also worked for the New York State Division of Criminal Justice Services in the research unit as well as in the sex offender management office. (Plf. Ex. 213; Freeman- Vol. 4, 709:10-12).

80.     Dr. Freeman has a bachelor's degree in psychology from Earlham College, a master's degree in forensic psychology from Castleton State College, a master's degree in criminal justice from the University at Albany, and a Ph.D. in criminal justice from the University at Albany. (Plf. Ex. 213; Freeman- Vol. 4, 700:6-11).

81.     Dr. Freeman has been an adjunct professor at the University of Albany where she taught a sex offender policy course and a sex offender management course. (Freeman- Vol. 4, 712:1-3; Plf. Ex. 213). She has also taught at Castleton State College. (Plf. Ex. 213).

82.     Dr. Freeman has a number of publications in peer reviewed journals regarding sex offender civil commitment. (Plf. Ex. 213).

83.     Dr. Freeman is a member of ATSA and SOCCPN. (Freeman- Vol. 4, 712:14-19).

84.     Ms. McCulloch is currently the Director of Wisconsin's Sexually Violent Person ("SVP") Program and the Institution Superintendent of the Sand Ridge Secure Treatment Center since January of 2010. (Trial Transcript, McCulloch- Vol. 1, 45:10-13 (hereinafter "[Witness] Vol. [number]"). In this role, Ms. McCulloch is responsible for overseeing the implementation of Wisconsin's Sexually Violent Person law, including court evaluations and risk assessment, the secure institution, and the statewide supervised

release program, as well as policy and day-to-day operations. (McCulloch- Vol. 1, 45:25-46:15).

85.     Prior to becoming the Director of the Wisconsin civil commitment program, Ms. McCulloch was the deputy director at the Winnebago Mental Health Institution in Oshkosh, Wisconsin. (McCulloch- Vol. 1, 46:25-47:3; Plf. Ex. 173). In that role, Ms. McCulloch operated the programming at that facility, where the population consisted of men and women found not guilty by reason of mental disease and defect and who were thus committed to the Department of Health Services. (McCulloch- Vol. 1, 47:16-22).

86.     Prior to working at the Winnegbago Mental Health Institution, Ms. McCulloch was the community and social services director for the SVP Program at Sand Ridge for approximately eight years. (McCulloch- Vol. 1, 48:2-6; Plf. Ex. 173). In that role, Ms. McCulloch oversaw all client rights implementation and social services offered to patients, including discharge planning. (McCulloch- Vol. 1, 48:7-10). She also co-facilitation in treatment groups. (McCulloch- Vol. 1, 48:11-12). Additionally, she implemented the supervised release program statewide. (McCulloch- Vol. 1, 48:14-16).

87.     Ms. McCulloch has been a licensed clinical professional in Wisconsin since 1992 and has years of clinical and administrative experience in forensic mental health. (Plf. Ex. 173). She has a bachelor's degree from the University of Wisconsin- Madison, in social work and a master's degree in social work with a concentration in mental health and criminal justice from the University of Wisconsin- Madison. (McCulloch- Vol. 1, 44:14-18; Plf. Ex. 173).

88.     Ms. McCulloch also has experience in private practice providing assessments for persons being considered for mental health treatment. (McCulloch- Vol. 1, 48:19-23).

89.     Ms. McCulloch has presented on the topic of Wisconsin's Sexually Violent Persons law and inpatient and outpatient programming throughout Wisconsin, including at the University of Wisconsin-Madison and Marquette School of Law, as well as to visitors from other state civil commitment programs. (McCulloch- Vol. 1, 44:25-45:5; Plf. Ex. 173).

90.     Ms. McCulloch is a member of the Association for the Treatment of Sexual Abusers ("ATSA"), which is a professional organization with a mission to establish standards for the treatment of sexual offenders and to research the effectiveness of treatment and risk assessment, and SOCCPN, which is a consortium of civil commitment programs. (McCulloch- Vol. 1, 49:22-50:11).

91.     Dr. Wilson is currently in private practice as a psychologist in Florida. (Plf. Ex. 175). This has been his sole activity since 2011. (Wilson- Vol. 2, 243:16-18). He does some assessments, including risk assessments of those being considered for sex offender civil commitment or possible release, and quite a bit of training and technical consultation. (Wilson- Vol. 2, 439:19-24, 440:5-9, 440:22-25). Dr. Wilson also does presentations on anything related to sexual violence or interpersonal violence. (Wilson- Vol. 2, 439:24-440:2). He has also performed with program evaluations and training. (Wilson- Vol. 2, 440:16-21).

41

92.     Dr. Wilson does some supervision of hospital-based programs in Canada because one of his areas of expertise is in people who have intellectual and cognitive issues as well as sexual behavior problems. (Wilson- Vol. 2, 441:8-25).

93.     Prior to 2011, Dr. Wilson was the clinical director of the Florida sex offender civil commitment program for four years. (Wilson- Vol. 2, 443:19-21; Plf. Ex. 175). In that role, Dr. Wilson was responsible for all clinical services offered to patients housed at the Florida Civil Commitment Center, including supervising all clinical and psychiatric staff. (Wilson- Vol. 2, 443:22-444:10).

94.     Dr. Wilson also has knowledge of the New Jersey, Missouri, Wisconsin, and New York sex offender civil commitment programs through involvement in trainings. (Wilson- Vol. 2, 449:3-19).

95.     From 2001 through 2005, Dr. Wilson was the Chief Psychologist for the Ontario region of the Correctional Service of Canada, and worked with that organization in other roles starting in 1997 prior to becoming the Chief Psychologist. (Plf. Ex. 175; Wilson- Vol. 2, 445:24-446:4). While working for the Correctional Services of Canada, Dr. Wilson was responsible for the post-release service delivery for all federally sentenced sexual offenders being released in the Toronto area. (Wilson- Vol. 2, 446:5-10).

96.     Prior to 1997, Dr. Wilson worked at a psychiatric hospital in the Department of Behavioral Sexology where he did risk assessments of sexual offenders. (Wilson- Vol. 2, 446:19-24).

97.     Dr. Wilson is licensed as a psychologist in Ontario, Canada and Florida. (Wilson- Vol. 2, 439:13-15; Plf. Ex. 175). He is a member of ATSA, SOCCPN, the American Psychological Association, the Canadian Psychological Association, the Florida chapter of ATSA, the American Board of Professional Psychology, the American Corrections Association, the American Board of Professional Psychology, the International Community Corrections Association, and the International Association for Forensic and Correctional Psychology. (Wilson- Vol. 2, 447:7-15).

98.     Dr. Wilson has published a number of publications, many of which are in peer-reviewed journals. (Wilson- Vol. 2, 447:21-24). The topics of Dr. Wilson's publications are generally in the area of sexual psychodiagnostics and community based treatment. (Wilson- Vol. 2, 448:3-21; Plf. Ex. 175).

99.     Dr. Wilson is a master trainer on the Static-99 instrument. (Wilson- Vol. 2, 442:13-16). He was involved in the process that led to the creation of the Stable-2007 and Acute-2007 and is a master trainer on those tools as well. (Wilson- Vol. 2, 242:16-18). He has been trained on the use of the PCL-R twice. (Wilson- Vol. 2, 242:18-21). He has also been trained on the VRS-SO. (Wilson- Vol. 2, 242:21-22). Dr. Wilson has had broad training in risk assessments and teaches courses with respect to risk assessment. (Wilson- Vol. 2, 242:22-25).

100.    Dr. Wilson has a bachelor's of science degree from the University of Toronto, a master's degree in education and counseling psychology from the University of Toronto, and a doctor of philosophy and educational psychology from the University of Toronto. (Wilson- Vol. 2, 439:7-11; Plf. Ex. 175).

101.    Dr. Wilson teaches classes at Humber College in Canada, and has taught courses in risk assessment, working with sexual offenders, and working with intellectually disabled offenders. (Wilson- Vol. 2, 444:15-19, 445:8-13).

102.    Dr. Miner is currently a professor of Family Medicine and Community Health at the University of Minnesota. (Miner- Vol. 5, 1034:4-6; Plf. Ex. 174). He is the research director at the Program in Human Sexuality and does his teaching within a postdoctoral fellowship program. (Miner- Vol. 5, 1034:18-22).

103.    Dr. Miner has been employed by the University of Minnesota for 22 years and was promoted to professor in 2009. (Miner- Vol. 5, 1034:7-9). He is also an adjunct professor in the Departments of Educational Psychology and the Department of Psychology. (Miner- Vol. 5, 1034:15-17; Plf. Ex. 174).

104.    Dr. Miner has been involved in clinical responsibilities throughout his time at the University of Minnesota through the Center for Sexual Health, which is the clinical enterprise of the Program for Human Sexuality. (Miner- Vol. 5, 1036:20-24). In the past he has been part time at the Program in Human Sexuality and at the Family Medicine Residency Clinic. (Miner- Vol. 5, 1036:25-1037:4; Plf. Ex. 174).

105.    In his role, he has performed sex offender risk assessments. (Miner- Vol. 5, 1041:1-7).

106.    Over the last 22 years, Dr. Miner's work has involved various aspects of sex offender treatment and the factors that lead individuals to commit sex crimes. (Miner- Vol. 5, 1038:13-16). The majority of Dr. Miner's numerous publications and presentations focus on these topics. (Miner- Vol. 5, 1038:16-19; Plf. Ex. 174).

107.    Dr. Miner has a bachelor's degree from Ohio University in Psychology, a

master's in counseling and psychology from Wyoming Marymount University, and a

Ph.D. in psychology from St. Louis University. (Miner- Vol. 5, 1033:22-25; Plf. Ex.

174).

108.    Dr. Miner has been trained on a number of actuarial tools, including the

Static-99R, the Static-2002-R, the MnSOST-R and the SVR:SO. (Miner- Vol. 5,

1039:12-22).

109.    Dr. Miner is the President-Elect of ATSA. (Miner- Vol. 5, 1037:21-23). He

is also a member of the American Psychological Association, the Minnesota

Psychological Association, and the International Association for the Treatment of Sexual

Offenders. (Miner- Vol. 5, 1038:1-3).

110.    The parties submitted their respective proposals with respect to the work of

the experts to the Court. (*Karsjens* Doc. No. 421). The Court also met with the 706

Experts, who then submitted their proposal with respect to their work to the Court.

(*Karsjens*, Doc. No. 427 at 46).

111.    The Court directed the 706 Experts to address each of the issues identified

in the 706 Experts' proposal as well as the additional issues raised by the parties, along

with each Class Member's current level of dangerousness, whether any Class Member is

eligible for discharge, whether Class Members are placed in the proper treatment phase,

whether Class Members are eligible for a less restrictive facility, and the specific needs

and parameters for less restrictive alternative facilities. (*Karsjens*, Doc. No. 427 at 48).

112.    As a result of their work, the 706 Experts issued three reports- one

recommending the full discharge of Eric Terhaar ("706 Report- ET"), one recommending

the transfer or provisional discharge of Rhonda Bailey("706 Report- RB"), and one

regarding their global review of the MSOP (the "706 Report"). (Plf. Exs. 117, 225, 237).

113.    The 706 Report reflects the collective findings, observations, and opinions

of all four of the 706 experts. (McCulloch- Vol. 1, 64:13-16).

114.    The 706 Report lists the duties of the 706 Experts based on the Court's

February 19, 2014, Order. (Plf. Ex. 225 at 2-3). It states, "On February 19, 2014 the

Court ordered the following:

      i.    The experts' work shall include, but shall not be limited to:
           i.    Evaluating all Class Members and issuing reports and
              recommendations as to: (a) each Class Members' current
              level of dangerousness (current risk assessment), including
              whether each Class Member poses a "real, continuing, and
              serious danger to society";
                  a.    whether each Class Member is actually eligible for
                      discharge under the applicable statutory provisions or
                      otherwise no longer meets the statutory criteria for
                      initial commitment (or should otherwise be
                      recommended for provisional or full discharge);
                  b.    whether each Class Member would be a candidate for
                      a less restrictive facility; and
                    c.    the specific need and parameter for less restrictive
                      alternative facilities, including the operation of such
                      facilities;
          ii.    Reviewing the current treatment program at MSOP and its
              implementation to determine whether the program meets
              professional standards of care and treatment for sexual
              offenders and issuing recommendations as to any changes
              that should be made to the treatment program; and
         iii.    Reviewing current MSOP policies and practices with regard
              to the conditions of confinement to determine whether they
              satisfy the balance between safety concerns and a therapeutic
              environment and making recommendations for any changes

that should be made to the conditions of confinement at both the Moose Lake and St. Peter facility.

iv. The experts shall report to the Court on the following:

a. the current professional standards for the treatment of civilly committed sex offenders and the extent to which MSOP's program design reflects those standards;

b. how other civil commitment programs have reintegrated civilly committed sexual offenders into the community, with particular attention to community relations; and

c. how other states, if any, are providing treatment and management of 'lowerfunctioning' civilly committed sexual offenders in community settings."

(Plf. Ex. 225 at 2-3)."

115. In the summer of 2014, the 706 Experts advised the Court that evaluating all of the Class Members and issuing reports regarding their current level of dangerous was not something that could be done because the 706 Experts did not have the resources to evaluate every Class Member. (McCulloch- Vol. 1, 65:22-66:16).

116. The 706 Experts then proposed to the Court that they would review a subsection of client files to draw their conclusions, which the Court approved. (McCulloch- Vol. 1, 66:17-22).

117. To complete their duties to the Court, the 706 Experts reviewed a number of documents, including the Minnesota Civil Confinement laws and statutes, other outside reviews of the MSOP, MSOP's Clinician's Guide, Matrix Scoring Manual and Theory Manual, MSOP policies and procedures, and MSOP templates for clinical reports. (Plf. Ex. 225 at 3-4; McCulloch- Vol. 1, 67:8-23).

118.   The 706 Experts also reviewed numerous Class Member treatment records. (Plf. Ex. 225 at 4). They had access to all the electronic records at the MSOP and reviewed many electronic records, including patient files. (McCulloch- Vol. 1- 67:24-68:5).

119.   The MSOP provided the 706 Experts with lists of the patients at Moose Lake and St. Peter. (Plf. Exs. 156, 158). They were also provided with lists of all Class Members in a special housing unit and with juvenile-only offenses. (Freeman- Vol. 4, 717:8-13). Fewer than ten of the Class Members reviewed were referred by the Ombudsman. (Freeman- Vol. 4, 718:14-18). Additionally, fewer than ten of the Class Members reviewed were referred by MSOP staff of other MSOP patients. (Freeman- Vol. 4, 718:19-23).

120.   The 706 Experts reviewed a total of 198 Class Member treatment files. (Miner- Vol. 5, 1048:16).

121.   The 706 Experts began their review of specific patient files by reviewing records of those on the Assisted Living Unit, those with severe mental illness, those in the Alternative Program, and those with juvenile-only offenses. (McCulloch- Vol. 1, 109:19-23). They looked at the majority of those records as thoroughly as possible. (McCulloch- Vol. 1, 109:23-110:1).

122.   Dr. Freeman then randomly assigned names of patients to review based on the lists provided by MSOP. (Freeman- Vol. 4, 716:10-717:2).

123.   If the 706 Experts believed someone was inappropriately placed or did not meet criteria for commitment, the treatment file was passed on to another of the 706

Experts for review. (McCulloch- Vol. 1, 110:2-8). If the reviewer did not find any issues with the treatment file, it would be set aside. (Wilson- Vol. 3, 560:11-16).

124.    The file reviews done by the 706 Experts took between 30 minutes and four hours, although some may have taken longer. (Wilson- Vol. 3, 560:17-21).

125.    The 706 Experts also reviewed the treatment files of 51 Class Members in the conventional treatment program. (Miner- Vol. 5, 1049:18). Of those, 32 were Class Members who were held in a conventional unit and were not juvenile-only offenders. (Miner- Vol. 5, 1049:19-21). Approximately 17% of the treatment files reviewed by the 706 Experts were for patients in the conventional program, excluding those who were juvenile-only offenders.. (McCulloch- Vol. 2, 270:23-271:7).

126.    The 706 Experts did not conduct any forensic risk assessments. (Wilson- Vol. 3, 561:16-21).

127.    The 706 Experts kept records of the names of the Class Members whose files they reviewed. (Plf. Exs. 156, 158).

128.    The 706 Experts did not specifically review the treatment files of the fourteen named Plaintiffs because they viewed the Class as all patients at the MSOP. (McCulloch- Vol. 2, 350:6-8).

129.    Based on their review of treatment files, the 706 Experts could have identified specific Class Members that may be eligible for a reduction in custody, but chose not to because they did not want to single out Class Members when there are likely other Class Members in similar situations whose files they were not able to review. (McCulloch- Vol. 1, 201:9-24). Additionally, the 706 Experts believe it is the MSOP's

responsibility to identify those people, and to do so regularly, because if the 706 Experts identified some but not all, it would be a disservice to those they were not able to identify. (McCulloch- Vol. 1, 201:25-202:8). Finally, the 706 Experts were uncomfortable opining that any individual receive a reduction in custody without doing a full forensic risk assessment. (Wilson- Vol. 3, 562:4-8).

130.    Through their treatment file review, the 706 Experts were attempting to understand the totality of the circumstances at MSOP by looking at examples. (Miner- Vol. 5, 1056:19-20).

131.    The 706 Experts met with and interviewed many Class Members during their visits to the MSOP facilities, many of whom were in the conventional program. (McCulloch- Vol. 2, 273:22-274:4). The 706 Experts did not write the names of each Class Member they met in a group setting. (McCulloch- Vol. 2, 274:18-23).

132.    Additionally, the 706 Experts visited both the Moose Lake and St. Peter facilities for multiple days and met with MSOP administration and MSOP staff. (Plf. Ex. 225 at 4; McCulloch- Vol. 1, 68:11-13, 18-24; McCulloch- Vol. 1, 68:25-69:5). The 706 Experts felt that some staff had been prepared to speak with them and their opinions may have been colored by that. (Miner- Vol. 5, 1055:1-5).

133.    The 706 Experts also interviewed Ombudsman staff. (Plf. Ex. 225 at 4; McCulloch- Vol. 1, 68:9-10).

134.    The 706 Experts did not sit in on any treatment groups or observe any individual treatment sessions because it would have been completely artificial and caused people to behave differently in those setting. (Wilson- Vol. 3, 571:11-18, 671:10-17;

Freeman- Vol. 5, 1024:13-19). The same would be true if the sessions were videotaped. (Wilson- Vol. 3, 673:5-11; Freeman- Vol. 5, 1022:21-25).

135.    The 706 Experts were provided with anything they asked to see. (McCulloch- Vol. 1, 138:14-15).

136.    Additionally, collectively, the 706 Experts have direct knowledge of the Wisconsin, Florida, and New York civil commitment programs, and general knowledge of the federal civil commitment program as well as the programs in Iowa, Illinois, Missouri, Texas, Kansas, and New Jersey. (Plf. Ex. 225 at 4-5; McCulloch- Vol. 1- 69:6-15). The general knowledge of other programs comes from being part of SOCCPN and attending presentations, as well as ongoing consultations and meetings with colleagues and reviewing other state's public documents regarding their programs. (McCulloch- Vol. 1, 69:16-24).

137.    The 706 Report is the product of the work the 706 Experts did with respect to evaluating the MSOP. (McCulloch- Vol. 1, 64:17-21). They had sufficient information to offer the conclusions in the 706 Report. (McCulloch- Vol. 1, 70:21-25).

138.    The 706 Experts view their recommendations as all very important because of the cumulative effect of the issues they identified at the MSOP. (Freeman- Vol. 4, 728:10-20).

## D. PLAINTIFFS' EXPERTS

139.    Plaintiffs' expert Dr. Cauley has been in private practice since 2003 where he regularly provides testimony to the court on actuarial risk assessment, community placement and community risk, community supervision and community management of

sexually violent predators and high risk sexual offenders. (Plf. Ex. 315).  Much of this

risk assessment work is related to the Florida Civil Commitment Center doing initial

commitment trials or annual reviews for release. (Cauley- Vol. 10, 2173:10-13).

140.    Dr. Cauley is licensed in Florida as a mental health counselor. (Cauley-

Vol. 10, 2184:1).

141.    Dr. Cauley holds a B.A. in psychology from the University of Michigan, an

M.A. in Mental Health Counseling from Oakland University, an M.B.A. from Florida

Gulf Coast University, and a Ph.D. from Wayne State University where he wrote his

dissertation on facilitating moral development in convicted sexual offenders. (Plf. Ex.

315).

142.    Dr. Cauley performs approximately 100 risk assessments each year.

(Cauley- Vol. 10, 2176:4-7).

143.    Dr. Cauley regularly performs Sexually Violent predator evaluation and

risk assessments through a contract with the Justice Administration Commission in the

State of Florida. (Plf. Ex. 315).

144.    Dr. Cauley contracted with the Children's Network of Southwest Florida to

conduct risk assessments and evaluations of alleged sexual offenders ages nine through

adult in five Counties in Florida from 2011-2014. (Plf. Ex. 315).

145.    From 2006-2014, Dr. Cauley also contracted with the Department of

Children and Families to provide forensic evaluations and expert witness services for

both adult and juvenile sex offenders. (Plf. Ex. 315).

146.    Before entering private practice in 2003, Dr. Cauley worked at the Florida Civil Commitment Center for Sexually Violent Predators ("Florida Commitment Center"). (Plf. Ex. 315).

147.    While employed at the Florida Commitment Center, Dr. Cauley worked as a testing assessment coordinator, a clinical therapist, and as a Clinical Team Leader. (Plf. Ex. 315).

148.    As a testing assessment coordinator, he performed a full battery of testing, including risk assessments, and worked on newly committed individuals' first treatment plans. (Cauley- Vol. 10, 2177:17-21).

149.    As a Clinical Team Leader, Dr. Cauley supervised two masters-level and two-bachelor-level clinical team members and oversaw 50 residents in a maximum security forensic facility housing approximately 400 residents. (Plf. Ex. 315).

150.    Prior to working at the Florida Commitment Center, Dr. Cauley worked as the owner and clinical director of New Beginning Counseling from 1997-2001. (Plf. Ex. 315). In that role, Dr. Cauley developed an outpatient sexual offender program and provided sex offender counseling in individual and group settings. (Plf. Ex. 315).

151.    From 1988-1997, Dr. Cauley also worked at other facilities as a clinical supervisor providing sex offender treatment. (Plf. Ex. 315).

152.    Dr. Cauley attends the ATSA conferences each year and has been trained on the Stable 2007, Static 99, VRS:SO, and the PCL-R. (Cauley- Vol. 10, 2184:11-21).

153.    Dr. Cauley has published a number of articles regarding risk assessment topics. (Plf. Ex. 315).

154.    Plaintiffs' expert Dr. Caldwell is a licensed psychologist who, since 1989, has operated a private independent practice specializing in sexual risk assessments for court evaluation, competence to stand trial, criminal responsibility, and sentencing issues. (Plf. Ex. 346; Caldwell- Vol. 11, 2470:23-2471:4).

155.    Dr. Caldwell has conducted risk assessments on civilly committed sex offenders at Wisconsin's Sand Ridge program. (Caldwell- Vol. 11, 2471:17-22). Throughout his career, Dr. Caldwell has done risk assessments on approximately 50-75 civilly committed individuals. (Caldwell- Vol. 11, 2471:23-2472:6).

156.    Dr. Caldwell is also a Staff Psychologist at Mendota Mental Health Institute and a co-founder of the Mendota Juvenile Treatment Center in Wisconsin where he is responsible for risk assessments and evaluations related to petitions under the Wisconsin Sexually Violent Persons Law. (Plf. Ex. 346).

157.    Dr. Caldwell has a bachelor's degree in life sciences from Kansas State University, a master's degree in counseling psychology from Kansas State University, and a Ph.D. from the University of Denver. (Caldwell- Vol. 11, 2478:22-2479:5).

158.    Dr. Caldwell also conducts various research regarding juvenile violence and juvenile sex offenders. (Caldwell- Vol. 11, 2472:10-24).

159.    Dr. Caldwell is an adjunct professor at the University of Wisconsin-Madison, where he teaches the psychology of juvenile delinquency. (Caldwell- Vol. 11, 2475:18-24).

160.    Dr. Caldwell began receiving training on risk assessment tools and sex offenders in 1979 and has been trained on the MnSOST-R, the Static-99, the J-SOAP, the

ERASOR, and has presented many times regarding risk assessments. (Caldwell- Vol. 11, 2477:17-2478:13).

161.    In addition, since 2013, Dr. Caldwell has served as the President of the Wisconsin Association for the Treatment of Sexual Abusers. (Plf. Ex. 346). He is also a member of the American Psychological Association's American Psychology-Law Society. (Caldwell- Vol. 11, 2478:14-21).

162.    Dr. Caldwell has authored a number of publications related to juvenile sex offender risk assessment methods. (Plf. Ex. 346).

## E. CIVIL COMMITMENT IN MINNESOTA

163.    Minnesota first enacted a sex offender civil commitment law in 1939. (Plf. Ex. 184 at 23). That law provided for the civil commitment of sex offenders with a "psychopathic personality." (Plf. Ex. 184 at 23).

164.    In 1994, the law was amended during a special session of the legislature to provide for the commitment of people found to be a "sexual psychopathic personality" or a "sexually dangerous person" (Plf. Ex. 184 at 23-24).

165.    The "sexually dangerous person" option was adopted by the legislature to allow for the commitment of persons who did not exhibit an utter lack of power to control their sexual impulses, and also removed the requirement that the sex offender's history of sexual misconduct be habitual. (Plf. Ex. 184 at 24). Additionally, it allowed for civil commitment even if the offender's actions resulted in emotional harm only rather than physical harm. (Plf. Ex. 184 at 24).

166.    The court in *In re Linehan*, 594 N.W.2d 867, 876 (Minn. 1999) (*Linehan IV*), clarified that in order to be committed as a sexually dangerous person, the individual must have engaged in a course of harmful sexual conduct, suffer from a current disorder or dysfunction, and that disorder or dysfunction does not allow the person to adequately control his behavior making him highly likely to commit harmful sexual acts in the future. (Plf. Ex. 184 at 25).

167.    Minnesota's civil commitment statute is currently found at Minn. Stat. § 253D. (Def. Ex. 31). Previously, it was part of Minn. Stat. §253B.

168.    Pursuant to Minn. Stat. § 253D, individuals may be committed to the MSOP as either a sexually dangerous person ("SDP") or sexual psychopathic personality ("SPP"). *Id.*

169.    Pursuant to Minn. Stat. § 253D.02, subd. 16, a SDP is defined as "a person who: (1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a." *Id.* In order to find that a person is an SDP, the state does not have to prove they have an inability to control their impulses. *Id.*

170.    A majority of commitments in Minnesota are under the SDP statute. (Plf. Ex. 184 at 25).

171.    Harmful sexual contact is defined in Minn. Stat. § 253D.02, subd. 8 as "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." *Id.* It includes criminal sexual conduct in the first, second, third, and

fourth degrees, other crimes where sexual impulses were part of the crime, or where the person's conduct had criminal sexual conduct as a goal. *Id.*

172.    Pursuant to Minn. Stat. § 253D.02, 15, a SPP is defined as, "any person of such conditions or emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons." *Id.*

173.    The Department of Corrections began reviewing sex offenders for possible civil commitment in 1991. (Plf. Ex. 184 at 27).

174.    The total number of civilly committed sex offenders in Minnesota has grown from less than 30 in 1990 to 149 in 2000 and 575 in 2010.  (Plf. Ex. 184 at 3).  The number of civilly committed sex offenders is now at approximately 714.  (Johnston- Vol. 13, 3209:5)

175.    From 2000 to 2010, the civilly committed population grew 286 percent or nearly fourfold.  (Plf. Ex. 184 at 4).

176.    In the twelve years prior to 2003, DOC had referred 333 sex offenders to county attorneys, or about 26 per year.  (Plf. Ex. 184 at 5).  In December 2003, the DOC made 236 additional referrals after an extensive review of incarcerated and paroled offenders. (Plf. Ex. 184 at 27). At that time this was more than 70% of the referrals that were made in the 13 previous years. (Plf. Ex. 184 at 27).

177.   Beginning in 2004, the DOC began to use a more formal criteria and review process for referrals consisting of three stages- (1) a computer program eliminates offenders from consideration based on criminal history and other factors, (2) a file review of the offenders, (3) a more detailed review of offenders, including independent legal counsel that reviews the file to determine if statutory criteria are met. (Plf. Ex. 184 at 27-28).

178.   This new screening process resulted in a substantial increase in the number of referrals. (Plf. Ex. 184 at 28. From 2004 to 2008, the DOC made about 157 referrals per year, which is six times the referral rate from 1991 through 2003. (Plf. Ex. 184 at 28).

179.   From 2004 through 2008, DOC referred 786 offenders or about 157 per year.  (Plf. Ex. 184 at 5).   Pursuant to Minn. Stat. § 253D.07, subd. 1, civil commitment proceedings are initiated by the county attorney who determines whether good cause exists to file a petition after receiving a court's preliminary determination or a referral from the commissioner of corrections. *Id.*

180.   In order to be civilly committed to the MSOP, the person must be found to be a SPP or SDP under Minn. Stat. § 253D. *Id.* Minn. Stat. § 253D.07, subd. 3 provides that patients shall be committed to a secure treatment facility "unless the patient establishes by clear and convincing evidence that a less restrictive treatment program is available that is consistent with the patient's treatment needs and the requirements of public safety." *Id.*

181.   The Minnesota Commitment and Treatment Act provides that a "person receiving services under this chapter has the right to receive proper care and treatment,

58

best adapted, according to contemporary professional standards, to rendering further supervision unnecessary." Minn. Stat. §253B.03, subd. 7.

### F.  MSOP FACILITIES

182.    The MSOP operates two secure facilities.  One is located in Moose Lake, Minnesota the other in St. Peter, Minnesota. (Plf. Ex. 184 at 3).

183.    The MSOP also operates Community Preparation Services, which is on the grounds of the St. Peter campus but outside the razor wire secure perimeter. (Plf. Ex. 184 at 56).

184.    The cost of confining Class Members at the MSOP was approximately $124,465 per year as of July 1, 2014. (Plf. Ex. 132 at RFA No. 8).

### G. OUTSIDE REVIEWS OF THE MSOP

185.    Mr. Bornus is the policy and compliance director at MSOP.  He is responsible for coordinating the policy and procedure system of MSOP.  He also coordinates their interactions with the oversight authorities in licensing.  (Bornus – Vol. 22 4805:8-10).

186.    Mr. Bornus agrees that it provides validation to have an outside entity looking at the program because it has an independent set of eyes looking at how the operation is running.  (Bornus- Vol. 22, 4826:1-7).

187.    The Site Visit auditors have been reviewing the MSOP since 2006. (Haaven Depo. 9:14-19; Plf. Exs. 25, 43, 46, 56, 81, 311; Def. Exs. 21, 22, 23). These reports are advisory and the MSOP does not have to follow any of their recommendations. (Haaven Depo. 139:2-6).

188.    In 2011, the Office of the Legislative Auditor issued a report recommending a number of changes to the commitment statute and the MSOP program itself.  (Plf. Ex. 184).

189.    Many of the recommendations required some legislative action or, to the extent they would require action by the MSOP, would involve legislative funding. (Jesson- Vol. 5, 915:16-916:7).

190.    To date, the Legislature has not specifically adopted any funding to implement the recommendations of the Auditor's Report. (Jesson- Vol. 5, 917:4-9).

191.    This Court appointed the Civil Commitment Advisory Task Force ("Task Force") to review the MSOP program and statute and recommend changes. (*Karsjens* Doc. No. 208 at 2).

192.    The first set of recommendations from the Task Force from November of 2012 recommends that the Legislature take certain steps to provide funding and authorization for less restrictive alternative placements. (Plf. Ex. 35; Jesson- Vol. 5, 920:5-10).

193.    To date, the Legislature has not enacted any of the Task Force's recommendations with regard to less restrictive alternatives. (Jesson- Vol. 5, 921:20-23). The DHS cannot fully implement many of the recommendations without funding from the Legislature. (Jesson- Vol. 5, 922:7-11).

194.    The Task Force issued their final report in December of 2013. (Plf. Ex. 41).

195.    The Task Force recommended that a statewide screening unit to evaluate offenders for civil commitment be established. (Plf. Ex. 41 at 7). The Legislature has not adopted that recommendation. (Jesson- Vol. 5, 926:17-927:1).

196.    The Task Force recommended that a centralized committing court be established. (Plf. Ex. 41 at 10). The Legislature has not adopted that recommendation. (Jesson- Vol. 5, 927:2-8).

197.    The Task Force recommended that the current statute be modified to provide for biennial review of the need for continued commitment. (Plf. Ex. 41 at 16). The current law does not prohibit such assessments, but the DHS would need funding to do them because it would be an expensive process. (Jesson- Vol. 5, 928:1-8, 18-23).

198.    Mr. Bornus also agrees that accreditation has the potential for good but it would be hard to say until the details are worked out.  (Bornus-Vol. 22, 4826:15-23).

199.    Ms. Richardson was also at one point of the view that the MSOP program was broken and "someone's got to care or this program is going to continue to be broken."  (Plf. Ex. 415).

200.    The Ombudsman does not have any authority to impose changes at the MSOP.  The Ombudsman can make recommendations and have discussions with MSOP but cannot impose changes.  (Richardson- Vol 21, 4708:1-5)

201.    Similarly the Hospital Review Board does not have any authority to order changes.  Their role is to hear concerns from clients and to make recommendations to MSOP.  (Richardson- Vol 21, 4708: 6-17).

202.    Ms. Richardson believes the ultimate goal of MSOP is to follow the Court's order and accept the clients who are civilly committed to them to provide treatment to them.  (Richardson- Vol 21, 4710:14-19).

## H. RISK ASSESSMENTS

203.    "There is broad consensus that the current system of civil commitment of sex offenders in Minnesota captures too many people and keeps many of them too long." (Plf. Ex. 41 at 1).

204.    It is critical for the Class Members to have ongoing and regular evaluations to determine if they continue to meet the criteria for civil commitment because they may no longer meet criteria as time goes on. (McCulloch- Vol. 1, 114:17-22). Without such regular risk assessments, it is impossible to determine whether an individual continues to meet commitment criteria. (McCulloch- Vol. 1, 114:22-24).

205.    Even if a particular Class Member is in fact properly placed at the MSOP, there is no way to know that without a current risk assessment. (McCulloch- Vol. 2, 352:3-12).

206.    Similarly, it is not possible to know whether a Class Member meets reduction in custody criteria without doing a forensic risk assessment. (Puffer- Vol. 7, 1526:6-11; Hébert - Vol. 10, 2402:1-5).

207.    "When we take someone's freedom away, we should… be doing it for a really really good reason, and we should know why we've done that. If the conditions that led to our taking that person's freedom away no longer exist, I believe we have an ethical obligation as people who believe in freedom to restore that person's freedom, or

to at least allow them to have more freedom than they currently do if that's what the situation warrants." (Wilson- Vol. 3, 553:9-16).

208.    Currently, the MSOP only performs risk assessments when a Class Member files a petition for a reduction in custody. (Elsen- Vol. 7, 1341:22-25; Puffer- Vol. 7, 1522:11-13, 17; Fox- Vol. 7, 1587:24-1588:6; Hébert - Vol. 10, 2391:24-2392:2; Johnston- Vol. 13, 2977:12-15).

209.    Therefore, if a Class Member has not petitioned for a reduction in custody, they have not received a risk assessment while committed to the MSOP. (Puffer- Vol. 7, 1523:13-17).

210.    If a risk assessment has not been done on a Class Member within the last year, there is no way to know whether they meet reduction in custody criteria. (Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18).

211.    Ms. Hébert admitted that the MSOP does not indicate to courts when Class Members have reached the statutory criteria that would allow them to be treated in another setting. (Plf. Ex. 146).

212.    Ms. Hébert testified that the MSOP would only be aware of a Class Member who meets statutory criteria after a petition has been filed. (Hébert - Vol. 12, 2684:21-2685:2).

213.    Dr. Caldwell testified that the issue with the failure to do initial and periodic risk assessments is at the routine policy level, not at the individual level. (Caldwell- Vol. 11, 2559:4-6).

214.    Nothing in the law prohibits the MSOP from doing risk assessments at any

other time. (Hébert - Vol. 10, 2392:3-6; Barry- Vol. 23, 4154:1-5; Johnston- Vol. 13,

2934:7-16).

### 1.  Initial Risk Assessments

215.    The MSOP does not do forensic risk assessments when Class Members are

first committed to the MSOP. (Peterson- Vol. 7, 1389:19-25; Puffer- Vol. 7, 1521:22-25;

Fox- Vol. 7, 1586:13-17; Johnston- Vol. 13, 2935:6-8).

216.    There is nothing that prevents the MSOP from doing forensic risk

assessments when Class Members are first committed. (Puffer- Vol. 7, 1522:1-3;

Johnston- Vol. 13, 2934:7-16).

217.    The Sex Offender Civil Commitment Advisory Task Force ("Task Force")

found that "[t]he statutory criteria for commitment…must ensure that the civil

commitment process accurately identifies and commits those individuals who present a

significant and demonstrable risk to the public in the absence of commitment, but does

not sweep into the civil commitment process individuals who prevent a lower risk." (Plf.

Ex. 41 at 2). The Task Force then notes that the "elasticity of the existing criteria is

illustrated by the dramatic increase in civil commitments after December 2003 despite no

change in the SDP/SPP criteria." (*Id.*).

218.    The 706 Experts agreed that civil commitment needs to be reserved for

those who are truly the most dangerous and highest risk to reoffend because civil

commitment is not an ordinary intervention- it deprives people of their right to be free on

the basis that they pose a risk to others- and thus must be used in a scientifically

defensible way. (Plf. Ex. 225 at 5; Wilson- Vol. 3, 468:19-469:15).

219.   "Following a November 2003 rape and murder by a sex offender recently

released from prison, DOC began referring all offenders who might meet the legal

standard for commitment.  With that change in policy, the number of annual DOC

referrals after 2003 grew to about six times its previous rate." (Plf. Ex. 184 at x). The

spike in referrals was likely political reaction to the Dru Sjodin incident. (Plf. Ex. 184 at

30; McCulloch- Vol. 2, 408:7-22).

220.   Mr. Benson testified (via recorded deposition that was not recorded

separately at trial by agreement of the parties) that the Dru Sjodin murder had a direct and

dramatic impact on the MSOP. (Benson Depo. 113:21-114:1). At the time, Mr. Benson

was the Deputy Commissioner of the DOC, and recommended that his staff review every

level 3 sex offender on supervised release. (Benson Depo. 114:8-10). As a result, there

were a number of people petitioned and committed. (Benson Depo. 114:10-13). Mr.

Benson testified that some of these people were doing well in the community and ended

up committed anyway. (Benson Depo. 114:14-21).

221.   Based on the history of the program, there were times where more referrals

were made based on political reasons, and therefore, there were likely people committed

that had they been referred at a different time, they would not have been committed.

(McCulloch- Vol. 1, 122:4-16). Currently, the referral rate in Minnesota is about 9%,

although county attorneys have the authority to file a petition even without a referral.

(Freeman- Vol. 4, 772:1-2, 19-23). In contrast, the referral rate in New York is 3-4%. (Freeman- Vol. 4, 771:23-25).

222.    Currently, the DOC refers approximately 1/3 of those reviewed for commitment. (Johnston- Vol. 13, 3216:2-8).

223.    Minnesota has the highest number, per capita, of civilly committed sex offenders in the country or the world. (Plf. Ex. 225 at 74-75; Plf. Ex 41 at 1; Plf. Ex. 184 at ix, 16-18). The rate of commitment is 128.6 per million, whereas the next highest, North Dakota, is 77.8 per million, and by contrast New York's rate is 15 per million. (Freeman- Vol. 4, 819:10-13). This suggests that more people are being committed than necessary. (Wilson- Vol. 3, 469:24-470:5).

224.    The current process for screening individuals for civil commitment results in a disproportionate rate of commitment petition filings in different parts of the state. (Plf. Ex. 41 at 3; Plf. Ex. 184 at ix, 30-31, 34). "There is significant geographic variation in petition and commitment rates across the state that is unexplained by the characteristics of offenders and their crimes . . . The geographic variation in petition and commitment rates is similar to the variation in commitment rates and commitments per capita." (Plf. Ex. 184 at 38).

225.    Ms. Johnston testified that she believes there should be a screening panel on the front end to give more consistency to the commitment process and take out some geographic variation. (Johnston- Vol. 13, 2946:10-22, 2947:3-4). This is a finding the Governor's Commission 2005 also made, as well as the 2013 Task Force. (Plf. Ex. 4 at 26; Plf. Ex. 41 at 7).

226.    Mr. Benson testified that it is likely that the State is committing people who could be treated in a less secure setting. (Benson Depo. 101:6-9).

227.    Furthermore, it is likely that Class Members who only have juvenile offenses should have never been committed. (Plf. Ex. 225 at 6; Plf. Ex. 41 at 4). This is because there are numerous problems with assessing the dangerousness of adults who committed sexual offenses only as juveniles. (Plf. Ex. 225 at 11).

228.    The issue with committing juvenile offenders was noted in the Governor's Commission on Sex Offender Policy in January 2005, which found that increasing attention should be paid to the number of offenders committed to the MSOP from the juvenile system, which at the time was roughly 20% of those committed to the MSOP. (Plf. Ex. 4 at 6). That report recommended that "greater emphasis should be placed on early treatment responses to young, sexually-dangerous offenders" because "civil commitments that could span the lifetime of these patients… is both costly and tragic." (Plf. Ex. 4 at 6).

229.    Many evaluators involved in the commitment process for juvenile-only offenders did not understand the nuances of assessing this special population and often inappropriately used actuarial risk assessment instruments. (Plf. Ex. 225 at 12-13; Miner-Vol. 6, 1093:2-6).

230.    Ms. Hébert testified that she assumes actuarial tests were used in the commitment risk assessments of the juvenile-only offenders. (Hébert- Vol. 12, 2722:6-12). She has not asked anyone she supervises to review the juvenile-only offender files to

see if they were committed using the Static-99 or Static-99R. (Hébert- Vol. 12, 2730:9-12).

231.    For example, Mr. Terhaar, who was committed as a result of sexual offenses he committed as a juvenile and who had been sexually abused himself, was evaluated for commitment using both the Static-99 and the Stable-2007. (Plf. Ex. 353 at 49).

232.    Dr. Powers-Sawyer testified that there are numerous problems with the application of risk assessment tools in Mr. Terhaar's history because at the time of his initial commitment the Static-99, Stable-2007, SVR-20 and PCL-R were used. (Plf. Ex. 105; Powers-Sawyer- Vol. 11, 2596:24-2597:2, 2597:11-2598:1).

233.    The Static-99 was never appropriate for use with Mr. Terhaar because his offenses occurred when he was ten. (Powers-Sawyer- Vol. 11, 2598:6-9).

234.    Dr. Lauren Herbert testified that the Static-99 was incorrectly used with Eric Terhaar at the time it was done.  (Herbert- Vol. 24, 5264:12-14)

235.    Dr. Powers-Sawyer testified that the Stable-2007 was not appropriate for use on Mr. Terhaar at the time of his commitment because the Stable tools are based on dynamic risk factors of adult sex offenders. (Powers-Sawyer- Vol. 11, 2599:3-11).

236.    Dr. Powers-Sawyer testified that both the SVR-20 and PCL-R are inappropriate for use on Mr. Terhaar because they are only appropriate for adult offenders. (Powers-Sawyer- Vol. 11, 2599:19-2600:8).

237.    There are no techniques currently available for conducting an assessment of long-term risk in people with juvenile-only sexual offending behavior. (Plf. Ex. 225 at

12). Additionally, the re-offense rate for juvenile sex offenders is approximately 5%, which is very low risk. (Freeman- Vol. 5, 1021:16-1022:5).

238.    The juvenile-only offenders committed to the MSOP, for example, are likely inappropriately committed but "there is no mechanism in the Minnesota sex offender civil commitment (SOCC) statute that requires regular assessment, [thus] none of these commitments have been 'corrected' through court release processes." (Plf. Ex. 225 at 14). Many of these patients would be eligible for discharge. (Plf. Ex. 225 at 14).

239.    Ms. Persons testified that juvenile-only offenders should not be civilly committed. (Persons Depo. 203:3-21)

240.    Mr. Puffer testified that the current research now suggests that the number of juvenile offenses, sexual or otherwise is a better predictors of sexual or otherwise, is a better predictor of sexual recidivism than the number of sexual only offense.  (Puffer- Vol. 20, 4414:23-4415:3).

241.    Additionally, unlike most states, Minnesota's civil commitment statute does not require that offenses resulted in convictions. (Plf. Ex. 184 at 20). This is a concerning issue because it opens up the chances that lower risk offenders will be committed (Cauley- Vol. 10, 2199:20-24, 2200:17-24).

242.    There are two Class Members who have no criminal convictions. (Plf. Ex. 124 at Interrog. 22; Johnston- Vol. 13, 3028:10-17).

243.    Dr. Caldwell testified that studies have shown that when a second risk assessment is done, you rule out those who never should have been committed. (Caldwell- Vol. 11, 2498:12-16, 2499:5-7, 2501:13-18). Based on the research, it is likely

that not having a new evaluation on admission means that people who are not actually appropriate for admission are getting admitted. (Caldwell- Vol. 11, 2571:9-15).

244.    A study done by Dr. Duwe at the Minnesota Department of Corrections looked at individuals who were eligible for a petition as SDP/SPP but were not petitioned and at individuals who were petitioned but not committed and those who were actually committed, and followed those who were released in the community. (Caldwell- Vol. 11, 2499:8-21). Those released to the community had a recidivism rate of a little over 6%, indicating that the initial risk assessment can be an overestimate. (Caldwell- Vol. 11, 2499:25-2500:4).

245.    Another study by Dr. Duwe used the MN-SOST 3.1, an actuarial test developed on sex offenders coming out of Minnesota's prisons, and looked at the files of 105 individuals who had been committed and assessed their risk. (Caldwell- Vol. 11, 2500:5-16). He found that only 4 individuals scored with a risk level over 50%, indicating that the initial risk assessment may be an overestimate. (Caldwell- Vol. 11, 2500:17-21).

246.    Ms. Hébert testified that there used to be a requirement under the commitment statute for a 60-day report to the committing court after the initial commitment. (Hébert- Vol. 12, 2679:10-13).

247.    These 60-day reports contained information regarding the patient's diagnosis, whether the patient is in need of further care and treatment, where further care and treatment could be best provided, and whether the patient is dangerous to the public. (Plf. Ex. 366).

248. These 60-day reports did not include actuarial tests. (Plf. Ex. 366). The information conveyed to the court in the report is not from a forensic risk assessment. (Johnston- Vol. 13, 3005:1-5).

249. The 60-day report requirement was removed during the 2011 legislative session after the MSOP sought its removal (Johnston- Vol. 13, 2936:24-2937:6, 2937:19-21).

250. Ms. Hébert testified that the 60-day review was unnecessary because if someone is a rapist, they are still a rapist in 60 days and there is no pill to cure that. (Hébert- Vol. 17, 3887:2-5).

251. Despite issues with over commitment and improper commitments, the MSOP does not perform risk assessments on newly committed individuals. (Plf. Ex. 225 at 6).

252. Risk assessments should always be done when an individual is first committed to the MSOP. (Caldwell- Vol. 11, 2484:6-10

253. If the MSOP did routine risk assessments, they would be able to pick up those who do not meet commitment criteria and move them through the system. (Miner- Vol. 6, 1094:3-6).

254. Performing risk assessments on newly committed Class Members would correct some of the situations in which individuals were improperly referred and committed. (Wilson- Vol. 3, 472:6-12).

255. Additionally, initial risk assessments assist in individualizing treatment based on risk and would determine treatment targets. (Cauley- Vol. 10- 2202:11-2203:7)

256.     Thus, the MSOP should assess newly committed patients to ensure that

commitment standards are met and, if they are not, the MSOP should petition for

immediate release of the patient. (Plf. Ex. 225 at 6; McCulloch- Vol. 1, 114:25-115:6;

Caldwell- Vol. 11, 2546:15-2547:1).

257.     Failure to conduct such initial risk assessments affects all Class Members.

(McCulloch- Vol. 1, 173:1-12; Wilson- Vol. 3, 472:13-15).

**2. Periodic Risk Assessments**

258.     The MSOP does not do risk assessments of Class Members on a regular,

periodic basis, such as annually. (Peterson- Vol. 7, 1390:4-5; Puffer- Vol. 7, 1522:4-7;

Johnston- Vol. 13, 2935:3-5).

259.     There is nothing that prevents the MSOP from doing such regular risk

assessments. (McCulloch- Vol. 1, 121:15-19; Plf. Ex. 225 at 78; Puffer- Vol. 7, 1522:8-

10).

260.     As Executive Clinical Director, Ms. Hébert could order the risk assessment

unit to do annual forensic risk assessments of all Class Members. (Hébert- Vol. 10,

2393:10-13).

261.     Deputy Commissioner Barry testified that it is within DHS's authority to

require MSOP to do more frequent risk assessments.  (Barry- Vol. 23, 5154:1-5).

262.     Ms. Hébert believes that all juvenile-only offenders who have not had a risk

assessment within the last year should be reassessed to determine whether they meet the

statutory commitment criteria. (Hébert- Vol. 12, 2727:9-15). The MSOP has not done this

because they do not have the resources. (Hébert- Vol. 12, 2728:13-16, 2729:8-11).

263.    Mr. Puffer, the Clinical Director at Moose Lake, could ask for a risk assessment to be done on a Class Member, but has never done so. (Puffer- Vol. 7, 1528:9-14).

264.    Mr. Thuringer has requested a risk assessment from his primary clinician, but one was never provided. (Thuringer- Vol. 9, 1946:11-24).

265.    The Auditor's Report states that "[a]nother way in which Minnesota differs from most states is in its lack of a required periodic report to the courts regarding each sex offender's continuing need to be committed. Most states require an annual report to be sent to the courts on each committed person as to whether the person continues to meet the commitment standard. Some states require mandatory court hearings, while others may only have a hearing if necessary. In some states, the state is required to reprove the commitment case in court periodically. Minnesota and Massachusetts appear to be the only two states where an annual report to the courts is not required." (Plf. Ex. 184 at 20).

266.    For example, Wisconsin's SVP Law, Chapter 980, requires annual risk assessments. (McCulloch- Vol. 1, 57:20-24). New York's civil commitment statute requires annual assessments as well. (Freeman-Vol. 4, 705:1-2).  In Texas, the statute provides for biennial reviews and a hearing whereby the court determines whether the individual no longer meets the criteria for commitment. (Freeman- Vol. 4, 786:19-787:2).

267.    The Rule 706 Experts shared this concern over the risk assessment timing. "In comparison to most other SOCC programs, in which periodic reviews of civil commitment status are conducted on a set periodic basis (e.g. annually), it is unusual and

of great concern to the Panel that assessments of this sort are only completed at MSOP when a client is actually petitioning for release or movement to CPS."  (Plf. Ex. 225 at 33).

268.    Nearly all of the other civil commitment programs that report to SOCCPN do annual risk assessments. (Plf. Ex. 228 at 48).

269.    Risk assessments of all the Class Members need to be done immediately and should then occur at least annually. (Plf. Ex. 225 at 6; McCulloch- Vol. 1, 66:23-67:2, 120:5-11; Cauley- Vol. 10, 2213:17-2214:2; Caldwell- Vol. 11, 2484:6-12).

270.    Additionally, risk assessments should be performed on all Class Members as the research regarding risk assessment tools changes (Cauley- Vol. 10, 2213:17-2214:2), or any time there is a significant reason to think that the person's condition has changed substantially. (Caldwell- Vol. 11, 2484:13-15).

271.    For example, the Static-99 was updated in 2008 as the Static-99R with new base rates. (Cauley- Vol. 10, 2214:3-6). The move from the Static-99 to the Static-99R would drop some levels of risk by as much as 66% in certain scores. (Cauley- Vol. 10, 2214:25-2215:2).

272.    Risk assessments are only valid for twelve months. (Cauley- Vol. 10, 2214:6-8; Hébert - Vol. 10, 2402:17-21; Johnston- Vol. 13, 2976:19-21).

273.    Risk assessments need to be performed regularly to account for new research, aging of the individual, and to track changes the individual is making through treatment. (Cauley- Vol. 10, 2214:10-2216:3).

274.    The 706 Experts recommended that "MSOP administration begin proactively assessing the petition readiness of each current MSOP client and that this process be undertaken in a clinically and scientifically defensible manner." (Plf. Ex. 225 at 6). This recommendation applies to all Class Members. (Wilson- Vol. 3, 474:20-22, 478:17-20).

275.    Additionally, the 706 Experts recommended "that all clients be assessed annually in order for their risk to be evaluated and determinations be considered regarding less restrictive placements. These evaluations should be conducted by the assessment unit and not by those who serve on the treatment team." (Plf. Ex. 225 at 78).

276.    These risk assessments are necessary in order to determine the need for continued commitment and the propriety of the current placement, and should be done without any request by the committed individual. (Plf. Ex. 41 at 3).

277.    Regular evaluations are the best way to determine whether or not a Class Member still meets the threshold for civil commitment. (Wilson- Vol. 3, 484:3-7).

278.    Additionally, regular risk assessments would give Class Members an understanding of where they are in treatment and on what they need to do in order to get out, which helps with hope and motivation. (Freeman- Vol. 4, 791:23-792:4).

279.    Dr. Caldwell testified that sex offenders can go for years without making any change, and then they can change very rapidly, so there need to be routine assessments in order to know when change happens. (Caldwell- Vol. 11, 2502:1-9).

280.    Dr. Caldwell testified that when the only information the offender has comes from the treatment team, it does not tell them where they stand with regard to

potential release, so a risk assessment is necessary to ensure that the people in the facility need that level of security. (Caldwell- Vol. 11, 2502:10-17).

281.    For example, Mr. Terhaar and Ms. Bailey were never identified by the MSOP as being inappropriately placed. (McCulloch- Vol. 2, 380:15-19).

282.    After the 706 Report was issued, Commissioner Jesson directed the MSOP to seek a transfer to CPS for Mr. Terhaar. (Jesson- Vol. 5, 956:14-16).

283.    Commissioner Jesson did not direct that a petition be filed for the transfer or provisional discharge of Ms. Bailey. (Jesson- Vol. 5, 958:19-21).

284.    The fact that there are no annual risk assessments affects all Class Members and the recommendation that annual risk assessments occur applies to all Class Members. (McCulloch- Vol. 1, 172:4-7; Wilson- Vol. 3, 485:23-25).

285.    If there are Class Members who are found, through a regular risk assessment, to not meet the high-risk level for their current placement, their placement at the MSOP could be doing them harm. (Wilson- Vol. 3, 495:1-5). There are likely many Class Members who do not require the level of intervention they are currently getting. (Wilson- Vol. 3, 495:13-17).

286.    In 2013, the DHS attempted to implement a rolling risk assessment process. (Plf. Ex. 314). Commissioner Jesson, in a memo to Ms. Johnston, stated that although the MSOP did not receive funding for biennial assessments of all Class Members, the MSOP will implement a new plan so all Class Members receive a full risk assessment, meaning of the kind done when a petition for a reduction in custody is filed, on a rolling schedule. (Plf. Ex. 314; Jesson- Vol. 5, 949:20-950:3).

287.     Commissioner Jesson indicated that the MSOP may prioritize groups of Class Members in the schedule of rolling risk assessments. (Plf. Ex. 314). The MSOP prioritized those who are medically needy as well as those in the Alternative Program. (Jesson- Vol. 5, 951:12-24).

288.     Ms. Hébert testified that there is a plan to obtain for staff to conduct rolling risk assessments. (Hébert- Vol. 10, 2396:6-12). The MSOP has not yet hired any risk assessors beyond the vacancies that already existed in the assessment department in order to implement this plan. (Hébert- Vol. 10, 2397:8-13, 2398:3-7).

289.     The MSOP could hire outside assessors to perform these rolling risk assessments. (Hébert- Vol. 10, 2400:18-20).

290.     The MSOP could contract with outside risk assessors to do any risk assessments. (Johnston, Vol. 13- 2954:11-20). Ms. Johnston has the authority to use unspent salary budget on outside risk assessors to do forensic risk assessments of Class Members. (Johnston- Vol. 13, 2954:23-2955:3).

291.     The first of the rolling risk assessments occurred recently. (Pascucci- Vol. 8, 1631:17-23). Dr. Pascucci was asked by Dr. Herbert to do a risk assessment outside of the petitioning process on Class Member Chad Plank. (Pascucci- Vol. 8, 1632:3-13). This is the first risk assessment the MSOP has ever done outside of the petitioning process. (Pascucci- Vol. 8, 1633:11-14).

292.     The plan is to do one to two risk assessments per month outside the petition process. (Hébert - Vol. 10, 2399:10-15; Johnston- Vol. 13, 3054:14-18). This means it

would take 60 years to assess all Class Members currently committed to the MSOP. (Hébert - Vol. 10, 2400:10-15).

293. Ms. Johnston testified that the MSOP plans to start the rolling risk assessments with juvenile-only offender Class Members. (Johnston- Vol. 13, 3056:10-12).

294. Commissioner Jesson also indicated that if, based on a risk assessment, the treatment team believes that a petition for transfer or provisional discharge is appropriate, the treatment team will assist the Class Member in preparing the petition. (Plf. Ex. 314). This is a new policy and practice for the MSOP. (Jesson- Vol. 5, 953:7-11).

### 3. No Independent Risk Assessments

295. Class Members do not receive a risk assessment from an examiner independent of the MSOP unless and until they have a petition before the SCAP. (Plf. Ex. 184 at 91; Hébert - Vol. 10, 2392:7-9, 16-18).

296. Class Members should be receiving a regular risk assessment that is independent of the MSOP. (McCulloch- Vol. 1, 115:16-19). If the evaluator is not independent of the program, there can be clinical, administrative, or political influence on decisions. (McCulloch- Vol. 1, 116:5-8).

297. The Auditor's Report discussed the benefits of independent reviewers. "Requiring an independent body to review client cases would allow MSOP to share responsibility for making release decisions. This would shelter both MSOP and the decision-making entity from unpopular decisions. Further, independent reviews would assure that decisions on provisional discharges or placement in alternatives to the secure

facility are based on risk, not treatment performance. A 2006 study of states' release processes found that when a treatment program has a policy of not recommending release until treatment is completed (as is the case in Minnesota) and the program must make decisions regarding provisional releases, provisional releases are unlikely." (Plf. Ex. 184 at 90).

298.    The MSOP has an internal forensic risk assessment unit headed by Dr. Herbert. (Hébert - Vol. 9, 2127:22-23). Dr. Herbert reports to the Executive Clinical Director, Ms. Hébert . (Hébert - Vol. 9, 2127:20-23). Ms. Hébert  is ultimately responsible for what happens in the forensic risk assessment department. (Hébert - Vol. 9, 2131:10-12).

299.    Ms. Hébert could change the organizational structure of the risk assessment department with permission from Ms. Johnston. (Hébert - Vol. 9, 2155:13-16).

300.    Ms. Hébert and Ms. Johnston have discussed changing the structure of the risk assessment unit, but have not done so. (Hébert - Vol. 9, 2155:17-23, 2157:5-7).

301.    Ms. Hébert is in regular contact with Dr. Herbert regarding the workload, staffing, and timing of risk assessment reports for the forensic risk assessment unit. (Hébert - Vol. 9, 2129:19-22). Ms. Hébert is involved if the template of the risk assessment form is changed. (Hébert- Vol. 9, 2129:24-2130:2). Ms. Hébert is involved in the types of training the MSOP risk assessors receive. (Hébert- Vol. 9, 2130:19-25).

302.    At times, Ms. Hébert makes comments on risk assessments by MSOP risk assessors before they are finalized. (Hébert- Vol. 9, 2131:23-2132:2). The comments Ms. Hébert makes to the risk assessor may be substantive, including information she believes

should be included about the individual's treatment progress and history. (Plf. Ex. 274; Plf. Ex. 367; Def. Ex. 438).

303.    Dr. Herbert testified that she would be concerned if the Executive Clinical Director was reviewing risk assessments before they were concluded and making comments to the overall opinions in risk assessments.  (Herbert-Vol. 24: 5254:19-24).

304.    It is Ms. Hébert's responsibility to know what the statutory reduction in custody criteria are and see that they are applied properly in risk assessments. (Hébert - Vol. 9, 2149:9-12).

305.    Risk assessments should be completely independent from clinical influence. (Hébert- Vol. 10, 2381:15-23).

306.    The reporting structure of the MSOP's Risk Assessment unit causes some inherent conflicts of interest. (Freeman- Vol. 4, 766:13-18). The culture of the MSOP is one that requires perfection, and there is a pervasive idea that a Class Member must be perfect and have zero risk before they can be released to the community. (Freeman- Vol. 4, 768:8-14).

307.    Dr. Jones testified that before finalizing risk assessments, she would discuss her actuarial scoring and conclusions with Dr. Herbert and other risk assessors and sometimes would change scoring on assessments based on those discussions. (Jones Depo. 46:1-47:22).

308.    Having the risk assessors at MSOP supervised by the Clinical Director is not best practice. (Freeman- Vol. 4, 853:11-14).

309.    The structure of the risk assessment unit at the MSOP is concerning because of the political intrusion in the process, which the MSOP is not insulated from. (Caldwell- Vol. 11, 2490:5-18). This is evidenced based on the Governor Pawlenty order in 2003 and the Governor Dayton letter in 2013. (Caldwell- Vol. 11, 241:7-18; Plf. Ex. 30).

310.    It is also difficult to not have opinion influenced by the structure of the assessment unit as part of the clinical reporting structure. (Caldwell- Vol. 11, 2490:19-2491:5).

311.    Evidence of improper influence of the clinical program over the risk assessors is Eric Terhaar, who has been in Phase I for six years and whose treatment team clearly believes he is not ready for discharge. (Freeman- Vol. 4, 891:22-892:6).

### 4.  Failure to Use Proper Risk Assessment Tools

312.    If a risk assessment tool is misapplied, it is unlikely to give a valid outcome. (Miner- Vol. 5, 1064:3-6).

313.    Additionally, tools used need to have been validated on a population similar to the individual being assessed with the particular tool. (Miner- Vol. 5, 1064:7-13).

314.    Dr. Herbert, who oversees the risk assessment program at MSOP, testified that she understood the Minnesota Supreme Court case *In re Ince*, to caution against over reliance on actuarial instruments (Herbert- Vol. 24, 5241:16-20) and yet MSOP has not changed their assessment approach since the *Ince* decision (Herbert- Vol. 24, 5242:16-21).

315.    MSOP uses the Static-99R, the Stable 2007 and occasionally the Acute-2007 as the actuarial tools used in their risk assessments. (Herbert- Vol. 24, 5199:18-20).

316.    The Static-99 is a risk assessment developed in Canada that is the best predictor available currently regarding risk to reoffend. (Freeman- Vol. 4, 707:24-708:5). It classifies individuals into different categories of risk. (Freeman- Vol. 4, 708:5-8).

317.    The Static-99R measures static factors.  Those are factors that are historically and generally unchangeable in nature. (Herbert- Vol 24, 5200:3-5).

318.    Actuarial tools have changed over time. For example, the Static-99 was changed to the Static-99R in approximately 2009. (Pascucci- Vol. 8, 1668:18-22). The changes occurred to take into account aging of the offender. (Pascucci- Vol. 8, 1669:11-14). Failure to take age into account could overstate risk. (Pascucci- Vol. 8, 1670:2-7).

319.    The Static-99R is scored by assessing the offender on a list of objective criteria, including the number of prior sexual offenses, whether they had unrelated victims, and age at release. (Plf. Ex. 236). The total score puts the individual into a risk category. (Plf. Ex. 236; Pascucci- Vol. 8, 1672:13-16). The scoring manual provides predictive recidivism rates based on the risk category. (Pascucci- Vol. 8, 1671:20-1672:1).

320.    The Static-99R does not make any distinction based on aging for someone who is 60 or older and someone who is 80 or 90. (Pascucci- Vol. 8, 1673:5-7).

321.    The Static-99 was used historically at the MSOP. (Pascucci- Vol. 8, 1668:11-17; Hébert - Vol. 9, 2158:23-2159:3).

322.    The MSOP has not re-evaluated all patients who have not been assessed using the Static-99R to determine if their risk level has changed. (Hébert , Vol. 9, 2159:4-7, 14-22).

323.    In Wisconsin, when the Static-99R came into use, there was a spike in discharges of committed individuals because they received annual reviews and were found, under the new Static-99R, to no longer meet commitment criteria. (McCulloch-Vol. 2, 433:10-18). New York also re-evaluated all committed individuals when the Static-99R was released to ensure their risk still met the threshold for commitment. (Freeman- Vol. 4, 794:1-6).

324.    As the Auditor's Report found, "[i]f assessed with current actuarial tools, some of these clients could no longer be found to be high risk…Some clients at MSOP facilities may no longer be considered high risk if scored under new scoring norms based on the newest research." (Plf. Ex. 184).

325.    The Stable-2007 assesses dynamic risk factors that are changeable in nature. (Plf. Ex. 234; Herbert- Vol. 24 5200:20-22). There is some subjectivity to the assessment. (Pascucci- Vol. 8, 1675:24-25, 1676:6-8).

326.    The Stable-2007 as an instrument has only been standardized on community samples, meaning that use of this tool in an institutional setting will require some modification, along with a degree of caution in interpretation.  (Pascucci- Vol. 8, 1678:24-1679:8). This is not currently happening at MSOP. (Plf. Ex. 225 at 40; Wilson- Vol. 3, 548:1-3).

327.    In general, the Stable-2007 is not appropriate for an inpatient population. (Freeman- Vol. 4, 769:3-5; Caldwell- Vol. 11, 2508:6-15).

328.    The Stable-2007 manual itself says that "[a]ssessing the stable variables for incarcerated offenders requires looking at different indicators than when those variable are assessed in the community." (Plf. Ex. 432 at 21).

329.    Dr. Caldwell testified that if the Stable-2007 is used in a forensic risk assessment of an institutionalized sex offender, the risk assessment would be completely unreliable. (Caldwell- Vol. 11, 2514:15-21).

330.    The Static-99R and the Stable-2007 scores can be combined to look at an overall risk category. (Plf. Ex. 431).

331.    Dr. Herbert acknowledged that someone who scored a 6 or higher on the Static 99-R (the test that measures the historical factors that are unchangeable in nature) but a zero on the Stable-2007 (which measures the dynamic risk factors) that client would still be in a high risk category when those scores are combined, at least until they age out of the Static 99-R.  (Herbert- Vol. 24, 5247:1-5; Plf. Ex. 431).

332.    Class Members who have juvenile-only offenses cannot be assessed using any existing actuarial tool, as none allow for the long-term predictive validity of risk in a person who sexually offended as a juvenile. (Wilson- Vol. 3, 474:10-13).

333.    The Static-99R and Stable-2007 cannot be used on juvenile-only offenders as they have been demonstrated to have no relationship with sexual recidivism in juveniles. (Caldwell- Vol. 11, 2512:14-20, 251:16-21). Dr. Caldwell testified that a risk

assessment done on a juvenile-only offender with these measures would be completely unreliable. (Caldwell- Vol. 11, 2513:23-2514:1, 2514:12-13).

334.    Factors that lead juveniles to engage in inappropriate sexual behavior are different factors than those that lead adults to commit similar crimes, and thus juveniles need to be looked at differently. (Miner- Vol. 5, 1067:7-13).

335.    The fact that an individual has committed a sex crime as a juvenile does not predict the probability that they will commit a sex crime as an adult, and, in fact, the risk of reoffending is generally between 2 and 5% for juvenile offenders. (Miner- Vol. 5, 1068:3-12).

336.    This risk rate for juvenile-only offenders is so low that risk is not an issue for these Class Members. (Miner- Vol. 6, 1214:12-15).

337.    Dr. Herbert agrees that juvenile-only offenders constitute a 5 % risk of re-offense.  (Herbert – Vol. 24, 5266:6-10).

338.    The risk assessment of Mr. Terhaar performed by Dr. Pascucci, an MSOP risk assessor, used inappropriate risk factors and scored them in a non-standardized way. (Miner- Vol. 5, 1070:5-14). Dr. Pascucci agrees with the current research that says that whether juveniles are going to be a sex offender as an adult is more closely aligned to how many juvenile adjudications they have and not the type of juveniles adjudications. (Pascucci- Vol 21, 2766:4-13.) But she did not discuss the absence or presence of nonsexual offenses in her risk assessment of Eric Terhaar. (Plf. Ex. 237).

339.    Clinical judgment should not be used in place of a validated actuarial tool because it over-predicts risk. (Miner- Vol. 6, 11:49:20-1150:5).

340.    Risk assessments of individuals with cognitive limitations need to take into account that the factors that predict sexual recidivism in individuals with severe cognitive limitations are far more situational and circumstantial than stable and significant. (Caldwell- Vol. 11, 2515:21-2516:5).

341.    For the Class Members in the Alternative Program, risk assessments must go beyond the standard tools used by risk assessment staff and include measures of functional capacity and/or a specialized tool such as the ARMIDILO-S, which is designed specifically to assess dynamic risk in Plaintiffs with intellectual disabilities and sexual offense histories.  (Plf. Ex. 225 at 21; Miner- Vol. 6, 1123:5-14).

342.    Dr. Caldwell testified that the Static-99 should not be used with individuals with cognitive limitations and instead the ARMIDILO-S should be used. (Caldwell- Vol. 11, 2516:16-18).

343.    Ms. Hébert and Dr. Herbert discussed using the ARMIDILO rather than the Static-99R and Stable with Class Members with cognitive limitations, but Dr. Herbert determined it was no better or worse than the Stable-2007. (Plf. Ex. 32). The MSOP does not use the ARMIDILO on Class Members with cognitive limitations. (Hébert - Vol. 10, 2387:1-4).

344.    Dr. Herbert did note that the Static-99R and Stable-2007 should be used with caution on cognitively disabled individuals. (Plf. Ex. 32). Any time a tool that is normed on a certain population is used on a population other than what it was normed on, it should be used with caution. (Hébert - Vol. 10, 2386:10-14).

86

345.    The Static-99 and Stable-2007 were not developed with a cognitively disabled population, so those tools have not been validated for use on that type of population. (Miner- Vol. 6, 1122:20-1123:4).

346.    Similarly, with respect to the Class Members who have been diagnosed as having a severe mental illness, the Rule 706 Experts found that the risk assessment processes must consider the possible relationship between mental health conditions and sexually offending behavior.  None of the risk assessment tools currently used by the MSOP explicitly assess this possible interaction.  (Plf. Ex. 225 at 17).

347.    Dr. Caldwell testified that sex offenders with severe mental illnesses have complex issues with regard to assessing their risk. (Caldwell- Vol. 11, 2515:4-10).

348.    The VRAG or the SORAG are actuarial instruments developed on a forensic psychiatric population in which a diagnosis of a major mental disorder is a protective factor. (Miner- Vol. 6, 1106:15-1107:2). The SORAG has been available since the mid-nineties. (Miner- Vol. 6, 1107:12-14). The 706 Experts did not see these instruments used at the MSOP. (Miner- Vol. 6, 1107:3-5).

349.    Simply using the Static-99R and the Stable-2007 would not result in an accurate risk assessment for Class Members with severe mental illness. (Miner- Vol. 6, 1109:2-6).

350.    For those Class Members who are currently housed in the Assisted Living Unit, the Rule 706 Experts noted that actuarial risk assessment instruments currently in use at MSOP are likely to over-estimate the risk of individuals in assisted living, in that

their level of risk is mediated (and may be ameliorated) by their physical abilities (or lack thereof).  (Plf. Ex. 225 at 19).

351.    For example, if a Class Member has severe Parkinson's disease, they are likely not at much risk to reoffend, regardless of what their actuarial risk is, because they physically could not do it. (Miner- Vol. 6, 1113:20-24).

352.    Risk assessments of those on the Assisted Living Unit should include a physical functioning examination. (Miner- Vol. 6, 1114:11-15).

353.    For the sole female Class Member, there are "no empirically supported instruments or methods for predicting re-offense potential or dangerousness in women with histories of sexual offending, severe mental disorders, and/or intellectual disabilities." (Plf. Ex. 225 at 21; Miner- Vol. 6, 1123:17-20).

354.    Because there is no way to perform a valid risk assessment of a female offender, a detailed psychological and functional assessment would need to be done to determine Ms. Bailey's needs. (Miner- Vol. 6, 1123:21-11:24:2).

**5.  MSOP's Current Risk Assessment Process**

355.    The MSOP has an internal forensic risk assessment unit. (Herbert- Vol. 24, 5186:3)..

356.    There are currently eight risk assessors employed by the MSOP, including Dr. Herbert. (Pascucci- Vol. 8, 1634:23-1635:1).

357.    MSOP has hired five new risk assessors in 2014 but only had two risk assessors (aside from Dr. Herbert) prior to that.  Since then one of those individuals has left. (Herbert- Vol. 24, 5233:23-5234:5).  At the beginning of 2014, Dr. Pascucci and

Cassandra Lind, who had been hired in 2013, were the only ones who could do training

of the new risk assessors. (Herbert- Vol. 24, 5234:3-5235:14).  Dr. Pascucci was not yet

licensed.  (Herbert- Vol. 24, 5234:3-5).

358.    In addition to Dr. Herbert, there are only one or two other risk assessors at

MSOP that are certified on the Stable-2007. (Herbert- Vol. 24, 5230:19-5231:10).  But no

one at MSOP is a certified trainer. (Herbert- Vol. 24, 5231:17-20).

359.    The MSOP does not have a manual or guide regarding how to do a risk

assessment. (Pascucci- Vol. 8, 1655:18-21, 1656:2-5).

360.    When training new risk assessors, the new assessors receive the new

employee orientation and then they have on-the-job training in which they work with a

peer mentor for roughly two to six months (Herbert- Vol 24, 5233:2-7).

361.    MSOP risk assessors use a risk assessment template. (Pascucci- Vol. 8,

1635:22-24).

362.    MSOP risk assessors typically do an interview if the Class Member

consents. (Jones Depo. 19:21-24).

363.    MSOP risk assessors look at the available files for the Class Member they

are evaluating, meaning the files that are available electronically. (Pascucci- Vol. 8,

1656:16-22). They have access to the paper records if needed. (Pascucci- Vol. 8, 1657:4-

5).

364.    MSOP risk assessors also discuss the Class Member's treatment progress

with their treatment team. (Pascucci- Vol. 8, 1659:12-24).

365.    MSOP risk assessors consider whether a Class Member has major and minor BERs when conducting a risk assessment. (Pascucci- Vol. 8, 1662:10-15).

366.    Polygraph exams and PPGs are considered in risk assessments. (Pascucci- Vol. 8, 1657:23-1658:10). PPGs measure sexual arousal, which is the strongest risk predictor factor, but Dr. Pascucci has never asked that a PPG be done prior to her reaching a conclusion on a risk assessment. (Pascucci- Vol. 8, 1658:12-25).

367.    Ms. Hébert also testified that the strongest predictor of sexual deviance is deviant arousal pattern. (Hébert- Vol. 18, 3962:14-15).

368.    The MSOP risk assessors then apply actuarial tools. They commonly use the Static-99R, the Stable-2007, and the PCL-R. (Pascucci- Vol. 8, 1665:18-1666:10).

369.    The Static-99R and Stable-2007 are almost always used. (Pascucci- Vol. 8, 1666:14-16).

370.    The Static-99R is not used on juvenile-only offenders. (Pascucci- Vol. 8, 1667:2-4).

371.    The Stable-2007 is not generally used on those with cognitive limitations or severe mental illness, and when it is used it is done so with caution. (Pascucci- Vol. 8, 1667:8-18).

372.    MSOP risk assessments offer a professional opinion regarding whether the Class Member meets reduction in custody criteria, including whether they meet the legal criteria in the statute. (Pascucci- Vol. 8, 1647:14-21; Hébert - Vol. 9, 2146:12-17; Jones Depo. 19:3-12).

373.    MSOP risk assessors do not offer an opinion regarding whether Class Members meet the initial commitment criteria because the MSOP views the commitment criteria as different from the discharge criteria. (Pascucci- Vol. 8, 1655:17-23).

374.    The MSOP risk assessors do not receive any formal legal training. (Pascucci- Vol. 8, 1647:22-1648:5).

375.    At the time Dr. Jones started at the MSOP, the statutory criteria were not part of the risk assessments done by the MSOP. (Jones Depo. 31:21-23). The MSOP risk assessments did not consider the statutory criteria until late 2010 or early 2011. (Jones Depo. 31:21-24).

376.    At the time Dr. Pascucci started at MSOP, she had no formal training on the legal criteria to be released from civil commitment in Minnesota, and since has not received any legal training regarding the statutory release criteria from outside of the DHS. (Pascucci- Vol. 8, 1648:14-24). Dr. Jones also did not receive any training from the MSOP regarding the Constitutional standards for commitment. (Jones Depo. 62:5-15).

377.    Dr. Pascucci cannot put a definition on the meaning of "reasonable degree of safety" as it is used in the statutory transfer criteria. (Pascucci- Vol. 8, 1649:19-1650:4, 1651:1-5).

378.    Dr. Pascucci testified that the statutory factors for discharge under Minn. Stat. §253D.31 are: (1) capable of making an adjustment to open society, (2) no longer dangerous to the public, and (3) no longer in need of inpatient treatment and supervision. (Pascucci- Vol. 8, 1683:4-14; Plf. Ex. 234 at 18).

379.   Ms. Hébert testified that in order to be committed to the MSOP, a Class Member must have a continued need for treatment of a sexual disorder and continue to pose a danger to the public. (Hébert- Vol. 9, 2150:3-8).

380.   Dr. Pascucci testified that the *Call v. Gomez* case modified the standards of the statute so that a person is entitled to discharge unless the party opposing the petition proves by clear and convincing evidence that the person continues to need treatment for a sexual disorder and continues to pose a danger to the public. (Pascucci- Vol. 8, 1683:17-1684:3; Plf. Ex. 234 at 18).

381.   The *Call v. Gomez* standard was not incorporated into the language of the MSOP's risk assessments until the risk assessment regarding Mr. Terhaar in June 2014. (Pascucci- Vol. 8, 1709:18-1710:13; Plf. Ex. 234; Plf. Ex. 351).

382.   Dr. Herbert agrees that a person has to both have a sexual disorder and pose a danger to the public in order to remain committed under the standard set out in *Call v. Gomez*.  (Herbert- Vol. 24, 5257:19-25).  She also agreed that posing a danger to the public has to be related to the sexual disorder (Herbert- Vol. 24, 5258:1-3).  However when writing the risk assessments for MSOP, when she is asked whether the danger to the public has be to related to the sexual disorder or whether general danger would count, Dr. Herbert testified that it must be looked at on a case-by-case basis.  (Herbert- Vol. 24, 5260:1-8).  In her view, because the *Call* case does not identify what a sexual disorder is, she believes that behaviors that may be sexual in nature would satisfy *Call.* (Herbert- Vol. 24, 5261:8-5262:2).

92

383.    The ongoing treatment needed must be for a sexual disorder. (Pascucci-Vol. 8, 1684:13-20).

384.    The risk assessment Dr. Pascucci performed on Mr. Terhaar does not contain any diagnosis of a sexual disorder. (Pascucci- Vol. 8, 1684:21-1686:18; Plf. Ex. 234 at 11-12).

385.    Dr. Pascucci agrees that Mr. Terhaar has no sexual disorder but testified that he needs treatment for his sexual behavior. (Pascucci- Vol. 8, 1687:18-1688:2).

386.    Ms. Hébert testified that Mr. Terhaar does not have any sexual disorder. (Hébert- Vol. 9, 2137:19-2139:7; Plf. Ex. 106).

387.    Dr. Jones testified that in her view, committed individuals did not need to have an Axis I diagnosis from the DSM (which are more treatable disorders, such as major depression or anxiety, and are less pervasive than personality disorders or mental retardation, which are found on Axis 2) in order to continue to be committed. (Jones Depo. 53:20-54:23).

388.    Dr. Pascucci testified that "pose a danger to the public" in the discharge statute means there is risk that if in the community the individual could be dangerous to the public as it relates to their sexual disorder, but also with regard to general dangerousness. (Pascucci- Vol. 8, 1691:13-1692:6, 1694:19-25).

389.    Dr. Pascucci testified that she could not quantify Mr. Terhaar's probability of risk to the public. (Pascucci- Vol. 8, 1692:7-16).

390.    One of the reasons Dr. Pascucci does not think Mr. Terhaar should be

discharged is because of his lack of life skills due to extended institutionalization, which

she agrees is not part of the statute or case law. (Pascucci- Vol. 8, 1696:18-1697:8).

391.    Dr. Pascucci has never recommended a Class Member be granted full

discharge. (Pascucci- Vol. 8, 1636:22-25).

392.    Dr. Pascucci has recommended provisional discharge for six Class

Members, five of which have been between October of 2014 and today. (Pascucci- Vol.

8, 1637:1-7). The five between October of 2014 and today were all Class Members that

had been proposed for transfer to the Cambridge site. (Pascucci, Vol. 8, 1645:11-16).

These have all had treatment team supported provisional discharge plan. (Pascucci- Vol.

8, 1638:10-12).

393.    Provisional discharge plans are evaluated as part of the MSOP's risk

assessment process. (Pascucci- Vol. 8, 1638:23-25). Dr. Pascucci has not had any formal

training in the area of evaluating provisional discharge plans or living placements.

(Pascucci- Vol. 8, 1640:7-18).

394.    Dr. Pascucci has never recommended a Phase I Class Member be

transferred to CPS. (Pascucci- Vol. 8, 1644:19-24).

395.    Dr. Jones recommended fewer than ten petitions for provisional discharge

be granted. (Jones Depo. 36:2-11).

Dr. Jones never recommended any petition for full discharge be granted. (Jones Depo

36:12-15).

## I.  DISCHARGE PROCESS

396.   To successfully be discharged from the secure facility at MSOP, a civilly committed individual must successfully convince the SRB (Special Review Board) and the SCAP (Supreme Court Appeal Panel) that they meet the criteria for Transfer, Provisional Discharge, or Discharge. (Def. Ex. 31 at §253D.27-31).

397.   Deputy Commissioner Barry testified that the SRB is really an administrative process that is supported inside the agency by staff by the collection and organizing of all the information, treatment reports and risk assessment reports.  (Barry – Vol. 23, 5121:2-8).

398.   Deputy Commissioner Barry also agrees that some petitions can take longer than 5 years to complete the process (Barry- Vol. 23:5141:10-16) and that she was concerned with how longer it was taking in between filing the petition and hearings at the SRB. (Barry- Vol. 23, 5142:8-12).There is no judicial bypass available for Class Members to challenge their continued commitment. The lack of a judicial bypass affects all Class Members. (McCulloch- Vol. 1, 178:8-25).

399.   Deputy Commissioner Barry testified that she has never seen constitutional claims raised before the SRB or included in an SRB finding (Barry- Vol. 23, 5153:1-5).

400.   The habeas procedure (an alternative legal process) does not provide for an independent psychologist or psychiatrist to do an evaluation of the petitioner. (Nicolaison- Vol. 23, 5036:9-16).  Nor is the petitioner provided counsel as a matter of right.  (Nicolaison – Vol. 23, 5036:20-22).

401.   The only way to receive a reduction in custody is by filing a petition for a reduction in custody and going through the SRB and SCAP process. (Berg- Vol. 7, 1498:11-13, 20; Puffer- Vol. 7, 1526:20-24; Fox- Vol. 7, 1590:13-16). A Class Member cannot get an SRB hearing without first filing a petition. (Peterson- Vol. 7, 1390:13-15).

402.   The current process of progression between phases and movement to CPS and provisional discharge is cumbersome and difficult for civilly committed individuals to negotiate. (Plf. Ex. 225 at 73).

403.   Most other states require patients to be evaluated on an annual or biannual basis to determine whether they continue to meet commitment criteria. (Plf. Ex. 225 at 76).

404.   For example, the Wisconsin statute allows patients to petition the committing court at any time to be discharged. (McCulloch- Vol. 1, 58:16-20, 63:14-19). In New York, patients receive a hearing and a risk assessment each year, although the hearing portion may be waived. (Freeman- Vol. 6, 758:14-20). Additionally, in New York, patients may petition the court at any point for a reduction in custody and if the civil commitment program feels an individual is ready to be released, they will file a petition on behalf of the patient. (Freeman- Vol. 4, 764:2-12).

405.   In order to achieve release of any kind, the Class Member must be supported by the program, satisfy the SRB, enjoy the support of the Commissioner, and successfully convince the SCAP that they are ready to return to the community.  The Rule 706 Experts found that this process was unnecessarily bureaucratic and invites political intervention.  (Plf. Ex. 225 at 77).

406.    No patients have been fully discharged from the MSOP "since at least 1994 when the program was created." (Plf. Ex. 184 at 4). "Minnesota has released no sex offenders from civil commitment and conditionally released only one offender [as of 2011], while some other states have made modest numbers of releases." (*Id* at 19).

407.    Only three Class Members have ever been provisionally discharged, one of whom was returned for a violation of his release conditions. (Berg- Vol. 7, 1502:10-12; Hébert - Vol. 12, 2800:9-11).

408.    The MSOP has never supported a full discharge petition. (Johnston- Vol. 13, 2983:4-7).

409.    Ms. Hébert testified that one of the reasons Minnesota cannot successfully reintegration Class Members into the community is the system for release. (Hébert- Vol. 12, 2804:22-2805:1). There are also a lack of resources for Class Members to be safely reintegrated into the community. (Hébert- Vol. 12, 2805:6-14).

410.    Ms. Johnston testified that Minnesota has not released many Class Members to the community because of community fear, resources at the SRB and SCAP, and the discharge process itself. (Johnston- Vol. 13, 2938:12-2939:1).

411.    Mr. Benson testified that Class Members were not being released because every time the program changed there was a new clinical director and they had to start at square one of treatment. (Benson Depo. 62:12-16).

412.    The lack of discharges from the MSOP has been noted by nearly every outside review of the program. The Governor's Commission in 2005 found that "those

who have made progress in treatment should have an expectation that their confinement in civil commitment will end one day." (Plf. Ex. 4 at 26).

413.    The 2010 Site Visit Report states, "No client has been released from the program in recent years.  This is likely attributable to two major factors.  First, client movement though the treatment program historically has been very slow.  Second, Minnesota statutes have prescribed multiple steps in the release process." (Plf. Ex. 25 at 7).

414.    The 2013 Task Force Report states, "[T]he Task Force was also acutely aware that one of the most striking features of the MSOP as it has operated over time is the negligible number of releases from the program. Significant modifications of the process by which the need for continued commitment is determined and the standards for evaluating that need will address the serious issues of duration of commitment and the absence of meaningful release from commitment." (Plf. Ex. 41 at 16).

415.    The 706 Experts found it quite concerning because there many other states are releasing civilly committed offenders to the community safely, and thus it is "shocking" that no one has been discharge in the history of the MSOP. (Freeman- Vol. 4, 734:25-735:7).

416.    By contrast, Wisconsin has fully discharged 118 individuals since 1994 (McCulloch- Vol. 1, 54:4-6) and placed approximately 135 individuals on supervised release since 1994. (McCulloch- Vol. 1, 54:16-19).  This is significant because Wisconsin incarcerates many more people than Minnesota, yet Minnesota refers and commits more

sex offenders than Wisconsin and has released far fewer. (McCulloch- Vol. 2, 434:10-25).

417.    In New York, 125 civilly committed offenders were immediately placed on SIST. (Freeman- Vol. 4, 773:18-19). 64 patients have been moved from the secure facility to the strict and intensive supervision and treatment program. (Freeman- Vol. 4, 778:8-10). 30 committed individuals have been fully discharged from New York's program. (Freeman- Vol. 4, 778:11-13). There have been no recidivism incidents for those who have been fully discharged. (Freeman- Vol. 4, 780:22-24).

418.    The 706 Report found that "the single most positive way to improve the therapeutic environment of the MSOP would be for all concerned (MSOP administration, all staff, and clients) to see more people being released." (Plf. Ex. 225 at 58).

419.    Mr. Bolte testified that he would rather be in prison for a set sentence than the MSOP because he would have an out date. (Bolte- Vol. 8, 1845:2-9).

### 1.  Reduction in Custody Options

420.    Class Members may petition for a transfer out of a secure treatment facility to programs under the control of the Commissioner of the DHS. (Def. Ex. 31 at §253D.29). The factors that must be considered in determining whether transfer is appropriate are: "(1) the person's clinical progress and present treatment needs; (2) the need for security to accomplish continuing treatment; (3) the need for continued institutionalization; (4) which facility can best meet the person's needs; and (5) whether transfer can be accomplished with a reasonable degree of safety for the public." (Def. Ex. 31 at §253D.29).

99

421.    Class Members may also petition for provisional discharge pursuant to Minn. Stat. §253D.30, which provides, " (a) A person who is committed as a sexually dangerous person or a person with a sexual psychopathic personality shall not be provisionally discharged unless the committed person is capable of making an acceptable adjustment to open society. (b) The following factors are to be considered in determining whether a provisional discharge shall be granted: (1) whether the committed person's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the committed person's current treatment setting; and (2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the person to adjust successfully to the community." (Def. Ex. 31 at §253D.30).

422.    The MSOP is responsible for the supervision of Class Members once they are provisionally discharged into the community in terms of providing supervision, overseeing the provisional discharge plan, and community treatment. (Johnston- Vol. 13, 3229:3-7).

423.    Class Members can also petition for full discharge pursuant to Minn. Stat. §253D.31, which provides, "A person who is committed as a sexually dangerous person or a person with a sexual psychopathic personality shall not be discharged unless… the committed person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision." (Def. Ex. 31 at §253D.31).

424. Ms. Hébert testified that in order to continue to commit someone, they have to have a need for continued treatment for a mental disorder of a sexual nature and be dangerous to society. (Hébert - Vol. 12, 2713:3-11). Both criteria have to be satisfied in order to continue to commit someone. (Hébert - Vol. 12, 2713:25-2714:2). Ms. Johnston testified that this is her understanding of the commitment criteria as well. (Johnston- Vol. 13, 5-13).

425. The 706 Experts found that, "the standards for discharge or advancement to CPS and provisional discharge appear to be more stringent than the standards for initial commitment. In its 20 year history, only two individuals have been provisionally discharged from MSOP and no clients have been unconditionally discharged. These statistics are in stark contrast to other SOCC states that have released numerous clients." (Plf. Ex. 225 at 75-76).

426. In order to be released, the statutory framework requires that a Class Member no longer be dangerous as opposed to highly likely to reoffend, which is the initial commitment standard. (McCulloch- Vol. 2, 252:13-16).

427. Dr. Herbert, who oversees the risk assessment department at MSOP, is unable to opine on whether the standards for provisional discharge, full discharge or transfer are more difficult to satisfy then the standards for commitment. (Herbert- Vol. 24, 5254:24-5256:9).

**2. Statutory Process**

428. The petition and hearing process is cumbersome and difficult for Class Members to negotiate. (Plf. Ex. 225 at 73).

101

429.    Mr. Benson testified that the whole process is set up in a way that cannot work to discharge Class Members due to the political influence. (Benson Depo. 68:2-70:16).

430.    The process is initiated by a petition for a reduction in custody, which can be filed by either the committed person or by the MSOP's Executive Director. (Def. Ex. 31 at §253D.27, subd. 2).

431.    Pursuant to Minn. Stat. §253D, the committed person cannot file a petition for a reduction in custody until six months has passed since their final commitment order or the final resolution of any prior petition. (Def. Ex. 31 at §253D.27, subd 2; Johnston-Vol. 15, 3384:3-7). The MSOP's Executive Director is not subject to this restriction and may file a petition at any time. (Def. Ex. 31 at §253D.27, subd 2; Johnston- Vol. 15, 3384:11-17).

432.    The SRB holds a hearing on each petition, and then issues a report and recommendation within thirty days of the hearing. (Def. Ex. 31 at §253D.27 subds. 3, 4).

433.    The SRB and subsequently the SCAP, cannot consider reduction in custody options not first raised in the initial SRB petition. (Def. Ex. 33).

434.    [S]ince January 1, 2010, the SRB has recommended granting 26 petitions for transfer, eight petitions for provisional discharge (for six Plaintiffs), and zero petitions for discharge. (Plf. Ex. 178 at Question 11).

435.    Either the committed individual, the county attorney of the committed individual's county of commitment, or the DHS Commissioner, may petition the SCAP

for a rehearing and reconsideration of a recommendation of the SRB. (Def. Ex. 31 at §253D.28, subd. 1).

436.    If no party petitions the SCAP for a rehearing or reconsideration within 30 days of the SRB recommendation, the SCAP may either issue an order adopting the recommendations of the SRB or may hold a hearing. (Def. Ex. 31 at §253D.28, subd. 1).

437.    If there is a SCAP hearing, any person may oppose the petition. The parties to the proceeding are the committed person, the county attorney, the committing county and the DHS Commissioner. (Def. Ex. 31 at §253D.28, subd. 2).

438.    There is no time limit on SCAP decisions and it is not uncommon for this process to take more than one year (Plf. Ex. 225 at 76).

**3.  Reduction in Custody Process in Practice**

439.    Although the MSOP's has the ability to file petitions on behalf of patients, it has only done so seven times. (Plf. Ex. 178 at Question 3; Fox- Vol. 7, 1590:4-7). The seven petitions were for six Alternative Program patients to transfer to Cambridge and one for Mr. Terhaar for transfer to CPS. (Fox- Vol. 7, 1590:8-12).

440.    The six Alternative Program Class Members the MSOP filed petitions for are Allan Barth, Benjamin Braylock, Marvin Breland, Demetrius Mathews, William Odenbrett, and Matthew Pardue. (Plf. Ex. 178 at Question 4).

441.    Ms. Hébert testified that prior to the Cambridge petitions, the MSOP did not petition for any Class Member on the Assisted Living Unit or in the Alternative Program. (Hébert- Vol. 12, 2705:12-15).

442.    The MSOP does not have an established process practice by which they decide whether to petition on behalf of a Class Member. (Plf. Ex. 178 at Question 2; Johnston- Vol. 13, 2962:1-4). The MSOP leadership reviews cases brought to its attention on a case by case basis.  (Plf. Ex. 178 at Question 2). The final decision would be made by Ms. Johnston in consultation with Commissioner Jesson. (Johnston- Vol. 13, 2962:21-25).

443.    The Rule 706 Experts affirmatively "recommend[ed] that, on an ongoing basis, MSOP administration establish procedures to evaluate all recently admitted clients to ensure commitment standards are met – If MSOP clinical teams do not believe a client meets standards, they should petition for immediate release."  (Plf. Ex. 225 at 6).

444.    There is no policy or practice at the MSOP that requires Ms. Johnston to file a petition on a Class Member's behalf if the MSOP knows or determines that the Class Member no longer satisfies the criteria for commitment. (Johnston-Vol. 13, 2962:9-15).

445.    It is the policy of the MSOP that they would not petition on behalf of Class Members. (Freeman- Vol. 4, 788:19-25).

446.    The MSOP has an obligation, when a Class Member no longer needs the level of supervision they are currently in, to petition on their behalf so they are not keeping people civilly confined who do not need to be there. (Freeman- Vol. 4, 797:12-18).

447.    In practice, the MSOP has not typically filed petitions on behalf of Class Members. (Hébert - Vol. 12, 2708:7-12).

448.    Ms. Johnston testified that it is not the MSOP's role to identify Class Members for release. (Johnston- Vol. 15, 3229:15-18). It is ultimately up to the Class Member to decide whether to petition. (Johnston- Vol. 15, 3233:3-10).

449.    Ms. Persons testified that no one at the MSOP monitors whether Class Members continue to meet the commitment criteria. (Persons Depo. 41:1-5).

450.    The MSOP estimates that 78 petitions were filed in 2010, 60 in 2011, 54 in 2012, 153 in 2013, and 56 in 2014 as of June 30, 2014. (Plf. Ex. 178 at Question 5; Johnston- Vol. 13, 2974:1-13).

451.    Approximately 441 Class Members have never petitioned for a reduction in custody between January 1, 2010, and June 3, 2014. (Plf. Ex. 178 at Question 6; Johnston- Vol. 13, 2976:1-5).

452.    The MSOP has never petitioned anyone for full discharge. (Hébert - Vol. 12, 2800:5-8).

453.    The MSOP has supported fewer than ten petitions for provisional discharge. (Hébert - Vol. 12, 2801:25-2802:5).

454.    The MSOP does not assist patients in petitioning unless they are at CPS or in Phase III of the treatment program. (McCulloch- Vol. 1, 174:7-11).

455.    The MSOP will determine when it is "appropriate timing" for Class Members to petition for provisional discharge. (Plf. Ex. 412).

456.    For example, Ms. Lewis, a clinician at Moose Lake, has never helped any of her patients with petitions they have filed. (Lewis- Vol. 7, 1409:23-25).

457.    Class Members are told by MSOP staff, and believe, that they will not be supported for reduction in custody until treatment is completed. (Bolte- Vol. 8, 1761:13-16, 1762:6-8; Nicolaison- Vol 23, 4986:20-4987:5; 4987:8-11).

458.    Many MSOP staff have never even encouraged patients to file petitions for a reduction in custody. (Elsen- Vol. 7, 1343:21-24; Lewis, Vol. 7, 1409:20-22).

459.    The MSOP admits that it does not provide legal advice to Class Members regarding filing a petition. (Plf. Ex. 178 at Question 8).

460.    Some Class Members do not even know the petitioning form exists. (Steiner- Vol. 6, 1298:24-1299:1).

461.    Mr. Bolte filed a petition one time, but forgot to sign the form. (Bolte- Vol. 8, 1761:4-6). He was not informed he forgot to sign it until the form was not returned to him after about four months. (Bolte- Vol. 8, 1761:6-8).

462.    Mr. Thuringer has never petitioned because he has watched other Class Members petition who have been there for over twenty years be denied, so he views it as futile to even attempt. (Thuringer- Vol. 8, 1873:11-16).

463.    Mr. Foster did not know about the petitioning form or process until another Class Member showed it to him on the computer, after Mr. Foster had been committed for approximately 6-7 years. (Foster- Vol. 12, 2852:16-25).

464.    Mr. Foster has only filed one petition, and it was denied by the SRB and the SCAP. (Foster- Vol. 12, 2853:13-22). The independent examiner at the SCAP recommended that Mr. Foster move to a less restrictive alternative. (Def. Ex. 361). Mr. Foster is currently at Phase II in Moose Lake. (Foster- Vol. 12, 2854:13-16).

465.    Mr. Terhaar has never petitioned on his own because the process is long, complicated, and he did not know how to do it. (Terhaar- Vol. 9, 2007:12-18). Mr. Terhaar asked MSOP Client Rights Coordinators and his clinical staff for help in filing a petition, but they would not help, telling him that it is his legal matter and only he could do that. (Terhaar- Vol. 9, 2008:4-11).

466.    By contrast, in New York, there is a requirement under the statute that a petition must be filed when the civil commitment program determines a patient no longer meets commitment criteria. (Freeman- Vol. 4, 765:19-766:2).

467.    However, there are patients at MSOP who may not have the cognitive ability to understand the petitioning process because, for example, they do not understand that they may be at a point where they might be successful at petitioning or don't understand the process or the steps that need to be taken. (Wilson- Vol. 3, 551:14-23).

468.    If the MSOP had annual evaluations, the MSOP could present patients with information regarding petitioning and their right to petition at that time. (McCulloch- Vol. 2, 244:7-14). Currently there are patients who do not believe they are able to petition because they are not in Phase III of treatment. (McCulloch- Vol. 2, 244:15-19).

### 4.  SRB Treatment Reports and Risk Assessments

469.    The MSOP takes a position regarding petitions in the SRB Treatment Report. (Hébert - Vol. 12, 2827:15-21).

470.    The position of the MSOP on the petition is decided by clinical leadership, including Ms. Hébert and the clinical directors. (Hébert- Vol. 2827:25-2828:7; Plf. Ex. 178 at Question 9).

471.    Dr. Fox testified that treatment staff are not trained on what legal criteria were for whether someone should be provisionally discharged.  (Fox-Vol. 19, 4309:20-4310:7).  Fox testified that they did not assess whether clients met the statutory criterial or not in the treatment reports.  (Fox-Vol. 19, 4310:2-7).

472.    Ms. Hébert looks at the petitions of all Phase III Class Members and most Phase II Class Members, but will generally only look at Phase I petitions if Mr. Puffer or Ms. Fox consult with her because they feel the petition should be supported. (Hébert-Vol. 18, 4056:2-15).

473.    Ms. Hébert testified that in Minnesota, as opposed to other states, treatment participation affects release decisions. (Hébert- Vol. 18, 4000:11-22).

474.    The SRB Treatment Report considers the outcome of the MSOP's risk assessment in making its recommendation. (Puffer- Vol. 7, 1547:18-25).

475.    The risk assessment decision is available before the treatment team makes its recommendation. (Hébert - Vol. 12, 2828:13-21).

476.    It is the MSOP's policy and practice to know the outcome of the risk assessment before the treatment team takes a position. (Plf. Ex. 142; Plf. Ex. 265).

477.    The SRB and SCAP generally rely on MSOP treatment team reports in making their determinations. (Plf. Ex. 184 at 88).

478.    The MSOP's Treatment Progression policy contains criteria regarding when a patient will have MSOP support for transfer to CPS. (Def. Ex. 7).

479.    The MSOP will support transfer to CPS when the Class Member has: (1) two consecutive Quarterly Treatment Progress Reports indicating an average rating of

"enhanced" or "proficient" on all Phase III matrix factors, (2) demonstrated competency through at least the first two levels of Phase III privileges, (3) completed relapse prevention and maintenance plans approved by the treatment team, and (4) participated in a maintenance polygraph to confirm self-reported compliance with program expectation. (Def. Ex. 7).

480.    The policy regarding when Class Members are supported for transfer to CPS is a policy that is properly enacted. (Johnston- Vol. 15, 3399:17-24).

481.    The MSOP's Treatment Progression policy and the MSOP's Clinician's Guide contain criteria regarding when a patient will have MSOP support for provisional discharge. (Def. Ex. 2 at 17; Def. Ex. 7).

482.    The MSOP will support for provisional discharge when: (1) they have ratings of 4-5 on the Matrix factors for Phase III on two consecutive quarterly reviews, (2) they have completed a Maintenance Plan approved by the treatment team, (3) they have completed a provisional discharge plan approved by the treatment team, (4) they have demonstrated competency throughout Phase III privileges, and (5) they have taken a maintenance polygraph to verify client report regarding adherence to program rules. (Def Ex. 2 at 17).

483.    The MSOP will only support provisional discharge when a Class Member has finished treatment and has gone all the way through all three phases. (Jesson- Vol. 5, 966:18-25; Berg- Vol. 7, 1516:17-21; Fox- Vol. 7, 1588:20-23; Johnston- Vol. 13, 2986:19-22).

484.    Ms. Persons testified that the MSOP has never supported a petition for provisional discharge for a Class Member in Phase I or II. (Persons Depo. 47:16-17, 21-22).

485.    The MSOP's Executive Director makes the final decision on the MSOP's position regarding provisional discharges when the treatment team proposes supporting the Class Member. (Plf. Ex. 178 at Question 9; Johnston- Vol. 13, 2991:5-10).

486.    The MSOP would not support a Class Member for full discharge who had not gone through all three phases of treatment and through provisional discharge. (Berg-Vol. 7, 1516:22-25, 1517:4).

487.    The MSOP has never supported a petition for full discharge. (Fox- Vol. 7, 1587:14-19).

488.    The MPET recommended that the provisional discharge support criteria for those with intellectual or developmental disabilities, severe and persistent mental illness, or severe cognitive impairment be modified to reflect the reality that many of those types of individuals will be placed in an environment that provides ongoing supervised care. (Plf. Ex. 48 at 5).

489.    In order to gain MSOP support for transfer to CPS, Provisional Discharge, or Discharge, Plaintiffs must progress through all three Phases of the treatment program. (Plf. Ex. 184 at 88; Freeman- Vol. 4, 801:12-16).

490.    The MSOP has supported Mr. Rydberg, Mr. Duvall, Mr. Gissendanner, Mr. Opheim, and Mr. Jeno for provisional discharge. (Johnston- Vol. 13, 2940:23-2941:9). The only one that the SCAP denied was Mr. Rydberg. (Johnston- Vol. 13, 2943:6-9).

491.    Mr. Steiner's SRB Treatment Report from 2012 did not support Mr. Steiner's petition and states, "Mr. Steiner's treatment team encourages him to continue working toward treatment completion." (Def. Ex. 346).

492.    Mr. Steiner has been in the final phases of treatment a number of times throughout his commitment yet the MSOP has never supported his petition for a reduction in custody. (Steiner- Vol. 6, 1227:16-20, 1228:17-25; Def. Ex. 334 at 5; Def. Ex. 334; Def. Ex. 345; Def. Ex. 346)

493.    SRB Treatment Reports list behavioral issues Class Members have had, even if they do not relate to sexual offending. (Def. Ex. 345; Steiner- Vol. 6, 1241:5-15, 1242:6-8; Def. Ex. 346 at 3).

**5.  Provisional Discharge Planning**

494.    Petitions for a provisional discharge must be accompanied by a provisional discharge plan. (Fox- Vol. 7, 1593:17-18, 22-23; Johnston- Vol. 13, 2984:25-2985:2).

495.    Generally, a provisional discharge plan would include information such as the location the Class Member would be living. (Fox- Vol. 7, 1593:25-1594:3).

496.    Dr. Barbo, the reintegration director at MSOP, (Barbo- Vol. 20, 4455: 18-20), testified that it is the expectation of the SRB and the SCAP that the discharge plan includes an address of where the client will live when they are on provisional discharge. (Barbo- Vol. 20, 4519:12-19).  Dr. Barbo explains that to go about locating a place for a client to live will vary.  Some clients have identified family members that they believe they would live with.  For clients who don't have that option, MSOP works with their contracted vendors to identify housing.  And if there is a client that needs something else,

111

MSOP continues to work to identify additional vendors.  (Barbo- Vol. 20, 4519:20-4520:11).

497.    The provisional discharge plan is considered by the MSOP treatment team when making a recommendation on a petition in the SRB Treatment Report. (Fox- Vol. 7, 1594:6-10).

498.    The SRB and SCAP would also be provided with the provisional discharge plan when deciding the petition. (Fox- Vol. 7, 1594:11-14).

499.    Mr. Karsjens did not know he needed to submit a provisional discharge plan until after his SRB hearing. (Karsjens- Vol. 16, 3611:3-15).

500.    The MSOP does not begin discharge planning upon admission, even though doing so is a standard of any inpatient program. (Plf. Ex. 225 at 6; McCulloch- Vol. 1). This affects all Class Members. (McCulloch- Vol. 1, 170:7-9).

501.    The 706 Experts recommend that the MSOP begin discharge planning on admission. (Plf. Ex. 225 at 6). This is important because the Class Member needs to understand that the goal is to move him safely back to the community. (Wilson- Vol. 3, 478:21-479:3). This recommendation applies to all Class Members. (Wilson- Vol. 3, 481:20-22).

502.    Such discharge planning should include where the individual would live and work and where they would receive treatment. (Wilson- Vol. 3, 479:13-19).

503.    Failing to begin such discharge planning on day one of commitment affects the motivation of patients in treatment and their hope to return to the community. (Wilson- Vol. 3, 480:24-481:3).

504.     The MSOP does not assist Class Members with discharge planning until they are in the final stages of treatment. (Freeman- Vol. 4, 810:5-7). This generally means when they are in CPS. (Johnston- Vol. 13, 2983:20-23).

505.     The MSOP does not provide any reintegration training until Phase III and CPS. (Persons Depo. 122:2-11).

506.     Dr. Barbo also testified that if somebody does not have the support of the program, MSOP will not help them with provisional discharge planning.  (Barbo- Vol. 20, 4556:20-24).

507.     Dr. Barbo also testified that clients do not have the same resources as MSOP has with regarding to discharge planning.  (Barbo- Vol. 20, 4572:18-24).

508.     The provisional discharge plan of Class Member Mr. Opheim (Plf. Ex. 413), who had MSOP support for his provisional discharge, and the provisional discharge plan of Mr. Gill (Plf. Ex. 414), who did not have MSOP support for his provisional discharge, are very different in terms of the amount of information they contain.

509.     Dr. Fox testified that there would be some individuals in the alternative program that would not be able to produce a provisional discharge plan independently of help.  (Fox-Vol. 19, 4311:10-21).

510.     It has been the MSOP's practice to not help Class Members in Phase I or II of treatment with provisional discharge plans- only Class Members in Phase III. (Johnston- Vol. 13, 2985:3-9).

511.   Ms. Johnston testified that she could change that practice and have MSOP staff assist Class Members in Phase I and II with discharge planning. (Johnston- Vol. 13, 2987:13-16).

512.   The MSOP's SRB policy states that when a petition for provisional discharge is supported by the treatment team, staff are authorized to help the Class Member with a provisional discharge plan. (Def. Ex. 33).

513.   If a Class Member does not have treatment team support for provisional discharge, they are only provided with a provisional discharge plan template, but not given help identifying a housing location. (Fox- Vol. 7, 1594:20-24).

514.   It would be difficult to get MSOP treatment team support for a provisional discharge petition if the Class Member had not had MSOP assistance in creating the provisional discharge plan. (Fox- Vol. 7, 1594:25-1595:4).

515.   MSOP Clinician Ms. Lewis has never helped one of her patients create a provisional discharge plan. (Lewis- Vol. 7, 1404:6-8).

516.   Additionally, even if the SRB grants a petition and the MSOP does not agree with it, they will not assist with discharge planning. (Freeman- Vol. 4, 810:12-20).

517.   Additionally, the MSOP does not provide any specific reintegration training until Phase III. (Lewis- Vol. 7, 1404:2-5; Puffer- Vol. 7, 1581:18-20; Fox- Vol. 7, 1608:19-21, 1609:1-4).

**6.   SRB Training and Decisions**

518.    The MSOP provides the SRB with training regarding the MSOP's clinical program and the relevant legal standards. (Johnston- Vol. 15, 3241:16-22; Plf. Ex. 461; Plf. Ex. 468; Plf. Ex. 463).

519.    The legal training is provided by Mr. Benson, a DHS attorney. (Johnston-Vol. 15, 3403:16-22; Barry- Vol. 23, 5148:2-7). That training includes the statutory reduction in custody criteria. (Plf. Ex. 217). The training notes that the discharge criteria include "capable of making an acceptable adjustment to open society." (Plf. Ex. 217).

520.    The SRB members are given a more than 600 page packet of materials to review as part of their new member training. (Plf. Ex. 464).

521.    According to the MSOP's SRB Policy, the petition must clearly state the relief sought. (Def. Ex. 33).

522.    At the SRB stage, Class Members do not receive any independent assistance from medical or clinical professionals or an independent medical exam. (Freeman- Vol. 4, 808:11-22; Barry- Vol. 23:5152:9-15).

523.    SRB members are not necessarily experts in sex offender treatment and risk assessment. (Plf. Ex. 225 at 77; Plf. Ex. 462 ("Most (if not all) of our SRB members are NOT experienced in the field of sex offender treatment.")).

524.    The MSOP provides the SRB with relevant Class Member records, the MSOP's SRB Treatment Report, and the MSOP's Sexual Violence Risk Assessment. (Plf. Ex. 178 at Question 10; Def. Ex. 33).

525.    The MSOP's SRB policy provides the criteria the SRB should consider for each form of reduction in custody. (Def. Ex. 33).

526.    The discharge criteria in the SRB policy include "whether the client is capable of making an acceptable adjustment to open society." (Def. Ex. 33).

527.    Since January 1, 2010, the SRB has recommended granting 26 petitions for transfer, eight petitions for provisional discharge (for six Class Members) and zero petitions for full discharge. (Plf. Ex. 178 at Question 17).

528.    The MSOP supported all of the provisional discharge petitions that were recommended to be granted by the SRB. (Johnston- Vol. 2995:18-21).

529.    Aside from a couple of times, Deputy Commissioner Barry acknowledged that the SRB nearly always follows the MSOP's recommendation.  (Barry- Vol. 23, 5153:8-18).

530.    Dr. Barbo testified that at least until recently it was her recollection that she had never seen a case go to the SRP with MSOP recommendation that was not followed. (Barbo- Vol 20, 4564:8-24).

531.    Class Members testified that, in their view, there is no way to correct a finding by the SRB because there is no record made.  So while you can appeal, there is no transcript of the SRB so no way to dispute the findings.  (Nicolaison – Vol. 23, 4990:20-4991:2)

### 7.  SCAP Process and Decisions

532.    If a SRB recommendation is appealed to the SCAP, the Class Member may receive an independent examiner to perform a risk assessment. (Def. Ex. 31 at Minn. Stat. §253D.28, subd. 2(c)).

533.    The DHS Commissioner takes a position at the SCAP level and either opposes or does not oppose the petition. (Johnston- Vol. 13, 2944:11-17).

534.    As of July 2014, the SCAP had granted transfer to CPS 28 times, provisional discharge once, and full discharge zero times. (Plf. Ex. 178 at Question 25; Johnston- Vol. 13, 2997:4-23).

535.    Mr. Steiner recently appealed to the SCAP after the SRB recommended denying his petition and received an independent risk assessment. (Def. Exs. 349, 351). That risk assessment found that he met criteria for transfer to CPS and had a low to moderate risk to the public. (Def. Ex. 351). The MSOP's risk assessment for the same petition found that he did not meet criteria for transfer to CPS. (Def. Ex. 347).

536.    After the independent risk assessment recommended transfer to CPS, the MSOP issued an addendum to its SRB Treatment Report supporting Mr. Steiner's transfer to CPS even though he was still in Phase II of treatment. (Plf. Ex. 347).

537.    Initially, the SCAP denied Mr. Steiner's petition. (Steiner- Vol. 6, 1265:7-11). After the SCAP received the MSOP's addendum to the SRB Treatment Report changing their position and supporting transfer to CPS, the SCAP issued a new order granting Mr. Steiner's petition for transfer to CPS. (Steiner- Vol. 6, 1265:12-19).

### 8.  Delays in the Reduction in Custody Process

538. The 706 Report found, "One particular impediment to timely release appears to center on the inordinately complicated and lengthy processes surrounding presentation of clients to the SRB and recommendation to SCAP. In some cases, this process can take several months to years to complete, which adds immeasurably to the sense of helplessness enunciated by both clients and staff." (Plf. Ex. 225 at 46).

539. There is a lengthy delay from initial petition to final decision that appears to exceed 12 months. (Plf. Ex. 225 at 76). The process, from filing the petition to receiving a SCAP decision, even when there is not a petition for hearing filed with the SCAP, can take nearly 400 days. (Plf. Ex. 252).

540. In fact, as of June 2014, approximately 105 SRB petitions were pending decision and 48 petitions were pending a SCAP decision and there are 63 cases pending a SRB hearing date (some filed as long ago as July 2013). (Plf. Ex. 225 at 76; Plf. Ex. 178 at Questions 7, 13; Johnston- Vol. 13, 2980:10-20).

541. The SRB holds a hearing on every petition filed. (Plf. Ex. 178 at Question 12).

542. The SRB process is very lengthy and can take up to two or three years. (Fox- Vol. 7, 1590:17-20, 1570:25-1591:1).

543. For example, Class Member Robert Hall filed a petition on 7/6/2009 that was not heard by the SRB until 3/8/2011, over 600 days later. (Plf. Ex. 229).

544. It takes a long time with the resources the MSOP and SRB currently have. (Johnston- Vol. 13, 2951:10-17).

545. SRB hearings are scheduled by the MSOP. (Fox- Vol. 7, 1591:18-20).

546.    The SRB currently may hold up to four hearings each day for a total of 16 per month. (Plf. Ex. 177 at Question 12; Johnston- Vol. 13, 2991:11-19).

547.    Deputy Commissioner Barry agrees that there are no restrictions on the number of hearings the SRB can hold.  (Barry- Vol. 23, 5146:24-5147:2).

548.    The MSOP's SRB Coordinator determines how often SRB hearings are conducted based on the availability of SRB members, the interested parties, and technical resources. (Plf. Ex. 178 at Question 12).

549.    For petitions filed between January 1, 2010, and June 30, 2014, the shortest number of days between the time of a petition's filing and the SRB hearing was 29 days, the longest was 610 days, the median was 207.5 days, and the mean was 221.9 days. (Plf. Ex. 177 at Question 16; Johnston- Vol. 13, 2992:17-2993:4).

550.    Mr. Benson wrote a memo to the SRB coordinator in 2010 regarding the backlog of petitions, noting that some petitions were over six months old. (Plf. Ex. 69).

551.    Ms. Johnston testified that these timelines for SRB hearings are too long. (Johnston- Vol. 13, 2993:22-2994:2).

552.    Delays in the process can be caused by the MSOP failing to complete the SRB Treatment Report and SRB Risk Assessment due to staffing vacancies. (Berg- Vol. 7, 1501:10-16; Puffer- Vol. 7, 1549:4-10).

553.    The MSOP has limited resources on staff to write the MSOP's risk assessment, which must be done by Dr. Herbert's forensic risk assessment unit, and the SRB Treatment Report. (Johnston- Vol. 13, 2951:23-2952:2, 2952:11-15).

554. Both the forensic risk assessment and the treatment report must be done when Class Members petition for a reduction in custody. (Johnson- Vol. 132952L20-25).

555. As of August 2013, the SRB could only hold 10-12 hearings per month given the staff Dr. Herbert had at the time on the risk assessment unit. (Plf. Ex. 137).

556. Treatment psychologist at MSOP is tasked with writing SRB reports and they are occasionally tasked, based on their availability, with completing sex offender assessments. (Peterson- Vol. 22, 4847:1-8). The purpose of the program assessment unit is to do assessments that inform sex offender treatment, such as penile plethysmograph and sex offender assessments. (Peterson- Vol. 22, 4842:12-20).

557. According to the testimony of Elizabeth Peterson, the program assessment unit supervisor at MSOP. (Peterson- Vol. 22, 4842:10-11), there are currently only two assessment psychologists at MSOP currently. Three would be fully staffed. ((Peterson- Vol. 22, 4845:19-23).

558. In 2014, Mr. Puffer asked that SRB hearings be delayed due to the MSOP's inability to stay current with SRB reports. (Plf. Ex. 100).

559. Dr. Jones testified that Dr. Herbert would move SRB hearing dates to accommodate for short-staffing in the risk assessment unit. (Jones Depo. 28:20-29:10).

560. In the spring of 2014, they cut out one week per month of SRB hearings because the MSOP risk assessors could not keep up with the workload. (Jones Depo. 29:21-24, 30:2-7).

561. Commissioner Jesson determines the number of SRB members. (Plf. Ex. 178 at Question 11).

562.    Commissioner Jesson selects SRB members after an application process. (Plf. Ex. 178 at Question 11).

563.    Commissioner Jesson has difficulty filling the SRB spots. (Jesson- Vol. 5, 947:1-2). This has been an ongoing issue. (Benson Depo. 65:22-66:2). Mr. Benson testified that it was not a high priority for anyone to appoint more SRB members. (Benson Depo. 66:3-7).

564.    There are currently 17 or 18 positions filled out of 24 available positions. (Jesson- Vol. 5, 947:3-7).

565.    There is nothing that prevents Commissioner Jesson from increasing the number of SRB members. (Jesson- Vol. 5, 947:8-13).

566.    There is nothing that prevents the DHS from paying SRB members more money. (Johnston- Vol. 13, 2950:20-22).

567.    The SRB panel is shared with state-operated services and also hears petitions for mentally ill and dangerous individuals. (Johnston- Vol. 13, 2950:1-3).

568.    Generally, petitions are heard in the order in which they are received. (Plf. Ex. 178 at Question 14; Johnston- Vol. 13, 2992:8-11).

569.    Currently, only petitions that have the support of the MSOP are heard within 90 days of the filing of the petition. (Plf. Ex. 314). This timeframe was not established until 2013, when Commissioner Jesson set a goal of having supported petitions heard more quickly. (Plf. Ex. 314).

570.    For example, when the MSOP's petition to transfer Mr. Terhaar was filed, it took less than a month from the date of the petition filing for the SRB hearing to occur.

(Plf. Ex. 212, Plf. Ex. 232). By contrast, the petition filed in October 2014 by the MSOP for full discharge for Mr. Terhaar, which does not have MSOP support, has a SRB hearing scheduled in May 2015. (Terhaar- Vol. 9, 2035:15-23).

571. Ms. Johnston testified that Mr. Terhaar's CPS petition was able to be expedited because the MSOP expedited the risk assessment and treatment reports, but that for his current full discharge petition, no one has recommended that his process be accelerated. (Johnston- Vol. 13, 2967:4-18).

572. The 706 Report found that firm timeframes should be established in which the court system needs to make a decision regarding reductions in custody. (Plf. Ex. 225 at 6). This is important because Class Members should have a reasonable understanding of how long it is going to be before they get a decision. (Wilson- Vol. 3, 486:8-12). This recommendation applies to all Class Members. (Wilson- Vol. 3, 488:22-24).

573. Timeframes of more than a year are too long. (Wilson- Vol. 3, 487:12-13). A case should be heard within 60-90 days. (Freeman- Vol. 4, 820:16-20).

574. Specifically, the SRB should be required to meet more frequently until the backlog of cases is addressed. (Plf. Ex. 225 at 77).

575. Alternatively, the SRB should be abolished altogether, as it is an unnecessary step given that the SCAP must make a ruling on every petition anyway. (Plf. Ex. 225 at 73, 77; Plf. Ex. 41 at 16).

576. The Governor's Commission in 2005 also recommended eliminating the SRB because it is run by the DHS, which threatens to overly politicize the process. (Plf. Ex. 4 at 27).

577.    Additionally, the SCAP does not have enough resources to handle the number of petitions in a timely fashion. (Johnston- Vol. 13, 2947:18-2948:1).

578.    This leads to petitions taking a long time to be resolved. (Johnston- Vol. 13, 2948:20-2949:3).

579.    Commissioner Jesson added another SCAP panel in 2012 and added additional judges, but because of the number of petitions and workload, that extra panel has not been sufficient to address the timeframes. (Johnston- Vol. 15, 3244:18-3245:4; Def. Ex. 74; Def. Ex. 75).

580.    There is nothing that prevents Commissioner Jesson from appointing more SCAP judges. (Johnston- Vol. 15, 3371:11-14).

581.    Mr. Steiner's most recent petition took approximately two and half years from the date of filing to the date of receiving a SCAP decision. (Steiner- Vol. 6, 1265:3-6).

582.    Mr. Karsjens filed a petition on October 20, 2011. (Def. Ex. 290). He did not receive a SCAP order on that petition until June 10, 2013. (Def. Ex. 295). He did not receive an order from his appeal to the Court of Appeals until March 10, 2014. (Def. Ex. 296).

583.    During the time of his petitioning process, Mr. Karsjens was not able to initiate a new petition. (Karsjens- Vol. 16, 3601:23-3602:1).

584.    The petitioning process for Class Member Mr. Duvall took approximately five years. (Fox- Vol. 7, 1591:5-6, 11).

### 9.  Class Members Who Meet Reduction in Custody Criteria

585.    The MSOP has an ethical obligation to release patients who do not meet the criteria for commitment. (Plf. Ex. 225 at 69).

586.    If Class Member is found not to meet the criteria for commitment, and that person is unable to petition, then the program should petition on their behalf; this should be adopted as a policy regardless of what the statute says. (McCulloch- Vol. 1, 123:18-21, 124:1-7). Currently the MSOP does not consider petitioning on behalf of Class Members to be one of their responsibilities. (McCulloch- Vol. 1, 186:16-187:7).

587.    There is nothing in the statute that prohibits the MSOP from filing petitions on behalf of Class Members. (Plf. Ex. 225 at 69, 78; McCulloch- Vol. 1, 124:24-125:9, 195:11-14). However, the MSOP believes it is the patient's role to file their own petition. (McCulloch- Vol. 1, 195:16-19).

588.    There are a number of Class Members who could be discharged or served in a less restrictive environment. (McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1).

589.    The MSOP is aware of specific Class Members who could be discharged or placed in a less restrictive environment. "Professionals we interviewed – including MSOP clinicians and outside psychologists who assess sex offenders for the court – generally agreed that some sex offenders at MSOP facilities could be treated in less secure community settings." (Plf. Ex. 184 at 43).

590.    Staff indicated that there are Class Members who should be released, but were not being released. (McCulloch- Vol. 1, 200:19-201:7).

591.   Ms. Hébert testified that there are Class Members in both the Assisted Living Unit and the Alternative Program who could be in a less secure facility. (Hébert-Vol. 12, 2706:15-23).

592.   Ms. Hébert testified that it is possible there are Class Members in CPS, beyond those who have already petitioned, who could live safely in the community today. (Hébert- Vol. 12, 2708:1-6).

593.   Mr. Benson testified that he had conversations with Ms. Hebert regarding a number of Class Members who would have been appropriate for other programs or less restrictive alternatives. (Benson Depo. 73:10-23). Those individuals would include the cognitively disabled Class Members. (Benson Depo. 74:5-10).

594.   Clinician Ms. Lewis testified that named Plaintiffs Mr. Steiner and Mr. Barber should be in a CPS-type setting. (Lewis- Vol. 7, 1407:18-23). She has not asked anyone to file a petition on their behalf for transfer to CPS. (Lewis- Vol. 7, 1408:10-12).

595.   Clinician Mr. Ulrich testified that Class Members Craig Fiedler and Kenneth Timm could be treated in a less secure facility. (Ulrich- Vol. 7, 1477:8-23). He has not encouraged either of these Class Members to file petitions and the MSOP has not filed petitions on behalf of these Class Members. (Ulrich- Vol. 7, 1478:2-7).

596.   Moose Lake Clinical Director Mr. Puffer testified that there are Class Members who could be treated in less restrictive settings. (Puffer- Vol. 7, 1560:20-22, 1561:2).

597.   St. Peter Clinical Director Dr. Fox testified that there are Class Members whose treatment needs could be met in a less secure environment. (Fox- Vol. 7, 19-22).

This would include the six Class Members from the Alternative Program the MSOP petitioned to transfer to Cambridge, as well as other patients in the Alternative Program. (Fox- Vol. 7, 1597:8-23).

598.    MSOP Treatment Psychologist Ms. White testified that there are Class Members who could be provisionally discharged, including Tom Duvall and John Rydberg. (White- Vol. 9, 1965:15-25, 1966:6-9, 14).

599.    The MSOP has not filed petitions on behalf of any Class Members, other than those for transfer to Cambridge, who could be treated in a less secure setting. (Fox- Vol. 7, 1597:24-1598:6).

600.    For example, the Rule 706 Experts have identified two individuals- Eric Terhaar and Rhonda Bailey, who should no longer be civilly committed to the MSOP. (Plf. Exs. 117, 237).

### a.  Juvenile-Only

601.    There are 67 juvenile-only offender Class Members at the MSOP.

(Johnston- Vol. 13, 3016:18-21).

602.    The 706 Experts believe that all Class Members with juvenile-only offenses are improperly placed at the MSOP. (Wilson- Vol. 3, 663:9-11).

603.    The Site Visit auditors were not even aware that there are individuals with juvenile-only offenses committed to the MSOP. (Haaven Depo. 199:10-13).

604.    Juvenile-only offender Class Members who don't have any conduct post-commitment to the MOSP that suggests any sort of risk factors should be discharged without further analysis. (Miner- Vol. 5, 1076:16-21). In fact, it is not possible to perform

a true forensic risk assessment on this group of Class Members because there are no valid

risk assessment measures. (Miner- Vol. 5, 1075:21-24).  It would be more appropriate to

provide them with a needs assessment and determine the supports they would need to be

successful in the community. (Miner- Vol. 5, 1077:8-18).

605.   These juvenile-only Class Members also do not need sex offender specific

treatment. (Miner- Vol. 5, 1078:5-9).

606.   Mr. Terhaar is a Class Member who has juvenile-only offenses. (Plf. Ex.

237). Mr. Terhaar has not had any sexually-related behavioral issues that led to criminal

charges during his commitment to the MSOP. (Terhaar- Vol. 9, 1987:17-20).

607.   The 706 Experts recommended that he be fully discharged because he did

not meet criteria for being committed. (McCulloch- Vol. 2, 262:12-17; Plf. Ex. 237).

608.   After receiving the 706 Report regarding Mr. Terhaar, the MSOP filed a

petition on behalf of Mr. Terhaar for transfer to CPS. (Plf. Ex 212; Terhaar- Vol. 9,

2010:17-22). Mr. Terhaar was in Phase I of treatment and has been in that phase

throughout his entire commitment. (Terhaar- Vol. 9, 1988:9-14).

609.   The SRB Treatment Report regarding Mr. Terhaar supported his petition

for transfer because of a concern that he has been institutionalized so long that he needed

time to live outside an institutionalized setting, not based on any danger of reoffending.

(Puffer- Vol. 7, 1543:13-25; Plf. Ex. 107; Plf. Ex. 115).

610.   Ms. Hébert testified that she was concerned with Mr. Terhaar abruptly

being released as opposed to gradually transitioning to the community due to his years of

127

institutionalization, as in a provisional discharge situation. (Hébert- Vol. 12, 2710:18-

2711:4).

611.     The MSOP's risk assessor, Dr. Pascucci, opined that Mr. Terhaar did not

meet the statutory criteria for full discharge or for transfer. (Plf. Ex. 206; Plf. Ex. 226).

612.     The End of Confinement Review Committee assigned Mr. Terhaar a risk

level of 1, which is the lowest. (Plf. Ex. 134).

613.     Mr. Puffer testified that Mr. Terhaar is not in need of sex offender treatment

if he has no deviant sexual interests and that Mr. Terhaar does not belong and the MSOP.

(Puffer- Vol. 7, 1567:19-1568:5).

614.     Ms. Johnston testified that Mr. Terhaar is at the lower end of risk with

regard to sexually reoffending. (Johnston- Vol. 13, 3066:4-6, 15-17).

615.     The MSOP hired Dr. Powers-Sawyer to do an independent evaluation of

Mr. Terhaar in the summer of 2014. (Powers-Sawyer- Vol. 11, 2582:17-24). She was

asked to conduct an evaluation in response to the Order to Show Cause and determine

whether Mr. Terhaar met the criteria for discharge. (Powers-Sawyer- Vol. 11, 2583:6-10).

616.     Dr. Powers-Sawyer recommended that Mr. Terhaar be unconditionally

discharged based on her evaluation of the statutory criteria. (Plf. Ex. 105; Powers-

Sawyer,-Vol. 11, 2606:1-7).

617.     Dr. Powers-Sawyer diagnosed Mr. Terhaar with a provisional diagnosis of

post-traumatic stress disorder and a diagnosis of attention deficit hyperactivity disorder in

partial remission. (Plf. Ex. 105). These diagnoses were based on a review of Mr.

Terhaar's records and an interview with Mr. Terhaar. (Powers-Sawyer- Vol. 11, 2595:14-

17). None of the diagnoses were sexual disorders. (Powers-Sawyer- Vol. 11, 2595:18-19).

618.    Dr. Powers-Sawyer's recommendation of full discharge was based on the fact that Mr. Terhaar had no current sexual disorder or sexual dysfunction, or any need for adult sex offender treatment. (Powers-Sawyer- Vol. 11, 2595:20-2596:2).

619.    Dr. Powers-Sawyer found that Mr. Terhaar does not have any sexual deviance and does not meet criteria under DSM-V for a sexual disorder or paraphilia. (Plf. Ex. 105; Powers-Sawyer- Vol. 11, 2596:3-14).

620.    Dr. Powers-Sawyer also concluded that Mr. Terhaar was not dangerous to the public with respect to sexual matters. (Plf. Ex. 105; Powers-Sawyer- Vol. 11, 2596:15-19).

621.    Dr. Powers-Sawyer testified that none of the diagnoses listed in Dr. Pascucci's risk assessment are sexual disorders. (Powers-Sawyer- Vol. 11, 2601:15-18; Plf. Ex. 106).

622.    With the support of MSOP, the SRB recommended that Mr. Terhaar be transferred to CPS. (Plf. Ex. 232). Commissioner Jesson did not oppose the transfer. (Plf. Ex. 259).

623.    Since moving to CPS, Mr. Terhaar is still in Phase I of treatment and does not know when he will progress to a higher phase. (Terhaar- Vol. 9, 2028:16-18). He is the only Phase I Class Member at CPS. (Terhaar- Vol. 9, 2028:9-10).

624.    Since moving to CPS, Mr. Terhaar has not received any BERs. (Terhaar-Vol. 9, 2029:1-7). His Matrix scores have improved quite a bit as well. (Plf. Ex. 361, Plf. Ex. 363, Plf. Ex. 365).

625.    In October of 2014, the Ms. Johnston filed a petition for full discharge for Mr. Terhaar, but the MSOP has yet to take a position on that petition. (Terhaar- Vol. 9, 2033:15-19, 2034:2-4).

626.    The MSOP is pushing Mr. Terhaar to petition for provisional discharge rather than full discharge. (Terhaar- Vol. 9, 2034:2-6). Ms. Johnston added provisional discharge to Mr. Terhaar's current petition. (Johnston- Vol. 15, 3287:14-17).

627.    The MSOP does not support Mr. Terhaar's full discharge petition. (Johnston- Vol. 13, 2973:11-13).

628.    It is the MSOP's position that Mr. Terhaar, because of his long institutionalization, should be slowly reintegrated into the community with the supports provisional discharge would provide. (Johnston- Vol. 15, 3405:14-19).

629.    Ms. Hébert testified that Mr. Terhaar was at the MSOP for years, had various intake assessments, approximately 24 quarterly reports, and nothing in his treatment file said that Mr. Terhaar was improperly placed at the MSOP. (Hébert- Vol. 18, 4185:2-4186:8).

630.    Ms. Johnston testified that if a Class Member satisfies the discharge criteria, they are entitled to a full discharge. (Johnston- Vol. 15, 3405:7-13).

631.    There are approximately 62 other Class Members with juvenile-only offenses who may be in the same situation as Mr. Terhaar if independent risk assessments were performed on them. (McCulloch, Vol. 2- 264:2-15).

632.    Named Plaintiff Mr. Bolte is a juvenile-only offender. (Plf. Ex. 300-M).

633.    The MSOP has been aware that juvenile-only offenders should be considered carefully. In April 2014, Ms. Hébert sent an email to Ms. Johnston stating, "Wondering if it is worth it for us to start closely examining all no adult convictions… thoughts?" (Plf. Ex. 88). She also says that she wants to "fast track" a particular individual through Phase III, which is not part of any policy at MSOP. (Plf. Ex. 88; Hébert - Vol. 12, 2732:23-2733:6; Johnston- Vol. 13, 3023:10-17).

634.    Ms. Johnston responded, "Yes, let's do that." (Plf. Ex. 88). By that, Ms. Johnston meant that they should look at Class Members with juvenile-only offenses. (Johnston- Vol. 13, 3024:3-8).

635.    In 2013, Ms. Hébert  emailed Dr. Herbert regarding the effect that institutionalization has on juvenile-only offenders and the impact that living with adult felons may have on them. (Plf. Ex. 113).

636.    In that email from 2013, Ms. Hébert says, "Yes, these juvie only offenders are going to be a challenge for the field. (Plf. Ex. 113). By that, Ms. Hébert meant that it was challenging to assess risk because no actuarial tools exist to determine their risk. (Hébert- Vol. 12, 2716:15-2717:2). This makes predicting their risk more complicated. (Hébert- Vol. 12, 2718:6-7).

637.    Mr. Benson testified that they were concerned about juvenile-only offender Class Members because, "the program was stuck, and you have very young individuals who may or may not be very dangerous." (Benson Depo. 74:11-20).

638.    Since the 706 Report was issued, the MSOP has not had discussions regarding immediately doing forensic risk assessments of all juvenile-only offenders because they do not have the resources on staff to do them. (Johnston- Vol. 3017:9-18, 3021:13-18).

639.    Ms. Johnston testified that since April of 2014, neither she, Ms. Hebert, nor Dr. Herbert ordered risk assessments of the juvenile-only offender Class Members. (Johnston- Vol. 13, 3025:5-12).

640.    Ms. Johnston testified that the MSOP does not have money in its budget to assess all the juvenile-only offender Class Members. (Johnston- Vol. 13, 3018:3-16). Ms. Johnston has not requested funding from the DHS for such assessments. (Johnston- Vol. 13, 3018:23-3019:1).

641.    The MSOP has not filed a petition on behalf of any juvenile-only offender Class Member except Mr. Terhaar. (Johnston- Vol. 15, 3366:19-22, 3367:1). The MSOP has not discussed filing on behalf of any others because it is the MSOP's practice that Class Members be encouraged to file petitions on their own. (Johnston- Vol. 15, 3367:14-17).

642.    Dr. Vietanen expressed concerns about a juvenile-only offender with a traumatic brain injury being inappropriate for civil commitment to other MSOP clinical staff. (Vietanen- Vol. 10, 2302:2-22)

643.    The 706 Experts recommend that juvenile-only offenders, particularly those who are younger, be released with appropriate supports in the community. (Miner- Vol. 6, 1095:8-18).

644.    Provisional discharge may not be appropriate for the younger juvenile-only offenders who, because of their age, are going to bend rules that may violate their provisional discharge and result in revocation. (Miner- Vol. 6, 1095:23-1096:5).

645.    Ms. Johnston testified that she would be the one who decides whether an individual on provisional discharge is taken back into custody. (Johnston- Vol. 15, 3405:24-3406:2).

646.    For example, Mr. Terhaar is concerned that if he were on provisional discharge, the MSOP would be able to make the decision to revoke his provisional discharge. (2116:20-2117:3)

647.    Dr. Fox testified that there are Class Members in St. Peter with juvenile-only offenses who could likely be in a less secure environment, but the MSOP has not singled out juvenile-only offenders for evaluation. (Fox- Vol. 7, 1598:24-1599:9).

### b. Alternative Program

648.    Many Class Members in the Alternative Program could be treated in a less restrictive alternative. (McCulloch- Vol. 1, 89:2-12; Miner- Vol. 6, 1125:2-9).

649.    Mr. Haaven also testified that there are Class Members in the Alternative Program that may likely have reached maximum treatment benefit and could receive services in a different setting. (Haaven Depo. 79:20-80:4).

650.    Commissioner Jesson asked Ms. Johnston and the MSOP to identify Class Members who could be moved to a less restrictive setting. (Plf. Ex. 313; Jesson- Vol. 5, 929:17-930:5). Ms. Johnston informed Commissioner Jesson and Deputy Commissioner Barry that, as of April of 2013, there were 21 Class Members on the Assisted Living Unit who met "maximum treatment effect" and could live outside the high security setting of Moose Lake, that there were 20 Class Members in the Alternative Program who met "maximum treatment effect" and could live outside the high security setting of St. Peter, and that there were 52 Class Members with no adult offenses who could be reviewed to determine whether they have reached maximum treatment effect. (Plf. Ex. 313).

651.    The MSOP has known for more than a year that the Class Members identified for Cambridge on the Assisted Living Unit and in the Alternative Program could live safely outside the secure perimeter. (Johnston- Vol. 13, 3013:25-3014:9).

652.    Ms. Hébert testified that by, "could live outside the high security setting," that meant the individuals identified could be placed in a less restrictive alternative. (Plf. Ex. 313; Hébert- Vol. 12, 2697:1-4).

653.    Commissioner Jesson testified that "maximum treatment effect" means they are able to receive treatment outside the Moose Lake or St. Peter facilities. (Jesson- Vol. 5, 932:7-11).

654.    Ms. Hébert testified that "maximum treatment effect" means that the individual may have plateaued in treatment but due to abilities or capacity are at a maintenance stage. (Hébert- Vol. 12, 2696:8-14).

655.    Ms. Johnston testified that "maximum treatment effect" means the clients have plateaued in their treatment process, meaning reached a point where continued sex offender specific treatment at the level in which they had been receiving it might not be necessary because they cannot benefit from it any further. (Johnston- Vol. 13, 3010:3-13).

656.    Dr. Elsen testified that "maximum treatment effect" means they cannot get any further benefit from treatment in their current placement. (Elsen- Vol. 7, 1383:20-1384:2).

657.    Mr. Puffer testified that "maximum treatment effect" means they are not capable of completing the treatment program, possibly due to cognitive impairment. (Puffer- Vol. 7, 1556:15-22, 1557:3-6).

658.    The Alternative Program patients for Cambridge were selected by determining where they were in treatment and whether a less restrictive environment was possible, not by doing a risk assessment. (Elsen- Vol. 7, 1345:6-13).

659.    The Alternative Program patients supported for transfer to Cambridge include Marvin Breland. (Elsen- Vol. 7, 1346:14-20).

660.    At the time this list was put together, no risk assessments had been done. (Jesson- Vol. 5, 934:4-6; Hébert- Vol. 12, 2694:6-12, 2697:15-18).

661.    At this time, risk assessments on the juvenile-only offenders have still not been done. (Jesson- Vol. 5, 935:12-19).

662.    In the fall of 2013, the MSOP selected six of the Class Members from the Assisted Living Unit and six of the Class Members from the Alternative Program to

support for transfer to the Cambridge facility, which was being repurposed as a less restrictive alternative for the MSOP. (Johnston- Vol. 13, 3038:2-6).

663.    The MSOP filed petitions for transfer to Cambridge on behalf of the six individuals from the Alternative Program. (Hébert- Vol. 12, 2699:16-19).

664.    The MSOP supported these petitions because the MSOP believed that they could live safely in the less restrictive facility at Cambridge. (Johnston- Vol. 13, 3038:20-25).

665.    No petitions were filed on behalf of the other fourteen Alternative Program patients identified as potential candidates for transfer to Cambridge. (Elsen- Vol. 7, 1353:22-1354:6; Johnston- Vol. 13, 3041:6-18).

666.    Ms. Hébert testified that there was no other facility those Class Members could have been transferred to at that time in 2013 even though they were at maximum treatment effect and could live safely outside the secure perimeter. (Hébert- Vol. 12, 2703:14-21).

667.    The Cambridge plan was suspended following an order from Governor Dayton to Commissioner Jesson (Plf. Ex. 30), and the twelve Class Members supported for transfer are still in secure facilities at Moose Lake and St. Peter in the secure facility. (Jesson- Vol. 5, 942:23-943:2; Elsen- Vol. 7, 1354:12-14; Puffer- Vol. 7, 1530:7-10).

668.    The SRB petitions of the six from the Alternative Program were remanded and the MSOP had to go through the petitioning process again and request provisional discharge. (Johnston- Vol. 13, 3037:19-24). Those SRB hearings on provisional discharge occurred in January 2015. (Johnston- Vol. 13, 3037:24-25).

669.     The MSOP is looking for housing for these six Class Members. (Johnston-Vol. 13, 3040:7-12). The MSOP asked for a 60-day window after the SRB petitions were ruled on to find housing, which was granted. (Johnston- Vol. 13, 3040:10-14). Normally, housing needs to be secured before the SRB can rule. (Johnston- Vol. 13, 3040:15-17).

670.     The MSOP has not done forensic risk assessments, or any other kind of assessments, on the remaining Class Members in the Alternative Program to determine if they had reached maximum treatment effect and could live safely outside the secure perimeter. (Johnston- Vol. 13, 3045:21-3046:7).

671.     Ms. Bailey is an example of a patient in the Alternative Program who could be treated in a less restrictive facility. (Plf. Ex. 117).

672.     The 706 Experts were "shocked and appalled" that there was a female on one of the units and in treatment with males, and her circumstances "shocked our conscience." (McCulloch- Vol. 1, 157:6-22; Wilson- Vol. 3, 472:22-473:1).

673.     The Site Visit auditors did not even know that Ms. Bailey was housed at the St. Peter facility until after the 706 Report was issued. (Haaven Depo. 42:23-44:5). Mr. Haaven testified that Ms. Bailey's living situation is not best practices. (Haaven Depo. 45:18-21).

674.     Ms. Bailey is an example of the MSOP's failure to individualize treatment. (McCulloch- Vol. 2- 265:19-266:1).

675.     Ms. Johnston testified that there is no group home that can take Ms. Bailey. (Johnston- Vol. 15, 3407:22-25).

676.    Dr. Fox testified that it would be optimal if Ms. Bailey were placed in a different facility.  (Fox-Vol. 19, 4311:23-4312:4).

677.    Since the 706 Experts' report regarding Ms. Bailey, the MSOP has taken her out of core groups with men and she receives individual therapy, and they have begun providing her with socialization opportunities with other women on the St. Peter campus. (Johnston- Vol. 15, 3289:1-9.

### c.  Assisted-Living Unit

678.    There are patients on the Assisted Living Unit who would be better served in other facilities. (Wilson- Vol. 3, 638:20-22; Peterson- Vol. 7, 1394:20-23; Berg- Vol. 7, 1503:9-11).

679.    The MSOP identified 21 Assisted Living Unit Class Members who could be described as meeting "maximum treatment effect" and could live outside the high security setting of Moose Lake. (Plf. Ex. 94; Plf. Ex. 313).

680.    After the Governor Dayton letter regarding Cambridge, the petitions of the six Assisted Living Class Members were suspended and the SRB hearings did not occur. (Johnston- Vol. 13, 3039:21-3040:1).

681.    The MSOP does not have any contracts in place with facilities that can take Class Members from the Assisted Living Unit. (Johnston- Vol. 13, 3040:2-6; Barbo- Vol. 20, 4562:2-5). The reason those petitions have not gone forward is because the MSOP does not have placements for them. (Johnston- Vol. 13, 3042:15-19). If there were options for housing the MSOP would proceed with those petitions. (Johnston- Vol. 13, 3042:20-22).

682.   A Class Member, Harley Morris, who is now deceased, was on hospice care at MSOP, was not dangerous, and should have been transferred out of the Moose Lake facility. (Peterson- Vol. 7, 1393:11-24). Mr. Morris passed away while at Moose Lake and no one at the MSOP ever petitioned for his transfer. (Peterson- Vol. 7, 1394:7-13).

### d.  Phase III and CPS

683.   The 706 Report found, "that most clients who have consistently completed the program elements necessary to be in and maintain Phase Three status could function well and benefit from the same environment and services offered on CPS. These clients seem to spend an unnecessary length of time in Phase Three prior to progression to CPS." (Plf. Ex. 225 at 43-44).

684.   CPS was originally designed to last about nine months. (Fox- Vol. 7, 1606:17-18, 22-25). However, no Class Member has moved through CPS in nine months or less. (Fox- Vol. 7, 1607:2-4).

685.   The first two Class Members ever placed at CPS, John Rydberg and Thomas Duvall, are still there. (Fox- Vol. 7- 1607:5-10).

686.   Additionally, CPS is intended to operate as a community integration program, yet only two Class Members have been provisionally discharged from CPS. (Freeman- Vol. 4, 741:2-7). This has led to a sense of hopelessness for patients in CPS. (Freeman- Vol. 4, 743:22-744:3).

687.    Dr. Peterson testified that the trust relationship with the clinician or the psychologist is more difficult to establish when there is a perception that no one ever gets out of the program.  (Peterson- Vol. 22, 4886:25-4887:3).

688.    Generally, when a patient has reached the point in treatment where their risk has been reduced enough to be in transitional programming, they would probably only need that programming for a year before their risk would be under the threshold of the commitment standard and they should be in the community. (Freeman- Vol. 4, 742:15-20). There are some patients who have been in CPS for over five years, and most patients currently placed in CPS have been there for over two years. (Freeman- Vol. 4, 745:24-746:4 *see also* Barbo- Vol. 20, 4553:8-20 (recognizing that the first individual who was ever moved to the predecessor of CPS is still there and that ten patients have been there for between two and five years)).

689.    In looking at the CPS policy, (Def. Ex. 61), Dr. Barbo admitted that the prior version of the policy used to have time lines but that those were taken out, in part, because they were too rigid.  (Barbo- Vol. 20, 4552:21-4553:7).

## J.  POLITICAL INVOLVEMENT

690.    Governor Dayton sent a letter to Commissioner Jesson in November 2013 directing her to stop plans to repurpose the Cambridge facility as a less restrictive facility for the MSOP. (Plf. Ex. 30). Commissioner Jesson then suspended the Cambridge plans. (Jesson- Vol. 5, 942:3-9).

691.    Governor Dayton's letter also ordered Commissioner Jesson to oppose any future petitions by Class Members for provisional release until (1) the Task Force Report

of 2013 was issued, (2) the 2014 Legislature has the opportunity to act on various

changes to the MSOP, and (3) the Legislature and the Dayton administration have agreed

to the additional facilities, programs, and staff necessary for the MSOP and have

provided sufficient funding for them. (Plf. Ex. 31).

692.    The first two conditions were met, but the third condition has not been met.

(Jesson- Vol. 5, 940:14-24, 941:10-24).

693.    The MSOP supported the petition of Class Member Mr. Duvall for

provisional discharge, and Commissioner Jesson did not oppose the petition. (Johnston-

Vol. 13, 3043:15-20). The Attorney General intervened in Mr. Duvall's case and opposed

the petition. (Johnston- Vol. 13, 3044:6-11).

694.    Mr. Benson testified that political issues made it difficult to get things done

at the MSOP. (Benson Depo. 27:21-28:8, 29:18-30:21).

695.    Deputy Commissioner Barry also testified that the repurposing of

Cambridge was scuttled in large part because of public opposition. (Barry- Vol. 23,

5160:25-5161:3).

696.    Dr. Jones testified that no one has been fully discharged because of the

political environment. (Jones Depo. 38:3-7).

## K. LESS RESTRICTIVE ALTERNATIVES

697.    "It is a fundamental principle in mental health treatment that individuals

should be treated in the least restrictive environment to ensure that infringement on

individual liberties is kept at a minimum." (Plf. Ex. 225 at 61-62).

698.    Dr. Barbo admitted that the goal of MSOP is to provide treatment and work people toward the placement in the program or community that is least restrictive as necessary to maintain public safety and over the course of that process, continue to work toward as much independence as possible.  (Barbo- Vol. 20, 4552:2-7).

699.    Dr. Barbo also acknowledged that since she started in 2012 only two people have ever been released into the community on provisional discharge and she admitted that she finds the pace frustrating.  (Barbo- Vol. 20, 4551:7-18).

700.    If Class Members can be safely managed in the community, then they need to be managed in the community. (Freeman- Vol. 4, 736:7-22).

701.    Minnesota law allows the committing judge to consider less restrictive alternative placements for committed individuals, however, there are no available alternatives that provide adequate supervision. (Plf. Ex. 184 at 42). "As a result, this provision in law is currently of virtually no practical use in commitment decisions involving sex offenders." (*Id.*).

702.    The only places a Class Member may be placed at the beginning of their commitment are the secure MSOP facilities at Moose Lake and St. Peter. (Fox- Vol. 7, 1600:7-10).

703.    Mr. Benson testified that there are no less restrictive placements for Class Members on the front-end of commitment, and a real weakness of the MSOP is the lack of community-based facilities. (Benson Depo. 134:14-135:3).

704.    Dr. Barbo testified that CPS is not available to a newly-committed person in Minnesota, in other words, one can't initially be committed to CPS. (Barbo- Vol. 20, 4550:7-17).

705.    Mr. Karsjens' commitment order states, "Respondent did not offer any evidence of a less restrictive alternative to the MSOP, as the MSOP is the only program available." (Def. Ex. 102).

706.    "At present, MSOP has no framework for a less restrictive alternative, nor does it have services available to assist clients in the task of community reintegration should they achieve release." (Plf. Ex. 225 at 73).

707.    The MSOP does not have any less restrictive facilities, other than CPS. (Puffer- Vol. 7, 1565:7-10).

708.    Therefore, "[u]nder current law all offenders committed to MSOP are presumptively placed in the highest level of security.  The result is that some offenders, while meeting the criteria for commitment, may be needlessly confined in the most secure facilities, when both public safety and the need for effective treatment might be better served in a less restrictive environment." (Plf. Ex. 41 at 3).

709.    The Sex Offender Civil Commitment Advisory Task Force ("Task Force") created by the Court issued recommendations in December of 2012 regarding less restrictive alternatives, including that the Legislature must provide adequate funding for less secure residential facilities within a reasonable period of time. (Plf. Ex. 35). The Task Force also recommended that the DHS Commissioner develop less restrictive programs throughout the state. (*Id.*).

710.    The Task Force recommended that any new less restrictive facilities be designed to serve those who are already civilly committed to secure facilities as well as those who are subsequently civilly committed. (Plf. Ex. 35).

711.    The MSOP should offer a continuum of facility options, which they currently do not have, as they would be beneficial to Class Members. (Puffer- Vol. 1565:11-20; Fox- Vol. 7, 1600:11-18).

712.    Following the recommendation of the Auditor's Report that MSOP develop and implement a plan for identifying when low functioning clients can be managed in a less restrictive setting and then petition for the movement of such clients, the MSOP issued a Request for Information on possible alternative setting. (Plf. Ex. 95 at 5).

713.    The DHS has since entered into contracts with various community providers, but those contracted facilities could only house about eight to ten patients per year. (Jesson- Vol. 5, 923:2-6, 924:7-15; Johnston- Vol. 13, 3033:23-3034:4).

714.    Some of the contracts the MSOP has entered into are for housing, some for treatment, some for supervision, and some for a combination of those services. (Johnston- Vol. 13, 3034:9-12).

715.    If 25 Class Members were provisionally discharged today, DHS would not have the funding to house all of those individuals. (Jesson- Vol. 5, 926:14-17, 23-25).

716.    The MSOP is working to create less restrictive alternative options. (Plf. Ex. 10).

717.    Ms. Johnston testified that in order to be provisionally discharged, the individual must have somewhere to live. (Johnston- Vol. 13, 3034:19-22).

718.    Outside of CPS, the MSOP has less than 20 beds for less restrictive alternative placements. (Johnston- Vol. 13, 3034:25-3035:17).

719.    CPS has a capacity of 38 and currently 32 beds are filled. (Johnston- Vol. 13, 3035:18-22). The MSOP is adding a new building with an additional 30 beds that should be completed by July 1, 2015. (Johnston- Vol. 13, 3035:25-3036:1).

720.    The MSOP is currently using a 23 bed facility as emergency beds for CPS, and they have not determined whether those beds will be permanent yet. (Johnston- Vol. 13, 3036:3-12). If those beds are not made permanent, CPS will have a capacity of 53 beds. (Johnston- Vol. 13, 3036:12-14).

721.    Dr. Barbo testified that there have been times when patients could have been transferred to CPS but they had to wait because of lack of beds.  (Barbo- Vol. 20, 4560:18-21).  Dr. Barbo also testified that MSOP currently does not have a contract with any entities that offer services for individuals who are on the assisted living unit.  (Barbo- Vol. 20, 4562:2-5).

722.    Other states successfully operate community-based programming. For example, New York operates SIST, where patients can be placed in the community either at the time of initial commitment or when risk is reduced. (Freeman- Vol. 4, 748:22-749:2).

723.    The strict and intensive supervision and treatment program places patients in various types of housing, including with family members, in private apartments, or in supportive housing. (Freeman- Vol. 4, 782:16-25). If they do not have a placement at the

time they are placed on SIST, they may go to a hotel paid for by the state. (Freeman- Vol. 4, 783:1-5).

724.    As early as 2011, MSOP clinical management agreed that some low-functioning patients could be managed in group homes. (Plf. Ex. 184 at 43-44). The Auditor's Report also noted that the MSOP should reassess its existing residents to determine which residents would be suitable for placement in an alternative setting. (Plf. Ex. 184 at 46).

725.    Deputy Commissioner Barry testified that the reason DHS has advanced a proposal for less restrictive alternatives is because they believes that there are people in MSOP that could be treated in a less restrictive environment.  (Barry- Vol. 23, 5171:2-8).

## L.  TREATMENT PROGRAM

726.    Class Members have the right to treatment or other training that will give them an opportunity to regain their liberty. (Plf. Ex. 184 at 51).

727.    Ms. Hébert testified that Class Members are civilly committed to the MSOP for sex offender treatment, which she is obligated to provide. (Hébert - Vol. 12, 2740:22-25). She testified that the treatment must be influenced by current research and contemporary practices. (Hébert - Vol. 12, 2740:12-16).

### 1.  Treatment Program Changes

728.    Over the years the MSOP has had many executive directors. (Hébert- Vol. 18, 4111:1-3).

729.    The MSOP's treatment program changed a number of times between 2003 and 2008. (Persons Depo. 90:19-23).

730.    Mr. Haaven, who has been evaluating the MSOP as part of the Site Visit group since 2006, testified that when there is a leadership change at the MSOOP there has generally been a change to the structure of the program. (Haaven Depo. 55:10-15).

731.    In the early 1990s, the MSOP had a four-phase program that operated solely at the St. Peter site. (Steiner- Vol. 6, 1228:16-20).

732.    As part of that program, Mr. Steiner progressed to Phase IV of that program. (Steiner- Vol. 6, 1227:16-20).

733.    At some point in the mid-1990s, the treatment program was changed and Class Members, including Mr. Steiner, were moved to Moose Lake, where they, including Mr. Steiner, started the treatment program from the beginning. (Steiner- Vol. 6, 1227:21-1228:1, 1228:14-23).

734.    At that time, Mr. Steiner worked his way through the program and made it to Phase IV again. (Steiner- Vol. 6, 1228:17-25).

735.    Again, at some point the treatment program changed, and in 2004, Mr. Steiner was in Phase III of treatment. (Def. Ex. 334 at 5).

736.    Dr. Powers-Sawyer was the Interim Clinical Director at the MSOP from 2006-2007. (Powers-Sawyer- Vol. 11, 2581:20-2582:3).

737.    As of 2007, the MSOP did not have a written program design. (Plf. Ex. 311 at 3).

738.    Ms. Hébert became the Executive Clinical Director of the MSOP in 2008. (Hébert - Vol. 12, 2744:21-23).

739.    Mr. Benson testified that good treatment was not occurring at the MSOP in 2008. (Benson Depo. 23:6-9). He also testified that as of 2008, decisions were not defensible in terms of who would go to the later stages of treatment. (Benson Depo. 23:15-25).

740.    Mr. Benson testified that in 2008, the treatment program was understaffed, poorly trained and inexperienced. (Benson Depo. 55:3-8). Treatment that was occurring was sporadic and inconsistent. (Benson Depo. 55:23-25).

741.    At the time Ms. Hébert started, the program was very short staffed, the treatment was inconsistent, and the program was not structured in a way that was reflective of a sex offender treatment program. (Hébert- Vol. 17, 3882:3-22). Class Members did not have primary therapists and the program did not have clinical supervisors. (Hébert- Vol. 17, 3884:6-14, 21-23).

742.    Ms. Hébert restructured the MSOP's program so there was clinical leadership at each site and primary therapists. (Hébert- Vol. 17, 3884:23-3885:7).

743.    When Ms. Hébert began, she identified programming, structure, and staffing as the three areas she needed to change. (Hébert- Vol. 17, 3885:11-13).

744.    At the time Ms. Hébert started, there were core groups but they were shuffled every trimester and there was no continuity for Class Members, so Ms. Hébert changed that practice. (Hébert- Vol. 17, 3886:6-10). Ms. Hébert changed core groups so they were co-facilitated. (Hébert- Vol. 17, 3886:11-17).

745.    Ms. Hébert changed the staffing structure and implemented staffing ratios of 50 clients to six clinicians and one treatment psychologist. (Hébert- Vol. 17, 3889:23-3890:7).

746.    Ms. Hébert also focused on recruiting and retention due to the short-staffing. (Hébert- Vol. 3892:1-3).

747.    In 2008, Ms. Hébert developed the modern version of the MSOP's treatment program, which involved creating new program language, creating and implementing the matrix factors, and creating a three-phase system where there had previously been a four-phase system. (Hébert - Vol. 12, 2745:2-18).

748.    Mr. Benson testified that this was essentially starting the treatment program over. (Benson Depo. 63:1-2).

749.    Ms. Hébert testified that the three phase system is arbitrary, it could be four phases or as many as you wanted- it is a clinical judgment. (Hébert- Vol. 17, 3909:13-16).

750.    At that time, Class Members were evaluated and placed in one of the three phases. (Hébert- Vol. 18, 4112:25-4113:3).

751.    The evaluations were done using placement forms based on the Matrix factors. (Hébert- Vol. 18, 4113:15-25). No sex offender assessment or forensic risk assessment was done. (Hébert- Vol. 18, 4114:12-21). No actuarial tests such as the Static-99 or Stable 2007 was done, and no polygraphs or PPGs were done. (Hébert- Vol. 18, 4115:8-23).

752.    Ms. Hébert testified that she does not know whether clinicians reviewed patient files as part of the phase placement process in 2008. (Hébert- Vol. 18, 4116:8-11).

753.    At the time the program changed in 2008, some Class Members were moved back in phase based on the re-evaluations done to place Class Members in the three phase program. (White- Vol. 9, 1967:15-23).

754.    The program change to the three phase system was not actually implemented until the end of 2009 or beginning of 2010. (Plf. Ex. 121). Prior to then, no information can be found in treatment files indicating what phase Class Members were in. (Plf. Ex. 121).

755.    Some Class Members who had been in Phase II of the prior treatment program were moved back to Phase I because they were not meeting the Matrix factor goals of Phase I. (White- Vol. 9, 1967:20-1968:2).

756.    As of 2008, Mr. Steiner was in Phase I of the treatment program. (Def. Ex. 345).

757.    Throughout Mr. Steiner's commitment, he has seen four or five different clinical directors who all started a new treatment program. (Steiner- Vol. 6, 1233:13-19). When the program changed, Mr. Steiner started in Phase I each time and had to work his way back up. (Steiner- Vol. 6, 1233:20-22, 1243:10-13).

758.    In the past, Class Members have moved back in phase. (Berg- Vol. 7, 1509:24-1510:1; Hébert- Vol. 17, 3942:19-25; Fox-Vol. 19, 4240:25-4241, 4241:21-4242:9; Persons Depo. 136:8-24).

**2.  Treatment Program Design**

759.    Deputy Commissioner Barry testified that she can direct the Executive

Director, Nancy Johnston on how to run the MSOP program and it is within her authority

to terminate the Executive Director.  (Barry- Vol. 23, 5155:18-25).  The Executive

Director can, in turn, direct the Executive Clinical Director on  how to run the program

and, she has the authority to terminate the Executive Clinical Director.  (Barry- Vol. 23,

5156:1-6).  Because of this, the treatment program at MSOP is subject to change. (Barry-

Vol. 23, 5156:7-9).

760.    The goal of the MSOP is to treat Class Members to the point where they

can be safely released into the community. (Johnston Vol. 13, 3049:5-7).

761.    The MSOP is responsible for preparing Class Members for reintegration

and eventual release into the community. (Johnston- Vol. 15, 3229:1-7).

762.    The MSOP's treatment program, as it exists today, is based on the MSOP's

Theory Manual, Clinician's Guide, and Matrix Scoring Guide. (Def. Ex. 2; Def. Ex. 4,

Def. Ex. 6). These documents govern the treatment program for all Class Members.

(Wilson- Vol. 3, 678:18-679:4).

763.    Ms. Hébert testified that it is best practices that there is a clear concise

pathway of a treatment program and that the program should be described in writing.

(Hébert- Vol. 18, 4116:20-24, 4117:19-22).

764.    The Matrix factors were created before the Theory Manual, Clinician's

Guide, and Matrix Scoring Guide. (Hébert- Vol. 18, 4120:12-14). They were then

incorporated into those documents. (Hébert- Vol. 18, 4121:3-5).

765.   The MSOP did not have any written documents laying out the treatment design until 2011 when the Theory Manual was completed. (Pl. Ex. 46 at 3). Site Visit Reports prior to 2011 had recommended that the MSOP put its treatment theory and program in writing. (Pl. Ex. 25 at 6; Plf. Ex. 81 at 3 ("The site visit team recommends that the program produce a written model of change available to all staff")).

766.   The Clinicians Guide was not completed until 2012 and was not rolled out until 2013. (Hébert- Vol. 18, 4121:8-10).

767.   The Matrix Scoring Manual was not completed until 2013. (Hébert- Vol. 18, 4121:11-16).

768.   The MSOP did not provide any training on the Theory Manual and Clinician's Guide until 2013. (Def. Ex. 72).

769.   The MSOP did not provide any training on Matrix scoring until 2014. (Def. Ex. 72).

770.   The MSOP's Treatment Program is divided into three phases. (Plf. Ex. 225 at 30-31).

771.   In Phase I, the MSOP emphasizes learning to comply with facility rules and expectations, as well as providing an introduction to basic treatment concepts.  The MSOP curriculum does not include any "sex offender specific" treatment during this phase.  (Plf. Ex. 225 at 30).

772.   In Phase II, the MSOP program focuses on discussion and exploration of the patient's history of sexual offending behavior and maladaptive patterns of behavior, along with the motivations for those behaviors.  (Plf. Ex. 225 at 30). Dr. Peterson testified

that Phase II treatment usually is where sexuality is part of the treatment and that emotional regulation and things that are risk factors for recidivism are addressed in Phase I.  (Peterson- Vol. 22, 4908:12-15).

773.    In Phase III, the MSOP has Plaintiffs work on applying skills learned in Phase II to daily life and demonstrating utilization of pro-social coping strategies. (Plf. Ex. 225 at 31).  Phase III is also where Plaintiffs begin their focus on reintegration back to the community.  *Id.*

774.    When Class Members are first committed, they receive a Sex Offender Assessment, which is not a forensic risk assessment. (Hébert - Vol. 12, 2677:7-10; Plf. Ex. 384; Peterson- Vol. 22, 4849:20-23). Sex Offender assessments fall under Ms. Hébert's area of supervision. (Hébert - Vol. 12, 2676:3-6).

775.    Dr. Peterson testified that the sex offender assessment that is done once a client agrees to treatment is to inform sex offender treatment in that it gives MSOP a picture of the client's psychosocial history, psychosexual history, personality functioning, dynamic risk factors, and some of the attitudes about his sexual offending.  (Peterson- Vol. 22, 4850:4-15).

776.    Dr. Peterson did not testify that it is to assist in placing the client in the correct phase of treatment or to make sure that the client should actually be placed at MSOP.  She states that the treatment recommendations made do not make a phase recommendation.  (Peterson- Vol. 22, 4907:  16-22).  Rather she testified that it is typical that a client will start in Phase I.  (Peterson- Vol. 22, 4907:12-15).

777. Dr. Vietanen was told by Dr. Herbert to increase scoring on the Stable-2007 assessment done as part of the Sex Offender Assessment because they did not know the patient well enough yet to justify lower scores. (Vietanen- Vol. 10, 2299:10-2300:10).

778. MSOP does not have a policy for trying to obtain documents that do not come over with the newly committed individuals. (Peterson- Vol. 22, 889:11-14). Rather, as Dr. Peterson testified to, whether or not they will be able to obtain the records varies by file. (Peterson- Vol. 22, 4890:7-4891:3).

779. MSOP does not always get all the documents.  (Peterson- Vol. 22, 4891: 4-23, 4892:11-20).

780. If MSOP does not get the underlying documents then they will rely on the findings of fact in making their assessment.  (Peterson- Vol. 22, 4892:21-4893:2).

781. Minn. Stat. §253B.03, subd. 7 provides that Class Members have the "right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary." They also have a right to a written program plan which "describes in behavioral terms the case problems, the precise goals, including the expected period of time for treatment, and the specific measures to be employed." Minn. Stat. §253D.03, subd. 7. This statute also provides that these plans should be reviewed quarterly. *Id.*

782. Class Members each have an individual treatment plan ("ITP") that is reviewed each quarter. (Hébert- Vol. 18, 4051:4-7). The ITPs are updated at least annually. (Hébert- Vol. 18, 4051:7-9).

154

783.    The 706 Experts found that "many [individual treatment] plans reviewed by the Panel contained boilerplate language that was not often altered to describe the individualized needs of each client or the interventions used to address those needs." (Plf. Ex. 225 at 53).

784.    Dr. Freeman testified that the use of boilerplate language is a systemic problem because, in the treatment files she reviewed, it was a significantly noticeable problem. (Freeman- Vol. 4, 720:13-25). Dr. Freeman testified that this is an indication that treatment is not individualized and that the MSOP is not being careful regarding documentation. (Freeman- Vol. 4, 721:13-722:7).

785.    All MSOP ITPs are structured the same- they list diagnoses, Matrix factors for the Class Member to work on, and action plans for addressing the Matrix factor concern. (*See e.g.* Def. Ex. 103; Def. Ex. 163; Plf. Ex. 383). ITPs from 2014 have time frames for the completion of goals, whereas earlier ITPs do not. (*Compare* Def. Ex. 103 *with* Plf. Ex. 383).

786.    MSOP treatment does not address Class Members' specific diagnoses, such as pedophilia or sadism. (Puffer- Vol. 20, 4439:4-12, 4439:23-4440:3).

787.    Class Members receive quarterly and annual treatment progress reports. (Hébert- Vol. 18, 4053:13-16).

788.    The quarterly and annual treatment progress reports do not assess the level of risk of Class Members like a forensic risk assessment would. (Hébert - Vol. 12, 2674:25-2675:5).

789.    There is no discussion at annual reviews regarding whether a Class Member is ready for a reduction in custody. (Persons Depo. 139:11-19).

790.    The majority of individuals committed to the MSOP are treated in the "conventional" program.  However, MSOP identifies several "special populations" receiving treatment as well.  (Plf. Ex. 225 at 10).

791.    Similarly, in 2014, the Rule 706 Experts determined that MSOP's rigid adherence to the Matrix model fails to recognize the very complex and individualized treatment needs of special needs Plaintiffs which will invariably interfere with treatment progress, particularly as it is defined by the program. (Plf. Ex. 225 at 45).   Further, the Rule 706 Experts found that the clinical staff and supervisors are not supported or encouraged to appropriately modify the treatment offered and that from a clinical point of view, this population seems to be administratively unrecognized, misunderstood and inappropriately served or underserved.  (Plf. Ex. 225 at 45).

792.    The Alternative Program at the MSOP is made up of Plaintiffs who have comorbid disorders with significant barriers to successful participation in the conventional treatment program – these disorders are most often observed in limited intellectual functioning and cognitive limitations.  (Plf. Ex. 225 at 20).

793.    There are no written criteria regarding assignment to the Alternative Program. (Elsen- Vol. 7, 1372:4-8). The specific criteria for assignment of an individual to this Program are unclear.  (Plf. Ex. 225 at 20; Miner- Vol. 6, 1115:25-1116:16).

794.   The mental health unit (Nova) is in Moose Lake. (Johnston- Vol. 15, 3305:8-11). Currently, there are approximately 23 Class Members with severe mental health conditions housed on the Nova Unit. (Plf. Ex. 225 at 15).

795.   The assisted living unit is a 25-bed unit in Moose Lake. (Johnston- Vol. 15, 3305:8-11). Class Members on this unit include elderly individuals and others with brittle chronic disorder and ambulatory disabilities.  Despite these conditions, there are no nursing or medical staff assigned to the assisted living unit and it is not clear what specialized training, if any, is provided to the security counselors assigned to this unit. (Plf. Ex. 225 at 18).

796.   Class Members on the Assisted Living Unit have a variety of medical issues, including Parkinson's and cancer, some are confined to wheelchairs or use walkers, and some are oxygen dependent. (Plf. Ex. 410).

**3.  Phase Progression**

797.   It is the practice for MSOP to start all patients in Phase I of the treatment program. (Elsen- Vol. 7, 1345:23-1346:1; Lewis- Vol. 7, 1399:13-15).

798.   The MSOP does not have a policy regarding what phase of treatment Class Members start in. (Hébert - Vol. 12, 2785:2-5).

799.   There is no report done at the time of admission to determine what phase of treatment a Class Member will be placed in. (Hébert - Vol. 12, 2786:19-24).

800.   Mr. Bolte started in Phase I of the treatment program even though he had participated in sex offender treatment in various juvenile placements. (Bolte- Vol. 8, 1716:6-1719:18, 1722:11-12).

801.    Mr. Thuringer started in Phase I of treatment and has not moved past Phase I of treatment despite having completed the inpatient portion of the Alpha House treatment program prior to his commitment. (Thuringer- Vol. 8, 1852:8-11, 1854:25-1855:2). Mr. Thuringer did not have any sexual contact offenses since completing the Alpha House program. (Thuringer- Vol. 8, 1855:23-25).

802.    There are no assessments done at initial intake to MSOP to determine what phase of treatment a Class Member should be placed in. (Peterson- Vol. 7, 1391:1-4; Berg- Vol. 7, 1509:8-11).

803.    The requirements for progression through the MSOP's treatment phases are found in the MSOP's Clinician's Guide and the MSOP's Treatment Phase Progression policy. (Def. Ex. 2; Def. Ex. 7).

804.    The phase progression requirements as they are in the Clinician's Guide govern phase progression in the MSOP's treatment program. (Hébert - Vol. 12, 2750:22-24).

805.    Class Members may be progressed in phase at either a quarterly or annual review. (Def. Ex. 2 at 16).

806.    Class Members cannot skip treatment phases. (Persons Depo. 107:6-)

807.    The current requirements for movement from Phase I to II are: (1) two consecutive quarterly reports that indicate the client has achieved at least satisfactory scores of 3+ on the Phase I Matrix Factors, (2) a score of at least a 2 on the Matrix Factors of healthy lifestyle and life enrichment, (3) participation in a maintenance polygraph, (4) two consecutive quarters of no major BERs, and (5) active treatment

participation by requesting group time at least 50% of the time in the previous quarter. (Def. Ex. 2 at 16).

808.    Ms. Persons testified that, for a Class Member who was engaged the entire time in Phase I, Phase I should take two quarters. (Persons Depo. 99:19-100:1)

809.    The current requirements for movement from Phase II to Phase III are: (1) two consecutive quarterly reports that indicate an average of 4 or better on each Phase II matrix factor, (2) client will have taken a PPG or Abel/ABID assessment and addressed the results in treatment, (3) take a maintenance polygraph to verify client report regarding adherence to program rules, (4) take a full disclosure polygraph to verify an agreed-upon sexual history, and (5) successfully address in core group the client's offense cycle/chain, roots of offending, relapse prevention plan, and an understanding of sexual arousal patterns and a plan to manage sexual deviance. (Def. Ex. 2 at 16-17).

810.    In the prior version of the Clinician's Guide, the Matrix score requirements for movement from Phase II to III was a 4+ on all Phase II Matrix factors. (Plf. Ex. 201).

811.    The phase progression requirements must be met to move to the next phase unless the approval of the facility clinical director is obtained. (Def. Ex. 2 at 18).

812.    The phase progression requirements, including the required Matrix scores, were chosen by the MSOP, and there is no research behind the requirements chosen. (Hébert - Vol. 12, 2756:16-25).

813.    The MSOP has recently implemented a Phase Progression Panel for movement from Phase II to III. (Plf. Ex. 201; Def. Ex. 2 at 17).

814.    The Progression Panel is comprised of MSOP clinical leadership- the

Executive Clinical Director, Clinical Directors, and Associate Directors. (Def. Ex. 2 at

17). The panels meet at least quarterly. (Def. Ex. 2 at 17).

815.    Clinicians are instructed to consult with their clinical supervisor before

referring a patient to the progression panel. (Def. Ex. 2 at 17). The patient must meet all

the Phase II to III progression markers before appearing before the panel. (Def. Ex. 2 at

17).

816.    Dr. Fox testified that at least with regard to individuals progressing from

Phase II to Phase III, it is a relatively long process.  (Fox-Vol. 19, 4262:17-4263:22).

817.    Mr. Steiner must go before the Phase Progression Panel before he can move

to Phase III. (Def. Ex. 228).

818.    The phase progression requirements are the same for all Class Members.

(Plf. Ex. 225 at 20; Plf. Ex. 48 at 5; Puffer- Vol. 7, 1577:13-16; Hébert - Vol. 12,

2788:11-14). They are not modified for anyone. (Hébert - Vol. 12, 2789:1-2).

819.    Mr. Puffer testified that a person that is not participating in treatment

cannot progress through the treatment program even if they get sufficient matrix scores.

(Puffer- Vol. 20, 4436:9-19).  So individuals who are not participating in treatment will

never get program support for release or conditional release.  (Puffer- Vol. 20, 4436:20-

25).

820.    Class Members with juvenile-only offenses must meet the same phase

progression requirements. (Hébert - Vol. 12, 2788:11-14).

821.    Class Members in the Alternative Program must meet the same phase progression requirements. (Miner- Vol. 6, 1118:1-3; Fox- Vol. 7, 1604:24-1605:2; Hébert - Vol. 12, 2788:15-16).

822.    Class Members on the Assisted Living Unit must meet the same phase progression requirements. (Hébert - Vol. 12, 2788:17-18)

823.    Class Members on the Mental Health or Nova Unit have to meet the same progression requirements as all other Class Members. (Ulrich- Vol. 7, 1472:13-16). There are some Class Members on the Nova Unit who do not have the ability to progress through the treatment program. (Ulrich- Vol. 7, 1489:13-17).

824.    However, there are Class Members who are not capable of meeting the phase progression requirements as they are written, such as many patients in the Alternative Program. (McCulloch- Vol. 2, 242:15-19).

825.    An MSOP clinical supervisor, Ms. Todd-Bense, informed Ms. Hébert in 2013 that there are lower functioning Class Members in the Alternative Program who are not capable of scoring 4s and 5s on the Matrix factors. (Plf. Ex. 6).

826.    For example, Mr. Manahl, who is in the Alternative Program (Manahl- Vol. 11, 2614:1-8), was unable to complete the polygraph exam required to move to Phase III. (Plf. Ex. 304-A, 304-B, 304-C, Def. Ex. 285). Mr. Manahl was expected to resolve the deception indicated in his polygraph before moving to Phase III. (Plf. Ex. 304-C). Inability to pass the polygraph was keeping Mr. Manahl from moving to Phase III. (Manahl- Vol. 11, 2623:3-5).

827.   Additionally, Class Members with severe mental illness, such as those on the Nova Unit, may be participating in treatment but are unable to benefit from it due to their psychiatric issues, which can affect ability to be successful in treatment and move forward. (Miner- Vol. 6, 1100:20-1101:9).

828.   Ms. Hébert testified that mental illness can cause Class Members to behave in a way that prohibits them from progressing in treatment. (Hébert - Vol. 12, 2790:19-23).

829.   If Class Members are unable to progress to Phase III of the treatment program, they are unlikely to get MSOP support for a reduction in custody. (McCulloch- Vol. 2, 243:6-15).

830.   Although the Clinician's Guide allows Class Members to be progressed even if they have not met the phase progression requirements, in practice this does not happen often. (Def. Ex. 2).

831.   For example, Dr. Elsen testified that she has never been involved in a case involving one of her Alternative Program patients where they were progressed without meeting the Matrix score requirements or the BER requirements. (Elsen- Vol. 7, 1348:11-1349:6). Additionally, Dr. Elsen does not know of any Class Members who have progressed from Phase II to Phase III without passing the full disclosure polygraph. (Elsen- Vol. 7, 1349:11-15).

832.   There are Class Members in the Alternative Program who have been in Phase I for over five years or in Phase II for over five years. (Elsen- Vol. 7, 1349:20-7).

833.    There are Class Members that have been on the Mental Health Unit in

Phase I of treatment since at least 2010. (Ulrich- Vol. 7, 1476:1-6).

834.    Every year since 2006, the Site Visit auditors have expressed that they are

concerned with the high number of Class Members in Phase I and the small number of

Class Members in Phase III. (Haaven Depo. 124:5-15). It was not until recently that

patients began moving through the MSOP's treatment phases. (Def. Ex. 15). As of the

first quarter of 2012, 65% of Class Members were in Phase I, 25% in Phase II and 4% in

Phase III. (Def. Ex. 15). As of the fourth quarter of 2014, 39% of Class Members are in

Phase I, 51% in Phase II, and 9% in Phase III. (Def. Ex. 15).

835.    Ms. Johnston testified that the increased movement was not due to a change

in policy or practice but may be due to staffing and improvements in Matrix factor

scoring training. (Johnston- Vol. 13, 3056:22-3058:1).

836.    Ms. Hébert testified that the increased movement was due to trainings with

staff, the structures and policies that are in place, a better therapeutic environment, and

the Class Members are more motivated for change, potentially because of the *Karsjens*

lawsuit. (Hébert- Vol. 18, 4177:16-4178:7).

837.    However, changes to treatment progression may have been made as a result

of this Court action, as indicated by an email among Ms. Hébert and clinical staff where

she says that she assumes all Phase II clients know what they need to move forward and

that there must be treatment plan discussions about what needs to be done so the

clinicians do not just take a passive position and say no to progression. (Plf. Ex. 122).

Ms. Hébert then says "I'm under some pretty big pressures with the settlement and am

trying to be proactive for the program before we all go under a court order." (Plf. Ex. 122).

838.    When asked why individuals were not previously progressing, Dr. Fox testified that the more skilled the MSOP staff has become at motivating client and providing good treatment and the more willing the clients become to take advantage of that treatment, the more quickly they progress.  (Fox-Vol. 19, 4302:6-16).

839.    Mr. Berg thinks that having a clear direction for a program, having clear parameters, having a treatment plan that allows clients to know what they need to do are all contributing factors to people progressing in the program.  (Berg- Vol. 20, 4623:20-4624:13). He believes in 2012 the parameters were clear and direct but that he is not sure that it was laid out and that the clients had all the information yet.  (Berg- Vol. 20, 4625:3-20).

840.    In an email from Ms. Hébert to Dr. Fox, she asks if the alternative guys "maxed out on treatment" or "just moving forward." (Plf. Ex. 45).  Dr. Fox understood "maximum treatment effect" to mean an individual has gained as much benefit from the treatment as is possible and cannot further gain benefit.  (Fox-Vol. 19, 4304:19-24).  She also testified that she does not believe that there is a single client in the program who could not continue to receive some benefit from the treatment that MSOP provides.  (Fox-Vol. 19, 4304:25-4305:8).

841.    The training on the Matrix factors occurred in 2013 and 2014. (Johnston-Vol. 13, 3058:2-3).

842.    Dr. Vietanen testified that in 2013, there was a big push to move Class Members from Phase II to Phase III but there was no consistency in that process and it did not seem that the phase progression factors from the Clinician's Guide were being used as the deciding factors. (Vietanen- Vol. 10, 2305:1-17).

843.    The 2011 Site Visit Report stated, "[w]e are concerned about the high number of clients in Phase I or the program and small number of clients in Phase III of the program." (Pl. Ex. 46 at 6). It recommended that the MSOP "examine factors contributing to the apparent slow movement through the program." (Pl. Ex. 46 at 6).

844.    The MSOP does not provide sufficient training to staff regarding phase movement, and some clinical staff are not even aware of their role in phase progression decision. (Plf. Ex. 225 at 54).

845.    Former MSOP Treatment Psychologist Dr. Vietanen testified that Class Members did not move forward through the program or out of the program, and it was not possible to do treatment in a way that was going to result in a return to the community. (Vietanen- Vol. 10, 2288:21-25).

846.    Throughout her time at MSOP, Dr. Vietanen received favorable performance reviews. (Plf. Ex. 368; Plf. Ex. 369; Plf. Ex. 370; Plf. Ex. 371).

847.    Many Class Members do not know exactly what they need to in order to progress in treatment. (Terhaar- Vol. 9, 1999:7-9; Karsjens- Vol. 16, 3604:8-11; Rud- Vol. 17, 3865:12-15).

848.    In fact, the MSOP will not allow Class Members to have access to the documents regarding the criteria for phase progression in the Clinician's Guide. (Plf. Ex. 119; Plf. Ex. 50).

849.    Mr. Karsjens has submitted many client requests to the clinical staff to find out what he needs to do to progress to Phase II and he still does not know what he must accomplish. (Karsjens- Vol. 16, 3605:13-3606:3).

850.    In fact, Mr. Karsjens received a quarterly treatment progress report telling him that he should stop using client requests to address problems. (Plf. Ex. 302-A).

851.    Mr. Lonergan does not know what he needs to do to progress to Phase II. (Def. Ex. 164 at 16).

852.    Ms. Hébert testified that neither Mr. Karsjens nor Mr. Lonergan should be in Phase II. (Hébert- Vol. 17, 3946:11-15).

853.    The MPET found that 30% of the Phase I patient files reviewed reflected that the patients were not placed in the proper phase based on the MSOP's own policies. (Plf. Ex. 48 at 4).

854.    Since receiving the MPET Report, the MSOP has not reassessed all Class Members to determine if they are in the proper phase of treatment. (Berg- Vol. 7, 1512:12-15; Puffer- Vol. 7, 1590:16-19).

855.    Mr. Puffer testified that statistically it would seem reasonable to say that there are people that are not placed in the correct phase.  (Puffer- Vol. 19, 4352:15-24). He also agreed that professionals can reasonably disagree on what phase of treatment an individual should be in.  (Puffer- Vol. 19, 4352:25-4353:4).

856.   Mr. Puffer testified that the MSOP should reassess all Class Members who have had sex offender treatment prior to commitment to the MSOP to see if they are in the correct phase of treatment, but he has not asked his clinicians to do such an assessment. (Puffer- Vol. 7, 1579:24-1580:7).

857.   Mr. Steiner's clinician believes he is in the incorrect treatment phase- he is currently in Phase II and should be in Phase III. (Lewis- Vol. 7, 1402:25-1403:10).

858.   Mr. Foster's clinician believes he is in the incorrect treatment phase- he is currently in Phase II and should be in Phase III. (Lewis- Vol. 7, 1403:11-18). However, Mr. Foster is not eligible to move to Phase III because he does not have the required Matrix scores and because he received a major BER within the last two quarters. (Def. Ex. 266; Lewis- Vol. 7, 1452:22-1453:12).

859.   Mr. Lonergan was supported by Dr. Vietanen to move to Phase II because he could comprehend was treatment was and was asking to move to Phase II and work on sex offender treatment, but he was not supported by his primary therapist or clinical supervisor so he did not progress. (Vietanen- Vol. 10, 2307:1-8). There was no specific identifiable problem with Mr. Lonergan's behavior or involvement in treatment given for him to work on in order to be progressed, making it impossible for him to be working on the right target. (Vietanen- Vol. 10, 2371:24-2372:13).

860.   Mr. Lonergan testified that his clinician proposed him for movement to Phase II twice and the treatment team did not agree, so he did not progress. (Lonergan- Vol. 17, 3739:20-3740:8).

861.    Mr. Lonergan testified that his primary clinician, Bruce Wagner, gave him an initial draft of his annual treatment progress report where he had all 3s on his Matrix scores and would have been eligible for Phase II, but clinical supervisor Ms. Osborne told Mr. Wagner to go back and change the scores and not progress Mr. Lonergan to Phase II. (Lonergan- Vol. 17, 3746:16-3747:1).

862.    The MSOP has no system or policy in place to ensure that Class Members who are not progressing through the treatment phases in a timely manner are reviewed through the MSOP clinical hierarchy or through an outside review. (Plf. Ex. 48 at 6; Hébert - Vol. 12, 2808:16-20).

863.    Mr. Puffer testified that if someone was stuck in a phase that one would have to look at the individual person to see why they are stuck but he also acknowledged that there is no policy to take a special look at a person who has been in a treatment phase for an extended period to see why.  (Puffer- Vol. 20, 4426:1-13).

864.    The MSOP should have a policy that applies to all Class Members where those who are stuck in a treatment phase are examined by clinical administration. (Plf. Ex. 225 at 8; McCulloch- Vol. 1, 106:21-24). Where Class Members are not making progress, it is the program's responsibility to identify the reasons for that failure to progress and address those issues. (Wilson- Vol. 3, 516:7-10). This recommendation affects all Class Members. (Wilson- Vol. 518:2-4).

865.    Mr. Haaven testified that the most important change he would like to see at the MSOP is a mechanism to identify barriers to phase progress. (Haaven Depo. 146:25-147:10).

866.    As of March 31, 2013, there were 131 Phase I Class Members, 67 Phase II Class Members, and 14 Phase III Class Members, who had been in their current treatment phase for 36 months or more. (Plf. Ex. 121).

867.    In New York, there are clinical staff at the central office who review the treatment file of any patient who has been in a phase of treatment for 18 months or two years, have conversations with their treatment team, and do what they can to help that patient move to the next phase. (Freeman- Vol. 4, 805:8-21).

868.    Ms. Hébert testified that a system like New York would be ideal, but the MSOP does not have the resources for it. (Hébert- Vol. 18, 4004:9-19).

869.    Research suggests that being in treatment for too long can be counter-productive and result in diminished returns, meaning it may actually make the patient worse. (Plf. Ex. 225 at 66).

870.    Additionally, when the level of risk of an individual is mismatched with the level of intervention, or treatment, the chance for problems increased. (Wilson- Vol. 3, 491:18-22). An example of this is those Class Members who have juvenile-only offenses. (Wilson- Vol. 3, 662:10-16).

871.    Ms. Hébert created a document showing potential timelines for each phase of treatment with Phase I lasting 2-3 years, Phase II lasting 2-4 years, and Phase III lasting 2 years. (Plf. Ex. 11).

872.    The MSOP's treatment program does not have any delineated end point. (Puffer- Vol. 7, 1556:5-6, 10-11). Treatment programs must have an end point or it may be counter therapeutic. (Plf. Ex. 225 at 66).

873. When treatment extends for too long, there is not any effect on recidivism and it may have a diminishing impact. (Cauley- Vol. 10, 2219:14-2220:11).

874. The MSOP does not have any definition of what a "treatment completer" is. (Wilson- Vol. 3, 540:12-15). Thus, no Class Member has ever completed the MSOP's treatment program. (Puffer- Vol. 7, 1556:5-6, 10-14).

875. Slow movement through the program, including the fact that only one individual had been released in recent years, was demoralizing, increased hopelessness, and negatively impacted motivation and engagement. (McCulloch- Vol. 1, 102:4-10; Plf. Ex. 43 at 7, 9).

876. Mr. Nicolaison testified that no one gets out of MSOP if you don't go to treatment but no one gets out if they go either. (Nicolaison- Vol 23: 4935:19-23). He questions why people do not get out if MSOP is in fact a real treatment program when people are being released in other states. (Nicolaison – Vol. 23, 4938:2-6). His last sexual offense occurred when he was thirty-four and he is now sixty-four. (Nicolaison – Vol. 23, 4945:14-16). He testified that he does not participate in treatment because no one gets out. (Nicolaison – Vol. 23, 5031:23-5032:12).

877. Class Member, Mr. Hayzlett, also testified that there is no progression for people in treatment because no one ever gets out. (Hayzlett – Vol. 23, 5055:12-16; 5056:8-12). He currently does not participate in treatment because he feels it is not beneficial or successful – meaning that no clients have been fully discharged. (Hayzlett – Vol. 23, 5086:23-5087:2).

878.    Unfortunately, very few individuals progress through treatment in a timely fashion.  Independent experts have expressed concern about this lack of progression. (Plf. Ex. 43 at 1).

879.    Ms. Persons testified that there are Class Members who have stopped participating in treatment because they felt it was futile. (Persons Depo. 66:18-22).

880.    The Rule 706 Experts found that the single most positive way to improve the therapeutic environment of the MSOP would be for all concerned (MSOP administration, all staff, and Plaintiffs) to see more people being released. (Plf. Ex. 225 at 58).

881.    The MSOP is aware of the hopelessness issue. In 2013, Dr. Fox emailed clinical staff regarding moving two Class Members to Phase II as soon as possible "in order to instill hope among ML clients that progression is happening in the program." (Plf. Ex. 138).

882.    Dr. Wilson identified John Rydberg as an example of a Class Member whose treatment progress was affected by hopelessness. (Wilson- Vol. 3, 658:25-959:7). Mr. Rydberg told the 706 Experts he has been moved back in phase a number of times and that there was no point in continuing treatment because it was never going to result in his release. (Wilson- Vol. 3, 660:14-18).

### a. Matrix Factors

883.    Programming at the MSOP is aimed at developing and maintaining meaningful change in a variety of domains, known as Matrix Factors.  (Plf. Ex. 225 at 31).

884.    Treatment progress is scored using the Matrix factors. (Hébert - Vol. 12, 2745:19-21).

885.    The Matrix Factors were developed by the MSOP. (Hébert - Vol. 12, 2745:22-25).

886.    No other sex offender programs use the Matrix factors. (Freeman- Vol. 5, 1026:4-9; Cauley- Vol. 10, 2221:12-14; Hébert - Vol. 12, 2747:21-24).

887.    These Factors include: Group behavior, attitude toward change, self-monitoring, thinking errors, emotional regulation, interpersonal skills, sexuality, cooperation with rules/supervision, prosocial problem solving, productive use of time, healthy sexuality, and life enrichment.  (*Id.* at 31).

888.    The Matrix Factors form the basis of the MSOP's treatment program. (McCulloch- Vol. 1, 104:13-24; Wilson- Vol. 3, 535:18-19). The Matrix Factors are an essential element of determining progression through the MSOP's treatment phases. (Plf. Ex. 225 at 31).

889.    The same Matrix Factors are used for all Class Members. (McCulloch- Vol. 1, 92:19-93:5).  "[I]t appears that the same Matrix Factors are applied wholesale to all clients, in a potentially cookie-cutter fashion. Instead, comprehensive assessments should be completed for each client to identify specific risk factors and individualized treatment needs, which should then be conveyed in language that the client can understand and address in treatment." (Plf. Ex. 225 at 59).

890.    Ms. Hébert testified that not all Class Members has every criminogenic need that is reflected in research. (Hébert- Vol. 19, 4041:2-3).

891.    The Matrix factors are not modified for Class Members in the Alternative Program. (Miner- Vol. 6, 1118:2-4; Elsen- Vol. 7, 1346:2-16; Def. Ex. 4).

892.    The Matrix factors are not modified for Class Members with severe mental illness. (Miner- Vol. 6, 1109:12-14; Ulrich- Vol. 7, 1471:4-7). The Matrix factor scoring is also not modified for Class Members with severe mental illness. (Ulrich- Vol. 7, 1471:8-10).

893.    The Matrix factors are not modified for Class Members on the Assisted Living Unit. (Miner- Vol. 6, 1112:23-25).

894.    Class Members are scored on the Matrix Factors in quarterly and annual treatment progress reports. (Freeman- Vol. 5, 1000:6-9).

895.    The 706 Report found that rigidly adhering to the Matrix model fails to recognize the very complex and individualized treatment needs of special needs clients, which will invariably interfere with treatment progress. (Plf. Ex. 225 at 8).

896.    Outside evaluators have questioned the accuracy of Matrix scores and the MSOP clinicians' ability to apply them consistently a number of times in recent years. (Plf. Ex. 225 at 38).

897.    In 2011, the Auditor's Report noted that clinicians stated that the Matrix factors were not applied consistently.  (Plf. Ex. 184 at 75).

898.    Also in 2011, the Site Visit Report found, "[d]iscussions with staff raised some concerns about interrater reliability of scoring the Goal Matrix across MSOP assessors.  We recommend that the program examine Goal Matrix scoring consistency and address any problem areas identified." (Plf. Ex. 46 at 5).

899.    In 2012, the Site Visit Report noted that "[t]he program continues to experience challenges scoring clients reliably on the Matrix and has scheduled staff trainings to address this problem." (Plf. Ex. 43 at 2). The 2012 Site Visit Report recommended "that the program develop a formal system for regular structured chart audit to assess Matrix scoring accuracy." (Plf. Ex. 43 at 5).

900.    In 2013, the Site Visit Report explained that the program needs to develop a process of regular reliability checks to ensure maintenance of scoring accuracy and minimize scoring drift. (Def. Ex. 21 at 4).

901.    Also in 2013, the MPET Report found that "the program continues to experience challenges scoring clients reliably on the Matrix." (Plf. Ex. 48 at 5).

902.    In 2014, the 706 Experts found that the Matrix Factors are not scored in a consistent manner and that MSOP staff were confused about the definitions of the Matrix Factors and how to score some items. (McCulloch- Vol. 1, 90:11-91:1, 97:17-25).

903.    MSOP administration agrees that applying the Matrix factors consistently was an issue among clinicians. (Puffer- Vol. 7, 1570:7-11).

904.    In 2013, Ms. Hébert asked Mr. Puffer and Dr. Fox to come up with ways to help staff use the Matrix factors more consistently in order to demonstrate to the auditors that the MSOP is taking steps to help staff learn to be more consistent in Matrix scoring. (Plf. Ex. 250).

905.    In 2013, an MSOP clinical supervisor, Ms. Todd-Bense, informed Ms. Hébert that there was a lack of consistency in Matrix scoring when Class Members moved from Moose Lake to St. Peter. (Plf. Ex. 6).

174

906.    Dr. Fox testified that there have been past instances where there needed to be clarification on the scoring of the Matrix factors, although she testified that she feels confident "now" that people are using that Soring Guide well and accurately.  (Fox-Vol. 19, 4248:19-4249:7).

907.    Ms. Persons testified that there have been issues with Matrix factor scoring consistency. (Persons Depo. 72:2-4, 8-12). Ms. Persons also testified that newer clinicians are more likely to give lower Matrix scores. (Persons Depo. 133:7-18).

908.    Inconsistent scoring on the Matrix Factors is an obstacle to phase progression that can impact the program's fidelity and implementation. (Plf. Ex. 43 at 7; McCulloch- Vol. 1, 92:9-14).

909.    Inconsistent scoring on the Matrix factors can slow the progress of Class Members through treatment. (Elsen- Vol. 7, 1350:8-10, 15-16; Berg- Vol. 7, 1511:9-13; Puffer- Vol. 7, 1572:9-11; Fox- Vol. 7, 1602:3-6).

910.    The MSOP has not done any analysis of treatment files to determine how clinicians are scoring the Matrix factors or to determine whether there is any consistency. (Hébert - Vol. 12, 2768:21-2769:1).  Ms. Hébert testified that this is something that needs to be done. (Hébert- Vol. 12, 2770:1-2).

911.    If a Class Member is receiving lower scores on the Matrix factors, they would not be moved as quickly through treatment as Class Members with higher scores. (Hébert- Vol. 12, 2758:19-21).

912.    There have not been any scientific investigations of the Matrix Factor tool to establish its reliability or its validity. (Wilson- Vol. 3, 536:13-18; Miner- Vol. 6,

1185:1-12). This is a serious problem with respect to the psychometric ability of the tool. (Wilson- Vol. 3, 537:10-15).

913.    Ms. Hébert testified that interrater reliability for a tool is very important, particularly for something that is outcome based. (Hébert- Vol. 17, 3914:8-11).

914.    Ms. Hébert testified that the MSOP has never done any interrater reliability studies with respect to how Matrix factors are scored. (Hébert- Vol. 12, 2768:13-5).

915.    The Matrix Factor Scoring Guide does not meet minimal requirements for a psychological test as promulgated by the joint APA-AERA Guidelines for Psychological and Educational Testing because it does not include a lot of information that would be required in a guide or manual. (Miner- Vol. 6, 1183:5-14).

916.    Despite this ongoing feedback from outside reviewers, the MSOP does not have a formal system for regular structured chart audit to assess Matrix Factor scoring accuracy of its clinical staff. (McCulloch- Vol. 1- 98:9-14).

917.    Ms. Hébert testified that Matrix scoring is subjective and dependent on the person using it. (Hébert- Vol. 12, 2756:6-10). Personal bias could affect scoring. (Hébert- Vol. 12, 2756:15-18). She also testified that the Matrix factors were not designed to be objective- they are professional guided clinical judgment decisions. (Hébert- Vol. 17, 3906:25-3907:8).

918.    MSOP clinical staff agrees that scoring the Matrix Factors is subjective. (Lewis- Vol. 7, 1449:13-18; Ulrich- Vol. 7, 1471:1-3).

919.    There was no interrater reliability with Matrix scoring. (Vietanen- Vol. 10, 2303:19-21). Different clinicians would score Class Members differently than other

176

therapists, which could be seen if they changed therapists throughout the year. (Vietanen-Vol. 10, 2304:13-19).

920.    If the Matrix Factors are incorrectly applied and resulted in a delay in treatment progression, the individual would be injured by that because the MSOP uses treatment progression to determine whether to support Class Members for reduction in custody. (Miner- Vol. 6, 1210:6-14).

921.    Additionally, fixing the Matrix scoring problem now would not solve the historical problem of Class Members being scored improperly on the Matrix Factors. (Miner- Vol. 6, 1216:2-15).

922.    This issue regarding Matrix scoring subjectivity and scoring reliability impacts all Class Members who are scored on the Matrix Factors. (McCulloch- Vol. 1, 168L22-169:9).

923.    Furthermore, Class Members in both the Alternative Program and conventional programming have difficulty understanding the Matrix factors and understanding what they need to do to progress to the next treatment phase. (McCulloch-Vol. 2, 241:17-242:10). If a patient does not know what he is expected to do, he cannot possibly succeed and progress in treatment. (Wilson- Vol. 3, 514:12-16).

924.    Outside Experts have also questioned the need for the scoring on the Matrix Factors as a progression indicator.  For example, the MPET Report suggested that the requirements for progression from Phase I to II and from Phase II to III are too high, and the MSOP should evaluate whether such scores are really necessary in order to participate in the next treatment phase. (Plf. Ex. 48 at 4-5). The 2012 Site Visit Report

found, "[W]e have some concerns that staff may have overly high expectations for movement between Phase II and III of the program." (Plf. Ex. 43 at 7).

925.    The 706 Experts found that, in general the expectations for movement between phases were extraordinarily high. (McCulloch- Vol. 1, 101:24-102:2). There is a culture that expects Class Members to be perfect in order to move to the next phase. (Freeman- Vol. 4, 768:2-7).

926.    An illustration of the issues with requiring particular Matrix scores to progress is that the 706 Report found that "many SMI clients will experience great difficulties in meeting the Matrix Goals that guide progress through the MSOP system." (Plf. Ex. 225 at 17). A further illustration is that the MSOP does not modify the treatment program for Class Members on the Assisted Living Unit, and holds it against them when they are unable to attend or participate in treatment, which is "reflected in their inability to progress in treatment phases." (Plf. Ex. 225 at 20).

927.    In general, the MSOP places unrealistic expectations on patients to progress even though there are some Class Members that would be unable to meet certain expectations because they might be people who, for example, will never live independently in the community. (McCulloch- Vol. 1, 188:16-23). These stringent and unrealistic expectations affect all Class Members, including and especially those in the conventional program like the named Plaintiffs. (McCulloch- Vol. 1, 188:25-189:5).

### b.  BERs

928.    Pursuant to MSOP policy, Class Members may receive behavioral expectation reports (BERs) when behavioral expectations of the program are violated. (Def. Ex. 48).

929.    In 2010, there were a total of 4490 BERs given at Moose Lake, 1418 of which were major BERs. (Plf. Ex. 392 at 19).

930.    In 2011, there were a total of 5616 BERs given at Moose Lake, 2012 of which were major BERs.

931.    After 2011, the MSOP's Annual Performance Report stopped tracking BER data. (Def. Ex. 80, Def. Ex. 81).

932.    Determining whether to give a BER is subjective, and they are normally given by security staff at MSOP. (Hébert - Vol. 12, 2772:14-21).

933.    In order to move from Phase I to II or Phase II to III, a Class Member must have two consecutive quarters with no major BERs. (Def. Ex. 2 at 16-17).

934.    This is true even if the major BERs are not related to sexual offending. (Hébert - Vol. 12, 2772:3-5).

935.    Major BERs can include things such as signing up for an activity and failing to attend or throwing paperwork (Bolte- Vol. 8, 1729:23-1730:5; Plf. Ex. 300-D; Plf. Ex. 356).

936.    Major BERs can be appealed. (Def. Ex. 48Bolte- Vol. 8, 1742:10). At the hearing, the Class Member is not able to have legal representation or call witnesses. (Def. Ex. 48; Bolte- Vol. 8, 1742:11-13). The BER hearings are run by MSOP staff. (Bolte-Vol. 8, 1742:14-17).

937.     Major BER hearings may be appealed to the facility director or designee. (Def. Ex. 48). If the Class Member is not satisfied with the facility director's response, an appeal of that decision can be made to the MSOP's Executive Director. (Def. Ex. 48). The decision of the Executive Director is final. (Def. Ex. 48).

938.     Minor BERs can include behavior such as horseplaying or taking an extra glass of Koolaid at a meal (Plf. Ex. 300-B, Plf. Ex. 355).

939.     Minor BERs are considered in phase progression decisions, even though they are not specifically addressed in the phase progression requirements. (Def. Ex. 2; Lewis- Vol. 7, 1402:17-20; Berg- Vol. 7, 1512:16-18).

940.     Ms. Hébert testified that minor BERs can hold back a Class Member's treatment progress, even if they are not related to sexual offending. (Hébert - Vol. 12, 2771:3-5, 2772:10-13).

941.     Minor BERs do not provide a hearing process. (Def. Ex. 48; Bolte- Vol. 8, 1742:1-5). They can be appealed to the MSOP's Behavioral Expectations Supervisor or designee. (Def. Ex. 48 Bolte- Vol. 8, 1743:3-9).

942.     Even if a Class Member met all the requirements of phase progression, yet they had a number of minor BERs, those minor BERs could keep them from progressing in phase. (Berg- Vol. 7, 1514:7-12).

943.     Receiving BERs is a common occurrence for patients in a sex offender civil commitment facility. (Plf. Ex. 225 at 9).

944.     Mr. Haaven testified that "when people become hopeless in a process, they start reacting within the environment they're in... because of frustration and anger… it's

180

pretty common, when people don't have a sense of movement or change or opportunity, that they start acting that frustration out." (Haaven Depo. 134:8-14).

945. For example, it is not uncommon for young MSOP patients between 19 and 25 years old to break rules given their age. (Miner- Vol. 5, 1074:10-15). Additionally, younger patients are more likely to be targeted and thus may need to break rules to show they are not vulnerable. (Miner- Vol. 5, 1074:16-25).

946. Mr. Bolte would fight with peers at the MSOP in order to not be viewed as vulnerable. (Bolte- Vol. 8, 1728:6-12).

947. Additionally, some rules at MSOP are counter-intuitive to Class Members, such as the rule that prohibits sharing items with one another. (Bolte- Vol. 8, 1731:19-25; Rud- Vol. 17, 3832:23-3833:5).

948. Mr. Karsjens' treatment file had the BERs of a different Class Member in it by accident, and although Mr. Karsjens proved they were not his, he has still not been progressed to Phase II. (Karsjens- Vol. 16, 3604:15-25).

949. BERs can also affect matrix scoring. (Bolte- Vol. 8, 1745:18-19). Mr. Bolte has been told by clinical staff that his Matrix scores were lowered due to BERs. (Bolte- Vol. 8, 1745:18-19).

950. Behavior is also an integral part of many Class Members' treatment plans and they must achieve certain goals such as receiving no BERs in order to meet that Matrix Goal. (Plf. Ex. 300-H; Plf. Ex. 300-I; Plf. Ex. 300-J; Plf. Ex. 300-K; Plf. Ex. 300-L).

951.     When Mr. Bolte had a Matrix goal of "Cooperation with rules and supervision," his Matrix scoring was tied directly to his behavior. (Plf. Ex. 300-H; Plf. Ex. 300-I; Plf. Ex. 300-J; Plf. Ex. 300-K).

952.     Even Class Members who follow MSOP rules receive the Matrix goal of "Cooperation With Rules and Supervision." (Plf. Ex. 244; Thuringer- Vol. 9, 1955:15-17).

953.     Similarly, it is more difficult for Class Members with severe mental illness to achieve the behavior necessary to get the required Matrix scores. (Ulrich- Vol. 7, 1472:8-12).

954.     The BER appeal process is rarely successful for Class Members. (Bolte- Vol. 8, 1739:8-10; Plf. Ex. 300-F; Terhaar- Vol. 9, 1995:12-18).

955.     BERs should not impact phase progression unless the behavior is directly related to the Class Member's pattern of sexual offending.  (Plf. Ex. 225 at 8, 69-70). This policy and practice is outside best practices. (Freeman- Vol. 4, 803:10-12).

956.     Mr. Foster was moved back from Phase II to Phase I after receiving a major BER for possessing adult-themed pornography. (Foster- Vol. 12, 2850:5-9, 2851:20-24). It took him three years to move back to Phase II again. (Foster- Vol. 12, 2851:20-24).

957.     The use of BERs in such a way as to impact treatment progress adds to the frustration and despair felt by Class Members. (McCulloch- Vol. 1, 181:25-182:3, Plf. Ex. 225 at 70).

958.     Currently, Class Members receive BERs despite, for example, a mental illness or intellectual disability that could be impacting the behavior. (McCulloch- Vol. 1,

181:16-24). Psychiatric symptoms are often viewed as behaviors for secondary gain and looked at as disciplinary issues rather than psychiatric issues. (Miner- Vol. 6, 1101:24-1102:2).

959.    Staff believes that patients need to have perfect behavior in order to progress in phase. (McCulloch- Vol. 1, 144:4-17). This is most pronounced in Phase I, where 100% good behavior was expected before movement to Phase II. (Wilson- Vol. 3-502:13-16).

960.    Treatment progress is delayed for Class Members who have behavioral problems because of this policy and practice. (Freeman- Vol. 4, 803:7-9).

### 4.  Staffing

5.    One of the major barriers to treatment progression for the individuals committed to MSOP is the chronic clinical staffing shortage. (Plf. Ex. 48 at 5). These staffing shortages affect the entire MSOP population because turnover of staff or insufficient staff can lead to treatment taking longer. (McCulloch- Vol. 1, 171:5-23).

6.    Maintaining clinical staffing has been a consistent issue at the MSOP. The 2010 Site Visit Report found, "A concern is that the clinical program is currently understaffed, particularly at the Moose Lake site.  As a result of understaffing, clinicians' current workload has increased beyond capacity . . . Four of the nine clinical supervisor positions were unfilled at the time of this review." (Plf. Ex. 25 at 8).

7.    The 2011 Auditor's Report found, "[c]linical understaffing has been a very serious problem, which has affected the ability of the program to deliver treatment to clients." (Plf. Ex. 184 at 60).

8.      The 2012 Site Visit Report found "Although clinical staffing levels at

Moose Lake had improved at the time of our last review in December 2011, clinical

staffing levels at the site have since dropped, and this is a significant concern." (Plf. Ex.

43 at 2). The 2012 Site Visit Report also found, "At the time of the present site visit, of

54 clinical positions at Moose Lake, 16 positions were vacant.  Of 11 clinical supervisor

positions, two positions were vacant." (Plf. Ex. 43 at 10).

9.      For example, the Office of the Legislative Auditor found that "[d]ue to

clinician turnover, clients often have not had the benefit of consistent clinical care. It is

difficult for clinicians who are new to their clients to know whether a client has improved

over time or whether a learning disability, cognitive problem, or mental illness is

hindering the client's treatment." (Plf. Ex. 184 at 61).

10.     In 2012, the Moose Lake facility had almost a 50% vacancy rate for

clinicians. (Plf. Ex. 145).

11.     As of March 2015, there was a 15% vacancy rate in Moose Lake and a 10%

vacancy rate in St. Peter. (Hébert- Vol. 18, 4018:11-22).

12.     Mr. Berg, an associate clinical director at MSOP (Berg- Vol. 20, 4583:1-2),

testified that when he started approximately three and a half years ago there were 20 to 22

clinical positions open but they are currently at 12 clinician positions open and two

psychologists. (Berg- Vol. 20, 4594:20 – 4595:1).  He viewed this as a problem.  (Berg-

Vol. 20, 4595:2-4).

13.     Ms. Johnston testified that staffing the MOSP with qualified individuals is

an ongoing challenge, particularly in Moose Lake. (Johnston- Vol. 15, 3347:10-13).

14.     The MSOP clinical staffing patterns are designed by Ms. Hebert, and if the MSOP changed the ratio of clinical staff to patients, the vacancy number would not be the same. (Johnston- Vol. 15, 3349:1-12).

15.     The MSOP has been woefully short on psychologists in the past. (Peterson- Vol. 7, 1393:2-4). These vacancy issues can affect treatment. (Peterson- Vol. 7, 1393:5-7).

16.     Dr. Fox acknowledges that hiring treatment psychologist has always been a challenge for MSOP.  (Fox-Vol. 19, 4255:23-4256:3).

17.     For most of Dr. Vietanen's employment, she was the only psychologist on a 98 bed unit, which was supposed to have two psychologists. (Vietanen- Vol. 10, 2293:14-21).

18.     Dr. Vietanen experienced regular turnover of staff on her unit, including primary clinicians, who often had caseloads of up to 16 patients. (Vietanen- Vol. 10, 2294:2-5).

19.     At certain times, Mr. Ulrich was the only clinician for one or two months at a time on the Mental Health Unit, which may have affected the treatment progress of those Class Members. (Ulrich- Vol. 7, 1477:1-7).

20.     High turnover of clinical staff can lead to poorly trained individuals executing a complicated and subjective treatment program.  (McCulloch- Vol. 1, 108:6-13).

21.     Ms. Hébert has stated that it takes about a year for a clinician "to get up to speed to do quality work." (Plf. Ex. 145).

22.    In fact, Ms. Hébert thinks that some staff may be "missing some fundamental basics of SO treatment." (Plf. Ex. 127).

23.    For example, if a team recommended phase progression for a patient but then the primary treatment provided left or was reassigned, the new primary would not support movement because they were new. (McCulloch- Vol. 1- 160:11-161:1).

24.    Mr. Lonergan testified that he had been proposed to move to Phase II, but then his clinical supervisor changed to Ms. Osborne, who he does not get along with, and he now has not been moved to Phase II. (Lonergan- Vol. 17, 3781:8-21).

25.    Mr. Lonergan testified that every time he receives a new clinician, his Matrix scores change. (Lonergan- Vol. 17, 3782:9-24).

26.    Mr. Rud's Matrix scores went down in 2013 when he changed primary therapists. (*Compare* Def. Ex. 199, Def. Ex. 443).

27.    Ms. Hébert testified that short staffing can affect the ability of the MSOP to deliver the treatment program as it is designed, which can affect progress through treatment. (Hébert- Vol. 12, 2816:6-14).

28.    Short-staffing can also cause clinicians to have higher caseloads (Johnston- Vol. 15, 3348:1-3), which can affect Class Member treatment progress. (Berg- Vol. 7, 1517:11-13).

29.    Short staffing can also lead harm the therapeutic alliance because clinicians must run larger groups and carry a higher workload and patients may experience more changes in their primary therapist. (Wilson- Vol. 3, 527:20-528:13; White- Vol. 9, 1968:25-1969:7).

30.    Frequent changes in primary therapist can affect progress through treatment and lead to frustration. (Wilson- Vol. 3, 529:1-3; White- Vol. 9, 1969:22-1970:3).

31.    When Class Members receive new primary therapists, their Matrix scores fluctuated because the new primary therapist did not know the patient well. (Vietanen- Vol. 10, 2294:19-2295:7; Hébert - Vol. 12, 2757:10-15).

32.    The therapeutic alliance is very important to providing good treatment. (Elsen- Vol. 7, 1351:8-11).

33.    It takes time to develop a good therapeutic alliance. (Elsen- Vol. 7, 1351:12-14; Thuringer- Vol. 8, 1864:20-1865:3; Persons Depo. 23:20-22:4).

34.    A poor therapeutic alliance can inhibit treatment progress. (Lewis- Vol. 7, 1404:23-1405:1).

35.    Mr. Steiner has had approximately 24 primary therapists during his commitment to the MSOP. (Steiner- Vol. 6, 1244:14-16).

36.    Mr. Bolte has had approximately six primary therapists during his commitment to the MSOP. (Bolte- Vol. 8, 1842:9-15).

37.    Mr. Thuringer has had at least four primary therapists during his commitment to the MOSP. (1865:22-24). He questioned how he could build trust when his primary switched all the time. (Plf. Ex. 308-D at 4).

38.    Mr. Rud has had approximately five or six primary therapists during his commitment to the MOSP. (Rud- Vol. 17, 3865:7-9).

39.    Even MSOP's leadership has expressed concern with the clinical judgment of the limited staff that does treat patients.  (Plf. Ex. 70 (stating that "I think my biggest

mistake in my job has been relying on staff ability to make independent

clinical decisions....")).

40.     The Rule 706 Experts recommended that the MSOP arrange for additional

staff training in diagnostics and treatment planning as well as noting that specific training

regarding phase movement has not been consistently provided and, in fact, some clinical

staff were unsure about their role in the phase progression decisions.  (Plf. Ex. 225 at 54,

58).

41.     The Rule 706 Experts also recommended that MSOP ensure consistent

clinical oversight, training, and supervision of all unit and clinical staff.  This is

especially pertinent for those staff with lesser experience, but attention to this for all staff

will ensure that treatment quality can be maintained and patient progression can be

maximized.  (Plf. Ex. 225 at 7).

42.     Clinical staffing issues affect all MSOP patients. (Wilson- Vol. 3, 529:16-

19).

43.     MSOP has only recently developed a comprehensive training program for

its own clinical program, which has not yet been fully implemented.  (Berg- Vol. 20,

4622:3-4623:2).

### 5.  Treatment Files

44.     It is Ms. Hébert's responsibility to be sure data in client files is accurate.

(Hébert - Vol. 12, 2794:9-12).

45.     Ms. Johnston testified that it would be concerning if it turned out that

information like a Class Member's admission date, diagnosis documentation, and the

dates and length of time in phases was wrong in the MSOP's treatment files. (Johnston-Vol. 15, 3379:2-7).

46.    Both the risk assessors and the treatment team rely on the information in treatment files. (Johnston- Vol. 15, 3379:11-24).

47.    The MSOP's internal documents show that they are aware of problems with the veracity of the data contained in the files of their patients.  MSOP's data practices have resulted in untrustworthy data that often misidentifies admission dates, contains inaccurate diagnoses and other incorrect data about Plaintiffs. (Plf. Ex. 255 ("In the past few weeks it has come to my attention that data related to admission, diagnosis and other important client information contain discrepancies which causes me to have grave concerns about the integrity of our data from the client charts. I feel strongly that we must prioritize the task of getting accurate data, making sure the client charts are reflecting accurate diagnosis and admission dates, and exploring why the clinicians are providing incomplete or wrong information on the clients. . . . As of today, we would not be able to answer the simple question of how long our clients have been with MSOP based on issues related to the admission dates.") (*see also* Richardson- Vol 21: 4701:9-13; 4702:5-7 (testifying that she recalls about the adequacy or accuracy of the data contained in client files and that people were reassigned to correct the discrepancies)).

48.    Review of treatment files demonstrated that the files are not always clear about where Class Members are in treatment and why. (Freeman- Vol. 4, 724:3-8).

### 6. Psychiatric Treatment

7.    Psychiatric care at the MSOP is currently inadequate to meet the needs of its clientele. (Plf. Ex. 225 at 8; Wilson- Vol. 3, 505:23-506:4). This has been an ongoing issue for the MSOP. The 2012 Site Visit Report found, "Psychiatric services for a program of this size is low." (Plf. Ex. 43 at 7). The 2011 Auditor's Report also found that patients' psychiatric needs were not being fully met. (Plf. Ex. 184 at 85).

8.    The MSOP has a full time psychiatric nurse practitioner at each site and has a contracted full-time psychiatrist who sees patients by telemedicine. (McCulloch- Vol. 2- 338:17-339:9; *see also* Fox-Vol 19, 4213:2-16 (discussing psychiatric care at St. Peter)).

9.    St. Peter has access to the psychiatrist by TV only one day per week. (Fox-Vol. 7, 1609:5-14).

10.   "Ideally, a full-time psychiatrist (or equivalent) and complementary psychiatric and psychological services should be available above and beyond the current services provided by the particularly diligent but clearly overburdened psychiatric nurse practitioner." (Plf. Ex. 225 at 49). "The MSOP has attempted to recruit a full-time psychiatrist, but has been unsuccessful. It is not clear if a full time psychiatrist would even be sufficient to serve the large population in the MSOP, without a comprehensive assessment of those in need of psychiatric services." (Plf. Ex. 225 at 18).

11.   Ms. Johnston and Ms. Hébert testified that it would be ideal to have a full-time psychiatrist onsite. (Johnston- Vol. 15, 3293:19-21; Hébert- Vol. 18, 4070:10-14).

12.     Ms. Hébert has asked her staff to come up with a "comprehensive plan to secure adequate [psychiatric] services." (Plf. Ex. 417).

13.     The clinical director at St. Peter, Dr. Fox, (Fox-Vol. 19, 4208:16-20), testified that it would very much be her preference to have a full-time psychiatrist on site and that they are trying to obtain a full-time psychiatrist.  (Fox-Vol. 19, 4216:11-16).

14.     Ms. Richardson, in an email to Sheila Brandt, discusses the need for a psychiatrist to assist MSOP in determining exactly what was needed but that has not yet happened.  (Richardson- Vol 21, 4704:2-4705: 3; Plf. Ex. 418).  Also in an email exchange with Ms. Hebert and others, which discusses inconsistent diagnoses, Ms. Hebert states that clinical supervisors do a diagnosis, psychiatry does a different one and the program looks stupid.  We really need our own doc."  (Plf. Ex. 417; Richardson- Vol 21, 4706:15-4707:14).

15.     Other civil commitment programs around the country offer psychiatric services more widely than at MSOP. (Plf. Ex. 225 at 18).

16.     There are Class Members, particularly at Moose Lake, who have not been identified as having serious mental illness or other serious barriers. (McCulloch- Vol. 1, 127:7-16; Freeman- Vol. 4, 866:16-22).

17.     Additionally, psychiatric services are not integrated into clinical services. (McCulloch- Vol. 2, 247:19-248:1). Psychiatric treatment is provided under health services, rather than clinical, indicating that mental health treatment is an aside to the MSOP's treatment program. (*Id.*). In fact, some MSOP clinical staff did not even know the name of the psychiatrist MSOP contracts with. (McCulloch- Vol. 2, 248:5-14).

18.     Additionally, the MSOP's contracted psychiatrist does not have access to Class Members' full treatment files. (McCulloch- Vol. 2, 337:8-17).

19.     Failure to treat mental illness- even mental illness that is not severe- can affect a patient's progress in treatment. (McCulloch- Vol. 2, 248:20-249:1).

20.     Mr. Karsjens testified that he submitted a client request asking to receive psychiatric services at MSOP. (Karsjens- Vol. 16, 3560:7-18).

### M. BEST PRACTICES AND PROFESSIONAL JUDGMENT

21.     Just because a certain number of other state's civil commitment programs engage in a certain practice does not make it a best practice. (McCulloch- Vol. 2, 417:1-4). SOCCPN surveys do not establish best practice or even common practice. (McCulloch- Vol. 2, 417:5-13).

22.     Best practices should be determined using information such as peer-reviewed academic papers and research. (McCulloch- Vol. 2, 417:14-1; Cauley- Vol. 10, 2245:13-19).

23.     Ms. Hébert  defines best practices three different ways- (1) evidence-based practice that is based on research and objective findings, (2) a more subjective or anecdotal observation of an outcome that is consistent in the field that may not have been researched enough to be evidence-based, and (3) common practice, regardless of whether it has evidence-based research. (Hébert - Vol. 10, 2379:8-2380:5).

24.     MSOP employees have several definitions of "professional judgment" and it is not always clear which standard is being applied.  Ms. Hébert testified that

professional judgment is based on education, experience, and training, as well as being up to date on research. (Hébert- Vol. 18, 4182:1-17).

25.    Dr. Fox, clinical director at St. Peter, testified that "best practices could mean a variety of things. It could mean "evidence-based practice" which are practices that have been sort of tested and proven to be very effective through research. She also testified that because not every practice used in sex offender treatment has had the benefit of that kind of rigorous testing, best practice generally refers to practices that are commonly used and acceptable standards in the field. (Fox-Vol. 19, 4232:6-19).

26.    Dr. Fox also acknowledged that "the commonly used and accepted really isn't a test of whether it is best but a test of whether it is common." (Fox-Vol. 19, 4313:2-5).

27.    She also acknowledged that it is possible that in the future it may turn out that the commonly engaged practice now are actually not best but far different than best. (Fox-Vol. 19, 4313:16-21).

28.    Mr. Puffer testified that he believes best practices evolves over time as it has in the field. He testified that currently best practices surrounds theory and delivery of services that are consistent primarily across programs in the field of sex offender treatment and that it changes over time. (Puffer- Vol 20, 4413:13-22). He also agreed that one would have to have sufficient education or experience in order to exercise professional judgment. (Puffer- Vol. 20, 4415:7-15). He also testified that it might be important in exercising professional judgment to have some licensure in addition to

education and some training with respect to the issues that one was going to exercise professional judgment on. (Puffer- Vol. 20, 4415:16-4416:2).

29.    Dr. Pascucci testified that "structured clinical judgment" which is sometimes called "professional judgment" means that a person is employing his or her own judgment based on what the research guides. (Pascucci- Vol 21, 4740:10-15).

30.    It is clear that Dr. Herbert testified that one can exercise professional judgment in a specific field, such as sex offender treatment, without ever having been educated in that field. (Herbert- Vol. 24, 5236:14-5237:3). Although she does agrees that experience is necessary to exercising professional judgment. (Herbert- Vol 24 5237:4-6). She also agrees that training is required to exercise professional judgment in forensic psychology (Herbert-Vol. 24 5237:7-10).

31.    Dr. Herbert testified that MSOP's structured professional or clinical judgement was consistent to a degree with other sex offender programs, (Herbert- Vol. 24, 5239:20-24), and yet she could not testified in detail what certain other states do with their risk assessments. (Herbert- Vol. 24, 5240:7-5241:3). She could testify that New York does things differently in how they do their risk assessments. (Herbert- Vol. 24, 5239:25-5240:6).

32.    The 2014 SOCCPN survey reported that 13 of 15 programs reporting perform risk assessments annually and that one program performs forensic risk assessments every ten months. (Plf. Ex. 228 at 48).

33.    For example, Wisconsin's SVP Law, Chapter 980, requires annual risk assessments. (McCulloch- Vol. 1, 57:20-24).

34.     New York's civil commitment statute requires annual assessments as well. (Freeman-Vol. 4, 705:1-2).

35.     In Texas, the statute provides for biennial reviews and a hearing whereby the court determines whether the individual no longer meets the criteria for commitment. (Freeman- Vol. 4, 786:19-787:2).

36.     But Minnesota's statute not only fails to require an annual risk assessment, MSOP chooses not to provide one either.  (Hébert - Vol. 10, 2392:3-6; Barry- Vol. 23, 4154:1-5; Johnston- Vol. 13, 2934:7-16)

37.     In Wisconsin, when the Static-99R came into use, there was a spike in discharges of committed individuals because they received annual reviews and were found, under the new Static-99R, to no longer meet commitment criteria. (McCulloch-Vol. 2, 433:10-18).

38.     New York also re-evaluated all committed individuals when the Static-99R was released to ensure their risk still met the threshold for commitment. (Freeman- Vol. 4, 794:1-6).  However, MSOP employees testified that despite the changes to the Static-99R, they chose not to reassess anyone under the new actuarial tool.  (Hébert, Vol. 9, 2159:4-7, 14-22).

39.     The Wisconsin statute allows patients to petition the committing court at any time to be discharged. (McCulloch- Vol. 1, 58:16-20, 63:14-19).

40.     In New York, patients receive a hearing and a risk assessment each year, although the hearing portion may be waived. (Freeman- Vol. 6, 758:14-20). Additionally, in New York, patients may petition the court at any point for a reduction in custody and if

the civil commitment program feels an individual is ready to be released, they will file a

petition on behalf of the patient. (Freeman- Vol. 4, 764:2-12).

41.     However, in Minnesota, patients must go through a cumbersome and

lengthy SRB and SCAP process in order to petition for reduction in custody or discharge.

There is not method to by-pass this process.  And there is no automatic review by the

Courts.

42.     Additionally, even if MSOP believes individuals satisfy the discharge

process, they are not required, nor do they choose to petition on behalf of those

individuals. (Johnston-Vol. 13, 2962:9-15).

43.     By contrast, in New York, there is a requirement under the statute that a

petition must be filed when the civil commitment program determines a patient no longer

meets commitment criteria. (Freeman- Vol. 4, 765:19-766:2).

44.     Minnesota has no formal process for reviewing files of individuals who

may be stuck in a treatment phase.  (Plf. Ex. 48 at 6; Hébert - Vol. 12, 2808:16-20). In

New York, there are clinical staff at the central office who review the treatment file of

any patient who has been in a phase of treatment for 18 months or two years, have

conversations with their treatment team, and do what they can to help that patient move

to the next phase. (Freeman- Vol. 4, 805:8-21).

45.     Minnesota has the highest number, per capita, of civilly committed sex

offenders in the country or the world. (Plf. Ex. 225 at 74-75; Plf. Ex 41 at 1; Plf. Ex. 184

at ix, 16-18). The rate of commitment is 128.6 per million, whereas the next highest,

North Dakota, is 77.8 per million, and by contrast New York's rate is 15 per million. (Freeman- Vol. 4, 819:10-13).

46.     Most importantly, Minnesota has never fully discharged anyone from MSOP since the program was created (Plf. Ex. 184 at 4).  Additionally only three Class Members have ever been provisionally discharged, one of whom was returned for a violation for his release conditions. (Berg- Vol. 7, 1502:10-12; Hébert- Vol. 12, 2800:9-11).

47.     By contrast, Wisconsin has fully discharged 118 individuals since 1994 (McCulloch- Vol. 1, 54:4-6) and placed approximately 135 individuals on supervised release since 1994. (McCulloch- Vol. 1, 54:16-19).  This is significant because Wisconsin incarcerates many more people than Minnesota, yet Minnesota refers and commits more sex offenders than Wisconsin and has released far fewer. (McCulloch- Vol. 2, 434:10-25).

48.     In New York, 125 civilly committed offenders were immediately placed on SIST. (Freeman- Vol. 4, 773:18-19). 64 patients have been moved from the secure facility to the strict and intensive supervision and treatment program. (Freeman- Vol. 4, 778:8-10). Thirty committed individuals have been fully discharged from New York's program. (Freeman- Vol. 4, 778:11-13). There have been no recidivism incidents for those who have been fully discharged. (Freeman- Vol. 4, 780:22-24).

# III.   CONCLUSIONS OF LAW

## A. DEFENDANTS ARE APPROPRIATELY SUED IN THEIR OFFICIAL CAPACITY AND PLAINIFFS HAVE STANDING.

1.    Where Defendants are sued in their official capacity, as is the case here, the suit is against the government entity of which the Defendant is an agent. *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n. 55 (1978)).

2.    Where the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision" by Defendants as government officials, or where the unconstitutional action occurs as a result of governmental custom, even where that custom has not been approved by an official government body, Defendants are liable in their official capacity. *See Monell*, 436 U.S. at 690-91.

3.    Plaintiffs have appropriately sued these Defendants in their official capacities.

4.    The Supreme Court has held that to have standing to invoke the federal court's jurisdiction the Plaintiff must show the following:

> (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; …(2) a causal relationship between the injury and the challenged conduct, by which we mean the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court" … and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative."

*See Northeastern Fla. Chapter of Assoc.'d Gen. Contractors v. City of*

*Jacksonville,* 508 U.S. 656, 663-664 (1993) (internal citations omitted).

5.      It is clear that Plaintiffs have met the standing requirements in this case.

First, Plaintiffs have suffered an injury in fact through the invasion of their liberty interest

in an unconstitutional manner.  Plaintiffs allege that Minn. Stat. §253D is

unconstitutional on its face and as applied.  Each Plaintiff and Class Member is civilly

committed under this statute.  Plaintiffs have alleged, among other things, that the statute

is unconstitutional because (1) the statute does not require, nor do Defendants provide, an

annual or required regular risk assessment, without which Defendants do not know

whether any of the Plaintiffs or any Class Members continue to satisfies the criteria for

commitment; (2) there is no judicial by-pass, and as such there is no way for Plaintiffs or

any Class Members to immediately access the judicial process to challenge their ongoing

commitment; (3) the statute does not require, nor do Defendants require, MSOP to

petition for the reduction of custody of those Class Members who MSOP knows or

reasonably believes meet reduction in custody criteria; (4) the treatment program as

implemented delays progression which is required for discharge from civil commitment.

As discussed below, the evidence is clear that each of these is a practice and policy that

applies to all Plaintiffs and Class Members.  As such, Plaintiffs have shown "injury in

fact."

6.      Plaintiffs have also established a causal relationship between the injury and

the challenged conduct.  In other words, "the injury 'fairly can be traced to the challenged

action of the defendant,' and has not resulted 'from the independent action of some third

party not before the court.'"  *See Northeastern Fla. Chapter of Assoc.'d Gen. Contractors,* 508 U.S. at 663-664.

7.      The injury suffered by each Plaintiff – the loss of liberty in a manner not narrowly tailored to the purpose for commitment – is directly related to the challenged actions of the Defendants.  As will be explained in detail below, it is the failures of the statute and the acts or omissions by the Defendants that result in the constitutional violation and, in turn, the injury suffered by each Plaintiff and Class Member.

8.      Each Plaintiff has been harmed by ineffective treatment at the MSOP because of the difficulty of phase advancement, the lack of regular risk assessments, and the fact that no one knows whether they continue to meet criteria for commitment to the MSOP. (Miner- Vol. 6, 1126:23-1127:5).

9.      Finally, Plaintiffs have shown a likelihood that the injury will be redressed by a favorable decision.  In other words, "prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative."  *See Northeastern Fla. Chapter of Assoc.'d Gen. Contractors,* 508 U.S. at 663-664.  Given the evidence set forth above and the conclusions set forth below, it is clear that there is a likelihood that the injury will be redressed by a favorable decision.

**B.  THE CLASS IS APPROPRIATELY CERTIFIED.**

10.      A class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion.  *Gen. Tel. Co. Sw. v. Falcon,* 457 U.S. 147, 155 (1982).

11. Rule 23 of the Federal Rules of Civil Procedure governs class certification. To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b). The Rule 23(a) requirements for class certification are (1) the putative class is so numerous that it makes joinder of all members impracticable; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the class or defenses of the class and (4) the representative parties will fairly and adequately protect the interests of the class. *In re St. Jude Med., Inc.,* 425 F.3d 1116, 1119 (8th Cir. 2005) (citing Fed. R. Civ. P. 23(a)).

12. District courts retain broad discretion in determining whether to certify a class. *Gilbert v. City of Little Rock, Ark.,* 722 F.2d 1390, 1399 (8th Cir. 1983).

13. On July 24, 2012, this Court certified a Rule 23(b)(2) class of "All patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat. § 253B." (*Karsjens,* Doc. No. 203).

14. A court may only certify the class if it is "satisfied, after rigorous analysis, that the prerequisites… have been satisfied." *Bishop v. Comm. on Prof'l Ethics and Conduct of Iowa State Bar Ass'n,* 686 F.2d 1278, 1287-88 (8th Cir. 1982) (citing *Gen. Tel. Co.*, 457 U.S. at 161).

15. Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Rule 23(a)'s first requirement is that joinder of all class members is impracticable because the class is too numerous…. The Eighth Circuit has not established any rigid rules regarding the necessary size of a

class and the question of what makes joinder impracticable depends on the facts of each case." *Sonmore v. CheckRite Recovery Services, Inc.,* 206 F.R.D. 257, 261 (D. Minn. 2001) *(*citing Fed.R.Civ.P. 23(a)(1)).

16.    Classes have been certified in this district consisting of roughly 540 class members (*see Kimball v. Fredrick J. Hanna & Associates, P.C.,* Civil No. 10-130 (MJD/JJG) 2011 WL 3610129 at *3 (D. Minn., Aug. 15, 2011)) to as few as 250-300 individuals. *In re Workers' Comp.*, 130 F.R.D. 99, 104 (1990) (citing *Bowman v. National Football League,* 402 F.Supp. 754, 756 (D. Minn. 1975)).

17.    Here, approximately 720 individuals fit the proposed class definition. The Court previously found, and continues to find, that those individuals face an identical process for treatment and potential release and to address each individual case would be an enormous drain on the resources of the Court and the parties.  (*Karsjens*, Doc. No. 203).  Plaintiffs have satisfied Rule 23(a)(1).

18.    Rule 23(a)(2) requires that "there are questions of law or fact common to the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-1 (2001) (quoting Fed. R. Civ. P. 23(a)(2)).

19.    The Supreme Court recently clarified the commonality requirement, stating:  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury . . . . [The class members'] claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke. *Id.* at 2551 (internal quotation omitted).

20.    Commonality "may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (internal quotation and citation omitted).

21.    As this Court previously found, and continues to find, the Class Members in this case allege the same injuries.   Specifically as noted above, the Class Members all suffer from injuries resulting from the unconstitutionality of Minn. Stat. § 253D on its face and as it is being applied.

22.    The following question is common to all Class Members -  Whether Minn. Stat. § 253D is unconstitutional on its face and/or as applied because:

> a.  Minn. Stat.  §253D fails to require regular independent review without which, individuals may remain civilly committed after such time that they no longer meet the constitutional criteria for commitment.
>
> b.  Defendants neither provide nor direct others to provide regular independent reviews of Class Members. Without such reviews, individuals may remain civilly committed after such a time that they no longer meet the constitutional criteria for commitment.
>
> c.  Defendants do not provide an assessment at the time Class Members are first civilly committed to MSOP to determine what phase of the treatment program the individual should be placed in or whether the individual, in fact, should be committed to either the Moose Lake or St. Peter facilities, or whether they could be treated in a less restrictive environment.

d.  Defendants are not providing Class Members with constitutionally adequate treatment or with treatment, best adapted according to contemporary professional standards, to render further supervision unnecessary.

e.  Defendants are not providing Class Members with constitutionally adequate due process relating to their fundamental liberty and property rights as established by the Constitution and the commitment statute.

f.  Defendants have implemented policies, practices, and confinement conditions which Class Members are subject to that cause MSOP to be punitive in nature, and therefore unconstitutional.

g.  Defendants do not provide a less restrictive alternative to confinement at a MSOP secure facility.  Not all Class Members have the same level of security needs, however, the statute, as implemented through the treatment program, does not account for this possibility.

**h.**  If a Class Member meets reduction in custody criteria, there is no less restrictive facilities or program for them to enter.  Defendants are aware of Class Members currently at MSOP's secure facility that could be treated in a less restrictive environment.

i.  Minn. Stat.  §253D fails to require the State to petition for a reduction in custody for Class Members who meet the statutory requirements for reduction in custody, and without such a requirement individuals may remain civilly committed after such time that they no longer meet the constitutional criteria for commitment.

j.  Defendants do not automatically, nor do they require others under their direction, to petition for a reduction in custody for Class Members who meet the statutory requirements for such a reduction in custody.  Without such a requirement, Class Members may

remain civilly committed after such a time that they no longer meet the constitutional criteria for commitment.

k.  Defendants do not automatically, nor do they require others under their direction, to petition for discharge of Class Members who are no longer dangerous and/or no longer in need of inpatient treatment for a sexual disorder.  Without such a requirement, Class Members may remain civilly committed after such a time as they no longer meet the constitutional criteria for commitment.

l.  Minn. Stat. §253D fails to require the discharge of committed individuals who are no longer dangerous and no longer in need of inpatient treatment for a sexual disorder, without such a requirement Class Members may remain civilly committed after such time that they no longer meet the constitutional criteria for commitment.

m.  Minn. Stat. §253D fails to provide for a judicial by-pass in the reduction in custody process, without such a requirement Class Members may remain civilly committed after such time that they no longer meet the constitutional criteria for commitment.

n.  Defendants have not implemented a process for reduction in custody that provides Class Members with the required constitutional due process.

o.  Ultimately, no individual has ever been fully discharged from civil commitment under Minn. Stat. §253D.

p.  The failure to release any Class Members over the life of the MSOP program demonstrates that Minn. Stat. §253D, and the treatment program are being unconstitutionally applied a result of orders from political leaders and is not based on professional judgment.

23.     "What matters to class certification ... is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to

generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 131 S. Ct.at 2551 (citation omitted, emphasis in original).

24.     The Court has previously found, and continues to find, that the Plaintiffs in this case allege the same injuries endured by all Class Members.  (*Karsjens*, Doc. No. 203). As such, resolution of the Plaintiffs' claims will necessarily remedy the injuries suffered by all potential Class Members.  The injuries alleged are all capable of classwide resolution. Therefore, Plaintiffs have satisfied Rule 23(a)(2).

25.     Rule 23(a) also requires that, in order for a class to be certified, the claims or defenses of the class representative must be typical of the other members of the class. Fed. R. Civ. P. 23(a)(3). "This requirement is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton*, 688 F.2d at 561-62 (internal quotation and citation omitted).

26.     Commonality and typicality tend to merge because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551, n.5 (quoting *Gen. Tel. Co.*, 457 U.S. at 157-58, n.13).

27.     As this Court previously found, and continues to find, Plaintiffs' claims stem from the same legal theory and seek the same legal remedy as those of the other Class Members. (*Karsjens*, Doc. No. 203). Therefore, Plaintiffs satisfy Rule 23(a)(3).

28.     Rule 23(a)(4) requires Plaintiffs to establish that the "representative parties will fully and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In order to satisfy the adequacy requirement, Plaintiff must show that (1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.,* Civ. No. 10-4372 (DWF/JJG),  2012 WL 1021679 at *4 (D. Minn. March 27, 2012) (citing *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 692 (D. Minn. 1995)).

29.     As this Court previously found, and continues to find, Plaintiffs and their appointed counsel aptly satisfy this requirement. The Court has found and continues to find that Plaintiffs will vigorously prosecute their claims. The fact that they filed *pro se* complaints (and motions for a TRO, appointment of counsel and class certification) alone proves the vigor of their commitment to this case.  The Plaintiffs have amply demonstrated that they are willing to work diligently to protect the interests of the class – particularly in light of the fact that all other similar cases are stayed pending the resolution of this matter. Plaintiffs have freely accepted the substantial responsibility by being the face of this litigation and advancing this case for all MSOP patients. They have actively engaged in all stages of this case.

30.     Likewise, Class Counsel, Gustafson Gluek PLLC, have demonstrated their determination to vigorously prosecute this case. At the request of the Minnesota Federal Bar Association's *Pro Se* Project, Dan Gustafson and the law firm of Gustafson Gluek

PLLC agreed to undertake representation of the Plaintiffs in this purported class action. Mr. Gustafson has over twenty years of experience in class action litigation, has been appointed lead counsel or co-lead counsel many times and has represented numerous classes in litigation during those years.  Gustafson Gluek PLLC has already expended substantial time and resources on this case, having taken it all the way through trial.  As such, this Court previously found and continues to find that Class Counsel, as well as the above-named Plaintiffs, is qualified, able and willing to competently and vigorously represent the Class.  (*Karsjens*, Doc. No. 203).

31.    With respect to the second prong, Plaintiffs' interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. The interests of Plaintiffs and the Class are certainly aligned in this case: they share the common goal of being civil committed in a constitutional manner and in a manner narrowly tailored to purposes of their commitment. Although Plaintiffs each have different circumstances that led to their initial and continued commitment, Plaintiffs' goals and viewpoints are unlikely to diverge from those of the remainder of the Class. Because the Class representative's interests are sufficiently similar to those of the Class, and because Plaintiffs and their counsel are able and willing to competently and vigorously prosecute this action, the Plaintiffs have satisfied Rule 23(a)(4).

32.    Even if a plaintiff meets all of the prerequisites set forth in Rule 23(a), he or she must also satisfy one or more of the conditions set forth under Rule 23(b). Fed. R. Civ. P. 23(b); *see also General Tel. Co.*, 457 U.S. at 161; *Harju v. Olson,* 709 F.Supp.2d 699, 734 (D. Minn. 2010).

33.     In the present case, Plaintiffs have only sought and the Court previously certified a Rule 23(b)(2) class.

34.     Certification may be established under Rule 23(b)(2) "if the prerequisites of subdivision (a) are satisfied, and in addition . . . (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2).

35.     In the present case, the Court previously found, and continues to find, that Defendants' alleged acts and omissions regarding the Plaintiffs' claims constitute actions, or refusals to act, generally applicable to the Class.

36.     Based on the above analysis, as well as Findings of Facts and additional Conclusions of Law, the Court continues to find that the certification of the following 23(b)(2) class is appropriate:

> All patients currently civilly committed in the Minnesota Sex
> Offender Program pursuant to Minn. Stat. § 253B.

## C. LEGAL STANDARD

37.     The Fourteenth Amendment provides that neither the United State nor state governments shall deprive any person "of life, liberty or property without due process of law." U.S. Const. amend. XIV.

38.     Civil commitment is a "massive curtailment of liberty" that is scrutinized under the due process clause of the Fourteenth Amendment.  See *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980); *Humphrey v. Cady*, 405 U.S. 504, 509 (1972); *Welsch v. Likins*, 373

F. Supp. 487, 491 (D. Minn. 1974), *supplemented,* 68 F.R.D. 589 (D. Minn. 1975), *aff'd,* 525 F.2d 987 (8th Cir. 1975)).

39.     "The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. . . . [C]ommitment to a mental hospital can engender adverse social consequences to the individual… it can have a very significant impact on the individual." *Vitek v. Jones*, 445 U.S. at 492 (citation omitted) (internal quotation marks omitted).

40.     "Among the historic liberties protected by the Due Process Clause is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Id*. (internal quotation marks omitted).

41.     A violation of substantive due process is found when the state "infringes 'fundamental' liberty interests, without narrowly tailoring that interference to serve a compelling state interest." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *Reno v. Flores*, 507 U.S. 292, 301-02 (1993)).

42.     Legislation infringing a fundamental right must survive strict scrutiny—the law must be "narrowly tailored to serve a compelling state interest." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).  Under the strict scrutiny test, the burden is on the state to demonstrate that the law "advances a compelling state interest and is narrowly tailored to serve that interest." *Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (citations omitted); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir. 2003) (citing *Graham v. Richardson*, 403 U.S. 365, 376 (1971)).

43.     Involuntary commitment statutes are only upheld where the "confinement takes place pursuant to proper procedures and evidentiary standards" and the confinement is narrowly tailored to the purpose for which the person is committed.  *Kansas v. Hendricks*, 521 U.S. 346, 357 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).

44.     The purposes of the civil commitment statute in Minnesota are to protect the public from sexual violence and to rehabilitate the mentally ill. *See In re Civil Commitment of Johnson*, 800 N.W.2d 134, 147 (Minn. 2011) (citation omitted).

45.     Only those individuals who constitute a "real, continuing, and serious danger to society" may continue to be civilly committed to MSOP. *Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring)).

46.     In other words, a person can be "confined [to the MSOP] for only so long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the public."  *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995); *see also Jones v. United States*, 463 U.S. 354, 370 (1983) ("[T]he Constitution permits the Government . . . to confine [an individual] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."); *see also Foucha*, 504 U.S. at 79.

47.     Indefinite commitment to MSOP constitutes a "significant deprivation of liberty" that infringes upon one's liberty, and therefore requires due process protection." *Jones,* 463 U.S. at 361 (1983) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979); *Cooper v. Oklahoma,* 517 U.S. 348, 368-69 (1996) ("The requirement that the grounds for civil commitment be shown by clear and convincing evidence protects the

individual's fundamental interest in liberty.")); *see also DeShaney v. Winnebago Cty.*

*Dept. of Soc. Servs.,* 489 U.S. 189, 200 (1989) ("In the substantive due process analysis,

it is the State's affirmative act of restraining the individual's freedom to act on his own

behalf – through incarceration, institutionalization, or other similar restraint of personal

liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process

Clause.").

48.     As this Court found, "where the government acts in a systematic way, such

as combining legislative and executive action, to indefinitely confine a class of citizens in

detention facilities like the MSOP facilities, the government action must be narrowly

tailored to serve a compelling state interest in order to pass constitutional muster."  Feb.

20, 2014, Order at 14 (citing *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir.

2012) (noting that where legislation infringes upon a fundamental right, such legislation

"must survive strict scrutiny – the law must be 'narrowly tailored to serve a compelling

state interest'" (quoting *Reno,* 507 U.S. at 302).

49.     The "Due Process Clause protects individuals against two types of

government action.  So-called 'substantive due process' prevents the government from

engaging in conduct that 'shocks the conscience,'… or interferes with rights 'implicit in

the concept of ordered liberty.'" *U.S. v. Salerno*, 481 U.S. 739, 746 (1987) (citing *Rochin

v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 32-326

(1937)).

50.     **"**The Supreme Court has described two strands of the substantive due

process doctrine. One strand protects an individual's fundamental liberty interests, while

the other protects against the exercise of governmental power that shocks the conscience." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (citing *Chavez v. Martinez,* 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part) ("The Due Process Clause of the Fourteenth Amendment protects individuals against state action that either 'shocks the conscience,' or interferes with [fundamental] rights 'implicit in the concept of ordered liberty' " (citations omitted)).

51.     A fundamental right or liberty interest is one that is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty," *Chavez,* 538 U.S. at 775 (internal quotation marks omitted), and "[w]ithout these rights, 'neither liberty nor justice would exist.'" *Palko,* 302 U.S. at 325, *overruled by Benton v. Md.*, 395 U.S. 784 (1969).

52.     "Because of their importance, fundamental liberty interests are preciously guarded.  The Fourteenth Amendment forbids the government to infringe fundamental liberty interests at all*,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Seegmiller*, 528 F.3d at 767 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted).

53.     "By satisfying either the 'fundamental right' or the 'shocks the conscience' standards, a plaintiff states a valid substantive due process claim under the Fourteenth Amendment."  *Seegmiller*, 528 F.3d at 767 (citation omitted).

54.     The Supreme Court has made clear that civil commitment of individuals "who, by reason of a mental disease or mental abnormality, constitute a real, continuing and serious danger to society," is permitted, "provided there is no object or purpose to

punish." *Hendricks,* 521 U.S. at 372 (Kennedy, J. concurring) (citing *Addington*, 441

U.S. at 426-27; *Baxstrom v. Herold*, 383 U.S. 107, 111-12 (1966)).

55.     Where, notwithstanding a civil label, a statutory scheme "is so punitive

either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will

reject a legislature's "manifest intent" to create a civil proceeding and "will consider the

statute to have established criminal proceedings for constitutional purpose." *Hendricks,*

521 U.S. at 361; *see also Seling v. Young,* 531 U.S. 250, 261 (2001)).

56.     A constitutional facial challenge to a statute must show either "that no set

of circumstances exists under which [the statute] would be valid" or that "the statute

lacks any plainly legitimate sweep." *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d

678, 685 (8th Cir. 2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)); *see*

*also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449

(2008).

57.     The Supreme Court has recognized that members of the Court have

criticized the *United States v. Salerno*, 481 U.S. 739 (1987) formulation, which

articulated that the "no set of circumstances exists" standard for facial challenges. *See*

*Washington State Grange*, 552 U.S. at 449.  Justice Stevens in his concurring opinion in

*Washington v. Glucksberg*, found that even though the "no set of circumstances exists

under which [the statute] would be valid" was articulated in *Salerno*, the Supreme Court

has never applied such a strict standard, even in *Salerno* itself.  *See Glucksberg*, 117 S.Ct.

at 2304-05 (Stevens, J., concurring).   Justice Stevens also recognized that "[i]n other

cases and in other contexts, [the Supreme Court] have imposed a significantly lesser

burden on the challenger.  The most lenient standard that [the Court] have applied requires the challenger to establish that the invalid application of a statute 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'"  *Id.* at 2304-05 n. 7 (citing *Broadrick v. Oklahoma,* 413 U.S. 601 (1973)).

58.     The *Glucksberg* Court required the plaintiff to show that the interest in liberty protected by the Fourteenth Amendment included the rights which the plaintiff was asserting.  *See Glucksberg,* 117 S. Ct. 2258, 2269 (1997); *see also Glucksberg,* 117 S.Ct. at 2305 (Stevens, J., concurring).

59.     A determination of which standard applies—(1)  no set of circumstances where the statute would be valid, or (2) the statute lacks any plainly legitimate sweep—depends on the case. *See Stevens*, 559 U.S. at 472-73.

60.     This case is much more akin to the "lacks any plainly legitimate sweep" test articulated in *Phelps-Roper* and *Stevens*.  In this case, the liberty right at issue is freedom from restraint, which is a fundamental liberty interest. *Foucha*, 504 U.S. at 86. The Plaintiffs must establish that the invalid application of a statute is "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Glucksberg,* 117 S.Ct. at 2304-05, n. 7 (Stevens, J., concurring) (*citing Broadrick*, 413 U.S. 601).

61.     Minn. Stat. § 253B.03, subd. 7 creates a property right to "receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary," including the right to a written program plan

that explains the precise goals and expected period of time for treatment, as well as the specific measures to be employed.

62.     As the Supreme Court in *Board of Regents v. Roth* explained, "[p]roperty interests…are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that supports claims of entitlement to those benefits*." Board of Regents v. Roth,* 408 U.S. 564, 577 (1972).

63.     "To have a property interest in a benefit a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id.*

64.     The Eighth Circuit has also found that a protected property interest requires a showing of a "legitimate claim of entitlement" based on state law. *See Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011); *see also Szajner v. Rochester Pub. Sch.*, Civil No. 13-2417 DWF/SER, 2015 WL 632147, at *6 (D. Minn. Feb. 13, 2015) (Frank, J.) (citing *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1089 (8th Cir. 2014)).

65.     The Eighth circuit also agreed that the claim must be more than a "unilateral expectation of receiving the benefit" stemming from an "independent source, such as a statute or contract that secures certain benefits and that supports claims of entitlement to those benefits." *Szajner*, 2015 WL 632147, at *6; *accord Mulvenon*, 643 F.3d at 657-68; *Lifgren v. Yeutter*, 767 F. Supp. 1473, 1490 (D. Minn. 1991). The

plaintiff must have a "reasonable and legitimate expectation" of receiving the benefit. *See Schueller v. Goddard*, 631 F.3d 460, 463 (8th Cir. 2011).

66.     "When government action depriving a person of life, liberty or property survives substantive due process scrutiny, it must still be implemented in a fair manner….This requirement has traditionally been referred to as 'procedural' due process." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

67.     When analyzing a procedural due process claim, a court first determines whether there has been a deprivation of a protected liberty or property interest. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005); *Bus. Commc'ns, Inc. v. U.S. Dep't of Educ.*, 739 F.3d 374, 380 (8th Cir. 2013), *reh'g granted in part* (Mar. 7, 2014).

68.     If there is a protected interest, then the court determines what process is due. *See Wilkinson*, 545 U.S. at 224; *Bus. Commc'ns, Inc.*, 739 F.3d at 380. "In a procedural due process claim, it is not the deprivation of property or liberty which is unconstitutional; it is the deprivation of property or liberty without due process of law—without adequate procedures." *Birkenholtz v. Sluyter*, 857 F.2d 1214, 1216 (8th Cir. 1988) (quoting *Daniels v. Williams*, 474 U.S. 327, 339 (19860); *see also Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005) ("To establish a procedural due process violation, a plaintiff need not only show a protected interest, but must also show that he or she was deprived of that interest without sufficient process, *i.e.,* without due process.").

217

69.     Determining what process is due is "flexible and call[s] for such procedural protections as the particular situation demands." *Wilkinson*, 545 U.S. at 224-25 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Generally, due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Bus. Commc'ns, Inc.*, 739 F.3d at 380 (quoting *Mathews*, 424 U.S. at 333); *Mickelson v. Cnty. of Ramsey*, No. 13-CV-2911 SRN/FLN, 2014 WL 4232284, at *5 (D. Minn. Aug. 26, 2014) (quoting *Booker v. City of Saint Paul*, 762 F.3d 730, 735 (8th Cir. 2014)).

70.     Courts interpreting this standard have developed a three-part balancing test: "[(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Wilkinson*, 545 U.S. at 224-25 (citing *Mathews*, 424 U.S. at 335); *Mickelson*, 2014 WL 4232284, at *5 (citing *Mathews*, 424 U.S. at 335).

**D. FACIAL UNCONSTITUTIONALITY OF MINN. STAT. §253D**

71.     Plaintiffs allege in Count I of their Third Amended Complaint that Minnesota Statute §253D is facially unconstitutional because the nature and duration of the civil commitment is not narrowly tailored to the purpose of commitment.

72.     First, the statute does not require independent regular risk assessments of the continued need for commitment. *See generally* Minn. Stat. §253D.

73.     Second, Minn. Stat. §253D is unconstitutional in all applications because it makes no provision for a judicial bypass to the reduction in custody process.  *See generally* Minn. Stat. §253D.

74.     Third, the statute does not require the MSOP to petition for the reduction of custody of those the MSOP knows or reasonably believes meet reduction in custody criteria.  *See generally* Minn. Stat. §253D.

### 1.  <u>No Requirement of Regular Risk Assessments.</u>

75.     Minn. Stat. §253D is facially unconstitutional for several reasons.  First, the statute does not require regular independent regular risk assessments of the continued need for commitment. *See generally* Minn. Stat. §253D; Minn. Stat. §253B.03, subd. 5.

76.     The MSOP does not do forensic risk assessments when Class Members are first committed to the MSOP. (Peterson- Vol. 7, 1389:19-25; Puffer- Vol. 7, 1521:22-25; Fox- Vol. 7, 1586:13-17; Johnston- Vol. 13, 2935:6-8).  In other words, the MSOP only performs risk assessments when a Class Member files a petition for a reduction in custody. (Elsen- Vol. 7, 1341:22-25; Puffer- Vol. 7, 1522:11-13, 17; Fox- Vol. 7, 1587:24-1588:6; Hébert - Vol. 10, 2391:24-2392:2; Johnston- Vol. 13, 2977:12-15).

77.     If a Class Member has not petitioned for a reduction in custody, they have not received a risk assessment while committed to the MSOP. (Puffer- Vol. 7, 1523:13-17).

78.     It is not possible to know whether a Class Member meets reduction in custody criteria without doing a forensic risk assessment. (Puffer- Vol. 7, 1526:6-11; Hébert - Vol. 10, 2402:1-5).

79. Defendants have petitioned for only seven Class Members. (Plf. Ex. 178 at Question 3; Fox- Vol. 7, 1590:4-7). Except in those cases, if a Class Member has not petitioned for a reduction in custody, they have not received a risk assessment while committed to the MSOP. (Puffer- Vol. 7, 1523:13-17).

80. This cannot be construed as actual regular independent review or assessment because it requires action on the part of the Class Members or, in the alternative, a petition may be brought by MSOP – something that almost never occurs in practice.

81. In fact, hundreds of Class Members have not petitioned for a reduction in custody. (Plf. Ex. 178 at Question 6; Johnston- Vol. 13, 2976:1-5).

82. If a risk assessment has not been done on a Class Member within the last year, there is no way to know whether they meet reduction in custody criteria. (Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18).

83. Therefore, for hundreds of Class Members, their current commitment status has never been reviewed to determine if they continue to meet the commitment standards, and, for hundreds more, no recent risk assessment has been completed.

84. It is also clear that Minnesota is over committing individuals initially. (Plf. Ex. 41 at 1("There is broad consensus that the current system of civil commitment of sex offenders in Minnesota captures too many people and keeps many of them too long.")).

85. The total number of civilly committed sex offenders in Minnesota has grown from less than 30 in 1990 to 149 in 2000 and 525 in 2010. (Plf. Ex. 184 at 3). The number of civilly committed sex offenders is now at 714. (Johnston- Vol. 13, 3209:5)

86.     From 2000 to 2010, the civilly committed population grew 286 percent or nearly fourfold.  (Plf. Ex. 184 at 4).

87.     As a result of the rape and murder of a young college student, the Minnesota DOC reviewed all level 3 sex offenders on supervised release.  As a result, there were a number of people petitioned and committed. (Benson Depo. 113:21-114:13). Some of these people were doing well in the community and ended up committed anyway. (Benson Depo. 114:14-21).

88.     Based on the history of the program, there were times where more referrals were made based on political reasons, and therefore, there were likely people committed that had they been referred at a different time, they would not have been committed. (McCulloch- Vol. 1, 122:4-16). Currently, the referral rate in Minnesota is about 9%, although county attorneys have the authority to file a petition even without a referral. (Freeman- Vol. 4, 772:1-2, 19-23). In contrast, the referral rate in New York is 3-4%. (Freeman- Vol. 4, 771:23-25).

89.     Without affirmative action on behalf of the civilly committed individuals, no such review would ever take place under the current statute, *see generally* Minn. Stat. §253D, and everyone committed to the MSOP would continue to be detained indefinitely regardless of whether or not they met the constitutional criteria for detention.

90.     This ongoing detention of civilly-committed individuals is a burden the Defendants must surmount by no less than clear and convincing evidence because a person can be "confined for only as long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the

221

public." *Call*, 535 N.W.2d at 319; *see also Jones*, 463 U.S. at 370 ("[T]he Constitution permits the Government . . . to confine [an individual] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."); *Foucha*, 504 U.S. at 79.

91.     For these reasons, the Court declares Minn. Stat. §253D to be unconstitutional on its face.

**2.   No Judicial By-Pass Provision.**

92.     Minn. Stat. §253D is also facially unconstitutional because it fails to provide for a judicial by-pass to the reduction in custody process. *See generally* Minn. Stat. §253D.

93.     Minn. Stat. §253D only provides for a single process for release from the secure facilities that involves a hearing by the SRB and an appeal to the SCAP. Minn. Stat. §253D.27, 253D.28. This process can only be accessed after six months has passed since the conclusion of a prior reduction in custody process or after a final commitment order is entered. (Minn. Stat. §253D.27, subd. 2).

94.     Moreover, there is no way for Class Members to immediately access the judicial process to challenge their ongoing commitment. The lack of a judicial bypass affects all Class Members. (McCulloch- Vol. 1, 178:8-25).

95.     Because of the absence of such provisions, the statute is not narrowly tailored, or even reasonably related, to the purposes of civil commitment, and thus, Minn. Stat. §253D is unconstitutional in all applications for that reason alone. *See Phelps-Roper*, 697 F.3d at 685 (quoting *Stevens*, 559 U.S. at 472).

96.     Most other states require patients to be evaluated on an annual or biannual basis to determine whether they continue to meet commitment criteria. (Plf. Ex. 225 at 76).  The Wisconsin statute allows patients to petition the committing court at any time to be discharged. (McCulloch- Vol. 1, 58:16-20, 63:14-19). In New York, patients receive a hearing and a risk assessment each year, although the hearing portion may be waived. (Freeman- Vol. 6, 758:14-20). Additionally, in New York, patients may petition the court at any point for a reduction in custody and if the civil commitment program feels an individual is ready to be released, they will file a petition on behalf of the patient. (Freeman- Vol. 4, 764:2-12).

97.     Even where a Class Member meets the criteria and wants to petition for reduction in custody and takes action to seek his or her release, the SRB and SCAP process is the only option. (Berg- Vol. 7, 1498:11-13, 20; Puffer- Vol. 7, 1526:20-24; Fox- Vol. 7, 1590:13-16).  Plaintiffs have established and Defendants have admitted that there is no method for obtaining a reduction in custody without both the SRB and SCAP process.  (Def. Ex. 31 at §253D.27-31).

98.     The petition and hearing process is cumbersome and difficult for Class Members to negotiate. (Plf. Ex. 225 at 73). It is also clear from the evidence that the SRB and SCAP process takes too long. (Plf. Ex. 225 at 46, 76; Plf. Ex. 252; Fox- Vol. 7, 1590:17-20, 1570:25-1591:1; Barry- Vol 23:5141:10-15; 5142:8-12; Plf. Ex. 177 at Question 16; Johnston- Vol. 13, 2992:17-2993:4).   For example, Mr. Steiner's most recent petition took approximately two and half years from the date of filing to the date of receiving a SCAP decision. (Steiner- Vol. 6, 1265:3-6).  Mr. Karsjens filed a petition on

October 20, 2011. (Def. Ex. 290). He did not receive a SCAP order on that petition until

June 10, 2013. (Def. Ex. 295). He did not receive an order from his appeal to the Court of

Appeals until March 10, 2014. (Def. Ex. 296). The petitioning process for Class Member

Mr. Duvall took approximately five years. (Fox- Vol. 7, 1591:5-6, 11).

99.     There are several reasons for the delays in the SRB and SCAP process.

First, there are not enough resources at the SRB. (Johnston- Vol. 13, 2951:10-17; Jesson-

Vol. 5, 947:1-2).  Second, there is not enough resources at MSOP. (Johnston- Vol. 13,

2951:10-17).  Delays in the process can be caused by the MSOP failing to complete the

SRB Treatment Report and SRB Risk Assessment due to staffing vacancies. (Berg- Vol.

7, 1501:10-16; Puffer- Vol. 7, 1549:4-10; Plf. Ex. 137; Plf. Ex. 100; Jones Depo. 28:20-

29:10; Jones Depo. 29:21-24, 30:2-7).  Third, the system design builds in delays as the

SRB is an unnecessary step.   Deputy Commissioner Barry testified that the SRB is really

an administrative process that is supported inside the agency by staff by the collection

and organizing of all the information, treatment reports and risk assessment reports.

(Barry – Vol. 23, 5121:2-8).   It has been suggested that the SRB should be abolished

altogether, as it is an unnecessary step given that the SCAP must make a ruling on every

petition anyway. (Plf. Ex. 225 at 73, 77; Plf. Ex. 41 at 16).  Finally, the SCAP does not

have enough resources to handle the number of petitions in a timely fashion.  (Johnston-

Vol. 13, 2947:18-2948:1).

100.    It is clear from the evidence that the SRB in most cases follows the

recommendations of the MSOP. (Barry- Vol. 23, 5153:8-18; Barbo- Vol 20, 4564:8-24.

101.    The lack of a judicial bypass affects all Class Members. (McCulloch- Vol. 1, 178:8-25).

102.    Thus, this process, combined with the exceptionally long delay included in the process, as well as the lack of regular risk assessments and the failure to require the State to immediately petition and discharge any individual detained at the MSOP who no longer satisfies the commitment criteria renders Minn. Stat. §253D unconstitutional on its face.

### 3.    No Requirement for State to Petition on behalf of Individuals.

103.    Minn. Stat. §253D is facially unconstitutional because it fails to require the State (or MSOP) to file a Petition for a reduction in custody for any individual civilly committed to the MSOP when they no longer meet the criteria for detainment. *See generally* Minn. Stat. §253D; Minn. Stat. §253B.03, subd. 5.

104.    After the time an individual is committed, the statute does not require that the committed individual continue to meet the initial commitment criteria. *See generally* Minn. Stat. §253D.

105.    The 706 experts testified that MSOP staff indicated that there are Class Members who should be released, but were not being released. (McCulloch- Vol. 1, 200:19-201:7).  The 706 experts also testified that there are a number of Class Members who could be discharged or served in a less restrictive environment. (McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1).

106.    MSOP current and former staff testified that there were certain individuals who could be treated in a less secure facility or provisionally discharged. (Benson Depo.

225

73:10-23; Lewis- Vol. 7, 1407:18-23; Ulrich- Vol. 7, 1477:8-23; Puffer- Vol. 7, 1560:20-22, 1561:2; Fox- Vol. 7, 19-22; White- Vol. 9, 1965:15-25, 1966:6-9, 14).

107.    MSOP executives acknowledged that there may be Class Members in CPS, beyond those who have already petitioned, who could live safely in the community today, (Hébert- Vol. 12, 2708:1-6) and  that there are Class Members in both the Assisted Living Unit and the Alternative Program who could be in a less secure facility. (Hébert- Vol. 12, 2706:15-23).

108.    The 706 Experts believe that all Class Members with juvenile-only offenses are improperly placed at the MSOP. (Wilson- Vol. 3, 663:9-11).

109.    The 706 Experts know of many other Class Members who should receive a reduction in custody as well. (McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1; Miner- Vol. 6, 1125:2-9; Wilson- Vol. 3, 638:20-22; Plf. Ex. 225 at 43-44).

110.    Although the executive members of MSOP acknowledge that if a Class Member satisfies the discharge criteria, they are entitled to a full discharge, (Johnston- Vol. 15, 3405:7-13), MSOP does not petition for Class Members it believes could be released or live in a less restrictive environment.  (Hébert - Vol. 12, 2708:7-12).   Nor does MSOP indicate to the courts when Class Members have reached the statutory criteria that would allow them to be treated in another setting. (Plf. Ex. 146).

111.    To be narrowly tailored, or even reasonably related, to the purpose of commitment, see *Kansas*, 521 U.S. at 357 (citing *Foucha*, 504 U.S.at 80), the statute must require the MSOP to file a petition on behalf of a patient any time it has a

substantial reason to believe that the patient meets the criteria for a reduction in custody or no longer meets the commitment criteria.

112.    The Plaintiffs have established that the invalid application of a statute is "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Glucksberg*, 117 S.Ct. at 2304-05, n. 7 (Stevens, J., concurring) (citing *Broadrick*, 413 U.S. 601).   For these reasons, Minn. Stat. §253D is found to be unconstitutional on its face.

### E.  MINN. STAT. §253D IS UNCONSTITUTIONAL AS APPLIED

113.    Plaintiffs' claims in Counts II, III, V, VI, VII of their Third Amended Complaint all allege that Minn. Stat. § 253D is unconstitutional as it is applied. As discussed above, "the state violates substantive due process when it infringes 'fundamental' liberty interests, without narrowly tailoring that interference to serve a compelling state interest." *Weiler,* 137 F.3d at 1051; *see also* Feb. 20, 2014 Order, at 14-15.

114.    As the commitment statute is applied, it is clear that there are certain individuals are being held beyond such a time as is constitutionally permissible. This continued unconstitutional detainment occurs, in part, because (1) there are no risk assessments performed (independent or otherwise) at the time of initial commitment or on a regular basis during Class Members' commitment, (2) the risk assessments that are provided are often performed inappropriately and may be biased, (3) once it knows that a Class Member does not satisfy the commitment criteria, the MSOP takes no action to

release or move those Class Members, and (4) the reduction in custody process- in

practice- is incredibly burdensome and time consuming.

115.    The evidence is clear that there certain individuals are being held beyond

such a time as (1) they need further inpatient treatment and supervision for a sexual

disorder or (2) that they pose a danger to the public, and therefore, under *Call*, the

statutory discharge standard is not being applied in a conditional manner.   (*See e.g.*

Hébert- Vol. 12, 2708:1-6; White- Vol. 9, 1965:15-25, 1966:6-9, 14; Wilson- Vol. 3,

663:9-11; Miner- Vol. 5, 1078:5-9).

### 1.   The Failure to Require Initial or Regular Risk Assessments Does Not Satisfy Constitutional Standard.

116.    It is critical for the Class Members to have ongoing and regular evaluations

to determine if they continue to meet the criteria for civil commitment because they may

no longer meet criteria as time goes on. (McCulloch- Vol. 1, 114:17-22). Without such

regular risk assessments, it is impossible to determine whether an individual continues to

meet commitment criteria. (McCulloch- Vol. 1, 114:22-24).

117.    It is undisputed that the MSOP does not provide such risk assessments at

the time of initial commitment or during Class Members' commitment. (*See generally*

Minn. Stat. §253D; Peterson- Vol. 7, 1389:19-25; Puffer- Vol. 7, 1521:22-25; Fox- Vol.

7, 1586:13-17; Johnston- Vol. 13, 2935:6-8).

118.    The MSOP could conduct such risk assessments, either internally or using

outside assessors, but chooses not to. (Hébert - Vol. 10, 2392:3-6; Puffer-Vol 7, 1522:1-

3; Barry- Vol. 23, 5154:1-5; Johnston- Vol. 13, 2934:7-16).

119.    MSOP does not know which of the Class Members still satisfy the commitment criteria because they do not do initial or regular risk assessments. (*See e.g.* McCulloch- Vol. 1, 114:17-24; Puffer- Vol. 7, 1526:6-11; Hébert - Vol. 10, 2402:1-5; Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18 ( recognizing that without an annual risk assessment, no one knows whether any person committed to MSOP still meets the statutory criteria for commitment)).

120.    Currently, the MSOP only performs risk assessments when a Class Member files a petition for a reduction in custody. (Elsen- Vol. 7, 1341:22-25; Puffer- Vol. 7, 1522:11-13, 17; Fox- Vol. 7, 1587:24-1588:6; Hébert - Vol. 10, 2391:24-2392:2; Johnston- Vol. 13, 2977:12-15).

121.    Therefore, if Class Members have not petitioned for a reduction in custody, they have not received a risk assessment while committed to the MSOP. (Puffer- Vol. 7, 1523:13-17).

122.    If a risk assessment has not been done on Class Members within the last year, there is no way to know whether they meet reduction in custody criteria. (Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18).

123.    In order to determine whether Class Members are appropriately placed, risk assessments must be conducted. See e.g. McCulloch- Vol. 1, 114:17-24; Puffer- Vol. 7, 1526:6-11; Hébert - Vol. 10, 2402:1-5;  Hébert- Vol. 10, 2402:23-2403:2; Johnston- Vol. 13, 2977:4-9, 2978:7-18)

124.    Even if MSOP agreed to do regular risk assessments of Class Members to assure that they remain appropriately placed, the MSOP is not adequately staffed in its

risk assessment department to undertake assessments of all Class Members. (Johnston-
Vol. 3017:9-18, 3021:13-18).

125.    Recently, Defendants plan to implement a rolling risk assessment process.
(Plf. Ex. 314).

126.    Commissioner Jesson, in a memo to Ms. Johnston, stated that although the
MSOP did not receive funding for biennial assessments of all Class Members, the MSOP
will implement a new plan so all Class Members receive a full risk assessment, meaning
of the kind done when a petition for a reduction in custody is filed, on a rolling schedule.
(Plf. Ex. 314; Jesson- Vol. 5, 949:20-950:3).

127.    Commissioner Jesson indicated that the MSOP may prioritize groups of
Class Members in the schedule of rolling risk assessments. (Plf. Ex. 314). The MSOP
prioritized those who are medically needy as well as those in the Alternative Program.
(Jesson- Vol. 5, 951:12-24).

128.    Ms. Hébert testified that there is a plan to obtain for staff to conduct rolling
risk assessments. (Hébert- Vol. 10, 2396:6-12).

129.    However, the MSOP has not yet hired any risk assessors beyond the
vacancies that already existed in the assessment department in order to implement this
plan. (Hébert- Vol. 10, 2397:8-13, 2398:3-7). The MSOP could hire outside assessors to
perform these rolling risk assessments. (Hébert- Vol. 10, 2400:18-20). The MSOP could
contract with outside risk assessors to do any risk assessments. (Johnston, Vol. 13-
2954:11-20). Ms. Johnston has the authority to use unspent salary budget on outside risk

assessors to do forensic risk assessments of Class Members. (Johnston- Vol. 13, 2954:23-2955:3).  But they have not done any of this.

130.    Rather the plan is to do the risk assessments of all 720 Class Members on a rolling basis.  The plan is to do one to two risk assessments per month outside the petition process. (Hébert - Vol. 10, 2399:10-15; Johnston- Vol. 13, 3054:14-18). At one per month, this means it would take 60 years to assess all Class Members currently committed to the MSOP. (Hébert - Vol. 10, 2400:10-15).

131.    Failure to conduct such initial or regular risk assessments affects all Class Members. (See e.g. McCulloch- Vol. 1, 173:1-12; Wilson- Vol. 3, 472:13-15).

## 2. __The Risk Assessments That Are Provided Are Often Performed Inappropriately And May Be Biased Which Does Not Satisfy Constitutional Standard.__

132.    MSOP's risk assessments are not independent.  (See e.g. Plf. Ex. 184 at 91; Hébert - Vol. 10, 2392:7-9, 16-18). The MSOP has an internal forensic risk assessment unit headed by Dr. Herbert. (Hébert - Vol. 9, 2127:22-23).  Dr. Herbert reports to the Executive Clinical Director, Ms. Hébert . (Hébert - Vol. 9, 2127:20-23). Ms. Hébert is ultimately responsible for what happens in the forensic risk assessment department. (Hébert - Vol. 9, 2131:10-12).

133.    Ms. Hébert could change the organizational structure of the risk assessment department with permission from Ms. Johnston, (Hébert - Vol. 9, 2155:13-16), and Ms. Hébert and Ms. Johnston have discussed changing the structure of the risk assessment unit, but they have not done so. (Hébert - Vol. 9, 2155:17-23, 2157:5-7).

134.    Ms. Hébert is in regular contact with Dr. Herbert regarding the workload, staffing, and timing of risk assessment reports for the forensic risk assessment unit. (Hébert - Vol. 9, 2129:19-22). Ms. Hébert is involved if the template of the risk assessment form is changed. (Hébert- Vol. 9, 2129:24-2130:2). Ms. Hébert is involved in the types of training the MSOP risk assessors receive. (Hébert- Vol. 9, 2130:19-25).

135.    At times, Ms. Hébert makes comments on risk assessments by MSOP risk assessors before they are finalized. (Hébert- Vol. 9, 2131:23-2132:2). The comments Ms. Hébert makes to the risk assessor may be substantive, including information she believes should be included about the individual's treatment progress and history. (Plf. Ex. 274; Plf. Ex. 367; Def. Ex. 438).

136.    Dr. Jones testified that before finalizing risk assessments, she would discuss her actuarial scoring and conclusions with Dr. Herbert and other risk assessors and sometimes would change scoring on assessments based on those discussions. (Jones Depo. 46:1-47:22).

137.    The reporting structure of the MSOP's Risk Assessment unit causes some inherent conflicts of interest. (Freeman- Vol. 4, 766:13-18).  Having the risk assessors at MSOP supervised by the Clinical Director is not best practice. (Freeman- Vol. 4, 853:11-14).

138.    MSOP is not using proper risk assessments tools.  Dr. Herbert, who oversees the risk assessment program at MSOP, testified that she understood the Minnesota Supreme Court case *In re Ince*, 847 N.W.2d 13 (Minn. 2014), to caution against over reliance on actuarial instruments (Herbert- Vol. 24, 5241:16-20) and yet

MSOP has not changed their assessment approach since the *Ince* decision (Herbert- Vol. 24, 5242:16-21).

139.   MSOP uses the Static-99R, the Stable 2007 and occasionally the Acute-2007 as the actuarial tools used in their risk assessments. (Herbert- Vol. 24, 5199:18-20). Actuarial tools have changed over time. For example, the Static-99 was changed to the Static-99R in approximately 2009. (Pascucci- Vol. 8, 1668:18-22). The changes occurred to take into account aging of the offender. (Pascucci- Vol. 8, 1669:11-14). Failure to take age into account could overstate risk. (Pascucci- Vol. 8, 1670:2-7).

140.   The MSOP has not re-evaluated all Class Members who have not been assessed using the Static-99R to determine if their risk level has changed. (Hébert, Vol. 9, 2159:4-7, 14-22).

141.   As the Auditor's Report found, "[i]f assessed with current actuarial tools, some of these clients could no longer be found to be high risk…Some clients at MSOP facilities may no longer be considered high risk if scored under new scoring norms based on the newest research." (Plf. Ex. 184).

142.   The Stable-2007 as an instrument has only been standardized on community samples, meaning that use of this tool in an institutional setting will require some modification, along with a degree of caution in interpretation.  (Pascucci- Vol. 8, 1678:24-1679:8). This is not currently happening at MSOP. (Plf. Ex. 225 at 40; Wilson- Vol. 3, 548:1-3).  In general, the Stable-2007 is not appropriate for an inpatient population. (Freeman- Vol. 4, 769:3-5; Caldwell- Vol. 11, 2508:6-15).

143.   Class members who have juvenile-only offenses cannot be assessed using any existing actuarial tool, as none allow for the long-term predictive validity of risk in a person who sexually offended as a juvenile. (Wilson- Vol. 3, 474:10-13).  It is clear there are Class Members with juvenile-only offenses on whom actuarial tools were used.  For example, Mr. Terhaar, who was committed as a result of sexual offenses he committed as a juvenile, was evaluated for commitment using both the Static-99 and the Stable-2007. (Plf. Ex. 353 at 49).

144.   For the Class Members in the Alternative Program, risk assessments must go beyond the standard tools used by risk assessment staff and include measures of functional capacity and/or a specialized tool such as the ARMIDILO-S, which is designed specifically to assess dynamic risk in Class Members with intellectual disabilities and sexual offense histories.  (Plf. Ex. 225 at 21; Miner- Vol. 6, 1123:5-14).

145.   Ms. Hébert and Dr. Herbert discussed using the ARMIDILO rather than the Static-99R and Stable with Class Members with cognitive limitations, but Dr. Herbert determined it was no better or worse than the Stable-2007. (Plf. Ex. 32). The MSOP does not use the ARMIDILO on Class Members with cognitive limitations. (Hébert - Vol. 10, 2387:1-4).

146.   Similarly, with respect to the Class Members who have been diagnosed as having a severe mental illness, the Rule 706 Experts found that the risk assessment processes must consider the possible relationship between mental health conditions and sexually offending behavior.  None of the risk assessment tools currently used by the MSOP explicitly assess this possible interaction.  (Plf. Ex. 225 at 17).

147.    For those Class Members who are currently housed in the Assisted Living Unit, the Rule 706 Experts noted that actuarial risk assessment instruments currently in use at MSOP are likely to over-estimate the risk of individuals in assisted living, in that their level of risk is mediated (and may be ameliorated) by their physical abilities (or lack thereof).  (Plf. Ex. 225 at 19).

148.    The MSOP risk assessors do not receive any formal legal training. (Pascucci- Vol. 8, 1647:22-1648:5).

149.    At the time Dr. Jones started at the MSOP, the statutory criteria were not part of the risk assessments done by the MSOP. (Jones Depo. 31:21-23). The MSOP risk assessments did not consider the statutory criteria until late 2010 or early 2011. (Jones Depo. 31:21-24).

150.    At the time Dr. Pascucci started at MSOP, she had no formal training on the legal criteria to be released from civil commitment in Minnesota, and since has not received any legal training regarding the statutory release criteria from outside of the DHS. (Pascucci- Vol. 8, 1648:14-24). Dr. Jones also did not receive any training from the MSOP regarding the constitutional standards for commitment. (Jones Depo. 62:5-15).

151.    Dr. Pascucci cannot put a definition on the meaning of "reasonable degree of safety" as it is used in the statutory transfer criteria. (Pascucci- Vol. 8, 1649:19-1650:4, 1651:1-5).

152.    Dr. Pascucci testified that the statutory factors for discharge under Minn. Stat. §253D.31 are: (1) capable of making an adjustment to open society, (2) no longer

dangerous to the public, and (3) no longer in need of inpatient treatment and supervision. (Pascucci- Vol. 8, 1683:4-14; Plf. Ex. 234 at 18).

153.    Ms. Hébert testified that in order to be committed to the MSOP, a Class Member must have a continued need for treatment of a sexual disorder and continue to pose a danger to the public. (Hébert- Vol. 9, 2150:3-8).

154.    Dr. Pascucci testified that the *Call v. Gomez* case modified the standards of the statute so that a person is entitled to discharge unless the party opposing the petition proves by clear and convincing evidence that the person continues to need treatment for a sexual disorder and continues to pose a danger to the public. (Pascucci- Vol. 8, 1683:17-1684:3; Plf. Ex. 234 at 18).

155.    The *Call v. Gomez* standard was not incorporated into the language of the MSOP's risk assessments until the risk assessment regarding Mr. Terhaar in June 2014. (Pascucci- Vol. 8, 1709:18-1710:13; Plf. Ex. 234; Plf. Ex. 351).

156.    There are situations in which MSOP risk assessors does not agree that an individual meets the standard for discharge even when they do not have a sexual disorder. (Pascucci- Vol. 8, 1684:21-1686:18; Plf. Ex. 234 at 11-12; Pascucci- Vol. 8, 1687:18-1688:2; Hébert- Vol. 9, 2137:19-2139:7; Plf. Ex. 106).

**3.    <u>The MSOP Takes No Action To Release Or Move Those Class Members It Believes No Longer Are Appropriately Placed Which Fails To Satisfy Constitutional Standard.</u>**

157.    Even when the MSOP is aware of Class Members, who MSOP believes should be discharged, they do not petition for the discharge or reduction in custody of those individuals.  (See *e.g*, Hébert - Vol. 12, 2708:7-12).

158.    There is no policy or practice at the MSOP that requires MSOP to file a petition on a Class Member's behalf if the MSOP knows or determines that the Class Member no longer satisfies the criteria for commitment. (Johnston-Vol. 13, 2962:9-15). In fact, it is the policy of the MSOP that they would not petition on behalf of Class Members. (Freeman- Vol. 4, 788:19-25).  The MSOP has affirmatively stated that they have only filed petitions for a reduction in custody for seven individuals in its 20-year history. (See. e.g. Plf. Ex. 178 at Question 3; Fox- Vol. 7, 1590:4-7).

159.    The MSOP is aware of, and has even identified itself, a number of Class Members who should receive a reduction in custody. Ms. Hébert testified that there are Class Members in both the Assisted Living Unit and the Alternative Program who could be in a less secure facility. (Hébert- Vol. 12, 2706:15-23). Ms. Hébert also testified that it is possible there are Class Members in CPS, beyond those who have already petitioned, who could live safely in the community today. (Hébert- Vol. 12, 2708:1-6).

160.    Clinicians identified specific Class Members by name who are improperly placed in a secure facility. (See e.g. Lewis- Vol. 7, 1407:18-23, 1408:10-12; Ulrich- Vol. 7, 1477:8-23, 1478:2-7).

161.    The MSOP actually supported the petitions for transfer to the proposed Cambridge facility of six Alternative Program Class Members and six Assisted Living Unit Class Members, and identified others from both of those programs that have met

maximum treatment effect and could live outside the secure perimeter. (Plf. Ex. 313; Johnston- Vol. 13, 3038:2-6). Because the Cambridge plans were suspended, the twelve Class Members supported for transfer are still in secure facilities at Moose Lake and St. Peter in the secure facility. (Jesson- Vol. 5, 942:23-943:2; Elsen- Vol. 7, 1354:12-14; Puffer- Vol. 7, 1530:7-10). No petitions were filed on behalf of the others that the MSOP had identified. (Elsen- Vol. 7, 1353:22-1354:6; Johnston- Vol. 13, 3041:6-18).

162.    The MSOP has been aware that juvenile-only offenders should be considered carefully. In April 2014, Ms. Hébert sent an email to Ms. Johnston stating, "Wondering if it is worth it for us to start closely examining all no adult convictions… thoughts?" (Plf. Ex. 88).

163.    The MSOP was informed by the 706 Experts that Mr. Terhaar should be fully discharge and Ms. Bailey should be transferred or provisionally discharged. (Plf. Ex. 117; Plf. Ex. 327). Mr. Terhaar was not supported for a full discharge (Plf. Ex 212; Terhaar- Vol. 9, 2010:17-22) and Ms. Bailey is still placed at St. Peter on a unit with male offenders. (Johnston- Vol. 15, 3407:22-25).

164.    The 706 Experts know of many other Class Members who should receive a reduction in custody as well. (McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1; Miner- Vol. 6, 1125:2-9; Wilson- Vol. 3, 638:20-22; Plf. Ex. 225 at 43-44).

### 4.  <u>Reduction in Custody Process Fails to Satisfy the Constitutional Standard.</u>

165.    The procedures for a reduction in custody are unconstitutional as applied to the Class Members.  The SRB and SCAP process, as it operates in practice, is not

constitutional specifically because it is incredibly slow and cumbersome, and results in Class Members being held at MSOP far beyond when they meet the reduction in custody criteria or no longer satisfy the initial commitment criteria.

166.    When a petition for a reduction in custody is filed, the process cannot commence until an SRB hearing is held. Minn. Stat. §253D.27.

167.    At the SRB stage, Class Members do not receive any independent assistance from medical or clinical professionals or an independent medical exam. (Freeman- Vol. 4, 808:11-22; Barry- Vol. 23:5152:9-15).

168.    In order to successfully be discharged from the secure facility at MSOP, a Class Member must successfully convince the SRB (Special Review Board) and the SCAP (Supreme Court Appeal Panel) that they meet the criteria for Transfer, Provisional Discharge, or Discharge. (Def. Ex. 31 at §253D.27-31).  The process can take years to complete (*See e.g.* Barry- Vol. 23:5141:10-16).  There is no judicial bypass available for Class Members to challenge their continued commitment.

169.    Ms. Hébert testified that one of the reasons Minnesota cannot successfully reintegration Class Members into the community is the system for release. (Hébert- Vol. 12, 2804:22-2805:1).

170.    There are also a lack of resources for Class Members to be safely reintegrated into the community. (Hébert- Vol. 12, 2805:6-14).

171.    The SRB hearings are scheduled by the MSOP, and due to the number of SRB members, which is controlled by Commissioner Jesson who makes the appointments, there are only up to 4 SRB hearings held each week, which results in

delays in the process.  (Fox- Vol. 7, 1591:18-20; Plf. Ex. 177 at Question 12; Johnston-

Vol. 13, 2991:11-19; Johnston- Vol. 13, 2993:22-2994:2). There is nothing that prevents

Commissioner Jesson from increasing the number of SRB members. (Jesson- Vol. 5,

947:8-13).

172.   Delays in the process are also caused by the MSOP failing to complete the

SRB Treatment Report and SRB Risk Assessment due to staffing vacancies. (Berg- Vol.

7, 1501:10-16; Puffer- Vol. 7, 1549:4-10).

173.   Ms. Johnston testified that Minnesota has not released many Class

Members to the community because of community fear, resources at the SRB and SCAP,

and the discharge process itself. (Johnston- Vol. 13, 2938:12-2939:1). Mr. Benson

testified that the whole process is set up in a way that cannot work to discharge Class

Members due to the political influence. (Benson Depo. 68:2-70:16).

174.   The petition and hearing process is cumbersome and difficult for Class

Members to negotiate. (Plf. Ex. 225 at 73).  Petitions for a provisional discharge must be

accompanied by a provisional discharge plan. (Fox- Vol. 7, 1593:17-18, 22-23; Johnston-

Vol. 13, 2984:25-2985:2). Generally, a provisional discharge plan would include

information such as the location the Class Member would be living. (See e.g. Fox- Vol. 7,

1593:25-1594:3; Barbo- Vol. 20, 4519:12-19).  The provisional discharge plan is

considered by the MSOP treatment team when making a recommendation on a petition in

the SRB Treatment Report. (Fox- Vol. 7, 1594:6-10).

175.   The SRB and SCAP would also be provided with the provisional discharge

plan when deciding the petition. (Fox- Vol. 7, 1594:11-14).  If somebody does not have

the support of the program MSOP will not help them with provisional discharge planning.  (See e.g. Barbo- Vol. 20, 4556:20-24).

176.    It has been the MSOP's practice to not help Class Members in Phase I or II of treatment with provisional discharge plans - only Class Members in Phase III. (Johnston- Vol. 13, 2985:3-9).

## F.   THE TREATMENT PROGRAM AS IMPLEMENTED DELAYS PROGRESSION REQUIRED FOR DISCHARGE FROM CIVIL COMMITMENT AND THEREFORE FAILS TO SATISFY THE CONSTITUTIONAL STANDARD

177.    Counts II and III of Plaintiffs' Third Amended Complaint ("TAC") challenge the constitutionality of the MSOP's treatment program as it is applied on constitutional grounds.

178.    Involuntary commitment statutes are only upheld where the "confinement takes place pursuant to proper procedures and evidentiary standards" and the confinement is narrowly tailored to the purpose for which the person is committed.  *Kansas*, 521 U.S. at 357 (citing *Foucha*, 504 U.S.71 at); *see also* Feb. 20, 2014 Order, at 14-16.

179.    The evidence has shown that certain aspects of the treatment program delay progression through the phases and ultimately release from the program. As such, those aspects of the program implicate fundamental liberty rights and therefore must be narrowly tailored to the purpose for which the person is committed

180.    Although Defendants argue that the Court should apply the "shocks the conscience" standard articulated in *Strutton v. Meade*, 668 F.3d 549 (8th Cir. 2012), the claims regarding treatment in Counts II and III of Plaintiffs' TAC arise from the failure

of the MSOP to provide treatment in accordance with the purpose of the civil commitment statute in violation of due process.

181.    *Strutton* is distinguishable because the claims were limited to access to treatment and there was not a systemic challenge to the treatment program as a whole. Moreover, unlike the Missouri statute at issue in *Strutton,* the Minnesota commitment statute contains an explicit requirement to provide treatment designed to render further supervision unnecessary. *Compare* Minn. Stat. § 253B.03, subd. 7 (patients are entitled to receive "proper care and treatment, best adapted, according to contemporary professional standards, *to rendering further supervision unnecessary*," as well as written program plans that describe "in behavioral terms the case problems, the precise goals, including the expected period of time for progress toward the goals," and quarterly reviews.) (emphasis added) *with Strutton*, 668 F.3d at 557.

**1.  <u>Problems with phase progression.</u>**

182.    The phase progression requirements are the same for all Class Members. (Plf. Ex. 225 at 20; Plf. Ex. 48 at 5; Puffer- Vol. 7, 1577:13-16; Hébert - Vol. 12, 2788:11-14). They are not modified for anyone. (Hébert - Vol. 12, 2789:1-2). However, there are Class Members who are not capable of meeting the phase progression requirements as they are written, such as many patients in the Alternative Program or those with severe mental illness. (McCulloch- Vol. 2, 242:15-19; Plf. Ex. 6; Miner- Vol. 6, 1100:20-1101:9).

183.    Progress through the MSOP's treatment program has historically been very slow. Every year since 2006, the Site Visit auditors have expressed that they are

concerned with the high number of Class Members in Phase I and the small number of Class Members in Phase III. (Haaven Depo. 124:5-15).

184.    It was not until recently that Class Members began moving through the MSOP's treatment phases. (Def. Ex. 15). As of the first quarter of 2012, 65% of Class Members were in Phase I, 25% in Phase II and 4% in Phase III. (Def. Ex. 15). As of the fourth quarter of 2014, 39% of Class Members are in Phase I, 51% in Phase II, and 9% in Phase III. (Def. Ex. 15). As of March 31, 2013, there were 131 Phase I Class Members, 67 Phase II Class Members, and 14 Phase III Class Members, who had been in their current treatment phase for 36 months or more. (Plf. Ex. 121).

185.    If Class Members are unable to progress to Phase III of the treatment program, they are unlikely to get MSOP support for a reduction in custody. (McCulloch-Vol. 2, 243:6-15; Plf. Ex. 184 at 88; Freeman- Vol. 4, 801:12-16).

186.    The MSOP would not support a Class Member for full discharge who had not gone through all three phases of treatment and through provisional discharge. (Berg-Vol. 7, 1516:22-25, 1517:4). The MSOP has never supported a petition for full discharge. (Fox- Vol. 7, 1587:14-19).

187.    The MSOP will only support provisional discharge when a Class member has finished treatment and has gone all the way through all three phases. (Jesson- Vol. 5, 966:18-25; Berg- Vol. 7, 1516:17-21; Fox- Vol. 7, 1588:20-23; Johnston- Vol. 13, 2986:19-22). The MSOP has never supported a petition for provisional discharge for a Class Member in Phase I or II. (Persons Depo. 47:16-17, 21-22).

188.    Similarly, it is the MSOP's policy to only support transfers to CPS for

Class Members in Phase III of the treatment program. (Def. Ex. 7).

189.    The MSOP has no system or policy in place to ensure that Class Members

who are not progressing through the treatment phases in a timely manner are reviewed

through the MSOP clinical hierarchy or through an outside review. (Plf. Ex. 48 at 6;

Hébert - Vol. 12, 2808:16-20).

190.    The 706 Experts found that if Class Members are not making progress, it is

the program's responsibility to identify the reasons for that failure to progress and

address those issues. (Wilson- Vol. 3, 516:7-10). The Site Visit experts also agree, and

Mr. Haaven testified that the most important change he would like to see at the MSOP is

a mechanism to identify barriers to phase progress. (Haaven Depo. 146:25-147:10).

### 2.  **Problems with the matrix factors.**

191.    MSOP developed and implemented the use of the matrix factors –

something that was not previously used.  (Hébert - Vol. 12, 2745:2-18; 2745:22-25).

192.    No other program in the country uses the matrix factors in any way,

including in the manner they are used at the MSOP.  (*See e.g.* Freeman- Vol. 5, 1026:4-9;

Cauley- Vol. 10, 2221:12-14; Hébert - Vol. 12, 2747:21-24).

193.    The same Matrix Factors are used for all Class Members. (McCulloch- Vol.

1, 92:19-93:5; Miner- Vol. 6, 1118:2-4; Elsen- Vol. 7, 1346:2-16; Def. Ex. 4; Miner- Vol.

6, 1109:12-14; Ulrich- Vol. 7, 1471:4-7; Miner- Vol. 6, 1112:23-25)).).

194.    It is clear that for years there was confusion regarding how the matrix

factors were to be used, there were inconsistencies with the application of the matrix

factors, and the matrix factors are subjectively applied and that MSOP was informed of these problems on several occasions.  (*See e.g.* Plf. Ex. 225 at 38; Plf. Ex. 184 at 75; Plf. Ex. 46 at 5; Plf. Ex. 43 at 2).

195.    In 2014, the 706 Experts found that the Matrix Factors are not scored in a consistent manner and that MSOP staff were confused about the definitions of the Matrix Factors and how to score some items. (McCulloch- Vol. 1, 90:11-91:1, 97:17-25).

196.    MSOP administration and staff agrees that applying the Matrix factors consistently was an issue among clinicians. (Puffer- Vol. 7, 1570:7-11; Plf. Ex. 6; Persons Depo. 72:2-4, 8-12).

197.    The Matrix Factors form the basis of the MSOP's treatment program. (McCulloch- Vol. 1, 104:13-24; Wilson- Vol. 3, 535:18-19).

198.    The Matrix Factors are an essential element of determining progression through the MSOP's treatment phases. ((Def. Ex. 7; Plf. Ex. 225 at 31; Def Ex. 2).

199.    However, no one has tested the reliability of the matrix factors.  (See e.g. Hébert- Vol. 12, 2768:13-5).

200.    The phase progression policy makes clear that in order to move from one phase to the next, a Class Member must receive a certain level of scores on the matrix factors in order to progress.  (Def. Ex. 2; Elsen- Vol. 7, 1348:11-1349:6). The phase progression requirements, including the required Matrix scores, were chosen by the MSOP, and there is no research behind the requirement chosen. (Hébert - Vol. 12, 2756:16-25).

201.    Not only did MSOP receive criticism regarding the training and understanding and consistency of the use of the matrix factors, but it also received criticism that the standards for phase progression were too high.  (Plf. Ex. 225 at 38; Plf. Ex. 48 at 4-5; Plf. Ex. 43 at 7).

202.    The matrix scoring is subjective and dependent on the person using it and personal bias could affect scoring. (See e.g.  Hébert- Vol. 12, 2756:6-10; Hébert - Vol. 12, 2756:15-18).

203.    In fact, different clinicians would score Class Members differently than other therapists, which could be seen if they changed therapists throughout the year. (Vietanen- Vol. 10, 2304:13-19).

204.    It is clear that if the Matrix Factors are incorrectly applied and resulted in a delay in treatment progression, the individual would be injured by that because the MSOP uses treatment progression to determine whether to support Class Members for reduction in custody. (Miner- Vol. 6, 1210:6-14).

205.    Even MSOP staff agrees that inconsistent scoring on the Matrix factors can slow the progress of Class Members through treatment. (Elsen- Vol. 7, 1350:8-10, 15-16; Berg- Vol. 7, 1511:9-13; Puffer- Vol. 7, 1572:9-11; Fox- Vol. 7, 1602:3-6).

206.    But, despite the criticism of the matrix factors as they were being applied at MSOP, it was not until 2014 that the program provided training to its entire staff on the matrix factors. (See e.g. Def. Ex. 72).

207.    And even though, Ms. Hébert testified that it is best practices that there is a clear concise pathway of a treatment program and that the program should be described

in writing, (Hébert- Vol. 18, 4116:20-24, 4117:19-22), it was not until 2013 that the

documents that set out the guidelines for the treatment program were finally complete.

(See e.g. Pl. Ex. 46 at 3 (recognizing that the Theory Manual was complete in 2011);

Hébert- Vol. 18, 4121:8-10 (the Clinicians Guide was not completed until 2012 and was

not rolled out until 2013); Hébert- Vol. 18, 4121:11-16 (testifying that the Matrix Scoring

Manual was not completed until 2013)).

208.    The MSOP's treatment program, as it exists today, is based on the MSOP's

Theory Manual, Clinician's Guide, and Matrix Scoring Guide. (Def. Ex. 2; Def. Ex. 4,

Def. Ex. 6). These documents govern the treatment program for all Class Members.

(Wilson- Vol. 3, 678:18-679:4).

209.    The MSOP has not done any analysis of treatment files to determine how

clinicians are scoring the Matrix factors or to determine whether there is any consistency,

even though they believe it should be done. (Hébert - Vol. 12, 2768:21-2769:1; 2770:1-

2).  Nor has MSOP ever done any interrater reliability studies with respect to how Matrix

factors are scored.  (Hébert- Vol. 12, 2768:13-5).

210.    This issue regarding Matrix scoring subjectivity and scoring reliability

impacts all Class Members who are scored on the Matrix Factors. (McCulloch- Vol. 1,

168L22-169:9).

### 3.  <u>The use of BERs to delay treatment progression.</u>

211.    Pursuant to MSOP phase progression policy, a Class Member shall not

progress to the next phase of treatment if they have a certain number of behavioral

expectation reports (BERs). (Def. Ex. 2 at 16-17).  This is true even if the major BERs

are not related to sexual offending. (Hébert - Vol. 12, 2772:3-5). Minor BERs are considered in phase progression decisions, even though they are not specifically addressed in the phase progression requirements. (Def. Ex. 2; Lewis- Vol. 7, 1402:17-20; Berg- Vol. 7, 1512:16-18).

212.    Determining whether to give a BER is subjective, and they are normally given by security staff at MSOP. (Hébert - Vol. 12, 2772:14-21).

213.    Although major BERs can be appealed, (Def. Ex. 48; Bolte- Vol. 8, 1742:10), at the appeal hearing, the Class Member is not able to have legal representation or call witnesses. (Def. Ex. 48; Bolte- Vol. 8, 1742:11-13). The BER hearings are run by MSOP staff. (Bolte- Vol. 8, 1742:14-17).

214.    Major BER hearings also may be appealed to the facility director or designee. (Def. Ex. 48). If the Class Member is not satisfied with the facility director's response, an appeal of that decision can be made to the MSOP's Executive Director. (Def. Ex. 48). The decision of the Executive Director is final. (Def. Ex. 48). The Class Member is not able to have legal representation or call witnesses. (Def. Ex. 48).

215.    Minor BERs do not provide a hearing process. (Def. Ex. 48; Bolte- Vol. 8, 1742:1-5). They can be appealed to the MSOP's Behavioral Expectations Supervisor or designee. (Def. Ex. 48; Bolte- Vol. 8, 1743:3-9). The Class Member is not able to have legal representation or call witnesses. (Def. Ex. 48).

216.    The failure to provide sufficient procedural due process for these BERs is a constitutional violation given that these affect Class Members' progression through the treatment program.

217.    It is clear from the evidence that MSOP, in most cases, will not support a

Class Member for provisional or full discharge unless they have gone through the

treatment program. (McCulloch- Vol. 1, 174:7-11; Def. Ex. 7; Jesson- Vol. 5, 966:18-25;

Berg- Vol. 7, 1516:17-21; Fox- Vol. 7, 1588:20-23; Johnston- Vol. 13, 2986:19-22). And

it is clear that the SRB and SCAP, in most cases, will not grant provisional discharge or

discharge without the support of MSOP. (Barbo- Vol 20, 4564:8-24; Barry- Vol. 23,

5153:8-18).

### 4.   <u>Understaffing has affected treatment progression.</u>

218.    One of the major barriers to treatment progression for the individuals

committed to MSOP is the chronic clinical staffing shortage. (Plf. Ex. 48 at 5). These

staffing shortages affect the entire MSOP population because turnover of staff or

insufficient staff can lead to treatment taking longer. (McCulloch- Vol. 1, 171:5-23).

Maintaining clinical staffing has been a consistent issue at the MSOP.  (*See e.g.* Plf. Ex.

25 at 8; Plf. Ex. 184 at 60; Plf. Ex. 43 at 10; Berg- Vol. 20, 4594:20 – 4595:1; Fox-Vol.

19, 4255:23-4256:3).

219.    High turnover of clinical staff can lead to poorly trained individuals

executing a complicated and subjective treatment program.  (McCulloch- Vol. 1, 108:6-

13).

220.    Ms. Hébert has stated that it takes about a year for a clinician "to get up to

speed to do quality work." (Plf. Ex. 145).  There have been times when Ms. Hébert

believed that some staff may be "missing some fundamental basics of SO treatment."

(Plf. Ex. 127).

221.   Ms. Hébert testified that short staffing can affect the ability of the MSOP to deliver the treatment program as it is designed, which can affect progress through treatment. (Hébert- Vol. 12, 2816:6-14).

222.   Short staffing can also lead harm the therapeutic alliance because clinicians must run larger groups and carry a higher workload and patients may experience more changes in their primary therapist. (Wilson- Vol. 3, 527:20-528:13; White- Vol. 9, 1968:25-1969:7).

223.   When Class Members receive new primary therapists, their Matrix scores fluctuated because the new primary therapist did not know the patient well. (Vietanen- Vol. 10, 2294:19-2295:7; Hébert - Vol. 12, 2757:10-15).  It takes time to develop a good therapeutic alliance. (Elsen- Vol. 7, 1351:12-14; Thuringer- Vol. 8, 1864:20-1865:3; Persons Depo. 23:20-22:4).  A poor therapeutic alliance can inhibit treatment progress. (Lewis- Vol. 7, 1404:23-1405:1).

**5.   <u>The statute is unconstitutional as applied because of MSOP's failure to follow "best practices" in several key areas.</u>**

224.   Finally, several MSOP employees testified that "best practices" often included "common practice."  (See e.g. Hébert - Vol. 10, 2379:8-2380:5; Fox-Vol. 19, 4232:6-19; Puffer- Vol 20, 4413:13-22).  And yet, MSOP fails to follow "common practices" that are found in other sex offender programs.

225.   Most states require regular risk assessments of their civilly committed sex offenders.  (See Plf. Ex. 228 at 48 (2014 SOCCPN survey reporting that 13 of 15 programs reporting perform risk assessments annually and that one program performs

forensic risk assessments every ten months)).  For example, Wisconsin's SVP Law,

Chapter 980, requires annual risk assessments. (McCulloch- Vol. 1, 57:20-24).  New

York's civil commitment statute requires annual assessments as well. (Freeman-Vol. 4,

705:1-2).  In Texas, the statute provides for biennial reviews and a hearing whereby the

court determines whether the individual no longer meets the criteria for commitment.

(Freeman- Vol. 4, 786:19-787:2).  But Minnesota's statute not only fails to require an

annual risk assessment, MSOP chooses not to provide one either.  (Hébert - Vol. 10,

2392:3-6; Barry- Vol. 23, 4154:1-5; Johnston- Vol. 13, 2934:7-16)

226.     In Wisconsin, when the Static-99R came into use, there was a spike in

discharges of committed individuals because they received annual reviews and were

found, under the new Static-99R, to no longer meet commitment criteria. (McCulloch-

Vol. 2, 433:10-18). New York also re-evaluated all committed individuals when the

Static-99R was released to ensure their risk still met the threshold for commitment.

(Freeman- Vol. 4, 794:1-6).  However, MSOP's Executive Clinical Director testified that

despite the changes to the Static-99R, MSOP chose not to reassess anyone under the new

actuarial tool.  (Hébert, Vol. 9, 2159:4-7, 14-22)

227.     The Wisconsin statute allows patients to petition the committing court at

any time to be discharged. (McCulloch- Vol. 1, 58:16-20, 63:14-19). In New York,

patients receive a hearing and a risk assessment each year, although the hearing portion

may be waived. (Freeman- Vol. 6, 758:14-20). Additionally, in New York, patients may

petition the court at any point for a reduction in custody and if the civil commitment

program feels an individual is ready to be released, they will file a petition on behalf of

the patient. (Freeman- Vol. 4, 764:2-12). However, in Minnesota, Class Members must go through a cumbersome and lengthy SRB and SCAP process in order to petition for reduction in custody or discharge. There is not method to by-pass this process. And there is no automatic review by the Courts. Additionally, even if MSOP believes Class Members satisfy the discharge process, MSOP is not required, nor do they choose to petition on behalf of those individuals. (Johnston-Vol. 13, 2962:9-15) By contrast, in New York, there is a requirement under the statute that a petition must be filed when the civil commitment program determines a patient no longer meets commitment criteria. (Freeman- Vol. 4, 765:19-766:2).

228.     Minnesota has no formal process for reviewing files of Class Members who may be stuck in a treatment phase.  (Plf. Ex. 48 at 6; Hébert - Vol. 12, 2808:16-20) In New York, there are clinical staff at the central office who review the treatment file of any patient who has been in a phase of treatment for 18 months or two years, have conversations with their treatment team, and do what they can to help that patient move to the next phase. (Freeman- Vol. 4, 805:8-21).

229.     Minnesota has the highest number, per capita, of civilly committed sex offenders in the country or the world. (Plf. Ex. 225 at 74-75; Plf. Ex 41 at 1; Plf. Ex. 184 at ix, 16-18). The rate of commitment is 128.6 per million, whereas the next highest, North Dakota, is 77.8 per million, and by contrast New York's rate is 15 per million. (Freeman- Vol. 4, 819:10-13).

230.     Most importantly, Minnesota has never fully discharged anyone from MSOP since the program was created (Plf. Ex. 184 at 4).  Additionally only three Class

Members have ever been provisionally discharged, one of whom was returned for a violation for his release conditions. (Berg- Vol. 7, 1502:10-12; Hébert- Vol. 12, 2800:9-11).  By contrast, Wisconsin has fully discharged 118 individuals since 1994 (McCulloch- Vol. 1, 54:4-6) and placed approximately 135 individuals on supervised release since 1994. (McCulloch- Vol. 1, 54:16-19).  This is significant because Wisconsin incarcerates many more people than Minnesota, yet Minnesota refers and commits more sex offenders than Wisconsin and has released far fewer. (McCulloch- Vol. 2, 434:10-25).  In New York, 125 civilly committed offenders were immediately placed on SIST. (Freeman- Vol. 4, 773:18-19). 64 patients have been moved from the secure facility to the strict and intensive supervision and treatment program. (Freeman- Vol. 4, 778:8-10). Thirty committed individuals have been fully discharged from New York's program. (Freeman- Vol. 4, 778:11-13). There have been no recidivism incidents for those who have been fully discharged. (Freeman- Vol. 4, 780:22-24).

231.    Thus, Minn. Stat. §253D is unconstitutional as applied for a number of reasons, including the failure to provide regular or annual risk assessments, the failure to file petitions for the reduction in custody of Class Members the MSOP knows are improperly placed, the failure of the discharge process to provide an adequate process for release, the failure to provide sufficient due process protections for the property right created by Minn. Stat. §253B.03, subd. 7, the failure of the treatment program to provide adequate due process protections due to the application of the phase progression standards, including the Matrix factors and BERS, the failure to address staffing issues, and the failure to follow best practices. The statute as it is being applied is not narrowly

tailored for the purpose for which Class Members were committed and as such must be declared unconstitutional.

## G. THE FAILURE TO PROVIDE LESS RESTRICTIVE ALTERNATIVE RENDERS MINN. STAT. § 253D UNCONSTITUTIONAL

232. Count II and Count VI of Plaintiffs' TAC allege that Defendants' failure to provide less restrictive alternative confinement options violate the Fourteenth Amendment, and thus renders Minn. Stat. § 253D unconstitutional as applied.

233. In the context of civil commitment, due process requires that people who are subject to involuntary commitment must be treated in the least restrictive setting. *See Foucha*, 504 U.S. at 79; *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (finding that even where a legitimate government purpose exists, that purpose cannot be pursued in a manner that broadly limits fundamental personal liberties when it could be more narrowly achieved); *Healey v. Murphy*, Civil Action Nos. 01-11099-NG, 04-30177-NG, 2011 WL 2693688 at * 5 (D. Mass. July 8, 2011) (declining to grant motion for summary judgment of a claim by a civilly committed sex offender about the right to a less restrictive alternative, finding that when looking at the conditions of confinement as a whole, plaintiff had plead an adequate claim that they were unnecessarily punitive). This is consistent with the requirement that civil confinement to the MSOP must be narrowly tailored to the purposes of the commitment due to the fundamental liberty interests at stake. *Weiler*, 137 F.3d at 1051 (citing *Reno*, 507 U.S. at 301-02).

234. In fact, the civil commitment statute explicitly provides that patients may be placed in a less restrictive setting upon commitment and that they may petition for

transfer to a less restrictive setting. Minn. Stat. §253D.07, subd. 3 ("[T]he court shall commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available…"); Minn. Stat. §253D.29-30.

235. Thus, the Court will apply the narrowly tailored standard when determining whether Class Members have a right to less restrictive confinement options and find that Class Members have a right to less restrictive alternative treatment options. Failure to provide such less restrictive options renders Minn. Stat. §253D unconstitutional because Class Members' confinement is not narrowly tailored to the purposes for which they are committed, unduly infringes on their fundamental liberty interests, and additionally, does not reflect professional judgment. *See Gallagher*, 699 F.3d at 1017; *In re Johnson*, 800 N.W.2d 134, 147 (D. Minn. 2011); *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982).

236. Placement in a less restrictive alternative should not be solely based on treatment progress- it should be based on risk. *See Foucha*, 504 U.S. at 79 ("Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." (citations omitted)).

237. Defendants have relied on *Beaulieu vs. Ludeman*, for the proposition that the Eighth Circuit has held there is no federal constitutional right to a less restrictive alternative. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1031-33 (8th Cir. 2012). However, the court in *Beaulieu* did not address the right to be placed in a less restrictive facility consistent with the purposes of civil commitment. Instead it addressed the MSOP's restraint policy for patient transports. *See Beaulieu*, 690 F.3d at 1031-33. The use of

restraints during transport is a very different restriction on liberty than placement in a facility that is more restrictive than necessary. The liberty interest implicated is much greater, and therefore the *Beaulieu* analysis does not apply.

238.    Even if, as some courts have suggested, the *Youngberg* professional judgment standard should be used to determine whether there is a right to a less restrictive alternative, Plaintiffs have shown that Defendants have not exercised professional judgment with respect to less restrictive alternatives. *See Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 (5th Cir. 1987); *Clark v. Cohen*, 794 F.2d 79, 93 n. 9 (3d Cir. 1986) (*en banc*) (Becker, J., concurring); *Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1249 (2d Cir. 1984); *Rennie v. Klein*, 720 F.2d 266, 268-69 (3d Cir. 1983); *Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir. 1983) (holding, "it must be determined whether professional judgment in fact was exercised in balancing the liberty interest of the class members against relevant State interests.")).

239.    As early as 2011, MSOP clinical management knew that some low-functioning patients could be managed in group homes. (Plf. Ex. 184 at 43-44). The Auditor's Report also noted that the MSOP should reassess its existing residents to determine which residents would be suitable for placement in an alternative setting. (Plf. Ex. 184 at 46).

240.    Because Defendants know that there are individuals who could be served in a less restrictive alternative, but have failed to move those individual or expedite the process, Minn. Stat. §253D is unconstitutional as it is being applied.

241.    DHS official as well as MSOP executive and staff all admit that there are individuals civilly committed to Moose Lake and St. Peter that could be served in less restrictive alternatives.  (See e.g. Plf. Ex. 313; Johnston- Vol. 13, 3013:25-3014:9; Hébert- Vol. 12, 2697:1-4).

242.    However, until very recently there were not less restrictive alternatives (aside from CPS) in which to place individuals. (Puffer- Vol. 7, 1565:7-10)

243.    As such, "…all offenders committed to MSOP are presumptively placed in the highest level of security.  The result is that some offenders, while meeting the criteria for commitment, may be needlessly confined in the most secure facilities, when both public safety and the need for effective treatment might be better served in a less restrictive environment." (Plf. Ex. 41 at 3).

244.    The recommendation of the Auditor's Report that MSOP develop and implement a plan for identifying when low functioning clients can be managed in a less restrictive setting and then petition for the movement of such clients, the MSOP issued a Request for Information on possible alternative setting. (Plf. Ex. 95 at 5).

245.    The DHS has since entered into contracts with various community providers, but those contracted facilities could only house about eight to ten patients per year. (Jesson- Vol. 5, 923:2-6, 924:7-15; Johnston- Vol. 13, 3033:23-3034:4).  Some of the contracts the MSOP has entered into are for housing, some for treatment, some for supervision, and some for a combination of those services. (Johnston- Vol. 13, 3034:9-12).  Even now, there are only a very limited number of beds available in the alternative

placement options that DHS has contracted with.  (See e.g. Jesson- Vol. 5, 923:2-6, 924:7-15; Johnston- Vol. 13, 3033:23-3034:4).

246.    Additionally, there is no alternative placement option at the time of initial commitment. (Barbo- Vol. 20, 4550:7-17; Fox- Vol. 7, 1600:7-10; Benson Depo. 134:14-135:3).

247.    Dr. Barbo testified that there have been times when Class Members could have been transferred to CPS but they had to wait because of lack of beds.  (Barbo- Vol. 20, 4560:18-21).  Dr. Barbo also testified that MSOP currently does not have a contract with any entities that offer services for Class Members who are on the assisted living unit.  (Barbo- Vol. 20, 4562:2-5).

248.    Other states successfully operate community-based programming. For example, New York operates SIST, where patients can be placed in the community either at the time of initial commitment or when risk is reduced. (Freeman- Vol. 4, 748:22-749:2).

249.    Because due process requires that the State narrowly tailor the confinement of Class Members to ensure that it comports with the purposes of the commitment statute (public safety and treatment), and because the statute clearly requires that less restrictive treatment programs be available, Defendants' failure to provide commitment in the least restrictive setting necessary to achieve the purposes of the commitment violates Class Members' constitutional rights.  *See Healey*, 2011 WL 2693688, at * 5.

## H. THE PRACTICES AND POLICIES OF THE DEFENDANTS CREATE OVERLY PUNITIVE CONDITIONS

250.    The constitutional violation alleged in Counts I, II, III, V, VI and VII of Plaintiffs' TAC create overly punitive conditions of confinement that are not narrowly tailored to the purposes of civil commitment.

251.    The civil commitment of sexual offenders is only constitutionally permissible "provided there is no object or purpose to punish." *Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring) (citing *Baxstrom,* 383 U.S. at 111–12).

252.    The statue must be narrowly tailored to the purposes of commitment when fundamental liberty interests are implicated, as they are here. Feb. 20, 2014 Order at p. 14-15 (citing *Gallagher ,* 699 F.3d at 1017; *see also Weiler*, 137 F.3d at 1051 (citing *Reno*, 507 U.S. at 301-02).

253.    The purposes of the civil commitment of sex offenders are to protect the public and to provide the committed individual with sex offender treatment. *See In re Johnson*, 800 N.W.2d at 147. "Where, notwithstanding a civil label, a statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil, a court will reject a legislature's manifest intent to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes." Feb. 20, 2014 Order, at 15 (internal quotations marks omitted) (citing *Hendricks*, 521 U.S. at 361; *Seling*, 531 U.S. at 261).

254.    Confinement to the MSOP involves a "significant deprivation of liberty" that "infringes upon one's fundamental right to be free from confinement." Feb. 20, 2014

Order, at 12-13 (citing *Jones*, 463 U.S. at 361; *Cooper v. Oklahoma*, 517 U.S. 348, 368-69 (1996)). Thus, the MSOP's policies and practices, both individually and as a whole, must be narrowly tailored to the purposes for which Class Members are committed-public safety and treatment. *See Foucha*, 504 U.S. at 79; *In re Johnson*, 800 N.W.2d at 147. The conditions of confinement at the MSOP, as the program is implemented, are not narrowly tailored to the purposes of Class Members' commitment, and thus Minn. Stat. §253D is unconstitutional.

255.    Defendants have argued that the holding in *Hendricks* rejects the notion that a civil commitment statute can be unconstitutional as it is applied due to the punitive implementation of the statute.  But, *Hendricks* merely considered the language of the commitment statute itself- not how the statute was implemented at the Kansas sex offender civil commitment program. *Hendricks*, 521 U.S. at 356-60. Thus, the holding in *Hendricks* is inapplicable to these claims, as Counts II, V and VII do not challenge Minn. Stat. § 253D as punitive on its face, but rather as punitive in its application.

256.    MSOP knows there are Class Members who could be safely managed in the community or in less restrictive alternatives, and yet they linger at MSOP. (*See e.g.* Hébert- Vol. 12, 2706:15-23; Puffer- Vol. 7, 1560:20-22, 1561:2; Fox- Vol. 7, 19-22)

257.    It is clear from the evidence that there are Class Members who should never have been committed to MSOP in the first place. (*See e.g.* Plf. Ex. 225 at 6; Plf. Ex. 41 at 4; )

258.    The fact is that no individual committed to the MSOP has ever been discharged, and only three have ever been provisionally discharged. (Berg- Vol. 7, 1502:10-12; Hébert - Vol. 12, 2800:9-11; Plf. Ex. 184 at 4).

259.    Because of this fact, "[t]he emotional climate at Moose Lake is replete with negativity, despair, and hopelessness." (Plf. Ex. 225 at 52). This hopeless attitude, and resultant lack of action by the MSOP to address this issue, has been noted in multiple outside reviews of the MSOP. (Plf. Ex. 225; Plf. Ex. 43). The 706 Report found that "the single most positive way to improve the therapeutic environment of the MSOP would be for all concerned (MSOP administration, all staff, and clients) to see more people being released." (Plf. Ex. 225 at 58).

260.    It is not any one aspects of the MSOP (the therapeutic environment, the organization, or the policies and procedures) that render the MSOP punitive in its application, but rather all of these aspects considered together. "Where… a statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil, a court will reject a legislature's manifest intent to create a civil proceeding." Feb. 20, 2014, Order at 15 (internal quotation marks omitted) (citing *Hendricks*, 521 U.S. at 361; *Seling*, 531 U.S. at 261). The fact that no one has been fully discharged and only a few have ever been provisionally discharged - leading to rampant hopelessness coupled with the fact that many could be kept in a less restrictive environment - renders the MSOP punitive as it is applied and not narrowly tailored to the purposes for which the Class Members have been and continue to be detained.

261.    Based on the evidence as set forth above, the application of Minn. Stat.

253D becomes preventative detention and thus unconstitutional.

## CONCLUSION

Based on the evidence submitted in this case, and the legal standards to be applied

by the Court, this Court should declare Minn. Stat. §253D unconstitutional.

Dated:  March 27, 2015

s/Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
David A. Goodwin (#386715)
Raina C. Borrelli (#392127)
**Gustafson Gluek PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: (612) 333-8844

*Attorneys for Plaintiffs*