DENNIS L. BENSON   8/11/2014

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Scott Karsjens,        Court File No.
David Leroy Gamble, Jr.,     11-cv-03659 (DWF/JJK)
Kevin John DeVillion,
Peter Gerard Lonergan,
James Matthew Noyer, Sr.,
James John Rud, James Allen Barber,
Craig Allen Bolte,
Dennis Richard Steiner,
Kaine Joseph Braun,
Christopher John Thuringer,
Kenny S. Daywitt,
Bradley Wayne Foster,
Brian K. Hausfeld,
and all others similarly situated,

            Plaintiffs,

-vs-

Lucinda Jesson, Dennis Benson,
Kevin Moser, Tom Lundquist,
Nancy Johnston, Jannine Hebert,
and Ann Zimmerman, in their
individual and official capacities,

            Defendants.


---------------------------------------------------


VIDEOTAPED DEPOSITION

OF

DENNIS L. BENSON


---------------------------------------------------



DATE TAKEN:  8/11/14     BY:  Amy L. Larson, RPR

DENNIS L. BENSON 8/11/2014

Page 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15    Q.  Sir, would you state your full legal name for

16        the record.

17    A.  Dennis Lee Benson.

18

19

20

21

22

23

24

25

DENNIS L. BENSON  8/11/2014

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Q.  Mr. Benson, tell me how long -- well, let me

22        back up.

23            Tell me what position that you held at

24        MSOP.

25    A.  I was the executive director from March -- I

DENNIS L. BENSON  8/11/2014

Page 13

1    believe March 1st, 2008, until I resigned or

2    retired in June of 2012.  June 5th, I believe

3    is my retirement date.

4  Q.  And why did you leave the program?

5  A.  Well, I had previously retired from

6    corrections after 34 years, and that was at

7    my kind of rule of 90, so I had enough time

8    that I didn't have to come back to work.  But

9    I had been watching this program struggle for

10   many, many years, and I had had conversation

11   with Wes Kooistra at the time and he was

12   interested in employing me if I was

13   interested in working, so I decided I would

14   give it a shot and see if I could be helpful.

15  Q.  And why did you resign?

16  A.  Well, it was just time.  I had this -- I had

17   been talking with -- as we were speaking, I

18   was talking with my old college roommate who

19   said that he was in -- I knew he was in the

20   casino business, but his son would possibly

21   be selling his casino in Billings and was I

22   interested.

23       And I've always had -- I've always been

24   kind of an entrepreneur.  I've done all kinds

25   of funny things on the side, including

DENNIS L. BENSON  8/11/2014

Page 14

1   16 years in the concert business in Somerset,

2   Wisconsin.

3       And so I thought it would be a great

4   retirement gig, it's -- they're easy to run

5   and if you got a good manager you can be

6   absent.  We travel a lot, so -- and the

7   stress of MSOP and the politics around it

8   were very frustrating to me.

9   Q.  Okay.  Let me back you up a little bit.  You

10      mentioned a gentleman I think named Wes -- I

11      couldn't --

12  A.  Kooistra.

13

14

15

16

17  Q.  All right.  And Mr. Kooistra's position in

18      the -- in the --

19  A.  He was a --

20  Q.  -- government?

21  A.  I believe he was an assistant commissioner in

22      DHS.  He had been with DHS for a number of

23      years.

24  Q.  At that time, 2007 or 8 when he first started

25      talking to you, was Mr. Ludeman the

DENNIS L. BENSON  8/11/2014

Page 15

1    commissioner?

2    A.   Yes.

3    Q.   Cal Ludeman?

4    A.   Cal Ludeman.

5    Q.   All right.  And you mentioned that before you

6         had these conversations, or at some time

7         before you took the job, that you understood

8         there were lots of problems at the MSOP.

9    A.   Yes.

10   Q.   Those are my words.  By the way, let me --

11        let me just make this clear for the record.

12        Sometimes I'm going to ask questions where I

13        sort of summarize what you say.  Those are my

14        words --

15   A.   Yup.

16   Q.   -- okay?  So I want you to use your words.

17   A.   Well, the Department of Corrections, going

18        way back to -- I started in corrections in

19        1974, and I was a case worker in 1977, and

20        part of the role of a case worker at a prison

21        was to -- we all had a couple of cases down

22        at the St. Peter Security Hospital.

23             So going way back to that time, DHS, in

24        my opinion, struggled with the management of

25        these patients, as they would call them, many

DENNIS L. BENSON  8/11/2014

Page 16

1    of them were dual commits, so they were both

2    offenders and patients, and how to -- how to

3    manage them inside of a hospital system.

4         And then more recently in 2005, I

5    believe, and 2006, both Easter Sundays, there

6    were escapes from the St. Peter Security

7    Hospital that got lots of attention and DHS

8    was very interested in -- in trying to get

9    some help around some security issues that

10   they obviously had.

11        So I was the deputy commissioner then in

12   corrections, and we actually sent some folks

13   over from corrections on mobility assignments

14   to do some analysis and do some training and

15   develop some policy around accountability of

16   patients, I guess would -- would be the

17   primary focus, because at that point it was

18   no more complicated than we've got to make

19   sure the public safety is ensured.

20        And their fences were inadequate, their

21   counts were -- in my opinion, again, were

22   inadequate.  And we sent a captain over for a

23   year, we sent a -- an investigator over for a

24   couple of years to help develop some systems

25   around patient accountability.

DENNIS L. BENSON   8/11/2014

Page 17

1    Q.   And this was in the 2005, 2006 time frame?

2    A.   A little bit later than that.

3    Q.   Even maybe into 7?

4    A.   Yeah.   They were over there -- somebody was

5         over there even up until the time that I came

6         to MSOP in 2008.

7    Q.   Was this primary -- primarily a problem at

8         St. Peter or was it both St. Peter and

9         Moose Lake?

10   A.   Well, at that time it was primarily

11        St. Peter.  But as the building project was

12        proceeding up at Moose Lake, they were

13        starting to move some of the more

14        difficult-to-manage patients from St. Peter

15        to Moose Lake because it had a better

16        security system.

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON  8/11/2014

Page 18

1  Q.  Okay.  When you were asked to take the job,

2      was there anything in particular that they

3      asked you to do?

4          Well, first of all, who approached you

5      about the job other than, is it Mr. Wes --

6  A.  Kooistra.

7  Q.  Kooistra?

8  A.  Mike Tessneer was also involved in those

9      conversations.  He was -- he reported to Wes.

10     And, actually, I believe he was directly

11     responsible for MSOP at that time.  I don't

12     know what his title -- I can't even recall

13     his title, but the hospitals and state

14     operated -- they call it SOS, State Operated

15     Services, were all under Mr. Tessneer.

16 Q.  He was at the commissioner's office --

17 A.  Yeah.

18 Q.  -- or worked for DHS anyway?

19 A.  Right, right, and then he reported to Wes.

20 Q.  And who was the -- who was the MSOP executive

21     director at that time?

22 A.  Jack Erskin.

23 Q.  And -- and had he announced his retirement,

24     was he leaving?  I mean, what --

25 A.  No.

DENNIS L. BENSON   8/11/2014

Page 19

1   Q.   Okay.

2   A.   No.

3   Q.   So they approached you about taking this

4        position when you retired from the Department

5        of Corrections; is that fair?

6   A.   Right.

7   Q.   Okay.  And what did they tell you they

8        needed?

9   A.   Well, somebody to manage MSOP was kind of the

10       bottom line.  It was a program that, in my

11       opinion, was -- was a real challenge to the

12       state hospital system to manage.  It was

13       growing in ways that historically it had not

14       grown, and managing a growing population was

15       something that I had some firsthand

16       experience in when I became a deputy

17       commissioner in -- in two thousand -- or,

18       excuse me, 1996, the prison population was

19       4,500.  When I left in 2008 it was 9,000.

20           So we had managed the doubling of the

21       prison population in Minnesota during those

22       12 years and we became pretty good at bonding

23       and building and trying to find the next bed

24       for the next offender that came in, and at

25       the same time trying to manage growth and

DENNIS L. BENSON  8/11/2014

Page 20

1    prepare people for promotion in other

2    positions and challenges, and trying to keep

3    the program a high priority, which is always

4    challenging when money is tight and you tell

5    legislators you need a sex offender program

6    at the new facility in Rush City, they see

7    that differently than we see it.  So I had

8    some of those qualifications, again, that I

9    thought could be helpful.

10        I was also a prison warden for about

11   five years, just short of five years at both

12   Stillwater and Oak Park heights, so knew

13   about running closed facilities, and also had

14   a fair amount of experience not as a program

15   administrator, but I worked very closely with

16   the education program, sex offender

17   programming and chemical dependency

18   programming in the department.

19        It became a passion of mine.  I had a --

20   unfortunately, my oldest son ended up in a

21   treatment center back in the early 2000s, and

22   I saw the magic that good treatment can work

23   and kind of took that on as a personal

24   project and challenge to keep adding beds.

25        So the other important piece of my resume

DENNIS L. BENSON  8/11/2014

Page 21

1   is when I started in corrections we had not

2   one single inpatient treatment bed in the

3   system.  When I left we had somewhere around

4   600 treatment beds, both chemical dependency

5   and sex offender treatment, and some of them

6   were combined programming, and we also did an

7   awful lot around the education initiative in

8   corrections.

9        So, again, I saw this job as contrary to

10  what I know patients will say is it was not

11  my intention to turn it into a prison, but

12  rather provide good programming inside of a

13  secure environment.

14  Q.  With respect to Mr. Tessneer and

15      Mr. Kooistra, did they tell you anything else

16      about what they wanted you to do when you

17      took over?  I mean, do you recall the

18      specific conversations, that they said

19      something like we want to, you know, fix

20      these security problems at St. Peter or we

21      want to fix these, you know, whatever kind of

22      problems?

23  A.  Lots of -- lots of conversation about some of

24      the security aspects of the program and the

25      two physical plants, and they also wanted me

DENNIS L. BENSON  8/11/2014

Page 22

1    to manage the construction of the new

2    facility, which had been planned prior to my

3    coming on.  So there was very little I could

4    change about the -- around the blueprint.

5        But the other thing that they did that

6    created a challenge for me when I came on is

7    added all these beds with very little program

8    space.  So that's a problem inside of a

9    treatment facility.

10       So my first project was to put together a

11   bonding initiative to add infrastructure, and

12   we did that successfully.  We convinced the

13   legislature, I believe in two thousand --

14   bonding years are, what, odd years or even

15   years?  Anyway, 2007, I think it was, to add

16   45 million in infrastructure up at Moose

17   Lake, so we got that going.

18       And that was -- in the process of

19   opening, the day I left I did a tour and they

20   were ready to open the new infrastructure.

21   So we had conversation around that.

22       We had conversation around treatment

23   protocol and developing a treatment protocol

24   that was cutting edge.  I don't know -- there

25   are lots of numbers, but there were a number

DENNIS L. BENSON  8/11/2014

Page 23

1  of treatment -- or clinical directors prior

2  to my hiring Jannine, so there was -- there

3  was not good stability in the treatment

4  program at MSOP, again, in my opinion, and

5  I'm not a treatment expert.

6      But I do know enough about treatment

7  environments to know that good treatment, in

8  my opinion, was not occurring when I got

9  there in 2008.

10     And we were also concerned about a

11 reintegration initiative, developing an

12 initiative to move people through the program

13 and getting them prepared for release, so we

14 developed a community preparation program

15 that they had some semblance of that when I

16 came in 2008, but it was loosely wired

17 together and, again, it was, in my opinion,

18 not very defendable in terms of how they

19 selected people to prepare them for the last

20 phases of treatment, which was -- which gave

21 them ground privileges and privileges to go

22 into the community and -- and there was also

23 some things lacking about who was selected

24 to -- to go down to the lesser secure

25 facility, which we decided should be

DENNIS L. BENSON  8/11/2014

Page 24

1    St. Peter.

2        That community had had lots of experience

3    with working with marginalized populations

4    and we -- I felt that we could develop an end

5    phase to that program more successfully down

6    there than we could up at Moose Lake where

7    the community pretty much gave us an edicts,

8    said we never want anybody outside of the

9    fence.

10        So -- so there was lots of concern about

11    this population, as there still is today, and

12    how they're managed.  So the politics of all

13    this was a new experience for me, and I have

14    considered myself a veteran of navigating

15    legislative waters and getting buildings and

16    developing, but there was a -- a new fear of

17    dealing with this population.

18        And, again, remember, this was post

19    Dru Sjodin, which in my opinion, was kind of

20    the turning point for Minnesota in how we

21    manage sex offenders.

22  Q.  So did you have any specific direction with

23    respect to people being released from the

24    program before you started?

25  A.  No, I didn't.  I certainly expressed my

DENNIS L. BENSON   8/11/2014

Page 25

1    concern about the fact that nobody had been

2    released in many years.  In fact, it was my

3    team that started to research that.  And

4    there were a couple of guys that had been

5    released from kind of the precursor to MSOP

6    back in, oh, gosh, the late '80s, I believe,

7    and nobody was keeping track of them.

8        We found one of them out on the East

9    Coast who had committed additional crimes,

10   and we worked for about two years to

11   extradite him or get him to come back to

12   Minnesota.  And then there was another guy we

13   found that was living in a -- oh, an

14   assisted-living center or halfway house, very

15   responsibly, down in, I believe, southern

16   Minnesota.

17       So we -- I wanted to make sure there were

18   no fugitives out there that were going to

19   haunt the program going forward and impact on

20   our ability to try to do the right thing with

21   respect to developing this treatment program.

22   Q.  How would you describe your job duties as

23       executive director when you started in March

24       of 2008, just generally?

25   A.  Well, to develop a -- a program for civilly

DENNIS L. BENSON   8/11/2014

Page 26

1    committed sex offenders that was defendable

2    and that was not a prison environment, that

3    was not a -- an attempt at snookering the

4    courts or the legislators, and to do that in

5    a responsible way that still addressed

6    concerns.

7         But it was very -- I tell a story back in

8    the '70s when I started at the prison it was

9    chaotic.  It was -- it always reminded me of

10   the childhood book by Dr. Seuss,

11   If I Ran This Zoo Here's What I Would Do, and

12   it goes on to talk about letting the zoo

13   animals run the zoo.  And I'm not making the

14   analogy that sex offenders are zoo animals,

15   but rather they certainly that a real hand in

16   what occurred every day in these facilities,

17   and I think that it ought to be the other way

18   around.

19        I think that as an administrator we have

20   responsibility to develop a climate that's

21   conducive to change, and I don't believe that

22   was the case at either Moose Lake or

23   St. Peter.

24        So my first order of business was to

25   develop a six-month strategic plan around

DENNIS L. BENSON   8/11/2014

Page 27

1   developing that climate.  And then the next

2   six months would be implementation and hiring

3   appropriate staff so that good treatment

4   could occur in this environment.

5       And I told them when I drove up, if you

6   want a caretaker, if you want somebody to

7   just manage a closed environment, I'm not the

8   right guy.  If we aren't going to move people

9   through the program, I don't -- you know,

10  that's not what I do.

11  Q.  Is that part of why you resigned in 2012,

12  because you were frustrated that you couldn't

13  actually move people through the program?

14  A.  Well, I had moved the first person in

15  20 years through the program, so I had a

16  success in getting Clarence --

17  Q.  Mr. Opheim?

18  A.  Yeah, through the program.  But I -- to

19  some -- I was frustrated, there was no

20  question about it.  I was frustrated with the

21  legislature, I was frustrated with the

22  Pawlenty administration, to some degree,

23  because it was difficult to get buy-in for

24  what had to occur if we were going to

25  responsibly release people.

DENNIS L. BENSON   8/11/2014

1          But, you know, that was passive

2     aggressive stuff.  Nobody looked me in the

3     eye and said we don't ever want anybody to

4     get out, but actions speak louder than words.

5          And we just -- we had trouble doing

6     simple things around this program that, in my

7     opinion, made lots of sense, because nobody

8     wanted to draw attention to it.

9          For instance, the sex offender statute

10    was buried inside of the contours of the DHS

11    statute, and it, in my opinion, clearly had

12    to be a separate statute.  There were all

13    kinds of issues.

14         And we put together a committee that was

15    looking at pulling out the civilly committed

16    sex offender pieces and making it its own

17    statute.  And it took me four years to get

18    that done.  I did -- we did get it done.  I

19    think it actually happened, probably, part of

20    it the year I left and then the rest of it

21    the following year.

22         But that was an example where we got to

23    conference committee and, oh, they just

24    didn't want to deal with it because it was

25    going to draw attention.  And, you know,

DENNIS L. BENSON  8/11/2014

Page 29

1    they're right too, somebody else could, you
2    know, add something germane to that bill that
3    was counterproductive or even tougher on sex
4    offenders or there was -- continues to be
5    talk about sentencing sex offenders
6    indeterminately, so then they could move the
7    problem from MSOP to corrections where people
8    would get an indeterminate sentence and
9    they'd never get out of prison.  And they
10   could do that probably much easier than under
11   a -- a civil process.
12        So, yes, I was frustrated.  Then the
13   Dayton administration came along and I -- I
14   can't say enough good things about
15   Commissioner Jesson.  I think she really
16   tried hard to move the program in the right
17   direction.
18        But I met a couple of times with her and
19   governor staff, and they never said don't do
20   this, don't do that, but I couldn't get much
21   done those -- I think I was with him a couple
22   of years.  We just were -- we ran into
23   obstacles.
24        And then viewing the process, when I --
25   you know, I -- it was there when John, I

DENNIS L. BENSON   8/11/2014

Page 30

1    can't say his name, but he went before the

2    judges and he was denied conditional release.

3        And that was frustrating, I think not

4    only to me, but treatment staff too, because

5    the focus of these hearings continues to be

6    the static part of the record, the part

7    that's never, ever going to change.  They

8    spent several days kind of regurgitating what

9    occurred 20, 30 years ago that resulted in

10   his commitment.

11       Which, you know, I kind of get that, but

12   it seems to me, you know, the factors that a

13   release panel should be really concerned

14   about what has happened, what's transpired

15   since he came into the program to now.

16       So I -- I just -- again, the politics

17   around the program are really thick.  And I'm

18   a doer.  I've always been able to accomplish

19   a fair amount, but certainly didn't feel the

20   same level of success with this program that

21   I had with corrections.

22

23

24

25

DENNIS L. BENSON  8/11/2014

Page 37

9        Is it fair to say as executive director

10      you were the sort of final voice of all the

11      decisions that were made within MSOP?

12  A.  With respect to operational issues I think

13      it's fair to say.

14  Q.  Okay.  Is there anything in particular in the

15      decision-making at MSOP that you did not have

16      direct final responsibility for?

17  A.  Well, I -- I certainly consulted with my boss

18      when we were ready to move somebody to the

19      community prep program.  If we were going to

20      do something with respect to a field trip or

21      something that could be controversial, I

22      would always run that by either Wes or

23      Anne Barry at the end or -- I didn't have a

24      lot of direct communication with the

25      commissioner.

Page 38

1    But the SRB process, when it was time to
2    put somebody up for release or up for
3    consideration, I'd certainly consult with my
4    boss as well and -- but I think that was more
5    of a notification.  I don't think anybody
6    ever said no, don't do that.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DENNIS L. BENSON   8/11/2014

Page 47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17   Q.   Mr. Benson, let's go back to when you started

18        at MSOP as the executive director in 2008.

19        What did you see in terms of the condition of

20        the program?  Maybe it would be easier if we

21        took it by area, but however you want to

22        describe it, what did you see as the issues?

23   A.   Well, prior to even coming to MSOP, again, I

24        had done some tours.  And as I said we had

25        some corrections people over there, so I had

DENNIS L. BENSON  8/11/2014

Page 48

1    reason to go through the facilities.  But one

2    of the things I did when I was in the process

3    of retiring from corrections and taking this

4    job, is I -- I held I think it was eight what

5    I called transition meetings where I would

6    bring MSOP staff over to corrections and just

7    talk about various things.

8  Q.  Let me interrupt you for a second.  Was this

9    before or after you started?

10 A.  This was before.

11 Q.  Okay.

12 A.  This was probably January, February of 2008.

13    And I would -- for instance, I had the HR

14    director to talk about staffing numbers, and

15    I had health care come over one Friday, and I

16    had a transition team.  And, again, in terms

17    of committee, there may or may not still be

18    minutes of some of that somewhere.

19       But we would talk about a variety of

20    different issues so that I had some idea of

21    what the priorities were going to be when I

22    ended up over there.

23       And I guess the -- during the course of

24    those meetings I -- one of the conversations

25    I had with the -- I had a bunch of therapist

DENNIS L. BENSON  8/11/2014

Page 49

1    s that came down, and I remember this young
2    female therapist telling me -- she was
3    pregnant, and she was almost in tears, and
4    she said, you know, I was going home last
5    week and a patient told me the only reason
6    you're going home tonight is because I'm
7    letting you.
8         And I thought, you know, when I started
9    in corrections back in '74, I was scared too.
10   And we had lots of disturbances my first
11   year, we had homicides, we had suicides, we
12   had lots of unrest, and I remember how hard
13   it was some nights, I worked third watch,
14   evenings, and how hard it was to go to work.
15        I thought, well, you know, anybody that
16   comes into these places to work should not
17   have to worry about their safety.  That is a
18   critical, critical standard that I think
19   anybody that runs one of these places should
20   pay attention to.
21        And, likewise, if I had a son who, heaven
22   forbid, ended up in one of these places, they
23   should also not have to worry about their
24   personal safety in a facility of this type.
25   So, you know, staff and patient safety was

DENNIS L. BENSON   8/11/2014

Page 50

1    one of the things that I was aware of, that

2    was a concern.

3        And I also met with a number of patients

4    when I was going through this transitional

5    process from corrections to MSOP.  So I paid

6    close attention to that and the -- kind of

7    the wide open system that may have worked

8    well when the state hospital or the program

9    had a hundred or 150 patients, but as it grew

10   it required more and more order.  So I felt

11   that we needed to not necessarily establish

12   control, but establish order in these places.

13       So we developed a daily routine, we

14   developed a policy around that, and we paid

15   very close attention to, you know, the whole

16   patient/staff safety issue and what it would

17   take to bring that up to a standard that I

18   felt was acceptable.  Part of the problem too

19   was crowding, and bringing these new beds on

20   was going to help.

21       But the best security, in my opinion, is

22   always good programming, and that was the

23   other piece that was missing, is there --

24   people were in and out of treatment

25   routinely.

DENNIS L. BENSON   8/11/2014

Page 51

1    The other thing I saw that concerned me,
2    and my -- my attorney, my staff attorney told
3    me the same thing, is that part of the
4    protocol for the previous administration was
5    the officers would be involved in --
6    peripherally involved in the treatment
7    process doing some documentation and -- and
8    they weren't properly trained.
9    So there were numerous data challenges by
10   patients that was taking up an inordinate
11   amount of time.  So I felt we had to do one
12   of two things.  We had to properly train
13   people or their job was going to be security
14   and they were going to be involved in
15   treatment in another, more defendable way.
16   So we -- we developed a policy around
17   accountability, daily routine, a staff -- or
18   a patient movement policy, so they -- we
19   didn't just open the doors in the morning and
20   kind of freewheel through the day, but there
21   was much more order to it, at least up at
22   Moose Lake.
23   St. Peter, which I also determined would
24   be the less secure where later phases in
25   treatment would occur, obviously, they'd have

DENNIS L. BENSON  8/11/2014

Page 52

1  more freedoms down there.  But the one thing

2  I found when I got there was there was no

3  curfew.  They could stay up as long as they

4  wanted, their doors would be left open.

5      And many of these people are predators,

6  and we had patients that were being abused,

7  we had patients that were being victimized,

8  we had patients that were being used.  And so

9  we addressed issues like that.

10      We -- I said there's going to be a

11  curfew, we're going to lock the place up at

12  night.  And we also had had two escapes in

13  2005, 2006, so at least at 10 o'clock at

14  night or 10:30, whenever we lock them up, I

15  can't tell you exactly, the exact time, we

16  sort of know we got them from 10 at night to

17  6:30, 7:00 in the morning.

18      And that was -- I got a reaction to that.

19  You know, they continue to say, I'm sure they

20  are today too, this is a treatment program,

21  this isn't a prison and da, da, da, da, da.

22  But it's no different, in my opinion, in

23  submarines or aircraft carriers or anything

24  else, there's order in those societies.

25      And I've always said these are like

DENNIS L. BENSON  8/11/2014

Page 53

1    little villages, little towns, there's got to

2    be some sense of order.  So we tried to do

3    what was reasonable.  We tried to do it in a

4    way that didn't impact on treatment or the

5    treatment day, but also ensured some -- a

6    higher degree of staff safety and patient

7    safety.

8        So that's a long answer to a short

9    question, but one of the things I saw was a

10   climate that was not conducive to good

11   treatment, a climate that lacked order.  It

12   was almost chaotic, in my opinion, in some

13   respects.  So we had to do some things to

14   address that.

15       Room allowable items, in my opinion, were

16   completely out of control.  And when I was in

17   prison, running prisons, I knew that there

18   were lots of standards around fire safety

19   that obviously had been ignored by DHS, in my

20   opinion.

21       So when I called the fire marshal, he

22   said that, yeah, we've -- we've been told

23   that those standards really don't apply to

24   our facilities.  But I think there were lots

25   of genuine, not fabricated fire and safety

DENNIS L. BENSON   8/11/2014

Page 54

1    issues with respect to what they were allowed

2    to have in their rooms, to and including

3    mattresses and bedspreads that were not fire

4    retardant, and that was a problem, from my

5    perspective.

6         They were also cooking food down in the

7    kitchen areas, which was a privilege that was

8    not controlled, everybody got to take

9    advantage of that, and the ductwork was -- in

10   some cases had a quarter inch of grease in

11   them, and vent fires are very dangerous.  So

12   I -- I asked the fire marshal to do a -- an

13   inspection and give me a report and be very

14   honest about what his concerns were with

15   respect to those units and the allowable

16   items and whatnot.

17        So we did -- we made some changes around

18   that.  And that also caused quite a reaction.

19   But, again, in my opinion, it was something

20   that really needed to be done from a safety

21   perspective.

22   Q.  How about with respect to the treatment side

23       of the equation.  You mentioned lots of

24       things in that first discussion about the

25       security and -- and needing more order.  What

DENNIS L. BENSON  8/11/2014

Page 55

1    about the treatment program, what did you see
2    as the problems with the treatment program?
3  A.  Again, kind of the same thing.  I don't think
4    there was good treatment occurring.  I think
5    they were understaffed, poorly trained,
6    young, inexperienced therapists that really
7    showed signs of lack of proper training,
8    supervision and experience.
9        And, again, I go back to when the prison
10    population went from 4,500 to 9,000, you end
11    up spending too much time on finding the next
12    bed, the next bunk, and not enough time on
13    hiring appropriate and proper staff.
14        And this population grew so quickly over
15    there that they really weren't ready for all
16    of that.  So finding the right staff,
17    training the right staff.
18        And this is -- this is a very complex
19    population that need the best therapists, the
20    best training, and they need to know that
21    they're going to get their -- their clinical
22    time X number of hours every week.
23        And the treatment that was occurring was
24    sporadic and it was inconsistent from unit to
25    unit and supervisor to supervisor.  So I knew

DENNIS L. BENSON  8/11/2014

Page 56

1  that this was going to be a huge challenge,

2  and I had to find a clinical person that had

3  the patience and fortitude to build a -- a

4  clinical process that was really going to

5  work.

6       And it took awhile to find the right

7  treatment director.  I looked inside of DHS,

8  I talked to a couple of people, and I also

9  then looked at a couple people in corrections

10  that were sex offender experts, in my

11  opinion.

12       And, again, I knew enough about sex

13  offender treatment from my days in

14  corrections to know that kind of the cutting

15  edge treatment protocol was really coming out

16  of Canada, and still is, in my opinion.

17  There's some in Europe.

18       But DHS, again, in my opinion, was

19  embracing sex offender treatment that was

20  dated and they weren't keeping up with

21  hiring.  I think we were -- the day I drove

22  up we were probably 50 clinical positions

23  understaffed.

24       And as -- you know, the other thing I

25  will say is that it's just like becoming a

DENNIS L. BENSON  8/11/2014

Page 57

1    good correctional officer, you don't drive up

2    with a college education and you're good at

3    it.  It's all about experience, it's all

4    about good training, and that process takes

5    not months, but literally years.

6         And, you know, I'm sure Jannine will tell

7    you that even today trying to keep up with

8    the hiring process and the training process,

9    and you make mistakes, you hire people that

10   have no business in that business, they don't

11   work out and you've got to get rid of them,

12   start all over, and I'm sure that's occurring

13   too.  So it takes a long time to develop

14   that.  And there's no question that good

15   treatment was lacking when -- when I took

16   this job.

17  Q. Is the -- when you -- again, we're still on

18      the 2008 when you started as executive

19      director.  Was it because they didn't fund

20      the program sufficiently?

21  A. No, I don't believe that was the problem.

22      Again, I've never had an easier time getting

23      money.

24  Q. Why do you say that?

25  A. Because the politicians were not going to

DENNIS L. BENSON  8/11/2014

Page 58

1    find themselves in a position where they --
2    they could in any way be seen as being soft
3    on sex offenders.  It was -- it was no more
4    complicated than that, in my opinion.  They
5    were careful.
6         In fact, when I got there, the other
7    thing I did is the security staffing was
8    something that was unusual, in my experience.
9    And in corrections I had always been pushed
10   to lower your per diem, lower your per diem.
11   We had a high daily cost in corrections, so I
12   spent -- the 12 years I was in corrections we
13   brought the per diem from about $90 a day
14   down to $78 a day, and we absorbed all the
15   inflation and we got lots of accolades for
16   that.
17        Well, I get over here and I developed a
18   plan to cut some security staffing, and I was
19   told no, we're not going to cut security
20   staffing, and they didn't care that the per
21   diem was $300 a day or 200 and some.  So I
22   could cut some other things, but -- and the
23   union, of course, was making noise at that
24   time too.
25        And we found ways to cut the per diem in

DENNIS L. BENSON   8/11/2014

Page 59

1      other ways, and one, of course, was just

2      economy of scale, you get cheaper and

3      cheaper.  But that whole idea that you've got

4      to lighten the financial load was just not

5      present there the way it was in corrections.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 61

18   Q.   Did you -- did you -- let me back up.

19        When you came onboard in 2008, you

20   understood under the current statute that

21   nobody had been released?

22   A.   Correct.

23   Q.   And did you have discussions with, let's

24   start with DHS, with respect to that problem?

25   A.   I had discussions with Commissioner Ludeman

DENNIS L. BENSON   8/11/2014

Page 62

1      about that when I took the job and

2      Wes Kooistra.  And I made it real clear that

3      I wasn't interested in taking this job if

4      I -- my job was to just warehouse sex

5      offenders.

6   Q. And what was the -- what was the response?

7   A. I got a positive response from

8      Commissioner Ludeman and Wes Kooistra.

9   Q. What did you see as the problem when you

10     started in -- in 2008, why weren't people

11     being released?

12  A. Well, again, you know, and it's -- I'm sure

13     the patients get tired of hearing it, but

14     every time there was a new clinical director

15     there was a new treatment protocol, so they

16     were kind of going back to square one.

17         And when I got there and when I hired

18     Jannine, she went through the process of

19     trying to determine where everybody was at.

20     And treatment records were lacking and she

21     just was not comfortable making any strong

22     recommendations until she had done an

23     analysis of not only the treatment protocol,

24     but where everybody else was -- everybody was

25     at.

DENNIS L. BENSON   8/11/2014

Page 63

1      So, unfortunately, we kind of started

2  over too in many respects.  And, you know, as

3  we got through the first couple of years, we

4  were able to fast-forward a few people and

5  move some people from up north where the

6  beginning phases of treatment occur down to

7  St. Peter, and we were, you know, I think

8  slowly starting to figure out how much valid

9  treatment people had had previous to our

10  coming to try to give them some credit.

11      But of course we didn't want to make a

12  mistake either.  We didn't want to

13  prematurely recommend somebody for campus

14  privileges and have them take off.  So we

15  were very careful.  We were keenly aware of

16  the climate in which we were operating.

17      So, again, you couple that with being

18  understaffed, with incredible growth and

19  finding the right people, training them, and

20  from the -- you know, the outsider, it was

21  difficult to explain why it was taking so

22  long.

23      And I'm sure she will tell you the same

24  thing, we're -- you know, we're trying to

25  validate where they're at in the process and

DENNIS L. BENSON  8/11/2014

Page 64

1    make appropriate recommendations.

2        But now I believe they have the community

3    reintegration beds almost full and they're

4    probably going to have to build more of those

5    beds.  So there's a lot of people now that

6    are starting to push at the end of the

7    process.  But, of course, the process is

8    incredibly cumbersome.

9    Q.  And by process there you mean the SRB --

10   A.  Right.

11   Q.  -- and then Supreme Court Panel, the SCAP

12       process?

13   A.  Yeah.

14   Q.  And why, in your view, is it cumbersome?

15   A.  Well --

16   Q.  Again, I'll still talking about 2008 when you

17       came in, so that's what I want you to think

18       about.

19   A.  In 2008 there wasn't much happening at the

20       end.  I mean, Rydberg, John Rydberg --

21   Q.  That was the name you were trying to think of

22       earlier?

23   A.  Yeah.  Yeah.  He was headed in that direction

24       and there had been -- I don't recall exactly

25       where he was in the process, but he was

DENNIS L. BENSON   8/11/2014

Page 65

1    headed towards being considered when we got

2    there.

3  Q.  And it was -- he was ultimately denied

4    provisional discharge?

5  A.  Right.  Right.

6  Q.  Let's talk a little bit about the SRB, SCAP

7    process.  When you came in 2008, do you know

8    how many petitions were pending?  I mean, do

9    you know if there was a backlog?

10  A.  There was a backlog.  I can't tell you how

11    many.

12  Q.  Did you -- were they tracking that process at

13    that time?  Ere they tracking how long it

14    took and how many -- how -- what the backlog

15    was, et cetera?

16  A.  No, we started that process of trying to

17    figure that out, make some sense of it.

18  Q.  As you recall in 2008, whose responsibility

19    was it to appoint SRB members, you know,

20    people to be on the SRB --

21  A.  I believe it was the commissioner's.

22  Q.  And did you have any conversations with the

23    commissioner about the fact that there wasn't

24    enough SRB members?

25  A.  Yeah.  That was kind of a perennial issue.  I

DENNIS L. BENSON 8/11/2014

Page 66

1    don't think we ever really stopped having

2    that discussion.

3    Q.  Was there resistance to appointing more SRB

4    members?

5    A.  No, I don't think there was resistance, but I

6    don't know that anybody held it as a real

7    high priority either.

8    Q.  Do you recall any statutory or a regulation,

9    rule that prohibited the commissioner from

10   appointing more SRB members?

11   A.  I don't recall.

12   Q.  At any time that you were executive director,

13   do you recall any restrictions on the number

14   of SRB members that the commissioner could

15   appoint?

16   A.  I don't recall.

17   Q.  Do you recall having conversations either

18   with Commissioner Jesson or Commissioner

19   Ludeman about, you know, why don't we double

20   the number of SRB members so we can get rid

21   of this backlog?

22   A.  I believe that we had discussion around that

23   issue.  I don't know that doubling it was

24   ever a recommendation.  But we -- we

25   certainly had discussion around that issue

DENNIS L. BENSON   8/11/2014

Page 67

1       and the cumbersome nature, again, from my

2       perspective, of -- of the process.

3   Q.  That was -- but your view was there wasn't

4       enough SRB members, correct?

5   A.  Right.

6   Q.  And your view is that backlog was an

7       inappropriate, sort of, bottleneck in the

8       release process?

9   A.  It was one of the problems.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 68

5   Q.   Okay.  So there was this SRB bottleneck,

6        again, the bottleneck is my -- my word, that

7        was, you know, slowing up the process of

8        potential discharge for people, correct?

9   A.   (Nods head.)

10  Q.   What were the other bottlenecks in 2008 when

11       you took over with the -- with the process?

12  A.   Well, certainly the appeal process took time.

13       And it was -- I saw it as a problem, but I

14       didn't see it as a screaming priority,

15       because, again, Jannine and I were nervous

16       about recommending people until we had an

17       opportunity to really do an analysis.

18           But the -- the number of people that had

19       the -- I guess, according to the statute, the

20       ability to weigh-in on the process, was a

21       problem, in my opinion.  And as time went on,

22       the number of people that either were elected

23       or served at the pleasure of was a problem.

24           I mean, I don't believe that this program

25       can work, I don't care how good your

DENNIS L. BENSON   8/11/2014

Page 69

1    treatment is, under the current process.  I

2    think it -- I think it was well-intended, but

3    it's an old, you know, unintended consequence

4    thing.  And until we can get politicians out

5    of the process, I believe it's going to

6    continue to be a problem.

7  Q.  Let me -- let me just make sure I understand

8    that.  I think I do.

9        In the current discharge process, which

10    was the same when you took over in 2008, the

11    county attorney from the commitment county

12    gets to have a say --

13  A.  Yup.

14  Q.  -- correct?

15        And, of course, the MSOP program gets a

16    say?

17  A.  Yup.

18  Q.  And the person whose petitioning gets a say?

19  A.  Uh-huh.

20  Q.  And then the Attorney General's Office gets a

21    say?

22  A.  Uh-huh.

23  Q.  And any interested person, that would include

24    the victims or any victim advocacy groups,

25    right, gets a say?

DENNIS L. BENSON   8/11/2014

Page 70

1   A.   Uh-huh.

2   Q.   That's when you mean when you say there was

3        too many political figures?

4   A.   Right.  And the commissioners involved in the

5        loop.  And then, of course, the panel are

6        elected officials as well.

7   Q.   Right.

8   A.   Great people, but they're elected officials

9        and --

10  Q.   So in your view, the sort of whole process

11       was set up in a way that, intent aside, just

12       couldn't work to discharge sex offenders

13       back --

14  A.   Right.

15  Q.   -- into the community?

16  A.   Right.

17  Q.   And did you have instances during your tenure

18       as executive director where you were

19       supportive of a discharge, but the

20       commissioner was not?

21  A.   Well, I was supportive of -- well, and

22       Rydberg was ultimately -- did go before the

23       panel.  I don't know that I had issues with

24       either of my commissioners with respect to

25       that.

DENNIS L. BENSON   8/11/2014

Page 71

1   Q.   Okay.  When you -- when you said that you and

2        Dr. Hebert were nervous about sort of getting

3        behind the release of someone until you had a

4        chance to reevaluate them, did you put in

5        place a process by which people were going to

6        be reevaluated for their -- whether they

7        should continue to be committed?

8   A.   Not necessarily continue to be committed,

9        because, you know, that -- that cow was

10       already out of the barn.  They were

11       committed.  It was where are they at in

12       treatment and what -- what are their

13       treatment needs, where should they be in the

14       process, should they be phase 1, phase 2,

15       phase 3.  So that's what we focused on.

16            We -- we had some folks that -- and we

17       had the other problem too.  I remember we

18       inherited a patient that had been

19       fast-forwarded to the community prep program

20       and he was not ready, and we were very

21       nervous about that and we ended up

22       ultimately, shortly before I left, having to

23       bring him back inside, because he had an

24       incident with a female patient from the

25       security hospital.

DENNIS L. BENSON   8/11/2014

Page 72

1    So, again, that's another example of a --

2    in my opinion, a flawed process where the

3    courts at the front-end said this guy should

4    go right into the community prep part of the

5    program.

6    The other thing that happens out there,

7    that I'm sure you're aware of, and I'm

8    editorializing, but I think it's an important

9    point to make, is we -- and I testified in

10   front of the legislature on this too.

11   But we got an old man, I think he was in

12   his eighties, who the county didn't know what

13   to do with and he had an old sex offense and

14   he was in a probation violation, I believe,

15   and he -- essentially, they let -- the courts

16   let him sign himself into this program.  An

17   incredibly expensive program, and he had lots

18   of medical issues.  And we ended up with this

19   guy.

20   I mean, and -- so, again, I believe it's

21   not just at the back-end that there are

22   issues, it's at the front-end too, again,

23   because you have people who are elected

24   involved in a process of sex offenders, which

25   is a scary word to anybody whose standing for

DENNIS L. BENSON  8/11/2014

Page 73

1      election.

2   Q.  Did you have discussions when you first

3      became executive director about the

4      possibility of -- I use the term less

5      restrictive alternatives, but perhaps

6      alternative placements --

7   A.  Yes.

8   Q.  -- for the people that were in the MSOP?

9   A.  Yes.

10  Q.  And was your view at that time in 2008 that

11     there were people at Moose Lake or St. Peter

12     who could be housed in a less restrictive

13     alternative?

14  A.  Yes.  Generally speaking, I believe it would

15     be safe to say.  I won't speak for Jannine.

16     But I -- I would not say that unless she said

17     it.  I'm not a treatment expert and I don't

18     pretend to be, but as time went on we had

19     lots of conversation about a number of

20     patients that we were dealing with and

21     probably would have been appropriate

22     candidates for other programs or certainly a

23     less restrictive alternative.

24

25

DENNIS L. BENSON  8/11/2014

Page 74

1

2

3

4

5    Q.   But, in particular, the discussions that you

6         had as you became the executive director, the

7         mentally disabled group was a possible group

8         that could have been handled in a less

9         restrictive alternative?

10   A.   Yes.

11   Q.   And how about the -- what I would call the

12        juvenile group, the young adults who had

13        committed only juvenile offenses?

14   A.   We certainly had concerns about that group.

15   Q.   When you say you had concerns, what do you

16        mean?

17   A.   Well, the fact that, in my opinion, the

18        program was stuck, and you have very young

19        individuals who may or may not be very

20        dangerous.  Again, we -- I didn't know.  But

21        I just think that a program like this -- I

22        mean, even if it were a program that was

23        running like the Wisconsin model, to bring

24        somebody to this level without exploring

25        other options, or in Minnesota's case,

DENNIS L. BENSON  8/11/2014

Page 75

1      developing other options, is unacceptable.

2      It -- it's swatting a mosquito with a

3      15-pound mallet.

4           And -- and then, again, let's assume that

5      they jump through every hoop perfectly, then

6      you get to the SRB process and -- and then

7      it's -- it's a political crapshoot.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON  8/11/2014

Page 77

1

2

3   Q.   So is it safe to say, Mr. Benson, that your

4        view is that what's broken at MSOP can be

5        generally characterized as the involvement of

6        political figures in the decision-making

7        process?

8

9

10                           I don't think

11       you and I would be here today if we had a

12       different release process.  If we were

13       releasing three to eight a year and we were

14       doing something on the front-end about the

15       indiscriminate commitment of these people, I

16       don't think we would -- I don't think we'd be

17       talking about, you know, the fact that I took

18       away their Vikings bed sheets.

19   Q.   Do you agree that the conditions of

20       confinement, if we can use that term sort of

21       generally, do affect the treatment, that the

22       two are interchangeable or linked?

23   A.   I believe that they can affect the treatment.

24       I don't believe that they are -- currently --

25       I haven't been there for two years, but I

DENNIS L. BENSON   8/11/2014

Page 78

1    don't think a lot has changed.  I think the

2    conditions of confinement that we instituted

3    were necessary to create an environment

4    that's conducive to change and good treatment

5    and order in a facility.

6        I would argue until the cows come home

7    that they're not punitive, they weren't

8    intended to be punitive.  They were intended

9    to make it safer and consistent with -- with

10   getting them prepared for release.

11       And, you know, my -- my sadness around

12   that is I don't think it matters, because I

13   don't think once they're ready for release

14   they're necessarily going to get a fair shot.

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

1

2

3  Q.  Would you agree with me that if we had a

4      population of 50 or 100 or even 200, that we

5      wouldn't necessarily need the controls that

6      we need with a population of 700?

7  A.  Again, if the release process and the intake

8      process were fixed, I might -- I might agree

9      with some of that.  But I still think you

10     have to have a sane environment.

11         You know, I go back to my experience in

12     prison.  When I started at Stillwater they

13     had only 600 inmates and the place was a

14     complete madhouse.  Today they have 1,400.

15         And I went through this at Stillwater.  I

16     went back as the warden in '93 and instituted

17     controlled movement and changed the visiting

18     policy dramatically and all of those kinds of

19     things, because, yes, I think it's -- you've

20     got to have some controls when you have a

21     small population too, but you might need more

22     controls when that population grows.

23         Incompatibility in any closed society

24     today is a -- it's an ever-present issue.

25     People with gang issues and -- so there's

DENNIS L. BENSON  8/11/2014

Page 80

1    reason to have to separate people.  Two

2    people can't live together.  You put one in

3    unit A and the other in unit B and give them

4    the same privileges as everybody else gets,

5    and I think that that keeps -- it's

6    defendable then, it keeps your -- people safe

7    and it also defends the fact that they have

8    equal access and equal protection issues

9    that, you know, we all struggle with in these

10   kinds of situations.

11 Q.  Would you agree with me that part of the,

12   sort of, need for these kinds of controls

13   that we're talking about resulted from the

14   fact that people were so frustrated about the

15   release -- the progress through treatment and

16   the release process, the patients, that is?

17 A.  Certainly, I believe there is that

18   frustration.  But, again, I -- I don't know

19   that what we instituted I wouldn't have done

20   if we had a population of, you know, 200.  I

21   just think there -- the reason -- I mean,

22   based on my experience and based on where

23   I've been in -- in both corrections and in

24   this environment, it just -- you've got to --

25   if you're going to provide treatment, you've

DENNIS L. BENSON  8/11/2014

Page 81

1     got to have a sane environment, you just do,

2     and you've got to have some order.

3  Q.  You've used that order sane environment

4     several times.  By sane you mean safe for the

5     staff and safe for the patients?

6  A.  Correct.

7  Q.  Your background in -- with respect to this is

8     mostly in corrections.  Do you see a

9     difference between the treatment facility

10     that you were asked to run at MSOP and the

11     prison facilities that you were asked to run

12     in the DOC in terms of the need for, you

13     know, the kinds of things that we've been

14     talking about, restricted movement and such?

15  A.  I think there's certainly different --

16     they're different.  There's no question that

17     they are different, but there are also

18     parallels.

19  Q.  Do you think that the MSOP protocols that you

20     put in place are less restrictive than the

21     prison protocols?

22  A.  I think they're -- certainly, the way that

23     MSOP runs is different than Stillwater and

24     Oak Park Heights where I was the warden.

25     There are, I think, glaring differences.

DENNIS L. BENSON   8/11/2014

Page 82

1   Q.   MSOP being less -- less restrictive?

2   A.   Yeah, yeah.

3   Q.   Well, tell me what you mean by glaring

4        differences.  I'm --

5   A.   Well, it's a -- it's a clinical environment

6        and there's, I think, more ability to move

7        around to make sure that people have adequate

8        access to treatment.

9             It is a -- you know, it's certainly more

10        therapeutic in the way that we do recreation,

11        hobby craft, meals and privilege level

12        grounds, moving about the grounds, going into

13        the community down in St. Peter.  Those

14        things are all very different from prison.

15        Discipline is very different.

16             We -- we have a very different due

17        process system in prisons than we do at MSOP.

18        Holding people appropriately accountable is

19        very different with the unit restrictions at

20        MSOP than they are in a prison setting.

21             And those were all lessons I had to learn

22        too.  I mean, I -- I didn't go in there with

23        this notion, again, that I've got to do

24        everything like we did in prison, but there

25        were things that we did in prison that

DENNIS L. BENSON   8/11/2014

Page 83

1   addressed a specific issue and it worked, and

2   some of that it made sense to me to have that

3   discussion as we made changes in MSOP.

4        But I did that in a thoughtful way and in

5   an inclusive way.  I had lots of clinical

6   people around the table and said we have this

7   problem, these two guys are problematic if

8   they are together, they -- one -- they prey

9   on each other and help me develop a process

10  where we can address things like that.

11       So when it came to things like visiting

12  policy, phone monitoring, the due process, we

13  had lots and lots and lots of discussion

14  about how can we appropriately hold people

15  accountable so that, you know, people can act

16  out and a day later they have the same

17  opportunity to act out.  So we -- you know,

18  we tried to be very thoughtful about how we

19  did that.

20       And, of course, the Elliot Holly case

21  that we spoke of earlier, you know, gave rise

22  to some of that.  I got the message very loud

23  and clear that you can't just throw people in

24  a room and really you can't in prison anymore

25  either.  I mean, due process means due

DENNIS L. BENSON  8/11/2014

Page 84

1    process, and I think it's a good thing that

2    the courts -- it was one of the consent

3    decrees that Stillwater was under back in --

4    as a result of time in the seventies.

5        So I have some -- some history with that

6    and brought some of that, I guess, knowledge

7    and history over to MSOP and then added

8    clinical to the mix and tried to come up with

9    something that works.

10        But, if people were really moving through

11    the system, you're -- especially with the

12    younger offenders -- or younger patients,

13    there probably wouldn't be the level of

14    acting out that there is and the feeling of

15    hopelessness that there is in that

16    environment and the fact that people don't

17    participate because they've given up.

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 87

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22   Q.   When you and Jannine sort of decided
23        that -- let me start over.
24             When you and Dr. Hebert sort of decided
25        that you needed to start fresh with a -- with
```

DENNIS L. BENSON  8/11/2014

Page 88

1       a new treatment program when she came

2       onboard, did you have in mind how long it

3       would take for people to move through from

4       phase 1 to phase 3 and then to CPS?

5   A.  Well, I didn't.  Again, I'm not the treatment

6       expert, but I -- you know, those are all

7       questions that I'm sure Jannine can answer.

8       She will tell you, I'm sure, that every case

9       is different, some people move quicker than

10      others.  There's kind of a mean average for a

11      population like this where they are, you

12      know, a pretty difficult group.  The average

13      number of felonies -- or victims, rather, is,

14      you know, somewhere around 15 to 16.

15          So they're -- they're not an easy group

16      to treat.  But it all depends on how much

17      treatment they had in prison, most of them

18      came from prison or were in prison, how many

19      treatment experiences they had.

20          And it isn't like she discounted any

21      previous treatment they had at Moose Lake,

22      but on the other hand, she sure didn't give

23      them full credit for -- you know, if they

24      said they were in treatment for five years,

25      you know, there's no magic in that number.

DENNIS L. BENSON  8/11/2014

Page 89

1  She would do her own analysis and she could

2  give -- go into great detail about where --

3  how she arrives at where she thinks people

4  are on the treatment continuum.

5  Q.  Do you -- did you have any experience -- I

6  understand you don't consider yourself a

7  treatment expert.  But did you have some

8  experience with the prison treatment programs

9  for sex offenders?

10  A.  I was around treatment programs for all the

11  years I was in corrections.  I spent a lot of

12  time in the -- the Oak Park Heights program,

13  high security.  We -- I was very involved in

14  developing a -- a chemical dependency sex

15  offender treatment program at that facility

16  and spent a fair amount of time there as we

17  moved people through that program.

18      So I kind of get, you know, how it starts

19  and how they move through and the magic of

20  the therapeutic community and certain

21  breakthroughs that patients achieve and

22  others that get stuck and others who are

23  gamers and those that just aren't interested

24  in changing, and we have those at Moose Lake

25  too.  And then the -- those that desperately

DENNIS L. BENSON  8/11/2014

Page 90

1    want to change but just, for a variety of

2    reasons, have trouble, including the mental

3    health component that's forever present in

4    these places.

5        The other population we didn't talk about

6    that I find frustrating is the -- the elderly

7    population.  These guys are taking up a bed,

8    they're 80 years old.  If you go to the

9    geriatric unit at Moose Lake you'll stumble

10   over wheelchairs and walkers.

11       And, again, in my opinion, there has to

12   be a better, cheaper alternative for these

13   people.  Many of them are not participating

14   in treatment, but, I mean, you could put them

15   in a -- in a facility that's, I think,

16   cheaper and offers the same kind of

17   protection that Moose Lake does.

18   Q.  Well, I take it that you're -- you share my

19   view that many of those people are no longer

20   dangerous in the way that they were committed

21   for, because they're either so old or so sick

22   they just can't be a danger anymore?

23   A.  That's correct.

24

25

DENNIS L. BENSON  8/11/2014

Page 95

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   Q.  Mr. Benson, let me show you an e-mail chain
22       that I've marked as Exhibit 3.  Tell me if
23       you can identify that for the record.
24   A.  (Reviews document.)  So this was after I
25       retired.

DENNIS L. BENSON   8/11/2014

Page 96

1   Q.   Well, tell me when you retired.

2   A.   June 5th, 2012, didn't I?  Yeah.

3   Q.   Let me start on the first page.  There's an

4        e-mail from you, partway down there, and you

5        see the e-mail address the somtel.net

6   A.   Yup.

7   Q.   Is that your personal e-mail?

8   A.   Yup.

9   Q.   Were you asked to search your personal

10       e-mails for MSOP-related communications in

11       this case?

12  A.   I don't recall.

13  Q.   Did you use your personal e-mail when you

14       were still the executive director at MSOP?

15  A.   Occasionally.

16  Q.   In that e-mail you say, "Careful, Jannine!

17       The best treatment in the world can't occur

18       in the MSOP I inherited, they are a horse

19       apiece."  Do you see that?

20  A.   Uh-huh.

21  Q.   First of all, tell me what you mean by they

22       are a horse apiece?

23  A.   Well, I -- I'm not sure.  I think it's -- I

24       think I must have been referring to security

25       and treatment.

DENNIS L. BENSON  8/11/2014

Page 97

1   Q.  By horse apiece do you mean that they go hand

2       in hand?

3   A.  They have equal -- they're equally as

4       important.

5   Q.  In the sentence before that you say, "The

6       best treatment in the world can't occur in

7       the MSOP I inherited."

8   A.  Uh-huh.

9   Q.  What do you mean by, "The MSOP I inherited"?

10   A.  Well, the mess that I walked into in 2008.

11   Q.  That's what we were talking about earlier

12       this morning?

13   A.  Yeah.

14   Q.  And that was both related to the security

15       issues that we've talked about and the

16       treatment issues?

17   A.  Uh-huh.

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 98

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19   Q.   You have said earlier that you don't consider

20        yourself to be an expert in treatment.  Do

21        you have any views on whether the treatment

22        hours are appropriate at MSOP?

23   A.   Again, I -- as somebody who has been around

24        treatment for many years, but I'm not an

25        expert and I -- I don't pretend to be, but I

DENNIS L. BENSON   8/11/2014

Page 99

1    think that treatment hours are coming along.

2    I don't think that -- we were criticized for

3    treatment hours in the legislative auditor's

4    report, and I think we, you know, made an

5    attempt at trying to address that.

6         But Jannine often told me that treatment

7    hours mean different things to clients who

8    are at a different phase in treatment.  For

9    many of them who are antisocial, and a fair

10   number of sex offenders are, having a

11   conversation in a day room in a unit during

12   the evening might be very therapeutic to

13   somebody who has just driven up and just

14   starting treatment as opposed to isolating

15   themselves where also many sex offenders get

16   themselves into trouble when they isolate

17   themselves and don't communicate and pretty

18   soon they're into thinking and fantasizing

19   and maybe even acting out on practices that

20   are criminal or unacceptable.

21   Q.  Do you -- you've mentioned several times that

22   when you started at MSOP as the executive

23   director that the treatment program, again

24   this is my words, was not adequate.

25   A.  Right.

DENNIS L. BENSON   8/11/2014

Page 100

18  Q.  And during the four years or so that you were

19      executive director, did you fix the treatment

20      program problems?

21  A.  Well, I think we made progress.  I would

22      submit that we made progress.

23  Q.  Why -- why haven't more people been released,

24      in your view?

25  A.  I believe it's -- again, I keep using the

DENNIS L. BENSON   8/11/2014

Page 101

1    word stuck, but I think the -- the crux of

2    the problem is the -- in terms of release, is

3    the release process.  I think it's -- it's

4    politically charged and it's -- politics

5    guide the thinking of those involved in that

6    process.  I also think the program is -- is

7    committing people who probably could be

8    treated at a less secure -- in a less secure

9    setting.  We have the largest program per

10   capita in the United States.  We have one of

11   the -- I think it's the third or fourth

12   largest program next to states like

13   California and Florida.

14   Q.  Do you -- and you think that's -- that is --

15       can generally be summed up as the problems

16       with the commitment process and the problems

17       with the release process?

18   A.  I think those are the two overarching

19       factors.  And, again, I'm not excusing the --

20       the fact that treatment isn't perfect and the

21       fact that it takes that piece of it a fair

22       amount of time to get up to speed to --

23       particularly when you continue to make

24       changes.  But if we had a system that truly

25       was a political at the front-end and we had

DENNIS L. BENSON   8/11/2014

Page 102

1    community resources that were available, I

2    think we'd have fewer people in the program,

3    thus, your -- your -- the challenge of hiring

4    the right number of therapists would diminish

5    dramatically.  I think then also turnover

6    goes down and treatment is more efficient and

7    you're going to maintain staff, you're going

8    to gain experience.

9         And then at the back-end, people really

10   did -- if you had the same people looking at

11   people coming in as you did going out, I

12   think there would be some value in that too.

13   I mean, I would structure it very differently

14   than it currently is if I were --

15   Q.  King?

16   A.  -- king and could do it, but obviously I'm

17      not.

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 105

1

2

3   Q.   Okay.  Do you think that the MSOP uses the

4        current technology sufficiently?

5   A.   Technology in terms of?

6   Q.   Well, like GPS monitoring systems and the

7        kinds of things that would allow more

8        community-based treatment?

9   A.   Well, we brought -- that's something else

10       that we did up -- or down at St. Peter when I

11       was actually still in corrections, but we got

12       them going on a GPS monitoring on the campus.

13       And I think -- I think the program does a

14       pretty good job of that, but outside of that,

15       I don't think we do.

16            I think there are other options for the

17       courts too.  I think the courts have -- I

18       think this is a copout in some respects, just

19       to throw them in this program.  I talked

20       about the scenario of the old man who more or

21       less signed himself in and -- and it's -- you

22       know, it covers their back side to commit

23       them or at least file a petition.

24            And you get up into some of these, with

25       all due respect, rural areas, and, you know,

DENNIS L. BENSON  8/11/2014

Page 106

1    the judges are not going to take that risk if

2    they've got this option and they come.

3        So I think we could do more with GPS, I

4    think we could do more with, you know, just

5    the therapeutic technology that's available

6    today, that -- there's home arrest or home

7    monitoring, we could make better use of that

8    technology.

9        But, again, citing any kind of even an

10   outpatient program in greater Minnesota is

11   going to be a challenge.  DHS tried to get a

12   facility for mental health juveniles up in, I

13   believe it was Anoka here, about six,

14   seven years ago, and just had a hell of a

15   time.  So there's always going to be that

16   challenge.

17       But I think this is an area where people

18   have got to rise above the politics and do

19   the right thing or -- or this -- this program

20   is going to, I think, eventually be deemed

21   unconstitutional, and in its current form

22   probably should be.

23   Q.  Do you -- is it your view, Mr. Benson, that

24       the security problems that you faced when you

25       took over as executive director, were also

DENNIS L. BENSON  8/11/2014

1    contributing to the treatment problems?

2    A.   Yes.

3    Q.   Because you -- when you talk about the horse

4         apiece --

5    A.   Yes.

6    Q.   -- it's your view that those two go hand in

7         hand?

8    A.   Right.

9    Q.   Can you have too much security?

10   A.   Yes.

11   Q.   And you can have not enough security?

12   A.   Yes.

13   Q.   Did the program swing too much the other way?

14   A.   In my opinion, no.  You mean --

15   Q.   Too much security.

16   A.   Too much security?  No.  But there's always

17        room for adjustment.  I mean, some of these

18        things you do and you tweak it forever.  I

19        mean, you -- for instance, room allowable

20        items, we talk about that -- we talked about

21        that in corrections forever.  I mean, we had

22        a room allowable items committee and we'd

23        have agendas every week and we'd talk about,

24        you know, should we allow an eagle feather or

25        shouldn't we.  I mean, those things are --

DENNIS L. BENSON   8/11/2014

Page 108

1    it's never done.  I certainly wouldn't be

2    insulted if somebody came along and said

3    we've got to let them have their Vikings

4    bedspreads.  I don't know why, but, I don't

5    have all the answers either.

6         But I -- it's a constant -- it's a

7    constant issue in any facility.  It sure was

8    in prison, you know, who was really king, was

9    it clinical or was it security.  Prison, it's

10   pretty clear that you can always hide behind,

11   well, that's -- we're doing that for

12   security.  It becomes more challenging in the

13   MSOP because it's a program for civil

14   commits.

15        So I think you have to -- you have to be

16   able to articulate why you do what you do as

17   it pertains to security issues.  You can't

18   just kind of hide behind it.  I think that

19   was easier in corrections.

20        We had the other problem -- we had that

21   problem in corrections, and I think it was

22   legitimate, a legitimate concern of their

23   therapists, too much -- they'd just hide

24   behind it, well, we can't do that because of

25   security, well.

DENNIS L. BENSON   8/11/2014

Page 109

1       So we were always, you know, kind of

2   monitoring that.  And -- and I think I -- I

3   think I did a good job as -- certainly as a

4   warden and associate warden of bringing some

5   good balance to those therapeutic communities

6   that didn't always favor security.  I had

7   lots of interesting discussions with the

8   captain about different things that we were

9   doing in some of our clinical programs.

10      So over in MSOP, I mean, there was the

11  same thing, but there were some things that

12  were going on in clinical that I -- I

13  struggled with too from a security

14  perspective and from a public perception

15  perspective that I just had some feelings

16  about.

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 113

21   Q.   You mentioned earlier that you thought the

22        Dru Sjoden incident affected the Minnesota

23        sex offender program.  Can you talk about

24        that a little bit more?

25   A.   Well, it had direct and dramatic impact on

DENNIS L. BENSON   8/11/2014

Page 114

1   the program.  I think one of the first things

2   we did, I was the deputy in corrections then,

3   and it -- it required, in my opinion, I'm the

4   one that went to my commissioner and said,

5   you know, the first thing we should do is

6   make sure we don't have another Alfonso

7   Rodriguez running around out there.

8        And so I said I think you should review

9   every level 3 sex offender that is out on

10  supervised release, and we did that.  And

11  there were a number of those that were

12  gathered up and a petition was filed and they

13  came into the program.

14       Now, all we did is said you might want to

15  take another look at this level 3 to a county

16  that's been released.  And, boy, if they got

17  a letter to that effect, you know, nine out

18  of ten of them were then civilly committed.

19       There were level 3 sex offenders that

20  were doing pretty well in the community that

21  ended up back in the program.  So that was,

22  again, what I would characterize as one of

23  the overcorrections of -- of that process.

24  It was well-intended, just take another look,

25  just make sure we didn't miss one here, and

DENNIS L. BENSON  8/11/2014

Page 115

1    pretty soon, good lord, we had lots of them.

2    So that was, I think, one of the pieces.

3        The -- just the whole review process at

4    the end of their corrections time and review

5    by the counties, in addition to that level 3

6    review was another piece that I think

7    impacted the population in a negative way.

8        And I -- you know, I'm not saying it

9    was -- they were all inappropriate.  But,

10   obviously, I think there was another

11   overcorrection there.  So those would be the

12   two areas that I think at least initially had

13   a great deal of impact on the size of the

14   program and the -- you know, the width of the

15   net.  Counties just weren't willing to take

16   chances.

17

18

19

20

21   Q.  Let me show you what I've marked as

22   Exhibit 4.  And tell me -- which I will

23   represent to you is an executive order from

24   Governor Tim Pawlenty signed in, I think it's

25   July of 2003.  You're familiar with that?

DENNIS L. BENSON   8/11/2014

Page 116

1    A.   Yup.

2    Q.   Is this -- well, tell me -- tell me what you

3         understood this executive order to mean when

4         you were at MSOP.

5    A.   Well, he -- he will tell you, as I heard it

6         many times, that it was a document that said

7         we're going to follow the law.  And that was

8         kind of the -- the explanation that came from

9         the governor's office.  It was not

10        necessarily that nobody would ever be

11        released.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 120

1

2

3

4    Q.  You -- you mentioned several times today that

5        you're sort of perceived by the patients as

6        the person who turned it into a more

7        prison-like setting.  Those are my words.

8              In retrospect, did you -- did you swing

9        the security needle too far to the other --

10       to the other side?

11             MR. WINTER:  Asked and answered.

12   BY MR. GUSTAFSON:

13   Q.  You can answer.

14   A.  I -- I really don't think so, no.  I think

15       you can always argue, as I said, you know,

16       did I or didn't I.  But in my opinion, I

17       really don't think I did.  The other thing

18       I -- you know, there are things that happen

19       in these places that I'm sure you haven't

20       heard yet about the sexual misconduct that

21       occurs in these places.

22             We had a -- an assistant director down at

23       St. Peter who was beat half to death in his

24       home, Gary Graham, before I came, but it was

25       a -- it was supposed to be a murder.  He was

DENNIS L. BENSON   8/11/2014

Page 121

1   supposed to have been killed.  And he wasn't

2   killed, but he was out of work for about six,

3   eight months with a concussion that was

4   intended to kill him.  And that occurred from

5   inside the walls of MSOP.  We had --

6   Q.  Do you mean by that somebody hired someone to

7       do it?

8   A.  Right.  Yeah.

9   Q.  Okay.

10  A.  And I had a sex offender on his deathbed tell

11      me the whole gig of how this thing went down,

12      a credible guy, a guy I had known for years

13      in corrections.

14          We've had way too many boundary issues

15      with staff.  That's another problem you get

16      when you hire lots of young junior staff,

17      both male and female boundary issues.  But --

18  Q.  You mean sexual boundary issues?

19  A.  Well, or in the case of males, not always

20      sexual it might be --

21  Q.  Physical?

22  A.  -- bringing stuff in or just doing favors for

23      clients that you shouldn't.  And so there

24      were all of those things in play too that led

25      to having a male monitoring policy that was

DENNIS L. BENSON  8/11/2014

Page 122

1      defendable, monitoring phone calls, again, in

2      cases where we had reasonable cause, visiting

3      room policy around what you could bring in

4      and how much you could touch, and room

5      allowable items policies.

6          That all fed into some of these things

7      that always go on in these places, but the

8      number of them that was going on there was

9      outrageous.

10         I mean, I had more instances of

11     inappropriate conduct between staff and --

12     and clients with 600 sex offenders than I did

13     with 9,000 inmates.  And, again, it was

14     training issues and -- around boundaries and

15     hiring lots and lots of staff really quickly

16     that didn't have the experience and

17     expertise, and also dealing with a clientele

18     that's incredibly manipulative.

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 123

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   Q.   You agree with that -- that that's a problem

23        when you have that many people in one place?

24   A.   I think -- I think it's a challenge.  I don't

25        know that it's an unsurmountable problem, but

DENNIS L. BENSON   8/11/2014

Page 124

1    it certainly is a challenge.  And I have to

2    tell you that they designed that facility

3    kind of after a building design that we came

4    up with at a medium-security prison.  And I

5    don't know that I'd design it -- a treatment

6    center for sex offenders the same way.  Now,

7    can it work, yeah, I think it work, but I

8    think it adds some challenges.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 127

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   Q.   Did you -- we talked earlier a little bit
21        about the legislative auditor's report, and
22        you indicated that you had some consultation
23        with the legislative auditors, with
24        Jim Nobels' office while the report was being
25        done.  Are there things in that report that
```

DENNIS L. BENSON   8/11/2014

Page 128

1       you disagree with?

2    A.  Yeah.

3    Q.  Can you tell me off the top of your head or

4        would you like to look at it?  I mean, it's a

5        long document.  I don't want you -- and I'm

6        not going to have you --

7    A.  No, I just think there are a couple of areas.

8        I mean, I -- as I said, I've worked with Jim

9        for -- and his staff for many years.  And

10       they truly, I think, are a great group and

11       they've kept the state out of lots and lots

12       of trouble with their oversight over the

13       years.  And he did numerous reports for us in

14       corrections, so I had a lot of experience

15       with him.

16           I think the area -- if I had to point to

17       an area that I struggle with the most, it's

18       the area around treatment hours and the

19       efficacy of treatment.

20           I think it's hard for any of us who don't

21       live in that world and who don't really

22       understand how you treat and how you measure

23       and how you keep score, to try to define

24       that.

25           And we kind of challenged some of their,

Page 129

1    I guess, definition of, you know, the

2    treatment process and the treatment hours.

3    The legislators too, everybody likes to

4    measure in black and white.  And, you know,

5    the world would be an easy place if we could.

6         But, you know, Jannine has a different

7    idea of what a treatment week looks like than

8    the chair of a -- an oversight committee.

9    And she's just really reluctant to say that

10   they need X number of hours and the hours

11   need to look like this.

12        And she would always say, well, you know,

13   too much treatment for some of these guys can

14   be very counterproductive.  And, of course,

15   that sounds very defensive and it sounds like

16   she's -- but I heard her say that in the car

17   when we'd ride together to St. Peter every

18   week time and time and time again, how much

19   they can tolerate and then they've got to

20   pull back and take a break, and how you get

21   them to these thresholds where they break

22   through and can start to own some of their

23   behavior.

24        You know, so many of these people are so

25   damaged, I mean, so damaged from the time

DENNIS L. BENSON   8/11/2014

Page 130

1    they were little, little kids, and to get

2    them to understand their own pathology is a

3    process that is different with every one of

4    them.

5         So to say, well, all 700 of them need 12

6    hours of treatment every single week and

7    they've got to be sitting in a group and

8    they've got to be -- that's just not valid

9    and it's -- it's short-cited from a clinical

10   perspective.

11        I'd like it too, it would be easier for

12   me to go up in front of a committee and say

13   here's what it is, it's six hours of this and

14   two hours of this and damn it, that's --

15   that's the treatment world.

16        But it's -- therapists, at least with

17   this group, will -- are going to be real

18   reluctant to approach it that way.

19        So I will say that the chapter on

20   clinical hours, I don't think it's perfect.

21   I don't think it's all BS either.  But I

22   think it's -- as good as his people are, I

23   don't think they have any better idea of how

24   it should look than anybody else and -- so

25   I -- I think, you know, if there's an area

DENNIS L. BENSON 8/11/2014

Page 131

1      where we got dinged that I thought was

2      somewhat unfair, it would be that area.

3   Q. Uh-huh. By and large, would you say you

4      generally agree with the auditor's report

5      with that exception?

6   A. I think there's a lot of good information in

7      there. And I don't agree with everything,

8      but I think it's a good report and I think it

9      was helpful. And, you know, as hard as it is

10     to say, it's kind of a critical report, but

11     you don't change something like that

12     overnight.

13         I mean, I was with that prison system and

14     I knew what it looked like in '74, I knew

15     what it looked like in '80, and I knew what

16     it looked like in '90 and '96 when I became

17     the deputy, and it's a process, it takes a

18     long time. And, again, that's a system where

19     people are moving through, people got hope,

20     and over here it's -- you know, it's just

21     tougher when you have one guy who has got out

22     in, what, now, 20 years. That's just tough.

23  Q. Do you think it's going to change if the

24     court doesn't intervene?

25  A. I think it will be real challenging for

DENNIS L. BENSON   8/11/2014

Page 132

1    either party or both parties to come together

2    and take action.  I really do.  And the

3    problem -- when you -- when you don't think

4    it can get worse, I think it can, because I

5    think the worst thing that could happen is if

6    they finally throw up their hands in disgust,

7    like I said, and said, you know what, let's

8    just ride it out with the 700 we got, but

9    starting tomorrow let's just sentence every

10   sex offender to an indeterminant sentence.

11       Then you got ten times the problem,

12   because then the peeping Toms are never going

13   to get out of prison, so you're going to --

14   again, it's that unintended consequence

15   thing.

16       So I think, you know, that to me is the

17   easy, quick fix.  But they haven't done it

18   yet, and I think they -- you know, they've

19   talked about it.  They've talked about

20   indeterminant sentencing for at least some

21   level of sex offenders.

22       But I just -- unless you have an

23   impartial body releasing them, I think that

24   would be a mistake.  So I think it would

25   be -- a better approach would be to fix the

DENNIS L. BENSON  8/11/2014

Page 133

1    program.  I just don't know that there's the

2    political fortitude to do it.

3

4

5

6

7

8

9

10

11   Q.   We talked earlier about less restrictive

12        alternatives in the community.  You dealt

13        with the legislature for -- for many years --

14   A.   Yeah.

15   Q.   -- with your time at corrections and your

16        time at MSOP.  Is the security concern

17        preventing those less restrictive

18        alternatives from being developed in

19        Minnesota?

20   A.   I don't think it's as much the security

21        concerns as it is -- would be the local

22        politics going into a community and saying

23        we're going to set up a 12-bed sex offender

24        program for juveniles or something.  I think

25        that would be the -- the real challenge.  I

DENNIS L. BENSON  8/11/2014

Page 134

1   think you can do -- there's all kinds of

2   ways, especially in today's world, you can do

3   good security without barbed wire fences, and

4   we talked about some of them.

5       I don't know if you have -- bringing up

6   another topic, but the -- there's a New York

7   model too that we really liked in terms of

8   diverting people at the front-end.  Jannine

9   and I did a lot of analysis of that and I

10  really liked that approach.  I think it's --

11  it's probably the best in the United States

12  in terms of heading them off before they fall

13  into the black hole.

14 Q.  And that -- but that model can't work in

15     Minnesota because there are no facilities of

16     that kind in Minnesota?

17 A.  Right, not right now.

18 Q.  Even though the statute provides for that

19     opportunity --

20 A.  Yeah.

21 Q.  -- there just aren't any facilities --

22 A.  Right.

23 Q.  -- that a judge could send someone to?

24 A.  Yeah.

25 Q.  And so you'd agree with me that that's --

DENNIS L. BENSON   8/11/2014

Page 135

1      that's a real weakness in our program is the

2      lack of those community-based facilities?

3   A.   Yes.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 139

1   Q.   Okay.  Is there anything that I haven't asked
2        you about that you'd like to talk about today
3        in terms of topics?
4   A.   No.  The other thing -- I mean, I've been
5        away from the program for a couple of years,
6        and the one thing, I think I told counsel
7        this the other day too, that -- and I -- I
8        hired Jannine, and I looked at a lot of
9        different possibilities for that position,
10       not a lot, but four or five anyway.
11            And I think she is one of the -- in terms
12       of a clinical therapist, I think she's
13       probably one of the best in the nation.  I
14       really believe that.  I was a member of ATSA
15       and MnATSA, and she is highly respected and
16       well-regarded.
17            And she doesn't always have the political
18       sense that you'd like to see, but she's
19       really committed to her life's chosen work,
20       and I think that the state is lucky to have
21       her.  I don't know how much longer they can
22       keep her if things don't change.
23            And I think all of us want to see -- if
24       we're going to have this program, it's got to
25       change.  We can't -- none of us should dilute

DENNIS L. BENSON   8/11/2014

Page 140

1   ourselves by thinking we can just kind of

2   continue to kerplunk along and to keep

3   dodging these -- these bullets that --

4   and -- and cards that the court is giving us.

5        I mean, they've kind of put us on notice

6   that something has got to change here.

7   Unfortunately, I think it's very hard for the

8   program to change it, the commissioners to

9   change it, whoever he or she might be, and

10   I -- I think it's going to be tough for the

11   legislature.

12        So I'm hoping that between, you know, the

13   judge and just continued conversation,

14   something can happen here or don't ever think

15   that it can't get worse.  But it's

16   unfortunate.

17        It's a tough place to work when -- when

18   you know it's broken and every time you go

19   for help to fix it they kind of look the

20   other way and -- but I think if they slowed

21   down the intake that would help dramatically.

22

23

24

25

DENNIS L. BENSON   8/11/2014

Page 141

8   Q.   I wanted to get a sense for your general

9        feeling about 2008 when you started versus

10       2012 when you left how the facility was

11       operating in 2012 as opposed to when you

12       found it?

13   A.   I think -- I think we made -- as I mentioned,

14       I think we made lots of progress, I really

15       do.  I think that -- I think people who

16       wanted to participate in treatment could and

17       in many cases did.

18            When I got there the treatment

19       participation was down around 50 percent.

20       When I left it was up around 90.  And people,

21       you know, start treatment, stop treatment,

22       start treatment.  There's always going to be

23       a lot of that.  But the treatment

24       participation was much higher.

25            We did have one feeble escape attempt

DENNIS L. BENSON   8/11/2014

Page 142

1    about 2011, I think it was, '10, four guys up

2    at Moose Lake.  But other than that we had no

3    real escape attempts or people trying to get

4    out, not that they liked it there any better.

5    But I think that the whole phase 1, 2, 3

6    treatment process was beginning to work and

7    take hold.  Staff turnover had slowed way

8    down.  The number of clinical staff that were

9    hired and retained was at a good number.

10        So I think in all of those areas -- and

11   costs were -- dropped a little bit.  We

12   opened new beds.  And I think we were in a

13   much better place in 2008.

14        But, I mean, the elephant in the room

15   continues to be that we've only released one

16   person.  So you can say all of these

17   wonderful things, but that's not how we

18   measure success in this program.

19 Q.  You've talked about the political pressures

20   at some length generally speaking and then

21   the two examples that you gave, one was there

22   is the situation with the big screen TVs that

23   you discussed and also the situation with

24   your concern related to escorted trip s to

25   the state fair, right?

DENNIS L. BENSON  8/11/2014

Page 143

1   A.  Uh-huh.

2   Q.  Did you ever -- or are you aware of any time

3       when someone on a treatment team did not

4       advance someone in treatment as a result of

5       political pressures?

6   A.  No.

7   Q.  Are you aware of a time when someone on the

8       treatment team made a different decision with

9       respect to discharge or transfer than they

10      would have otherwise with --

11  A.  No.

12  Q.  -- as a result of political pressures?

13  A.  No.

14  Q.  Are you aware of any time when a risk

15      assessor made a different decision as a

16      result of political pressures?

17  A.  No.

18  Q.  Can you give me a general idea of what MSOP's

19      response was to the report of the Office of

20      the Legislative Auditor, did you make

21      changes, what was the process, et cetera?

22  A.  Yeah, the -- they made some minor changes.  I

23      don't think it was atypical.  Again, having

24      been through that process numerous times both

25      here and in corrections, they -- they

DENNIS L. BENSON  8/11/2014

Page 144

1    listened, they tweaked it, they -- they made
2    some adjustments to their report after
3    getting additional information.  So I -- I
4    sure wouldn't say it was an unfair report.
5  Q.  Okay.  And -- but I'm asking about the --
6    just now were you addressing the changes that
7    the Office of the Legislative Auditor made to
8    their report?
9  A.  Right.
10  Q.  Okay.  So after that, upon receiving the
11    final report from the OLA, did -- how did
12    MSOP react upon receiving that report?
13  A.  I mean, we took it very seriously.  We tried
14    to -- to the extent that we could, those
15    areas where we had authority to make changes,
16    I think we developed work plans and -- and
17    tried to implement some of the
18    recommendations and changes that they
19    suggested.  But, again, there were obviously
20    a fair number that were out of our hands.
21  Q.  Do you remember which ones you were able to
22    address?
23  A.  Oh, gosh, I don't --
24  Q.  Or just some examples, whatever you can
25    remember.

DENNIS L. BENSON   8/11/2014

Page 145

1    A.   Well, Jannine and her team took a hard look

2         at treatment hours and how we might better

3         define that so that people like us, lay

4         people who really weren't from the treatment

5         world, could better understand what -- what

6         the definition of treatment for civilly

7         committed sex offenders were and the fact

8         that we think what they were doing was

9         defendable.

10             So she tried to realign that in such a

11        way that it was more consistent with some of

12        the recommendations that the auditor's report

13        made around that.  That would be one example.

14

15

16

17

18

19

20

21

22

23

24

25