UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy
Gamble, Jr., Kevin John DeVillion,
Peter Gerard Lonergan, James
Matthew Noyer, Sr., James John
Rud, James Allen Barber, Craig
Allen Bolte, Dennis Richard Steiner,
Kaine Joseph Braun, Brian
Christopher John Thuringer, Kenny
S. Daywitt, Bradley Wayne Foster,
and Brian K. Hausfeld and others
similarly situated,

        Plaintiffs,

    vs.

Lucinda Jesson, Dennis Benson,
Kevin Moser, Tom Lundquist,
Nancy Johnston, Jannine Hébert,
and Ann Zimmerman, in their
individual and official capacities,

        Defendants.

Civil File No. 11-cv-3659 (DWF/JJK)

**[DEFENDANTS' AMENDED
PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

A first-phase trial in the above-captioned matter was tried to the Court without a
jury beginning on February 9, 2015 and ending on March 18, 2015. Plaintiffs were
represented by Daniel Gustafson, Karla Gluek, Raina Borrelli, David Goodwin, Lucy
Massopust, and Eric Taubel of Gustafson Gluek PLLC. Defendants were represented by
Nathan Brennaman, Scott Ikeda, Aaron Winter, and Adam Welle of the Minnesota

Attorney General's Office.  Based upon the entire file, record, and proceedings, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### A.   THE PARTIES.

1.     Each Plaintiff purports to represent a class of over 700 individuals (referred to as "clients") that are civilly committed to the Minnesota Sex Offender Program (MSOP) as either a Sexually Dangerous Person ("SDP") or a Sexual Psychopathic Personality ("SPP") (or both) by a Minnesota court pursuant to the procedures under Minn. Stat. ch. 253D.  Each Plaintiff resides at MSOP's Moose Lake facility.  (Doc. 203.)

2.     Defendants are administrators at MSOP that manage and provide treatment to the population at MSOP's facilities in Moose Lake and St. Peter.  Defendants have no control over the process by which Plaintiffs were civilly committed, and the propriety of civil commitments is not an issue in this case.  (*See* Doc. 427, at 30 31.)

3.     Plaintiff Kevin Karsjens is in Phase I of MSOP's three-phase treatment program.  Karsjens was committed in 2010 based on a long course of sexual and violent abuse of family members and partners over several years.   (DX 102; T. 3436-91.) Karsjens' history at MSOP is described further below.

4.     No evidence was presented regarding Plaintiff David Leroy Gamble.

5.     No evidence was presented at trial regarding Plaintiff Kevin DeVillion.

2

6.     Plaintiff Peter Gerard Lonergan is in Phase I of MSOP's treatment program.  Lonergan was committed in 2008 based on several sexual offenses against children and adolescents.  (DX 160.)  He also had a history of burglaries, theft, and substance abuse.  (T. 3633-35.)  Lonergan's history at MSOP is described below.

7.     No evidence was presented regarding Plaintiff James Noyer.

8.     Plaintiff James John Rud is in Phase II of MSOP's treatment program.  Rud was imprisoned at age 27 based on a plea involving convictions regarding 10 different victims.  (T. 3810-11; DX 189; DX 190.)  He was committed in 2010 at age 53 based on a history of sexually abusive behavior towards more than 50 children and adolescents.  (T. 3802-06; D-190.)  He once admitted to over 150 offenses against children but now admits to just 16 victims.  (T. 3805, 3815.)  Rud's history at MSOP is described below.

9.     No evidence was presented at trial regarding Plaintiff James Barber.

10.    Plaintiff Craig Allen Bolte is in Phase II of MSOP's treatment program.  Bolte was committed in 2006 by a Dakota County Court based on an adjudication of criminal sexual assaults against his sister, many instances of sexual violent behavior, and a detailed history of sexual deviancy focused on both children and adults.  (T. 1721-21; PX 300-M, at 1-17.)  Bolte's history at MSOP is described below.

11.    Plaintiff Dennis Richard Steiner is in Phase II of MSOP's treatment program.  Steiner stipulated to commitment in 1991 to avoid prison, though he now claims he never read the stipulation.  (T. 1222-24, 1270-71; DX 222; DX 223.)  Steiner's

3

commitment was based on three convictions for sexual assault and several other disclosed sexual assaults involving children that occurred between 1990 and 1991.  (DX 222; DX 223.)  Steiner's history at MSOP is described below.

12.     No evidence was presented at trial regarding Plaintiff Kaine Braun.

13.     Plaintiff Brian Christopher John Thuringer is in Phase I at MSOP's treatment program, though he does not meaningfully participate in treatment.  Thuringer was committed in 2011 by a Ramsey County Court based on convictions for sexual contact with a minor, criminal sexual conduct, and possession of child pornography, along with 21 other disclosed sex offenses against children.  Thuringer stipulated to these offenses and that he met criteria for commitment, though he now claims he never read the stipulation and should not have been committed.  (T. 1878-79, 1888-89, 1899-94; DX 239, DX 390.)  Thuringer's history at MSOP is described below.

14.     No evidence was presented at trial regarding Plaintiff Kenny Daywitt.

15.     Plaintiff Bradley Foster is in Phase II of MSOP's treatment program.  Foster was committed in 2007 by a St. Louis County court following several offenses against children and teenage girls, and repeated violations of supervision requirements involving contact and grooming behavior with children.  (T. 2835-46; 2856-68; DX 260.)  Foster's history at MSOP is described below.

16.     No evidence was presented at trial regarding Plaintiff Brian Hausfeld.

17.     Defendant Lucinda Jesson is the Commissioner of the Minnesota Department of Human Services.   Jesson has authority over MSOP's operations in accordance with Minn. Stat. § 246B.04.

18.     Defendant Dennis Benson is the former Executive Director of MSOP.  Both parties have agreed and stipulated that Dennis Benson is no longer a Defendant in this action because he was only named in his official capacity as Executive Director, and the parties agree that Defendant Nancy Johnson is the current Executive Director of MSOP and would be substituted as Defendant for Mr. Benson if she were not already named as another Defendant.

19.     Defendant Kevin Moser is the facility director at MSOP's Moose Lake facility.  He is responsible for overseeing facility operations, security divisions, MSOP's physical plant, and other units and services.

20.     Defendant Tom Lundqust is an associate clinical director of MSOP's Moose Lake facility who is currently on extended medical leave. The Court heard little to no testimony regarding Lundquist's conduct in relation to the matters alleged.

21.     Defendant Nancy Johnston is the Executive Director of MSOP.  Johnston is responsible for overseeing administration of programming, facilities, and policies.

22.     Defendant Jannine Hébert is the Executive Clinical Director at MSOP. Hébert is responsible for overall treatment programming at MSOP.

23.     Defendant Ann Zimmerman is a Security Director at MSOP.  Zimmerman oversees security functions at MSOP's Moose Lake facility.

24.     Plaintiffs brought suit by Complaint filed on December 21, 2011. (Doc. No. 1).  On July 14, 2012, the Court certified a class that includes "[a]ll patients currently civilly committed in the Minnesota Sex Offender Program pursuant to Minn. Stat. § 253B."  (Doc. 203).  Plaintiffs filed their Second Amended Complaint on August 8, 2013.  (Doc. 301).  Plaintiffs' filed the Third Amended Complaint on October 28, 2014. (Doc. 635.)

### B.     CIVIL COMMITMENT AND PETITIONS FOR REDUCTIONS IN CUSTODY.

25.     The first issue identified for adjudication at the first phase of trial is "whether Minnesota Statute Chapter 253D is unconstitutional on its face and as applied." (Doc. 647, at 2.)  The Third Amended Complaint's allegations in this regard focus on the mechanisms for becoming discharged from civil commitment.  (TAC ¶¶ 226-53.)

26.     The Court heard evidence at trial regarding the statutory process for petitioning and the petitioning experiences by some (but not all) of the named Plaintiffs. (T. 5118-173 (Barry), 3236-X83 (Johnston), 3573-95 (Karsjens), 2852-54, 2908-12 (Foster); 3754-69 (Lonergan); 3856-64 (Rud).

27.     The Court also received several exhibits related to SRB statutory and administrative policies, as well as some (but not all) of the named Plaintiffs' petitions and proceedings before the SRB and the Judicial Appeal Panel.  (DX 31; DX 32; DX 33;

DX 34; DX 78; DX 295; DX 320; DX 321; DX 325; DX 326; DX 328; DX 329; DX 330; DX 331; DX 332; DX 345; DX 349; DX 350; DX 351; DX 360; DX 361; DX 362.)

28.     MSOP has a published policy regarding administration of the SRB. (DX 33.)  There was no evidence presented at trial other than that MSOP and DHS staff comply with this policy.  (T. 3236 (Johnston).)

29.     Under chapter 253D, when a Minnesota district court determines a person meets commitment criteria, section 253D.07 permits a request for placement in a less-restrictive alternative to the extent consistent with treatment needs and public safety. If the committed person cannot show that safety and treatment needs would be met at the alternative, the person is committed to MSOP's secure facility at Moose Lake.  Minn. Stat. § 253D.07, subd. 3.

30.     Six months after commitment, clients may seek a "reduction in custody," which includes transfer "from a secure facility" (i.e., to CPS), provisional discharge, and discharge.  The statute places no limit on the timing and amount of times that a client may petition, so long as the petition is at least six months from a final decision on a prior petition.  Minn. Stat. § 253D.27.  (T. 5120-21 (Barry).)

31.     Completing a petition for a reduction in custody is simple.  All a client needs to do is fill in their name, check the box to indicate what relief they seek, i.e., transfer, provisional discharge, or discharge, and identify or request an attorney.

(T. 3238-39 (Johnston), 1299 (Steiner); 1910 (Bolte); 2648-49 (Manahl); 2907-08 (Foster); 3754-55 (Lonergan) DX 34; DX 290; DX 320; DX 328; DX 348; DX 357.)

32.     MSOP treatment providers testified that they will encourage clients to petition when they believe they are ready and likely to receive a reduction in custody. Treatment providers explained that it is important from a clinical perspective that clients take ownership over their treatment gains and petition willingly for a reduction in custody.  (T. 4088-91 (Hébert), 4270 (Fox).)

33.     When an MSOP client files a Petition, their first hearing is before a three member Special Review Board ("SRB").  The SRB must contain "three members experienced in the field of mental illness.  One member of each SRB panel shall be a psychiatrist or a doctoral level psychologist with forensic experience and one shall be an attorney.  No member shall be affiliated with the Department of Human Services."  Minn. Stat. § 253B.18, subd. 4c.  (DX 33; T. 5122 (Barry).)

34.     The Commissioner of DHS may appoint and remove SRB members. Following a recent increase in the number of petitions, the Commissioner increased the amount of SRB allotted positions to 24 and retained several new SRB members.   There are currently 24 allotted SRB positions and 17 SRB members.  The Commissioner also changed the appointment process to open SRB positions up to a wider audience.  It has been challenging to find psychiatric and other professionals to fill that position on the

SRB.   DHS also expedited hearings where a client's treatment team supported the petition.  (T. 946-48 (Jesson); 3242-45 (Johnston), 5146 (Barry).)

35.    SRB members are provided training in forensics, sex offender treatment, and legal standards and case law pertaining to their work.   MSOP staff also provide SRB members with reference materials and tours of MSOP facilities.   New SRB members observe several hearings before serving on SRB panels.   SRB members continue to receive training during their appointments on current research and developments in civil commitment issues.  (T. 3240-41 (Johnston).)

36.    The SRB Coordinator works with the attorney for the petitioner to schedule a hearing date as soon as practicable, and works with clinical and assessment support staff to monitor the preparation of risk assessments and treatment reports to ensure that hearings will go forward.   Hearing dates are generally assigned based on the order in which petitions are received, although an expedited process may be ordered in exceptional circumstances, such as remand from the Judicial Appeal Panel specifying a particular date for the matter to be returned to the Judicial Appeal Panel.  (DX 33.)

37.    The petitioning client or their attorney may request a continuance of the hearing.  (DX 33.)

38.    For every petition filed, the risk assessment department of MSOP provides an independent expert opinion regarding the petitioner's risk levels and criteria for the requested reduction in custody.   Before the SRB hearing, the risk assessment unit

conducts a comprehensive review of the petitioning client's records, conducts a thorough interview with the client (if the client consents), consults the client's treatment team, and applies recognized assessments including actuarial instruments to determine risk and comment on statutory criteria in a Risk Assessment report that they send to the SRB. (DX 33; T. 1655-1665 (Pascucci); T. 5199-5217 (Herbert)).

39.     Plaintiffs make the argument, though it does not appear in the Third Amended Complaint, that MSOP's risk assessment unit is not sufficiently independent, and the Court heard much testimony regarding the design and inner workings of the department.    The risk assessment department is ultimately under the general administrative responsibilities of the MSOP executive clinical director, but its day-to-day operations and reports are supervised by a separate director Dr. Lauren Herbert.  The Court finds that Dr. Herbert and her staff of Ph.D. level psychologists are reasonably educated in current risk-assessment methods, exercise their own professional judgment, and are not influenced by clinical staff at MSOP.    (T. 5194-5217 (Herbert); T. 5190:12-23 (Herbert); T. 4728:12-4729:5 (Pascucci); Jennifer Jones Depo. 63:22-64:4. DX 291).

40.     Also before an SRB hearing, a psychologist that is not involved in the petitioner's treatment creates a report on the petitioner's treatment history and progress. This report is based on reviews of records and consultation with the client's treatment team.  To ensure accuracy and completeness, the treatment report is reviewed by the

10

clinical supervisor, the facility clinical director, and (for Phase II and III clients) the executive clinical director.  (T. 4051-58 (Hébert); DX 193; DX 292; DX 412; DX 413; DX 415; DX 417; DX 419; DX 421; DX 423; DX 425; DX 427.)

41.     The Treatment Report and risk assessment report authors are directed to submit their reports at least 14 days before the hearing to allow the SRB participants to review them.  (DX 33.)

42.     60 days before the SRB hearing, the SRB Coordinator sends a notice of the hearing to the petitioning client, the client's attorney, the county for the committing county (and, if different, the county of financial responsibility), and county social services.  (DX 33.)

43.     The petitioning client and his attorney may call any witnesses and present any evidence they wish to the SRB.  The risk assessor and the treatment report author may also participate in the hearing and present to the SRB, and answer any questions from the panel.  The county attorney and other representatives from the county of commitment or of financial responsibility may also present to the SRB and answer questions.  The SRB then takes the petition under advisement. (DX 33.)

44.     The SRB issues a decision recommending that the petition be granted or denied within 30 days of the hearing.  The recommendation is directed to the Judicial Appeal Panel (also known as the Supreme Court Appeal Panel or "SCAP").  The SRB complies with this requirement.  (T. 5123 (Barry); DX 33.)

11

45.     MSOP clients have the right to counsel throughout the proceedings outlined under chapter 253D, including when they decide to petition, when they appear before the SRB, when and if they appear before Judicial Appeal Panel, and when and if they go through any appeal process to the Minnesota Court of Appeals and Supreme Court. Minn. Stat. § 253D.20.  (T. 5121 (Barry).)

46.     The Judicial Appeal Panel decides Petitions after they are heard by the SRB.  The Judicial Appeal Panel is comprised of district court judges that are appointed by the Minnesota Supreme Court.  The district court judges sit in panels of three.  Minn. Stat. § 253D.28.  (T. 5123-24 (Barry).)

47.     The Commissioner arranged for and funded the addition of a second panel of Judicial Appeal Panel judges to hear cases.  (T. 961 (Jesson), 3243-47 (Johnston); DX 78; DX 76; DX 75.)

48.     The statute provides that the petitioning client, the county attorney of the county from which the person was committed or the county of financial responsibility, or the Commissioner may petition the Judicial Appeal Panel for a rehearing and reconsideration of a recommendation of the SRB.  The statute provides that the request must be filed within 30 days after the recommendation is mailed by the SRB Coordinator to the Judicial Appeal Panel.  The Judicial Appeal Panel is required to hold a hearing when any party objects to the SRB recommendation.  If no one objects, the Judicial Appeal Panel can enter an order adopting the recommendation or schedule a hearing on

12

its own.  A hearing must be held by the Judicial Appeal Panel within 180 days of the filing of the petition unless an extension is granted for good cause.  Minn. Stat. 253D.29.

49.     The procedure for the Judicial Appeal Panel's hearings is set forth in section 253D.28, subdivision 2.  The petitioning client, the client's counsel, the county attorney of the committing county and county of financial responsibility, and the Commissioner participate as parties to the Judicial Appeal Panel hearing.  The petitioning client can put forward any fact witnesses, expert witnesses, or other evidence in support of their petition.  The Judicial Appeal Panel also appoints an expert examiner of the petitioning client's choosing from a list of qualified experts in sex-offender treatment and forensic assessments.  (T. 5124-26 (Barry), 2607-10 (Powers Sawyer); DX 294.)

50.     The substantive standards applied by the Judicial Appeal Panel for transfer, provisional discharge, and discharge are set forth in sections 253D.29-.31, along with case law interpreting and applying the statute.  Decisions are made by a majority of the Judicial Appeal Panel.  The Panel holds a de novo evidentiary hearing.

51.     An aggrieved party may appeal the Judicial Appeal Panel's decision to the Minnesota Court of Appeals and then may seek review at the Minnesota Supreme Court. (T. 5137-38 (Barry).)

52.     The procedures outlined in chapter 253D and the SRB policy are routinely followed.  (T. 3247-48 (Johnston), 5119-30 (Barry).)

13

53.     The average time between a petition and the SRB hearing is 220 days. (T. 5144 (Barry).)  The Court heard no details about this timeframe, heard no details of any particular petitioning processes by the named Plaintiffs, and received no evidence to show any intentional delaying of proceedings by Defendants in regard to Plaintiffs or the entire class.

54.     Plaintiffs repeatedly made reference to a petition that they claim took "five years," but the evidence in that particular case was that the client actually withdrew his petition several times over the course of that period.  (T. 5161-62.)

55.     Plaintiffs also repeatedly highlight the longest petition process identified that took 600 days, but Plaintiffs supplied no testimony or evidence regarding the nature of this petition, and Defendants testified that in fact it was the result of a medical emergency involving the petitioner's attorney and that a resulting continuance requested by the petitioning client caused the delay.  (T. 5163.)  Plaintiffs offered no evidence to contradict this testimony.

56.     The Court received no evidence that any Defendant or other DHS or MSOP employee intentionally delays MSOP petitions.  To the contrary, Defendants have taken several measures to increase the amount of qualified SRB members and increased the panels for Judicial Appeal Panel proceedings.

**C.      PLAINTIFFS' PETITIONS.**

57.      As described below, none of the named Plaintiffs that testified has been denied the opportunity to petition the SRB for a reduction in custody as described above.

58.      Five of the seven Plaintiffs who offered testimony and evidence at trial—Plaintiffs Karsjens, Lonergan, Rud, Foster, and Steiner—have petitioned to the SRB and received hearings before the SRB and the Judicial Appeal Panel.  The two testifying Plaintiffs that did not petition—Plaintiffs Bolte and Thuringer—did not make any claim that they were unable to petition.  (T. 1810-11 (Bolte), 1873 (Thuringer).)

59.      Plaintiff Karsjens most recently filed a petition to the SRB seeking transfer to Community Preparation Services ("CPS"), provisional discharge, and discharge on October 18, 2011.  The SRB recommended denying his petition for transfer, provisional discharge, and discharge.  Plaintiff Karsjens petitioned for rehearing and reconsideration of his petition.  The Judicial Appeal Panel held an evidentiary hearing and dismissed Plaintiff Karsjens's petition based in part on an independent court-appointed examiner's opinion that Mr. Karsjens was "just paying 'lip service to treatment concepts' and does not see himself as an offender," "has no empathy or insight and would, therefore, not be capable of developing a relapse prevention plan," and "has a high risk of reoffending if released into the community."  Karsjens appealed to the Minnesota Court of Appeals, which affirmed.  *Karsjens v. Jesson*, A13-1746, 2014 WL 902860 (Minn. Ct. App. Mar. 10, 2014) (finding that Karsjens did not present competent evidence in support of

15

his petition) (unpublished).  (T. 3572-95 (Karsjens), 5128-40 (Barry); DX 291; DX 292; DX 293; DX 294; DX 295; DX 296.)

60.     Plaintiff Lonergan most recently filed a petition to the SRB seeking transfer to CPS, provisional discharge, or discharge on May 30, 2013.  The SRB issued a recommendation on May 18, 2014.  Lonergan's petition is pending before the Judicial Appeal Panel.  Mr. Lonergan also previously petitioned in 2010 for transfer, provisional discharge, and discharge, which the SRB recommended denying, and the Judicial Appeal Panel denied the petition.  (T. 3754-69 (Lonergan); DX 320; DX 321; DX 322; DX 323; DX 324; DX 325; DX 326; DX 327.)

61.     Plaintiff Rud most recently filed a petition to the SRB seeking transfer to CPS, provisional discharge, or discharge on June 2, 2013.  The SRB issued a recommendation on April 10, 2014, which recommended denying the relief requested.  Rud did not appeal to the Judicial Appeal Panel, and the petition was denied on August 11, 2014.  (T. 3856-64 (Rud); DX 193; DX 328; DX 329; DX 330; DX 331; DX 332.)

62.     Plaintiff Steiner most recently filed a petition to the SRB seeking transfer to CPS, provisional discharge, and discharge on June 19, 2012.  The SRB issued a recommendation on January 11, 2013.  Steiner's petition is pending before the Judicial Appeal Panel, and the Commissioner does not oppose Mr. Steiner's petition for transfer.

Plaintiff Steiner previously petitioned in 2003 and 2007.  (DX 345; DX 346; DX 347; DX 348; DX 349; DX 350; DX 351.)

63.     Plaintiff Foster most recently filed a petition to the SRB seeking transfer to CPS and discharge on October 29, 2012.  The SRB issued a recommendation on March 11, 2013.  The Judicial Appeal Panel issued an order on May 8, 2014, which dismissed the petition.  The Court of Appeals affirmed based, in part, on the testimony of the court-appointed expert.  *Foster v. Jesson*, 857 N.W.2d 545 (Minn. App. 2014). (T. 2908-12 (Foster); DX 357; DX 358; DX 359; DX 360; DX 361; DX 362; DX 363.)

64.     Other testifying class members have petitioned and received the procedures outlined under chapter 253D and the SRB policies in place at MSOP.  (DX 471; DX 472; DX 474; DX 477; DX 478 (Nicolaison); DX 481; DX 486; DX 487; DX 488; DX 489; DX 490; DX 491; DX 492; DX 493; DX 494; DX 495; DX 496 (Hayzlett).)

65.     In sum, as demonstrated by the above-cited testimony and exhibits, Plaintiffs have received all the benefits of the statutory process afforded under chapter 253D.  They had the right to periodically petition for a reduction in custody.  They have been provided attorneys to assist them in building their case and presenting to the SRB and Judicial Appeal Panel.  They were permitted to call witnesses and enter evidence to a neutral decision maker.  They received a risk assessment from MSOP's independent risk assessment unit before their SRB hearing, and they received an independent risk assessment from a Court-appointed examiner of their choosing at the Judicial Appeal

17

Panel.  Minnesota courts apply a clear-and-convincing burden of proof to its discharge proceedings.  Plaintiffs had the right to appeal.  Plaintiffs show no intentional conduct or practice by Defendants to thwart the process outlined under chapter 253D for themselves or for their class members.

66.    To the extent Plaintiffs believe their civil commitment is illegal or unconstitutional, they may seek habeas relief in accordance with state and federal law.

### D.    MSOP'S TREATMENT PROGRAMMING AND PLAINTIFFS' TREATMENT.

67.    The second issue for the first-phase of trial was "whether the treatment provided is constitutionally and/or statutorily infirm."  On this issue the Court heard testimony from MSOP's executive director Nancy Johnston, executive clinical director Ms. Jannine Hébert, Moose Lake clinical director Peter Puffer, St. Peter clinical director Dr. Haley Fox, Moose Lake associate clinical director Jim Berg, former Moose Lake associate clinical director Sue Persons, clinical supervisors Dr. Elizabeth Peterson and Dr. Nicole Elsen, and reintegration director Dr. Elizabeth Barbo.  The Court also heard testimony of clinicians providing direct treatment to class members, including treatment psychologist Rhonda White, therapist Terrance Ulrich, and therapist Darci Lewis.  The Court also received testimony regarding oversight of the clinical program from MSOP's policy and compliance director David Bornus and Deputy Director Shelby Richardson, along with testimony of one of MSOP's auditors, Mr. James Haaven.

68.     The Court received detailed testimony describing how the current treatment program was created and developed, its foundations in research and best practices, education and staffing levels of clinical leadership and staff, various specialty programming offered to special populations, program oversight, and the program's overall execution by MSOP's clinical staff.  The Court received several exhibits that both parties agree explain MSOP's policies and programming related to sex-offender treatment, including (a) MSOP's Treatment Overview Policy, (DX 1,) (b) MSOP's Clinician's Guide, (DX 2,) (c) MSOP's Program Theory Manual, (DX 4,) (d) MSOP's Matrix Factor Scoring Manual, (DX 6,) (e) MSOP's Treatment Progression Policy, (DX 7,) (f) MSOP's module courses for Phase I, in addition to many other policies that relate to treatment programming, (DX 8; DX 9; DX 10; DX 11; DX 38; DX 60; DX 61; DX 65; DX 72.)

69.     MSOP leadership has significant experience and expertise in providing sex offender treatment in a civil-commitment setting.  Executive Clinical Director Jannine Hébert, St. Peter Clinical Director Dr. Haley Fox, and Moose Lake Clinical Director Peter Puffer all are highly educated, licensed, and experienced in sex-offender treatment. (T. 3871-82 (Hébert); 4319-30 (Puffer); 4217-25 (Fox).)   Each are engaged in their profession and current research.  (T. 3880-81 (Hébert); 4329-30 (Puffer); 4222-24 (Fox).)

70.     Executive Director Nancy Johnston also has significant experience in sex-offender treatment as well as program administration.  (T. 3201-08.)

19

71.     MSOP's auditors find MSOP to have a "strong administrative structure." (Haaven Dep. 229:18-232:5.)  This Court agrees.

72.     MSOP also utilizes Associate Clinical Directors and Clinical Supervisors—all with masters' degrees or higher and significant experience in sex-offender treatment—who supervise primary clinicians to supervise and ensure treatment quality.  To be hired as a primary therapist, an individual must have a masters' degree or higher.  (T. 4017-19 (Hébert), 4208, 4211-12, 4215-16, 4223-30, 4253-56 (Fox), 4574-85, 4601-07 (Berg), 4341-42 (Puffer), 1359-61 (Elsen), 1412, 1415, 1422 (Lewis).)

73.     The Court also heard testimony about MSOP's treatment psychologists, who provide additional individual therapy to clients, and for consultation from primary therapists.  (T. 4214-15 (Fox), 1972-76 (White), 141-42 (Lewis), 4601-07 (Berg).)

74.     Treatment psychologists also conduct various clinical assessments that assist in identifying and addressing treatment needs, which are described further below. (T. 1972-76 (White), 1412 (Lewis), 2317-18 (Vietanen).)

75.     Additionally, MSOP employs a PhD-level reintegration director and several reintegration specialists who assist clients in preparing for and transitioning to the community.  (T. 4455-533 (Barbo); DX 61; DX 445; DX 446; DX 447.)

76.     MSOP also employs a therapist to help clients develop pro-social supports, and conduct family and restorative therapy.  (T. 4212.)

77.     The Court also heard testimony from experienced assessment psychologists employed at MSOP.  At intake and throughout a client's stay at MSOP, these assessors evaluate mental health, vulnerable-adult status, chemical dependency, and many other aspects related to treatment are conducted by trained professionals.  Those assessments are in addition to the thorough "sex-offender assessments" performed at intake to inform individualized needs and Matrix areas of concern for each particular client when beginning treatment.  (T. 4841-42 (Peterson); DX 60; DX 124; DX 127; DX 211; DX 286; DX 455; DX 456.)

78.     The Court heard testimony about training and continuing education of MSOP's clinical staff.  In addition to receiving education required via licensure and professional associations, MSOP provides initial and ongoing training to ensure that staff are up-to-date on best practices in the field.  (T. 3929-32, 4023-28, 4031-33 (Hébert), 4253-55 (Fox), 4341-43 (Puffer), 1410, 1415-17 (Lewis), 2321 (Vietanen), 4602-05 (Berg); DX 72.)

79.     MSOP's auditors believed that MSOP provides the most training than any other civil commitment program in the country.  (T. 3359-60.)  The Court agrees.

80.     MSOP also maintains a research department to keep the program up to date on research and trends inside and outside the facility.  (T. 3888-89, 3988-89 (Hébert), 4224 (Fox).)

81.     Defendants' argue that MSOP's clinical leadership and staff are caring and dedicated professionals who have chosen to work to help sexual abusers change their lives and prevent future sexual assault.  Plaintiffs' counsel agreed.  (T. 3194.)   So does the Court.

82.     Regarding staffing levels, MSOP clinical directors set the number of clinical positions they desire to fill.  (T. 3348-49, 3391, 3389-90.)   MSOP's desired clinician-to-client rates are low compared to other civil commitment programs. (T. 3348.)

83.     Currently, MSOP has a 7% vacancy rate for clinical staff, though the vacancy rate has been higher in the past.  (T. 3347-48, 3891-96.)

84.     Plaintiffs have presented no evidence to show that Defendants have been negligent in their efforts to hire and retain staff, and to the contrary the Court finds that MSOP leadership has undertaken significant measures to attract and retain clinical professionals at MSOP.  This includes creating new loan repayment and signing bonuses schemes negotiated between the state and state-employee unions.  (T. 3348, 3391-95.)

85.     The Court finds that, with 51 clinical positions filled, Moose Lake's clinician to patient ratio was just over 10:1.  While MSOP agrees that it would be ideal to have no staffing vacancies, the Court finds that MSOP engages in reasonable effort to hire and retain staff, that staffing vacancies have not resulted in canceled treatment

programming, and that MSOP's staffing levels compare favorably to other inpatient civil commitment sex offender programs.  (T. 3347-48.)

86.    The Court heard testimony from clinical leadership on how MSOP's treatment programming was carefully developed based on current research and best practices.  (T. 3885-86, 3396-98, 4228-29 (Hébert), 4232-33 (Fox), 4445-46 (Puffer), 4600 (Berg).)  MSOP's Clinician's Guide, Program Theory Manual, and Matrix Scoring Manual describe in detail the theories, research, methods, and procedures for treatment at MSOP.  (T. 3897-915 (Hébert), 4253 (Fox); DX 2; DX 4; DX 6.)  The evidence was consistent with MSOP's auditors conclusion that "[t]he Theory Manual and Clinicians Guide describe [a] program model . . . consistent with best practices in the field and with research." (2013 Report, at 3.)

87.    The Rule 706 experts similarly concluded that "[e]ach of these documents is well-written and includes a wealth of information for program staff and those reviewing the program" and "provide information and guidelines for clinical staff that are consistent with general thinking in the literature and practice regarding treatment for people who have sexually offended."  (706 Rep. 28 30.)  The manuals outline a sex-offender treatment program designed to reduce risk for re-offense and grounded in the evidence-based "risk, needs, responsivity principles" of Drs. Donald Andrews and James Bonta.  The Rule 706 experts, MSOP's auditors, and even Plaintiffs' expert Dr. Cauley agree that the RNR model is "the pre-eminent model of effective correctional

interventions."   (706 Rep. 23; Haaven Dep. 127:23 128:4; T. 842-45 (Freeman), 2242 (Cauley).)

88.     The Court heard from several witnesses about MSOP's phase system and "stages of change"—i.e., a first phase focusing on emotional regulation, rule compliance, and treatment engagement; a second phase focused on identifying and addressing previous patterns of sexually abusive behavior and cycles; and a third phase focused on reintegration.  (T. 3908-35, 3943-76 (Hébert).)

89.     MSOP's auditors, the Rule 706 experts, and Dr. Cauley agreed that this framework "organized by phases and modules" is "common," and that "the MSOP program is largely in line with the majority of other SOCC programs."  (706 Rep. 28-31; Haaven Dep. 213:4-214:8; 219:9-17, 222:18-223:1; T. 2777-78 (Cauley).)

90.     The Court heard testimony about MSOP's Matrix factors, which are merely plain-language expressions of factors found in the research as controlling risk.   The factors were developed in accordance with the risk-needs-responsivity (RNR) model and the good-lives model, adjusted and specialized towards a civil commitment setting.  (T. 3899-906, 3918-22 (Hébert), 4227-28 (Fox); 2327 (Vietanen); Haaven Dep. 213:4 214:8; 219:9 17, 222:18 223:1.)  The Court heard no contrary testimony.

91.     The Court's appointed Rule 706 experts stated that the "Matrix Factors are tailored to each treatment phase, and the Theory Manual contains an elaborate Goal Matrix that comprehensively outlines expectations and goals that become progressively

24

more sophisticated as clients advance through the phases." (706 Rep. at 32.) The Rule 706 experts also confirmed that "the Matrix Factors . . . are factors demonstrated in the literature as being worthy of consideration." (706 Rep. at 39; T. 999, 1028-29 (Freeman).) The Court heard no contrary testimony.

92. The Court also heard testimony explaining the continuum of settings within MSOP—from the Moose Lake facility to St. Peter and CPS. These facilities feature different environments based on different populations, and provide for additional privileges and freedoms as clients move through treatment and demonstrate change. (T. 3976-79, 4009-20 (Hébert), 4455-533 (Barbo).) The Court heard no contrary testimony.

93. The Court heard testimony about how MSOP staff conduct treatment-based "Sex Offender Assessments" upon admission. These assessments are the "foundation for designing the part of the individualized treatment plan that would relate to the sex offender treatment component." (T. 4005-07 (Hébert), 4843-69 (Peterson); DX 60.) Sex Offender Assessments consider all treatment records, judicial findings, previous treatment assessments, and risk assessments available, consider original testing conducted by the assessment psychologist, consider an original interview by the assessment psychologist, and identify "target treatment needs" to the treatment team for each client. (T. 4007-08 (Hébert), 2328-30 (Vietanen), 4843-69 (Peterson); DX 60;

DX 455.)  These assessments make recommendation and identify areas of concern or potential roadblocks to treatment for treatment teams.  (T. 4852-57 (Peterson).)

94.     The admissions policy also provides for various evaluations based on clients' mental status, their need for alcohol or chemical dependency treatment, their psychiatry needs, whether they are a vulnerable adult.  (DX 60; DX 183; T. 4848-52, 4860-69, 4872-79 (Peterson).)  Clients can in fact begin in Phase II of treatment if they came from MSOP's program at the Department of Corrections and the program determines it is proper, but clinical leadership (and Rule 706 expert Dr. Wilson) emphasized the importance of beginning in Phase I for most clients to get acclimated and motivated for intensive treatment and change.  (T. 4008-09 (Hébert), 333-34 (Wilson), 2362 (Vietanen).)

95.     The Court heard testimony regarding detailed and required individual treatment plans or ITPs that are prepared and annual renewed for each client.  Each MSOP client's primary therapist, with consultation from their clinical supervisor, uses initial assessments to develop the ITP for that client.  (T. 1413-17 (Lewis); Persons Dep. 71:22-73:17; T. 4353-53, 4356-57 (Puffer); Haaven Dep. 97:23-98:1.)

96.     As demonstrated by the numerous ITPs placed in evidence concerning Plaintiffs and other clients, ITPs identify specific diagnoses and clinical aspects presented by each client, consists of specific Matrix factors that the client must address to reduce their risk of re-offending, and then identifies unique goals and action plans to address that

area.  (DX 103, DX 191, DX 194; DX 215; DX 216; DX 217; DX 225; DX 240; DX 263; DX 284; DX 409; DX 439; DX 458; DX 484.)

97.     Each ITP is updated annually by the primary clinician after a formal review meeting with the client's treatment team along with any family, attorneys, or other supporters that the clients wants at the meeting.  (T. 2905-06; 1413-17 (Lewis).)

98.     Matrix factors that are not a problem for that client are not included on the ITP.  (Persons Dep. 241:20 22; 249:13 25.)

99.     The Court also heard testimony regarding MSOP's policy for clinicians to create and provide quarterly reports to clients with individualized ratings on Matrix factors, descriptions of progress on those areas, summaries of group and treatment participation, an individualized history, narrative discussions of treatment progress, client feedback, and a detailing of needs for the next quarter.  (T. 4050-51, 1422-32 (Lewis).)

100.     Witnesses testified that these quarterly reviews provide an opportunity to review and consider each client for phase progression.  (T. T. 4003-04, 4054-55 (Hébert), 1422 (Lewis).)

101.     Several exhibits represent the individualization of treatment plans, reviews, and quarterly updates for the Plaintiffs and other class members that testified.  (DX 104; DX 105; DX 106 (Karsjens); DX 164; DX 165; DX 166; DX 167; DX 168; DX 169; DX 437 (Lonergan); DX 195; DX 196; DX 197; DX 443 (Rud); DX 212; DX 213; DX 214 (Bolte); DX 226; DX 227; DX 228; DX 444 (Steiner); DX 241; DX 242;

DX 243 (Thuringer); DX 264; DX 265; DX 266 (Foster); DX 285 (Manahl); DX 405 (Terhaar; DX 484 (Hayzlett).)

102.    Every fourth quarterly report is an annual report that follows the annual review meeting described above.  Annual reports recap the last year's treatment gains and assists in identifying areas of concern and goals for the next year's ITP, as described by witnesses and demonstrated in the many examples pertaining to testifying clients (T. 3981-82 (Hébert); 706 Rep. 32-33; Persons Dep. 136:25, 139:2; DX 107; DX 108 (Karsjens); DX 170; DX 171 (Lonergan); DX 198; DX 199 (Rud); DX 224; DX 229 (Steiner); DX 244 (Thuringer); DX 267; DX 268 (Foster); DX 406 (Terhaar); DX 470 (Nicolaison); DX 479 (Hayzlett).)

103.    MSOP's program provides for implementation of the program via weekly core group sessions, psycho-educational module sessions, and individual therapy sessions and in line with professional standards.  (T. 3885-99, 3937-41 (Hébert), 4234-39 (Fox), Haaven Dep. 59:18 62:1; 706 Rep. 27.)   MSOP clinicians described core groups co-facilitated by two therapists, and that address treatment concepts through talk therapy and assignments.  (T. 3937-41 (Hébert), 1411-24 (Lewis).) The Rule 706 experts testified that hours of group therapy and other programming is consistent with best practice. (T. 608 (Wilson).)   Mr. Haaven also testified that MSOP's programming hours are consistent with other programs. (Haaven Dep. 59:18-62:1; DX 21, at 4.)

104.    MSOP programming also includes weekly psychoeducational courses or "modules" addressing specific risk factors.   (T. 1414-19 (Lewis), 4234-36 (Fox).) Curriculum for these modules is created by clinicians, and courses are selected by a client's treatment team (with the client's consultation) based on that specific client's need areas.  (T. 4049-50 (Hébert), 4234-37 (Fox), 1414-15 (Lewis), 1489 (Ulrich).)  MSOP also offers individual sessions every month with a client' primary therapist, as well as additional sessions with treatment psychologists based on requests and needs. (T. 3937-41 (Hébert), 1414 (Lewis), 4234-36 (Fox).)

105.    MSOP's treatment program also provides for educational, vocational, and recreational programming.   (T. 4013-17 (Hébert), T. 4258-59 (Fox); DX 11; DX 38; DX 39.)  The Rule 706 experts observed MSOP's excellence in this programming:

> MSOP has a well-developed cadre of program opportunities beyond involvement in "core groups" (i.e., sexual behavior process treatment). Indeed, it is in this particular area that MSOP shines brightest. The Panel was particularly impressed by the MSOP's education, vocation, and therapeutic recreation departments. Each campus has superior availability of education materials, equipment, and opportunities for instruction. Clients are able to seek high school diplomas, as well as take college level courses. The vocational programs at both campuses would likely be the envy of any correctional or forensic treatment facility in the country. Clients are clearly able to develop both skills and competencies in a number of different employment areas. The agriculture programs (e.g., fish farm and vegetable gardening) were simply fascinating. As to therapeutic recreation, each facility has a bright and well-appointed gymnasium with trained recreation staff. Further, each campus has large outdoor areas available for team sports and other functions. Outdoor sports equipment is also widely available at both campuses.

(706 Rep. 36.)

106.    Mr. Haaven expressed a similar opinion. (Haaven Dep. 134:15-135:4; 224:10-227:4.)  MSOP also provides comprehensive chemical dependency treatment for clients at Moose Lake and St. Peter, including through modules and attendance of AA and NA in the community.  (T. 4079-80 (Hébert), 4266-67 (Fox); 1462-63 (Lewis).)

107.    Treatment programming is communicated in several ways to clients.  Aside from daily communications between treatment teams and clients, MSOP has a "treatment overview" policy designed to educate on treatment concepts, the RNR model, and MSOP's phase framework.  (DX 1.)

108.    MSOP also publishes a "Progression Policy" that spells out what clients need to typically achieve to move through phases.  (T. 3920; DX 7.)

109.    MSOP's Clinicians' Guide, Program Theory Manual, and Matrix Scoring Manual also communicate the program's guidelines and principles.  (DX 2, DX 4, DX 6.)

110.    MSOP's principles are also summarized in every quarterly report. MSOP also provides to each client "Matrix cards" that show the plan-language matrix factors as they pertain to each phase, and which clients can carry with them. (T. 3928 (Hébert); DX 8; DX 8A; DX 8B; DX 8C; DX 9; DX 10.)

111.    The Court heard clear, consistent, and unrefuted testimony from all levels of clinical staff that they and others exercise professional clinical judgment in making decisions and providing treatment at MSOP as a matter of course and custom.  Witnesses

30

consistently and credibly described how decisions are not made in a vacuum, but rather described how multiple individuals form an overall "treatment team" make final decisions based on a consensus approach.   The Court has no doubt that MSOP's clinicians provide dedicated and compassionate care to MSOP clients.   (T. 1332-33 (Puffer), 1384 (Elsen), 1491 (Ulrich); 1358 (Elsen), 1439-41 (Lewis), 1484 (Ulrich). 3951-52, 4022-25, 4027-29, 4030-32 (Hébert); 4290 (Fox), 4331-32 (Puffer), 1370 (Elsen), 1443 (Lewis), 1484-91 (Ulrich), 1973-76 (White), 2318-19 (Vietanen).)   4290 (Fox), 1384 (Elsen); 1440 (Lewis), 1484-91 (Ulrich), 2319 (Vietanen). T. 3362 (Johnston), 4445-46 (Puffer); 4615-16 (Berg), 4885 (Peterson).

112.   MSOP's auditor Mr. Haaven—who the Rule 706 experts, Plaintiffs' experts, and MSOP agree is an internationally respected expert in this field—confirmed that MSOP's treatment professionals are qualified and act in accordance with their professional judgment.  (Haaven Dep. 229:21-230:14.)

113.   Mr. Haaven was clear that MSOP complies with "international best practice standards and guidelines in the field" and "provid[es] timely and effective treatment designed to help clients reduce their risk to sexually reoffend and reintegrate back into the community." (Haaven Dep. 144:18 145:4, 207:19 208:11.)

114.   Haaven credibly testified, and no evidence refutes, that "never did [he] see situations that raised concern[s] . . . of folks that were not, that were then working outside of what [he] call[ed] best practice standards."  (Haaven Dep. 59:12-17.)

115.   Dr. Wilson similarly testified that he found no intent by any clinician to defy best practices, administration "tr[ies] to do a good job," clinicians have good therapeutic relationships, and clinicians make decisions based on professional judgment and nothing else.  (T. 597-99, 640-53.)

116.   Dr. Miner testified that MSOP's model is consistent with best practices and that staff use good faith in carrying out that model.  (T. 1178-79.)  Miner testified that MSOP staff are caring and make decisions according with professional judgment. (T. 1186-87.)

117.   Ms. McCulloch testified that MSOP staff's decisions and policies are never undertaken to punish; rather she said they reflect current thinking and best practices in sex-offender treatment.  (T. 330-31.)

118.   Dr. Freeman testified that MSOP administrators and clinicians generally exercise their professional judgment according to current acceptable practices in the field. (T. 848.)

119.   These features of MSOP's treatment program—e.g., a treatment design conforming with best practices, competent and trained staff and administrators, regular psychiatric and other treatment assessments, individualized treatment planning and quarterly reporting—are required by state law and enforced through independent oversight.  (T. 3335-41 (Johnston), 4092-95 (Hébert), 4650-76 (Richardson); 4805-40 (Bornus); DX 433.)

120.   Since 2006, MSOP has retained three internationally respected experts in sex-offender treatment and civil commitment programming (including Mr. Haaven) to inspect and scrutinize MSOP's treatment program and administration.   Minn. Stat. § 246B.03, subd. 2. (T. 3354-61 (Johnston), 4095-99 (Hébert); DX 19; DX 20; DX 21; DX 23; DX 24; DX 26.)

121.   These auditors' reports thoroughly review clinical services, programming, design and implementation, and training; they review residential units to ensure a therapeutic environment; they review administrative structures and collaboration between security and clinical services.   (T. 3356-57; DX 19; DX 20; DX 21; DX 23; DX 24; DX 26.)

122.   These auditors are paid out of MSOP's own budget, and mandated by state law.  (T. 3357-58.)

123.   The auditors' reports are submitted by MSOP along with an annual report to the Minnesota Legislature every year.   MSOP's annual report to the legislature provides information and data regarding clinical programming and progress of clients. (T. 3340-41; DX 79; DX 80; DX 81.)

124.   In addition to those program audits, an independent unit of the Department of Human Services enforces "Rule 26."  Minn. R. 9515.3000-.3110.  (DX 434.)

125.   Rule 26 and its variance were specifically developed to regulate MSOP's treatment program.  (DX 74; T. 4651-63 (Richardson), 4806, 4808-12 (Bornus).)

126.   Rule 26 ensures sound programming and care at MSOP, including intake and periodic assessments for psychiatric and other care, sex-offender treatment planning and reporting, staff training, record-keeping, educational programming, chemical-dependency treatment, and background checks for staff.  (T. 3335-36 (Johnston), 4651-74 (Richardson), 4808-12 (Bornus); DX 434.)

127.   Rule 26 auditors conduct site visits, including one that occurred in late 2014, and investigate complaints.  (T. 4654.)

128.   If Rule 26 auditors or investigators find a problem, they submit to MSOP a corrective order, investigate and ensure compliance, and can fine MSOP for uncorrected violations.  (T. 4810-13 (Bornus).)

129.   MSOP is also licensed as a "supervised living facility" by the Minnesota Department of Health (MDH).  (T. 3336 (Johnston), 4650-51, 4675-76 (Richardson); 4814-19 (Bornus); DX 65; DX 433.)

130.   MDH regulates the physical plant of MSOP and ensures safe custodial conditions.  It ensures adequate health care, adequate maintenance of records, and adequate food service.  (T. 4650-51 (Richardson); 4814-19 (Bornus).)

131.   MSOP also receives oversight from the Hospital Review Board, an independent entity that meets with MSOP clients and hears complaints and grievances. The HRB considers those complaints and makes recommendations to MSOP. (T. 3338-39 (Johnston), 4675 (Richardson).)

132.   MSOP also is scrutinized by the Ombudsman for Mental Health and Developmental Disabilities, another independent entity that hears complaints and brings them to MSOP and public attention.  (T. 3339 (Johnston), 4654 (Richardson).)

133.   Clients can also lodge complaints with the MDH.  (T. 4654 (Richardson).)

134.   MSOP is also licensed for occupational and other health and fire safety regulations under OSHA and by the State Fire Marshal.  (DX 433; T. 4649 (Richardson).) In addition to MDH licensing, such rules ensure safe custodial conditions for MSOP clients.  (T. 3338 (Johnston).)

135.   MSOP also conducts internal audits of its programming: Staff from Moose Lake or St. Peter audit the other site on all aspects of the program, and provide feedback on any issue including facilities, programming, security, and delivery of treatment. MSOP also conducts quarterly reporting in all aspects of its programming to track progress and performance.  (T. 3339-40 (Johnston); DX 84; DX 85; DX 86; DX 87; DX 88; DX 89; DX 90; DX 91; DX 92; DX 93; DX 94; DX 95; DX 96; DX 97; DX98; DX 99; DX 100; DX 101.)

136.   All of these audits and independent reviews are in addition to the 2011 audit by the Office of the Legislative Auditor—which, though it never found any aspect falling below best practices, included some recommendations for improvement.  MSOP took the report very seriously and has addressed and improved many aspects of its overall

program based on the Legislative Auditor's recommendations.  (T. 3346-50; PX 184; DX 435; DX 30.)

137.  Plaintiffs have received appropriate sex offender treatment at MSOP. Because of the nature of sex offending, there simply cannot be a predetermined date whereby an individual will be safely released to the community; if this were the case, it is possible that many MSOP clients would elect not to engage and treatment and wait until the predetermined date to be released into the community, no less dangerous than when they were committed.

138.  Plaintiffs at suggest that initial intake procedures and assessments are inadequate based on the allegation that MSOP does not consider placing clients in later phases.  However, the testimony was that committed persons coming from MSOP's Department of Corrections program may begin in later phases based on the clinical judgment of admissions staff.  (T. 4008-09 (Hébert).)  To the extent most clients start in Phase I, MSOP's clinical director explained the importance of acclimating and embracing treatment (i.e., Phase I concepts), and that any client that demonstrates change appropriate for Phase II can quickly advance.  (T. 4008-09 (Hébert).)  Dr. Wilson agreed: "I'm a firm believer that everyone should be in Phase I for some period. There should be a process of orientation."  (T. 530-31.)

139.  Plaintiffs also suggest that initial intake procedures and assessments are inadequate because MSOP does not conduct a risk assessment to second-guess the legal

decision to commit by the committing court.  The Court questions the basis and logic for Plaintiffs' criticism.  For a client admitted to MSOP, a committing court would have within months made the judicial determination that the client met commitment criteria. For the named Plaintiffs, the testimony demonstrated that such decisions are based on (often multiple) independent risk assessments performed on behalf of the committing court.  (T. 1988-918 (Thuringer), 2856, 2880-82 (Foster); 3635-36 (Lonergan); DX 407; DX 408; DX 390; DX 102; DX 160; DX 189; DX 190; DX 223; DX 239; DX 260.)

140.    To the extent Plaintiffs' point to other states' practice to conduct a risk assessment on intake and cite the Rule 706 experts' recommendations, the Rule 706 experts who testified that their programs do risk assessments "upon initial commitment" were clear that they conduct those assessments in order to inform the committing court before it makes a decision, not after.  Specifically, Ms. McCulloch testified that potential committees "referred from Department of Corrections our evaluator in Department of Health Services can do an evaluation and disagree. And then the trial has that information and people then may or may not be committed. So our department has already done an evaluation before they come to us." (T. 57).  Dr. Freeman testified that her office conducts "all of the evaluations for individuals who are – for sex offenders who have a pending release date [from a criminal sentence] and need to be reviewed for civil management. So our office conducts all of the risk assessments. We make determinations as to who is appropriate to be placed in civil management." (T. 701).  It is unclear if the

Rule 706 experts appreciated this distinction when making their recommendations. Dr. Miner in fact described a system for his program that is very similar to Minnesota's civil commitment process—i.e., a court adjudicates a client to require treatment at his in-patient facility, and his program does *not* perform an intake risk assessment because the adjudicating court just conducted one for purposes of its order.  (T. 1181-82.)  Like with Dr. Miner's program, the Court finds that it would be obviously needless, redundant, and inefficient for MSOP staff to conduct another risk assessment for the purpose of second guessing a final legal determination made by the committing Court based on their own independent risk assessments.

141.    To the extent Plaintiffs suggest that a risk assessment is necessary to assess treatment needs, the evidence is clear that a committed client's risk assessment performed upon commitment is in fact integrated into the Sex Offender Assessment performed by MSOP upon commitment.  (DX 271; DX 391; DX 455.)  In the case of Plaintiff Foster, for example, two separate risk assessments conducted just four months from the date of Foster's initial intake assessment at MSOP were integrated into the analysis of his treatment needs at MSOP.  (T. 2885-86 (Foster); DX 271.)

142.    Plaintiffs also complained about consistency of Matrix scoring among MSOP clinicians.  Again, the Matrix factors are expressions of dynamic risk factors (based on research) that clients address through treatment and for which they are evaluated for progression through the program.

38

143.   Whatever reported problems existed regarding Matrix scoring were almost entirely based on MSOP's auditors' reports—which in 2013 complimented the development of the Matrix Scoring Guide and training that that was "well received" by staff.  The auditors stated that "[s]taff appear to be using a common language to describe client progress."  Mr. Haaven testified that clarity and application of Matrix factors has "significantly improved" since 2009 (DX 21, at 8; T. 4253 (Fox), Haaven Dep. 67:2 15.)

144.   MSOP witnesses for their part were consistent that quality-control mechanisms currently exist to ensure reasonably uniform Matrix scoring.  The Court heard evidence that clinical supervisors oversee scoring and ensure consistency across their teams.  (T. 3916-18 (Hébert), 4248-50, 4255-56 (Fox), 1361-62, 1377-78 (Elsen).)

145.   Core groups are co-facilitated so that clinicians' subjective impressions are checked.  (T. 3917-18, 4029-30 (Hébert), 4248-50 (Fox).)

146.   Peer review and collaboration, the Matrix Scoring Guide, and trainings ensure reasonable accuracy.  (T. 3916-37 (Hébert), 4248-52 (Fox), 1431-59 (Lewis); Persons Dep. 71:22-73:17, 123:18-126:21, 128:14-129:17.)

147.   The primary clinicians who testified at trial said that they do not have a problem with Matrix scoring.  (T. 1362 (Elsen); 1431-59 (Lewis).)

148.   Plaintiffs' complaint about "subjectivity" and "consistency" ignores the unavoidable need for and the importance of clinical judgment involved in assessing treatment progress.  (T. 4249-50 (Fox), 3906-07 (Hébert).)  The fact that the Matrix

factors were carefully devised to create a level of objectivity in clinical judgment of treatment progress is commendable. The majority of civil commitment programs in fact use no objective tools at all in measuring treatment progress; rather they rely purely on "subjective" clinical judgment. (T. 2268-69 (Cauley); PX 228. )

149. MSOP clinicians use clinical judgment when scoring on the Matrix. (T. 4252-53 (Fox).) There is no evidence of a single example where a client was not scored on the Matrix factors based on professional clinical judgment.

150. For the Plaintiffs that testified, their primary clinicians and treatment records explained and demonstrated accurate scoring. The Rule 706 experts, meanwhile, could not identify a person harmed by potential inconsistent scoring. (T. 90-95 (McCulloch), 515 (Wilson), 885 (Freeman), 1184 (Miner).) Moreover, hypothetical "inconsistent" scoring would certainly also cause *faster* progression for clients when the "inconsistency" is an unjustified *high* score. (T. 4252-53.) Plaintiffs' vague criticism over Matrix scoring comes nowhere near conscience-shocking conduct, even if it was perpetrated by Defendants and actually and concretely harmed Plaintiffs and their class.

151. Plaintiffs complain about the design of the Matrix factors and suggest that they are not consistent with best practices. But as described above, the Matrix factors were developed in accordance with the risk-needs-responsivity (RNR) model and the good-lives model, adjusted for a civil commitment setting. (T. 3899-906, 3918-22 (Hébert), 4227-28 (Fox); 2327 (Vietanen).)

40

152.    The design of the Matrix factors has been approved by the international experts including Mr. Haaven.  (Haaven Dep. 213:4 214:8; 219:9 17, 222:18 223:1.)

153.    The Rule 706 experts  stated in their report that "Matrix Factors [are] factors demonstrated in the literature as being worthy of consideration."  (PX 225, at 39.)

154.    The Matrix factors are merely simplified language adopted by MSOP to express what are clearly established in the research as dynamic risk factors for past sexual abusers.  (T.3899-07 (Hébert); 4227-30 (Fox).)

155.    The Matrix was developed by an outside expert in sex offender treatment and MSOP's clinical leadership to describe such research-based factors in a common, understandable way.  (T. 3899-07, 3918-22  (Hébert).)

156.    Ms. Hébert explained, and no evidence refutes, that civil-commitment programs all use these factors to guide treatment but communicate those factors differently.  (*Id*.)

157.    Ms. Hébert has in fact presented on the Matrix factors at nationwide conferences, and compared them to the myriad ways other programs implement the research.  (T. 3921-22.)

158.    The only expert in this case to outright disagree with the development of the Matrix factors was Plaintiffs' expert Dr. Cauley, who has no experience in developing, administering, or auditing a treatment program and has no knowledge of best practices on this issue.  (T. 2234-36, 2245, 2266 (Cauley).)

159.    Dr. Cauley's ambiguous concerns make little sense since he agreed with MSOP's program design as expressed in the Clinician's Guide and Theory Manual (formed around the Matrix), and his agreement that Matrix factors are based on current research.  (T. 2242, 2273-75.)

160.    Plaintiffs also criticize that the Matrix factors are applied to all MSOP clients.  This criticism also makes little sense because ITPs emphasize only those Matrix factors that are "areas of concern" for a given client.   (T. 1283; DX 103; DX 163; DX 191; DX 192; DX 194; DX 215; DX 216; DX 217; DX 225; DX 240; DX 263; DX 409; DX 439; DX 458; DX 484.)

161.    Clinicians use professional judgment in accommodating and considering each client's needs and capabilities and areas of concern when scoring on Matrix goals.  (T. 4046-48 (Hébert).)

162.    While each client would be scored on all factors—in addition to their areas of concern—those factors that are not a problem would be scored well.  (T. 3907-08, 4039-41 (Hébert), 1279 (Steiner).)

163.    MSOP staff also explained how they provide additional and individualized support in addressing Matrix factors for clients in the Alternative Program, or who have severe mental illness or high psychopathy.  (T. 4229-30 (Fox).)

164.   The risk factors that make up the Goal Matrix would inform any sex offender's future risk; there isn't a factor that MSOP can safely ignore in determining treatment progress.  (T. 3906-08, 4040-42, 4046-48 (Hébert).)

165.   Plaintiffs take issue with the psychiatric services at MSOP, but MSOP employs a full-time psychiatric nurse practitioner on site, and a full-time contract psychologist who takes referrals from the nurse practitioner, meets with clients, and coordinates treatment with primary therapists—all via telemedicine.   (T. 4069-72 (Hébert), 4212-13 (Fox).)  One treatment psychologist testified that psychiatric services are better at MSOP than private services offered in the community.  (T. 1978 (White).)

166.   MSOP administrators seek to recruit a full-time psychiatrist on site, and the Court heard testimony about general shortages of psychiatrists in the Midwest. (T. 340.) But clinicians testified that the psychiatric nurse practitioner and contract psychiatrist deliver adequate care.  (T. 4216-17 (Fox), 1479 (Ulrich).)

167.   There are no wait times for appointments or to receive medications.  If a client requests a psychiatrist, they see one.  (T. 4070-72 (Hébert); 4212-15 (Fox).)

168.   MSOP's auditors concluded that the current system for delivering psychiatric care, while not perfect, "appears to be working effectively."  (DX 21, at 9.)

169.   MSOP also hosts trainings on integration of psychiatry and sex offender treatment.  (T. 4071 (Hébert); 4215-16 (Fox).)

170.   Plaintiffs only cite the Rule 706 experts "concern" about psychiatric services, but the Rule 706 experts were clear that they had no knowledge of whether any actual client was not receiving necessary psychiatric care.  (T. 340 (McCulloch), T. 665 (Wilson), T. 1110, 1160 (Miner).)

171.   Plaintiffs testified that none of them need psychiatric care or medication. (T. 1840 (Bolte), 3561 (Karsjens).)

172.   Plaintiffs complain about a lack of phase progression and allege that rule violations are improperly used to inhibit clients' treatment progress.  The Court heard consistent testimony that progression from Phase I to Phase II is decided by a client's treatment team with approval from the clinical director.  (T. 1417-41 (Lewis), 4350-53 (Puffer).)

173.   Progression from Phase II to Phase III is made by a panel of clinical leadership, with consultation from other involved clinicians.  (T. 4246-48, 4262-64 (Fox), 4396-98 (Puffer), 1437-38 (Lewis).)

174.   Criteria for phase progression are outlined in MSOP's Progression Policy, and is also explained in the Clinician's Guide and Program Theory Manual.  (DX 7; DX 2; DX 4.)

175.   The Court heard testimony and many examples from clinicians about how they make exceptions to these criteria depending on an individual client's circumstances. (T. 1358 (Elsen), 1439, 1421 (Lewis).)

176.    MSOP's clinicians attested to the accuracy of MSOP's phase-progression process.  (T. 1440 (Lewis).)

177.    The evidence was uniform that phase-progression decisions are made based on clinical judgment.   (T. 4349-55 (Puffer); 3918-19 (Hébert), 4247, 4262-64 (Fox), 1417-40 (Lewis), 2324-26 (Vietanen); Persons Dep. 24:12 25:13; 74:4 24; 93:23-99:8; 119:23 120:19; 213:12 214:11.)

178.    Plaintiffs cite the MPET report that opined on the propriety of client placement, but the MPET concluded that "overall . . . MSOP has followed their policies with respect to appropriate phase placement."  (PX 48; T. 4100-03 (Hébert).)

179.    The MPET found that, of randomly selected patient files, 88 percent were appropriately placed.  The team found no improper placements for clients in Phases II and III.  (PX 48.)

180.    The MPET opined that six clients in Phase I should be in Phase II—a determination undoubtedly involving clinical judgment to which reasonable professionals could disagree—but regardless MSOP had within two months progressed four Phase I clients to Phase II independent of the MPET Team's review.  (T. 4101-04 (Hébert); PX 48; DX 26.)

181.    Plaintiffs themselves also alleged that they were arbitrarily moved back in treatment phase when Ms. Hébert overhauled the treatment program in 2008, but there is no evidence of this: witnesses with knowledge testified that they carefully assessed all

clients under the new program's criteria and placed them in phases based on professional clinical judgment.  (T. 3914-16, 3942-43 (Hébert), 4240-41 (Fox).)

182.    Plaintiffs also complain about "behavioral expectation reports" (BERs), which can reflect treatment progress because the unrefuted testimony was that refusal to follow rules is an important risk factor for sex offenders. (T. 3327 (Johnston), 4072-77 (Hébert); DX 4, at DEF01165554; DX 2 at DEF01198734-35.)   Plaintiffs offer no evidence that there BERs are systematically used as a pretextual tool to hold clients back.

183.    MSOP's Executive Director also discussed the clear importance of rule compliance to safety, security, and order at an institution like MSOP.   (T. 3294 (Johnston).)

184.    Safety and order is necessary to preserve a therapeutic environment. (T. 4075-79 (Hébert).)

185.    MSOP outlines BER policy to staff and shows how they are carefully used and can affect treatment.  (T. 3326-27 (Johnston); DX 48; DX 49.)

186.    MSOP "redirects" behavior without assigning BERs, assigns minor BERs when necessary, and assigns major BERs that serious affect the institution and a client's clinical progress.  (T. 3317-21 (Johnston); 4074-75 (Hébert); DX 48; DX 49.)

187.    An appeal process allows clients to be heard.  (T. 3320; DX 48; DX 49.) Plaintiffs have no evidence this policy is not followed.  Rather staff testified how they act consistent with the policy.  (T. 3326-27 (Johnston).)

188.   The testimony was consistent that recognition of BERs affect treatment progress only when based on clinical judgment.  (T. 4076-79 (Hébert), 592-94 (Berg), 4262 (Fox).)

189.   Plaintiffs complain that the policy provides that clients typically must abstain from major BERs for two quarters before advancement to Phase III, but MSOP's professionals testified to the clear clinical reasons for and reasonableness of such a policy.  (T. 4626-27 (Berg).)

190.   Clinical leadership described how they carefully consider BERs for purposes of phase progression from a clinical perspective, and make exceptions to the two-quarter expectation.  (T. 4343-48 (Puffer), 4260-61 (Fox), 4586-93 (Berg).)

191.   While Plaintiffs point to the Rule 706 experts' "concerns" about = BERs inhibiting phase progression, the Rule 706 experts' testimony in this regard is inexact and, according to them, was based entirely on unverified client reports.  (T. 643-51 (Wilson), 896-97 (Freeman).)

192.   Statistics also belie Plaintiffs' allegations that BERs are improperly used to hold clients back.  Notably, half of MSOP clients receive no BERs at all.  (T. 3321 (Hébert).)

193.   In the relevant time period there has been overall steady client progress through the program, with very few regressions.  (T. 3995-98; DX 13; DX 15; DX 17.)

194.    In 2013, just three clients regressed to Phase I (as opposed to 70 progressed to Phase II) and zero regressed to Phase II (as opposed to 13 progressed to Phase III). (DX. 16; T. 4081-84 (Hébert).)

195.    These statistics are consistent with MSOP witnesses' testimony that regressions happen "[v]ery infrequently" and only based on serious and unique circumstances and clinical judgment.  (T. 3325 (Johnston), 4241-43 (Fox).)

196.    The statistics are also consistent with other programs—which provide for phase regressions based on serious rule violations—including Rule 706 expert Deb McCulloch's own program in Wisconsin.  (T. 3323-25; DX 228.)

197.    Plaintiffs complain of clinical staffing levels, mainly at the Moose Lake campus.   The Court heard much testimony that staffing of qualified clinicians is a challenge for MSOP and other civil commitment programs.   (T. 3347-48 (Johnston), 4255-57 (Fox).)

198.    The Court also heard testimony of the efforts by MSOP administrators to recruit staff and develop monetary and professional incentives that have achieved clear results.  (T. 3893-95 (Hébert), 3347-48 (Johnston), 2316 (Vietanen), 4595-600 (Berg).)

199.    These improvements were noted by MSOP auditors in 2013: "Although Moose Lake is still understaffed, improvements in staffing patterns have [led] to greater stability among client's primary and group therapists."  (DX 21, at 5, 8-9.)

200. In 2011 there was a 33% clinical vacancy rate; in 2014 there was a 7% clinical vacancy rate. (T. 3348 (Hébert).)

201. Currently MSOP has a 15% clinical vacancy rate in Moose Lake, and a 10% clinical vacancy rate in St. Peter. (T. 4018 (Hébert), 4256-57 (Fox), 4594-95 (Berg).)

202. It is notable that MSOP has higher staff ratios per client than other programs. (T. 3889-90, 4017 (Hébert), 3349 (Johnston).)

203. MSOP has never cancelled programming based on staff vacancies at any time. (3347-48, 4257 (Fox), 4020-21 (Hébert).)

204. MSOP clinicians all testified that their caseloads were manageable. (T. 1973 (White), 4258 (Fox), 4342 (Puffer), 4594-600 (Berg).)

205. Plaintiffs argue that every time a new therapist is assigned, Matrix scores go down, but they was no actual evidence presented of this phenomenon. Rather quarterly reports for Plaintiffs Rud, Steiner, and Thuringer refuted this allegation. (T. 4390-93, 4399-401, 4404-06 (Puffer).)

206. Plaintiffs complain about record keeping based on a single internal MSOP email noting a need to improve data regarding dates of commitment and other data. MSOP's administrators however testified that any issues were clearly addressed and that records are accurate. (T. 3212-14 (Johnston); 4127-33 (Hébert).)

207.   MSOP's officials described the state-of-the-art record keeping system currently in place.  (T. 3888-89, 3891 (Hébert).)

208.   The only incorrect information in any Plaintiff record is a one year discrepancy in Plaintiff Karsjens data of birth noted on a quarterly report.  (T. 3514-15.)

209.   Plaintiffs argue that accreditation is necessary without explanation of what such accreditors (known as JACO and CARF) actually review, whether it would be suitable to MSOP, and whether it would be preferable to existing licensing and oversight described above.   But MSOP officials in fact reviewed Plaintiffs' demanded accreditations—which are designed for private hospitals—and determined that they do not "fit in terms of what a civil commitment program looks like and the individuals that we serve in civil commitment."   (T. 3341 (Johnston), 4819-23 (Bornus), 4092-95 (Hébert).)   Plaintiffs have no evidence to rebut that conclusion.   In fact, the evidence showed that most civil commitment programs are not accredited.   (T. 3333; PX 228.) And Mr. Haaven agreed that state licensing may be better suited than Plaintiffs' demanded accreditations, rejecting Plaintiffs' suggestion that accreditation would benefit MSOP: "No one has come up with an accreditation system for . . . programs specific to sex offenders, that are high intensity programs of this kind. . . . In fact, it would be a bit of a surprise if [MSOP] was [accredited], considering the difficulty in how you . . . pull that off." (Haaven Dep. 33:21-35:24.)

E.    PLAINTIFFS' TREATMENT AT MSOP.

210.    The named Plaintiffs themselves  have been afforded the opportunity to receive care consistent with best practices in sex-offender treatment.  As described below, whatever lack of progress through treatment programming that they complain of is clearly the result of their own behaviors and decisions notwithstanding the good-faith attempts by their clinical teams to provide them opportunities to address their offending behaviors and reduce risk.  At the very least, Plaintiffs demonstrate no decision or conduct by any MSOP official that is conscience shocking towards any of the named Plaintiffs.

211.    Plaintiff Kevin Karsjens continues to deny that he ever committed his several offenses. (T. 3434-82.)  He continues to claim that all of his victims lied, and that they engaged in a conspiracy against him through a Mille Lacs women's advocacy group. (T. 3436-70.)  He views himself as the victim when faced with his history of repeated sexual assault and violence.  (T. 3463-67.)

212.    Before being committed, Karsjens repeatedly refused treatment in and out of prison, including because prior programs wanted him to admit to and address his past offending cycle.  (T. 3477-82, 3488-90.)

213.    Karsjens believes that MSOP's goal should be to investigate his crimes and prove that he did not commit them. (T. 3483-84, 3504-05, 3622-23.)  He considers MSOP a Nazi concentration camp.  (T. 3530-31.)  He has threatened to kill MSOP staff if

the lawsuit doesn't go his way. (T. 3542-46; DX 436.)   He refuses to attend psychoeducational modules because he believes he already took the courses and does not need further work.  (T. 4377-78.)

214.   MSOP's clinical director described how Karsjens' thinking—extreme externalizing and denial of his offending—as indicative of a client needing continued work in Phase I.  (T. 3946-47 (Hébert).)  The Moose Lake clinical director testified that Karsjens' refusal to acknowledge any past offenses or behaviors requiring treatment inhibits treatment progress.  (T. 4379 (Puffer).)

215.   Notwithstanding the clear roadblocks to treating Karsjens, MSOP provides him with a treatment team and group and individual therapy.  (T. 3508.)  He receives a yearly individualized ITP and quarterly reports that document his progress in group and show his treatment team's work and professional judgment regarding his treatment in Phase I. (DX 104; DX 105; DX 106; DX 107; DX 108; DX 109; DX 103; DX 110; DX 111; PX 302-A; PX 302-B; PX 302-C.)   Karsjens' clinicians work with him to formulate treatment concepts into the framework of his strong religious beliefs. (T. 4375-80 (Puffer).)

216.   Like Karsjens, Plaintiff Peter Lonergan denies all prior sexual offenses (except he admits one may have happened while he was intoxicated).  (T. 3627-44; DX 160.)  He believes he should have never been committed.  (T. 3669-70, 3701.)  He denies his pedophilia diagnosis and that he is attracted to children (though he has stated

he is attracted to "innocence, which unfortunately comes with children").  (T. 3643-44, 3708-09, 3711-14.)   He denies his diagnosis of alcohol and substance dependency. (T. 3732.)

217.   While in prison Lonergan did not attend sex offender treatment. (T. 3658-59.)  He testified that he has no interest in change. (T. 3747.)  He believes that clients that have advanced to Phase III and provisional discharge are "phony" and "sick." (T. 3748-50.)  Lonergan's complaint with MSOP treatment is that they should investigate and determine that his commitment was unlawful.  (T. 3701-02.)

218.   Lonergan's behavior at MSOP has been marked by falling outs with two therapists, complaints against an assessor based on his pedophilia diagnosis that caused her to leave MSOP, and verbal abuse of MSOP staff and threats.  (3716-27; DX 173.)  He has had periods where he did not attend group therapy.  (T. 3770-71.)  He has also had major rule violations. (T. 3782.)  Lonergan testified that he pays no heed to his treatment plans and reports, and that the risk factors identified for him—e.g., self-monitoring, attitude to change—are "not legitimate." (T. 3735-36.)

219.   MSOP's clinical director described how Lonergan's testimony is indicative of a client needing more work in Phase I.  (T. 3946-47.)   And Lonergan's treatment records observe and he does not dispute "that managing his emotions and a pattern of presenting himself as a victim of the system are the primary barriers of completing Phase I."  (T. 3731-35, 3779; DX 163.)

220.    Despite these issues, Lonergan calls his primary therapist a "great clinician." (T. 3736.)  His ITPs and quarterly reports show individualized treatment and professional judgment exercised by his treatment team.  (T. 3731-36; DX 163; DX 437; DX 169, DX 164; DX 165; DX 166; DX 167; DX 168; DX 171.)

221.    There is no evidence that Plaintiff James Rud does not receive the opportunity to attend and receive individualized sex offender treatment in accordance with best practices.  While in prison Rud participated in treatment but wasn't engaged because he "was forced to do treatment" and he also "consistently had pornographic and pedophile-related materials in his possession."  (T. 3812-13.)  He believes he had not completed any treatment before commitment and didn't have any interest in doing so when he was committed.  (T. 3815.)  However, unlike other Plaintiffs, he admits that he was a significant risk to re-offend when committed.  (T. 3817.)

222.    Rud's treatment records and testimony reveal that he has received significant individualized treatment by MSOP clinicians.  (DX 192, DX 198, DX 191; DX 195; DX 196; DX 200; DX-197; DX 194; DX 200; DX 443: DX 199.)

223.    Rud was in Phase I for two years, and now is in Phase II. (T. 3823.)  He contributed to and agreed with the formulation of his ITPs and identified Matrix factors (e.g., system stancing, secretive behavior), and both he and his treatment team agree that he has improved on those issues.  (T. 3821-23.)  Rud participates in group therapy and works well with his primary therapist, who he claims encourages him to participate and

54

advance in treatment. (T. 3841-43.)  Rud testified to helpful sessions with his treatment psychologist (in addition to core group and sessions with his primary therapist). (T. 3827-28.)  Rud agrees that his ITP's currently identified risk factors are relevant to him, and is working on the action plans identified by his treatment team.  (T. 3826, 3835-36.)  Rud has had the same therapist for over a year and a half.  (T. 3824.)  Rud and his treatment team agree that in Phase II he has gained insight into his offense patterns. (T. 3806-11, 3824.)

224.   Rud also agrees that he needs to work on action plans identified by his treatment team to address his goals further.  (T. 3826-27.)  Moose Lake's clinical director testified that Rud needs to come to terms and address his disputes and difficulties with his documented offending history.  (T. 4387-89 (Puffer).)

225.   There is no evidence that Plaintiff Craig Bolte does not receive the opportunity to attend and receive individualized sex offender treatment in accordance with best practices.  Before commitment Bolte failed to complete three different in-patient treatment programs, including for refusing to complete assignments, threatening staff, dishonesty, harassment, refusing to follow rules, and engaging in grooming behavior towards peers and staff.  (T. 1718-19; PX 300-M. at 1-17.)

226.   Bolte disagrees that he ever posed a risk and he denies nearly all of the many past sexual behaviors and assaultive conduct documented in his commitment order, including many offenses that he previously admitted to but that he now says he lied about

to get through past treatment programming.  Bolte disagrees with his diagnosis of paraphilia.  (T. 1771-74, 1790.)

227.   Within a year of being committed to MSOP, Bolte assaulted staff and was sent back to prison for several months.  (T. 1721, 1726, 1800.)  Bolte returned to MSOP, but then in 2014 assaulted another client and was sent back to prison.  (T. 1727-28, 1801-03.)  Bolte testified that these prison terms would have disrupted his treatment "if [MSOP] was a real treatment program."  (T. 1801-02.)  Bolte also indicated that he only participated in treatment at all because he had prison "hanging over [his] head" if he did not.  (T. 1796.)

228.   In addition to his convictions, Bolte's time at MSOP has been plagued by major rule violations including for disorderly conduct and sexual misbehavior. (PX-300-C; 300-D; PX 300-E; PX 300-F; T. 1741-42.)   Bolte explains his refusal to follow rules by saying that he must "maintain [his] social status, [his] standing, [his] reputation."  (T. 1731-32.)   He also believes he can violate rules that he thinks are "counter-therapeutic."  (T. 1731-32, 1824-26.)

229.   Bolte's sincerity towards change is further questioned by his statements that he would stop participating in treatment once the execution of a prison sentence was not contingent such participation.  (T. 1797 (Bolte), 2353 (Vietanen).)

230.   Bolte's past ITPs are clear that rule and supervision compliance is a major risk factor that he needs to address, yet he continued to engage in serious rule violations. (PX 300-H; PX 300-I; PX 300J; PX 300-K; PX 300-L; PX 300-P; T. 1746-60, 1826-27.)

231.   Bolte could not deny cooperation with rules and supervision as a Matrix factor and did not deny that reasonable compliance with rules was something he could achieve if he wanted to.  (T. 1828-30.)

232.   The Moose Lake Clinical Director testified to Bolte's refusals to address and make progress on his attitude to change and treatment, emotional and behavioral regulation, rule compliance, and his sexual offense history.  (T. 4360-65 (Puffer).)

233.   Nevertheless, MSOP progressed Bolte to Phase II based on treatment gains made until 2012, and he was not moved back to Phase I because of his 2014 assault. (T. 1770, 1803-04.)

234.   Bolte's ITPs and treatment reports demonstrate individualized treatment. (T. 1784-PP; PX 300-O; DX 217; DX 215; DX 219; DX 220; DX 212; DX 214; DX 221.)

235.   Bolte believes that his therapist wants him to succeed, involves him in determining his needs, is the "best he ever had," and is a "very good clinician." (T. 1783-87, 1795.)

236.    Bolte can attend group therapy, and has received individual sessions from his therapist and treatment psychologists when he refused to attend.  (T. 1791-92 (Bolte), 2346 (Vietanen).)

237.    Bolte agrees with the Matrix factors assigned to him as areas of concern. (T. 1832-35.)

238.    There is no evidence that Plaintiff Bradley Foster does not receive the opportunity to attend and receive individualized sex offender treatment in accordance with best practices.  Foster has a history of denying responsibility for his behavior and at trial continued to downplay or deny his offenses and behavior that led to his commitment; he believes that he never needed treatment at MSOP.  (T. 2855-78; T. 2883-84.)

239.    Foster was assessed for treatment needs upon admission to MSOP. (T. 2885-87; DX 271.)  Foster moved quickly to Phase II but in 2011 was caught hiding and distributing pornography within MSOP.  (T. 2887-89; DX 270; PX 379, PX 381, PX 382; PX 383.)  His treatment team decided that his behavior required that he be properly placed back in Phase I.  (T. 2889)  Foster admits that he reacted to the incident by verbally abusing staff and that other life events resulted in a lack of treatment progress, but that since improved and he progressed in 2013 to Phase II.  (T. 2893-97.) Foster testified to, and his treatment records reflect, real treatment progress he has achieved at MSOP since then.  (T. 2896-98; DX 264; 265; 267.)

240.   Both Foster and his primary therapist testified that his treatment team has worked hard with him to address his offense history and develop a relapse-prevention plan, which are important aspects of Phase II.  (T. 1428-1433 (Lewis).)  Foster's therapist testified, and Foster agreed, that she receives input from Foster and has identified what he needs to do to advance to Phase III.  (T. 1433-40; 2900-02, 2919.)

241.   Foster receives individualized treatment planning and reporting on his progress.  (T. 4366-70 (Puffer); DX 263; DX 268.)

242.   Foster's therapist believes he is ready for Phase III, but Foster testified that he has not participated in treatment during the lawsuit and does not want to advance to Phase III in St. Peter (because it is farther away from his family).  (T. 2902, 2906, 2920-22.)

243.   Foster also won't participate in the polygraph process because he claims his polygrapher caused deception in prior examinations.  (T. 4371-72 (Puffer), 2902-04 (Foster).)

244.   Foster, however, agrees that his treatment team has forged a positive relationship with him.  (T. 2918.)

245.   There is no evidence that Plaintiff Christopher Thuringer does not receive the opportunity to attend and receive individualized sex offender treatment in accordance with best practices. Thuringer testified that, at the time of his commitment, he in fact did

not believe that he needed sex offender treatment, and that MSOP should have given him "credit" for his past treatment and immediately advanced him to Phase III.  (T. 1911-26.)

246.   Thuringer's demand for "credit" is odd because Thuringer had been kicked out of his previous treatment program for being "chronically dishonest" and carrying on a secretive relationship with an ex-girlfriend involved in prior offenses, and he possessed child pornography after his discharge from that program and then agreed he needed commitment.  (T. 1879-85, 1910-16, 1922-24, 1958-61.)

247.   Thuringer had also always refused treatment unless subject to court order or threats of prison time.  (T. 1885-88.)

248.   Thuringer's testimony and treatment records show that he needed to engage in treatment groups and assignments to demonstrate treatment concepts, but that he became frustrated that MSOP didn't abide by his demand for credit and he quit treatment in 2011.  (T. 1875-78, 1924-26.)

249.   A comprehensive assessment of his treatment needs identified that Thuringer would face difficulties with demanding such credit.  (T. 1917-21; DX 391.)

250.   Thuringer agreed that quitting prevented him from addressing important treatment areas for which he needed improvement.  (T. 1924-28.)

251.   Despite quitting, Thuringer testified that MSOP clinicians continue to meet with and encourage him to engage in treatment, hold meetings about his progress that he

doesn't show up to, and provide him with detailed quarterly reports and descriptions of specific goals.  (T. 1929-41; DX 243, DX 244; DX 241; DX 242.)

252.   Thuringer is given every opportunity to meaningfully engage in treatment and work to reduce his risk to re-offend.  (T. 4401-04 (Puffer).)  He chooses to not participate and advance because it will "look good on paper" for MSOP.  (T. 1932-34.)

253.   There is no evidence that Plaintiff Dennis Steiner does not receive the opportunity to attend and receive individualized sex offender treatment in accordance with best practices.

254.   Treatment records described Steiner's progress and commitment to treatment over the years as inconsistent, and Steiner admits that he held negative attitudes toward treatment during most of his time at MSOP.  (T. 1230-38.)

255.   Steiner dropped out of treatment at one time, and his clinicians placed him in a special program to address issues relating to negative thinking.  (T. 1238-40, 1242-43.)

256.   Steiner also engaged in various misconduct while at MSOP related to fraud, sexual misbehavior, and contraband possession.  (DX 345, at 00897020-23.)

257.   After completing assigned special programming, Steiner's clinicians placed him in Phase I in 2008.  (T. 1240 (Steiner), 4239-40 (Fox).)

258.   In March 2013 Steiner moved to Phase II, and has since continued to improve his Matrix scores.  (T. 1244-52, 1281.)

259.   Treatment records show how Steiner received individualized scoring and reports about his progress, received group therapy and assignments, attended periodic meetings to address treatment issues, and received ITPs that highlight his relevant Matrix factors and action plans to address them.   (T. 1243, 1278-89; PX 306-H; DX 224; DX 225; DX 225; DX 227; DX 229; DX 389; DX 444.)

260.   Steiner's primary therapist Darci Lewis attested to the individualization and clinical judgment that goes into his treatment.  (T. 1420-36.)

261.   Steiner identified and agrees with the Matrix goals identified in his ITP. (T. 1282, 1284-85.)   Steiner agrees that his treatment plans are personalized to him. (T. 1290.)  Steiner does not claim to have been denied group therapy, and agrees that his treatment team recognizes his progress. (T. 1277.)   Steiner believes his clinicians are trying to advance him through treatment so he can be discharged, and that they use professional judgment in providing treatment.   (1277-78.)   Steiner believes his Matrix scores are fair and correct.  (T. 1282, 1286.)

262.   Steiner testified to his understanding of his offending cycle, triggers, and sexuality, (T. 1273-74,) however he struggled in understanding his attraction to minors and his current risk.  (T. 1306-11.)  Nevertheless, his therapist testified to his recent gains in understanding his offending cycle, and that she supports him for progression to Phase III.  (T. 1435-40.)   Steiner confirmed that he is currently awaiting a panel to

proceed to Phase III, for which his therapist has prepared him.  (T. 1252-43, 1284, 1288-89 (Steiner), 1436 (Lewis), 4396-97 (Puffer).)

263.   Moose Lake's clinical director testified to Steiner's previous struggles but that he has met with him and explained what Steiner would have to do for advancement. (T. 4398 (Puffer).)  MSOP's clinical director testified that Steiner's testimony indicated someone ready for Phase III:

> And Mr. Steiner, I think, is a really good example of someone who has figured out a lot of things and he's moved into that later Phase II, maybe even Phase III in that process. He was very clearly -- he spoke really differently about his need for treatment and his behavior and what his issues are, profoundly different from someone in Phase I.
>
> And that doesn't mean to say that clients in Phase I can't get to that place. I don't want to sound like Mr. Karsjens and Mr. Lonergan can't get to Phase II, but I think that it's pretty clear the way they spoke that their presentation is consistent with someone at that stage of change.

(T. 3946 (Hébert).)

264.   Steiner also is expecting the Judicial Appeal Panel to grant a pending unopposed petition for transfer to CPS.  (T. 1265.)

265.   Plaintiffs presented no evidence concerning the sex-offender treatment afforded to Plaintiffs Gamble, DeVillion, Noyer, Barber, Braun, Daywitt, or Hausfeld.

266.   Plaintiffs called Eric Terhaar in their case in chief, who was the juvenile-only offender that the Rule 706 experts identified in July 2014 as someone who they believed could be subject to discharge.  Whether Plaintiffs allege that Terhaar's

treatment was inadequate is unclear. Terhaar's treatment records demonstrate individualized treatment provided by a team of professionals at MSOP. (DX 404, DX 405; DX 406; PX 359; PX 360; PX 361; PX 363; PX 364; PX 365.)

267.    While at MSOP, Terhaar refused to address his risk factors relating to rule compliance and emotional regulation until recently, and his treatment team created an individualized plan to help him address those issues. (T. 2000-04.) While at MSOP Terhaar engaged in five separate assaults on staff and peers, possession of drugs and making alcohol, making threats, and abuse and harassment. (T. 2054-77; DX 393; DX 394; DX 395; DX 396; DX 397; DX 398; DX 399; DX 400; DX 401; DX 403.)

268.    Terhaar believes that he now understands his need to avoid rule breaking and follow supervision, and is violating less rules following his recent transfer to CPS. (T. 2031.)

269.    MSOP staff testified that, while Terhaar has continued issues with rule breaking and engaging in treatment and reintegration, his behavior has improved and staff are working with him to enhance his reintegration skills for a possible provisional discharge or discharge. (T. 4534-46 (Barbo).)

270.    Terhaar believes he has made much progress on risk factors related to attitude to change, pro-social problem solving, and emotional regulation. (T. 2090-91.)

271.    However Terhaar still deflects responsibility for his behaviors or past offenses. (T. 2068.) He refuses to engage in family therapy that MSOP wants to

facilitate with him, and he refuses to sit for polygraphs related to rule compliance. (T. 3286-87.)  He also agrees that his more recent good behavior is what his clinicians have been trying to get him to do since his commitment.  (T. 2101-02.)

272.   Plaintiffs called Matthew Manahl, an Alternative Program client, as a witness during their case-in-chief.  (T. 2613-51.)  Manahl and St. Peter's clinical director both described how he was placed in Phase III under the new program but was then moved back to Phase II based on clear problems with identifying and addressing his sexual triggers.  (T. 2616-20 (Manahl), 4243-46 (Fox).)

273.   Manahl's testimony and records showed how he worked on his issues through a module course and journaling, was given a modified polygraph that removed problem areas, and he advanced back to Phase III.  (T. 2620-25, 2631-32 (Manahl), 4243-46 (Fox); DX 409; .)

274.   Manahl explained a good understanding of the Matrix factors, describing how the Matrix factors apply to the Alternative Program but "there's different things that they do in that program" to assist him.  (T. 2627.)  Manahl said he knows what he needs to do to advance and he achieves high Matrix scores.  (T. 2627, 2634-35.)  Manahl was provided training and education to help him with reading and writing.  (T. 2636.)  Manahl testified that his treatment team and the Alternative Program helped him work around his reading and writing issues.  (T. 2644 (Manahl), T. 4243-46 (Fox).)  Manahl agrees with

his specific Matrix factors that he worked on with his treatment team.  (T. 2646.)  He said his treatment team helps him improve on his Matrix scores.  (T. 2648.)

275.    Client Jason Hayzlett and Wayne Nicolaison also testified.  Hayzlett denies he has a sexual disorder and denies he has committed sexual offenses, and refuses to participate in treatment for such offenses. (T. 5048-50; DX 480, DX 483.)   Though he refuses to participate, his treatment team holds meetings in which he will not attend and issues reports addressing his progress and status. (T. 5054.)  His treatment team would meet with him weekly for individual sessions to try to accommodate his refusals. (T. 5080.) His treatment records, ITPs, and progress notes indicate his treatment team's attempts to work with him and address his treatment needs.  (DX 479; DX 484, DX 485; T. 5062.)

276.    Nicolaison similarly refuses to participate in treatment, and denies most of his offending history.   (T. 4933.)    He firmly believes that his commitment is unconstitutional and therefore MSOP is a sham. (T. 4933.)   Nicolaison still receives an ITP from his treatment team that attempts to identify his treatment needs and action plans.  (T. 4941-97; DX 458; DX 459; DX 460; DX 461; DX 462; DX 463; DX 464; DX 465; DX 466; DX 467; DX 468; DX 469; DX 470.)   Nicolaison believes there is nothing for him to work on.  (T. 4945.)

### F.   MSOP CONDITIONS AND FACILITIES.

277.   The fourth issue identified for the first phase of trial is "whether confinement is tantamount to unconstitutional punitive detention."  This issue concerns the conditions at MSOP and whether they are designed to punish Plaintiffs and MSOP clients.

278.   The MSOP operates facilities at Moose Lake and St. Peter.  St. Peter has both a secure facility and a residential unit outside the secure perimeter for clients in Community Preparation Services ("CPS").  (T. 3299-309 (Johnston).)

279.   The Moose Lake facility serves clients (a) who are subject to a judicial hold order, i.e., have not yet been indeterminately civilly committed; (b) who are in the early stages of treatment; or (c) those clients who refuse treatment.  (T. 3306 (Johnston)).  Clients at Moose Lake are in either Phase One or Two of treatment.  (T. 4334 (Puffer)).

280.   The Rule 706 experts observed that the Moose Lake facility "is not unlike some other SOCC facilities, but, in contrast, it is much bigger and has larger units than many other facilities."  (PX 225, at 50.)

281.   The Moose Lake facility is well lit with natural light, features adequate furniture and amenities, telephone access and voice-messaging systems, access to computers, and social-gathering places.  Client room space and furniture is adequate and property limitations are in line with other programs.  The hallways are wide and decorated with artworks made by clients in the workshop.  (T. 3299-309 (Johnston).)

The Rule 706 experts opined that "[t]he facility, grounds, and outdoor spaces at Moose Lake are clean, well maintained, and abundant.  The open common areas of the facility have the appearance and relative feel of a 'community college.'" (PX 225, at 50-51.)

282.   The Rule 706 experts also stated that MSOP staff have "made efforts to reduce the institutional feel of the environment," and have succeeded in doing so. (PX 225, at 51.).  Moose Lake clients have the option to wear electronic monitoring devices, which allows for the relatively greater open movement throughout the facility. (T. 3299-309 (Johnston); PX 225.)

283.   Moose Lake clients have access to several large outdoor spaces for recreation and other activities, including music rooms, craft area, game room, full indoor gym and fitness area, and other areas for vocational and recreational programming. (T. 3299-309 (Johnston); PX 225, at 52).

284.   MSOP offers a wealth of vocational, educational, and recreational opportunities to its clients.  (T. 3299-309 (Johnston).)  The Rule 706 experts opined that this programming is the best in the nation and the envy of other sex offender civil commitment programs. (PX 225, at 46).

285.   Clients who agree to electronic monitoring gain access to "relatively greater open movement throughout the [Moose Lake] facility."   (PX 225, at 51; T. 3306-07 (Johnston).)

286.   Two hundred twenty-one MSOP clients reside inside the secure perimeter at the St. Peter facility.   The St. Peter facility is primarily for clients in later stages in treatment—clients with demonstrated behavioral management, emotional regulation, and engagement with treatment.   The St. Peter facility also houses clients with intellectual disabilities and other special needs, including those at earlier stages of treatment. (T. 3299-309 (Johnston), 4209-11 (Fox).)

287.   The Rule 706 experts found the St. Peter facility to be pleasant and "resembl[ing] a state mental health or forensic hospital."   (PX 225, at 42).   Client rooms at St. Peter provide adequate space and a positive environment.   (PX 225, at 43).   Most rooms include windows and clients "are provided with adequate supplies to maintain activities of daily living and grooming."   (PX 225, at 43).   MSOP provides clients with "homelike amenities" that include social spaces, entertainment equipment, supplies for leisure activities, comfortable furniture, and plants.   (PX 225, at 43).

288.   The St. Peter facility offers vocational, work, recreation, education, and library services that are excellent; the Court's own experts described them as "more than adequate," along with "a nicely remodeled food service area, leisure activities, and supplies for indoor and outdoor activities and recreation."   (PX 225, at 43; T. 4258-59 (Fox)).   There is a large yard between the Pexton and Shantz buildings where clients can engage in gardening and recreational activities.   (T. 2639 (Manahl)).

69

289.    Phase III clients, who reside at St. Peter, are able to walk outside the secure perimeter on the St. Peter campus, accompanied by staff.  (T. 2642).  They also enjoy community outing privileges, which includes recreational and shopping outings to St. Peter and Mankato.  (2642-43 (Manahl)).  In the words of one client, Matthew Manahl, the purpose of these outings is to reintegrate clients "so you can learn how to maintain and keep yourself safe from others."  (T. 2643).

290.    Phase III clients are not subject to unclothed visual body searches or restraints when leaving the facility.  (T. 2643-44; 4211 (Fox)).  They also receive an additional storage bin for their personal items.  (T. 2644 (Manahl)).

291.    CPS is a home-like setting located in St. Peter, Minnesota, and outside MSOP's secure perimeter.  The building is unlocked and has several entrances and exits. CPS clients with community privileges participate in supervised therapeutic outings, including support groups, volunteer opportunities, and special events consistent with treatment goals.  (T. 3307-08; 3285 (Johnston); 4469-79 (Barbo).)

292.    Clients in CPS have three steps of privileges, which respectively focus on acclimation, reintegration, and provisional discharge planning.  CPS provides MSOP clients with greater independence and increased ability to practice self-direction and self-management in a less restricted setting.  (T. 4474-99 (Barbo); DX 446.)  The Court agrees with its own experts who concluded that:

> The residential and program areas for clients in CPS are pleasant and as home-like as most community-based residential facilities or group homes. The furniture, décor, environment, unit amenities, and outdoor spaces are comparatively outstanding. The kitchen facilities, common areas, and access to personal property are beyond adequate.

(DX 225, at 45.)

293. MSOP has worked to arrange contracts with about fifteen outside housing and treatment providers who can serve clients on provisional discharge. (T. 4520-21 (Barbo)). Through provisional discharge planning, clients who petition for provisional discharge can identify these or other facilities as appropriate to meet their needs as they transition to the community. (T. 4523-24 (Barbo)). Provisionally discharged clients' needs are "assessed on an individual basis . . . The goal is, of course, to always strive for as independent an environment as possible with the most autonomy that is safe for the client, as well as provides for public safety." (T. 4524 (Barbo).)

294. MSOP's auditors—who have visited MSOP and prepared annual reports since 2006—conclude that MSOP's operations are "within the standard of care for programs of this nature," and that they "continue[] to be impressed with the range of services offered by recreational, therapy, education, and vocational services," which are "an important part of therapeutic programming." DX 21 at pp. 1, 7. One of the auditors, Mr. Haaven, testified that there is "a softening of the [MSOP] environment to make it more therapeutic," and that although "security staff have their primary role as security . . . there's a therapeutic component to what they're doing." James Haaven Depo. at

pp. 50-51.  This Court's own experts have testified consistent with the three auditors'

reports and Mr. Haaven's testimony, and the Court has no reason to disagree with any of

their conclusions.

295.   Not only do MSOP's facilities meet or exceed standards for sex offender

civil commitment programs, but the record reflects that MSOP's policies related to

conditions are standard and MSOP does a good job balancing the needs of safety and

security with the fostering of a therapeutic environment.  Indeed, the Rule 706 Experts

found that:

> For the most part, MSOP administration and staff at Moose Lake and St.
> Peter maintains reasonable policies and practices that balance security with
> promotion of a therapeutic environment. Developing and maintaining a
> culture that balances safety concerns and a therapeutic environment is a
> difficult challenge that often involves compromise among departments with
> different perspectives. It is particularly challenging in large institutions that
> serve diverse populations, like Moose Lake. The MSOP does a fairly good
> job of this, while striving for continuous improvements. The MSOP
> program's rules, policies and practices with regard to mail, movement,
> searches, property and phones are mostly standard in comparison to other
> SOCC programs and institutions.

(*Id.* at 57).  Deb McCulloch, to whom the other 706 experts deferred on policy and

conditions of confinement questions, (T. 627-28 (Wilson); 871-76 (Freeman); 1172-73

(Miner)),  testified that she had no problems with policies governing searches, movement,

and other conditions at MSOP.  (T. 307-11, 321-22, 324-26); DX 24-29; 35-37).  She

recognized that MSOP does a good job of balancing security and treatment.  (T. 303-05).

She opined that MSOP's conditions are designed to create a safe and secure environment

rather than to punish clients, and that she had no evidence of MSOP staff malice or intent to punish clients.  (T. 329-30).

296.   MSOP policies are reasonable and standard for sex offender civil commitment programs.  There being no evidence presented to the contrary, the Court finds that MSOP leadership and staff exercise their professional judgment in good faith to balance the needs of safety and security.

297.   Specifically, MSOP policies are the product of work performed by its Policy Committee, which represent clinical, safety, security, and administration.  The Policy Committee conducts annual reviews of every policy.

298.   MSOP Policy development and review follow a standard process for creating, reviewing, and revising MSOP policies and procedures.  This process is followed closely for every policy executed at MSOP, which means that every policy at MSOP is carefully written, considered, balanced, and reviewed by professionals and experts in treatment, safety and security, rehabilitation services, and other appropriate disciplines.

299.   The Policy Committee includes but is not limited to the Program Policy and Compliance Director, Deputy Director, Associate Clinical Director, Administrative Services Director, Reintegration Director, Office of Special Investigations Director, Special Projects Director, facility directors, Legal and Records Director, and Staff Development Manager.  The Policy Committee assigns a drafting committee chair for

every policy.  This chair coordinates and leads a drafting team for their policies and conducts the yearly review for each policy.

300.    The drafting committee chair is considered the content expert for the identified topic, but the Policy Development and Maintenance Policy requires them to consult with the following areas/staff for every policy review or provide written justification why they did not need to provide input:  Records Management, Staff Development, Legal, Financial Services, Health Services, Information Technology, Human Resources, Security Committee, Clinical, Plant Management, Office of Special Investigations (OSI), Client Rights Coordinators, and Reintegration.

301.    The drafting committee can review the policy by email or through in person meetings.  Once they have a final draft, the drafting chair sends it to the Program Policy and Compliance Director who puts it on the policy committee agenda.  The policy committee meets weekly unless there is a holiday or other event where a large number of staff may be absent.  The Program Policy and Compliance Director ensures that there is always a clinical director, manager, or supervisor in attendance at all policy committee meetings.

302.    The policy committee then reviews the new policy or proposed changes to an existing policy, ensuring that it is clear and does not conflict with other policies; is consistent with MSOP's mission, vision, and values; is supportive of a therapeutic environment while ensuring the safety of clients, staff, and the public; and is consistent

with the expectations of applicable rules and statues.  The policy committee is authorized to make changes to the drafting team's proposal to ensure it meets all those criteria. Once the policy committee has reviewed and approved a policy, the Program Policy and Compliance Director sends it to the MSOP Executive Director or designee for final approval. (T. 3236-38 (Johnston), 4643-47 (Richardson), 4609-13 (Berg); DX 35.)

303.   The Rule 706 experts and Mr. Haaven consistently found that double occupancy rooms – what Plaintiffs have referred to as "double bunking" – is reasonable and not uncommon for secure civil-commitment facility.   (T. 380-81 (McCulloch); Haaven Dep. 239:15-140:10.)

304.   The Rule 706 experts approved of MSOP's monitoring and movement policies. (T. 321 (McCulloch), 3306-07 (Johnston); DX 37.)

305.   MSOP's visitation policies are reasonable and constitutional.   Visiting hours are seven days per week, and the visitation policy appropriately puts limited restrictions on visitation, including by persons with arrest warrants, where a no contact order prohibits contact, or when a person is excluded based on individual applicable clinical reasons.  (T. 324 (McCulloch); DX 40; DX 41.)

306.   MSOP's search and restraints policies are appropriate and the product of appropriate professional judgment.  Evidence of this includes the fact that the searches and restraints become less restrictive as clients progress in treatment, e.g., clients with privileges outside the secure perimeter are not subject to unclothed visual body searches

when they enter or exit the secure perimeter.  Pat searches and room searches are necessary to ensure security and safety in the facility.  (T. 306-08 (McCulloch); DX 44; DX 45; DX 46; DX 47.)

307.   MSOP policies involving communications, media, and personal property are appropriate and the product of professional judgment.  Such policies are also standard among sex offender civil commitment facilities and MSOP's policies do not materially differ from the policies at other facilities.  Surveillance of mail and telephone calls are necessary and appropriate to maintain security and safety within the facility.  Regular client mail is subject to search prior to being given to the client, and privileged legal mail is only opened and scanned for contraband in front of the client.  Media policies are more than appropriate.  Clients are subject to appropriate property limits and limitations on the media they may possess to foster a therapeutic environment.  (T. 309-24 (McCulloch), 3331-32, 3341-44 (Johnston); DX 36; DX 43; DX 51, DX 52; DX 54; DX 55; DX 56; DX 57.)

308.   MSOP's use of behavioral expectation reports ("BERs") is appropriate and consistent with sound professional judgment.  Such policies are also standard among sex offender civil commitment facilities and MSOP's policy does not materially differ from the policies at other facilities.  (T. 311-13 (McCulloch); DX 48; DX 49.)

309.   Clients who receive BERs receive a process for challenging them. For "major" BERs, clients may appear before a panel consisting of program representatives,

who were not involved in the original incident, which reviews facts, may interview witnesses, determines whether the behavior occurred, and what restrictions, if any, to impose. (T. 3315-23 (Johnston; DX 48; DX 49; DX 175.)

310.    MSOP's high security area ("HSA") policy and use is appropriate and the product of professional judgment related to therapy, safety, and security.  Such policies are also standard among sex offender civil commitment facilities and MSOP's policy does not materially differ from the policies at other facilities.  Clients are only in the HSA for as long as is necessary and are afforded timely reviews of their placement.  The Court's experts and Plaintiffs have not identified a single inappropriate use of the HSA. (T. 3327-31 (Johnston); DX 50.)

311.    Plaintiffs are afforded significant freedom as it relates to spiritual practices. MSOP clients may possess and use individual and group spiritual items, and spiritual groups may hold one spiritual group meal per year.  MSOP supports spiritual practices through a Volunteer Services Coordinator who receives requests and schedules ceremonies and events.   Any restriction on the ability to practice their religion is grounded in institutional safety and security.  (T. 308-10 (McCulloch); DX 42; DX 53.)

## CONCLUSIONS OF LAW

312.    The parties agreed that issues selected by the Court for the completed first phase of trial concerned Counts I, II, III, IV, V, VI, VII, and XI of Plaintiffs' Third

Amended Complaint.  (Doc. 635; T. 5310-12.)  These counts attack chapter 253D as well as actions and conduct executed by Defendants in executing their responsibilities.

313.   Plaintiffs' theory that strict scrutiny applies to their claims is incorrect. Substantive due process extends strict scrutiny only "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"  *Glucksberg*, 521 U.S. at 720-21 (quoting *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (plurality opinion); *Palko v. Connecticut*, 302 U.S. 319, 325, 326, (1937)).  Because "[i]t . . . cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty," *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997), Plaintiffs' claims do not trigger strict scrutiny.

314.   The fact that Plaintiffs' claims require a showing of unconstitutional deprivation of liberty renders them not cognizable in a § 1983 action.  a federal district court in a § 1983 action cannot write an order opining that a person in state custody is entitled to liberty (or, as Plaintiffs have argued, that there *may* be some among the class who *may* be entitled to liberty); it can only do so in the context of a federal habeas corpus action brought by the confined individual under 28 U.S.C. § 2254(a).  *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 488-490 (1973) ("[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or

duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983.")).  This rule applies equally to those confined pursuant to a commitment order.  *Carter v. Bickhaus*, 142 F. App'x 937, 938 (8th Cir. 2005); *see also* 28 U.S.C. § 2254(a) (writ may be brought on behalf of "person in custody pursuant to the judgment of a State court.").

315.   In addition, regardless of whether Plaintiffs actually request an order invalidating their confinement in a § 1983 suit, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated" in some proper forum.  *Heck*, 512 U.S. at 487.

316.   Regarding attacks on Minn. Stat. ch. 253D, Plaintiffs' have a "heavy burden" to prove unconstitutionality because state legislative enactments are presumed constitutional.  *Fitz v. Dolyak*, 712 F.2d 330, 333 (8th Cir.1983).

317.   Regarding attacks on the constitutionality of policies created or executed by Defendants, this Court defers "to the professional expertise of the institution's administrators, when evaluating the relationship between the challenged condition and the government's interest."  *E.g.*, *Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012).

318.    Unless some specific constitutional provision and its doctrines are invoked, only "conscience shocking" conduct by executive officials and affecting established legal rights is actionable.  *E.g., Strutton v. Meade*, 668 F.3d 549, 552 (8th Cir. 2012

319.    Defendants raise several legal arguments related to standing.  Federal courts have no jurisdiction if a plaintiff does not have an injury in fact, a causal connection between the injury and the conduct complained of, and likely redressability by the Court. *E.g*., *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  An injury in fact is "concrete and particularized" and not "conjectural" or "hypothetical."  *Id*. at 560. Standing doctrine "prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  "It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Id*.; *accord Elizabeth M. v. Montenez*, 458 F.3d 779, 786-87 (8th Cir. 2006); *Dulany v. Carnahan*, 132 F.3d 1234, 1244 (8th Cir. 1997); *Montenez*, 458 F.3d at 784-86.

320.    Standing doctrine applies the same to claims by plaintiffs in a class action. *Avritt v. Reliastar Life Ins. Co*., 615 F.3d 1023, 1034 (8th Cir. 2010).

321.    Defendants also argue that only certain limited issues are capable of resolution before this Court under Fed. R. Civ. P. 23(b)(2).  That rule, which governs this class action, requires that for Plaintiffs to prevail they must show conduct and injuries

applicable to the entire class, in addition to adjudicating issues meeting the requirements of Rule 23(a). Rule 23(b)(2) can only be a mechanism to seek "a single injunction or declaratory judgment [that] would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011); *see also Montenez*, 458 F.3d at 786-88 (reversing class certification because necessary proof and substantive-due-process injuries not classwide).

322. Consistent with this need for classwide injury under standing doctrine, Plaintiffs' official-capacity claims require them to prove that it was an official policy or custom, and not some failure of implementation, that caused their concrete constitutional harms. *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987).

323. An "official 'policy or custom' must have 'caused' the constitutional violation" and "there must be an 'affirmative link' or a 'causal connection' between the policy and the particular constitutional violation alleged." *Id*. To establish their claims, Plaintiffs must show a generally applicable "policy" or "persistent, widespread pattern of unconstitutional conduct" specifically harming them and applicable to the entire class. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1999); Fed. R. Civ. P. 23(b)(2). Plaintiffs' claims cannot be based on either implementation as to individual plaintiffs or subgroups of individual plaintiffs.

324. Under these principles, the Court will address each one of the applicable counts in turn:

### COUNT I:  FACIAL CHALLENGE TO MINN. STAT. 253D.

325.    A party challenging a statute must demonstrate beyond a reasonable doubt that the statute is unconstitutional.  *See State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998); *see also Ivey v. Mooney*, Case No. 05-cv-2666, 2008 WL 4527792 (D. Minn. Sept. 30, 2008).  Moreover, challenges to state statutes run up against "a presumption of constitutionality," and parties challenging state laws "bear a heavy burden."  *Fitz v. Dokyak*, 712 F.2d 330, 332-33 (8th Cir. 1983).  Count I alleges that chapter 253D is unconstitutional on its face.  A litigant who facially challenges the constitutionality of a statute must show that "there are no circumstances under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987); *see also Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (a plaintiff can successfully challenge a statute on its face only if the statute is "unconstitutional in every conceivable application").

326.    A facial challenge is the "most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at 745. A statute is constitutional on its face so long as it can be validly applied to serve a state interest.  *See Members of City Council of City of Los Angeles*, 466 U.S. at 802-03 (holding that the appellees could not make a facial challenge to the ordinance, particularly because the "appellees acknowledge that

the ordinance serves safety interests in many of its applications, and hence do not argue that the ordinance can never be validly applied").

327.   Plaintiffs allege that chapter 253D is unconstitutional on its face because (a) the statute fails to require risk assessments that are done on a regular schedule (annually or bi-annually) "to determine if Class members continue to meet requirements for continued commitment," (b)  "fails to provide a judicial bypass to the statutory reduction in custody process," and (c) there is no requirement that the State take affirmative action (such as to petition for reduction of custody) to seek the transfer or release of those Class Members that the MSOP knows or reasonably believes no longer satisfy the criteria for continuing confinement."  (Doc. 914, at 5).

328.   Plaintiffs' suggested additions to chapter 253D and complaints on the current statute are better framed as attacks that the statute does not reasonably ensure that the "nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed," as is required for civil-commitment statutes under  *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) and *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992).

329.   But the Minnesota Supreme Court has already held that Minn. Stat. § 253D provides for reduction-in-custody criteria sufficient to ensure there exists a reasonable relation between the purpose and duration of commitment under *Foucha*.  *In re Blodgett*, 510 N.W.2d 910 (Minn. 1994); *Call v. Gomez*, 535 N.W. 2d 312 (Minn. 1995).

83

330.   The *Call* court concluded that the statute's petitioning process and discharge criteria can be applied to meet the requirements that a committed person "is confined for only so long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the public," and that such application of the discharge criteria complied with the "reasonable relation" test.  *Call*, 535 N.W.2d at 319.

331.   Minnesota's discharge procedure was also held sufficient to protect the substantive due process rights of MSOP clients under *Foucha* standards:

> We do not read *Foucha* to prohibit Minnesota's commitment program for psychopathic personalities.

*Blodgett*, 510 N.W.2d at 915.

332.   These cases specifically held that chapter 253D provides for periodic independent review of a client's eligibility for a reduction in custody.  *See Blodgett*, 510 N.W.2d 910, 916 ("Minnesota's commitment system provides for periodic review and reevaluation of the need for continued treatment"); *Call*, 535 N.W.2d at 318-19 (noting that statute provides "the opportunity to petition for full discharge"); *Poole*, 335 F.3d at 709.

333.   Indeed, the statute provides for a risk assessment conducted by an independent department at MSOP upon a client's petition.  The statute also provides for a qualified examiner of the petitioner's choosing—independent of MSOP—to evaluate and

opine on such client's suitability for a reduction of custody before the Judicial Appeal Panel.

334.   The discharge mechanisms and criteria under chapter 253D were also approved by the Eighth Circuit in *Poole v. Goodno*:

> The Minnesota sexual predator statutes have many of the same procedural protections to ensure fairness and accuracy in the commitment process as those cited in *Sahhar*. Individuals who may be indeterminately committed as SPPs or SDPs have the same procedural rights as those who may be committed as "mentally ill and dangerous." Minn.Stat. §§ 253B.18, 253B.185 (2002). Although the commitment trial is to the court without a jury, the court must find by clear and convincing evidence that the proposed patient meets the requirements to be considered an SPP or SDP. An individual has the right to attend and testify at the trial, to call and cross examine witnesses, and to present other relevant evidence. If the court decides that an individual should be initially committed as a sexual predator, he or she is temporarily committed to a secure treatment facility for treatment and evaluation. Within sixty days the facility must provide a report to the court on the individual's condition and evaluation, and another hearing is held within ninety days of the initial commitment. If a court determines after this second hearing that an individual continues to meet the commitment criteria, the commitment is made indeterminate.

> Committed persons have the right to appeal their commitments, as well as unabridged rights to seek state habeas relief. Furthermore, the committed individual or the treatment facility may petition for provisional or full discharge every six months. A special review board hears such petitions and makes recommendations to the Commissioner of Human Services, and any party aggrieved by the Commissioner's decision may petition for rehearing to a judicial appeal panel.

335 F.3d 705, 710 (8th Cir. 2003) (citations omitted); *see also Bailey v. Gardebring*, 940 F.2d 1150, 1152-53 (8th Cir. 1991); *Nicolaison v. Ludeman*, No. 07-322407-3224, 2008 WL 508549, *5 (D. Minn. Feb. 21, 2008).

335.   Plaintiffs' arguments that (a) it is unconstitutional to have a voluntary mechanism for this periodic review and (b) that it is unconstitutional to not require an MSOP staff member to petition on behalf of clients they believe they could meet discharge criteria are contradicted by the above precedent, which specifically reviewed the exact process that they challenge and affirmed its validity under *Foucha* and Fourteenth Amendment standards.   Plaintiffs in fact cite no authority anywhere for the proposition that a voluntary mechanism for receiving a hearing on reduction-in-custody criteria is unlawful.   Plaintiffs' theory in fact clashes with basic judicial notions that a party is normally expected to exercise their own rights. *C.f.* 31 C.J.S. *Estoppel and Waiver* § 92 (discussing historical doctrine of waiver of constitutional rights); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (observing, in regard to standing, general rule that a party "generally must assert its own legal rights and interests").

336.   What is more damaging to Plaintiffs' facial claim is that—for several of the named Plaintiffs that testified and presented evidence on their behalf—they in fact did petition, were reviewed by MSOP's risk assessment unit, were reviewed by an independent court appointed examiner, and were provided complete review and due process under chapter 253D.

337.   Finally, Chapter 253D is not facially unconstitutional because it lacks a "judicial bypass."  Plaintiffs never developed why another procedure must be added to a discharge process that is already a "judicial" process.  To the extent Plaintiffs allege that

the SRB/Judicial Appeal Panel process take too long, they have cited no authority for the proposition that the constitution guarantees judicial process of a particular duration.  The judicial bypass that Plaintiffs seek also appears to be nothing more than a habeas petitioning process, which is available to MSOP clients.  Plaintiffs argue that habeas petitions do not provide for an attorney and expert assessment paid for by the state, but chapter 253D does provide counsel in discharge proceedings.  And again, most of the named Plaintiffs that testified asserted their rights and received the periodic review that they request by a statutory change.  Therefore they were not procedurally harmed by the petitioning process and Plaintiffs' facial challenge fails.

338.    Minn. Stat. chapter 253D has therefore already been held not to require amendment in order to pass procedural due process and *Foucha* standards. The Court finds in Defendants favor on Count I.

### COUNT II: "AS APPLIED" CHALLENGE TO MINN. STAT. CH. 253D.

339.    A party challenging a statute must demonstrate beyond a reasonable doubt that the statute is unconstitutional.  *See State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998); *see also Ivey v. Mooney*, Case No. 05-cv-2666, 2008 WL 4527792 (D. Minn. Sep. 30, 2008).  Moreover, challenges to state statutes run up against "a presumption of constitutionality," and parties challenging state laws "bear a heavy burden."  *Fitz v. Dokyak*, 712 F.2d 330, 332-33 (8th Cir. 1983).  A litigant who facially challenges the constitutionality of a statute must show that "there are no circumstances under which the

Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987); *see also Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (a plaintiff can successfully challenge a statute on its face only if the statute is "unconstitutional in every conceivable application").

340.   Plaintiffs' "as applied" theory remains unclear.   Much of Plaintiffs' complaint surrounds Minnesota's higher commitment rates and low provisional-discharge and discharge rates for petitioning clients, and argues that such statistics mean the law's effect is "punitive" punishment.   (Doc. 914, at 1 ("[T]he key fact that overwhelms all others is that "no one ever gets out.")   But if that is the nature of their challenge—i.e., that Minnesota has commitment rates that are too high and discharge rates that are too low—it is nothing more than a cumulative attack on prior state judicial rulings that could not be second guessed in this § 1983 suit even if there was evidence that those rulings were incorrect or unconstitutional.   *E.g.*,   *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994) (holding that a claim that, in effect, attacks the constitutionality of a conviction or imprisonment is not cognizable under 42 U.S.C.§ 1983); *Skit Int'l, Ltd. v. DAC Technologies of Arkansas, Inc.,* 487 F.3d 1154, 1156–57 (8th Cir. 2007) (citing *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923)).

341.   To the extent that Plaintiffs claim that relatively high confinement rates and low reduction-in-custody rates cause chapter 253D to be unconstitutional, they fail to

even attempt to meet evidentiary burdens to establish how unconstitutional conduct by a particular Defendant directly prevented release for a particular Plaintiff (let alone how conduct by a particular Defendant directly prevented release for the entire class).

342.    The evidence rather shows that Defendants execute and Plaintiffs received the substantive and procedural due process provided under chapter 253D and approved under previous rulings like *Blodgett*, *Call*, and *Poole*.  As explained above, most Plaintiffs that put forth evidence in fact petitioned at least once, received an attorney to assist them in the legal process, received a hearing, had the right to and received a rehearing before the Judicial Appeal Panel, received the benefit of a court-appointed independent examiner of their choosing, presented evidence to the Judicial Appeal Panel, and had the right to appeal to the Minnesota appellate courts.  Plaintiffs point to no corruption of or deviation from the process provided under the statute.  And again, even if they did, this § 1983 action would not be the appropriate venue to raise such a complaint.

343.    To the extent that Plaintiffs assert that the mere result of high commitment rates and low discharge rates, notwithstanding a civil scheme with adequate substantive and procedural due process, has caused "preventative detention" for the currently committed population, that argument runs against clear U.S. Supreme Court holdings that confinement is a legitimate end of civil commitment, and failure to release individuals who are difficult or impossible to treat does not render a civil commitment scheme

89

unconstitutional.  *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997).  *Hendricks* upheld the Kansas Act at issue even though there was evidence that treatment was not the "overriding" or "primary" purpose of the Kansas Act.  *Id.* at 367.   The Court found that because treatment was "possib[ly]" an "ancillary" goal of the program, that the Kansas Act was constitutional, even though the Kansas treatment program was "somewhat meager."  *Id.*   In contrast, the evidence here is that MSOP provides a substantial, comprehensive sex-offender treatment program that is consistent with best practices in the field, that Plaintiffs have individualized treatment and clinicians that serve them and provide the opportunity to participate in MSOP's program, and that all clients (including Plaintiffs) have a full opportunity to petition a court for a reduction in custody based on criteria reasonably related to the reason for their commitment.

344.    To the extent Plaintiffs attack chapter 253D "punitive" (i.e., not civil) based on conditions or implementation of the law by Defendants or some other unidentified actors, such an "as applied" claim is not cognizable under *Seling v. Young*, 531 U.S. 250 (2001).  In *Seling*, the United States Supreme Court reviewed a Ninth Circuit decision upholding an "as applied" challenge to Washington State's Civil Commitment Statute, based on allegations that the conditions of confinement were "too restrictive, that the conditions [were] incompatible with treatment, and that the system is designed to result in indefinite confinement."  *Id*. at 263.   Despite acknowledging the severity of the conditions of Young's confinement, the Supreme Court reversed the Ninth Circuit and

denied Young's as-applied challenge. *Id.* at 262-63. Although the principal holding in *Seling* addressed whether the Washington Act was criminally punitive and therefore contrary to Double Jeopardy and Ex Post Facto protections, the Supreme Court also discussed how such "as applied" challenges to civil commitment statutes were fundamentally problematic. *See id.* at 262-64. In noting that such challenges were "unworkable," the Supreme Court explained that "confinement is not a fixed event" and, instead, "it extends over time under conditions that are subject to change." *Id.* at 263. The Court held that "the civil nature of a confinement scheme cannot be altered based merely on vagaries in implementation of the authorizing statute." *Id.* Courts have already ruled that the Minnesota Legislature intended a civil scheme in chapter 253D, *e.g.*, *In re Linehan*, 557 N.W.2d 171, 187-189 (Minn. 1996), and Plaintiffs cannot challenge that intent based on vagaries of implementation under *Seling*.

345. To the extent Plaintiffs allege that Defendants' actions in designing and implementing the treatment program at MSOP violate substantive due process, Plaintiffs have to demonstrate that Defendants' application of the statute and administration of the MSOP program fell below the "conscience shocking" standard. *Strutton*, 668 F.3d at 557-58 (citing *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104–05 (8th Cir. 1992)); *see also Salerno*, 481 U.S. at 746 ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty.'" (quoting *Rochin v.*

*California*, 342 U.S. 165, 172, (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325–326,

(1937)).  As explained below in regard to Count III, Plaintiffs have no support for such an

argument.  As described below with regard to Count IV, Plaintiffs have come nowhere

close to making this burden with respect to themselves or the entire class.

346.   If Plaintiffs allege that Defendants violate substantive due process by not

creating new requirements to chapter 253D in terms of risk assessments and petitioning

on clients' behalf, that argument too would be subject to conscience-shocking standards

for executive officials acting in their discretion, and Plaintiffs have no law or evidence

that supports their claim.   Again, the Minnesota Supreme Court already held that

discharge procedure contained in Minn. Stat. § 253D is constitutional; Defendants cannot

"enforce" that statute in a way that would change the discharge procedure it contains.

There is no need for Defendants to provide additional independent periodic review,

because such review is already provided by statute and is constitutional under cases like

*Blodgett*, *Call*, and *Poole*.  Plaintiffs offer no evidence that the statute, as written, is not

executed by its terms and in good faith by DHS officials.

347.   To the extent Plaintiffs argue that Defendants violate the constitution by not

on their own initiative providing annual or bi-annual expert risk assessments for clients,

or by not filing petitions on behalf of MSOP clients why believe a client may meet

reduction-in-custody criteria, Plaintiffs' claims similarly find no legal support and defy

common sense.  The statute itself  calls for a state-provided forensic risk assessment by

MSOP upon any petition, and an independent court-appointed examiner upon appeal to the Judicial Appeal Panel.  As explained above, cases like *Blodgett*, *Call*, and *Poole* have found this exact mechanism constitutional as written in the statute, so it could never be unconstitutional for Defendants to apply it as written.

To the extent Plaintiffs argue that the risk assessment department at MSOP is not sufficiently independent, it is unclear how this argument fits into any plausible legal theory of liability.  Both MSOP Special Review Board treatment reports and forensic risk assessments, even if they were flawed, are simply opinions placed before the Judicial Appeal Panel to inform the panel's decisionmaking on reduction in custody.  (T. 4727 (Pascucci)).  They are not the only such opinions.  The Judicial Appeal Panel is statutorily entitled to appoint independent examiners paid for by the state, and in practice the petitioning client chooses the examiner to be appointed.  Minn. Stat. S 253D.28 Subd. 2(c); (*See, e.g.*, T. 3586 (Karsjens); 5036 (Nicolaison)).  The petitioner has a right to an attorney, *see* Minn. Stat. S 253D.20, with whom he can work to attack the reliability of any unfavorable opinion, including those of MSOP with respect to treatment progression or risk assessment decisions.  Indeed, the more flawed those decisions, the more subject they are to effective cross-examination.  A petitioner's attorney is specifically required to "be given adequate time and access to records to prepare for all hearings," 253D.20(2), and can thereby attack MSOP decisionmaking as reflected in BER documentation and, with respect to matrix scoring and other treatment decisions, quarterly and annual

treatment reports.  "The committed person [and] the committed person's counsel . . . have the right to be present and may present and cross-examine all witness and offer a factual and legal basis in support of their positions."  253D.28 Subd. 2(c).  Plaintiffs simply have no evidence that the Judicial Appeal Panel so lacks the capacity for independent consideration of all the sources of information above that MSOP can be said to "cause" that panel's client-adverse decisions.

348.   Moreover, the idea that the Executive Director or some other staff member of MSOP is constitutionally liable to all class members for not petitioning on certain clients' behalf when he or she "should know" that a person meets reduction-in-custody criteria is not coherent.  Plaintiffs do not explain such an obligation would be enforceable given that it would have to be triggered by the subjective impression of the Executive Director of MSOP regarding what is a legal determination assigned to the Courts.  Also, the Executive Director has exercised her ability to petition several times, so Plaintiffs' dispute appears to reflect a difference of opinion on whether clients can meet statutory criteria.

349.   To the extent Plaintiffs highlight timeframes for the SRB administration process and the appeal process before the Judicial Appeal Panel and Minnesota appellate courts, the Court heard no testimony about the details of any extremely long petitioning times, why they occurred, whether continuances were granted and who requested them, or whether petitions were withdrawn.  Analogous to an attack on the duration of pretrial

detention, Plaintiffs must show "deliberate indifference" by some official to thwart a justified release. *Davis v. Hall*, 375 F.3d 703, 718 (8th Cir. 2004); *Blair v. Neb. Dep't of Correctional Servs.*, 719 F. Supp. 2d 1072, 1078 (D. Neb. 2010). But here, Plaintiffs made no demonstration to show that any of their own specific SRB-SCAP processes were delayed to some extreme degree as to constitute a constitutional violation. The Court certainly heard no evidence to show that any DHS or MSOP employee intentionally (or even negligently) delayed proceedings. Rather the evidence showed that MSOP officials have been adding SRB members and funding additional Judicial Appeal Panel judges to handle increasing caseloads. The Court heard no testimony about how a specific timeframe for an SRB-SCAP process could compare to other judicial processes. The Court heard no evidence how MSOP's administrative SRB process and SCAP appeal process varies from other states' discharge procedures or other judicial processes.

350. The above-discussed example of the "five year" and 600-day petitions cited by Plaintiffs demonstrate the difficulty with Plaintiffs' general statements about the length of time of time for the petitioning process. Testimony established that those petitions involved nuances and required continuances or delays based on requests from the petitioning clients themselves—for example withdrawn petitions in the case of the "five year" case and the petitioning client's medical emergency in the 600-day example. The Court has no other evidence about the nature of such proceedings. Without such

evidence, and especially without such evidence applied to the whole class, Plaintiffs show no constitutional (and certainly no classwide) injury in regard to SRB timeframes.

351.    At bottom, Plaintiffs' demand that MSOP staff provide expert opinions on legal criteria every year for each MSOP client and that MSOP staff petition on certain clients' behalf seek to impose an obligation on MSOP staff to act as legal advocate to enforce clients' legal rights.  Plaintiffs cite no law, and none appears to exist, supporting such a radical notion.   Accordingly, the Court finds in Defendants' favor on Count II.

### COUNT III:  FOURTEENTH-AMENDMENT INADEQUATE-TREATMENT CLAIM.

352.    Count III is controlled by *Strutton,*  668 F.3d at 552-54.  *Strutton* held that there is no Fourteenth Amendment substantive due process right to treatment.  The Eighth Circuit was clear that "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions" but "has not recognized a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement."   *Id*. at 557 (modifications and quotations omitted).  The Court held that a civilly committed person has a "due process claim originat[ing] from the state statutory mandate to provide for [the plaintiff's] confinement," though the Court was clear about the standard for such claims: "[w]e remain cautious not to turn every alleged state law violation into a constitutional claim.  Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise."  *Id*. at 557-58.

96

353.   In the Eighth Circuit, "conscience-shocking" behavior is only that which involves "malice" or "sadism":

> Substantive due process is concerned with violations of personal rights … so severe … so disproportionate to the need presented, and … so inspired by malice or sadism rather than merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience.

*See Golden v. Balch*, 324 F.3d 650, 652-53 (8th Cir. 2003) (quotations and citations omitted); *see also Hess v. Ables*, 714 F.3d 1048, 1053 (8th Cir. 2013); *Christiansen v. West Branch Comm. Sch. Dist.*, 674 F.3d 927 (8th Cir. 2012).

354.   Plaintiffs did not present evidence of conscience-shocking conduct by any of the Defendants with regard to treatment.  The testimony of MSOP's clinical leadership was clear in describing how MSOP's treatment design and programming was created based on and comports with best and current practices in the treatment of sexual abusers. The central policies regarding treatment—e.g., MSOP's Clinician's Guide, Program Theory Manual, and Matrix Scoring Guide—all showcase a program based on current research, reasonably instruct clinicians on execution of that program, and inform clients and the public how clients must address dynamic risk factors to advance in treatment. The various treatment records admitted into evidence, and the testimony of the named Plaintiffs, confirm that this treatment program is executed in the professional clinical judgment of the staff at MSOP, even if Plaintiffs disagree with their phase placement and treatment concepts.

355.    Plaintiffs do not dispute that MSOP's treatment program design and policies are sound and consistent with best practices.   Plaintiffs rather make several arguments regarding critiques and imperfections in the implementation of treatment programming that have been highlighted over the years by MSOP's auditors, the Rule 706 experts, and the Minnesota Legislative Auditor.   As explained above in the Court's findings, these critiques—to the extent they hold any merit at all—do not rise to any level of conscience shocking conduct, nor do they showcase anything other than disagreements with decisions made based on professional clinical judgment.   Even if they did, Plaintiffs have not shown how these critiques have concretely injured them personally (along with every other class member) in a way that this Court can actually provide them redress. *See Lewis*, 518 U.S. at 349; *Montenez*, 458 F.3d at 786-87.

356.    Moreover, the Court concludes that MSOP's licensing authorities, along with annual auditors that are international experts in the field, adequately ensure and confirm that MSOP's programming comports with best practices.   The Court's Rule 706 experts also confirmed that MSOP's treatment design and program is in conformance with current research and best practices.

357.    The treatment experiences of the named Plaintiffs also confirm the Court's conclusion that Defendants have engaged in no conscience shocking behavior.   To the contrary, Plaintiffs' experiences show that MSOP employs dedicated professionals working under difficult circumstances to improve clients' lives and maintain public

safety. Plaintiffs Karsjens, Lonergan, and Bolte denied that they ever really engaged in sexually problematic behavior in the past, and completely deny that they have any need for sex offender treatment. When "attitude to change" and treatment readiness is an important factor that must be established in the first phase of any reasonable treatment program, it is not surprising that such Plaintiffs remain in Phase I.

358.   Karsjens, Lonergan have engaged in verbal abuse of staff, and Craig Bolte has engaged in frequent assaultive rulebreaking, as well as sexual behavior towards staff. The Court heard testimony from MSOP's clinicians and other experts that rule compliance and complying with supervision are important risk factors that must be addressed in Phase I, so it is not surprising that these Plaintiffs have not advanced through treatment quickly. These are just some examples of behaviors by Plaintiffs that clearly inhibited their own treatment progress.

359.   Plaintiffs Steiner, Rud, and Foster appear to be showing better competence on Phase I concepts, and are accordingly more advanced in treatment.

360.   Regardless of these issues and other nuances of their individual treatment histories, Plaintiffs have produced no evidence to rebut that MSOP clinicians have tried their best to provide treatment and made decisions based on professional clinical judgment. All treatment records and testimony by Plaintiffs and Defendants is consistent to show that MSOP clinicians have exercised clinical judgment in providing treatment and acted in good faith to address Plaintiffs' treatment needs.

361.  Plaintiffs argue that MSOP's sex offender treatment is unconstitutional because of low provisional discharge and discharge rates, but Plaintiffs presented no evidence that they were unconstitutionally prevented from release based on some conscience-shocking decision or action by an MSOP clinician.

362.  Plaintiffs' contention that strict scrutiny applies to their claims of inadequate treatment is plainly wrong.  Clearly established precedent establishes  that challenges to decision-making and execution of laws by executive-branch officials must be adjudged under the "conscience-shocking" standard.  *E.g.*, *Montin v. Gibson*, 718 F.3d 752 (8th Cir. 2013).  The "professional judgment" standard argued by Plaintiffs also does not apply to their treatment claim.  *Strutton* and *Montin* make clear that in the Eighth Circuit, the *Youngberg* professional judgment standard is limited to situations involving placing a client in physical restraints.  *Id.*  Even if the professional judgment standard did apply, however, the Court heard no evidence that MSOP staff fail to exercise their professional judgment in administering MSOP.

363.  The "reasonable relation" test under *Foucha*, 504 U.S. 71, also is not applicable.  This standard is about substantive criteria and procedures for discharge from civil commitment—not the adequacy of treatment.  *Id.*  Plaintiffs cannot point to any applicable caselaw stretching *Foucha* to the adequacy of treatment.

364.  Accordingly, Plaintiffs' Fourteenth Amendment claim in Count III is dismissed with prejudice.

365.    Plaintiffs' Count III also alleges a violation of the Minnesota Constitution. Defendants have asserted that Plaintiffs' state-law claims are invalid under principles of the Eleventh Amendment and *Pennhurst State School & Hosp. v. Halderman*, 485 U.S. 89, 106 (1984).[1]  At trial, Plaintiffs dropped any independent claim under the Minnesota Constitution or Minnesota law.  (T. X.)  Consistent with that concession, this Court holds that Plaintiffs' claims arising under the Minnesota Constitution—including those in Count III, V, and VI—would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment."  The Supreme Court has been clear that such a claim, i.e., "that state officials violated state law in carrying out their official responsibilities," is "a claim against the State" and barred by the Eleventh Amendment.  *Id*. at 121; *see Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815 (D. Minn. 2010) (Frank, J.).

366.    Even if this Court were not barred from deciding such claims, "[u]nlike 42 U.S.C. § 1983, Minnesota has no statutory scheme providing for private actions based on violations of the Minnesota constitution."  *See Riehm v. Engelking*, No. 06-293

---

[1] Defendants appealed the Court's denial of summary judgment as to certain state-law claims based on the Eleventh Amendment, but Defendants did not make *Pennhurst* arguments at summary judgment with regard to Count III, Count V, and Count VI, and those Minnesota Constitution claims were not the subject of Defendants' appeal.  Thus this Court retains jurisdiction over those claims.

(JRT/RLE), 2007 WL 37799, at *8 (D. Minn. Jan. 4, 2007) (citing *Guite v. Wright*, 976 F. Supp. 866, 871 (D.Minn.1997)).   Accordingly, all Plaintiffs' claims under the Minnesota Constitution are hereby dismissed with prejudice

### COUNT IV:  FAILURE TO PROVIDE TREATMENT UNDER MINN. STAT. 253B.03, SUBD. 7.

367.   Defendants have appealed the Court's denial of summary judgment as to Count IV on the basis of sovereign immunity established under the Eleventh Amendment and *Pennhurst.*  (Doc. 880.)  The Court currently lacks jurisdiction over this claim..

### COUNTS V AND VII:  FOURTEENTH AMENDMENT CLAIM TO BE FREE FROM PUNISHMENT AND INHUMANE TREATMENT.

368.   Counts V and VII both claim that the conditions of MSOP clients' confinement are tantamount to punishment.  At this point in the litigation, Plaintiffs have combined their Count V and Count VII claims into their overall Count II argument that the chapter 253D is unconstitutional as applied.  In their summary judgment briefing and closing arguments, Plaintiffs do not suggest or add any new legal analysis or argument for these Counts than what they argue in regard to Count II.  (Doc. 914, at 9; Doc. 741, at 16.)

369.   For the reasons stated above in regard to Count II, the Court concludes that Plaintiffs have not articulated a cognizable theory to support their argument that their civil commitment at MSOP is "punitive."   In *Hendricks*, 521 U.S. at 361, the Supreme Court rejected the claim that Kansas's civil commitment statute, similar to Minn. Stat.

ch. 253D, was "'punishment' predicated on past conduct for which [the claimant] has already been convicted and forced to serve a prison sentence" under "the Constitution's Double Jeopardy and Ex Post Facto Clauses." 521 U.S. at 361. The *Hendricks* Court found the intention and nature of the statute, procedural safeguards, available treatment ("if such is possible"), and a discharge opportunity sufficient to render the statute nonpunitive. *Id*. at 368-69.

370.   As described above, a 'punitive as applied' theory was again directly rejected in *Seling v. Young*, where the Court heard the argument that Washington's civil-commitment statute could be deemed punitive based on conditions "as applied" to that claimant. 531 U.S. 250 (2001). The Court rejected the theory, observing that arguments about general conditions sharing attributes of a prison "are in many respects like the claims presented to the Court in *Hendricks*, where we concluded that the conditions of confinement were largely explained by the State's goal to incapacitate, not to punish." *Id*. at 262. The Court concluded that the statute's language can be the only basis for determining whether there is punitive detention, and rejected the "as applied" approach. *Id*. at 262-63. The Court held that implementation of a civil-commitment statute is immaterial to whether commitment is punitive: "The civil nature of a confinement scheme cannot be altered based merely on vagaries in the implementation of the authorizing statute." *Id.* at 263.

371.   Plaintiffs have produced no evidence, and do not purport to produce evidence, that any Defendant or any other government actor has acted with an intent to "punish" Plaintiffs or their class members.   Plaintiffs agreed with Defendants and the Rule 706 experts that the polices and conditions at MSOP are reasonable.   (T. 3162.) Plaintiffs rather have changed their argument to suggest that by alleging "punitiveness" at MSOP they mean to highlight that commitment at MSOP has resulted in "preventative detention" based on their allegations under Counts I and II and the  overall rate of commitments in Minnesota and the relatively low rate of successful reduction-in-custody petitions.   (T. 3105, 3160-62.)   For the reasons explained above, Plaintiffs' "as applied" challenge in all the forms it could be suggested are legally invalid and not supported by facts.   Accordingly, the Court finds in favor of Defendants on Counts V and VII.

**COUNT VI:  DENIAL OF LESS RESTRICTIVE ALTERNATIVES.**

372.   Plaintiffs' Count VI argues that Defendants violated Plaintiffs' right to a less restrictive alternative.   Plaintiffs' arguments under this Count have again been lumped in with their arguments under Count II, and Plaintiffs offer no original or independent legal analysis for this claim.

373.   In any event, there is no federal constitutional right to a less restrictive alternative. The Eighth Circuit recently rejected such a right (in the context of restraints) when it held that "although MSOP may be able to address its security interests with a more tailored policy. . . *that is not the test*" and "[n]othing in *Youngberg* suggests that the

choice made by the institution must have been the least restrictive alternative available."
*Beaulieu*, 690 F.3d at 1031-33 (emphasis added) (citing *Youngberg*, 457 U.S. 307).

374.   It is also impossible to reconcile a federal right to a least restrictive alternative with the holding of *Strutton*, 668 F.3d at 557.  There, the Eighth Circuit held that there is no federal constitutional substantive due process right to treatment at all—let alone treatment in a least restrictive alternative—and that the constitution only entitled committed sex offenders to "reasonably safe custodial conditions." *Id.*

375.   The least restrictive alternative standard has also repeatedly been rejected by other federal Courts of Appeal. *See Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 (5th Cir. 1987) (stating there is no "federal constitutional right to treatment in a least restrictive alternative setting"); *Clark v. Cohen,* 794 F.2d 79, 93 n. 9 (3d Cir. 1986) (*en banc*) (Becker, J., concurring) (stating that the "least restrictive alternative" argument has "been effectively foreclosed" by the Third Circuit's decision in *Rennie v. Klein,* 720 F.2d 266 (3d Cir. 1983) (*en banc*) in which six judges endorsed the view that *Youngberg* "made [the] least alternative analysis *inapplicable* to the involuntarily civilly committed") (emphasis added); *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1248-49 (2d Cir. 1984) (citing *Youngberg* and holding that "[e]ven if every expert . . . agrees that another type of treatment or residence setting might be better, the federal courts may only decide whether the treatment or residence setting that actually was selected was a 'substantial departure' from prevailing standards of practice" and that, as a

result, the Court may not look to whether trial testimony "established the superiority of a 'least restrictive environment' in general or of community placement in particular"); *Phillips v. Thompson,* 715 F.2d 365, 367-68 (7th Cir. 1983) (finding no constitutional right to a less restrictive setting under *Youngberg* where class members alleged they were "illegally denied a right to alternative care by placement in a less restrictive community residential setting").

376.   There is also no state law right to a less restrictive alternative.  Section 253D.07 places the burden on the patient to establish to the committing court that a less restrictive alternative is available that is consistent with his treatment needs and public safety:  "If the court finds by clear and convincing evidence that the respondent is a [SDP or SPP], the court shall commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available, is willing to accept the respondent under commitment, and is consistent with the person's treatment needs and the requirements of public safety."   Minn. Stat. § 253D.07, subd. 3.  This provision does not place a burden on the Defendants or the State to place committed individuals in the least restrictive alternative.

377.   Even if State law did provide a requirement to ensure commitment in the least restrictive alternative, this Court is barred by the Eleventh Amendment from providing relief.  As established in *Pennhurst*, such a claim would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment."   485 U.S.

at 106.   The Supreme Court is clear that such a claim, i.e., "that state officials violated state law in carrying out their official responsibilities," is "a claim against the State" and barred by the Eleventh Amendment.   *Id*. at 121; *see also Minn. Pharmacists Ass'n*, 690 F. Supp. 2d at 815.

378.   Finally, even if the statute provided a right to least restrictive alternatives, and this Court were constitutionally authorized to vindicate it, the facts do not support the proposition that Defendants have denied Plaintiffs least restrictive alternative facilities. The record at trial established that MSOP provides a spectrum of privileges and liberties in the three facilities they manage and that security restrictions are appropriately reduced as clients advance in treatment.   As stated by the Court's expert, Deb McCulloch, MSOP does not "need more buildings."

379.   The Court finds in Defendants favor on Count VI.

**COUNT VIII:  DENIAL OF FREE EXERCISE OF RELIGION.**

380.   Count VIII is the subject of the second phase of the bifurcated trial ordered by the Court on November 7, 2014. (Doc. 647, at 2.)

**COUNT IX:  DENIAL OF FIRST AMENDMENT.**

381.   Count IX is the is the subject of the second phase of the bifurcated trial ordered by the Court on November 7, 2014. (Doc. 647, at 2.)

**COUNT X:  UNREASONABLE SEARCHES AND SEIZURES.**

382.    Count X is the subject of the second phase of the bifurcated trial ordered by the Court on November 7, 2014. (Doc. 647, at 2.)

**COUNT XI:  VIOLATION OF COURT-ORDERED TREATMENT.**

383.    Defendants have appealed the Court's denial of summary judgment as to Count XI on the basis of sovereign immunity established under the Eleventh Amendment and *Pennhurst.*  (Doc. 880.)  The Court currently lacks jurisdiction over this claim.

**COUNT XII:  BREACH OF CONTRACT.**

384.    Count XII is the subject of the second phase of the bifurcated trial ordered by the Court on November 7, 2014. (Doc. 647, at 2.)  Count XII is also the subject of Defendants' March 2, 2015 appeal and thus this Court currently lacks jurisdiction over this claim.  (Doc. 880.)

**COUNT XIII:  TORTIOUS INTERFERENCE.**

385.    Count XIII is the subject of the second phase of the bifurcated trial ordered by the Court on November 7, 2014. (Doc. 647, at 2.)  Count XIII is also the subject of Defendants' March 2, 2015 appeal and thus this Court is without jurisdiction over this claim.  (Doc. 880.)

LET JUDGMENT BE ENTERED ACCORDINGLY.

**BY THE COURT**:

Dated: _____          _____
                                      DONOVAN W. FRANK
                                      United States District Court Judge