# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy Gamble,
Jr., Kevin John DeVillion, Peter Gerard
Lonergan, James Matthew Noyer, Sr.,
James John Rud, James Allen Barber,
Craig Allen Bolte, Dennis Richard Steiner,
Kaine Joseph Braun, Christopher John
Thuringer, Kenny S. Daywitt, Bradley Wayne
Foster, Brian K. Hausfeld, and all others
similarly situated,

Civil No. 11-3659 (DWF/JJK)

                    Plaintiffs,

                                                    **FINDINGS OF FACT,**
v.                                                  **CONCLUSIONS OF LAW,**
                                                    **AND ORDER**

Lucinda Jesson, Dennis Benson, Kevin
Moser, Tom Lundquist, Nancy Johnston,
Jannine Hébert, and Ann Zimmerman,
in their official capacities,

                    Defendants.

---

Daniel E. Gustafson, Esq., Karla M. Gluek, Esq., David A. Goodwin, Esq., Raina
Borrelli, Esq., Lucia G. Massopust, Esq., and Eric S. Taubel, Esq., Gustafson Gluek
PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Deputy Attorney General, Scott H. Ikeda, Adam H. Welle, and
Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office,
counsel for Defendants.

# INTRODUCTION

This case challenges the constitutionality of the statutes governing civil commitment and treatment of sex offenders in Minnesota as written and as applied, and in so doing, challenges the boundaries that we the people set on the notions of individual liberty and freedom, the bedrock principles embedded in the United States Constitution. As has been long recognized, the government may involuntarily detain an individual outside of the criminal justice system through the so-called "civil commitment" process, which permits the state to detain individuals who are suffering from acute symptoms of severe mental illness and who are truly dangerous to the public as a result of their psychiatric condition. But our constitutional preservation of liberty requires that we carefully scrutinize any such deprivation of an individual's freedom to ensure that the civil commitment process is narrowly tailored so that detention is absolutely limited to a period of time necessary to achieve these narrow governmental objectives. After all, the individual who is civilly committed is not being detained in order to be punished for the commission of a crime. If it turns out that the civil commitment is in reality punishment for past crimes or a way to prevent future crimes that might be committed, or, in the words of Justice Anthony M. Kennedy, "[i]f the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function." *Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring); *see also id.* ("We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.").

One reason why we must be so careful about civil commitment is that it can be used by the state to segregate undesirables from society by labeling them with a mental abnormality or personality disorder. For example, civil commitment might improperly be used to indefinitely extend the prison terms of individuals who have been criminally convicted of a crime and who have finished serving their defined terms of imprisonment. As the Court has observed previously, the fact that those committed to and confined at the Minnesota Sex Offender Program (the "MSOP") are sex offenders, who may indeed be subject to society's opprobrium, does not insulate the criminal and civil justice systems from a fair and probing constitutional inquiry. (*See* Doc. No. 427 ("February 20, 2014 Order") at 66.)

It is fundamental to our notions of a free society that we do not imprison citizens because we fear that they might commit a crime in the future. Although the public might be safer if the government, using the latest "scientific" methods of predicting human behavior, locked up potential murderers, rapists, robbers, and, of course, sex offenders, our system of justice, enshrined in rights guaranteed by our Constitution, prohibits the imposition of preventive detention except in very limited circumstances. This strikes at the very heart of what it means to be a free society where liberty is a primary value of our heritage. Significantly, when the criminal justice system and the civil commitment system carry out their responsibilities, the constitutional rights of all citizens, including sex offenders, can be upheld without compromising public safety or disrespecting the rights, concerns, and fears of victims.

It is against this backdrop that the Court has closely scrutinized the constitutionality of the civil commitment scheme that the State of Minnesota has adopted, which has resulted in the indefinite detention of over 700 sex offenders at the MSOP.

**SUMMARY OF DECISION**

As detailed below, the Court conducted a lengthy trial over six weeks to determine whether it should declare that the Minnesota statutes governing civil commitment and treatment of sex offenders are unconstitutional as written and as applied. The Court concludes that Minnesota's civil commitment statutes and sex offender program do not pass constitutional scrutiny. The overwhelming evidence at trial established that Minnesota's civil commitment scheme is a punitive system that segregates and indefinitely detains a class of potentially dangerous individuals without the safeguards of the criminal justice system.

The stark reality is that there is something very wrong with this state's method of dealing with sex offenders in a program that has never fully discharged anyone committed to its detention facilities in Moose Lake and St. Peter since its inception in 1994. The number of committed individuals at these facilities keeps growing, with a current count of approximately 714 committed individuals and a projection of 1,215 committed individuals by 2022. In light of the structure of the MSOP and the history of its operation, no one has any realistic hope of ever getting out of this "civil" detention. Instead, it is undisputed that there are committed individuals who meet the criteria for reduction in custody or who no longer meet the criteria for commitment who continue to be confined at the MSOP.

The Court's determination that the MSOP and its governing civil commitment statutes are unconstitutional concludes Phase One of this case. The next part of this case will involve the difficult question of what the remedy should be to address this complex problem. The public should know that the Moose Lake and St. Peter facilities will not be immediately closed. This case has never been about the immediate release of any single committed individual or committed individuals. Recognizing that the MSOP system is unconstitutional, there may well be changes that could be made immediately, short of ordering the closure of the facilities, to remedy this problem. The Court will hold a hearing to determine what remedy should be imposed, including, but not limited to, the potential remedies set forth in the Conclusion section below. In the meantime, the Court will hold a Remedies Phase pre-hearing conference on August 10, 2015, where all stakeholders, including state legislative and executive leadership, will be called upon to fashion suitable remedies to be presented to the Court.

Moreover, the parties to this case and all stakeholders know that what is true today, was also true before this lawsuit was filed in 2011. That is, there are some sex offenders who are truly dangerous and who should not be released; however, the criminal and civil justice systems should say so and implement appropriate procedures so as to afford individuals their constitutional protections. So too, there are individuals who should have been released, provisionally or otherwise, some time ago, and those individuals should be released with a significant support system and appropriate conditions of supervision, all of which can be accomplished without compromising public safety or the concerns and fears of victims.

**DECISION**

Based upon the presentations of counsel, including the extensive testimony of the witnesses and the voluminous exhibits produced at trial, as well as counsel's arguments and post-trial submissions, the entire record before the Court, and the Court being otherwise duly advised in the premises, the Court hereby issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

**FINDINGS OF FACT**

1.      This is a civil rights action pursuant to 42 U.S.C. § 1983.

2.      The fourteen named Plaintiffs in this case, Kevin Scott Karsjens ("Karsjens"), David Leroy Gable, Jr., Kevin John DeVillion, Peter Gerard Lonergan ("Lonergan"), James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte ("Bolte"), Dennis Richard Steiner ("Steiner"), Kaine Joseph Braun, Brian Christopher John Thuringer ("Thuringer"), Kenny S. Daywitt, Bradley Wayne Foster ("Foster"), and Brian K. Hausfeld (collectively, "Named Plaintiffs"), represent a class of over 700 individuals (collectively, "Plaintiffs" or "Class Members") who are all currently civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services ("DHS").

3.      The seven individual Defendants in this case are all senior managers of the MSOP and employees of the State of Minnesota (collectively, "Defendants").

4.      Defendant Lucinda Jesson ("Commissioner Jesson") is the Commissioner of DHS.  Commissioner Jesson has served in that position since January 2011. Commissioner Jesson is ultimately responsible for all operations of the MSOP.

5.     Defendant Dennis Benson ("Benson") is the former Executive Director of the MSOP.  Benson served in that position from 2008 to 2012.  As Executive Director, Benson was primarily responsible for developing the programming and policies of the MSOP.

6.     Defendant Kevin Moser ("Moser") is the Operational Director of the MSOP at Moose Lake.  Moser has served in that position since December 2011.  Moser is responsible for overseeing all facility and security operations and for setting policies relating to security, facility maintenance, living unit management, and special services.

7.     Defendant Tom Lundquist ("Lundquist") is the Associate Clinical Director of the MSOP at Moose Lake.  Lundquist has served in that position since at least September 2010.

8.      Defendant Nancy Johnston ("Johnston") is the Executive Director of the MSOP.  Johnston has served in that position since 2012.  Johnston is responsible for overseeing the programming, policies, and facilities of the MSOP.  As part of these responsibilities, Johnston is vested with the authority to change the operations of the MSOP.

9.     Defendant Jannine Hébert ("Hébert") is the Executive Clinical Director of the MSOP.  Hébert has served in that position since 2008.  Hébert is responsible for overall treatment programming at the MSOP.

10.     Defendant Ann Zimmerman ("Zimmerman") is the Security Director of the MSOP.  Zimmerman has served in that position since 2010.  Zimmerman is responsible

for overseeing security functions and maintaining a secure environment at the MSOP's Moose Lake facility.

11.     Plaintiffs initiated this action against Defendants on December 21, 2011. Plaintiffs filed an Amended Complaint on March 15, 2012, and a Second Amended Complaint on August 8, 2013.

12.     Plaintiffs filed the Third Amended Complaint on October 28, 2014. In the Third Amended Complaint, Plaintiffs seek a declaratory judgment that the Minnesota statutes governing civil commitment and treatment of sex offenders are unconstitutional as written and as applied.  Plaintiffs do not request that the Court order any specific individual or individuals released from civil confinement.

**History of Civil Commitment in Minnesota**

13.     In 1939, the Minnesota Legislature adopted its first civil commitment law, now codified at Minn. Stat. § 526.10, which provides for the civil commitment of any individual found to have a "psychopathic personality" to the Minnesota State Security Hospital in St. Peter, Minnesota.  Over the course of the next fifty years, the statute was used primarily as an alternative to criminal punishment, and individuals were civilly committed under the law rather than being criminally charged and convicted.  By 1970, civil commitment under the "psychopathic personality" law had dramatically decreased; in the 1970s, only thirteen individuals were civilly committed, and in the 1980s, only fourteen individuals were civilly committed.

14.     Following a series of horrific rape and murder crimes that were committed between 1987 and 1991 by recently released sex offenders from state prison, a task force

on the prevention of sexual violence against women recommended stiffer criminal sentences for dangerous sex offenders and increased use of the "psychopathic personality" law to confine and treat the most dangerous offenders being released from prison.

15.     In 1989, the Minnesota Legislature modified the "psychopathic personality" law to include provisions that required the district court sentencing a sex offender to determine whether civil commitment under the statute would be appropriate and to refer such cases to the county attorney.

16.     In 1992, the Minnesota Legislature enacted a screening process to evaluate "high-risk" sex offenders before their release from prison upon completing a criminal sentence.  As a result of this enactment, commitments under the "psychopathic personality" law increased from two commitments in 1990 to twenty-two commitments in 1992.  In contrast to earlier commitments under the statute, which typically involved first-time offenders who were civilly committed as an alternative to criminal punishment, individuals who were civilly committed during the early 1990s were repeat sex offenders who either had failed or refused to participate in sex offender treatment while in prison.

**Civil Commitment under the Minnesota Civil Commitment and Treatment Act**

17.     In 1994, the Minnesota Legislature enacted the Minnesota Civil Commitment and Treatment Act:  Sexually Dangerous Persons and Sexual Psychopathic Personalities ("MCTA"), Minn. Stat. § 253D (formerly Minn. Stat. § 253B), which provides for the involuntary civil commitment of any individual who is found by a court

to be a "sexually dangerous person" ("SDP") and/or a "sexual psychopathic personality" ("SPP") to the MSOP.

18.     Under the MCTA, civil commitment proceedings are initiated by the county attorney, who determines whether good cause exists to file a petition for commitment after receiving a district court's preliminary determination or a referral from the Commissioner of Corrections.  Minn. Stat. § 253D.07, subd. 1.

19.     To be civilly committed to the MSOP, an individual must be found to be a SPP and/or SDP under the MCTA.

20.     To be committed to the MSOP as a SPP, an individual must be found by a court to have "such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons." Minn. Stat. § 253D.02, subd. 15; Minn. Stat. § 253D.07.

21.     To be committed to the MSOP as a SDP, an individual must be found by a court to be someone who "(1) has engaged in a course of harmful sexual conduct"; "(2) has manifested a sexual, personality, or other mental disorder or dysfunction"; and "(3) as a result, is likely to engage in acts of harmful sexual conduct."  Minn. Stat. § 253D.02, subd. 16; Minn. Stat. § 253D.07.

22.     If a court finds that an individual is a SPP and/or SDP, "the court shall commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available, is willing to accept the [person] under commitment, and is consistent with the person's treatment needs and the requirements of public safety."  Minn. Stat. § 253D.07, subd. 3.

23.     The Commissioner of DHS is vested with the authority to maintain the program, which "shall provide specialized sex offender assessment, diagnosis, care, treatment, supervision, and other services to civilly committed sex offenders," including "specialized programs at secure facilities," "consultative services, aftercare services, community-based services and programs, transition services, or other services consistent with the mission of the Department of Human Services."  Minn. Stat. § 246B.02.

24.     Following the enactment of the MCTA in 1994, several civilly committed individuals under the newly-enacted legislation challenged the statute's constitutionality. For example, Dennis Darol Linehan, who was subject to commitment under the new law, appealed the state court's commitment order on constitutional grounds.  At the time of these challenges, the state represented to the courts that the MSOP was an approximately thirty-two-month program for "model patients."

25.     However, the MSOP has developed into indefinite and lifetime detention. Since the program's inception in 1994, no committed individual has ever been fully discharged from the MSOP, and only three committed individuals have ever been provisionally discharged from the MSOP.  By contrast, Wisconsin has fully discharged 118 individuals and placed approximately 135 individuals on supervised release since

1994. New York has fully discharged 30 individuals—without any recidivism incidents, placed 125 individuals on strict and intensive supervision and treatment ("SIST") upon their initial commitment, and transferred 64 individuals from secure facilities to SIST.

26.     Minnesota presently has the lowest rate of release from commitment in the nation.

27.     Since the MCTA's enactment in 1994, the number of civilly committed sex offenders in Minnesota has grown significantly.  The total number of civilly committed sex offenders in Minnesota has grown from less than 30 in 1990, to 575 in 2010, to a current count of approximately 714.  From 2000 to 2010, the civilly committed population in Minnesota grew nearly fourfold.  The state projects that the number of civilly committed sex offenders will grow to 1,215 by 2022.

28.     Minnesota presently has the highest per-capita population of civilly committed sex offenders in the nation.

29.     The rate of commitment in Minnesota is 128.6 per million, the rate of commitment in North Dakota is 77.8 per million, and the rate of commitment in New York is 15 per million.  The rate of commitment in Minnesota is significantly higher than the rate of commitment in Wisconsin, which is demographically similar to Minnesota.

30.     A significant increase in commitment and referral rates followed the abduction and murder of Dru Sjodin in late 2003.  Johnston credibly testified that the MSOP experienced a "tremendous growth" in early 2004 following the Dru Sjodin tragedy, which caused the treatment program to expand "at an enormous rate."  Hébert

credibly testified that the MSOP received over 200 referrals in one month alone in 2003, followed by hundreds of referrals in subsequent months and years. Benson credibly testified that the Dru Sjodin murder "had a direct and dramatic impact on the program."

31.     After the Dru Sjodin tragedy, state law was amended to increase the duration of conditional release for sex offenders and to increase the conditional release options available to a state court when sentencing sex offenders.

32.     Minn. Stat. § 609.3455, subd. 6 requires that, when a district court commits a first-time sex offender to the custody of the Commissioner of the Department of Corrections ("DOC"), the court shall provide that, after the offender has been released from prison, the Commissioner of the DOC shall place the offender on conditional release for ten years.

33.     Minn. Stat. § 609.3455, subd. 7 requires that, when a district court commits a sex offender with two or more offenses to the custody of the Commissioner of the DOC, the court shall provide that, after the offender has been released from prison, the Commissioner of the DOC shall place the offender on conditional release for the remainder of the offender's life.

34.     Minn. Stat. § 609.3455, subd. 8, and Minn. Stat. § 244.05, subd. 6 provide that conditions of release for sex offenders sentenced to prison may include successful completion of treatment and aftercare programs, random drug testing, house arrest, daily curfews, electronic surveillance, and participation in an appropriate sex offender program.

35.     In December 2003, the DOC began to use a formal review process to identify sex offenders in Minnesota's correctional facilities for referral to civil commitment following their incarceration. Prior to December 2003, the DOC focused on identifying sex offenders who were clearly dangerous for possible commitment. Beginning in December 2003, the DOC began referring all sex offenders who the DOC believed satisfied the legal commitment standard or who the DOC believed might qualify for civil commitment to county attorneys.

36.     In December 2003, the DOC referred 236 additional sex offenders to county attorneys after an extensive review of incarcerated offenders and offenders on supervised release. This increase constituted more than seventy percent of the referrals that were made in the previous thirteen years.

37.     Between 2004 and 2008, the DOC made approximately 157 referrals per year, which was 6 times the referral rate between January 1991, when the DOC began reviewing sex offenders for referral to civil commitment, and November 2003. In 2009, the DOC made 114 referrals to county attorneys. Currently, the DOC refers approximately one-third of those reviewed for commitment. Every sex offender that the DOC has referred for commitment has served their full prison sentence.

38.     The majority of commitments result from referrals by the DOC to county attorneys.

39.     There are significant geographic variations in petition and commitment rates across the state. On average, county attorneys in the seven most populous counties in Minnesota filed commitment petitions for forty-four percent of the referrals between

1991 and 2008. Between 1991 and 2008, the commitment rates varied from thirty-four percent to sixty-seven percent among the ten judicial districts, with the lowest commitment rates in counties around northeastern Minnesota and the highest commitment rates in counties in southeastern, southwestern, west central, and northwestern Minnesota.

40.     Since 1994, various evaluators have published reports that are critical of the state's civil commitment system, the MCTA, and the MSOP's treatment program structure. The Governor's Commission on Sex Offender Policy ("Governor's Commission")[1] issued a report in January 2005 recommending, among other things, the transfer of the screening process of sex offenders for possible civil commitment to an independent panel and the establishment of a continuum of treatment options. The Office of the Legislative Auditor for the State of Minnesota ("OLA") issued a report in March 2011 ("OLA Report") recommending numerous changes to the civil commitment statutory scheme as well as to the MSOP, including revising statutory commitment standards and creating lower cost, reasonable alternatives to commitment at high-security facilities. The Sex Offender Civil Commitment Advisory Task Force ("Task Force")[2]

---

[1]     The Governor's Commission consisted of twelve individuals appointed by Governor Tim Pawlenty to focus on current and best practices relating to sentencing, supervision, commitment, healthcare services, and registration of sex offenders.

[2]     The Task Force was established pursuant to the Court's August 15, 2012 Order requiring the Commissioner of DHS to establish a fifteen-member advisory task force to examine and recommend legislative proposals to the Commissioner of DHS on topics related to the civil commitment process, less restrictive alternative options, and standards and processes for the reduction of custody. (*See* Doc. No. 208 at 2.)

recommended, among other things, that the Commissioner of DHS develop less restrictive programs throughout the state. The MSOP Program Evaluation Team ("MPET")[3] found that the MSOP's requirements for phase progression may be too stringent and recommended modification of the phase progression criteria. The Rule 706 Experts[4] published reports criticizing the commitment and placement of certain committed individuals and a final report identifying problems with various aspects of the program, including the lack of periodic assessments. The MSOP Site Visit Auditors[5] have issued reports every year since 2006 that have identified deficiencies in the program and statutory scheme and have included recommendations to improve the civil commitment system.

41.     During the 2013-2014 legislative session, Senator Kathy Sheran introduced a bill, Senate File Number 1014, which included provisions that would have implemented

---

[3]     The MPET was established pursuant to the Court's November 9, 2012 Order requiring the Commissioner of DHS to create an evaluation team consisting of five qualified sex offender clinical professionals to evaluate sex offender treatment and to address possible program issues associated with phase progression. (*See* Doc. No. 275 at 2-3.) The MPET Program Evaluation team members include James Haaven ("Haaven"), Christopher Kunkle ("Kunkle"), Robert McGrath ("McGrath"), Dr. William Murphy ("Dr. Murphy"), and Dr. Jill D. Stinson ("Dr. Stinson").

[4]     On December 6, 2013, the Court appointed four experts, Dr. Naomi Freeman ("Dr. Freeman"), Deborah McCulloch ("McCulloch"), Dr. Robin Wilson ("Dr. Wilson"), and Dr. Michael Miner ("Dr. Miner"), pursuant to Rule 706 of the Federal Rules of Evidence. (*See* Doc. No. 393.) The parties jointly nominated these four experts (*id.* at 1) and the parties submitted their respective proposals regarding the work of the Rule 706 Experts to the Court (*see* Doc. No. 421).

[5]     The Site Visit Auditors, Haaven, McGrath, and Dr. Murphy, were hired by the MSOP to review and evaluate its treatment program.

certain recommendations by the Task Force. Although the bill passed the Senate on May 14, 2013, the bill did not become law because the companion bill that was introduced by Representative Tina Liebling in the House of Representatives, House File Number 1139, did not pass the House.

42. During the 2015-2016 legislative session, Senator Kathy Sheran, Senator Tony Lourey, and Senator Ron Latz introduced a bill, Senate File Number 415, which included provisions that would have established and appropriated funding to a civil commitment screening unit to review cases and conduct evaluations; required biennial reviews; implemented a statewide sex offender civil commitment judicial panel; and established a sex offender civil commitment defense office. The bill was referred to the Senate Committee on Health, Human Services and Housing in January 2015, but did not reach the Senate floor.

**The MSOP Facilities**

43. The MSOP provides housing for its civilly committed residents in three facilities, which include the secure treatment facility in Moose Lake, Minnesota; the secure treatment facility in St. Peter, Minnesota; and the Community Preparation Services ("CPS"), which is located on the St. Peter site outside of the secure perimeter.

44. The Moose Lake facility is the most restrictive facility and CPS is the least restrictive facility.

45. The St. Peter facility is designated for committed individuals in later stages of treatment and for individuals with special needs, such as individuals with cognitive disabilities, individuals with severe mental illness, or vulnerable adults. Approximately

257 committed individuals currently reside within the secure perimeter of the St. Peter facility.

46.     The CPS facility currently has a thirty-eight bed capacity limit. Approximately thirty-two committed individuals currently reside at CPS. This is a significant increase from the six CPS residents in 2010, eight CPS residents in 2011, and nine CPS residents in 2012.

47.     As a result of the limited bed capacity at the CPS facility, committed individuals have had to wait for beds to become available before being transferred to CPS from the more restrictive facilities at the MSOP. Dr. Elizabeth Barbo ("Dr. Barbo"), the MSOP Reintegration Director, credibly testified that there have been individuals who have been transferred to CPS who have had to wait due to a lack of bed space at the CPS facility.

48.     Since the commencement of this lawsuit in 2011, the MSOP has started constructing a new facility, akin to CPS, with an additional thirty beds. Construction on the new building is projected to be completed by July 1, 2015. Dr. Barbo credibly testified that once construction on the new building is complete, CPS will have fifty-three licensed beds in total.

49.     Committed individuals to the MSOP cannot be initially placed at the CPS facility. Dr. Barbo credibly testified that CPS is not available to a newly-committed individual in Minnesota.

50.     Minnesota is one of two states that have reported providing housing for its female civilly committed residents in the same facility as its male civilly committed

residents.  Currently, one female, Rhonda Bailey ("Bailey"), resides at the MSOP's St. Peter facility in a unit with twenty-two male civilly committed residents.  Although Bailey has been committed to the MSOP since 1993 and has been housed at the St. Peter facility with all males since 2008, the Site Visit Auditors did not know that Bailey was housed with all men prior to 2014.  Until recently, Bailey was receiving group therapy with all men and was denied recommended eye movement desensitization and reprocessing treatment.  Despite the Rule 706 Experts' June 4, 2014 report and recommendation that Bailey be transferred or provisionally discharged from the MSOP to a supervised treatment setting, and Plaintiffs' motion to transfer Bailey to an appropriate treatment facility, the MSOP has not taken any steps to implement these recommendations.  Dr. Haley Fox ("Dr. Fox"), Clinical Director of the MSOP St. Peter facility, credibly testified that it would be optimal if Bailey were placed in a different facility.  Dr. Fox further credibly testified that the MSOP has the ability to contract with both in-state and out-of-state facilities to place Bailey in another setting.

51.     The evidence clearly establishes that hopelessness pervades the environment at the MSOP, and that there is an emotional climate of despair among the facilities' residents, particularly among residents at the Moose Lake facility.  Bolte, Karsjens, Foster, and Eric Terhaar ("Terhaar"),[6] offered compelling testimony regarding

---

[6]     Bolte and Terhaar are only two of the sixty-seven committed individuals at the MSOP with no adult convictions ("juvenile-only offenders").  Bolte was civilly committed to the MSOP in June 2006 when he was nineteen years old.  Terhaar was civilly committed to the MSOP in January 2009 when he was nineteen years old.  On

(Footnote Continued on Next Page)

the "hopeless environment" at the MSOP. Bolte credibly testified that he is "[e]xtremely hopeless" because he believes that "the only way to get out is to die." Foster credibly testified that he does not want to move from the Moose Lake facility to the St. Peter facility and progress in treatment because he is more likely to see his ten-year-old son, who lives near the Moose Lake facility, while in Phase II at Moose Lake than if he moved to St. Peter and lingered in Phase III for years. Dr. Freeman corroborated that many individuals in CPS expressed severe hopelessness. Terrance Ulrich ("Ulrich"), a Senior Clinician at the MSOP Moose Lake facility, agreed that there is a perception among committed individuals that they will never be discharged from the MSOP and that "they might die in the facility." Ronda White ("White"), a Treatment Psychologist at the MSOP Moose Lake facility, offered persuasive testimony that working at the facility can be difficult "because of the hopelessness."

52.     As of July 1, 2014, the cost of confining committed individuals at the MSOP was approximately $124,465 per resident per year. This cost is at least three times the cost of incarcerating an inmate at a Minnesota correctional facility.

53.     There is no alternative placement option to allow individuals to be placed in a less restrictive facility at the time of their initial commitment to the MSOP. Dr. Fox credibly testified that the only facilities in which individuals can be placed at the beginning of their commitment are the secure facilities at Moose Lake and St. Peter.

---

(Footnote Continued From Previous Page)
May 18, 2014, the Rule 706 Experts issued a report recommending Terhaar's full discharge from the MSOP.

Sue Persons ("Persons"), former Associate Clinical Director of the MSOP, confirmed that the MSOP lacks less restrictive options, such as halfway houses, for committed individuals at the MSOP. This lack of less restrictive facilities and programs undermines the MCTA's provision allowing a committing court to consider placing an individual at a less restrictive alternative.

54. It is undisputed that there are civilly committed individuals at the MSOP who could be safely placed in the community or in less restrictive facilities. McCulloch credibly testified that there are individuals at both the Moose Lake and St. Peter facilities who could be treated in a less restrictive environment. Similarly, Dr. Nicole Elsen ("Dr. Elsen"), Clinical Supervisor of the MSOP St. Peter facility, James Berg ("Berg"), Associate Clinical Director of the MSOP, Ulrich, Benson, Persons, Peter Puffer ("Puffer"), Clinical Director of the MSOP Moose Lake facility, Hébert, Johnston, Anne Barry ("Deputy Commissioner Barry"), Deputy Commissioner of DHS Direct Care and Treatment, and Dr. Fox, all credibly testified that there are committed individuals at the MSOP, including some of the sixty-seven juvenile-only offenders at the MSOP, who could be treated safely in a less secure facility.

55. The Task Force recommended that the Commissioner of DHS develop less restrictive programs throughout the state. The Task Force recommended that less restrictive facilities be designed to serve both those who are already civilly committed to secure facilities as well as those who are subsequently civilly committed to the MSOP.

56. In recent years, DHS attempted to provide less restrictive placement options for civilly committed individuals at the MSOP. In September 2013,

Commissioner Jesson sent a letter to the Minnesota Legislature identifying committed individuals at the MSOP who could be transferred to an existing DHS site in Cambridge, Minnesota. Commissioner Jesson expected the facility to become available to the MSOP in 2014. Commissioner Jesson credibly testified that she planned to transform the Cambridge facility to become a less restrictive alternative for individuals committed as sex offenders. However, those efforts were halted by Governor Dayton's November 2013 letter. In that letter, Governor Dayton directed Commissioner Jesson to suspend DHS' plans to transfer any sex offenders to a less restrictive facility such as Cambridge until: (1) the Task Force issued its findings and recommendations; (2) the legislature had the opportunity to review existing statutes and make any necessary revisions; and (3) the legislature and the Governor's Administration have agreed to and provided sufficient funding for the additional facilities, programs, and staff necessary for the program's successful implementation.

57.     The Task Force issued its final findings and recommendations on December 2, 2013. After the 2013-2014 legislative session, Minnesota renewed efforts to create less restrictive alternatives that could be used to relocate individuals committed to the MSOP. Commissioner Jesson credibly testified that DHS recently entered into third-party contracts to allow committed individuals to be placed outside of the current facilities in Moose Lake and St. Peter. Dr. Barbo credibly testified that the MSOP entered into approximately fifteen contracts for transitioning housing and adult foster care or treatment services. Despite this, there are currently only a very limited number of beds available in the MSOP's contracted alternative placement options. Outside of CPS,

the MSOP has less than twenty beds available for less restrictive alternative placements. In addition, these contracts are only for a limited type of population at the MSOP. The MSOP does not have any contracts in place to allow vulnerable adults in the Assisted Living Unit at the MSOP to be placed in other facilities. A Class Member, Harley Morris ("Morris"), passed away while he was on hospice care at the MSOP's Moose Lake facility.

58.     The evidence overwhelmingly demonstrates, as Dr. Fox concluded, that providing less restrictive confinement options would be beneficial to the State of Minnesota and the entire civil commitment system without compromising public safety.

**The MSOP Treatment Program**

59.     The MSOP Program Theory Manual, the MSOP Treatment Manual, and the MSOP Clinician's Guide describe the MSOP's program model.

60.     The stated goal of the MSOP's treatment program, observed in theory but not in practice, is to treat and safely reintegrate committed individuals at the MSOP back into the community.

61.     Currently, the MSOP treatment program is organized into three phases of indeterminate length.

62.     The current three-phase program began in 2008 after Hébert became Executive Clinical Director of the MSOP. Prior to 2008, the MSOP used various programming over the years. Steiner credibly testified that there have been four or five clinical directors during his commitment at the MSOP, and that the MSOP's treatment program changed four or five times with each change in clinical leadership.

63.     Currently, Phase I of the MSOP treatment program focuses on rule compliance, emotional regulation, and treatment engagement.  In Phase I, the MSOP emphasizes learning to comply with facility rules and expectations, as well as providing an introduction to basic treatment concepts.  However, in Phase I, individuals do not receive any specific sex offense related therapy.

64.     Phase II focuses on identifying and addressing patterns of sexually abusive behavior and cycles.  In Phase II, the MSOP emphasizes discussion and exploration of the committed individual's history of sexual offending behavior and maladaptive patterns of behavior, along with the motivations for those behaviors.

65.     Phase III focuses on reintegration into the community.  In Phase III, the MSOP emphasizes application of skills learned in Phase II to daily life, demonstrating utilization of pro-social coping strategies, and reintegrating back to the community.

66.     Reintegration services are not available to individuals committed at the MSOP until they are in Phase III of the treatment program.  Puffer, Darci Lewis ("Lewis"), a clinician at the MSOP Moose Lake facility, and Dr. Fox each credibly testified that reintegration training and services do not start until Phase III.  Johnston credibly testified that the MSOP's reintegration staff does not assist committed individuals who are in Phase I or Phase II with discharge planning, which Johnston described as merely "finding an address and a place to live and putting together a supervision plan."  Although Hébert credibly testified that the provisional discharge plan is "certainly more than an address," Hébert confirmed that the MSOP does not assist

committed individuals with finding an address as part of a provisional discharge plan when they are initially committed to the MSOP or are in an earlier treatment phase.

67. Although the MSOP's Treatment Manual states that individuals who are civilly committed at the MSOP may start treatment in other phases, virtually every offender enters the treatment program in Phase I. For example, Lewis credibly testified that all committed individuals are placed in Phase I of the treatment program at the Moose Lake facility and that she was not aware of any individuals who had started in any other phase.

68. There are no reports or assessments conducted at the time of admission to determine what phase of treatment a committed individual should be placed in at the MSOP.

69. The MSOP does not have a policy of seeking to obtain documents pertaining to a committed individual from the DOC when the DOC fails to provide them to the MSOP when a committed individual is initially placed at the MSOP. Dr. Elizabeth Peterson ("Dr. Peterson"), Treatment Assessment Unit Supervisor of the MSOP Moose Lake facility, credibly testified that whether MSOP will be able to obtain the records varies by file and that the MSOP does not always obtain all of the documents or records.

70. The MSOP does not have a practice of considering past participation in sex offender treatment when placing committed individuals into assigned treatment phases or when attempting to individualize treatment. Bolte credibly testified that he started in Phase I, even though he had participated in sex offender treatment in previous juvenile

placements. Thuringer credibly testified that he started in Phase I, despite completing an inpatient treatment program prior to his commitment. Puffer credibly testified that the MSOP should assess committed individuals at the MSOP who have had sex offender treatment prior to commitment to determine if they are in the correct phase of the treatment program.

71.     Some committed individuals at the MSOP are not in the proper phase of treatment. The MPET reported that thirty percent of the Phase I patient files reviewed reflected that the patients were not placed in the proper phase based on the MSOP's own policies. Since receiving the MPET Report, the MSOP has not reassessed all committed individuals to determine if they are in the proper phase of treatment. In addition, the MSOP clinicians credibly testified that there are individuals who are in the wrong treatment phase. For example, Lewis credibly testified that both Steiner and Foster should have been allowed to progress to a different treatment phase and should be moved to Phase III.

72.     The requirements for progression from Phase I to Phase II are: (1) two consecutive quarterly reports that indicate the individual has achieved at least satisfactory scores of three plus out of five on the Phase I Matrix factors; (2) a score of at least a two on the Matrix Factors of healthy lifestyle and life enrichment; (3) participation in a maintenance polygraph; (4) two consecutive quarters of no major Behavioral Expectation Reports; and (5) active treatment participation as evidenced by requesting group time at least fifty percent of the time in the previous quarter.

73.     The requirements for progression from Phase II to Phase III are: (1) two consecutive quarterly reports that indicate an average of four or better on each Phase II Matrix factor; (2) taking of a PPG or Abel/ABID assessment and addressing the results in treatment; (3) taking a maintenance polygraph to verify the individual's report regarding adherence to program reports; (4) taking a full disclosure polygraph to verify an agreed-upon sexual history; and (5) successfully addressing in core group, through goal presentation and discussion, the individual's offense cycle/chain, roots of offending, relapse prevention plan, and an understanding of sexual arousal patterns and a plan to manage sexual deviance.

74.     The phase progression requirements apply to all committed individuals at the MSOP, including those in the Nova Unit for individuals with severe mental illness, those in the Alternative Program for individuals with cognitive disabilities, and those in the Young Adult Unit for juvenile-only offenders. Puffer and Dr. Fox credibly testified that the MSOP's phase progression policy applies to all committed individuals at the MSOP. Persons credibly testified that the MSOP treatment program is not structured differently for juvenile-only offenders, and that the three-phase progression model applies equally to juvenile-only offenders. Ulrich credibly testified that individuals in the mental health unit must meet the same phase progression criteria as all other committed individuals at the MSOP.

75.     Committed individuals at the MSOP must meet the progression policy requirements outlined in the Clinician's Guide in order to progress through the treatment program. Puffer credibly testified that committed individuals generally must satisfy the

requirements for each phase in order to progress through treatment. Dr. Elsen credibly testified that she has never progressed an individual through the MSOP treatment program who has not satisfied each of the phase progression requirements listed in the Clinician's Guide.

76.     Committed individuals at the MSOP may not skip phases of the treatment program. Persons credibly testified that it is not possible for committed individuals to skip a phase in the phase progression process.

77.     The MSOP uses the Goal Matrix for Phases I, II, and III to identify treatment goals for each phase of the program, to measure treatment progress, and to reference as a benchmark for moving committed individuals between phases of the program. The MSOP began using the Goal Matrix in 2009.

78.     Treatment progress is scored using the Matrix factors. Puffer credibly testified that committed individuals are scored on their Matrix factors to assess their treatment progress and to determine whether they should progress in treatment. Dr. Fox credibly testified that the Matrix factors are the primary tool used for measuring treatment progress at the MSOP.

79.     The Matrix factors include group behavior, attitude toward change, self-monitoring, thinking errors, emotional regulation, interpersonal skills, sexuality, cooperation with rules/supervision, prosocial problem solving, productive use of time, healthy sexuality, and life enrichment.

80.     The Matrix factors are used for all committed individuals at the MSOP, including those in the Nova Unit for individuals with severe mental illness, those in the

Alternative Program for individuals with cognitive disabilities, those in the Assisted Living Unit for vulnerable adults, those in the Behavior Therapy Unit for individuals who have demonstrated problematic behavioral issues, and those in the Young Adult Unit for juvenile-only offenders.

81. The Matrix factors are scored using the same scoring spectrum for all committed individuals at the MSOP, including those in the Nova Unit for individuals with severe mental illness, those in the Alternative Program for individuals with cognitive disabilities, those in the Assisted Living Unit for vulnerable adults, those in the Behavior Therapy Unit for individuals who have demonstrated problematic behavioral issues, and those in the Young Adult Unit for juvenile-only offenders.

82. The Matrix factors are not used by any other civil commitment program in the country.

83. Independent evaluators and internal staff at the MSOP have repeatedly observed confusion regarding how the Matrix factors were to be used and inconsistencies with the application of the Matrix factors. McCulloch and Puffer credibly testified that the MSOP clinicians were not applying and scoring the Matrix factors in a consistent manner on committed individuals at the MSOP. Dr. Mischelle Vietanen ("Dr. Vietanen"), the former MSOP Clinical Supervisor, credibly testified that she frequently saw individuals' scores on the Matrix factors fluctuate, due to changes in staffing, and that she was concerned by the lack of inter-rater reliability of the Matrix factors. Persons credibly testified that newer clinicians are more likely to give

lower Matrix scores.  The Site Visit Auditors expressed concerns regarding the scoring accuracy and consistency of scoring of the Goal Matrix across the MSOP assessors.

84.     Despite the critical reports by external reviewers, the MSOP has not implemented any system to determine how clinicians are scoring the Matrix factors or whether there is any consistency in scoring the Matrix factors.

85.     The MSOP did not provide training to all staff on the Matrix factors until 2013 and 2014, and the MSOP did not provide any training on the Matrix scoring until 2014.  Dr. Vietanen credibly testified that she did not receive any training on the Matrix factors.

86.     Inconsistent scoring on the Matrix factors can slow treatment progression. Puffer and Dr. Fox credibly testified that inconsistency in scoring the Matrix factors could affect a committed individual's ability to progress in treatment phase.

87.     To progress in treatment phase, a committed individual must have at least two consecutive quarters with no major Behavioral Expectation Reports ("BERs"), even if the major BERs are not related to sexual offending.  Elsen credibly testified that she has never progressed an individual through the MSOP treatment program who has not achieved two consecutive quarters with no major BERs as required by the MSOP's phase progression policy.

88.     Minor BERs, including those unrelated to sexual offending, can prevent a committed individual from progressing in treatment phase.  Hébert and Berg credibly testified that minor BERs can hinder treatment progression.  Bolte credibly testified that

receiving multiple minor BERs can prevent phase progression. Lewis credibly testified that minor BERs can be considered in making phase progression decisions.

89. BERs can also affect scoring on the Matrix factors. Bolte credibly testified that he was told by clinical staff that his Matrix scores were lowered due to BERs.

90. Committed individuals can be regressed in treatment as a result of receiving major BERs. Foster was moved from Phase II back to Phase I after receiving a major BER for possessing adult-themed pornography.

91. As of October 2012, the MSOP phase progression design time line indicated a range of six to nine years for a "model client" to progress from Phase I through Phase III.

92. Currently, the treatment program at the MSOP does not have any delineated end point.

93. The lack of clear guidelines for treatment completion or projected time lines for phase progression impedes a committed individual's motivation to participate in treatment for purposes of reintegration into the community. Bolte credibly testified that when he was initially committed to the MSOP, he was told that he would be "fast-tracked" through the program and would be one of the first individuals to ever complete the program, but that now, after years of being in Phase I without progressing, he has lost motivation to participate in the treatment program. The OLA Report found that lack of client motivation has been a barrier to progression in treatment at the MSOP. The Site Visit Auditors reported that committed individuals "consistently expressed concerns that slow movement through the program . . . was demoralizing, increased

hopelessness, and negatively impacted motivation and engagement." The Governor's Commission reported that "those who have made progress in treatment should have an expectation that their confinement in civil commitment will end one day."

94. Some committed individuals at the MSOP, such as Steiner, have been confined for more than twenty years.

95. Progression through the treatment program at MSOP has historically been very slow. As of June 30, 2010, approximately fifty percent of committed individuals at the MSOP were in Phase I, twenty-one percent were in Phase II, seven percent were in Phase III, and twenty-one percent had declined treatment. As of February 2011, only thirty committed individuals at the MSOP were in Phase III. As of the first quarter of 2012, sixty-five percent of committed individuals at the MSOP were in Phase I, twenty-five percent were in Phase II, four percent were in Phase III, and six percent had declined treatment.

96. Committed individuals only began progressing through the treatment phases at the MSOP in recent years. As of the fourth quarter of 2014, thirty-nine percent of committed individuals at the MSOP were in Phase I, fifty-one percent were in Phase II, nine percent were in Phase III, and one percent had declined treatment.

97. Independent evaluators and outside experts have repeatedly criticized the lack of progression. Every year since 2006, the Site Visit Auditors have voiced concerns in all of their evaluation reports to the MSOP about the disproportionately high number of committed individuals in Phase I compared to those in Phase III of the treatment program. In 2011 and 2012, the Site Visit Auditors reported that "[s]low movement

through the program and the multiple required legislative steps for discharge in Minnesota hampers program effectiveness" and that "[t]he lack of clients 'getting out' can be demoralizing to clients and staff, and in the long run may increase security concerns." These concerns have never been successfully addressed.

98.     Some committed individuals in the Alternative Program have been in Phase I for over five years or in Phase II for over five years. Puffer credibly testified that some committed individuals in the Alternative Program may not be able to complete the treatment program due to cognitive capacity limitations.

99.     As of March 31, 2013, the MSOP identified 131 individuals who had been in Phase I for 36 months or more, 67 individuals who had been in Phase II for 36 months or more, and 14 individuals who had been in Phase III for 36 months or more.

100.     Although CPS was originally designed to last approximately nine months, no committed individual at the MSOP has moved through CPS in nine months or less. The first two individuals who were ever placed at CPS, sometime before 2010, John Rydberg ("Rydberg") and Thomas Duvall ("Duvall"), still remain at CPS.

101.     There are committed individuals at the MSOP who have reached the maximum benefit and effect of treatment at the MSOP. Dr. Elsen identified individuals who had reached "maximum treatment effect" at the MSOP who could not receive any further benefit from sex offender treatment. Similarly, the Site Visit Auditors reported that there are individuals at the MSOP who may have reached the maximum benefit within the treatment program and who could receive services in a different setting.

102.    The MSOP has no system or policy in place to ensure that committed individuals who are not progressing through the treatment phases in a timely manner are reviewed by clinicians at the MSOP or by external reviewers.  Haaven credibly testified that the most important change he would like to see at the MSOP is a mechanism to identify barriers to phase progression.

103.    Some committed individuals at the MSOP have regressed as a result of changes to the treatment program phase progression model.  For example, Steiner had progressed to the last phase of the treatment program; the MSOP then adopted the current three-phase model, resulting in Steiner starting over and moving back to the MSOP Moose Lake facility.

104.    Clinical staffing shortages and turnover at the MSOP have hindered the ability of the MSOP to provide treatment as designed and have impeded treatment progression of committed individuals at the MSOP.  White credibly testified that since 2008, shortages in the clinical staffing at the MSOP have impacted the therapeutic alliance between committed individuals and their clinicians and have slowed down the treatment progression for some individuals.  Berg credibly testified that a high vacancy rate of clinicians and a high turnover rate of clinicians at the MSOP could slow treatment progress.  McCulloch acknowledged that staffing shortages have been a reoccurring problem at the MSOP due to staffing vacancies.  Dr. Fox confirmed that the MSOP has experienced staff shortages and that, as a result of those shortages, clinicians' caseloads have tended to be greater at times, which have affected the quality of treatment.  The

Site Visit Auditors also confirmed that frequent staff turnover, particularly at Moose Lake, has negatively impacted therapeutic treatment engagement.

105.    Committed individuals at the MSOP are uncertain and unaware of how to progress through treatment.  For example, Bolte credibly testified that "[n]obody knows how to complete the program."  Terhaar credibly testified that he is confused as to what scores he needs to progress from Phase I to Phase II of the treatment program.  Lonergan credibly testified that he does not know what he needs to do to progress to Phase II of the treatment program.

106.    Some individuals confined at the MSOP have stopped participating in treatment, despite satisfying phase progression requirements, because they knew it was futile and they would never be released.  Thuringer credibly testified that some individuals have been confined at the MSOP for over twenty years and have completed the treatment program three times, but are currently only in Phase II due to subsequent treatment program changes; he concluded it would be "futile" to even attempt to progress through the treatment program.  Dr. Peterson credibly testified that some individuals do not participate in treatment because they do not see the purpose of participating if they do not believe they will ever be discharged from the MSOP, or because they previously participated in treatment but were forced to restart the treatment program when the program changed.

**Risk Assessments**

107.    There are individuals who meet the reduction in custody criteria or who no longer meet the commitment criteria, but who continue to be confined at the MSOP.

108.    Defendants are not required under the MCTA to conduct periodic risk assessments after the initial commitment to determine if individuals meet the statutory requirements for continued commitment or for discharge.

109.    The large majority of states require regular risk assessments of all civilly committed sex offenders.  For example, the Wisconsin and New York civil commitment statutes require annual risk assessments, and the Texas civil commitment statute requires biannual reviews and a hearing before a court to determine whether an individual no longer meets the criteria for commitment.

110.    As of 2011, Minnesota and Massachusetts were the only two states that did not require annual reports to the courts regarding each sex offender's continuing need to be committed.

111.    Significantly, a full risk assessment is the only way to determine whether a committed individual meets the discharge criteria.

112.    Risk assessments are only valid for approximately twelve months. Johnston and Puffer credibly testified that if a risk assessment has not been conducted within the past year on civilly committed individuals at the MSOP, the MSOP does not know whether those individuals meet the statutory criteria for commitment or for discharge.  Hébert credibly testified that all juvenile-only offenders who have not had a risk assessment within the last year should be reassessed to determine whether they meet the statutory criteria for continued commitment or for discharge.

113.    Risk assessments need to be performed regularly to account for new research, aging of the individual, and to track an individual's changes through treatment.

114. The MSOP does not conduct risk assessments on a regular, periodic basis to determine whether an individual continues both to need further inpatient treatment and supervision for a sexual disorder and continues to pose a danger to the public.

115. The MSOP historically has not conducted risk assessments on civilly committed individuals outside of the petitioning process. Dr. Elsen, Puffer, Berg, and Dr. Fox credibly testified that risk assessments are only performed when a petition for a reduction in custody is filed.

116. In 2013, DHS attempted to implement a rolling risk assessment process. Commissioner Jesson, in a letter to Johnston, stated that the MSOP will implement a new plan so that all Class Members receive a full risk assessment on a rolling schedule. Although Hébert and Johnston testified that the MSOP had begun to undertake one or two risk assessments per month outside the petitioning process, many witnesses were not aware of Commissioner Jesson's letter or the proposed directive. For example, Dr. Elsen was unaware that the MSOP was conducting any rolling risk assessments. Puffer credibly testified that he had never seen Commissioner Jesson's letter regarding rolling risk assessments. Dr. Anne Pascucci ("Dr. Pascucci"), a Forensic Evaluator at the MSOP, credibly testified that she had not heard of Commissioner Jesson directing the MSOP to begin conducting risk assessments on a rolling basis. Dr. Fox credibly testified that the MSOP had not established a new policy regarding rolling risk assessments, but the MSOP had been "having conversations about doing more risk assessments on a more regular basis." At the proposed rolling assessment rate, it would take between thirty and

sixty years to finish just one risk assessment for each Class Member currently committed at the MSOP.

117.    The MSOP could hire outside assessors to perform these rolling risk assessments.  Hébert and Johnston credibly testified that the MSOP could hire outside experts to conduct risk assessments.

118.    Only recently has the MSOP begun conducting risk assessments outside of the petitioning context.  Recently, Dr. Pascucci was asked by Dr. Lauren Herbert ("Dr. Herbert"), the MSOP Risk Assessment Director, to conduct a risk assessment on Class Member Chad Plank ("Plank").  This is the first risk assessment the MSOP has ever conducted outside of the petitioning process.

119.    There are currently eight risk assessors employed by the MSOP.

120.    The MSOP has an internal forensic risk assessment unit.  Risk assessments are not conducted by independent examiners outside of the MSOP unless a committed individual has a petition before the Judicial Appeal Panel (the "Supreme Court Appeal Panel" or the "SCAP").

121.    Outside evaluators and reports, including the OLA Report, have discussed the benefits of independent reviewers for committed individuals.  The OLA Report found that requiring an independent review body would shelter the MSOP from making unpopular decisions and would ensure that decisions on reduction in custody petitions are based on risk, not treatment performance.

122.    There are no techniques or actuarial tools currently available for conducting an assessment of long-term risk for committed individuals with juvenile-only offenses.

Dr. Pascucci credibly testified that current actuarial assessment tools are not validated for juvenile-only offenders, and, therefore, risk assessment instruments cannot quantitatively assess risk for juvenile-only offenders. Dr. Amanda Powers-Sawyer ("Dr. Powers-Sawyer"), former Interim Clinical Director at the MSOP, credibly testified that long-term risk for juvenile-only offenders is impossible to calculate. The Rule 706 Experts reported that there are no techniques currently available for conducting an assessment of long-term risk for individuals with juvenile-only sexual offenses.

123.     Juvenile-only offenders have low recidivism rates compared to adult offenders. Dr. Powers-Sawyer credibly testified that the majority of juvenile-only offenders do not recidivate. Dr. Freeman credibly testified that the re-offense rate for juvenile sex offenders is approximately five percent. In comparison to the sixty-seven juvenile-only offenders currently committed to the MSOP, McCulloch credibly testified that only two or three juvenile-only offenders have been committed to the Wisconsin sex offender program, and Dr. Freeman credibly testified that no juvenile-only offenders are committed to the New York sex offender program, as juvenile-only offenders cannot be civilly committed in New York.

124.     The MSOP does not have a manual or guide regarding how to conduct risk assessments.

125.     The MSOP risk assessors consider whether a committed individual has major or minor BERs when conducting a risk assessment.

126.     The MSOP risk assessors most commonly use the Static-99R and the Stable-2007 as actuarial risk assessment tools.

127.     The Static-99R is a risk assessment tool that measures static factors, which are generally unchangeable in nature, whereas the Stable-2007 measures dynamic risk factors that are changeable in nature. The Static-99R is scored by assessing the offender on a list of objective criteria, including the number of prior sexual offenses, whether they had unrelated victims, and age at release, which provides predictive recidivism rates based on the corresponding risk category. The Static-99R and the Stable-2007 can be combined to assess an overall risk category.

128.     Both the Static-99R and Stable-2007 have limitations to their use as risk assessment tools. The Static-99R does not distinguish age for an individual who is over sixty years old or an individual who is over ninety years old. Dr. Herbert credibly testified that both the Static-99R and the Stable-2007 should be used with caution on individuals with cognitive disabilities. Dr. Pascucci credibly testified that the Stable-2007 is not generally used on individuals with cognitive limitations or severe mental illness and that when it is used, it is used with caution.

129.     The MSOP risk assessors did not consider the statutory criteria in risk assessment reports until late 2010 or early 2011.

130.     The MSOP risk assessors do not receive any formal legal training. Dr. Pascucci and Dr. Jennifer Jones ("Dr. Jones"), a Risk Assessor at the MSOP, credibly testified that they did not receive any training regarding the constitutional standards for commitment or discharge.

131. The standard set forth in the Minnesota Supreme Court's *Call v. Gomez* decision in 1995 was not incorporated into the language of the MSOP risk assessments until the risk assessment for Terhaar in June 2014.

**Petitioning Process for Reduction in Custody**

132. The MCTA provides that the process for a "reduction in custody," or a "transfer out of a secure treatment facility, a provisional discharge, or a discharge from commitment," begins with filing a petition with the Special Review Board ("SRB"). Minn. Stat. § 253D.27, subds. 1 & 2.

133. At least six months after initial commitment or a final decision on a prior petition, a committed individual or the Executive Director of the MSOP may file a petition for a reduction in custody with the SRB. Minn. Stat. § 253D.27, subd. 2.

134. Other state commitment statutes, including the Wisconsin and New York statutes, allow committed individuals to petition the committing court at any time to be discharged or for a reduction in custody.

135. Upon the filing of a petition, the SRB holds a hearing on the petition, and within thirty days of the hearing, the SRB issues a report with written findings of fact and recommendations of denial or approval of the petition to the SCAP. Minn. Stat. § 253D.27, subds. 3 & 4.

136. Petitions are generally heard in the order in which they are received.

137. The SCAP has the sole authority to grant a reduction in custody. No reduction in custody recommended by the SRB is effective until it has been both

reviewed by the SCAP and until fifteen days after the SCAP issues an order affirming, modifying, or denying the SRB's recommendation.  Minn. Stat. § 253D.27, subd. 4.

138.	Upon receipt of the SRB's recommendation, the committed individual, the county attorney of the county from which the person was committed or the county of financial responsibility, or the commissioner may petition the SCAP for a rehearing and reconsideration of the SRB's recommendation.  Minn. Stat. § 253D.28, subd. 1(a).  The SCAP hearing must be held "within 180 days of the filing of the petition [with the SCAP] unless an extension is granted for good cause."  *Id.*  If no party petitions the SCAP for a rehearing or reconsideration within thirty days, the SCAP shall either "issue an order adopting the recommendations of the [SRB] or set the matter on for a hearing."  Minn. Stat. § 253D.28, subd. 1(c).

139.	At the SCAP rehearing, "[t]he petitioning party seeking discharge or provisional discharge bears the burden of going forward with the evidence, which means presenting a prima facie case with competent evidence to show that the person is entitled to the requested relief."  Minn. Stat. § 253D.28, subd. 2(d).

140.	At the SCAP rehearing, the petitioning party seeking a transfer "must establish by a preponderance of the evidence that the transfer is appropriate."  Minn. Stat. § 253D.28, subd. 2(e).

141.	A party "aggrieved by an order of the [SCAP]" may appeal the SCAP decision to the Minnesota Court of Appeals.  Minn. Stat. § 253D.28, subd. 4; *see also* Minn. Stat. § 253B.19, subd. 5.

142.   To be transferred out from a secure treatment facility, the SCAP must be satisfied that transfer is appropriate based on five factors:  "(1) the person's clinical progress and present treatment needs; (2) the need for security to accomplish continuing treatment; (3) the need for continued institutionalization; (4) which facility can best meet the person's needs; and (5) whether transfer can be accomplished with a reasonable degree of safety for the public."  Minn. Stat. § 253D.29, subd. 1.

143.   For a provisional discharge, the SCAP must be satisfied that "the committed person is capable of making an acceptable adjustment to open society" based on two factors:  "(1) whether the committed person's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the committed person's current treatment setting; and (2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the committed person to adjust successfully to the community."  Minn. Stat. § 253D.30, subd. 1.

144.   For a full discharge, the SCAP must be satisfied that, after a hearing and recommendation by a majority of the SRB, "the committed person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision."  Minn. Stat. § 253D.31.  In determining whether a discharge shall be recommended, the SRB and the SCAP "shall consider whether specific conditions exist to provide a reasonable degree of protection to the public and to assist the committed person in adjusting to the community."  *Id.*

145.    The discharge criteria is more stringent and harder to prove than the commitment criteria.

146.    The SRB and the SCAP, with limited exception, will not grant provisional discharge or discharge without the support of the MSOP.  The SRB nearly always follows the MSOP's recommendation.  Dr. Fox credibly testified that the SRB and the SCAP have agreed with and granted petitions that the MSOP has supported and that she could not recall the SCAP not agreeing with the MSOP's recommendation in support of an individual's petition.  Deputy Commissioner Barry credibly testified that the SRB generally follows the MSOP's recommendations for provisional discharge or discharge.

147.    Since January 1, 2010, the SRB has recommended granting twenty-six petitions for transfer, eight petitions for provisional discharge, and no petitions for discharge.

148.    The MSOP supported all of the provisional discharge petitions that were recommended to be granted by the SRB.

149.    As of July 2014, the SCAP has granted transfer to CPS twenty-eight times, provisional discharge once, and full discharge zero times.

150.    SRB hearings are scheduled by the MSOP.  Currently, the SRB may hold up to four hearings a day for a total of sixteen hearings per month, although there are no restrictions on the number of hearings the SRB can hold.

151.    There is no time limit on the SCAP decisions.

152.    The SRB and the SCAP petitioning process, from the filing of the initial petition to receiving a final SCAP decision, can take years.  Karsjens credibly testified

that he filed a petition for a reduction in custody on October 11, 2011, and he did not receive a final order until June 10, 2013. The petitioning process for Duvall took approximately five years. Deputy Commissioner Barry credibly testified that some petitions can take longer than five years to complete the petitioning process. Johnston credibly testified that these time lines for the SRB hearings are too long.

153. As of June 2014, approximately 105 SRB petitions were pending decision and 48 petitions were pending a SCAP decision.

154. The shortest number of days between the time a petition is filed and the time of the hearing on the petition is twenty-nine days. This time period referred to Terhaar's petitioning process, which occurred after the Rule 706 Experts issued a report on May 18, 2014, unanimously recommending full discharge for Terhaar, and after the Court issued an order on June 2, 2014, ordering Defendants to show cause why Terhaar's continued confinement is not unconstitutional and why Terhaar should not be immediately and unconditionally discharged from the MSOP.

155. The MSOP has previously attempted to address delays in the petitioning process, but has not attempted to address the problem recently. In 2013, Commissioner Jesson set a goal of having petitions supported by the MSOP heard more quickly.

156. The SRB and the SCAP process is unduly lengthy and is bogged down with difficult procedures; the process denies individuals the services necessary to navigate the process.

157. These delays, in substantial part, are a result of insufficient funding and staffing. Berg and Puffer credibly testified that the MSOP lacks sufficient staff to complete the reports needed by the SRB and the SCAP.

158. Commissioner Jesson determines the number of SRB members and selects the SRB members after an application process. Currently, seventeen or eighteen positions out of twenty-four available positions are filled.

159. A committed individual retains the right to the writ of habeas corpus during the petitioning process. Minn. Stat. § 253B.23, subd. 5. However, the habeas procedure does not provide for an independent psychologist or psychiatrist to conduct an evaluation of the petitioning committed individual, and the petitioner is not provided counsel as a matter of right.

160. There is no bypass mechanism available for individuals to challenge their commitment.

161. Defendants are not required under the MCTA to petition for transfer or reduction in custody of committed individuals who meet the statutory requirements for such a reduction in custody.

162. There is no policy or practice at the MSOP, nor a requirement in the statute, that requires the MSOP to file a petition on an individual's behalf, even if the MSOP knows or reasonably believes that the individual no longer satisfies the statutory or constitutional criteria for commitment or for discharge.

163. Defendants could choose and have the discretion to file a petition for a reduction in custody on behalf of committed individuals at the MSOP.

164.    The MSOP knows that there are Class Members who meet the reduction in custody criteria or who no longer meet the commitment criteria but who continue to be confined at the MSOP.

165.    Despite its knowledge that individuals have met the criteria for release, the MSOP has never petitioned on behalf of a committed individual for full discharge.

166.    The MSOP had never filed a petition for a reduction in custody on behalf of a committed individual before 2013.

167.    The MSOP has only filed a petition for a reduction in custody on behalf of a committed individual seven times in the history of the program.  The seven petitions were for six individuals in the Alternative Program who were designated for transfer to Cambridge, but who ultimately were never transferred to Cambridge, and for Terhaar for transfer to CPS.

168.    The MSOP has only filed a petition for transfer to CPS on behalf of one individual in the history of the program.  In October 2014, Johnston filed a petition for transfer to CPS on behalf of Terhaar.  Terhaar credibly testified that no one from the MSOP told him about the filing of the petition on his behalf for transfer to CPS, and that he wanted the petition to be for his discharge from the MSOP rather than for his transfer to CPS.

169.    The MSOP has not filed a petition on behalf of any juvenile-only offender except Terhaar.

170.    The MSOP does not have an established process or practice to determine whether to petition on behalf of a committed individual.

171.    The MSOP's SRB policy states that when a petition for provisional discharge is supported by the treatment team, the MSOP staff are authorized to assist the individual petitioner with a provisional discharge plan.

172.    The MSOP only assists committed individuals who are in Phase III of treatment with provisional discharge plans.

173.    Although a committed individual must have a fully completed provisional discharge plan to support a provisional discharge petition, the MSOP does not assist committed individuals who are in Phase I or Phase II in creating a provisional discharge plan.

174.    The MSOP does not provide legal advice to committed individuals regarding filing a petition.

175.    Individuals confined at the MSOP have expressed confusion and uncertainty regarding the petitioning process, and some have been deterred from petitioning due to the daunting petitioning process.  For example, Terhaar credibly testified that he has not filed a petition for a reduction in custody because the petitioning process is very long and complicated, and he does not know how to navigate the petitioning process.  Foster credibly testified that he did not know about the petitioning form or process until another committed individual explained the form and process to him, after he had been committed for approximately six years.

176.    Between January 2010 and June 2014, 441 committed individuals at the MSOP who were potentially eligible for discharge had not filed a petition for a reduction in custody.

177. The MSOP has never supported a full discharge petition.

178. The MSOP has supported fewer than ten petitions for provisional discharge.

179. The MSOP will only support a petition for a reduction in custody if the petitioning individual fully completes the treatment program. Commissioner Jesson credibly testified that the MSOP will only support individuals for discharge if they had been successful in finishing treatment and defined "successful" to mean "finished." Johnston credibly testified that the MSOP's practice is that committed individuals must be in Phase III for the MSOP to support their petition.

180. The MSOP has only supported one petition for transfer to CPS from a committed individual in Phase I. Dr. Fox credibly testified that the MSOP has only supported a petition for transfer to CPS for an individual in Phase I in one case, and that was for Terhaar. Dr. Pascucci credibly testified that she has never recommended that a committed individual in Phase I be transferred to CPS.

181. Within the last year, the MSOP has supported one petition for transfer to CPS from a committed individual in Phase II. Johnston credibly testified that "[i]t wasn't until more recently in the last year that treatment team support for transfer to CPS while a client is in Phase II has occurred."

182. Any conclusion of law which may be deemed a finding of fact is incorporated herein as such.

Based upon the above findings of fact, the Court hereby makes the following:

## CONCLUSIONS OF LAW

### Jurisdiction

1.      The Court has subject matter jurisdiction over this case pursuant to

28 U.S.C. § 1331.

2.      The United States Supreme Court has held that to have standing to invoke

the federal court's jurisdiction, a plaintiff must show the following:

> (1) "injury in fact," by which we mean an invasion of a legally protected
> interest that is "(a) concrete and particularized, and (b) actual or imminent,
> not conjectural or hypothetical"; . . . (2) a causal relationship between the
> injury and the challenged conduct, by which we mean the injury "fairly can
> be traced to the challenged action of the defendant," and has not resulted
> "from the independent action of some third party not before the court"; . . .
> and (3) a likelihood that the injury will be redressed by a favorable
> decision, by which we mean that the "prospect of obtaining relief from the
> injury as a result of a favorable ruling" is not "too speculative."

*See Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S.

656, 663-64 (1993) (internal citations omitted).

3.      Plaintiffs have standing in this case.  Contrary to Defendants' assertion that

Plaintiffs allege merely a generalized concern, Plaintiffs have shown that all Class

Members have suffered an injury in fact—the loss of liberty in a manner not narrowly

tailored to the purpose for commitment.  Each Class Member has been harmed by not

knowing whether they continue to meet the criteria for commitment to the MSOP through

regular risk assessments.  Each Class Member has been harmed by the treatment

program's structural problems, resulting in delays in progression.

4.    Plaintiffs have shown that each Class Member has been harmed and their liberty has been implicated as a result of Defendants' actions.  For example, Defendants created the MSOP's treatment program structure, developed the phase progression policies, and had the discretion to conduct periodic risk assessments of each Class Member and to petition on behalf of the Class Members, but have chosen not to do so.  By failing to provide the necessary process, Defendants have failed to maintain the program in such a way as to ensure that all Class Members are not unconstitutionally deprived of their right to liberty.

5.    Plaintiffs have shown that each Class Member's injury with respect to their liberty interests will likely be redressed by a favorable decision, as is exemplified through the possible remedies proposed below.

**Plaintiffs' Facial Challenge**

6.    A "plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation omitted).

7.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that "[n]o state shall . . .  deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV § 1.

8.    "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)

(internal quotation omitted); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (noting that the Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government") (internal quotation omitted).

9.      Substantive due process protects individuals against two types of government action:  action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty."  *United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008).

10.      State and federal caselaw has long recognized that civil confinement is a "massive" curtailment of liberty.  *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *In re Blodgett*, 510 N.W.2d 910, 914 (Minn. 1994) ("To live one's life free of physical restraint by the state is a fundamental right; curtailment of a person's liberty is entitled to substantive due process protection.").

11.      Substantive due process requires that civil committees may be confined only if they are both mentally ill and pose a substantial danger to the public as a result of that mental illness.  *See Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995); *see also Foucha v. Louisiana*, 504 U.S. 71, 77 (1992) ("Even if the initial commitment was permissible," a civil commitment may not "constitutionally continue after that basis no longer exist[s].") (internal citations omitted); *see also id.* (explaining that a "committed

acquittee is entitled to release when he has recovered his sanity or is no longer dangerous").

12. When a fundamental right is involved, courts must subject the law to strict scrutiny, placing the burden on the state to show that the law is narrowly tailored to serve a compelling state interest. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("[T]he Fourteenth Amendment forbids the government to infringe . . . fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (internal citations and quotations omitted) (emphasis in original); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (noting that, where legislation infringes upon a fundamental right, such legislation "must survive strict scrutiny—the law must be 'narrowly tailored to serve a compelling state interest'") (internal citations omitted).

13. The Court concludes that the strict scrutiny standard applies because Plaintiffs' fundamental right to live free of physical restraint is constrained by the curtailment of their liberty. *See, e.g.*, *Foucha*, 504 U.S. at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (internal citation omitted); *Jones v. United States*, 463 U.S. 354, 361 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.") (internal citation omitted); *see also Cooper v. Oklahoma*, 517 U.S. 348, 368-69 (1996) ("The requirement that the grounds for civil commitment be shown by clear and convincing evidence protects the individual's fundamental interest in liberty."); *Reno v. Flores*, 507 U.S. 292, 316 (1993)

(O'Connor, J., concurring) ("The institutionalization of an adult by the government triggers heightened, substantive due process scrutiny."); *Vitek*, 445 U.S. at 492 ("The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement."); *Blodgett*, 510 N.W.2d at 914 ("The state must show a legitimate and compelling interest to justify any deprivation of a person's physical freedom.").

14.     This case is distinguishable from other challenges to the involuntary confinement of sex offenders where it was represented to the court that the program's anticipated duration of completion was a few years or only *potentially* indefinite; here, not one offender has been released from the MSOP program after over twenty years. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 364 (1997) (stating that "commitment under the Act is only *potentially* indefinite" because "[t]he maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year" and "[i]f Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement"); *In re Linehan*, 557 N.W.2d 171, 188 (Minn. 1996) (finding that "model patients" were expected to complete the program in approximately thirty-two months and finding that, in light of this finding, the program was remedial and not punitive in nature); *Call*, 535 N.W.2d at 318 n.5 (noting the state's representation that "[a]n average patient is expected to complete the program in a minimum of 24 months").

In addition, no other case has raised a systemic challenge to section 253D or specifically addressed section 253D's failure to require regular risk assessments to determine if class members continued to meet the criteria for continued commitment or

section 253D's failure to require the MSOP to initiate the petitioning process when it is aware that a committed individual likely meets the statutory discharge criteria.

15.    The United States Supreme Court has held that a civil commitment statutory scheme is permitted provided that an individual is not detained past the time they are no longer dangerous or no longer have a mental illness without rendering the statute punitive in purpose or effect as to negate a legitimate nonpunitive civil objective. *See Hendricks*, 521 U.S. at 361-62.  Thus, where, notwithstanding a "civil label," a statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes."  *Id.* at 361.  Moreover, "[i]f the object or purpose" of a civil commitment law is to provide treatment, "but the treatment provisions were adopted as a sham or mere pretext," such a scheme would indicate "the forbidden purpose to punish." *Id.* at 371 (Kennedy, J., concurring).

16.    To satisfy the narrowly tailored standard, section 253D must ensure that individuals are committed no longer than necessary to serve the state's compelling interests.

17.    The purpose for which an individual is civilly committed to the MSOP is to provide treatment to and protect the public from individuals who are both mentally ill and pose a substantial danger to the public as a result of that mental illness.

18.    The Court concludes that the state has failed to demonstrate that section 253D is narrowly tailored to achieve its compelling interests.

19.     First, section 253D is not narrowly tailored because the statute indisputably fails to require periodic risk assessments.  In the absence of such assessments, Defendants cannot know whether any Class Members satisfy the statutory criteria for continued commitment.  The MSOP has no periodic risk assessment for individuals the MSOP knows or should know no longer meet the criteria to remain confined or restricted to early phases of the progression program.  The statute, on its face, allows the continued civil commitment of sex offenders, even after they no longer meet the statutory criteria for commitment or meet the criteria for discharge or reduction in custody.  By not providing for periodic risk assessments, the statute, on its face, authorizes prolonged commitment, even after committed individuals no longer pose a danger to the public and need further inpatient treatment and supervision for a sexual disorder.  The statute is therefore not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment.  *See Hendricks*, 521 U.S. at 361-62.

20.     Second, section 253D is not narrowly tailored because it fails to provide a judicial bypass mechanism to the statutory reduction in custody process.  Section 253D provides for a single process to obtain transfer, provisional release, or full discharge.  As noted above, the SRB and the SCAP process takes too long, is burdened with difficult and cumbersome procedures, and denies committed individuals services necessary to navigate the process.  The SRB and the SCAP process, and its corresponding duration and procedures, are insufficient to meet this standard.  Neither the habeas process nor a Rule 60 motion provide sufficient bypass because neither provides the right to counsel or the right to medical professional assistance to individuals seeking those alternative

processes. The failure of the statute to provide for an adequate emergency or alternative mechanism by which someone who satisfies the discharge standard can obtain release from commitment in a reasonable time period demonstrates that the statute on its face is not narrowly tailored. The Court is unpersuaded by Defendants' argument that federal habeas law already provides a series of procedures allowing federal review of Minnesota's compliance with federal constitutional standards because the habeas process does not provide the right to counsel or the right to medical professional assistance to committed individuals seeking alternative processes. As written, section 253D contains no judicial bypass mechanism, and, as such, there is no way for Plaintiffs to timely and reasonably access the judicial process outside of the statutory discharge process to challenge their ongoing commitment. Therefore, section 253D is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

21.    Third, the Court concludes that section 253D is not narrowly tailored because the statutory discharge criteria is more stringent than the statutory commitment criteria. To be discharged from the MSOP, section 253D requires that a committed individual "no longer be dangerous" as opposed to being "highly likely to reoffend," which is the initial commitment standard. Although an individual may be initially committed to the MSOP on proof of being "highly likely to engage in harmful sexual conduct" in the future, an individual is prohibited from being discharged unless he demonstrates, among other things, that he is no longer dangerous. Because the statute renders discharge from the MSOP more onerous than admission to it, section 253D is not

narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

22.     Fourth, the Court concludes that section 253D is not narrowly tailored because the statute impermissibly places the burden on committed individuals to demonstrate that they may be placed in a less restrictive setting upon commitment or by transfer from the MSOP. The Court concludes that the burden of demonstrating the justification for continued confinement by clear and convincing evidence should remain on the state at all times. Because the burden to petition impermissibly shifts from the state to committed individuals, section 253D is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

23.     Fifth, the Court concludes that section 253D is not narrowly tailored because although the statutory scheme contemplates that less restrictive alternatives are available, *see* Minn. Stat. § 253D.07, subd. 3, and requires that committed individuals show by clear and convincing evidence that a less restrictive alternative is appropriate, *see id.*, the evidence demonstrates, and the Court concludes, that there are no less restrictive alternatives available upon commitment. Moreover, committed individuals can never meet the preponderance of the evidence standard to transfer to a "facility that best meets the person's needs," *see id.*, when those alternative facilities do not exist. Therefore, the Court concludes that section 253D is not narrowly tailored, and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

24.     Finally, the Court concludes that section 253D is not narrowly tailored because the statute does not require the state to take any affirmative action, such as petition for reduction of custody, on behalf of individuals who no longer satisfy the criteria for continued commitment.  The statute's failure to require the state to petition for individuals who no longer pose a danger to the public and no longer need inpatient treatment and supervision for a sexual disorder is a fatal flaw that renders the statute not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment.  *See Hendricks*, 521 U.S. at 361-62.

25.     For the reasons set forth above, section 253D is unconstitutional on its face because no application of the statute provides sufficient constitutional protections to render the statute narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment.  *See Hendricks*, 521 U.S. at 361-62.

**Plaintiffs' As-Applied Challenge**

26.     The Court concludes that the strict scrutiny standard also applies to Plaintiffs' as-applied challenge because Plaintiffs' substantive due process claim involves the infringement of a fundamental right.

27.     Under the strict scrutiny standard, the burden is on Defendants to demonstrate that the statute, as applied, is narrowly tailored to serve a compelling state interest.

28.     Confinement under civil commitment at the MSOP is constitutional only if the state determines and confirms that the basis for commitment still exists or that the statutory reduction in custody criteria is not met.  It is constitutionally mandated that only

individuals who constitute a "real, continuing, and serious danger to society" may continue to be civilly committed to the MSOP. *See Hendricks*, 521 U.S. at 372 (Kennedy, J., concurring). Individuals who are no longer dangerous cannot constitutionally continue to be confined at the MSOP. *See Foucha*, 504 U.S. at 77 (holding that a committed individual "may be held as long as he is *both* mentally ill *and* dangerous, but no longer") (quoting *Jones*, 463 U.S. at 368) (emphasis added). In *Call v. Gomez*, the Minnesota Supreme Court held that continued confinement of a committed individual is constitutional "for only so long as he or she continues *both* to need further inpatient treatment and supervision for his sexual disorder *and* to pose a danger to the public." *Call*, 535 N.W.2d at 319 (emphasis added). Consistent with these statutory and constitutional requirements, when the standard for commitment is no longer met or when the standard for discharge is satisfied, the state has no authority to continue detaining the confined individual at the MSOP.

29.     The Court concludes that section 253D is unconstitutional as applied because Defendants apply the statute in a manner that results in Plaintiffs being confined to the MSOP beyond such a time as they either meet the statutory reduction in custody criteria or no longer satisfy the constitutional threshold for continued commitment.

30.     First, the Court finds that section 253D, as applied, is not narrowly tailored because Defendants do not conduct periodic risk assessments of civilly committed individuals at the MSOP. Defendants admit that they do not know whether many individuals confined at the MSOP meet the commitment or discharge criteria, but they do know that certain individuals could be discharged or transferred to a less restrictive

facility.  Although Defendants claim that the MSOP provides a risk assessment to the SRB upon the filing of a petition, Defendants do not purport to procure periodic, independent assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition.  This is true even after decades of confinement in the program.  In addition, although the statute currently does not require risk assessments, nothing in the statute prohibits the MSOP from conducting periodic risk assessments.  The MSOP has yet to fix the periodic risk assessment problem even though Defendants concede they could add periodic risk assessments at their discretion.

Despite Defendants' assertions that they have started to conduct "rolling risk assessments," this plan is insufficient to pass constitutional muster.  Defendants have not hired any additional risk assessors beyond the existing department vacancies to implement this plan, and many employees of the MSOP had never heard of this plan.  In addition, even if Defendants were in fact implementing such a plan, the planned one or two risk assessments per month outside of the petitioning process would take 30 to 60 years in order to assess all currently committed Class Members at the MSOP, and yet risk assessments are only valid for one year.  Therefore, section 253D, as applied, is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment.  *See Hendricks*, 521 U.S. at 361-62.

31.     Second, section 253D, as applied, is not narrowly tailored because those risk assessments that have been performed have not all been performed in a constitutional manner.  The testimony of several risk assessors at the MSOP support a conclusion that

the risk assessors have not been applying the correct legal standard when evaluating whether an individual meets the criteria for transfer, provisional discharge, or discharge. For example, Dr. Pascucci's testimony indicated that she did not use the correct standard for discharge under *Call*, which requires that a person be "confined for only so long as he or she continues *both* to need further inpatient treatment and supervision for his sexual disorder *and* to pose a danger to the public." *Call*, 535 N.W.2d at 319 (emphasis added). In other words, the Minnesota Supreme Court has indicated that discharge must be granted if the individual is *either* no longer dangerous to the public *or* no longer suffers from a mental condition requiring treatment. (*See id.*) Moreover, the MSOP did not use the correct legal standard until after these proceedings commenced in 2011, despite the fact that the Minnesota Supreme Court decided the *Call* case in 1995. Therefore, section 253D, as applied, is not narrowly tailored in that there is no requirement to apply the correct legal standard in risk assessments and it results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

32. Third, section 253D, as applied, is not narrowly tailored because individuals have remained confined at the MSOP even though they have completed treatment, can no longer benefit from treatment, or have reduced their risk below either the "highly likely to reoffend" standard or below a "dangerous" standard. The fact that no one has been fully discharged from the MSOP since the program was created and that only three individuals have been provisionally discharged, one of whom was subsequently returned to civil confinement and who passed away at the MSOP,

underscores the failure of section 253D, as applied, to be narrowly tailored to confine only those individuals who should remain civilly committed at the MSOP. Therefore, section 253D, as applied, is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

33.     Fourth, section 253D, as applied, is not narrowly tailored because the discharge procedures are not working as they should at the MSOP. The Court finds that this is the result of the MSOP refusing to petition on behalf of committed individuals, the MSOP failing to provide discharge planning to committed individuals until they are in Phase III, and Defendants' failure to address impediments and delays in the reduction in custody process. These failures further delay Plaintiffs' ultimate discharge from the MSOP. As a result, section 253D, as applied, is not narrowly tailored, and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

34.     Fifth, section 253D, as applied, is not narrowly tailored because there are no less restrictive alternatives. Although section 253D expressly allows for the referral of committed individuals to less restrictive alternatives, this is not occurring in practice. It is undisputed that there are individuals confined at the Moose Lake and St. Peter secure facilities who could be served in less restrictive alternatives. However, until recently, there were no less restrictive alternatives, aside from CPS, in which to place individuals. Even now, there are simply not enough less restrictive alternatives available for committed individuals seeking transfer to less restrictive alternatives. In addition,

committed individuals cannot be placed at CPS or other less restrictive alternatives upon initial commitment. Insisting on confinement at the secure facilities impinges on the individual's liberty interest, particularly given the statutorily proscribed less restrictive options, and thus the statute is not narrowly tailored, resulting in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

35.    Finally, section 253D, as applied, is not narrowly tailored because, although treatment is made available, there is no meaningful relationship between the treatment program at the MSOP and discharge from custody. Progression through the phases of treatment at the MSOP has been so slow, for so many years, that treatment has never been a way out of confinement for committed individuals, especially in light of the fact that no periodic risk assessments are conducted. Most of the committed individuals get stuck in Phase I of the program, a part of the program where no specific offender-related therapy is provided, only institutional rule compliance training and preparation for therapy. The treatment program has been plagued by a lack of funding, staff shortages, and periodic alterations in the treatment program, resulting in committed individuals having to go through stoppages and starting over again. Even if the treatment that is provided has led to a reduction in risk of reoffending of some committed individuals, the previously identified risk assessment problems have nullified any such positive effect. The lack of a meaningful relationship between the treatment program and discharge is borne out by the fact that over the past twenty-one years, very few have been progressed to Phase III, no one has been fully discharged, and only three persons have been

provisionally discharged. The overall failure of the treatment program over so many years is evidence of the punitive effect and application of section 253D. *See Hendricks*, 521 U.S. at 361-62.

36. Each of the reasons set forth above are an independent reason for the Court to conclude that section 253D is unconstitutional as applied. Together, these reasons support the Court's conclusion that the statute, as applied, is not narrowly tailored to protect against individuals being confined to the MSOP beyond such time as they either satisfy the statutory reduction in custody criteria or no longer satisfy the constitutional standards for continued commitment. Instead, the statute, as applied, is a three-phased treatment system with "chutes-and-ladders"-type mechanisms for impeding progression, without periodic review of progress, which has the effect of confinement to the MSOP facilities for life. As a result, section 253D, on its face and as applied, is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment. *See Hendricks*, 521 U.S. at 361-62.

37. Any finding of fact which may be deemed a conclusion of law is incorporated herein as such.

38. Because the Court finds the program is unconstitutional on its face and as applied (Counts I and II), and because any remedy fashioned will address the issues raised in the remaining Phase One Counts, the Court need not address Counts III, V, VI, and VII. Counts IV and XI will be addressed under separate Order.

# CONCLUSION

The Court concludes that the evidence presented over the course of the six-week trial in this case demonstrates that Minnesota's civil commitment statutory scheme is unconstitutional both on its face and as applied. Contrary to Defendants' assertions, the Court concludes that the "shocks the conscience" standard does not apply to Plaintiffs' facial and as-applied challenges because Plaintiffs' substantive due process claims involve the infringement of a fundamental right. *See Cooper*, 517 U.S. at 368-69; *Flores*, 507 U.S. at 316 (O'Connor, J., concurring); *Foucha*, 504 U.S. at 80; *Jones*, 463 U.S. at 361; *Vitek*, 445 U.S. at 492; *Blodgett*, 510 N.W.2d at 914. After applying the strict scrutiny standard, the Court concludes that Minnesota's civil commitment statutory scheme is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment and that the MSOP, in implementing the statute, systematically continues to confine individuals in violation of constitutional principles.

Specifically, the Court concludes that section 253D is facially unconstitutional for the following six reasons: (1) section 253D indisputably fails to require periodic risk assessments and, as a result, authorizes prolonged commitment even after committed individuals no longer pose a danger to the public and need further inpatient treatment and supervision for a sexual disorder; (2) section 253D contains no judicial bypass mechanism and, as such, there is no way for Plaintiffs to timely and reasonably access the judicial process outside of the statutory discharge process to challenge their ongoing commitment; (3) section 253D renders discharge from the MSOP more onerous than admission to it because the statutory discharge criteria is more stringent than the statutory

66

commitment criteria; (4) section 253D authorizes the burden to petition for a reduction in custody to impermissibly shift from the state to committed individuals; (5) section 253D contemplates that less restrictive alternatives are available and requires that committed individuals show by clear and convincing evidence that a less restrictive alternative is appropriate, when there are no less restrictive alternatives available; and (6) section 253D does not require the state to take any affirmative action, such as petition for a reduction in custody, on behalf of individuals who no longer satisfy the criteria for continued commitment.

In addition, the Court further concludes that section 253D is unconstitutional as applied for the following six reasons: (1) Defendants do not conduct periodic, independent risk assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition; (2) those risk assessments that have been performed have not all been performed in a constitutional manner; (3) individuals have remained confined at the MSOP even though they have completed treatment or sufficiently reduced their risk; (4) discharge procedures are not working properly at the MSOP; (5) although section 253D expressly allows the referral of committed individuals to less restrictive alternatives, this is not occurring in practice because there are insufficient less restrictive alternatives available for transfer and no less restrictive alternatives available for initial commitment; and (6) although treatment has been made available, the treatment program's structure has been an institutional failure and there is no meaningful relationship between the treatment program and an end to indefinite detention.

The Fourteenth Amendment does not allow the state, DHS, or the MSOP to impose a life sentence, or confinement of indefinite duration, on individuals who have committed sexual offenses once they no longer pose a danger to society. The Court must emphasize that politics or political pressures[7] cannot trump the fundamental rights of Class Members who, pursuant to state law, have been civilly committed to receive treatment. The Constitution protects individual rights even when they are unpopular. As Justice Sandra Day O'Connor sagely observed, "[a] nation's success or failure in achieving democracy is judged in part by how well it responds to those at the bottom and the margins of the social order." *Third Annual William French Memorial Lecture: A Conversation with Retired Justice Sandra Day O'Connor*, 37 Pepp. L. Rev. 63, 65 (2009).

As a former Assistant County Attorney, the undersigned prosecuted sexual assault and child sexual abuse cases and, as a former Minnesota District Judge who handled many such cases, the undersigned then and now is sensitive to the interests of all individuals affected by this matter, as well as the fears and concerns of the public at large,

---

[7] Benson credibly testified that "the politics around the program are really thick" and that "politics guide the thinking of those involved in the [release] process," which Benson described as a "political crapshoot." Benson further credibly testified that "I think this is an area where people have got to rise above the politics and do the right thing or . . . this program is going to, I think, eventually be deemed unconstitutional, and in its current form probably should be." The Task Force Report corroborated these observations, stating that "the Task Force is deeply concerned about the influence of public opinion and political pressure on all levels of the commitment process."

including, of course, victims of these heinous and tragic crimes.[8]  The undersigned

accepts and acknowledges that it has an obligation to all citizens to not only honor their

constitutional rights, but to do so without compromising public safety and the interests of

justice.  The balance is a delicate and important one, but it can and will be done.  The

Court observes that the parties and this Court are in the same position now as when this

lawsuit was filed in 2011 in at least two ways.  First, there are some individuals who

indisputably should be discharged from the MSOP and who are being confined

unconstitutionally at the MSOP.  As stated by Grant Duwe, Director of Research at the

DOC:  "[M]any high-risk sex offenders can be managed successfully in the community.

The cost of civil commitment in a high-security facility also implies that this type of

commitment should be reserved only for those offenders who have an inordinately high

risk to sexually reoffend."  (Doc. No. 427 (February 20, 2014 Order") at 67 n.48 (citing

Doc. No. 410 ("Nelson Decl.") ¶ 2, Ex. 1, at 9).)  The confinement of the elderly,

individuals with substantive physical or intellectual disabilities, and juveniles, who might

never succeed in the MSOP's treatment program or who are otherwise unlikely to

reoffend, is of serious concern for the Court and should be for the parties as well.

Importantly, provisional discharge or discharge from the MSOP does not mean discharge

or release without a meaningful support network, including a transition or release plan

into the community with intensive supervised release conditions.  Virtually all of these

---

[8]     The Court has received numerous letters from not only victims and family
members of victims of committed individuals, but also from family members of
committed individuals at the MSOP as well as individuals who claim to have experienced
the MSOP firsthand.

offenders have been institutionalized, as the reintegration component of Phase III of this program acknowledges.  Second, there are others who are truly dangerous and should remain confined at the MSOP, but for whom constitutional procedures must be followed because "[s]ubstantive due process forecloses the substitution of preventative detention schemes for the criminal justice system, and the judiciary has a constitutional duty to intervene before civil commitment becomes the norm and criminal prosecution the exception."  *In re Linehan*, 557 N.W.2d at 181.

Further, the Court must emphasize how truly systemic the state's problem has become.  The record before this Court shows that a number of Class Members were allowed to plead to a lesser criminal sexual conduct charge and often received concurrent sentences even though there were multiple victims involved,[9] and, as defendants, were never advised of the "collateral consequence" of what being committed to the MSOP means.[10]  In some cases, defendants were allowed to enter a guilty plea, even though they

---

[9]     For example, Steiner was convicted of several counts of criminal sexual conduct of varying degrees involving a number of victims, sentenced to the custody of the DOC Commissioner with his sentence stayed, and then stipulated to his civil commitment to the MSOP.

There are a number of cases where the plea agreement called for either a plea to a lesser charge or dismissal of other charges involving multiple victims.  For two other such examples where a sex offender was allowed to plead to a lesser criminal sexual conduct charge or other counts of criminal sexual conduct were dismissed, see *Call v. Gomez*, 535 N.W.2d 312 (Minn. 1995) and *In re Ince*, 847 N.W.2d 13 (Minn. 2014).

[10]     Terhaar, Bolte, and Steiner, among others, were never advised of what the MSOP entailed.  At the time of his commitment to the MSOP, Steiner was told that he would be committed for three to four years, consistent with the representations made by the state to the Minnesota Supreme Court in *In re Linehan*, 557 N.W.2d 171, 188 (Minn. 1996).  Steiner has been committed to the MSOP for twenty-three years.

proclaimed their innocence, by accepting the benefits of the plea bargain, more commonly known as an *Alford* plea.[11] It is difficult for this Court to understand why the criminal justice system so heavily relies on plea agreements in criminal sexual conduct cases. It appears to this Court that the civil commitment process—with lower burdens of proof—is being utilized instead. This reliance on the civil commitment process is especially troubling given the provisions of Minn. Stat. § 609, specifically Minn. Stat. § 609.3455, which authorizes a mandatory ten-year period of conditional release for a first-time offender and placing an offender with prior sex offense convictions on conditional release for the remainder of the offender's life. *See* Minn. Stat. § 609.3455, subds. 6, 7. In addition, Minn. Stat. § 609 authorizes mandatory life prison sentences for "egregious first-time offenders" and repeat offenders, as well as significant increases in the presumptive sentence under certain circumstances. *See* Minn. Stat. § 609.3455. Such plea negotiations, with few exceptions, have only proved to be a disservice to the entire system and have rarely served the interests of justice.

---

[11] An *Alford* plea is "[a] guilty plea that a defendant enters as part of a plea bargain without admitting guilt." *Black's Law Dictionary* 71 (7th ed. 1999). The term "*Alford* plea" is named after the United States Supreme Court case of *North Carolina v. Alford*, 400 U.S. 25 (1970).

A number of committed individuals at the MSOP, including Karsjens, denied their guilt and entered an *Alford* plea, but are now having difficulty advancing past Phase I of the treatment program because they still proclaim their innocence and deny any wrongdoing.

There are circumstances under which an *Alford* plea may serve the interests of justice. However, as a former prosecutor and as a state and federal judge, the undersigned has never allowed or accepted an *Alford* plea.

Further, in a number of the civil commitment cases, the DOC referred the offender to the county attorney for commitment, even though the sentencing judge had imposed the mandatory ten-year conditional release to follow the prison sentence, which can be intensive supervised release and can include GPS monitoring, daily curfews, alcohol and drug testing, and other conditions of release while on supervision. *See, e.g.*, *In re Ince*, 847 N.W.2d 13 (Minn. 2014). Deferring to the mandatory conditional release imposed by the sentencing judge, especially for those individuals convicted of sex crimes who are not evaluated to be "the worst of the worst" (i.e., the most dangerous of sexual offenders), not only addresses public safety, but also considers the constitutionally-protected liberty interests of individuals with convictions. In the words of Justice John E. Simonett:

> At issue is not only the safety of the public on the one hand and, on the other, the liberty interests of the individual who acts destructively for reasons not fully understood by our medical, biological and social sciences. In the final analysis, it is the moral credibility of the criminal justice system that is at stake.

*Blodgett*, 510 N.W.2d at 918. Consequently, the Court observes that, in light of the current state of Minnesota's sex offender civil commitment scheme, it is not only the "moral credibility of the criminal justice system" that is at stake today, but the credibility of the entire system, including all stakeholders that work within the system, and those affected by the system, not forgetting those who have been convicted of sex crimes, their victims, and the families of both.

The Court concludes that the Constitution requires that substantial changes be made to Minnesota's sex offender civil commitment scheme. Accordingly, the Court will

hold a Remedies Phase pre-hearing conference where it will consider all remedies

proposals, which could include, but would not be limited to the following:

- Requiring risk and phase placement reevaluation, with all deliberate speed, of all current patients, starting with the elderly, individuals with substantive physical or intellectual disabilities, and juveniles;

- Requiring periodic, independent risk assessments to determine whether the clients still satisfy the civil commitment requirements and whether the treatment phase placement is proper;

- Requiring and creating a variety of alternate less restrictive facilities;

- Revising the discharge process, including the possibility of using a specialized sex offender court with authority to request information, order transfer, provisional discharge, or discharge, and order appropriate conditions and supports for individuals transitioning to the community;

- Requiring the MSOP to promptly file petitions for any person the MSOP believes does not meet the criteria for civil commitment upon arrival, may no longer meet the criteria for civil commitment, or should be transferred to an alternative facility, including for individuals that cannot be well served at the MSOP (for example, due to an individual's physical or intellectual disability);

- Requiring the MSOP to proactively and continuously develop and adjust specific treatment and discharge plans, no matter which phase a person is in;

- Requiring the MSOP to provide annual notice to all clients of the right to petition and provide assistance with the petitioning process dependent upon the client's needs;

- Requiring the state to have the burden to prove that the committed individuals meet statutory and constitutional standards for continued commitment and placement;

- Requiring the statutory standards for discharge and commitment be the same;

- Requiring a judicial bypass mechanism;

- Requiring changes to the civil commitment process to correct systemic problems and to ensure that only those who need further inpatient treatment and supervision

for a sexual disorder and pose a danger to the public are civilly committed, taking into account an individual's age, adult convictions, severity of adult convictions, and physical or intellectual disability;

- Requiring the provision of qualified defense counsel and professional experts to all petitioners;

- Requiring ongoing external review and evaluation by experts to recommend changes to the MSOP treatment program processes, including an overview of the structure of the treatment program and phase progression processes;

- Requiring continued and specific training for all employees of the MSOP and for those people involved with the petitioning, commitment, or discharge process;

- Requiring a plan for educating the public on civil commitment, civil commitment alternative facilities, provisional discharge conditions, and risk of re-offense data, among other things, and requiring funding for such education; and

- Appointing a Special Master to monitor compliance with all of the remedies.[12]

The Court is hopeful that the stakeholders will fashion suitable remedies so that the Court need not consider closing the MSOP facilities or releasing a number of individuals from the MSOP with or without conditions. As the Court has stated in a number of previous orders[13] and will now say one last time, the time is now for all of the stakeholders in the criminal justice system and civil commitment system to come together and develop policies and pass laws that will not only protect the public safety and address

---

[12] As the Court noted in its February 20, 2014 Order, at least one court has taken strong remedial action against a state's sex offender program and has required court monitoring over a thirteen-year time period. (*See* Doc. No. 427 (citing *Turay v. Richards*, No. C91-0664RSM, 2007 WL 983132, at *5 (W.D. Wa. Mar. 23, 2007)).)

[13] (*See, e.g.*, Doc. No. 427 ("February 20, 2014 Order") at 68; Doc. No. 828 ("February 2, 2015 Order") at 42.)

the fears and concerns of all citizens, but will preserve the constitutional rights of the Class Members.

## ORDER

Based upon not only the findings and conclusions of this Court, but also the entire record of this case, the Court hereby enters the following:

1.  Plaintiffs' request for declaratory relief with respect to Counts I and II of their Third Amended Complaint (Doc. No. [635]) is **GRANTED**.

2.  The parties shall participate in a Remedies Phase pre-hearing conference on **August 10, 2015,** at **9:00 a.m.,** to discuss the relief that they find appropriate with respect to both Counts I and II, in light of the above requirements and recommendations. In addition to counsel for the parties, the Court urges the following individuals to be present and participate in the pre-hearing conference: Governor Mark B. Dayton; Representative Kurt L. Daudt (Speaker of the House); Senator Thomas M. Bakk (Majority Leader of the Senate); Attorney General Lori Swanson; Commissioner Lucinda E. Jesson; Deputy Commissioner Anne M. Barry; Robin Vue Benson (DHS attorney); Jannine Hébert; Nancy Johnston; former Chief Justice Eric J. Magnuson (Chair of the Task Force); former Chief Judge James M. Rosenbaum (Vice Chair of the Task Force); the Honorable Joanne M. Smith (Task Force Member); Minnesota Commissioner of Corrections Tom Roy (Task Force Member); Eric S. Janus (Dean of William Mitchell College of Law and Task Force Member); Kelly Lyn Mitchell (Executive Director of the Sentencing Guidelines Commission and Task Force Member); Mark A. Ostrem (Olmstead County Attorney and Task Force Member); Ryan B. Magnus (defense attorney

and Task Force Member); John Kirwin (Assistant Hennepin County Attorney); and Donna Dunn (Executive Director of the Minnesota Coalition Against Sexual Assault and Task Force Member). [14] The conference will be presided over by the undersigned, along with United States Magistrate Judge Jeffrey J. Keyes. The conference will take place in the 7th Floor Conference Room, Warren E. Burger Federal Building and United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.

     3.    Counts VIII, IX, and X, will be tried in the second phase of trial ("Phase Two"). Phase Two will be addressed at the Remedies Phase pre-hearing conference on August 10, 2015.

     4.    Counts IV, XI, XII, and XIII will be addressed under separate Order.


Dated:  June 15, 2015                     s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                        United States District Judge

---

[14]     Although the Court acknowledges that it cannot compel non-parties to attend the conference, the Court invites select non-parties to the conference to fashion suitable remedies to be presented to the Court.