# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld, and all others similarly situated,

                Plaintiffs,

Lucinda Jesson, Kevin Moser, Peter Puffer, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their official capacities,

                Defendants.

Civil No. 11-3659 (DWF/JJK)

**FIRST INTERIM
RELIEF ORDER**

---

Daniel E. Gustafson, Esq., Karla M. Gluek, Esq., David A. Goodwin, Esq., Raina Borrelli, Esq., Lucia G. Massopust, Esq., and Eric S. Taubel, Esq., Gustafson Gluek PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Deputy Attorney General, Scott H. Ikeda, Adam H. Welle, and Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

Eric S. Janus, Esq., William Mitchell College of Law; and Teresa J. Nelson, Esq., ACLU of Minnesota, counsel for Amici Curiae.

Michael O. Freeman, Hennepin County Attorney, John L. Kirwin, and Theresa Couri, Assistant Hennepin County Attorneys, Hennepin County Attorney's Office, counsel for Amicus Curiae.

---

**INTRODUCTION**

On June 17, 2015, this Court concluded the liability phase of this class action litigation with respect to Counts I and II of Plaintiffs' Third Amended Complaint. (*See* Doc. No. 966.) In its Findings of Fact, Conclusions of Law, and Order, the Court found that the Minnesota Civil Commitment and Treatment Act ("MCTA"), Minn. Stat. § 253D, is unconstitutional on its face and as applied. (*See id*. at 66.) This case is now before the Court in its post-trial Remedies Phase. After consideration of all submissions and argument, and for the reasons discussed below, the Court enters its First Interim Relief Order, enjoining Defendants as described below.[1]

**BACKGROUND**

**I.      Procedural History**

In its June 17, 2015 Findings of Fact, Conclusions of Law, and Order, the Court concluded that "Minnesota's civil commitment statutory scheme is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment and that [the Minnesota Sex Offender Program ("MSOP")], in implementing the statute, systematically continues to confine individuals in violation of constitutional principles." (*Id.*) The Court's Order included detailed findings that

---

[1]      The Court's Order enjoining Defendants begins on page 39.

demonstrate the basis for the Court's conclusion that Minnesota's statutory scheme for committing sex offenders and Defendants' operation of the MSOP are unconstitutional.[2]

In particular, the Court found that the problems that have plagued the MSOP for decades are deeply systemic. The Court suggested "there is something very wrong with this state's method of dealing with sex offenders in a program that has never fully discharged anyone committed to its detention facilities in Moose Lake and St. Peter since its inception in 1994," (*id.* at 4), despite Defendants' knowledge that there are individuals at the MSOP who could be safely treated in a less secure environment, (*id.* at 21), or no longer meet the criteria for continued commitment, (*id.* at 47). The MCTA establishes a complex system in which actors at multiple levels of state government play a role.[3] At multiple stages in this system, Defendants' actions and inactions have led to the continued operation of an unconstitutional scheme that unjustifiably detains hundreds

---

[2]     The Court encourages readers to review its seventy-six page Findings of Fact, Conclusions of Law, and Order (Doc. No. 966) in conjunction with this First Interim Relief Order. The Court's detailed findings summarize the systemic nature of the constitutional violations surrounding the MSOP's operation and give important context for the remedies ordered herein.

[3]     Although this case only involves specific named Defendants in their official capacities as senior managers of the MSOP, the Court necessarily analyzes Minnesota's civil commitment scheme in full awareness of the many state actors who play a role in the system's continued operation. *See id.* at 9 (statutory enactment by the Minnesota Legislature); *id.* at 10 (civil commitment proceedings initiated by state county attorneys); *id.* (initial commitment findings determined by a state court); *id.* at 11 (supervision, care, and treatment under the authority of the Commissioner of the Department of Human Services); *id.* at 22 (power to halt efforts of administrative officials exercisable by the Governor); *id.* at 41 (sole authority to grant reductions in custody in the Supreme Court Appeal Panel); *id.* at 42 (authority to review Supreme Court Appeal Panel Decisions vested in the Minnesota Court of Appeals).

of committed individuals in this state. At the initial commitment stage, Defendants have failed to establish less restrictive alternatives to commitment at the secure facilities at Moose Lake and St. Peter. (*See id.* at 20-21.) Thus, committing courts have no options to authorize an individual to be committed to a less restrictive facility even though the MCTA contemplates this possibility. (*See id.* at 21.) During an individual's commitment, Defendants do not periodically assess committed individuals to ensure they continue to meet statutory standards for commitment. (*Id.* at 36-37.) Defendants also fail to proactively petition for discharge on behalf of individuals who are found to no longer meet statutory criteria for commitment. (*See id.* at 47.) The MSOP has only filed seven petitions for a reduction in custody on behalf of committed individuals since the inception of the program, and these seven petitions were only filed after this litigation commenced. (*Id.*) Prior to 2013, the MSOP had never filed a petition for a reduction in custody on behalf of a committed individual. (*Id.*) For those committed individuals who seek to petition on their own behalf, the process is daunting and Defendants do not provide legal advice to committed individuals seeking to file a petition. (*See id.* at 48.) Also, the Court found there to be a significant backlog in petitions pending decision before the Special Review Board ("SRB") and the Supreme Court Appeal Panel ("SCAP"). (*See id.* at 44-45.) Specifically, the Court indicated "[t]he SRB and the SCAP petitioning process . . . can take years." (*Id.* at 44.) Defendants are ultimately responsible for scheduling SRB hearings, (*id.*), and have the authority to appoint SRB members. (*Id.* at 46.) Also, Defendants' recommendations to the SRB carry significant weight in whether an individual is ultimately recommended for provisional discharge or

discharge.  (*Id.* at 44.)  And at the time of trial, "[s]ince January 1, 2010, the SRB has recommended granting . . . no petitions for discharge."  (*Id.*)

Since the MCTA was enacted, the population of committed sex offenders in Minnesota has increased dramatically.  (*See id.* at 12.)  The Court found that Minnesota has both the lowest rate of release from commitment and the highest per-capita population of civilly committed sex offenders in the nation.  (*Id.*)  By 2022, the state projects that 1,215 individuals will be civilly committed for sex offenses.  (*Id.*)  The cumulative effect of Defendants' actions and inactions throughout the state's entire civil commitment system led the Court to conclude that "the MSOP has developed into indefinite and lifetime detention" for the hundreds of individuals under Defendants' control.[4]  (*Id.* at 11.)

In addition, the Court found that Defendants have been on notice of these systemic problems for several years.  Plaintiffs initiated this litigation in December 2011.  (*Id.* at 8;

---

[4]   Notably, the state originally disclaimed the notion that confinement under Minnesota's sex offender civil commitment scheme would constitute indefinite detention.  *See In re Linehan*, 557 N.W.2d 171, 188 (Minn. 1996) (finding that "model patients" were expected to complete the program in approximately thirty-two months and finding that, in light of this finding, the program was remedial and not punitive in nature).  As of October 2012, the MSOP's own phase progression design time line indicated that a "model client" could progress through treatment in six to nine years, yet that has not been the reality.  (*See* Doc. No. 966 at 31.)  At trial, committed individuals explained that they never contemplated a program of indefinite duration at the time they were committed.  (*See id.* at 70 n.10 ("Steiner was told that he would be committed for three to four years, consistent with the representations made by the state to the Minnesota Supreme Court in *In re Linehan*, 557 N.W.2d 171, 188 (Minn. 1996).  Steiner has been committed to the MSOP for twenty-three years.").)

*see also* Doc. No. 1.)  Both prior to and during this case, the MSOP has been the subject

of critical scrutiny by various evaluators recommending changes to improve the program.

(*See* Doc. No. 966 at 15-16 (describing evaluations and recommendations by the

Governor's Commission on Sex Offender Policy in January 2005, the MSOP Site Visit

Auditors every year since 2006, the Office of the Legislative Auditor for the State of

Minnesota in March 2011, the Sex Offender Civil Commitment Advisory Task Force in

August 2012, the MSOP Program Evaluation Team in November 2012, and the Rule 706

Experts in December 2013).)  And in recent legislative sessions, Minnesota legislators

have introduced bills to implement several changes to the MSOP and Minnesota's civil

commitment scheme, putting Defendants on further notice of the need to implement

substantial reforms.[5]  (*Id.* at 16-17.)

Defendants' own actions also demonstrate that they have been on notice of the

problems at the MSOP and have considered implementing changes similar to the

remedies the Court imposes today.  For example, in 2013 Defendants purportedly started

a process to implement rolling risk assessments outside of the normal petitioning

process.[6]  (*Id.* at 37-38.)  The same year, Minnesota Department of Human Services

("DHS") Commissioner Lucinda Jesson ("Commissioner Jesson") set a goal of speeding

---

[5]     These bills did not pass in the Minnesota legislature.  (*Id.* at 17.)

[6]     The Court notes that several individuals from the MSOP credibly testified that
they had never heard about this rolling risk assessment process, purportedly established
by Commissioner Jesson in 2013.  (*Id.* at 37-38.)

up the hearing process for petitions supported by the MSOP. (*Id.* at 45.) Commissioner

Jesson also testified that since this lawsuit began DHS entered into third-party contracts,

albeit limited, to establish less restrictive alternatives to the Moose Lake and St. Peter

facilities. (*Id.* at 22-23.) The Court's findings clearly illustrate that Defendants were on

notice of the systemic problems resulting from their own deliberate actions and inactions

in operating the MSOP.

In light of these findings and the many, many more found in the Court's June 17,

2015 Order, the Court concluded that Minnesota's civil commitment scheme, Minn. Stat.

§ 253D, is unconstitutional on its face and as applied under the Due Process Clause of the

Fourteenth Amendment. (*See id*. at 66.) In particular, the Court concluded that

section 253D is facially unconstitutional for six reasons:

> (1) section 253D indisputably fails to require periodic risk assessments and, as a result, authorizes prolonged commitment even after committed individuals no longer pose a danger to the public and need further inpatient treatment and supervision for a sexual disorder; (2) section 253D contains no judicial bypass mechanism and, as such, there is no way for Plaintiffs to timely and reasonably access the judicial process outside of the statutory discharge process to challenge their ongoing commitment; (3) section 253D renders discharge from the MSOP more onerous than admission to it because the statutory discharge criteria is more stringent than the statutory commitment criteria; (4) section 253D authorizes the burden to petition for a reduction in custody to impermissibly shift from the state to committed individuals; (5) section 253D contemplates that less restrictive alternatives are available and requires that committed individuals show by clear and convincing evidence that a less restrictive alternative is appropriate, when there are no less restrictive alternatives available; and (6) section 253D does not require the state to take any affirmative action, such as petition for a reduction in custody, on behalf of individuals who no longer satisfy the criteria for continued commitment.

(*Id.* at 66-67.)  The Court concluded that section 253D is unconstitutional as applied for six reasons:

> (1) Defendants do not conduct periodic, independent risk assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition; (2) those risk assessments that have been performed have not all been performed in a constitutional manner; (3) individuals have remained confined at the MSOP even though they have completed treatment or sufficiently reduced their risk; (4) discharge procedures are not working properly at the MSOP; (5) although section 253D expressly allows the referral of committed individuals to less restrictive alternatives, this is not occurring in practice because there are insufficient less restrictive alternatives available for transfer and no less restrictive alternatives available for initial commitment; and (6) although treatment has been made available, the treatment program's structure has been an institutional failure and there is no meaningful relationship between the treatment program and an end to indefinite detention.

(*Id.* at 67.)  The Court concluded that substantial changes needed to be made to Minnesota's sex-offender civil commitment scheme to remedy the ongoing affront to constitutional principles embedded in the MSOP's continued operation.  The Court granted Plaintiffs' request for declaratory relief with respect to Counts I and II and ordered the parties to participate in a Remedies Phase pre-hearing conference "to discuss the relief that they find appropriate with respect to both Counts I and II."  (*Id.* at 75.)

On August 10, 2015, the parties participated in the Remedies Phase pre-hearing conference to discuss possible relief.  (Doc. No. 1003.)  The pre-hearing conference was presided over by the undersigned, along with United States Magistrate Judge Jeffrey J. Keyes and Special Master former Minnesota Supreme Court Chief Justice Eric J. Magnuson.  Attorneys for Plaintiffs and Defendants were in attendance, along with Governor Mark B. Dayton, Representative Kurt L. Daudt (Speaker of the House), Senator

Thomas M. Bakk (Majority Leader of the Senate), Attorney General Lori Swanson, and other interested stakeholders invited by the Court. (*See id.*; Doc. No. 966 at 75 (listing individuals whom the Court urged to attend and participate in the pre-hearing conference).) The Court was hopeful that the parties would use this conference to productively address the issues identified in the Court's Findings of Fact, Conclusions of Law, and Order. Unfortunately, this did not occur.

## II. Remedies Proposals

On August 12, 2015, the Court issued a Scheduling Order requiring the parties to submit remedy proposals and supporting briefs and setting a hearing for September 30, 2015, to receive any argument regarding remedies. (*See* Doc. No. 1006.)

On August 14, 2015, Defendants submitted a letter to the Court indicating that they "[would] not be asking the Court to order particular remedies against them in this case" based on their position that "the sex offender civil commitment statute and Defendants' administration of the Minnesota Sex Offender Program are constitutional." (Doc. No. 1007.) They also indicated that they planned to respond to Plaintiffs' proposed remedies. (*Id.*)

On August 19, 2015, Plaintiffs submitted a Remedies Proposal and Brief in Support of the Remedies Proposal. (Doc. No. 1009.) Plaintiffs argue that the scope of the Court's remedial authority is broad and assert that any remedies that may require additional state funding are properly within the Court's discretion. (*See id.* at 10.) Plaintiffs propose numerous specific remedies that the Court should impose on Defendants, including risk assessments of committed individuals at the MSOP, creation

of less restrictive alternative facilities, improvements to the MSOP's treatment program and discharge process, comprehensive training for MSOP employees, and a statewide public education campaign about sex offenders and civil commitment.  (*Id.* at 20-30.) Unless certain changes are made, Plaintiffs argue, the Court must eliminate the entire MCTA.  (*Id.* at 19.)

On September 4 and 8, 2015, respectively, the Hennepin County Attorney ("HCA") and the American Civil Liberties Union of Minnesota ("ACLU-MN") and Professor Eric S. Janus ("Professor Janus") filed motions for leave to file Amicus briefs concerning remedies.  After the Court granted these motions, (Doc. Nos. 1019, 1020), on September 14, 2015, the Amici Curiae filed their submissions with the Court.  (Doc. Nos. 1021-1023.)  On September 21, 2015, the HCA also filed a letter submission indicating that the county attorneys from six other Minnesota counties wished to join in the HCA's Amicus Memorandum.[7]  (Doc. No. 1025.)

The HCA supports some of Plaintiffs' proposed remedies, including the creation of less restrictive alternatives and requiring periodic risks assessments.  (*See* Doc. No. 1023 at 6-8.)  The HCA also advocates expediting SRB hearings to improve the reduction-in-custody process for committed individuals.  (*See id.* at 8-9.)  However, the HCA argues that several remedies are beyond the Court's authority such as modifying the

---

[7]    The county attorneys joining the HCA's Amicus Memorandum included the county attorneys from Anoka, Dakota, McLeod, Ramsey, Washington, and Wright counties.

commitment or discharge standard, changing the burden of proof for reduction in custody, and supplanting the three-judge appeal panel process. (*See id.* at 9-19.)

The ACLU and Professor Janus highlight the long history of the state's flawed civil commitment system and point out the "legislative intransigence" that has allowed the constitutional infirmities at the MSOP to persist. (*See* Doc. No. 1021 at 15-17, 19.) These Amici argue that the Court must impose remedies that are substantive rather than merely procedural in order to measure the impact of the remedies and to hold the state accountable. (*Id.* at 4-5, 18.) In particular, Amici propose that the Court establish benchmarks to reduce the number of individuals committed at the MSOP and to increase the number of individuals placed in less restrictive alternatives. (*See id.* at 14, 18.) The ACLU and Professor Janus also recommend substantive changes to clarify the risk threshold that justifies continued commitment. (*See id.* at 18-19.) Finally, Amici argue that "the only truly effective remedy may be the possibility of shutting down the MSOP system." (*Id.* at 19.)

On September 21, 2015, Defendants filed a Brief on Remedies in response to Plaintiffs' proposed remedies. (Doc. No. 1026.) Defendants argue that Plaintiffs' proposed remedies exceed constitutional limits placed on a federal district court's authority. (*Id.* at 2.) In particular, Defendants assert there are federalism concerns and separation of powers issues raised by the Court's exercise of authority in this matter. (*Id.* at 5-8.) Defendants assert that "the Minnesota Legislature may consider initiatives that relate to remedies proposed by Plaintiffs" which would "obviate Court consideration of the proposed remedies." (*Id.* at 3.) In addition, Defendants describe many of Plaintiffs'

proposed remedies as "practically impossible for . . . Defendants to accomplish." (*Id.* at 4.) According to Defendants, Plaintiffs' proposals "contemplate a total re-shaping of Minnesota sex offender civil commitment law, which would significantly impact the state executive branch, the Minnesota judicial branch, the Minnesota Legislature, county attorneys, and even local governments and communities." (*Id.* at 22.) Finally, Defendants argue that Plaintiffs' proposed remedies constitute improper individualized relief in this Rule 23(b)(2) class action. (*Id.* at 26.)

On September 24, 2015, Plaintiffs filed a Reply Brief with the Court. (Doc. No. 1029.) On September 30, 2015, the undersigned heard arguments from the parties on the remedies proposed by Plaintiffs and Amici and any objections to those proposals. (Doc. Nos. 1030, 1034.) Hennepin County Attorney Michael Freeman also presented arguments at the September 30, 2015 hearing. (*See* Doc. No. 1034.)

## DISCUSSION

## I. The Scope of the Court's Equitable Authority

The Remedies Phase of this class action litigation requires the Court to exercise its equitable authority. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12 (1971) (quoting *Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294, 300 (1955)). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 15.

The Court's broad equitable powers are tempered by the principle that "judicial powers may be exercised only on the basis of a constitutional violation." *Id.* at 16.

The Supreme Court has identified three factors to guide federal district courts in crafting equitable remedies. First, "the nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (citing *Swann*, 402 U.S. at 16). In other words, federal courts may impose remedies that "are aimed at eliminating a condition that . . . violate[s] the Constitution or . . . flow[s] from such a violation." *Id.* at 282. Second, the remedy "must indeed be remedial in nature, that is, it must be designed as nearly as possible 'to restore the victims of [unconstitutional] conduct to the position they would have occupied in the absence of such conduct.'" *Id.* at 280 (quoting *Milliken v. Bradley*, 418 U.S. 717, 746 (1974) (*Milliken I*)); *see also id.* at 280 n.15 ("[T]he ultimate objective of the remedy is to make whole the victims of unlawful conduct."). Third, the Court "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* at 280-81. With respect to the third factor, courts need not tolerate undue delay or excuses—such as insufficient funding—in the state authorities' attempts to remedy constitutional infirmities. As the Supreme Court has explained, "[S]tate and local authorities have primary responsibility for curing constitutional violations. 'If, however, '[those] authorities fail in their affirmative obligations . . . judicial authority may be invoked.'" *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (quoting *Milliken*, 433 U.S. at 281).

This case involves highly sensitive and politicized issues that implicate important questions of federalism and the separation of powers. To properly balance the myriad interests of all parties affected by this litigation, the Court remains attentive to the proper limits on its equitable powers and can only grant such relief as is authorized by law. However, at the same time, the Court fully expects Defendants to act swiftly to remedy the pervasive constitutional infirmities at the MSOP in accordance with this Order. As the Court has previously stated, the Court "has an obligation to all citizens to not only honor their constitutional rights, but to do so without compromising public safety and the interests of justice. The balance is a delicate and important one, but it can and will be done." (Doc. No. 966 at 69.)

## II.     First Interim Relief

As noted above, determining the proper remedy and its scope requires the Court to consider the nature of the constitutional violation justifying relief. *See Swann*, 402 U.S. at 16 ("[T]he nature of the violation determines the scope of the remedy."). Thus, the Court will briefly summarize the constitutional infirmities outlined in detail in its June 17, 2015 Findings of Fact, Conclusions of Law, and Order. (*See* Doc. No. 966 at 51-65.)

The Court concluded that section 253D is unconstitutional under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, which provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The civil commitment of individuals results in a significant curtailment of liberty, infringing the fundamental right to live free

of physical restraint.  *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (internal citation omitted)).

When a fundamental right is involved, courts must subject the law to strict scrutiny, placing the burden on the government to show that the law is narrowly tailored to serve a compelling state interest.  *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  To satisfy this standard, the Court determined that section 253D must ensure that individuals are committed no longer than necessary to serve the state's compelling interests.  The purpose for which an individual is civilly committed to the MSOP must be to provide treatment to those committed and to protect the public from individuals who are both mentally ill and pose a substantial danger to the public as a result of that mental illness.  *See Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995).  The purpose may not be to impose punishment for past crimes or to prevent future crimes.  *See Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring) ("If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function.").[8]

---

[8]    Several individuals committed to the MSOP were allowed to plead to lesser criminal charges, not fully aware of what it would mean to be civilly committed.  (*See* Doc. No. 966 at 70.)  Also, the Minnesota Department of Corrections ("DOC") has frequently referred offenders for civil commitment, despite the availability of intensive supervised release following an offender's prison sentence on the criminal side.  (*Id.* at 72.)  Under Minnesota law, first-time sex offenders are mandatorily placed on conditional release for ten years following a prison sentence, and repeat sex offenders are mandatorily placed on conditional release for life.  (*Id.* at 71 (citing Minn. Stat.

(Footnote Continued on Next Page)

Applying strict scrutiny, the Court found that "section 253D, on its face and as applied, is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment." (*See* Doc. No. 966 at 65 (citing *Hendricks*, 521 U.S. at 361-62.) In particular, the Court concluded that section 253D is facially unconstitutional for six specific reasons and unconstitutional as applied for six specific reasons, as outlined above. These numerous, systemic constitutional violations dictate the scope of the Court's power to fashion suitable remedies.

The Court may impose a "systemwide remedy" when constitutional violations result in a "systemwide impact." *See Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977) (citing *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 213 (1973)). This is precisely what the Court found in this case. The constitutional infirmities at the MSOP have created a widespread and deleterious impact on Minnesota's entire sex offender civil commitment system. The Court, therefore, must exercise its equitable authority to remedy the system as a whole. In doing so, the Court will begin by choosing some initial remedies that must be instituted first.

The record in this case contains ample evidence that the current assessment process and procedures for seeking release from the MSOP are constitutionally

(Footnote Continued From Previous Page)
§ 609.3455, subds. 6, 7).) Such conditional release could include intensive supervision, GPS monitoring, daily curfews, alcohol and drug testing, and other conditions. (*Id.*) Minnesota's reliance on the civil commitment process in lieu of the criminal justice system in criminal sexual conduct cases compounds the systemic problems at the MSOP. For a complete discussion of these issues, see the Court's June 17, 2015 Findings of Fact, Conclusions of Law, and Order. (*Id.* at 70-72.)

inadequate. Defendants have no meaningful idea of the status of persons committed, which of those persons continue to meet the criteria for commitment, and whether those persons are confined under conditions that remain appropriate. The class-wide remedy for those circumstances is that Defendants must promptly assess those persons it currently has confined, starting with those who are most likely to be mis-classified (and in many cases those who are also the most vulnerable) such as the elderly and individuals with disabilities. Defendants must have those assessments performed by independent qualified examiners using the appropriate standards. In addition, Defendants must not continue to confine individuals who are improperly detained. As is more fully set forth in this Order, these remedies will ensure that those committed still meet the commitment criteria and will allow the terms of commitment to be tailored to the appropriate level of liberty deprivation. Due to the systemic nature of the problems at the MSOP and the fact that Defendants have been on notice of the program's deficiencies for many, many years, the Court expects prompt compliance with this Order on an expedited time line as outlined below.

### A.     Independent Risk Assessments and Phase Placement Reevaluation

In this First Interim Relief Order, the Court orders Defendants to promptly conduct independent risk and phase placement reevaluation of all committed individuals currently committed to the MSOP. These independent risk assessments will fulfill four distinct purposes. First, they will determine whether committed individuals continue to meet the constitutional standard for commitment. Second, they will determine whether committed individuals could be appropriately transferred or provisionally discharged.

Third, they will determine whether committed individuals could be housed in or monitored by a less restrictive alternative. Fourth, they will determine whether committed individuals are in the proper treatment phase. Defendants shall complete the assessments in the order specified by the Court below, starting first with those individuals who have been identified during this litigation as eligible for a reduction in custody, next with the elderly, individuals with substantive physical or intellectual disabilities, and juvenile-only offenders,[9] and finally with all remaining committed individuals at the MSOP. The Court orders Defendants to complete these reevaluations on designated time lines and to provide detailed plans relating to these reevaluations as outlined below.

The Court has the authority under *Milliken* to order Defendants to conduct immediate independent risk assessments and phase placement reevaluation of all MSOP patients. First, these remedies are "aimed at eliminating a condition that . . . violate[s] the Constitution or . . . flow[s] from such a violation." *Milliken*, 433 U.S. at 282. In its June 17, 2015 Findings of Fact, Conclusions of Law, and Order, the Court found that Defendants' application of section 253D resulted in unconstitutional deprivations of liberty in contravention of the Fourteenth Amendment's Due Process Clause because:

> (1) Defendants do not conduct periodic, independent risk assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition; (2) those risk assessments that have been performed have not all been performed in a constitutional manner; (3) individuals have remained

_____

[9] The Court uses the term "juvenile-only offenders" to refer to committed individuals at the MSOP with no adult convictions. At the time of trial, there were sixty-seven juvenile-only offenders committed to the MSOP. (*See id.* at 19 n.6.)

confined at the MSOP even though they have completed treatment or sufficiently reduced their risk; . . . and (6) although treatment has been made available, the treatment program's structure has been an institutional failure and there is no meaningful relationship between the treatment program and an end to indefinite detention.

(Doc. No. 966 at 67.)  The Court explained, "The Fourteenth Amendment does not allow the state, DHS, or the MSOP to impose a life sentence, or confinement of indefinite duration, on individuals who have committed sexual offenses once they no longer pose a danger to society." (*Id.* at 68.)

Defendants argue that the Court "has the authority only to cure constitutional violations established by the record, not to require Defendants to determine whether such violations exist." (Doc. No. 1026 at 17.)  In particular, Defendants claim that proposals relating to risk assessments and treatment progress reviews are improper because they "are not aimed at remedying a condition held to violate the Constitution, but rather seek to determine whether any class member committed to MSOP is entitled to a reduction in custody." (*Id.*)  The Court disagrees.  The record could not be more clear.  The MCTA does not require Defendants to conduct periodic risk assessments to ensure that committed individuals continue to meet statutory requirements for commitment.[10]  (Doc. No. 966 at 36.)  Defendants' own witnesses "admit that they do not know whether many

---

[10]    The Court notes that this aspect of Minnesota's civil commitment scheme is in contrast with the large majority of states, including the "best practice" states of Wisconsin and New York, which require annual risk assessments.  (*See id.* at 36; *see also* Amicus Brief of ACLU-MN and Professor Janus (Doc. No. 1021 at 14) (describing Wisconsin and New York as "best-practice states").)

individuals confined at the MSOP meet the commitment or discharge criteria." (*Id.* at

60.)  Further, not only did risk assessors at the MSOP not begin using statutory criteria in

risk assessment reports until late 2010 or early 2011, (*id.* at 40), but the MSOP risk

assessors do not receive any training on the constitutional standards for discharge or

commitment.  (*Id.*)  And astonishingly, the standard identified by the Minnesota Supreme

Court in 1995 in *Call v. Gomez* was not utilized in the MSOP's risk assessments until

June 2014.  (*Id.* at 41.)  The proper remedy for the constitutional infirmity of the

continued commitment by Defendants of individuals who may no longer pose a danger to

society is to conduct independent risk assessments to ensure that individuals continue to

be committed under constitutional standards and are in the proper treatment phase[11] with

the possibility of moving toward eventual release.

Second, these remedies are indeed remedial in nature because they will restore

those committed at the MSOP to the position they would have been in absent the

wrongful conduct of Defendants.  *See Milliken*, 433 U.S. at 280.  In other words,

conducting risk assessments and reevaluating each committed individual's treatment

phase placement will start the process of correcting a systemic constitutional violation

that has resulted in the unconstitutional confinement of those held at the MSOP for years.

If Defendants had operated a constitutional civil commitment program from the MSOP's

---

[11]    See the Court's June 17, 2015 Findings of Fact, Conclusions of Law, and Order
(Doc. No. 966 at 23-35) for a complete discussion of the MSOP treatment program and
the problems associated with individual treatment progress and treatment phase
placement.

inception, each committed individual would have been routinely assessed to ensure that they were committed "for only so long as he or she continues *both* to need further inpatient treatment and supervision for his sexual disorder *and* to pose a danger to the public." *Call*, 535 N.W.2d at 319 (emphasis added). Defendants claim that the record at trial does not support a finding "that any Plaintiff is being unconstitutionally detained." (Doc. No. 1026 at 20.) Defendants argue, "[b]ecause there was no evidence that any Class representative—let alone the entire Class—is entitled to a less restrictive setting or freedom, there is no remedy needed to 'restore' Plaintiffs 'to the position they would have occupied in the absence of' the purported unconstitutional conduct." (*Id.* at 19 (quoting *Milliken*, 433 U.S. at 280).) Denying any proven harm to Plaintiffs, Defendants argue that the Court's remedial power is narrowly limited. (*Id.* at 20.) The Court rejects this argument.

Defendants are rehashing arguments that this Court has already considered in the liability phase of this litigation. The Court concluded that Defendants' application of section 253D is unconstitutional "because Defendants apply the statute in a manner that results in Plaintiffs being confined to the MSOP beyond such a time as they either meet the statutory reduction in custody criteria or no longer satisfy the constitutional threshold for continued commitment." (Doc. No. 966 at 60.) Based on testimony of Defendants' own witnesses, the Court found that "a full risk assessment is the only way to determine whether a committed individual meets the discharge criteria." (*Id.* at 36.) By not doing these assessments, Defendants are essentially burying their heads in the sand, rather than doing what is required of them to run a constitutional program—make sure that those

committed continue to pose a danger to the public. The only way to adequately remedy the long-standing constitutional violations at the MSOP now is to immediately assess all committed individuals to ensure that the fact and conditions of their confinement meet constitutional standards.

Third, the Court imposes these remedies taking full consideration of "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *See Milliken*, 433 U.S. at 281. Defendants cite numerous limitations described by Commissioner Jesson that purportedly inhibit the MSOP's ability to conduct risk assessments of all committed individuals at the MSOP. (*See, e.g.*, Doc. No. 1026 at 24-25 ("Defendants know from experience the challenge of recruiting the highly qualified forensic evaluators needed to conduct risk assessments.").)[12] Also, in critiquing Plaintiffs' proposed remedies, Defendants cite to a case in which the Supreme Court rejected a federal court injunction that was deemed "inordinately—indeed wildly— intrusive." (*See id.* at 22-23 (quoting *Lewis v. Casey*, 518 U.S. 343, 362 (1996)).)[13] This

---

[12]     Commissioner Jesson cites "shortage of qualified staff," potentially lengthy administrative processes for hiring independent contractors, and "limited ability to divert funds" as barriers to conducting immediate risk assessments. (Doc. No. 1027 at 2-8.)

[13]     In *Lewis*, the injunctive order sought to protect inmates' rights of access to the courts and counsel and "specified in minute detail the times that libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree, or paralegal degree), the content of a videotaped legal-research course for inmates (to be prepared by persons appointed by the Special Master but funded by [the Arizona Department of Corrections]), and similar matters." *See Lewis v. Casey*, 518 U.S. 343, 347 (1996).

First Interim Relief Order avoids such improper intrusion by deferring to state authorities' expertise to carefully devise a specific plan for implementation. In this First Interim Relief Order, the Court identifies the assessments that Defendants must complete to come into compliance with constitutional standards and leaves the implementation of those assessments in the general control of state authorities at the MSOP.

The Court has fully considered Defendants' claims regarding the timing and feasibility of conducting risk assessments of all committed individuals at the MSOP, but these assessments must be done. The State of Minnesota has elected to establish this sex offender civil commitment program, and it is Defendants' responsibility to ensure that it is operated in a constitutional manner. *Cf. Welsch v. Likins*, 550 F.2d 1122, 1132 (8th Cir. 1977) ("If Minnesota chooses to operate hospitals for the [developmentally disabled], the operation must meet minimal constitutional standards, and that obligation may not be permitted to yield to financial considerations."). Due to the systemic problems at the MSOP of which Defendants have been on notice for years, the Court emphasizes that Defendants must make the implementation of these remedies their top priority and must implement these processes in an expedited fashion to quickly resolve the constitutional infirmities at the MSOP.

### B.      Discharge-Related Remedies

In this Order, the Court also orders remedies relating to the discharge or transfer of committed individuals following the assessments described above. If the independent risk assessment of any individual concludes that the individual should be fully discharged, transferred, or receive a reduction in custody, the MSOP must seek the

release or reduction in custody of that individual to the appropriate placement by immediately filing a petition with the SRB.  Should Defendants wish to challenge the assessment that an individual should be fully discharged, transferred, or receive a reduction in custody, the burden shall be on Defendants to prove that such individual's commitment or current level of custody is appropriate by clear and convincing evidence.  Throughout the petitioning process, Defendants must provide all petitioners with access to experienced independent counsel and professional experts.  Defendants must ensure that the SRB and SCAP hearings following the independent risk assessments proceed in a timely manner and in no case conclude more than 120 days after the petition has been filed on behalf of a patient.  Defendants must ensure that less restrictive alternatives are available to accommodate the placement of all individuals found eligible for a reduction in custody.  Such alternatives could include, for example, facilities developed and run by DHS, facilities in which DHS has entered into third-party contracts to provide services to committed individuals, or intensive supervision and treatment of committed individuals, using means such as GPS monitoring, daily curfews, and no-contact orders, among other things.[14]  For individuals found eligible for discharge, Defendants must provide

---

[14]    Although the parties devoted little if any attention to this possibility at trial or during the Remedies Phase of this litigation, the Court notes that community supervision of sex offenders under intensive supervision and monitoring should be considered a valid less restrictive alternative to commitment in any facility.  As noted in the Court's June 17, 2015 Findings of Fact, Conclusions of Law, and Order, Grant Duwe, Director of Research at the DOC has stated, "[M]any high-risk sex offenders can be managed successfully in the community.  The cost of civil commitment in a high-security facility also implies that this type of commitment should be reserved only for those offenders

(Footnote Continued on Next Page)

transitional services and discharge planning needed to facilitate the individual's successful transition into the community. Following the treatment phase placement reevaluation of each individual at the MSOP, Defendants shall immediately move any individual who is determined to be in an improper treatment phase into the proper treatment phase. If Defendants wish to object to the movement of any individual, the matter must be submitted to the Special Master for resolution. The Court orders Defendants to provide a detailed plan to the Special Master describing how Defendants will implement these remedies at the MSOP as outlined below.[15]

The Court has the authority under *Milliken* to order Defendants to implement the remedies relating to discharge described above. First, these remedies are appropriate given the nature and scope of the constitutional violations relating to the MSOP's discharge process. *See Milliken*, 433 U.S. at 280, 282. Defendants contend that "[t]he Constitution does not require MSOP staff to petition for reduction in custody on behalf of clients." (Doc. No. 1026 at 13.) Defendants also argue that Minnesota statutes already

_____

(Footnote Continued From Previous Page)
who have an inordinately high risk to sexually reoffend." (Doc. No. 966 at 69; *see also* Doc. No. 1022, ¶ 2, Ex. 1, at 9.) Other states have successfully implemented such alternatives in their sex offender civil commitment schemes. (*See, e.g.*, Doc. No. 966 at 11-12 (describing programs in Wisconsin and New York that utilize supervised release or "strict and intensive supervision and treatment").)

[15]     The Court notes that Defendants' plan must establish a means of expedited release for those individuals who are found to no longer meet the constitutional standards for commitment. If the Court is not satisfied that Defendants' proposed plan achieves this requirement, the Court may impose more drastic remedies such as enjoining enforcement of the statutory scheme requiring committed individuals to utilize the SRB and SCAP process for release from the MSOP.

provide for state-funded attorneys for committed individuals seeking release, (*id.* at 9

(citing Minn. Stat. § 253D.20)), provide access to independent examiners, (*id.* at 16

(citing Minn. Stat. § 253D.28, subd. 2(c))), and place the burden on Defendants to

challenge discharge, (*id.* at 15 (citing Minn. Stat. § 253D.28)).  Defendants also challenge

the Court's authority to order Defendants to ensure the availability of less restrictive

alternatives, claiming "[t]here is no Fourteenth Amendment right to treatment in a least

restrictive alternative setting."  (*Id.* at 12 (citing *Beaulieu v. Ludeman*, 690 F.3d 1017,

1031-33 (8th Cir. 2012).)  These arguments ignore the Court's clear findings of

unconstitutionality in its June 17, 2015 Findings of Fact, Conclusions of Law, and Order.

The Court concluded section 253D is facially unconstitutional because:

> (4) section 253D authorizes the burden to petition for a reduction in custody
> to impermissibly shift from the state to committed individuals;
> (5) section 253D contemplates that less restrictive alternatives are available
> and requires that committed individuals show by clear and convincing
> evidence that a less restrictive alternative is appropriate, when there are no
> less restrictive alternatives available; and (6) section 253D does not require
> the state to take any affirmative action, such as petition for a reduction in
> custody, on behalf of individuals who no longer satisfy the criteria for
> continued commitment.

(Doc. No. 966 at 67.)  Similarly, the Court concluded section 253D is unconstitutional as

applied because:

> (4) discharge procedures are not working properly at the MSOP; [and]
> (5) although section 253D expressly allows the referral of committed
> individuals to less restrictive alternatives, this is not occurring in practice
> because there are insufficient less restrictive alternatives available for
> transfer and no less restrictive alternatives available for initial
> commitment[.]

(*Id.*)  Significantly, the Court found that "[t]he MSOP knows that there are Class Members who meet the reduction in custody criteria or who no longer meet the commitment criteria but who continue to be confined at the MSOP."  (*Id.* at 47.)  As part of this litigation, the Rule 706 Experts identified two such individuals whose situations are likely representative of many more individuals confined at the MSOP.  The Rule 706 Experts issued a report recommending that Defendants transfer or provisionally discharge the MSOP's one committed female, Rhonda Bailey.  (*See id.* at 18-19.)  Bailey was never transferred, despite testimony of the MSOP's Clinical Director that the MSOP had the ability to contract with in-state and out-of-state facilities to place her in another setting. (*Id.* at 19.)  The Rule 706 Experts also unanimously recommended that Defendants fully discharge another committed individual from the MSOP.  (*See id.* at 45 (describing the recommendation to fully discharge Eric Terhaar, a juvenile-only offender at the MSOP).) Despite knowledge that there are individuals who no longer meet commitment criteria, the MSOP has never filed a petition on behalf of a committed individual for full discharge from the program.  (*Id.* at 47.)

In addition, Defendants have full control to schedule SRB hearings and to appoint individuals to the SRB, yet Defendants have allowed lengthy delays in the SRB process and significant backlogs to delay decisions on individual petitions for transfer, provisional release, or discharge.  (*Id.* at 44-46, 56.)  Finally, despite the testimony of MSOP representatives that "there are committed individuals at the MSOP, including some of the sixty-seven juvenile-only offenders at the MSOP, who could be treated safely in a less secure facility," (*id.* at 21), and the testimony of Commissioner Jesson that she

had identified specific individuals at the MSOP who could be transferred to a less restrictive facility, (*id.* at 22), Defendants have failed to provide a sufficient number of such facilities, either by their own creation or through third-party contracts. (*Id.* at 21-23; *see also id.* at 47 (noting that the MSOP has filed petitions for reduction in custody on behalf of seven committed individuals, six of whom were never ultimately transferred).) In fact, history has shown just how systemic the problem is when the Governor of the State of Minnesota intervened to halt all transfers to less restrictive facilities to await a possible legislative solution that has never, after several attempts, come to fruition. (*See id.* at 22.) Simply put, in light of the evidence and the Court's findings, the Court has the authority to order Defendants to implement remedial measures to ensure that committed individuals are not detained longer than necessary due to these systemic constitutional violations in the discharge process at the MSOP.

Second, these discharge-related remedies are truly remedial in nature. *See Milliken*, 433 U.S. at 280. For many of the same reasons outlined above, these remedies to the MSOP's discharge process will have the effect of restoring committed individuals to the position they would have held had the MSOP been operating constitutionally all along. If Defendants know that an individual no longer meets constitutional standards for commitment, the program may not continue to detain that individual at the MSOP. The Court's discharge-related remedies ordered below will help ensure that individuals committed at the MSOP are not detained beyond such time as the constitution permits. Importantly, putting committed individuals into the position they would have been in had the MSOP been operating constitutionally all along requires Defendants to provide

transitional services to individuals who are deemed eligible for discharge. Defendants have offered no reintegration services to individuals committed to the MSOP until they have reached the final phase of treatment, (*see* Doc. No. 966 at 24), so individuals in earlier treatment phases have received no assistance with discharge planning whatsoever (*id.* at 24-25). Because Defendants' reevaluation of committed individuals may require provisional or complete discharge of committed individuals who have not received any reintegration services from the MSOP, Defendants must provide these services in accordance with this Order to provide a full remedy to those who have been subject to unconstitutional confinement at the MSOP.

Third, the Court imposes these remedies with appropriate deference to state and local authorities. *See Milliken*, 433 U.S. at 280-81. The Court acknowledges that Minnesota statutes as enacted may include some of the relief the Court imposes today. *See, e.g.*, Minn. Stat. § 253D.20 (providing a right to counsel for committed individuals "at any proceeding under [Chapter 253D]"). As applied, however, Defendants have not ensured that the discharge process is operating properly to confine individuals at the MSOP for only so long as the Constitution allows.[16] The Court also imposes this relief in full consideration of Commissioner Jesson's claims regarding difficulty of implementing

---

[16]     *See* Amicus Brief of ACLU-MN and Professor Janus (Doc. No. 1021 at 4) ("[T]he State's persistent two-decades of 'slow-walking' the procedural protections that were theoretically already in the law demonstrates that proper process is not sufficient to guarantee a non-punitive purpose. If the past two decades have proved anything, it is that procedural due process, standing alone, cannot protect against the subterfuge of an intent to punish.").

these discharge-related remedies.[17]  In deference to the interests of state authorities in "managing their own affairs," *Milliken*, 433 U.S. at 281, the Court invites the participation of Defendants and other state actors to propose in detail how they will shape the particular discharge process to fully comply with this Order.

### C.    Annual Independent Risk Assessments

Finally, the Court orders Defendants to establish a plan to conduct annual, independent risk assessments to determine whether each client continues to satisfy civil commitment requirements and whether each client's treatment phase placement is proper. The discharge-related remedies outlined above should apply identically following these subsequent annual assessments.  The Court orders Defendants to provide a plan to the Special Master describing how Defendants will comply with this remedy as outlined below.

---

[17]     Commissioner Jesson suggested that a requirement to petition on behalf of committed individuals would create "a number of difficulties," including determining whose belief should trigger a determination that a petition is appropriate and what should be done if a committed individual does not wish to petition when the MSOP initiates the process.  (*See* Doc. No. 1027 at 14.)  Jesson also described the "limited availability of MSOP forensic evaluators and treatment psychologists" as barriers to increasing the frequency of SRB hearings.  (*See id.* at 9-10.)  Further, Jesson claimed the MSOP has virtually no authority to impose remedies related to the provision of counsel or experts for committed individuals and suggests that these remedies are already included in Minnesota statutes.  (*See id.* at 18.)  Finally, Jesson described numerous barriers to creating additional less restrictive alternatives for committed individuals, including limited funding, lengthy time lines to build or repurpose facilities, licensing and approval requirements, and community opposition which Jesson described as "a serious, or insurmountable, obstacle."  (*See id.* at 10-14; *see also* Doc. No. 1026 at 25.)

The Court has the authority to order Defendants to complete annual independent risk assessments of all committed individuals at the MSOP. In ordering this remedy, the Court reiterates its analysis above regarding the appropriateness of a remedy imposing immediate risk assessments.[18] This additional measure will not only remedy immediate constitutional violations suffered by individuals at the MSOP, but will ensure that constitutional violations that have plagued the MSOP's operation will not persist into the future. In its Findings of Fact, Conclusions of Law, and Order, the Court found that "[r]isk assessments are only valid for approximately twelve months." (Doc. No. 966 at 36.) And Defendants own witnesses "credibly testified that if a risk assessment has not been conducted within the past year on civilly committed individuals at the MSOP, the MSOP does not know whether those individuals meet the statutory criteria for commitment or for discharge." (*Id.*) Thus, as suggested by the state's own authorities, annual risk assessments are a necessary remedy to ensure the constitutionality of the MSOP's continued commitment of sex offenders into the future.

Based on the identified constitutional violations at the MSOP, the measures needed to directly remedy these violations, and the Court's deference to MSOP

---

[18]    In response to Plaintiff's proposal to implement annual, independent risk assessments of committed individuals at the MSOP, Defendants reiterate many of the same objections raised with respect to immediate risk assessments. (*See* Doc. No. 1026 at 17 (arguing that annual independent risk assessments "are not aimed at remedying a condition held to violate the Constitution"); Doc. No. 1027 at 8-9 (noting hiring additional risk assessors and funding as key limitations to implementing annual risk assessments of all committed individuals at the MSOP).)

authorities in crafting specific plans for compliance, the Court concludes that the injunctive relief ordered below is proper under *Milliken*.

### D. Class-Wide Relief

Defendants challenge Plaintiffs' proposed remedies, including those that the Court orders today, because, according to Defendants, they request individualized relief "which is impermissible in [a] Rule 23(b)(2) class action." (Doc. No. 1026 at 26 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011)).) In particular, Defendants argue that ordering assessment of all class members "is exactly the type of non-final injunctive order prohibited in a (b)(2) class." (*Id.* at 27.) Defendants challenge any form of relief that would result in individualized determinations or benefits for only a subset of Class members including the creation of less restrictive facilities or remedies specific to individuals with physical or mental disabilities. (*See id.* at 27-28.)

Contrary to Defendants' assertions, the remedies ordered by the Court below are not improper for class-wide relief under Federal Rule of Civil Procedure 23(b)(2). Class certification under Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class cohesiveness and the possibility of uniform resolution" are hallmark characteristics of a properly certified Rule 23(b)(2) class. *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1036 (8th Cir. 2010). As the Supreme Court has explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores*, 131 S. Ct. at 2557.

"Because one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule 'must be read liberally in the context of civil rights suits.'" *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (quoting *Ahrens v. Thomas*, 570 F.2d 286, 288 (8th Cir. 1978)); *see also* 7AA Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, & Adam N. Steinman, *Federal Practice and Procedure* § 1775 (3d ed. 2015) ("[S]ubdivision (b)(2) was added to Rule 23 in 1966 primarily to facilitate the bringing of class actions in the civil-rights area.").

In this case, all Class members have suffered an identical injury through the unconstitutional deprivation of liberty in contravention of the Fourteenth Amendment. (*See* Doc. No. 966 at 50.) As this Court stated in its Findings of Fact, Conclusions of Law, and Order, "all Class Members have suffered an injury in fact—the loss of liberty in a manner not narrowly tailored to the purpose for commitment." (*Id.*) By failing to periodically assess all Class members and failing to operate a treatment program that provides a meaningful opportunity for potential release into the community, Defendants have directly harmed all Class members and have caused substantial injury. (*See id.*) The first interim relief ordered herein directly and finally addresses harms faced by all Class members, making such relief proper in this Rule 23(b)(2) class action litigation. The Court's remedy will help establish a system through which all class members' rights may be vindicated. The fact that the Court's remedy may result in varied outcomes for committed individuals at the MSOP does not render certification under Rule 23(b)(2) improper. *See Coley*, 635 F.2d at 1378 (finding class certification under Rule 23(b)(2) proper and rejecting the district court's determination that "so many variations of remedy

[for inmates committed to a state mental hospital]" would make "any sort of class relief

. . . impossible").  Unlike cases in which courts ordered individualized relief tailored to

individualized harms, the relief that the Court imposes today will broadly affect the

MSOP's risk assessment and discharge processes and will address the constitutional

harms inflicted upon all Class members.  *Cf. Avritt*, 615 F.3d at 1037 (affirming a district

court's denial of class certification under Rule 23(b)(2) when "resolution of the plaintiffs'

claims would require numerous individual determinations"); *Jamie S. v. Milwaukee Pub.

Sch.*, 668 F.3d 481, 499 (7th Cir. 2012) (finding class certification under Rule 23(b)(2)

improper because the district court's remedy "require[d] thousands of individual

determinations of class membership, liability, and appropriate remedies").  The relief

imposed below will operate identically for all class members to remedy the

unconstitutional deprivations of liberty faced by those committed to the MSOP.

## CONCLUSION

Given the MSOP's decades-long history of operating an unconstitutional civil

commitment program, the deeply systemic nature of the problems plaguing this state's

sex offender civil commitment scheme, and the minimal progress made toward

remedying any constitutional infirmities since the start of this litigation four years ago,

the Court concludes that it must exercise its broad remedial power.  The Constitution

requires that substantial changes be made to Minnesota's sex offender civil commitment

scheme at the MSOP.

The Court emphasizes that it has invited the participation of the state in shaping

the proper remedy for eliminating the constitutional violations at the MSOP.  The

Supreme Court has indicated that it is proper for federal courts to invite state input in developing appropriate relief in institutional reform cases. *See Lewis v. Casey*, 518 U.S. 343, 362 (1996) (identifying the "proper procedure" for federal courts to follow in imposing institutional reform remedies in the prison context). Particularly, federal courts should "charge[] the [state agency] with the task of devising a Constitutionally sound program." *Id.* (internal citation omitted). And, the state agency should "respond[] with a proposal" that the Court may approve after inviting objections from the opposing party. *Id.* at 362-63. The Court has followed this procedure, both leading up to this Order and through the relief identified herein. Defendants have refused to propose any solutions. This Order requires Defendants to develop plans to fully implement the remedies ordered below. Offering Defendants the opportunity to submit such plans gives state authorities sufficient input into the proper administration of the MSOP. This Order therefore lies squarely within the scope of the Court's constitutional authority and respects the sensitive federalism concerns inherent in this case.

The Court reminds Defendants of how important prompt and meaningful compliance will be for protecting not only the constitutional rights of the Plaintiffs but also the credibility of the state's civil commitment system and the public safety for all Minnesotans. The State of Minnesota is not obligated to operate a civil commitment program for sex offenders. However, because the state has chosen to operate this system, it must do so in a constitutional manner, and it must provide appropriate funding to support the program's constitutional operation. *See Welsch*, 550 F.2d at 1132. Despite Defendants' claim that "the Minnesota Legislature may consider initiatives" that would

supplant the need for judicially-imposed remedies (Doc. No. 1026 at 3), the Court will

not allow Defendants to simply wait for such a solution. The political sensitivities

surrounding the MSOP have repeatedly hampered past efforts at legislative reform.[19] To

properly remedy the constitutional violations found in Defendants' operation of the

MSOP, Defendants must take action to resolve the program's unconstitutionality without

waiting for legislative change. The Court also reminds Defendants that the Remedies

Phase of this litigation is not a platform for them to relitigate previously-determined

issues such as the actual harm faced by the Plaintiffs in this matter or the fundamental

constitutional flaws in the MSOP's continued operation. Continued intransigence by

Defendants will only further compound the significant harms faced by those subject to

unconstitutional confinement at the MSOP. And a prolonged stay of enforcement may

also place at risk those individuals at the MSOP who continue to operate the program on

a daily basis. The Court will not tolerate delay.

 In the interest of federalism, the Court hopes that Defendants' response to this

Order does not necessitate deeper and more prolonged involvement of the Court in this

---

[19]  *See* HCA Amicus Curiae Memorandum (Doc. No. 1023 at 3-4) (describing prior legislative efforts to improve the state's civil commitment system); Amicus Brief of ACLU-MN and Professor Janus (Doc. No. 1021 at 15-17) ("The Legislature has had ample opportunities to address the glaring problems with MSOP and they have so far failed to do so."); Doc. No. 966 at 15-17 (describing several reports critical of the state's civil commitment scheme and noting recent bills introduced in the legislature that have failed to implement key changes).

state's civil commitment scheme.[20]  And in the interest of public safety, the Court hopes to avoid the need to impose a more drastic solution in the future such as demanding the release of individuals committed to the MSOP[21] or shutting down the program's operation.[22]  Even so, the Court notes that the relief outlined below is interim only.  The

---

[20]     *See, e.g.*, *Turay v. Richards*, No. C91-0664RSM, 2007 WL 983132, at *5 (W.D. Wa. Mar. 23, 2007) (dissolving an injunction over a state's sex offender program that had lasted over a decade and noting that "injunctions against the state are not intended to operate in perpetuity").

[21]     *See, e.g.*, *Coleman v. Brown*, No. 2:90-cv-0520 LKK JFM P, 952 F. Supp. 2d 901, 935 (E.D. Cal. 2013) (ordering a state prison system to release prisoners to achieve a specific population threshold in the event that the state's implementation plan failed to reach this threshold by a given date).  The Court is particularly troubled by the possible remedy of immediately releasing individuals from the MSOP without proper transitional services in place to ensure that these individuals are prepared to live outside an institutionalized setting.  (*See* Doc. No. 966 at 69-70 ("[P]rovisional discharge or discharge from the MSOP does not mean discharge or release without a meaningful support network, including a transition or release plan into the community with intensive supervised release conditions.").)  Section 253D contemplates that the MSOP may provisionally discharge committed individuals from the program in accordance with a provisional discharge plan "developed, implemented, and monitored by the executive director in conjunction with the committed person and other appropriate persons."  *See* Minn. Stat. § 253D.30.  The Court has been unable to fully evaluate how this provisional discharge process is applied by Defendants, however, because Defendants offered few details about this topic at trial.  (*See, e.g.*, Doc. No. 966 at 24-25.)  This lack of evidence can properly be attributed to Defendants' inexperience in implementing provisional discharge plans because only three individuals have ever been provisionally discharged from the MSOP in the program's history.  (*See id.* at 11.)

[22]     *See* Amicus Brief of ACLU-MN and Professor Janus (Doc. No. 1021 at 19) ("[T]he only truly effective remedy may be the possibility of shutting down the MSOP system.").  *Cf. Welsch v. Likins*, 550 F.2d 1122, 1132 & n.8 (8th Cir. 1977) (noting in the context of remedying unconstitutional infirmities at Minnesota's state hospitals for individuals with disabilities that "[a]lternatives to the operation of the existing state hospital system . . . may appear undesirable, but alternatives do exist" and suggesting that

(Footnote Continued on Next Page)

Special Master and the Court will monitor Defendants' compliance with these initial remedies, and more remedies orders are likely to follow.

Finally, although the Court cannot dictate what statutory solutions the legislature should enact to remedy the constitutional infirmities at the MSOP, the legislature should prioritize and begin with addressing the issues identified in this First Interim Relief Order (immediate risk and phase placement reevaluations, discharge-related remedies including prompt discharge or transfer of individuals who are no longer committed under constitutional standards, ensuring availability of less restrictive alternatives such as new facilities or intensive supervision using GPS monitoring, expedited completion of SRB and SCAP hearings (or revising the discharge process altogether), and implementation of an annual risk reevaluation process). Defendants should urge the legislature to prioritize these remedies and to provide the necessary funding to remedy the pervasive constitutional violations faced by those detained at the MSOP. Justice requires no less.

---

(Footnote Continued From Previous Page)
"[a]n extreme alternative would, of course, be the closing of the hospitals and the abandonment by the State of [the program]").

# ORDER

Based upon the Findings of Fact and Conclusions of Law, the presentations and submissions of the parties, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1.  Defendants are hereby enjoined as follows:

    a.  Defendants must promptly conduct independent risk and phase placement reevaluation of all current patients at the MSOP. These independent risk assessments shall determine whether each patient (1) continues to meet the constitutional standard for commitment as set forth in *Call v. Gomez*, 535 N.W.2d 312 (Minn. 1995); (2) could be appropriately transferred or provisionally discharged; (3) could be housed in or monitored by a less restrictive alternative; and (4) is in the proper treatment phase. Defendants must complete these assessments according to the following time lines:

    i.   Within 30 days, Defendants shall complete reevaluations of the six individuals in the Alternative Program who were designated for transfer to Cambridge, Eric Terhaar, and Rhonda Bailey.

    ii.  Within 30 days, Defendants shall submit a detailed plan for approval by the Special Master for the reevaluations of the elderly, individuals with substantive physical or intellectual disabilities, and juvenile-only

offenders.  The plan must identify the individuals who will be reevaluated, the independent evaluators who will conduct the evaluations, and a detailed schedule for these reevaluations to be completed by a presumptive deadline of April 1, 2016, subject to modification by the Court based on the recommendations of the Special Master taking into account any submissions of the parties.

      iii.      Within 60 days, Defendants shall submit a detailed plan for approval by the Special Master for the reevaluations of all remaining individuals at the MSOP.  The presumptive completion deadline for these reevaluations is December 31, 2017, subject to modification by the Court based on the recommendations of the Special Master taking into account any submissions of the parties.

    b.    If the independent risk assessment for any patient concludes that the patient should be fully discharged, transferred, or receive a reduction in custody, the MSOP must seek the release or reduction in custody of that patient to the appropriate placement by immediately filing a petition with the Special Review Board.  *See* Minn. Stat. § 253D.27, subd. 2.  Should Defendants wish to challenge the finding that a patient should be fully discharged, transferred, or receive a reduction in custody, the burden shall be on Defendants to prove that such individual's

commitment and/or current level of custody is appropriate by clear and convincing evidence. *See* Minn. Stat. § 253D.28, subd. 2(d). Defendants must provide access to experienced independent counsel and professional experts to all petitioners. Defendants must ensure that the Special Review Board and Supreme Court Appeal Panel hearings following the independent risk assessments proceed in a timely manner and in no case conclude more than 120 days after the petition has been filed on behalf of a patient.

       c.      Defendants must ensure that less restrictive alternatives are available to accommodate all individuals found eligible for a reduction in custody. For individuals found eligible for discharge, Defendants must provide transitional services and discharge planning needed to facilitate the individual's successful transition into the community.

       d.      Following each treatment phase placement reevaluation identified in part a., above, Defendants shall immediately move any individual who is determined to be in an improper treatment phase into the proper treatment phase. If Defendants wish to object to the movement of any individual, the matter must be submitted to the Special Master for resolution.

       e.      Defendants shall establish a plan to conduct annual, independent risk assessments to determine whether each client still satisfies the civil commitment requirements and whether each client's treatment

phase placement is proper. Parts b., c., and d. shall apply equally to the results of these subsequent annual assessments.

f. Within 30 days, Defendants must submit a plan to the Special Master for approval by the Court providing for how they will complete the actions identified in parts b., c., and d., and e., above. Should Defendants seek an alternate deadline, they must prove to the Court why a later deadline is proper.

2. Special Master former Minnesota Supreme Court Chief Justice Eric J. Magnuson shall have authority to monitor compliance with the remedies identified above. The Special Master shall also have the authority to implement and enforce the injunctive relief imposed by the Court and to mediate any dispute between the parties with regard to the implementation of the remedies. Mediation of disputes by the Special Master shall be binding upon the parties.

3. This First Interim Relief Order contemplates that the Court will order further specific relief against Defendants. Subsequent orders by this Court may require Defendants to make improvements to the MSOP's treatment structure and discharge process, to conduct training for MSOP employees on the constitutional standards for commitment, to require periodic evaluation of the MSOP's treatment program by external experts, or to develop a statewide public education campaign to educate the public about Minnesota's sex offender civil commitment scheme, among other things. The Court may also revisit the relief ordered above in the event that Defendants fail to act on these requirements.

4. The Court shall retain jurisdiction over the Parties for 5 years from the date of final judgment, unless the Court orders otherwise.

5. If Defendants fail to fully comply with this Order, the Court reserves the right to issue an injunction enjoining the enforcement of the Act and precluding civil commitments under the Act and to issue an order to show cause why Defendants should not be held in contempt.

Dated:  October 28, 2015                            s/Donovan W. Frank
                                                        DONOVAN W. FRANK
                                                        United States District Judge