# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy Gamble,
Jr., Kevin John DeVillion, Peter Gerard
Lonergan, James Matthew Noyer, Sr.,
James John Rud, James Allen Barber,
Craig Allen Bolte, Dennis Richard Steiner,
Kaine Joseph Braun, Christopher John
Thuringer, Kenny S. Daywitt, Bradley Wayne
Foster, Brian K. Hausfeld, and all others
similarly situated,

        Plaintiffs,

Lucinda Jesson, Kevin Moser, Peter
Puffer, Nancy Johnston, Jannine
Hébert, and Ann Zimmerman,
in their official capacities,

        Defendants.

Civil No. 11-3659 (DWF/JJK)

**ORDER**

---

Daniel E. Gustafson, Esq., Karla M. Gluek, Esq., David A. Goodwin, Esq., Raina
Borrelli, Esq., Lucia G. Massopust, Esq., and Eric S. Taubel, Esq., Gustafson Gluek
PLLC, counsel for Plaintiffs.

Nathan A. Brennaman, Deputy Attorney General, Scott H. Ikeda, Adam H. Welle, and
Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office,
counsel for Defendants.

---

This matter is before the Court on Defendants' Motion to Stay or Suspend the

Court's October 29, 2015 Order Pending Appeal. (Doc. No. 1037.) Plaintiffs oppose the

motion. (*See* Doc. No. 1045.) For the reasons set forth below, the Court denies

Defendants' motion.

## BACKGROUND

On June 17, 2015, the Court concluded the liability phase of this litigation and issued its Findings of Fact, Conclusion of Law, and Order. (Doc. No. 966.) On October 29, 2015, the Court issued its First Interim Relief Order in the remedies phase of this litigation. (Doc. No. 1035.) In that Order, the Court enjoined Defendants as follows: (1) to complete risk and phase placement reevaluations within 30 days of eight individuals who have been identified during this litigation as eligible for a reduction in custody; (2) to submit a plan within 30 days to complete risk and phase placement reevaluations of the elderly, individuals with disabilities, and juvenile-only offenders by a presumptive deadline of April 1, 2016, subject to modification by the Court; (3) to submit a plan within 60 days to complete risk and phase placement reevaluations of all remaining individuals at the MSOP by a presumptive deadline of December 31, 2017, subject to modification by the Court; (4) to submit plans within 30 days describing how Defendants would establish various discharge-related remedies; and (5) to submit a plan within 30 days describing how Defendants would manage conducting annual, independent risk assessments for all individuals at the MSOP. (*See id.* at 39-42.)

On October 29, 2015, Defendants filed a Notice of Appeal of the Court's Orders and a Motion to Stay or Suspend the Court's October 29, 2015 Order Pending Appeal. (Doc. Nos. 1036; 1037.) On November 4, 2015, Plaintiffs filed a memorandum in

opposition to Defendants' motion.  (Doc. No. 1045.)  The Court took the matter under

advisement without a hearing.  (*See* Doc. No. 1046.)[1]

---

[1]    Defendants' Memorandum of Law includes a lengthy recitation of what Defendants characterize as "the irregular proceedings that led to the Court's liability and injunctive Orders."  (Doc. No. 1039 at 1-17.)  In response, Plaintiffs' Memorandum addresses "Defendants' inaccurate characterization of the record in this case."  (Doc. No. 1045 at 2-20.)  The Court will refrain from responding to all of Defendants' charges against the Court and will let the record speak for itself.  However, the Court notes a few examples in which Defendants' mischaracterizations take the facts out of context and distort the record in this case.

    Defendants challenge the Court's decision to admit the Sex Offender Civil Commitment Advisory Task Force Report into evidence based on Federal Rule of Evidence 408, which prohibits the admission of settlement communications into evidence.  (Doc. No. 1039 at 9-10.)  In fact, although the idea of a Task Force was born from settlement discussions, the Task Force Report was not created for settlement purposes.  The Task Force was created "to examine and provide Human Services Commissioner Lucinda Jesson with recommendations on the processes relating to the civil commitment of sex offenders in Minnesota," and as Plaintiffs point out, (Doc. No. 1045 at 12), the Task Force Report was publicly disclosed by Defendants themselves on the Department of Human Services website where it continues to remain public to this day.  (*See* http://mn.gov/dhs/general-public/about-dhs/advisory-councils-task-forces/sex-offender-task-force.jsp (last visited November 20, 2015)); *see also* Doc. No. 832, Feb. 5, 2015 Order at 4-6.)

    In addition, Defendants criticize the Court's appointment of a Technical Advisor who also served as a Court Monitor on another case before the Court.  (Doc. No. 1039 at 2.)  Defendants claim that the Court made this appointment "based on a purported factual relationship between this case and . . . *Jensen v. DHS*."  (*Id.*)  In fact, it was Commissioner Lucinda Jesson herself who identified the relationship between this case and the *Jensen* case when she sent a letter to the Court "in connection with both *Jensen* and *Karsjens*" to notify the Court about a plan to transfer a group of committed individuals with disabilities from the MSOP to a state facility which would no longer be used to house individuals with developmental disabilities.  (*See* Doc. No. 341, Sept. 27, 2013 Order at 2-5.)

    These are only a few examples, and—as noted above—the Court will refrain from commenting further.  The Court will, however, address additional mischaracterizations as they are relevant to this Order, below.

# DISCUSSION

A federal district court may—in its discretion—"suspend, modify, restore, or grant an injunction" pending the matter's resolution on appeal.  *See* Fed. R. Civ. P. 62(c).  "A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant.  It is an exercise of judicial discretion.  The propriety of its issue is dependent upon the circumstances of the particular case."  *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 10-11 (1942) (internal quotation marks and citations omitted); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009).  The Court considers four factors in determining whether to grant a motion to stay:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the non-moving party; and (4) the public interest.  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011).  As the moving party, Defendants bear the heavy burden to prove all four factors, and the first two factors are the most critical.  *Nken*, 556 U.S. at 433-34; *see also* 11 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, & Adam N. Steinman, *Federal Practice and Procedure* § 2904 (3d ed. 2015) ("[B]ecause the burden of meeting the standard is a heavy one, more commonly stay requests will be found not to meet this standard and will be denied.").  "Ultimately, [the Court] must consider the relative strength of the four factors, balancing them all."  *Brady*, 640 F.3d at 789 (internal quotation marks and citations omitted).

# I.    Likelihood of Success on the Merits

The Court must consider whether Defendants have "made a strong showing that [they are] likely to succeed on the merits." *Hilton*, 481 U.S. at 776. "It is not enough that the chance of success on the merits be better than negligible. . . . [M]ore than a mere possibility of relief is required." *Nken*, 556 U.S. at 434 (internal quotation marks and citations omitted). Contrary to Defendants' assertions, the Court finds that Defendants have failed to carry their burden of proving a strong likelihood of success on appeal. Defendants identify five "plain errors of law" to support their assertion that they "are likely to succeed on the merits on appeal." (Doc. No. 1039 at 21.) But in prior rulings and orders, the Court has already rejected many of Defendants' arguments relating to these purported errors. *See Robinson Rubber Prods. Co., Inc. v. Hennepin Cty., Minn.*, 927 F. Supp. 343, 346 (D. Minn. 1996) (denying a motion to stay an injunction and noting that "[t]he court has previously considered and found unpersuasive the cases cited by [Defendant]").

## A.    Use of Rule 706 Experts

First, Defendants assert that they are likely to succeed on appeal based on the Court's use of the Rule 706 Experts. (Doc. No. 1039 at 21-23.) Rule 706(a) provides:

> On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act.

Fed. R. Evid. 706(a). Defendants argue that the Rule 706 Experts were improperly appointed for the benefit of Plaintiffs and to develop Plaintiffs' case. (Doc. No. 1039 at 23.) The Court, however, explained in a prior Order that it would make "no determination as to whether Plaintiffs are entitled to appointment of experts solely on their behalf pursuant to Rule 706." (Doc. No. 354, Oct. 25, 2013 Order at 3.) Instead, the Court appointed the Rule 706 Experts based on the recognition that the Court "require[d] the assistance of expert testimony to properly adjudicate the claims in this matter." (*Id.*) Furthermore, as the Court explained in a prior ruling from the bench regarding the Rule 706 Experts, "the four 706 experts were appointed on the joint nomination of the parties as experts in the field and endorsed by and with the parties' confidence in their fairness and independence, as required by Rule 706." (Doc. No. 570, Evid. Hr'g Tr. at 265-66.) Counsel for Defendants admitted as much in a pretrial evidentiary hearing, stating that "[t]he Court . . . appointed Rule 706 [E]xperts . . . with the cooperation of both sides and the agreement of all sides." (*Id.* at 272.) Simply because the Rule 706 Experts made findings in Plaintiffs' favor does not retroactively demonstrate that they were appointed to develop Plaintiffs' case. The Court finds that its appointment of the Rule 706 Experts was proper and finds Defendants have not made a strong showing of likely success with respect to this argument.[2]

---

[2]    Defendants also claim that the Court "required Defendants to pay for the entire expense of the [Rule 706 E]xperts" on a $1.8 million budget. (Doc. No. 1039 at 4.) In

(Footnote Continued on Next Page)

Defendants also argue that the Court's use of the Rule 706 Experts resulted in an "unfair review process" based on certain *ex parte* instructions from the Court that purportedly violated Rule 706. (Doc. No. 1039 at 23.) Rule 706(b) requires the court to "inform the expert of the expert's duties . . . in writing . . . or . . . orally at a conference in which the parties have an opportunity to participate." Fed. R. Evid. 706(b). The Court complied with this requirement by including detailed descriptions of the Rule 706 Experts' duties in its written Orders. (*See* Doc. Nos. 393, Dec. 6, 2013 Order at 4; 427, Feb. 19, 2014 Order at 70-75.) As the Court explained in ruling on Defendants' evidentiary objection to the use of the Rule 706 Experts' reports, the Court had *ex parte* communications with the Rule 706 Experts "for logistical and organizational purposes[,] subject to the limitations [of] Rule 706." (Doc. No. 570, Evid. Hr'g Tr. at 267 (quoting Doc. No. 427, Feb. 19, 2014 Order at 74).) "[N]o other instructions [were] given that would go beyond the scope of [the Court's February 19, 2014 Order]." (*Id.* at 280.) In

_____

(Footnote Continued From Previous Page)
fact, the Court ordered the parties to "meet and confer, facilitated by the Court's Technical Advisor if necessary, to establish an interim budget deposit for the experts and a mechanism for payment." (Doc. No. 427, Feb. 19, 2014 Order at 75.) The Court provided that "[w]ithout prejudice to subsequent adjustment, such costs shall be initially allocated to Defendants." (*Id.*) In a subsequent Order, the Court memorialized the parties' agreement as to the budget for the Rule 706 Experts, providing that "[b]y agreement, the Department of Human Services shall make an interim budget deposit to the Registry of Court in the amount of $1,800,000 on account for the fees and expenses pursuant to this Order." (Doc. No. 434, Mar. 17, 2014 Order at 2.) The Court further provided that any remaining balance not expended would "promptly be returned to the Department of Human Services." (*Id.* at 3.)

addition, the parties all knew of the Court's meetings with the Rule 706 Experts and neither party raised objections to those meetings being held. (*Id.* at 267-69.) The Court overruled Defendants' Rule 706 objection prior to trial, (*id.* at 271), and finds that Defendants are unlikely to succeed in advancing this objection on appeal.

Furthermore, the Court's conclusions that Minnesota's sex offender civil commitment statute is unconstitutional on its face and as applied were based primarily on the testimony and admissions of Defendants' own witnesses and employees. (*See* Doc. No. 1045, Pls.' Mem. in Opp'n to Defs.' Mot. to Stay at 27-30 (cataloguing numerous findings in the Court's Findings of Fact, Conclusions of Law, and Order that were based solely on Defendants' and MSOP employees' testimony).) Significantly, the Court would have reached the same conclusions on the record before the Court even without the Rule 706 Experts. Nevertheless, the Court's use of the Rule 706 Experts in this case was proper, and the Court does not find that Defendants have made a strong showing of likely success on this argument on appeal.

### B. Applicability of *Preiser* and *Heck*

Second, Defendants contend that the Court's orders improperly challenge the fact and duration of Plaintiffs' commitment in violation of *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and *Heck v. Humphrey*, 512 U.S. 477 (1994). (Doc. No. 1039 at 24-26.) The Court has previously addressed these arguments, (*see* Doc. No. 580, Aug. 11, 2014 Order at 35-37 & n.21), finding this § 1983 class action proper notwithstanding the holdings of

*Preiser* and *Heck*.  The Court will not rehash its analysis here, but notes that its First Interim Relief Order demonstrates how this case is distinguishable from cases in which individuals challenge the validity of a state commitment or incarceration order.  *See, e.g.*, *Carter v. Bickhaus*, 142 F. App'x 937, 938 (8th Cir. 2005) (applying *Preiser* and *Heck* and dismissing a committed individual's § 1983 claim because he sought "release from custody").  Here, Plaintiffs challenge deeply systemic problems in the overall operation of the MSOP, which have led to a system of indefinite and punitive detention contrary to the proper purpose of civil commitment.  *See Kansas v. Hendricks*, 521 U.S. 346, 368-69 (1997).  Consistent with what Plaintiffs have sought in this case, the Court's remedies do not directly order the release or transfer of any individual.  Rather, the Court orders Defendants to complete assessments to ensure that those committed to the MSOP continue to meet the constitutional criteria for civil commitment outlined in *Call v. Gomez*, 535 N.W.2d 312, 318-19 (Minn. 1995) (i.e., that they continue to need treatment *and* pose a danger to the public).  (Doc. No. 1035 at 39.)  Only if those assessments determine that an individual should be released are Defendants required to comply with the state's statutory process to petition and release that individual from the MSOP.  (*Id.* at 40-41.)  This case is clearly distinguishable from *Preiser* and *Heck*, and the Court finds Defendants have not met their burden of demonstrating a strong likelihood of success on appeal based on this argument.

## C.    Absence of Identifiable Harm

Third, Defendants argue that they have a strong likelihood of success on appeal because the Court has not found concrete, identifiable harm suffered by any Plaintiff. (Doc. No. 1039 at 26-28.)  As such, Defendants assert that Plaintiffs lack standing and claim the Court ordered improper relief.  (*Id.* at 26-28.)  As the Court explained in both its Findings of Fact, Conclusions of Law, and Order and its First Interim Relief Order, "all Class Members have suffered an injury in fact—the loss of liberty in a manner not narrowly tailored to the purpose for commitment."  (Doc. Nos. 966 at 50; 1035 at 33.) Further, Class members have suffered injury by being civilly committed to a system that has a punitive effect contrary to the purpose of civil commitment.  (Doc. No. 966 at 59, 65.)  The Court's remedies will redress the unconstitutional liberty deprivations suffered by Plaintiffs by ensuring that they are not subject to continued commitment without proper constitutional safeguards to ensure that they are committed for only so long as they are both in need of treatment and sufficiently dangerous to warrant continued confinement.[3]  *See Call*, 535 N.W.2d at 319.  The Court finds Defendants' arguments

---

[3]     Defendants argue that a lack of risk assessments alone is insufficient to prove harm.  They suggest "Plaintiffs were required to go 'one step further,' . . . and prove at trial that because they did not receive risk assessments, they continued to be committed to MSOP when they should have instead been released."  (Doc. No. 1039 at 27 (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996).)  In *Lewis*, the Supreme Court explained that prisoners seeking to vindicate their right of access to the courts cannot demonstrate actual injury merely by pointing out deficiencies in the prison's law library.  *Lewis*, 518 U.S. at 351. The Court emphasized that there is no "abstract, freestanding right to a law library or

(Footnote Continued on Next Page)

10

with respect to Plaintiffs' real and substantial injury to be meritless, and, as such,

Defendants have failed to demonstrate a strong likelihood of success on appeal on this

basis.

### D.    Class-Wide Relief

Fourth, Defendants argue that the Court's First Interim Relief Order is erroneous

"because it provides for a non-final process for the determination of individualized relief

for Class members." (Doc. No. 1039 at 31-34.) Defendants also challenge the Court's

imposition of relief for identified groups such as the elderly, individuals with substantive

physical or intellectual disabilities, or juvenile-only offenders. (*Id.* at 31.) In issuing its

First Interim Relief Order, the Court addressed Defendants' arguments about the

propriety of the Court's relief under Rule 23(b)(2). (Doc. No. 1035 at 32-34.) The Court

concludes that its relief is proper because it imposes a systemwide remedy that will affect

---

(Footnote Continued From Previous Page)
legal assistance," so prisoners must "go one step further" to demonstrate that the
deficiencies actually harmed a prisoner's efforts to access the courts. *Id.* Here, Plaintiffs
seek risk assessments to vindicate their due process right to be confined under a system
that employs proper constitutional safeguards to protect their liberty interests. And here,
unlike in *Lewis*, Plaintiffs have shown that they have been actually harmed through their
unjustified confinement to an institution that fails to properly assess whether they pose a
sufficient risk to warrant continued detention. The Court therefore finds this case clearly
distinguishable from *Lewis*. Furthermore, another Court in this Circuit has recently
suggested that "a system that includes proper risk assessment and release are rights
protected by the constitutional guarantee of liberty," supporting this Court's finding of
harm based on the lack of risk assessments at the MSOP. *See Van Orden v. Schafer*,
No. 4:09CV00971 AGF, 2015 WL 5315753, at *30 (E.D. Mo. Sept. 11, 2015).

all class members identically. The Court's identification of certain individuals and sub-populations does not alter the remedy afforded to each Class Member, but simply identifies the priority in which Defendants must complete the risk assessments ordered by the Court.[4] For the reasons described more fully in its prior Order, the Court concludes that Defendants have failed to demonstrate a strong likelihood of success on appeal based on this argument.

### E.  Application of Strict Scrutiny

Fifth, Defendants suggest they are likely to succeed on the merits on appeal because the Court improperly applied a strict scrutiny standard. As the Court has explained in prior Orders, the Court applied strict scrutiny in analyzing Plaintiffs' claims because Plaintiffs' fundamental right to live free of physical restraint is implicated by their continued commitment to the MSOP and constrained by the curtailment of their liberty. (*See* Doc. No. 966 at 51-53; 1035 at 15.) Because Plaintiffs' claims implicate a fundamental right, the Court properly applied strict scrutiny, requiring Defendants to show that Minnesota's sex offender civil commitment statute and Defendants' application

---

[4]     The Court's prioritization for evaluating committed individuals at the MSOP is especially proper because Defendants have failed to make any recommendations themselves to suggest a more appropriate order in which to complete assessments. Further, these particular subgroups were identified throughout trial as those who were mostly likely to be improperly assessed under current risk assessment practices. (*See* Doc. No. 966 at 36, 38-40.)

of the statute are narrowly tailored to serve a compelling interest.[5]  (Doc. Nos. 966 at 53;

1035 at 15 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).)  Applying strict

scrutiny, the Court further considered whether Minnesota's sex offender civil

commitment statute or Defendants' operation of the MSOP results in a punitive effect

contrary to the purpose of civil commitment.  (Doc. No. 966 at 2 (citing *Hendricks*, 521

U.S. at 373 (Kennedy, J., concurring) ("We should bear in mind that while incapacitation

is a goal common to both the criminal and civil systems of confinement, retribution and

general deterrence are reserved for the criminal system alone.")).)  The Court finds that it

applied the correct standards, and Defendants have not made a strong showing of likely

success based on this argument.  Considering all of Defendants' arguments, the Court

concludes that the likelihood-of-success-on-the-merits factor weighs against staying the

Court's First Interim Relief Order.

## II.    Irreparable Harm to Defendants

The Court also considers whether Defendants will be irreparably harmed absent a

stay.  *Hilton*, 481 U.S. at 776.  As with each factor, the burden is on Defendants to prove

---

[5]      Defendants argue that the proper standard under Eighth Circuit precedent is
whether Defendants' conduct is "so egregious or outrageous that it is
conscience-shocking."  (Doc. No. 1039 at 32 (quoting *Beck v. Wilson*, 377 F.3d 884, 890
(8th Cir. 2004)).)  Although the Court continues to conclude that the proper standard to
apply in this case is strict scrutiny, the Court notes that the record in this case and the
findings outlined in the Court's Findings of Fact, Conclusions of Law, and Order would
compel the Court to reach the same decision, even under a "shocks the conscience"
standard.

that this factor weighs in favor of granting its motion. "[S]imply showing some

'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at

434-35 (internal citation omitted). Defendants point to three types of irreparable harm

that they would purportedly suffer if the Court declines to stay enforcement of its

October 29, 2015 First Interim Relief Order. (Doc. No. 1039 at 18-21.) First, Defendants

argue that denying a stay would deprive Defendants of their right to appeal by mooting

issues to be raised on appeal. (*Id.* at 18-19.) Second, Defendants argue that they will be

irreparably harmed by incurring "significant unrecoverable monetary loss." (*Id.* at 20.)

And third, Defendants suggest that they will suffer irreparable harm by being forced to

comply with the Court's First Interim Relief Order because it "present[s] practical

challenges that are insurmountable given the timelines prescribed by the Court" and that

are "practically impossible for [] Defendants to achieve." (*Id.* at 21.)

Defendants have failed to meet their burden of establishing irreparable harm

sufficient to warrant a stay pending appeal. As an initial matter, the Court finds it

implausible to suggest that Defendants' appeal rights will be deprived by the denial of a

stay in this matter. Defendants have already appealed the case to the Eighth Circuit, and,

as Plaintiffs have pointed out, the parties have been provided with a briefing schedule for

appeal, with briefs to be completed by mid-February 2016. (*See* Doc. No. 1045 at 23.)

The Court's First Interim Relief Order requires Defendants to evaluate eight specific

individuals within thirty days of the Court's Order. (Doc. No. 1035 at 39.)[6]  Other

deadlines imposed by the Court, however, are subject to modification by the Court if

Defendants establish a reasonable rationale for an alternate deadline. (*See id.* at 40, 42.)

Specifically, the Court has ordered Defendants to submit detailed plans for completing

risk assessments and phase placement reevaluations of the elderly, individuals with

substantive physical or intellectual disabilities, and juvenile-only offenders by a

*presumptive* deadline of April 1, 2016. (*Id.* at 40.) Similarly, the Court has ordered

Defendants to submit plans to complete the assessments of the remaining individuals

residing at the MSOP by a *presumptive* deadline of December 31, 2017. (*Id.*) The Court

also orders Defendants to submit plans to establish discharge-related remedies and a plan

to implement an annual risk assessment process within 30 days, but provides that

Defendants may seek an alternate deadline by request to the Court. (*Id.* at 42.)

Defendants have failed to establish how completing these specific actions on the Court's

time lines will result in irreparable harm or deprivation of their appellate rights. More

importantly, Defendants have failed to demonstrate how they will be irreparably harmed

by complying with the Court's First Interim Relief Order when they have the clear option

of requesting alternate reasonable deadlines in which to complete the ordered relief.

---

[6]     And notably, six of these eight individuals were identified by Defendants
themselves as appropriate candidates for a reduction in custody. (Doc. No. 966 at 22, 47.)

With respect to Defendants' arguments regarding monetary losses and practical challenges, the Court is similarly unpersuaded. As noted in its First Interim Relief Order, the Court has considered Defendants claims regarding the cost and feasibility of completing risk assessments of all individuals at the MSOP. (Doc. No. 1035 at 22-23; *see also* Doc. No. 1027, Aff. of Lucinda Jesson.) However, the Court is not persuaded that these costs or difficulties will result in irreparable harm. A court may decline to grant a motion to stay based on claims of administrative and monetary harm where "the principal irreparable injury which defendants claim that they will suffer . . . is injury of their own making." *See Long v. Robinson*, 432 F.2d 977, 981 (4th Cir. 1970) (denying a motion to stay in a case where the Defendants had repeatedly delayed remedying constitutional infirmities that had been the subject of legislative and public attention for four years). Here, the Court's First Interim Relief Order implements expected remedies that have been proposed to Defendants for several years. In addition, the Court invited Defendants to propose how they could remedy the unconstitutional infirmities at the MSOP on numerous occasions. By failing to do so, Defendants have effectively created their own administrative and financial difficulties by forcing the Court to impose a remedy in the absence of Defendants' own detailed input. The Court's First Interim Relief Order invites Defendants to submit such input, and the Court reasonably allows for modification of deadlines to address specifically-identified fiscal and administrative challenges. At

this stage, Defendants have failed to establish the irreparable harm they claim they will suffer if the Court's order is not stayed.

In addition, a court may take into account the moving party's admissions regarding the appropriateness of the ordered relief in rejecting a party's claim of irreparable harm. *See, e.g.*, *Halderman v. Pennhurst State Sch. and Hosp.*, 451 F. Supp. 233, 236 (E.D. Pa. 1978) ("In view of the testimony given by Commonwealth witnesses at trial that the Commonwealth intended to move all the [developmentally disabled] residents from Pennhurst into community facilities, the Commonwealth's contention that the Court's Order requiring this to be done will cause irreparable injury is unpersuasive."). At trial, Defendants' own employees admitted that they supported—or were in the process of implementing—many of the remedies that the Court ultimately ordered in this case. Commissioner Lucinda Jesson explained that she sought to implement a rolling risk assessment process at the MSOP, (Doc. No. 966 at 37-38), sought to speed up the hearing process for individuals seeking transfer or release, (*id*. at 45), and had entered into third-party contracts to establish less-restrictive alternative facilities, (*id*. at 22-23). Defendants' own employees also testified that an annual risk assessment is the only way to determine whether an individual at the MSOP continues to meet the statutory criteria for commitment or for discharge. (*Id*. at 36.) Given these admissions, the Court is not persuaded by Defendants' vague claims that they will suffer irreparable economic and

administrative harms by implementing the Court's remedies.  Thus, the Court finds this factor weighs against Defendants' request for a stay of the Court's order pending appeal.

## III.    Injury to Plaintiffs

Next, the Court must consider whether issuance of the stay will substantially injure Plaintiffs.  *Hilton*, 481 U.S at 776.  Reiterating arguments about the lack of identified harm suffered by any Class Member, Defendants flatly assert that "Plaintiffs cannot show that a stay . . . will 'substantially injure' any identifiable Plaintiff or Class Member." (Doc. No. 1039 at 34.)  Specifically, Defendants note that "neither [Plaintiffs] nor the Court identified a single individual who is being unconstitutionally detained and should receive a reduction in custody."  (*Id.*)  Again, Defendants mischaracterize the nature of the real and substantial injury suffered by the Class Members on a daily basis.  All Plaintiffs will suffer substantial injury if this Court's remedial order is stayed pending appeal.

Persistent confinement under unlawful conditions constitutes substantial injury to weigh against the imposition of a stay.  *See, e.g.*, *United States v. Broncheau*, 759 F. Supp. 2d 694, 697 (E.D.N.C. 2010) ("Respondents have already waited years without resolution of their cases and their continued incarceration is unacceptable under the laws and constitutional protections accorded all individuals."); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 476, 481 (E.D. Pa. 1998) ("[T]hese class members are irreparably injured every day they remain unnecessarily segregated in violation of the

ADA.").  Defendants' operation of the MSOP results in a punitive effect contrary to the

purpose of civil commitment, and Plaintiffs will be harmed by continuing to reside under

such unlawful conditions.  *See Hendricks*, 521 U.S. at 368-69 (finding a state civil

commitment scheme to be not punitive in part because the state "permitted immediate

release upon a showing that the individual is no longer dangerous or mentally impaired").

Although Plaintiffs' do not seek—and the Court has not ordered—the discharge of any

specific individual, the Court orders Defendants to establish a process that will ensure

committed individuals only remain at the MSOP if they pose a sufficient danger to

warrant continued confinement.  The Court also orders Defendants to establish a plan to

ensure that less-restrictive alternatives are available to accommodate individuals with

varying levels of risk.  If these remedies are stayed throughout Defendants' appeal,

Plaintiffs will continue to suffer each day by being subject to unjustified and

unconstitutional deprivations of their fundamental liberty interests.  The Court finds that

this factor weighs strongly against granting Defendants' motion.[7]

---

[7]     The Court also notes the emotional and psychological harm that Plaintiffs will face
if Defendants are allowed to further postpone implementing remedies to the systemic
problems at the MSOP.  Numerous individuals at trial testified to the pervasive sense of
hopelessness among residents at the MSOP.  (Doc. No. 966 at 19-20.)  In addition, an
MSOP employee admitted that committed individuals believe they have no chance of
being discharged and think "they might die in the facility."  (*Id.* at 20.)  Defendants'
failure to periodically assess all committed individuals at the MSOP to ensure that they
continue to be committed under constitutional standards and continue to be in the proper
treatment phase has created this sense of hopelessness.

## IV. Public Interest

Finally, the Court considers the public interest. *Hilton*, 481 U.S. at 776. Defendants argue that avoiding the unnecessary expenditure of public funds and protecting the public safety should weigh in favor of granting their motion to stay. (Doc. No. 1039 at 34-36.) Importantly, however, "the public interest [also] favors the enforcement of the United States Constitution." *Robinson Rubber Prods. Co., Inc. v. Hennepin Cty.*, Minn., 927 F. Supp. 343, 348 (D. Minn. 1996). As outlined in detail in the Court's Findings of Fact, Conclusions of Law, and Order, Defendants' operation of the MSOP under Minnesota's sex offender civil commitment statute is unconstitutional. (*See* Doc. No. 966 at 51-68 ("The Fourteenth Amendment does not allow the state, DHS, or the MSOP to impose a life sentence, or confinement of indefinite duration, on individuals who have committed sexual offenses once they no longer pose a danger to society.").) Balanced against Defendants' vague and unsupported claims that the Court's First Interim Relief Order imposes public costs and threatens the public safety, the Court finds that the public interest in enforcing the Constitution weighs in favor of denying a stay. *See Doe v. LaDue*, 514 F. Supp. 2d 1131, 1138 (D. Minn. 2007) ("[T]here is great public interest in monitoring predatory offenders. However, there is an equally strong public interest in preserving constitutional rights.").

The Court does not weigh Defendants' public safety concerns lightly. However, Defendants have failed to articulate in sufficient detail the purported public safety risks

they claim will result from complying with the Court's First Interim Relief Order. The Court's Order simply requires Defendants to establish a system through which individuals who are assessed *to no longer pose a safety risk* may be promptly transferred from the MSOP to a less-restrictive alternative (whether another facility or a community placement under intensive supervision) or released into the community with proper transitional services. (Doc. No. 1035 at 39-42 (citing *Call*, 535 N.W.2d 312).) Balancing any public safety risks that this Order may create against the important interest in preserving Constitutional rights, the Court finds this factor weighs against granting Defendants' motion to stay pending appeal.

## CONCLUSION

The Court's First Interim Relief Order requires Defendants to take an intermediate first step toward remedying the grave constitutional infirmities that the Court identified in its Findings of Fact, Conclusions of Law, and Order. The First Interim Relief Order requires Defendants to begin conducting risk assessments of a small number of individuals, to submit plans to subsequently complete risk assessments of all individuals at the MSOP, and to submit plans to improve various problems in the MSOP's discharge process. Importantly, risk assessments must take place to ensure that the MSOP is not confining any individuals who no longer meet the constitutional criteria for civil commitment. Defendants have failed to meet their burden of proving that they have a strong likelihood of success on the merits on appeal, that they will suffer irreparable harm

by complying with the Court's Order, that Plaintiffs will not be substantially injured by a stay, or that a stay of the Court's Order would best uphold the public interest. Therefore, the Court concludes that a stay pending appeal is not warranted.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Stay or Suspend the Court's October 29, 2015 Order Pending Appeal (Doc. No. [1037]) is **DENIED**.

2. All deadlines imposed in the Court's First Interim Relief Order, (Doc. No. 1035 at 39-42), are modified to be effective from the date of this Order.

Dated:  November 23, 2015        s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge