UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Scott Karsjens, et al.,                    Civil File No. 11-cv-3659 (DWF/TNL)

          Plaintiffs,

    vs.                                               **SUPPLEMENTAL BRIEFING
                                                     ON PHASE ONE (COUNTS III, V, VI,
                                                     AND VII), REQUEST FOR FINAL
Emily Johnson Piper, et al.,                        APPORTIONMENT OF RULE 706
                                                     EXPERT COSTS, AND
                                                     MOTION FOR
          Defendants.                         SUMMARY JUDGMENT
                                                     ON PHASE TWO
                                                     (COUNTS VIII, IX, AND X)**

**INTRODUCTION**

Plaintiffs' remaining Phase One claims, all of which were tried in 2015 and based on substantive due process, were disposed of by the Eighth Circuit when it held that Plaintiffs failed to prove a fundamental due process right and conscience-shocking conduct, as required.  The Court should also grant summary judgment to Defendants on Plaintiffs' Phase Two claims, which primarily involve First and Fourth Amendment challenges to policies that courts have repeatedly upheld and on which Plaintiffs can put forth no evidence of a constitutional violation.  Defendants further request that the Court apportion all of the Rule 706 Experts' fees and expenses to Plaintiffs.

**SUPPLEMENTAL BRIEFING ON PLAINTIFFS' REMAINING
PHASE ONE CLAIMS**

## I.   FACTUAL AND PROCEDURAL BACKGROUND RELEVANT TO PHASE ONE.

The Court bifurcated trial in this matter.  Doc. 647, p. 2.  The Phase One trial encompassed substantive due process claims (Counts I, II, III, IV, V, VI, VII, and XI of the Third Amended Complaint ("TAC")), and took place between February 9 and March 18, 2015.  Docs. 839, 908.  Counts IV and XI were dismissed with prejudice on August 10, 2015, leaving Counts I, II, III, V, VI, and VII for the Court's consideration after the Phase One trial.  Doc. 1005.[1]

The Court ruled for the plaintiffs and held that their civil commitment violated substantive due process under the Fourteenth Amendment, both facially and "as applied." In so holding, the Court ruled on only two of the Phase One claims, Counts I and II, "because any remedy fashioned will address the issues raised in the remaining Phase One Counts."  Doc. 966, p. 65.  The remaining counts, counts III, V, VI, and VII, are all also substantive due process claims:   Count III contends that Defendants do not provide Plaintiffs with effective treatment; Count VI contends that Defendants do not provide Plaintiffs with less restrictive alternatives to their confinement; and Counts V and VII claim that the conditions of Plaintiffs' confinement are punitive and inhumane.  *See generally* Doc. 635, ¶¶ 254–61, 269–97.  None of these counts allege a violation of a

---

[1] Phase Two Counts XII and XIII were also dismissed at that time.  Doc. 1005.

statute, and instead assert that the acts and omissions of Defendants in administering MSOP violate substantive due process.[2]

The Eighth Circuit reversed and vacated the Court's injunctive order. *Karsjens v. Piper*, 845 F.3d 394, 411 (8th Cir. 2017). The Eighth Circuit searched the factual record from the Phase One trial and could not identify any deficiency under the Fourteenth Amendment, which requires both a fundamental right and conscience-shocking conduct. *Id*. at 410-11. Specifically, the Eighth Circuit concluded, among other things, that due process did not require Defendants to provide Plaintiffs with treatment different from what Plaintiffs were already receiving, or less restrictive alternatives to their present confinement. *Id*. The Eighth Circuit also acknowledged that this Court's liability decision rested on the conclusion that Minnesota's civil commitment system "results in a punitive effect and application contrary to the purpose of civil commitment." *Id*. at 402. However, the Eighth Circuit concluded that Plaintiffs failed to prove a violation of substantive due process, including the required "egregious, malicious, or sadistic" conduct. *Id*. at 410-11.

---

[2] *See* Doc. 635 at ¶¶ 257 (Count III, reference to "policy and procedure"); 258 (Count III, reference to "acts and omissions); 259 (Count III, reference to "conduct" by defendants); 273-79 (Count V, references to policies and procedures created and implemented by the defendants); 289 (Count VI, reference to awareness by defendants of ability to establish less restrictive alternatives but not doing so); 290 (Count VI, reference to "acts and omissions of Defendants"); 294 (Count VII, reference to "policy and procedures created and implemented by Defendants"); 295 (Count VII, reference to "acts and omission of Defendants").

The Eighth Circuit denied Plaintiffs' Petition for Rehearing En Banc, *see*

*Karsjens*, No. 15-3485, Entry ID: 4503853 (8th Cir.), and the United States Supreme

Court denied Plaintiffs' petition for writ of certiorari.  Doc. 1090.

## II.   THE EIGHTH CIRCUIT'S OPINION MANDATES DISMISSAL OF PLAINTIFFS' REMAINING PHASE ONE CLAIMS (COUNTS III, V, VI, AND VII).

The Phase One claims that the Court declined to rule upon are based on a theory

that Defendants' actions in administering MSOP violate substantive due process.  For the

same reasons the Eighth Circuit reversed the Court's substantive due process analysis as

to Counts I and II, the substantive due process claims asserted in Counts III, V, VI, and

VII should also be dismissed.

The Eighth Circuit held that substantive due process challenges to the actions of

executive officials must involve both a "fundamental right" and conduct that "shocks the

conscience."   *Karsjens*, 845 F.3d at 408; *see also id.* (quoting *Moran v. Clarke*,

296 F.3d 638, 647 (8th Cir. 2002) ("alleged substantive due process violations must

involve conduct 'so severe . . . so disproportionate to the need presented, and . . . so

inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it

amounted to a brutal and inhumane abuse of official power literally shocking to the

conscience.'").[3]

---

[3] Plaintiffs previously agreed that the standard of review applicable to their remaining substantive due process claims would "remain[] in dispute" only "until the parties either get a ruling from the Supreme Court or the petition for certiorari is denied," Doc. 1074, p. 6, the latter of which has now occurred.

Because Counts III, V, VI, and VII are all substantive due process challenges to executive action, the Eighth Circuit identified the applicable legal standard. It also reviewed the Phase One evidentiary record, which applies to consideration of Plaintiffs' remaining Phase One claims, and concluded Defendants' conduct did not violate the "shocks the conscience" standard. Accordingly, based on the Eighth Circuit's legal analysis, and since the same factual record applies to Counts III, V, VI, and VII, the Eighth Circuit's decision requires that these claims also be dismissed. *See Borchers v. Comm'r of Internal Revenue*, 943 F.2d 22, 23 (8th Cir. 1991) (A district court may revisit on remand only those issues the appellate court did not "expressly or impliedly decide."). In other words, the Eighth Circuit's reasoning disposes of the remaining Phase One claims.

## A.    Count III:  Effective Treatment.

In Count III, Plaintiffs contend that Defendants' alleged failure to provide adequate treatment violates the Fourteenth Amendment. Doc. 635, ¶¶ 254–61. The Eighth Circuit explicitly rejected Plaintiffs' contention that they have a fundamental substantive due process right to treatment:

> [W]e have previously held that although "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement."

*Karsjens*, 845 F.3d at 410 (quoting *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012)).

Indeed, the Eighth Circuit observed that "the Constitution does not prevent 'a State from

civilly detaining those for whom no treatment is available.'"   *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997)).

In addition, even if Plaintiffs could claim a fundamental right to treatment, the Eighth Circuit concluded that the evidentiary record did not contain conduct that shocks the conscience.  *Id.* at 410 (stating that none of the "arguable shortcomings" in the MSOP meet the conscience-shocking standard).   Accordingly, the Eighth Circuit held that Plaintiffs do not have a constitutional right to treatment nor have Defendants engaged in any conscience-shocking behavior related to their provision of treatment.

At a minimum, the Eighth Circuit has implicitly decided Count III, and the Court may not revisit this claim on remand.   *Borchers*, 943 F.2d at 23.   Even if the Court concludes the Eighth Circuit did not implicitly or explicitly decide Count III, the claim lacks substantive merit for the same reasons discussed in *Karsjens*, and therefore should be dismissed.

### B.    Count VI:  Less Restrictive Facilities.

In Count VI, Plaintiffs allege that Defendants failed to provide them with less restrictive alternatives.   Doc. 635, ¶¶ 284–91.   The Eighth Circuit, however, explicitly rejected Plaintiffs' contention that due process requires the availability of less restrictive facilities.  *Karsjens*, 845 F.3d at 409–10 (quoting *Hendricks*, 521 U.S. at 357).

In addition, even if a fundamental right to less restrictive confinement existed, the Eighth Circuit concluded that none of the alleged deficiencies identified by this Court, including the claimed unavailability of less restrictive alternatives, shocked the conscience.  *Id.* at 410 (stating that none of the "arguable shortcomings" in the MSOP

6

meet the conscience-shocking standard).   Accordingly, the Eighth Circuit held that Plaintiffs do not have a fundamental right to less restrictive alternatives, nor have Defendants engaged in any conscience-shocking behavior related to less restrictive alternatives.

At a minimum, the Eighth Circuit has implicitly decided Count VI, and the Court may not revisit this claim on remand.  *Borchers*, 943 F.2d at 23.   Even if the Court concludes the Eighth Circuit did not implicitly or explicitly decide Count VI, the claim lacks substantive merit for the same reasons discussed in *Karsjens*, and therefore should be dismissed.

### C.   Counts V And VII:  Punitive And Inhumane Treatment.

In Counts V and VII, Plaintiffs claim that certain MSOP "polic[ies] and procedures" violate Plaintiffs' substantive due process "right to be free from punishment" and "inhumane treatment."   Doc. 635,  ¶¶ 259–83, 292–97.   The claims challenge MSOP's use of double-occupancy rooms, the BER ("Behavioral Expectations Report") appeal procedure, the use of the high security area, property restrictions and removal of furniture, vocational options, quality of meals, and medical treatment.  *See id.*

Counts V and VII, including issues related to alleged punitiveness and inhumane treatment, were tried as part of Phase One.  *See* Doc. 960, pp. 5310-12 (acknowledging that all parties agreed Phase One encompassed Counts I–VII and XI).  Indeed, the Court made clear in its June 17, 2015 order that its decision rested on the proposition that Minnesota's civil commitment system was punitive in nature.  *See, e.g,* Doc. 966 at 55-59, 61-65 (concluding that the civil commitment system was not "narrowly

tailored" and "results in a punitive effect and application contrary to the purpose of civil commitment"); *id.* at 66 (same).

It should also be noted that, as discussed in Defendants' prior briefing before this Court, the concept of "punitiveness" is relevant to an ex post facto or double jeopardy claim. *See* Doc. 721, pp. 66-70; 930, pp. 142-46. Plaintiffs made no such claim in this case. *See also In re Linehan*, 594 N.W.2d 867, 871-72 (Minn. 1999) (rejecting ex post facto and double jeopardy challenge to Minnesota's civil commitment statute).

Plaintiffs may not use the Fourteenth Amendment to raise an ex post facto or double jeopardy challenge. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."). Further, the Supreme Court rejected the proposition that a civil commitment system may become punitive "as applied," as Plaintiffs claim. *Seling v. Young*, 531 U.S. 250 (2001). Finally, whether a substantive due process claim alleges that executive action results in "punitiveness" or anything else makes no difference: as the Eighth Circuit made clear, the standard of review remains the same, and Plaintiffs have not shown the violation of a fundamental right or conscience-shocking conduct, as any substantive due process challenge to executive action requires. *Karsjens*, 845 F.3d at 402, 410-11

Without a fundamental right and conscience-shocking conduct, Plaintiffs cannot meet their burden to show a substantive due process violation for Counts V and VII of the TAC. *See id.* at 408 (stating that substantive due process challenges to executive action require both infringement of a fundamental right and conscience-shocking conduct). At a minimum, the Eighth Circuit has implicitly decided Counts V and VII, and the Court may not revisit this claim on remand. *Borchers*, 943 F.2d at 23. Even if the Court concludes the Eighth Circuit did not implicitly or explicitly decide Counts V and VII, these claims lack substantive merit for the same reasons discussed in *Karsjens*, and therefore should be dismissed.

### D. To The Extent Plaintiffs' Remaining Phase One Claims Continue To Allege Violations Of The Minnesota Constitution, Such Claims Must Be Dismissed For Lack Of Jurisdiction.

This Court previously dismissed certain of Plaintiffs' state law claims with prejudice because, among other reasons, they were barred by the Eleventh Amendment. *See generally* Doc. 1005.[4] Counts III, V, VI, and VII also reference the Minnesota Constitution. Doc. 635, pp. 64, 67, 70, 72. For the same reason the Court already dismissed state law claims, such claims must also be dismissed for lack of subject matter

---

[4] The Court did so on a motion made by *Plaintiffs*, in which – despite previously opposing Defendants' motion to dismiss and a motion for summary judgment on all of Plaintiffs' state law claims – Plaintiffs acknowledged that "the Defendants' Eleventh Amendment and *Pennhurst* arguments may very well bar Plaintiffs' right to relief in federal court." Doc. 927, p. 6. Indeed, Plaintiffs recognized these claims were so meritless that they did not even "seek to prove the state law elements of Counts IV and XI at [the Phase One] trial." *Id.*

jurisdiction.[5]   *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-01, 104-06 (1984); *Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815 (D. Minn. 2010).

---

[5] *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## REQUEST FOR FINAL APPORTIONMENT OF RULE 706 EXPERTS' COMPENSATION TO PLAINTIFFS

## I.   FACTUAL AND PROCEDURAL BACKGROUND RELEVANT TO THE RULE 706 EXPERTS' COMPENSATION.

On August 22, 2013, Plaintiffs moved the Court to "appoint experts on Plaintiffs' behalf pursuant to [Federal] Rule [of Evidence] 706," claiming that "Rule [706] can reasonably be extended to allow the Court to provide for compensation of experts to assist Plaintiffs."  Doc. 319, p. 6.  Plaintiffs alternatively asked that the Court order that Defendants pay Plaintiffs' costs and litigation expenses, including for expert witnesses. *Id.* at 12-19.  The Court, over Defendants' objections, ordered that "[t]o the extent Plaintiffs seek the appointment of expert witnesses for the benefit of the Court pursuant to Rule 706, the motion is **GRANTED**."[6]  Doc. 354, p. 4.  The Court later essentially adopted Plaintiffs' proposal regarding the Rule 706 Experts' duties, and added additional duties. *Compare* Doc. 421, pp. 2-4 *with* Doc. 427, pp. 70-74.

Upon appointing the Rule 706 Experts, the Court stated that their compensation would be "paid by the parties in the proportion and at the time the Court will direct," and noted that "[p]ursuant to Rule 706(c), the [706 Experts'] compensation shall be charged as costs in this litigation."  Doc. 393, p. 5.  The Court later "initially allocated" the

---

[6] Plaintiffs, however, never asked the Court to appoint 706 Experts for the Court; rather they very explicitly asked that the experts be appointed "to assist Plaintiffs."  Doc. 319, p. 6.

entirety of these costs to Defendants "without prejudice to subsequent adjustment." Doc. 427, p. 75.   The Court ordered Defendants on March 17, 2014 to deposit $1.8 million into the court's registry account for the purpose of paying the Rule 706 Experts.  Doc. 434, p. 2.  The Rule 706 Experts were subsequently paid approximately $685,000 out of the funds Defendants deposited with the Court.  Docs. 440, 454, 466, 562, 597, 677, 857, 915.  On August 23, 2017, the Court granted Defendants' request to refund the remaining funds in this registry account to the Department of Human Services. Doc. 1087, p. 2.

## II.   THE COURT SHOULD FINALLY APPORTION THE COST OF THE RULE 706 EXPERTS TO PLAINTIFFS.

Having both asked for the appointment of the Rule 706 Experts and lost on appeal, Plaintiffs cannot plausibly argue that Defendants should have to pay the Rule 706 Experts.  Even if it were otherwise allowed, it would be especially inappropriate and unfair to continue apportioning the Rule 706 Experts' costs to Defendants where Plaintiffs requested their appointment "to assist Plaintiffs," and Defendants objected. Doc. 319, p. 6.

Plaintiffs' in forma pauperis ("IFP") status does nothing to prevent apportionment of the Rule 706 Experts' compensation to Plaintiffs.  First, under 28 U.S.C. § 1915, IFP status does not entitle a plaintiff to payment of expert witness costs or other similar fees and costs of litigation.  *U.S. Marshals Serv. v. Means*, 741 F.2d 1053, 1057 (8th Cir. 1984) (holding that Section 1915 does not authorize the payment of witness fees and expenses to indigent parties); *Nelson v. Stuart*, No. 11-3143 (DSD/TNL),

2014 WL 4749180, *11 n.12 (D. Minn. Sept. 24, 2014) ("[A]s this Court previously told [plaintiff], the fact that he is proceeding [IFP], likewise does not relieve him 'from all the expenses of litigation.'" (quoting *Porter v. Dep't of Treasury*, 564 F.3d 176, 180 n.3 (3d Cir. 2009) ("We note that the granting of IFP status exempts litigants from filing fees only.  It does not exempt litigants from the costs of copying and filing documents; service of documents other than the complaint; costs; expert witness fees; or sanctions.")).  Nor does IFP status exempt Plaintiffs from paying the Rule 706 Experts' costs.  28 U.S.C. § 1915(f)(1)  (IFP statute states that "[j]udgment may be rendered for costs at the conclusion of the suit or action as in other proceedings").

Accordingly, Defendants respectfully ask the Court to finally apportion the full costs of the Rule 706 Experts to Plaintiffs.

## MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PHASE TWO CLAIMS

**I.     PROCEDURAL HISTORY AND STATEMENT OF UNDISPUTED MATERIAL FACTS REGARDING PLAINTIFFS' PHASE TWO CLAIMS (COUNTS VIII, IX, AND X).**

Defendants previously brought a summary judgment motion as to all of Plaintiffs' claims, including Plaintiffs' Phase Two claims (Counts VIII, IX, and X). *See* Doc. 721, pp. 49-57. The evidence supporting that summary judgment motion, as well as certain evidence admitted at trial, remain relevant to Defendants' renewed summary judgment motion on Plaintiffs' Phase Two claims.

In addition, the Court's order staying Phase Two pending Plaintiffs' certiorari petition made clear that its previous denial of Defendants' summary judgment motion on these claims was based on the rationale that the Phase One and Phase Two claims were "inextricably related." Doc. 1080, p. 11. The Court explained it denied summary judgment as to Plaintiffs' Phase Two claims because those claims might have merit in combination with Plaintiffs' Phase One claims. *See id.* at 11 (explaining the Court denied summary judgment on Count IX "*in light of all of Plaintiffs' allegations regarding their conditions of confinement*") (emphasis in original) (quoting Doc. 828, p. 36), 11-12 (explaining the Court denied summary judgment on Count X only after considering that claim "*in conjunction with other evidence presented by Plaintiffs surrounding the punitive nature of their confinement.*") (emphasis in original) (quoting Doc. 828, pp. 38-39). The Court also agreed with Plaintiffs that "Plaintiffs' further appeal of

Phase One issues will likely impact the Court's ultimate analysis of Plaintiffs' Phase Two claims." *Id*. at 12.

### A.     MSOP Policies Generally.

Counts VIII, IX, and X challenge MSOP policies governing clients' spiritual practices, phone use and media access, and searches and seizures.  The Rule 706 Experts and MSOP's auditors all found MSOP's rules and policies reasonable:

> For the most part, MSOP administration and staff at Moose Lake and St. Peter maintains reasonable policies and practices that balance security with promotion of a therapeutic environment.  Developing and maintaining a culture that balances safety concerns and a therapeutic environment is a difficult challenge that often involves compromise among departments with different perspectives.  It is particularly challenging in large institutions that serve diverse populations, like Moose Lake.  The MSOP does a fairly good job of this, while striving for continuous improvements.   The MSOP Program's rules, policies and practices with regard to mail, movement, searches, property and phones are mostly standard in comparison to other SOCC programs and institutions.

Doc. 658, p. 57; *see also* Haaven Dep. 85:3-88:8.[7]

### B.     MSOP's Policy Committee And Policy Drafting Process.

Every policy and rule at MSOP passes through the Policy Committee which includes professionals and experts in treatment, safety and security, and other appropriate disciplines.  Doc. 725, ¶¶ 17-21; Richardson Dep. 137:18-138:8.  A committee member described the Committee's role as follows:

---

[7] Depositions referenced herein are attached as exhibits to the previously-filed Doc. 724.

> Our policy committee is a blend of people who represent clinical, safety, security, administration, the actual act of drafting a new policy, a revised policy comes with a review sheet that asks the person who's chairing the drafting of a policy to consult with a list of people from different disciplines . . . .  When we sit at the table in policy committee, the goal is not to skew policies to one direction or another but to provide the proper balance to meet the treatment needs of our clients in the safest and secure manner.  I can't say the scales are looked at as skewing one way or the other.  I can say that the people sitting around the table are people who bring their expertise and their role in the program to the table, and we all work to have a policy that balances a treatment program surrounded by a therapeutic environment, surrounded by security, that balances out and provides the most benefit to the treatment program without compromising safety and security of both clients and staff.

Richardson Dep. 144:11-145:18.  The Committee conducts yearly reviews of each policy.

*Id*. 146:6-22; Doc. 725, ¶ 18.

### C.    MSOP's Spiritual Practices Policies.

MSOP provides opportunities for clients to observe religious and spiritual holidays and diet menus in line with reasonable safety and institutional concerns.  Doc. 725, ¶ 28, Ex. 7.  MSOP's Spiritual Practices Policy provides for spiritual programming and a Volunteer Services Coordinator to receive requests and schedule ceremonies and events.  *Id*.  The policy provides for clients to be able to possess and use individual and group spiritual items, and hold one spiritual group meal each year.  *Id*.

The TAC does not identify a specific religious infringement on any specific Plaintiff, TAC ¶¶ 298-306, but Plaintiff Daywitt, who practices Judaism, testified that his "main focus" is the religious claim, which involves a policy that permitted headwear only in rooms or outside and a policy that did not allow clients to wear a suit jacket except to court proceedings and religious ceremonies.  Daywitt Dep. 8:4-9:6, 66:18-77:10.  The

16

policy regarding headwear was based on safety and security concerns, but in any event Mr. Daywitt acknowledged that the policy now makes an exemption for him to wear a yarmulke. *Id*. 68:12-69:24. The clothing policy prevented clients from impersonating staff or other visitors to MSOP, and it is noteworthy for Mr. Daywitt, who has a history of impersonating law enforcement officers. *Id*. 66:6-12. Regardless, Mr. Daywitt stated that his religion does not require him to wear a jacket, but that he "prefers" it.[8] *Id*. 61:1-62:1. Mr. Daywitt further testified that he celebrates Jewish holidays, receives a visiting Rabbi for services, engages in Torah study, has the option of Kosher meals, and receives specially prepared meals at holidays like Passover. *Id*. 61:3-23; 73:7-77:10.

Other than Mr. Daywitt, Plaintiff Barber complained that the dress policy only permitted him to wear jewelry, including that showing a cross, inside his shirt. Barber Dep. 42:16-23. MSOP's policy permits the wearing of jewelry within certain restrictions based on safety, including that necklaces be worn inside the shirt. Doc. 725, ¶ 37, Ex. 19. Plaintiff DeVillion and another MSOP client testified to being able to engage in significant spiritual practices and activities related to their Native American religion, including allowing 10 "packs of herbs" for religious practice, pipe ceremonies, and a sweat lodge on campus for clients' use. DeVillion Dep. 42:3-43; Buse Dep. 58:1-60:19; Doc. 725, ¶¶ 51, 71.

---

[8] In any event, MSOP policy now permits such clothing to be worn.

**D.     MSOP's Supervision, Movement, Recreation, And Visitation Policies.**

Client movement must be monitored to ensure a safe, secure, and orderly facility. Doc. 725, ¶ 24.  In addition to freer movement for later-phase clients in St. Peter and CPS, MSOP's open movement policy allows behaviorally compliant clients to move throughout the secure facilities during the day; clients that refuse can attend scheduled activities or remain in their unit.  MSOP has a yard-use policy allowing liberal use of outdoor spaces.  *Id*. ¶ 26, Ex. 4.  In addition to the Rule 706 experts' statements above, MSOP's auditors approve of MSOP's use of monitoring and open movement.  Haaven Dep. 186:6-187:7.

MSOP has a Therapeutic Recreation Policy that provides recreational activities that serve therapeutic goals.  Doc. 725, ¶ 25. Ex. 3.  The policy provides for client participation in recreation, leisure, and educational programming.  *Id.*  As discussed above, the Rule 706 experts and auditors are "impressed" with MSOP's recreational and therapeutic recreational programming.  Doc. 658, p. 52; Haaven Dep. 224:1-22.

MSOP's visitation policy is designed to ensure safety and security for MSOP clients, staff, and visitors balanced with therapeutic and other needs for clients.  Doc. 725, ¶ 27, Ex. 5.  The policy provides visitation seven days per week and for approval of a visiting list with certain reasonable restrictions on visitation by persons with arrest warrants, persons for which there is an order prohibiting contact, or a person excluded for clinical reasons.  *Id*.; Daywitt Dep. 51:1-10.  Plaintiffs can put forward no evidence that

18

MSOP's movement, visitation, or recreation policies are contrary to best practices or unduly restrict their associational rights.

### E.   MSOP's Communications, Media, And Personal Property Policies.

MSOP's policy on mail accounts for safety and security concerns regarding contraband entering the facility and maintenance of a therapeutic environment—a policy that follows customary practices in civil-commitment programs.  Doc. 725, ¶ 29, Ex. 8. The policy permits clients to send and receive packages and other mail but MSOP staff scan and open client mail before it enters the facility.  Staff only open legal mail in front of the client and cannot search the mail.  Doc. 725, ¶ 29, Ex. 8.

MSOP's telephone policy provides for recoupment of the cost of calls, and non-legal calls are monitored to prevent planning escape attempts and crimes from occurring within MSOP—all of which MSOP previously experienced.  *Id*. ¶ 23, Ex. 1. Plaintiffs' main complaint is that they have to pay the costs of their calls.  Daywitt Dep. 53:24-55:8; Foster Dep. 72:3-18; DeVillion Dep. 47:11-48:14.

MSOP has policies relating to possession of media and property in line with customary practices in similar programs.  Tr. 305, 307.  The policy outlines categories of items clients may not possess, along with a process for reviewing incoming media by a Media Review Committee (consisting of both clinical and operational staff) and a mechanism through which a client can challenge the denial of an incoming item. Doc. 725, ¶¶ 36, 39, Exs. 21, 36.  MSOP only limits contraband prohibited by statute and

as necessary to further a safe therapeutic environment. *Id.* CPS residents have their own policy with fewer limitations. *Id.* Ex. 22; Michaels Dep. 106:23-108:14.

Plaintiffs receive newspapers and magazines in accordance with this policy. Daywitt Dep. 55:8-56:21; DeVillion Dep. 48:15-51:25; Barber Dep. 43:12-51:44; Buse Dep. 69:16-72:13. The TAC complains of MSOP's contraband policy on its face, and does not specify a particular incident or deprived piece of property that forms the basis of Plaintiffs' claim. Doc. 635, ¶¶ 173-79. Deposition testimony did not highlight any specific instance where the policy was not followed. Plaintiff Noyer complained about the policy not permitting him to have a computer in his room, but he acknowledged that, when the policy permitted computers in the past, he was caught storing 120 images of nude "young girls" on it. Noyer Dep. 24:1-27:14; 58:2-60:25.

### F. MSOP's Policies Regarding Searches And Use Of Restraints.

MSOP's policy regarding searches is designed to limit the potential for contraband to enter the facilities. Doc. 725, ¶ 30, Exs. 9, 10. MSOP staff administer unclothed visual body searches ("UVBS") and pat searches of clients as necessary to ensure security and safety. *Id.* The policy provides for a UVBS when a client enters and exits the secure perimeter, enters the HSA, or there is "reasonable suspicion." *Id.* The policy outlines where and in what manner the search must be done. *Id.* Under MSOP policy, staff doing an UVBS or pat search must work in pairs and avoid unnecessary force, embarrassment, and indignity to the client. *Id.* Phase III clients generally do not undergo

these searches.  Buse Dep. 63:7-64:3; Michaels Dep. 106:6-22.  The policy also provides for searches of facility areas, including client rooms.  Doc. 725, ¶ 30, Exs. 9, 10.

The TAC does not identify a specific instance and client affected by the search and restraint policies.  Doc. 635, ¶¶ 163-68.  At depositions, all Plaintiffs could say is that the policy is not individually tailored to the client and that a warrant should be required.  Noyer Dep. 48:1-49:7; Steiner Dep. 40:25-41:4; Braun Dep. 92:2-25.  No experts dispute that MSOP's search policies follow standard practices.  *See* Doc. 658, p. 57.

## G.  MSOP's High Security Area.

MSOP has a policy providing guidelines regulating necessary use of a High Security Area ("HSA" or "Protective Isolation Status") for clients who pose a danger to themselves or others.  Doc. 725, ¶ 35, Ex. 16.  Staff must follow strict requirements outlined in this policy for placing a client in the HSA, Administrative Restriction Status, or Levels of Observation Status.  *Id*.  Each policy has separate requirements that must be met before a client can be placed on that status and requires reviews within certain timeframes.  *Id*.  If a client no longer meets requirements, the client must be released from the HSA.  *Id*.  The TAC does not allege a specific incident as violating this policy.  Doc. 635, ¶¶ 135-37, 274.

## H.  The Rule 706 Experts Testified That MSOP's Policies Comply With Best Practices.

At the Phase One trial, Rule 706 Expert Deb McCulloch testified that she "reviewed all of the policies that are written by the program."  Tr. 67.  Ms. McCulloch agreed that the mail policy and search policies were not "outside the bounds of what you

would expect at a highly secure sex offender treatment center." Tr. 147-48.  She also testified, with respect to her global review of MSOP's policies, that she believed MSOP mirrored her Wisconsin program in that MSOP staff have an ongoing process designed to balance security and therapeutic needs.  Tr. 304-05.  She had no concerns about MSOP's policies regarding searches, transport, spiritual practices, media possession, client mail, client movement, yard use, visitation, client property (other than that it should be *more* restrictive in some instances), and therapeutic recreation.  Tr. 305, 307-11, 321-26.

Dr. Naomi Freeman testified that she did not have any problem with any of MSOP's policies as written.  Tr. 876.  She specifically testified she had no problem with MSOP's policies related to room searches, mail monitoring, and restraint policies, and otherwise deferred to Ms. McCulloch.  Tr. 877-88.  Dr. Robin Wilson also deferred to Ms. McCulloch's judgment, and agreed that the policies she discussed in testimony "are policies that you would expect to see in a sex offender civil commitment program." Tr. 626-27, 628.  Dr. Michael Miner also deferred to Ms. McCulloch's judgment, and for his part testified that he had no evidence any of the Plaintiffs were harmed by MSOP's mail policy, search policies, restraint policy, or the physical conditions at MSOP. Tr. 1127-29, 1172-73.

## II.   DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFFS' PHASE TWO CLAIMS.

### A.   Defendants Are Entitled To Summary Judgment On Plaintiffs' Claims Under The First And Fourth Amendments.

As discussed in Defendants' previous summary judgment motion, the undisputed facts and extensive case law mandate summary judgment in Defendants' favor on Plaintiffs' First and Fourth Amendment claims. This conclusion is consistent with the numerous district court decisions issued since the Court's prior summary judgment decision.

### 1.   The Eighth Circuit's Opinion renders inapplicable the Court's rationale for previously denying summary judgment on these claims.

As discussed above, the Court based its denial of Defendants' previous summary judgment on Counts VIII, IX, and X on the proposition that they might have merit in combination with Plaintiffs' Phase One substantive due process claims regarding the conditions of their confinement. *See supra* at 14-15. This rationale lacks merit, and in any event is disposed of by the Eighth Circuit's opinion as discussed above. *See supra* at 4-10. Summary judgment should be entered for Defendants.

First, there continues to be no legal basis for the proposition that the merits of a First or Fourth Amendment claim has any relationship to the merits of substantive due process claims brought in the same case, or that conduct not otherwise violating the First or Fourth Amendments might somehow constitute such a violation in light of factual allegations relating to substantive due process claims. Indeed, the United States Supreme Court expressly forbids Plaintiffs from alleging that the same conduct simultaneously

violates substantive due process and another constitutional amendment:   "'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"   *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114 (1994) (plurality opinion of REHNQUIST, C.J.)).

In any event, as explained in Section I, *supra*, Plaintiffs' substantive due process claims are without merit consistent with the Eighth Circuit's decision in this case.  If it were true that Plaintiffs' First and Fourth Amendment claims were "inextricably related" to the merits of Plaintiffs' Phase One claims as the Court held, Doc. 1080, p. 11, the fact that Defendants prevailed on the latter mandates summary judgment in their favor.[9]

---

[9] For its part, Plaintiffs' response to Defendants' initial summary judgment motion contains only abbreviated discussion of the actual legal standards applicable to First and Fourth Amendment claims.  Doc. 741, pp. 74-77.  Instead, Plaintiffs primarily discussed the relevant policies in connection with an erroneous "cumulatively punitive" theory.  *See generally* Doc. 741; *see also id*. at 82 (conceding that "specific policies and practices of the MSOP mentioned in Plaintiffs' [Third Amended Complaint] have been found constitutional" but that "these policies and practices in combination rather than in isolation that renders the MSOP punitive as it is applied.").  As noted above, *see supra* at 8, "punitiveness" is not a freestanding concept in substantive due process law, and there is otherwise no authority for the proposition that constitutional policies somehow become unconstitutional when combined.

## 2.   Defendants are entitled to summary judgment on Count VIII's First Amendment Free Exercise Claim.

The TAC's Count VIII challenges MSOP policies that Plaintiffs claim place restrictions on religious rights by:  monitoring their religious activities; not providing kosher or halal meals; placing restrictions on the religious items that may be worn or kept in their rooms; and only allowing annual religious feasts.  Doc. 635, ¶¶ 298-306.

Under the Free Exercise Clause of the First Amendment, Plaintiffs must first demonstrate that MSOP has placed a "substantial burden" on their ability to practice their religion.  *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).

In order to be considered a "substantial" burden, the governmental action:

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Id*. (citing *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004)).  "[I]n making a free exercise claim under 42 U.S.C. § 1983, the [plaintiff] must establish both the existence of a sincerely held religious belief and the infringement upon that belief by the challenged act or regulation."  *Hayes v. Long*, 72 F.3d 70, 73 (8th Cir. 1995).

As developed in the context of prison litigation, if an institutionalized plaintiff pleads a substantial burden on their religious exercise under the First Amendment, the challenged regulation remains valid "if it is reasonably related to legitimate penological interests," which requires consideration of four factors:  (1) a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it;

25

(2) whether there are alternative means of exercising the right that remain open; (3) the impact accommodation that the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the presence or absence of ready alternatives. *Turner v. Safley*, 482 U.S. 78, 89 (1987).[10]

Overall, the record contains no evidence of a substantial burden on any client's religious practice, much less that of MSOP policy caused a widespread substantial burden on clients' religious practice, as required to demonstrate class liability. *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (the success of a classwide challenge requires plaintiffs to show "widespread actual injury."). The TAC does not identify a specific religious infringement on any specific Plaintiff, *see* Doc. 635, ¶¶ 298-306; nor do Plaintiffs have any evidence of such. Plaintiff Daywitt complained that the client-dress policy used to prevent him from wearing his yarmulke at all times, but he acknowledged the policy is changed to allow an exception for him. Daywitt Dep. 68:12-69:24; Doc. 725, ¶¶ 28, 37, Exs. 7, 19. Daywitt also complained that the client dress policy did not permit him to wear a suit jacket except in his room, at religious services, and at court proceedings, but he offered no evidence that wearing a suit jacket was a "sincere religious belief" that was

---

[10] *But see Ivey v. Mooney*, No. 05–cv–2666 (JRT/FLN), 2008 WL 4527792, at *5 (D. Minn. Sept. 30, 2008) (concluding that, because MSOP is not a prison, MSOP's policies may not be justified by "penological" interests, and using the *Turner* factors to instead analyze whether "the regulations at issue . . . are reasonably related to legitimate *therapeutic or institutional interests*." (emphasis added)).

"substantially infringed," Daywitt Dep. 61:1-62:1., and in any event MSOP policy now allows him to wear a suit jacket.

He in fact acknowledged the clear security interest in a policy that prevents MSOP clients from impersonating visitors, staff, or other authorities at MSOP, *see id.* 65:9-66:12, Doc. 725, ¶ 37, a policy ironically apt for him based on a history of impersonating law enforcement. Daywitt Dep. 66:6-12. Even if Plaintiffs had some evidence of MSOP policy's widespread substantial burden on religious exercise, the evidence uniformly shows that MSOP's policies are crafted in order to balance the rights of clients with therapeutic and security interests, easily passing muster under either *Turner* or *Ivey*. *See supra* at 16-17, 21-22.

Existing case law also supports a grant of summary judgment to Defendants. *See Mueller v. Mesojedic*, Civ. No. 16-cv-277 (JNE/TNL), 2017 WL 764866, at *5-8 (D. Minn. Jan. 6, 2017) (holding that plaintiffs' allegations that MSOP fails to provide a dedicated ritual space or appropriate amenities, restricts ritual length, restricts food preparation and some holiday celebrations, and fails to provide a fire pit and access to certain tools used in rituals failed to plausibly state a claim of substantial burden on religious practice). Defendants are entitled to summary judgment on Plaintiffs' First Amendment Free Exercise claim.

### 3.    Defendants are entitled to summary judgment on Count IX's First Amendment Freedom of Speech Claim.

The TAC's Count IX challenges various MSOP policies as allegedly violating Plaintiffs' First Amendment Rights. Doc. 635, ¶¶ 307-15. The Eighth Circuit recognizes

that civil commitment "may necessitate restrictions on the right to free speech." *Beaulieu*, 690 F.3d at 1038-39 (quotations omitted).  This Circuit applies *Turner v. Safley* to First Amendment claims by civilly committed individuals, *Beaulieu*, 690 F.3d at 1038-39, but this District has "modified" *Turner* to account for civil commitment as opposed to other types of detainment.  *Semler*, 2010 WL 145275, at *8-9.  *Turner* identifies four considerations when evaluating a First Amendment challenge to institutional policies:   (1) whether there is a valid rational connection between the regulation and legitimate governmental interests;  (2) whether there is an alternative means of exercising the right; (3) the impact that accommodation would have on others; and (4) the absence of a ready alternative.  482 U.S. at 85; *accord Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004); *see also Stone v. Jesson*, No. 11-CV-0951 (WMW/HB), 2017 WL 1050393, at *3 (D. Minn. Mar. 17, 2017).  Like with other constitutional inquiries discussed above, this test defers to institutional and clinical administrators: policies premised on "legitimate governmental interests[s]" are upheld.  *Beaulieu*, 690 F.3d at 1041.

**Mail Policy**.  Plaintiffs complain of the general policy regarding the opening of mail, *see* Doc. 635, ¶¶ 138, 161, but again this specific policy has been repeatedly upheld. *Beaulieu*, 690 F.3d at 1035-37; *Semler*, 2010 WL 145275 at *10-11.  In *Beaulieu*, the Eighth Circuit affirmed the policy permitting MSOP to open non-legal mail, and affirmed dismissal where there was no evidence of a violation of that policy.  690 F.3d at 1035-37. In *Semler*, the court specifically upheld "policies" relating to "inspection of incoming and

outgoing mail" and "conclude[d] that MSOP has a legitimate interest in maintaining the safety of its staff and patients and the rehabilitation of its patients.  The Mail Policy furthers those interests, as its goal is to prevent patient access to contraband." 2010 WL 145275, *11.

**Phone Policy**.  Plaintiffs challenge MSOP's policy allowing Defendants to monitor telephone calls, which was also upheld in *Beaulieu* and *Semler*.  690 F.3d at 1039-40;  2010 WL 145275, at *16.  "[M]onitoring non-legal telephone calls and prohibiting incoming calls is reasonably related to the MSOP's security interests in detecting and preventing crimes and maintaining a safe environment."  *Beaulieu*, 690 F.3d at 1039-40 (quotation and modification marks omitted).  Plaintiffs' challenge to the rate charged also fails because MSOP charges clients for the cost of their calls, Doc. 725, ¶ 23, but the Constitution regardless does not dictate a specific rate for which clients could be charged.  *Semler*, 2010 WL 145275 at *15.

**Media Policy**.  Plaintiffs challenge MSOP's media policy, which reasonably allows clients to possess nearly all newspapers and magazines but with exceptions related to legitimate therapeutic needs.  Doc. 725, ¶ 36, Ex. 17.  The policy was upheld in *Ivey v. Mooney*, No. 05-2666, 2008 WL 4527792 (D. Minn. Sept. 30, 2008), and provides for further client protection by featuring a special Media Review Committee that can only limit media prohibited by statute and as necessary to further the therapeutic environment—e.g., media that is obscene, pornographic, or promoting sexual violence. Doc. 725, ¶ 36, Ex. 17.  Plaintiffs have no evidence of conduct beyond this policy, which

is "reasonably related to legitimate therapeutic and institutional interests." *Ivey*, 2008 WL 4527792, *6. This policy has again been upheld since the Court previously decided summary judgment. *Banks v. Jesson*, Civ. No. 11-cv-1706 (SRN/JSM), 2016 WL 3566207 (D. Minn. June 27, 2016) (upholding MSOP's media policy that prohibits MSOP clients' possession of items containing nudity).

**Choice of Vendors**. Plaintiffs also assert they are restricted in choosing suppliers. Doc. 635, ¶ 161(j). The Eighth Circuit has held that restrictions on the choice of vendors are *de minimus* restrictions that do not implicate constitutional rights. *Senty-Haugen*, 462 F.3d at 886 n.7. The Supreme Court in *Bell* also approved similar restrictions on a rule prohibiting pretrial detainees from "receiving hard-cover books that are not mailed directly from publishers, book clubs, or bookstores," as well as other "prohibitions on food and personal items from outside the institution." 441 U.S. at 550-57. The Court noted that the rules are "a rational response by prison officials to the obvious security problem of preventing the smuggling of contraband in books sent from outside." *Id*. This policy has again been upheld since the Court previously decided summary judgment. *Branson v. Piper*, No. 16-CV-1790 (WMW/FLN), 2017 WL 2730027 (D. Minn. June 26, 2017) (MSOP policy limiting vendor choice does not violate First or Fourth Amendment).

### 4. Defendants are entitled to summary judgment on Count X's Fourth Amendment Search and Seizure Claim.

Count X alleges that searches and seizures violate the Fourth Amendment, and the Court follows the legal standard for pretrial detainees. *Serna v. Goodno*, 567 F.3d 944,

948 (8th Cir. 2009).  The Eighth Circuit has repeatedly stated that, in this inquiry, "the expectation of privacy shared by involuntarily civilly committed persons and pretrial detainees is of a 'diminished scope.'" *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)); *Serna*, 587 F.3d at 948-49. This standard derives from *Bell*, which "adopted a general tone of deference to detention-center officials." *Serna*, 587 F.3d at 950 (citing *Bell*, 451 U.S. at 562.)  Courts "emphasize[] the need for deference to institutional officials in difficult and sensitive matters of institutional administration and security" and the "limited scope of the judicial inquiry under [*Bell*]." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984).) The Eighth Circuit has specifically recognized that MSOP's security concerns are "crucial to safety as well as treatment . . . Administrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety. . . .  [T]he government may take steps to maintain security at its institutions where sexually violent persons are confined." *Id.* at 952-53 (quotation marks omitted); *accord Beaulieu*, 690 F.3d at 1028-29 (upholding MSOP search policies).   Dr. Wilson specifically noted the validity of such security concerns within MSOP and the reasonableness of Defendants' search policies.  Wilson Dep. 41:1-43:2.

**Room Search Policy**.   Plaintiffs challenge MSOP's room-search policy. Doc. 635, ¶ 319.  But *Bell* specifically recognizes the constitutionality of these types of searches in light of security concerns, 441 U.S. at 555-57, and this District repeatedly upheld the very room-search policy at issue:  "Random room searches at MSOP do not

violate the Fourth Amendment." *Daniels v. Jesson*, No. 13-746, 2014 WL 3629874, at *6 (D. Minn. July 22, 2014); *accord Pyron v. Ludeman,* No. 10-3759, 2011 WL 3293523, *6 (D. Minn. June 6, 2011); *Semler v. Ludeman*, No. 09-0732, 2010 WL 145275, *21-22 (D. Minn. Jan. 8, 2010).  MSOP's room-search policies are designed to deter the possession of contraband and preserve a safe, secure, and therapeutic environment for MSOP staff and clients.  Doc. 725, ¶ 30, Exs. 9, 10. Dr. Wilson testified that such a policy is standard for civil-commitment programs. Wilson Dep. 41:1-25.  MSOP's room search policies have again been upheld since this Court previously denied summary judgment.  *Housman v. Jesson*, No. 15-CV-2209 (PAM/HB), 2016 WL 7231600 (D. Minn. Dec. 14, 2016) (affirming random room searches at MSOP do not violate the Fourth Amendment).

**Pat-Search Policy**.   Plaintiffs also challenge MSOP's pat-search policies, Doc. 635, ¶ 321, which were upheld in *Semler*.   2010 WL 145275, at *16-19.   These policies similarly exist to prevent contraband within the facility and preserve a safe, secure, and therapeutic environment.  Doc. 725, ¶ 30, Exs. 9, 10.  This policy has again been upheld since the Court previously denied summary judgment.  *Geiger v. Niemeyer*, Civ. No. 14-cv 1576 (JRT/LIB), 2016 WL 5660454 (D. Minn. Sept. 9, 2016) (holding that post-vocational work pat searches are constitutional).

**UVBSs**.  Plaintiffs challenge unclothed visual body searches that MSOP security staff perform when clients have exited and return to the facility, Doc. 635, ¶ 320, which were specifically upheld by the Eighth Circuit in *Beaulieu,* 690 F.3d at 1028-29.

MSOP's search and transport policies have the goal of preventing escape, to "control the entry of contraband into facilities," and to "manage threats to the safety and security of facilities, staff, clients, and public," Doc. 725, ¶¶ 30-31, Exs. 9-11, and are constitutional under established Eighth Circuit law.

**Restraint Policy**.  Plaintiffs challenge MSOP's policy regarding use of restraints, Doc. 635 ¶¶ 163-68, which also has been repeatedly upheld.  *Beaulieu*, 690 F.3d at 1031-33 ("The MSOP's articulated reasons for using full restraints are for the safety of the public and staff and to prevent escapes and attempted escapes, which have occurred at MSOP facilities.  We conclude that such policy is a proper exercise of the DHS officials' professional judgment"); *Halsar v. Megerman,* 104 F.3d 178, 180 (8th Cir. 1997) (observing a policy of restraining pretrial detainees when outside the correctional facility "serves the legitimate penological goal of preventing [detainees] awaiting trial from escaping."); *Semler*, 2010 WL 145275, at *27 ("Given the rationale for the use of restraints, deemed necessary for safety reasons in light of the growth of the MSOP program, and possibly in response to an escape attempt . . .  it cannot be said that Defendants' actions are arbitrary or shocking to the conscience.").

This policy, which does not apply to clients with privileges outside the secure perimeter, is necessary to ensure a safe, secure, and therapeutic environment for MSOP staff and clients, and is common in civil-commitment systems.  Doc. 725, ¶¶ 31-32, Exs. 11-12.  The policy is justified by legitimate security concerns such as smuggling contraband when a client is transported, preventing assault on the transporters

or others, and preventing attempted escapes when clients are transported outside the secure perimeter. *Semler,* 2010 WL 145275 at *27. This is especially true where MSOP clients have previously attempted escape. *Senty-Haugen v. Goodno*, 462 F.3d 876, 882 (8th Cir. 2006). Insofar as Plaintiffs claim that individualized assessments should be employed for every time they leave the facility, the Eighth Circuit held that MSOP is not required to tailor their restraint policy to account for the least restrictive option available. *Beaulieu*, 690 F.3d at 1032.

### D. Defendants Are Entitled To Summary Judgment On Count VIII's Fourteenth Amendment Substantive Due Process Claim.

In addition to a First Amendment freedom of religion claim, Count VIII includes a substantive due process claim under the Fourteenth Amendment. Doc. 635, pp. 74-75. Defendants are entitled to summary judgment on this claim.

Plaintiffs may not use substantive due process to challenge conduct alleged to violate the First Amendment. *Lewis*, 523 U.S. at 842 ("'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"). Accordingly, this claim based on substantive due process must be dismissed.

Even if Plaintiffs could use substantive due process to challenged conduct allegedly violating the First Amendment, the record contains no evidence of infringement upon a fundamental right recognized by substantive due process, and no evidence of conscience-shocking behavior – including behavior relating to MSOP clients' freedom of

religion – as required.  *Karsjens*, 845 F.3d at 408.  Instead, as discussed above, *see supra* at 24-26, the evidence uniformly establishes that MSOP policies governing clients' spiritual practices conforms with best practices and does not substantially burden clients' spiritual practice.

### E. Defendants Are Entitled To Summary Judgment On Count IX And Count X's Claims Under The Minnesota Constitution.

In addition to suing under the United States Constitution, Counts IX and X purport to sue under the Minnesota Constitution.  Doc. 635, pp. 76-77.  Again, for the same reasons discussed above, *see supra* at 9-10, the Eleventh Amendment deprives federal courts of subject matter jurisdiction over claims that state officials sued in their official capacity have violated state law.  *Pennhurst*, 465 U.S. at 100-01; *Minn. Pharmacists*, 690 F. Supp. 2d at 815.  Defendants are entitled to summary judgment on these claims.

## CONCLUSION

Based on the foregoing authorities and reasoning, Defendants ask that the Court dismiss Counts III, V, VI, and VII with prejudice, finally apportion the cost of the Rule 706 Experts to Plaintiffs, grant summary judgment to Defendants on Counts VIII, IX, and X, and close this case.

Dated: December 8, 2017.

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

**s/ Scott H. Ikeda**
SCOTT H. IKEDA
Assistant Attorney General
Atty. Reg. No. 0386771
scott.ikeda@ag.state.mn.us

AARON WINTER
Assistant Attorney General
Atty. Reg. No. 0390914
aaron.winter@ag.state.mn.us

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1385 (Voice)
(651) 282-5832 (Fax)
(651) 297-7206 (TTY)

*Attorneys for Defendants Emily Piper, Kevin Moser, Peter Puffer, Nancy Johnston, Jannine Hébert, and Ann Zimmerman*