**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld and all others similarly situated,<br><br>                       Plaintiffs,<br><br>v.<br><br>Emily Johnson Piper, Kevin Moser, Peter Puffer, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their individual and official capacities,<br><br>                    Defendants. | Court File No. 11-cv-03659 (DWF/TNL)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEFING ON PHASE ONE (COUNTS III, V, VI, AND VII), REQUEST FOR FINAL APPORTIONMENT OF RULE 706 EXPERT COSTS, AND MOTION FOR SUMMARY JUDGMENT ON PHASE TWO (COUNTS VIII, IX, AND X)** |

## <u>INTRODUCTION</u>

The remaining claims from Phase One of this case, Counts III (Failure to Provide Treatment in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution), V (Denial of Right to Be Free From Punishment in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution), VI (Denial of Less Restrictive Alternative Confinement in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution) and VII (Denial of Right to Be Free from Inhumane Treatment in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution), have yet to be decided by the Court, and their outcome

is not dictated by the Eighth Circuit's decision with respect to Counts I and II regarding the constitutionality of Minn. Stat. §253D.

Unless the Court accepts Defendants' position that the Eighth Circuit's opinion holds that civilly committed sex offenders have no substantive due process rights, under Counts III, V, VI and VI, Plaintiffs have shown both conscience-shocking conduct by Defendants and the violation of a fundamental liberty right such that they should prevail on these claims, especially as Defendants have had ample time to consider the purpose and effect of their decisions regarding the treatment program, availability of less restrictive alternatives, risk assessment process, and discharge process.[1] Alternatively, at trial Plaintiffs showed that the MSOP is punitive in effect, as alleged in Counts III, V, VI, and VII. Thus, regardless of the Eighth Circuit's holding with respect to the substantive due process standard, Plaintiffs should prevail on these remaining claims because it is unconstitutional to punish Plaintiffs and Class members, who are confined under a civil statute.

Defendants also ask the Court to reconsider two prior decisions.[2] First, the Phase Two claims (Counts VIII, IX, and X) were already the subject of a prior summary

_____

[1] If this Court agrees with Defendants that pursuant to the Eighth Circuit's opinion, despite the conscience-shocking behavior of Defendants, civilly committed sex offenders have no fundamental liberty rights, then this Court should specifically state this finding and dismiss these claims.

[2] Defendants cannot meet the high standard required to prevail on a motion for reconsideration. Such motions cannot be used to introduce new evidence that could have been produced while the motion was pending. *See Julianello v. K-V Pharmaceutical Co.*, 791 F.3d 915, 922 (8th Cir. 2015). They also cannot be used to relitigate old issues. The purpose of a motion to reconsider is "…to afford an opportunity for relief in

judgment motion by Defendants, which the Court denied. There are no new facts or case law that necessitate reaching a different decision here, and Defendants' motion should be denied given that there are material facts in dispute. Second, Defendants also ask the Court to reconsider its prior decision to apportion the costs of the Rule 706 Experts to Defendants. It is well-within this Court's discretion to require Defendants to pay the full amount, and the Court should reaffirm its prior decision to apportion those costs to Defendants, particularly given Defendants' own reliance on the 706 Experts' report and testimony. Additionally, although not a deciding factor on this issue, the Plaintiffs simply do not have the financial means to pay even a portion of these costs.

Defendants' motion should be denied in its entirety.

## RELEVANT PROCEDURAL BACKGROUND

This case was filed on December 21, 2011, alleging constitutional and state law violations regarding Minnesota's civil commitment of sex offenders. Phase One of trial, involving Counts I, II, III, IV, V, VI, VII and XI, began on February 9, 2015, and concluded on March 18, 2015.[3] Doc. Nos. 839, 847-48, 851-52, 860-62, 865-66, 869-72, 883-85, 887-88, 892-93, 902, 906-08. Counts VIII, IX, and X, were reserved for a Phase Two of trial. Doc. No. 647. On June 17, 2015, the Court issued an Order finding for

---

extraordinary circumstances… [it] cannot be used to raise arguments which could have been raised prior to the issuance of judgment." *Arnold v. Cargill Inc.*, No. CIV01-2086 (DWF/AJB), 2004 WL 2331814, at *1 (D. Minn. Oct. 13, 2004) (internal quotation marks omitted) (citations omitted). Both the Rule 706 Expert cost issue and summary judgment on Counts VIII, IX, and X have already been litigated, and there are no new facts or arguments Defendants can advance such that reconsideration is appropriate.

[3] Counts IV and XI were dismissed with prejudice on August 10, 2015. Doc. No. 1005.

Plaintiffs on Counts I and II, and concluding that the Minnesota Civil Commitment and Treatment Act, Minn. Stat. §253D (the "Act") is unconstitutional on its face and as applied by the Defendants. *See* Doc. No. 966, Findings of Fact, Conclusions of Law, and Order, 9, 11 ("Order"). The Court expressly declined to decide Counts III, V, VI and VII, stating, "because any remedy fashioned will address the issues raised in the remaining Phase One Counts, the Court need not address Counts III, V, VI and VII." Order, Conclusions of Law ("COL") at ¶38.

Defendants appealed this Court's decision to the Eighth Circuit, which reversed the findings on Counts I and II, holding that the Act was not unconstitutional on its face or as applied. *See Karsjens v. Piper*, 845 F.3d 394 (8th Cir. 2017). Although the Eighth Circuit held that the "shocks the conscience standard" applied to Plaintiffs' as-applied substantive due process claims, it did not make any findings as to Counts III, V, VI or VII. *See id*. In fact, the Eighth Circuit's order makes no mention of these claims. *See generally, id.* It also did not decide or mention the Phase Two claims- Counts VIII, IX, and X.

## REMAINING PHASE ONE CLAIMS

Counts III, V, VI and VII have yet to be ruled on by the Court, and, contrary to Defendants' contention that the Eighth Circuit's order requires summary dismissal, Plaintiffs are entitled to a full analysis and ruling on these claims. The Eighth Circuit's order makes no mention of these remaining counts and does not indicate whether they are subject to the same analysis and outcome as Counts I and II. If the Eighth Circuit's opinion is read as broadly as Defendants suggest, then there is no path for Plaintiffs, or

any civilly committed sex offender, to ever prevail on a substantive due process claim. *See* Doc. No. 1097, Supp. Br. on Phase One (Counts III, V, VI, and VII), Request for Final Apportionment of Rule 706 Expert Costs, and Mot. For Summ. J. on Phase Two (Counts VIII, IX, and X) ("Defs.' Br."), at 5. To the extent this Court does not view the Eighth Circuit's opinion as disposing of all remaining Phase One substantive due process claims, the Court should apply the "shocks the conscience" standard to the trial record rather than just dismiss the claims summarily as Defendants suggest.

Additionally, Counts III, V, VI and VII each contend that commitment to the MSOP cannot be "tantamount to punishment." *See* Doc. No. 635, Third Amended Complaint, at ¶¶ 256, 271, 287, 293 ("TAC").[4] Whether commitment to the MSOP is punitive, as alleged in each of these claims, has not yet been determined by the Court based on the factual record from trial, and the Eighth Circuit's order did not address the proper standard of review for analyzing Plaintiffs' allegations that commitment under these conditions is punitive and therefore in violation of the Constitution.

## I.   PLAINTIFFS SHOULD PREVAIL ON THE REMAINING SUBSTANTIVE DUE PROCESS CLAIMS

The Eighth Circuit held that to show an as-applied substantive due process claim, "…the court should determine both whether the state defendants' actions were conscience-shocking ***and*** if those actions violated a fundamental liberty interest." *Karsjens*, 845 F.3d at 408 (emphasis added). Defendants argue that the Eighth Circuit's

---

[4] Plaintiffs concede that, to the extent these claims are brought under the Minnesota Constitution, they are barred by the Eleventh Amendment and *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).

order applying this standard to Count II disposes of any remaining Fourteenth Amendment substantive due process claims brought by Plaintiffs. *See* Defs.' Br. at 4. However, the evidence at trial showed that Defendants violated Plaintiffs' and the Class' substantive due process rights as alleged in Counts III, V, VI and VII under the standard articulated by the Eighth Circuit.

As will be discussed below, with regard to the allegations in Counts III, V, VI and VII, Defendants' behavior was conscience shocking, thus satisfying the first element of the analysis. With respect to the second element, Defendants contend that the Eighth Circuit found there is no fundamental right at issue. If, in fact, the Eighth Circuit's order is read as broadly as Defendants suggest, the practical effect is that civilly committed individuals have no substantive due process rights at all. This cannot be the case. Plaintiffs should prevail on their remaining substantive due process claims.

### A.      Defendants' Actions Were Conscience Shocking

According to the Eighth Circuit, when conducting an as-applied substantive due process analysis, "the court should determine both whether the state defendants' actions were conscience-shocking *and* if those actions violated a fundamental liberty interest." *Karsjens*, 845 F.3d at 408 (emphasis added). Conscience-shocking conduct is conduct that is, "so severe… so disproportionate to the need presented, and… so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* (quoting *Moran*, 296 F.3d at 647).

Deliberate indifference can satisfy the conscience shocking threshold where "actual deliberation is practical." *See Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998)). Thus, Plaintiffs do not need to show an intent to harm here, where there is no "rapidly evolving, fluid, and dangerous situation[]." *Id.* (quoting *Neal v. St. Louis Cty. Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000)). Whether deliberate indifference rises to the level of conscience-shocking action depends on the specific circumstances. "[D]eliberate indifference that shocks the conscience in one environment may not be so patently egregious in another…" *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted). Generally, "an official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation omitted) (internal quotation marks omitted). The evidence at trial demonstrated that Defendants' actions meet this standard for the claims alleged in Counts III, V, VI and VII.

### i.      Count III[5]

_____

[5] Although the Eighth Circuit stated in its opinion that "[n]one of the six grounds upon which the district court determined the state defendants violated the class plaintiffs' substantive due process rights in an as-applied context satisfy the conscience-shocking standard" *see See Karsjens v. Piper*, 845 F.3d 394, 410 (8th Cir. 2017), the Eighth Circuit did not address these allegations in the context of Count III and Count VI, nor did it provide any detail into what evidence it specifically relied on in finding that the conduct was not conscience-shocking.  Although Counts III and VI, which relate to treatment and less restrictive alternatives, overlap to some extent with the six grounds this Court identified to find the Act unconstitutional as-applied, *see* Doc. No. 966, Findings of Fact, Conclusions of Law, and Order, at 67 ("Order"), the Court should specifically address the allegations in Counts III and VI and apply the "shocks-the-conscience" standard to those counts.  If the Court disagrees, then these two counts should be dismissed.

Count III alleges that the MSOP's treatment program violates Plaintiffs' substantive due process rights because it hinders Plaintiffs' release from civil commitment. Although the Eighth Circuit stated that the Supreme Court never held that there is a constitutional right to treatment, the Supreme Court has never addressed the issues raised by this case.  First, the Supreme Court has never addressed the issue as to whether sex offenders who are specifically committed for treatment have the right to adequate treatment.  Second, the Supreme Court has never addressed the issue whether treatment in a sex offender civil commitment program that actually interferes with the chance and timing of release is constitutional. Third, the Supreme Court has never addressed the issue of whether treatment deficiencies can be addressed under constitutional law when the state has voluntarily created a standard of care for the treatment it promises by statute. As such, Plaintiffs assert that a whether or not there is a constitutional right to treatment in this context has not been addressed by the Supreme Court for the reasons set forth above.

Plaintiffs here allege in Count III that the MSOP's treatment program violates Plaintiffs' substantive due process rights because it hinders Plaintiffs' release from civil commitment, rather than alleging a constitutional right to treatment per se. Defendants' conduct with respect to the treatment program is certainly conscience shocking. Plaintiffs and Class members only receive the MSOP's support for a reduction in custody if they have completed the treatment program, and the treatment program has no delineated end point. *See* Order, Findings of Fact ("FOF") at ¶¶92, 179. However, it is incredibly difficult to progress to that stage given the roadblocks Defendants have intentionally put

into place. For example, the MSOP is aware that there are Plaintiffs and Class members in the incorrect treatment phase based on its own criteria. An outside report by the MPET found that thirty percent of the Phase I patients it reviewed showed that those individuals were in the wrong treatment phase. *Id.* at ¶71. Yet, the MSOP failed to take any steps to reassess all Plaintiffs and Class members to determine their proper treatment phase placement. *Id.* The progression policies Defendants have implemented are also intended to limit movement through the treatment program. The same phase progression requirements and treatment progress scoring apply to all Plaintiffs and Class members, including those with severe mental illness, cognitive disabilities, or juvenile-only offenses. *Id.* at ¶¶74, 80, 81. Outside auditors have been critical of the treatment progress scoring system, called the Matrix factors, and yet the MSOP has not implemented any system to ensure that its clinicians are properly scoring the Matrix factors or to ensure any consistency in scoring. *Id.* at ¶¶83-85. The MSOP admitted that inconsistent scoring on the Matrix factors can slow treatment progress. *Id.* at ¶88. And the testimony at trial confirmed that inconsistent scoring occurs. *Id.* at ¶83. Additionally, Defendants intentionally designed the treatment program such that minor behavioral violations, not related to sex offender treatment, can and do hinder treatment progress. *Id.* at ¶¶87-90.

The multitude of issues with the MSOP's treatment program, when considered as a system-wide problem, reach the level of conscience shocking behavior that violates due process. The MSOP, in its current form, has been in existence since 1994. *Id.* at ¶17. Defendants have had years to develop the treatment program, view its affects, and adjust the program as necessary. However, despite the years of deliberation and years of

independent criticism regarding the treatment program, Defendants have intentionally put into place a program that confines Plaintiffs and Class members beyond what is constitutionally permissible. Defendants admitted that the treatment program slows progress towards release and that release will only be supported once Plaintiffs reach Phase III of treatment. *Id.* at ¶179.  They have "draw[n] the inference" that the treatment program is causing a substantial risk of serious harm. *See Fields*, 652 F.3d at 891. Thus, the MSOP's treatment program shocks the conscience.

ii.     **Count VI**

Defendants' failure to provide less restrictive alternatives, as alleged in Count VI, also meets the conscience shocking standard. All Plaintiffs and Class members are placed in one of the MSOP's secure facilities at Moose Lake or St. Peter when they are initially committed, regardless of their individual risk level. *See* Order, FOF at ¶53. This is true even for the lone female committed to the MSOP, Rhonda Bailey, who is housed on a secure unit with 22 male offenders. *Id.* at ¶50. The Act actually provides that a committing court can place an individual in a less restrictive alternative upon commitment, but the MSOP admitted that it has intentionally not created any such options. *Id.* at ¶53. Defendants acknowledge that there are Plaintiffs and Class members who have lower risk levels such that confinement in a less restrictive alternative is appropriate. *Id.* at ¶54. However, the very few community placement options that the MSOP has contracted for are only for certain populations, such as those with cognitive disabilities. *Id.* at ¶57. As the Court found, "[t]he evidence overwhelmingly demonstrates… that providing less restrictive confinement options would be beneficial to

the State of Minnesota and the entire civil commitment system, without compromising public safety." *Id.* at ¶58.

Intentionally failing to provide confinement that is appropriate for the varying levels of risk presented by Plaintiffs and the Class, and actually knowing that there are committed individuals who could be properly treated and managed in less restrictive settings, is conscience shocking. As with the treatment program, Defendants have had years to deliberate what system of housing options is appropriate under the constitutional limits surrounding civil commitment and have received extensive independent outside criticism relating to the lack of less restrictive alternatives. Instead of choosing to offer varying levels of restriction based on the risk level, mental capacity, and health of Plaintiffs and Class members, Defendants intentionally limit the liberty interest of Plaintiffs and the Class beyond what is constitutionally permissible. And, even more telling, Defendants admit that there are Plaintiffs and Class members who should be housed in less restrictive alternatives, showing that they are aware of the substantial risk of serious harm to Plaintiffs' liberty. *See Fields*, 652 F.3d at 891. The Court should find that Defendants' failure to provide less restrictive alternatives is conscience-shocking.

### iii.   Counts V and VII

Counts V and VII allege that the Act is punitive in its application because the duration of Plaintiffs' and Class members' commitment is not reasonably related to the purposes of the commitment. While these claims allege that the conditions of confinement at the MSOP are punitive, they also allege, which is the crux of these claims,

that commitment to the MSOP continues in duration beyond a time that it is constitutionally permissible.[6] *See* TAC at ¶¶271, 293.

Plaintiffs should prevail on these claims because the evidence at trial showed conscience-shocking actions by Defendants. Most shockingly, Defendants do not even know whether hundreds of Plaintiffs and Class members continue to meet the constitutional criteria for commitment. The only way to determine whether an individual meets commitment or discharge criteria is through a risk assessment, and risk assessments are only scientifically valid for one year. *See*, Order, FOF at ¶¶111-112. Defendants intentionally do not regularly perform risk assessments for Plaintiffs and Class members, but rather only provide a risk assessment if an individual affirmatively files a petition for a reduction in custody. *Id.* at ¶¶114-115. Any evidence about attempts to institute regular risk assessments clearly indicate that such attempts are a farce. Under the proposed policy, it would take between thirty and sixty years to assess each Plaintiff and Class member. *Id.* at ¶116.

Furthermore, even if a risk assessment were to show that a Plaintiff or Class member meets reduction in custody criteria, the reduction in custody process has been designed and implemented by Defendants to block Plaintiffs and Class members from actually being released from their commitment. No annual reviews of commitment occur,

---

[6] Contrary to Defendants' argument, Plaintiffs are not asserting *ex post facto* or double jeopardy claims, as shown by the plain language of the Complaint. Plaintiffs do not allege that their commitment to the MSOP is punishment for their prior sex offenses, but rather that they are confined beyond such a time as is constitutionally permissible for civil commitment.

but rather Plaintiffs and Class members must affirmatively request a reduction in custody, which they can only do if six months has elapsed from a final decision on a prior petition. *Id.* at ¶133. This process can take years. *Id.* at ¶152. And petitions are unlikely to be successful if they are not supported by the MSOP.[7] *Id.* at ¶146. Even where Defendants know that a particular Plaintiff or Class member meets reduction in custody criteria, the MSOP does not have a policy or practice in place requiring the MSOP to file and support a petition for that individual, and, in practice, Defendants do not do so. *Id.* at ¶¶162, 164. Once again, Defendants have had years to put a constitutional risk assessment and discharge system into place, and despite the independent outside criticism, have not done so.

Defendants acted with deliberate indifference that shocks the conscience. The facts here clearly lead to this conclusion, given Defendants' admissions that they do not know whether hundreds of Plaintiffs and Class members are properly committed and that they know of Plaintiffs and Class members who should no longer be committed. Defendants certainly know there is a substantial risk of serious harm to Plaintiffs and the Class due to the lack of risk assessments and procedurally deficient discharge process because these practices result in confinement that is longer than necessary. *See Fields*, 652 F.3d at 891. Defendants' punitive confinement of Plaintiffs and the Class is conscience-shocking.

---

[7] As discussed above, the MSOP will not support petitions until the individual is in Phase III of the treatment program. *See* Order, FOF at ¶179.

### B.      Plaintiffs' Fundamental Liberty Interest

Under the substantive due process analysis mandated by the Eighth Circuit's

order, this Court also needs to rule that a fundamental right was violated to find a

constitutional violation. Counts III, V, VI and VII all involve Plaintiffs' fundamental

liberty right to be free from confinement. *See Foucha v. Louisiana*, 504 U.S. 71, 80

(1992) ("Freedom from bodily restraint has always been at the core of the liberty

protected by the Due Process Clause…") (internal citation omitted); *Jones v. United*

*States*, 463 U.S. 354 361 (1983) ("[C]ommitment for any purpose constitutes a

significant deprivation of liberty that requires due process protection.") (internal citation

omitted). Counts III, V, VI and VII each implicate this fundamental liberty right to be

free from commitment, or bodily restraint, when the basis for the commitment no longer

exists. However, Defendants contend that the Eighth Circuit's order found that Plaintiffs

had no fundamental liberty interest. *See* Defs.' Br. at 5, 6, 8-9.

If, as Defendants contend, Plaintiffs do not have a fundamental liberty interest in

freedom from physical restraint, they then have no substantive due process rights given

the Eighth Circuit's two factor standard for as-applied due process claims. In its analysis

of the proper standard for a facial constitutional claim, the Eighth Circuit found that

Plaintiffs did not have a fundamental liberty interest, stating, "[a]lthough the Supreme

Court has characterized civil commitment as a 'significant deprivation of liberty,'… it

has never declared that persons who pose a significant danger to themselves or others

possess a fundamental liberty interest in freedom from physical restraint." *Id.* at 407

(internal citation omitted) (citing *Foucha*, 504 U.S. at 116 (Thomas, J., dissenting)). It

14

also cited *Kansas v. Hendricks*, 521 U.S. 346 (1997), stating, "[t]he [*Hendricks*] Court noted that many states provide for the involuntary civil commitment of people who are unable to control their behavior and pose a threat to public health and safety, and it thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." *Karsjens*, 345 F.3d at 407 (citing *Hendricks*, 521 U.S. at 356-57) (internal quotation marks omitted). Defendants argue this means that civilly committed sex offenders, like Plaintiffs and the Class, do not have a fundamental liberty interest after they are committed. If that is correct, the practical effect is that civilly committed persons have no substantive due process rights once they are committed. Should this Court interpret the Eighth Circuit's opinion as such, Plaintiffs ask that the Court make a specific finding stating that because Plaintiffs and the Class are civilly committed, they no longer have a fundamental liberty right and, given the Eighth Circuit's two-part test, no longer have any substantive due process rights.

However, if the Court agrees with Plaintiffs that Counts III, V, VI and VII implicated Plaintiffs' fundamental liberty right to be free from bodily restraint, Plaintiffs should prevail on these claims given the conscience-shocking action shown at trial.

## II.     THE MSOP IS PUNITIVE

Alternatively, Counts III, V, VI and VII each allege that the Act is punitive rather than civil. *See* TAC, at ¶¶ 256, 271, 287, 293 (commitment to the MSOP cannot be "tantamount to punishment."). Indeed, the basis for Counts V and VII is that civil commitment under the Act is punitive, *see id.* at ¶¶269-283 (Count V, alleging denial of Plaintiffs' right to be free from punishment); ¶¶292-297 (Count VII, alleging denial of

Plaintiffs' right to be free from inhumane treatment), while Counts III and VI allege that

commitment to MSOP is tantamount to punishment because the sham of a treatment

program and lack of less restrictive alternatives render Plaintiffs' commitment punitive.

*See id.* at ¶¶254-261, 284-291. The Eighth Circuit's order does not address this Court's

finding that the Act is punitive and, as such, there can be no argument that the Eighth

Circuit's ruling should apply to these claims. *See generally*, *Karsjens*, 845 F.3d 394.

Rather, the Court should now make a finding that the Act is punitive under Counts III, V,

VI and VII.

The evidence at trial demonstrated that Plaintiffs' commitment to the MSOP under

the Act is punitive in effect, regardless of the civil nature of the Act, because the

treatment provided, the living conditions (including lack of less restrictive alternatives),

and the discharge process do not result in the movement of Plaintiffs to a potential

reduction in custody, the consequence of which is effectively life-long punitive detention.

### A.      Civilly Committed Persons Cannot Be Subjected To Punishment

Plaintiffs, as civilly committed persons and not prisoners, cannot be subjected to

conditions "that amount to punishment." *Bell v. Wollfish*, 441 U.S. 520, 535 (1979);

*Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) ("civilly-committed persons,

like pretrial detainees, are entitled to at least as great protection as that afforded convicted

prisoners under the Eighth Amendment.") (internal quotation marks omitted) (citation

omitted); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (noting that those confined for

civil purposes "may not be punished at all."). The Minnesota Supreme Court has found

the Act to be civil on its face, but no court has considered whether the Act is punitive in

effect for all committed individuals based on the evidence of the statute's systemic implementation over the past twenty years. *See In re Linehan*, 557 N.W.2d 171 (Minn. 1996), *affirmed*, 594 N.W.2d 867 (finding the Act on its face to be civil in purpose, not punitive). As the Supreme Court held in *Hendricks*, the legislature's intent that a statute is civil rather than punitive will be rejected where "a party challenging the statute provides the clearest proof that the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Hendricks*, 521 U.S. at 361 (internal quotation marks omitted) (citation omitted). Where evidence shows that the effect of a statute is retribution or deterrence, it may be punitive rather than civil. *Id.* at 361-62. This is particularly true where, as here, there are not "proper procedures" in place such that "incapacitation [is a] legitimate end of the civil law." *Id.* at 365-66.

To show that a statute has a punitive effect, courts consider the seven factors noted in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), including whether there is "an affirmative disability or restraint," whether it involves something that has historically been regarded as punishment, whether it promotes the aim of deterrence, whether it has a rational connection to a nonpunitive purpose, or is excessive with respect to that nonpunitive purpose. *See id.*; *see also Smith v. Doe*, 538 U.S. 84, 97 (2002); *Bell*, 441 U.S. at 538 (finding that the *Mendoza-Martinez* factors "provide useful guideposts in determining whether particular restrictions and conditions… amount to punishment."). In other words, the Court must determine "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 537. Where the condition or restriction "is reasonably related

to a legitimate governmental objective, it does not, without more, amount to punishment," but "if [the condition or restriction] is arbitrary or purposeless- a court permissibly may infer that the purpose of the governmental action is punishment." *Id.* at 539 (internal quotation marks omitted) (citations omitted). Plaintiffs do not disagree that the Act has the nonpunitive purpose of protecting public safety, however the Act is excessive in relation to this purpose because it is not designed to either treat or house Plaintiffs and the Class based on their individual risk level, or to actually allow them to return to society when they no longer pose a danger to the public.

Defendants argue that *Seling v. Young*, 531 U.S. 250 (2001), precludes any argument that the Act is punitive in effect. Defs.' Br. at 8. However, this case addresses a civil commitment statute as applied to a class, not just an individual (as in *Seling*), and is thus distinguishable. Doc. No. 828, at 28. In fact, *Seling* specifically held, "[t]his case gives us no occasion to consider… the extent to which a court may look to actual conditions of confinement and implementation of the statue to determine in the first instance whether a confinement scheme is civil in nature." *Seling*, 531 U.S. at 266.

### B.    The Act is Punitive in Effect

Here, the evidence at trial regarding the treatment program, the unavailability of less restrictive alternatives, and the lack of a meaningful discharge process demonstrates that the Act, as implemented by Defendants, has an improper deterrent effect and is punitive. *See Shimota v. Wegner*, Case No. 15-1590 (JRT/FLN), 2016 WL 1254240, at *9 (D. Minn. March 29, 2016) (the court should review the "totality of the

circumstances" of confinement to determine whether it is punitive) (quoting *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010)).

The treatment program is punitive because it operates in such a way to continue the confinement of Plaintiffs and the Class beyond such a time as the legitimate goals of public safety and treatment are served. *See Bell*, 441 U.S. at 539. The three-phase treatment program, in practice, starts all committed individuals in Phase I of the treatment program upon commitment, regardless of any prior treatment received. Order, FOF at ¶¶67, 70. No assessments are done at the time of commitment to determine what phase of treatment would be appropriate. *Id.* at ¶68. Moreover, there are Plaintiffs and Class members that are not in the proper phase of treatment based on the MSOP's own policies. *Id.* at ¶71. To be supported by the MSOP for any reduction in custody, Plaintiffs must progress through all phases of the treatment program. *Id.* at ¶179. However, the same progression requirements apply to all Plaintiffs and Class members, including those with mental disabilities or those with juvenile-only offenses. *Id.* at ¶¶74, 75. Similarly, all Plaintiffs and Class members are assessed on the same set of criteria (the Matrix factors) to determine whether they should progress through the treatment program. *Id.* at ¶¶80, 81. The MSOP does not consistently apply the Matrix factors, and staff has expressed confusion over how to use the factors, thus affecting the ability of individuals to progress through the treatment program. *Id.* at ¶¶83-86. As a result of this poorly designed treatment program, the evidence showed that progression through the treatment program has been incredibly slow. *Id.* at ¶¶95-100. The entire structure of the treatment program is designed and implemented in such a way as to continue Plaintiffs' and Class members'

confinement indefinitely, which is clearly promoting the aim of deterrence and thus not rationally related to a nonpunitive purpose. *See Smith*, 538 U.S. at 99-100. Thus, the Court should find that the MSOP's treatment program is punitive, as alleged in Count III.

Similarly, the fact that there are no less restrictive alternative housing options available for Plaintiffs shows that commitment under the Act is not intended to confine Plaintiffs based on their individual risk or dangerousness such that public safety goals are served, but rather to confine them, period. *See Bell*, 441 U.S. at 539. The MSOP currently operates secure facilities at Moose Lake and St. Peter as well Community Preparation Services (CPS) on the St. Peter campus. *See* Order, FOF at ¶43. CPS is the least restrictive facility operated by the MSOP, but it is still within the MSOP campus and has a limited number of beds available. *Id.* at ¶¶44, 46. There is no alternative placement option that would allow housing at a less restrictive facility upon commitment to the MSOP. *Id.* at ¶53. The MSOP has no less restrictive options available, such as halfway houses. *Id.* In fact, attempts by the MSOP to open a less restrictive facility were halted by Governor Dayton. *Id.* at ¶56. The MSOP agrees there are Class members that could be safely placed in the community or in less restrictive facilities. *Id.* at ¶54. Once again, Defendants have set up a system that is intended to confine Plaintiffs in a punitive manner by physically restraining them in overly restrictive conditions given individual risk levels. This renders the MSOP much more like a prison (i.e. a deterrent option) than a rehabilitation facility, particularly given that the MSOP knows there are people that could be safely placed somewhere other than the secure facilities. *See Smith*, 398 U.S. at 100 (noting that where a statue imposes physical restraint similar to the punishment of

imprisonment, it may be punitive). As alleged in Count VII, the lack of less restrictive

alternative options renders the Act punitive.

The discharge process from the MSOP is a sham that, in effect, does not actually

result in releases, and therefore is further evidence that commitment is merely intended to

prevent future criminal conduct. Unlike the statute in *Hendricks*, the evidence here has

shown that confinement under the act is more than just "potentially indefinite," it is in

fact a lifetime sentence for those who are committed. 521 U.S. at 364. As an initial

matter, the MOSP does not actual know whether hundreds of Class members meet the

standards for commitment because it does not conduct regular risk assessments. Order,

FOF at ¶¶108, 111. Even when a risk assessment does occur as part of the reduction in

custody process, the petitioning process does not operate to actually release individuals

from their civil commitment. The Special Review Board (SRB) and Supreme Court

Appeal Panel (SCAP) will generally not grant provisional discharge or discharge if the

petitioning individual does not have the support of the MSOP. *Id.* at ¶146. The MSOP

has never supported a petition for full discharge. *Id.* at ¶177. Even though the MSOP can

affirmatively file petitions for reduction in custody, in practice it does not do so, even

where it knows or reasonably believes that an individual no longer satisfies the

commitment criteria or meets criteria for a reduction in custody. *Id.* at ¶162. Moreover,

the SRB and SCAP petitioning process can take years. *Id.* at ¶152. Holding Plaintiffs and

Class members beyond such a time as they meet commitment standards, as well as not

even knowing whether people should continue to be confined, is certainly not rationally

related to a nonpunitive purpose, thus rendering the Act punitive in effect. *See Smith*, 538

U.S. at 97. This affirmative physical restraint cannot pass constitutional muster- it must be deemed punitive or civil commitment will continue to be used by Defendants for an improper purpose. As alleged in Counts VI and VI, the Act is punitive and unconstitutional.

As discussed above, the evidence at trial shows that the Act is punitive for many reasons, as alleged in Counts III, V, VI and VII, and thus Plaintiffs have shown the Act is unconstitutional.

## RULE 706 EXPERTS AND THE PHASE II CLAIMS

### I.   DEFENDANTS' RELIANCE ON THE RULE 706 EXPERTS' FINDINGS

Rule 706 allows courts to "appoint any expert that the parties agree on and any of its own choosing." Fed. R. Evid. 706(a). Experts appointed pursuant to this rule are "entitled to reasonable compensation, as set by the court," Fed. R. Evid. 705(c), and such compensation is to be paid "by the parties in the proportion and at the time that the court directs." Fed. R. Evid. 706(c)(2). This rule gives the Court full discretion to determine what party or parties will pay the costs of Rule 706 Experts, regardless of the outcome of the case.

Defendants argue that Plaintiffs should bear the full costs of the Rule 706 Experts because they "requested their appointment to assist Plaintiffs, and Defendants objected." Defs.' Br. at 12 (internal quotation marks omitted) (citation omitted). Defendants, in fact, did object to Plaintiffs' request and argued that Rule 706 was intended to permit the Court to designate a neutral expert witness for the Court's benefit. *See* Doc. No. 328, at 3-4.  Rather than granting Plaintiffs' motion to appoint experts to assist the Plaintiffs, the

22

Court appointed Rule 706 Experts to assist the Court.  Furthermore, the Court asked for input from both parties with regard to the scope of the Rule 706 Experts' work and both parties submitted proposals to the Court. *See* Doc. No. 421.  The Rule 706 Experts also submitted a proposal as to the scope of their work.   The Court reviewed these proposals, and ordered the Rule 706 Experts to proceed with everything from both parties' proposals, everything from the Experts' own proposal, and some additional items proposed by the Court. Doc. No. 427 at 44-49.

Defendants' argument that Plaintiffs should now pay for the 706 Experts conveniently ignores that Defendants have relied on, and continue to rely on, the 706 Experts' findings and testimony. In their brief, Defendants heavily cite to the 706 Experts' report and trial testimony in support of their motion for summary judgment on the Phase Two claims. *See, e.g.* Defs.' Br. at 15 (quoting the Rule 706 Experts' finding that the MSOP's policies are similar to those at other civil commitment programs), 21-22 (spending two pages quoting testimony by 706 Experts Deb McCulloch and Dr. Naomi Freeman stating that they had no concerns with the MSOP's policies as written). This reliance, in conjunction with the fact that Defendants prevailed on Counts I and II (meaning that the Rule 706 Experts' report and testimony did not actually benefit Plaintiffs but rather Defendants), further supports this Court's decision to apportion the Rule 706 Experts' costs to Defendants.[8]

---

[8] Moreover, Plaintiffs are indigent, as stated in their applications to proceed in forma pauperis. Doc. Nos. 2-15. Courts have held that it is appropriate for the costs of Rule 706 experts to be apportioned based on the parties' respective assets. *See, e.g. Norwood v. Liping Zhang*, No. 10 C 3143, 2013 WL 5162202, at *7 (N.D. Ill. Sept. 13, 2013)

Indeed, Defendants argue that the Rule 706 Experts' finding that the MSOP's conditions of confinement, including the policies and practices addressed in Counts VIII, IX and X of Plaintiffs' Complaint, are in line with other sex offender civil commitment programs and as such cannot present a constitutional issue. If the Court agrees with Defendants that this evidence is sufficient to grant summary judgment on the Phase Two claims, then Counts VIII, IX and X fail. If the Court finds there are genuine issues of material fact with respect to these claims, as discussed below, then summary judgment should be denied.

## II.   SUMMARY JUDGMENT ON THE PHASE TWO CLAIMS SHOULD BE DENIED

Counts VIII (alleging that Defendants violate Plaintiffs' right to religion and religious freedom), Count IX (alleging that Defendants violate Plaintiffs' rights to free speech and free association), and Count X (alleging that Defendants violate Plaintiffs' right to be free from unreasonable searches and seizures), all claim that the policies and practices at the MSOP are punitive. Each of these claims involves a number of policies and practices that, when viewed individually, may not rise to the level of a constitutional violation.  Defendants rely on the Rule 706 Experts to support their argument that these policies are not unconstitutional but in fact are reasonable and the norm in these types of institutions.  See Defs.' Br. at  15, 21-22.  If the Court believes this is sufficient to grant

---

(finding the plaintiff, who demonstrated he had very few assets, was only responsible for the cost of Rule 706 experts up to a certain dollar amount, and anything over that amount was to be paid by the defendants). Here, Plaintiffs simply do not have the assets to pay $685,000 to the Rule 706 Experts.

Defendants' motion for summary judgment on Counts VIII, IX and X, these claims should be dismissed without prejudice so Plaintiffs and Class members may pursue them on an individual basis. Claims regarding the application of specific policies to a particular Plaintiff or Class member are not appropriate for class treatment to the extent it involves actions or failures to act by Defendants "on grounds that [do not] apply generally to the class." Fed. R. Civ. P. 23(b)(2). However, Plaintiffs assert that when viewed collectively, these policies are clear violations of Plaintiffs' and Class members' constitutional rights.[9]

There are genuine issues of material fact in dispute as to whether Defendants' policies and practices violate Plaintiffs' First, Fourth, and Fourteenth Amendment rights, as alleged in Counts VIII, IX, and X.[10] Defendants argue that specific policies[11] and practices of the MSOP mentioned in Plaintiffs' TAC have been found constitutional. Although that is true for specific policies viewed in isolation, Plaintiffs allege that it is these policies and practices in combination and when applied to the Class as a whole, that rise to the level of a constitutional violation, along with the fact that they are applied uniformly to all Plaintiffs without regard for individual treatment needs or risk levels.[12]

---

[9] Defendants have already moved for summary judgment on these claims, and their motion was denied. Doc. No. 828.

[10] Plaintiffs concede that, to the extent these claims are brought under the Minnesota Constitution, they are barred by the Eleventh Amendment and *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).

[11] Some of the MSOP's policies and practices may have been changed as a result of this litigation since the time of trial. However, on the record before the Court, the MSOP's policies and practices violate Plaintiffs' constitutional rights as alleged in the Complaint.

[12] The Eighth Circuit's opinion does not mandate dismissal of Counts VIII, IX and X and, in fact, has no bearing on the analysis of these claims. Moreover, this Court's prior denial

The case law is clear that Plaintiffs should not be treated like prisoners. Their rights are analogous to those held by pretrial detainees, and the court should consider "the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations." *See Williams v. Johnston*, Civil No. 14-369 (DWF/FLN), 2015 WL 1333991, at *6 (D. Minn. Jan. 28, 2015) (quoting *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009)). The MSOP's policies and practices, when viewed in their totality, demonstrate that it operates as a punitive detention center rather than a treatment facility.[13]  As of 2010, security accounted for 45% of the MSOP's operating expenditures and 61% of the total staffing. *See* Doc. No. 757-1, Ex. 1 (Auditor's Report at 12-13). In contrast, in 2010, clinical treatment accounted for 11% of operating expenditures and 11% of total staffing. *Id.* Policies are applied uniformly to all patients, unless the policy specifies it is only applicable to CPS, for example. *See* Doc. No. 742-1, Ex. 1 (Zimmerman Dep. at 114:7-24); Doc. No. 757-13, Ex. 21 (Hannah Dep. at 57:14-18). There are genuine issues of material fact in dispute for Counts VIII, IX and X, and Defendants' motion should be denied.

---

of summary judgment on these counts was not solely based on the fact that they may "have merit in combination" with the Phase One claims, but rather found that Plaintiff raised genuine issues of material fact.

[13] Although the Rule 706 Experts found that, in general, "The MSOP Program's rules, policies and practices with regard to mail, movement, searches, property and phones are mostly standard in comparison to other SOCC programs and institutions," Plaintiffs' claims in Counts VIII, IX and X are based on the totality of their effect on Plaintiffs rather than individual policies.

A.     **Counts VIII and IX- First Amendment Claims**

At a minimum, the MSOP's policies and practices must be reasonably related to

the purposes for which Plaintiffs are committed. *See Foucha*, 504 U.S. at 79. With

respect to Counts VIII and IX, although involuntarily committed persons may have their

First Amendment rights restricted, *see Pyron v. Ludeman*, Civ. Nos. 10-3759 (PJS/JJG),

10-4236 (PJS/JJG), 2011 WL 3293523, at *5 (D. Minn. June 6, 2011) (citing *Bell*, 441

U.S. at 545-46), any such restrictions must be reasonably related to "legitimate

therapeutic or institutional interests." *See Ivey v. Mooney*, Civil No. 05-2666 (JRT/FLN),

2008 WL 4527792, at *4, 10 (D. Minn. Sept. 30, 2008). Courts have held that individuals

who are civilly committed as dangerous persons are entitled to "more considerate

treatment and conditions of confinement" than prisoners. *See Ivey*, 2008 WL 4527792 at

*4 (quoting *Senty-Haugen v. Goodno,* 462 F.3d 876, 886 (8th Cir. 2006). Although the

*Ivey* court used a modified version of the standard from *Turner v. Safley*, 482 U.S. 78

(1987)[14], to determine whether a particular statutory scheme impermissibly infringed on

an MSOP patient's First Amendment rights, it acknowledged that *Turner* involved

prisoner rights and might not apply, even as modified, to all challenges by civilly

committed patients. *See Ivey*, 2008 WL 4527792 at *4, n. 7. Moreover, *Ivey* recognized

---

[14] The four factors from *Turner* that courts generally consider when assessing First
Amendment claims are: (1) whether prohibiting an inmate from exercising a
constitutional right is rationally related to a legitimate governmental interest; (2) whether
there are alternative means of exercising the right; (3) what effect accommodation of the
interest would have on guards, other inmates, and the allocation of prison resources; and
(4) whether there are ready alternatives that would fully accommodate the prisoners'
rights at *de minimis* cost to the valid penological interest. *See Turner*, 482 U.S. at 89-90.

that the appropriate standard, even if *Turner* was applied, is to consider the therapeutic

interests rather than penological interests of the state. *See id.* at *10.

### i. Count VIII- Violation of Plaintiffs' Rights to Freedom of Religion

Plaintiffs allege that policies and practices created and implemented by

Defendants place a substantial burden on Plaintiffs' sincerely held religious beliefs.[15] *See*

*Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997). To substantially burden one's free

exercise of religion, a regulation must: (1) "significantly inhibit or constrain conduct or

expression that manifests some central tenet of a person's individual religious beliefs";

(2) "meaningfully curtail a person's ability to express adherence to his or her faith"; or

(3) "deny a person reasonable opportunities to engage in those activities that are

fundamental to a person's religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813

(8th Cir. 2008) (quoting *Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 988 (8th Cir.

2004)). "[P]olicies that put confined persons to the choice of adhering to their religious

beliefs or facing serious disciplinary action substantially burden religious exercise."

*Mueller v. Mesojedec*, Case No. 16-cv-277 (JNE/TNL). 2017 WL 764866, at *5 (D.

Minn. Jan. 6, 2017) (citing *Holt v. Hobbs*, 135 S.Ct. 853, 862 (2015)).

---

[15] Plaintiffs bring this claim under the First Amendment and, in the alternative, the Fourteenth Amendment. The same facts supporting Plaintiffs' First Amendment claim can be used to support Plaintiffs' Fourteenth Amendment claim that Defendants violate their substantive due process rights be limiting their ability to practice their religion. The fact that Plaintiffs can be disciplined for exercising their religious beliefs in a safe, non-disruptive manner certainly involves a fundamental right (freedom of religion) and is conscience-shocking.

Plaintiffs have shown that the MSOP, through all of its policies and practices related to religious expression, substantially burdens Plaintiffs' and Class members' practice of their chosen religious beliefs. The MSOP has arbitrarily stopped letting some Plaintiffs use particular rooms for religious studies. *See* Doc. No. 724-2 (Pls.' Third Supp. Resps. to Defs.' First Set of Interrogs., at 108) (named Plaintiffs Karsjens and Lonergan, along with other Class members were denied the use of unit team rooms for regular religious studies that had been occurring for years); Doc. No. 757-17, Ex. 44 (Bolte Dep. at 23:3-10) (members of the Asatru religion, which is a nature based religion that requires an outside area for worship, is not provided with such an outdoor area). The MSOP also prohibits the wearing of certain clothing and jewelry that is important to Plaintiffs' and Class members' religious practice. *See, e.g.* Doc. No. 757-26, Ex. 79 (MSOP's Client Jewelry policy (302.253)); Doc. No. 725-1, Ex. 19 (MSOP's Client Hygiene/Dress Code policy (303.020)); Doc. No. 757-17, Ex. 44 (Bolte Dep. at 108:7-19); Doc. No. 757-23, Ex. 75 (Daywitt Dep. at 59:19-63); Doc. No. 742-9, Ex. 9 (Barber Dep. at 42:16-23).  The MSOP restricts the type of spiritual herbs allowed, which affects a number of religions. Doc. No. 757-23, Ex. 74 (DeVillion Dep. at 43:21-44:24). Defendants monitor Plaintiffs when they speak to clergy and religious volunteers, even though they have been screened by MSOP staff upon entry to the facility. Doc. No. 742-14, Ex. 14 (Braun Dep. at 70:3-10). If Plaintiffs do not follow the MSOP's policies restricting their religious practice, they are disciplined by being given a BER, which can affect treatment progress and other privileges. *See* Doc. No. 742-19, Ex. 19 (Foster Dep. at 10:10-11:6) (Plaintiff Mr. Foster received a BER for practicing his religion and having

his bible out in a group room). In general, this results in the MSOP being "a culturally hostile environment for employees and clients." Doc. No. 757-32, Ex. 102 (DEF01151410).

These policies and practices substantially burden Plaintiffs' ability to engage in their sincerely held religious beliefs and are not related to legitimate facility safety concerns or therapeutic interests. *See Ivey*, 2008 WL 4527792, at *10. In fact, Defendants point to no security or safety justifications for these policies and practices, instead merely asking the Court to assume that they have proper justification for limiting Plaintiffs' religious expression. Defendants' motion for summary judgment on Count VIII should be denied.

## ii.   Count IX- Violation of Plaintiffs' Rights to Freedom of Speech and Association

Plaintiffs also allege that their rights to freedom of speech and association have been violated. The right to free speech involves "the right to utter or print… the right to distribute, the right to receive, the right to read," as well as the freedom to exercise inquiry and thought. *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). Freedom of association involves "the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other means." *Id.* at 483. Although Plaintiffs admittedly have a lesser right to freedom of speech and association than members of free society, they maintain more rights than prisoners. *See Semler v. Ludeman et al.,* Civ. No. 09-0732 (ADM/SRN), 2010 WL 145275, at *15 (D. Minn. Jan. 8, 2010). Any policy that

limits freedom of speech association must be reasonably related to "legitimate therapeutic or institutional interests." *See Ivey*, 2008 WL 4527792 at *4, 10.

When all of the MSOP's policies and practices affecting Plaintiffs' freedom of speech and association are considered together, it is clear that the MSOP does not limit its restrictions to those that are necessary for therapeutic or security reasons. The MSOP opens all mail for all Plaintiffs. Doc. No. 725-1, Ex. 8 (MSOP Policy- Client Mail (302.030)). This results in delays to Plaintiffs of receiving their mail. Doc. No. 757-23, Ex. 74 (DeVillion Dep. at 59:21-60:13); Doc. No. 757-21, Ex. 54 (Steiner Dep. at 60:5-25). Defendants state that the purpose of this policy is to "prevent patient access to contraband." Defs' Br. at 29. However, Defendants' Expert admitted that most contraband comes in through MSOP staff. Doc. No. 757-13, Ex. 13 (Carabello Dep. at 86:9-20). Thus, any policies and practices involving opening Plaintiffs' mail is unrelated to any legitimate interest. Similarly, all outgoing Plaintiff mail is stamped with "secure treatment facility," which can interfere with outside interaction and serves no safety purpose as all mail is reviewed prior to leaving the facility. Doc. No. 757-23, Ex. 69 (Braun Dep. at 85:24-86:14); Doc. No. 725-1, Ex. 8 (MSOP Policy- Client Mail (302.030)). Thus, this policy is not related to facility safety.

As another example, the MSOP also restricts Plaintiffs' access to visitors by denying visiting requests, limiting visitors to only one Plaintiffs' visiting list, and discouraging visits by not allowing contact or sharing meals. *See, e.g.* Doc. No. 742-6, Ex. 6 (Hausfeld Dep. at 112:1-13); Doc. No. 757-17, Ex. 44 (Bolte Dep. at 85:15-87, 89:3-90:1:15); Doc. No. 742-17, Ex. 17 (DeVillion Dep. at 62:1-19); Doc. No. 757-26,

Ex. 81 (Manahl Dep. at 11:5-12:2); Doc. No. 755 (Steiner Decl.) at ¶39; Doc. No. 757-

23, Ex. 69 (Braun Dep. at 76:1-77:16, 100:21-25).  Defendants' brief offers no

justification at all for these policies, beyond the conclusory statement that they are

"designed to ensure safety and security…" Defs.' Br. at 18. The MSOP also limits access

to media and listens in on all phone conversations. Doc. No. 725-1, Ex. 17 (MSOP Client

Telephone Use Policy (302.210)); Doc. No. 745 (Braun Decl.) at ¶32; Doc. No. 725-1,

Ex. 17 (MSOP Media Policy (302.230)).

These policies and practices are examples of the MSOP's limitation on First

Amendment freedoms that are not reasonably related to legitimate therapeutic or

institutional interests. Counts VIII and IX should not be dismissed on summary judgment

because disputed material facts are present.

**B.    Count X- Violation of Plaintiffs' Rights to be Free From Unreasonable Searches and Seizures**

Count X of Plaintiffs' TAC alleges that Defendants violate Plaintiffs' rights to

be free from unreasonable searches and seizures through policies and practices that allow

for searches of Plaintiffs' physical selves or property. Whether a search or seizure is

reasonable turns on whether there is a legitimate governmental interest in carrying out the

search that outweighs the intrusion on privacy. *See Serna*, 567 F.3d at 949

(citing *Bell*, 441 U.S. 520). A search or seizure is not assumed to be reasonable simply

because it was conducted in an institution. *See Allan v. Ludeman*, Civ. No. 10-176

(ADM/JJK), 2011 WL 978768, at * 4 (D. Minn. Jan. 18, 2011), *report and*

*recommendation adopted,* Civ. No. 10-176 ADM JJK, 2011 WL 978658 (D. Minn. Mar.

17, 2011). The Eighth Circuit has held that involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches, analogous to the right retained by pretrial detainees. *See Serna*, 567 F.3d at 948.

The judgment of facility officials as to what policies and procedures are necessary for institutional safety and security should only be deferred to when the policies and procedures are necessary and justified. *See Beaulieu*, 690 F.3d at 1028-29 (citation omitted). Where "the record contains substantial evidence showing… policies are an unnecessary or unjustified response to problems of institutional security," the court need not defer to the judgment of the institution. *See Arnzen v. Palmer*, 713 F.3d 369, 373 (8th Cir. 2013) (quoting *Beaulieu*, 690 F.3d at 1029). When assessing the reasonableness of a challenged procedure, the availability of less intrusive measures should be considered. *See id.* at 373. If a search or seizure does not provide any immediate information that would protect patient or facility safety or prevent assaults or other dangerous acts, the state's safety justification is less persuasive. *See id.*; *cf.* Doc. No. 748 (Foster Decl.) at ¶¶19, 31. Furthermore, civilly committed persons retain the right to be free from bodily restraint except when, in the professional judgment of the facility, such restraint is necessary for safety. *See Beaulieu*, 690 F.3d at 1032 (citing *Youngberg*, 457 U.S. at 324); *cf.* Doc. No. 755 (Steiner Decl.) at ¶21.

It is clear that the MSOP's strip-search policy is not therapeutic. Doc. No. 757-21, Ex. 64 (White Dep. at 97:21-98:3); Doc. No. 757-3, Ex. 3 (Puffer Dep. at 273:9-12); Doc. No. 757-13, Ex. 13 (Carabello Dep. at 89:22-90:9). The Moose Lake Clinical Director admitted that, from a clinical perspective, not every Plaintiff leaving the secure perimeter

33

needs to be strip searched. Doc. No. 757-3, Ex. 3 (Puffer Dep. at 274:19-22). These

searches are conducted on every Plaintiffs exiting or entering the secure perimeter and is

not applied based on individual risk. If Plaintiffs refuse the strip search, they are not

allowed to attend the scheduled activity or appointment they were leaving the facility for.

Doc. No. 724-3, Ex. 19 (Jumper/Carabello Report at 8). This leaves Plaintiffs with little

choice but to submit to the search or miss, for example, a medical appointment. Plaintiffs

are also subject to an unclothed visual body search upon placement to HSA, regardless of

whether the individual has left the secure facility and regardless of whether there is

evidence to suggest the individual is hiding contraband. Doc. No. 725-1, Ex. 16 (MSOP

High Security Area Policy (301.0878)); Doc. No. 757-17, Ex. 44 (Bolte Dep. at 230:2-

18). Similarly, Plaintiffs are subject to pat searches at any time, regardless of suspicion or

individual risk. Doc. No. 725-1, Ex. 9 (MSOP Policy- Searches- Clients (301.010)); Doc.

No. 757-23, Ex. 69 (Braun Dep. at 93:23-94:4) ("You get [pat searched] coming out of

the Vocational Department and the shop, then you get them done out of the kitchen, you

get them done out of the visiting room, you get them done out of the craft room and rec,

and they can pat search you any time they deem they want to.").

The MSOP requires all Plaintiffs to be restrained when leaving the secure

perimeter of the MSOP. Doc. No. 725-1, Ex. 11 (MSOP Policy- Transports (301.090));

All patients are subject to restraint policy except for "maybe six" who have

waivers. Doc. No. 757-13, Ex. 20 (Zimmerman Dep. at 54:14-55:3); Doc. No. 757-17,

Ex. 39 (Moser Dep. at 76: 4-12); *cf.* Doc. No. 743 (Barber Decl.) at ¶43 (describing how

MSOP refuses to provide him with soft restraints for his regular medical transports even

though he has never made an escape attempt). The MSOP has made no effort to tailor this policy to individual risk. Doc. No. 757-13, Ex. 20 (Zimmerman at 58:22-59:11); Doc. No. 757-23, Ex. 72 (Rud Dep. at 77:9-78:19). The MSOP has admitted that the use of handcuffs, black box, and leg shackles during transport is not the least restrictive way to manage a person. Doc. No. 757-14, Ex. 23 (Berg Dep. at 212:18-213:17).

The MSOP conducts random room searches as part of their strategy for controlling contraband items in the facility as well as to verify compliance with property limits. Doc. No. 724-3, Ex. 19 (Jumper/Carabello Report at 8); Doc. No. 757-17, Ex. 44 (Bolte Dep. at 119:15-120:7) (MSOP opens storage bins for "hooch checks" in all rooms every day); Doc. No. 757-23, Ex. 72 (Rud Dep. at 76:22-77:6) (MSOP security does "window checks" of Plaintiffs' rooms every day even though the windows are only 5 inches wide and about 4 feet tall); Doc. No. 757-17, Ex. 45 (Lonergan Dep. At 129:16-130:11); Doc. No. 757-23, Ex. 67 (Karsjens Dep. at 121:17-25).

None of the cases cited by Defendants relating to decisions regarding specific search and seizure policies at the MSOP addressed whether the policies were appropriately applied to all MSOP patients or whether application on an individual basis would be less restrictive. *See e.g. Daniels v. Jesson*, Civ. No. 13-736 (JNE/SER), 2014 WL 3629874, *6 (D. Minn. July 22, 2014); *Semler*, 2010 WL 145275 at *16-17; *Beaulieu*, 690 F.3d at 1026-34. Considering all of the MSOP's search policies together, it is apparent that Defendants do not take less intrusive measures into consideration, nor are all of these policies necessary for the safety of the facility. For example, random room searches are done without any regard to probable cause or suspicion, rendering them

unrelated to legitimate security concerns. *See Arnzen*, 713 F.3d at 373. Similarly,

unclothed visual body searches and pat searches are performed without any consideration

of individual risk or probably cause, and thus not related to legitimate security issues. *Id.*

Count X should not be dismissed on summary judgment because disputed material facts

are present.

<u>**CONCLUSION**</u>

Following a full analysis based on the facts presented at trial, the Court should rule

in Plaintiffs' favor on Counts III, V, VI and VII. Additionally, Defendants' motion for

summary judgment on Counts VIII, IX, and X should be denied because there are

genuine issues of material fact. Finally, Defendants' request that the Court revisit its

decision regarding the Rule 706 Experts' costs should be denied.


Dated:  January 12, 2018                    s/Daniel E. Gustafson_____
                                            Daniel E. Gustafson (#202241)
                                            Karla M. Gluek (#238399)
                                            David A. Goodwin (#386715)
                                            Raina C. Borrelli (#392127)
                                            **Gustafson Gluek PLLC**
                                            Canadian Pacific Plaza
                                            120 South Sixth Street, Suite 2600
                                            Minneapolis, MN  55402
                                            Telephone:  (612) 333-8844

                                            ***Attorneys for Plaintiffs***