UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Scott Karsjens, et al.,

Plaintiffs,

vs.

Jodi Harpstead, et al.,

Defendants.

Civil File No. 11-cv-3659 (DWF/TNL)

**DEFENDANTS' SECOND
SUPPLEMENTAL BRIEF
ON COUNTS V, VI, AND VII**

### INTRODUCTION

As Plaintiffs have admitted since trial, the record contains no evidence that the conditions of confinement at MSOP are unconstitutionally punitive. Instead, the record shows those conditions—whether the physical structure of MSOP's facilities or its governing policies—uniformly meet or exceed the standard at other civil commitment facilities, are related to legitimate security, therapeutic, and other governmental interests, and are not excessive in relation to those interests. In addition, Plaintiffs have no evidence of inadequate medical care at MSOP. The Court should dismiss Counts V-VII and close this case.

### FACTUAL BACKGROUND RELEVANT TO COUNTS V, VI, AND VII

As the Court knows, and as the parties have previously discussed (*see* Doc. 1160, pp. 11-12), the Eighth Circuit directed that the conditions of confinement claims contained in Counts V-VII be evaluated under the standard for punitive conditions applied in *Bell v. Wolfish*, 441 U.S. 520 (1979) and that Plaintiffs' claim for inadequate medical care be

evaluated under the deliberate indifference standard in *Senty-Haugen v. Goodno*, 462 F.3d 876 (8th Cir. 2006). *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021). Plaintiffs' claims under each count are as follows.

Count V alleges that MSOP is punitive because Plaintiffs: (1) "are double bunked in wet cells in a facility modeled after a prison"; (2) "do not have a reasonable grievance procedure to use when they are punished with BERs because the hearing board is made up of MSOP employees and any appeals are heard by the MSOP facility director"; (3) "are punished by having their rights to access activities and areas of the facility limited or completely taken away or by being placed in protective isolation in the HSA"; (4) "are not allowed to possess certain property and the grievance procedure for confiscated property leaves Plaintiffs and Class members no reasonable way to challenge the confiscation because by the time their grievance is heard, the property will have been destroyed"; (5) "are denied access to group therapy"; (6) have their "furniture . . . removed as punishment for alleged rule violations"; (7) are punished "by taking away their employment options"; and (8) are subject to random searches of their "persons, property, and cells," and "are placed in shackles and black boxes anytime they leave the secure facility." Doc. 635, pp. 68-69 ¶¶ 273-79.

Count VI alleges that MSOP: (1) "does not provide a less restrictive alternative to confinement at a MSOP secure facility" and (2) that "if a Plaintiff or Class member no longer meets the statutory requirements for civil commitment, there is no less restrictive facility or program for them to enter." *Id*. at 71 ¶ 288.

Aside from a duplicative allegation about "double-bunking," Count VII alleges Plaintiffs: (1) "have their rights restricted for minor violations of MSOP facility rules" and "are subject to arbitrary discipline and decision-making by MSOP staff"; (2) "receive inadequate meals"; and (3) are "subject to inadequate medical treatment that has resulted in injury to Plaintiffs and Class members." *Id*. at 73 ¶ 294.

## I.    PLAINTIFFS HAVE REPEATEDLY ACKNOWLEDGED THEY DID NOT PROVE, AND ACCORDINGLY ABANDONED, THEIR CONDITIONS OF CONFINEMENT CLAIMS.

Plaintiffs have repeatedly acknowledged that the record contains no evidence supporting their conditions of confinement claims in Counts V-VII, and that they at some point chose not to pursue them.  Indeed, Plaintiffs abandoned these claims as early as trial—even when Plaintiffs thought conditions at MSOP had to comply with strict scrutiny, a much more demanding standard for Defendants than *Bell*—and thereafter continued to note their abandonment of the TAC's conditions claims.

First, Plaintiffs admitted at trial that they wanted relief only for release-related claims, and that in challenging MSOP's alleged punitiveness they "[did not] mean the physical setting."  Tr. 3161.  Instead, Plaintiffs challenged MSOP as "prison-like" on the release-related grounds now disposed of in Counts I and II, meaning "in the sense that we can take away your liberty just because you violated the law." *Id*.  Plaintiffs then said that the "program that doesn't have the proper checks and balances and doesn't have the proper constitutional safeguards"—a theory the Eighth Circuit ultimately rejected in *Karsjens I*— and that the conditions of confinement could at most "add to that punitive aspect." Tr. 3161-62.  Overall, Plaintiffs admitted that "[t]here is not evidence to support the notion

3

that double bunking or the mail policy or the listening to the phone policy, those policies in isolation could not support a claim that this program is punitive," acknowledging after their case-in-chief that 706 Expert Deb McCulloch "testified that those policies in isolation cannot support a punitive finding and [Plaintiffs] don't dispute that."  Tr. 3162.

Second, Plaintiffs reiterated in their recent motion to amend that the record does not contain evidence supporting their conditions of confinement claims.  They admitted that they did not put on evidence at trial substantiating their conditions claims:  Plaintiffs "did not try Counts V and VII as they are pleaded in the Third Amended Complaint, where the focus within the allegations specific to those counts is on conditions of confinement such as double-bunking, property policies, and other facility policies."  Doc. 1154, p. 7 (citing Doc. 635 at ¶¶ 269-97).  Consistent with the comments at trial referenced above, Plaintiffs stated that they instead "put in evidence that the MSOP is punitive because Defendants operate it in such a way as to continue the confinement of Plaintiffs and the Class beyond the time that the legitimate goals of public safety and treatment are served"—meaning, again, that Plaintiffs' advanced a release-related theory ultimately disposed of in Counts I and II, not a conditions-based theory.  Doc. 1154, p. 7.

## II.  EVIDENCE RELATING TO PLAINTIFFS' CONDITIONS OF CONFINEMENT CLAIMS IN COUNTS V-VII.

### A.    Double-Occupancy Rooms.

The 706 Experts testified that MSOP's double-occupancy rooms are "adequate given the operational need for double bunking and the facility has provided creative space saving storage for its clients."  PX 225, at 51.  Ms. McCulloch testified that other programs

4

utilize double-occupancy rooms, and that MSOP's use of double-occupancy rooms is appropriately managed. Tr. 381. Dr. Wilson also testified MSOP's rooms are superior to those in Florida's program where he was previously Clinical Director. Tr. 443, 620-22. Dr. James Haaven, who performed evaluations of MSOP, as well as 706 Experts Ms. McCulloch and Dr. Miner, also testified that MSOP's rooms are standard at civil commitment facilities and favorable compared to some. Doc. 919, pp. 9, 240 (Haaven); T. 380-81 (McCulloch) 620-22 (Wilson).

**B.     The BER Grievance Procedure.**

The 706 Experts expressed no concern with the appeal process for BERs, which MSOP's witnesses testified serves to provide due process to clients and a multi-layered appeal process. DX 48, 49. The record contains no evidence of bias or any inappropriate decision-making by the individuals tasked with deciding BER appeals.

**C.     HSA And Access To Areas Of MSOP Facilities.**

The undisputed evidence shows that HSA is used for a short period of time to safeguard the security and safety of MSOP facilities by controlling rule-breaking behavior that has not responded to less restrictive interventions, and for clients on Administrative Restriction Status, Protective Isolation Status, or Levels of Observation. DX 50; Tr. 3327-30. HSA placements are reviewed by staff both during and after the placement, and discontinued when the criteria justifying the HSA placement are no longer met. *Id*. To the extent this claim otherwise challenges client movement, Ms. McCulloch had no concerns about MSOP's client movement policy. Tr. 321.

5

### D.    The Property Policy And Grievance Procedure.

The 706 Experts raised no concerns with MSOP's property policy.  PX 225, p. 57. The record reflects it is in place to maintain a therapeutic and safe environment by controlling contraband.  DX 54-56.  The record contains no evidence substantiating that MSOP's property policy disposes of property before a grievance can be heard.

### E.    Access To Group Therapy.

The record contains no evidence substantiating that MSOP fails to provide access to group therapy; to the contrary, the record shows MSOP provides clients group therapy as part of a treatment design "consistent with general thinking in the literature and practice regarding treatment for people who have sexually offended."  PX 225, pp. 27-28; *see also*, *e.g.*, Doc. 919, pp. 53-54, 64 (Haaven).

### F.    Furniture Removal.

The record contains no evidence substantiating that furniture is removed as punishment for alleged rule violations.

### G.    Employment Options.

The record reflects that by tying vocational access and hours to rule compliance and treatment engagement, this program serves therapeutic and security interests by incentivizing rule compliance and treatment engagement.  DX 11.  The 706 Experts were impressed by the vocational opportunities at MSOP's facilities.  PX 225, pp. 42, 45, 52, and noted that vocational programming is part of sex offender treatment.  Tr. 603, 850.

**H.      Searches And Seizures.**

The record reflects MSOP's search and restraints policies are in place for security reasons.   DX 44-47.   The 706 Experts, including Ms. McCulloch, Dr. Freeman, and Dr. Miner, testified they had no concerns about MSOP's search, transport, and restraint policies.  Tr. 305, 307-11, 876-88, 1127-29.

**I.      Restriction Of Rights For Minor Violations Of MSOP Facility Rules And Arbitrary Discipline And Decision-Making.**

These claims appear to challenge MSOP's BER policy, but Plaintiffs put on no evidence that the BER system disciplines MSOP clients for unconstitutionally "arbitrary" or "minor" reasons, and the record instead reflects that the BER system serves security interests at MSOP and has therapeutic benefit by shaping prosocial behavior and allowing MSOP to operate an effective treatment facility.  Tr. 3322, 3326.   Ms. McCulloch also acknowledged MSOP's BER policies and process do not materially differ from policies at other facilities.   Tr. 311-13.   Under MSOP policy, any disciplinary restriction must be reasonably related to the nature of the behavior; in proportion to the severity of the violation and to the rule's importance to the order, safety, and security of the treatment program; and take into consideration the client's past behavior while in the program, the client's treatment needs, and his or her current phase in treatment.  DX 48, p. 3; Tr. 3322.  Thus, MSOP takes an individualized approach to determining any restrictions.  Tr. 3322.

MSOP's Executive Clinical Director, Jannine Hébert, discussed how MSOP's BER policy intersects with sex offender treatment.   Risk factors for sexual recidivism are categorized into two groups:  one being sexual deviancy, the other being antisociality.

7

Tr. 4073. Antisocial attitudes, beliefs, or trains increase the likelihood of recidivism. *Id.* MSOP needs markers to gauge how someone's antisociality is manifesting itself, and rule-breaking behavior is akin to antisociality. *Id.* Further, sex offender recidivism research shows that one dynamic risk factor includes "adherence to rules and supervision." *Id.* All rule-breaking, therefore, is treatment related because it all plays into one's risk for recidivism. Tr. 4073–74. Addressing rule breaking behaviors is clinically indicated and research shows rule compliance is a very important treatment target to look at. Tr. 4075. And although major BERs can impact a client's progression in treatment, the impact of BERs on phase progression is an individualized determination and can be waived or overridden. Tr. 4076.

### J.    Inadequate Meals.

Count VII alleges that Plaintiffs "receive inadequate meals." Doc. 635, p. 73 ¶ 294. The record contains no evidence substantiating this, and instead shows clients have access to MSOP's food service and additional canteen items. Tr. 136, 191, 3308. The 706 Experts noted the cafeteria offerings at MSOP were "consistent with most institutional food, but . . . nonetheless quite palatable." PX 225, p. 51.

### K.    Less Restrictive Alternatives.

The trial record is full of indisputable evidence that MSOP provides less restrictive alternatives. MSOP established CPS, which is indisputably "a less restrictive alternative to confinement at a MSOP secure facility." Tr. 3308; PX 225, at 64. CPS is also a "less restrictive facility or program," and provisional discharge is also available to civilly

committed clients who meet particular statutory criteria. *See* Minn. Stat. § 253D.30. In any event, the record shows that MSOP offers a wide continuum of facilities for different security needs, from Moose Lake to CPS and provisional discharge locations. Tr. 4520–21. The 706 Experts extensively praised CPS' facilities as "comparatively outstanding," its on-grounds access, vocational opportunities, and community-based opportunities as "superior to any sexual offender civil commitment . . . program of which the Panel is aware," and CPS overall as containing "innovative programming and a therapeutic environment that should be the envy of other [sex offender civil commitment] programs." PX 225, pp. 45-46.

## L.    Conditions As A Whole.

Finally, the record reflects positively on MSOP's conditions as a whole. Ms. McCulloch, to whom the other 706 Experts deferred on policy questions, reviewed all the program's policies and had no concerns about them. Tr. 304–11, 321–26. Aside from the 706 Experts' praise of CPS referenced above, Ms. McCulloch described Moose Lake's physical structure and amenities as "either fine or exceed[ing] what other facilities are," Tr. 139, and the 706 Experts' Report noted the "extensive space and opportunities that many SOCC facilities do not have, including several large outdoor spaces for recreation and other outdoor activity." PX 225, pp. 51-52. The 706 Experts also opined that the secure facilities in St. Peter are adequate, including group space, social gathering space with TVs, other entertainment equipment and supplies for leisure activities, comfortable furniture, plants, other home-like amenities, and vocational, recreation, and library

9

services.  *Id*. at 43.  Plaintiffs did not contradict this testimony, especially because their purported experts did not visit any MSOP facilities.  Tr. 2189, 2421, 2482.

### III.    EVIDENCE RELATING TO PLAINTIFFS' CLAIM FOR INADEQUATE MEDICAL TREATMENT IN COUNT V.

Plaintiffs put on no evidence that any MSOP provided inadequate medical treatment on either an individual or program-wide basis.

## ARGUMENT

### I.    THE PORTIONS OF COUNTS V-VII GOVERNED BY THE *BELL* STANDARD SHOULD BE DISMISSED.

All of the conditions of confinement claims in Counts V-VII should be dismissed.

### A.    Legal Standard.

As noted, *Karsjens II* requires application of the *Bell* standard to Plaintiffs' conditions of confinement claims.  988 F.3d at 1053.  As *Bell* explains, whether a disability constitutes punishment in the constitutional sense turns on whether it is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  441 U.S. at 538.  In the absence of an "expressed intent to punish . . . that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"  *Id*. (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 167 (1963)).  Overall, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  *Id*. at 539; *see also id*. (noting that a

10

condition "is not reasonably related to a legitimate goal" when it is "arbitrary or purposeless.").

Bell recognizes the existence of a wide range of legitimate governmental objectives in administering a detention facility. While recognizing the legitimacy in the pretrial detention context of ensuring detainee presence at trial, Bell sets forth numerous other legitimate interests like the "need to manage the facility in which the individual is detained," including "tak[ing] steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." Id. at 539-40; see also id. at 540 ("We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.").

Bell also reserves significant discretion for officials operating a detention facility to institute policies in service of legitimate governmental objectives. It requires courts to "be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Id. at 539. It specifically notes that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" and that administrators "should be accorded wide-ranging deference in the adoption and execution

11

of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547; *see also id.* at 562 (warning of the "natural tendency to believe that [one's] individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination."). Finally, deference to facility officials is not simply a matter of expertise, but of respect for the constitutional order:

> judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.

*Id.*; *see also id.* at 562 ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.").

In its discussion of governing precedent in the pretrial detention context, *Karsjens II* illustrates the deference properly extended to officials like Defendants. For instance, the Eighth Circuit held in *Smith v. Copeland* that placing a pretrial detainee in solitary confinement for four days without clothing, bedding, or blankets did not violate *Bell* because defendants "submitted affidavits stating that their actions were both provoked and justified and that there are penological reasons for denying a pretrial detainee bedding and clothing in solitary confinement." 87 F.3d 265, 267 (8th Cir. 1996). *Smith* also held that "allegations regarding 'raw sewage' [did] not rise to a level of constitutional significance"

where the plaintiff alleged he "was 'made to endure the stench of [his] own feces and urine'" for four days due to an overflowed toilet in the isolation cell, but did not become sick and "was offered an opportunity to flush the toilet and to clean up the mess but he declined." *Id*. at 268. Similarly, in *Green v. Baron*, the Eighth Circuit held a jury could conclude a "behavioral modification program based on a deprivation and reward framework" was not punitive where the plaintiff was initially allowed no clothing but his underwear, given no bedding, and allowed only cold meals. 879 F.2d 305, 307 (8th Cir. 1989).

By contrast, conditions that violate *Bell* are both extreme and unnecessary for accomplishment of a legitimate government goal. For example, as cited in *Karsjens II*, the Eighth Circuit denied qualified immunity to a defendant who transported a pretrial detainee for about 90 minutes in a "dog cage . . . approximately three and a half feet wide, three feet tall, and three feet deep [and] littered with animal hair and dried dog urine and feces," "with no compelling urgency and other options available." *Morris v. Zefferi*, 601 F.3d 805, 807, 811 (8th Cir. 2010). In another case, the Eighth Circuit held a jury could find a *Bell* violation where a pretrial detainee was held "in a barred cell measuring six feet by six feet with a small window, a combination toilet-sink and a light bulb," was "regularly confined in this cell for seventy-two hour periods without opportunity for exercise or showers," was allowed out "for only fifteen minutes and then he was only allowed to walk up and down his cell corridor or shower," and was "forced to eat his meals in his cell which was infested with insects and housed rodents." *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981).

*Karsjens II*'s other illustrative citations involve similarly extreme and purposeless conditions. *See Campbell v. Cauthron*, 623 F.2d 503, 506 (8th Cir. 1980) (holding jail conditions punitive where pretrial detainees' cells were so small they could "do little but sit or lie on their bunks," and were "ordinarily kept locked in their cells twenty-four hours per day, including meal times," being "released only three times per week for fifteen to thirty minutes for showers and exercise.").

Finally, in addition to proving the challenged conditions violate *Bell*, Plaintiffs chose to proceed as a class suing only Defendants in their official capacities. Plaintiffs' official-capacity claims require them to prove that it was an official policy or custom, and not some failure of implementation, that caused their concrete constitutional harms. *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987). Plaintiffs must show a generally applicable "policy" or "persistent, widespread pattern of unconstitutional conduct" specifically harming them and applicable to the entire class. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1999). In addition, as with any class under Rule 23(b)(2), Plaintiffs must show any violation is "widespread enough to justify systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 359 (1996); *see also Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977) ("only if there has been a systemwide impact may there be a systemwide remedy.").[1]

---

[1] These requirements also apply to Plaintiffs' claim for inadequate medical treatment, discussed further below. *See infra* at 24-25.

14

**B.**     **The Court Should Dismiss The Claims In Count V.**

All the claims in Count V merit dismissal under the *Bell* test.

    **i.**     **The Court should dismiss Plaintiffs' double occupancy claim.**

Courts have repeatedly held double occupancy rooms constitutional in both pretrial and civil commitment facilities, including at MSOP.   *Bell* itself considered double occupancy and disagreed "that that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment."   441 U.S. at 542.   *Bell* held, in the context of a pretrial detention facility, that "nothing even approaching" hardship sufficient to constitute punishment was shown where detainees were required to spend seven to eight hours a day in their double occupancy rooms, the rooms provided adequate space for sleeping, and the detainees were "free to move between their rooms and the common area" the remainder of the time.   *Id.*   In *Beaulieu v. Ludeman*, the Eighth Circuit upheld MSOP's double occupancy rooms at both a former temporary complex with rooms not designed for double occupancy, and at a facility with rooms designed for double occupancy.   690 F.3d 1017, 1043 (8th Cir. 2012); s*ee also Aune v. Ludeman*, Civ. No. 09-cv-0015 (JNE/SRN), 2010 WL 145276, at *6 (D. Minn. Jan. 8, 2010) ("there is no evidence that the double-bunking practice utilized by the MSOP is punitive."); *Miles v. Johnson-Piper*, No. 19-CV-1078 (WMW/KMM), 2020 WL 1330028, at *3 (D. Minn. Mar. 23, 2020), *aff'd sub nom.   Miles v. Piper*, 831 F. App'x 220 (8th Cir. 2020) ("It is well settled that double-bunking is not a constitutional violation.").

The evidence at trial also established that there is nothing punitive about double-occupancy rooms. The 706 Experts noted the operational need for double occupancy rooms and concluded MSOP's rooms are adequate, and Ms. McCulloch, Dr. Miner, and Dr. Haaven also testified that MSOP's rooms are standard at civil commitment facilities and favorable compared to some. S*ee supra* at 4-5.

### ii.    The BER grievance procedure.

Defendants know of no authority for the proposition that a civil committee or pretrial detainee is entitled, under *Bell*, to appeal internal disciplinary decisions to some sort of external decision-maker. To the contrary, Defendants' BER procedure, including the appeals process to the facility director or executive director, serves the legitimate governmental interests of shaping prosocial behavior while providing adequate procedural protections. DX 48, p. 1. Plaintiffs have no evidence of any bias or unfairness in BER appeal decisions, much less "widespread" biased results. *See Lewis*, 518 U.S. at 359. Indeed, in response to a similar challenge, the Eighth Circuit has recognized that "[MSOP] staff have a substantial interest in providing efficient procedures to address security issues." *Senty-Haugen*, 462 F.3d at 887.

### iii.    HSA and access to areas of the MSOP facility.

MSOP's HSA policy and use is appropriate and the product of professional judgment related to therapy, safety, and security. As noted, MSOP uses HSA to control behavior that has not responded to less restrictive interventions and for clients on Administrative Restriction Status, Protective Isolation Status, or Levels of Observation,

clients are only in the HSA for as long as is necessary, and are afforded timely reviews of their placement, including by clinical staff. *See supra* at 5. The record contains no evidence that Defendants' HSA policy is unconstitutionally punitive, much less that any unconstitutionality in the policy's application has been widespread, as required for class relief. *Lewis*, 518 U.S. at 359.

In addition, this Court has held that MSOP's use of HSA does not categorically violate the constitution. *Larson v. Jesson*, No. CV 11-2247 (PAM/LIB), 2018 WL 3352926, at *5 (D. Minn. July 9, 2018) ("placement in administrative segregation is not a constitutional deprivation actionable under § 1983."); *Benson v. Harpstead*, No. CV 17-266 (DWF/TNL), 2021 WL 2852046, at *2 (D. Minn. July 8, 2021) ("As noted above, Benson's only claim analogous to the punitive conditions of confinement claims in *Karsjens* is his Fourteenth Amendment due process claim based on his HSA placements. Importantly, Magistrate Judge Leung already addressed this claim under the *Bell* standard and dismissed it because he found that the placements were reasonably related to the legitimate governmental interest of maintaining security and order at the MSOP . . . the recent *Karsjens* decision has no impact on the Judgment in this case.").

### iv.    The property grievance procedure.

Plaintiffs do not appear to have put on any evidence that MSOP disposed of any client's confiscated property before the conclusion of a related grievance procedure, much less on the widespread basis necessary for class relief. *Lewis*, 518 U.S. at 359. The record shows MSOP's property policy serves both therapeutic and security interests, and

Ms. McCulloch actually testified that it should be more restrictive. *See supra* at 6. This claim should be dismissed under the *Bell* test.

### v.    Access to group therapy.

Plaintiffs presented no evidence MSOP denies access to group therapy at all, much less on a widespread basis. *Lewis*, 518 U.S. at 359. The record shows MSOP provides group therapy as part of treatment delivery consistent with professional standards. *See supra* at 6. To the extent Plaintiffs simply mean to challenge the quality of MSOP's treatment program, the Eighth Circuit dismissed Count III's allegation of inadequate treatment. *Karsjens II*, 988 F.3d at 1054.

### vi.    Furniture removal.

Plaintiffs presented no evidence about furniture removal, and there is no basis on which to conclude that MSOP's furniture situation is somehow punitive.

### vii.    Employment options.

This claim appears to refer to MSOP's vocational work program, which the record shows offers extensive, more-than-adequate work opportunities to MSOP clients. *See supra* at 6. The record reflects that by tying vocational access and hours to rule compliance and treatment engagement, the vocational program serves therapeutic and security interests by incentivizing rule compliance and treatment engagement, making it obviously compliant with *Bell*. *Id.*; *see also Gamble v. Minnesota State-Operated Servs.*, No. CV 16-2720 (JRT/KMM), 2021 WL 2686094, at *2, 7 (D. Minn. June 30, 2021) (MSOP's vocational program "incentivize[s] detainee participation in sex-offender

treatment" and "Minnesota law explains that the [vocational work program] is part of sex-offender treatment.").  Defendants know of no authority that MSOP must operate a vocational program at all, much less that it violates the constitution by utilizing it as described above.

### viii.    Searches and seizures.

As an initial matter, this claim must be dismissed because it advances Fourth Amendment claims, not substantive due process claims.  Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" such a claim.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In addition, Plaintiffs already brought a Fourth Amendment claim in this case that included these allegations, the Court dismissed it, and Plaintiffs did not appeal.  Doc. 1108, pp. 35-38; Doc. 1118, p. 2.  Finally, the Court has already held MSOP's search and seizure policies to be a reasonable response to legitimate problems of institutional security.  Doc. 1108, pp. 35-38, and there is no evidence to the contrary, which also mandates dismissal of this claim.  *See supra* at 7; *see also Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) ("The law of the case doctrine provides that a court's decision on legal issues should govern the same issues in later stages of the same case.").

### C.    The Court Should Dismiss The Claims In Count VI.

#### i.    *Karsjens I* mandates dismissal of Count VI both as binding precedent and under the law of the case doctrine.

First, Count VI must be dismissed because it duplicates the "less restrictive alternative" claims from Counts I and II that the Eighth Circuit already disposed of in *Karsjens v. Piper*, 845 F.3d 394 (8th Cir. 2017) ("*Karsjens I*").  *See* Doc. 1160, pp. 2-8 (discussing and comparing the "less restrictive alternative" claims in Counts I, II, and VI, and the Eighth Circuit's dismissal of those claims in Counts I and II); *see also* Doc. 914, at 20 (Plaintiffs stating in their closing argument that "Count II and Count VI allege that Defendants' failure to provide less restrictive alternative confinement options violate the Fourteenth Amendment, and thus renders Minn. Stat. 253D unconstitutional as applied."). Nothing about *Karsjens II* overruled *Karsjens I*'s determinations on any subject, including this one.  Accordingly, under both the law of the case and binding precedent, substantive due process does not require Defendants to provide less restrictive environments tailored to each client's security needs, whether at initial commitment or thereafter.  *Karsjens*, 845 F.3d at 409-11; *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Hum. Servs.*, 364 F.3d 925, 931 (8th Cir. 2004) ("It is well settled that when a matter is decided by [the Eighth Circuit], it becomes the law of the case; the district court is not free on remand to reconsider any question finally disposed of by the court of appeals.").

#### ii.    This Count rests on indisputably incorrect factual allegations.

Second, as noted, the record simply does not substantiate Count VI's allegations. MSOP established CPS, which is indisputably "a less restrictive alternative to confinement

at a MSOP secure facility." *See supra* at 8-9. While Defendants do not understand precisely what Plaintiffs mean by clients who "no longer meet[] the statutory requirements for civil commitment," Doc. 635, pp. 70-71 ¶ 288, CPS is again a "less restrictive facility or program," and provisional discharge is also available to civilly committed clients who meet particular statutory criteria. *See* Minn. Stat. § 253D.30.

> ### iii. In any event, civilly committed sex offenders have no substantive due process right to a setting customized to their precise level of security needs as a general matter or under *Bell*, and there is no evidence the broad continuum of facilities available to Plaintiffs is punitive.

The Eighth Circuit and numerous other courts of appeal have held there is no right to the least restrictive alternative, either under *Bell* or tests consistent with the *Bell* "reasonable relationship" test. In the context of restraints, the Eighth Circuit held that "[n]othing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available" after noting that "'whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus non-punitive distinction, the outcome is the same." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1032 (8th Cir. 2012); *see also Valdez v. Rosenbaum*, 302 F.3d 1039, 1046 (9th Cir.2002) ("A reasonable relationship between the governmental interest and the challenged restriction does not require . . . showing a 'least restrictive alternative.'" (citation omitted)). *Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 (5th Cir. 1987); *Soc'y for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1248-49 (2d Cir. 1984); *Phillips v. Thompson*, 715 F.2d 365, 367-68 (7th Cir. 1983).

In any event, MSOP offers a wide continuum of facilities, from Moose Lake (which itself contains various security levels), to the facilities within the secure perimeter in St. Peter, to CPS, to provisional discharge locations. *See supra* at 8-9. This claim has no merit under either *Karsjens I* or *Bell*.

### D. The Court Should Dismiss The Conditions Of Confinement Claims In Count VII.

All the claims in Count VII to which *Bell* applies merit dismissal under that standard.

#### i. Count VII's double occupancy claim is redundant.

Count VII duplicates Count V's claim about double-occupancy rooms and should be dismissed for the same reasons. *See supra* at 15-16.

#### ii. The Court should dismiss Count VII's claim alleging restriction of rights for minor violations of MSOP facility rules and arbitrary discipline and decision-making by MSOP staff.

While not entirely clear, these claims in Count VII appear to challenge MSOP's BER system. Plaintiffs put on no evidence that the BER system disciplines MSOP clients for unconstitutionally "arbitrary" or "minor" reasons, and the record instead reflects that the BER system serves security interests at MSOP and has therapeutic benefit by shaping prosocial behavior. *See supra* at 7-8. Ms. McCulloch also acknowledged MSOP's BER policies and process do not materially differ from policies at other facilities. *Id.* To the extent Plaintiffs complained of specific BERs or instances of discretionary discipline they thought were unfounded, they put on no evidence of any widespread discipline not

connected with a legitimate government interest. *See Lewis*, 518 U.S. at 359. These claims should be dismissed under *Bell*.

### iii. The Court should dismiss Count VII's claim of inadequate meals.

Plaintiffs put on no evidence of inadequate meals. The record reflects no deficiencies in the food available at MSOP, including the MSOP-provided diet, the food available through the canteen, or other food available at CPS. *See supra* at 8. This claim should be dismissed.

### E. There is No Evidence The Totality Of The Conditions Of Confinement Challenged In Counts V-VII Are Unconstitutionally Punitive.

As discussed above, Plaintiffs have no evidence that any of the challenged conditions at MSOP lack a connection to a legitimate government purpose, or are excessive to that purpose, within the meaning of the deferential *Bell* standard. To the extent Plaintiffs intend to claim that those conditions as a whole somehow become punitive within the meaning of *Bell* when aggregated, that is also not supported by the record. To the contrary, as discussed above, the 706 Experts testified overall that there is nothing unusual about the conditions at MSOP's facilities; indeed, to the extent they noted MSOP's facilities and policies as outliers, they praised Moose Lake as having the appearance and feel of a community college and being either fine or exceeding comparable facilities, and CPS as a location that should be the envy of other civil commitment programs. *See supra* at 9-10. All of Plaintiffs' conditions of confinement claims should be dismissed.

23

## II.    THE COURT SHOULD DISMISS THE CLAIM FOR INADEQUATE MEDICAL TREATMENT IN COUNT VII.

### A.    Legal Standard.

As the Eighth Circuit stated in *Karsjens II*, this claim is governed by the "deliberate indifference" standard contained in *Senty-Haugen*, 462 F.3d at 889-90. *Karsjens II*, 988 F.3d at 1051. Under that standard, Plaintiffs "must show 'deliberate indifference' to a 'serious illness or injury.'" *Senty-Haugen*, 462 F.3d at 889 (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "Deliberate indifference is a higher standard than gross negligence, and [a plaintiff] must prove that officials knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries." *Id*. at 890 (internal citations omitted).

Such a deliberate indifference claim requires a plaintiff to make a significant showing. "Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Further, when a plaintiff "alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect." *Id*. No deliberate indifference is shown when medical professionals make "efforts to cure the problem in a reasonable and sensible manner," even if those efforts are not successful. *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997).

### B.    This Claim Lacks Merit.

The record simply contains no evidence of inadequate medical treatment resulting in injury to any MSOP client; consistent with their abandonment of their conditions claims

at trial, it does not appear that Plaintiffs even attempted to prove this claim. Even some such evidence would not entitle Plaintiffs to relief, however, given this case's class certification: in a class action like this one under Fed. R. Civ. P. 23(b)(2), Plaintiffs must show any violation is "widespread enough to justify systemwide relief." *Lewis*, 518 U.S. at 359; *see also Brinkman*, 433 U.S. at 420 ("only if there has been a systemwide impact may there be a systemwide remedy."). For systemwide relief, there must be proof that the law has been violated as to all persons subject to the challenged system, not just general allegations some unknown persons may have been harmed. *Lewis*, 518 U.S. at 360. This claim should be dismissed.

## CONCLUSION

Based on the foregoing authorities and reasoning, Defendants ask that the Court dismiss Plaintiffs' remaining claims with prejudice.

Dated: August 13, 2021.                    Respectfully submitted,

                                           KEITH ELLISON
                                           Attorney General
                                           State of Minnesota

                                           **s/ Aaron Winter**
                                           AARON WINTER
                                           Assistant Attorney General
                                           Atty. Reg. No. 0390914
                                           aaron.winter@ag.state.mn.us

                                           SCOTT H. IKEDA
                                           Assistant Attorney General
                                           Atty. Reg. No. 0386771
                                           scott.ikeda@ag.state.mn.us

BRANDON BOESE
Assistant Attorney General
Atty. Reg. No. 0396385
brandon.boese@ag.state.mn.us

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1453 (Voice)
(651) 282-5832 (Fax)

*Attorneys for Defendants*

|#5020591