UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Scott Karsjens, et al.,                                    Civil File No. 11-cv-3659 (DWF/TNL)

Plaintiffs,

vs.                                              **[PROPOSED] FINDINGS OF FACT,**
**CONCLUSIONS OF LAW, AND ORDER**

Jodi Harpstead, et al.,

Defendants.

## INTRODUCTION

Plaintiffs are individuals residing at the Minnesota Sex Offender Program ("MSOP") who are civilly committed under Minnesota Statute § 253D, the Minnesota Civil Commitment and Treatment Act ("MCTA"). The fourteen named Plaintiffs represent a class certified under Federal Rule of Civil Procedure 23(b)(2), consisting of "[a]ll patients currently civilly committed to [MSOP] pursuant to Minn. Stat. § 253B." Doc. 203, at 11. Plaintiffs raised thirteen claims in their Third Amended Complaint. *See generally* Doc. 635.

The Court bifurcated trial in this matter into two phases. Phase One of trial took place between February 9, 2015, and March 18, 2015, and encompassed Counts I–VII and XI of the Third Amended Complaint.[1] Following this six-week trial, the Court granted Plaintiffs' request for declaratory relief on Counts I and II. Doc. 966, at 75. The Court held, "Because the Court finds the program is unconstitutional on its face and as applied

---

[1] Phase Two, which encompassed Counts VIII–X and XII–XIII was to commence after the conclusion of Phase One. Doc. 647.

(Counts I and II), and because any remedy fashioned will address the issues raised in the remaining Phase One Counts, the Court need not address Counts III, V, VI, and VII."[2]  *Id.* at 65.  The Court subsequently issued a First Interim Relief Order directing injunctive relief in favor of Plaintiffs.  Doc. 1035.

Defendants appealed, and the Eighth Circuit issued an opinion "revers[ing] the district court's finding of a constitutional violation and vacat[ing] the injunctive order." *Karsjens v. Piper*, 845 F.3d 394, 411 (8th Cir. 2017) ("*Karsjens I*").  It entered judgment in favor of Defendants on Counts I and II, and it remanded the case to the Court "for further proceedings on the remaining claims in the Third Amended Complaint."  *Id.*

The remanded Phase One claims included Counts III, V, VI, and VII of the Third Amended Complaint.  All four counts purport to arise under the Due Process Clause of the Fourteenth Amendment.  Count III raises a failure-to-provide treatment claim.  Doc. 635, ¶¶ 254–61.  Counts V and VII challenge the conditions of confinement within the MSOP facilities, claiming the conditions are punitive and inhumane.  *Id.* ¶¶ 269–83, 292–97. Count VI alleges Plaintiffs are entitled to less restrictive alternatives than a secure treatment facility.  *Id.* ¶¶ 284–91.

In response to *Karsjens I*, the parties filed supplemental briefing on the remaining Phase One claims, and Defendants moved for summary judgment on the Phase Two claims. *See* Doc. 1097.  Applying the "shocks the conscience" standard, the Court dismissed with prejudice the remaining Phase One claims.  Doc. 1108.  The Court also granted

---

[2] Counts IV, XI, XII, and XIII were later dismissed with prejudice following an August 10, 2015, fairness hearing.  Doc. 1005.

Defendants' motion for summary judgment and dismissed with prejudice the Phase Two claims. *Id.*

Plaintiffs appealed the Court's ruling on the Phase One claims. The Eighth Circuit affirmed dismissal of Count III, concluding it was duplicative of Count II of the Third Amended Complaint. *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021) ("*Karsjens II*"). But it reversed the Court's dismissal of Counts V, VI, and VII, finding the Court applied the wrong legal standard. *Id.* at 1051–54. It remanded the case back to this Court to consider Counts V, VI, and VII under the standards outlined in *Karsjens II*. *Id.* at 1053–54.

Following remand, Plaintiffs moved for leave to file a Fourth Amendment Complaint, which the Court denied. Docs. 1152, 1154, 1160, 1166. Following the denial of Plaintiffs' motion to amend, the parties agreed to submit briefs and proposed findings of fact and conclusions of law to assist the Court in deciding the remanded issues. Docs. 1168, 1170.

Based upon the entire file, record, and proceedings, the Court now makes the following findings of fact and conclusions of law regarding Counts V, VI, and VII of the Third Amended Complaint:

## FINDINGS OF FACT[3]

### I.   THE PARTIES.

1.     Each Plaintiff purports to represent a class of over 700 individuals (referred to as "clients") that are civilly committed to the MSOP as either a Sexually Dangerous Person ("SDP") or a Sexual Psychopathic Personality ("SPP") (or both) by a Minnesota court pursuant to the procedures under Minnesota Statutes Chapter 253D.

2.     Defendants are administrators at MSOP that manage and provide treatment to the population at MSOP's facilities in Moose Lake and St. Peter.

### II.   REMAINING CAUSES OF ACTION.

3.     Following the Eighth Circuit's *Karsjens II* decision, three counts remain before this Court:  Counts V, VI, and VII.

4.     In Count V, Plaintiffs claim their conditions of confinement at MSOP are punitive in violation of the Fourteenth Amendment.  Doc. 635, ¶¶ 269–83.  In support of their claim, Plaintiffs cite to MSOP's use of double-occupancy rooms, MSOP's use of Behavioral Expectations Reports ("BERs"), MSOP's use of the High Security Area ("HSA"), MSOP's property limitations, the alleged denial of group therapy, the alleged removal of furniture and vocational opportunities for rule violations, random searches of client rooms and persons, and MSOP's use of restraints on clients when transported outside of the facility.  *Id.*

5.     In Count VI, Plaintiffs challenge the "denial of less restrictive alternative confinement," alleging that:   (1) "MSOP, as implemented, does not provide a less

---

[3] All Findings of Fact are based on the facts in evidence at the time of the trial in this case.

restrictive alternative to confinement at a MSOP secure facility," thereby failing to account for the fact that "[n]ot all Plaintiffs and Class members have the same level of security needs"; and (2) "if a Plaintiff or Class member no longer meets the statutory requirements for civil commitment, there is no less restrictive facility or program for them to enter." *Id.* ¶ 288.

6.     In Count VII, Plaintiffs claim their conditions of confinement at MSOP are inhumane in violation of the Fourteenth Amendment.  *Id.* ¶¶ 292–97.  In support of this claim, Plaintiffs cite to MSOP's use of double-occupancy rooms, restrictions for violations of MSOP rules, inadequate meals, arbitrary discipline and decision-making by MSOP staff, and inadequate medical treatment.  *Id.* ¶ 294.

## III.   CONDITIONS OF CONFINEMENT AT MSOP.

7.     Plaintiffs' counsel admitted at trial that they had no evidence that any of MSOP's policies were punitive in nature:

> And it's clear, Your Honor – look, to the extent that I've ever not been candid with the Court, I certainly am going to be candid here.  There is not evidence to support the notion that double bunking or the mail policy or the listening to the phone policy, those policies in isolation could not support a claim that this program is punitive.  I acknowledge that.  Deb McCulloch, who I consider a highly qualified expert on this, testified that those policies in isolation cannot support a punitive finding and I don't dispute that.

Tr. 3162.  As discussed below, the Court agrees that MSOP's policies and the conditions of Plaintiffs' confinement are not punitive in violation of the Fourteenth Amendment.

### A.     Overview Of MSOP's Facilities.

8.     MSOP has two campuses, one located in St. Peter and one located in Moose Lake.

*St. Peter.*

9.      MSOP's St. Peter campus is located on grounds that include state programs other than MSOP, such as the Minnesota Security Hospital and the forensic nursing home. Plaintiffs' Ex. ("PX") 225, at 42.  The MSOP population at the St. Peter campus includes clients with intellectual disabilities in the Alternative Program, clients with severe mental illness, clients with other disabilities requiring special accommodation, clients in Phase Three of treatment, and clients participating in Community Preparation Services ("CPS").  *Id.*

10.      The buildings and grounds are clean and well maintained.  *Id.*  The grounds are nicely groomed and include walking paths, outdoor recreation equipment, social gathering furniture and places, and several areas for outdoor gardening.  *Id.* at 42–43.

11.      The main facility is surrounded by a secure perimeter and has secure entrance and exit procedures.  *Id.* at 42.  Approximately 25 clients live on each unit in mostly shared rooms with dorm-like furniture and personal property.  *Id.* at 43.  The space and the environment of individual rooms are adequate, and most rooms include windows.  *Id.*  On and off the units, the buildings include staff offices, group space, social gathering space with TVs, other entertainment equipment and supplies for leisure activities, comfortable furniture, plants, and other home-like amenities.  *Id.*  There is more than adequate access to vocational opportunities, as well as therapeutic recreation and library services.  *Id.*  The facility also has a nicely remodeled food service area.  *Id.*

12.      CPS is MSOP's unlocked residential location.   Tr. 3308; PX 225, at 64. Clients who reside in CPS went through the statutory process for a reduction in custody

and received a favorable decision from the Commitment Appeal Panel that authorized their transfer to CPS. It allows clients to live outside of the secure perimeter while still on the grounds of MSOP. PX 225, at 64. CPS provides opportunities for supervised and unsupervised movement on MSOP's campus, as well as supervised activities in the community. *Id.* While many sex offender civil commitment ("SOCC") programs offer some form of conditional release, Minnesota's CPS "is unique." *Id.*

13.    Furniture at CPS is home-like, and CPS has been decorated to look like a home. Tr. 4470. Clients' artwork is also used to decorate the units. Tr. 4471. Furniture is purchased at major retailers, as well as built through the vocational shops at MSOP. Tr. 4470–71.

14.    The residential and program areas for clients in CPS are pleasant and as home-like as most community-based residential facilities or group homes. PX 225, at 45. The individual rooms are similar to shared accommodations in other clinical care settings. *Id.* The amenities and facilities at CPS are excellent. The furniture, décor, environment, unit amenities, and outdoor spaces are "comparatively outstanding"; the kitchen facilities, common areas, and access to personal property are "beyond adequate"; and the on-grounds access, vocational opportunities, and community-based opportunities (including community treatment) provided to clients at CPS "are superior to any sexual offender civil commitment . . . program." *Id.* The CPS program and its staff should be "commended for developing innovative programming and a therapeutic environment that should be the envy of other SOCC programs." *Id.* at 46. CPS is a facility that is superior to any other sex offender civil commitment program. Tr. 613–14.

*Moose Lake.*

15.    The Moose Lake campus was built specifically for MSOP and, unlike St. Peter, does not share its campus with any other programs or facilities.  PX 225, at 50. Its environment is not unlike other sex offender civil commitment facilities, though it is larger than many other facilities around the country due to MSOP's higher census.  *Id.* There is a secure perimeter surrounding the entire facility, which is not unlike some of the SOCC programs around the country.  *Id.*  The facility, grounds, and outdoor spaces at Moose Lake are clean, well maintained, and abundant.  *Id.*  Moose Lake's open common areas have the appearance and relative feel of a community college.  *Id.*

16.    The units are well lit, well maintained, and clean.  *Id.*  Each unit has televisions and other entertainment equipment, supplies for activities, adequate furniture and amenities, small spaces adjacent to the units for clinical and other staff to meet with clients, access to telephones (including a feature where clients' families and friends can leave voice messages), access to computers with a "great deal" of relevant information for clients to easily access, and a social gathering place.  *Id.* at 51.

17.    Nearly all clients at MSOP's Moose Lake facility reside in double-occupancy rooms, which is not uncommon in sex offender civil commitment programs.  *Id.* at 50. Although client rooms are not large, the space is adequate "given the operational need for double bunking and the facility has provided creative space saving storage for its clients." *Id.* at 51.  The facility also provides "privacy screens" to be used between client spaces. *Id.*  The rooms have adequate furniture with "average to above average (compared to other SOCC programs) allowable personal property."  *Id.*

18.     Off the units, the hallways are wide and "nicely decorated with impressive artworks made by clients in the workshop." *Id.* There is "adequate cafeteria space," and the food is "quite palatable" and "consistent with most institutional food." *Id.* The facility has "nicely furnished" social gathering spaces for clients, and clients move about much more freely than in most SOCC facilities. *Id.*

19.     Moose Lake has "extensive space and opportunities that many SOCC facilities do not have, including several large outdoor spaces for recreation and other outdoor activity." *Id.* at 52. Other examples include music rooms where clients can play an array of musical instruments, a ceramics area, game rooms and other spaces for arts and crafts and other leisure activities, a gym and fitness space, and an "extensive and very well resourced and utilized vocational programming space." *Id.* Indeed, Moose Lake offers various relevant educational and vocational opportunities that "impressed the [706 Experts] in innovation and obvious outreach with other agencies," *id.* and "[t]hese areas can serve as a model to other SOCC programs." *Id.* The 706 Experts believed that MSOP should receive "broad recognition" in this area. *Id.* "The vocational programs at both campuses would likely be the envy of any correctional or forensic treatment facility in the country." *Id.* at 36.

20.     Overall, the Moose Lake facility is "relatively pleasant." *Id.* at 52. Rule 706 Expert Deb McCulloch, to whom the other 706 experts deferred to on conditions and policy-related issues, stated that the physical structure and amenities of the Moose Lake facility was "either fine or exceed[ed] what other facilities are." Tr. 139.

**B.     MSOP Policies.**

21.     McCulloch testified that she "reviewed all of the policies that are written by the program."  Tr. 67.  Following her global review of MSOP's policies, she believed MSOP mirrored her Wisconsin program in that MSOP staff have an ongoing process designed to balance security and therapeutic needs.  Tr. 304–05.  She had no concerns about MSOP's policies regarding searches, transport, spiritual practices, media possession, client mail, client movement, yard use, visitation, client property (other than that it should be more restrictive in some instances), and therapeutic recreation.  Tr. 306–11, 321–26.

22.     Dr. Naomi Freeman did not have any problem with any of MSOP's policies as written.  Tr. 876.  She specifically stated she had no problem with MSOP's policies related to room searches, mail monitoring, and restraint policies, and otherwise deferred to Ms. McCulloch.   Tr. 876–78.   Dr. Robin Wilson also deferred to Ms. McCulloch's judgment, and agreed that the policies she discussed in testimony "are policies that you would expect to see in a sex offender civil commitment program."  Tr. 626–27, 628. Dr. Michael Miner likewise deferred to Ms. McCulloch's judgment, and for his part testified that he had no evidence that any of the named Plaintiffs were harmed by MSOP's search policies, restraint policy, or the physical conditions at MSOP.  Tr. 1127–29, 1172-73.

23.     The specific conditions Plaintiffs challenge in Counts V and VII are discussed below:

*Behavioral Expectation Reports.*

24.     MSOP's use of BERs is appropriate and consistent with sound professional judgment.   MSOP's Behavioral Expectations Handbook contains, among other things, descriptions of behavioral violations at MSOP.   Defendants' Ex. ("DX") 48, at 2; DX 49. When admitted to MSOP, clients are provided a copy of the handbook.   DX 48, at 2.   When staff believe a client has violated a rule, the staff member and his or her supervisor discuss the incident and make a determination if a verbal redirection, minor BER, or major BER will be issued.   *Id.* at 4.

25.     A minor rule violation constitutes behavior that violates facility policy or procedure, but does not place anyone in immediate jeopardy or present an immediate disruption to the therapeutic environment.   *Id.* at 2.   Minor rule violations can lead to Restriction Status 1 ("RS1").   *Id.* at 3.   RS1 is a minor disciplinary restriction imposed proportionately to the occurrence of a rule violation, and results in the limited use or full restriction of the area and/or item involved in the violation.   *Id.*   In addition to RS1, treatment assignments may be assigned by the client's clinical staff or treatment team.   *Id.* Minor violation restrictions are offered as a means for the client to modify and self-correct his or her behavior.   *Id.* at 5.   For the first violation, the duration of restrictions imposed may range from 1 to 14 days.   *Id.* at 4.   For the second violation in 45 days, the duration may range from 1 to 28 days.   *Id.*   For the third violation in 45 days, the duration may range from 1 to 45 days.   *Id.*   The fourth violation and beyond may result in a major BER.   *Id.*

26.     Within three business days of receiving a minor violation restriction BER, a client may request that the BER be reviewed by submitting a client request form to the

Behavioral Expectations Supervisor or designee, who will conduct a review within three business days of receiving the client request. *Id.* at 5. During the review, the client may present his or her perspective on the situation leading to the BER, including by presenting physical evidence if necessary. *Id.* at 6. The Behavioral Expectations Supervisor or designee will issue findings and the restriction imposed at the conclusion of the review, and a Minor Violation Restriction Review Report will be provided to the client. This report will be forwarded to the facility director/designee for review and signature. *Id.*

27.     A major rule violation constitutes behavior that jeopardizes the safety or security of clients, staff, or others, or constitutes continued minor rule violations. *Id.* at 2. Major rule violations can lead to Restriction Status 2 ("RS2") or Restriction Status 3 ("RS3"). *Id.* at 3. RS2 can include, among other things, a restriction of client movement or full restriction from off-unit privileged activities, on-unit privileged activities, and/or vocational assignments. *Id.* RS3 can include full restriction from all off-unit privileged activities and all on-unit privileged activities. *Id.* While on RS3, a client is expected to remain in his or her room except for designated times. *Id.* For the first violation, the duration of restrictions may range from 1 to 14 days. *Id.* at 4. For the second violation in 180 days, the duration of restrictions may range from 1 to 28 days. *Id.* For the third violation and beyond, the duration of the restrictions may range from 1 to 56 days. *Id.* The use of a weapon, injury, disorderly conduct or disturbance in a high-risk situation, other unsanctioned behavior with multiple participants, or action taken for the benefit of a security threat group may double the existing restriction. *Id.*

28.     Upon issuance of a major BER, the officer of the day, the unit director, the clinical supervisor, or the area supervisor may place the client on Pre-Hearing Restriction Status. *Id.* at 7. If placed on Pre-Hearing Restriction Status, the Behavioral Expectations Supervisor or designee will review the BER within two business days of the issuance of the BER. *Id.* If not on Pre-Hearing Restriction Status, it will be reviewed within five business days. *Id.* During the Behavioral Expectations Supervisor's review, the client may waive his or her right to a major restriction hearing, or he or she may choose to take the violation to a hearing. *Id.* A major violation restriction hearing is held before a Hearing Panel, which consists of representatives from clinical, security, and treatment programming, and they are appointed by the facility director. *Id.* at 2. During a major violation restriction hearing, the Hearing Panel may request the testimony of witnesses, and evidence may also be presented when the Hearing Panel determines it is necessary, relevant, and not unduly repetitious. *Id.* at 9. If the Hearing Panel determines by a preponderance of the evidence the client violated the behavioral expectation, it will determine what restriction, if any, will be imposed, and its decision will be documented on a Hearing Findings Report. *Id.* The client may appeal the decision of the Hearing Panel to the facility director or designee, who may affirm, amend, or dismiss the restriction, or may remand the case for a new hearing. *Id.* at 10. If unsatisfied with that result, the client may submit an appeal of that decision to the Executive Director, who may also affirm, amend, or dismiss the restriction, or may remand the case for a new hearing. *Id.* at 10–11. The decision of the Executive Director is final. *Id.* at 11.

29.     The purpose of the behavioral expectations policy is to provide procedures designed to shape prosocial behavior appropriate to a secure treatment environment and to offer clients due process for appealing decisions of the behavioral expectations hearing panel. *Id.* at 1. Any disciplinary restriction must be reasonably related to the nature of the behavior; in proportion to the severity of the violation and to the rule's importance to the order, safety, and security of the treatment program; and take into consideration the client's past behavior while in the program, the client's treatment needs, and his or her current phase in treatment. *Id.* at 3; Tr. 3322. Thus, MSOP takes an individualized approach to determining any restrictions. Tr. 3322.

30.     If rules at MSOP were not followed, MSOP could not run an effective treatment facility. *Id.* The Sex Offender Civil Commitment Programs Network survey indicated that the most common sanction imposed for rule violators is a loss or reduction in privileges. Tr. 3323–24. This is consistent with sanctions at MSOP. Tr. 3324. The purpose of the BER system is to shape behavior; it is not about punishment. Tr. 3326.

31.     MSOP's Executive Clinical Director, Jannine Hébert, discussed how MSOP's BER policy intersects with sex offender treatment. Risk factors for sexual recidivism are categorized into two groups: one being sexual deviancy, the other being antisociality. Tr. 4073. Antisocial attitudes, beliefs, or traits increase the likelihood of recidivism. *Id.* MSOP needs markers to gauge how someone's antisociality is manifesting itself, and rule-breaking behavior is akin to antisociality. *Id.* Further, sex offender recidivism research shows that one dynamic risk factor includes "adherence to rules and supervision." *Id.* All rule-breaking, therefore, is treatment related because it all plays into

one's risk for recidivism.  Tr. 4073–74.  Addressing rule breaking behaviors is clinically indicated and research shows rule compliance is a very important treatment target to look at.  Tr. 4075.  And although major BERs can impact a client's progression in treatment, the impact of BERs on phase progression is an individualized determination and can be waived or overridden.  Tr. 4076.

32.    Rule 706 Expert McCulloch acknowledged that treatment regression can be an appropriate consequence of serious rule violations.  Tr. 317–18.  She did not know of any example of MSOP using its BER policy in an inappropriate manner with respect to treatment phase progression or regression.  Tr. 321.  She acknowledged that MSOP's policy does not materially differ from the policies at other facilities.  Tr. 311–13.

33.    The 706 Experts expressed no concern with the appeal process for BERs.

### High Security Area.

34.    The HSA is an area within MSOP's secure facilities where a client can be isolated for a short period of time if he or she demonstrates behavior that could be dangerous to himself or others.  Tr. 3327.  In Moose Lake, the HSA has several rooms; in St. Peter, the HSA is a single room.  *Id.*  The purpose of the HSA is to provide an area of the facility with specialized safety procedures to reduce the risk of harm to clients, staff, and the public, and to manage dangerous behavior.  DX 50, at 1.

35.    A client placed in HSA will be on one or more of the following statuses: Administrative Restriction Status, Protective Isolation Status, or Levels of Observation. *Id.*  Levels of Observation is used when a client engages in self-injurious harm and is in need of constant supervision.  Tr. 3328.  Such client is placed in a room where the client

can be observed, monitored, and documented to keep safe until the client is at a place where the client can go back to their unit. *Id.* Protective isolation is used when someone is not in behavioral control, or there is potential for a major disruption. *Id.* Administrative restriction status is designed for individuals when criminal activity is being investigated. Tr. 3328–29. Someone on administrative restriction could be in either their own room or in HSA. Tr. 3329. Clients are placed on one of these statuses in the HSA when it is necessary to maintain safety and security for the client involved, staff, other clients, or the public. DX 50, at 1.

36.     MSOP uses the high security in a thoughtful and sparing manner. Tr. 3329. MSOP's HSA policy ensures that clients are treated in a respectful manner, and that any isolation period is as short as possible so that the client can return to his or her unit. Tr. 3329–30. MSOP discontinues a client's placement in HSA when the criteria under which he or she was placed in HSA is no longer met. DX 50, at 3.

37.     MSOP clinical staff are informed when a client is placed in HSA. Tr. 3330. Clinical staff are also involved in reviewing placements in HSA. *Id.* Following every placement in HSA, there is a team of individuals that reviews the placement from start to finish. *Id.* While in HSA, clients can continue with their treatment assignments and meet with their therapists. *Id.*

### Food.

38.     The food at MSOP is "quite palatable" and "consistent with most institutional food." PX 225, at 51. Clients also have the ability to purchase snacks and other food items through the canteen. Tr. 136. At CPS, clients have a kitchen facility where they can cook

their own meals if they do not want to eat the meals provided by MSOP.  Tr. 191, 3308.
The Department of Health has oversight of the quality and nature of the food that is served
to clients at MSOP.  Tr. 4814–15.

39.     No evidence was presented at trial that even suggested the meals provided at
MSOP are inadequate.

### *Client Movement.*

40.     MSOP's Moose Lake facility allows for "relatively greater open movement
throughout the facility" because clients wear electronic monitoring devices.  PX 225, at 51;
Tr. 321–22.  This electronic monitoring system is, according to 706 Expert McCulloch, "an
effective tool to help provide monitoring and access to specific areas of a really large
institution."  Tr. 323.

41.     McCulloch did not have any concerns with MSOP's client movement policy.
Tr. 321.

### *Group Therapy.*

42.     The primary mode of treatment intervention at MSOP is group therapy, either
in core therapy groups or psychoeducational and content groups.  PX 225, at 27.  There is
no dispute that MSOP provides group therapy to clients.  *Id.*; Doc. 919, at 53–54, 64.  No
evidence was presented at trial that clients at MSOP are denied access to group therapy.

### *Property Policy.*

43.     MSOP's property policy is in place to "maintain a therapeutic environment
and ensure the safety and security of clients, staff, and the public," DX 55, at 1; DX 56,
at 1, and the purpose of its contraband policy is to "ensure a safe, secure and therapeutic

environment for all persons by identifying, prohibiting and responding to contraband on the grounds of [MSOP] facilities," DX 54, at 1.

44.    The 706 Experts raised no concerns with MSOP's property policy, PX 225, at 57, and McCulloch stated that, if anything, MSOP's property policy should be *more* restrictive.  Tr. 324–26.  MSOP's property policies are appropriate to foster a therapeutic environment.

### *Furniture Removal.*

45.    Plaintiffs presented no evidence at trial that client furniture is taken away as punishment for alleged rule violations.

### *Random Searches.*

46.    The purpose of MSOP's policy related to searches of areas within MSOP is to "control the presence of contraband in facilities and grounds," as well as "[t]o prevent, discover and manage threats to the safety and security of facilities, staff, clients, and the public."  DX 45, at 1.  The purpose of MSOP's policy related to searches of clients is similarly related to controlling contraband and keeping clients, staff, and the public safe. DX 44, at 1.  MSOP conducts random searches of client rooms, property, and their person.

47.    Plaintiffs presented no evidence that these searches are unnecessary.  The 706 Experts stated that MSOP's rules and policies regarding searches were standard in comparison to other SOCC programs.  PX 225, at 57; Tr. 306 (McCulloch stating she had no issues with MSOP's search policy).

48.    This Court previously held that MSOP's search policies do not violate the Fourth Amendment.  *Karsjens v. Piper*, 336 F. Supp. 3d 974, 994–96 (D. Minn. 2018).

This Court observed that "[t]he record lacks substantial evidence showing [that the MSOP's] policies are an unnecessary or unjustified response to problems of institutional security," *id.* at 996, and that the expert testimony presented at trial demonstrated that "the policies are reasonable for a sex offender civil commitment facility," *id.*

### *Restraints.*

49.     Under the MSOP policy in place at the time of trial, all clients, except those in Phase III of treatment who have on- or off-campus privileges and clients with CPS standard movement privileges, are placed in restraints when transported out of the facility. DX 46, at 1.  MSOP's restraint policy is in place to transport clients "in a safe, secure and therapeutic manner."  *Id.*  MSOP's use of restraints becomes less restrictive as clients progress in treatment.

50.     Neither Freeman nor McCulloch had any concerns with MSOP's restraint policy.  Tr. 308, 877–78.  Both stated MSOP's restraint policy was consistent with their home state program's restraint policy.  *Id.*  Freeman believed MSOP's restraint policy was within acceptable standards, and stated that transporting clients in restraints was consistent with New York's program.  Tr. 877–78.

51.     "The MSOP Program's rules, policies and practices with regard to mail, movement, searches, property and phones are mostly standard in comparison to other SOCC programs and institutions."  PX 225, at 57.

### *Double Occupancy Rooms.*

52.     Clients at MSOP generally reside in private, double occupancy rooms.

53.     Staff at MSOP exercise their professional judgment appropriately to manage the double occupancy rooms.   Tr. 381.   MSOP is not the only sex offender treatment program that uses double occupancy rooms.   *Id.*   MSOP's living units are far superior to Florida's program, where individuals sleep in open space separated into four-bed "quads" that are only divided from each other by a three-foot wall.   Tr. 620, 622.   MSOP's double occupancy rooms are "adequate given the operational need for double bunking and the facility has provided creative space saving storage for its clients."   PX 225, at 51.

### *Arbitrary Punishment.*

54.     706 Expert Wilson was not aware of any intent by any MSOP staff member to go against best practices for the care and treatment of persons committed to MSOP. Tr. 597, 628, 643.   706 Expert Freeman testified that MSOP treatment administrators and clinical staff exercised their professional judgment according to current acceptable practices in the field.   Tr. 848.   706 Expert Miner opined that MSOP staff exercised their professional judgment in creating policies related to the conditions at MSOP facilities. Tr. 1173.

55.     Plaintiffs did not present any evidence of arbitrary punishment at MSOP.   As discussed above, any discipline under MSOP's BER policy is related to the offense that occurred.

### *Less Restrictive Alternatives.*

56.     As MSOP clients progress through the treatment program, they have the opportunity to reside in lesser and lesser restrictive settings.

57.    Most new admissions and clients in Phase I and II of treatment reside at MSOP's Moose Lake facility.  As discussed above, the Moose Lake facility is a secure treatment setting.

58.    Once clients reach Phase III of treatment, they are generally moved to St. Peter's secure setting.  PX 225, at 31.  Clients in Phase III have greater liberties than clients in Phase I and II of treatment.  As just one example, under the policy in place at the time of trial, clients in Phase III are not required to be in restraints when they are transported to locations outside of the facility, nor are they subject to an unclothed visual body search when leaving the facility.  Tr. 2643–44, 4211.  While clients reside in a secure setting, depending on treatment progression, they may be allowed supervised access to the community to attend meetings or other functions aimed at increasing reintegration potential under the policy in place at the time of trial.  PX 225, at 31.

59.    Six months after final commitment and any related appeals, a client may seek a "reduction in custody," which includes transfer "from a secure facility" (i.e., to CPS), provisional discharge, and discharge.  The statute places no limit on the timing and amount of times that a client may petition for a reduction in custody, so long as the petition is at least six months from a final decision on a prior petition.  Minn. Stat. § 253D.27.

60.    CPS is not within the secure perimeter.  PX 225, at 31.  CPS provides MSOP clients with greater independence and increased ability to practice self-direction and self-management in a less restricted setting.  Tr. 4474–99; DX 446.  The building is unlocked and has several entrances and exists.  Clients can, among other things, walk between buildings without staff, go to an on-campus gym that is outside the secure perimeter, and

go fishing at an on-campus pond.  Tr. 4469. Clients with community privileges participate in supervised therapeutic outings, including support groups, volunteer opportunities, and special events consistent with treatment goals.  Tr. 3307–08, 3285, 4478–80.  CPS is a unique program in Minnesota that other SOCC programs do not have, and it should be the "envy of other SOCC programs."  PX 225, at 46, 64.

61.     With respect to provisional discharge locations, MSOP has approximately fifteen contracts with third party vendors that provide community housing and/or treatment services for clients on provisional discharge.  Tr. 4520–21.  These contracts represent a wide range of settings, including halfway houses, adult foster care settings, supported apartments, and independent living.  Tr. 4521.  MSOP has contracts with different levels of living to accommodate the different needs of clients on provisional discharge.  Tr. 4521, 4523–24.  Provisionally discharged clients' needs are "assessed on an individual basis . . . . The goal is, of course, to always strive for as independent an environment as possible with the most autonomy that is safe for the client, as well as provides for public safety."  Tr. 4524.

### *Inadequate medical care.*

62.     Plaintiffs put on no evidence at trial that MSOP clients are provided inadequate medical care on either an individual or program-wide basis.

## CONCLUSIONS OF LAW

1.     The Eighth Circuit directed the Court to evaluate the conditions of confinement claims contained in Counts V–VII under the standard for punitive conditions applied in *Bell v. Wolfish*, 441 U.S. 520 (1979) and Plaintiffs' claim for inadequate medical

care under the deliberate indifference standard in *Senty-Haugen v. Goodno*, 462 F.3d 876

(8th Cir. 2006). *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021).

## I.   LEGAL STANDARDS.

### A.   Conditions Of Confinement.

2.     As to Plaintiffs' conditions of confinement claims, *Bell* explains that whether

a disability constitutes punishment in the constitutional sense turns on whether it is

"imposed for the purpose of punishment or whether it is but an incident of some other

legitimate governmental purpose." 441 U.S. at 538. In the absence of an "expressed intent

to punish . . . that determination generally will turn on 'whether an alternative purpose to

which [the restriction] may rationally be connected is assignable for it, and whether it

appears excessive in relation to the alternative purpose assigned [to it].'" *Id*. (quoting

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 167 (1963)). Overall, "if a particular

condition or restriction of pretrial detention is reasonably related to a legitimate

governmental objective, it does not, without more, amount to 'punishment.'" *Id*. at 539;

*see also id*. (noting that a condition "is not reasonably related to a legitimate goal" when it

is "arbitrary or purposeless.").

3.     *Bell* recognizes the existence of a wide range of legitimate governmental

objectives in administering a detention facility. While recognizing the legitimacy in the

pretrial detention context of ensuring detainee presence at trial, *Bell* sets forth numerous

other legitimate interests like the "need to manage the facility in which the individual is

detained," including "tak[ing] steps to maintain security and order at the institution and

make certain no weapons or illicit drugs reach detainees." *Id*. at 539–40

23

4. *Bell* also reserves significant discretion for officials operating a detention facility to institute policies in service of legitimate governmental objectives. It requires courts to "be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Id*. at 539. It specifically notes that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" and that administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547; *see also id.* at 562 (warning of the "natural tendency to believe that [one's] individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination."

5. *Bell* also notes that deference to facility officials is not simply a matter of expertise, but of respect for the constitutional order:

> judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.

*Id*.; *see also id*. at 562 ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.").

6.     Conditions that violate *Bell* are both extreme and unnecessary for accomplishment of a legitimate government goal.  For example, as cited in *Karsjens II*, the Eighth Circuit denied qualified immunity to a defendant who transported a pretrial detainee for about 90 minutes in a "dog cage . . . approximately three and a half feet wide, three feet tall, and three feet deep [and] littered with animal hair and dried dog urine and feces," "with no compelling urgency and other options available." *Morris v. Zefferi*, 601 F.3d 805, 807, 811 (8th Cir. 2010).  In another case, the Eighth Circuit held a jury could find a *Bell* violation where a pretrial detainee was held "in a barred cell measuring six feet by six feet with a small window, a combination toilet-sink and a light bulb," was "regularly confined in this cell for seventy-two hour periods without opportunity for exercise or showers," was allowed out "for only fifteen minutes and then he was only allowed to walk up and down his cell corridor or shower," and was "forced to eat his meals in his cell which was infested with insects and housed rodents." *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981).

## B.     Inadequate Medical Care.

7.     The standard applicable to Count VI's claim for inadequate medical care requires Plaintiffs to "show 'deliberate indifference' to a 'serious illness or injury.'" *Senty-Haugen*, 462 F.3d at 889 (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  "Deliberate indifference is a higher standard than gross negligence, and [a plaintiff] must prove that officials knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries."  *Id.* at 890 (internal citations omitted).

8.      Such a deliberate indifference claim requires a plaintiff to make a significant showing.   "Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury."  *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).  Further, a plaintiff "alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect."  *Id*.  No deliberate indifference is shown when medical professionals make "efforts to cure the problem in a reasonable and sensible manner," even if those efforts are not successful.  *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997).

**C.      Class Claims.**

9.      In addition to the applicable standards from *Bell* and *Senty-Haugen*, the Court's decision is governed by legal principles applicable to this case as a class action certified under Fed. R. Civ. P. 23(b)(2) against official-capacity Defendants only. Plaintiffs' official-capacity claims require them to prove that it was an official policy or custom, and not some failure of implementation, that caused their concrete constitutional harms.  *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987).

10.     To establish their claims, Plaintiffs must show a generally applicable "policy" or "persistent, widespread pattern of unconstitutional conduct" specifically harming them and applicable to the entire class.  *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1999); Fed. R. Civ. P. 23(b)(2); *see also Lewis v. Casey,* 518 U.S. 343, 349, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996) ("We agree that the success of respondents' systemic challenge was dependent on their ability to show

widespread actual injury, and that the court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic *Bounds* violation invalid.").

## II.   PLAINTIFFS' CONDITIONS OF CONFINEMENT CLAIMS.

11.   The record contains no evidence that Defendants instituted any of the challenged policies or conditions with intent to punish Plaintiffs.  Plaintiffs also have failed to establish that any of the challenged policies or conditions bear no reasonable relation to a legitimate governmental interest, or are excessive in relation to that interest, within the meaning of *Bell*.

### A.   MSOP's Double Occupancy Rooms (Counts V And VII).

12.   MSOP's double occupancy rooms comply with *Bell*.  *Bell* itself considered double occupancy and disagreed "that that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment."  441 U.S. at 542. *Bell* held, in the context of a pretrial detention facility, that "nothing even approaching" hardship sufficient to constitute punishment was shown where detainees were required to spend seven to eight hours a day in their double occupancy rooms, the rooms provided adequate space for sleeping, and the detainees were "free to move between their rooms and the common area" the remainder of the time.  *Id.*

13.   The Eighth Circuit and this Court have also held MSOP's double occupancy rooms are constitutional.  In *Beaulieu v. Ludeman*, the Eighth Circuit upheld MSOP's double occupancy rooms at both a former temporary complex with rooms not designed for double occupancy, and at a facility with rooms designed for double occupancy. 690 F.3d 1017, 1043 (8th Cir. 2012); s*ee also Aune v. Ludeman*, Civ. No. 09-cv-0015

(JNE/SRN), 2010 WL 145276, at *6 (D. Minn. Jan. 8, 2010) ("there is no evidence that the double-bunking practice utilized by the MSOP is punitive."); *Miles v. Johnson-Piper*, No. 19-CV-1078 (WMW/KMM), 2020 WL 1330028, at *3 (D. Minn. Mar. 23, 2020), *aff'd sub nom. Miles v. Piper*, 831 F. App'x 220 (8th Cir. 2020) ("It is well settled that double-bunking is not a constitutional violation.").

14.    The evidence at trial established the operational need for double occupancy rooms, that clients are not inappropriately confined to their rooms, and that such rooms are standard at sex offender civil commitment programs.  Double occupancy rooms at MSOP are reasonably related to the legitimate government goals of efficiently and cost-effectively housing clients, not excessive in relation to those goals, and not punitive under *Bell*.

###    B.    MSOP's BER Grievance Procedure (Count V).

15.    The record reflects that MSOP's internal grievance procedure for BERs serves MSOP's interest in providing clients a multi-layered appeal option that provides due process in an efficient manner.  The Eighth Circuit has recognized that "[MSOP] staff have a substantial interest in providing efficient procedures to address security issues." *Senty-Haugen*, 462 F.3d at 887.  There is also no authority for Plaintiffs' apparent claim that *Bell* requires an external BER appeal process.  MSOP's BER grievance procedure is reasonably related to the legitimate government goals above, is not excessive in relation to those goals, and is not punitive under *Bell*.

###    C.    HSA And Access To Areas Of The MSOP Facilities (Count V).

16.    The record shows that MSOP uses the HSA only to control behavior that has not responded to less restrictive interventions, clients are only in the HSA for as long as is

necessary, and clients are afforded timely reviews of their placement. The record contains no evidence of arbitrary or purposeless use of HSA, much less on a widespread basis, which is consistent with this Court's previous holdings that the existence of HSA at MSOP is lawful. *Larson v. Jesson*, No. CV-11-2247 (PAM/LIB), 2018 WL 3352926, at *5 (D. Minn. July 9, 2018) ("placement in administrative segregation is not a constitutional deprivation actionable under § 1983."); *see also Benson v. Harpstead*, No. CV 17-266 (DWF/TNL), 2021 WL 2852046, at *2 (D. Minn. July 8, 2021) (upholding report and recommendation concluding HSA permissible under *Bell*). In addition, to the extent the claim challenges client movement more generally, Ms. McCulloch had no concerns about MSOP's client movement policy. MSOP's HSA policy and client movement policies are reasonably related to the legitimate government goals above, are not excessive in relation to those goals, and are not punitive under *Bell*.

### D.     The Property Policy And Grievance Procedure (Count V).

17.     Plaintiffs do not appear to have put on any evidence that MSOP disposed of any client's confiscated property before the conclusion of a related grievance procedure, much less on the widespread basis necessary for class relief. *Lewis*, 518 U.S. at 359. The record shows MSOP's property policy serves both therapeutic and security interests, and Ms. McCulloch actually testified that it should be more restrictive. MSOP's property policy and grievance procedures are reasonably related to the legitimate government goals above, are not excessive in relation to those goals, and are not punitive under *Bell*.

### E.     Access To Group Therapy (Count V).

18.     The record contains no evidence Defendants deny Plaintiffs access to group therapy; to the contrary, the record shows that group therapy is offered.  To the extent Plaintiffs simply mean to challenge the quality of MSOP's treatment program, the Eighth Circuit dismissed Count III's allegation of inadequate treatment.  *Karsjens II*, 988 F.3d at 1054.

### F.     Furniture Removal (Count V).

19.     Plaintiffs presented no evidence about punitive furniture removal, and there is no basis on which to conclude that MSOP's furniture situation is punitive under *Bell*.

### G.     Employment Options (Count V).

20.     The record reflects that MSOP ties vocational programming opportunities and hours to rule compliance and treatment engagement, which serves MSOP's therapeutic and security interests.  *E.g., Gamble v. Minnesota State-Operated Servs.*, No. CV 16-2720 (JRT/KMM), 2021 WL 2686094, at *2, *7 (D. Minn. June 30, 2021) (MSOP's vocational program "incentivize[s] detainee participation in sex-offender treatment" and "Minnesota law explains that the [vocational work program] is part of sex-offender treatment").  MSOP's vocational program is reasonably related to these legitimate objectives, its vocational policies, is not excessive in relation to those goals, and is not punitive under *Bell*.

### H.     Searches And Seizures (Count V).

21.     Count V's claims related to searches and seizures must be dismissed because they are properly addressed under the Fourth Amendment, not Fourteenth Amendment

substantive due process:  where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" such a claim.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).

22.     In addition, Plaintiffs already brought a Fourth Amendment claim in this case that included these allegations, the Court dismissed it, and Plaintiffs did not appeal. Doc. 1108, at 35–38; Doc. 1118, at 2.  During that process, the Court already held MSOP's search and seizure policies to be a reasonable response to legitimate problems of institutional security, Doc. 1108, at 35–38, and there is no evidence to the contrary, which mandates dismissal of this claim.  *See supra* pp. 18–19; *see also Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) ("The law of the case doctrine provides that a court's decision on legal issues should govern the same issues in later stages of the same case.").

## I.     Restriction Of Rights For Minor Violations Of MSOP Facility Rules And Arbitrary Discipline And Decision-Making (Count VII).

23.     These claims appear to challenge MSOP's BER policy, but Plaintiffs put on no evidence that the BER system disciplines MSOP clients for unconstitutionally "arbitrary" or "minor" reasons, and the record instead reflects that the BER system serves security interests at MSOP and has therapeutic benefit by shaping prosocial behavior and allowing MSOP to operate an effective treatment facility.

24.     MSOP's BER policy requires disciplinary restrictions to be reasonably related to the nature of the behavior and proportional in severity.  Ms. McCulloch testified

that the BER policy and process is consistent with common practice at other such facilities. MSOP's BER policy is reasonably related to the legitimate interests above, is not excessive in relation to those interests, and is not punitive under *Bell*.

### J.   Inadequate Meals (Count VII).

25.   The record contains no evidence that Plaintiffs receive inadequate meals, instead reflecting that MSOP's cafeteria offerings are palatable, and that MSOP clients have access to a variety of other food sources, including canteen items.  MSOP's food service is not punitive under *Bell*.

### K.   Less Restrictive Alternatives (Count VI).

26.   As an initial matter, the less restrictive alternative claims advanced in Count VI duplicate claims from Counts I and II that the Eighth Circuit already disposed of in *Karsjens v. Piper*, 845 F.3d 394 (8th Cir. 2017) ("*Karsjens I*").  *See* Doc. 1160, at 2–8 (discussing and comparing the "less restrictive alternative" claims in Counts I, II, and VI, and the Eighth Circuit's dismissal of those claims in Counts I and II).  Nothing about *Karsjens II* overruled *Karsjens I*'s determinations on any subject, including this one. Accordingly, under both the law of the case and binding precedent, substantive due process does not require Defendants to provide less restrictive environments tailored to each client's security needs, whether at initial commitment or thereafter.  *Karsjens*, 845 F.3d at 409-411; *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Hum. Servs.*, 364 F.3d 925, 931 (8th Cir. 2004) ("It is well settled that when a matter is decided by [the Eighth Circuit], it becomes the law of the case; the district court is not free on remand to reconsider any question finally disposed of by the court of appeals.").

27.    In addition, contrary to Count VI's allegations, the record shows that MSOP provides less restrictive alternatives to MSOP's secure facilities, in the form of CPS and provisional discharge locations.  The record also shows that this range of facilities is more than adequate, including the 706 Experts' praise for CPS as containing "innovative programming and a therapeutic environment that should be the envy of other [sex offender civil commitment] programs."

28.    Finally, existing case law confirms, under *Bell*, that these facilities do not need to provide confinement in the least restrictive environment.  In the context of restraints, the Eighth Circuit held that "[n]othing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available" after noting that "'whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus non-punitive distinction, the outcome is the same." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1032 (8th Cir. 2012); *see also Valdez v. Rosenbaum*, 302 F.3d 1039, 1046 (9th Cir.2002) ("A reasonable relationship between the governmental interest and the challenged restriction does not require . . . showing a 'least restrictive alternative.'" (citation omitted)).  *Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 (5th Cir. 1987); *Soc'y for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1248–49 (2d Cir. 1984); *Phillips v. Thompson*, 715 F.2d 365, 367–68 (7th Cir. 1983).

## L.    Conditions As A Whole (Counts V–VII).

29.    To the extent Plaintiffs contend the individual conditions above somehow aggregate into punitive conditions overall, the Court disagrees.  The record reflects positively on both MSOP's policies and physical conditions as a whole.  The 706 Experts—

in particular Ms. McCulloch—reviewed all of MSOP's policies and raised no concerns about them being unusual for civil commitment facilities or excessive.  In addition to the 706 Experts' praise of CPS, they referenced Moose Lake as either consistent with or exceeding the quality of other such facilities, and detailed the adequacy of the secure facilities in St. Peter.  As otherwise detailed above, MSOP's policies and facilities reasonably relate to legitimate government objectives, are not excessive in relation to those objectives, and are not punitive under *Bell*.

### III.     PLAINTIFFS' INADEQUATE MEDICAL CARE CLAIM.

30.     As noted, the record contains no evidence that Defendants were deliberately indifferent to any MSOP client's serious illness or injury, much less at the policy level, on a widespread basis, or in a way that caused harm.  Plaintiffs have not proven their claim for inadequate medical care under the governing standard in *Senty-Haugen*.

### ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' remaining claims (Counts V, VI, and VII) are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  _____          _____
                                                    DONOVAN W. FRANK
                                                    United States District Court Judge