## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Scott Karsjens, David Leroy Gamble, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, Brian K. Hausfeld and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Jodi Harpstead, Dennis Benson, Kevin Moser, Tom Lundquist, Nancy Johnston, Jannine Hébert, and Ann Zimmerman, in their official capacities,<br>Defendants. | Court File No. 11-cv-03659 (DWF/JJK)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF COUNTS V, VI, AND VII OF PLAINTIFFS' THIRD AMENDED COMPLAINT ON REMAND** |

## INTRODUCTION

Plaintiffs are all involuntarily and indefinitely committed to the Minnesota Sex Offender Program ("MSOP") for treatment, not punishment.[1]

Plaintiffs now present three Counts from their Third Amended Complaint to be considered under the guidance set forth in the Eighth Circuit's recent Order in this matter. Count V asserts a claim for Denial of Right to Be Free From Punishment in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution. Count VI

---

[1] As civil detainees, Plaintiffs "may not be punished at all." *Youngberg v. Romero,* 457 US 307, 316 (1982).

asserts a claim for Denial of Less Restrictive Alternative Confinement in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution. Count VII asserts a claim for Denial of Right to Be Free from Inhumane Treatment in Violation of the 14th Amendment to the U.S. Constitution and the Minnesota Constitution.

Plaintiffs and Class members have a right under Minnesota Statute ¶¶ 253D.03 and 253B.03, to receive proper care and treatment, best adapted, according to contemporary professional standards, to render further supervision unnecessary. In its February 24, 2021 Order addressing Plaintiffs' claims that the Defendants have violated the Fourteenth Amendment by subjecting Plaintiffs and the Class to punitive and inhumane conditions, including for failing to provide less restrictive alternatives, the Eighth Circuit directed that this Court is "instructed to consider the claim of inadequate medical care under the deliberate indifference standard outlined in *Senty-Haugen*, and to consider the remaining claims under the standard for punitive conditions of confinement outlined in *Bell*." *Karsjens v. Lourey*, 988 F.3d 1047, 1054 (8th Cir. 2021). The Eighth Circuit also instructed that, "[i]n considering whether the conditions ... are unconstitutionally punitive, the court ***must*** review the totality of the circumstances of [Appellants'] confinement." *Id.* (citations omitted, emphasis added).

When viewed under these standards and observing Plaintiffs' claims in the totality of their circumstances, Plaintiffs presented evidence at trial that amply supports a finding that Defendants' violated Plaintiffs' constitutional rights and this Court should enter judgment in favor of Plaintiffs.

## PROCEDURAL HISTORY

This *pro se* case was filed on December 21, 2011, alleging constitutional and state law violations regarding Minnesota's civil commitment of sex offenders. Shortly thereafter, the district court appointed the undersigned counsel to represent the purported class. This Court then certified a class of all individuals in the MSOP on July 24, 2012.

After comprehensive discovery and motion practice, this Court issued a pretrial order on November 7, 2014 bifurcating the trial and identifying the claims to be tried in the first trial (Phase One). (Doc. 647).

The Phase One trial, which involved Counts I, II, III, IV, V, VI, VII and XI of Plaintiffs' Third Amended Complaint ("TAC"), began on February 9, 2015 and concluded on March 18, 2015. The remaining counts – VIII, IX, and X were reserved for Phase Two of trial. (Doc. 647).

On June 17, 2015, this Court issued an Order in favor of Plaintiffs on Counts I and II – ruling that the Minnesota Commitment and Treatment Act ("the Act") was unconstitutional on its face and as applied. This Court found that it did not need to address Counts III, V, VI and VIII, "because any remedy fashioned [regarding Counts I and II] will address the issues raised in the remaining Phase One Counts…." *See* Doc. 966 at ¶38.

Defendants appealed this Court's ruling on Counts I and II to the Eighth Circuit. The Eighth Circuit rejected the application of strict scrutiny to the Act and reversed this Court's findings on Counts I and II. *Karsjens I,* 845 F.3d 394 (8th Cir 2017). The Eight

Circuit did not make any findings as to whether the Act was punitive in purpose or effect under Counts III, V, VI, or VII. *Id.*

On December 8, 2017, Defendants filed a renewed Motion for Summary Judgment on Counts VIII, IX, and X as well as for apportionment of the Rule 706 expert costs to Plaintiffs. Docs. 1095, 1097. Defendants also argued that the district court should dismiss the remaining Phase One claims (Counts III, V, VI, and VII) under this Court's mandate from *Karsjens I.* Doc. 1097 at 4-9.

Plaintiffs opposed Defendants' motion to dismiss Counts III, V, VI and VII, arguing that these claims raise allegations that the Act is punitive (as opposed to civil) in purpose or effect and therefore unconstitutional. Doc. 1100 at 15. Plaintiffs specifically argued that the basis for Counts V and VII is that civil commitment under the Act is punitive. TAC at ¶¶269-283.

Plaintiffs also argued that the Eight Circuit's opinion on Counts I and II did not address whether the Act was punitive and therefore the ruling in *Karsjens I* did not apply to those claims. Doc. 1100 at 16. Plaintiffs contended that based on the evidence presented at trial that this Court should find that the Act is punitive and therefore unconstitutional as set forth in Counts III, V, VI, and VII.

This Court held oral arguments on these issues and dismissed Plaintiffs' remaining Phase One claims (Counts III, V, VI, and VII) with prejudice and dismissed Plaintiffs' remaining Phase Two claims (Counts VIII, IX, and X) also with prejudice. This Court held that the Eighth Circuit's *Karsjens I* was dispositive of Plaintiff's Phase One claims.

Plaintiffs appealed the dismissal of Counts III, V, VI, and VII. On February 24, 2021, the Eighth Circuit issued an Opinion which affirmed the dismissal of Plaintiffs' Count III as duplicative of Counts I and II.[2] The Eighth Circuit remanded this matter to this Court with the direction to review the deficient medical treatment aspect of Count VII under the *Senty-Haugen v. Goodno* deliberate indifference standard and apply the *Bell v. Wolfish* standard to Counts V, VI, and the remaining portion of Count VII. That standard establishes that conditions of confinement violate due process for detainees if the conditions "amount to punishment of the detainee." *Karsjens v. Lourey*, 988 F.3d 1047, 1054 (8th Cir. 2021). The Eight Circuit further instructed that in "considering whether the conditions ... are unconstitutionally punitive, the court must review the totality of the circumstances of [Appellants'] confinement." *Id.* (citations and quotations omitted).

On April 8, 2021, Plaintiffs filed a Motion to Amend the Third Amended Complaint ("TAC"). Doc. 1152. This Court held oral arguments on the matter and ultimately issued an Order denying Plaintiffs' Motion. Doc. 1167. On July 21, 2021, this Court issued an Order setting the briefing schedule for these motions and proposed Findings of Facts and Conclusions of Law. Doc. 1170.

## **ARGUMENT**

In its February 24, 2021 Order, the Eighth Circuit recognized that "[n]either pretrial detainees nor civilly committed individuals may be punished without running

---

[2] Plaintiffs filed a Petition for Certiorari with the United States Supreme Court on July 22, 2021 on the dismissal of Count III.

afoul of the Fourteenth Amendment…. Regarding pretrial detainees, this prohibition against punishment encompasses conditions of confinement." *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) (citing *Bell* [*v. Wolfish*], 441 U.S. at 535, 99 S.Ct. 1861 (holding that pretrial detainees may not be punished); *Youngberg* [*v. Romero*], 457 U.S. at 316, 102 S.Ct. 2452)).

The Eighth Circuit went on to note that, "In analyzing whether a condition of confinement is punitive, courts 'decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose' and "[u]nless the detainee can show 'an expressed intent to punish ..., that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.'" *Id.* at 1054 (citing *Bell*, 441 U.S. at 538 (citation omitted); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 398, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). ("[A]s *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing ... objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.").

Put another way, "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539. The Eighth Circuit additionally noted that "In considering whether the conditions ... are unconstitutionally

punitive," the court must "review the totality of the circumstances of [Appellants'] confinement." *Id.* at 1054 (citing *Morris v. Zeferi*, 601 F.3d at 810 (8th Cir 2010)).

Plaintiffs and Class Members in this case have all been involuntarily civilly committed. Plaintiffs and Class Members have a right under Minnesota Statute ¶¶253D.03 and 253B.03, subd. 7, to receive proper care and treatment, best adapted, according to contemporary professional standards, to render further supervision unnecessary.

Under the standards set forth by the Eighth Circuit in this matter, Plaintiffs have successfully asserted claims and presented more than enough evidence at trial to prevail on Counts V, VI, and VII[3] of their Third Amended Complaint. Judgment should be entered accordingly.

## I.      Defendants Failure To Provide Less Restrictive Alternatives Is Unconstitutionally Punitive.

Plaintiffs' Count VI of their Third Amended Complaint asserts a claim that Defendants' failure to provide access to less restrictive alternative confinement. Defendants' failure to provide less restrictive alternative confinement harms Plaintiffs in numerous ways, each of which is tantamount to unconstitutional punishment under the *Bell* standard set forth above.[4]

---

[3] The Eighth Circuit did recognize that claims related to inadequate medical treatment should be reviewed under the deliberate indifference standard outlined in *Senty-Haugen,* which will be discussed in more detail below.  *See Karsjens II*, 988 F.3d at 1054.

[4] *See also Foucha v. Louisiana*, 504 U.S. 71, 77 (1992) ("Even if the initial commitment was permissible, a civil commitment may not constitutionally continue after that basis no longer exist[s].") (internal citations and quotations omitted).

At trial, MSOP's Dr. Barbo admitted that the goal of MSOP is to provide treatment and work people toward the placement in the program or community that is least restrictive as necessary to maintain public safety and over the course of that process, continue to work toward as much independence as possible. *See* Barbo- Vol. 20, 4552:2-7. But it is clear from the evidence presented at trial that "[a]t present, MSOP has no framework for a less restrictive alternative, nor does it have services available to assist clients in the task of community reintegration should they achieve release." *See* Plf. Ex. 225 at 73.

### 1. There Is No Option For A Less Restrictive Alternative At The Time Of Initial Commitment Regardless Of Risk.

First, the evidence at trial made clear that Defendants apply a blanket policy of requiring all individuals in the MSOP to start treatment at the prison-like MSOP facilities regardless of their risk level. *See* Fox- Vol. 7, 1600:7-10; Doc. 966 at ¶53 ("There is no alternative placement option to allow individuals to be placed in a less restrictive facility at the time of their initial commitment to the MSOP. Dr. Fox credibly testified that the only facilities in which individuals can be placed at the beginning of their commitment are the secure facilities at Moose Lake and St. Peter."). Upon initial commitment, every Plaintiff is placed in the high security Moose Lake facility regardless of that individual's risk profile, prior treatment, or physical condition.

Indeed, MSOP does not perform risk assessments on newly committed individuals, despite the fact that various experts testified that risk assessments should be done when an individual is first committed to MSOP. *See* Plf Ex. 225 at 6; Caldwell –

Vol 11, 2484:6-10 (testifying that risk assessments should always be done when an individual is first committed); Wilson- Vol 3, 472:6-12 (testifying that performing risk assessments on newly committed Class Members would correct some of the situations in which individuals were improperly referred and committed).

Furthermore, it is the practice for MSOP to start all patients in Phase I of the treatment program, *see* Elsen- Vol. 7, 1345:23-1346:1; Lewis- Vol. 7, 1399:13-15, even though there is no report done at the time of admission to determine what phase of treatment a Class Member will be placed in. *See* Hébert - Vol. 12, 2786:19-24; *see also* Peterson- Vol. 7, 1391:1-4; Berg- Vol. 7, 1509:8-11 (testifying that there are no assessments done at initial intake to MSOP to determine what phase of treatment a Class Member should be placed in.).

Former MSOP Executive Director, Dennis Benson, testified that there are no less restrictive placements for Class Members on the front-end of commitment, and a real weakness of the MSOP is the lack of community-based facilities. *See* Benson Depo. 134:14-135:3. This Court in its prior Finding of Fact also recognized that, "[t]here is no alternative placement option to allow individuals to be placed in a less restrictive facility at the time of their initial commitment to the MSOP." Doc. 966 at ¶53; *see also* Barbo- Vol. 20, 4550:7-17 (testifying the CPS is not available to newly-committed individuals); Puffer – Vol. 7, 1565:7-10) (MSOP Clinical Director Peter Puffer testifying that MSOP does not have any less restrictive facilities other than Community Preparation Services on the St. Peter campus.) Accordingly, as this Court previously found, "[t]his lack of less restrictive facilities and programs undermines the MCTA's provision allowing a

committing court to consider placing an individual at a less restrictive alternative." Doc. 966 at ¶53.

Because MSOP does not have any less restrictive facilities, other than CPS, which is not available to individuals when they are initially committed, "[u]nder current law all offenders committed to MSOP are presumptively placed in the highest level of security. The result is that some offenders, while meeting the criteria for commitment, may be needlessly confined in the most secure facilities, when both public safety and the need for effective treatment might be better served in a less restrictive environment." *See* Plf. Ex. 41 at 3.

### 2. There Are No Less Restrictive Alternative Available For Any Individuals Regardless Of Their Risk Other Than CPS.

The evidence at trial also showed that Defendants have simply failed to provide alternative confinement even when Plaintiffs have been clinically approved to have access to less restrictive confinement. As this Court noted in its prior Findings of Fact, "It is undisputed that there are civilly committed individuals at the MSOP who could be safely placed in the community or in less restrictive facilities." Doc. 966 at ¶53. *See also,* Plf. Ex. 225 at 73 (The Rule 706 Experts observe that "[a]t present, MSOP has no framework for a less restrictive alternative, nor does it have services available to assist clients in the task of community reintegration should they achieve release.").

The Sex Offender Civil Commitment Advisory Task Force ("Task Force") created by the Court issued recommendations in December of 2012 regarding less restrictive alternatives, including that the Legislature must provide adequate funding for less secure

residential facilities within a reasonable period of time. *See* Plf. Ex. 35. The Task Force also recommended that the DHS Commissioner develop less restrictive programs throughout the state. *See id.* The Task Force recommended that any new less restrictive facilities be designed to serve those who are already civilly committed to secure facilities as well as those who are subsequently civilly committed. *See* Plf. Ex. 35

The evidence was clear at trial that MSOP should offer a continuum of facility options, which they currently do not have, *see* Puffer- Vol. 1565:11-20; Fox- Vol. 7, 1600:11-18, and that there are a number of Class Members who could be served in less restrictive environments, *see* McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1.

Currently CPS is the only less restrictive alternative at MSOP and, in reality, that is only available to individuals who have completed the first three phases of treatment, regardless of risk. *See* Def. Ex. 7; *see also* Plf. Ex. 184 at 88; Freeman- Vol. 4, 801:12-16.

### 3.   MSOP Knows There Are Individuals Who Could Be In Less Restrictive Settings But They Still Remain In The Highly Secure MSOP Facility.

The evidence at trial clearly showed that Defendants continue to house Plaintiffs and Class Members in prison-like facilities despite knowing specific Class Members who could be discharged or placed in a less restrictive environment.

The Rule 706 Experts reported that "[p]rofessionals we interviewed – including MSOP clinicians and outside psychologists who assess sex offenders for the court – generally agreed that some sex offenders at MSOP facilities could be treated in less

secure community settings." *See* Plf. Ex. 184 at 43. The Rule 706 Experts likewise agreed that there are several Class Members who could be discharged or served in a less restrictive environment. *See* McCulloch, Vol. 2- 255:23-256:5; McCulloch- Vol. 1, 154:11-17; Wilson- Vol. 3, 550:22-551:1.

Moose Lake Clinical Director, Mr. Puffer, testified that there are Class Members who could be treated in less restrictive settings. *See* Puffer- Vol. 7, 1560:20-22, 1561:2. St. Peter Clinical Director, Dr. Fox, testified that there are Class Members whose treatment needs could be met in a less secure environment. *See* Fox- Vol. 7, 1597:19-22. MSOP Treatment Psychologist, Ms. White, testified that there are Class Members who could be provisionally discharged. *See* White- Vol. 9, 1965:15-25, 1966:6-9, 14. Clinician Ms. Lewis testified that certain Class Members should be in a CPS-type setting. *See* Lewis- Vol. 7, 1407:18-23. Clinician Mr. Ulrich testified that certain Class Members could be treated in a less secure facility. *See* Ulrich- Vol. 7, 1477:8-23. Mr. Benson testified that he had conversations with Ms. Hébert regarding a number of Class Members who would have been appropriate for other programs or less restrictive alternatives. *See* Benson Depo. 73:10-23. Ms. Hébert testified that it is possible there are Class Members in CPS, beyond those who have already petitioned, who could live safely in the community today. *See* Hébert- Vol. 12, 2708:1-6.

The 706 Experts also testified that all Class Members with juvenile-only offences were improperly placed. *See* Wilson- Vol. 3, 663:9-11. Dr. Fox also testified that there are Class Members with juvenile-only offenses who could likely be in a less secure environment, but the MSOP has not singled out juvenile-only offenders for evaluation.

*See* Fox- Vol. 7, 1598:24-1599:9. The MSOP has been aware that juvenile-only offenders should be considered carefully. See Plf. Ex. 88. Indeed, Mr. Benson testified that they were concerned about juvenile-only offender Class Members because, "the program was stuck, and you have very young individuals who may or may not be very dangerous." *See* Benson Depo. 74:11-20. But Ms. Johnston testified that the MSOP does not have money in its budget to assess all the juvenile-only offender Class Members. *See* Johnston- Vol. 13, 3018:3-16.

In addition, the 706 Experts testified that many Class Members in the Alternative Program could be treated in a less restrictive alternative. *See* McCulloch- Vol. 1, 89:2-12; Miner- Vol. 6, 1125:2-9. Mr. Haaven also testified that there are Class Members in the Alternative Program who may likely have reached maximum treatment benefit and could receive services in a different setting. *See* Haaven Depo. 79:20-80:4. The evidence at trial was clear that as of April of 2013, there were 21 Class Members on the Assisted Living Unit who met "maximum treatment effect" and could live outside the high security setting of Moose Lake, that there were 20 Class Members in the Alternative Program who met "maximum treatment effect" and could live outside the high security setting of St. Peter, and that there were 52 Class Members with no adult offenses who could be reviewed to determine whether they have reached maximum treatment effect. *See* Plf. Ex. 313.

The evidence at trial showed that, in the fall of 2013, the MSOP selected six of the Class Members from the Assisted Living Unit and six of the Class Members from the Alternative Program to support for transfer to a less restrictive alternative for the MSOP

in Cambridge, Minnesota. *See* Johnston- Vol. 13, 3038:2-6. But, despite the fact that even the MSOP director supported the transfer of these individuals to a less restrictive alternative, the plan was suspended following an order from Governor Dayton to Commissioner Jesson, *see* Plf. Ex. 30, and the twelve Class Members supported for transfer were, at the time of trial, still in the high secure facilities at Moose Lake and St. Peter. *See* Jesson- Vol. 5, 942:23-943:2; Elsen- Vol. 7, 1354:12-14; Puffer- Vol. 7, 1530:7-10.

Even today, dozens of Plaintiffs await placement in the Community Preparation Services Unit ("CPS") on the St. Peter campus despite being approved for progression to that phase of treatment because MSOP simply has not provided adequate resources to accommodate those individuals. MSOP's Reintegration Director, Dr. Elizabeth Barbo, testified that there have been times when Class Members could have been transferred to CPS but they had to wait because of lack of beds. *See* Barbo- Vol. 20, 4560:18-21.

Additionally, because MSOP does not do regular risk assessments, *see* Peterson- Vol. 7, 1390:4-5; Puffer- Vol. 7, 1522:4-7; Johnston- Vol. 13, 2935:3-5, they do not actually know the proper placement for each Class Member. *See* Plf. Ex. 41 at 3. In fact, according to the expert testimony at trial, if there are Class Members who are found, through a regular risk assessment, to not meet the high-risk level for their current placement, their placement at the MSOP could be doing them harm. *See* Wilson- Vol. 3, 495:1-5.

14

As such, the evidence at trial demonstrated that (1) all Class Members regardless of risk is place in the highest secured facilities at the outset of commitment; (2) that there are no other less restrictive alternatives, other than CPS, which is only available to people who have completed Phases 1 – 3 (again regardless of risk), (3) that MSOP knows there are many people who could be served in less restrictive alternatives but fail to move them to those less restrictive alternatives, and (4) that keeping someone in the wrong placement could cause them harm. The 706 Experts found that "[i]t is a fundamental principle in mental health treatment that individuals should be treated in the least restrictive environment to ensure that infringement on individual liberties is kept at a minimum." *See* Plf. Ex. 225 at 61-62. If Class members can be safely managed in the community, then they need to be managed in the community. *See e.g.* Freeman- Vol. 4, 736:7-22.

The condition of confinement at MSOP that keep Plaintiffs in more restrictive conditions then their risk level requires simply because Defendants choose not to check their risk level or move them to a more appropriate living facility serves no legitimate purpose and is punitive – particularly in light of all the time Defendants have had to correct this constitutional deficiency. That failure results in glaring unconstitutional punishment of Plaintiffs and Class Members under the *Bell* standard.

Defendants' failure to move Plaintiffs and Class Members to less restrictive alternatives when they satisfy that criteria is unconstitutional. Budgetary restrictions or lack of resources cannot not justify constitutional violations. *See Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974) (finding that "[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration.") The same must hold

true here, where Plaintiffs are entitled to be free from **any** punishment. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S. Ct. 2452, 2458, 73 L. Ed. 2d 28 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—**who may not be punished at all**—in unsafe conditions.") (emphasis added). There is no justification for keeping Plaintiffs in the high security facilities at MSOP without providing less restrictive alternatives for those whose risk level supports such a confinement. Without having the restrictions be reasonably related to the legitimate governmental goal, it becomes arbitrary and purposeless. *See Bell*, 441 U.S. at 539. At that point, the confinement amounts to unconstitutional punishment.

Based on the evidence presented at trial, it is clear that Defendants' failure to provide less restrictive alternative facilities, to move Class Members to those facilities when appropriate and the resulting delays in progression is unconstitutionally punitive and violates Plaintiffs' and Class Members' constitutional rights under the standard set forth by the Eighth Circuit. This Court should grant judgment in favor of Plaintiffs on this Count.

## II.    As Asserted In Count Five And Seven Of Their Third Amended Complaint, Plaintiffs Were Subjected to Inhumane Treatment And Improper Punishment under *Bell v. Wolfish.*

Count V of Plaintiffs' Third Amended Complaint asserts a claim that Defendants' violated Plaintiffs' and Class Members' right to be free from punishment under  the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution. Plaintiffs' Count VII asserts a claim that Defendants' violated Plaintiffs' and Class

16

Members' right to be free from inhumane treatment punishment under  the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution.[5] Again, "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539.

In their Third Amended Complaint, Plaintiffs alleged a number of specific deficiencies in the MSOP that – particularly when viewed in the totality of the circumstances - render the program punitive and unconstitutional.

Plaintiffs have presented evidence that show that the restrictions they endure are not rationally connected to the purported alternative purposes and are arbitrary and excessive – particularly when observed in the totality of the circumstances within the MSOP.

**Double Bunking** – Plaintiffs and Class Members are double bunked in wet cells in a facility modeled after a prison. As the Court appointed Rule 706 Experts recognized,

> Nearly all the clients at Moose Lake are double bunked, with the exception of clients living on one of the specialized units. Double bunking is not uncommon at other [Sex Offender Civil Commitment] facilities, but it is not optimal and can be extremely difficult to manage, given the assaultive history of many of its clients and the presence of vulnerable clients. As is common in many institutional settings, sexual liaisons between clients (abusive or consensual) can be difficult to manage in a double bunking scenario. Civil commitment administrators generally agree that double bunking can be

---

[5] The evidence to support Counts V and VII overlap, except with regard to the inadequate medical treatment claim in Count VII which will be addressed below.

counter-therapeutic for this population, but bed space demands may require it.

PX225 (November 17, 2014 Rule 706 Expert Report and Recommendations)

While civil commitment administrators may find double bunking necessary due to budgetary constraints, those limitations do not give Defendants leeway to violate Plaintiffs right to be free from punishment. *See Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974) (finding that "[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration."). Defendants' decision to double bunk Class Members can and does put them at risk for unconstitutional violence. *See Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984) ("Subjecting prisoners to violent attacks or sexual assaults, or constant fear of such violence, shocks modern sensibilities and serves no legitimate penological purpose."). The same must hold true in a civil commitment setting.

**Behavioral Expectation Reports** – Plaintiffs and Class Members lack a reasonable grievance procedure when they are punished with Behavioral Expectation Reports (BERs). These BERs directly affect Class Members' progress through the program and unconstitutionally delay their release well after they no longer fit the requirement for commitment.

Class Members receive BERs when behavioral expectations of the program are violated. Def. Ex. 48. The BER policy, as implemented delays Class Members' progression through treatment. Pursuant to MSOP phase progression policy, a Class Member cannot progress to the next phase of treatment if they have a certain number of

behavioral expectation reports (BERs). Def. Ex. 2 at 16-17. Both major and minor BERs can affect treatment progression. *See e.g.* Hébert - Vol. 12, 2772:3-5; Def. Ex. 2; Berg-Vol. 7, 1512:16-18.

For major BERs, Class Members are entitled to a hearing; however, they cannot have legal representation or call witnesses, the hearings are run by the staff and can only be appealed internally. *See e.g.* Def. Ex. 48; Bolte- Vol. 8, 1742:11-17. For minor BERs, which can also be used to hold back a Class Member's treatment progress, the Class Member is not even entitled to a hearing. *See e.g.* Def. Ex. 48; Bolte- Vol. 8, 1742:1-5.

Determining whether to give a BER is subjective, and they are normally given by security staff at MSOP. *See* Hébert - Vol. 12, 2772:14-21. In order to move from Phase I to II or Phase II to III, a Class Member must have two consecutive quarters with no major BERs. Def. Ex. 2 at 16-17. This is true even if the major BERs are not related to sexual offending. *See* Hébert - Vol. 12, 2772:3-5*; see also* Doc. 966 at ¶88 ("Minor BERs, including those unrelated to sexual offending, can prevent a committed individual from progressing in treatment phase."); *Id.* at ¶87 ("To progress in treatment phase, a committed individual must have at least two consecutive quarters with no major Behavioral Expectation Reports ("BERs"), even if the major BERs are not related to sexual offending.").

Major BERs may be issued for things such as signing up for an activity and failing to attend or throwing paperwork. Bolte- Vol. 8, 1729:23-1730:5; Plf. Ex. 300-D; Plf. Ex. 356. Plaintiffs and Class Members may appeal a major BER. Def. Ex. 48, Bolte- Vol. 8, 1742:10. At the appeal hearing, the Class Member is not able to have legal representation

or call witnesses. Def. Ex. 48; Bolte- Vol. 8, 1742:11-13. The BER hearings are run by

MSOP staff. Bolte- Vol. 8, 1742:14-17.

If the Class Member is not satisfied with the facility director's response, an appeal

of that decision can be made to the MSOP's Executive Director. Def. Ex. 48. The

decision of the Executive Director is final. Def. Ex. 48. The BER appeal process is rarely

successful for Class Members. Bolte- Vol. 8, 1739:8-10; Plf. Ex. 300-F; Terhaar- Vol. 9,

1995:12-18.

Minor BERs may be issued for behavior such as horseplaying or taking an extra

glass of Koolaid at a meal. Plf. Ex. 300-B, Plf. Ex. 355. Minor BERs are considered in

phase progression decisions, even though they are not specifically addressed in the phase

progression requirements. Def. Ex. 2; Lewis- Vol. 7, 1402:17-20; Berg- Vol. 7, 1512:16-

18. Ms. Hébert testified that minor BERs can hold back a Class Member's treatment

progress, even if they are not related to sexual offending. Hébert - Vol. 12, 2771:3-5,

2772:10-13. Minor BERs do not provide a hearing process. Def. Ex. 48; Bolte- Vol. 8,

1742:1-5. Even if a Class Member met all the requirements of phase progression, yet they

had a number of minor BERs, those minor BERs could keep them from progressing in

phase. Berg- Vol. 7, 1514:7-12.

BERs may even result in phase regression. One Plaintiff was moved back from

Phase II to Phase I after receiving a major BER for possessing adult-themed

pornography. Foster- Vol. 12, 2850:5-9, 2851:20-24. It took him three years to move

back to Phase II again. Foster- Vol. 12, 2851:20-24. Treatment progress is delayed for

Class Members who have behavioral problems because of this policy and practice.

Freeman- Vol. 4, 803:7-9. These delays result in Class Members being unconstitutionally confined longer than necessary. The Supreme Court has held that a "committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous, *i.e.,* the acquittee may be held as long as he is both mentally ill and dangerous, but no longer." *Foucha v. Louisiana*, 112 S.Ct. 1780, 1784, 504 U.S. 71, 77 (U.S. 1992) (citations and quotations omitted).

**Delays In Progression Caused by MSOP -** The evidence at trial made clear that the treatment program at MSOP has changed many times over the years and has resulted in many delays in progression for Class Members. *See e.g*. Hébert- Vol. 18, 4111:1-3 (testifying that over the years the MSOP has had many executive directors); Persons Depo 90:19-23 (testifying that the MSOP's treatment program changed a number of times between 2003 and 2008); Haaven Depo. 55:10-15 (testifying that when there is a leadership change at the MSOP there has generally been a change to the structure of the program); Steiner- Vol. 6, 1227:21-1228:1, 1228:14-23 (testifying that at some point in the mid-1990s, the treatment program was changed and Class Members were moved to Moose Lake, where they started the treatment program from the beginning); White- Vol. 9, 1967:15-23 (testifying that in 2008, some Class Members were moved back in phase based on the re-evaluations done under the new program).

The evidence at trial also showed that understaffing has resulted in delays in treatment progression. *See e.g*. Benson Depo. 55:3-8, 23-25 (testifying that 2008, the treatment program was understaffed, poorly trained and inexperienced and that the treatment that was occurring was sporadic and inconsistent); Hébert- Vol. 17, 3882:3-22

(testifying that in 2008 the program was very short staffed, the treatment was inconsistent, and the program was not structured in a way that was reflective of a sex offender treatment program). Maintaining clinical staffing has been a consistent issue at the MSOP. The 2010 Site Visit Report found, "A concern is that the clinical program is currently understaffed, particularly at the Moose Lake site.  As a result of understaffing, clinicians' current workload has increased beyond capacity . . . Four of the nine clinical supervisor positions were unfilled at the time of this review." *See* Plf. Ex. 25 at 8.  The 2011 Auditor's Report found, "[c]linical understaffing has been a very serious problem, which has affected the ability of the program to deliver treatment to clients." *See* Plf. Ex. 184 at 60. The 2012 Site Visit Report found "Although clinical staffing levels at Moose Lake had improved at the time of our last review in December 2011, clinical staffing levels at the site have since dropped, and this is a significant concern." *See* Plf. Ex. 43 at 2. The 2012 Site Visit Report also found, "At the time of the present site visit, of 54 clinical positions at Moose Lake, 16 positions were vacant.  Of 11 clinical supervisor positions, two positions were vacant." *See* Plf. Ex. 43 at 10. As of March 2015, there was a 15% vacancy rate in Moose Lake and a 10% vacancy rate in St. Peter. *See* Hébert- Vol. 18, 4018:11-22. Ms. Hébert testified that short staffing can affect the ability of the MSOP to deliver the treatment program as it is designed, which can affect progress through treatment. *See* Hébert- Vol. 12, 2816:6-14. Short-staffing can also cause clinicians to have higher caseloads, *see* Johnston- Vol. 15, 3348:1-3, which can affect Class Member treatment progress. *See* Berg- Vol. 7, 1517:11-13.

Many MSOP staff members testified that inconsistent scoring on the Matrix factors can slow the progress of Class Members through treatment, again something outside of the Class Members control. *See* Elsen- Vol. 7, 1350:8-10, 15-16; Berg- Vol. 7, 1511:9-13; Puffer- Vol. 7, 1572:9-11; Fox- Vol. 7, 1602:3-6.

The treatment program is a condition of the Class Members confinement and to consistently place barriers, which are outside the control of Class Members, to delay progression is punitive. In fact, there was evidence at trial suggesting that being in treatment for too long can be counter-productive and result in diminished returns, meaning it may actually make the patient worse. *See* Plf. Ex. 225 at 66. Indeed, Plaintiffs' expert testified that when treatment extends for too long, there is not any effect on recidivism and it may have a diminishing impact. *See* Cauley- Vol. 10, 2219:14-2220:11. Defendants' policies and the application of those policies result in needless delays in progression through the program. These delays, which are caused only by the Defendants' conduct and of which Class Members have no control, have no rational relationship to the legitimate governmental interest of confinement and are therefore results in constitutionally impermissible punishment under the *Bell* standard.

This Court should grant judgment in favor of Plaintiffs on this Count.

### III.   Plaintiffs Were Subject To Inhumane Treatment For Lack of Adequate Medical Care in Violation of the Fourteenth Amendment.

Plaintiffs' Count VII, which asserts a claim to be free from inhumane treatment in violation of the Fourteenth Amendment, also brings this claim based on inadequate

medical care, which is to be analyzed under the deliberate indifference standard set forth in *Senty-Haugen v. Goodno,* 462 F.3d 876 (8th Cir. 2006).

In its February 24, 2021 Order, the Eighth Circuit directed that "[o]n remand, the district court is instructed to consider the claim of inadequate medical care under the deliberate indifference standard outlined in *Senty-Haugen*," *Karsjens v. Lourey*, 988 F.3d 1047, 1054 (8th Cir. 2021). To prevail under the *Senty-Haugen* standard, "a plaintiff must show that officials knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries." *Id.* at 1052. (citations and quotations omitted).  Defendants and MSOP staff also do not seek professional medical assistance for various conditions Plaintiffs suffer. Plaintiffs regularly endure delayed and inadequate medical care. This delayed and deficient health care results in injury and death to Plaintiffs and the class.

Defendants' treatment of individuals in the Assisted Living Unit is particularly troubling. Individuals on this unit include elderly individuals and others with brittle chronic disorder and ambulatory disabilities. Despite these conditions, there are no nursing or medical staff assigned to the assisted living unit and it is not clear what specialized training, if any, is provided to the security counselors assigned to this unit. *See* Plf. Ex. 225 at 18. Individuals on the Assisted Living Unit have a variety of medical issues, including Parkinson's disease, and cancer. *See* Plf. Ex. 410. Some individuals are confined to wheelchairs or use walkers, some are oxygen dependent, and some require dialysis. *Id.*

The 706 Experts raised concerns about this specific group, finding that

> Clients on this unit include elderly individuals and others with brittle chronic disorders and ambulatory disabilities. Despite these conditions, there are no nursing or medical staff assigned to the Assisted Living Unit and it is not clear what specialized training, if any, is provided to the security counselors assigned to this unit. Although the unit is in close proximity to the health clinic, the Panel is concerned that the lack of trained medical personnel on the unit may put clients at risk. Many of these clients have severe illnesses and disabilities and present as quite frail. It is not clear that the staff on the units are prepared to intervene if clients have acute incidents, such as cardiac arrest, seizure, or stroke. It is also not clear that unit staff have the training to identify when clients with chronic illness are in acute distress or in need of immediate medical attention.

Plf. Ex. 225 at 18-9.

The 706 Experts also recognized the broader implications of the insufficient

medical care in MSOP:

> The Panel recommends that MSOP administration support through allocation of resources to the integration in practice of medical and insufficient psychiatric treatment with the sexual offender treatment programming in recognition of treating clients holistically. The Panel recommends that MSOP administration consider experienced executive clinical oversight of the assessment, treatment and staff development of programming for patients with severe comorbid disorders; in collaboration with current executive oversight of the sexual offender treatment program and executive oversight of health services.

*Id.* at 48.

Further the 706 Experts recognized that,

> MSOP has insufficient resources to address the primary medical and psychiatric clinical supervision and care of its client population, resulting in the needs of the client population being inadequately addressed. Other than prescribing and monitoring medication, it is unclear what services or programming is being provided to assist clients with mental illness and physical challenges or its recognition of their unique needs. Without adequate diagnostics and proactive medical or psychiatric case management,

it is likely that there are other clients who would benefit from attention, but who are presently unidentified.

*Id.* at 58.

These conclusions were reached in 2014. Medical conditions at MSOP remain unconstitutionally deficient. Defendants have demonstrated years of ongoing deliberate indifference towards Plaintiffs' medical care, even in the face of the observations and recommendations of the Rule 706 Experts. This Court must end Defendants' unconstitutionally deficient medical care of Plaintiffs.

## **CONCLUSION**

For the reasons set forth above, this Court should issue a Judgment in favor of Plaintiffs on Counts V, VI, and VII of their Third Amended Complaint.

Dated:  August 13, 2021

s/Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
David A. Goodwin (#386715)
Anthony J. Stauber (#401093)
**Gustafson Gluek PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
dgoodwin@gustafsongluek.com
tstauber@gustafsongluek.com

*Attorneys for Plaintiffs*