## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Scott Karsjens, David Leroy Gamble,
Jr., Kevin John DeVillion, Peter Gerard
Lonergan, James Matthew Noyer, Sr.,
James John Rud, James Allen Barber,
Craig Allen Bolte, Dennis Richard Steiner,
Kaine Joseph Braun, Christopher John
Thuringer, Kenny S. Daywitt, Bradley Wayne
Foster, Brian K. Hausfeld, and all others
similarly situated,

        Plaintiffs,

v.

Jodi Harpstead[1], Kevin Moser, Peter Puffer,
Nancy Johnston, Jannine Hébert, and Ann
Zimmerman, in their individual and official
capacities,

        Defendants.

Civil No. 11-3659 (DWF/TNL)

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER**

---

Daniel E. Gustafson, Esq., Karla M. Gluek, Esq., and David A. Goodwin, Esq.,
Gustafson Gluek PLLC, counsel for Plaintiffs.

Aaron Winter, Scott H. Ikeda, and Brandon L. Boese, Assistant Attorneys General,
Minnesota Attorney General's Office, counsel for Defendants.

---

[1]     Pursuant to Fed. R. Civ. P. 25(d), Jodi Harpstead, in her official capacity as the
current commissioner of the Department of Human Services, is automatically substituted
for former commissioner Emily Johnson Piper.  Fed. R. Civ. P. 25(d).

## INTRODUCTION

This matter is before the Court upon the Eighth Circuit's reversal and remand of this Court's dismissal of Counts V, VI, and VII in Plaintiffs' Third Amended Complaint, *Karsjens v. Lourey*, 988 F.3d 1047, 1051 (8th Cir. 2021) ("*Karsjens II*"). Specifically, the Eighth Circuit directed that this Court reconsider Counts V, VI, and VII under a different legal standard. *Id.* at 154. The parties submitted additional briefing on Counts V, VI, VII (Doc. Nos. 1173 ("Def. Memo."), 1175 ("Pl. Memo.")), as well as updated proposed findings of fact and conclusion of law (Doc. Nos. 1174 ("Def. Prop."), 1176 ("Pl. Prop.")).[2]

## BACKGROUND

The Court has detailed the complex history of this case in previous orders including its February 2, 2015 Memorandum and Opinion (Doc. No. 828) and June 17, 2015 Findings of Fact, Conclusions of Law, and Order (Doc. No. 966 ("Phase One Order")) and incorporates these orders by reference herein.[3] The Court assumes familiarity with these and other relevant orders and provides only an abbreviated background here.

Plaintiffs are individuals residing at the Minnesota Sex Offender Program ("MSOP") who are civilly committed under Minnesota Statute § 253D, the Minnesota Civil Commitment and Treatment Act ("MCTA"). (*See* Doc. No. 635 ("Third Amended

---

[2]     Each party also submitted a response to the other's briefing. (Doc. Nos. 1177 ("Pl. Opp."), 1178 ("Def. Opp.").)

[3]     Updates to the initial Findings of Fact and Conclusions of Law are noted below.

Complaint" or "TAC") ¶ 2.)  The fourteen named Plaintiffs represent a class certified under Federal Rule of Civil Procedure 23(b)(2), consisting of "[a]ll patients currently civilly committed to [the MSOP] pursuant to Minn. Stat § 253B."  (*See* Doc. No. 203.) Plaintiffs' lawsuit challenges the constitutionality of the MCTA on its face and as applied, as well as various aspects of the MSOP's operation and treatment regimen.  (*See generally* TAC ¶ 1.)

Specifically, Plaintiffs' Third Amended Complaint, filed on October 28, 2014, asserts the following thirteen claims:  (I) Minnesota Statute § 253D is facially unconstitutional; (II) Minnesota Statute § 253D is unconstitutional as applied; (III) Defendants have failed to provide treatment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (IV) Defendants have failed to provide treatment in violation of the MCTA; (V) Defendants have denied Plaintiffs the right to be free from punishment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VI) Defendants have denied Plaintiffs the right to less restrictive alternative confinement in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VII) Defendants have denied Plaintiffs the right to be free from inhumane treatment in violation of the Fourteenth Amendment to the United States Constitution and the Minnesota Constitution; (VIII) Defendants have denied Plaintiffs the right to religion and religious freedom in violation of the First and Fourteenth Amendments to the United States Constitution; (IX) Defendants have unreasonably restricted free speech and free association in violation of the First

Amendment to the United States Constitution and the Minnesota Constitution;

(X) Defendants have conducted unreasonable searches and seizures in violation of the

Fourth Amendment to the United States Constitution and the Minnesota Constitution;

(XI) Defendants have violated court ordered treatment; (XII) individual Defendants have

breached Plaintiffs' contractual rights; and (XIII) individual Defendants have tortiously

interfered with contractual rights and have intentionally violated Minn. Stat. § 253B.03,

subd. 7.  (TAC at 59-84.)

On February 2, 2015, the Court issued an order denying Defendants' Motion for

Summary Judgment on all counts in Plaintiffs' Third Amended Complaint.  (Doc.

No. 828.)  The matter proceeded to trial in two phases.  (*See* Doc. No. 647.)  The Phase

One bench trial ("Phase One Trial"), which encompassed Counts I, II, III, IV, V, VI, VII,

and XI of the Third Amended Complaint, commenced on February 9, 2015 and lasted

nearly six weeks.[4]  (Doc. Nos. 839, 908.)  The Phase One Trial specifically addressed:

> (1) whether Minnesota Statute Chapter 253D is unconstitutional on its face
> and as applied; (2) whether the treatment provided is constitutionally and/or
> statutorily infirm; (3) whether the treatment program complies with court-
> ordered treatment; (4) whether confinement is tantamount to
> unconstitutional punitive detention; and (5) whether less restrictive
> alternatives to confinement are constitutionally required.

(Doc. No. 647.)

---

[4]    Phase Two, which encompassed Counts VIII, IX, X, XII, and XIII of the Third
Amended Complaint, was to "commence after the conclusion of Phase One" and address:
(1) whether confinement conditions constitute unconstitutional restrictions on freedom of
speech, religion, and association; (2) whether confinement procedures constitute
unconstitutional searches and seizures; (3) whether the treatment program and its
implementation constitutes a breach of contract, tortious interference with contract, and
intentional violation of Minnesota Statute Section 253B.03(7).  (Doc. No. 647.)

On June 17, 2015, the Court issued its Findings of Fact, Conclusions of Law, and Order, granting Plaintiffs' request for declaratory relief on Counts I and II.  (Phase One Order at 75.)  The Court stated, "[b]ecause the Court finds the program is unconstitutional on its face and as applied (Counts I and II), and because any remedy fashioned will address the issues raised in the remaining Phase One Counts, the Court need not address Counts III, V, VI, and VII."[5]  (*Id.* at 65.)  The Court noted that its "determination that the MSOP and its governing civil commitment statutes are unconstitutional concludes Phase One of this case." (*Id.* at 5.)  The Court also reiterated that "Counts VIII, IX, and X, will be tried in the second phase of trial ('Phase Two')." (*Id.* at 76.)  On October 29, 2015, the Court issued a First Interim Relief Order directing injunctive relief to remedy its findings of unconstitutionality.  (Doc. No. 1035 ("Injunctive Relief Order").)

Defendants appealed the Court's Phase One and Injunctive Relief Orders to the Eighth Circuit.  (Doc. No. 1036.)  The Eighth Circuit reversed this Court's Phase One order and entered judgment in favor of Defendants on Counts I and II.  *Karsjens v. Piper*, 845 F.3d 394, 409 (8th Cir. 2017) ("*Karsjens I*").  It also vacated this Court's Injunctive Relief Order and remanded the case for further proceedings on the remaining claims.  *Id.*

---

[5]     On April 10, 2015, Plaintiffs moved to voluntarily dismiss Counts IV, XI, XII, and XIII of the Third Amended Complaint.  (Doc. No. 925 ("Motion to Dismiss").)  Thus, the Court did not address Counts IV and XI in its Phase One Order, but ultimately granted Plaintiffs' Motion to Dismiss after a fairness hearing on August 10, 2015. (Doc. Nos. 1004, 1005.)

The remanded Phase One claims included Counts III, V, VI, and VII of the Third Amended Complaint.  Each claim arose under the due process clause of the Fourteenth Amendment and challenged Defendants' acts and omissions relating to the creation and implementation of various policies at the MSOP.  (*See* TAC ¶¶ 254-61, 269-97.) Count III raised a failure-to-provide treatment claim.  (*Id.* ¶¶ 254-61.)  Counts V and VII challenged the conditions of confinement within the MSOP facilities (*id.* ¶¶ 269-83, 292-97), and Count VI alleged that denial of less restrictive alternative confinement was impermissibly punitive (*id.* ¶¶ 284-291).

In response to *Karsjens I*, the parties filed supplemental briefing on the remaining Phase One claims, and Defendants moved for summary judgment on the Phase Two claims.[6]  On August 23, 2018, the Court dismissed with prejudice the remaining Phase One claims under the "shocks the conscience standard."  (Doc. No. 1108 ("Aug. 2018 Dismissal").)  In the same Order, the Court granted Defendants' motion for summary judgment and dismissed with prejudice the Phase Two claims as well.  (*Id.*)  Plaintiffs appealed the Court's ruling on the Phase One claims to the Eighth Circuit.  (Doc. No. 1118 ("Oct. 2018 Appeal").)

---

[6]     Defendants argued that the remaining Phase One claims should be dismissed because the Eighth Circuit implicitly determined that they failed when it found that Defendants did not engage in conduct that shocked the conscience with respect to Counts I and II.  (Doc. No. 1095.)  Plaintiffs countered that the remaining Phase One claims should be decided on the merits because the Eighth Circuit's decision on Counts I and II did not dictate their outcome.  (Doc. No. 1100.)

On February 24, 2021, the Eighth Circuit reversed the dismissal of Counts V, VI, and VII after finding that this Court applied the wrong legal standard and remanded the case again for further proceedings.[7]  *Karsjens II*.  The Eighth Circuit explained:

> In *Karsjens I*, the claims and allegations in Counts [I and II]—and subsequent bench trial and findings—focused on the statutory scheme itself and the officials' implementation thereof, specifically the indefinite nature of [Plaintiffs'] confinement; the lack of automatic periodic review; and the administration of the treatment program.  By contrast, the present claims and allegations focus squarely on the conditions of confinement including the inadequacy of meals, double-bunking, overly harsh punishment for rules violations, property being taken and destroyed before any hearing, the lack of less restrictive alternatives, and the inadequacy of medical care.

*Karsjens II*, 988 F.3d at 1051.  While the "shocks the conscience standard" was appropriate for Counts I and II, the Eighth Circuit determined that this Court should have considered the claim of inadequate medical care [part of Claim VII] under the "deliberate indifference standard" outlined in *Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006), and the remaining claims under the standard for punitive conditions of confinement outlined in *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  *Karsjens II*, 988 F.3d at 1054.

## DISCUSSION

## I.   Scope of Remand

The parties dispute the scope of the *Karsjens II* remand.  Specifically, Defendants argue that because Count VI simply restates elements of Counts I and II, it is barred by *Karsjens I*, and should be dismissed without further evaluation.  Plaintiffs contend that

---

[7]   The Eighth Circuit affirmed dismissal of Count III.  *Karsjens II*, 988 F.3d at 1051.

because the Eighth Circuit reviewed Counts III, V, VI, and VII in *Karsjens II* and only

dismissed Count III as duplicative of claims asserted in *Karsjens I*, Count VI is properly

before this Court.

Upon review of Plaintiffs' claims in Count VI, and those in Counts I and II, the

Court finds that the claims in Count VI are indeed duplicative of those already considered

and dismissed.  Specifically, Count VI challenges the "denial of less restrictive

alternative confinement," alleging that:  (1) "MSOP, as implemented, does not provide a

less restrictive alternative to confinement at a MSOP secure facility," thereby failing to

account for the fact that "[n]ot all Plaintiffs and Class members have the same level of

security needs"; and (2) "if a Plaintiff or Class member no longer meets the statutory

requirements for civil commitment, there is no less restrictive facility or program for

them to enter."  (TAC ¶ 288.)

In Count I, Plaintiffs alleged that because Minn. Stat. § 235D fails to require

independent periodic reviews, "individuals may remain civilly committed after such time

that they no longer meet the criteria for commitment after such a time that they satisfy the

statutory requirements for reduction in custody or discharge."  (*Id.* ¶ 228.)  Plaintiffs'

Count II similarly alleged that:

> Defendants do not provide a less restrictive alternative to confinement at a
> MSOP secure facility.  Not all Plaintiffs and Class members have the same
> level of security needs, however, the MSOP as implemented does not
> account for this possibility.  Also, if a Plaintiff or Class member no longer
> meets the statutory requirements for civil commitment, there is no less
> restrictive facility or program for them to enter.

(*Id.* ¶ 244.)  Plaintiffs further alleged in Count II that "Defendants are aware of individuals currently at MSOP's secure facility that could be treated in a less restrictive environment," and that "Defendants have implemented policies and conditions of confinement which Class members are subject to that are punitive in nature, and therefore not reasonably related to the purpose of confinement."  (*Id.* ¶¶ 245-46.)

Importantly, while this Court ultimately agreed with Plaintiffs that Defendants' conduct related to less restrictive alternatives violated Plaintiffs' substantive due process, *Karsjens I* reversed both this Court's liability findings and injunctive order relating to these claims.  *See Karsjens I*, 845 F.3d at 409-11.  *Karsjens I* specifically observed that Minn. Stat. § 253D "provide[s] proper procedures and evidentiary standards for a committed person to petition for a reduction in his custody or release from confinement," and found no Constitutional violation related to release or the availability of less restrictive alternatives.  *Id.* at 409-411 (internal quotation marks and citation omitted).

The Court cannot conclude that the claims in Count VI are distinct from those already considered and rejected in Counts I and II by the Eighth Circuit.  Accordingly, the Court finds that Count VI is properly barred by *Karsjens I* and dismisses it with prejudice.[8]

---

[8]     The Court recognizes that *Karsjens II* dismissed Count III as duplicative of Counts I and II but did not dismiss Count VI.  It could be that the Eighth Circuit left space for Plaintiffs to distinguish their Count VI claims from those already dismissed in the context of punitive conditions.  This Court finds that Plaintiffs have not done so; their allegations and arguments in Count VI are the same as those the Eighth Circuit has already considered and rejected and is therefore properly dismissed.

The parties also dispute whether treatment-related claims are properly before this Court.[9]  The Court notes that Counts V-VII in the Third Amended Complaint do not assert any treatment-related claims.  (*See* TAC ¶¶ 273-94.)  Therefore, the Court finds that any treatment-related claim is beyond the scope of the Eighth Circuit's remand.

---

Even if this Court were to consider Count VI under *Bell*, it would find that Plaintiffs' claims fail.  The Court first notes that Plaintiffs do not have a right to the "least restrictive alternative" possible.  *Beaulieu v. Ludeman*, 690 F.3d 1017, 1032 (8th Cir. 2012).  Moreover, the record reflects that the MSOP offers a continuum of facilities and residences to MSOP Clients.  (Phase One Order ¶¶ 43-48; *see also infra*.  Findings of Fact ¶¶ 7-14.)  The Court finds that while not every MSOP Client may be able to access a least restrictive alternative, there is no evidence that the continuum of facilities that Defendants offer is punitive.  *See Bell*, 441 U.S. at 538.  The Court also notes that in light of the process under which an MSOP Client may petition for a reduction in custody, which includes "transfer out of a secure treatment facility, a provisional discharge, or a discharge from commitment," placement is neither arbitrary nor purposeless.  *See* Minn. Stat. § 253D.27.  It is clear, however, that there are grave flaws in the implementation of this process.  *See In the Matter of the Civil Commitment of Al Stone Folson*, County File No. 62-MN-PR-06-267; Appeal Panel File No. AP19-9153 (Ramsey County, Dec. 2, 2021) ("*Folson*").  The Court has no doubt that unless the MSOP properly utilizes "this extensive process and the protections" in a timely manner, it will be inundated with additional individual lawsuits.  *Karsjens I*, 845 F.3d at 410-411.

While the Court understands Plaintiffs' strong desire to live in a facility tailored to their specific needs at any given point in time, given the Supreme Court's decision in *Bell*, the Court finds no constitutional violation and must defer to the Defendants' "execution of policies and practices that in [their] judgment [is] needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. In short, the Court finds no *Bell* violation in Count VI.  The Court's analysis does not change even when considering Count VI in combination with Plaintiffs' other challenges to their conditions of confinement.

[9]     The Court previously addressed Plaintiffs' challenges to the MSOP's treatment structure, understaffing, risk assessments, and treatment progression in its Phase One Order and Order for Injunctive Relief.  (*See* Phase One Order ¶¶ 62, 83-86, 103-131; *see also* Order for Injunctive Relief at 17-23, 25, 30, 38-39, 41.)  The Eighth Circuit reversed and vacated both orders.  Here again, Plaintiffs raise claims related to treatment understaffing, risk assessments, and treatment progression.  (*See, e.g.*, Pl. Memo. at 8-9, 14, 21-23; Pl. Opp. at 7-10, 14, 18-19; Pl. Prop. ¶¶ 87-93.)

*Thornton v. Carter*, 109 F.2d 316, 20 (8th Cir. 1940) ("[The district] court is without

power to do anything which is contrary to either the letter or spirit of the mandate

construed in the light of the opinion of [the Eighth Circuit] deciding the case."). As

discussed in its June 30, 2021 Order denying Plaintiffs' motion to file a fourth amended

complaint (Doc. No. 1166), the Court respectfully declines to permit Plaintiffs to

reanimate any dismissed claims by relocating the underlying facts and issues to other

Counts. (*See* Doc. No. 1166.)

Moreover, challenges to a civil commitment program are not *Bell*-governed

conditions claims.[10] The Eighth Circuit has repeatedly held that while "the Supreme

Court has recognized a substantive due process right to reasonably safe conditions, [it has

not recognized] a broader due process right to appropriate or effective or reasonable

treatment of the illness or disability that triggered the patient's involuntary confinement."

*Karsjens I*, 845 F.3d at 410 (quoting *Strutton v. Meade*, 668 F.3d 549, 557 (8th

Cir. 2012)); *see also Karsjens II*, 988 F.3d at 1051.[11] Accordingly, the Court declines to

consider any treatment-related claims on remand.

---

[10]   Plaintiffs attempt to reassert their challenges to the treatment program under the guise that perceived flaws in the treatment program contribute to the overall totality of the circumstances that make the MSOP's conditions of confinement punitive. The Court notes that regardless of how Plaintiffs repackage these claims, they remain dismissed and are not properly before the Court given the Eighth Circuit's decision.

[11]   On October 4, 2021, the United States Supreme Court denied Plaintiffs' petition for writ of certiorari on this issue. (Doc. No. 1179.)

## II.    Legal Standards

### A.    Inadequate Medical Care Claim

In accordance with *Karsjens II*, this Court now addresses Plaintiffs' claim of inadequate medical care [part of Claim VII] under the "deliberate indifference standard" outlined in *Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006) ("*Senty-Haugen*" or the "*Senty-Haugen* Deliberate Indifference Standard").  Under *Senty-Haugen*, Plaintiffs "must show 'deliberate indifference' to a 'serious illness or injury.'" *Senty-Haugen*, 462 F.3d at 889 (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

"Deliberate indifference is a higher standard than gross negligence, and [a plaintiff] must prove that officials knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries." *Id*. at 890 (internal citations omitted).  "Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).  Moreover, a plaintiff who "alleg[es] that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect." *Id*.  Finally, no deliberate indifference is shown when medical professionals make "efforts to cure the problem in a reasonable and sensible manner," even if those efforts are not successful. *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997).

### B.    Remaining Claims

The Court addresses Plaintiffs' remaining claims, all related to their conditions of confinement, under *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("*Bell*" or the "*Bell*

Standard"). Under *Bell*, neither pretrial detainees nor civilly committed individuals may be punished; including a prohibition against punitive conditions of confinement. *See Bell*, 441 U.S. at 535-37. Whether a condition of confinement is unconstitutionally punitive turns on whether it "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Absent an "expressed intent to punish. . . that determination will generally turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the purpose assigned [to it].'" *Id.* (alterations in original) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 167 (1963)). Therefore, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539 (also noting that if a restriction is arbitrary or purposeless, a Court may infer that its purpose is to punish and is constitutionally prohibited). Importantly, to properly determine whether conditions of confinement are unconstitutionally punitive, the Court must review "the totality of the circumstances." *Karsjens II*, 988 F.3d at 1054 (citing *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010).

Bell sets forth numerous legitimate governmental interests, such as the "need to manage the facility in which the individual is detained," including "tak[ing] steps to maintain security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees." *Id*. at 539-40; *see also id*. at 540 ("We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in

addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."). *Bell* also cautions courts to "be mindful that inquiries [into the legitimacy of governmental objectives] spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention center."[12] *Id.* at 539.

**C.    Class Claims**

In addition to the applicable standards from *Bell* and *Senty-Haugen*, Plaintiffs' claims are governed by legal principles applicable to a class action certified under Fed. R. Civ. P. 23(b)(2) against Defendants in their official capacities.  Specifically, to establish their claims, Plaintiffs must show a generally applicable "policy" or "persistent, widespread pattern of unconstitutional conduct" harming them and applicable to the entire class. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1996); Fed. R. Civ. P. 23(b)(2); *see also Lewis v. Casey,* 518 U.S. 343, 349 (1996) ("We agree that the success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and that the court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic [ ] violation invalid.").

---

[12]    *Bell* specifically notes that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" and that administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

14

## SUMMARY OF DECISION

Upon careful review of the record and careful consideration of the parties' submissions, the Court dismisses Plaintiffs' remaining claims with prejudice. Specifically, the Court finds that Plaintiffs' challenged conditions of confinement, even when considered as a whole, serve legitimate governmental objectives that are not excessive, arbitrary, or purposeless, and are not punitive under *Bell*. The Court also finds insufficient evidence to conclude that Defendants were ever deliberately indifferent to any specific MSOP Client's serious illness or injury, much less at the policy level or on a widespread basis, or that any alleged indifference caused any actual injury or harm. *Senty-Haugen*, 462 F.3d at 889-90.

While the Court recognizes Plaintiffs' strong desire for greater independence and previously found aspects of the MSOP to be unconstitutional, the Court is bound by the law as it currently exists and cannot conclude that Plaintiffs have proven their remaining claims under the governing legal standards.

It is truly unfortunate that after years of litigation, the parties have been unable to agree upon some sort of class-wide settlement to forestall the certain flood of litigation that is sure to follow this Order. As the Court has stated in a number of previous orders,[13] all stakeholders in the criminal justice system and civil commitment system should come together and develop policies and pass laws that will not only protect the public safety and address the fears and concerns of all citizens, but will preserve the constitutional

---

[13]    *See, e.g.*, Doc. No. 427 at 68; Doc. No. 828 at 42, Doc. No. 966 at 74.

rights of civil detainees at the MSOP.  There would then be all winners and no losers.

Now is the time to do that.

**FINDINGS OF FACT**[14]

1.      This is a civil rights action pursuant to 42 U.S.C. § 1983.

---

[14]      The Court's Findings of Fact derive from facts in evidence at the time of the Phase One Trial.  In this Order, the Court focuses exclusively on the remanded claims, which it did not address in the Phase I Order; therefore, the Court incorporates by reference ¶¶ 11-42 Findings of Fact in its Phase One Order (providing the history of civil commitment in Minnesota, including civil commitment under the MCTA), occasionally reiterating important facts, and updates and supplements its findings relevant to this Order with the Findings of Fact stated herein.

The history of civil commitment in Minnesota was partially informed by court appointed experts.  Specifically, On December 6, 2013, the Court appointed four experts, Dr. Naomi Freeman ("Dr. Freeman"), Deborah McCulloch ("McCulloch"), Dr. Robin Wilson ("Dr. Wilson"), and Dr. Michael Miner ("Dr. Miner") (collectively, ("Rule 706 Experts"), pursuant to Rule 706 of the Federal Rules of Evidence.  (*See* Doc. No. 393.) The parties jointly nominated these four experts (*id.* at 1) and the parties submitted their respective proposals regarding the work of the Rule 706 Experts to the Court (*see* Doc. No. 421).  After months of research and analysis, the Rule 706 Experts presented the Court with their reports and recommendations, which contains over 100 pages of their findings and opinions regarding the MSOP.  (*See* Doc. No. 658; ("Rule 706 Expert Report").)

While it is not relevant to this Order, the Court remains deeply disturbed and finds it utterly repugnant that Rhonda Baily remains at the MSOP years after the fact and in spite of credible expert testimony that it would be optimal for her to be placed elsewhere. (*See* Phase One Order ¶ 50; *see also* Doc. No. 481 ¶ 2, Ex. A, ("Pl. Ex. 117, Rule 706 Expert Report re: Rhonda Bailey").)  At the time of the Phase One Trial, Ms. Bailey had been civilly committed since 1993 and housed with all male inmates since 2008—she was the sole female among 721 civil detainees.  (Phase One Order ¶ 50; *see also* Pl. Ex. 117, Rule 706 Expert Report re: Rhonda Bailey.)  It is difficult to imagine why nothing has been done to remedy this situation, particularly when the MSOP has the ability to contract with both in-state and out-of-state facilities to place Bailey in another setting.

2.      At the time of the Phase One Trial, Minnesota had the highest per-capita population of civilly committed sex offenders in the nation.  It also had the lowest rate of release from civil commitment in the nation.  The cost of confining committed individuals at that time was $124,465 per resident per year—approximately three times the cost of incarcerating an inmate at a Minnesota correctional facility.

3.      The fourteen named Plaintiffs in this case, Kevin Scott Karsjens, David Leroy Gable, Jr., Kevin John DeVillion, Peter Gerard Lonergan, James Matthew Noyer, Sr., James John Rud, James Allen Barber, Craig Allen Bolte, Dennis Richard Steiner, Kaine Joseph Braun, Brian Christopher John Thuringer, Kenny S. Daywitt, Bradley Wayne Foster, and Brian K. Hausfeld, represent a class of over 700 individuals (collectively, "Plaintiffs", "Class Members", or "Clients") who are all currently or were previously civilly committed to the MSOP in the care and custody of the Minnesota Department of Human Services ("DHS").

4.      Defendants are current or former administrators of the MSOP who are or were employees of the State of Minnesota (collectively, "Defendants").

**Remaining Causes of Action**

5.      Following the Eighth Circuit's *Karsjens II* decision, three Counts were remanded to this Court for further consideration: Counts V, VI, and VII.

6.      Count V asserts rights under the Fourteenth Amendment to be free from punishment and includes allegations that Plaintiffs:  (1) are double bunked in wet cells in a facility modeled after a prison; (2) lack a reasonable grievance procedure when punished with Behavioral Expectation Reports; (3) are punished by having their rights to

17

access activities and areas of the facility limited or completely taken away, or by being placed in protective isolation in the High Security Area; (4) are not allowed to possess certain property and their property is wrongfully destroyed prior to completion of the applicable grievance procedure; (5) are denied access to group therapy; (6) have furniture removed as punishment for alleged rules violations; (7) are punished by having their employment options taken away; and (8) and are placed in shackles and black boxes anytime they leave the facility.  (TAC. ¶¶ 273-79.)

7.      Count VI alleges that the MSOP does not account for the possibility that not all Plaintiffs require the same level of security and that if a Plaintiff no longer meets the statutory requirements for civil commitment, there is not a less restrictive facility or program for them to enter.  (*Id.* ¶ 288.)

8.      Count VII asserts rights under the Fourteenth Amendment to be free from inhumane treatment and reiterates that Plaintiffs are double bunked in wet cells.  (*Id.* ¶ 294.)  It further alleges that Plaintiffs receive inadequate meals, are subject to arbitrary discipline and decision-making, receive inadequate medical treatment, and have their rights restricted for minor rules violations.  (*Id.*)

**The MSOP Facilities**

9.      The MSOP provides housing for its civilly committed residents in three facilities, which include the secure treatment facility in Moose Lake, Minnesota; the secure treatment facility in St. Peter, Minnesota; and the Community Preparation Services ("CPS"), which is located on the St. Peter site outside of the secure perimeter.

10.     The Moose Lake facility is the most restrictive facility and CPS is the least restrictive facility.  Most new admissions and Clients in Phase I and II of treatment reside at the Moose Lake facility.[15]

11.     The St. Peter facility is designated for committed individuals in later stages of treatment and for individuals with special needs, such as individuals with cognitive disabilities, individuals with severe mental illness, or vulnerable adults.  At the time of the Phase One Trial, approximately 257 committed individuals resided within the secure perimeter of the St. Peter facility.

12.     At the time of the Phase One Trial, the CPS facility had a thirty-eight-bed capacity limit with approximately thirty-two committed individuals who resided there. This represented a significant increase from the six CPS residents in 2010, eight CPS residents in 2011, and nine CPS residents in 2012.

13.     As a result of the limited bed capacity at the CPS facility, committed individuals have had to wait for beds to become available before being transferred to CPS from the more restrictive facilities at the MSOP.  Dr. Elizabeth Barbo ("Dr. Barbo"), the MSOP Reintegration Director, credibly testified that there have been individuals who

---

[15]     The MSOP program employs a phase model of treatment, encompassing three different phases.  Phase I emphasizes learning to comply with facility rules and expectations and an introduction to basic treatment concepts.  (Rule 706 Expert Report at 30.)  Phase II focuses on discussion and exploration of the Client's history of sexual offending behavior and maladaptive patterns of behavior, along with the motivations for those behaviors.  (*Id.*)  In Phase III, Clients work on applying skills learned in Phase II to daily life, while demonstrating consistent utilization of pro-social coping strategies.  (*Id.* at 30.)

have been transferred to CPS who have had to wait due to a lack of bed space at the CPS facility.

14.     After the commencement of this lawsuit in 2011, the MSOP started constructing a new facility, akin to CPS, with an additional thirty beds.  Construction on the new building was projected to be completed by July 1, 2015.  Dr. Barbo credibly testified that once construction on the new building was complete, CPS would have fifty-three licensed beds in total.

15.     Committed individuals to the MSOP cannot be initially placed at the CPS facility.  Dr. Barbo credibly testified that CPS is not available to a newly committed individual in Minnesota.

16.     Minn. Stat. § 253D provides procedures and evidentiary standards for a committed person to petition for a reduction in his or her custody or release from confinement.  Specifically, six months after final commitment and any related appeals, a Client may seek a reduction in custody, which includes transfer from a secure facility, provisional discharge, and discharge.  The statute places no limit on the timing and number of times that a Client may petition for a reduction in custody, so long as the petition is at least six months from a final petition on a prior petition.

**The MSOP Policies**

17.     Upon review of the MSOP policies, including policies related to searches, transport, spiritual practices, media possession, mail monitoring, movement, yard use, visitation, property, therapeutic recreation, and restraint, the Rule 706 Experts credibly testified that as written, the policies are not dissimilar from what you would expect to see

in a sex offender civil commitment program, strike an appropriate balance between security and therapeutic needs, and do not appear to cause the MSOP Clients harm.

The Court addresses below various policies referenced or alluded to in Counts V and VII of the Third Amended Complaint which Plaintiffs allege constitute punitive conditions of confinement.[16]

### A.    Double Occupancy Rooms

18.    Clients at the MSOP generally reside in double occupancy rooms.

19.    Double occupancy rooms are not uncommon at other sex offender civil commitment facilities, but it is not optimal and can be difficult to manage.

### B.    Behavioral Expectation Reports and Grievance Procedure

20.    When admitted to the MSOP, Clients are provided a copy of its Behavioral Expectation Handbook which contains descriptions of behavioral violations.  The MSOP classifies rule violations as major or minor and issues Clients corresponding Behavioral Expectation Reports ("BERs").

21.    A minor rule violation constitutes behavior that violates facility policy or procedure but does not place anyone in immediate jeopardy or present an immediate disruption to the therapeutic environment.  Minor rule violations can lead to Restriction

---

[16]    Plaintiffs' briefing and proposed findings of fact and conclusions of law focuses largely on double occupancy rooms, behavioral expectation reports, and delays in treatment progression.  To properly consider the totality of the circumstances under which Plaintiffs argue that the MSOP's conditions of confinement are punitive, the Court addresses additional policies and conditions Plaintiffs initially referenced or alluded to in their TAC.  As discussed above, the Court does not address Plaintiffs' previously dismissed treatment-related claims.

Status 1 ("RS1").  RS1 is a minor disciplinary restriction imposed proportionately to the occurrence of a rule violation, and results in the limited use or full restriction of the area, the item involved in the violation, or both.  RS1 treatment assignments may be assigned by the Client's clinical staff or treatment team.  Minor violation restrictions are offered as a means for the Client to modify and self-correct his or her behavior.  For the first violation, the duration of restrictions imposed may ranged from 1 to 14 days.  For a second violation in 45 days, the duration may range from 1 to 28 days.  For a third violation in 45 days, the duration may range from 1 to 45 days.  The fourth violation and beyond may result in a major BER.

22.     Within three business days of receiving a minor violation restriction BER, a Client may request that the BER be reviewed by submitting a Client request form to the Behavioral Expectations Supervisor or designee, who conducts a review within three business days of receiving the request.  During the review, the Client may present his or her perspective on the situation leading to the BER, including by presenting physical evidence if necessary.  The Client is not permitted to have legal representation or call witnesses.  The Behavioral Expectations Supervisor or designee will issue findings and the restriction imposed at the conclusion of the review, and a Minor Violation Restriction Review Report will be provided to the Client.  The report is also forwarded to the facility director/designee for review and signature.

23.     A major rule violation constitutes behavior that jeopardizes the safety or security of Clients, staff, or others, or constitutes continued minor rule violations.  Major rule violations can lead to Restriction Status 2 (""RS2") or Restriction Status 3 ("RS3").

RS2 can include a restriction of Client movement or full restriction from off-unit privileged activities, on-unit privileged activities, and/or vocation assignments. RS3 can include full restriction from all off-unit privileged activities and all on-unit privileged activities. While on RS3, a Client is expected to remain in his or her room except for designated times. For the first violation, the duration of restrictions may range from 1-14 days. For a second violation in 180 days, the duration of restrictions may range from 1 to 28 days. For a third violation and beyond, the duration of the restrictions may range from 1 to 56 days. The use of a weapon, injury, disorderly conduct or disturbance in a high-risk situation, other unsanctioned behavior with multiple participants, or action taken for the benefit of a security threat may double the existing restriction.

24.     Upon issuance of a major BER, the officer of the day, unit director, clinical supervisor, or area supervisor may place the Client on Pre-Hearing Restriction Status. If placed on Pre-Hearing Restriction Status, the Behavioral Expectations Supervisor or designee will review the BER within two business days of the issuance of the BER. If not on Pre-Hearing Restriction Status, the BER will be reviewed within five business days. During the Behavioral Expectations Supervisor's review, the Client may waive his or her right to a major restriction hearing, or he or she may choose to take the violation to a hearing.

A major violation restriction hearing is held before a Hearing Panel, which consists of representatives from clinical, security, and treatment programming, who are appointed by the facility director. During a major violation restriction hearing, the Hearing Panel may request the testimony of witnesses, and evidence may also be

presented when the Hearing Panel determines it is necessary, relevant, and not unduly repetitious. The Client, however, may not call witnesses or have legal representation. If the Hearing Panel determines by a preponderance of the evidence that the Client violated the behavioral expectation, it will determine what restriction, if any, will be imposed, and its decision will be documented on a Hearing Findings Report.

The Client may appeal the decision of the Hearing Panel to the facility director or designee, who may affirm, amend, or dismiss the restriction, or may remand the case for a new hearing. If unsatisfied with that result, the Client may submit an appeal of that decision to the Executive Director, who may also affirm, amend, or dismiss the restriction, or may remand the case for a new hearing. The decision of the Executive Director is final.

25.     To progress in a treatment phase, Clients must have at least two consecutive quarters without a major BER even if the major BER is not related to sexual offending. Major BERs can also cause MSOP Clients to regress in a treatment phase. Minor BERS can also prevent MSOP Clients from progressing in a treatment phase.

26.     The purpose of the behavioral expectations policy is to provide procedures designed to shape prosocial behavior appropriate to a secure treatment environment and to offer Clients due process for appealing decisions of the behavioral expectations hearing panel. Any disciplinary restriction must be reasonably related to the nature of the behavior; in proportion to the severity of the violation and to the rule's importance to the order, safety, and security of the treatment program; and take into consideration the Client's past behavior while in the program, the Client's treatment needs, and his or her

current phase in treatment.  The record does not reflect any evidence of arbitrary discipline or decision making.

27.     Addressing rule-breaking behavior is clinically indicated in the treatment of sex-offenders.

### C.     Use of the High Security Area

28.     The High Security Area ("HSA") is an area within the MSOP's secure facilities where a Client can be isolated for a short period of time if he or she demonstrates behavior that could be dangerous to him/herself or others.  In Moose Lake, the HSA has several rooms; in St. Peter, the HSA is a single room.

29.     The purpose of the HSA is to provide an area of the facility with specialized safety procedures to reduce the risk of harm to Clients, staff, and the public, and to manage dangerous behavior.

30.     A Client placed in HSA will be on one or more of the following statuses: Administrative Restriction Status, Protective Isolation Status, or Levels of Observation. Levels of Observation is used when a Client engages in self-injurious harm and is in need of constant supervision.  Such a Client is placed in a room where the Client can be observed, monitored, and documented to keep safe until the Client is at a place where the Client can go back to their unit.  Protective isolation is used when someone is not in behavioral control, or there is potential for a major disruption.  Finally, Administrative restriction status is designed for individuals when criminal activity is being investigated. Someone on administrative restriction could be in either their own room or in HSA.

31.     Clients on Administrative Restriction Status, Protective Isolation Status, or Levels of Observation statuses are placed in the HSA when it is necessary to maintain safety and security for the Client involved, staff, other Clients, or the public.

32.     The HSA policy dictates that any isolation in the HSA be as short as possible.

33.     The MSOP clinical staff is informed when a Client is placed in the HSA. Clinical staff are also involved in reviewing placements in the HSA.  Specifically, following every placement in the HSA, a team of individuals reviews the placements from start to finish.

34.     A Client in the HSA can continue his or her treatment assignments and meet with their therapists.

**D.     Client Movement**

35.     At the Moose Lake facility, the MSOP Clients wear electronic monitoring equipment for surveillance of movement.

36.     The CPS provides opportunities for supervised and unsupervised movement on the MSOP campus as well as supervised activities in the community.

37.     The record does not reflect that the movement or transport of the MSOP Clients is improper or punitive, particularly in light of security concerns.

**E.     Meals**

38.     The Rule 706 Experts found that the food at the MSOP was consistent with most institutional food but overall palatable.

39.     The record does not reflect any evidence that the meals the MSOP provides are inadequate.

**F.     Group Therapy**

40.     The primary mode of treatment intervention at MSOP is group therapy, either in core therapy groups or psychoeducational and content groups.

41.     The record does not reflect any evidence that MSOP Clients are denied access to group therapy.

**G.     Client Property**

42.     The MSOP's Client property policy is designed to maintain a therapeutic environment and ensure the safety and security of Clients, staff, and the public by permitting Clients to possess property that falls within the parameters of the policy.

43.     Property determined to be contraband is inventoried and routed to the MSOP Special Services Department which provides a Contraband Notice to the Client's assigned living unit.  The Client has 30 calendar days to finalize the disposition of the contraband by choosing to mail the contraband out at the Client's expense, sending the contraband out on a visit, or disposing of the contraband at the Client's expense.  If no disposition is chosen within the designated timeframe, Special Services Staff may dispose of it.

44.     Clients who disagree with a Contraband Notice may submit a request to the Special Services Program Manager or designee; however, appeals do not delay or stop the requirement for disposition within 30 calendar days.  Clients who disagree with the Special Services Program Manager may seek recourse through filing a grievance.

**H.    Furniture Removal**

45.    The record does not reflect that Client furniture is removed as punishment for alleged rule violations.

**I.    Random Searches**

46.    The MSOP conducts random searches of Client rooms, property, and their person.

47.    The purpose of the MSOP's policy related to searches of areas within MSOP is to control the presence of contraband in facilities and grounds, as well as to prevent, discover and manage threats to the safety and security of facilities, staff, Clients, and the public.

48.    The Rule 706 Experts stated that the MSOP's rules and policies regarding searches were standard in comparison to other sex-offender treatment programs.

49.    This Court previously held that the MSOP's search policies do not violate the Fourth Amendment. *Karsjens v. Piper*, 336 F. Supp. 3d 974, 994–96 (D. Minn. 2018).  This Court specifically observed that "[t]he record lacks substantial evidence showing [that the MSOP's] policies are an unnecessary or unjustified response to problems of institutional security," *id.* at 996, and that the expert testimony presented at trial demonstrated that "the policies are reasonable for a sex offender civil commitment facility," *id.*  The Court's previous analysis and conclusion remains unchanged.

**J.    Employment Options**

50.    The record reflects that the MSOP ties vocational programming opportunities and hours to rule compliance and treatment engagement.

51.    The record does not reflect that the MSOP's employment related policies are arbitrary or purposeless.

### K.    Restraints

52.    Under the MSOP policy in place at the time of the Phase One Trial, all Clients—except those in Phase III of treatment who have on or off campus privileges, and Clients with CPS standard movement privileges—are placed in restraints when transported out of the MSOP facililities.  The policy is designed to transport Clients in a safe, secure, and therapeutic manner.  The MSOP's use of restraints becomes less restrictive as Clients progress in treatment.

53.    No Rule 706 Expert expressed concern with the MSOP's restraint policy.

**Medical Care (Count VII)**

54.    There is no medical staff assigned to the Moose Lake facility's Assisted Unit that houses individuals who have physical disabilities with needs that cannot be accommodated on conventional units.

55.    The record does not reflect evidence of any injury to an MSOP Client resulting from inadequate medical treatment.

### CONCLUSIONS OF LAW

1.    The Eighth Circuit directed this Court to evaluate Plaintiffs' conditions of confinement claims contained in Counts V-VII under the *Bell* Standard, and Plaintiffs' claim for inadequate medical treatment (part of Count VII) under the *Senty-Haugen* Deliberate Indifference Standard.  The Court incorporates by references its discussion of the *Bell* and *Senty-Haugen* legal standards stated above.  The Court also incorporates by

reference its discussion of Plaintiffs' burden to prove their class claims against Defendants in their official capacities.

2.      As discussed above and incorporated by reference here, the Court dismisses Count VI with prejudice because:  (1) the Court cannot conclude that Plaintiffs' claims in Count VI are distinct from those already considered and rejected in Counts I and II and is therefore properly barred by *Karsjens I*; and (2) even if this Court were to consider Count VI under *Bell*, it would still find that Plaintiffs' claims fails because:  (a) Plaintiffs do not have a right to the least restrictive environment, *Bealieu*, 690 F.3d at 1032; (b) Defendants offer a continuum of facilities and residences to the MSOP Clients (*see supra* Findings of Fact ¶¶ 7-14.); (c) there is no evidence that the continuum of facilities Defendants offer is punitive, *Bell*, 441 U.S. at 538; (d) placement in any specific facility is neither arbitrary or purposeless, *see* Minn. Stat. § 253D.27; and (e) finding no constitutional violation, the Court must defer to Defendants' execution of polices and practices that in their judgment is necessary to preserve internal order and to maintain institutional security, *Bell*, 441 U.S. at 538.

3.      As discussed above and incorporated by reference here, the Court declines to consider any treatment-related claims because they are: (1) beyond the scope of the Eighth Circuit's remand when Counts V-VII do not include any treatment-related claims, *Thornton*, 109 F.2d at 320; and (2) an improper attempt to reanimate claims already considered and dismissed in Counts I and II, *Karsjens I*, 845 F.3d at 410; *Karsjens II*, 988 F.3d at 1051.

**Conditions of Confinement Claims**

4.      The Court finds insufficient evidence to conclude that Defendants instituted

any of the challenged policies or conditions with intent to punish Plaintiffs.  The Court

also finds that Plaintiffs have failed to establish that any of the challenged policies or

conditions bear no reasonable relation to a legitimate government interest, or are

excessive to that interest, within the meaning of *Bell*.

      **A.**      **Double Occupancy Rooms (Counts V and VII)**

5.      The Court finds that the MSOP's use of double occupancy rooms complies

with *Bell* and does not pose a constitutional violation.  *Bell* considered the issue of

double-bunking in the context of a pretrial detention facility and found that "nothing even

approaching" hardship sufficient to constitute punishment was shown where detainees

were required to spend seven to eight hours a day in their double occupancy rooms, the

rooms provided adequate space for sleeping, and the detainees were "free to move

between their rooms and the common area" the remainder of the time.  *Bell*, 441 U.S.

at 542.

6.      The Eighth Circuit and this Court have also held the MSOP's double

occupancy rooms are constitutional.  In *Beaulieu v. Ludeman*, the Eighth Circuit upheld

the MSOP's double occupancy rooms at both a former temporary complex with rooms

not designed for double occupancy, and at a facility with rooms designed for double

occupancy.  690 F.3d 1017, 1043 (8th Cir. 2012); s*ee also Aune v. Ludeman*, Civ.

No. 09-cv-0015(JNE/SRN), 2010 WL 145276, at *6 (D. Minn. Jan. 8, 2010) ("[T]here is

no evidence that the double-bunking practice utilized by the MSOP is punitive.");

*Miles v. Johnson-Piper*, Civ. No. 19-1078 (WMW/KMM), 2020 WL 1330028, at *3

(D. Minn. Mar. 23, 2020), *aff'd sub nom. Miles v. Piper*, 831 F. App'x 220 (8th Cir.

2020) ("It is well settled that double-bunking is not a constitutional violation.").

7.      Moreover, the evidence at trial established the operational need for double

occupancy rooms, that Clients are not inappropriately confined to their rooms, and that

such rooms are standard at sex offender civil commitment programs.  The Court therefore

concludes that the double occupancy rooms at the MSOP are reasonably related to the

legitimate government goals of efficiently and cost-effectively housing Clients, not

excessive in relation to those goals, and not punitive under *Bell*.

> **B.      Behavioral Expectation Reports and Grievance Procedure
> (Counts V and VII)**

8.      The Court finds that the MSOP's use of BERs strikes an appropriate

balance between the legitimate objectives of maintaining institutional security and

supporting Clients' therapeutic needs.  The Court similarly finds that the use of BERs is

not excessive in relation to those goals and is not punitive under *Bell*.  The Court also

finds insufficient evidence to conclude that the administration of BERs and related

decision making is arbitrary or purposeless.  To the contrary, the Court finds that the

record reflects a transparent process with a built-in grievance procedure.

9.      The Court also finds that the internal grievance procedure for BERs serves

the MSOP's interests in preserving institutional order while providing Clients a multi-

layered appeal option that facilitates due process in an efficient manner.  Moreover, the

Court finds insufficient evidence to conclude that the internal appeal process is somehow

unfair, ineffective, or punitive.  The Eighth Circuit has recognized that "[the MSOP] staff have a substantial interest in providing efficient procedures to address security issues." *Senty-Haugen*, 462 F.3d at 887.  The Court also finds no authority for Plaintiffs' apparent claim that *Bell* requires an external BER appeal process.

10.     The Court concludes that the MSOP's BER grievance procedure is reasonably related to the legitimate government goals stated above, is not excessive in relation to those goals, and is not punitive under *Bell*.

11.     In Count VII, Plaintiffs allege that "they have their rights restricted for minor violations of MSOP facility rules" and "are subject to arbitrary discipline and decision-making by MSOP staff."  (TAC ¶ 294.)  The Court construes these allegations as a challenge to the MSOP's BER policy.

As discussed above, the Court finds that the MSOP's use of BERs strikes an appropriate balance between the legitimate objectives of maintaining institutional security and supporting Clients' therapeutic needs.  Specifically, the Court finds that the use of BERs and related grievance procedure provides therapeutic benefit by shaping prosocial behavior while allowing the MSOP to operate a secure treatment facility.

Moreover, the Court finds sufficient evidence to conclude that the BER policy requires disciplinary actions to be reasonably related to the nature of the behavior and proportional in severity.  The Court also finds that the BER policy is consistent with common practice at other such facilities and reiterates that the Court finds it is reasonably related to the legitimate interests stated above, is not excessive in relation to those interests, and is not punitive under *Bell*.  To the extent Plaintiffs' allegations can be

33

construed as anything other than a challenge to the BER policy, the Court finds insufficient evidence to conclude that or any other form of discipline or decision making at the MSOP is arbitrary, purposeless, inappropriate, or punitive under *Bell*.

### C.      Use of the High Security Area (Count V)

12.      The record reflects that the MSOP uses the HSA only to control behavior that has not responded to less restrictive interventions, Clients are only in the HSA for as long as is necessary, and Clients are afforded timely reviews of their placement. Moreover, the Court finds insufficient evidence to conclude that use of the HSA is arbitrary or purposeless, much less on a widespread basis, which is consistent with this Court's previous holdings that use of the HSA at the MSOP is lawful. *Larson v. Jesson*, Civ. No. 11-2247 (PAM/LIB), 2018 WL 3352926, at *5 (D. Minn. July 9, 2018) ("placement in administrative segregation is not a constitutional deprivation actionable under § 1983"); *see also Benson v. Harpstead*, Civ. No. 17-266 (DWF/TNL), 2021 WL 2852046, at *2 (D. Minn. July 8, 2021) (upholding report and recommendation concluding that use of the HSA is permissible under *Bell*).

13.      Here again, the Court finds that the MSOP's use of the HSA is reasonably related to the legitimate government goal to control behavior that has not responded to less restrictive interventions, is not excessive in relation to that goal, and is not punitive under *Bell*.

### D.      Client Movement (Count V)

14.      The record does not reflect that the movement or transport of the MSOP Clients is improper or punitive, particularly in light of security concerns.  Moreover, no

Rule 706 Expert expressed concern over Client movement at the MSOP or indicated that the Client Movement differed from what one would expect to see in a sex offender civil commitment program. The Court therefore finds that the MSOP's policies related to the movement or transport of Clients are reasonably related to its legitimate government interest of maintaining safety and order in its facilities, are not excessive in relation to that goal, and are not punitive under *Bell*.

### E.    Meals (Count VII)

15.    The record does not reflect that the meals the MSOP provides are inadequate or inconsistent with most institutional food. While the food may be less desirable or varied than Clients prefer, the Court finds no basis to conclude that the food provided at the MSOP is inappropriate or punitive in way under *Bell*.

### F.    Group Therapy (Count V)

16.    The record reflects that the primary mode of treatment intervention at the MSOP is group therapy. The record does not reflect that any Client has been denied access to group therapy; therefore, the Court finds no basis to conclude that any alleged denial is punitive under *Bell*.

17.    To the extent that Plaintiffs challenge the quality of the MSOP's treatment program, the Eighth Circuit previously considered and rejected Plaintiffs' inadequate treatment claims in Count III of their Third Amended Complaint. *Karsjens II*, 988 F.3d at 1054.

**G.      Client Property (Count V)**

18.      The record does not reflect that the MSOP disposed of any Client's confiscated property before the conclusion of a related grievance procedure, much less on a widespread basis necessary for class relief.  *Lewis*, 518 U.S. at 549.

19.      Moreover, the Court finds that the MSOP's property policy and related grievance procedure serve both therapeutic and security interests, are reasonably related to and not excessive in relation to those goals and are not punitive under *Bell*.

**H.      Furniture Removal (Count V)**

20.      The record does not reflect any instance of punitive furniture removal, much less on a widespread basis.  Therefore, the Court finds no basis on which to conclude that any alleged furniture removal is punitive under *Bell*.

**I.      Random Searches (Count V)**

21.      The Court finds that Plaintiffs' Count V claims regarding searches and any related searches must be dismissed because they are properly addressed under the Fourth Amendment, not the Fourteenth Amendment substantive due process.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" such a claim.).

Here, Plaintiffs previously brought a Fourth Amendment claim (Count X) that included allegations related to searches and seizures, the Court dismissed the claim, and Plaintiffs did not appeal.  (*See* Aug. 2018 Dismissal at 35–38 (finding that the MSOP's

36

search and seizure policies are a reasonable response to legitimate problems of institutional security; *see also* Oct. 2018 Appeal at 2 (limiting appeal to Counts III, V, VI, and VII.) *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) ("The law of the case doctrine provides that a court's decision on legal issues should govern the same issues in later stages of the same case.").

While the Court finds that Plaintiffs' search and seizure allegations are properly dismissed pursuant to the law of the case doctrine, the Court also notes that upon a subsequent review of the record, the Court still finds that the MSOP's search and seizure policies are reasonably related to the legitimate objective to preserve institutional security.  The Court also finds that the polices are not excessive in relation to that goal and are not punitive under *Bell*.

### J.    Employment Options (Count V)

22.    The Court finds that the MSOP legitimately ties vocational programming opportunities and hours to rule compliance and treatment engagement and that in doing so strikes an appropriate balance between the MSOP's therapeutic and security needs. *See, e.g., Gamble v. Minnesota State-Operated Servs.*, No. CV 16-2720 (JRT/KMM), 2021 WL 2686094, at *2, *7 (D. Minn. June 30, 2021) (the MSOP's vocational program "incentivize[s] detainee participation in sex-offender treatment" and "Minnesota law explains that the [vocational work program] is part of sex-offender treatment"). Moreover, the Court finds that the MSOP's employment related policies are neither arbitrary or purposeless, excessive in relation to its legitimate objectives, and are not punitive under *Bell*.

**K.      Restraints (Count V)**

23.      The record does not reflect that the MSOP's use of restraint when transporting Clients out of its facilities is improper or punitive, particularly in light of security concerns, and the fact that the restraints become less restrictive as a Client progresses in treatment.  Moreover, no Rule 706 Expert expressed concern over the use of restraint at the MSOP or indicated that the MSOP's policies and procedures differed from what one would expect to see in a sex offender civil commitment program.

The Court therefore finds that the MSOP's policies related to the use of restraint when transporting Clients is reasonably related to its legitimate government interest of maintaining safety and order in its facilities, is not excessive in relation to that goal, and is not punitive under *Bell*.

**L.      Totality of Conditions**

24.      To properly determine whether the conditions of confinement at the MSOP are unconstitutionally punitive under *Bell*, the Court must review "the totality of the circumstances."  *Karsjens II*, 988 F.3d at 1054 (citing *Morris*, 601 F.3d at 810.)

After careful consideration, the Court finds that no condition, in isolation, or in combination, constitutes a *Bell* violation.  As discussed above, the Court finds that each condition of confinement referenced or alluded to in Plaintiffs' Third Amended Complaint is reasonably related to a legitimate government objective, is not excessive in relation to the objective(s) and is not punitive under *Bell*.  Notably, the Rule 706 Experts reviewed all of the MSOP's challenged policies and raised no concerns about them being unusual or excessive for similar civil commitment programs, individually or in

combination.  Upon careful review of the record, the Court simply cannot conclude that the totality of Plaintiffs' current conditions of confinement is unconstitutionally punitive.

The Court understands that Plaintiffs would prefer fewer restrictions and greater independence; however, "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" and the Court must accord "wide-ranging deference" to the MSOP's "adoption and execution of policies and practices that in [its] judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell*, 441 U.S. at 547.  Here, the Court finds that the challenged conditions of confinement, even when considered as a whole, serve legitimate governmental objectives that are not excessive, arbitrary, or purposeless, and are not punitive under *Bell*.  *Id.* at 39-40.

**Inadequate Medical Care**

25.    While the record reflects that there are no nursing or medical staff assigned to the MSOP's assisted living unit, the Court finds insufficient evidence to conclude that Defendants were ever deliberately indifferent to any specific MSOP Client's serious illness or injury, much less at the policy level or on a widespread basis, or that any alleged indifference caused any actual injury or harm.  *Senty-Haugen*, 462 F.3d at 889-90.  The Court therefore concludes that Plaintiffs have not proven their claim for inadequate medical care under the governing *Senty-Haugen* Deliberate Indifference Standard.

## CONCLUSION

As discussed above, this Court is bound by and obligated to follow the law as it currently exists.  The Eighth Circuit has determined that the MSOP is constitutional both on its face and as applied.  The Court now concludes that based on the governing legal standards, Plaintiffs' claims related to the conditions of confinement and inadequate medical care also fail.

Notwithstanding, the confinement of the elderly, individuals with substantive physical or intellectual disabilities, and juveniles, who might never succeed in the MSOP's treatment program or who are otherwise unlikely to reoffend, remains of serious concern for the Court and should be for the parties as well.[17]   The Court continues to believe that politics or political pressures should not compromise Class Members' rights to treatment and eventual reintegration into society.  The Court re-emphasizes that the Constitution protects individual rights even when they are unpopular and reiterates Judge Sandra Day O'Connor's judicious observation that "'[a] nation's success or failure in achieving democracy is judged in part by how well it responds to those at the bottom and the margins of the social order.'" (Phase One Order at 69 (quoting *Annual William French Memorial Lecture: A Conversation with Retired Justice Sandra Day O'Connor*, 37 Pepp. L. Rev. 63, 65 (2009))).

---

[17]    The Court continues to receive numerous letters from civilly committed individuals and their family members agonizing over the incessant nature of confinement. Moreover, for multiple individuals, civil commitment has proven to be a life sentence.

The fact that the MSOP is constitutionally sound should not deter the State of Minnesota from doing better.[18]  The leaders in this great State are capable of more; there is no reason that Minnesota cannot, as the Rule 706 Experts advised, "refin[e] its sexual offender civil commitment policies and procedures, with an aim towards providing humane and evidence-based clinical services to civilly committed clients, while maintaining a high degree of public safety."  (Rule 706 Expert Report at 2.)  The interests of justice for all concerned would then be appropriately and finally served.  Justice requires no less.

## ORDER

Based upon not only the findings and conclusions of this Court, but also the entire record of this case, it is hereby ordered that Plaintiffs' remaining claims (Counts V, VI, and VII) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  February 17, 2022             s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      United States District Judge

---

[18]     Notably, as pointed out in *Folson*, the MSOP was able to withstand facial and as-applied challenges before the Eighth Circuit based on its representation that it had proper procedures and evidentiary standards in place for Clients to petition for a reduction in custody or release from confinement.  *See Karjens I*, 845 F.3d at 409-411.  The *Folson* decision indicates immensely troubling flaws in the process which warrant immediate attention.  *Folson*, County File No. 62-MN-PR-06-267; Appeal Panel File No. AP19-9153 at *6 ("The Commissioner and the MSOP Executive Director have exhibited a brazen disregard for the statutory civil commitment process, evident from the initial hearing where the client rightfully expressed concern that the reduction [in] custody, even if ordered, was not going to occur.").